## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| PENGCHENG SI, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>  v.<br><br>BED BATH & BEYOND CORPORATION, RYAN COHEN, RC VENTURES LLC, and JP MORGAN SECURITIES LLC,<br><br>        Defendants. | Case No. 22-cv-2541 |

## AMENDED COMPLAINT

# TABLE OF CONTENTS

I.      Introduction ........................................................................................................... 1

II.     Jurisdiction and Venue ......................................................................................... 4

III.    Parties .................................................................................................................... 4

IV.     Statutory Framework ............................................................................................ 5

A.      Section 13(d) of the Exchange Act ...................................................................... 6

B.      Section 16(a) of the Exchange Act ....................................................................... 8

C.      Rule 144 ................................................................................................................ 9

D.      Fraud and Manipulation ..................................................................................... 13

V.      Factual Background ............................................................................................ 14

A.      Background ......................................................................................................... 14

    1.   The rise and fall of Bed Bath & Beyond ............................................................ 14

    2.   As Bed Bath's fortunes as a company fell, its stock rose as a "meme stock" ................. 17

    3.   Ryan Cohen rises as the pied piper of meme stock traders ............................... 28

    4.   Cohen announces Bed Bath & Beyond as his next turnaround target ............... 33

    5.   After Cohen's acquisition, Bed Bath's stock prices steadily declines as the company faces a stream of unfavorable news ....................................................... 46

B.      Cohen's scheme to manipulate the market for Bed Bath & Beyond securities ................ 55

VI.     Defendants' Deceptive and Manipulative Acts .................................................. 78

VII.    Defendants' False and Miseading Statements .................................................... 80

A.      Cohen's and RC Ventures' false and misleading statements .............................. 80

B.      Bed Bath's false and misleading statements ...................................................... 82

VIII.   Additional Allegations of Defendants' Scienter ................................................ 83

IX.     Loss Causation and Economic Loss ................................................................... 84

X.      Applicability of Presumption of Reliance .......................................................... 85

A.      Rule 10b-5(a) and (c) Claims ............................................................................. 85

B.      Rule 10b-5(b) Claim .......................................................................................... 86

XI.     Class Action Allegations .................................................................................... 87

XII.    No Safe Harbor ................................................................................................... 89

XIII.   Claims for Relief ................................................................................................ 89

    Count I: Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) ................. 89

    Count II: Section 10(b) of the Exchange Act and Rule 10b-5(b) ........................... 90

    Count III: Section 9(a)(2) of the Exchange Act ...................................................... 91

    Count IV: Section 9(a)(3) of the Exchange Act ...................................................... 92

Count V: Section 9(a)(4) of the Exchange Act ................................................................. 92

Count VI: Section 9(f) of the Exchange Act ................................................................. 93

Count VII: Section 18(a) of the Exchange Act ................................................................. 93

Count VIII: Section 20A of the Exchange Act ................................................................. 94

Count IX: Section 20(a) of the Exchange Act ................................................................. 95

XIV.   Prayer for Relief ................................................................................................. 96

XV.   Jury Trial Demand ................................................................................................. 96

Plaintiff Pengcheng Si, by and through counsel, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review and analysis of filings by Bed Bath & Beyond Inc. ("Bed Bath," "BBBY," or the "Company"), RC Ventures LLC ("RC Ventures"), and Ryan Cohen ("Cohen") with the U.S. Securities and Exchange Commission; press releases, analyst reports, news articles, investment industry commentary, media, and other public statements about Bed Bath, RC Ventures, Cohen, and other relevant companies or persons; corporation registrations and filings with state governments; the corporate websites of Bed Bath, RC Ventures, and other companies; and other public documents readily obtainable on the internet. Plaintiff's investigation into the factual allegations continues and many of the relevant facts are known only to Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery, including access to documents exclusively within the Defendants' custody or control, and other documents or materials provided to or prepared by state and federal regulators and third parties.

## I.    INTRODUCTION

1.     This is a federal securities class action under the Securities Exchange Act of 1934 ("Exchange Act") against Bed Bath, Cohen, RC Ventures, and JP Morgan Securities LLC ("JP Morgan") on behalf of all persons who purchased or otherwise acquired Bed Bath common stock (including those who bought to cover a short position) or Bed Bath call options, or sold Bed Bath put options, from August 12, 2022 through August 18, 2022, inclusive, and who were damaged thereby.

2.     This case involves a scheme to manipulate the securities markets orchestrated by Cohen, the billionaire co-founder and former CEO of the pet e-commerce company Chewy, Inc. Cohen's

scheme was made possible through and with the willing participation of Bed Bath and JP Morgan, a U.S. broker-dealer based in New York, who provided Cohen with access to the U.S. securities markets to execute the scheme and otherwise assisted in carrying out the scheme.

3.    In March 2022, Cohen, through his investment firm Defendant RC Ventures, bought nearly a 10% stake in Bed Bath, which he successfully used to obtain three seats on Bed Bath's board of directors and a commitment from the Company to study his proposal to turn around the company by, among other things, selling or spinning off Bed Bath's more successful Buy Buy Baby chain. Over the next five months, however, Bed Bath's stock price plummeted amid a stream of bad news, as the Company announced record losses, dwindling cash on hand, and soaring debt. By August, Bed Bath had also rejected Cohen's turnaround strategy, electing to seek new loans backed, in part, by the Buy Buy Baby assets, along with the issuance of millions in new shares of stock that would dilute Cohen's holdings. As a result, Cohen's investment in Bed Bath securities was underwater by tens of millions of dollars with little prospect of improving anytime soon.

4.    Other investors in Cohen's position would have chosen between maintaining their investment or selling at a loss. But Cohen instead orchestrated a market manipulation scheme to artificially inflate the price and trading volume of Bed Bath securities so that he could secretly sell his holdings at a profit at the expense of Bed Bath's public investors.

5.    To carry out his scheme, Cohen needed to drive up the stock price and flood the market with trading activity so that he could sell his shares quickly, secretly, and at a profit. Cohen accomplished that goal by leveraging his loyal following among retail investors, many of whom closely followed his every public statement, filing, or social-media post to guide their own investment decisions. Since Cohen seized control of GameStop in 2021, many retail investors who traded in so-called "meme stocks"—like GameStop, AMC, and Bed Bath—viewed Cohen as their de

facto leader, dissecting his public statements on social-media platforms such as Reddit, Discord, and Twitter. Delivering targeted messages that he knew would appeal to and resonate with these retail investors, Cohen deceived them into believing that he was holding onto his investment in Bed Bath and was projecting that the price of Bed Bath's stock would soar to as much as $60 to $80 per share—a feat that Bed Bath had not achieved in years. In online discussion forums, these retail investors amplified Cohen's misleading statements and further promoted the value of investing in Bed Bath, despite the near-universal agreement among analysts that the Company's stock was worth less than $5 per share.

6.    Cohen's scheme worked perfectly. In a matter of days, the market for Bed Bath securities was flooded with retail investors who bought the Company's stock at higher and higher prices, sending Bed Bath's stock price to an intraday high of $30 on August 17, with the highest daily trading volume in more than a decade.  While retail investors bought Bed Bath's stock in record numbers, Cohen secretly sold his entire holdings of the Company's securities, earning about $178.1 million in proceeds and $58 million in illicit profits from the scheme

7.    More than a day after Cohen had dumped his remaining holdings, he finally disclosed his sales to the public in a filing with the SEC on August 18, after the markets had closed. Bed Bath's stock price plunged on the news, dropping by 45% in after-hours trading. Later that day, Bed Bath announced that it had hired a restructuring expert as it pursued its new turnaround strategy. On August 31, Bed Bath formally announced its new strategic plan that involved shutting stores, taking on new debt, and issuing millions of new shares of stock. By mid-October, Bed Bath's stock price had dropped to under $5 per share. As a result, retail investors who acquired Bed Bath securities based on Cohen's manipulative and deceptive acts have suffered hundreds of millions of dollars in losses.

## II.   JURISDICTION AND VENUE

8.    The claims asserted arise under Sections 9(a), 10(b), 18(a), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78i, 78j(b), 78r(a), 78t(a), and 78t-1, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), promulgated thereunder.

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 77aa. Many acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

11.    In connection with the acts and conduct alleged in this Complaint, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange, the NASDAQ Stock Market.

## III.   PARTIES

12.    Plaintiff **Pengcheng Si** purchased Bed Bath securities during the Class Period as described in the attached Certification and incorporated by referenced and suffered damages.

13.    Defendant **Cohen** is a venture capitalist, activist investor, co-founder and former CEO of the pet e-commerce company Chewy.com, current Chairman of the Board of Directors of GameStop Corp., and founder and managing member of RC Ventures.

14.    Defendant **RC Ventures** is a Delaware limited liability company founded and managed by Defendant Cohen that operates as a seed and venture capital firm, with its principal business address in Miami, Florida.

15.   Defendant **Bed Bath** is a New York corporation with its principal executive offices in Union, New Jersey. Throughout the Class Period, Bed Bath's common stock was actively traded on the NASDAQ Global Select Market ("NASDAQ") under the symbol BBBY.

16.   Defendant **JP Morgan** is a registered broker-dealer incorporated in the state of Delaware corporation with its corporate headquarters based in New York, New York. JP Morgan acted as broker-dealer for Defendants Cohen and RC Ventures during the Class Period.

17.   Nonparty **Gustavo Arnal** ("Arnal") served as Bed Bath's Chief Financial Officer ("CFO") from May 2020 until his death on September 2, 2022.

## IV.   STATUTORY FRAMEWORK

18.   The mechanics of the U.S. securities markets can be abused and manipulated to artificially inflate or deflate prices and trading activity to generate short-term profits at the expense of other investors. One common type of market manipulation is a "pump-and-dump" scheme, a form of scalping, which typically has two parts. In the first, the manipulators acquire a large amount of stock and then begin to promote the stock to boost the share price or create trading volume by stimulating market interest. Once the stock price and trading volume has been pumped up, the manipulators then dump their holdings of the stock into the public market at a profit. After the manipulators dump their shares and cease hyping the stock, the price typically falls, trading volume dries up, and investors caught up in the hype lose their money.

19.   The federal securities laws are designed to deter this sort of manipulation and ensure transparency by requiring that investors be provided with timely, accurate information about companies and persons who own large amounts of company. The Securities Act and the Exchange Act have several provisions designed to ensure that companies, their officers, and large shareholders provide the marketplace with adequate information about their holdings and their purchases and sales of their companies' stock.

5

20.   For instance, investors owning 5% or more of such company's stock are required publicly to disclose their ownership interest, while investors owning 10% or more of such company's stock are required publicly to disclose all their trading in that stock, regardless of quantity. Such registration requirements, sale restrictions, and disclosure obligations are safeguards designed to protect the market for purchases and sales of stock, to inform investors about the nature of the stock they are holding or considering buying, and from whom they would be buying that stock.

## A.  Section 13(d) of the Exchange Act

21.   Section 13(d)(1) of the Exchange Act and Rule 13d-1, require any person who acquires more than five percent of any voting class of a Section 12 registered equity security to file, within 10 days of the acquisition, a statement with the Commission containing the information required by Schedule 13D. This statement must be complete and accurate. *SEC v. Savoy Industries, Inc.*, 587 F.2d 1149, 1165 (D.C. Cir. 1978). When their holdings materially change, Section 13(d)(2) of the Exchange Act and Rule 13d-2(a), 17 C.F.R. § 240.13d-2, require a filer to amend a previously filed Schedule 13D "promptly" and provide the information necessary. Any delay beyond the date the filing reasonably can be filed may not be prompt. *See In re Cooper Laboratories*, Release No. 34-22171, at *5 (June 26, 1985). A disposition of one percent or more of a class of securities is deemed material for purposes of Rule 13d-2. Section 13(d) is the key provision that allows shareholders and potential investors to evaluate changes in substantial shareholdings. *See* 113 Cong. Rec. 855 (1967).

22.   Item 4(a) of Schedule 13D provides that a reporting person must disclose "any plans or proposals" relating to "the disposition of securities of the issuer." 17 C.F.R. § 240.13d-101. Disclosure of such plans is necessary even when the plans or proposals are "not yet fixed" and "even when it was argued that such plans were to be executed in the future." *In re: Douglas A. Kass, Respt.*, 50 S.E.C. 1110, 1992 WL 204252, at *6 (Aug. 17, 1992) (citing cases).  Generic, boilerplate

6

disclosure that indicates the filer is reserving the right to sell securities must be amended promptly when a material change occurs in the facts previously reported. *See, e.g., In re: Tracinda Corporation*, S.E.C. Release No. 34-58451, 2008 WL 4068303, at *4 (Sept. 3, 2008) (settled order finding respondent's amendment to its Schedule 13D announcing sale of 14 million shares violated Section 13(d)(2) because respondent did not disclose it had a plan to sell 28 million of the shares it owned); *In re: WCAS Mgt. Corp., Respt..*, S.E.C. Release No. 34-89914, 2020 WL 5592752, at *3 (Sept. 17, 2020) (settled order finding respondent failed to disclose in amended Schedule 13D that respondent had "formulated a definitive intention to liquidate the entirety of its Hanger holdings, and taken steps to liquidate its Hanger shares").

23.   The qualitative disclosures providing narrative in response to line-item requirements of Rule 13d-101, such as Item 4, also are subject to material changes. For example, generic disclosure that indicates the beneficial owner is reserving the right to engage in any of the kinds of transactions enumerated in Item 4 (a)-(j) of Exchange Act Rule 13d-101 must be amended when a plan with respect to a disclosable matter has been formulated. *See Tracinda Corporation,* 2008 WL 4068303, at *4. Depending on the facts and circumstances, however, an amendment also may be required before a plan has been formulated because the obligation to revise arises under Section 13(d)(2) and corresponding Rule 13d-2(a) promptly after a "material change occurs in the facts set forth in the" Schedule 13D. *In re: Berjaya Lottery Mgt. (H.K.) Ltd.*, S.E.C. Release No. 74498, 2015 WL 1096463, at *3(Mar. 13, 2015); *In re Norman C. Payson*, S.E.C.  Release No. 50589, 2004 WL 2387456, at *2 (statement that shareholder "may at any time and from time to time sell or otherwise transfer shares or acquire additional shares" did not adequately disclose his actual plan to sell shares as soon as the next trading window opened for corporate insiders); *see also In re Wilkerson*, Exchange Act Release No. 48703 (Oct. 27, 2003) (disclosure of possible future

actions did not adequately disclose specific plans). These disclosure provisions are intended to alert a company's stockholders and the marketplace to changes in securities ownership that indicate potential for changes in control of the company.

## B. Section 16(a) of the Exchange Act

24.   In addition to Section 13(d), Section 16(a) of the Exchange Act imposes an additional reporting requirement for officers and directors of a public company, as well as "every person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security." 15 U.S.C. § 78p(a)(1). Such persons are deemed to be Company insiders and must file statements reporting their ownership to the SEC by filing initial statements of beneficial ownership of equity securities on Form 3 and a subsequent changes in beneficial ownership filed on Form 4. 15 U.S.C. § 78p(a); 17 C.F.R. § 240.16a–3. Sec. & Exch. Comm'n, Form 3, General Instruction 2(a).

25.   Section 16(a) require these insiders to file these disclosures under Section 16(a) when their existing ownership stake increases, even if they did not affirmatively engage in any transactions. For instance, the SEC has explained that "[f]ollowing a company's buy-back of its stock, a person who previously owned less than 10 percent of the company's stock may own more than 10 percent of the stock without having purchased additional shares." *Exchange Act Section 16 and Related Rules and Forms*, U.S. SEC (Aug. 11, 2010), https://www.sec.gov/divisions/corpfin/guidance/sec16interp.htm. In such cases, if the investor is "aware that the buy-back will occur and will have this result on his or her holdings, the investor must file a Form 3 "within 10 days after the buy-back." If the person "does not have advance awareness of the buy-back and/or its consequences, he or she would need to determine whether he or she is a more than 10 percent beneficial owner and satisfy any obligation to file a Form 3 within ten days after information in the company's most recent quarterly, annual or current report indicates the amount of

securities outstanding following the buy-back." *Id.* As reflected in the legislative history of the enactment of Exchange Act Section 16(a), "the most potent weapon against the abuse of inside information is full and prompt publicity." H.R. Rep. 73-1383, at 13, 24 (1934). Disclosure of an insider's purchases and sales gives investors an indication of the insider's private opinion as to the prospects of the company.

## C. Rule 144

26. Affiliates such as officers, directors, and 10% stockholders are also subject to certain restrictions and disclosure requirements with respect to selling the stock of public companies.

27. Under Rule 144, an "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e., a control person), including officers, directors, and 10% stockholders. Before selling stock, persons who control the stock of public companies ("control persons") are required to: (a) register such sales with the Commission pursuant to Section 5 of the Securities Act, 15 U.S.C. § 77e, (b) sell the stock pursuant to an applicable exemption from registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144, 17 C.F.R. § 240.144, including limitations on the amount of stock a control person can legally sell. Thus, Rule 144 is available for the resale of shares by an affiliate purchased in the open market. It is also available for the resale of securities acquired from an affiliate in a transaction not involving a public offering.

28. Rule 144 provides a non-exclusive safe harbor for individuals or entities to sell restricted or affiliate-owned shares without being deemed to be a statutory underwriter and therefore qualify for Securities Act Section 4(a)(1)'s exemption from registration for "transactions by any person other than an issuer, underwriter, or dealer." To qualify for the safe harbor, the resale must meet each of the following conditions: the individual or entity must hold the shares of a non-reporting

9

issuer for at least a year prior to reselling them and there must be adequate current public information available. 17 C.F.R. § 230.144(c) & (d).

29.   The amount that can be sold by any person pursuant to Rule 144 during any three-month period cannot exceed the greatest of: (i) one percent of the shares or other units of the class outstanding as shown by the most recent report or statement published by the issuer, or (ii) the average weekly reported volume of trading in such securities on all national securities exchanges and/or reported through the automated quotation system of a registered securities association during the four calendar weeks preceding the filing of notice required by Rule 144(h), or if no such notice is required the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker, or (iii) the average weekly volume of trading in such securities reported pursuant to an *effective transaction reporting plan* or an *effective national market system plan* (as those terms are defined in 17 C.F.R. § 242.600) during the four-week period specified in (ii) above.

30.   Rule 144(f) requires any affiliate-seller of securities who intends to rely upon Rule 144, to resell either in "brokers' transactions," within the meaning of Section 4(a)(4) of the 1933 Act, or in transactions directly with a "market maker," as that term is defined in Section 3(a)(38) of the 1934 Act. 17 C.F.R. § 230.144(f). The counterpart of Rule 144(f), which is concerned about the manner of sale by the affiliate-owner of the securities, is Rule 144(g), which defines the term "brokers' transactions" and in doing so sets forth the obligations of a broker that seeks an exemption under Section 4(a)(4). 17 C.F.R. § 230.144(g).

31.   Rule 144(g) conditions a broker's exemption under Section 4(a)(4) for its role in an unregistered sale of securities purportedly made by a seller in reliance upon Section 4(a)(1) of the Act, by reason of Rule 144. The conditions of Rule 144(g) are designed to:

a) A broker may do no more than "execute the order or orders to sell the securities as agent for the person for whose account the securities are sold;

b) A broker may receive and receives as remuneration "no more than the usual and customary broker's commission,"

c) Subject to three qualifications, a broker may not solicit nor arrange for the solicitation of "customers' orders to buy the securities in anticipation of or in connection with the transaction,"

d) A broker must make a reasonable inquiry into the facts and circumstances surrounding the proposed resale including any facts or statements contained in the notice required by Rule 144(h); and

e) After making such reasonable inquiry, a broker must not be "aware of circumstances indicating that the person for whose account the securities are sold is an underwriter with respect to the securities or that the transaction is a part of a distribution of securities of the issuer."

17 C.F.R. § 230.144(g)(1)-(3).

32.   Note (ii) to Rule 144(g) explains that the reasonable inquiry required by paragraph (g)(3) of the rule should include, but not necessarily be limited to, inquiry as to the following matters:

a) The length of time the securities have been held by the person for whose account they are to be sold. If practicable, the inquiry should include physical inspection of the securities;

b) The nature of the transaction in which the securities were acquired by such person;

c) The amount of securities of the same class sold during the past 3 months by all persons whose sales are required to be taken into consideration pursuant to paragraph (e) of this section;

d) Whether such person intends to sell additional securities of the same class through any other means;

e) Whether such person has solicited or made any arrangement for the solicitation of buy orders in connection with the proposed sale of securities;

f) Whether such person has made any payment to any other person in connection with the proposed sale of the securities; and

g) The number of shares or other units of the class outstanding, or the relevant trading volume.

17 C.F.R. § 230.144

33.   The Commission has explained that whether a broker has conducted a ""reasonable inquiry" depends on the facts and circumstances surrounding the transaction:

A dealer who is offered a modest amount of a widely traded security by a responsible customer, whose lack of relationship to the issuer is well known to him, may ordinarily proceed with considerable confidence. On the other hand, when a dealer is offered a substantial block of a little-known security, either by persons who appear reluctant to disclose exactly where the securities came from, or where the surrounding circumstances raise a question as to whether or not the ostensible sellers may be merely intermediaries for controlling persons or statutory underwriters, then searching inquiry is called for.

*Distribution by Broker-Dealers of Unregistered Securities*, S.E.C. Release No. 33-4445, 1962 WL 69442, at *2 (Feb. 2, 1962) (Commission interpretative release).

34.   On January 13, 2009, the Financial Industry Regulatory Authority ("FINRA") issued Notice to Members 09-05 in which FINRA reminded firms of their obligations to determine whether sales comply with the registration requirements of the federal securities laws. FINRA's Notice to Members 09-05 listed examples of "red flags" that broker-dealers should be on the alert for in order to identify possible illegal unregistered distributions, including: (1) a customer opens a new account and delivers physical certificates representing a large block of thinly traded or low priced securities; (2) a customer has a pattern of depositing physical share certificates, immediately selling the shares, and then withdrawing the proceeds from the account; (3) a customer deposits share certificates that have been recently issued or represent a large percentage of the float of the security; and (4) the lack of a restrictive legend on deposited shares seems inconsistent with the date the customer acquired the securities or the nature of the transactions in which the securities were acquired. The red flags in FINRA's Notice to Members 09-05 had been previously identified by the SEC as red flags that are indicative of illegal unregistered distributions. *See In the Matter of Eisler*, Release No. 4145 (S.E.C. Release No. July 23, 2015).

35.   Under Rule 144(h), if the selling security holder proposes to sell 5,000 or more shares (or other units) or irrespective of the number of units the aggregate sale price may exceed $50,000 during any three-month period, he or she must concurrently with the placing of his order with the

broker or the sale to the market maker transmit to the SEC three copies of a "Notice of Proposed Sale" on Form 144, which must be signed by the person for whose account the securities are to be sold.

36.   In April 2020, in recognition of several logistical difficulties related to the submission of Form 144 in paper pursuant to Rules 101(b)(4) or 101(c)(6) of Regulation S-T, as well as ongoing health and safety concerns related to COVID-19, the Commission issued a statement announcing a temporary no-action position that it would not recommend enforcement action to the Commission if Forms 144 for the period from and including April 10, 2020 to June 30, 2020 were submitted as a complete PDF attachment and emailed to the Commission in lieu of filing the form in paper. Subsequently, on June 25, 2020, the Division of Corporation Finance indefinitely extended this statement from the period beginning on April 10, 2020. *See Division of Corporation Finance Statement Regarding Requirements for Form 144 Paper Filings in Light of COVID-19 Concerns*, U.S. Sec. & Exch. Comm'n (June 25, 2020), available at https://www.sec.gov/corpfin/announce-ment/form-144-paper-filings-email-option-update.

**D.  Fraud and Manipulation**

37.   Fraudulent promotion or manipulative trading used to pump the company's stock price and trading volume can also violate the antifraud provisions of the Securities Act and the Exchange Act. For example, fraudsters may use online newsletters, message boards, or social media to dis-seminate false and misleading statements to the public in order to encourage investors to purchase their undisclosed stake at inflated prices. Promoters may falsely claim to offer informed recom-mendations when they stand to profit from convincing others to buy or sell certain securities.

38.   In addition to false promotional pieces, fraudsters sometimes use other tools to drive up the price of a security, such as by engaging in matched trades. Members of a scheme will trade shares between themselves, gradually inflating the price. A rising stock price creates the false

impression that there is investor demand for the security, and thus serves to encourage other investors to buy. If the fraudsters have disguised their ownership and control of securities being traded, investors are deceived into believing that the trading activity reflects genuine beliefs about the value of the Company's securities. For this reason, the Exchange Act prohibits entering an order for the purchase or sale of a security with knowledge that an order or orders of substantially the same size, at substantially the same time and substantially the same price, for the sale or purchase of a security, had been or would be entered.

39.   Collectively, these and other provisions of the federal securities laws protect investors from pump-and-dump schemes and ensure that investors understand who is controlling a company and whether any large shareholders have amassed a position that will allow them to control or influence the company and its securities. When these required disclosures are evaded or issued in a misleading fashion, investors are deprived of material information about an issuer.

## V.   FACTUAL BACKGROUND

### A.  Background

#### 1.  The rise and fall of Bed Bath & Beyond

40.   Bed Bath was founded in New Jersey in 1971. For nearly 40 years, Bed Bath was one of the country's leading retailers for bedding, bath accessories, kitchen textiles and cookware, appliances, and more. Originally called Bed 'n Bath, the Company expanded to operate 17 locations by 1985. Two years later, the chain changed its name to Bed Bath & Beyond to reflect its full range of "domestic merchandise and home furnishing," as the company once put it. Pioneering the concept of "big box" superstores, Bed Bath opened 20,000 square-foot shops that stocked a wide array of popular brands and products in all colors and styles with prices comparable to department stores. By 1991, Bed Bath had opened seven new superstores in six states, with sales reaching $134 million that year and generating earnings of $10.4 million.

41.   In June 1992, Bed Bath went public on the NASDAQ exchange. The Company's growth soared in the early 1990s. By 1999, the Company reported more than $1 billion in sales and by the start of the new millennium, Bed Bath operated more than 300 stores across more than 40 states. Over the next decade, Bed Bath began to focus on acquisitions, acquiring health and beauty retailer Harmons in 2002, followed by holiday chain Christmas Tree Shops in 2003 and Buy Buy Baby in 2007.

42.   In the wake of the 2008 financial crisis, however, Bed Bath's sales began to suffer, with customers turning to cheaper stores like Target and Wal-Mart or online retailers like Amazon and Overstock. In May 2019, then-CEO Steven Temares was ousted after a group of activist investors released a presentation that called for his resignation, claiming Temares oversaw the "destruction of more than $8 billion in market value" during his 15 years helming the Company. Temares was replaced by Mark Tritton, who had served as the chief merchandising officer for Target.

43.   As Bed Bath's new CEO, Tritton pushed to declutter stores, close 200 underperforming ones, and drop national brands in favor of Bed Bath's own labels, like Everhome and Nestwell. Although a similar plan had worked when Tritton was at Target, Bed Bath was unable to replicate the strategy. Tritton ushered in changes faster than the retailer could build systems to support them, sources later told the *Wall Street Journal*. Further, to make room for the new "owned brands," as Bed Bath calls its private-label items, the Company scaled back brand names like All-Clad cookware and OXO kitchen gadgets, while selling what it had in stock at steep discounts. Bed Bath continued its slide. From January 2015 to April 2020, Bed Bath's stock price had declined by 95%, trading at only about $4 per share, as shown in the following chart:



BBBY Stock Price, January 2015 to April 2020

44.   In February 2020, Bed Bath announced a $1 billion capital allocation strategy, which included $600 million toward stock buybacks and debt reduction, and $400 million in store re-modeling, supply chain improvements, and digital projects. But when the Covid-19 pandemic ar-rived, Bed Bath was at a disadvantage compared to its competitors. While the pandemic was a boon to most home-goods retailers, benefiting from customers stuck at home, Bed Bath was unable to capitalize like its competitors. Bed Bath temporarily shut nearly all its stores, with S&P Global downgrading the retailer, predicting a weak economy and pullback on consumer spending as a result of the pandemic. Sales slumped further, and the company closed 44 stores in eight states. In the three months ending August 29, 2020, Bed Bath's net sales declined, whereas sales of home-related items grew more than 30% at Target, Tritton's former employer.

**2. As Bed Bath's fortunes as a company fell, its stock rose as a "meme stock"**

45.   By the spring of 2020, Bed Bath had joined a handful of other struggling retailers and consumer-focused companies, such as GameStop and AMC Entertainment, whose securities became known as "meme stocks." With people forced to stay home amidst the pandemic, many of them focused their attention on stock trading, which had become easier with the growing availability and popularity of stock trading apps such as Robinhood. Many of these new retail investors began to form social-media communities on platforms like Twitter, Discord, and Reddit, discussing their trading strategies and ideas, and even posting screenshots of their transactions in real time.

46.   One popular Reddit discussion forum (known as a subreddit) is r/WallStreetBets, which, along with other subreddits popular with retail investors, such as r/Superstonk, is characterized by its unique subculture focused on real-time discussion of financial investments, frequent use of "memes" and emojis, and its own trading vocabulary. The movie "Rise of the Planet of the Apes," for instance, inspired Reddit users frequenting r/WallStreetBets to refer to themselves as "APES," promoting an aggressive trading philosophy expressed with acronyms like HODL ("hold on for dear life") and YOLO ("you only live once"). The phrase "to the moon" is a rally cry on r/WallStreetBets, which its members use to express their confidence that a stock will rise significantly, often accompanied by emojis of a rocket ship or the moon, as shown below:[1]



---

[1] Emojis are displayed differently depending on the program or operating system used by the user viewing the emoji. For example, the first "moon with face" emoji in the graphic above is the version displayed by Apple's iOS, whereas the second and third emoji graphics are the versions displayed by Twitter. *See* Full Moon Face, Emojipedia.org, *available at* https://emojipedia.org/full-moon-face/; Full Moon, Emojipedia.org, *available at* https://emojipedia.org/full-moon//

GameStop's and AMC's stock were both celebrated by r/WallStreetBets users as going "to the moon."

47.   Many of these retail investors were entirely new to the markets and their picks were often unorthodox, selecting companies that most investors and analysts dismissed. One of the most popular meme stocks was GameStop, the brick-and-mortar video game retailer. Other popular meme stocks included AMC, the movie theatre chain, and Bed Bath, which were consumer-focused companies that were familiar names to the public and to novice investors. These meme stocks, as they became known, saw surges in trading activity in 2020 and early 2021, fueled by trading by retail investors who frequented social-media communities like r/WallStreetBets. For some of these companies, the amount of "short interest" in their securities, measured as the number shares sold short as a portion of total shares outstanding, exceeded the market average.[2] That statistic, which would be seen as anathema to most investors, was often viewed (counterintuitively) by r/WallStreetBets users to make the stock even more attractive.

48.   One popular Reddit user was Keith Gill, who went by the username u/DeepFuckingValue (or DFV) on Reddit, and who also created content on YouTube and Twitter under the name "Roaring Kitty." In September 2019, Gill announced his initial $50,000 purchase of GameStop stock, explaining that based on his own financial analysis, he had determined that GameStop was undervalued, citing, among other things, that there had been extensive shorting of GameStop's stock. In August 2020, Gill promoted his analysis of GameStop's stock on his YouTube channel and many

---

[2] Short selling is a form of securities transaction that market participants may use when they believe that the market value of a publicly traded company's stock may decrease. To engage in such a transaction, short sellers typically borrow a security and sell it on the open market, planning to buy it back later at a lower price and return the security to the lender. When a short seller buys a stock to return it to the lender, the short seller is said to have "bought to cover" or to have "covered the short position."

users on r/WallStreetBets contended that the unusually high levels of short interest in GameStop presented the potential for a coordinated "short squeeze."[3]

49.   By the beginning of August 2020, GameStop's stock was trading at only a little more than $1 per share. But by the end of that month, GameStop's stock began to suddenly rise after Cohen announced that he had acquired, through his investment firm RC Ventures, a nearly 10% stake in the Company.

50.   Cohen founded the pet e-commerce company Chewy in 2011, serving as the company's CEO until 2018. In April 2017, PetSmart acquired Chewy for $3.35 billion in the then largest e-commerce acquisition of all time,[4] and later took Chewy public in June 2019 at a valuation of $8.7 billion. After leaving Chewy, Cohen began to pursue private investment opportunities through his firm RC Ventures, initially investing in large mainstream companies such as Apple Inc. and Wells Fargo & Co.

51.   But on August 28, 2020, after the markets had closed for the day, Cohen disclosed in a Schedule 13D filed with the SEC that he had bought 5.8 million shares of GameStop's stock. Three days later, on August 31, Cohen filed an amended Schedule 13D/A to reflect additional purchases of 400,000 shares, totaling more than 6.2 million shares and amounting to a roughly 9.6% ownership stake in GameStop. In his Schedule 13D and 13D/A filings, Cohen stated that he had begun "conversations and communications with senior management" and "several members of the Board of Directors" of GameStop concerning Cohen's views about the company's strategy and future,

---

[3] The term "short squeeze" refers to a situation where short sellers are compelled to cover their short positions and return securities to lenders due to unexpected increases in the share price. As these short sellers buy the stock to return it to their lenders, the price may rise even more, potentially creating a situation in which more short sellers must cover their position. Such short squeezes can result in dramatic increases in the price of security.

[4] https://www.wsj.com/articles/how-petsmart-swallowed-chewyand-proved-the-doubters-wrong-11569858310

expressing his willingness to "become more involved" in GameStop. When investors learned about Cohen's acquisitions and interest in GameStop, the company's stock price rose by more than 27%, closing at $1.91 per share on September 1, with trading volume spiking to 38 million shares on August 31, compared to 4.2 million shares traded on August 28.[5]

52.   In the following months, Cohen continued to disclose additional purchases of GameStop securities and his efforts to influence the company's management.

53.   On September 21, 2020, after the markets had closed, Cohen filed another amended Schedule 13D/A to reflect purchases of 300,000 shares of GameStop stock, increasing his owner-ship stake to roughly 9.98%. When the market learned about Cohen's filing, the price of GameStop's stock spiked to a 52-week high the following day, rising by more than 20% from $2.19 to $2.64 per share, with trading volume rising to more than 34.7 million shares, more than 4-1/2 times the number of shares traded the previous day.

54.   One month later, on November 16, Cohen filed another amended Schedule 13D/A, dis-closing a letter he had sent to GameStop's board of directors on behalf of himself and his invest-ment firm, RC Ventures. In the letter, Cohen wrote that his attempts to "privately engage" with the retailer had "yielded little progress" and he thus felt "compelled to send a clear message to the Board." In his letter, Cohen continued by asserting his view that GameStop needed to redirect its focus away from physical stores in favor of building a robust e-commerce platform, writing that GameStop should "evolve into a *technology company* that delights gamers and delivers excep-tional digital experiences – not remain a *video game retailer* that overprioritizes its brick-and-mortar footprint and stumbles around the online ecosystem." Cohen's letter was particularly

---

[5] All prices for GameStop stock are adjusted to reflect a 4-for-1 stock split that occurred in July 2022. Trading volumes for GameStop stock are unadjusted.

critical of GameStop's then-CEO, George Sherman, stating, "Regrettably, Mr. Sherman appears committed to a twentieth-century focus on physical stores and walk-in sales despite the transition to an always-on digital world." The *Wall Street Journal* later reported that GameStop's board responded to the letter by hosting a private call with Cohen to discuss his criticisms and proposals.[6]

55.   The next month, in early December 2020, GameStop announced that it would sell at least $100 million in new stock to raise capital. Cohen "erupted," the *Wall Street Journal* later reported, worrying that "the plan would damage the company's standing among investors by reducing the value of existing shares."[7] According to the *Wall Street Journal*, Cohen responded to the announcement by writing "an email to GameStop's then-chairwoman, Kathy Vrabeck, warning her that he would go public with his disapproval if the company proceeded with the sale," and urging Vrabeck "to share the email with other directors, people familiar with the matter said." Shortly after the email, GameStop scuttled the planned stock sale, for reasons it did not disclose. "The ill-timed stock offering created a wedge and [Cohen] used it to his advantage," a former board member told the *Wall Street Journal.*

56.   While Cohen was publicly disclosing his increased ownership and interest in GameStop, retail investors who posted on r/WallStreetBets and other social-media platforms began to increasingly rely on Cohen to guide their investment decisions. For example, on December 10, 2020, one Reddit user u/CPTHubbard posted a "DD"—due diligence in the parlance of the r/WallStreetBets subreddit—making the case that Ryan Cohen had the vision and resources needed to transform GameStop, even if it involved a hostile takeover. Summarizing his lengthy post, u/CPTHubbard

---

[6] https://www.wsj.com/articles/gamestop-ryan-cohen-chewy-meme-stock-11628776861

[7] https://www.wsj.com/articles/gamestop-ryan-cohen-chewy-meme-stock-11628776861

explained that he believed Cohen would trigger a MOASS—a "mother of all short squeezes"—explaining:

> **So here's the TL/DR**: I believe that Cohen is executing a plan to take out the GME Board. And I think that Sherman just walked right into Cohen's trap because he's a dumb, selfish Boomer with a huge ego and a Broken Brain. And Cohen is going to be a legend because of it after he executes this plan, triggers the MOASS, and takes control of GME to convert it to a tech-first gaming juggernaut.[8]

The post received considerable attention amongst other "DDs" posted to r/wallstreetbets around this time, receiving hundreds of comments and more than 1,800 "upvotes," reflecting the positive reaction to the post by other Reddit users.

57.    While GameStop was becoming more and more popular on r/WallStreetBets, the Company continued to struggle. On December 8, GameStop's shares fell 9% following a disappointing earnings report in which sales and earnings before interest, taxes, depreciation, and amortization ("EBITDA") "fell short" of expectations, with sales down 24.6%.[9] On December 19, S&P Global Ratings downgraded GameStop's credit rating, explaining:

> GameStop recently reported weak operating performance as it continues to face risks from the elongation in the launch of new consoles, increasing competitive challenges, and longterm structural technological shifts. We lowered the ratings on the company…on both near-term performance volatility and long-term competitive uncertainties. The negative outlook reflects our expectation that intense competition from online and traditional retailers, economic uncertainty, and the lengthening of the console cycle could result in further deterioration for operating prospects.

58.    But despite the company's lowered credit rating, Cohen continued to increase his stake in GameStop. On December 21, two days after S&P downgraded the company's credit rating, Cohen filed another amended Schedule 13D/A, disclosing that he had bought even more

---

[8]https://www.reddit.com/r/wallstreetbets/comments/kakxrm/gme_tribe_a_story_about_how_ryan_cohen_is_about/

[9]    https://seekingalpha.com/news/3642665-gamestop-drops-9-percent-after-sales-ebitda-fall-short

GameStop stock, bringing his total ownership stake in the retailer to roughly 12.9%. That same day, in accordance with the requirements of Section 16(a) of the Exchange Act, Cohen filed an initial statement of beneficial ownership of securities on Form 3 and a statement of changes in beneficial ownership on Form 4 to reflect his ownership of more than 10% of GameStop's total outstanding shares. When the market learned about Cohen's increased ownership stake, the price of GameStop's stock surged by 32% from $3.88 per share on December 21 to $5.14 per share on December 23, with more than 25 million shares traded on each of the previous two days.



59. While GameStop was the most popular meme stock at the time, other meme stocks like Bed Bath saw unexpectedly large gains during the same time, with the price of Bed Bath's stock rising by 112.75% from $10.82 per share at the end of July 2020 to $23.02 per share by January 13, 2021. Bed Bath's sudden surge came as the Company was receiving more and more attention on r/WallStreetBets and other discussion forums and social-media platforms. On January 14, 2021,

Reddit users created a new subreddit called r/BBBY dedicated to discussions about investing in Bed Bath securities.

60.   On January 11, 2021, GameStop announced that it had agreed to give Cohen and two of his associates, both former Chewy executives seats on GameStop's board.[10] Cohen approached his first board meeting as a "blitz," the *Wall Street Journal* reported, proposing the formation of a new "strategy committee" to review GameStop's spending and hiring practices, which would consist of himself, a fellow activist investor, and a former Chewy executive. GameStop's shares rallied 7% following the news of the agreement. As the rally continued, *Seeking Alpha* reported that the high level of short interest on GameStop "as a percentage of total float landed it on [*Seeking Alpha's*] Catalyst Watch for the week."[11]

61.   GameStop's share price and trading volume began to increase noticeably on January 13, after the *Wall Street Journal* reported on Cohen's addition to the board. In its article the *Wall Street Journal* noted that GameStop's announcement was part of the company's turnaround plan and had fueled a short squeeze "according to some analysts." The article, the first the *Wall Street Journal* published mentioning the short squeeze, continued, "As of the end of last year, short interest in the stock—expressed as a percentage of GameStop shares available for trading—exceeded 138%, making it the second-most shorted company by that metric with a market value of at least $1 billion, according to data from FactSet." That day, GameStop's stock price rose by more than 57% to $7.85 per share, with a trading volume of more than 144 million shares, compared to only 7 million shares traded the day before.

---

[10]   https://www.globenewswire.com/news-release/2021/01/11/2156168/0/en/GameStop-Announces-Additional-Board-Refreshment-to-Accelerate-Transformation.html

[11]   https://seekingalpha.com/news/3651108-gamestop-rally-extends-chewy-influence-touted

62.   The next day, on January 14, the *Wall Street Journal* reported that shares of GameStop had doubled in the past two days, noting the activity on the r/WallStreetBets subreddit. The *Wall Street Journal* explained that some Reddit users had predicted that "stock might rapidly rise if short sellers had to cover their bets by buying back shares should the stock suddenly increase in value," quoting an analyst at Wedbush securities, Michael Pachter, who said, "the shorts are freaking out…meanwhile the Robinhood message boards are bragging." Other analysts and financial news outlets echoed that account, with CNBC's Jim Cramer stating, "Like it or not, right now we've got a bull market in short busting, and I bet you'll see more stories like GameStop."

63.   GameStop's skyrocketing stock price was driven mainly by aggressive trading by retail investors, like those who posted on r/WallStreetBets, who looked to bolster stocks that large Wall Street firms had placed heavy bets against. And as GameStop's stock rose, so did Cohen's popularity with the users on r/WallStreetBets and other subreddits, as well as other social-media platforms. During the week of January 24, 2021, mentions of Ryan Cohen on Reddit and Twitter more than tripled mentions from the week prior, according to media-intelligence firm Zignal Labs. As the *Wall Street Journal* reported, Defendant Cohen's "sometimes enigmatic tweets, such as one showing a photo of a Sears building being demolished, inspired some of his more than 205,000 followers to hunt for cryptic meanings."[12] Many r/WallStreetBets users, "[a]ssured by their new perceived alliance with" Cohen, began to refer to Cohen as "Papa Cohen" or the "meme lord," closely following every statement, social media post, public filing, and transaction to guide their own investment decisions.[13]

---

[12] https://www.wsj.com/articles/gamestop-ryan-cohen-chewy-meme-stock-11628776861

[13]  https://www.forbes.com/sites/qai/2022/09/07/bbby-stock-what-chewys-ryan-cohen-has-to-do-with-the-meme-stock/?sh=550bde4620b1

64.   On r/WallStreetBets, as well as other similar subreddits popular with retail investors, such as r/Superstonk, Reddit users routinely post every single tweet by Cohen, often only seconds after Cohen posts the tweet. Each of the posts about Cohen's tweets typically receive hundreds or thousands of comments and tens of thousands of upvotes, as Reddit users try to dissect the meaning and significance of each tweet.

65.   While retail investors fueled the skyrocketing stock prices of GameStop and other meme stock companies, institutional investors, often holding large short positions in the companies, began to publicly criticize the rise of GameStop's stock price, asserting that the company was not as valuable as retail investors thought. For example, on January 21, 2021, when GameStop's stock was valued at approximately $10.76 per share, Andrew Left, the founder of Citron Research, a capital research and investment firm, gave an interview explaining why he was shorting GameStop, calling meme stock traders "the suckers at this poker game."

66.   In response, retail investors doubled down on their meme stock investments, continuing to build long positions and purchase call options in GameStop and other meme stock companies, sending GameStop's stock price higher and higher over the next week, with trading volumes exceeding 175 million each day from January 22 to 26. On January 22, the price of GameStop shares rose by 71% in around three hours, as Keith Gill posted an update on his holdings on Reddit that included a screenshot of his holdings showing 50,000 shares and 1,000 call options with a $12 strike price and an April 2021 expiration date, and an account balance, including cash and realized and unrealized gains, totaling $11.2 million. Three days later, Keith Gill posted again, reporting that he was still holding his 50,000 shares and 800,000 April 2021 $12 calls. Many Reddit users began to express their own continued holdings of GameStop stock by posting the phrase, "If he's still in, I'm still in."

67.   The next day, on January 26, after previously closing at $19.20, GameStop's share price gapped-up during after-hours trading to open at $22.14 per share, closing at $37.00 per share. The massive price increase exposed short sellers of GameStop to substantial losses, forcing them to buy the company's stock at high prices to cover their short positions, which resulted in only further increasing the market price of GameStop's stock. This "short squeeze" contributed to meteoric growth in GameStop's stock over the week. On January 27, GameStop's stock closed at $86.88 per share, representing a 1915.78% increase from its price at the beginning of the month. The next day, on January 28, GameStop's stock price peaking at an intraday high of $120.75 per share, before closing at $48.40 per share.



68.   Other meme stocks such as AMC and Bed Bath also experienced significant increases in price, trading volume, and volatility in January 2021, with Bed Bath's stock price closing at $52.89

per share on January 27, 2021, increasing by more than 190% from the beginning of the month, with more than 90.3 million shares traded.



BBBY & GME Share Price, Jan. to Feb. 2021

69.     Over the next week, however, both GameStop's and Bed Bath's stock prices began to fall steadily and rapidly, with GameStop's falling by 30.77% on February 1 and by another 60% on February 2, closing at $22.50 per share. On February 4, U.S. Treasury Secretary Janet Yellen met with financial regulators to discuss the craze around GameStop, and its impact on investors and the broader market. That day, GameStop's share price plunged by more than 41% from the day before, dropping from $23.10 per share on February 3 to $13.38 per share on February 4, 2021.

**3.   Ryan Cohen rises as the pied piper of meme stock traders**

70.     GameStop's stock, along with other meme stocks like BBBY and AMC, would continue to experience bursts of volatility, often in response to Cohen's posts on Twitter. On February 24,

2021, for example, Cohen tweeted an image of a McDonald's ice cream cone, accompanied by an

emoji of a frog, as shown below:



71.    As the *Wall Street Journal* later reported in an article entitled, "The Meme Lords Who

Are Taking Over the C-Suite," the tweet "made little sense," but on the afternoon that he posted

it, GameStop's stock skyrocketed by as much as 104% that day as retail investors in GameStop

"spun into a frenzy."[14] On r/WallStreetBets and other online discussion forums, the *Wall Street*

*Journal* reported, "traders scrambled to untangle the post's meaning and shared it as a meme." For

instance, one Reddit user on r/WallStreetBets "guessed that Cohen had signaled he wanted shares

---

[14]https://www.wsj.com/articles/the-meme-lords-who-are-taking-over-the-c-suite-
11630056603

to leap like a frog." Another Reddit user suggested that Cohen "would fix GameStop just as McDonald's tried to fix its troubled ice cream machines." Others predicted the ice cream itself hinted at a big announcement. "Ryan Cohen's tweet = Big news coming this Sundae?" one Reddit user wrote." Though Cohen has never publicly revealed the meaning behind the February 24 tweet, the *Wall Street Journal* wrote: "One thing was clear: A meme lord now occupied the boardroom."



72.   In the months after joining GameStop's board, Cohen continued to post memes and unusual photos. In one post, he tweeted a photo of a tombstone bearing the words, "RYAN COHEN R.I.P DUMB ASS." In another, Cohen posted a picture of himself with chopsticks up his nose. As the *Wall Street Journal* reported, these posts "garnered thousands of likes and retweets and inspired discussions across the internet—and created ardent followings in real life."[15]

---

[15]https://www.wsj.com/articles/the-meme-lords-who-are-taking-over-the-c-suite-11630056603

73.   That interest only grew when, in April 2021, GameStop announced that Cohen would become its new chairman of the board. The announcement cemented Cohen's control over GameStop's future and his reputation as a champion for retail investors and as an activist shareholder focused on turning around companies that Wall Street firms had bet against.

74.   Some of the retail investors who follow Cohen are so loyal to him that in June 2021, they traveled to Grapevine, Texas for GameStop's annual shareholders meeting to hear Cohen, who appeared virtually, speak. On June 9, 2021, Cohen was confirmed as Chairman of GameStop's Board of Directors and the Company announced that its CEO, CFO, and Chief Customer Officer were all stepping down from their positions. According to the *Wall Street Journal,* Cohen said in his remarks at GameStop's annual shareholder meeting that day that the company was fortunate to have such a special group of investors holding its shares. "You guys inspire us to think bigger, fight harder and work longer each day," Cohen said, adding that the investors have ushered in a new era at GameStop. On the r/Superstonk subreddit, one Reddit user posted a partial transcript of Cohen's remarks:

> We continue to be blown away by your passion and support. We're fortunate to have such a special group of investors holding the company's shares. You guys inspire us to think bigger, fight harder and work longer each day. You've ushered in a whole new era at GameStop. On a personal note, I want you to know I'm humbled to be elected to YOUR board to be YOUR chairman. We have a lot of work in front of us and it will take time.

> We are trying to do something that nobody in the retail space has ever done, but we believe we are putting the right pieces in place and we have clear goals: delighting customers, and driving shareholder value for the long term. The management team and refreshed board will remain totally focused on these goals at all times.

> We know some people want us to lay out a whole detailed plan today, but that's not gonna happen. You won't find us talking a big game, making a bunch of lofty promises, or telegraphing our strategy to the competition; that's the philosophy we adopted at Chewy. Here are a few things we've done so far: refreshed the board, added technology and retail experience to the leadership team, paid off all our long term debt and strengthened the balance sheet, and begun laying the foundation for long term growth.

Moving forward, we want you to judge GameStop based on our actions, not our words. Thank you everyone, and as my dad would say: buckle up.[16]

75.   One follower, Justin Gnant, a 36-year-old individual trader who holds roughly 1,100 GameStop shares, traveled from his home from the Dallas area. According to the *Wall Street Journal,* Gnant "started buying last fall, picking up more shares along the way, on a belief that Mr. Cohen can transform GameStop" and frequently follows what Cohen posts online.[17] "Every now and then, he makes me wonder if he posts a tweet that actually has no meaning," Mr. Gnant told the *Wall Street Journal.* "And then you just kind of comb through the Reddit conspiracies and tinfoil-hat posts to see if any good ideas float up."

76.   Cohen's acquisitions of GameStop did not end in 2021. On March 22, 2022, Cohen reported that he had bought 100,000 shares of GameStop, bringing his total number of shares owned to 9.1 million and enlarging his ownership stake in the company to 11.9%. GameStop's share price shot up 30.7% on the news, closing at $30.79 per share and registering the highest one-day percentage gain for the company since March 25 the previous year. That day, *Reuters* reported that apart from the news of Cohen's purchase, "[t]here was no clear reason for the rally during normal trading hours, according to analysts." Later that day, after the markets had closed, Cohen tweeted: "I put my money where my mouth is."

---

[16]https://www.reddit.com/r/Superstonk/comments/nvz5nu/transcript_of_ryan_cohens_remarks_today_at/

[17]https://www.wsj.com/articles/the-meme-lords-who-are-taking-over-the-c-suite-11630056603



**4. Cohen announces Bed Bath & Beyond as his next turnaround target**

77.   Throughout 2021, Bed Bath's stock would also experience period spikes that correlated with attention by Reddit users on the r/WallStreetBets subreddit and other social-media platforms.



78.   Despite that periodic attention by retail investors, by November 2021, Bed Bath's stock was among the most heavily shorted stocks in the country, with 27% of its shares available for trading sold short, the third highest among the 1,500 largest U.S. stocks, according to FactSet.

79.   On November 2, 2021, after the markets had closed for the day, Bed Bath announced in a press release that it would accelerate its $1 billion three-year share repurchase plan by the end of fiscal 2021, two years ahead of schedule. In the press release, Bed Bath disclosed that in the first six months of the 2021 fiscal year, the Company executed approximately $225 million in repurchases with $100 million remaining under its $325 million plan for fiscal 2021.  With the acceleration, Bed Bath the total expected share repurchase amount for fiscal 2021 had increased to approximately $625 million, nearly doubling the initial share repurchase plan of $325 million for the fiscal year. The next day, Bed Bath's stock price climbed as much as 54% before closing at $19.30 per share, a 15% increase from the day before, with more than 104 million shares traded. That same day, the *Wall Street Journal* published an article entitled "Bed Bath & Beyond Stock Surge Recalls Meme Mania," reporting that retail investors' enthusiasm for Bed Bath's stock had increased as short interest in the Company had grown, with 28% of the retailer's free float sold short at the time, up from 21% at the start of September 2021.[18]

80.   Two months later, in January 2022, Defendant Cohen celebrated the one-year anniversary since his January 2021 appointment to GameStop's board with a tweet that read "Happy Anniversary," accompanied by a "poo" emoji.[19] The tweet received more than 21 thousand likes and 2,600 retweets. On the subreddit r/Superstonk, user u/PermissionAware2410 posted the tweet, which received more than a thousand comments and more than 22 thousand upvotes.

---

[18]https://www.wsj.com/articles/bed-bath-beyond-stock-surge-recalls-meme-mania-11635954958

[19] https://twitter.com/ryancohen/status/1480918109510852610



81.   Over the next two months, Cohen began to lay the groundwork for his next turnaround target: Bed Bath. From January to early March 2022, Cohen acquired millions of shares of Bed Bath's stock in multiple transactions, acquiring more than 5% of the Company's total outstanding shares by February 24, 2022.

82.   On March 7, 2022, Cohen filed a Schedule 13D that disclosed his total beneficial ownership, acquired through RC Ventures, of a total of 9,450,100 shares of Bed Bath's stock, including 7,780,000 shares of common stock, as well as 1,670,100 shares underlying call options, with strike prices ranging from $60 to $80 and an expiration date of January 2023, as shown in the chart below:

| Nature of Transaction | Amount of Securities Purchased | Price per Share ($) | Date of Purchase |
|---|---|---|---|
| Purchase of Common Stock | 1,000,000 | 14.7690 | 01/13/2022 |
| Purchase of Common Stock | 500,000 | 15.2860 | 01/14/2022 |
| Purchase of Common Stock | 300,717 | 14.3930 | 01/20/2022 |
| Purchase of Common Stock | 99,283 | 13.0760 | 01/21/2022 |
| Purchase of Common Stock | 50,000 | 14.9100 | 01/25/2022 |
| Purchase of Common Stock | 200,000 | 15.0480 | 01/26/2022 |
| Purchase of Common Stock | 251,336 | 13.8440 | 01/27/2022 |
| Purchase of Common Stock | 440,981 | 14.4890 | 01/28/2022 |
| Purchase of Common Stock | 44,333 | 16.5810 | 01/31/2022 |
| Purchase of Common Stock | 609,941 | 16.4710 | 01/31/2022 |
| Purchase of Common Stock | 187,962 | 16.9760 | 02/01/2022 |
| Purchase of Common Stock | 156,574 | 17.1020 | 02/02/2022 |
| Purchase of Common Stock | 75,000 | 16.0790 | 02/04/2022 |
| Purchase of Common Stock | 83,873 | 16.2780 | 02/07/2022 |
| Purchase of Common Stock | 70,000 | 15.8230 | 02/14/2022 |
| Purchase of Common Stock | 30,000 | 16.2280 | 02/16/2022 |

| Nature of Transaction | Amount of Securities Purchased | Price per Share ($) | Date of Purchase |
|---|---|---|---|
| Purchase of Common Stock | 75,000 | 14.0310 | 02/22/2022 |
| Purchase of Common Stock | 367,833 | 15.2060 | 02/24/2022 |
| Purchase of Common Stock | 500,000 | 13.6600 | 02/24/2022 |
| Purchase of Common Stock | 500,000 | 14.5770 | 02/24/2022 |
| Purchase of Common Stock | 300,000 | 13.4260 | 02/24/2022 |
| Purchase of Common Stock | 542,621 | 16.2230 | 02/25/2022 |
| Purchase of Common Stock | 115,000 | 16.1140 | 02/25/2022 |
| Purchase of Common Stock | 500,000 | 16.6010 | 02/28/2022 |
| January 2023 Call Option ($60 Exercise Price) | 4,757 | 0.9324 | 02/28/2022 |
| January 2023 Call Option ($75 Exercise Price) | 243 | 0.7603 | 02/28/2022 |
| January 2023 Call Option ($60 Exercise Price) | 5,000 | 1.4693 | 03/01/2022 |
| January 2023 Call Option ($60 Exercise Price) | 1,500 | 1.4115 | 03/01/2022 |
| January 2023 Call Option ($75 Exercise Price) | 201 | 1.0803 | 03/01/2022 |
| January 2023 Call Option ($80 Exercise Price) | 5,000 | 0.7103 | 03/01/2022 |
| Purchase of Common Stock | 307,341 | 16.9429 | 03/01/2022 |
| Purchase of Common Stock | 311,660 | 16.7564 | 03/01/2022 |
| Purchase of Common Stock | 70,545 | 16.6800 | 03/01/2022 |
| Purchase of Common Stock | 69,516 | 17.2540 | 03/02/2022 |
| Purchase of Common Stock | 20,484 | 16.8090 | 03/03/2022 |

83.    Cohen's reported transactions show that he paid approximately $119.39 million between mid-January and March 3 to acquire the shares and call options, including $119.37 million for the common stock and $17,852.57 for the call options. As a result of the acquisition, Cohen reported that he beneficially owned 9.8% of the total outstanding shares of Bed Bath's stock, which the Schedule 13D stated was based on the Company's 96.3 million shares outstanding as of November 27, 2021, as reported in Bed Bath's most recent Form 10-Q filed on January 6, 2022. Like his initial acquisition of GameStop shares, Cohen's disclosed 9.8% stake in Bed Bath kept his owner-ship just short of 10%, which would otherwise trigger the requirements under Section 16 of the Exchange Act. To expire in the money, Cohen's call options, with strike prices ranging from $60 to $80, would require a five-fold increase in Bed Bath's current stock price, which had closed at $16.18 per share on March 4, signaling extraordinary confidence in a potentially astonishing

turnaround for Bed Bath's stock. Bed Bath's stock price had not closed above $60 since November 2015 and had not closed above $80 since January 2014.

84.    Under Item 4 of the Schedule 13D, the section dedicated to the "Purpose of Transaction," Cohen explained that he "purchased the Shares based on the [his] belief that the Shares, when purchased, were undervalued and represented an attractive investment opportunity," and that he had engaged in communications with Bed Bath's board of directors, stating:

Item 4.        Purpose of Transaction.

The Reporting Persons purchased the Shares based on the Reporting Persons' belief that the Shares, when purchased, were undervalued and represented an attractive investment opportunity. Depending upon overall market conditions, other investment opportunities available to the Reporting Persons, and the availability of Shares at prices that would make the purchase or sale of Shares desirable, the Reporting Persons may endeavor to increase or decrease their position in the Issuer through, among other things, the purchase or sale of Shares on the open market or in private transactions including through a trading plan created under Rule 10b5-1(c) or otherwise, on such terms and at such times as the Reporting Persons may deem advisable.

The Reporting Persons intend to engage in communications with the Issuer's Board of Directors (the "Board") and management team regarding opportunities to enhance shareholder value and improve corporate governance.

On March 6, 2022, the Reporting Persons delivered a letter to the Board (the "Letter") encouraging the Board to adjust the Issuer's strategy and explore alternative paths to value creation. Specifically, the Reporting Persons expressed their belief that the Issuer should narrow its focus to fortify operations and maintain the right inventory mix to meet demand, while simultaneously exploring strategic alternatives that include separating buybuy Baby, Inc. and a full sale of the Issuer. The full text of the Letter is attached hereto as Exhibit 99.1 and is incorporated herein by reference.

No Reporting Person has any present plan or proposal which would relate to or result in any of the matters set forth in subparagraphs (a) - (j) of Item 4 of Schedule 13D except as set forth herein or such as would occur upon or in connection with completion of, or following, any of the actions discussed herein. The Reporting Persons intend to review their investment in the Issuer on a continuing basis and to communicate with the Issuer's management, Board and other interested parties about a broad range of operational and strategic matters, and may discuss a potential sale of the Issuer or certain of its businesses or assets, in which the Reporting Persons may participate, as a means of enhancing shareholder value. Depending on

various factors including, without limitation, the Issuer's financial position and investment strategy, the price levels of the Shares, conditions in the securities markets and general economic and industry conditions, the Reporting Persons may in the future take such actions with respect to their investment in the Issuer as they deem appropriate including, without limitation, engaging in additional communications with management and the Board of the Issuer, engaging in discussions with shareholders of the Issuer or third parties, including potential acquirers, service providers and financing sources, about the Issuer and the Reporting Persons' investment, making proposals to the Issuer concerning changes to the capital allocation strategy, capitalization, ownership structure, including a sale of the Issuer as a whole or in parts, Board structure (including Board composition) or operations of the Issuer, purchasing additional Shares, selling some or all of their Shares, engaging in short selling of or any hedging or similar transaction with respect to the Shares, or changing their intention with respect to any and all matters referred to in Item 4.

85.    Mirroring his approach with GameStop, Cohen accompanied his Schedule 13D with a copy of the letter he had sent to Bed Bath's board. In the letter, which was dated March 6, 2022, Cohen assailed the Bed Bath's executive compensation "relative to performance" and its "strategy for reigniting meaningful growth:

> We have carefully assessed Bed Bath's assets, balance sheet, corporate governance, executive compensation, existing strategy and potential alternatives. While we like Bed Bath's brand and capital allocation policy, we have concerns about leadership's compensation relative to performance and its strategy for reigniting meaningful growth. <u>Approximately 18 months after releasing a 170-page cover-the-waterfront plan, the Company is struggling to reverse sustained market share losses, stem years-long share price declines and navigate supply chain volatility.</u> Meanwhile, the Company's named executive officers were collectively awarded nearly $36 million in compensation last fiscal year – a seemingly outsized sum for a retailer with a nearly $1.6 billion market capitalization.

86.    Cohen "stressed" that he does "not place significant emphasis on any one quarter or any one year when evaluating a business" and that he is "maniacally focused on the long-term." But Cohen added that "the issue at Bed Bath is that its highly-publicized and scattershot strategy is not ending the tailspin that has persisted before, during and after the pandemic's nadir and the appointment of Chief Executive Officer Mark Tritton," writing as follows:

> It is important to stress that we do not place significant emphasis on any one quarter or any one year when evaluating a business. We also do not criticize a board of directors and management team when they are quietly laying a foundation for future

growth and value creation. To the contrary, we are maniacally focused on the long-term. But the issue at Bed Bath is that its highly-publicized and scattershot strategy is not ending the tailspin that has persisted before, during and after the pandemic's nadir and the appointment of Chief Executive Officer Mark Tritton.

87.   Citing BBBY's "disappointing shareholder returns and perpetual underperformance across every relevant time horizon," Cohen lambasted Tritton's leadership and the viability of Company's "extremely ambitious and widely-touted strategy, urging Tritton and the Board to be "open to adjusting Bed Bath's strategy and exploring alternative paths to value creation," writing as follows:

> Almost two-and-a-half years into Mr. Tritton's tenure, Bed Bath has underper-formed the S&P Retail Select Industry Index by more than 58% on an absolute basis and is looking at an approximately 29% decline in full-year sales from pre-pandemic levels. In the most recent quarter, core sales dropped by 14% year-over-year and same-store sales dropped by 7% year-over-year. These results cannot be solely blamed on the pandemic when other retailers are nearing or exceeding 2019 sales levels. That is why we feel compelled to scrutinize the viability of the Com-pany's extremely ambitious and widely-touted strategy.
>
> In light of these circumstances, we hope you are open to adjusting Bed Bath's strat-egy and exploring alternative paths to value creation. We cannot imagine Bed Bath's Board of Directors (the "Board") is wedded to its current strategy when the independent members have made very few open market purchases and appear to hold less than 0.5% of the Company's shares in the aggregate (most of which has been granted at shareholders' expense). Similarly, we do not see how Mr. Tritton is in a position to dismiss our input when shareholders have compensated him to the tune of approximately $27 million over the past two fiscal years – a number that exceeds what was paid to the chief executives of much larger retailers such as Ad-vanced Auto Parts (~$13 billion market capitalization), Dollar Tree (~$33 billion market capitalization), Kohl's (~$8 billion market capitalization) and Macy's (~$7.5 billion market capitalization). Though we understand the pandemic was a major challenge, Mr. Tritton should recognize that chief executives who are awarded out-sized compensation and seek frequent publicity also invite much higher expecta-tions when it comes to growth and shareholder value creation.

88.   Cohen asserted that "cracks have emerged in Bed Bath's overly ambitious strategy" and that "[l]eadership should assess whether a shrinking small-cap retailer with a modest cash position and nearly $1.2 billion in debt can afford to roll the dice," writing as follows:

At bottom, cracks have emerged in Bed Bath's overly ambitious strategy. Leadership should assess whether a shrinking small-cap retailer with a modest cash position and nearly $1.2 billion in debt can afford to roll the dice. **We believe Bed Bath needs to narrow its focus to fortify operations and maintain the right inventory mix to meet demand, while simultaneously exploring strategic alternatives that include separating buybuy Baby, Inc. ("BABY") and a full sale of the Company.**

89.   Cohen and RC Ventures proposed four suggestions. First, Cohen proposed that the Company needed to bring "greater focus to the Company's cumbersome strategy," writing as follows:

**Bring Greater Focus to the Company's Cumbersome Strategy –** From our vantage point, Bed Bath's strategy looks far better in a PowerPoint deck than it does in practice. It is full of "*principles*" and "*pillars*" that high-priced management consultants probably thought would placate information-hungry analysts and satisfy shareholders. However, we – and apparently a large portion of the market based on Bed Bath's short interest – doubt the Company can simultaneously buy back shares, cut expenses, invest in its infrastructure and growth, launch new offerings and meet customer demand for core goods. This plan, at least in its present form, does not seem viable.

Our own experience taking Chewy from a start-up to the ultimate destination for pets leads us to believe that focusing on a core set of objectives drives superior outcomes. In the case of Bed Bath, it appears that trying to execute on dozens of initiatives at once is leading to dozens of mediocre outcomes. We believe the Company would have been better served by front-loading the modernization of its supply chain and technology stack before engaging in more fanciful pursuits. Similarly, we feel managing the core product catalog and sustaining the right inventory mix for customers amidst the supply-constrained environment should have been fully prioritized over meeting management's October 2020 pledge to launch various private label brands in 18 months. We suspect Bed Bath will benefit more at this stage by bringing simplicity to its plan: finish fortifying the infrastructure, make remaining store fleet improvements, and prioritize core assortment and inventory fixes to meet near-term demand.*      *       *

In light of our long-term focus, we are not an investor that demands guidance. In fact, we appreciate that Apple, one of our long-term holdings, suspended guidance amidst pandemic-related uncertainty and has never given away a detailed strategy for all of its competitors to see. We dislike when a management team spends time accommodating Wall Street, engaging with television pundits and telegraphing forecasts to the competition. We believe management's time is best spent focusing on execution that drives a better customer experience and tangible value creation.

90.   Second, Cohen proposed that the Company could "streamline Bed Bath's strategy and unlock value trapped within the Company's underperforming shares is a sale or spin-off of the BABY banner," writing as follows:

> **Seek to Monetize the Ultimate Destination for Babies –** Another path that can streamline Bed Bath's strategy and unlock value trapped within the Company's underperforming shares is a sale or spin-off of the BABY banner. Given that BABY is estimated to reach $1.5 billion in sales in Fiscal Year 2023 with a double-digit growth profile and at least 50% digital penetration, we believe it is likely much more valuable than the Company's entire market capitalization today.[9] Assuming continued growth and low double-digit margins, we estimate that BABY could be valued at a double-digit earnings multiple on a standalone basis. We believe under the right circumstances, BABY could be valued on a revenue multiple, like other ecommerce-focused retailers, and justify a valuation of several billion dollars.

91.   Third, Cohen urged the Company to consider "is a full sale of Bed Bath, in its current form, to one of the many well-capitalized financial sponsors with track records in the retail and consumer sectors and the ability to pay a meaningful premium," writing was follows:

> **Evaluate a Full Sale to a Well-Capitalized Acquirer** – The final path we want to raise for consideration is a full sale of Bed Bath, in its current form, to one of the many well-capitalized financial sponsors with track records in the retail and consumer sectors and the ability to pay a meaningful premium. The past 10 years have shown that Bed Bath faces a difficult existence in the public market. The market is not giving the Company nearly enough credit for BABY's value. A sale that can lock in a substantial premium for shareholders and provide Bed Bath the flexibility of the private market could be an ideal outcome for customers, employees and investors.
>
> We believe Bed Bath presently satisfies financial sponsors' interest in specialty retailers with recognizable brands, niche assets and sub-banners, and margin expansion opportunities. A private market participant with a long-term vision could unlock meaningful value by running the core business for cash and initiating a public offering for BABY at the optimal time. After stripping out the sizable costs of being a public company and setting a more focused strategy, we suspect Bed Bath's core business — excluding BABY — could generate attractive earnings.

92.   Finally, Cohen contended that there needed "to be improvements to the Company's executive compensation structure and a stronger ownership mentality in the boardroom," writing as follows:

**Strengthen Leadership's Alignment with Shareholders –** We are supportive of corporate leaders receiving significant compensation when they produce superior shareholder returns. But when it comes to Bed Bath, we contend there need to be improvements to the Company's executive compensation structure and a stronger ownership mentality in the boardroom. We believe these improvements should be made regardless of the Company's strategic direction.

93.   Cohen closed his letter by hoping that "leadership acts with urgency to implement the aforementioned suggestions," adding that "[g]iven that I am the Chairman of GameStop and over-seeing a systematic transformation, I am not in a position to join Bed Bath's Board and personally drive the initiatives outlined in this letter," but that "[t]his does not mean, however, that RC Ventures will not seek to hold the Board and management accountable if necessary."

94.   On March 7, before the markets had opened, Bed Bath released a press release entitled, "Bed Bath & Beyond Inc. Comments on Letter from RC Ventures," which acknowledged that the Company had received the letter from Cohen the previous evening, adding the following statement:

> Bed Bath & Beyond's Board and management team maintain a consistent dialogue with our shareholders and, while we have had no prior contact with RC Ventures, we will carefully review their letter and hope to engage constructively around the ideas they have put forth.
>
> Our Board is committed to acting in the best interests of our shareholders and regularly reviews all paths to create shareholder value. 2021 marked the first year of execution of our bold, multi-year transformation plan, which we believe will create significant long-term shareholder value.

95.   Reddit users on r/WallStreetBets reacted immediately with enthusiasm, viewing Cohen's acquisition of Bed Bath securities as a clear signal that the Company's was Cohen's next GameStop. That day Bed Bath's stock became the second most mentioned stock on the r/WallStreetBets subreddit. On the r/Superstonk subreddit, user u/Routine_Huckleberry5 posted Cohen's letter in a thread entitled, "Ryan Cohen's actual letter to BBBY board for all who were

asking in related posts…,” which received thousands of upvotes.[20] User u/Particular_Job-3174 posted Bed Bath's response to Cohen's letter, which received more than 9,000 upvotes and hundreds of comments.[21] After Cohen's early morning filing on March 7, Bed Bath's stock price opened at $30 per share, nearly twice the $16.18 closing price on the previous trading day, before closing with a trading volume of more than 105.6 million shares, compared to 2.79 million shares traded the previous day.

96.   The next day, on March 8, 2022, shortly after the markets had closed, Cohen tweeted about his letter to Bed Bath's board, stating that he had received "no response" to his letter. Cohen also noted that he had also sent an email to Bed Bath's CEO "asking for a discussion," but had not received a "prompt response," posing a rhetorical question that Bed Bath's leadership was "[t]oo busy talking to expensive consultants." The tweet, shown below, received more than 21,400 likes and 2,200 retweets.



Three hours later, Cohen tweeted that he "finally got a response" from Bed Bath, as shown below, which received more than 14,600 likes.

<hr />

[20]https://www.reddit.com/r/Superstonk/comments/t8d4xx/ryan_cohens_actual_letter_to_bbby_board_for_all/

[21]https://www.reddit.com/r/Superstonk/comments/t8myyk/official_bed_bath_beyond_inc_comments_on_letter/



Reddit user u/PermissionAware2410 posted both of Cohen's tweets on the subreddit r/Superstonk, which received more than two thousand comments and tens of thousands of upvotes combined.

97. One week later, Cohen tweeted several statements attacking "hedge fund short sellers," calling them in a March 14 tweet "the dumb stormtroopers of the investing galaxy."[22] The next day, on March 15, Cohen tweeted that "[g]ood use of taxpayer $ is the government cracking down on hedge fund short sellers."[23] Both tweets, shown below, received more than 37 thousand likes and were each retweeted more than 7,000 times by other users, and were also reshared multiple times by Reddit users on the r/WallStreetBets and r/Superstonk subreddits.



---

[22] https://twitter.com/ryancohen/status/1503565469068009473

[23] https://twitter.com/GMEshortsqueeze/status/1503927905918894087

98.   Three days later, on March 25, 2022, Bed Bath and Cohen both filed public reports with the SEC that announced that they had reached a "Cooperation Agreement." Like the agreement Cohen had reached with GameStop, Cohen's agreement with Bed Bath permitted him to appoint three members to Bed Bath's board and required the creation of a four-member "Strategy Committee" to oversee and review a strategic analysis of the Company's Buy Buy Baby banner, which Cohen had urged Bed Bath in his March 6 letter to sell or spin off as the centerpiece of his proposed turnaround strategy.

99.   In a press release that Bed Bath issued that day, Harriet Edelman, the independent chair of Bed Bath's board, stated: "We are pleased to have reached this constructive agreement with RC Ventures, which we believe to be in the best interest of all our shareholders." CEO Mark Tritton was quoted as stating the following:

> Our Company and Board have always been committed to evaluating all options to maximize long-term shareholder value, and we look forward to integrating our new directors' ideas to drive our continued transformation. Our buybuy BABY business is a tremendous asset, and we are committed to unlocking its full value. As we move forward, our goals will continue to focus on delivering value for our shareholders, enhancing experiences for our customers, executing on the transformation throughout our business, and creating new and exciting opportunities for our dedicated employees across all our banners.

100.  In the same press release, Cohen was quoted as stating the following:

> The resolution announced today represents a positive outcome for all of Bed Bath's shareholders. By refreshing the Board with shareholder-designated individuals who possess capital markets acumen and transaction experience, the Company is well-positioned to review alternatives for buybuy BABY. I appreciate that management and the Board were willing to promptly embrace our ideas and look forward to supporting them in the year ahead.

101.  Over the next three trading days, the stock price rose by 23.21% on the news, rising from $22.10 to $27.23 per share from March 24 to March 29, with an average daily trading volume of about 12.39 million shares compared to a daily average of 4.6 million shares traded over the previous two weeks.

**5.  After Cohen's acquisition, Bed Bath's stock prices steadily declines as the company faces a stream of unfavorable news**

102.  Over the next four months, however, Bed Bath's stock price steadily declined as the Company faced a steady stream of unfavorable news.

103.  On April 13, 2022, Bed Bath announced its financial results for the fourth quarter of 2021, disclosing that the Company continued to struggle to overcome supply chain issues and announcing a loss of $159 million or $1.79 per share. Bed Bath reported that sales had fallen 22% to $2.05 billion even while other retailers booked surging profits.

104.  One week later, on April 21, 2022, Bed Bath filed its annual report on Form 10-K for the fiscal year ended February 26, 2022 ("2021 10-K"), disclosing that the number of shares outstanding for Bed Bath's common stock was about 79.8 million as of March 26, 2022, a decrease of more than 17 million shares from amount disclosed in Bed Bath's previous quarterly report. The decrease in Bed Bath's outstanding shares had resulted from, in part, the completion of Bed Bath's $1 billion share repurchase program, with the Company reporting that it had completed share repurchases of $950 million by February 26, 2022, and repurchasing approximately $40 million in March 2022. Because of these repurchases, the Company's total outstanding shares decreased to approximately 81.98 million shares by February 26 and approximately slightly less than 80 million shares by March 26.

105.  Because of Bed Bath's repurchases, Cohen's disclosed beneficial ownership of the Company exceeded 10% of Bed Bath's total number of outstanding shares by March 1, when Cohen's purchases brought his total number of beneficially owned shares to approximately 9.36 million, amounting to 11.4% of the 81.98 million shares outstanding as of February 26. By March 3, Cohen's total beneficial ownership stake had increased to 11.5%. When the Company completed the rest of its repurchases by March 26, Cohen's ownership stake then increased to approximately

11.8%. As Cohen's ownership stake exceeded 10%, he was required under Section 16(a) of the Exchange Act to file an Initial Statement of Beneficial Ownership of Securities on Form 3 disclosing his status as a 10% stockholder within 10 days after the buy back unless he was unaware that the buy backs would occur and that they would have such a result on his holdings. Cohen was aware of Bed Bath's $1 billion share repurchase program, which he mentioned in his March 6 letter to the Company's board, and which had been covered widely in the financial press for months. Thus, Cohen was required to file a Form 3 by March 11. If Cohen had been unaware of the buy back, he would have been required to file a Form 3 no later than May 2, 2022, ten days after April 21, the date Bed Bath filed its annual report that disclosed the decreased number of outstanding shares as of March 26. But Cohen would not file a Form 3 disclosing his status as a 10% stockholder until August 15, 2022, more than three months later in violation of the disclosure requirements.

106.  On June 29, 2022, Bed Bath reported its financial results for the fiscal first quarter ending May 28, 2022, and filed its quarterly report on Form 10-Q. In a press release issued that day, Bed Bath reported continued declines in sales, with sales for the three months ending May 28 plunging by 25% compared with the same period the previous year. Bed Bath also reported that net losses had widened to $358 million compared with $51 million in the same period the previous year, while inventory swelled by 19.5% from the year-ago period. In addition, Bed Bath reported that it was then carrying net debt that was 6.2 times its trailing 12-month EBITDA, the highest in at least the past two decades. Further, Bed Bath reported its cash and cash equivalents totaled only about $107 million, down from more than $1 billion the previous May, raising alarming signs that the Company would be unable to pay its obligations. That same day, Bed Bath announced that then-CEO Mark Tritton was stepping down and would be replaced by Sue Gove, an independent

director, who would serve as interim CEO as the Company searched for a successor. In the wake of the news, Bed Bath's share price, which had already dropped by more than 76% since its March 29 high mark that year, tumbled by another 23.58% to $4.99 per share.

107. That day, financial news outlets reported that Bed Bath's latest results raised questions about the Company's future, with analysts concluding that Bed Bath's quarterly results portended the Company's potential bankruptcy. For instance, the *Wall Street Journal* published an article entitled, "Bed Bath & Beyond the Point of No Return?" In the article, the *Wall Street Journal* reported that while Cohen "brought some sparkle earlier this year when he disclosed a large stake in the company," which "helped lift the retailer's share prices for a while," Cohen's "influence seems to have long worn off."

108. That same day, *Yahoo Finance* published an article entitled "Bed Bath & Beyond is 'in the end days' after 'dumpster fire' quarter, analyst says," which summarized an interview with, Anthony Chukumba, Managing Director and Senior Research Analyst for Loop Capital Markets.[24] In the interview, Chukumba said that Bed Bath's quarterly results showed the Company was "clearly" headed for bankruptcy. "We are looking at a situation in which this company is probably not going to be around," Chukumba told *Yahoo Finance Live.* "It's not going to take years. We could be talking about months at this point. We are in the end days. These results were a dumpster fire, there is no other way to put it." Chukumba explained that Bed Bath "was in a lot of trouble even when things were good," but "[n]ow that things are bad, it's game over." In his interview with *Yahoo! Finance,* which was separately covered by *Business Insider,* Chukumba was

---

[24]https://finance.yahoo.com/news/bed-bath-beyond-dumpster-fire-out-of-business-181505056.html#:~:text=We%20are%20in%20the%20end,other%20way%20to%20put%20it.%22&text=Dumpster%20fire%20may%20even%20be%20an%20understate-ment.&text=On%20Wednesday%2C%20Bed%20Bath%20%26%20Beyond,worri-some%20%24107%20million%20in%20cash.

particularly critical of Cohen.[25] "Clearly Ryan Cohen was bored one day, he went on to WallStreet-Bets, he saw people talking about Bed Bath & Beyond, he decided to buy a big stake," Chukumba reportedly said. "Everything that Ryan Cohen has said to this point has been nonsensical." Chukumba added, "The notion that this guy is the next Warren Buffett or Carl Icahn is an insult to Warren Buffett or Carl Icahn. He's lost a ton of money and he's going to lose it all. Every single penny. This company is going bankrupt."

109.  The next day on June 30, *Barron's* published an article entitled, "Bed Bath & Beyond's Plunging Bonds Point to Fears About Repayment,"[26] which reported that Bed Bath's bonds—maturing in August 2024, 2034, and 2044—all sold off on the news of the Company's most recent financial results,  with the 2024 debt yielding above 32% on June 29, compared with a yield of just over 3% for two-year Treasury bonds, a spread that suggested that "credit markets are increasingly concerned that Bed Bath won't be able to meet its obligations in a little over two years" and thus were "demanding a higher premium to offset the perceived increase in risk."

110.  Over the next month, Bed Bath's stock price continued its decline. By the end of July, Bed Bath's share price had plunged to $4.60 per share by July 26, 2022, dropping by more than 83% from its 2022 high-water mark of $27.23 per share, which it reached on March 29 after the Company announced its agreement with Cohen, as shown in the chart below:

---

[25]https://markets.businessinsider.com/news/stocks/it-s-game-over-loop-capital-analyst-warns-that-bed-bath-beyond-s-days-are-limited-1031558871

[26]  https://www.barrons.com/articles/bed-bath-beyonds-plunging-bonds-point-to-fears-about-repayment-51656603973?noredirect=y



111. Bed Bath's continuing woes led an increase in investors taking short positions in the Company's stock. By early August, nearly 40% of Bed Bath's stock was shorted. Reddit users began posting on r/WallStreetBets that Bed Bath's levels of short interest were reaching a point at which another "short squeeze" could occur, just like GameStop's had in January 2021, potentially enabling retail investors to bid the price of Bed Bath's stock high enough to force short sellers to close out their positions and push shares even higher.



112. On August 3, 2022, *Bloomberg* published an article entitled, "Bed Bath & Beyond Weighs Private Loans as Retailer Burns Though Cash," which reported that Bed Bath was considering tapping the private credit market to boost much-needed liquidity as the Company's cash holdings dwindled. In the article, *Bloomberg* also reported that Company management had consulted with direct lenders about a potential new asset-based credit line. Later that month, *Bloomberg* reported that Bed Bath had fallen behind on payments, leading some of the Company's suppliers to restrict or halt shipments altogether, with a survey of vendors by Pulse Ratings, an independent credit-rating and consulting firm, finding that Bed Bath was in arrears with all respondents, with some saying that more than half of their accounts receivable with the Company were past due by as much as 90 days.

113. While financial news outlets and analysts reported on Bed Bath's continuing struggles, retail investors on the r/WallStreetBets subreddit and other online discussion forums expressed increasing enthusiasm about Bed Bath's stock. On August 5, 2022, Bed Bath's stock became the most mentioned stock on the r/WallStreetBets subreddit, remaining the most mentioned stock for the first three weeks of August. "OG WSB is back," said one later post by Reddit user u/SurrogateHair. On August 5, 2022, Bed Bath's stock price rose by 32.68%, closing at $11.41 per share with a trading volume of 52.7 million shares, compared to 9 million shares traded the previous day.

114. In their posts on r/WallStreetBets, retail investors specifically cited Ryan Cohen's continued holdings in Bed Bath as one of the main reasons for their confidence in the Company's performance in the markets. For instance, on August 7, user u/Conscious_evening_57 posted a thread entitled, "Ryan Cohen's purchases/options in BBBY," which included a screenshot of Cohen's holdings of BBBY securities from his March 2022 Schedule 13D.[27]

---

[27]https://www.reddit.com/r/wallstreetbets/comments/wibu6q/ryan_cohens_purchases_options_in_bbby/

**Ryan Cohen's purchases / options in BBBY**

`Meme`

| | | | |
|---|---|---|---|
| | By: | /s/ Ryan Cohen | Ryan Cohen |
| | | Name: | Manager |
| | | Title: | |
| | /s/ Ryan Cohen | | |
| | Ryan Cohen | | |

**SCHEDULE A**

Transactions in Securities of the Issuer During the Past Sixty Days

| Nature of Transaction | Amount of Securities Purchased | Price per Share ($) | Date of Purchase |
|---|---|---|---|
| | | RC VENTURES LLC | |
| Purchase of Common Stock | 1,038,000 | 14.7880 | 10/14/2022 |
| Purchase of Common Stock | 530,000 | 13.2860 | 10/14/2022 |
| Purchase of Common Stock | 500,717 | 14.9850 | 10/20/2022 |
| Purchase of Common Stock | 39,283 | 13.0780 | 10/21/2022 |
| Purchase of Common Stock | 50,000 | 14.8180 | 10/25/2022 |
| Purchase of Common Stock | 200,000 | 13.0480 | 04/26/2022 |
| Purchase of Common Stock | 251,338 | 13.8440 | 01/27/2022 |
| Purchase of Common Stock | 440,881 | 14.4880 | 01/28/2022 |
| Purchase of Common Stock | 44,333 | 18.3810 | 01/31/2022 |
| Purchase of Common Stock | 609,841 | 18.4710 | 01/31/2022 |
| Purchase of Common Stock | 107,962 | 16.9780 | 02/01/2022 |
| Purchase of Common Stock | 136,174 | 17.1020 | 02/02/2022 |
| Purchase of Common Stock | 71,000 | 16.0780 | 02/04/2022 |
| Purchase of Common Stock | 83,819 | 16.2780 | 02/07/2022 |
| Purchase of Common Stock | 76,000 | 15.8230 | 02/14/2022 |
| Purchase of Common Stock | 50,000 | 16.2280 | 02/16/2022 |
| Purchase of Common Stock | 73,000 | 14.0310 | 02/22/2022 |
| Purchase of Common Stock | 367,833 | 13.2080 | 02/24/2022 |
| Purchase of Common Stock | 100,000 | 13.8880 | 02/24/2022 |
| Purchase of Common Stock | 100,000 | 14.1770 | 02/24/2022 |
| Purchase of Common Stock | 500,080 | 13.4280 | 02/24/2022 |
| Purchase of Common Stock | 142,621 | 16.2230 | 02/25/2022 |
| Purchase of Common Stock | 115,000 | 18.1140 | 02/25/2022 |
| Purchase of Common Stock | 500,000 | 16.6810 | 02/28/2022 |
| Purchase of January 2023 Call Option ($60 Exercise Price)* | 4,717 | 0.0324 | 02/28/2022 |
| Purchase of January 2023 Call Option ($75 Exercise Price)* | 243 | 0.7465 | 02/28/2022 |
| Purchase of January 2023 Call Option ($80 Exercise Price)* | 5,000 | 3.4485 | 03/01/2022 |
| Purchase of January 2023 Call Option ($60 Exercise Price)* | 1,500 | 3.4115 | 03/01/2022 |
| Purchase of January 2023 Call Option ($75 Exercise Price)* | 205 | 3.0803 | 03/01/2022 |
| Purchase of Common Stock | 5,000 | 0.7335 | 03/01/2022 |
| Purchase of Common Stock | 301,341 | 18.9429 | 03/02/2022 |
| Purchase of Common Stock | 313,880 | 18.7384 | 03/02/2022 |
| Purchase of Common Stock | 70,545 | 18.6800 | 03/03/2022 |
| Purchase of Common Stock | 89,518 | 17.2140 | 03/03/2022 |
| Purchase of Common Stock | 20,484 | 18.8080 | 03/03/2022 |

115. One popular Reddit user, u/spicy_chimp5, posted a response that received hundreds of upvotes, explaining that Cohen's holdings, coupled with other indicators, showed that Bed Bath's stock was poised to replicate GameStop's meteoric rise in January 2021:

> Look guys and gals of this sub. When gme popped for real, we had low starting prices and a figure, Deep Fucking Value and also decent fundamentals for us all to like the stock. Now we have Ryan and low low starting prices with quote on quote, fundamentals... Please, and I cannot stress this enough. Stop posting other possible short squeeze candidate stocks when we've got the perfect looking one right here. Don't let the shorts divide and conquer us. Please remember gme started as a pre $10 stock weeks before it popped big time. Buy any possible dip, also buy at open and let it run for a few weeks. This is our time again. Also, fuck Citidel, who are also shorting the fuck outta BBBY, which was the same deal for gme all those months ago. Peace and love, don't gamble more than you're willing to loose, but at the same time, yolo if you're a true player. Namaste

116. The next day, on August 8, Reddit user u/TheDude0007 posted a thread entitled, "I am the guy who 10X'd a $45K YOLO in BBBY. The following is my analysis on why I believe this run is just beginning… (The Ryan Cohen Effect)."[28]



In the lengthy post, which also included a screenshot of Cohen's transactions from his March 7 Schedule 13D, u/TheDude0007 explained that he is "HEAVILY invested in Ryan Cohen," noting that Bed Bath was "the only one of those companies (other than GME) that Ryan Cohen has personally taken stake in." According to u/TheDude0007, Cohen's investment in Bed Bath showed that Bed Bath's stock was the "the deepest value stock on the market," stating the following:

> With GME as far and away, my primary holding, I am, and have been HEAVILY invested in Ryan Cohen. As an investor, I do not invest in companies with the conviction in which I invest in people. This theory of mine started with Steve Jobs / AAPL, back when I was 18 and the first iPhone came out, continued with Elon Musk in Tesla before they even had the first consumer vehicle on the road, and now Ryan Cohen, as he is tactically fighting to dismantle the forces of Wall Street that blatantly fuck the little guy. Not to mention the turnaround/pivot strategy in which he executing in GME. So naturally - his acquisition of equity in $BBBY caught my attention, and it soon became immediately clear that this was possibly the deepest value stock on the market. (Especially considering RC's cost basis is $15, in addition to the millions of dollars worth of $60, $65, $70 and $80 strike call options he holds, expiring January 23.)

The post received hundreds of replies and thousands of upvotes. That day, Bed Bath's stock price continued to rise, growing by 39.83% to close at $11.41 per share, closing in double digits for the

---

[28]https://www.reddit.com/r/wallstreetbets/comments/wizna5/i_am_the_guy_who_10xd_a_45k_yolo_in_bbby_the/

first time in three months, with a trading volume of 124.7 million shares—more than double the number of shares traded the previous trading day.

117. But over the next three days, Bed Bath's stock reversed its gains with lower trading volume each day. On August 9, Bed Bath's stock price dropped by 14.20% to $9.79 per share, with 74.69 million shares traded. Some analysts attributed Bed Bath's slowing momentum in the markets to the retailer's continued financial struggles. For instance, on August 9, Justin Kleber, an analyst for Robert W. Baird & Co., cut his rating on Bed Bath's stock from neutral to underperform, projecting the Company's stock price would fall roughly 60% to $4 per share. Kleber explained that he believed that investors had driven up Bed Bath's stock price beyond what could be justified by the fundamental value of its business, noting the Company's steep market-share losses and negative cash flow. That same day, CNBC's Jim Cramer tweeted: "Memo to the people who run Bed Bath, if you do not take advantage of that short position to sell equity you are as equally ill-advised when you bought back all that stock at much higher prices. Read your balance sheet: you need the money and you need it today."

118. In the next two days, on August 10 and 11, Bed Bath's stock price saw modest gains, closing at $10.63 on August 11, but continued to show decreasing market interest with 51.98 million and 37.53 million shares traded on August 10 and 11, respectively. At the same time, Bed Bath's stock received fewer and fewer mentions on r/WallStreetBets, with the total number of mentions of Bed Bath's stock dropping to 670 by August 11, a little more than a third of the total number of mentions the stock received two days earlier.

**B.  Cohen's scheme to manipulate the market for Bed Bath & Beyond securities**

119. Beginning in or around August 12, Cohen secretly devised a scheme to artificially inflate the price and trading volume of Bed Bath's securities to sell his holdings at a profit at the expense of Bed Bath's public investors. By that time, Cohen's investment in Bed Bath stock had lost

roughly 82% of its value, falling from its high mark of $211.84 million on March 29 to $35.78 million on July 26, representing net losses of $83.58 million. At the same time, Cohen's call options, which had strike prices ranging from $60 to $80, also appeared increasingly certain to expire out of the money.



Net value of value of Cohen's investment in Bed Bath
March 2022 to August 2022

120.   By early August, Cohen had also learned that Bed Bath's board had rejected or was likely to reject the centerpiece of his turnaround strategy, his proposed spinoff or sale of the Company's Buy Buy Baby chain. Instead, Bed Bath's board had decided or was likely to decide to pursue alternative approaches, including pursuing a new line of credit, backed in part by the Buy Buy Baby assets. In addition, to help repay the Company's growing debt, Bed Bath would be seeking to conduct an offering of millions of new shares of stock, which would dilute Cohen's holdings and likely depress the stock price even further. To head off near-certain losses in the tens of

millions, Cohen devised a scheme to inflate the Company's stock price and trading volume so he could sell his holdings at a profit.

121.  To pull off the scheme, Cohen first needed to create liquidity so he could sell his holdings rapidly and profit from his investments. Cohen also needed to conceal his trading activity so that would-be investors could not track his sales of 7.78 million shares of Bed Bath stock. Such rapid sales of large quantities of stock would be noticeable unless the trading volume was much greater than the typical daily volume, which averaged about 12.07 million shares traded daily in July 2022. With trading volume dropping rapidly from August 9 to 11, Cohen needed to encourage retail investors to aggressively purchase Bed Bath securities to inflate the price high enough for Cohen to make a profit and to drive trading volume high enough to keep his trading secret.

122. Cohen accomplished both goals by leveraging his loyal following of retail investors on social media platforms like Reddit and Twitter, who Cohen knew watched his every public state-ment, filing, and transaction. From August 12 to August 16, Cohen made statements on social media and filed reports with the SEC that were designed to appeal to these retail investors, sending materially misleading messages that deceived the investors to believe that Cohen was maintaining his holdings of Bed Bath securities and that he expected that the Company's stock price would or was likely to increase.

123. On August 12, 2022, CNBC published an article entitled, "Loop Capital says Bed Bath & Beyond comeback doesn't make fundamental sense, stock headed to $1," in which the financial network reported that Loop Capital conducted recent channel checks on Bed Bath, finding "wide-spread out-of-stocks, heavily discounted private label merchandise, and disengaged employees." According to Loop Capital's analyst, Anthony Chukumba, the proposed asset-based credit line would be expensive and might not change much for the company. "We also doubt a new ABL

would make BBBY's vendors— who we continue to worry could place the company in a "death spiral" by demanding more onerous payment terms—any more comfortable about BBBY's near- and long-term prospects," Chukumba told CNBC. The only "Hail Mary pass" that could potentially change Loop's outlook on the retailer is a sizeable equity offering, according to Chukumba's note. "At BBBY's current price this would result in the company issuing 47M new common shares—which would dilute its existing shareholders by a whopping 37%," Chukumba wrote. CNBC tweeted the article at 7:04 AM on August 12.



124.  After CNBC posted its August 12 tweet, Cohen responded later that morning with a tweet that read "At least her cart is full" adding a smiley moon emoji:



125.  Cohen's tweet received more than 14,400 likes and was retweeted more than 1,600 times. The tweet was also reshared multiple times on r/WallStreetBets and other subreddits. That day, Bed Bath's stock received increased attention by users on r/WallStreetBets, with users mentioning the stock more than 1,650 times on August 12, nearly 2-1/2 times the number of mentions on the previous day.  In their posts about Cohen's tweet, Reddit users speculated that the use of a moon emoji signaled Cohen's expectation that Bed Bath's stock price would go "to the moon"—which, as noted above, is a popular phrase used by Reddit users on r/WallStreetBets to express their confidence in the future performance of a chosen stock—thus indicating that Bed Bath's stock price would or was likely to increase. Just one minute after Cohen's tweet, Reddit user u/PermissionA-ware2410 posted the tweet to the subreddit r/Superstonk—like users had consistently done for all of Cohen's tweets—accompanying the post with an exclamation mark and three "rocket" emojis,[29] which Reddit users commonly use to express their confidence that a particular stock will rocket "to the moon," as shown below:

---

[29] https://www.reddit.com/r/Superstonk/comments/wmmzwm/ryan_cohen_on_twitter/



The post by u/PermissionAware2410 received more than 11,000 upvotes and hundreds of comments. Likewise, Reddit user u/AIB88 posted a thread to the subreddit r/WallStreetBets entitled, "In case you needed additional confirmation, Ryan Cohen's earlier tweet included a literal moon emoji in response to the bs article from cnbc," adding "[g]oodnight future millionaires,"[30] and the same moon emoji used by Cohen, as shown below:

> In case you needed additional confirmation, Ryan Cohen's earlier tweet included a literal moon emoji in response to the bs article from cnbc. Goodnight future millionaires. 🌝 soon.

Similarly, at 3:19 pm EST on August 12, Reddit user u/Swaggybullinthisbih posted a thread entitled, "$BBBY UPDATE RYAN COHEN (MOON EMOJI),"[31] adding emojis for the moon and a rocket ship, as shown below:

$BBBY UPDATE RYAN COHEN ( MOON EMOJI) 

DD

---

[30]   https://www.reddit.com/r/BBBY/comments/wn6ryi/in_case_you_needed_additional_confirmation_ryan/

[31]https://www.reddit.com/r/Wallstreetbetsnew/comments/wmtihj/bbby_update_ryan_cohen_moon_emoji/

Later that day, Reddit user u/badmojo2021 posted a thread to the r/Superstonk subreddit, entitled, "He LITERALLY tweeted a moon. That is all. Thanks for listening to my ted talk," attaching a screenshot of Cohen's tweet.[32] The post received more than 4,000 upvotes.

126. Following Cohen's tweet on August 12, Bed Bath's stock price surged by 21.83% that day, closing at $12.95 per share, with a trading volume of 80.1 million shares, more than double the trading volume the previous day, and reversing the downward trend from the previous three days.



127. Over the weekend, on August 13 and 14, Reddit users continued to discuss Cohen's tweet on r/WallStreetBets and other subreddits, with many concluding that Cohen's tweet was a clear signal to aggressively buy Bed Bath's Stock because the stock would or was likely to increase. On

---

[32]https://www.reddit.com/r/Superstonk/comments/wn2kep/he_liter-ally_tweeted_a_moon_that_is_all_thanks/

August 14, for instance, Reddit user u/OfficialBJones90 posted a thread to the r/BBBY subreddit that was entitled, "Never been so confident in a play,"[33] explaining:

> I wasn't trading of the time of GME I started trading last August. Love me a good squeeze play and I am locked and loaded because you got me f*cked up if you think I am missing this moonshot. I think RC has a plan. He obviously knows about the situation. The CNBC tweet kinda confirms this. A lot of pressure are on the shorts. Even if BBBY did a PR about up and coming PR could be the catalyst to send this.

In response, another user, u/tplaceboeffect posted, "The moon tweet is what did it for me. There's no other explanation, he fucking knows."

128. On August 15, before markets opened for the day, one user posted a threat entitled "$BBBY 26K YOLO WITH MY COLLEGE FUNDS," accompanied by emojis of a rocket and a moon, claiming to have put in $26,000 into Bed Bath stock using their college funds, attaching a screenshot of their holdings.[34] The post, shown below, received more than 3,000 upvotes and hundreds of comments.



129. When the markets opened again on Monday, August 15, Bed Bath's stock continued to rise, opening at $15.00 per share and rising by 23.55% to close at $16.00 per share, with a trading volume of 164.66 million shares, more than double the number of shares traded on the previous trading day. By closing at $16.00 per share, the price of Bed Bath's common stock reached a value just above the minimum price that Cohen needed to be able to profit by selling his holdings.

---

[33] https://www.reddit.com/r/BBBY/comments/wo9l8y/never_been_so_confident_in_a_play/

[34] https://www.reddit.com/r/wallstreetbets/comments/wovb39/bbby_26k_yolo_with_my_college_funds/



130. By August 15, Cohen had formulated an intent to liquidate some or all his holdings of Bed Bath securities. To do so, Cohen needed to satisfy multiple procedural steps that restricted his ability to dump his holdings quickly. Because he owned more than 10% of Bed Bath's total number of outstanding shares, Cohen qualified as an affiliate under Rule 144. To sell his affiliate-owned shares, Cohen needed to satisfy each of the required elements of Rule 144, including among other things, the requirement that Cohen file a Notice of Proposed Sale of Securities on Form 144 with the SEC before or concurrently with the placing of his order with any broker or sale to a market maker. Any broker that facilitated Cohen's transactions was required to conduct a reasonable inquiry into the facts and circumstances surrounding the proposed resale including any facts or statements contained in the notice required by Rule 144(h) and, after making such reasonable inquiry,

had to ensure that they are not "aware of circumstances indicating that the person for whose account the securities are sold" has satisfied the requirements of Rule 144.

131. Later that day, on August 15, after the markets had closed, Cohen began the process of selling his holdings by filing an Initial Statement of Beneficial Ownership on Form 3, which disclosed that, through RC Ventures, Cohen owned more than 10% of BBBY's outstanding shares of common stock and thus qualified as an affiliate under Section 16(a). Cohen had been required to file the Form 3 by no later than May 2, 2022, which Cohen confirmed by listing April 21, 2022, the day the 2021 10-K was filed, as the "date of event requiring statement," and identified as his holdings the same 9,450,100 shares that he beneficially owned as of March 7, 2022, consisting of 7,780,000 shares of common stock and 1,670,100 shares underlying call options.

132. Investors commenting on the r/WallStreetBets subreddit reacted with enthusiasm. That day, Bed Bath's stock was mentioned more than 2,600 times on r/WallStreetBets, more than six times the number of times GameStop's stock was mentioned. In their posts, Reddit users expressed their view that Cohen's filing confirmed the signal sent by his August 12 tweet that Cohen was expecting Bed Bath's stock price to increase, and that by holding onto his call options, Cohen was projecting the stock to soar to as much $60 to $80. For example, Reddit user u/Slut_Spoiler commented "Tldr; He's still in with an increased position. $80 strikes for January. Let's not let him down."[35] Similarly, Reddit user u/predictany007 posted a thread entitled "GME chair Ryan Cohen has disclosed he is still in his call options for BBBY ranging $60 to $80," writing:

> GameStop's Ryan Cohen – along with his RC Ventures LLC – had disclosed a 9.8 percent stake in Bed Bath & Beyond back in March 2022. Crucially, Cohen also purchased 2023 call options on BBBY shares, with strike prices ranging between $60 and $80. For reference, the stock closed on Friday at $12.95 per share. While these bullish bets had appeared outlandish back in March, given the ongoing short

---

[35]https://www.reddit.com/r/wallstreetbets/comments/wpmekp/ryan_cohen_sec_filing_8152022_bbby/

squeeze in BBBY shares, it remains within the realm of the possible that Ryan Co-
hen's call options enter the in-the-money territory. Even if that does not occur, any
rally that takes the stock above $30 – which was the stock's rough price level to-
ward the end of March – will result in outsized gains for Cohen on the back of the
increase in these options' intrinsic value.

GameStop (GME) chair Ryan Cohen has disclosed he is still in his call options for
BBBY. He bought on April 21, 2022 at strike price of $60, $75, and $80 expiring
on Jan 20th 2023. BBBY is currently trading at $16. How much do you think BBBY
will be trading by Jan 2023?[36]

The post received more than 5,100 upvotes and hundreds of comments. While some Reddit users

noted that Cohen's transactions were not new, others emphasized that the filing showed that he

was maintaining his large position, including his out-of-the-money call options. Reddit user

u/ssaxamaphone, for instance, commented "the point is he HELD all his positions. BULLISH."

Many Reddit users responded by commenting with the phrase "If he's still in, then I'm still in,"

which Reddit users had commonly used in 2020 and 2021 to refer to Keith Gill's posts of screen-

shots of his transactions in GameStop securities, which helped spur the buying spree in that com-

pany's stock in January 2021. Reddit user u/El_Patron_1911 commented specifically that Cohen's

filing resembled posts by Keith Gill, referencing his Reddit username DeepFuckingValue (or

DFV), writing: "This is like DFV posting his positions... I love it!"

133. On August 16, 2022, shortly before the markets opened, Cohen filed an amended Sched-

ule 13D/A ("August 16 Schedule 13D/A"), amending the Schedule 13D that he originally filed in

March 2022. Like Cohen's Form 3 filed the previous day, Cohen's August 16 Schedule 13D/A did

not disclose any new transactions. Instead, Cohen stated that the amendment "was triggered solely

due to a change in the number of outstanding Shares of the Issuer," reporting that he now owned

11.8% of BBBY's total outstanding stock. But like his Form 3, August 16 Schedule 13D/A stated

---

[36]https://www.reddit.com/r/wallstreetbets/comments/wprkgj/gme_chair_ryan_co-
hen_has_disclosed_he_is_still_in/

that the "date of event which requires filing of this statement" was April 21, 2022, the filing date of the 2021 10-K that disclosed the decreased total number of shares outstanding. In Item 5 of the amended filing, entitled "Interest in Securities of the Issuer," Cohen stated: "There have been no transactions in securities of the Issuer by the Reporting Persons during the past sixty days nor since the filing of Amendment No. 1 to the Schedule 13D." Even though Item 4(a) of Schedule 13D required Cohen to disclose "any plans or proposals" relating to "the disposition of securities of the issue," 17 C.F.R. § 240.13d-101, Cohen did not amend the generic, boilerplate disclosures that he included in his initial March 7 Schedule 13D. By signing the filing, Cohen falsely certified that "[a]fter reasonable inquiry and to the best of [his] knowledge and belief…that the information set forth in this statement is true, complete and correct." *Id.*

134. Although Cohen's Form 3 and August 16 Schedule 13D/A showed that he beneficially owned the same amount of shares that he owned months earlier, reporting by some financial news outlets suggested that filing revealed Cohen had increased his stake in the company. For example, *CNBC* reported that "GameStop Chairman Ryan Cohen placed another bet on the struggling retailer," explaining that "[a] regulatory filing Monday evening showed that Cohen's venture capital firm RC Ventures bought distant out-of-the-money call options on more than 1.6 million Bed Bath & Beyond shares with strike prices between $60 and $80."[37]

135. Reddit users posting on r/WallStreetBets continued to react with enthusiasm to Cohen's August 16 Schedule 13D/A, viewing the filing as another clear signal that Cohen was expecting that the price of Bed Bath's stock would or was likely to increase. That day, Bed Bath's stock

---

[37] https://www.cnbc.com/2022/08/16/bed-bath-beyond-soars-70percent-as-meme-traders-bet-on-ryan-cohen.html

continued to be the most mentioned stock on the r/WallStreetBets subreddit, receiving more than 2,900 mentions, more than three times as many mentions as GameStop's stock.

136. Following Cohen's filing of the August 16 Schedule 13D/A, Bed Bath's stock price surged by more than 70% to an intraday high of $28.04 per share amid multiple halts due to volatility, closing 29% higher than the previous day at $20.65 per share. That day, trading volume soared to more than 395 million shares compared to only about 80 million shares outstanding, more than double the 164 million shares traded the previous day. The following day, *Bloomberg* published an article entitled, "Bed Bath & Beyond 402% Rally Is Supercharged by Retail Money," reporting that retail traders bought an all-time high of $73.2 million of the stock on August 16, bringing their total net purchases in three weeks to $171.4 million, according to data compiled by Vanda Research.[38]

---

[38]https://www.bloomberglaw.com/product/blaw/document/RGRZKZDWRGG5?criteria_id=ddc558747700b97b46d4271144932a51&searchGuid=bc3ad964-eb13-4aaf-ad4b-fb12bb48c3c8



137. In an article entitled, "Bed Bath & Beyond Shares Surge Despite Liquidity Concerns," the *Wall Street Journal* reported that the "sharp rise in shares came despite a number of analysts' warnings about dwindling liquidity at the retailer, which is fighting to maintain the confidence of suppliers and investors after a push into private-label brands that didn't resonate with consumers," adding that "Bed Bath & Beyond ended May with roughly $100 million in cash, after burning through more than $300 million of its reserves and borrowing $200 million from its credit line."[39] Research analyst Susan Anderson at B. Riley Securities, the *Wall Street Journal* noted, cut its rating for Bed Bath's stock to sell, saying its $2.2 billion valuation implied by the high point in its share price Tuesday was "unrealistic." In the article, the *Wall Street Journal* also reported that Bed

---

[39]https://www.wsj.com/articles/bed-bath-beyond-shares-surge-despite-liquidity-concerns-11660677005?mod=markets_lead_pos3

Bath was expecting responses "this week" to its loan proposal for a $375 million first-in-last-out loan that would build cash and help manage an asset-based debt facility, adding that the loan "will be secured by equity in the company's Buy Buy Baby brand."

138. Unbeknownst to investors, however, Cohen had sold 5 million shares of Bed Bath stock on August 16, representing 64% of his holdings, at prices between $18.06 and $26.45, for a total amount of around $105.84 million, as shown in the chart below:

| Nature of the Transaction | Securities Sold | Price per Security ($)[40] | Date of Sale |
|---|---|---|---|
| Sale of Common Stock | 446,399 | 18.6848 | 08/16/2022 |
| Sale of Common Stock | 812,448 | 19.4817 | 08/16/2022 |
| Sale of Common Stock | 1,443,818 | 20.7834 | 08/16/2022 |
| Sale of Common Stock | 1,059,021 | 21.4209 | 08/16/2022 |
| Sale of Common Stock | 795,559 | 22.7093 | 08/16/2022 |
| Sale of Common Stock | 169,335 | 23.3293 | 08/16/2022 |
| Sale of Common Stock | 103,901 | 24.8685 | 08/16/2022 |
| Sale of Common Stock | 104,077 | 25.5918 | 08/16/2022 |
| Sale of Common Stock | 65,442 | 26.2713 | 08/16/2022 |

139. On August 17, 2022, investors continued to buy millions of shares of Bed Bath stock, unaware that Cohen had already sold nearly his entire holdings the day before. That day, Bed Bath's stock price opened at $26.93, rising to an intraday high of $30 before closing up by 11.77% at $23.08 per share, with trading volume of more than 261 million shares. According to *Bloomberg,* retail investors continued to drive Bed Bath's rally, reporting that Bed Bath's stock was the most purchased asset on Fidelity on August 17, with buy orders that markedly outpaced those to sell and net purchases that were more than double the size for Tesla, Inc., the next most-bought stock.[41] *Bloomberg* continued: "That demand mirrors the optimism expressed on day trader chatroom

---

[40] According to Cohen's later-filed amended Schedule 13D, these prices represent a weighted average price of shares sold in multiple transactions at prices ranging from $18.06 to $26.45.

[41] https://www.bloomberg.com/news/articles/2022-08-17/bed-bath-beyond-s-492-rally-is-supercharged-by-retail-traders

StockTwits where Bed Bath & Beyond has the number one trending ticker and on Reddit's WallStreetBets where it continued to be the most discussed company."

140.   Throughout the day on August 17, however, and unbeknownst to investors, Cohen sold the rest of his holdings of Bed Bath securities, selling his remaining 2.78 million shares at prices between $23.06 and $29.99, for a total amount of about $72.17 million, as shown in the chart below:

| Nature of the Transaction | Securities Sold | Price per Security ($)[42] | Date of Sale |
|---|---|---|---|
| Sale of Common Stock | 189,689 | 23.7337 | 08/17/2022 |
| Sale of Common Stock | 512,185 | 24.6266 | 08/17/2022 |
| Sale of Common Stock | 896,238 | 25.4997 | 08/17/2022 |
| Sale of Common Stock | 610,828 | 26.4432 | 08/17/2022 |
| Sale of Common Stock | 323,483 | 27.5756 | 08/17/2022 |
| Sale of Common Stock | 140,788 | 28.5122 | 08/17/2022 |
| Sale of Common Stock | 106,789 | 29.2192 | 08/17/2022 |

141.   That same day, Cohen also sold all his call options at prices from $6.4 to $8.9, for a total amount of $112,733.30. Cohen's sales earned him a total profit of approximately $58.64 million, before taxes, compared to his purchases just five months earlier.[43]

142.   At approximately 3:45 PM on August 17, Cohen's Form 144 was released publicly. In the Form 144, Cohen provided notice of his intent to sell up to all his shares and call options. While the Form 144 was dated August 16, Cohen filed his submission via paper and not via EDGAR, the SEC's electronic filing system, which delayed the public release of the filing. Bed Bath's stock price immediately dropped by more than 10% on the news, before closing at $23.08, representing

---

[42] According to Cohen's later-filed amended Schedule 13D, these prices represent a weighted average price of shares sold in multiple transactions at prices ranging from $23.06 to $29.99.

[43] This figure is based on the weighted average prices of shares bought and sold by Ryan Cohen from January to August 2022, as disclosed in his Schedule 13D filings.

a 11.8% increase from the previous trading day and a 300% increase from the price at the end of July 2022.

143.  In the Form 144, Cohen and RC Ventures disclosed the "potential sale of up to 7,780,000 common stock and the following call options: 11,257 BBBY CALLS 01/20/23 @ 60, 5,000 BBBY CALLS 01/20/23 @ $80, 444 BBBY CALLS 01/20/23 @ $75." For the "Approximate Date of Sale," Cohen listed "Beginning 08/16/22" and listed Defendant JP Morgan as the "Broker Through Which the Securities are to be Offered." Under Table II of the Form 144, which requires disclosure of any securities sold during the past three months, Cohen and RC Ventures listed "(none)." The metadata for the PDF of the filing, however, shows that the PDF was created at 5:20 PM on August 16, 2022. In the filing, Cohen also signed a representation that read:

> **ATTENTION:**
> The person for whose account the securities to which this notice relates are to be sold hereby represents by signing this notice that he does not know any material adverse information in regard to the current and prospective operations of the Issuer of the securities to be sold which has not been publicly disclosed. If such person has adopted a written trading plan or given trading instructions to satisfy Rule 10b5-1 under the Exchange Act, by signing the form and indicating the date that the plan was adopted or the instruction given, that person makes such representation as of the plan adoption or instruction date.

Despite signing that representation, Cohen did not disclose that he had already sold 5 million of his shares by August 16.



144. Reactions to Cohen's Form 144 filing were mixed. While some viewed the Form 144 has

a sign that Cohen intended to immediately sell his holdings, many commentors on the r/WallStreet-

Bets subreddit concluded that Cohen was merely giving himself the right to sell in the next 90

days. For example, Reddit user u/foyerhead posted: "Ryan Cohen did not sell. FORM 144 is the

'right' to sell. It does not mean you are selling or have sold. If you own 10% or greater of a com-

pany, you have to file the form giving you the right to sell within the next 90 days."[44] Reddit user

u/DeadSol echoed that assessment "Of course he didn't sell. He's an ape like us."[45]

---

[44]https://www.reddit.com/r/wallstreetbets/comments/wqzdz0/ryan_co-
hen_did_not_sell_shares_he_filed_a_form/

[45]   https://www.cnbc.com/2022/08/17/bed-bath-beyond-shares-fall-more-than-10percent-af-
ter-investor-ryan-cohen-reveals-intent-to-sell-entire-stake.html

145.  In response to media attention on Cohen's Form 144, however, Bed Bath tried to reassure the market that Cohen and the Company remained partners. That evening, a spokeswoman for Bed Bath told *CNBC.com* that the retailer is "pleased to have reached a constructive agreement with RC Ventures in March and are committed to maximizing value for all shareholders."[46] In the emailed statement, the spokeswoman continued, "Specifically, we have been working expeditiously over the past several weeks with external financial advisors and lenders on strengthening our balance sheet," adding that the retailer will provide more information in an update at the end of the month.

146.  The next day, on August 18, before markets opened, Bed Bath filed a Form 8-K, signed by CFO Gustavo Arnal, which disclosed a media statement that Bed Bath had released the previous day "in response to numerous media inquiries," which read:

> We were pleased to have reached a constructive agreement with RC Ventures in March and are committed to maximizing value for all shareholders. We are continuing to execute on our priorities to enhance liquidity, make strategic changes and improve operations to win back customers, and drive cost efficiencies; all to restore our company to its heritage as the best destination for the home, for all stakeholders. Specifically, we have been working expeditiously over the past several weeks with external financial advisors and lenders on strengthening our balance sheet, and the Company will provide more information in an update at the end of this month."

147.  Many Reddit users on the r/WallStreetBets subreddit understood Bed Bath's statement to represent that Cohen had not liquidated his holdings and that he remained a partner with Bed Bath and its board. For example, Reddit user u/SwearImNotACat posted Bed Bath's statement in a post entitled, "$BBBY AND RYAN COHEN UPDATE!" In response, Reddit user u/AssumptionGod1337 commented, "Very nice. Actual bullish news right after to counter that pathetic misleading headline earlier about RC liquidating. Next two days should be interesting after this dip."

---

[46]    https://www.cnbc.com/2022/08/17/bed-bath-beyond-shares-fall-more-than-10percent-after-investor-ryan-cohen-reveals-intent-to-sell-entire-stake.html

148. With many investors buoyed by Bed Bath's assurances, the Company's stock price opened at $27.00 per share on August 18, before closing at $18.55, declining by 19.63% from the previous trading day, with a trading volume of more than 239 million shares.

149. Sixteen minutes after markets closed on August 18, Cohen filed another amended Schedule 13D, which finally disclosed that he had liquidated his entire position in Bed Bath securities, selling his remaining stock and call options on August 17. Cohen's filing listed the following transactions:

| Nature of the Transaction | Securities Sold | Price per Security ($) | Date of Sale |
|---|---|---|---|
| Sale of Common Stock | 446,399 | 18.6848 | 08/16/2022 |
| Sale of Common Stock | 812,448 | 19.4817 | 08/16/2022 |
| Sale of Common Stock | 1,443,818 | 20.7834 | 08/16/2022 |
| Sale of Common Stock | 1,059,021 | 21.4209 | 08/16/2022 |
| Sale of Common Stock | 795,559 | 22.7093 | 08/16/2022 |
| Sale of Common Stock | 169,335 | 23.3293 | 08/16/2022 |
| Sale of Common Stock | 103,901 | 24.8685 | 08/16/2022 |
| Sale of Common Stock | 104,077 | 25.5918 | 08/16/2022 |
| Sale of Common Stock | 65,442 | 26.2713 | 08/16/2022 |
| Sale of Common Stock | 189,689 | 23.7337 | 08/17/2022 |
| Sale of Common Stock | 512,185 | 24.6266 | 08/17/2022 |
| Sale of Common Stock | 896,238 | 25.4997 | 08/17/2022 |
| Sale of Common Stock | 610,828 | 26.4432 | 08/17/2022 |
| Sale of Common Stock | 323,483 | 27.5756 | 08/17/2022 |
| Sale of Common Stock | 140,788 | 28.5122 | 08/17/2022 |
| Sale of Common Stock | 106,789 | 29.2192 | 08/17/2022 |
| Sale of 01/23 Call Option ($60 Strike Price) | 7,475 | 6.5466 | 08/17/2022 |
| Sale of 01/23 Call Option ($60 Strike Price) | 3,782 | 8.6177 | 08/17/2022 |
| Sale of 01/23 Call Option ($75 Strike Price) | 444 | 5.6596 | 08/17/2022 |
| Sale of 01/23 Call Option ($80 Strike Price) | 3,826 | 5.3433 | 08/17/2022 |
| Sale of 01/23 Call Option ($80 Strike Price) | 1,174 | 7.0264 | 08/17/2022 |

150. Soon thereafter, at around 4:42 PM, Cohen filed a Form 4 that disclosed the same transactions listed in his amended Schedule 13D.

151. That same day, at around 4:35 PM, *Bloomberg* posted an article entitled "Bed Bath & Beyond Taps Kirkland & Ellis for help Addressing Debt Load," reporting that BBBY hired the

law firm Kirkland & Ellis "to help it address a debt load that's become unmanageable amid a sales slump, according to a person with knowledge of the decision."[47] The article continued: "Kirkland, typically known for its dominance in restructuring and bankruptcy situations, was tapped to advise the retailer on options for raising new money, refinancing existing debt, or both, according to the person, who asked not to be named discussing private company plans."

152. After the market learned about Cohen's sales, Bed Bath's stock price immediately collapsed, sliding by 46% in after-hours trading, and closing at $11.03 on August 19, representing a 40.54% drop from the previous day, with a trading volume of 136.5 million.



BBBY Share Price, August 17 to 18, 2022

153. In the weeks that followed, Bed Bath began to disclose the specifics of the Company's new turnaround strategy. On August 31, 2022, Bed Bath announced a what it called a "strategic

---

[47]    https://www.bloomberg.com/news/articles/2022-08-18/bed-bath-beyond-is-said-to-tap-kirkland-ellis-for-debt-help#xj4y7vzkg

and business update focused on changes intended to meet the demand of its customers, drive growth and profitability, and improve its balance sheet and cash flows," telling investors that it had secured $500 million in financing and that it would close 150 stores, cut jobs, and overhaul its merchandising strategy to turn around the business. To help finance the Company's new debt, Bed Bath announced that it would launch a stock offering of up to 12 million shares. In a press release issued the same day, Bed Bath also disclosed that its Strategy Committee of the Board of Directors, which included two of the directors selected by Cohen, had completed its review of the Buy Buy Baby banner and that the Company had decided against selling or spinning off the baby stores, which had been the centerpiece of Cohen's proposed turnaround strategy for BBBY, stating:

> The Strategy Committee of the Board of Directors, with the assistance of independent strategic and financial advisors, has completed a comprehensive review of the inherent value of the Company's buybuy BABY banner, which confirmed the banner's strategic potential. The Board of Directors believes that, at this time, buybuy BABY will deliver greater value for the Company's shareholders as part of the Bed Bath & Beyond Inc. portfolio. The Board of Directors and management team have identified several strategies to implement impactful, organic changes to accelerate further growth and unlock the brand's full potential including building on its digital and registry platforms, addressing additional age groups and expanding products and services. The Board of Directors' Strategy Committee will continue to monitor the buybuy BABY business as it preserves optionality and future value creation.

154. Bed Bath's stock price fell 21.3% on the new, closing at $9.53 per share, falling another 8.6% the following day to close at $8.71 per share.

155. On September 29, 2022, Bed Bath announced its financial results for its fiscal second quarter, reporting that sales fell 28% to $1.44 billion for the three months ended Aug. 27, compared with $1.99 billion a year earlier. Same-store sales, which excludes newly opened or closed locations, declined 26%, the company's net loss ballooned to $366 million, compared with a loss of $73 million in the same period a year ago, and its gross margin fell several percentage points as it cleared inventory it was unable to sell at full price. According to the Company, it finished the quarter with only $135.3 million of cash, down from $970.6 million a year earlier. Bed Bath's

share price fell 4.02% on the news to $6.02 per share. In an article entitled "Bed Bath & Beyond's Losses Widen as Sales Drop 28%," the *Wall Street Journal* reported that Neil Saunders, managing director of research firm GlobalData PLC, in a note to clients, stated that "[t]here is nothing in these numbers that suggests the company has turned a corner; indeed, they firmly point to a business that is living on borrowed time."[48] Mr. Saunders, the *Wall Street Journal* reported, said that while the recently secured loans protected the retailer from imminent bankruptcy, they also weakened its balance sheet with liabilities now exceeding assets by over $500 million. "This isn't a sustainable position and, if it is to survive, Bed Bath & Beyond will need to make changes at a pace that would be challenging for a healthy company, let alone an ailing one."



BBBY Share Price, July to October 2022

---

[48]https://www.wsj.com/articles/bed-bath-beyonds-losses-widen-as-sales-drop-28-11664452190

## VI.   DEFENDANTS' DECEPTIVE AND MANIPULATIVE ACTS

156.  During the Class Period, Defendant Cohen knowingly engaged in a manipulative scheme to deceive Bed Bath's public investors by knowingly or recklessly engaging in manipulative and deceptive acts for the purpose of artificially inflating the price and trading volume of Bed Bath securities so that Cohen could sell those shares at inflated prices at the expense of Bed Bath's public investors.

157.  Cohen accomplished this by, among other things, (i) circulating or disseminating information to induce transactions in Bed Bath securities; (ii) filing materially misleading reports with the SEC that concealed his plans to liquidate his entire ownership stake in Bed Bath; (iii) secretly instigating and coordinating the promotion of Bed Bath securities by third parties on social-media platforms; (iv) effecting transactions in Bed Bath securities by retail investors; and (v) concealing his liquidation of his entire holdings of Bed Bath securities.

158.  *First,* Cohen circulated or disseminated his August 12 statement on Twitter that included a "moon" emoji in connection with a statement about Bed Bath that Cohen knew, or was reckless in not knowing, would be understood by retail investors who followed his statements closely to represent Cohen's expectation that the price of Bed Bath securities would or was likely to rise because of market operations and the natural interplay of supply and demand. Cohen knew, or was reckless in not knowing, that his August 12 statement would be understood by these retail investors to be informed by his status as one of Bed Bath's largest shareholders, and influence on and involvement with the Company's management and turnaround strategy.

159.  *Second,* Cohen filed reports with the SEC on August 15 and 16 that he knew, or was reckless in not knowing, would be understood by investors to represent that Cohen was maintaining his significant ownership of Bed Bath securities, that Cohen had not formulated or was not likely to formulate an intent or plans to sell those securities, and that Cohen expected that the price

78

of Bed Bath securities would or was likely to rise because of market operations and the natural interplay of supply and demand. Cohen knew, or was reckless in not knowing, that investors had already relied on his previously filed reports of his beneficial ownership of and transactions in Bed Bath securities to guide their investment decisions, and that his August 15 and 16 filings would be understood by investors to confirm their beliefs that the price of Bed Bath securities would or was likely to rise.

160. *Third,* Cohen knew, or was reckless in not knowing, that by circulating or disseminating the information and reports above, he would instigate the circulation or dissemination of his statements, as well as further promotion of Bed Bath's securities, by third parties on social-media platforms such as Twitter and Reddit, which were targeted at retail investors.

161. *Fourth,* Cohen knew, or was reckless in not knowing, that by carrying out the deceptive and manipulative acts above, he would affect substantial transactions in Bed Bath securities by retail investors that would artificially inflate the price and trading volume of those securities, providing the liquidity Cohen needed to secretly sell his entire holdings of Bed Bath securities at a profit at the expense of the Company's public investors.

162. *Fifth,* Cohen concealed his liquidation of his entire holdings of Bed Bath securities by failing to promptly file reports with the SEC that disclosed his plans, proposals, or intent to sell Bed Bath securities, and failed to promptly file reports with the SEC that disclosed his liquidation of his holdings of Bed Bath securities, in violation of Section 13(d) and 16(a) of the Exchange Act.

163. Under Section 13(d) of the Exchange Act, when a person acquires beneficial ownership of more than 5% of a voting class of a company's equity securities, such person (colloquially known as a Section 13(d) filer) or group is required to publicly update—through a Section 13(d) filing with the SEC—his or her ownership interest within ten days. Also, after an investor reaches

the 5% ownership threshold and becomes a Section 13(d) filer, he or she must report additional purchases or sales *promptly* on Schedule 13D or 13D/A so that public shareholders and the SEC are aware of the transactions. Additionally, under Section 13(d) and Rule 13d-101, Section 13(d) filers are required to disclose "any plans or proposals" relating to "the disposition of securities of the issue." 17 C.F.R. § 240.13d-101.

164.  As explained above, Cohen and RC Ventures filed reports on Form 3 and Schedule 13D on August 15 and 16 that failed to disclose Cohen had planned, proposed, or formulated an intent, or was likely to plan, propose, or intend, to sell some or all of his holdings in Bed Bath securities. Then, Cohen and RC Ventures failed to promptly file amendments on Schedule 13D to disclose his transactions in Bed Bath securities. Specifically, on August 16, 2022, Cohen sold 5 million shares of Bed Bath common stock, which constituted 6.25% of the Company's outstanding shares and which reduced Cohen's total beneficial ownership to approximately 5.57%. The next day, on August 17, Cohen sold his remaining holdings of 2.78 million shares of Bed Bath common stock and 16,701 call options. Cohen did not disclose these sales until he filed the August 18, 2022 Schedule 13D/A and Form 4 after the markets had closed.

## VII.   DEFENDANTS' FALSE AND MISEADING STATEMENTS

165.  During the Class Period and as described below, Defendants made materially false and misleading statements and omissions in violation of Sections 10(b), 18(a), 20(a) of the Exchange Act and Rule 10b-5(b).

### A.  Cohen's and RC Ventures' false and misleading statements

166.  *First,* Cohen made materially misleading statements on Twitter that misrepresented and concealed material facts concerning Cohen's beliefs about the expected performance of Bed Bath securities and Cohen's coordinated effort to aggressively liquidate his holdings of Bed Bath securities at the expense of the Company's public investors. Specifically, Cohen posted an August 12

tweet concerning Bed Bath in response to a news article reporting an analyst's conclusion that the Company's stock price was worth as little as $1 per share. In the tweet, Cohen included an emoji resembling a "moon" that Cohen knew, or was reckless in not knowing, would be understood by the retail investors who followed his statements on Twitter, Reddit, and other social-media platforms to mean that Cohen believed that the price of Bed Bath's securities was likely to go "to the moon." Cohen knew, or was reckless in not knowing, that investors would understand his belief to be informed based on his involvement and influence in Bed Bath's turnaround strategy and plans.

167. *Second,* on August 15, 2022, Cohen and RC Ventures filed a Form 3 disclosing that together, they collectively beneficially owned more than 10% of BBBY's outstanding shares of common stock and thus qualified as an insider under Section 16(a). Cohen's Form 3 listed April 21, 2022, the day the 2022 10-K was filed, as the "date of event requiring statement," and identified as his holdings the same 9,450,100 shares that he beneficially owned as of March 7, 2022, consisting of 7,780,000 shares of common stock and 1,670,100 shares underlying call options. This filing was false or misleading because it omitted to disclose Ryan's having an intent or plan to sell some or all of his Bed Bath securities.

168. *Third,* on August 16, 2022, Cohen filed a second amendment to his Schedule 13D. Like his Form 3, the amended Schedule 13D did not disclose any new transactions. Instead, Cohen stated that the amendment "was triggered solely due to a change in the number of outstanding Shares of the Issuer." This was false and misleading because the amendment was not triggered "solely" due to a change in the number of outstanding shares. The amended Schedule 13D also stated that "[t]here have been no transactions in securities of the Issuer by the Reporting Persons during the past sixty days nor since the filing of Amendment No. 1 to the Schedule 13D." This

was false and misleading because it failed to disclose that Cohen had sold, had planned, proposed, or formulated an intent to sell, or was likely to plan, propose, or formulate an intent to sell all or some of Cohen's holdings of Bed Bath securities, and had taken steps to liquidate his holdings of Bed Bath securities.

169. *Fourth,* on August 16 and 17, 2022, after he had engaged in transactions to sell all or some of his holdings of Bed Bath securities, Cohen failed to promptly disclose those transactions in an amendment to his Schedule 13D or in a Form 4 in violation of Sections 13(d) and 16(a) of the Exchange Act.

170. *Fifth,* on August 16, 2022, Cohen and RC Ventures filed a Form 144 that disclosed his intent to sell his entire holdings of Bed Bath securities. Under Rule 144(h), Cohen was required to transmit the Form 144 concurrently with either the placing with a broker of an order to execute a sale of securities in reliance upon Rule 144 or the execution directly with a market maker of such a sale. In addition, Rule 144 required Cohen to disclose all securities that he had sold during the previous three months. Cohen did not transmit his Form 144 until after he had placed with a broker an order to execute a sale of Bed Bath securities in reliance upon Rule 144 or had executed directly with a market maker of such a sale in violation of Rule 144. Cohen also failed to disclose the securities that he had already sold on August 16 at the time he transmitted the Form 144 for filing.

## B.  Bed Bath's false and misleading statements

171. On August 17, Bed Bath released statements to the media in response to multiple media inquiries about the Form 144 transmitted by Cohen and RC Ventures, which was released publicly at approximately 3:45 PM that day. The statement, which Bed Bath also included in a Form 8-K filed on August 18, read as follows:

> We were pleased to have reached a constructive agreement with RC Ventures in March and are committed to maximizing value for all shareholders. We are continuing to execute on our priorities to enhance liquidity, make strategic changes and improve operations to win back

customers, and drive cost efficiencies; all to restore our company to its heritage as the best destination for the home, for all stakeholders. Specifically, we have been working expeditiously over the past several weeks with external financial advisors and lenders on strengthening our balance sheet, and the Company will provide more information in an update at the end of this month.

172. This statement was false and misleading because it omitted to disclose that Cohen and RC Ventures had liquidated, had begun to liquidate, or intended to liquidate the entirety of their holdings of Bed Bath securities.

## VIII.  ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

173. The facts discussed above show that Cohen knew, or was reckless in not knowing, that the public documents and statements which he caused to be issued, circulated, or disseminated were materially false or misleading.

174. In addition, Defendant Cohen's sales of Bed Bath securities at artificially inflated prices earned him approximately $58 million in illicit profits. Cohen's Class Period sales were highly unusual and unprecedented in terms of their timing, size, and frequency when compared to his pre-Class Period selling history. A review of Form 4s filed with the SEC prior to the start of the Class Period reveals that these sales were highly irregular compared to Cohen's sales prior to the Class Period. Before the Class Period, Cohen never made any sales of Bed Bath securities.

175. Thus, Cohen had a powerful personal motive to inflate Bed Bath's stock price and maintain those inflated prices so that he could gain over $58 million in profit from his sales of Bed Bath securities. These sales came at a time when BBBY stock price was artificially inflated by Cohen's manipulation and materially misleading filings on Form 3 and Schedule 13D.

176. During the Class Period, Bed Bath's CFO Gustavo Arnal also sold 54,913 shares of Bed Bath common stock while in possession of material nonpublic information concerning Bed Bath's operations, finances, financial condition, and turnaround strategy. Arnal's stock sales earned him more than $1.28 million in proceeds, as summarized in the following chart:

| Transaction Date | Amount | Price | Proceeds |
|---|---|---|---|
| 8/16/2022 | 10,000 | $24.95 | $249,500.00 |
| 8/16/2022 | 10,000 | $27.45 | $274,500.00 |
| 8/16/2022 | 7,500 | $20 | $150,000.00 |
| 8/16/2022 | 7,400 | $22.45 | $166,130.00 |
| 8/16/2022 | 7,513 | $24.95 | $187,449.35 |
| 8/16/2022 | 12,500 | $20.95 | $261,875.00 |
| | | Total: | $1,289,454.35 |

## IX.   LOSS CAUSATION AND ECONOMIC LOSS

177. As detailed above, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and maintained the price of Bed Bath securities and operated as a fraud on investors in Bed Bath securities during the Class Period. This scheme was accomplished both by: (1) manipulating the market for Bed Bath securities; and (2) failing to disclose and misrepresenting Defendants Cohen's and RC Ventures' holdings and transactions in Bed Bath securities

178. Defendants' scheme caused Bed Bath securities to artificially inflate in price from $11.04 to a high of $30 per share and forced investors who held short positions before the Class Period to purchase Bed Bath securities at these artificially inflated prices in order to "cover" their short positions when they otherwise would not have, causing real economic loss. Any investor that purchased during this period suffered significant damages as a result of having to purchase shares whose price was artificially inflated by the short squeeze created by Defendants' market manipulation.

179. Defendants' false and misleading statements and omissions regarding Cohen's and RC Venture's holdings and transactions in Bed Bath securities also artificially inflated the price of Bed Bath securities. As the truth was disclosed through a series of partial corrective disclosures,

the price of Bed Bath securities declined significantly, causing real economic loss to those who purchased such securities during the Class Period at artificially inflated prices.

180. Additionally, when Cohen's market manipulation scheme ended, the price of Bed Bath securities declined significantly as the prior artificial inflation came out of the price of those securities, causing real economic loss to those who transacted Bed Bath securities during the Class Period at artificially inflated prices.

181. As a direct result of their purchases of Bed Bath securities during the Class Period, Plaintiff and the other Class members suffered economic loss and damages under the federal securities laws. Plaintiff and the Class would not have purchased at the prices they paid, or at all, but for Defendants' manipulative conduct and the resulting artificial inflation in the price of Bed Bath securities. The economic loss and damages suffered by Plaintiff and the other Class members resulted from Defendants' fraudulent scheme to manipulate the market and to artificially inflate and maintain the price of Bed Bath securities causing a subsequent decline in the value of the securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE

### A.  Rule 10b-5(a) and (c) Claims

182. To the extent the element of reliance must be established for Plaintiff's Rule 10b-5(a) and (c) market manipulation claims, Plaintiff is entitled to a presumption of reliance.

183. Plaintiff's market manipulation claims are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972) ("*Affiliated Ute*"), because Plaintiff's market manipulation claims exclusively involve omissions to the market.

184. Plaintiff's market manipulation claims are also entitled to a presumption of reliance under the fraud-on-the-market doctrine under *Basic v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") because,

during the Class Period, the market for Bed Bath securities was an efficient market for these reasons, among others:

a) Bed Bath's common stock is actively traded on the NASDAQ, a highly efficient, electronic stock market;

b) As a regulated issuer, Bed Bath filed periodic public reports with the SEC;

c) Bed Bath's common stock traded at high weekly trading volumes;

d) Bed Bath was eligible to file registration statements with the SEC on Form S-3;

e) The market reacted promptly to public information disseminated by Bed Bath;

f) Bed Bath regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

g) Bed Bath was regularly covered throughout the Class Period by financial analysts, and each of these reports was publicly available and entered the public marketplace;

h) Bed Bath was regularly covered throughout the Class Period by the financial news;

i) The material misrepresentations and omitted material facts alleged would tend to induce a reasonable investor to misjudge the value of Bed Bath securities; and

j) Without knowledge of the misrepresented or omitted material facts alleged, Plaintiff and other members of the Class transacted Bed Bath securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

k) Accordingly, Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Bed Bath securities and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## B. Rule 10b-5(b) Claim

185. Plaintiff's Rule 10b-5(b) claims are entitled to a presumption of reliance under *Affiliated Ute,* since those claims are similarly based on material omissions of fact that Defendants had a duty to disclose.

186. These claims are also entitled to a presumption of reliance under the fraud-on- the-market doctrine under *Basic* because, during the Class Period, the market for BBBY common stock was an efficient market for these reasons, among others:

a) Bed Bath's common stock is actively traded on the NASDAQ, a highly efficient, electronic stock market;

b) As a regulated issuer, Bed Bath filed periodic public reports with the SEC;

c) Bed Bath's common stock traded at high weekly trading volumes;

d) Bed Bath was eligible to file registration statements with the SEC on Form S-3;

e) The market reacted promptly to public information disseminated by Bed Bath;

f) Bed Bath regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

g) Bed Bath was regularly covered throughout the Class Period by financial analysts, and each of these reports was publicly available and entered the public marketplace;

h) Bed Bath was regularly covered throughout the Class Period by the financial news;

i) The material misrepresentations and omitted material facts alleged would tend to induce a reasonable investor to misjudge the value of Bed Bath securities; and

j) Without knowledge of the misrepresented or omitted material facts alleged, Plaintiff and other members of the Class transacted Bed Bath securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

k) Accordingly, Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Bed Bath securities and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

187. Accordingly, Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Bed Bath securities, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## XI.   CLASS ACTION ALLEGATIONS

188. Plaintiff brings this class action under Federal Rules of Civil Procedure 23(a) and 23(b) on its own behalf and on behalf of:

All persons and entities who purchased or otherwise acquired Bed Bath & Beyond's common stock (including those who bought to cover a short position) or Bed Bath & Beyond call options, or sold Bed Bath & Beyond put options from August 12, 2022 through August 18, 2022, inclusive, and who were damaged thereby.

189. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Plaintiff at this time and can be found out only through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Bed Bath or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

190. Plaintiff's claims are typical of the claims of the Class in that all members of the Class were damaged by the same wrongful conduct of Defendants as alleged, and the relief sought is common to the Class.

191. Numerous questions of law or fact arise from Defendants' conduct common to the Class, including but not limited to:

    a) whether the federal securities laws were violated by Defendants' acts during the Class Period, as alleged;

    b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Bed Bath;

    c) whether the price of Bed Bath securities was artificially inflated and maintained during the Class Period;

    d) whether Defendants manipulated the price of Bed Bath securities during the Class Period; and

    e) to what extent the members of the Class have sustained damages and the proper measure of damages.

192. These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual members of the Class.

193. Plaintiff will fairly and adequately represent the interests of the Class in that it has no conflict with any other members of the Class. Plaintiff has retained also competent counsel experienced in class action and other complex litigation.

194. This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

195. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XII.   NO SAFE HARBOR

196. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged. Many of the statements herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## XIII.   CLAIMS FOR RELIEF

### Count I: Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)
### (Against Defendants Ryan Cohen and RC Ventures)

197. Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

198. During the Class Period, Defendants Cohen and RC Ventures carried out a plan, scheme, and course of conduct which was intended to and did (i) deceive the investing public, including Plaintiff and other members of the Class; (ii) artificially inflate the price and trading volume of

Bed Bath's securities; and (iii) cause Plaintiff and other members of the Class to purchase Bed Bath securities at artificially inflated prices.

199. Cohen and RC Ventures, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information as specified.

200. Cohen's and RC Ventures' liability arises from the fact that they developed and engaged in a scheme to manipulate the price of Bed Bath securities, and were privy to, participated in, and were otherwise aware of the dissemination of information to the investing public, which they knew or recklessly disregarded was materially false and misleading.

201. Cohen and RC Ventures had actual knowledge of the misrepresentations, omissions, and deceptive conduct alleged, or acted with reckless disregard for the truth. Cohen's and RC Ventures' acts were done for the purpose and effect of concealing the scheme alleged herein from the investing public, and manipulating the price of Bed Bath securities.

202. As a direct and proximate result of the Cohen's and RC Ventures' wrongful conduct, Plaintiff and the Class have suffered damages from Cohen's and RC Ventures' manipulative acts in that, in reliance on an assumption of an efficient market free of manipulation, they purchased Bed Bath securities. Plaintiff and the Class would not have purchased Bed Bath securities at the prices they paid, or at all, if they had been aware of the Cohen's and RC Ventures' manipulative conduct which artificially affected the prices of Bed Bath securities.

### Count II: Section 10(b) of the Exchange Act and Rule 10b-5(b)
### (Against Ryan Cohen, RC Ventures, and BBBY)

203. Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

204. During the Class Period, Defendants Cohen, RC Ventures, and Bed Bath made, had authority over, or controlled the materially false and misleading statements specified above, which

they knew or recklessly disregarded were misleading, in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

205. Cohen, RC Ventures, and Bed Bath made untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading

206. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Bed Bath securities. Plaintiff and the Class would not have purchased Bed Bath securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants Cohen's, RC Ventures', and Bed Bath's misleading statements.

### Count III: Section 9(a)(2) of the Exchange Act
### (Against Defendants Ryan Cohen and RC Ventures)

207. Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

208. Defendants Cohen and RC Ventures, directly or indirectly, alone or with one or more other persons, effected a series of transactions in Bed Bath securities, creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others,

209. As a direct and proximate result of the Cohen's and RC Ventures' wrongful conduct, Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Bed Bath securities. Plaintiff and the Class would not have purchased Bed Bath securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants Cohen's and RC Ventures' conduct.

## Count IV: Section 9(a)(3) of the Exchange Act
### (Against Defendants Ryan Cohen and RC Ventures)

210. Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

211. Defendants Cohen and RC Ventures, directly or indirectly, alone or with one or more other persons, to induce the purchase or sale of Bed Bath securities registered on a national securities exchange, circulated or disseminated information to the effect that the price of Bed Bath securities would or was likely to rise because of market operations for the purpose of raising or depressing the price of such securities

212. As a direct and proximate result of the RC Ventures' and Cohen's wrongful conduct, Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Bed Bath securities. Plaintiff and the Class would transacted Bed Bath securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by RC Ventures' and Cohen's conduct.

## Count V: Section 9(a)(4) of the Exchange Act
### (Against Defendants Ryan Cohen and RC Ventures)

213. Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

214. During the Class Period, Defendants Cohen and RC Ventures made, had authority over or controlled the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

215. Defendants Cohen and RC Ventures made untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading

216. As a direct and proximate result of the Cohen's and RC Ventures' wrongful conduct, Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market,

they paid artificially inflated prices for Bed Bath securities. Plaintiff and the Class would not have purchased Bed Bath securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants Cohen's and RC Ventures' misleading statements.

**Count VI: Section 9(f) of the Exchange Act**
**(Against All Defendants)**

217.  Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

218.  During the Class Period, all Defendants willfully participated in the Defendants Cohen's and RC Ventures' violations of Section 9(a)(2), 9(a)(3), and 9(a)(4) of the Exchange Act.

219.  All Defendants willfully participated in the Defendants Cohen's and RC Ventures' acts that effected a series of transactions in Bed Bath securities, creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others, and Defendants Cohen's and RC Ventures' making of, or control over, untrue statements of material fact and omissions to state material facts necessary to make the statements not misleading.

220.  As a direct and proximate result of Defendants' willful participation in the foregoing wrongful conduct, Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Bed Bath securities. Plaintiff and the Class would not have purchased Bed Bath securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' conduct and misleading statements.

**Count VII: Section 18(a) of the Exchange Act**
**(Against Defendants Cohen and RC Ventures)**

221.  Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

222. As alleged above, Defendants Ryan Cohen and RC Ventures filed or caused to be filed with the SEC documents regarding that contained misrepresented material facts and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

223. Prior to purchasing Bed Bath securities, Plaintiff and members of the Class read and relied upon RC Ventures and Cohen's Schedule 13D, Form 3, and Form 144, including amended versions of the same. Plaintiff's actual "eyeball" reliance on such documents specifically includes statements concerning Cohen's holdings and transactions of Bed Bath securities.

224. Plaintiff's and class members' reliance was reasonable. Plaintiff and members of the class read and relied upon these documents not knowing they contained materially false statements and omissions. Had Plaintiff and members of the Class known the true facts, they would not have purchased Bed Bath securities or would not have purchased it at the inflated price they paid. At the time of their purchases and acquisitions of Bed Bath securities, Plaintiffs were not aware of the untrue statements and/or omissions alleged herein and could not have reasonably discovered such untruths or omissions.

225. Defendant Cohen's and RC Ventures' materially false or misleading statements artificially inflated the prices of Bed Bath securities. When the truth began to emerge about the false and misleading statements and omissions, the price of Bed Bath securities declined significantly, and Plaintiff and members of the Class were damaged.

226. Plaintiff and members of the Class have brought this claim within one year of discovery of the violations alleged here, and within three years of the accrual of this cause of action.

### Count VIII: Section 20A of the Exchange Act
### (Against Defendants Cohen and RC Ventures)

227. Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

228. As detailed herein, Defendants Cohen and RC Ventures were in possession of material, non-public information concerning Bed Bath. Cohen and RC Ventures took advantage of their possession of material, non-public information regarding Bed Bath to obtain millions of dollars in insider trading profits during the Class Period.

229. Cohen and RC Ventures' sales of Bed Bath securities were made contemporaneously with Plaintiffs' purchases of Bed Bath securities during the Class Period, as reflected in the following chart:

| Cohen & RC Ventures Stock Transactions | | | Contemporaneous Purchases | | |
|---|---|---|---|---|---|
| Date | Shares Sold | Total Proceeds | Purchaser | Shares Purchased | Price |
| 8/16/22 | 500,000 | $105,845,233.23 | Pengcheng Si | 1,860 | $26.30 |
| 8/17/22 | 278,000 | $72,176,181.19 | Pengcheng Si | 6,160 | $23.93 - 26.18 |

230. Plaintiff and all other members of the Class who purchased Bed Bath securities contemporaneously with Defendants Cohen and RC Ventures have suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§ 10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the securities at the prices it paid, or at all, if it had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

## Count IX: Section 20(a) of the Exchange Act
### (Against Defendant Ryan Cohen)

231. Plaintiff repeats and re-allege the above paragraphs as though fully set forth herein.

232. Cohen acted as a controlling person of RC Ventures within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of his position as Manager of RC Ventures and his culpable participation, as alleged above, Cohen had the power and authority to cause RC Ventures to engage in the wrongful conduct complained of herein.

233. By reason of such conduct, Cohen is liable pursuant to Section 20(a) of the Exchange Act.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment as follows:

a)   Determining that this action may proceed as a class action, with Plaintiff as the designated Class representative and Plaintiff's counsel designated as Class Counsel;

b)   Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged;

c)   Awarding Plaintiff and the Class damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment and postjudgment interest;

d)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, reasonable attorney's fees and costs and fees and costs incurred by consulting and testifying expert witnesses;

e)   Granting Plaintiff permission to replead should the Court deem this pleading in any way insufficient; and

f)   Granting such other and further relief as the Court deems just and proper.

## XV.   JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Amended Complaint so triable.

Date: November 2, 2022                    Respectfully submitted,

                                          */s/ Steven J. Toll*

                                          COHEN MILSTEIN SELLERS & TOLL
                                          PLLC
                                          Steven J. Toll
                                          Julie G. Reiser
                                          Jan E. Messerschmidt
                                          1100 New York Avenue, N.W., Fifth Floor
                                          Washington, D.C. 20005
                                          Tel.: (202) 408-4600
                                          Fax: (202) 408-4699
                                          stoll@cohenmilstein.com
                                          jreiser@cohenmilstein.com
                                          jmesserschmidt@cohenmilstein.com

                                          *Counsel for Plaintiff and Proposed Lead Counsel
                                          for the Class*