**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

IN RE BED BATH & BEYOND
CORPORATION SECURITIES
LITIGATION

Case No. 1:22-cv-02541-TNM

<u>ORAL ARGUMENT REQUESTED</u>

**DEFENDANTS RC VENTURES LLC AND RYAN COHEN'S
<u>MOTION TO DISMISS THE SECOND AMENDED COMPLAINT</u>**

Pursuant to Federal Rules of Civil Procedure Rules 12(b)(6), 9(b), and the Private Securities Litigation Reform Act, Defendants RC Ventures LLC and Ryan Cohen, by their undersigned counsel, hereby respectfully move this Court to dismiss Lead Plaintiff Bratya SPRL's Second Amended Complaint. *See* ECF No. 66 (the "***Complaint***").

Dismissal is warranted  because the Complaint fails to state a claim upon which relief can be granted.

The grounds for this Motion are set forth in the Memorandum of Points and Authorities filed concurrently herewith.

Dated:  March 15, 2023

Respectfully submitted,

VINSON & ELKINS LLP

*/s/ Clifford Thau*

Ephraim (Fry) Wernick
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Telephone: (202) 639-6730
Facsimile: (202) 879-8830
Email: ewernick@velaw.com

Clifford Thau
Marisa Antonelli
1114 Avenue of Americas
New York, NY 10036
Telephone: (212) 237-0000
Facsimile: (212) 237-0100
Email: cthau@velaw.com
Email: mantonelli@velaw.com

Justin C. Beck
2001 Ross Avenue
Dallas, Texas 75201
Telephone: (214) 220-7700
Facsimile: (214) 220-7716
Email: jbeck@velaw.com

*Attorneys for RC Ventures LLC and Ryan Cohen*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN RE BED BATH & BEYOND
CORPORATION SECURITIES
LITIGATION

Case No. 1:22-cv-02541-TNM

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF RC VENTURES LLC AND RYAN COHEN'S MOTION TO DISMISS**

VINSON & ELKINS LLP

Ephraim (Fry) Wernick
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Telephone: (202) 639-6730
Facsimile: (202) 879-8830
Email: ewernick@velaw.com

Clifford Thau*
Marisa Antonelli*
1114 Avenue of Americas
New York, NY 10036
Telephone: (212) 237-0000
Facsimile: (212) 237-0100
Email: cthau@velaw.com
Email: mantonelli@velaw.com

Justin C. Beck*
2001 Ross Avenue
Dallas, Texas 75201
Telephone: (214) 220-7700
Facsimile: (214) 220-7716
Email: jbeck@velaw.com

*Attorneys for RC Ventures LLC and  Ryan Cohen*

* Admitted *Pro hac vice*.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................................... iii

I.    INTRODUCTION ........................................................................................ 1

II.    BACKGROUND ......................................................................................... 4

    A.    The Parties ...................................................................................... 4

    B.    The Cohen Defendants Invest in BBBY and Enter into the Cooperation Agreement .................................................................................... 4

    C.    The Company's Financial Condition Publicly Deteriorates. ................................. 6

    D.    RCV's Stake in BBBY Increases Without Any Additional Purchases .................. 7

    E.    BBBY Stock Sees an August 2022 Surge, Ryan Cohen Tweets a Moon Emoji, and RCV Files Required Forms. .............................................. 8

    F.    BBBY's Stock Price Continues to Surge and RCV Sells its BBBY Holdings ...................................................................................... 10

    G.    BBBY Stock Price Declines Again ...................................................... 12

    H.    Plaintiff Files Suit. ........................................................................ 12

III.    SEC FILING REQUIREMENTS ...................................................................... 12

    A.    Schedule 13D ................................................................................ 12

    B.    Form 144 ...................................................................................... 13

IV.    LEGAL STANDARDS ................................................................................. 14

    A.    Rule 12(b)(6) ................................................................................. 14

    B.    Rule 9(b) ...................................................................................... 15

    C.    The Private Securities Litigation Reform Act ...................................... 15

V.    ARGUMENT ............................................................................................ 15

    A.    Plaintiff's Section 10(b) Claims ......................................................... 16

        1.    The Complaint Does Not Adequately Plead a Section 10(b) and Rule 10b-5(b) Claim for False or Misleading Statements ................................... 16

            a.    Plaintiff Does Not Allege a Material Misrepresentation or Omission. ............................................................................ 16

                (i)    The August 12th Tweet Is Neither False Nor Misleading. ............................................................ 16

                (ii)    The August 16th 13D/A Is Not Actionable Under Section 10(b), Let Alone Materially Misleading. ............................... 19

                (iii)    The Form 144 Was Not False or Misleading. .......................... 21

            b.    The Complaint Fails to Plead a "Strong Inference" of Scienter. ........ 23

i

          c.     Plaintiff Cannot Demonstrate Reliance. .............................................. 26

          d.     The Complaint's Loss Causation Allegations Are Implausible.......... 28

    2.     The Complaint Fails to State a Market Manipulation Claim Against the Cohen Defendants Under Section 10(b) and Rules 10b-5(a) and (c). ..................................................................................................... 33

    3.     The Complaint Does Not Plead Insider Trading Under Section 10(b)........ 35

B.    Plaintiff's Section 9(a) Claims................................................................................ 36

    1.     The Complaint Alleges No "Series of Transactions" for a Section 9(a)(2) Claim....................................................................................... 37

    2.     Plaintiff Alleges No Actionable "Prophecy" Under Section 9(a)(3). .......... 38

    3.     The Section 9(a)(4) Claim Is a Recast 10(b) Claim and Fails for the Same Reasons. ...................................................................................... 39

C.    The Complaint's Section 20A Claim Is Not Viable. ............................................ 40

D.    The Complaint Does Not State a Section 20(a) Claim Against Mr. Cohen. ........ 40

VI.    CONCLUSION..................................................................................................................... 41

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972)..................................................................................... 26, 27

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................... 14

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ............................................................................. 33, 34

*Azurite Corp. v. Amster & Co.*,
    52 F.3d 15 (2d Cir. 1995) .............................................................................. 13, 20

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)........................................................................................... 23

*Catton v. Def. Tech. Sys., Inc.*,
    No. 05 Civ. 6954, 2006 WL 27470 (S.D.N.Y. Jan. 3, 2006)................................... 34

*Chemetron Corp. v. Bus. Funds, Inc.*,
    682 F.2d 1149 (5th Cir. 1982) ............................................................................. 37

*Chill v. Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996) ............................................................................... 23

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
    928 F. Supp. 2d 705 (S.D.N.Y. 2013) ................................................................. 31

*Doe v. Roman Cath. Diocese of Greensburg*,
    581 F. Supp. 3d 176 (D.D.C. 2022)..................................................................... 30

*Doherty v. Turner Broad. Sys., Inc.*,
    No. 20 Civ. 134, 2020 WL 12118918 (D.D.C. June 22, 2020) ............................... 14

*ECD Inv. Grp. v. Credit Suisse Int'l*,
    No. 14 Civ. 8486, 2017 WL 3841872 (S.D.N.Y. Sept. 1, 2017)....................... 36, 37

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)........................................................................................... 25

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)........................................................................................... 33

*Feldman v. Simkins Indus., Inc.*,
    679 F.2d 1299 (9th Cir. 1982) ............................................................................. 12

*Friel v. Dapper Labs, Inc.*,
    No. 21 CIV. 5837 (VM), 2023 WL 2162747 (S.D.N.Y. Feb. 22, 2023)............................ 17, 18

*Grigsby v. BofI Holding, Inc.*,
    979 F.3d 1198 (9th Cir. 2020) ....................................................................... 23, 32

iii

*Gruber v. Gilbertson*,
  No. 16 Civ. 9727, 2019 WL 4458956 (S.D.N.Y. Sept. 17, 2019) .......................................... 39

*\*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ............................................................................................... 2, 16, 17

*\*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
  286 F.3d 613 (2d Cir. 2002) ............................................................................................... 19

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
  422 F. Supp. 3d 821 (S.D.N.Y. 2019) ............................................................................... 18

*Hemp Indus. Ass'n v. Drug Enf't Admin.*,
  36 F.4th 278 (D.C. Cir. 2022) ........................................................................................... 14

*Howard v. Liquidity Servs. Inc.*,
  322 F.R.D. 103 (D.D.C. 2017) ........................................................................................... 27

*I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC*,
  280 F. Supp. 3d 524 (S.D.N.Y. 2017) ............................................................................... 36

*In re CRM Holdings, Ltd. Sec. Litig.*,
  No. 10 Civ. 975, 2012 WL 1646888 (S.D.N.Y. May 10, 2012) .......................................... 23

*\*In re Harman Int'l Indus., Inc. Sec. Litig.*,
  791 F.3d 90 (D.C. Cir. 2015) ....................................................................................... 17, 40

*\*In re Interbank Funding Corp. Sec. Litig.*,
  629 F.3d 213 (D.C. Cir. 2010) ........................................................................................... 27

*In re Jan. 2021 Short Squeeze Trading Litig.*,
  No. 21-2989-MDL, 2022 WL 3682083 (S.D. Fla. Aug. 11, 2022) ...................................... 36

*In re Openwave Sys. Sec. Litig.*,
  528 F. Supp. 2d 236 (S.D.N.Y. 2007) ............................................................................... 39

*In re Philip Morris Int'l Inc. Sec. Litig.*,
  437 F. Supp. 3d 329 (S.D.N.Y. 2020) ............................................................................... 18

*\*In re Synchrony Fin. Sec. Litig.*,
  988 F.3d 157 (2d Cir. 2021) ............................................................................................... 17

*In re U.S. Off. Prod. Sec. Litig.*,
  326 F. Supp. 2d 68 (D.D.C. 2004) ..................................................................................... 25

*\*In re XM Satellite Radio Holdings Sec. Litig.*,
  479 F. Supp. 2d 165 (D.D.C. 2007) ..................................................................................... 4

*Kessev Tov, LLC v. Doe(s)*,
  No. 20 Civ. 4947, 2022 WL 2356626 (N.D. Ill. June 30, 2022) ........................................ 33

*Koch v. SEC*,
  793 F.3d 147 (D.C. Cir. 2015) ........................................................................................... 33

*Kraft v. Third Coast Midstream*,
  No. 19 Civ. 9398, 2021 WL 860987 (S.D.N.Y. Mar. 8, 2021) ............................................ 13

iv

*L. Xia v. Tillerson*,
  865 F.3d 643 (D.C. Cir. 2017) ....................................................................... 4

*\*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) .................................................................. 30, 34

*Liberty Nat. Ins. Holding Co. v. Charter Co.*,
  734 F.2d 545 (11th Cir. 1984) .................................................................... 19

*Liberty Prop. Tr. v. Republic Properties Corp.*,
  577 F.3d 335 (D.C. Cir. 2009) ................................................................... 22

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) ................................................................. 32

*Motient Corp. v. Dondero*,
  529 F.3d 532 (5th Cir. 2008) ..................................................................... 19

*Noto v. 22nd Century Grp., Inc.*,
  35 F.4th 95 (2d Cir. 2022) ................................................................... 33, 34

*Onel v. Top Ships, Inc.*,
  806 F. App'x 64 (2d Cir. 2020) .................................................................. 37

*Plymouth County Ret. Assn. v. Advisory Bd. Co.*,
  370 F. Supp. 3d 60 (D.D.C. 2019) ................................................... 15, 16, 40

*Raab v. General Physics Corp.*,
  4 F.3d 286 (4th Cir. 1993) ........................................................................ 18

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ...................................................................... 25

*Salvani v. ADVFN PLC*,
  50 F. Supp. 3d 459 (S.D.N.Y. 2014) .......................................................... 39

*Schwab v. E\*Trade Fin. Corp.*,
  285 F. Supp. 3d 745 (S.D.N.Y.), *aff'd*, 752 F. App'x 56 (2d Cir. 2018)............... 26

*SEC v. e-Smart Techs.*, Inc.,
  31 F. Supp. 3d 69 (D.D.C. 2014) ............................................................... 22

*\*SEC v. Familant*,
  910 F. Supp. 2d 83 (D.D.C. 2012) ............................................................. 34

*SEC v. Rio Tinto plc*,
  41 F.4th 47 (2d Cir. 2022) ......................................................................... 33

*SEC v. RPM Int'l, Inc.*,
  282 F. Supp. 3d 1 (D.D.C. 2017) ................................................................. 4

*SEC v. Teo*,
  746 F.3d 90 (3d Cir. 2014) ........................................................................ 13

*Set Cap. LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021) ........................................................................ 33

*Shenk v. Mallinckrodt plc*,
No. 17 Civ. 145, 2019 WL 3491485 (D.D.C. July 30, 2019) ...................................... 15, 22, 28

*Singletary v. Howard Univ.*,
939 F.3d 287 (D.C. Cir. 2019) ....................................................................................... 4

*Steginsky v. Xcelera Inc.*,
741 F.3d 365 (2d Cir. 2014) ........................................................................................ 36

*\*Stone Fam. Tr. v. Credit Suisse AG*,
2022 WL 954743 (S.D.N.Y. Mar. 30, 2022) ............................................................... 38

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
552 U.S. 148 (2008) ............................................................................................... 25, 26

*\*Strougo v. Barclays pls*,
312 F.R.D. 307 (S.D.N.Y. 2016) ................................................................................. 23

*\*Takata v. Riot Blockchain, Inc.*,
No. 18 Civ. 2293, 2022 WL 1058389 (D.N.J. Apr. 8, 2022) ..................................... 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ............................................................................................... 15, 22

*United States ex rel. Shea v. Cellco P'ship*,
863 F.3d 923 (D.C. Cir. 2017) .................................................................................... 14

*United States v. O'Hagan*,
521 U.S. 642 (1997) .................................................................................................... 35

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017) .......................................................................................... 26

*Y-GAR Cap. LLC v. Credit Suisse Grp. AG*,
No. 19 Civ. 2827 (AT), 2020 WL 71163 (S.D.N.Y. Jan. 2, 2020) ............................ 39

**Statutes**

15 U.S.C. § 78a .................................................................................................... 1, 3, 15, 35

15 U.S.C. § 78i ................................................................................................... 36, 37, 38

15 U.S.C. § 78m(d) ..................................................................................................... 12

15 U.S.C. § 78t(a) ....................................................................................................... 40

15 U.S.C. § 78u–4(b) ..................................................................................... 15, 22, 35

**Rules**

Fed. R. Civ. P. 9(b) ............................................................................................... 1, 14

SEC, Div. Corp. Fin., Compliance and Disclosure Interpretations, Securities Act Rules, Q.
136.09 (March 4, 2011) ............................................................................................... 13

**Regulations**

17 C.F.R. § 230.144(h) ......................................................................................... 13, 21

17 C.F.R. § 232.101 ................................................................................................ 13, 21

17 C.F.R. § 240.13d-101 ................................................................................................ 12

17 C.F.R. § 240.13d-2 .......................................................................................... 9, 12, 20

17 C.F.R. § 240.16a-2 ...................................................................................................... 9

17 C.F.R. § 240.17f-1(a)(5) ........................................................................................... 36

87 Fed. Reg. 35,393, 35,400 (June 10, 2022) ............................................................... 13

87 Fed. Reg. 61,977 (Oct. 13, 2022) ............................................................................. 14

**Other Authorities**

2 West's Fed. Admin. Prac. § 2312 ................................................................................ 38

Eric Goldman, *Emojis and the Law*,
   93 Wash. L. Rev. 1227 (2018) ................................................................................... 17

*In the Matter of Cooper Lab'ys, Inc.*, Release No. 22171 (June 26, 1985) .................. 12

Defendants RC Ventures LLC ("***RCV***") and Ryan Cohen (collectively, the "***Cohen Defendants***") submit this memorandum of points and authorities in support of their motion to dismiss the second amended complaint filed by lead plaintiff Bratya SPRL ("***Plaintiff***").  *See* ECF No. 66 (the "***Complaint***" or "***Compl.***").

## I.    INTRODUCTION

Plaintiff's Complaint, despite nearly 300 paragraphs of innuendo, hyperbole, and surplusage, rests almost entirely on the implausible theory that the Cohen Defendants committed securities fraud by (1) commenting on a negative article about Bed Bath & Beyond, Inc. ("***BBBY***" or the "***Company***")[1] with a moon emoji, and (2) making a required filing with the U.S. Securities and Exchange Commission ("***SEC***") reporting their (unchanged) holdings of BBBY shares. Plaintiff contends that the Cohen Defendants intended these actions as signals to investors that BBBY's stock price would increase, and that despite widely available information from BBBY's public filings, news articles, and market analysts that BBBY was suffering increasingly poor financial results, a putative class of shareholders purchased BBBY shares as a result of the Cohen Defendants' actions.  These implausible allegations do not come close to satisfying the stringent standards required to plead securities fraud under Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("***PSLRA***").

Plaintiff fails as an initial matter to plead the foundational element of its claims under Section 10(b) of the Securities and Exchange Act of 1934 (the "***Exchange Act***"):  a false or misleading statement.  Plaintiff contends that Mr. Cohen's tweet, responding to a linked article predicting that BBBY's stock was "headed to $1" and coupled with a moon emoji, falsely represented to investors that BBBY's stock price would increase.  But Plaintiff's strained

---

[1] The caption of this case erroneously references Bed Bath & Beyond ***Corp.*** (rather than "Inc.").

interpretation of the tweet does not follow from its contents, which drew attention to a negative article that suggests pessimism, not optimism, about BBBY's success.  Next, Plaintiff alleges that the Cohen Defendants' August 16, 2022 Schedule 13D/A filing—required because BBBY had decreased the number of shares outstanding but which reported no new information regarding the Cohen Defendants' stock ownership—was false or misleading.  But a statement in a Schedule 13D filing cannot form the basis of a 10(b) claim.  And even if it could, Plaintiff cannot show that any statement therein was inaccurate or misleading.  Finally, Plaintiff contends that the Cohen Defendants' Form 144 filing, made the day the Cohen Defendants began selling their BBBY shares, was misleading because it was filed in a manner that delayed news of the intended sales to the market, even though the Form 144 filing was made timely in accordance with SEC rules and in the manner customary for such filings.  In any event, each of these purported misstatements is immaterial; given the widespread news about BBBY's declining sales and massive losses, neither Mr. Cohen's obscure tweet, nor public filings concerning the Cohen Defendants' BBBY ownership and sales would have "significantly altered the 'total mix' of information" available to a reasonable investor.  *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 278 (2014).

Plaintiff's securities fraud claims fail for the additional independent reason that Plaintiff does not plead "a strong inference of scienter" on the part of the Cohen Defendants.  The Complaint's primary theory of scienter is that the Cohen Defendants (a) planned for Mr. Cohen's tweet and Schedule 13D/A filing to "pump" the price of BBBY stock and (b) intentionally delayed making a Form 144 filing (that was in fact timely filed) to avoid informing the market that they were selling shares.  But given that Mr. Cohen's tweet referred primarily to negative information about BBBY and the routine nature of the SEC filings at issue, the Complaint offers no plausible basis—let alone a "strong inference"—that the Cohen Defendants harbored this plan.

The deficiencies in Plaintiff's Complaint do not end with its failure to plead a false statement or scienter.  The Complaint fails to plead facts showing virtually every required element of its asserted claims.  For example, Plaintiff's effort to plead a Section 10(b) "scheme liability" claim based on unsupported "pump and dump" allegations (without any facts showing manipulative conduct or intent) fails as a matter of law, its vague claims of insider trading under Section 10(b) fail to plead a single fact showing that the Cohen Defendants possessed inside information, and Plaintiff's failure to plead reliance or loss causation dooms all of its Section 10(b) claims.  Plaintiff's claims under Sections 9(a), 20A, and 20(a) of the Exchange Act fail for many of the same reasons.

Rather than pleading the requisite facts, the primary source of Plaintiff's allegations against the Cohen Defendants appears to be statements by a handful of Twitter and Reddit users, who Plaintiff alleges read the Cohen Defendants' actions as secret signals that BBBY's stock price would rise.  But Twitter and Reddit forums were optimistic about BBBY stock independent of, and well before, any alleged misstatement by the Cohen Defendants.  That users on these forums may have encouraged others to buy BBBY stock, fueling a stock rally, which eventually ended on the same day BBBY announced that it was exploring restructuring options, does not remotely suggest that the Cohen Defendants committed securities fraud, much less satisfy Plaintiff's heavy burden for pleading such claims.

## II.     BACKGROUND[2]

### A.     The Parties

Plaintiff purports to represent a shareholder class that purchased BBBY common stock or options between August 12, 2022 and August 18, 2022 (the "***Class Period***").  *See* Compl. ¶ 1. BBBY is a retailer that sells merchandise in the home, beauty, baby and wellness categories through its banners Bed Bath & Beyond, buybuy BABY, Harmon Health & Beauty, and Decorist. *See* Compl. ¶ 2.  BBBY is publicly traded on NASDAQ and is a New York corporation.  *See id.* ¶¶ 22, 211.  Mr. Cohen is the founder and manager of Defendant RCV, *see id.* ¶ 21, which purchased a substantial stake in BBBY between January and March 2022, *see id.* ¶ 92.

### B.     The Cohen Defendants Invest in BBBY and Enter into the Cooperation Agreement.

On March 7, 2022, the Cohen Defendants filed a Schedule 13D disclosing RCV's beneficial ownership of 9,450,100 BBBY shares—constituting a 9.8% ownership interest in BBBY.  *See id.* ¶ 92; Bed Bath & Beyond Inc., Beneficial Ownership Rep., Row 11 (Sched. 13D) (March 7, 2022) (the "***March 7th 13D***") (attached as Exh. 1 to the Declaration of Clifford Thau in Support of the Cohen Defendants' Motion to Dismiss ("***Thau Decl.***")[3]   The March 7th 13D

---

[2] The following Background is taken from the Complaint, documents incorporated by reference therein, documents publicly filed with the SEC and other matters of which the Court may take judicial notice.  *Singletary v. Howard Univ.*, 939 F.3d 287, 293 n.1 (D.C. Cir. 2019); *accord SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 12 (D.D.C. 2017).  The Cohen Defendants assume the facts in the Complaint, and documents incorporated by reference therein, to be true for the purpose of this motion and not for any other purpose.  *See L. Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir. 2017).

[3] The documents referenced in this motion are appended as exhibits to the accompanying Declaration of Clifford Thau and referred to as "Exh."  The Court may properly consider all of these documents, which consist of SEC filings and/or other public documents that are referenced in the Complaint or pertain to matters of which the court may take judicial notice.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 332 (2007); *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 174 n.8 (D.D.C. 2007) ("[A] court may consider the full text of the SEC filings, prospectus, analysts' reports and statements integral to the complaint, even if not

disclosed that the Cohen Defendants calculated their ownership percentage of 9.8% based on the number of shares outstanding disclosed by BBBY in its last periodic SEC filing. *See id.* at Item 5. It also attached as an exhibit a letter the Cohen Defendants had sent to the BBBY board of directors (the "***Board***"), encouraging it to "explore alternative paths to value creation" including through a sale or spinoff of "buybuy BABY," a specialty retailer owned and operated by the Company. *Id.* at Item 4. The filing explicitly stated twice that the Cohen Defendants may sell their BBBY shares at any time. *See id.* ("[T]he Reporting Persons may endeavor to increase or decrease their position in the Issuer through, among other things, the purchase or sale of Shares on the open market or in private transactions . . ." "Depending on various factors . . . , the Reporting Persons may in the future take such actions with respect to their investment in the Issuer as they deem appropriate including, without limitation, . . . selling some or all of their Shares . . .").

Approximately two weeks later, on March 25, 2022, the Cohen Defendants amended their Schedule 13D filing. *See* Compl. ¶ 99; Bed Bath & Beyond Inc., Beneficial Ownership Rep. (Sched. 13D/A Amend. No. 1) (March 25, 2022) (the "***March 25th 13D/A***"), attached as Thau Decl. Exh. 2. The March 25th 13D/A showed that there was no change in the Cohen Defendants' BBBY holdings. It recited RCV's ownership of 9,450,100 BBBY shares and did not amend the statements in Item 4 that the Cohen Defendants could sell their shares at any time. *See id.*

The March 25th 13D/A also attached as an exhibit a cooperation agreement between RCV and BBBY. *See id.* at Exh. 99.1 (the "***Cooperation Agreement***" or "***Coop. Agr.***"). Under the Cooperation Agreement, BBBY agreed to appoint three independent directors suggested by RCV to the Board and nominate those directors for election at the 2022 annual meeting of shareholders.

---

attached, without converting the motion into one for summary judgment . . . .") (internal citations omitted).

*See* Compl. ¶ 99; Thau Decl. Exh. 2 at Exh. 99.1 § 1(a)(i)(A)-(B).  BBBY further agreed to appoint two of RCV's suggested independent directors to the Board's "Strategy Committee," which was charged with exploring strategic alternatives for the buybuy BABY business.  *See* Compl. ¶ 99; Thau Decl. Exh. 2 at Exh. 99.1 § 1(a).

For their part, the Cohen Defendants agreed that, for a specified "standstill period," they would (1) not acquire more than 19.9% of BBBY shares, (2) not participate in any proxy solicitation, (3) not nominate any director, (4) not make any proposal for consideration by shareholders at any annual or special meeting, and (5) with limited exceptions, vote their shares in accordance with the Board's recommendations.  Compl. ¶ 99; Thau Decl. Exh. 2 at Exh. 99.1 § 1(e)(iii) and 2(a)(i)-(vi).  In the Cooperation Agreement, the Cohen Defendants also acknowledged their understanding that U.S. securities laws prohibit the use of material, nonpublic information to buy or sell securities.  *Id.* § 1(f).  The Cooperation Agreement did not, however, indicate or suggest that the Cohen Defendants would ever receive such material, nonpublic information. To the contrary, the Cooperation Agreement expressly required the RCV-suggested directors "to strictly adhere to the policies on confidentiality, insider trading and conflicts of interest imposed on all members of the Board."  *Id.* § 1(d).

### C.    The Company's Financial Condition Publicly Deteriorates.

In the days following the Cooperation Agreement announcement, BBBY stock saw a roughly 20% increase.  *See* Thau Decl. Exh. 3.  However, BBBY's stock price experienced a steady decline over the next four months as the public learned more about the Company's financial situation.  Financial results published in April showed net sales had declined 22% and net losses had increased by $150 million.  Compl. ¶ 103.  Analysts lamented the Company's "waning cash balance" and blamed its poor performance on the Company's "antiquated supply and distribution

networks, weak e-commerce platforms and a failure to resonate with younger customers." *Id.* ¶¶ 103, 104.   Market watchers wrote that the possibility of a buybuy BABY "spin-off" or "monetization" appeared to be fading.  *Id.* ¶¶ 104, 105, 108.

On June 1, 2022 the Company filed a Proxy Statement identifying RCV as its fourth-largest shareholder with an ownership interest in 11.8% of the Company's outstanding shares.  *Id.* ¶ 109. Later that same month, as its performance continued to decline, the Company announced that it had fired its CEO.  *Id.* ¶ 112.  The Company's Quarterly Report showed net sales were down 25% year over year (even buybuy BABY sales were down), and net losses increased from $50.9 million to more than $350 million.  *Id.* ¶ 114.  By July 29, 2022, BBBY's stock price was $5.03, down from the $27.23 high it saw in March 2022.  Thau Decl. Exh. 3.

### D.    RCV's Stake in BBBY Increases Without Any Additional Purchases.

BBBY's Quarterly Report filed with the SEC on June 29, 2022 also disclosed a series of share repurchases, resulting in a decrease in the number of outstanding common shares—from 96,337,713 reported in BBBY's Quarterly Report filed on January 6, 2022, to 79,957,649 reported in the June 29, 2022 filing.  *See* Bed Bath & Beyond Inc., Quarterly Report on Form 10-Q for the period ended May 28, 2022, filed on June 29, 2022 at 1, attached as Thau Decl. Exh. 4.  As a result of this decrease in outstanding shares, the Cohen Defendants' shareholdings in BBBY—while they had not changed since the Cohen Defendants' original March 7th 13D—represented 11.8%, rather than 9.8%, of outstanding shares.  *See* Bed Bath & Beyond Inc., Am. Beneficial Ownership Rep. (Sched. 13D/A Amend. No. 2) (Aug. 16, 2022) (the "***August 16th 13D/A***"), attached as Thau Decl. Exh. 5; Compl. ¶ 157.

E.     **BBBY Stock Sees an August 2022 Surge, Ryan Cohen Tweets a Moon Emoji, and RCV Files Required Forms.**

After hitting a new low for the year on July 29, the price of BBBY shares surged more than 150% during the first week of August.   Thau Decl. Exh. 3.  By August 4, it had risen to $6.15.  *Id.* This increase occurred despite continued bad news from the Company and market analysts.  On July 29, 2022, for example, "the Company disclosed that it had hired the Berkeley Research Group to focus on cash, inventory and balance sheet optimization," effectively announcing to the world that the Company had a "looming liquidity crisis."  Compl. ¶ 121.  On August 1, 2022, TheStreet wrote that "short sellers have been betting heavily against" BBBY because of "several successive disastrous quarters."  Thau Decl. Exh. 6.  It also warned—before any of Mr. Cohen's tweets—that BBBY stock nevertheless had "significant meme appeal" and could be vulnerable to a "short squeeze."  *Id.*  On August 3, 2022, TheStreet published another article titled "Bed Bath & Beyond: Is There Any Hope for This Stock?," reporting that BBBY "has been missing loss-per-share and revenue estimates for at least the last four consecutive quarters" and "is starting to struggle to pay its obligations."  Thau Decl. Exh. 7.  The same day, Bloomberg published an article reporting that the Company was "considering tapping the private credit market to boost liquidity as the struggling retailer burns through its cash."  Compl. ¶ 119.  Nevertheless, from August 4 to August 5 (a Friday), the stock price rose again to $8.16.  *Id.*  After the weekend, BBBY stock opened at $10.92 and reached an intraday high of $13.34, a more than two-fold increase from the previous week. *Id.*  Plaintiffs allege that this surge in the stock price (which began on August 1) is attributable in part to Mr. Cohen's August 5, 2022 tweet, "Ask not what your company can do for you—ask what

you can do for your company," despite what the Complaint concedes was "confusion" among investors about what the tweet meant.  Compl. ¶¶ 139-140.[4]

On August 12, 2022, as the Company suffered public financial losses, CNBC tweeted a link to an article titled, "Loop Capital says Bed Bath & Beyond comeback doesn't make fundamental sense, stock headed to $1."  Compl. ¶ 147.  The article said, "[e]ven though shares of Bed Bath & Beyond have surged more than 70% this week, Loop Capital isn't upgrading its view on the stock," including because "[r]ecent news concerning the company has been more negative than positive" and "the jump in share price is likely due to a meme-stock short squeeze and isn't tied to any fundamental improvements."  Thau Decl. Exh. 12.  The article described "widespread out-of-stocks, heavily discounted private label merchandise, dirty stores, and disengaged employees."  *Id.*  The tweet displayed a photograph of a woman pushing a shopping cart full of items around a BBBY store.  *Id.*  In response, Mr. Cohen tweeted: "At least her cart is full" with a smiling moon emoji.  *Id.*  This is the first alleged "misstatement" in the Complaint.  *Id.* ¶¶ 148, 222.

Meanwhile, the shift in RCV's ownership percentage brought about by BBBY share repurchases—while not triggered by any action on the part of the Cohen Defendants—required them to make certain additional filings.  Since the Cohen Defendants now held more than 10% of BBBY shares, they were required by Section 16 of the Exchange Act to file a Form 3 with the SEC.  *See* 17 C.F.R. § 240.16a-2.  They did so on August 15, 2022.  *See* Bed Bath & Beyond Inc., Initial Statement of Beneficial Ownership of Securities (Form 3) (August 15, 2022), attached as Thau Decl. Exh. 8.  Moreover, because BBBY's stock repurchase caused a "material increase" in

---

[4]  Despite this suggestion, Plaintiff does not (and cannot) allege that this is an actionable misstatement or an act of market manipulation for purposes of its Section 10(b) claim.  *See* Compl. ¶¶ 222, 231.

the percentage of BBBY stock held by the Cohen Defendants, they were required to again amend their Schedule 13D.  *See* 17 C.F.R. § 240.13d-2.

Accordingly, at 9:16 a.m. Eastern Time on August 16, 2022, the Cohen Defendants amended their Schedule 13D filing for the second time.  *See* Thau Decl. Exh. 5.  The filing affirmed that the Cohen Defendants had not purchased or sold any BBBY shares in the preceding two months nor since the previous filing made in March 2022.  *See id.* ("There have been no transactions in securities of the Issuer by the Reporting Persons during the past sixty days nor since the filing of Amendment No. 1 to the Schedule 13D.")  This is the second alleged "misstatement" in the Complaint.  Compl. ¶¶ 161, 222.  Further clarifying the amendment, the filing stated that "[t]his Amendment No. 2 was triggered ***solely*** due to a change in the number of outstanding Shares of the Issuer."  *Id.* (emphasis added).  And as with the Cohen Defendants' prior 13D amendment, the August 16th 13D/A did not change the statements in Item 4 of the March 7th 13D that the Cohen Defendants could sell their shares at any time, effectively reaffirming this statement to the market.

### F.       BBBY's Stock Price Continues to Surge and RCV Sells its BBBY Holdings.

By August 16, 2022, BBBY's stock had "increased by over 70% and peaked at an intraday high of $28.60 per share."  Compl. ¶ 163.  That day it closed at $20.65, a roughly 30% increase from the day before.  *Id.* ¶ 164.  On August 17, 2022, BBBY stock again rose, opening at $26.94 and closing at $23.08.  *Id.*  ¶ 166.

Over the course of August 16 and August 17, following the unexpected surge in the share price of what BBBY's public filings showed was a company facing serious financial problems, the Cohen Defendants sold all of their BBBY common stock and call options, making a profit in the process.  *See* Bed Bath & Beyond Inc., Beneficial Ownership Rep., Sched. A (Sched. 13D/A Amend. No. 3) (Aug. 18, 2022) (the "***August 18th 13D/A***"), attached as Thau Decl. Exh. 9.

In connection with the sale of their BBBY shares, the Cohen Defendants were required to make additional filings with the SEC.  On August 16, 2022, RCV filed a Form 144 providing notice of its intent to sell up to all of its BBBY shares and call options.  *See* RC Ventures LLC, Notice of Proposed Sale of Securities (Form 144) (August 16, 2022), attached as Thau Decl. Exh. 10 ("This filing represents the potential sale of up to 7,780,000 common stock and the following call options: 11,257 BBBY CALLS 01/20/23 @ $60, 5,000 BBBY CALLS 01/20/23 @ $80, 444 BBBY Calls 01/20/23 @ $75.").  The form also confirmed that RCV had not sold any BBBY securities in the three months prior to August 16, 2022.  *Id.* (showing "None" where the form asks for "SECURITIES SOLD DURING THE PAST 3 MONTHS").  These two statements are the final "misstatements" alleged in the Complaint.  Compl. ¶¶ 174, 222.

Because the Cohen Defendants used the common practice of filing RCV's Form 144 by email (rather than through EDGAR), the SEC did not make the Form 144 publicly available until August 17, 2022.  Compl. ¶ 169.  On August 18, 2022, the Cohen Defendants filed a third amendment to the Schedule 13D and a Form 4 disclosing the sale of all of their BBBY holdings over the course of the previous two trading days.  *See* Thau Decl. 9.

Also on August 18, 2022, Bloomberg reported that BBBY had retained Kirkland & Ellis for "help addressing [its] debt load."  Compl. ¶ 130.  The article noted that the Company's debt load had become "unmanageable" and that Kirkland was "typically known for its dominance in restructuring and bankruptcy situations."  Thau Decl. Exh. 11.  The next day, another Bloomberg article reported that "suppliers had halted shipments because Bed Bath had failed to pay its bills" and that a recent survey of BBBY vendors found that the Company "was in arrears with all respondents, with some saying more than half of their accounts receivable with the company were past due."  Compl. ¶ 130.

### G.     BBBY Stock Price Declines Again.

After its early-August surge, the Company's share price gradually returned to its prior levels.  On August 19, 2022, the stock closed at $18.55.  Thau Decl. Exh. 3.  The next day it closed at just over $11.00, before slowly over the next two months returning to the roughly $5.00 price it was trading at in late July.  *Id.*  Since then, BBBY shares have not traded at more than $7.03 per share.  *Id.*

### H.     Plaintiff Files Suit.

The first iteration of this Complaint was filed on August 23, 2022, and amended for the first time on November 2, 2022.  The operative Second Amended Complaint was filed on January 30, 2023.  The Cohen Defendants now move to dismiss the Complaint for failure to state a claim.[5]

## III.   SEC FILING REQUIREMENTS

Plaintiff's claims rely in part on the contention that the Cohen Defendants violated the law with the timing and manner of their required SEC filings.  Below is a summary of the legal requirements applicable to the two filings relevant here:  Schedule 13D and Form 144.

### A.     Schedule 13D

Section 13(d) of the Exchange Act requires any person who acquires more than 5% of any class of equity securities registered under the Exchange Act to file a Schedule 13D within 10 days after reaching the 5% threshold.  15 U.S.C. § 78m(d).  Amendments to the Schedule 13D must also occur "promptly" after any "material change" in ownership.  *See* 17 C.F.R. § 240.13d-2.  The Exchange Act considers "material" any "acquisition or disposition of beneficial ownership of

---

[5] Plaintiff's original complaint alleged that JP Morgan Securities LLC "aided and abetted" the Cohen Defendants' alleged "fraud," "negligent[ly] misrepresent[ed]" information on RCV's Schedule 13Ds, and separately violated Section 10(b) by acting as RCV's "stock broker."  *See* ECF No. 2 at ¶¶ 9, 79, 86, 89-98.  In the operative Complaint, Plaintiff has withdrawn those claims.

securities in an amount equal to one percent or more of the class of securities." *Id.* § 240.13d-2(a). The SEC has not clearly defined what constitutes a "prompt" filing. *See In the Matter of Cooper Lab'ys, Inc.*, Exchange Act Release No. 22171 (June 26, 1985) ("No bright line test has been adopted in order to determine when an amendment to a Schedule 13D is 'prompt'. … [T]he question … will be determined based on all of the facts and circumstances" of each particular case.). But courts have found Schedule 13D amendments to be "'prompt' as a matter of law" where they are filed "the first day after [the filer's] sales were completed." *See Feldman v. Simkins Indus., Inc.*, 679 F.2d 1299, 1306 (9th Cir. 1982).

In a Schedule 13D, filers must "[d]escribe any plans or proposals the reporting persons may have" that relate to "the disposition of securities of the issuer." 17 C.F.R. § 240.13d-101. But until a course of action is "***decided upon***," it need not be disclosed. *Azurite Corp. v. Amster & Co.*, 52 F.3d 15, 18 (2d Cir. 1995) (emphasis added); *see also SEC v. Teo*, 746 F.3d 90, 100 (3d Cir. 2014). Filers need not disclose "tentative" or "inchoate" plans on a Schedule 13D. *Azurite*, 52 F.3d at 18; *see, e.g.*, *Kraft v. Third Coast Midstream*, No. 19 Civ. 9398, 2021 WL 860987, at *17 (S.D.N.Y. Mar. 8, 2021) (no 10(b) violation based on failure to disclose a take-private transaction in a Schedule 13D because it was "part of a 'preliminary consideration, exploratory work or tentative plan'").

### B.    Form 144

SEC Rule 144(h) requires a Form 144 to be filed with the SEC if a certain kind of shareholder seeking to rely on the exemption from registration afforded by Rule 144 sells more than 5,000 shares (or any number of shares worth more than $50,000) during any three-month period. 17 C.F.R. § 230.144(h). The form must be signed by the seller and transmitted for filing "*concurrently* with either the placing with a broker of an order to execute a sale of securities in

reliance upon this rule or the execution directly with a market maker of such a sale." 17 C.F.R. §

230.144(h)(3) (emphasis added). The SEC has explained that "concurrently" here means "on the

same day" as the placement of a sale order or execution of a sale. *See* SEC, Div. Corp. Fin.,

Compliance and Disclosure Interpretations, Securities Act Rules, Q. 136.09 (Mar. 4, 2011).

The SEC until very recently did not require electronic filing of Forms 144. Indeed, the

most common historical practice by far has been for filers to submit by email or in hard copy. *See*

Updating EDGAR Filing Requirements and Form 144 Filings, 87 Fed. Reg. 35,393, 35,400 (June

10, 2022) (amending 17 C.F.R. § 232.101) (noting that only 0.8% of all Form 144 submissions in

2021 were via EDGAR, while the rest were by email or hard copy). In June 2022, the SEC

published an updated rule requiring Forms 144 to be filed electronically. *See id.* at 35,393; 17 §

C.F.R. 232.101(a)(1)(xxvii). In recognition of widespread reliance on email and paper filings,

however, Form 144 filers will not be required to submit electronically until April 13, 2023. *Id.* at

35,399; *see* Adoption of Updated EDGAR Filer Manual, 87 Fed. Reg. 61,977 (Oct. 13, 2022).

## IV.   LEGAL STANDARDS

To survive a motion to dismiss, Plaintiff's claims must satisfy the following pleading

standards.

### A.   Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (citation omitted). To be plausible, a complaint must plead "factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id*. Although courts must construe the complaint in the plaintiff's favor upon a motion

to dismiss, this "does not entail accepting inferences unsupported by facts or legal conclusions cast

in the form of factual allegations." *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 36 F.4th 278, 288 (D.C. Cir. 2022).

### B.        Rule 9(b)

In addition, Plaintiff's claims must satisfy the heightened pleading requirements of Rule 9(b), which requires that, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Doing so requires "a plaintiff to plead the time, place, and content of the fraud and to identify the individuals allegedly involved." *United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 936 (D.C. Cir. 2017); *accord Doherty v. Turner Broad. Sys., Inc.*, No. 20 Civ. 134, 2020 WL 12118918, at *3 (D.D.C. June 22, 2020).

### C.        The Private Securities Litigation Reform Act

Plaintiff's securities fraud claims must meet the PSLRA's "exacting pleading requirements" by "stat[ing] with particularity both the facts constituting the alleged violation, and the facts evidencing scienter. . . ." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  The Complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, [] state with particularity all facts on which that belief is formed."  *See Shenk v. Mallinckrodt plc*, No. 17 Civ. 145, 2019 WL 3491485, at *5 (D.D.C. July 30, 2019) (quoting 15 U.S.C. § 78u–4(b)(1) (alterations omitted)).  Likewise, the Complaint must "state with particularity facts giving rise to a ***strong inference*** that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A) (emphasis added); *see also Plymouth Cnty. Ret. Assn. v. Advisory Bd. Co.*, 370 F. Supp. 3d 60, 75 (D.D.C. 2019).

## V.    ARGUMENT

The Complaint alleges three categories of claims against the Cohen Defendants.  First, it alleges that the Cohen Defendants violated Section 10(b) of the Exchange Act by (a) making

material misrepresentations, (b) manipulating the market, and (c) trading on inside information. Second, it alleges that same conduct violated Section 9(a) of the Exchange Act.  Finally, the Complaint alleges a claim for insider trading under Section 20A of the Exchange Act and for control person liability under Section 20(a) of the Exchange Act, both of which depend on successfully pleading its other claims.  For the reasons set forth below, all of the claims fail.

### A.    Plaintiff's Section 10(b) Claims

#### 1.    The Complaint Does Not Adequately Plead a Section 10(b) and Rule 10b-5(b) Claim for False or Misleading Statements.

To state a Section 10(b) claim based on false or misleading statements, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (*Halliburton II*) (citation omitted); *see Plymouth*, 370 F. Supp. 3d at 75.  The Complaint fails to plead the required elements of a Section 10(b) claim.

#### a.    Plaintiff Does Not Allege a Material Misrepresentation or Omission.

The Complaint alleges three purported misrepresentations or omissions by the Cohen Defendants.  *See* Compl. ¶¶ 146-148, 160-161, 169-174, 222.  None can support Plaintiff's claim.

#### (i)    The August 12th Tweet Is Neither False Nor Misleading.

The Complaint asserts that Mr. Cohen made a false or misleading statement when, in replying to a CNBC tweet linking an article opining that BBBY's stock price was worth $1 per share, he tweeted "'[a]t least her cart is full' accompanied by a smiley moon emoji." *Id.* ¶ 147. According to the Complaint, the moon emoji is an alleged code for Mr. Cohen's belief that BBBY

16

stock was going "to the moon," *id.* ¶ 149, and it was misleading because Mr. Cohen allegedly no longer held that belief and instead planned to sell his shares, *id.* ¶ 148.

As an initial matter, even assuming that Mr. Cohen believed BBBY's share price would decrease and planned to sell his shares as of August 12 (a conclusion for which Plaintiff pleads no supporting facts), Plaintiff still has not alleged that the August 12 tweet was misleading.  In the tweet, Mr. Cohen responded to an article predicting that BBBY's stock was "headed to $1." Compl. ¶¶ 146-147.  The article opined that the August 2022 surge in BBBY's stock price "isn't tied to any fundamental improvements" and described "widespread out-of-stocks, heavily discounted private label merchandise, dirty stores, and disengaged employees."  Thau Decl. Exh. 12.  The contents of this article show pessimism, not optimism, as to BBBY's future stock price. Yet Plaintiff asks the Court to conclude that Mr. Cohen's tweet is a concrete prediction of BBBY's future success based on nothing more than a sarcastic comment by Mr. Cohen about the article's cover photo of a BBBY shopper—that "at least her cart is full"—and a moon emoji.   Plaintiff's primary support for his contention is not Mr. Cohen's words at all, but the reactions of various Twitter and Reddit users to Mr. Cohen's tweet. Compl. ¶¶ 149-155.  At a minimum,  the meaning of Mr. Cohen's tweet, like various others cited in the Complaint (a frog emoji and a picture of an ice cream cone, ¶ 76; a fist emoji and nothing else, ¶ 78), was ambiguous and cannot constitute a material misstatement.  *See In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 168 (2d Cir. 2021) (a material misstatement requires a "concrete description" and a "factual representation," rather than a "vague expression").[6]

---

[6] In fact, the makers of emojis purposely design emojis to be ambiguous.  *See* Eric Goldman, *Emojis and the Law*, 93 Wash. L. Rev. 1227, 1246 (2018) ("Unicode prefers to adopt emojis that have multiple meanings" in order to "add useful ambiguity to messages, allowing the writer to convey many different possible concepts at the same time." (citation omitted)).

At a minimum, the August 12 tweet is not material.  It is not plausible that an investor would have made an investment decision based on Mr. Cohen's obscure tweet at a time when BBBY's public financials showed the Company's sales declining precipitously, its losses skyrocketing, and its cash dwindling.  Compl. ¶¶ 103, 104, 114.  The information available to the market uniformly described BBBY's deteriorating financial condition.  A moon emoji would not have "significantly altered the 'total mix' of information" to the reasonable investor.  *See Halliburton II*, 573 U.S. at 278.  Moreover, to be material, a statement must also be "capable of objective verification."  *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 109 (D.C. Cir. 2015).  But a moon emoji is not.  There is no way to establish objectively the truth or falsity of a tiny lunar cartoon.[7]

Furthermore, even if the moon emoji actually means what the Complaint suggests—*i.e.*, that BBBY's stock price was likely to go "to the moon"—such a statement would be non-actionable puffery, because it too is not capable of objective verification.  *See, e.g.*, *In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 357 (S.D.N.Y. 2020), *appeal filed*, No. 21-2546 (2d Cir. Oct. 8, 2021)  (statement that the defendant had "attributes of a growth stock as well as a value stock" was puffery); *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent.*

---

[7] Nor does *Friel v. Dapper Labs, Inc.*, No. 21 Civ. 5837, 2023 WL 2162747, at *17 (S.D.N.Y. Feb. 22, 2023) change this analysis.  In *Friel*, the court held that a seller of non-fungible tokens (NFTs) had communicated an objective "promise of profits" where its official Twitter account published tweets promoting recent sales that contained the "rocket ship," "stock chart," and "money bags" emojis.  *Id.*  In context, the court held that those emojis "objectively mean one thing: a financial return on investment."  *Id.*  But in *Friel*, unlike here, the substance of the tweets involved the promotion and sale of a product which the CEO had already touted as a profitable investment.  With that as a backdrop, it required no significant leap for the court to infer that the "rocket ship," "stock chart," and "money bags" emojis meant "profits."  Mr. Cohen's tweet, by contrast, draws attention to an article suggesting BBBY stock was "headed to $1"; yet Plaintiff suggests the tweet communicated exactly the opposite message—that the stock would increase—allegedly because it contained a single "moon" emoji.  That inference is not warranted here.

*Holdings, Inc.*, 422 F. Supp. 3d 821, 845 (S.D.N.Y. 2019) (statement that defendant expected a "big pop" in company's stock price was puffery); *see also Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) (holding statement predicting future growth not material because "the market price of a share is not inflated by vague statements predicting growth").

**(ii)      The August 16th 13D/A Is Not Actionable Under Section 10(b), Let Alone Materially Misleading.**

On August 16, 2022, the Cohen Defendants filed a Schedule 13D/A disclosing that they owned more than 10% of BBBY.  *See* Thau Decl. Exh. 9.  The Complaint alleges, but pleads no facts showing, that this document is materially misleading because (1) it stated that "[t]here have been no transactions in securities of the Issuer by the Reporting Persons during the past sixty days nor since the filing of Amendment No. 1 to the Schedule 13D" (Compl. ¶ 160) and (2) the Cohen Defendants had already formed a "plan or proposal" to sell RCV's BBBY shares before filing (*id.* ¶ 161).

The Complaint cannot plead a material false statement based on the August 16th 13D/A because a Schedule 13D filing cannot constitute an actionable false statement or omission under Section 10(b).  *See Takata v. Riot Blockchain, Inc.*, No. 18 Civ. 2293, 2022 WL 1058389, at *10 (D.N.J. Apr. 8, 2022) ("The trend in Section 13(d) cases indicates a strong reluctance of, if not an absolute bar to, allowing suits for damages, both under 10(b) and 18(a).").  No private right of action for damages exists under Section 13(d) of the Exchange Act.  *See Motient Corp. v. Dondero*, 529 F.3d 532, 536 (5th Cir. 2008); *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 619 (2d Cir. 2002); *Liberty Nat'l Ins. Holding Co. v. Charter Co.*, 734 F.2d 545, 567 (11th Cir. 1984).  Plaintiff cannot circumvent the lack of a private cause of action for damages under Section 13(d) by using purported false statements in a Schedule 13D as the basis for a Section 10(b) claim.  *See Takata*, 2022 WL 1058389, at *10.

Even if it were possible to plead a Section 10(b) claim based on a material misstatement or omission in a Schedule 13D filing, the Complaint fails to plead any facts showing that any statement in the August 16th 13D/A was false or misleading.  With respect to the statement that the Cohen Defendants had not engaged in any transactions in BBBY securities in the prior 60 days, the facts Plaintiff itself alleges in the Complaint demonstrate that this statement was accurate.  The Complaint alleges that RCV sold its shares on August 16 and 17, 2022.  *Id.* ¶¶ 165, 166.  As the Complaint concedes, RCV filed this amended Schedule 13D "[o]n August 16, 2022, at 9:16 AM, *almost fifteen minutes before the market opened*."  *Id.* ¶ 159 (emphasis added).  Prior to this filing, RCV had not bought or sold any BBBY stock since the first week of March 2022.

Plaintiff claims that the Schedule 13D's statement regarding the fact that the Cohen Defendants had not transacted in securities of BBBY since the prior 13D filing in March 2022 was nonetheless "misleading" because it failed to disclose that the Cohen Defendants were *planning* to sell BBBY shares later that day.  Compl. ¶ 161.  But this argument also fails.  SEC rules require only prompt disclosure *after* the sale of securities (which the Cohen Defendants indisputably did here).  *See* 17 C.F.R. § 240.13d-2.

While Item 4 of the Schedule 13D filing requires disclosure of a current "plan or proposal" to sell securities, the Cohen Defendants satisfied this obligation.  When the Cohen Defendants filed their initial Schedule 13D, they explicitly twice disclosed the possibility that they could sell their BBBY shares *at any time*:  "Depending upon overall market conditions, other investment opportunities available to the Reporting Persons, and the availability of Shares at prices that would make the purchase or sale of Shares desirable, the Reporting Persons may endeavor to increase or decrease their position in the Issuer through, among other things, the purchase or sale of Shares on the open market or in private transactions . . . ."  "Depending on various factors . . . , the Reporting

Persons may in the future take such actions with respect to their investment in the Issuer as they deem appropriate including, without limitation, . . . selling some or all of their Shares . . . ."). Thau Decl. Exh. 1. The Cohen Defendants never withdrew or changed those statements in subsequent amendments. Accordingly, investors had advance notice of the precise possibility that Plaintiff alleges the Cohen Defendants omitted in the August 16th 13D/A—*i.e.*, that they might sell their BBBY shares.[8]

### (iii)    The Form 144 Was Not False or Misleading.

Plaintiff claims that the Cohen Defendants' Form 144 was false or misleading because it was intentionally filed late—in alleged violation of SEC Rule 144—to delay the discovery that RCV had sold all of its shares, and because it falsely stated that RCV had not sold any securities in the three months prior to the filing. Compl. ¶¶ 169-170. Plaintiff's arguments are contradicted by the straightforward Rule 144 filing requirements and the plain contents of the Cohen Defendants' form.

The facts alleged in the Complaint demonstrate that the Cohen Defendants' Form 144 was timely filed and in full compliance with SEC Rules. The basic purpose of Form 144 is to advise the SEC of a person's reliance on the safe-harbor exemption from registration afforded by Rule 144 by notifying the SEC of the potential sale of shares numbering more than 5,000 or worth more than $50,000. *See* 17 C.F.R. § 230.144(h). That purpose is served where the seller transmits his Form 144 "***concurrently*** with either the placing with a broker of an order to execute a sale of securities in reliance upon this rule or the execution directly with a market maker of such a sale."

---

[8] Plaintiff has also failed to plead facts showing that the Cohen Defendants' plan to sell was "decided upon" at the time of the August 16th 13D/A. *See Azurite*, 52 F.3d at 18. The far more plausible inference is that RCV sold its shares not as part of a predetermined plan but after their value unexpectedly rose beyond what Mr. Cohen believed they were worth.

17 C.F.R. § 230.144(h)(3) (emphasis added).  The SEC has explained that "concurrently" means "on the same day" as the placement of a sale order or execution of a sale.  *See* SEC, Div. Corp. Fin., Compliance and Disclosure Interpretations, Securities Act Rules, Q. 136.09 (Mar. 4, 2011).

As Plaintiff concedes, the Cohen Defendants submitted their Form 144 on August 16, 2022, the same day RCV executed the sale plan disclosed therein.  Compl. ¶ 10.  Thus, the form was not filed late, as Plaintiff contends.  Nor was the method of filing, which resulted in the form's publication a day later, inappropriate or out of step with normal procedure.  Paper and email filings were not only permitted in August 2022 (and to this day); they were the method of choice for over 99% of all filers the previous year.  *See supra* Section III.B; Updating EDGAR Filing Requirements and Form 144 Filings, 87 Fed. Reg. 35,393, 35,400 (June 10, 2022) (amending 17 C.F.R. § 232.101) (noting that only 0.8% of all Form 144 submissions in 2021 were via EDGAR, while the rest were by email or hard copies).  Moreover, because the Form 144 was filed—as a matter of law—concurrently with RCV's sales of BBBY securities, the statement that RCV had sold no BBBY stock "DURING THE PAST 3 MONTHS" was true.  That statement clearly refers to the three-month period preceding the date of the sale announced by the Form 144—during which time the Cohen Defendants, indeed, sold no BBBY securities.  The purpose of this provision of Form 144 is to facilitate a determination whether the sales for which notice is given, together with sales made in the previous three months, would exceed the volume limitations in Rule 144(e).  The Form 144 therefore contains no material misstatement or omission and cannot form the basis of a Rule 10b-5(b) claim.[9]

---

[9] Given the overwhelmingly grim news about BBBY's financial performance in BBBY's public filings, the press and analyst reports, the Cohen Defendants' August 16th 13D/A and Form 144 filings were also immaterial as neither RCV's BBBY holdings nor its plans to sell securities would have significantly altered the total mix of information available to investors.  *See* Sections II.C, II.E , *supra*.

> **b.** **The Complaint Fails to Plead a "Strong Inference" of Scienter.**

The Complaint must also plead a "strong inference" of scienter. 15 U.S.C. § 78u–4(b)(2)(A). Scienter is defined as "intentional wrongdoing" or "extreme recklessness." *Liberty Prop. Tr. v. Republic Props. Corp.*, 577 F.3d 335, 342 (D.C. Cir. 2009). A complaint is sufficient "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Scienter can ordinarily be demonstrated by pleading facts demonstrating that the defendant had a (1) "motive and opportunity to commit fraud," or (2) "strong circumstantial evidence of conscious misbehavior or recklessness." *SEC v. e-Smart Techs.*, Inc., 31 F. Supp. 3d 69, 81 (D.D.C. 2014); *Shenk*, 2019 WL 3491485, at *21. The Complaint's scienter allegations fall far short of this exacting standard.

Plaintiff's scienter allegations fall into roughly three categories. First, the Complaint highlights the fact that the Cohen Defendants sold their entire position in BBBY at a significant profit. *See* Compl. ¶ 188. However, mere desire to make a profit does not establish "motive and opportunity" for fraud. *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) (no scienter based on "a generalized motive" that can be "imputed to" any "for-profit endeavor" because it "is not sufficiently concrete for purposes of inferring scienter"). Indeed, courts have held similarly large stock sales do not establish scienter. *See, e.g.*, *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ. 975, 2012 WL 1646888, at *23 (S.D.N.Y. May 10, 2012) (finding sales of 100%, 36%, and 26% of defendants' shares for proceeds in excess of $37.3 million, standing alone, to be inadequate proof of scienter).

Second, the Complaint's core theory is that Mr. Cohen planned to deceive investors by disclosing benign information—*i.e.*, tweeting a moon emoji and disclosing his unchanged,

23

previously-disclosed BBBY holdings—to cause frenetic investment in BBBY.  *See, e.g.*, Compl. ¶ 159.  Accordingly, the Complaint's core allegation is that Mr. Cohen knew *ex ante* that investors would ignore all the negative information about BBBY and invest based on incorrect inferences drawn from his accurate but immaterial statements and disclosures.  But this theory is not remotely plausible.  Per the Complaint, BBBY trades in an "efficient market."  Compl. ¶ 227.  In an "efficient market," investors are presumed to be rational.  *Strougo v. Barclays pls*, 312 F.R.D. 307, 315 (S.D.N.Y. 2016).  Moreover, all publicly available information in an "efficient market" is presumed to be incorporated into a stock's price, *see Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988), such that disclosure of "confirmatory" information that is already publicly available is presumed not to impact a stock's price, *see Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020).  As a result, the Cohen Defendants had no reason to anticipate BBBY's stock price would spike in reaction to their "confirmatory" (and, hence, immaterial) disclosure of already-publicly-available information.  *See supra* Section V.A.1.a.ii.  Nor did the Cohen Defendants have a basis to believe that rational investors in the efficient market would make their investment decisions based on Mr. Cohen's tweeting moon emojis or ice cream cones—rather than corporate financial statements.  The much more cogent inference is non-nefarious: the Cohen Defendants sold their BBBY shares after the market rose ***surprisingly*** on August 16, 2022, and they saw an unexpected opportunity to exit at a profit.

In an effort to allege that Mr. Cohen knew how the market would react to his comments and filings, Plaintiff quotes a YouTube interview in which Mr. Cohen said he "noticed retail activity" after his prior Schedule 13D filings.  Compl. ¶¶ 193-194.  But Plaintiff's quote is improperly incomplete and therefore misleading.  Plaintiff fails to include that immediately after the quoted language, Mr. Cohen said that retail activity following Schedule 13D filings "was

impossible to predict." Thau Decl. Exh. 14.  Far from being an "admission," as Plaintiff suggests, Mr. Cohen's comments undermine the theory that he knew what would happen after he filed his Schedule 13D and planned to "pump" the stock price before selling.

Plaintiff also cites an excerpt from the interview in which Mr. Cohen explains that he sold his BBBY stock because his "views of the business clearly changed" when he saw the Company "go from aggressively repurchasing shares to losing a lot of money."  Compl. ¶ 194.  Plaintiff argues that this "bolster[s] an inference of fraud" because "[n]othing changed between August 12, 2022 [the date of the "moon emoji" tweet] and August 16, 2022."  *Id.*  But Plaintiff's theory assumes its conclusion (fraud) at the outset.  The more cogent explanation (when fraud is not improperly assumed) is that Mr. Cohen's views of the business began to sour long before August 12, his August 12 tweet was an expression of pessimism about BBBY's future (*see* Section V.A.1.a.i, *supra*), and he decided to exit his position when the price unexpectedly increased to a value that exceeded what he believed it was worth (or would be worth at any time in the future).

Finally, the Complaint alleges RCV sold its BBBY stock when it did because Mr. Cohen "knew material, nonpublic information about the Company's deteriorating liquidity and crushing debt burden that prevented a sale or spinoff of buybuy BABY."  Compl. ¶ 185.  But that allegation is not plausibly pleaded in the Complaint.  Plaintiff alleges that the Board possessed such information, including the directors appointed pursuant to the Cooperation Agreement with RCV.  But the Cohen Defendants were not on the Board.  The newly-appointed directors were independent and required to keep confidential any material, nonpublic information in their possession.  Thau Decl. Exh. 2 at Exh. 99.1 § 1(d) (directors must "strictly adhere to the policies on confidentiality, insider trading and conflicts of interest imposed on all members of the Board").  Aside from unsupported statements that every RCV-suggested director must have been feeding

Mr. Cohen inside information, the Complaint contains no facts plausibly alleging that BBBY directors had or would have readily breached their fiduciary duties and joined with Mr. Cohen to commit securities fraud.  Such conclusory allegations do not satisfy the PSLRA.  *See In re U.S. Off. Prods. Sec. Litig.*, 326 F. Supp. 2d 68, 77 (D.D.C. 2004) ("[A] pleading technique that couples a factual statement with a conclusory allegation of fraudulent intent is insufficient to support the inference that the defendants acted recklessly or with fraudulent intent.") (quoting *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004)).

### c.   Plaintiff Cannot Demonstrate Reliance.

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action."  *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008).  "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing common stock—based on that specific misrepresentation."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011).  But where a plaintiff does not allege actual reliance, the Supreme Court has "found a rebuttable presumption of reliance in two different circumstances."  *Stoneridge*, 552 U.S. at 159.  "First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance."  *Id.* (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972)).  Second, under the fraud-on-the-market doctrine, courts presume reliance where the alleged misstatements become public and certain other elements are met.  *Id.*  Plaintiff here does not plead actual reliance and is entitled to neither presumption on the facts alleged.

Plaintiff is not entitled to a presumption of reliance under *Affiliated Ute*.  *See* Compl. ¶ 218.  Such a presumption applies only if the claim "involv[es] primarily a failure to disclose," *Affiliated*

*Ute*, 406 U.S. at 153, and thus proving reliance is "virtually impossible," *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017).  Courts are careful to avoid granting *Affiliated Ute* reliance to plaintiffs who argue that their claims are based on omissions, when really the purported "omissions" are "simply the flip side of those positive statements."  *See Schwab v. E*Trade Fin. Corp.*, 285 F. Supp. 3d 745, 753 (S.D.N.Y.), *aff'd*, 752 F. App'x 56 (2d Cir. 2018).  That is exactly what Plaintiff has done here.  Plaintiff's claim is that investors were misled by Mr. Cohen's moon emoji tweet and the Cohen Defendants' August 16th 13D/A and Form 144 filings.  Plaintiff attempts to cast its allegations in terms of an omission.  *See* Compl. ¶¶ 148, 161 (alleging that the statements were misleading because they "failed to disclose" that Mr. Cohen planned to sell).  But the heart of its allegations is not that investors bought BBBY securities because the Cohen Defendants' future plans were not made public; it is that (however implausible it may be) investors were willing to buy BBBY shares based on what they may have possibly perceived to be unclear hints from Mr. Cohen about BBBY's future performance—whether in the form of an emoji or required SEC filings.  Based on the allegations in the Complaint, it was the Cohen Defendants' affirmative statements that allegedly misled investors, not their omissions.  Where, as here, the "crux" of the claims are "affirmative misrepresentations," the *Affiliated Ute* presumption is inapplicable.  *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 220-21 (D.C. Cir. 2010) (rejecting plaintiffs' attempt to characterize affirmative misrepresentations in defendants' financial statements as omissions by saying that defendants had "omitted" to disclose that they were running a Ponzi scheme).

Plaintiff also has not pleaded the elements of fraud on the market.  *See* Compl. ¶ 216.  To support this theory, the Complaint must plead: "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff

traded the stock between when the misrepresentations were made and when the truth was revealed." *Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 116 (D.D.C. 2017).  For the reasons discussed above, however, Plaintiff cannot demonstrate that any of the alleged misstatements were misleading (Prong 1) or material (Prong 2).  *See* Section V.A.1.a.  Plaintiffs' allegations are also fundamentally inconsistent with the theory that BBBY traded in an efficient market.  In an efficient market, all publicly available information is incorporated into BBBY's stock price.  *See Basic*, 485 U.S. at 241–42.  According to Plaintiff's Complaint, the overwhelming majority of BBBY's publicly disclosed financial information, analyst opinions, Wall Street sentiment, and press reporting suggested that BBBY was a failing company.  *See, e.g.*, Compl. ¶¶ 103 (BBBY reported Q4 2021 results showing "[n]et sales declined by double digits with a year-over-year decline of 22%" and "[n]et losses over the same year-over-year period increased from $9 million to $159 million"), 104 ("analysts were now increasingly alarmed by the Company's dwindling cash balance"), 114 (BBBY reported financial results for Q1 2022 showing "[n]et sales again declined by double digits with a year-over-year decline of 25%" and losses "ballooned from $50.9 million to $357.7 million").  Yet Plaintiff's theory is that, despite all of this negative information, BBBY's stock price went up (and investors bought BBBY shares) based on a single moon emoji tweeted by Mr. Cohen (responding to a negative article about BBBY), a Schedule 13D filing containing no new information, and a Form 144 filing announcing the potential sale of RCV's BBBY holdings.  Assuming the truth of these allegations, BBBY shares did not trade in an efficient market.

### d.    The Complaint's Loss Causation Allegations Are Implausible.

To plead loss causation, a plaintiff must adequately allege that "the act or omission of the defendant alleged to violate [Section 10(b)] caused the loss for which the plaintiff seeks to recover

damages." *Shenk*, 2019 WL 3491485, at *24. The Complaint's theory of loss causation is that, despite a wealth of public information suggesting that BBBY was facing terrible financial losses, Mr. Cohen's moon emoji tweet and the Cohen Defendants' two SEC filings caused investors to continue buying shares. Compl. ¶ 9. This theory is implausible.

First, BBBY stock was already experiencing extreme volatility prior to Mr. Cohen's involvement. *See* Thau Decl. Ex. 1 (showing BBBY share price fluctuations in January and February 2021, long before the Cohen Defendants' March 7th 13D). It also began to surge in August 2022 prior to Mr. Cohen's tweet. *See supra* Section II.E. Indeed, users on the r/WallStreetBets forum on Reddit were already actively promoting BBBY stock prior to Mr. Cohen's August 12 moon emoji tweet. For example, the below r/WallStreetBets posts were among the most popular on the forum in the week before Mr. Cohen's tweet:







**Mon, Aug 08, 2022, 11:39:03 AM Central Daylight Time**

r/wallstreetbets · Posted by u/shrek2watcher 7 months ago

$BBBY gains to infinity and beyond! **Gain**

4.5k upvotes   431 comments   5 awards



**Mon, Aug 08, 2022, 07:16:37 PM Central Daylight Time**

r/wallstreetbets · Posted by u/bighomiej69 PAPER TRADING COMPETITION WINNER 7 months ago

HIT ME $BBBY ONE MORE TIME **Meme**

2.3k upvotes   67 comments   5 awards



**Tue, Aug 09, 2022, 09:22:02 AM Central Daylight Time**

r/wallstreetbets · Posted by u/[deleted] 7 months ago

BBBY.... Added 1000 shares ! Buying the Dip . Not selling .

**Loss**

3.6k upvotes   782 comments   15 awards



**Tue, Aug 09, 2022, 05:49:33 PM Central Daylight Time**

r/wallstreetbets · Posted by u/Responsible_Big4813 7 months ago

If BBBY closes above $15 by Friday, I'll print top voted comment onto sign outside CNBC/mad money studios **Discussion**

11.5k upvotes   954 comments   44 awards

These posts all communicate enthusiasm for buying BBBY stock.[10]  "YOLO" (short for: "you only live once") is meant to communicate the sentiment that high risks should be tolerated for the possibility of high rewards.  Other messages tout BBBY stock as going "to infinity and beyond" and encourage forum participants to "buy the dip."  These facts undermine any inference that the Cohen Defendants caused BBBY's subsequent rise and fall.  *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) (no loss causation because plaintiff failed to plead that the alleged "misrepresentations and omissions caused the losses flowing from the well-disclosed volatility of securities").  The stock indisputably experienced wild swings before Mr. Cohen's involvement and independent of his influence.

Second, the public information available at the time of the Cohen Defendants' stock sales uniformly made clear to the investing public that BBBY was suffering severe financial difficulties.  The Complaint alleges, for example, that:  in April 2022, BBBY reported Q4 2021 financial results showing "[n]et sales declined by double digits with a year-over-year decline of 22%" and "[n]et losses over the same year-over-year period increased from $9 million to $159 million" (¶ 103); also in April 2022, analysts reported that the Company's "waning cash balance" was in danger of running dry in the near future (¶ 104); in June 2022, BBBY published financial results for Q1 2022 showing "[n]et sales again declined by double digits with a year-over-year decline of 25%" and losses "ballooned from $50.9 million to $357.7 million" (¶ 114); also in June 2022, BBBY announced the hire of Berkeley Research Group to assist with its ongoing cash crisis (¶ 121); the industry, as early as June 30, 2022, had been speculating that buybuy BABY was worth far less

---

[10]  Each of these posts is also publicly available on Reddit's r/WallStreetBets forum at https://www.reddit.com/r/wallstreetbets/search/?q=BBBY&restrict_sr=&sort=top&t=all, and therefore judicially noticeable.  *See Doe v. Roman Cath. Diocese of Greensburg*, 581 F. Supp. 3d 176, 195 (D.D.C. 2022) ("A court may take judicial  notice of the contents of an Internet website.") (internal citations and quotation marks omitted).

than previously thought (¶ 114); the media in August 2022 continued reporting that BBBY had severe liquidity issues (¶ 119); and by mid-August 2022, the *Wall Street Journal* had reported that the Company was in need of a $375 million loan, which "was expected to be collateralized by a security interest in buybuy BABY" (¶ 128).

With this as a backdrop, Plaintiff suggests that investors nonetheless believed the Company was going to rebound and purchased additional shares based only on (i) Mr. Cohen's response to an article denigrating the Company as a lost cause, solely because it contained a moon emoji, (ii) the Cohen Defendants' August 16th 13D/A (even though it contained no new information), and (iii) the Cohen Defendants' failure to submit their Form 144 sooner (even though it was timely filed). This theory is simply not plausible. The far more plausible explanation is that BBBY's stock price would have shot up with or without the alleged misstatements, and it would have thereafter declined because of other news in the market suggesting that BBBY was headed to bankruptcy. *See* Compl. ¶ 130 (alleging that, on August 18, 2022, Bloomberg reported that BBBY had retained Kirkland & Ellis for a potential bankruptcy filing); s*ee City of Westland Police & Fire Ret. Sys. v. MetLife, Inc*., 928 F. Supp. 2d 705, 715-16 (S.D.N.Y. 2013) (dismissing for lack of loss causation where the "amended complaint fails even to acknowledge the U.S. credit downgrade and the accompanying upheaval in the marketplace").

Moreover, at least with respect to the August 16th 13D/A, Plaintiff cannot plead loss causation without undermining its reliance allegations. In pleading reliance, Plaintiff alleges that BBBY securities were traded in an efficient market. Compl. ¶ 227. But if that were the case, then all publicly available information already would have been reflected in BBBY's stock price, making it impossible for the August 16th 13D/A (which contained no new information) to be the cause of any increase. *See Grigsby,* 979 F.3d at 1205 ("Because publicly available information in

an efficient market is generally reflected in the price of a security, the disclosure of confirmatory information—or information already known by the market—will not cause a change in stock price."). Plaintiff "cannot contend that the market is efficient for purposes of reliance and then cast the theory aside when it no longer suits their needs for purposes of loss causation." *Meyer v. Greene*, 710 F.3d 1189, 1198–99 (11th Cir. 2013).

As discussed above, the August 16th 13D/A: (1) discloses the exact same number of shares and ownership percentage as BBBY had disclosed for RCV in the Definitive Proxy Statement it filed in June 2022; (2) explicitly states that the Cohen Defendants had not traded in BBBY in more than two months nor since the previous Schedule 13D filing; and (3) clearly states that the sole reason for the amendment is that BBBY had repurchased shares, thereby increasing the Cohen Defendants' ownership percentage interest above 10%. *See* Bed Bath & Beyond Inc., Definitive Proxy Statement, 74 (Form DEF 14A) (June 1, 2022), attached as Thau Decl. Exh. 14; *see also supra* Section II.D. Given that the information in the August 16th 13D/A was already publicly available, it is not plausible that the filing caused BBBY's share price to rise.

## 2. The Complaint Fails to State a Market Manipulation Claim Against the Cohen Defendants Under Section 10(b) and Rules 10b-5(a) and (c).

The Complaint's core market manipulation theory is that the Cohen Defendants engaged in a "pump-and-dump" scheme to influence the price of BBBY's stock. *See, e.g.*, Compl. ¶ 31. But the Complaint does not plead facts showing a viable "scheme liability" claim for market manipulation under Section 10(b).

"Market-manipulative behavior is 'intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.'" *Koch v. SEC*, 793 F.3d 147, 152 (D.C. Cir. 2015) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)). For a private party to plead "market manipulation under § 10(b) and Rules 10b-5(a) and (c)," they

must allege: "(1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 106 (2d Cir. 2022) (citation omitted); *see Kessev Tov, LLC v. Doe(s)*, No. 20-CV-04947, 2022 WL 2356626, at *7 (N.D. Ill. June 30, 2022) (same).  Plaintiff here fails to allege the required elements of a manipulative act, reliance, scienter, or loss causation and therefore its market manipulation claim must be dismissed.

To plead a manipulative act, a plaintiff must allege "market **activity**" or some other manipulative conduct by the defendant that is "designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 76 (2d Cir. 2021) (emphasis added).  Consequently, a "market manipulation claim . . . cannot be based solely upon misrepresentations or omissions." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 101 (2d Cir. 2007); *see SEC v. Rio Tinto plc*, 41 F.4th 47, 48-54 (2d Cir. 2022).  The "critical question" is "what **activity** 'artificially' affects a security's price in a deceptive manner." *Noto*, 35 F.4th at 106 (quoting *ATSI*, 493 F.3d at 100) (emphasis added).  In addition to market activity or manipulative acts, the defendant must have also "injected inaccurate information into the marketplace." *Id.* (citation omitted).

Despite the Complaint's use of the phrase "pump and dump," it identifies no "market activity" designed to "pump" BBBY's share price.  *See* Compl. ¶¶ 24, 31, 32, 195, 265; *see also Catton v. Def. Tech. Sys., Inc.*, No. 05 Civ. 6954, 2006 WL 27470, at *7 (S.D.N.Y. Jan. 3, 2006) ("The phrase 'pump and dump' is not a talisman that will convert a claim grounded in misrepresentations into a scheme.") (citation omitted).  While a "pump and dump" scheme may include the use of material misrepresentations, "the 'scheme' must include deceptions beyond

misrepresentations and omissions." *SEC v. Familant*, 910 F. Supp. 2d 83, 93-94 (D.D.C. 2012) (citing *Lentell*, 396 F.3d at 177). The Complaint does not allege that the Cohen Defendants engaged in any "market activity" (*e.g.*, "wash sales, matched orders, or rigged prices") to "pump" BBBY's share price or any other manipulative conduct beyond the alleged misstatements. *ATSI*, 493 F.3d at 101. The Complaint shifts its verbiage in pleading manipulation—alleging a "coordinated . . . campaign to promote Bed Bath securities," "use[] [of] Cohen's notoriety amongst retail investors," the filing of SEC forms, among other things—but each of these allegations amounts to a refashioning of Plaintiff's false statement claims. Compl. ¶ 233.

Plaintiff's market manipulation claim also fails for the additional, independent reasons that it fails to plead facts showing (1) that the Cohen Defendants "injected inaccurate information into the marketplace," *Noto*, 35 F.4th at 106; (2) loss causation, or (3) a "strong inference of scienter." *See supra* Sections V.A.2, V.A.1.d, V.A.1.b.

### 3.      The Complaint Does Not Plead Insider Trading Under Section 10(b).

Trading on the basis of material, nonpublic information can qualify as a "deceptive device," giving rise to Section 10(b) liability. *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997). To the extent Plaintiff alleges such liability, however, it is not adequately pleaded in the Complaint.

Plaintiff does not plausibly allege that Mr. Cohen possessed material, nonpublic information. It alleges only that the Board possessed such information, including the directors appointed pursuant to the Cooperation Agreement with RCV. But Mr. Cohen was not himself on the Board, and the directors suggested pursuant to the Cooperation Agreement were independent and duty-bound to keep nonpublic information confidential. *See* Thau Decl. Exh. 2 at Exh. 99.1 §§ 1(a)(ii), 1(b)(i); Thau Decl. Exh. 14 at 5 (showing each of the RCV-suggested directors was

independent). Plaintiff claims that it is "inconceivable" that the directors would not have shared material, nonpublic information with Mr. Cohen, but alleges no facts to suggest that the directors would so readily breach their fiduciary duties or that they in fact did so. Compl. ¶¶ 7, 122.

The Company has publicly concluded exactly the opposite. BBBY rejected a shareholder demand that the Company take action against RCV to recoup "short-swing profits" under Section 16(b) of the Exchange Act based on the premise that the newly-appointed directors were acting "solely for RCV's benefit." In rejecting the demand, BBBY wrote that RCV had done nothing improper, in significant part because "RC Ventures' nominees to the Company's Board of Directors are independent of RC Ventures, and each possesses substantial prior experience serving as a director of other public companies." Thau Decl. Exh. 15. Plaintiff's conclusory allegations to the contrary do not satisfy the strict PSLRA standard. 15 U.S.C. § 78u–4(b)(1)(B) ("[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.").

Plaintiff's insider trading claim also fails because the Complaint does not plead any facts showing scienter or loss causation. *See supra* Sections V.A.1.b, V.A.1.d; *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 (2d Cir. 2014) (insider trading claim requires showing that the insider traded "while knowingly in possession of the material nonpublic information").

### B.    Plaintiff's Section 9(a) Claims

Section 9(a) of the Exchange Act forbids various forms of market manipulation. 15 U.S.C. § 78i(a)(2). "Section 9(f) creates a private right of action" for those injured by Section 9(a) violations. *I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC*, 280 F. Supp. 3d 524, 540 (S.D.N.Y. 2017). Plaintiff alleges that it was injured by the Cohen Defendants' violations of Sections 9(a)(2), 9(a)(3), and 9(a)(4). Compl. ¶¶ 246-263. None of these allegations states a claim.

1.      **The Complaint Alleges No "Series of Transactions" for a Section 9(a)(2) Claim.**

"To assert a claim under Section 9(a)(2), a plaintiff must show (1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter and (3) for the purpose of inducing the security's sale or purchase by others." *ECD Inv. Grp. v. Credit Suisse Int'l*, No. 14-CV-8486, 2017 WL 3841872, at *25 (S.D.N.Y. Sept. 1, 2017) (citation omitted). Plaintiff meets none of these elements.

First, the Complaint alleges no "series of transactions" by the Cohen Defendants that was executed to affect BBBY's stock price. The basis for Plaintiff's market manipulation claim is the Cohen Defendants' series of alleged misstatements, not any series of "transactions." These are not the same thing. *See* 17 C.F.R. § 240.17f-1(a)(5) ("The term securities-related ***transaction*** shall mean a purpose, sale or pledge of investment securities, or a custodial arrangement for investment securities.") (emphasis added); *In re Jan. 2021 Short Squeeze Trading Litig.*, No. 21-2989-MDL, 2022 WL 3682083, at *10 (S.D. Fla. Aug. 11, 2022) (conduct that "involved no exchange or activity between two or more persons" is not a "transaction" under Section 9(a)(2)); *id.* ("To hold otherwise would equate a transaction with *any* activity and result in prospective liability under section 9(a) for virtually any conduct; at which point, the refrain, 'Everything is securities fraud' would ring true."). Indeed, the only "transactions" alleged in the Complaint are those that occurred ***after*** the Cohen Defendants allegedly manipulated the market (via statements). But under Section 9(a)(2) the transactions ***are*** the market manipulation—they must be carried out "for the purpose of

inducing the security's sale or purchase by others." *ECD Inv. Grp.*, 2017 WL 3841872, at *25. That is not pleaded here.[11]

In addition, Plaintiff fails to plead facts showing scienter with respect to its Section 9(a)(2) claim for the same reasons it fails to plead scienter with respect to its Section 10(b) claims. *See supra* Section III.A.iv.

### 2.    Plaintiff Alleges No Actionable "Prophecy" Under Section 9(a)(3).

Section 9(a)(3) of the Exchange Act makes it unlawful for "a dealer, broker . . . or other person selling or offering for sale or purchasing or offering to purchase the security," to (1) "induce the purchase or sale of any security," (2) "by the circulation or dissemination … of information to the effect that the price of any such security will or is likely to rise or fall because of market operations of any 1 or more persons," (3) "in the ordinary course of business," (4) "conducted for the purpose of raising or depressing the price of such security."  15 U.S.C. § 78i(a)(3).  There appears to be no case applying this statute.  But at least one court has explained that the purpose of Section 9(a)(3) is to "prohibit dissemination of information on predicted stock values or trading, commonly known as 'prophecies.'"  *Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1158 (5th Cir. 1982), *cert. granted, judgment vacated on unrelated grounds*, 460 U.S. 1007 (1983).

Unlike its sister provisions in Section 9(a), the text of Section 9(a)(3) makes clear that it applies only to broker-dealers who make predictions in the ordinary course of that business.  *See* 15 U.S.C. § 78i(a)(3) (limiting application to predictions made "in the ordinary course of business" by "a dealer, broker, security-based swap dealer, major security-based swap participant, or other person selling or offering for sale or purchasing or offering to purchase the security, a security-

---

[11] Similarly, because a "transaction" is an "act" and not a "statement," the failure to plead a "manipulative act" for purposes of a Section 10(b) manipulation claim also defeats a Section 9(a)(2) claim. *See Onel v. Top Ships, Inc.*, 806 F. App'x 64, 66 (2d Cir. 2020) (summary order).

based swap, or a security-based swap agreement").[12]  The Cohen Defendants are not broker-dealers and thus cannot be liable under Section 9(a)(3).

Additionally, Plaintiff here does not allege the kind of "prophecy" proscribed by the statute. The only statement even alleged to be a prediction regarding stock prices is the moon emoji tweet. But as discussed above, Plaintiff does not plausibly allege that the tweet communicated a prediction that BBBY stock would increase.  *See supra* Section V.A.1.a.i.  Nor does Plaintiff plausibly plead that Mr. Cohen had a manipulative purpose when he published the tweet.  *See supra* Section V.A.2.

### 3.   The Section 9(a)(4) Claim Is a Recast 10(b) Claim and Fails for the Same Reasons.

Plaintiffs pleading claims under Section 9(a)(4) must show "a (1) misstatement or omission (2) of material fact (3) made with scienter (4) for the purpose of inducing a sale or purchase of a security (5) on which the plaintiff relied (6) that affected plaintiff's purchase or selling price." *Stone Fam. Tr. v. Credit Suisse AG*, No. 19 Civ. 5192, 2022 WL 954743, at *6 (S.D.N.Y. Mar. 30, 2022).  Plaintiff's Section 9(a)(4) claims are based on the same alleged misstatements as its 10b-5(b) claims.  Compl. ¶¶ 257-263.  They fail for the same reasons.  *See supra* Sections V.A.1, V.A.2; *Stone Fam.*, 2022 WL 954743, at *6 ("The analysis of claims under Section 9(a) closely parallels the analysis of claims under Section 10(b).") (citation omitted); *Y-GAR Cap. LLC v. Credit Suisse Grp. AG*, No. 19 Civ. 2827, 2020 WL 71163, at *9 (S.D.N.Y. Jan. 2, 2020) ("Because Plaintiff has failed to allege misrepresentations and scienter sufficient to sustain a Section 10(b) claim, the Section 9(a)(4) claim also fails."); *Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 477

---

[12] With such limited applicability, the statute is scarcely invoked and even more rarely applied by courts.  *See* "Manipulative and deceptive devices and schemes," 2 West's Fed. Admin. Prac. § 2312 ("Section 9(a)(3) … ha[s] spawned virtually no litigation.").

(S.D.N.Y. 2014) (where the plaintiff's Section 10(b) claimed failed, "Plaintiffs' Section 9(a)(4) claim necessarily fails" as well).

### C.      The Complaint's Section 20A Claim Is Not Viable.

Plaintiff also brings a separate insider trading claim against the Cohen Defendants under Section 20A of the Exchange Act.  "A plaintiff bringing a claim under this section must . . . plead: (1) a predicate violation of the [Exchange] Act or its rules and regulations; (2) that the defendant traded the security at issue contemporaneously with the plaintiff; and (3) that the defendant was in possession of material, nonpublic information at the time of the trade."  *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255 (S.D.N.Y. 2007) (citations omitted).  "[C]laims brought under § 20A must comply with the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act."  *Gruber v. Gilbertson*, No. 16 CV 9727, 2019 WL 4458956, at *2 (S.D.N.Y. Sept. 17, 2019) (citation omitted).

Plaintiff's Section 20A claim fails because it has failed to allege any predicate violation of the Exchange Act.  *See* Sections V.A, V.B, V.C, *supra*.  Plaintiff has also, as demonstrated above, failed to plausibly allege that Mr. Cohen possessed material, nonpublic information at the time of his trades.  *See* Section V.A.3, *supra*.  Plaintiff thus cannot state a claim for insider trading under Section 20A.

### D.      The Complaint Does Not State a Section 20(a) Claim Against Mr. Cohen.

Plaintiff attempts to hold Mr. Cohen accountable as a "control person" under the Exchange Act for any violations by RCV.  *See* 15 U.S.C. § 78t(a).  Plaintiff's "control person" claims fail because the Complaint does not state any viable securities fraud violation by RCV.  *See supra* Sections V.A, V.B, V.C.  Without such a "primary" violation, there cannot be any individual liability for "control persons" under Section 20(a).  *See, e.g.*, *Harman*, 791 F.3d at 111 ("A claim

under Section 20(a) can exist only if there is a viable claim against the corporation."); *accord*

*Plymouth*, 370 F. Supp. 3d at 97 (same).

## VI.   CONCLUSION

For these reasons, the Court should dismiss the Complaint in its entirety with prejudice.

Dated:  March 15, 2023

Respectfully submitted,

VINSON & ELKINS LLP

*/s/ Clifford Thau*

Ephraim (Fry) Wernick
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Telephone: (202) 639-6730
Facsimile: (202) 879-8830
Email: ewernick@velaw.com

Clifford Thau
Marisa Antonelli
1114 Avenue of Americas
New York, NY 10036
Telephone: (212) 237-0000
Facsimile: (212) 237-0100
Email: cthau@velaw.com
Email: mantonelli@velaw.com

Justin C. Beck
2001 Ross Avenue
Dallas, Texas 75201
Telephone: (214) 220-7700
Facsimile: (214) 220-7716
Email: jbeck@velaw.com

*Attorneys for RC Ventures LLC and Ryan Cohen*