# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE BED BATH & BEYOND CORPORATION SECURITIES LITIGATION | Case No. 1:22-cv-2541-TNM |
| | CLASS ACTION |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Oral Argument Requested |

## DEFENDANTS BED BATH & BEYOND INC. AND SUE E. GOVE'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Pursuant to Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6), and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, Defendants Bed Bath & Beyond Inc. and Sue E. Gove (the "Bed Bath Defendants"), by their undersigned counsel, hereby respectfully move this Court to dismiss with prejudice the Second Amended Class Action Complaint (ECF No. 66) (the "Second Amended Complaint") filed by Lead Plaintiff Bratya SPRL ("Plaintiff"). This Motion is supported by the Declaration of Jared Gerber dated March 15, 2023, and the exhibits attached thereto, as well as the accompanying Memorandum of Law.

Dismissal is warranted because the Second Amended Complaint fails to state a claim upon which relief can be granted as all of Plaintiff's causes of action against the Bed Bath Defendants fail to plead necessary elements—including falsity, scienter, and reliance for Plaintiff's claims under Section 10(b) of the Exchange Act of 1934 (the "Exchange Act") and an underlying violation and culpable participation for Plaintiff's claims under Section 20(a) of the Exchange Act—or meet the heightened pleading standards for securities fraud claims. The grounds for this Motion are set forth in the Memorandum of Law filed concurrently herewith.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE BED BATH & BEYOND CORPORATION SECURITIES LITIGATION | Case No. 1:22-cv-2541-TNM |
| | CLASS ACTION |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Oral Argument Requested |

**DEFENDANTS BED BATH & BEYOND INC. AND SUE E. GOVE'S**
**MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.................................................................. iii

PRELIMINARY STATEMENT.................................................. 1

FACTUAL BACKGROUND ..................................................... 3

I.  THE BED BATH DEFENDANTS AND
    BED BATH'S OPERATIONS.......................................... 3

II. RYAN COHEN, THE MEME STOCK MOVEMENT, AND RC
    VENTURES' INVESTMENTS IN BED BATH SHARES ............... 4

III. BED BATH'S CONTINUED FINANCIAL STRUGGLES AND
     COHEN'S SUBSEQUENT SALE OF HIS BED BATH SHARES..................... 6

IV. POST-CLASS PERIOD DEVELOPMENTS CONCERNING
    BED BATH'S FINANCIAL CONDITION ........................... 8

V.  THE FILING OF THIS ACTION AND THE
    CURRENT COMPLAINT................................................. 9

ARGUMENT......................................................................10

I.  THE SECOND AMENDED COMPLAINT FAILS TO PLEAD
    THAT THE BED BATH DEFENDANTS MADE ANY
    ACTIONABLY FALSE STATEMENTS ...........................................11

    A.  Plaintiff Fails To Adequately Plead That The Alleged
        Misstatements By The Bed Bath Defendants Were False Or
        Misleading When Made ........................................12

        1.  Bed Bath's Statement That It Was "Pleased To
            Have Reached A Constructive Agreement With
            [Cohen] In March" Was Not Misleading .....................12

        2.  The Second Amended Complaint Confirms That
            Bed Bath Was "Working . . . On Strengthening [Its]
            Balance Sheet," "Enhanc[ing] Liquidity," And
            "Maximizing Value For All Shareholders"................................15

    B.  The Challenged Statements By The Bed Bath Defendants
        Are Non-Actionable As A Matter Of Law .............................18

        1.  The Alleged Misstatements By The Bed Bath
            Defendants Were Inactionable Puffery.......................................18

**Page**

2.     The Alleged Misrepresentations By The Bed Bath
Defendants Were Statements Of Opinion That Are
Not Adequately Alleged To Be False ..........................................20

C.     Plaintiff Does Not Adequately Allege That Gove Was A
Maker Of The Challenged Statements .......................................21

II.     THE SECOND AMENDED COMPLAINT FAILS TO RAISE A
STRONG INFERENCE OF SCIENTER AGAINST THE BED
BATH DEFENDANTS ......................................................................22

A.     Plaintiff Fails To Allege Any Strong Circumstantial
Evidence That The Bed Bath Defendants Acted
With Scienter....................................................................................23

B.     Plaintiff Fails To Plead That The Bed Bath Defendants Had
Motive And Opportunity To Commit Fraud .............................27

C.     When Considered Collectively, Plaintiff's Allegations Fail
To Raise A Strong Inference That The Bed Bath
Defendants Acted With Scienter ...............................................30

III.    THE SECOND AMENDED COMPLAINT DOES NOT PLEAD
RELIANCE ON THE BED BATH DEFENDANTS'
STATEMENTS..................................................................................31

A.     Plaintiff's Factual Allegations Are Fundamentally
Inconsistent With The Fraud-On-The-Market Presumption
Of Reliance .....................................................................................31

B.     Plaintiff Also Cannot Invoke The *Affiliated Ute*
Presumption Of Reliance Against The Bed Bath
Defendants........................................................................................34

IV.    THE CONTROL PERSON CLAIM AGAINST GOVE
ALSO FAILS.....................................................................................35

CONCLUSION.............................................................................................36

# TABLE OF AUTHORITIES[*]

**Page(s)**

**Cases**

*Affiliated Ute Citizens of the State of Utah v. United States,*
406 U.S. 128 (1972) ......................................................................................... 31, 34

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ......................................................................................... 10, 32

*Chill v. Gen. Elec. Co.,*
101 F.3d 263 (2d Cir. 1996) ................................................................................ 26

*City of Brockton Ret. Sys. v. Avon Prods., Inc.,*
2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ................................................... 24

*City of Phila. v. Fleming Cos., Inc.,*
264 F.3d 1245 (10th Cir. 2001) .......................................................................... 17

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.,*
412 F. Supp. 3d 206 (E.D.N.Y. 2019) ............................................................... 18

*Dodona I, LLC v. Goldman, Sachs & Co.,*
847 F. Supp. 2d 624 (S.D.N.Y 2012) ................................................................ 34

*Druskin v. Answerthink, Inc.,*
299 F. Supp. 2d 1307 (S.D. Fla. 2004) .............................................................. 27

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.,*
553 F.3d 187 (2d Cir. 2009) ............................................................................... 19

*Edwards v. Ocwen Loan Servicing, LLC,*
24 F. Supp. 3d 21 (D.D.C. 2014) ....................................................................... 34

*Elam v. Neidorff,*
544 F.3d 921 (8th Cir. 2008) .............................................................................. 28

*Erica P. John Fund, Inc. v. Halliburton Co.,*
563 U.S. 804 (2011) ....................................................................................... 31, 32

---

[*] Asterisks identify those authorities on which Defendants Bed Bath & Beyond Inc. and Sue E. Gove chiefly rely.

**Page(s)**

*Freeburg v. Wolf,*
    42 F. App'x 715 (6th Cir. 2002) ................................................................. 17

*Gariety v. Grant Thornton, LLP,*
    368 F.3d 356 (4th Cir. 2004) .................................................................. 32

*Gillis v. QRX Pharma Ltd.,*
    197 F. Supp. 3d 557 (S.D.N.Y. 2016) ....................................................... 30

*Glaser v. The9, Ltd.,*
    772 F. Supp. 2d 573 (S.D.N.Y. 2011) ....................................................... 28

*Glickenhaus & Co. v. Household Int'l, Inc.,*
    787 F.3d 408 (7th Cir. 2015) .................................................................. 21

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.,*
    141 S. Ct. 1951 (2021) .......................................................................... 32

*Gross v. Summa Four, Inc.,*
    93 F.3d 987 (1st Cir. 1996) .................................................................... 31

*Hoyte v. Yum! Brands, Inc.,*
    489 F. Supp. 2d 24 (D.D.C. 2007) ........................................................... 19

*In re Baan Co. Sec. Litig.,*
    103 F. Supp. 2d 1 (D.D.C. 2000) ............................................................. 19

*In re Carter-Wallace, Inc. Sec. Litig.,*
    220 F.3d 36 (2d Cir. 2000) .................................................................... 15

*In re Dot Hill Sys. Corp. Sec. Litig.,*
    594 F. Supp. 2d 1150 (S.D. Cal. 2008) ..................................................... 18

*In re Express Scripts Holding Co. Sec. Litig.,*
    773 F. App'x 9 (2d Cir. 2019) .............................................................15, 17

*In re Ferroglobe PLC Sec. Litig.,*
    2020 WL 6585715 (S.D.N.Y. Nov. 10, 2020) ............................................. 14

*In re GeoPharma, Inc. Sec. Litig.,*
    411 F. Supp. 2d 434 (S.D.N.Y. 2006) ...................................................26–27

\*   *In re Interbank Funding Corp. Sec. Litig.,*
    629 F.3d 213 (D.C. Cir. 2010) .............................................................34–35

Page(s)

*In re Marriott Int'l, Inc. Customer Data Sec. Breach Litig.*,
 543 F. Supp. 3d 96 (D. Md. 2021),
 *aff'd sub nom. In re Marriott Int'l, Inc.*,
 31 F.4th 898 (4th Cir. 2022)..................................................................... 18

*In re Morgan Stanley Info. Fund Sec. Litig.*,
 592 F.3d 347 (2d Cir. 2010) ..................................................................... 12

*In re NAHC, Inc. Sec. Litig.*,
 2001 WL 1241007 (E.D. Pa. Oct. 17, 2001),
 *aff'd*, 306 F.3d 1314 (3d Cir. 2002) ......................................................... 17

*In re PetSmart, Inc. Sec. Litig.*,
 61 F. Supp 2d 982 (D. Ariz. 1999).......................................................... 29

*In re PXRE Grp., Ltd., Sec. Litig.*,
 600 F. Supp. 2d 510 (S.D.N.Y. 2009),
 *aff'd sub nom. Condra v. PXRE Grp. Ltd.*,
 357 F. App'x 393 (2d Cir. 2009) .............................................................. 23

*In re Rockwell Med., Inc. Sec. Litig.*,
 2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ....................................14, 24

*In re ShengdaTech, Inc. Sec. Litig.*,
 2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014) .......................................... 35

*In re Sofamor Danek Grp., Inc.*,
 123 F.3d 394 (6th Cir. 1997)..................................................................... 14

*In re Synergy Pharms., Inc. Sec. Litig.*,
 2021 WL 4480625 (E.D.N.Y. Sept. 30, 2021)......................................... 19

*In re Tempur Sealy Int'l, Inc. Sec. Litig.*,
 2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) ....................................13–14

*In re Twitter, Inc. Sec. Litig.*,
 506 F. Supp. 3d 867 (N.D. Cal. 2020),
 *aff'd sub nom. Weston Fam. P'ship LLLP v. Twitter, Inc.*,
 29 F.4th 611 (9th Cir. 2022)..................................................................... 14

\* *In re U.S. Office Prods. Sec. Litig.*,
 326 F. Supp. 2d 68 (D.D.C. 2004) ...............................................10–11, 24, 35

**Page(s)**

*In re Wachovia Equity Sec. Litig.*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011) ................................................................. 23

\* *In re XM Satellite Radio Holdings Sec. Litig.*,
   479 F. Supp. 2d 165 (D.D.C. 2007) ............................................... 17, 18, 20, 24

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) ........................................................................................... 21

\* *Kowal v. MCI Commc'ns Corp.*,
   16 F.3d 1271 (D.C. Cir. 1994) ..................................................... 18, 20, 33–34

*Lin v. Interactive Brokers Grp., Inc.*,
   574 F. Supp. 2d 408 (S.D.N.Y. 2008) ............................................................... 13

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
   547 U.S. 71 (2006) ......................................................................................... 9, 11

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ........................................................................ 33

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) ........................................................................................... 20

*Pipefitters Union Loc. 537 Pension Fund v. Am. Exp. Co.*,
   773 F. App'x 630 (2d Cir. 2019) ....................................................................... 15

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
   11 F.4th 90 (2d Cir. 2021) ................................................................................. 19

*Plumbers Loc. #200 Pension Fund v. Wash. Post Co.*,
   930 F. Supp. 2d 222 (D.D.C. 2013) .............................................................. 26, 29

*Plumley v. Sempra Energy*,
   2017 WL 2712297 (S.D. Cal. June 20, 2017) ................................................... 19

\* *Plymouth Cnty. Ret. Ass'n v. Advisory Bd. Co.*,
   370 F. Supp. 3d 60 (D.D.C. 2019) .................................................................... 12

*River Birch Cap., LLC v. Jack Cooper Holdings Corp.*,
   2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019) .................................................... 15

*Rochester Laborers Pension Fund v. Monsanto Co.*,
   883 F. Supp. 2d 835 (E.D. Mo. 2012) .............................................................. 19

**Page(s)**

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ........................................................................ 29

*Ross v. Walton*,
    668 F. Supp. 2d 32 (D.D.C. 2009) ................................................................ 25

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) ........................................................................... 29

*Russo v. Bruce*,
    777 F. Supp. 2d 505 (S.D.N.Y. 2011) .......................................................... 28

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*,
    75 F.3d 801 (2d Cir. 1996) ........................................................................... 27

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009) ........................................................................... 26

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
    119 F. Supp. 3d 1213 (C.D. Cal. 2015) ....................................................... 32

*SE Penn. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
    2015 WL 3833849 (M.D. Pa. June 22, 2015) .............................................. 19

*SEC v. Steadman*,
    967 F.2d 636 (D.C. Cir. 1992) ................................................................22, 27

*Shekoyan v. Sibley Int'l Corp.*,
    217 F. Supp. 2d 59 (D.D.C. 2002),
    *aff'd*, 409 F.3d 414 (D.C. Cir. 2005) ........................................................... 30

*Sinnathurai v. Novavax, Inc.*,
    2022 WL 17585715 (D. Md. Dec. 12, 2022) ............................................... 19

\*   *Stevens v. InPhonic, Inc.*,
    662 F. Supp. 2d 105 (D.D.C. 2009) ..................................... 22, 25, 27, 28–29

*Sullivan & Long, Inc. v. Scattered Corp.*,
    47 F.3d 857 (7th Cir. 1995) ...................................................................32–33

*Tchrs' Ret. Sys. of La. v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ........................................................................ 29

**Page(s)**

\* *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)........................................................................................22, 30

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017)......................................................................... 35

*Winer Fam. Tr. v. Queen*,
503 F.3d 319 (3d Cir. 2007)......................................................................... 14

**Statutes**

15 U.S.C. § 78j(b) ...................................................................................*passim*

15 U.S.C. § 78t(a)................................................................................10, 35

15 U.S.C. § 78u-4 .........................................................................1, 22, 23–24

**Other Authorities**

Fed. R. Civ. P. 8 ...................................................................................1, 10, 32

Fed. R. Civ. P. 9(b)..............................................................................1, 10, 30

Fed. R. Civ. P. 12(b).................................................................................. 1

Defendants Bed Bath & Beyond Inc. ("Bed Bath" or the "Company") and Sue E. Gove ("Gove" and, together with Bed Bath, the "Bed Bath Defendants") respectfully submit this memorandum of law in support of their motion to dismiss with prejudice the Second Amended Class Action Complaint (ECF No. 66) (the "Second Amended Complaint" or "SAC") filed by Lead Plaintiff Bratya SPRL ("Plaintiff") for failure to state a claim pursuant to Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (the "PSLRA").[1]

## PRELIMINARY STATEMENT

The primary claim in this securities fraud class action is that Defendant Ryan Cohen ("Cohen")—an alleged leader of the "meme stock movement"—manipulated Bed Bath's stock price over the course of one week in August 2022 by tweeting a moon emoji and filing a number of forms with the SEC that repeated previously disclosed information about his stock holdings, which allegedly caused retail investors to drive up the stock price so that Cohen could "secretly" and "surreptitiously" sell his shares for a $68 million profit. In fact, the Second Amended Complaint devotes almost all of its first 66 pages and 178 paragraphs to describing Cohen's background, laying out an extended history of the meme stock movement, and explaining the intricacies of the SEC forms filed by Cohen (including the mechanics of their filing).

Then, as a complete afterthought, the Second Amended Complaint spends 3 pages and 6 conclusory paragraphs contending that Bed Bath itself made a single set of misstatements just one day before the end of the class period by generically stating in response to press inquiries about Cohen's filings that it was "pleased to have reached a constructive agreement with [him] in

---

[1] Unless indicated otherwise, all internal quotation marks and citations are omitted. Citations to "Ex." are to the exhibits attached to the Declaration of Jared Gerber.

March"—without saying anything about his stock holdings in March, August, or any time in between—and that the Company remained "committed to maximizing value for all shareholders." Plaintiff provides little more than unsupported speculation in an attempt to plead this implausible theory, asserting that Bed Bath should have known that Cohen "secretly" sold his shares as of that date (notwithstanding that Cohen had not yet publicly disclosed those sales) because the Company signed an amended credit agreement two weeks later, which Plaintiff assumes Cohen learned about at some unspecified time much earlier. Piling speculation on top of speculation, Plaintiff then contends that Bed Bath was required to guess that Cohen had actually sold his shares in response to his supposed unhappiness with that potential credit agreement, and to disclose that conjecture to its investors. This wholly speculative and unsupported theory fails for several reasons.

*First*, the Second Amended Complaint fails to adequately plead that any of the challenged statements by the Bed Bath Defendants were false or misleading when made. The challenged statements truthfully described Bed Bath's earlier cooperation agreement with Cohen and the Company's current efforts to address its financial circumstances, without discussing the subject of Cohen's holdings, and therefore did not give rise to a duty for Bed Bath to speculate that he may have sold his shares. Moreover, the generically positive statements made by Bed Bath—including that it was "pleased" to have reached a "constructive" agreement with Cohen in March, was "committed" to "maximizing value" for shareholders, and was "working expeditiously" on "strengthening [its] balance sheet"—are textbook examples of puffery and statements of opinion that are non-actionable as a matter of law.

*Second*, Plaintiff likewise fails to plead particularized facts raising the requisite strong inference of scienter. The Second Amended Complaint does not cite a single contemporaneous

fact available to the Bed Bath Defendants that contradicted their challenged statements at the time they were made, and instead relies on a convoluted string of speculation (advanced with the benefit of hindsight) that Bed Bath should have known that Cohen must have learned about a credit agreement the Company was negotiating and was so unhappy with that potential agreement that he decided to sell his shares. But the heightened pleading standards applicable to securities fraud claims cannot be satisfied by such unsupported speculation, which nonsensically presumes that Bed Bath decided to defraud its investors for a single day without making any attempt to profit from that supposed fraud.

*Third*, the Second Amended Complaint also fails to adequately plead that Plaintiff relied on the challenged statements by the Bed Bath Defendants. Plaintiff makes no attempt to plead that it directly relied on those loosely optimistic statements, and instead advances conclusory assertions seeking to invoke various presumptions of reliance, including claiming that Plaintiff is entitled to the fraud-on-the-market presumption because Bed Bath's securities supposedly traded in an efficient market. However, the actual factual allegations in the Second Amended Complaint are wholly inconsistent with those conclusory assertions, as they affirmatively plead that the market for Bed Bath stock was being manipulated during the class period, and that retail investors were causing the stock price to rise based on emojis and the repetition of previously disclosed information without regard to the Company's financial fundamentals.

For these reasons, and those discussed below, the Second Amended Complaint's implausible claims against Bed Bath and its CEO Gove should be dismissed with prejudice.

## FACTUAL BACKGROUND

## I.  THE BED BATH DEFENDANTS AND BED BATH'S OPERATIONS

Bed Bath is a home goods retailer that sells products such as bed linens, bath accessories, kitchen textiles, dinnerware, and electric appliances. SAC ¶ 2. It also owns and operates buybuy

BABY, Inc. ("buybuy BABY"), which is a specialty retailer that sells products meant for infants and children.  *Id.*  Defendant Sue E. Gove served as the interim CEO of Bed Bath from June to October 2022, and was appointed as the permanent CEO in October 2022.  SAC ¶ 23.

Plaintiff alleges that, "[o]ver the last few years, the Company has experienced a dramatic decline in sales and earnings, persistent losses, and a significant loss of market share."  SAC ¶ 2.  The Second Amended Complaint further claims that "[t]his resulted in the ouster of then-CEO Steven Temares in May 2019," as "[a]ctivist investors pushing for his ouster blamed him for the Company's outdated e-commerce platforms and deficient distribution network."  SAC ¶ 88.  Temares was replaced as CEO in November 2019 by Mark Tritton, who was previously the Chief Merchandising Officer of Target, where he "successfully rolled out Target's private-label brands."  SAC ¶ 89.  Plaintiff alleges that "Tritton attempted to replicate that strategy" at Bed Bath in order to "boost margins and increase foot traffic to the Company's stores," but that "[t]he move backfired" during the pandemic because of "weaknesses in the Company's supply chain and distribution network, inadequate investments in digital technology to adapt to the rise of online shopping, and a failure to implement curbside pickup."  SAC ¶¶ 89–90.

The Second Amended Complaint alleges that Bed Bath's financial situation further worsened by the third quarter of 2021.  SAC ¶ 91.  In particular, on January 6, 2022, the Company announced that net sales during that quarter had declined 28% year-over-year and net losses year-over-year had increased from $75.4 million to $276.4 million.  *Id.*

## II.   RYAN COHEN, THE MEME STOCK MOVEMENT, AND RC VENTURES' INVESTMENTS IN BED BATH SHARES

Between January and March 2022, Defendant Ryan Cohen purchased more than 9.4 million shares of Bed Bath, representing 9.8% of the Company's outstanding shares, through his personal investment entity, Defendant RC Ventures LLC ("RC Ventures").  SAC ¶ 92.

Cohen is a Canadian entrepreneur who, in 2011, founded the pet e-commerce company Chewy, Inc.  SAC ¶¶ 41, 43.  Plaintiff alleges that "[a] few years before the Class Period began, Cohen became one of the principal leaders of the 'meme stock' movement," which involved "online communities of retail investors dedicat[ing] their attention to particular stocks, sometimes for purposes of initiating a squeeze on short investors and hedge funds, and other times based on genuine beliefs about a company's prospects."  SAC ¶ 4.  Cohen allegedly became involved in the meme stock movement after purchasing a 9% stake in GameStop Corp. ("GameStop"), a business that sells video games and gaming consoles, in mid-August 2020.  SAC ¶¶ 52–53.  The Second Amended Complaint claims that GameStop's stock price immediately rose by more than 41% when investors learned about Cohen's investment in the company, and that "retail investors expressed their excitement on online forums and social media in threads that Cohen occasionally addressed on his Twitter account."  SAC ¶ 53.  As GameStop's stock price further increased throughout 2021, Cohen allegedly "took preeminence as the leader of retail investors in meme stocks," with "investors on Reddit forums like r/WallStreetBets [] increasingly rely[ing] on Cohen" and his posts on social media "to guide their investment decisions," often referring to him as "Papa Cohen" or the "meme lord."  SAC ¶¶ 60, 62, 69, 73.  Plaintiff further alleges that Cohen used his influence over these investors to drive up the price of GameStop's stock in January 2021 in order to execute a short squeeze that inflicted losses on certain hedge funds.  *See* SAC ¶¶ 66–72.  Cohen also allegedly used his influence at GameStop to push out certain GameStop senior executives, and eventually became the Chairman of GameStop's board of directors in June 2021.  *See* SAC ¶¶ 76–79.

After acquiring his shares in Bed Bath in early 2022, Cohen sent a letter to Bed Bath's Board of Directors on March 6, 2022, "implor[ing]" it "to evaluate a sale or spinoff of buybuy

BABY or a full sale of the Company to a private equity firm." SAC ¶ 94.  Two weeks later, Cohen reached a cooperation agreement with Bed Bath, pursuant to which Cohen agreed to limit his ownership to less than 20% of the Company's outstanding shares.  SAC ¶ 99.  In exchange, Bed Bath agreed to add three new directors nominated by Cohen and to create a strategy committee to oversee a strategic analysis of the buybuy BABY business.  *Id.*

## III.   BED BATH'S CONTINUED FINANCIAL STRUGGLES AND COHEN'S SUBSEQUENT SALE OF HIS BED BATH SHARES

The Second Amended Complaint alleges that Bed Bath's financial results continued to deteriorate after Cohen's investment, with net losses increasing year-over-year in the quarter ending on February 26, 2022 from $9 million to $159 million.  SAC ¶ 103.  As a result, beginning in April 2022, "several analysts [became] increasingly alarmed by the Company's dwindling cash balance."  SAC ¶ 104.  On June 21, 2022, allegedly as a result of Cohen's influence, Mark Tritton was replaced as Bed Bath's CEO by Sue Gove.  SAC ¶¶ 112–13.  A week later, on June 29, 2022, Bed Bath reported financial results for the first quarter of 2022, which again showed "ballooned" net losses, and disclosed that it had hired an external consultant to focus on cash, inventory, and balance sheet optimization.  *See* SAC ¶¶ 114, 121.

Against this backdrop, on August 5, 2022, Cohen allegedly "stoked Bed Bath retail investors" by tweeting "Ask not what your company can do for you – ask what you can do for your company."  SAC ¶ 139.  On the next trading day, "Bed Bath's stock price rose in reaction, from its prior day's closing price of $8.16 to close at $11.41, on extremely heavy trading volume."  SAC ¶ 143.  Then, on August 12, 2022—the first day of the class period—Cohen responded to a "negative article about Bed Bath and Cohen" by sending a tweet including "a smiley moon emoji."  SAC ¶¶ 146–47.  Meme investors allegedly "understood Cohen's tweet as a rallying cry to buy Bed Bath's stock and 'take it to the moon.'"  SAC ¶ 149.  As a result, Bed

Bath's stock price continued to increase to $16.00 on August 15, 2022, on heavy trading volume.
SAC ¶¶ 153–56.  Subsequently, after the close of trading on August 15, 2022, Cohen filed with
the SEC an Initial Statement of Beneficial Ownership on Form 3, which disclosed that Cohen
owned more than 10% of Bed Bath's outstanding shares.  SAC ¶ 156.  Although Cohen had
passed the 10% threshold based on share repurchases by Bed Bath earlier in the year, rather than
due to any new purchases, meme investors allegedly viewed the filings "as another signal from
Cohen that Bed Bath's stock price would continue to rise."  SAC ¶¶ 157–58.  Then, shortly
before the market opened on August 16, 2022, Cohen filed with the SEC an amendment to his
previously filed Schedule 13D, which reiterated the same share ownership information from the
form filed the night before.  SAC ¶ 159.  Purportedly as a result of meme investors' positive
reaction to these filings, Bed Bath's stock price increased by over 70% during trading on August
16, 2022.  SAC ¶ 163.  On that day and the following one, Cohen privately sold all of his shares
of Bed Bath stock, "earn[ing] a profit of over $68 million based on the purchase prices of his
holdings in March 2022."  SAC ¶¶ 165–68.

        After the close of trading on August 17, 2022, a Form 144 that Cohen had emailed to the
SEC the prior day was released to the public.  SAC ¶ 169.  That Form 144 indicated that Cohen
had not sold any Bed Bath securities during the prior three months, but that "this filing represents
the potential sale of up to 7,780,000 [shares of] common stock."  SAC ¶¶ 170, 173.  That filing
created uncertainty in the market about Cohen's intentions, with some meme investors
"doubt[ing] that any sales [of Bed Bath stock] were imminent" while members of the media
speculated that Cohen may have "hypothetically managed to sell all of his Bed Bath common
stock" on August 17.  SAC ¶¶ 175, 179.  In response to press inquiries about Cohen's filing, on
August 17 and 18, Bed Bath did not comment on whether Cohen had sold his shares or would

sell his shares, but instead stated that it was "pleased to have reached a constructive agreement with RC Ventures in March and [was] committed to maximizing value for all shareholders." SAC ¶¶ 179–80.  Bed Bath further stated that it had "been working expeditiously over the past several weeks with external financial advisors and lenders on strengthening [its] balance sheet," and that it would "provide more information in an update at the end of this month."  SAC ¶ 180.

After the market closed on August 18, 2022—the last day of the class period—Cohen filed with the SEC another amendment to his Schedule 13D and a Form 4, publicly disclosing for the first time that he had sold his entire stake in Bed Bath on August 16 and 17, 2022.  SAC ¶ 177.  Over the next three trading days, Bed Bath's stock price dropped from $18.55 to $8.78. SAC ¶ 178.

## IV.   POST-CLASS PERIOD DEVELOPMENTS CONCERNING BED BATH'S FINANCIAL CONDITION

On August 31, 2022, Bed Bath executed an amendment to an existing loan agreement, which provided the Company with $500 million in additional funds.  SAC ¶ 131.  That amendment "included a first priority lien on buybuy BABY and a guarantee from that subsidiary that would render a non-bankruptcy sale [of buybuy BABY] impossible."  SAC ¶ 133.

Notwithstanding this influx of funds, the Second Amended Complaint contends that "news about the Company's deteriorating performance and the intensity of the problems that existed as far back as late 2021 and existed throughout 2022 began to emerge" after the end of the Class Period.  SAC ¶ 196.  This included reports in late August 2022 that suppliers restricted shipments to Bed Bath because of missed payments, as well as the Company's announcement that it would reduce its workforce, close stores, and cut capital expenditures, SAC ¶¶ 197–99; ratings downgrades and increasing net losses in September 2022, SAC ¶¶ 200–04; Bed Bath's announcement of an exchange offer in October 2022, which was terminated in January 2023,

SAC ¶¶ 205–06; and the Company's disclosure in January 2023 that "there was substantial doubt about [its] ability to continue as a going concern" and that "management continued to consider all strategic alternatives, including seeking relief under the U.S. Bankruptcy Code," SAC ¶ 206.[2]

## V. THE FILING OF THIS ACTION AND THE CURRENT COMPLAINT

This action was originally filed on August 23, 2022, just days after Cohen's sales, by a plaintiff proceeding pro se. The initial complaint was riddled with errors—including incorrectly naming Bed Bath as "Bed Bath & Beyond Corporation" (rather than Bed Bath & Beyond Inc.), incorrectly referring to Bed Bath's then-CFO as Arnal Gustavo (rather than Gustavo Arnal), and incorrectly alleging that Bed Bath "is a District of Columbia corporation" (when it is incorporated in New York), Compl. ¶¶ 1, 7, 11—and asserted a number of state law fraud claims that were clearly barred under controlling law. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 74 (2006) (discussing federal law that "pre-empts state-law class-action claims" in connection with the purchase or sale of securities). That complaint also advanced an entirely unsupported and fantastical theory that Cohen, Arnal, and JP Morgan engaged in a multi-month conspiracy to inflate Bed Bath's stock price so that they could sell their shares at artificially high prices. Compl. ¶¶ 19–23, 43, 47. Tragically, according to reporting cited in the Second Amended Complaint, the false (if not defamatory) allegations in that initial complaint contributed to Arnal committing suicide on September 2, 2022. SAC ¶ 192.

Bratya SPRL was subsequently appointed the lead plaintiff in this action, and filed the Second Amended Complaint on January 30, 2023. Rejecting the unfounded conspiracy

---

[2] Although Plaintiff asserts that Bed Bath was "days away from filing for bankruptcy" when Plaintiff filed the Second Amended Complaint on January 30, 2023, SAC ¶ 2, Bed Bath has not in fact filed for bankruptcy over the subsequent weeks. To the contrary, on February 6, 2023, it announced the launch of an underwritten public offering that was expected to raise over $1 billion. *See* Ex. C.

allegations from the original complaint, the Second Amended Complaint instead primarily alleges that "Cohen manipulated the market for Bed Bath securities" from August 12, 2022 to August 18, 2022 (the "Class Period") to "create liquidity and secretly s[ell] the entirety of his interests in the Company" before the Company released negative financial news during subsequent weeks, "while abandoning ordinary investors, who looked to him for guidance." SAC ¶ 3.  On that basis, Plaintiff alleges that Cohen and RC Ventures violated Section 9 of the Exchange Act of 1934 (the "Exchange Act") by committing market manipulation, Section 20A of the Exchange Act by engaging in insider trading, and Sections 10(b) and 20(a) of the Exchange Act by making the allegedly fraudulent tweet and SEC filings discussed above.  SAC ¶¶ 222, 230–38, 240, 246–71.  With respect to Bed Bath and Gove, the Second Amended Complaint only narrowly claims that the Company's disclosures on August 17 and 18—that it was pleased to reach the cooperation agreement with Cohen in March—were false in violation of Sections 10(b) and 20(a) of the Exchange Act because Bed Bath somehow knew or should have known that Cohen had already "secretly" sold his shares in the Company.  SAC ¶¶ 223, 241.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This requires the plaintiff to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Thus, even under Rule 8, "[a] pleading that offers labels and conclusions . . . will not do," "[n]or does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.*  Fraud allegations must also satisfy Rule 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), including the "who, what, when, where,

and how with respect to the circumstances of the fraud." *In re U.S. Office Prods. Sec. Litig.*, 326 F. Supp. 2d 68, 73 (D.D.C. 2004). In addition, securities fraud actions must meet the heightened pleading requirements of the PSLRA, which require that "complaints specify each misleading statement; that they set forth the facts on which [a] belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dabit*, 547 U.S. at 81–82. The Second Amended Complaint fails to plead the necessary elements of falsity, scienter, and reliance against the Bed Bath Defendants under these standards.

## I.   THE SECOND AMENDED COMPLAINT FAILS TO PLEAD THAT THE BED BATH DEFENDANTS MADE ANY ACTIONABLY FALSE STATEMENTS

Plaintiff challenges just two (nearly identical) sets of statements purportedly made by the Bed Bath Defendants, which were first quoted in part in a CNBC story published after the market closed on August 17, 2022 and then issued in full on a Form 8-K filed before the market opened on August 18, 2022. SAC ¶¶ 179–80. The full text of the statement is as follows:

> We were pleased to have reached a constructive agreement with RC Ventures in March and are committed to maximizing value for all shareholders. We are continuing to execute on our priorities to enhance liquidity, make strategic changes and improve operations to win back customers, and drive cost efficiencies; all to restore our company to its heritage as the best destination for the home, for all stakeholders. Specifically, we have been working expeditiously over the past several weeks with external financial advisors and lenders on strengthening our balance sheet, and the Company will provide more information in an update at the end of this month.

SAC ¶ 180. Plaintiff alleges that this statement was "materially misleading" because it failed to disclose that Cohen had already sold his holdings, failed to disclose that an amended credit agreement that was not finalized until two weeks later would "undermin[e] any incentive for [Cohen] to remain a holder of Bed Bath securities" because it would not allow the sale of buybuy BABY, and as a result "the Company's relationship with Cohen was no longer 'constructive.'"

SAC ¶ 182.  Plaintiff also contends the statement was false because "Cohen's decision to exit from his positions undermined the Company's stated goal of 'maximizing value for all shareholders.'" *Id.*

These allegations fail, as the challenged statements were true and non-actionable, and did not give rise to any duty to disclose the speculative information demanded by Plaintiff.

## A.  Plaintiff Fails To Adequately Plead That The Alleged Misstatements By The Bed Bath Defendants Were False Or Misleading When Made

To state a claim under Section 10(b), a plaintiff must plausibly allege that a defendant's statement was "misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *Plymouth Cnty. Ret. Ass'n v. Advisory Bd. Co.*, 370 F. Supp. 3d 60, 76 (D.D.C. 2019).  Moreover, "a defendant need not immediately disclose to investors all material information," *id.*, and "[a] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010).  "Rather, in general, a company [only] must disclose information when silence would make other statements misleading or false." *Plymouth Cnty.*, 370 F. Supp. 3d at 76.  Plaintiff fails to adequately allege that any aspect of Bed Bath's challenged disclosure was false or misleading under these standards.

### 1.  *Bed Bath's Statement That It Was "Pleased To Have Reached A Constructive Agreement With [Cohen] In March" Was Not Misleading*

Plaintiff initially claims that Bed Bath's statement that it "w[as] pleased to have reached a constructive agreement with RC Ventures in March [2022]" was "materially misleading when made" because the Company failed to disclose "that Cohen and RC Ventures had already formed a plan to liquidate all their holdings and, in fact, had already liquidated the vast majority if not all of their holdings before these statements were made," and "[a]s a result, the Company's

relationship with Cohen was no longer 'constructive.'"  SAC ¶¶ 179–80, 182.  These arguments fail to plead that the challenged statement was false or misleading for several reasons.

*First*, Plaintiff does not plead any facts plausibly alleging that Bed Bath's statement that it "w[as] pleased to have reached a constructive agreement with [Cohen] in March" was untrue. As the Second Amended Complaint itself acknowledges, "[i]n March 2022," the Company "entered into a cooperation agreement" with Cohen, under which he agreed he would not acquire more than 20% of Bed Bath's shares and Bed Bath agreed to accommodate directors nominated by Cohen and form a strategy committee to consider its strategy for buybuy Baby.  SAC ¶¶ 5, 99. Plaintiff presents no reason to believe that this cooperation agreement was anything other than "constructive" in March, let alone that Bed Bath was not "pleased" to reach that agreement then.

*Second*, although Plaintiff contends that this statement was misleading because it failed to disclose that Cohen "had already formed a plan" to secretly sell his shares and bad begun selling those shares at the time of the challenged statement, SAC ¶ 182, the Second Amended Complaint fails to plead particularized facts in support of its conclusory assertions that the Bed Bath Defendants knew (or had any way of knowing) that Cohen had done so.  *See Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008) (to plead a misstatement a plaintiff must, "at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time").  "Plaintiff[] simply assert[s] that defendants would have known these things – presumably via clairvoyance and a secret window into the corporate thinking and workings of [Cohen and RC Ventures] – and disclosed them," which is insufficient to state a claim.  *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, 2019 WL 1368787, at *7–8 (S.D.N.Y. Mar. 26, 2019) (dismissing claim that company had duty to disclose that relationship with third

party "already had deteriorated" because "plaintiffs . . . failed to plead with particularity why the statements were false and misleading absent disclosure of . . . likely unknowable facts").

*Third*, Plaintiff presents no reason why the truthful statement that the Company "was pleased to have reached a constructive agreement with [Cohen] in March" gave rise to a further duty to disclose that Cohen had "secretly" sold his shares in August (even assuming Bed Bath had any way of knowing that).  Bed Bath's disclosure accurately referred, in the past tense, to the cooperation agreement reached in March, without any reference to Cohen's past, present, or future holdings of Bed Bath stock.  It thus did not imply that Cohen currently held Bed Bath stock, and therefore could not give rise to an obligation to disclose that Cohen had "secretly" sold that stock.  *See In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997) ("It is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data."); *see also In re Ferroglobe PLC Sec. Litig.*, 2020 WL 6585715, at *7 (S.D.N.Y. Nov. 10, 2020) ("The Court fails to see how discussion of a company's historical success would mislead a reasonable investor into any particular belief about that company's present or future performance.").  "The duty to disclose rule does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise." *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 330 (3d Cir. 2007) ("Liability may exist under Rule 10b-5 for misleading or untrue statements, but not for statements that are simply incomplete.").[3]

---

[3] *See also In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 886 (N.D. Cal. 2020) ("merely mentioning a topic does not require the company to disclose every tangentially related fact that might interest investors"), *aff'd sub nom. Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022); *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *10 (S.D.N.Y. Mar. 30, 2018) ("[I]t is well settled that a corporation is not required to reveal all facts on a subject just because it reveals a single fact.").

*Finally*, courts have routinely held that companies do not have an obligation to characterize their relationships with third parties in negative terms or disclose problems in those relationships even where they have described those relationships much more positively than Bed Bath did here. *See, e.g.*, *In re Express Scripts Holding Co. Sec. Litig.*, 773 F. App'x 9, 11–13 (2d Cir. 2019) (statement that company "really enjoys" its relationship with a third party was not "false, misleading, or incomplete" even though it did not disclose that "in fact both parties had accused each other privately of not proceeding in good faith" and the partner had served "two notices of breach").[4]  This is so because "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view," and courts "would not expect" a company to disparage its prospects based "on what, at the time, would have been speculation." *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 42 (2d Cir. 2000).  Thus, Bed Bath stating that it "was pleased to have reached a constructive agreement" with Cohen in March 2022 did not give rise to an obligation to disclose the Company's purportedly "deteriorated relationship with Cohen," as Plaintiff contends.  SAC ¶¶ 11, 182.

> **2.** ***The Second Amended Complaint Confirms That Bed Bath Was "Working . . . On Strengthening [Its] Balance Sheet," "Enhanc[ing] Liquidity," And "Maximizing Value For All Shareholders"***

As with the prior challenged statement about Bed Bath reaching a "constructive agreement with [Cohen] in March," the facts alleged in the Second Amended Complaint likewise establish that the remaining challenged statements by Bed Bath—that it was "working . . . on

---

[4] *See also Pipefitters Union Loc. 537 Pension Fund v. Am. Exp. Co.*, 773 F. App'x 630, 632–33 (2d Cir. 2019) (statement that company "work[s] with [a third party] on an ongoing basis" did not give rise to duty to disclose that relationship had "deteriorated"); *River Birch Cap., LLC v. Jack Cooper Holdings Corp.*, 2019 WL 1099943, at *7–8 (S.D.N.Y. Mar. 8, 2019) (plaintiff failed to plead omission concerning company's "deteriorating relationships" with third parties because plaintiff's "Jenga tower of assumptions" that it was "highly unlikely" that company was not aware of problems at time of challenged statement was "insufficient to establish the existence of a duty to disclose").

strengthening [its] balance sheet," "continuing to execute on [its] priorities to enhance liquidity,"
and "committed to maximizing value for all shareholders," SAC ¶ 180—were unquestionably
true.  Indeed, Plaintiff itself concedes that:

- "in June 2022, the Company hired a consultant to focus on cash and balance sheet optimization," SAC ¶¶ 7, 121;

- by July 2022, it had "already studied . . . and identified several options for buybuy BABY," SAC ¶¶ 122, 125–28;

- in early August 2022, it "had already talked to lenders about a potential new asset-based credit line" and "was still weighing other options," SAC ¶ 119;

- in mid-August 2022, it was "hunting for an extension of an existing credit line that would provide hundreds of millions of dollars in relief" and hired a law firm "to provide advice on the Company's unmanageable debt load, including options to raise new money or refinance existing debt, or both," SAC ¶¶ 7, 130;

- in late August 2022, it "executed . . . an amended loan agreement" raising hundreds of millions of dollars and announced reductions in force, store closures, and reductions to capital expenditures, SAC ¶¶ 7, 131–35, 199;

- in October 2022 it commenced an exchange offer, SAC ¶ 205; and

- in January 2023, it "continued to consider all strategic alternatives, including seeking relief under the U.S. Bankruptcy Code," SAC ¶ 206.

All of these allegations confirm that Bed Bath was working to strengthen its balance sheet,
execute on its priorities to enhance liquidity, and maximize value for shareholders.

Plaintiff does not appear to dispute this, but nonetheless contends that these statements
were misleading because they supposedly "put these issues at play but failed to disclose that the
[amended] Credit Agreement eliminated the strategic plan vigorously advanced by Cohen,
undermining any incentive for him to remain a holder of Bed Bath securities" and
"undermin[ing] the Company's stated goal of maximizing value for all shareholders."
SAC ¶ 182.  Again, however, these generic statements said nothing about Cohen, and therefore
could not give rise to a duty to make statements about him.  *See supra* at Part I.A.1.

Moreover, as the Second Amended Complaint acknowledges, the amended credit agreement that Plaintiff cites was not entered into until August 31, 2022, SAC ¶ 131, which was nearly two weeks after the challenged statements. As such, the later entry into the amended credit agreement does nothing to establish that these earlier statements were false when made or that Bed Bath could disclose the terms of that amended agreement at the time of the alleged misstatements. *See In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 176 (D.D.C. 2007) ("[T]here is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation").[5] Indeed, the sources cited in the Second Amended Complaint make clear that the amended agreement was just a "proposal" at the time of the challenged statements, and one that Bed Bath had not yet received responses to. SAC ¶ 128 (describing article in *The Wall Street Journal* one day before the challenged statements as reporting "Bed Bath expected responses to its loan proposal during that same week"). "[I]n the circumstances here, where the discussions were ongoing, Defendants did not have a duty to disclose more about the uncertain state of the negotiations." *In re Express Scripts*, 773 F. App'x at 14; *see also Freeburg v. Wolf*, 42 F. App'x 715, 716 (6th Cir. 2002) (rejecting claim that defendant had "misl[ed] investors as to the true status of the negotiations" with a third party because "defendants had no legal duty to inform the public of these developments until the outcome of the negotiations became as certain as hard facts").

---

[5] *See also City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1260 (10th Cir. 2001) ("allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud"); *In re NAHC, Inc. Sec. Litig.*, 2001 WL 1241007, at *14 (E.D. Pa. Oct. 17, 2001) ("For an actionable claim of a misleading omission, the plaintiffs must show that the omitted information in fact existed at the time the statement was made."), *aff'd*, 306 F.3d 1314 (3d Cir. 2002).

**B.      The Challenged Statements By The Bed Bath Defendants Are Non-
         Actionable As A Matter Of Law**

In addition to the foregoing, the challenged statements by the Bed Bath Defendants must

also be dismissed because they are generic statements of corporate puffery that are not actionable

as a matter of law, as well as mere statements of opinion that Plaintiff has failed to adequately

plead were false.

**1.      *The Alleged Misstatements By The Bed Bath Defendants Were
         Inactionable Puffery***

It is well settled that corporate disclosures can be considered puffery, which is

inactionable as a matter of law, where the statements are "vague and incapable of objective

verification." *In re XM*, 479 F. Supp. 2d at 179.  Similarly, "generalized statements of optimism

represent management's opinion of how the company is expected to perform within a defined

time frame . . . [and] are not guarantees of future financial performance, nor are they understood

as such by reasonable investors." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C.

Cir. 1994).

Here, the disclosures by the Bed Bath Defendants that are challenged in the Second

Amended Complaint are riddled with generic statements that courts have uniformly rejected as

inactionable puffery, including statements that Bed Bath was:

- "pleased to have reached a constructive agreement with RC Ventures,"[6]

---

[6] *See, e.g.*, *In re Marriott Int'l, Inc. Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 117
(D. Md. 2021) ("the statement that Marriott was pleased with the results is another statement of
puffery and opinion that is not actionable"), *aff'd sub nom. In re Marriott Int'l, Inc.,* 31 F.4th 898
(4th Cir. 2022); *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206,
223 (E.D.N.Y. 2019) ("[B]road characterizations of Foot Locker's vendor relationships as
'strong,' 'positive,' and 'great' [are] statements that amount to puffery, and are insufficient to
sustain a 10(b) action."); *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1159–60
(S.D. Cal. 2008) (statements about third party "speaking vaguely of an 'excellent relationship'
[and] 'highly positive and mutually beneficial' interactions" are "non-actionable puffery").

- "committed to maximizing value for all shareholders,"[7]

- "continuing to execute on [its] priorities to enhance liquidity, make strategic changes and improve operations to win back customers, and drive cost efficiencies,"[8]

- working "to restore [the] company to its heritage as the best destination for the home,"[9] and

- "working expeditiously . . . on strengthening [its] balance sheet."[10]

These are the types of vaguely optimistic statements that all companies make, and on which reasonable investors therefore do not rely. *See Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 103 (2d Cir. 2021) ("[N]o investor would take such statements seriously in assessing a potential investment because almost every [company] makes these statements."). Moreover, to the extent that Plaintiff claims these representations were too "positive," SAC ¶ 225, that argument also fails because a company is under no obligation to

---

[7] *See, e.g.*, *In re Synergy Pharms., Inc. Sec. Litig.*, 2021 WL 4480625, at *11 (E.D.N.Y. Sept. 30, 2021) (statement that a loan "will ultimately maximize long-term shareholder value" was "too vague to be actionable"); *Rochester Laborers Pension Fund v. Monsanto Co.*, 883 F. Supp. 2d 835, 882 (E.D. Mo. 2012) ("statements about being . . . 'committed' to reaching the predicted goals" are "vague statement[s] of corporate optimism constitut[ing] inactionable puffery").

[8] *See, e.g.*, *Sinnathurai v. Novavax, Inc.*, --- F. Supp. 3d ---, 2022 WL 17585715, at *18 (D. Md. Dec. 12, 2022) (to be published) ("[V]ague statements about the defendant's priorities and other non-factual boasting statements constitute puffery."); *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 13 (D.D.C. 2000) (statements about company's "strong momentum" and that "business performance continues to develop according to our plan" constitute puffery).

[9] *See, e.g.*, *SE Penn. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2015 WL 3833849, at *30 (M.D. Pa. June 22, 2015) (statements company was "'deep and experienced,' 'strong,' and [had a] 'proven track record' are all examples of corporate puffery"); *Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24, 30 (D.D.C. 2007) ("KFC's claims that its restaurants serve the 'best food' is a non-measurable, bald statement of superiority that is non-actionable puffery.").

[10] *See, e.g.*, *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (statement company would "continue to reposition and strengthen [its] franchises with a focus on financial discipline" was "no more than puffery"); *Plumley v. Sempra Energy*, 2017 WL 2712297, at *9 (S.D. Cal. June 20, 2017) (statements company was "working as quickly as safety will allow" were "not actionable because they are vague statements of optimism, i.e. inactionable corporate puffery").

adopt the particular "pejorative characterizations" demanded by a plaintiff.  *Kowal*, 16 F.3d at 1277 ("Since the use of a particular pejorative adjective will not alter the total mix of information available to the investing public, such statements are immaterial as a matter of law and cannot serve as the basis of a 10b-5 action under any theory."); *see also In re XM*, 479 F. Supp. 2d at 181 ("[A] company has no duty to disparage its own competitive position in the market.").

**2.      *The Alleged Misrepresentations By The Bed Bath Defendants Were Statements Of Opinion That Are Not Adequately Alleged To Be False***

The disclosures by the Bed Bath Defendants that are challenged by Plaintiff also reflect numerous statements of opinion that the Second Amended Complaint fails to adequately allege were false.  For example, whether the Company's agreement with Cohen was "constructive," whether a particular action was expected to "maximiz[e]" value for shareholders, and whether a contemplated financial arrangement could be seen as "strengthening" the balance sheet are all matters of subjective judgment rather than objective fact, and are therefore statements of opinion. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) ("A fact is a thing done or existing or an actual happening.  An opinion is a belief, a view, or a sentiment which the mind forms of persons or things.").  Accordingly, because an opinion "convey[s] some lack of certainty as to the statement's content," Plaintiff cannot plead that these opinions were false merely by alleging a contrary view that the agreement with Cohen was not constructive, or that the actions the Company was taking did not maximize value or strengthen the balance sheet.  *Id.* at 187, 194 ("an investor cannot state a claim by alleging only that an opinion was wrong").  Instead, Plaintiff must adequately allege either that the Bed Bath Defendants did not "actually hold[] the stated belief" or omitted "fact[s] show[ing] that [the Bed Bath Defendants] lacked the basis for making those statements that a reasonable investor would

expect." *Id.* at 184, 196.  Plaintiff makes no attempt to satisfy this burden, and its claims against the Bed Bath Defendants fail for this additional reason.

### C.  Plaintiff Does Not Adequately Allege That Gove Was A Maker Of The Challenged Statements

The Section 10(b) claims against Gove must also be dismissed because the Second Amended Complaint does not adequately allege that she actually made any of the challenged statements.  A defendant can only be liable for "making" a statement under Section 10(b) and Rule 10b-5 if they are "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).  "[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed."  *Id.* at 142–43.

Here, Plaintiff does not (and cannot) allege that the challenged statements were actually attributed to Gove:  the initial CNBC article attributed the statements to "[a] spokeswoman for Bed Bath," and the full statement released in the Form 8-K was attributed to the Company generally.  Exs. A–B.  Instead, Plaintiff contends that Gove "had ultimate authority over the statements" solely because she was the interim CEO of the Company and had responsibility to oversee its disclosures.  SAC ¶ 181.  But these generic and conclusory assertions are plainly insufficient.  *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 426–27 (7th Cir. 2015) (declining "to hold as a matter of law that a CEO 'makes' all statements contained in a company press release").  "As CEO, [Gove] of course had authority over the press release[] in the sense that [s]he *could have* exercised control over [its] content," "[b]ut if that were enough to satisfy *Janus*, then CEOs would be liable for *any* statements made by their employees acting within the scope of their employment" and "[t]hat wouldn't square with the [*Janus*] Court's

reminder about the narrow scope that we must give the implied private right of action under Rule 10b-5." *Id.* at 427.  Accordingly, because the Second Amended Complaint does not contain any particularized factual allegations showing that Gove "*actually exercised* control over the content of the press release[] and whether and how [it] w[as] communicated," *id.*, it has failed to plead that Gove can be subject to liability as a maker of the challenged statements.

## II.   THE SECOND AMENDED COMPLAINT FAILS TO RAISE A STRONG INFERENCE OF SCIENTER AGAINST THE BED BATH DEFENDANTS

To state a claim under Section 10(b) of the Exchange Act, a plaintiff must also plead scienter, meaning "an intent to deceive, manipulate, or defraud" or "extreme recklessness." *SEC v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992).  "Extreme recklessness" in this context "is not merely a heightened form of ordinary negligence," and instead can only be shown where there is an "extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 641–42.  To plead scienter, a plaintiff must either "allege facts to show that defendants had both motive and opportunity to commit fraud or . . . facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Stevens v. InPhonic, Inc.*, 662 F. Supp. 2d 105, 115 (D.D.C. 2009).  Moreover, under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference" of scienter, 15 U.S.C. § 78u-4(b)(2), meaning one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent," *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).  The generic and illogical allegations of scienter asserted against the Bed Bath Defendants in the Second Amended Complaint do not come close to satisfying these standards.

A.    **Plaintiff Fails To Allege Any Strong Circumstantial Evidence That The Bed Bath Defendants Acted With Scienter**

To adequately plead scienter based on strong circumstantial evidence, a plaintiff must "specifically allege[] that defendants either (1) knew facts or had access to information contradicting their public statements, or (2) failed to review or check information they had a duty to monitor." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 351 (S.D.N.Y. 2011).  This requires "allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements." *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009).  For several reasons, Plaintiff does not do so here.

*First*, the Second Amended Complaint's scienter allegations against the Bed Bath Defendants amount to little more than a string of conclusory assertions devoid of any particularized factual support.  Plaintiff variously asserts that "the Company's liquidity and credit crises had worsened beyond repair" before Cohen's sales, SAC ¶ 7; "the Company had rejected Cohen's proposal to sell or spin off buybuy BABY because a serious liquidity crisis threatened its ability to remain a going concern," SAC ¶ 6; unspecified individuals at the Company supposedly informed Cohen of these developments, SAC ¶ 7; this information "undermin[ed] any incentive for [Cohen] to remain a holder of Bed Bath securities," SAC ¶ 182; and Bed Bath "knew or recklessly disregarded" that Cohen "formed a plan to sell the entirety of his holdings," SAC ¶ 184.  But Plaintiff provides no contemporaneous factual support for any of these assertions:  the Second Amended Complaint does not cite a single internal document, former Bed Bath employee, or confidential witness connected with Cohen supporting any of these points.  This pleading approach plainly fails under the PSLRA, which mandates that where "an allegation regarding [a] statement or omission is made on information and belief, the

complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. §

78u-4(b)(1).[11]  Pleading a strong inference of scienter requires particularized facts, not

unsupported conjecture.  *See In re U.S. Office Prods. Sec. Litig.*, 326 F. Supp. 2d 68, 79 (D.D.C.

2004) ("A claim of securities fraud cannot rest on . . . speculation.").

     *Second*, Plaintiff's repeated attempts to fill this gap by relying on the benefit of hindsight

fail under clearly established law.  As discussed above, "[s]ecurities fraud claims may not be

based on fraud by hindsight—in other words, there is no reason to assume that what is true at the

moment plaintiff discovers it was also true at the moment of the alleged misrepresentation."  *In*

*re XM*, 479 F. Supp. 2d at 176; *see also In re U.S. Office*, 326 F. Supp. 2d at 79 ("Courts have

uniformly rejected this pleading of fraud by hindsight.").  Thus, Plaintiff's citations to a credit

agreement executed on August 31, 2022, which supposedly "included a first priority lien on

buybuy BABY and a guarantee from that subsidiary that would render a non-bankruptcy sale

impossible," SAC ¶¶ 131–33, provide no support for the Second Amended Complaint's

assumption that Bed Bath knew that it would agree to those terms at the time of its challenged

statements weeks earlier (let alone Plaintiff's further unsupported assumptions that Cohen was

---

[11] The closest that the Second Amended Complaint comes to identifying the basis for its
information and belief is citing various articles in *The Wall Street Journal* and other press
sources.  *See, e.g.*, SAC ¶¶ 124, 191 (reporting that Cohen and Arnal spoke on conference calls
with other executives), 7, 128 (reporting that Bed Bath was seeking a loan).  However, "it is well
settled that conclusory allegations of wrongdoing are no more sufficient if they come from a
newspaper article than from plaintiff's counsel."  *In re Rockwell*, 2018 WL 1725553, at *8.  The
cited reports here only vaguely cite to "people familiar with the matter" or "people with
knowledge of the matter," SAC ¶¶ 124, 128, which is insufficiently particularized under the
PSLRA.  *See City of Brockton Ret. Sys. v. Avon Prods., Inc.*, 2014 WL 4832321, at *23
(S.D.N.Y. Sept. 29, 2014) (rejecting allegation based on WSJ article citing information "obtained
from a person familiar with the matter" because "[t]his vague description of the source provides
no basis for the Court to evaluate its reliability").

informed of this and lost his "interest in retaining his holdings" as a result).[12]   The same is true of Plaintiff's extended discussion of "subsequent events" that supposedly "enhance an inference of scienter," including financial challenges that Bed Bath faced from August 2022 through January 2023.  SAC ¶¶ 196–209.  These later events do nothing to plead that similar circumstances existed before the challenged statements (let alone that they somehow provided the Bed Bath Defendants with knowledge that Cohen would "secretly" sell his holdings months earlier).

*Third*, the Second Amended Complaint's reliance on Gove's positions as interim CEO and former chair of the strategy committee, Arnal's role as "the senior executive with the most hands-on experience in managing the Company's precarious finances and negotiating with its lenders," and the positions of unidentified "other senior executives," SAC ¶¶ 23, 181, 184, 191, likewise do nothing to establish scienter.  "[A]lleging that a defendant, as a corporate officer in a company, should have known of misleading or fraudulently-made statements based on that person's position with the company is not enough, by itself to infer scienter."  *Stevens*, 662 F. Supp. 2d at 121; *see also Ross v. Walton*, 668 F. Supp. 2d 32, 40 (D.D.C. 2009) ("[A] vague assertion that a defendant must have known about the fraud by virtue [of] a position of authority does not result in a strong inference of scienter.").  Instead, a plaintiff's "generalized assertion that the defendants' corporate positions exposed them to confidential information about [the company] is insufficient to warrant an inference of scienter in the absence of details regarding what this information entailed, when the defendants received it, or how it related to the alleged fraud."  *Stevens*, 662 F. Supp. 2d at 121.  No such details are provided here.

---

[12] In fact, as discussed above, the Second Amended Complaint itself makes clear that the proposed credit agreement remained in its early stages at the time of the alleged misstatements. SAC ¶ 128 (referring to the agreement as a "proposal" and stating that Bed Bath "expected responses to [the] loan proposal" during "that same week").

*Finally*, perhaps acknowledging the complete lack of support for the Second Amended Complaint's assertions that Bed Bath knew that Cohen had "secretly" sold his shares at the time of the challenged statements, Plaintiff alternatively claims that it would be reckless for Bed Bath to "fail[] to check whether Cohen had done so or otherwise investigate or question whether he" did so.  SAC ¶ 184; *see also* SAC ¶ 186 (asserting that "Bed Bath and Gove could have easily checked with Cohen and ascertained the truth").  But this last-ditch theory also fails:  it is little more than an attempt to impose a "should have known" standard, which is insufficient to plead scienter.  *See Plumbers Loc. #200 Pension Fund v. Washington Post Co.*, 930 F. Supp. 2d 222, 225 (D.D.C. 2013) ("While extreme recklessness is a lesser form of intent, it is not a 'should have known' standard.").

Moreover, it is well established that "there are limits to the scope of liability for failure to adequately monitor the allegedly fraudulent behavior of others."  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110 (2d Cir. 2009).  In fact, courts have held that even "a parent corporation" has no duty to affirmatively investigate a "subsidiary" in the face of "unprecedented and dramatically increasing profitability," *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269–70 (2d Cir. 1996), let alone to investigate third parties over whom it has no control.  Here, Plaintiff neither identifies any affirmative duty that Bed Bath had to monitor the undisclosed real-time trading activity of one of its investors—a third party that it had no control over—nor any independent means for Bed Bath to do so.  Instead, the Second Amended Complaint seems to naively assume that Cohen would have admitted to his alleged wrongdoing if the Bed Bath Defendants had only asked.  But such an implausible allegation, which is directly contradicted by Plaintiff's repeated assertions that Cohen had "secretly" and "surreptitiously" sold his shares to mislead others, cannot raise a strong inference of scienter.  *See In re GeoPharma, Inc. Sec. Litig.*,

411 F. Supp. 2d 434, 446, 446 n.83 (S.D.N.Y. 2006) (rejecting scienter theory that was "internally inconsistent" and stating that "fundamentally illogical and contradictory scienter allegations fail as a matter of law").  Therefore, at the very least, failing to "check" whether Cohen had sold his shares under these circumstances was not an "extreme departure from the standards of ordinary care," as required to plead scienter.  *Steadman*, 967 F.2d at 641.

> **B.    Plaintiff Fails To Plead That The Bed Bath Defendants Had Motive And Opportunity To Commit Fraud**

Plaintiff also attempts to plead that Bed Bath had a motive and opportunity to commit fraud by pointing to certain limited stock sales during the Class Period by a single individual at Bed Bath, its then-CFO Gustavo Arnal.  SAC ¶¶ 189–92.  However, such "allegations of insider trading can be strongly indicative of scienter only if the timing and amount of the sales are suspicious."  *Stevens*, 662 F. Supp. 2d at 122.  For multiple reasons, Arnal's sales raise no inference that Bed Bath had a motive to commit the fraud alleged here.

*First*, it is well settled that "the sale of stock by [just] one company executive does not give rise to a strong inference of the company's fraudulent intent; the fact that other [executives] did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive."  *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996).  That is particularly true where, as here, the only individual at Bed Bath actually named as a defendant (the then-interim CEO Gove) is not alleged to have made any sales.  *See Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1336 n.40 (S.D. Fla. 2004) ("The fact that the CEO, who held a significant amount of shares and who would have been an essential participant in any fraudulent scheme, did not sell stock undermines any suggestion of knowledge on the part of the defendants due to any other claimed inside sells.").  And the absence of any allegation that Arnal was actually involved in making the

alleged misstatements only further underscores that his sales are irrelevant to analyzing whether the Bed Bath Defendants possessed scienter in making those statements.  *See Russo v. Bruce*, 777 F. Supp. 2d 505, 518 (S.D.N.Y. 2011) (motive allegations are "fatally undermine[d]" where "[t]he Complaint does not attribute a single alleged misstatement" to the selling individual and "[t]he defendants to whom misstatements are actually attributed," who were "all well-placed to take advantage of the fraud they allegedly committed," "are not alleged to have sold any [] stock during the Class Period").

*Second*, the timing of Arnal's sales was not suspicious because those sales were made automatically pursuant to a 10b5-1 trading plan that he adopted months before the Class Period. SAC ¶ 192; *see also* Ex. D (SEC filing stating Arnal's sales "were effected pursuant to a Rule 10b5-1 trading plan entered into by [Arnal] in April 2022"); Exs. E–F (trading plans entered into by Arnal on April 20, 2022).  Plaintiff does not (and cannot) allege that Arnal knew or could have known in April 2022 that Cohen (who had just invested in Bed Bath) would decide to sell his shares months later and do so by allegedly manipulating Bed Bath's stock price.  Under these circumstances, "it is well-established that trades under [a] 10b-5-1 plan do not raise a strong inference of scienter."  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011); *see also Elam v. Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008) ("Stock sales pursuant to Rule 10b-5 trading plans can raise an inference that the sales were . . .  not suspicious").

*Third*, the amounts of Arnal's sales were also not suspicious because he sold less than 18% of his total holdings, *see* Ex. D (listing sales of 55,013 shares out of 310,409 originally held), leaving more than 82% to decline in value after the alleged fraud was revealed just days later.  Courts routinely recognize that "the defendant's continued possession of a vast majority of his shares [is] enough to defeat a strong inference of scienter."  *Stevens*, 662 F. Supp. at 123

(finding stock sales of up to 28% of defendant's holdings not suspicious); *see also Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (sales of 17% of shares "are not suspicious in amount"). Nor is the total amount of proceeds from Arnal's sales ($1.404 million), SAC ¶ 189, suspicious as a matter of law. *See Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000) ("alleged $1.6 million profit is not unusual even if we look only to the absolute amount of profit").

*Finally*, regardless of the foregoing, Arnal's sales are entirely irrelevant to determining whether the Bed Bath Defendants acted with scienter when making the alleged misstatements because those sales occurred before those alleged misstatements were made. *Compare* SAC ¶ 189 (listing Arnal sales on August 16 and 17) *with* SAC ¶¶ 179–80 (alleging misstatements made by the Bed Bath Defendants after trading hours on August 17 and "before the market opened" on August 18). Executive stock sales can only contribute to an inference of scienter where they occur after the alleged misstatements—and are timed to take advantage of the inflation allegedly caused by those misstatements—not where they occur before the statements and therefore are not impacted in any way by the alleged fraud. *See Tchrs' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007) ("complaint falls far short of showing that the trades were made at a time consistent with knowing or reckless fraud" where it "does not allege that defendants timed their sales to profit from any particular disclosures"); *In re PetSmart, Inc. Sec. Litig.*, 61 F. Supp 2d 982, 1000–01 (D. Ariz. 1999) (stock sales "would only be probative of [an individual's] motives regarding events prior to those sales").

The lack of viable motive allegations in the Second Amended Complaint "[i]s significant and require[s] Plaintiff to provide allegations of scienter of a correspondingly greater degree." *Plumbers Loc. #200 Pension Fund*, 930 F. Supp. 2d at 226. Plaintiff's generic allegations of circumstantial evidence of scienter do not satisfy this burden.

### C.   When Considered Collectively, Plaintiff's Allegations Fail To Raise A Strong Inference That The Bed Bath Defendants Acted With Scienter

For the reasons discussed above, none of the Second Amended Complaint's allegations contain particularized facts raising any inference that the Bed Bath Defendants acted with scienter.  That alone is sufficient to reject Plaintiff's scienter allegations.  *See Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 73 (D.D.C. 2002) ("Conclusory allegations that a defendant's actions were fraudulent and deceptive are not sufficient to satisfy Rule 9(b)."), *aff'd*, 409 F.3d 414 (D.C. Cir. 2005).

But even if those individually defective allegations could be seen as raising any inference of scienter when viewed collectively, they do not raise an inference that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  To the contrary, Plaintiff's scienter theory with respect to the Bed Bath Defendants makes no sense at all:  Bed Bath somehow knew or should have known that Cohen liquidated his position even though he "secretly" and "surreptitiously" sold his shares, SAC ¶¶ 3, 10; Bed Bath decided to obliquely mislead investors on that subject by making a truthful reference to its prior agreement with Cohen, rather than just directly saying he still held his shares, SAC ¶ 11; and Bed Bath thought it made sense to defraud investors for just one day before Cohen's sales would be publicly disclosed, SAC ¶¶ 11–12, without making any attempt to profit off of that fraud in the interim.  Such a nonsensical string of assumptions fails to raise a strong inference of scienter. *See Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 601 (S.D.N.Y. 2016) ("Courts regularly refuse to infer scienter when confronted with such illogical allegations.").

In contrast to any weak and improbable inference of scienter raised by Plaintiff's allegations, the far more likely inference is one of nonfraudulent intent:  that Bed Bath (like the market more broadly) was uncertain of Cohen's intentions, SAC ¶¶ 175–76, 179, and therefore

made statements accurately describing the Company's historical agreement with him, as well as its current efforts to address its financial condition, without intending to make any reference to whether Cohen still held his shares.  Accordingly, the Second Amended Complaint's claims against the Bed Bath Defendants fail to plead scienter and must be dismissed.

## III.   THE SECOND AMENDED COMPLAINT DOES NOT PLEAD RELIANCE ON THE BED BATH DEFENDANTS' STATEMENTS

Plaintiff's claims against the Bed Bath Defendants also independently fail because the Second Amended Complaint does not adequately plead the element of reliance with respect to any statement made by those Defendants.  "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action . . . because proof of reliance ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011).  Here, Plaintiff makes no attempt to allege that it directly relied on the alleged misstatements by the Bed Bath Defendants in making its purchases, and instead only attempts to plead reliance by invoking a presumption of reliance under the fraud-on-the-market doctrine or the Supreme Court's decision in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972).  *See* SAC ¶¶ 216–18. [13]  Neither presumption applies under the facts alleged here.

### A.   Plaintiff's Factual Allegations Are Fundamentally Inconsistent With The Fraud-On-The-Market Presumption Of Reliance

The fraud-on-the-market presumption of reliance is based on the theory that "the market price of shares traded on well-developed markets reflects all publicly available information,"

---

[13] Of course, it would have been impossible for Plaintiff to rely on the Bed Bath Defendants' challenged statements with respect to the overwhelming majority of its purchases, which were made before the Bed Bath Defendants' statements were even made (one day before the end of the Class Period).  *See Gross v. Summa Four, Inc.*, 93 F.3d 987, 993 (1st Cir. 1996) ("[B]ecause [defendant] issued the [statements] after [plaintiff] had purchased his stock, the statements . . . could not possibly have inflated the market price that he paid for those shares.").

including "any material misrepresentations," and as a result an investor can be considered to have indirectly "relie[d] on public misstatements whenever he buys or sells stock at the price set by the market." *Halliburton*, 563 U.S. at 811. To invoke the fraud-on-the-market presumption of reliance, a plaintiff must therefore show, among other things, "that the stock traded in an efficient market," *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1958 (2021), meaning that "the market price . . . adjusts rapidly to reflect all new information" about the company. *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 367 (4th Cir. 2004).

Here, Plaintiff alleges in only a boilerplate fashion that Bed Bath's "securities traded in an efficient market" because they were "liquid," traded in unspecified volume, followed by an unspecified number of analysts, and subject to coverage by "news outlets, discussion forums, and social media." SAC ¶ 216. Even under Rule 8, such "conclusory statements" do "not suffice" to state a claim. *Iqbal*, 556 U.S. at 678–79 ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). But those generic allegations are even more plainly insufficient under the heightened pleading standards applicable here. *See ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1253 n.129 (C.D. Cal. 2015) ("[W]hen allegations of the existence of an efficient market are pled to invoke a presumption of reliance, the existence of such a market must be pled with particularity.").

Moreover, in contrast to those conclusory and vague assertions of efficiency, the Second Amended Complaint is replete with factual allegations that are fundamentally inconsistent with any claim that Bed Bath's securities traded in an efficient market during the relevant time period:

- The Second Amended Complaint regularly asserts that Bed Bath's stock price and trading volume increased in response to emojis, social media posts, and other activity by Cohen containing no material information about the company's financial condition, which is inconsistent with market efficiency. *See Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 861 (7th Cir. 1995) ("An efficient stock market is one in which stock prices reflect all potentially available

information *that is relevant to the economic value of the stocks.*").  This includes allegations that:  (i) "trading volume and the Company's stock price surged" because Cohen tweeted "a moon-emoji," leading to meme investor commentary such as "He LITERALLY tweeted a moon.  That is all.  Thanks for listening to my ted talk," SAC ¶¶ 8–9, 147–55; (ii) the share price rose over 30% "on extremely heavy trading volume" because Cohen tweeted "Ask not what your company can do for you – ask what you can do for your company," SAC ¶¶ 139–44; and (iii) Cohen's prior activities with respect to GameStop caused stock price increases with "no clear reason for the rally," SAC ¶ 82, and his actions with respect to Bed Bath had a similar impact, SAC ¶¶ 85, 193.

- The Second Amended Complaint cites to numerous articles and analyst reports stating that Bed Bath's stock movements were unrelated to (and unsupported by) the Company's financial fundamentals, unlike what would be expected in an efficient market.  These include:  (i) an article in *The Wall Street Journal* stating that its shares "surge[d] despite liquidity concerns," SAC ¶ 128, and that the stock's valuation was "exaggerated" and "driven by market participants who are not focused on fundamentals," Ex. J; (ii) a CNBC report that said the Company's stock price movement "doesn't make fundamental sense," SAC ¶ 146, and was "likely due to a meme-stock short squeeze" as it "isn't tied to any fundamental improvements" and "[r]ecent news concerning the company has been more negative than positive," Ex. I; (iii) a Benzinga article attributing the Company's stock price movement to "Cohen us[ing] retail investors to pump the stock for his own benefit," "an option gamma squeeze," and "speculation," SAC ¶ 30, Ex. K; (iv) a Seeking Alpha article attributing a "30%+" increase in the Company's stock price to a "suspected short-squeeze," SAC ¶ 24, Ex. H; and (v) a Wells Fargo analyst report stating that it was "surpris[ing] to see BBBY shares up +1.8% today" because the Company had "sharply deteriorating" financial trends and "a waning cash balance that . . . appears increasingly troubling," SAC ¶ 104, Ex. G.

- The Second Amended Complaint alleges that "retail investors react[ed] enthusiastically" to Cohen's August 15 and 16 filing of SEC forms stating that he "owned more than 10% of Bed Bath's outstanding shares," causing the stock price to increase "by over 70%," SAC ¶¶ 156–63, even though the same information was previously disclosed by Bed Bath on June 1.  SAC ¶ 109 ("In a section of the Proxy Statement entitled 'our shareholders,' RC Ventures was identified as [having] an ownership interest in 11.8% of the Company's outstanding shares.").  Stocks that trade in an efficient market should not respond at all—let alone in such a significant way—to such previously disclosed information.  *See Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013) ("A corollary of the efficient market hypothesis is that disclosure of confirmatory information—or information already known by the market—will not cause a change in the stock price.").

In light of the foregoing, "the court need not accept [the] inference[] drawn by plaintiff[]" that

Bed Bath's securities traded in an efficient market because that inference is "unsupported by the

facts set out in the complaint."  *Kowal*, 16 F.3d at 1276; *see also Edwards v. Ocwen Loan Servicing, LLC*, 24 F. Supp. 3d 21, 26 n.4 (D.D.C. 2014) ("Where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true.").

Because the Second Amended Complaint pleads no particularized facts in support of its conclusory assertion that Bed Bath's securities traded in an efficient market—and to the contrary relies on a theory that affirmatively contends those securities did not trade efficiently—Plaintiff is not entitled to the fraud-on-the-market presumption of reliance.  *See Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 651 (S.D.N.Y 2012) (holding that "conclusory allegations" of market efficiency "do not suffice to plead an efficient market . . . especially when the rest of the Complaint contradicts such a conclusion").

### B.  Plaintiff Also Cannot Invoke The *Affiliated Ute* Presumption Of Reliance Against The Bed Bath Defendants

Perhaps recognizing the weakness of its allegations under the fraud-on-the-market presumption of reliance, Plaintiff alternatively alleges that it is entitled to a separate presumption of reliance under *Affiliated Ute*.  SAC ¶ 218.  In that decision, recognizing the difficulty of presenting "positive proof of reliance" upon information that was omitted, the Supreme Court held that in cases "involving primarily a failure to disclose," reliance will be presumed if "the facts withheld [are] material in the sense that a reasonable investor might have considered them important in the making of his decision." *Affiliated Ute*, 406 U.S. at 153–54.  As a result, the *Affiliated Ute* presumption does not apply "in a case involving a claim that primarily alleges affirmative misrepresentations," where there is no such difficulty showing reliance. *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 219–20 (D.C. Cir. 2010) (collecting cases applying the presumption only "when reliance on a negative would be practically impossible to

34

prove," and—even "more restrictively"—when the case is "primarily based on omissions").  Nor does it apply to cases alleging the defendants made "affirmative misrepresentations that encompassed the alleged omissions cited in the [] complaint."  *Id.* at 221.

The *Affiliated Ute* presumption does not apply here under this binding authority.  Plaintiff does not allege that the Bed Bath Defendants had any independent duty to disclose information about Cohen's sales, and instead only alleges that their voluntary disclosures were affirmative misstatements because they supposedly misrepresented the status of Cohen's holdings.  SAC ¶ 182.  "The *Affiliated Ute* presumption is therefore inapplicable" because the Bed Bath Defendants "did make express attestations, which . . . encompassed [any] alleged omissions cited in the [] complaint."  *In re Interbank Funding*, 629 F.3d at 221; *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017) ("The *Affiliated Ute* presumption does not apply to . . . misstatements whose only omission is the truth that the statement misrepresents.").

## IV.   THE CONTROL PERSON CLAIM AGAINST GOVE ALSO FAILS

Because Plaintiff fails to plead a primary violation under Section 10(b) of the Exchange Act, the Second Amended Complaint's control person claim against Gove under Section 20(a), which is "predicated on an underlying primary violation of securities laws by a controlled person," must also be dismissed.  *In re U.S. Office*, 326 F. Supp. 2d at 83.  Additionally, because the Second Amended Complaint fails to plead scienter against Gove for the reasons discussed above, Plaintiff's Section 20(a) claim likewise fails to plead that Gove was, in some meaningful sense, a "culpable participa[nt]" in the alleged fraud, as required for Section 20(a) liability.  *In re ShengdaTech, Inc. Sec. Litig.*, 2014 WL 3928606, at *10 (S.D.N.Y. Aug. 12, 2014).

## CONCLUSION

For the foregoing reasons, the claims asserted against the Bed Bath Defendants in the

Second Amended Complaint should be dismissed with prejudice.

Dated: March 15, 2023

                                     Respectfully submitted,

                                     CLEARY GOTTLIEB STEEN & HAMILTON LLP

                                     */s/ Jared M. Gerber*
                                     Victor L. Hou (*pro hac vice*)
                                     Jared M. Gerber (*pro hac vice*)
                                     One Liberty Plaza
                                     New York, New York 10006
                                     Telephone: (202) 225-2507
                                     Email: vhou@cgsh.com
                                     Email: jgerber@cgsh.com

                                     Nowell D. Bamberger (D.C. Bar No. 989157)
                                     2112 Pennsylvania Avenue
                                     Washington, D.C. 20037
                                     Telephone: (202) 974-1752
                                     Email: nbamberger@cgsh.com

                                     *Counsel for Defendants Bed Bath & Beyond Inc.*
                                     *and Sue E. Gove*