**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE BED BATH & BEYOND CORPORATION SECURITIES LITIGATION | Case No. 1:22-cv-02541-TNM<br><br>CLASS ACTION<br><br>Jury Trial Demanded |

**PLAINTIFF'S CONSOLIDATED MEMORANDUM OF POINTS
AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ iii

I.     INTRODUCTION ...................................................................................................1

II.    STATEMENT OF FACTS .....................................................................................5

        A.  Cohen Becomes the Most Prominent Meme Stock Investor ....................5

        B.  Cohen Executes the "GameStop Blueprint" to Manipulate BBBY's Securities .....7

               1.  Cohen Established an Active Role within BBBY and Received Material, Non-Public Information ................................................................7

               2.  Cohen Learns That BBBY Rejected His Rescue Plan .............................9

               3.  Cohen Schemes to Pump and Dump BBBY's Securities ......................10

        C.  Post-Class Period Events Show Defendants Knew About the Extent of the Company's Problems Before Other Investors Could Know ..................14

III.   LEGAL STANDARD ...........................................................................................14

IV.  DEFENDANTS' REQUEST FOR JUDICIAL NOTICE SHOULD BE DENIED, OR, IN THE ALTERNATIVE, THEIR MOTION TO DISMISS SHOULD BE CONVERTED INTO A MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF SHOULD BE ALLOWED TO OBTAIN DISCOVERY ......................................................................15

V.   PLAINTIFF SUCCESSFULLY PLEADS SECTION 10(b) AND RULE 10b-5(b) CLAIMS AGAINST COHEN AND RC VENTURES ....................................................19

        A.  Plaintiff Adequately Alleges Falsity ......................................................19

               1.  Cohen's Tweet Misled Investors ..........................................................19

               2.  Cohen Failed to Disclose His Plan to Dump BBBY's Securities ..........25

               3.  Cohen Lied in his Form 144 ..................................................................28

         B.  Plaintiff Alleges a Cogent and Compelling Inference of Scienter .........31

               1.  Motive and Opportunity .......................................................................32

i

        2.   Access to Information Contradicting Public Statements ......................37

    C.  The SAC Adequately Alleges Loss Causation ....................................39

    D.  The SAC Adequately Pleads Reliance................................................42

        1.   Fraud-on-the-market ................................................................42

        2.   Affiliated Ute ...........................................................................48

VI.    SECTION 10(B) CLAIMS AGAINST BBBY AND GOVE ARE SUFFICIENTLY ALLEGED ...........................................................................................50

    A.  BBBY and Gove Misled Investors .....................................................50

    B.  BBBY's and Gove's Omissions Were Reckless..................................54

    C.  Gove was a Maker of the Company's Statements ...............................57

VII.   THE SAC ADEQUATELY PLEADS THAT COHEN ENGAGED IN A SCHEME TO DEFRAUD..........................................................................................59

VIII.  CONTROL PERSON CLAIMS ARE ADEQUATELY ALLEGED..............................61

IX.   PLAINTIFF SUCCESSFULLY PLEADS SECTION 20A CLAIMS AGAINST COHEN ...........................................................................................62

X.    PLAINTIFF SUCCESSFULLY PLEADS CLAIMS UNDER SECTION 9 ..................63

    A.  Section 9(a)(2) ..................................................................................63

    B.  Section 9(a)(3) ..................................................................................64

    C.  Section 9(a)(4) ..................................................................................65

XI.   CONCLUSION...............................................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens v. United States*,
  406 U.S. 128 (1972) ................................................................................................42

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002) .....................................................................................37

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
  19 F.4th 145 (2d Cir. 2021) .....................................................................................15

*Atchley v. Astrazeneca UK Ltd.*,
  22 F.4th 204 (D.C. Cir. 2022) .............................................................................41, 42

*Barrie v. Intervoice-Brite, Inc.*,
  397 F.3d 249 (5th Cir. 2005) ...................................................................................28

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ................................................................................................47

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ..............................................................................19, 20

*BofI Fed. Bank v. Erhart*,
  No. 15cv2353 BAS (NLS), 2016 U.S. Dist. LEXIS 103582 (S.D. Cal. Aug. 5, 2016)..........41

*Brown v. United States*,
  271 F. Supp. 2d 225 (D.D.C. 2003) .........................................................................15

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ........................................................................43, 45

*Chemetron Corp. v. Bus. Funds*,
  682 F.2d 1149 (5th Cir. 1982) .................................................................................65

*Chemetron Corp. v. Bus. Funds*,
  460 U.S. 1007 (1983) ..............................................................................................65

*Chubb INA Holdings Inc. v. Chang*,
  Civil Action No. 16-2354-BRM-DEA, 2017 U.S. Dist. LEXIS 16744
  (D.N.J. Feb. 7, 2017)................................................................................................36

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ...................................................................................38

*Cohen v. Kitov Pharm. Holdings, Ltd.*,
17 Civ. 0917 (LGS), 2018 U.S. Dist. LEXIS 45676 (S.D.N.Y. Mar. 20, 2018) ...................36

*Commonwealth v. Danzey*,
210 A.3d 333 (Pa. Super. Ct. 2019)....................................................................................24

*\*DeMarco v. Robertson Stephens Inc.*,
318 F. Supp. 2d 110 (S.D.N.Y. 2004)...................................................................................37

*\*Desai v. Gen. Growth Props.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009) .............................................................................28, 29

*Dist. Title v. Warren*,
No. CV 14-1808 (ABJ), 2015 U.S. Dist. LEXIS 188961 (D.D.C. June 1, 2015) .................36

*Dodona I, LLC v. Goldman, Sachs & Co.*,
847 F. Supp. 2d 624 (S.D.N.Y. 2012)..................................................................................43

*Doe v. Roman Cath. Diocese of Greensburg*,
581 F. Supp. 3d 176 (D.D.C. 2022) .....................................................................................17

*Dougherty v. Esperion Therapeutics*,
No. 16-10089, 2020 U.S. Dist. LEXIS 216515 (E.D. Mich. Nov. 19, 2020) ........................44

*\*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)..............................................................................................................39

*EEOC v. Fox News Network, LLC*,
806 F. Supp. 2d 128 (D.D.C. 2011) ......................................................................................18

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ..............................................................................................65

*Epstein v. World Acceptance Corp.*,
203 F. Supp. 3d 655 (D.S.C. 2016).......................................................................................43

*Esso Expl. & Prod. Chad, Inc. v. Taylors Int'l Servs.*,
No. 09-0467, 2010 U.S. Dist. LEXIS 57287 (W.D. La. June 9, 2010) ..................................32

*\*Freeland v. Iridium World Commc'ns., Ltd.*,
545 F. Supp. 2d 59 (D.D.C. 2008) ........................................................................................40

*\*Friel v. Dapper Labs, Inc.*,
21 Civ. 5837 (VM), 2023 U.S. Dist. LEXIS 29176 (S.D.N.Y. Feb. 22, 2023) ......................21

*Gaf Corp. v. Milstein*,
453 F.2d 709 (2d Cir. 1971)............................................................................................25, 26

*Genasys Inc. v. Vector Acoustics, Ltd. Liab. Co.*,
   No. 22-CV-152 TWR (BLM), 2022 U.S. Dist. LEXIS 199682
   (S.D. Cal. Nov. 1, 2022) ...............................................................................16, 17

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)...............................................................28, 29

*Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*,
   No. 21-16876, 2023 U.S. App. LEXIS 6285, __ F.4th __ (9th Cir. Mar. 16, 2023) ....... *passim*

*Glickenhaus & Co. v. Household Int'l, Inc.*,
   787 F.3d 408 (7th Cir 2015) ...................................................................................58

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
   141 S. Ct. 1951 (2021)............................................................................................48

*Grove v. Mead Sch. Dist.*,
   753 F.2d 1528 (9th Cir. 1985) ...........................................................................18, 19

*Gruber v. Gilbertson*,
   No. 16cv9727, 2018 U.S. Dist. LEXIS 45677 (S.D.N.Y. Mar. 20, 2018)..............................25

*Guidotti v. Legal Helpers Debt Resolution, L.L.C.*,
   716 F.3d 764 (3d Cir. 2013)....................................................................................18

*Halliburton Co. v. Erica P. John Fund, Inc.*, (*Halliburton II*),
   573 U.S. 258 (2014)..........................................................................................46, 47

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
   422 F. Supp. 3d 821 (S.D.N.Y. 2019)......................................................................24

*HB v. Monroe Woodbury Cent. Sch. Dist.*,
   No. 11-CV-5881 (CS), 2012 U.S. Dist. LEXIS 141252 (S.D.N.Y. Sept. 27, 2012) ..............17

*Howard v. Liquidity Servs., Inc.*,
   177 F. Supp. 3d 289 (D.D.C. 2016).....................................................................33, 34

*Howard v. Liquidity Servs.*,
   322 F.R.D. 103 (D.D.C. 2017).................................................................................43

*Hurd v. District of Columbia*,
   864 F.3d 671 (D.C. Cir. 2017).................................................................................18

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
   45 F.4th 1236 (10th Cir. 2022) ..................................................................21, 32, 34, 52

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016)......................................................................................23

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ................................................................29, 54, 58

*In re Apple Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989) ....................................................................30

*In re Barclays Liquidity Cross & High Frequency Trading Litig.*,
  390 F. Supp. 3d 432 (S.D.N.Y. 2019).....................................................49, 50

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) ......................................................................39

*In re Carter-Wallace Sec. Litig.*,
  220 F.3d 36 (2d Cir. 2000).........................................................................53

*In re Credit Suisse-AOL Sec. Litig.*,
  465 F. Supp. 2d 34 (D. Mass. 2006) ...........................................................42

*In re CRM Holdings, Ltd.*,
  10 Civ. 975 (RPP), 2012 U.S. Dist. LEXIS 66034 (S.D.N.Y. May 10, 2012) ......................33

*In re Diamond Foods, Inc.*,
  295 F.R.D. 240 (N.D. Cal. 2013)................................................................42

*In re Domestic Airline Travel Antitrust Litig.*,
  221 F. Supp. 3d 46 (D.D.C. 2016) ..............................................................17

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
  MDL 765 PHX RCB, CV 90 0118 PHX RCB, 1991 U.S. Dist. LEXIS 20824
  (D. Ariz. Jan. 4, 1991)...............................................................................18

*In re DVI, Inc. Sec. Litig.*,
  639 F.3d 623 (3d Cir. 2011)........................................................................44

*In re Express Scripts Holdings Co. Sec. Litig.*,
  773 F. App'x 9 (2d Cir. 2019) ....................................................................53

*In re FirstEnergy Corp. Sec. Litig.*,
  No. 2:20-cv-3785, 2022 U.S. Dist. LEXIS 39308 (S.D. Ohio Mar. 7, 2022).........................60

*In re Galena Biopharma, Inc. Sec. Litig.*,
  117 F. Supp. 3d 1145 (D. Or. 2015) ...........................................................61

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
  791 F.3d 90 (D.C. Cir. 2015) .........................................................14, 24, 40, 42

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003).........................................................42

*In re InterBank Funding Corp. Sec. Litig.*,
   629 F.3d 213 (D.C. Cir. 2010) ................................................................50

*In re January 2021 Short Squeeze Trading Litig.*,
   No. 21-2989-MDL, 2022 U.S. Dist. LEXIS 143699 (S.D. Fla. Aug. 10, 2022) ...................63

*In re Newbridge Networks Sec. Litig.*,
   926 F. Supp. 1163 (D.D.C. 1996) ......................................................43, 44

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) ................................................................23

*In re Oxford Health Plans, Inc.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ............................................................33

*In re Parmalat Sec. Litig.*,
   376 F. Supp. 2d 472 (S.D.N.Y. 2005) .......................................................44

*In re Philip Morris Int'l Inc., Sec. Litig.*,
   437 F. Supp. 3d 329 (S.D.N.Y. 2020) .......................................................24

*In re PTC Therapeutics, Inc., Sec. Litig.*,
   No. 16-1124 (KM) (MAH), 2017 U.S. Dist. LEXIS 137930 (D.N.J. Aug. 28, 2017) ...........54

*In re Teva Sec. Litig.*,
   No. 3:17-cv-558 (SRU), 2021 U.S. Dist. LEXIS 43316 (D. Conn. Mar. 9, 2021)................46

*In re Tronox, Inc.*,
   09 Civ. 6220 (SAS), 2010 U.S. Dist. LEXIS 67664 (S.D.N.Y. June 28, 2010).....................43

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ...............................................15, 32, 34, 38

*In re Snap Sec. Litig.*,
   No. 2:17-cv-03679-SVW-AGR, 2018 U.S. Dist. LEXIS 97704 (C.D. Cal. June 7, 2018).....21

*In re Synchrony Fin. Sec. Litig.*,
   988 F.3d 157 (2d Cir. 2021)....................................................24, 51, 55

*In re SLM Corp. Sec. Litig.*,
   740 F. Supp. 2d 542 (S.D.N.Y. 2010)......................................................33

*In re Tesla Sec. Litig.*,
   477 F. Supp. 3d 903 (N.D. Cal. 2020) .....................................................22

*In re UBS Auction Rate Sec. Litig.*,
   08 Civ. 2967 (LMM), 2010 U.S. Dist. LEXIS 59024 (S.D.N.Y. June 10, 2010)...................42

*In re Vivendi, S.A. Sec. Litig.,
    838 F.3d 223 (2d Cir. 2016)......................................................................19, 20, 51

In re Vivendi Universal, S.A. Sec. Litig.,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)...................................................................40

*In re WebMD Health Corp. Sec. Litig.,
    No. 11 Civ. 5382 (JFK), 2013 U.S. Dist. LEXIS 1512 (S.D.N.Y. Jan. 2, 2013)..............43, 45

*In re Willis Towers Watson PLC Proxy Litig.,
    937 F.3d 297 (4th Cir. 2019) ..................................................................................23

In re XM Satellite Radio Holdings Sec. Litig.,
    479 F. Supp. 2d 165 (D.D.C. 2007) ........................................................................51

*Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.,
    620 F.3d 137 (2d Cir. 2010)..............................................................................28, 57

*Iwa Forest Indus. Pension Plan v. Textron Inc.,
    14 F.4th 141 (2d Cir. 2021) ....................................................................................19

*Janus Capital Grp., Inc. v. First Derivative Traders,
    564 U.S. 135 (2011)............................................................................................57, 58

Jones v. Coty Inc.,
    362 F. Supp. 3d 1182 (S.D. Ala. 2018)...................................................................32

Kaplan v. S.A.C. Capital Advisors, L.P.,
    40 F. Supp. 3d 332 (S.D.N.Y. 2014)........................................................................63

*Khoja v. Orexigen Therapeutics, Inc.,
    899 F.3d 988 (9th Cir. 2018) ............................................................................16, 32

*Klein v. Altria Grp., Inc.,
    525 F. Supp. 3d 638 (E.D. Va. 2021) ....................................................................60

Kowal v. MCI Commc'ns Corp.,
    16 F.3d 1271 (D.C. Cir. 1994) ...............................................................................43

Kraft v. Third Coast Midstream,
    No. 19-cv-9398 (LJL), 2021 U.S. Dist. LEXIS 43016 (S.D.N.Y. Mar. 8, 2021)...................25

Kryzak v. State,
    No. 05-18-00660-CR, 2019 Tex. App. LEXIS 7786 (Tex. App. – Dallas Aug. 27, 2019).....24

Kusnier v. Virgin Galactic Holdings, Inc.,
    No. 21-CV-03070-ARR-TAM, 2022 U.S. Dist.
    LEXIS 202432 (E.D.N.Y. Nov. 7, 2022).............................................................32, 33

*Lake v. Aetna Life Ins. Co.*,
    No. 8:20-CV-3010-VMC-TGW, 2021 U.S. Dist. LEXIS 119804 (M.D. Fla.
    June 28, 2021) ......................................................................................................36

*Lea v. TAL Educ. Grp.*,
    837 F. App'x 20 (2d Cir. 2020) ...................................................................31, 57

*\*Lewis v. M&T Bank*,
    No. 21-933, 2022 U.S. App. LEXIS 6596 (2d Cir. Mar. 15, 2022).........................17

*\*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
    416 F.3d 940 (9th Cir. 2005) ..............................................................................28

*\*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec. LLC*,
    797 F.3d 160 (2d Cir. 2015).................................................................................39

*\*Lorenzo v. SEC*,
    139 S. Ct. 1094 (2019)........................................................................................59

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ...........................................................................31, 38

*Luce v. Edelstein*,
    802 F.2d 49 (2d Cir. 1986)...................................................................................65

*Lumen v. Anderson*,
    280 F.R.D. 451 (W.D. Mo. 2012) ........................................................................44

*Macovski v. Groupon, Inc.*,
    553 F. Supp. 3d 460 (N.D. Ill. 2021) ..................................................................57

*\*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    437 F.3d 588 (7th Cir. 2006) ..............................................................................19

*Mausner v. Marketbyte LLC*,
    No. 3:12-CV-2461-JM (NLS), 2013 U.S. Dist. LEXIS 199521 (S.D. Cal. Jan. 4,
    2013) ....................................................................................................................61

*Maz Partners v. First Choice Healthcare Sols.*,
    No. 6:19-cv-619-Orl-40LRH, 2019 U.S. Dist. LEXIS 184611 (M.D. Fla. Oct. 16,
    2019) ....................................................................................................................61

*McMath v. FDIC*,
    No. 2:10cv21-SRW, 2011 U.S. Dist. LEXIS 34650 (M.D. Ala. Mar. 31, 2011) ...................32

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ..........................................................................43

*Meyer v. JinkoSolar Holdings Co.,
    761 F.3d 245 (2d Cir. 2014)................................................................38

Micholle v. Ophthotech Corp.,
    No. 17-CV-210 (VSB), 2019 U.S. Dist. LEXIS 160131 (S.D.N.Y. Sept. 18, 2019) .............32

Miss. Pub. Emples. Ret. Sys. v. Bos. Sci. Corp.,
    523 F.3d 75 (1st Cir. 2008)................................................................15

Nanko Shipping, Guinea v. Alcoa, Inc.,
    330 F. Supp. 3d 439 (D.D.C. 2018)....................................................14

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.,
    320 F.3d 920 (9th Cir. 2003) .......................................................32, 34

*Novak v. Kasaks,
    216 F.3d 300 (2d Cir. 2000)..............................................19, 31, 38, 55

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.,
    58 F.4th 195 (5th Cir. 2023) .....................................15, 19, 28, 61

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,
    575 U.S. 175 (2015)....................................................................53, 54

Onel v. Top Ships, Inc.,
    806 F. App'x 64 (2d Cir. 2020) ........................................................64

Pelletier v. Endo Int'l PLC,
    338 F.R.D. 446 (E.D. Pa. 2021)........................................................44

*Petrobras Am., Inc. v. Samsung Heavy Indus. Co.,
    9 F.4th 247 (5th Cir. Aug. 11, 2021) ...............................................17

Phelps v. Stomber,
    883 F. Supp. 2d 188 (D.D.C. 2012)..................................................51

Plymouth Cnty. Ret. Sys. v. Patterson Cos.,
    No. 18-871 (MJD/HB), 2020 U.S. Dist. LEXIS 177505 (D. Minn. Sept. 28, 2020)..............44

*Policemen's Annuity & Benefit Fund of Chi. v. Bank of Am., NA,
    943 F. Supp. 2d 428 (S.D.N.Y. 2013)................................................30

*Puddu v. 6D Glob. Techs., Inc.,
    No. 15-cv-8061 (AJN), 2021 U.S. Dist. LEXIS 60905 (S.D.N.Y. Mar. 30, 2021)................25

Raab v. Gen. Physics Corp.,
    4 F.3d 286 (4th Cir. 1993) ..............................................................24

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) ...........................................................................38

*Roofer's Pension Fund v. Papa*,
333 F.R.D. 66 (D.N.J. 2019) ............................................................................45

*\*Rosen ex rel. Egghead.com, Inc. v. Brookhaven Capital Mgmt. Co.*,
113 F. Supp. 2d 615 (S.D.N.Y. 2000) ..............................................................26

*Roth v. AON Corp.*,
No. 04-C-6835, 2008 U.S. Dist. LEXIS 18471 (N.D. Ill. Mar. 7, 2008) ................32

*Scanz Techs., Inc. v. JewMon Enters., LLC*,
Civil Action No. 20-22957-Civ-Scola, 2021 U.S. Dist. LEXIS 2651 (S.D. Fla.
Jan. 6, 2021) .............................................................................................17, 18

*Schlagal v. Learning Tree Int'l*,
No. 98-6384 ABC (Ex), 1998 U.S. Dist. LEXIS 20306 (C.D. Cal. Dec. 23, 1998)...............34

*ScrippsAmerica, Inc. v. Ironridge Glob. LLC*,
119 F. Supp. 3d 1213 (C.D. Cal. 2015) ......................................................42, 43

*\*Seagoing Unif. Corp. v. Texaco, Inc.*,
705 F. Supp. 918 (S.D.N.Y. 1989) ...................................................................25

*SEC v. Familant*,
910 F. Supp. 2d 83 (D.D.C. 2012) ...................................................................59

*\*SEC v. Fassari*,
No. SACV 21-403 JVS(ADSx), 2021 U.S. Dist. LEXIS 88170 (C.D. Cal. May 5, 2021) .....21

*SEC v. Lek Sec. Corp.*,
276 F. Supp. 3d 49 (S.D.N.Y. 2017).................................................................63

*SEC v. Levin*,
No. 1:12-cv-21917-UU, 2014 U.S. Dist. LEXIS 197845 (S.D. Fla. Oct. 6, 2014) ...............59

*\*SEC v. Recycle Tech, Inc.*,
No. 12-21656-CIV, 2013 U.S. Dist. LEXIS 195982 (S.D. Fla. Sept. 26, 2013) ...................27

*SEC v. Rio Tinto PLC*,
No. 17-cv-7994 (AT), 2019 U.S. Dist. LEXIS 43986 (S.D.N.Y. Mar. 18, 2019)...............53

*\*SEC v. Teo*,
Civil Action No. 2:04-cv-01815 (SDW)(MCA), 2010 U.S. Dist. LEXIS 81543 (D.N.J. Aug.
10, 2010) ......................................................................................................25

*Seow Lin v. Interactive Brokers Grp., Inc.*,
    574 F. Supp. 2d 408 (S.D.N.Y. 2008).................................................................53

*Set Cap. LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021)....................................................................................31

*\*S. Ferry LP v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ................................................................................35

*\*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015)...............................................................63, 65

*\*Shenk v. Mallinckrodt PLC*,
    No. 17-cv-00145 (DLF), 2019 U.S. Dist. LEXIS 128312 (D.D.C. July 30, 2019) ...........14, 31

*\*Skiadas v. Acer Therapeutics, Inc.*,
    1:19-cv-6137-GHW, 2020 U.S. Dist. LEXIS 105814 (S.D.N.Y. June 16, 2020) ..................22

*Sullivan & Long v. Scattered Corp.*,
    47 F.3d 857 (7th Cir. 1995) ..................................................................................47

*Takata v. Riot Blockchain, Inc.*,
    Civil Action No. 18-02293 (ZNQ) (TJB), 2022 U.S. Dist. LEXIS 65498 (D.N.J. Apr. 8, 2022) ....................................................................................25

*\*Teamsters Local 237 Additional Sec. Ben. Fund v. Caruso*,
    No. 2020-0620-PAF, 2021 Del. Ch. LEXIS 188 (Del. Ch. Aug. 31, 2021)...............35, 36, 37

*\*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..............................................................19, 27, 28, 31, 34

*Thesling v. Bioenvision, Inc.*,
    374 F. App'x 141 (2d Cir. 2010) ..........................................................................25

*U.S. v. Sargent*,
    No. 22 CR 15-2, ECF No. 101 (N.D. Ill. Mar. 2, 2023) ........................................24

*Vladimir v. Bioenvision Inc.*,
    606 F. Supp. 2d 473 (S.D.N.Y. 2009)..................................................................25

*Weiner v. Tivity Health, Inc.*,
    334 F.R.D. 123 (M.D. Tenn. 2020) ......................................................................46

*Wu v. Stomber*,
    883 F. Supp. 2d 233 (D.D.C. 2012)................................................................48, 49

*\*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    845 F.3d 384 (8th Cir. 2016) ................................................................................60

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
 780 F.3d 597 (4th Cir. 2015) .................................................................16

**Rules**

Fed. R. Civ. P. 12(b)(6).................................................................14, 15, 16, 18, 41

Fed. R. Civ. P. 12(c) .................................................................................18

Fed. R. Civ. P. 12(d) .........................................................................16, 18

Fed. R. Civ. P. 56(d) ...............................................................................19

NASDAQ Rule 5605-2 ........................................................................ 35, 36

Rule 12(B) of the Court's Standing Order .................................................58

Rule 13(A) of the Court's Standing Order...........................................15, 16

SEC Rule 10b-5 .......................................................................................29

SEC Rule 10b5(a) .....................................................................................62

SEC Rule 10b5(b) .....................................................................................62

SEC Rule 10b5(c) .....................................................................................62

SEC Rule 144...................................................................................28, 29

**Statutes**

15 U.S.C. § 78i(a)(3).................................................................................64

18 U.S.C. §1001........................................................................................29

Private Securities Litigation Reform Act............................................ *passim*

Securities Exchange Act of 1934 ...................................................... *passim*

**Additional References**

A. Aloosh et al., *The Tail Wagging the Dog: How Do Meme Stocks Affect Market Efficiency* (2022), available at https://papers.ssrn.com/sol3/Papers.cfm?abstract_id=3839832. ...............4, 5

Eric Goldman, *Emojis and the Law*, 93 Wash. L. Rev. 1227 (2018) ...........................................22

Hamza Alshenqeeti, *Are Emojis Creating a New or Old Visual Language for New Generations? A Socio-semiotic Study*,
7(6) ADVANCES IN LANGUAGE AND LITERARY STUD. 56 (2016) .......................................22, 23

Form 42B45, filed with the SEC on March 30, 2023, available at: https://www.sec.gov/Archives /edgar/data/886158/000119312523084693/d468823d424b5.htm ............................................2

## I.     INTRODUCTION

This case arises from a pump-and-dump scheme that meme stock investor Ryan Cohen (together with his one-man investment entity, RC Ventures LLC, "Cohen") employed to sell his massive holdings in struggling retailer Bed Bath & Beyond Inc. ("BBBY" or "the Company") at inflated prices.  The Second Amended Complaint ("SAC") alleges the scheme in detail, including how Defendants' omissions and/or actions violated the Securities Exchange Act of 1934 ("Exchange Act").  The SAC pleads with a high degree of specificity that Cohen "used retail investors" to "pump the stock to unload his position at temporary higher valuations," exactly as market observers concluded after Cohen's surreptitious sales were revealed.  ¶30.[1]  Cohen's strategic ploy, which was exacerbated by BBBY's misleading statements concealing the rift between Cohen and BBBY, allowed Cohen to turn an eight-figure loss into over $68 million in personal profits.  ¶168.

Defendants offer no plausible alternative for why prices for BBBY shares spiked conveniently from $5 to above $30 during the short period at issue, why Cohen's plan or proposal to sell BBBY shares was omitted from a Form 13D filed the same day he dumped a whopping 5 million BBBY shares on unsuspecting investors, why Cohen intentionally omitted from his Form 144 that he had already sold millions of BBBY shares, or why BBBY spoke positively to investors about its relationship with Cohen long after it had fallen apart.  Nor do Defendants contest well-pleaded factual allegations in the SAC establishing that:

---

[1] All references to "¶" followed by a number are to the numbered paragraphs of the SAC, ECF No. 66.  References to "Cohen Br." are to the Memorandum of Points and Authorities in Support of Cohen's Motion to Dismiss, ECF No. 70.  References to "BBBY Br." are to Defendants BBBY's and Sue E. Gove's ("Gove") Memorandum of Law in Support of their Motion to Dismiss, ECF No. 72.  Unless otherwise noted, internal citations and quotation marks are omitted and all emphasis is supplied.

- BBBY shares were heavily traded on the basis of the interest of retail investors, which in turn were driven by information about Cohen's continued involvement in and rescue plan for the Company, including Cohen's own public statements. ¶¶146-84.  In fact, outside of this litigation, BBBY admits that "extreme fluctuations in the market price of and trading volumes in our common stock" during the Class Period were the result of "strong retail investor interest, including on social media and online forums."[2]

- Cohen communicated with BBBY's Board of Directors and senior officers, took conference calls with them, and actually received material nonpublic information about the Company before and during the Class Period.  ¶¶113, 122-28; 132-61, 191.

- Before the Class Period commenced, BBBY had internally rejected Cohen's plan to raise money by selling off its valuable buybuy BABY unit and instead decided to leverage that unit as collateral to refinance some of its debt, eviscerating Cohen's sole interest in retaining his BBBY securities.  ¶¶94-95.

- Cohen's relationship with BBBY broke down when BBBY rejected Cohen's rescue plan, ¶¶119-37, consistent with Cohen's admission in this case that he soured on the investment "***long before***" the Class Period began just as the SAC alleged in tedious detail, *see* Cohen Br. at 25.

- The rift between Cohen and BBBY was concealed from investors throughout the Class Period, and no Defendant ever acknowledged the rift's existence.  ¶¶119-86.

---

[2] *See* Form 42B45, filed with the SEC on March 30, 2023, available at: https://www.sec.gov /Archives/edgar/data/886158/000119311523084693/d468823d424b5.htm

- Cohen was widely followed by an army of investors, who, according to THE WALL STREET JOURNAL ("*The WSJ*"), considered him a "meme lord," and SAC allegations demonstrate that trading volume and BBBY's stock prices immediately and repeatedly reacted to Cohen's statements and actions.  ¶¶77, 139-78.

- Cohen knew from numerous prior experiences that he could effectively use tweets and emojis to deliver messages to investors and sway both trading volume and price. ¶¶73-85.

- Cohen sent highly misleading tweets in August 2022 that were universally understood by investors to indicate Cohen remained positive about BBBY, an impression which Cohen never contradicted despite knowing how his statements and actions were understood by tens of thousands of investors.  ¶¶139-54.

- Cohen also knew from past experiences, and has all but admitted, that he can instill retail frenzy using SEC Form 13D filings and force a squeeze in stocks he traded, causing a massive price and volume spike.  ¶¶53-58.

- Cohen filed a Form 13D on August 16, 2022, the day he dumped the majority of his shares, that omitted any reference to an already formed plan to sell BBBY securities.  ¶159.

- Cohen emailed the SEC a Form 144 after having sold millions of BBBY shares, intentionally omitting any reference to those sales.  ¶169.

- Although BBBY's relationship with Cohen had broken down by August 2022, it still spoke positively about that relationship on August 17, 2022 and August 18, 2022.  ¶¶179-84.

- After the "potential" of Cohen selling was disclosed on the night of August 17, 2022, the price of BBBY securities remained artificially inflated as investors believed Cohen's misleading statement that he had not sold any shares.  ¶¶175-76, 183.  However, the price of BBBY securities collapsed and plunged for the next few trading days after Cohen's actual sales were finally revealed on August 18, 2022.  ¶¶177-78.

Unable to squarely address the sufficiency of these damning SAC factual allegations, Defendants instead engage in improper trial arguments by addressing issues reserved for the jury, draw inferences impermissibly against Plaintiff, advance legal assertions that have soundly been rejected by courts, and ask this Court to make implausible assumptions based upon naked assertions of defense counsel and unattributed items that defense counsel found on the Internet.

Nor can Defendants manufacture a basis for dismissal by nakedly asserting that the market for BBBY shares was inefficient.  *See infra* at 42-46.  Besides the fact that market efficiency is a factual question to be determined on a developed record, the SAC shows that BBBY met the measures considered by courts when assessing market efficiency, including NASDAQ listing, active trading, rapid dissemination of company-specific information, analyst and media coverage, and ability to arbitrage.  *Id.*  And, while Defendants ask this Court to assume that meme stock surges and social trading are antithetical to efficient markets, academic research shows that both actually enhance the efficient market hypothesis ("EMH"), which underpins the fraud-on-the-market presumption of reliance:

> Our test results indicate that MS [meme stock] traders do not degrade market efficiency. Since the COVID-19 crisis, when comparing market efficiency tests for MS with those for the S&P 500, our EMH tests' results are stronger for MS. How does social trading increase market efficiency? The power of the crowd, from the perspective of our new digital era, involves the emergence of big investors' networks through gatherings of online social

traders on platforms like Reddit or eToro, wherein social traders empowered by new financial technologies can freely access both complex financial information and other investors' trade information. These features might also improve the price discovery process. Several theories support this hypothesis.

A. Aloosh et al., *The Tail Wagging the Dog: How Do Meme Stocks Affect Market Efficiency* (2022), available at https://papers.ssrn.com/sol3/Papers.cfm?abstract_id=3839832. Thus, to the extent Defendants continue to advance this baseless argument at class certification or trial, where it belongs, they will lose.

At most, Defendants' arguments show only that they have an alternate view that they might advance at trial if they can find admissible supporting evidence. None of their arguments even remotely shows any ***pleading*** deficiency. Accordingly, Defendants' Motions to Dismiss should be denied in their entirety, and the parties directed to proceed to discovery without further delay.

## II.    STATEMENT OF FACTS

### A.    Cohen Becomes the Most Prominent Meme Stock Investor

After selling his pet e-commerce company Chewy, Inc. for $3.35 billion, Cohen turned his attention to private investments via his one-man investment company, RC Ventures. ¶¶41-44. By 2020, he focused on large, activist investments in "meme stocks." *Id.* Meme stocks are stocks, principally in the United States, which are the focus of a subculture of investors who communicate on social platforms using their own vernacular that employs memes and emojis to convey ideas. ¶¶47-48. For example, the phrase "to the moon" is a rallying cry to convey that the price of a stock will rise significantly and is often accompanied by emojis of a rocket ship or a moon. *Id.*

Cohen quickly became prominent in the meme stock community and learned he could exploit that power for personal gain. On August 28, 2020, RC Ventures filed a Schedule 13D with the SEC identifying the purchase of 5.8 million shares of GameStop for a 9% stake in the company. ¶53. GameStop's stock price immediately rose by more than 41% upon the news. *Id.* Trading

volume also spiked up to 151.9 million shares traded compared to only 16.95 million shares traded on the previous day. *Id*. In a November 2022 interview, Cohen admitted understanding from the reaction to his August 2020 13D filing that he could invoke retail investor frenzy in a company simply by filing a Schedule 13D, describing the experience as a loss of his "13D virginity." ¶¶54, 193. Since August 2020, Cohen did so, and observed a dramatic increase in price and trading volume, on at least nine different occasions. ¶¶53-56, 63, 82, 84-85, 92-97, 99, 159, 162-66.

Cohen's ability to affect stock prices with such filings was widely recognized. Analysts concurred that Cohen was the "share price catalyst" for GameStop's rapid rise in stock price. ¶61. On the subreddit r/WallStreetBets, investors also increasingly relied on Cohen's actions to guide their investment decisions. ¶62. By the beginning of 2021, Cohen's popularity on social media exploded, and r/WallStreetBets users began to refer to him as "Papa Cohen" or the "meme lord," closely following every statement, social media post, public filing, and transaction by Cohen to guide their own investment decisions. ¶¶66-72.

Before the Class Period, Cohen also learned that positive statements he made on Twitter about his investments directly affected the market. For example, on March 22, 2022, Cohen bought a substantial amount of additional GameStop shares and tweeted: "I put my money where my mouth is[.]" ¶¶82-83. On this news alone, GameStop's share price increased by 30.7%, registering the highest one-day percentage gain for the company since March 25, 2021, and continued to surge to record levels over the next five trading days. ¶¶82-84.

Cohen's popularity with retail investors on Twitter and Reddit only increased as Cohen began to strategically post on Twitter, often with emojis and memes. ¶73. Cohen admits that he connected with retail investors via his Twitter account by either liking or retweeting memes of himself that first appeared on Reddit. ¶74. Investors on Reddit responded enthusiastically and

believed that Cohen was "on these threads all day just like us." *Id.*

As another illustration, on February 24, 2021, Cohen tweeted a frog emoji that coincided with the announcement that GameStop's CFO, Jim Bell, was pushed out, rumored at Cohen's behest.  ¶76.  Investors responded positively as expected, and GameStop's stock price rose from $11.17 to a high of $46.17 before closing on February 25, 2021, at $27.18, with a trading volume of 332.45 million shares on February 24, 2021, and 601.24 million shares traded on February 25, 2021.  *Id.*  Cohen learned to speak the language of his followers, mainly through emojis and memes, with followers tweeting Cohen to "post a '🚀' [rocket emoji] already" to signal when they should buy more shares in companies.  ¶77.  On April 16, 2021, after the market closed, Cohen tweeted a fist emoji that was understood as expressing a positive outlook on GameStop. ¶78.  The next trading day, GameStop's stock price rose by $2.42 with a trading volume of 42.08 million shares, more than double the number of shares traded on the previous day.  *Id.*  Cohen would continue to employ this strategy of using emojis and tweets to spur retail investors' interest and boost stock prices over the next year.  ¶¶80-81.

**B.      Cohen Executes the "GameStop Blueprint" to Manipulate BBBY's Securities**

**1.      Cohen Established an Active Role within BBBY and Received Material, Non-Public Information**

For his next investment play, Cohen targeted BBBY by buying millions of its securities between January 2022 and February 2022.  ¶¶86-92.  On March 7, 2022, Cohen filed a Schedule 13D, disclosing that he purchased 9,450,100 shares of BBBY for approximately $119.37 million, and owned 9.8% of the Company.  *Id.*  In his Schedule 13D, Cohen declared that BBBY's shares were "undervalued," and attached a letter that he had sent to the Company's Board of Directors on the previous day claiming that he was "maniacally focused on the long-term," and imploring the Board to evaluate a sale or spinoff of buybuy BABY, BBBY's most lucrative retail chain, or other

transactions.  ¶¶94-95.  On the same day, BBBY became the second most mentioned stock on the r/WallStreetBets subreddit, with Cohen's followers proclaiming, "I suddenly Love Bed bath & beyond" and "ALL IN on BBBY."  ¶96.  As a direct result of Cohen's Schedule 13D filing, BBBY's stock price experienced the largest intraday percentage increase since its IPO in June 1992, consistent with Cohen's own previous experiences and his admission that he pays attention to and understands how the market reacts to his ownership filings.  ¶97.

On March 25, 2022, Cohen filed an amended Schedule 13D and BBBY filed a Current Report on Form 8-K, both announcing that the parties had reached a Cooperation Agreement whereby BBBY agreed to appoint two Directors of Cohen's choosing to its Board and a newly-formed Strategy Committee that would evaluate options for buybuy BABY's future.  ¶99.  In the Cooperation Agreement, Cohen agreed not to use material, non-public information he might receive to purchase or sell BBBY's securities, confirming his and BBBY's understanding that Cohen would have access to such information.  ¶100.

On April 21, 2022, BBBY reported that there were now 79,845,789 outstanding shares due to the recent completion of its stock repurchase program.  ¶¶103, 106.  Since Cohen owned over 9.45 million shares, his beneficial ownership now exceeded 11.8%, and he was required to disclose that his ownership surpassed 10% within the following ten days.  ¶107.  Cohen failed to do so for over the next four months even though he publicly acknowledged his awareness of the share repurchase program, and BBBY's June 1, 2022 Proxy Statement prominently identified RC Ventures as its fourth largest holder with an ownership interest of 11.8% of all outstanding shares. ¶¶107, 109-10.

Over the next several months, BBBY's financial performance worsened as net sales decreased, losses and markdowns increased, and its cash balance dwindled to dangerous levels.

¶¶103-105, 114-18.  On June 21, 2022, Cohen took a swing at generously compensated CEO Mark Tritton ("Tritton") on Twitter, opining that: "Nobody sane can defend today's compensation for the Corporate Power Brokers (most of which is risk free) How did we get here?"  ¶¶111-12.  Two days later, BBBY announced that it had terminated Tritton, and appointed Gove as Interim CEO. *Id*.  Cohen immediately celebrated Tritton's firing when he tweeted: "I'm sick of seeing failed executives making millions in risk free compensation while shareholders are left holding the bag[.]"  *Id*.  On the same day, BLOOMBERG reported that Cohen "had grown fed up with Tritton's performance and pushed the Board to fire him[,]" demonstrating that Cohen did, in fact, receive material non-public information about internal matters unavailable to investors, and sought to directly influence BBBY and its management.  ¶113.

### 2.    Cohen Learns That BBBY Rejected His Rescue Plan

By June 2022, the Company hired advisors to help consider options to address its looming liquidity crisis.  ¶121.  On July 14, 2022, the Chairwoman of the Board of Directors, Harriet Edelman, told investors that the Strategy Committee had "done a great deal of work evaluating the potential of" buybuy BABY and had already "identified several options for this business."  ¶122. However, the Strategy Committee decided against Cohen's favored rescue plan of selling or spinning off buybuy BABY because doing so would require the Company to pay hundreds of millions of dollars that it already needed to stay afloat.  ¶¶126-27.  Instead, the Strategy Committee concluded that it was better to leverage buybuy BABY as collateral for a new financing package to cover its cash burn, which would yield a much-needed influx but prevent any sale or spinoff of the chain.  ¶125.

Days before Cohen began his scheme, BLOOMBERG published an article reporting that the Company was considering tapping the private credit market to boost liquidity, and noted that

BBBY had already talked to lenders about "a potential new asset-based credit line."  ¶119. Throughout August 2022, the Company negotiated an amendment to the 2021 Credit Agreement which guaranteed an additional $500 million in additional funds (the "2022 Credit Agreement"). ¶¶128-31.  In exchange for the additional funds, the 2022 Credit Agreement prevented the sale of buybuy BABY – the exact course of action Cohen had championed since March 2022.  ¶¶132-35. Contrary to BBBY's new assertion in this litigation, BBBY Br. at 17, the 2022 Credit Agreement was not and could not have been negotiated in a few late August days, given the complexity of the issues and the number of parties involved.  ¶¶119, 137.  In fact, on August 18, 2022, the Company admitted that it had worked on the loan package for *several weeks*, and news confirming that buybuy BABY would be encumbered as loan collateral emerged on the *same day* that Cohen dumped most of his stake.  ¶¶128-31.

Cohen's access to company knowledge about BBBY's strategy is clear and beyond dispute. Besides controlling two members of the Strategy Committee, Cohen participated in conference calls with then-CFO Gustavo Arnal ("Arnal"), had reported inside knowledge of other strategic decisions like replacing Tritton, and the Cooperation Agreement contemplated that Cohen may receive material, non-public information.  ¶¶100, 113, 123-24, 131, 136, 191.  Contrary to Defendants' strained reading of the Cooperation Agreement, there would be no need to include a prohibition on the misuse of material, nonpublic information if there was no expectation that Cohen would receive such information in the first place.

### 3.  Cohen Schemes to Pump and Dump BBBY's Securities

After learning that his rescue plan had been rejected, and the 2022 Credit Agreement would prevent any future spinoff of buybuy BABY, Cohen did not come clean with his retail investor followers about the rift that had grown between him and the Company.  Instead, he exploited those

investors to secretly exit his BBBY position with a healthy profit.  On August 5, 2022, Cohen began his scheme by tweeting, "Ask not what your company can do for you – ask what you can do for your company[.]"  ¶139.  Cohen's followers understood this to mean that Cohen was positively referencing BBBY and imploring them to support the stock.  ¶¶140-42.  That same day, BBBY was the most mentioned stock on the r/WallStreetBets subreddit.  *Id.*  Twitter users confirmed understanding that Cohen was referring to BBBY, as did market prices the next trading day when BBBY shares rose from $8.16 to $11.41 on extremely heavy trading volume.  ¶143. Cohen looked to build upon the success of his opening salvo with his next, much more impactful tweet.

On Friday, August 12, 2022, Cohen undermined a story by CNBC suggesting the Company was under financial strain but showing a picture of a woman with an overflowing shopping cart by tweeting, "At least her cart is full" accompanied by a smiley moon emoji, an homage to the meme stock rallying cry of sending a stock "to the moon."  ¶¶146-47.  Investors on Twitter and Reddit immediately understood this tweet as a directive to buy BBBY's stock and "take it to the moon." ¶¶149-52.  Trading in BBBY securities surged in response, causing BBBY's stock price to rise from $10.63 to $12.95.  ¶153.  Throughout the weekend, investors continued to echo Cohen's message on Internet forums, and confirmed that they bought BBBY securities because of Cohen's tweet.  ¶¶154-55.  Cohen did nothing to contradict the plain meaning of his tweets, as investors correctly understood them.  On August 15, 2022, BBBY's stock price opened at $15.00 and closed at $16.00 on a volume of over 164 million shares, double the amount traded on August 12, 2022. ¶156.

On the night of August 15th, at 9:01 PM, Cohen made his next move by filing a delinquent Initial Statement of Beneficial Ownership on Form 3, emphasizing that he owned more than 10%

of BBBY common stock even though he had owned more than 10% of the Company since at least April 21, 2022, to excite investors further.  ¶¶156-57.  Investors understood this filing as an affirmation that Cohen remained invested in BBBY for the long term as he had publicly promised.  ¶158.  On the morning of August 16, 2022, Cohen filed an amended Schedule 13D, reiterating his ownership in BBBY, as well as misleadingly affirming that "[t]here have been no transactions in securities of the Issuer by the Reporting Persons during the past sixty days nor since the filing of Amendment No. 1 to the Schedule 13D."  ¶¶159-60.  Cohen also falsely certified that the information contained in the amended Schedule 13D was true, complete, and accurate.  ¶160.

No event in August 2022 compelled Cohen's Form 3 or amended Schedule 13 filings— they were due four months earlier and could have been filed at any time.  ¶¶156-57, 159-60.  But doing so in August 2022, immediately after the Company internally rejected Cohen's rescue plan, served a very important purpose: ginning up investor frenzy, just as Cohen knew was likely from previous similar filings.  ¶162.  In reaction, on August 16, 2022, BBBY shares increased by over 70% on massive volume and peaked at an intraday high of $28.60, with trading halted several times during the day due to volatility.  ¶163.  Options trading also surged.  *Id*.  The stock closed at $20.65 with 395.32 million shares traded.  ¶164.  Retail investors bought record amounts of BBBY shares, heeding Cohen's call to take the price of BBBY securities to the moon.  *Id*.  Cohen secretly exploited the surge he stimulated to sell the majority of his BBBY securities for total proceeds of over $105 million.  ¶165.

After Cohen had sold BBBY securities for over $105 million in total proceeds, he emailed his Form 144 to the SEC at the end of the day on August 16, 2022, and intentionally omitted to disclose this massive sale in it.  ¶¶169-70, 173.  In the Form 144, Cohen also misleadingly described any sales of BBBY securities as "potential," and claimed that he did not know any

material adverse information about BBBY that was not public.  ¶173.

On August 17, 2022, investors, still unaware of Cohen's sales, continued to purchase hundreds of millions of BBBY shares, and the stock price again increased.  ¶166.  Options trading also continued to surge.  ¶166.  Cohen took advantage of the spike to sell his remaining BBBY securities for total proceeds of over $83 million.  ¶¶167-68.  By engineering and then selling into the price spike, Cohen garnered a profit of over $68 million, instead of a more than $80 million loss he would have otherwise incurred.  ¶168.

After the market closed on August 17, 2022, Cohen's Form 144 was released, and, in reaction, investors continued to believe that he remained interested in holding BBBY securities, again demonstrating that his misleading statements concerning "potential" sales had their intended effect.  ¶¶175-76.  Also, after market close on August 17, 2022, CNBC published a story about Cohen's Form 144 and "intent to sell entire stake."  ¶179.  In response to an inquiry from CNBC about Cohen's sales, BBBY said that it was "pleased to have reached a constructive agreement with RC Ventures" in March 2022, remained committed to maximizing value for all shareholders, and had been working "on strengthening our balance sheet."  ¶¶179-81.  On August 18, 2022, BBBY repeated these misleading claims in a Current Report filed with the SEC on Form 8-K that was signed by Arnal and approved by Gove.  ¶¶180-81, 186.  BBBY's statements had a misleading effect as investors understood the statements to suggest that Cohen was still invested in and remained committed to BBBY.  ¶183.

After the market closed on August 18, 2022, Cohen filed another amendment to his Schedule 13D and a Form 4, both of which finally disclosed that he had secretly sold every single BBBY share and option he owned during the previous two days, immediately after telling investors to ask what they could do to help BBBY and take its stock price to the moon.  ¶177.  Upon this

disclosure, the Company's stock price plunged over the next three trading days and lost over half

its value, falling from $18.55 on August 18, 2022 to close at $8.78 on August 23, 2022.  ¶178.

C.    **Post-Class Period Events Show Defendants Knew About the Extent of the Company's Problems Before Other Investors Could Know**

In the weeks and months after Cohen fully exited his BBBY position, previously

undisclosed information that further motivated Cohen to sell began to emerge.  Stories published

in the next few weeks confirmed that vendors had refused to approve orders as early as the

beginning of 2022 because of the Company's cash position.  ¶201.  On September 29, 2022, BBBY

employees confirmed to the financial press that the Company had not paid suppliers since, at least,

September 2021.  ¶201.

Upon these disclosures, analysts concluded that BBBY may not have sufficient liquidity

for the rest of the year, and only a bankruptcy filing could alleviate the cash burden.  ¶204.  As a

major bond payment loomed, the Company's financial performance continued to deteriorate

rapidly over the next few months until it disclosed that it had defaulted under the 2022 Credit

Agreement, and was considering all options under the U.S. Bankruptcy Code.  ¶¶205-209.

III.    **LEGAL STANDARD**

On a motion to dismiss, courts accept all allegations in the complaint as true and draw all

reasonable inferences in favor of the plaintiff.  *See In re Harman Int'l Indus., Inc. Sec. Litig.*, 791

F.3d 90, 99 (D.C. Cir. 2015); *Shenk v. Mallinckrodt PLC*, No. 17-cv-00145 (DLF), 2019 U.S. Dist.

LEXIS 128312, at *16 (D.D.C. July 30, 2019).  The purpose of a Rule 12(b)(6) motion is to test

the sufficiency of the complaint, not to decide the merits.  *See Nanko Shipping, Guinea v. Alcoa,*

*Inc.*, 330 F. Supp. 3d 439, 448 (D.D.C. 2018).  The Supreme Court has cautioned that "when a

complaint adequately states a claim, it may not be dismissed based on a district court's assessment

that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the

satisfaction of the factfinder." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007).  This applies with equal force to securities fraud cases despite the pleading standards of the Private Securities Litigation Reform Act ("PSLRA").  *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (holding that neither the PSLRA nor Rule 9(b) require a plaintiff to plead "detailed evidentiary matter" in a securities case); *Miss. Pub. Emples. Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 90 (1st Cir. 2008) (reaffirming that "in determining the adequacy of a complaint . . . we cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence.").

Defendants almost always either misstate the applicable standards or exaggerate the requirements of the PSLRA, and this case is no exception.  Recent Circuit decisions, however, make it clear that the purpose of the PSLRA was to prevent sham litigation, not meritorious lawsuits, and lower courts therefore "must be careful not to mistake heightened pleading standards for impossible ones." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021); *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp.*, 58 F.4th 195, 214 (5th Cir. 2023) (similar); *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, No. 21-16876, 2023 U.S. App. LEXIS 6285, __ F.4th __ (9th Cir. Mar. 16, 2023) (similar).

## IV.   DEFENDANTS' REQUEST FOR JUDICIAL NOTICE SHOULD BE DENIED, OR, IN THE ALTERNATIVE, THEIR MOTION TO DISMISS SHOULD BE CONVERTED INTO A MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF SHOULD BE ALLOWED TO OBTAIN DISCOVERY

"For purposes of Rule 12(b)(6), the Court may only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Brown v. United States*, 271 F. Supp. 2d 225, 228 (D.D.C. 2003).  This Court's Standing Order also confirms that Defendants may not improperly rely on facts outside the pleadings to quarrel with well-pled complaint allegations.  *See*

Rule 13(A) of the Standing Order (warning that the Court may convert a motion to dismiss to a motion for summary judgment if a party relies on matters outside the pleadings).  Many Circuits have also condemned these tactics in securities fraud class actions, warning that the risk of improper dismissal based on matters outside the pleadings is high in such cases because a defendant can hide behind the discovery stay of the PSLRA yet simultaneously flood the Court with inappropriate material in an attempt to topple meritorious claims.  *See, e.g.*, *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998-99 (9th Cir. 2018); *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607-08 (4th Cir. 2015).

Defendants repeatedly cite external materials neither referenced in the SAC nor appropriate for judicial notice.  The Court should deny the request for judicial notice as to such material, or, in the alternative, convert the motions to ones for summary judgment pursuant to Rule 12(d) and allow Plaintiff to engage in discovery relating to the issues raised by the new material.

In one egregious example, Cohen disputes the allegation that his handpicked Directors shared material non-public information with him because "[t]he Company has publicly concluded exactly the opposite."  Cohen Br. at 36.  Cohen cites an external letter, generated after the Class Period and not referenced in the SAC, by a BBBY lawyer asserting a litigation position that was not even substantiated by sworn testimony or subjected to cross-examination.  *Id.*  Yet Cohen asks the Court to assume as a matter of law the truth of BBBY's lawyer's assertion.  *See* Cohen Br. at 4 n.2 & n.3.

Rule 12(b)(6) squarely prohibits this ploy.  Courts "only take[] judicial notice of the content of the SEC Forms [] and the fact that they were filed with the agency.  The truth of the content, and the inferences properly drawn from them, however, is not a proper subject of judicial notice under Rule 201."  *Genasys Inc. v. Vector Acoustics, Ltd. Liab. Co.*, No. 22-CV-152 TWR (BLM),

2022 U.S. Dist. LEXIS 199682, at *14 (S.D. Cal. Nov. 1, 2022).  That the unsubstantiated BBBY lawyer letter was subsequently filed with the SEC makes no difference.  "[C]ourts may take judicial notice of publicly available documents such as regulatory filings.  But they must do so to determine what statements [the documents] contained . . . [and] not for the truth of the matters asserted in the documents."  *Lewis v. M&T Bank*, No. 21-933, 2022 U.S. App. LEXIS 6596, at *3 (2d Cir. Mar. 15, 2022).

Cohen also cites and relies upon screenshots of seven anonymous Reddit posts and additional assertions in online news articles, which were neither mentioned nor incorporated by reference in the SAC.  *See* Cohen Br. at 8, 29-31.  Cohen brazenly misstates the law by asserting that anything on the Internet is subject to judicial notice.  Cohen Br. at 31 n.10.  Doing so is reversible error.  *See Petrobras Am., Inc. v. Samsung Heavy Indus. Co.*, 9 F.4th 247, 255-56 (5th Cir. Aug. 11, 2021) (reversing dismissal of fraud claims because the district court took judicial notice of facts contained in news articles for their truth).  Courts can "take judicial notice of the internet and news articles for the fact of their publication, ***but not for the truth of the statements contained therein***."  *HB v. Monroe Woodbury Cent. Sch. Dist.*, No. 11-CV-5881 (CS), 2012 U.S. Dist. LEXIS 141252, at *14 (S.D.N.Y. Sept. 27, 2012); *see also In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 71-72 (D.D.C. 2016) (taking judicial notice of the *existence* of news articles but not accepting these articles for the truth of their assertions).

Cohen's reliance on *Doe v. Roman Cath. Diocese of Greensburg*, 581 F. Supp. 3d 176, 195 (D.D.C. 2022), is misplaced.  In *Doe*, the court took judicial notice of the defendants' website to find personal jurisdiction.  But generally, as noted above, internet content is not subject to judicial notice for the truth of the matter asserted therein.  *See Scanz Techs., Inc. v. JewMon Enters., LLC*, Civil Action No. 20-22957-Civ-Scola, 2021 U.S. Dist. LEXIS 2651, at *18 (S.D. Fla. Jan. 6, 2021)

(refusing to take judicial notice of tweets and content from websites for the truth of the matter asserted).[3]

Alternatively, if the Court chooses to consider any of the aforementioned material, the motion to dismiss should be converted to a motion for summary judgment, and Plaintiff should be allowed to obtain discovery about the subjects of these materials, including whether Cohen's Directors shared material non-public information with him.  "The text of Rule 12(d) specifies that, '[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.'"  *Hurd v. District of Columbia*, 864 F.3d 671, 687 (D.C. Cir. 2017); *see also EEOC v. Fox News Network, LLC*, 806 F. Supp. 2d 128, 134 (D.D.C. 2011) ("Because the Court must rely in part on evidence outside of the pleadings to address plaintiff's retaliation claim, defendant's Motion to Dismiss will be converted to one for summary judgment.").  "Once the motion is converted to a motion for summary judgment, reasonable allowance must be made for the parties to obtain discovery."  *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 775 n.6 (3d Cir. 2013); *see also In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, MDL 765 PHX RCB, CV 90 0118 PHX RCB, 1991 U.S. Dist. LEXIS 20824, at *25 (D. Ariz. Jan. 4, 1991) ("The Ninth Circuit provides that parties shall have time for any necessary discovery after a motion to dismiss is converted.") (citing *Grove v. Mead Sch. Dist.*, 753 F.2d 1528, 1532 (9th Cir.

---

[3] To the extent Cohen wishes to use the Reddit posts to show that Reddit users discussed BBBY's stock before Cohen entered the scene, this fact is in full harmony with the SAC's allegations and, in any event, inappropriate for the purpose that Cohen misuses the posts at the pleading stage.  The SAC never alleges that BBBY's stock was not discussed before Cohen purchased shares.  It alleges that "[o]n the same day that he filed his Schedule 13D, BBBY became the second most mentioned stock on the r/WallStreetBets subreddit."  ¶96.  Furthermore, even if this fact bore *any* evidentiary import with respect to the SAC's claims, assessing the evidentiary import of this fact versus the facts alleged in the SAC would be improper at the motion to dismiss stage.

1985)).  Pursuant to Rule 56(d), Plaintiff has submitted herewith the Declaration of Omar Jafri

identifying the expedited discovery it would need to address summary judgment.

## V.   PLAINTIFF SUCCESSFULLY PLEADS SECTION 10(b) AND RULE 10b-5(b) CLAIMS AGAINST COHEN AND RC VENTURES

### A.   Plaintiff Adequately Alleges Falsity

#### 1.   Cohen's Tweet Misled Investors

Under Section 10(b) of the Exchange Act, a statement is misleading if it gives an

"impression of a state of affairs that differs in a material way from the one that actually exists."

*Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).  When a defendant chooses

to speak on an issue or topic, he has a duty to be both complete and accurate.  *See In re Vivendi,*

*S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016).  Under the PSLRA, a plaintiff is required to only

specify each misleading statement and explain why it is misleading.  *See Six Flags*, 58 F.4th at 214

(rejecting attempt to impose further requirements on securities fraud plaintiffs as inconsistent with

the statutory text of the PSLRA).  Nothing more is required.  *Id.*

The PSLRA also allows a plaintiff to plead claims based on information and belief, so long

as sufficient facts are pled to suggest that the plaintiff's belief is reasonable.  *See, e.g.*, *Novak v.*

*Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d

588, 595 (7th Cir. 2006), *overruled on other grounds*, 551 U.S. 308 (2007).  This does not require

a plaintiff to plead each and every fact upon which the belief can be formed.  *Id.*; *Iwa Forest Indus.*

*Pension Plan v. Textron Inc.*, 14 F.4th 141, 147-48 (2d Cir. 2021) (reversing dismissal and

reaffirming that a plaintiff is not required to show that its reasonable interpretation is superior to

the district court's alternative theories at the pleading stage); *but see* Cohen Br. 36

(misunderstanding the standard to insinuate that a smoking gun must be provided to support

information and belief allegations).

The SAC easily surpasses these tests.  On August 5, 2022, shortly after Cohen learned that the Company abandoned his rescue plan, he tested the waters on Twitter by telling his followers to "ask not what your company can do for you, [but] what you can do for your company."  ¶139. Consistent with Cohen's prior experiences, ¶¶74-85, investors understood his statements as a cue to purchase BBBY's securities, and the Company's trading volume and stock price surged.  ¶¶141-43.  By August 10, 2022, retail investors tagged Cohen on Twitter and asked him to tweet further to "fuel us up."  ¶144.  Two days later, Cohen acceded to their demands, and countered a negative story on CNBC about how BBBY's stock price was "headed to $1" that contained a picture of a woman with a full shopping cart.  ¶147.  On August 12, 2022, Cohen retweeted the CNBC story with an emoji of a moon accompanied by the statement "at least her cart is full."  ¶148.  Thousands of investors on Twitter and Reddit unambiguously and correctly understood Cohen's tweet as a rallying cry to buy BBBY securities.  ¶¶149-55.  Trading volume subsequently spiked to unprecedented levels and the Company's stock price similarly rose.  ¶156.

While Cohen encouraged investors to buy the Company's securities, and watched them do exactly that for the next three days, he failed to disclose that he had already soured on his investment before this tweet was sent (as he now concedes, Cohen Br. at 25) since his turnaround strategy was rejected, or that he had already formed a plan or proposal to sell all his shares.  ¶148. Nor did Cohen tell investors that he abandoned his promise to "maniacally focus[]" on the Company's long-term interest, as he had repeatedly stated before.  *Id.*  Cohen's decision to conceal this information from investors is actionable under the securities laws because he created a false impression that materially differed from his actual views and plans.  *See Berson*, 527 F.3d at 985; *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 258.

Cohen attempts to minimize his misleading tweet, but the law does not support his position.

Recently, in *Friel v. Dapper Labs, Inc.*, a court in the Southern District of New York denied a motion to dismiss meme-based securities claims, ruling that emojis of stock charts, money bags and rocket ships "objectively mean one thing: a financial return on investment." 21 Civ. 5837 (VM), 2023 U.S. Dist. LEXIS 29176, at *44-45 (S.D.N.Y. Feb. 22, 2023).  Moon emojis signal the same to meme stock investors, and the facts here show investors interpreted them in the exact same way.  ¶¶149-55; *see also SEC v. Fassari*, No. SACV 21-403 JVS(ADSx), 2021 U.S. Dist. LEXIS 88170, at *18-20 (C.D. Cal. May 5, 2021) (sustaining complaint alleging that defendant encouraged investors to buy stock with misleading statements and emojis on Twitter when the defendant intended to sell his own shares).

Cohen cannot distinguish *Friel*.  Cohen Br. at 18 n.7.  While Cohen asks the Court to reimagine the tweet not for its plain meaning as the SAC alleges and meme stock investors understood, but rather as "sarcastic," *id.* at 17, 24, and an "expression of pessimism" about the Company's future, *id.* at 25, Cohen's reimagination of what his tweet meant cannot be considered on a motion to dismiss.  *See, e.g.*, *In re Snap Sec. Litig.*, No. 2:17-cv-03679-SVW-AGR, 2018 U.S. Dist. LEXIS 97704, at *15-16 (C.D. Cal. June 7, 2018) (ruling that defendants' alternative interpretation of executive's statement raised a factual dispute that cannot be resolved at the pleading stage).  Securities fraud plaintiffs need only explain why they believe a statement is misleading; they need not refute alternative explanations to plead falsity under the PSLRA.  *See, e.g.*, *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1250-51 (10th Cir. 2022).  In any event, Cohen does not even offer an alternative interpretation of the moon emoji he sent, and which was understood by retail investors to mean exactly what he intended – to buy BBBY securities.

Moreover, Cohen's litigation recharacterization of his tweet is not even plausible and will fully be refuted at the proper stage of the litigation.  Cohen did not lift a finger to dispel the

misleading impression he created.  He never before asserted that his tweet was intended to convey sarcasm or pessimism.  He never contradicted any one of the thousands of investors on Twitter or Reddit, including those who directly responded to his tweet, correctly understanding his directives as a rallying cry to purchase the Company's securities.  ¶¶149-55.  Indeed, more than 164 million shares were traded on the next trading day in reaction to Cohen's tweet.  ¶156.  *See, e.g., In re Tesla Sec. Litig.*, 477 F. Supp. 3d 903, 923–24 (N.D. Cal. 2020) (declining to adopt defendant's mischaracterization of a tweet as an inactionable opinion, in part, because the market reacted to the tweet with heavy trading volume).  Instead, Cohen waited for the stock price to skyrocket and then secretly sold his entire holdings without the slightest forewarning to investors.  As such, Cohen's creative attempt to reimagine his actual words lacks credibility.

Cohen's remaining arguments are equally meritless.  Cohen asserts that the moon emoji was ambiguous at best though he offers no alternative interpretation of his own, Cohen Br. at 17, but even if true, that would cut against dismissal.  Courts must read ambiguities in the plaintiff's favor at the pleading stage.  *See, e.g.*, *Skiadas v. Acer Therapeutics, Inc.*, 1:19-cv-6137-GHW, 2020 U.S. Dist. LEXIS 105814, at *26-27, *32-35 (S.D.N.Y. June 16, 2020).  Regardless, Cohen misreads academic literature to gin up this ambiguity.  Cohen's source states that ambiguity in emojis can be resolved by looking at the country, culture, or community where they are used.  *See* Eric Goldman, *Emojis and the Law*, 93 Wash. L. Rev. 1227, 1245-48 (2018) (emphasizing that groups develop their own idiosyncratic meanings of emojis).  Even Cohen does not dispute that his followers in the meme stock movement perfectly understood the meaning of a moon emoji. Cohen also disregards scholarly research concluding that emojis are a powerful means of non-verbal cues in personal communications.  *See, e.g.*, Hamza Alshenqeeti, *Are Emojis Creating a New or Old Visual Language for New Generations? A Socio-semiotic Study*, 7(6) Advances in

LANGUAGE AND LITERARY STUD. 56 (2016).

These facts further discredit Cohen's assertion that his misleading tweet was immaterial or inactionable puffery.  Cohen neglects to explain why his unsubstantiated arguments concerning materiality should be considered on a motion to dismiss.  *See, e.g., In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 304-06 (4th Cir. 2019) (holding that materiality is a fact-intensive inquiry that cannot be resolved on the pleadings); *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (holding that a complaint cannot be dismissed unless the information is so obviously unimportant to a reasonable investor "that reasonable minds could not differ on the question of their importance.").  Cohen makes no effort to meet this demanding standard, and the materiality is obvious given his relationship with the Company, his leadership role in the meme stock movement, and the historic trading activity in the Company's shares that occurred following his tweet.  ¶¶156, 163, 166.  Plaintiff addresses these issues because they were improperly raised by Cohen.  However, Plaintiff believes that the significance of meme stock emojis generally, and Cohen's emoji usage in particular, are properly addressed by experts at the merits stage.  As the Sixth Circuit explained, courts must tread lightly in determining materiality on the pleadings because federal courts have a "limited understanding of investor behavior and the actual economic consequences of certain statements."  *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 471-72 (6th Cir. 2014).

Cohen's feeble attempt to mischaracterize his tweet as inactionable puffery also fails.  Cohen's unsubstantiated opinion that emojis are incapable of objective verification is contradicted by the market reaction to his tweet, social science research and the law across federal and state jurisdictions.

As a matter of fact, criminal defendants have been convicted where evidence of a crime

was predicated on communications based on emojis. *See, e.g.*, *Commonwealth v. Danzey*, 210 A.3d 333, 342-43 (Pa. Super. Ct. 2019) (upholding conviction where social media posts accompanied with emojis demonstrated defendant's ill will towards the victim); *Kryzak v. State*, No. 05-18-00660-CR, 2019 Tex. App. LEXIS 7786, at *4-5 (Tex. App. – Dallas Aug. 27, 2019) (affirming conviction when the defendant sent the victim incriminating messages with frowning face emojis before the commission of a violent offense); *see also* Defendant Sargent's Post-Trial Motion at 26, *U.S. v. Sargent*, No. 22 CR 15-2, ECF No. 101 (N.D. Ill. Mar. 2, 2023) (complaining in post-trial brief that insider trading conviction should be set aside because the government's case rested on "nothing more than a timeline and an emoji."). If such evidence supports advancing a criminal case to trial and upholding a conviction beyond a reasonable doubt, it certainly supports advancing this meritorious civil claim, which will be subject to far more lenient burdens at trial, beyond the pleadings stage.

The Court should also note that Cohen's inconsistent argument again lacks credibility. The D.C. Circuit teaches that puffery refers to "generalized statements of corporate optimism" that a reasonable investor would not deem important to an investment decision. *Harman*, 791 F.3d at 108-09.[4] However, Cohen now baselessly claims that his tweet was intended to express

---

[4] Cohen puzzlingly cites *Harman* and other instances where dismissal of securities fraud suits was reversed. These decisions cannot help Cohen. In *Harman*, the D.C. Circuit reversed dismissal of claims involving representations of "very strong" sales, holding that the critical question was whether the statements, like here, were capable of misleading investors. 791 F.3d at 109. Similarly, in *In re Synchrony Fin. Sec. Litig.*, the Second Circuit reversed dismissal after consulting the dictionary definition of the word "pushback," holding that it was improperly assumed to be vague puffery. 988 F.3d 157, 167-68 (2d Cir. 2021). Cohen's reliance on *In re Philip Morris Int'l Inc., Sec. Litig.* is also misplaced. 437 F. Supp. 3d 329, 357-58 (S.D.N.Y. 2020). There, statements were dismissed as inactionable opinions, but Cohen does not claim his tweet was an opinion. *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.* dismissed general statements about <u>future</u> expectations, but Cohen does not invoke the PSLRA's safe harbor or claim that his tweet could reasonably be construed as anything other than an expression of his present beliefs about the Company. 422 F. Supp. 3d 821, 845 (S.D.N.Y. 2019). The same is true for *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289-90 (4th Cir. 1993).

"pessimism about BBBY's future."  Cohen Br. at 25.  As such, he should not be allowed to rely on this doctrine to escape liability given his new interpretation of the tweet.

>   **2.     Cohen Failed to Disclose His Plan to Dump BBBY's Securities**

Virtually every court to directly address the issue has ruled that false or misleading statements made in a Schedule 13D are actionable under Section 10(b) of the Exchange Act.  *See Seagoing Unif. Corp. v. Texaco, Inc.*, 705 F. Supp. 918, 926-27 (S.D.N.Y. 1989); *Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 490–91 (S.D.N.Y. 2009) *aff'd sub nom. Thesling v. Bioenvision, Inc.*, 374 F. App'x 141 (2d Cir. 2010); *SEC v. Teo*, Civil Action No. 2:04-cv-01815 (SDW)(MCA), 2010 U.S. Dist. LEXIS 81543, at *24-25 (D.N.J. Aug. 10, 2010); *Gruber v. Gilbertson*, No. 16cv9727, 2018 U.S. Dist. LEXIS 45677, at *43 (S.D.N.Y. Mar. 20, 2018); *Puddu v. 6D Glob. Techs., Inc.*, No. 15-cv-8061 (AJN), 2021 U.S. Dist. LEXIS 60905, at *19-20 (S.D.N.Y. Mar. 30, 2021).  This also includes authority that Cohen cites.  *See Kraft v. Third Coast Midstream*, No. 19-cv-9398 (LJL), 2021 U.S. Dist. LEXIS 43016, at *51-53 (S.D.N.Y. Mar. 8, 2021) (ruling that failure to disclose a fixed plan to sell in a Schedule 13D is actionable, but tentative plans need not be disclosed).  Cohen has dug up one outlier case that appears to reach an erroneous contrary conclusion, but he did not disclose adverse authority or explain why the Court should not follow the majority rule.  Cohen Br. at 19.

That case, in *Takata v. Riot Blockchain, Inc.*, misconstrued the Second Circuit's "landmark case" in *Gaf Corp. v. Milstein*, 453 F.2d 709, 721-22 (2d Cir. 1971), as expressing "reservations" about whether non-injunctive relief is available under Section 10(b) for Section 13(d) violations. Civil Action No. 18-02293 (ZNQ) (TJB), 2022 U.S. Dist. LEXIS 65498, at *28-29 (D.N.J. Apr. 8, 2022).  That is a misunderstanding of *Gaf Corp.*, where the Second Circuit held that an ***issuer*** of securities (like BBBY here) does not have standing to pursue damages under Section 10(b)

because it is not a purchaser or seller of securities.  453 F.2d at 721-22.  That fact pattern is not present here.  Plaintiff is a purchaser of securities with standing to sue for a Section 10(b) violation.  *Takata*'s misreading of the law is further confirmed by the fact that no lower court in the Second Circuit agrees with its conclusions, and Cohen overlooks that the plain language of Section 10(b) applies to all public statements.  There is no safe harbor for false statements and omissions in Schedule 13D filings, as Cohen urges this Court to adopt.  Cohen Br. at 18, 24.[5]

As for the merits, Cohen's August 16, 2022 Schedule 13D falsely certified that the information contained in it was complete and accurate, but he failed to disclose that he had already formed a plan to sell BBBY securities in violation of the Exchange Act and SEC regulations.  ¶¶ 35-36, 160-61.  A plan to sell shares ***must*** be disclosed in a Form 13D if a course of action is decided upon ***or intended***.  *See Rosen ex rel. Egghead.com, Inc. v. Brookhaven Capital Mgmt. Co.*, 113 F. Supp. 2d 615, 630 (S.D.N.Y. 2000).  Cohen has no basis to refute the SAC's allegations about his plans to sell BBBY securities before August 16, 2022.  *See* Cohen Br. at 21.

Cohen's brief does not acknowledge (let alone address) the detailed factual allegations pled in the SAC substantiating that he had formed a plan to sell prior to his Class Period omissions.  Nor does Cohen dispute that his "maniacal[] focus[]" on the long-term prospects of BBBY ended prior to the Class Period, when the Company rejected his rescue plan based on a sale or spinoff of buybuy BABY, the reason he bought shares in the first place.  ¶¶119-38.

Cohen, in fact, concedes that he ***soured*** on BBBY securities "***long before***" his August 12, 2022 tweet, just as the SAC alleged.  Cohen Br. at 25.  Cohen's own arguments and concessions support Plaintiff's reasonable belief that he was highly motivated to sell the Company's shares and

---

[5] Cohen's remaining citations are irrelevant.  The SAC does not plead any direct claim under Section 13(d) of the Exchange Act.  Cohen's Br. at 19 (citing cases brought under Section 13(d) and not Section 10(b)).

intended to do so before the Class Period began.  That is all the law requires to plead falsity.  *See, e.g.*, *Forescout*, 2023 U.S. App. LEXIS 6285, at *40-41 (holding that complaint with similarly tedious detail was sufficient to support plaintiffs' reasonable belief that defendants made false statements, and requiring anything more would improperly hold plaintiffs to an impossible standard inconsistent with the PSLRA's intent to prevent sham lawsuits, not meritorious ones).

Cohen's naked litigation assertion that he sold shares only to take advantage of the serendipitous rise in price cannot be credited at the pleading stage.  Cohen does not cite one fact to support his assumptions, which make no sense.  Cohen Br. at 21 n.8.  Having made the statements and reaped an enormous personal benefit from the inflated prices and volume surge they caused, Cohen's alternate narrative directly contradicts the well-pleaded and particularized allegations of the SAC.  At this stage, all facts alleged must be assumed true, and all plausible inferences must be drawn in favor of Plaintiff, not Cohen.  *See Tellabs*, 551 U.S. at 322.

Cohen's remaining arguments fare even worse.  Cohen misinterprets SEC regulations to bizarrely claim that he was free to hide disclosure of his sales plan on August 16, 2022, yet he admits in the same discussion that Item 4 of Schedule 13D ***requires disclosure of all plans or proposals to sell***.  Cohen Br. at 20. Without citation to any authority, Cohen further claims that boilerplate in an old Schedule 13D from March 2022 concerning purely hypothetical possibilities about further purchases or sales at undefined times in the future immunizes his fraud.  Cohen Br. at 20-21.  Courts have squarely rejected this argument.  *See SEC v. Recycle Tech, Inc.*, No. 12-21656-CIV, 2013 U.S. Dist. LEXIS 195982, at *16-17 (S.D. Fla. Sept. 26, 2013) (ruling that telling investors that shares "may" be sold is misleading when a defendant has already decided to sell his shares).  Moreover, Cohen cannot rely on this boilerplate because he made omissions and misrepresentations of then-current facts in the August Schedule 13D, which are wholly outside the

forward-looking statement safe harbor.  *See, e.g., Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947-48 (9th Cir. 2005) (holding that risk disclosures can only be invoked for predictive statements); *Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010) (holding that a defendant cannot hide behind purported disclosures when misrepresentations of current fact or omissions of existing fact are alleged).[6]

### 3.      Cohen Lied in his Form 144

Like any other SEC filing or public statement, a statement that is false ***when made*** on a Form 144 is actionable under Section 10(b) of the Exchange Act.  *See, e.g., Desai v. Gen. Growth Props.*, 654 F. Supp. 2d 836, 856 (N.D. Ill. 2009) (rejecting claim that false statements on a Form 144 constitute immaterial boilerplate because the Form is required to be filed by the SEC and is presumed to be in the total mix of information publicly available to the market); *see also Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 260-61 (5th Cir. 2005) (reversing dismissal of Exchange Act claims because the complaint adequately pled defendant's statement was ***false when made***).  Federal court decisions and SEC Rule 144 also make it clear that a Form 144 must be filed ***before*** a defendant sells his shares.  *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 584 n.9 (S.D.N.Y.

---

[6] Cohen's argument that he should be assumed not to have misled investors because, at the hour of filing, neither he nor his LLC had yet to fully execute any sales also lacks merit even assuming it did not contradict his concession that Item 4 requires all plans to be disclosed.  A defendant's statements are measured not by their literal truth, but by their ability to accurately and fully inform and not mislead investors.  *Six Flags*, 58 F.4th at 218.  Context is critical in evaluating whether a statement misleads investors.  *See Forescout*, 2023 U.S. App. LEXIS 6285, at *43-44 (holding that direct responses to analyst questions cannot be deemed puffery despite vagueness).  Neither the text or context of Cohen's statement narrow the scope of Item 4 of Form 13D to actual sales, and Cohen cites no legal support for his restrictive definition.  Moreover, well-pled allegations about the massive amount Cohen sold and the secret deterioration of Cohen's relationship with BBBY over the preceding weeks (coupled with his admission that he soured on the Company before the Class Period) render implausible any assumption that Cohen's sale was an impulse decision spontaneously made minutes or hours after the Form 13D was completed.  Regardless, this is a factual issue to be explored on the merits.  At this stage, all well-pleaded allegations must be accepted as true and all inferences drawn in favor of Plaintiff.  *See Tellabs*, 551 U.S. at 322.

2011) (observing that transactions need to be proposed before the sales occur); 17 C.F.R. § 230.144 (stating that a bona fide intent to sell must exist within a reasonable time **after** notice is filed).

Cohen ignores and thus concedes that the SAC not only pleads, but provides incontrovertible proof, that he sold millions of BBBY's shares before he created the pdf and emailed his Form 144 to the SEC.  ¶¶170-72.  Cohen does not, and cannot, dispute that trading data demonstrates he sold a large amount of shares before the Form 144 was sent to the SEC.  *Id.* Therefore, Cohen's omission of his sales on the Form 144 was a lie.  ¶¶170, 173.  It is a federal felony under 18 U.S.C. §1001 to "intentionally omit" facts on a Form 144.  *See* Cohen's Ex. 10; *see als*o *Desai*, 654 F. Supp. 2d at 856 (rejecting similarly flippant attempt to minimize false representations on a Form 144 given the criminal consequences).

Cohen also does not challenge the falsity of his affirmative misrepresentations in the Form 144 that he had contemplated only a "potential sale" of the Company's securities when the Form was filed, or that he did not know any material adverse information about BBBY at the time of sale.  *Compare* ¶¶173-74 *with* Cohen Br. at 21-22.  Arguments not addressed in motion papers cannot support dismissal.  *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) (reversing dismissal where specific securities claims were dismissed, but the motion to dismiss had failed to address them).  At any rate, the SAC pleads a strong factual basis to infer the falsity of those statements, which must be credited at this stage.  ¶¶170-73.

Cohen's attempts to wriggle out of his serious violation fail.  Cohen asks the Court to ignore the plain language of the Exchange Act and federal regulations (SEC Rule 10b-5 and Rule 144) in favor of his expansive reimagining of a Q&A document found on the SEC's website, which is not even attributed to the Commission itself but rather unidentified members of SEC "staff."  Cohen Br. at 21-22.  Q&A sessions with SEC staff are not law, and courts have no obligation to follow

them.  *Compare* Cohen Br. at 21-22 (misstating that Q&A sessions are law) *with Policemen's Annuity & Benefit Fund of Chi. v. Bank of Am., NA*, 943 F. Supp. 2d 428, 439 n.10 (S.D.N.Y. 2013) (refusing to follow the SEC staff's interpretive guidance because it was untethered to the facts of the case and the unambiguous language of the statute provided sufficient basis for independent decision).

Here, Cohen claims that he is free to lie and omit material facts on his Form 144 because he emailed it to the SEC after he lied.  Cohen Br. at 22.  This argument is untenable under the plain language of the Exchange Act and SEC Rules that prohibit knowing or reckless falsehoods ***at the time they are made***.  15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5.  Cohen also neglects to inform the Court that the Q&A session he hides behind concerns a Form 144 sent through the postal system, not emailed as he did.  U.S. SEC. AND EXCH. COMM'N, *Questions and Answers of General Applicability*, Question 136.09, https://www.sec.gov/corpfin/securities-act-rules# (last visited April 11. 2023); ¶¶169, 175.  Hence, concerns about the lack of control over when a mailing is picked up, sent, or delivered do not apply to him.

Cohen's unfounded assertion that lying on a Form 144 is immaterial if other, unrelated negative news about the company has reached investors also lacks merit.  Materiality cannot properly be considered at the pleading stage under these circumstances.  *See supra* at 23.  And, Cohen does not and cannot deny that the price of the Company's securities increased and remained artificially high at the time of his omissions, misrepresentations, and deceptive conduct, and plummeted after the truth of his sales became known.  ¶¶175-78.  Such dramatic price movement confirms materiality.  *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989) (dramatic stock price movement following a misstatement is a strong indicator of materiality).

**B.      Plaintiff Alleges a Cogent and Compelling Inference of Scienter**

A complaint can adequately plead scienter either based on (1) motive and opportunity to commit fraud *or* (2) strong circumstantial evidence of recklessness. *See Shenk*, 2019 U.S. Dist. LEXIS 128312, at *69-70.  Knowledge of facts or access to information that suggests a defendant's statements are misleading or a failure to check information that a defendant has a duty to monitor is classic evidence of recklessness.  *Novak*, 216 F.3d at 311-12.  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324.  A complaint survives a motion to dismiss if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.  The Supreme Court requires courts to examine complaints "holistically [and] consider[] ***all of the facts alleged, taken collectively***, rather than any individual allegation, ***scrutinized in isolation***." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021).  The SAC here pleads a powerful inference of both motive and opportunity to commit fraud as well as, at a minimum, severe recklessness.

Under *Tellabs*, a tie of inferences breaks in favor of the plaintiff at the pleading stage, and a defendant must present facts to demonstrate that a non-inference of fraud is ***more compelling*** to succeed on a motion to dismiss.  *See, e.g.*, *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254-55 (5th Cir. 2009); *Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 24-25 (2d Cir. 2020).  While a court can consider competing inferences in weighing allegations of scienter, alternative inferences must be "***rationally drawn from the facts alleged***" in the SAC.  *Tellabs*, 551 U.S. at 314; *Shenk*, 2019 U.S. Dist. LEXIS 128312, at *17 (same).  This means that a competing inference cannot be drawn from random material located on the Internet, as both Cohen and BBBY appear to believe.  Further,

general denials of SAC allegations, even if included in external documents, do not support dismissal. *See, e.g.*, *Roth v. Aon Corp.*, No. 04-C-6835, 2008 U.S. Dist. LEXIS 18471, at *26-27 (N.D. Ill. Mar. 7, 2008) (ruling that arguments concerning a defendant's subjective beliefs overlook the possibility of severe recklessness, and take the form of affirmative defenses that are more appropriately addressed after full discovery); *Micholle v. Ophthotech Corp.*, No. 17-CV-210 (VSB), 2019 U.S. Dist. LEXIS 160131, at *47-49 (S.D.N.Y. Sept. 18, 2019) (similar). Weighing facts is inappropriate on a motion to dismiss; it is within the province of the jury assuming admissible evidence exists. *Khoja*, 899 F.3d at 1011-12 (reversing dismissal because the lower court improperly weighed facts to dismiss securities fraud claims).[7]

### 1.    Motive and Opportunity

The Circuits are unanimous in holding that large, disproportionate, and suspiciously timed sales of stock during the Class Period are sufficient to plead a powerful inference of fraud. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 74–75 (scienter established by stock sales of 80% of total holdings within a matter of days at a significant profit when no stock was sold for a year before the class period); *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 939-40 (9th Cir. 2003) (motive was adequately pled where defendants sold all their holdings at suspicious times and the sales were dramatically out of line with prior trading practices); *Pluralsight*, 45 F.4th at 1267 (similar); *see also Kusner v. Virgin*

---

[7] The naked (and unfounded) assertions conjured by Defendants cannot even support summary judgment. *See, e.g.*, *Esso Expl. & Prod. Chad, Inc. v. Taylors Int'l Servs.*, No. 09-0467, 2010 U.S. Dist. LEXIS 57287, at *28 (W.D. La. June 9, 2010) (ruling that unsworn facts asserted only by counsel in a brief are insufficient to prevail on summary judgment); *McMath v. FDIC*, No. 2:10cv21-SRW, 2011 U.S. Dist. LEXIS 34650, at *24 (M.D. Ala. Mar. 31, 2011) (refusing to dismiss complaint based on facts raised only by defendant in its motion to dismiss). Parties cannot "create genuine issues of material fact by making speculative, conclusory, unsupported statements in their summary judgment briefs." *Jones v. Coty Inc.*, 362 F. Supp. 3d 1182, 1196 (S.D. Ala. 2018).

*Galactic Holdings, Inc.*, No. 21-CV-03070-ARR-TAM, 2022 U.S. Dist. LEXIS 202432, at *73 (E.D.N.Y. Nov. 7, 2022) (sales of all holdings while in possession of yet-to-be-released information contributed to an inference of scienter); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 (S.D.N.Y. 2010) ("[L]iquidation of 97% of [defendant's] holdings [ ] are unusual for a corporate officer by any measure."); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (a "$78 million profit from sales ... is … massive by any measure").[8]

During the Class Period, Cohen sold all of his holdings in two days, suspiciously timed to take advantage of the massive increase in BBBY's share price within days after he encouraged investors to buy the Company's securities.  ¶¶165-68; 185-87.  Courts in this Circuit have found weaker allegations sufficient to plead motive.  For example, in *Howard v. Liquidity Servs., Inc*., Judge Howell found that suspiciously timed and disproportionate sales of 25% of a defendant's holdings during the Class Period enhanced an inference of scienter.  177 F. Supp. 3d 289, 304–05 (D.D.C. 2016).  The facts here are far stronger.  Cohen sold all of his holdings within days at suspicious times soon after he encouraged investors to buy BBBY securities, allowing him to turn a $83.58 million loss into a profit of over $68 million.  ¶188.  Detailed factual allegations show that Cohen communicated with Arnal and other Company executives in conference calls, as the Company admitted to a WSJ reporter, ¶¶190-91.

Arnal's sales also raise an inference of scienter because they were unusual in both timing

---

[8] Cohen mistakenly relies on *In re CRM Holdings, Ltd.* to argue otherwise, Cohen Br., 23, but in *CRM*, the court ruled that large dollar-amount but mostly low percentage-of-holding sales alone did not support scienter without suspicious circumstances and when the defendants did not make false statements.  10 Civ. 975 (RPP), 2012 U.S. Dist. LEXIS 66034, at *68-70 (S.D.N.Y. May 10, 2012).  *CRM* expressly instructs that the "inquiry of whether a sale of stocks by a company executive shows scienter is a factual, situation-specific inquiry," hinging in part on the "percentage of shares sold in relation to the number held."  *Id.* at *67-68.  The same analysis would **support** scienter here: Cohen sold 100% of his holdings, retained none, made sales that were not only massive but also suspiciously timed and dramatically out of line with his prior trading history, and made highly misleading omissions and affirmative misrepresentations.  *Supra* at 19-30.

and volume.  ¶¶190-92.  The Court should reject BBBY's invocation of Arnal's trading plan because this affirmative defense is unavailable at the pleading stage.  *Pluralsight, Inc.*, 45 F.4th at 1266 (holding that trading plans do not rebut an inference of scienter, and crediting amicus brief's conclusion that such plans are abused to trade on inside information).  Nor is the amount Arnal sold insignificant.  *Id.* at 1267 (rejecting claim that retention of most of a defendant's holdings cuts against scienter).[9]

For these reasons, the SAC's motive and opportunity allegations surpass pleading standards.  *See, e.g.*, *Howard*, 177 F. Supp. 3d at 304–05.  Cohen's arguments to the contrary, *see* Cohen Br. at 35-36, are little more than a demand that Plaintiff produce "smoking gun" evidence that the Supreme Court has made clear is not necessary.  *Tellabs*, 551 U.S. at 323-24.   Courts do not require such direct evidence, so long as disproportionate, suspiciously timed sales in large amounts and proceeds are pled.  Cohen Br. at 25, 35-36.  That is all the law requires to **plead** motive.  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 74–75; *Am. W. Holding Corp.*, 320 F.3d at 939-40.

Nevertheless, the SAC pleads facts supporting a strong and compelling inference that Cohen possessed material, nonpublic information and traded on that information during his fraudulent scheme.   Cohen received material, nonpublic information about the Company

---

[9] That Defendant Gove did not herself sell shares is irrelevant.  BBBY Br. at 27; *see Am. W. Holding Corp.*, 320 F.3d at 944; *Schlagal v. Learning Tree Int'l*, No. 98-6384 ABC (Ex), 1998 U.S. Dist. LEXIS 20306, at *51 (C.D. Cal. Dec. 23, 1998) (noting that numerous courts have upheld scienter allegations under the PSLRA when some but not all defendants traded).  BBBY's claim that Arnal did not make any statements is false.  BBBY Br. at 27-28.  On behalf of BBBY, Arnal signed the Current Report filed on Form 8-K with the SEC on August 18, 2022, and which contained misleading statements.  BBBY's Ex. B at 4.  Nor do Arnal's suspicious sales need to be tied to the timing of any statement.  *See Am. W. Holding Corp.*, 320 F.3d at 938 (reversing dismissal when the district court disregarded suspicious sales of defendants on the ground that they did not make misleading statements).

unavailable to ordinary investors since he discussed Tritton's performance with the Board, convinced the Board to fire Tritton, and then gloated about his firing in public.  ¶¶111-13, 123. Cohen does not even address this fact.  Unlike ordinary investors, Cohen also communicated with BBBY's CFO in conference calls, as individuals at the Company admitted to *The WSJ*.  ¶124.  Two of Cohen's handpicked Directors served on the Strategy Committee that evaluated options for buybuy BABY, the source of Cohen's principal fixation with BBBY.  ¶122. Cohen does not dispute SAC allegations that the Strategy Committee had determined that a sale or spinoff of buybuy BABY was off the table before the Class Period began.  ¶¶125-37.  It is not conceivable that Cohen's handpicked Directors concealed this information from him.  Courts do "not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry LP v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

Nor does Cohen's citation to extraneous materials undercut the SAC's strong inference of scienter.  Cohen. Br. at 25-26, 35-36; *but see* Section IV (explaining why consideration of such materials would convert this proceeding into one for summary judgment).  Even if the Court considered Cohen's exhibits, they do not support the conclusory and unpersuasive inference that the Directors that Cohen appointed to advance Cohen's rescue plan on the Strategy Committee would hide the internal rejection of that rescue plan from Cohen simply because the Company labels them as "independent."  Under Delaware law, the independence of a director has to do with the director's relationship with the corporation, not whether there are business, personal, or financial ties to another party. *See Teamsters Local 237 Additional Sec. Ben. Fund v. Caruso*, No. 2020-0620-PAF, 2021 Del. Ch. LEXIS 188, at *37-38 (Del. Ch. Aug. 31, 2021); *see also* NASDAQ Rule 5605-2 (defining directors as independent where they "do not have a relationship *with the listed Company* that would impair their independence"), available at https://listingcenter.

35

nasdaq.com/rulebook/nasdaq/rules/nasdaq-5600-series.  Sharing material, nonpublic information

with Cohen about options for buybuy BABY has nothing to do with director independence,

especially because Cohen explicitly acknowledged that he was prohibited from using material,

nonpublic information in his Cooperation Agreement.  ¶100.  As such, Cohen's independence

arguments are implausible and do not support the inferences he seeks to make.  Cohen Br. at 25-

26, 35-36.

The same is true for Cohen's attempt to rely on alleged denials made by his Co-Defendant

BBBY in unresolved, contested litigation.  Cohen Br. at 36.  The letter from a BBBY lawyer he

cites **did not deny** improprieties by Cohen or RCV.  *Id.*  But, even if it did, a defendant's bare

denial of wrongdoing alone is not sufficient to resolve a motion to dismiss.  *See Forescout*, 2023

U.S. App. LEXIS 6285, at *29; *Cohen v. Kitov Pharm. Holdings, Ltd.*, 17 Civ. 0917 (LGS), 2018

U.S. Dist. LEXIS 45676, at *14-15 (S.D.N.Y. Mar. 20, 2018) (observing that denial and

vehemently insisting on one's own version of the facts cannot support dismissal in securities fraud

cases).[10]  The letter from BBBY's counsel says only that Cohen himself was not a director under

Section 16(b) of the Exchange, and Cohen's nominees to the Board were independent.  Cohen's

Ex. 15 at 3-4.  It establishes nothing about whether or not the directors he handpicked funneled

him information as the Cooperation Agreement contemplated.  They can do that and still act in the

best interests of the Company, which is all "independence" requires.  *See Caruso*, 2021 Del. Ch.

---

[10] *See also Lake v. Aetna Life Ins. Co.*, No. 8:20-CV-3010-VMC-TGW, 2021 U.S. Dist. LEXIS 119804, at *7-8 (M.D. Fla. June 28, 2021) (denying dismissal and rejecting attempt to use a "self-serving denial letter" "to prove a disputed fact"); *Chubb INA Holdings, Inc. v. Chang*, Civil Action No. 16-2354-BRM-DEA, 2017 U.S. Dist. LEXIS 16744, at *26-27 (D.N.J. Feb. 7, 2017) (rejecting similar claim at the pleading stage "based entirely on [defendants'] own self-serving denials which are insufficient to resolve this issue of fact"); *Dist. Title v. Warren*, No. CV 14-1808 (ABJ), 2015 U.S. Dist. LEXIS 188961, at *16-19 (D.D.C. June 1, 2015) (denying motion to dismiss for improper service because a "bare, self-serving denial certainly does not constitute strong and convincing evidence").

LEXIS 188, at *37-38.

## 2.    Access to Information Contradicting Public Statements

The knowing or reckless omission of facts that render a statement misleading is "classic evidence" of severe recklessness. *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82-83 (1st Cir. 2002). As fully explained in Section V(B)(1), Cohen knew, and does not dispute, that his plan to sell or spinoff buybuy BABY had been rejected before the Class Period began.  This made Cohen highly motivated to sell his holdings, and Cohen concedes that he soured on BBBY's outlook "***long before***" he encouraged investors on Twitter to buy the Company's shares.  Cohen Br. at 25.  These facts are more than sufficient to support an inference of recklessness.  *Aldridge,* 284 F.3d at 82-83; *DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 118 (S.D.N.Y. 2004) (finding that scienter was adequately pled when defendants did not follow their own public advice to purchase securities, but instead sold their holdings within days of when the statements were made).  Cohen also failed to disclose his plan to sell his holdings in his Schedule 13D filing and made intentional omissions on the Form 144, as fully explained in Sections V(A)(2)-(3).  The SAC sufficiently pleads that the statements made in these filings were false when made.

In response, Cohen confuses different elements of Section 10(b) by discussing market efficiency and reliance instead of scienter.  Cohen Br. at 24.  Cohen's factually unsupported assumptions about market efficiency are contradicted by academic literature and well-established case law.  *See supra* at 4-5 and *infra* at 42-48.  As for scienter, the relevant inquiry is whether Cohen recklessly disregarded that his statements created "an obvious danger of misleading investors," not whether he knew in advance with "absolute certainty" how the market may react. *Forescout,* 2023 U.S. App. LEXIS 6285, at *28, *72-73.  The Court should again reject Cohen's attempt to mischaracterize his tweet as "benign" or "confirmatory" of negative information

concerning BBBY, as fully explained in Section V(A)(1).

Cohen's pre-Class Period experience with successfully manipulating stocks, ¶¶52-85, and his post-Class Period admissions, ¶¶193-95, enhance an inference of scienter. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 72 (holding that **pre-class period** sales data was relevant to confirm what defendants **should have known** during the class period); *Novak*, 216 F.3d at 312-13 (holding that admissions made after the end of the class period powerfully supported scienter); *Reese v. Malone*, 747 F.3d 557, 574-75 (9th Cir. 2014) (reversing dismissal where the district court disregarded evidence of scienter that emerged months after the statements were made), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017); *Lormand*, 565 F.3d at 254 (similar).  Cohen learned time and time again prior to the Class Period that he could influence stock prices with emoji-filled tweets and Schedule 13D filings.  ¶¶52-85, 193.

Cohen tries to escape his admission that he understood the impact his 13D filings had on markets, ¶193, because although he personally had observed a cause-and-effect relationship with prior filings, market reaction may be "impossible to predict."  Cohen Br. at 24-25.  Cohen would have the Court fixate on this alleged disclaimer but ignore his admission that he paid attention to how investors reacted to his mere act of filing Forms with the SEC or that he knew about the market's reaction on numerous occasions before his scheme.  Regardless, Cohen's inability to predict with 100% certainty is irrelevant.  As the Second Circuit has observed, the understanding that an impact is not 100% guaranteed does not allow fraudsters to omit or misstate material facts.  *See Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014).  And Cohen remains unable to explain why he sold his shares so quickly after telling investors to buy BBBY's shares.  ¶¶194-95.

For all of these reasons, the SAC pleads as powerful an inference of scienter as it can get.

C.     **The SAC Adequately Alleges Loss Causation**

The burden of pleading loss causation "is not a heavy one." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec. LLC*, 797 F.3d 160, 187 (2d Cir. 2015); *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (same).   "The complaint must simply give defendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Id*.   Alleging a corrective disclosure that reveals new facts rendering some aspect of a defendant's prior statements misleading provides such notice and is all the law requires at this stage.   *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020).

Here, Cohen (but not BBBY) raises baseless challenges to SAC loss causation allegations. However, the SAC gives Cohen a clear indication of how Plaintiff contends that Cohen's misrepresentations and omissions caused investor losses.   It alleges that BBBY stock was artificially inflated by Cohen's omissions of his secret plan to dump BBBY securities and his actual stock sales in mid-August 2022 SEC filings, as well as by affirmative misrepresentations days earlier falsely representing that he had a positive view about BBBY inconsistent with the dumping of shares, and dropped precipitously when the truth was revealed.   ¶¶146-84, 196-209.   In reaction to the first partial disclosure after market close on August 17, 2022, that Cohen could potentially sell his BBBY holdings, the stock *fell from $23.08 to $18.55*.   ¶175.   Business journalists attributed the drop to Cohen's partial disclosure, just as the SAC plausibly alleges.   ¶¶11, 179 (citing articles titled *"Bed Bath & Beyond shares fall after investor Ryan Cohen reveals intent to sell entire stake"* and *"Meme Stock Hero Ryan Cohen Used Retail Investors To Pump 'Extremely Underwater' Bed Bath & Beyond Position, Strategist Says"*).

When Cohen finally revealed after market close on August 18, 2022, that he had actually

sold his position, shares **fell more than 45%**, closing at $11.03 on August 19, 2022, and continued to drop over the next two trading days.  ¶178.  Cohen does not dispute that he has notice of the connection that Plaintiff, the SAC, and the business press made between his own pump-and-dump and investor losses.  He just disagrees.

Raising trial arguments, Cohen speculates that part or all of the decline might have alternatively been caused by fears about BBBY's declining liquidity.  Cohen Br. at 32.  Cohen's arguments are "belied by the precipitous drop" in the Company's stock price when news about his insider sales emerged.  *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 181-82 (S.D.N.Y. 2003).  Cohen's alternative theory has no place on a motion to dismiss.  As the D.C. Circuit makes clear, Plaintiff "need not demonstrate on a motion to dismiss that the corrective disclosure was the only possible cause for decline in the stock price."  *Harman*, 791 F.3d at 111.  *Harman* expressly rejected Cohen's precise argument, holding that the existence of a potential alternate cause does not render an alleged cause "implausible."  *Id.*  Cohen's claim that he was free to mislead investors because some facts about BBBY's financial health were publicly disclosed is also a disguised truth-on-the-market affirmative defense, raising a jury question that cannot be considered at the pleading stage.  *See, e.g.*, *Freeland v. Iridium World Commc'ns., Ltd.*, 545 F. Supp. 2d 59, 80 (D.D.C. 2008) (denying motion for summary judgment, and ruling that defendant attempted to "inject [a] truth on the market defense" because its loss causation arguments rested on fact issues about whether the information was publicly disclosed).

At any rate, Cohen's assumption makes no sense.  SAC allegations show that liquidity concerns were aired two days earlier, on August 16, 2022, and discussed in an article titled "Bed Bath & Beyond Shares Surged Despite Liquidity Concerns."  ¶128.  The share price did not decline then, or even when the similar article Cohen references was published, and only plummeted after

Cohen's secret sales were revealed.  ¶¶175, 178.[11]

Cohen delves further into factual disputes reserved for the jury by injecting screenshots of several anonymous internet posts that he believes support an alternate narrative that investors were enthusiastic prior to Cohen's tweets.  Cohen Br. at 29-30.[12]  Cohen ignores that virtually all the posts he cites appeared on Reddit after investors had already understood his August 5, 2022 tweet as a signal to load up on the Company's shares.  *Compare* Cohen Br. at 29-30 *with* ¶¶138-45. Cohen also disregards controlling authority.  "It is beyond the bounds of the motion to dismiss to consider whether [Plaintiff] can substantiate [his] allegations with admissible evidence, or to assess defendants' contrary evidence."  *Atchley v. Astrazeneca UK Ltd.*, 22 F.4th 204, 238 (D.C. Cir. 2022).  Moreover, Cohen's extrinsic citations show nothing.  Cohen Br. at 30.  Even if admitted at trial, that seven unnamed persons liked BBBY's shares in early August 2022 would not in any way undercut Plaintiff's claims, particularly when the trading volume and the Company's stock price spiked significantly as soon as Cohen engaged in a scheme to defraud. ¶¶153-56.

---

[11] Unsurprisingly, when asking the Court to go beyond the pleadings and consider extraneous evidence, Cohen submits *end-of-day* trading data.  *See* Cohen's Ex. 3.  Had Cohen submitted *intraday* trading data and matched the same to the publication time of the article he now claims moved the market, it would be abundantly clear that Cohen's assertion is false.  That is why the law does not permit factual disputes to be resolved by the naked assertion of counsel on a Rule 12(b)(6) motion.

[12] Contrary to Cohen's assertion, the Court cannot simply take judicial notice of anything Cohen finds on any "Internet website," and his cited authority does not so hold.  *See* Cohen Br. at 31 n.10; *but see, e.g.*, *BofI Fed. Bank v. Erhart*, No. 15cv2353 BAS (NLS), 2016 U.S. Dist. LEXIS 103582, at *15-16 (S.D. Cal. Aug. 5, 2016) (observing that courts do not take judicial notice of Internet posts for their truth).  Notice of Cohen's cited social media posts would be particularly inappropriate because they are facially unreliable.  One states that the user had deleted it.  Cohen Br. at 30.  Others are cut off so the Court cannot examine parts that cut against Cohen's litigation narrative.  Nor does Cohen provide any information about the authors themselves – including whether the authors had elsewhere professed that their optimism was due to Cohen's continued involvement in the Company.  Should Cohen advance this dubious argument at trial, Plaintiff is prepared to provide evidence that the authors were heavily influenced by Cohen and his continued stock ownership.

At this stage, only pleading sufficiency matters.  Cohen shows no infirmity in SAC loss causation allegations and his spurious factual arguments must be reserved for a later stage. *Harman*, 791 F.3d at 111; *Atchley*, 22 F.4th at 238.

### D.     The SAC Adequately Pleads Reliance

The SAC adequately pleads two bases for a Class-wide presumption of reliance.  First, it alleges that BBBY shares traded in a generally efficient market, which can hardly be disputed given the Company's NASDAQ listing, wide following by analysts and media, and massive trading volume.  Reliance is therefore presumed under the fraud-on-the-market doctrine.  Second, the SAC principally pleads omissions, not affirmative misrepresentations, giving rise to an independent presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).  Defendants raise no credible challenge to either presumption.

### 1.     Fraud-on-the-market

Whether the fraud-on-the-market presumption applies generally "should not be decided on a motion to dismiss."  *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 377 (S.D.N.Y. 2003); *see also In re Diamond Foods, Inc.*, 295 F.R.D. 240, 250 (N.D. Cal. 2013) (collecting cases and concluding that "the majority of courts treat efficiency as an issue for the finder of fact at trial"); *In re UBS Auction Rate Sec. Litig.*, 08 Civ. 2967 (LMM), 2010 U.S. Dist. LEXIS 59024, at *79-81 (S.D.N.Y. June 10, 2010) (whether fraud-on-the-market applies is "rarely appropriate to decide … on a motion to dismiss."); *In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 51 n.18 (D. Mass. 2006) ("Market efficiency is not, however, an appropriate inquiry for a motion to dismiss.").[13]

---

[13] The few cases Defendants cite where market efficiency was considered on a motion to dismiss involve securities that, unlike here, did not trade on an open and developed national exchange. *See ScrippsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1251-52 (C.D. Cal. 2015)

At class certification, the appropriate stage for this largely factual issue, market efficiency will be assessed pursuant to the five factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989): (1) average weekly trading volume, (2) analyst coverage, (3) market makers, (4) SEC Form S-3 eligibility, and (5) price reaction to unexpected information. *See Howard v. Liquidity Servs.*, 322 F.R.D. 103, 116 n.7 (D.D.C. 2017). But "on a motion to dismiss, plaintiffs do not have to allege facts sufficient to satisfy the *Cammer* test. In this context, *Cammer* simply indicates the types of factors that a court should weigh in analyzing whether claims of market efficiency are plausible." *In re Tronox, Inc.*, 09 Civ. 6220 (SAS), 2010 U.S. Dist. LEXIS 67664, at \*49 n.166 (S.D.N.Y. June 28, 2010).

While neither motion cites a single case in which the efficiency of an exchange-listed stock was even questioned on a motion to dismiss, efficiency in such cases presents an exceptionally low pleading bar. *Id.* For example, a complaint alleging that a "stock is publicly traded on the NASDAQ, with the number of shares outstanding in the tens of millions…. clearly met this burden." *In re WebMD Health Corp. Sec. Litig.*, No. 11 Civ. 5382 (JFK), 2013 U.S. Dist. LEXIS 1512, at \*41-42 (S.D.N.Y. Jan. 2, 2013). Similarly, allegations that a "stock was traded on NASDAQ," the company "filed periodic reports with the SEC, had a substantial daily trading volume, and was followed by securities analysts who issued reports on the company" was found

---

(involving an over-the-counter ("OTC") stock); *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 650-51 (S.D.N.Y. 2012) (involving collateralized debt obligations that are not traded on any market). *Kowal v. MCI Commc'ns Corp.* addressed whether projections and optimistic statements lacked a reasonable basis and did not discuss reliance. 16 F.3d 1271, 1279 (D.C. Cir. 1994). *Meyer v. Greene* also cannot help Defendants because it assumed that reliance was adequately pled but held that the announcement of a governmental investigation alone is not sufficient to plead loss causation. 710 F.3d 1189, 1195 (11th Cir. 2013). The facts pled in *Meyer* have nothing to do with Cohen's scheme or the misleading impression that BBBY perpetuated about Cohen's insider sales. *See also Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 676 (D.S.C. 2016) (rejecting a similar attempt to mischaracterize *Meyer* and overstate the reach of its holding).

"sufficient to allege an efficient market." *In re Newbridge Networks Sec. Litig.*, 926 F. Supp. 1163, 1176-77 (D.D.C. 1996).  Notably, courts do not require pleadings "to specify the markets for [a company's] various securities, the market makers, the weekly trading volume, and empirical evidence that the price of [the company's] securities moved in response to announcements and events." *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 508-09 (S.D.N.Y. 2005).

SAC allegations easily surpass this minimal pleading standard:

- ***The SAC alleges that BBBY traded on the NASDAQ, an open and developed market.*** ¶¶211, 216.  A NASDAQ listing by itself "is frequently held to be a standalone basis for finding market efficiency." *Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 481 (E.D. Pa. 2021) (collecting cases).  "Securities markets like the NYSE and the NASDAQ are open and developed, and are therefore well suited for application of the fraud on the market theory." *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011); *see also Dougherty v. Esperion Therapeutics*, No. 16-10089, 2020 U.S. Dist. LEXIS 216515, at *11 (E.D. Mich. Nov. 19, 2020) (same).  "It would be remarkable for a court to conclude NASDAQ is not an efficient market—which is why securities traded on NASDAQ are often presumed to be traded on an efficient market." *Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) (footnote omitted); *see also Plymouth Cnty. Ret. Sys. v. Patterson Cos.*, No. 18-871 (MJD/HB), 2020 U.S. Dist. LEXIS 177505, at *28 (D. Minn. Sept. 28, 2020) (same).

- ***The SAC alleges that BBBY traded at heavy volumes.***  The SAC demonstrates that BBBY shares traded at exceptionally heavy volume both on specific dates in question and throughout the relevant period. *See, e.g.,* ¶97 (over 105 million shares when Cohen first filed Form 13D); ¶143 ("extremely heavy trading volume" alleged in reaction to

Cohen's tweet); ¶156 (over 164 million shares traded on August 15, 2022); ¶211 ("During the Class Period, the average weekly trading volume averaged 215.34 million shares"). Indeed, the alleged share volume during the Class Period, ¶211, constitutes a weekly turnover of 269%, ***more than one-hundred and thirty times the threshold needed to establish a "strong presumption" of market efficiency.*** *See Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 81 (D.N.J. 2019).

- ***The SAC alleges that BBBY had a large share base.*** BBBY had 80 million shares outstanding (¶211), more than the "tens of millions" found sufficient to plead efficiency in *WebMD. See In Re WebMD Health Corp. Sec. Litig.,* 2013 U.S. Dist. LEXIS 1512, at *41-42.

- ***The SAC alleges that BBBY was widely covered by analysts, news media, and social media.*** The SAC alleges that BBBY was covered by analysts at numerous significant investment banks, including Morgan Stanley (¶114), Wells Fargo (¶104), Raymond James (¶200), Wedbush Securities (¶¶67, 198, 204), Guggenheim Securities (¶91), and Loop Capital (¶¶91, 105, 108, 146). The existence of securities analysts who report on a security supports a finding of market efficiency. *Cammer*, 711 F. Supp. at 1286. The SAC also alleges that BBBY was widely followed by both business media and social media. *See, e.g.*, ¶¶7, 30, 124, 128, 191-92, 201 (*The WSJ*), ¶24 (SEEKING ALPHA), ¶30 (BENZINGA), ¶¶11, 146, 179, 200 (CNBC), ¶¶113, 119, 130 (BLOOMBERG), ¶201 (SOURCING JOURNAL), ¶¶12, 139-40, 147-51, 154 (Twitter), ¶¶141-42, 144, 151-52, 154, 158, 162, 175, 183 (Reddit). Thus, there can be no question that the SAC alleges that company-specific information regarding BBBY was widely disseminated to

investors, which is the hallmark of efficiency.  *See Halliburton Co. v. Erica P. John Fund, Inc.,* (*Halliburton II*), 573 U.S. 258, 271 (2014).

- ***The SAC alleges further evidence that BBBY traded in an open and developed market.***  While the exact number of market makers covering a stock is generally reserved for expert testimony at class certification, the SAC does allege additional information confirming that BBBY shares traded in an open and developed market, and that arbitrage was possible.  For example, it was possible for investors, if they chose, to sell short shares of BBBY (¶¶25-26), or actively trade options on such shares (¶30). Both are indicia of arbitrage, which evidences an efficient market.  *See In re Teva Sec. Litig.*, No. 3:17-cv-558 (SRU), 2021 U.S. Dist. LEXIS 43316, at *42 (D. Conn. Mar. 9, 2021) (noting "short positions" and stating that such "arbitrage opportunities … weigh heavily in favor of market efficiency").

- ***The SAC alleges a cause-and-effect relationship between the disclosure of company-specific news and responses in the stock price***.  "[E]mpirical evidence of a cause-and-effect relationship is helpful for a finding of market efficiency."  *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 134 (M.D. Tenn. 2020) (quotation and citation omitted). The SAC alleges that when false or misleading information about Cohen's plans for and stake in BBBY was published, shares rose (¶¶97, 143), and when the truth was revealed, they fell (¶178).

In light of these extraordinarily detailed factual allegations, Defendants' attempts to disparage the SAC's market efficiency allegations as "conclusory" are wholly unsubstantiated.

Defendants' other challenges to the fraud-on-the-market presumption also lack merit.  For example, Cohen states that the presumption fails because "Plaintiff cannot demonstrate that any of

the alleged misstatements were misleading … or material." Cohen Br. at 28.  But, controlling Supreme Court authority makes clear that the presumption is assessed on the basis of **"alleged misrepresentations,"** and requires no proof of falsity to establish fraud-on-the-market. *Halliburton II*, 573 U.S. at 277.  Likewise, the Supreme Court instructs that the materiality element of fraud-on-the-market "should be left to the merits stage." *Id.* at 282.  Regardless, the SAC clearly alleges both materiality and falsity.  *See supra* at Sections (V)(A) and VI(A)-(B).

Both briefs further erroneously contend that efficiency is dispelled because BBBY did not trade at what Defendants' lawyers contend should have been the price based on "the Company's financial fundamentals."  *See* Cohen Br. at 28, BBBY Br. at 32-34.  This presumes a limitation on efficiency that contradicts Supreme Court authority.  Pursuant to *Basic*, all publicly available information is reflected in BBBY's stock price, including Cohen's misleading statements, and Cohen's presumptions about the lack of efficiency for meme stocks are rebutted by academic literature.  Cohen Br. at 24 (conceding what the holding of *Basic* entails); *see also supra* at 4-5.  Cohen and BBBY cite nothing to support their presumptions.  Moreover, the general efficiency required by the Supreme Court hinges only on whether company-specific information reached market participants, who can trade thereon.  *Halliburton II,* 573 U.S. at 271-73.  It is not narrowly constrained to the Company's financials or what the Company chooses to disclose about itself.  *Id.* at 272.[14]

---

[14] Defendants' reliance on older cases for propositions inconsistent with Supreme Court precedent is inappropriate. *See, e.g.*, BBBY Br. at 32-33 (citing *Sullivan & Long v. Scattered Corp.*, 47 F.3d 857 (7th Cir. 1995) for the proposition that efficiency requires that stock prices reflect information affecting "the economic value of the stock."), which the Supreme Court has since clarified is not the law. *See Halliburton II*, 573 U.S. at 263.  Similarly, Defendants' claim that an efficient market requires "rapid[]" price impact also contravenes binding precedent.  The Supreme Court "refused to endorse 'any particular theory of how quickly and completely publicly available information is reflected in market price.'"  *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 248, n.28 (1988)).  Defendants cannot urge this Court to disregard binding precedent.

Both briefs also rely on internally inconsistent theories.  Defendants repeatedly assert that "all publicly available information" is considered incorporated into the Company's stock price in an efficient market, but simultaneously contend that market efficiency can be tested only based on the Company's disclosures and actions, and cannot be affected by Cohen's misleading statements and omissions and his fraudulent scheme.  *Compare* Cohen Br. at 24 *with* 28 and BBBY Br. at 31 *with* 32-33.  Defendants cannot have it both ways.  In fact, SAC allegations demonstrate that the market did react to Cohen's public statements, omissions, and deceptive acts given the heavy trading volume and price reaction in response.  *See, e.g.*, ¶¶139-45, 146-78.  Equally inconsistent and unsupported is Defendants' argument that misrepresentations about Cohen's Form 13D could not have moved the market because they were earlier published without market impact.  *See, e.g.*, BBBY Br. at 33.  Such arguments do not squarely address SAC allegations, which plead that Cohen's August 16 Form 13D was misleading because it omitted listing his intent to dump his entire stake, starting hours later.  ¶161.  Defendants point to no previous publication of this material, nor could they.  Moreover, Supreme Court precedent instructs that the absence of price impact must be proved by competent evidence, based on expert testimony, as an affirmative defense.  *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1963 (2021).  Defendants' naked assertion will not suffice.  *Id.*

## 2.    *Affiliated Ute*

Plaintiff's SAC also adequately pleads that the Class is entitled to a rebuttable presumption of reliance under *Affiliated Ute* because it sounds primarily in omission.  Where, as here, a federal securities fraud case "involv[es] primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery."  *Id.* at 153.  Rather, "reliance on the omitted information may be presumed where such information is material."  *Wu v. Stomber*, 883 F. Supp. 2d 233, 271 (D.D.C.

2012).  *See also supra* at Section V(A) (showing why each omission alleged here was highly material).

To determine whether the presumption applies, courts engage in a "context-specific inquiry, bearing in mind that the *Affiliated Ute* presumption … exists in the first place to aid plaintiffs when reliance on a negative would be practically impossible to prove."  *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 448-49 (S.D.N.Y. 2019). To do so, courts "analyz[e] the complaint to determine whether the offenses it alleges can be characterized primarily as omissions or misrepresentations."  *Id.*  Here, four out of the five misrepresentations alleged in the SAC are omissions, not affirmative misrepresentations, misleading principally because of what was left out, not what was affirmatively stated:

| SAC ¶ | Maker | Nature | Principally Omission or Affirmative Misrepresentation |
|---|---|---|---|
| 147 | Cohen/RC Ventures | Tweet falsely implying Cohen had positive views about BBBY | Affirmative misrepresentation |
| 160 | Cohen/RC Ventures | Form 13D omitting that Cohen had plan to sell his entire BBBY stake | Omission |
| 173 | Cohen/RC Ventures | Form 144 omitting that Cohen had already sold millions of BBBY shares | Omission |
| 179 | BBBY/Gove | When responding to question regarding Cohen, omitted to disclose that relationship had broken down and company had already rejected Cohen's proposed rescue strategy | Omission |
| 180 | BBBY/Gove | 8-K regarding Cohen relationship omitting that relationship had broken down and company had already rejected Cohen's proposed rescue strategy | Omission |

In such omissions, the deception lies not in the communication itself, but in facts that were not disclosed in any respect to investors.  For example, Cohen's SEC filings deceived investors and manipulated the market because there had been no disclosure – in those filings or elsewhere –

that Cohen planned to dump his massive holdings.  And, because the truth could be communicated to investors in many different forms (for example, Cohen could have tweeted that he was dumping shares even if he did not properly state so in SEC filings), the particular document or communication from which the statement is omitted loses significance.  Thus, this case is quite like *Barclays,* where the bank made misleading statements by omitting from its various investor disclosures the potential for high-frequency traders to abuse its trading platform.  390 F. Supp. 3d at 449.

In contrast, this case presents the exact opposite scenario from *In re InterBank Funding Corp. Sec. Litig.*, 629 F.3d 213, 219-20 (D.C. Cir. 2010), cited by Defendants.  There, a plaintiff alleged that financial statements were affirmatively false, and argued that the affirmative falsehoods could alternately be viewed as omissions because they did not state that the balance sheet was inflated by a Ponzi scheme.  *Id.*  For this reason, *InterBank* held that any omissions merely "exacerbated" the affirmative misrepresentations.  *Id.*  Here, the opposite is true: Defendants' omissions were the basis of the deception, not mere flourishes to affirmative misrepresentations.  Cohen's omissions hid his planned and actual stock sales, and BBBY's omissions hid the breakdown in the relationship with Cohen and the private rejection of Cohen's rescue plan.  ¶¶161, 165-75, 179-82.  Because the SAC primarily involves omissions, the *Affiliated Ute* presumption applies.

## VI.   SECTION 10(B) CLAIMS AGAINST BBBY AND GOVE ARE SUFFICIENTLY ALLEGED

### A.   BBBY and Gove Misled Investors

On August 17 and 18, 2022, in response to media inquiries about the disclosure of Cohen's Form 144, BBBY made two false and misleading statements (the "August Statements").  In both, BBBY represented: "We were pleased to have reached a constructive agreement with RC Ventures

in March and are committed to maximizing value for all shareholders." ¶¶179–80.   These statements were misleading because they omitted to disclose that Cohen had already formed a plan to liquidate his interest and, in fact, had already liquidated the vast majority, if not all of his interest before these statements were made.   As a result, the agreement with RC Ventures was *not* constructive at that time.   Nor could it be, given that the plain meaning of the word is productive, helpful, handy or useful.   *Constructive*, WWW.DICTIONARY.COM, https://www.dictionary.com/browse/constructive (last visited April 11, 2023); *see also In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 168 (reversing dismissal of claims for alleged vagueness because the dictionary definition of the word "pushback" was concrete and easily understood by a reasonable investor).   For the same reason, the reference to "maximizing value for all shareholders" was misleading because Cohen's massive sales could not, and did not, maximize value for other shareholders.[15]

BBBY's arguments completely disregard that courts measure statements not by their literal truth, but by their ability to inform investors accurately and fully.   *See supra* at 18 n.3.   In considering whether a statement is misleading, "[t]he touchstone of the inquiry is . . . whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered."   *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 178 (D.D.C. 2007).   Here, BBBY's representations and omissions, considered together and in context, were misleading.   Both statements were issued in direct response to media inquiries about Cohen's

---

[15] BBBY's August 18, 2022 statement also referenced its attempt to "enhance liquidity" and seek additional financing to "strengthen" its balance sheet.   By speaking on this topic, BBBY assumed a duty to disclose that the 2022 Credit Agreement eviscerated Cohen's turnaround strategy, incentivizing him to exit from his entire position.   *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 258; *see also Phelps v. Stomber*, 883 F. Supp. 2d 188, 211 (D.D.C. 2012) ("With respect to omissions, a company must disclose information when silence would make other statements misleading or false.").

intention to sell shares.  In that context, BBBY's description of the agreement with RC Ventures as "constructive" – without disclosure of Cohen's plan or proposal – would mislead a reasonable investor.  The reference to a "constructive agreement" signaled the exact opposite of the actual broken relationship at the time of the statement.  It would also signal that Cohen remained a substantial BBBY investor, since a wholesale divestiture by Cohen would of course mean that his relationship with BBBY's was no longer constructive.  The SAC demonstrates that reasonable investors were, in fact, misled by these statements – damaging facts that BBBY's brief totally disregards.  ¶183.

None of BBBY's arguments are persuasive.  *First*, that the August Statements referred to a "constructive agreement" in March does not immunize BBBY and Gove given the context of the media inquiry, which directly related to questions about whether Cohen had sold.  *See Pluralsight, Inc.*, 45 F.4th at 1251 n.3 (agreeing that in determining whether omissions are misleading, courts must be careful to read statements in context rather than fixate on isolated fragments).  Nor are the statements a mere recitation of historical data or historical success.  Given their context, reasonable investors did, in fact, understand the statements as directly related to whether Cohen had held on to or sold his shares.  ¶183.  *See supra* at 51 n.15.

*Second*, as explained below, the SAC pleads a strong inference of scienter that Bad Bath and Gove either (i) knew that Cohen and RC Ventures formed a plan to sell, and had sold much if not all of, his holdings; or (ii) recklessly disregarded the risk of misleading investors about Cohen's plan to sell, and actual sale, even if it did not know anything about his plan.  Because the SAC adequately pleads scienter, BBBY's attempt to transform the scienter requirement into a prerequisite for a misleading statement – in addition to being misguided, *see Forescout*, 2023 U.S. App. LEXIS 6285, at *31-32 (warning that courts cannot "comingle" the lower standard for falsity

with the higher standard for scienter to analyze securities claims)[16] – is moot and poses no bar to Plaintiff's claim.

*Third*, a company's reluctance to disparage its relationship with third parties does not allow it to mislead investors. *See Forescout*, 2023 U.S. App. LEXIS 6285, at *66-71 (rejecting identical arguments and holding that a lack of "absolute certainty" about a third party's intentions or defendants' own subjective beliefs of optimism about its behavior did not excuse concealing that the relationship was falling apart).[17]

*Fourth*, BBBY's statements cannot be mischaracterized as puffery when reasonable investors did, in fact, interpret the Company's statements as a highly significant endorsement of its positive relationship with Cohen and an indication that Cohen continued to hold his shares. ¶183; *see also supra* at 51-52; *SEC v. Rio Tinto PLC*, No. 17-cv-7994 (AT), 2019 U.S. Dist. LEXIS 43986, at *35-37 (S.D.N.Y. Mar. 18, 2019) (statement that project had significant future potential was not puffery as it was sufficiently alleged that the speaker had reason to believe the project actually had no potential). Again, BBBY ignores these well-pleaded allegations.

*Fifth*, BBBY's argument that its statements were non-actionable opinions errs in two respects. As an initial matter, BBBY's statements were not opinions. The description of its agreement as "constructive" was not qualified by an expression of opinion (*e.g.*, "we believe the

---

[16] BBBY relies in part on case law addressing the need for a statement to be misleading based upon contemporaneous facts, in contrast to hindsight or future events. *See, e.g., Seow Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008) (dismissing claims based entirely on hindsight). This argument distorts SAC allegations. Even assuming that BBBY and Gove did not know that Cohen had already sold his shares, then they had no basis to make positive representations about Cohen in response to questions about his sales. ¶¶184, 186.

[17] The contexts and contemporaneous facts in the cases cited by BBBY were far different and/or related to scienter. *See In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 13 (2d Cir. 2019) (affirming dismissal of far more general statements where, unlike here, defendants acknowledged the possibility that negotiations could fail and the agreement would not be renewed); *In Re Carter-Wallace Sec. Litig.*, 220 F.3d 36, 42 (2d Cir. 2000) (affirming dismissal where company had no way of knowing about the seriousness of a drug's adverse reactions).

agreement was constructive"), which might "convey some lack of certainty as to the statement's content." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 187-88 (2015). As explained above, the description of the agreement as "constructive" was a statement of fact. Furthermore, even if BBBY's statements expressed beliefs, they are still misleading and actionable. The statements in response to media inquiries about Cohen's Form 144 "did not 'fairly align[] with the information in [defendant's] possession at the time' and are therefore actionable." *Forescout*, 2023 U.S. App. LEXIS 6285, at *43-44. BBBY knew about Cohen's Form 144 and, as discussed below, knew or recklessly disregarded the risk that Cohen had formed a plan to sell, or had sold, his holdings. The most BBBY can muster is that it "was uncertain of Cohen's intentions[.]" BBBY Br. at 30. That is a concession that it did not conduct a reasonable inquiry into Cohen's sales before making misleading statements, and thus had no basis to respond to the media in the manner that it did. *See Omnicare*, 575 U.S. at 188-89 (agreeing that assertions about legal compliance would be actionably false if the defendant never sought any legal advice in the first place).

## B.     BBBY's and Gove's Omissions Were Reckless

BBBY and Gove misstate the standard for scienter and seek to improperly elevate Plaintiff's burden. BBBY Br. at 24-25. No confidential witness is required to plead scienter and the absence of such evidence cannot support dismissal. *In re Alphabet Inc. Sec. Litig.*, 1 F.4th at 707 (rejecting the same argument). Nor is Plaintiff required to produce "internal documents," especially when discovery is frozen under the PSLRA. *See, e.g.*, *In re PTC Therapeutics, Inc., Sec. Litig.*, No. 16-1124 (KM) (MAH), 2017 U.S. Dist. LEXIS 137930, at *41 n.22 (D.N.J. Aug. 28, 2017) (observing that defendants point to no authority that requires a plaintiff to produce internal documents that are unavailable at the pleading stage). BBBY's arguments concerning

information disclosed in financial publications, including where its own employees served as sources, *see, e.g.*, ¶¶192, 201, also disregard well-established law. *Compare* BBBY Br. at 24 n.11 *with In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 169 (reversing dismissal when the district court disregarded evidence of scienter that emerged in *The WSJ*, and again reaffirming that financial publications "play an important role in informing investors about public corporations."). That some sources in the news articles were unnamed is of no moment. *Id.*

Nor can BBBY's failure to check information that could easily be obtained demonstrate anything other than its own recklessness. BBBY Br. at 26. The Circuit with the most hands-on experience in securities fraud cases has repeatedly described this specific failure as reckless. *See, e.g.*, *Novak*, 216 F.3d at 308-09. Such inquiry is not tantamount to a duty to monitor Cohen. BBBY Br. at 26, 30. It simply requires that BBBY, like any speaker, not make factual misrepresentations without verification. Likewise, the hypothetical possibility that Cohen could have lied if BBBY attempted to verify facts does not excuse BBBY from making misleading representations without verification. BBBY Br. at 26-27. BBBY had a duty to ensure that it did not omit material information that rendered its statements misleading. *See supra* at 51-54. If BBBY believed that Cohen was not an honest person, that would only provide an additional reason to refrain from making positive but unverified representations about its relationship with him.

Recklessness is the ***only*** plausible inference. In an odd defense against scienter, BBBY argues that "the far more likely inference" is "that Bed Bath (like the market more broadly) was uncertain of Cohen's intentions[.]" BBBY Br. at 30. BBBY claims that, because it was uncertain of Cohen's intentions, it made the August Statements without intending to reference whether Cohen still held his shares. *Id.* at 30-31. This is a concession that BBBY was reckless. Without knowing whether Cohen had sold any shares, BBBY and Gove should not have made positive

statements about their relationship with Cohen in direct response to questions about whether he had exited his position.

The events leading up to the August Statements further buttress the inference of scienter. Cohen's Form 144, disclosed after market close on August 17, 2022, indicated a possible sale (which had already occurred), and the 2022 Credit Agreement was only two weeks from execution. ¶¶119-38.  The planned financing agreement definitively prohibited Cohen's turnaround strategy and his ultimate interest in retaining his holdings.  In addition, the Strategy Committee of the Board of Directors (which Gove chaired) and other senior executives at BBBY had informed Cohen about the options considered for buybuy BABY's future, including the financing arrangement that would preclude Cohen's turnaround strategy.  BBBY's fixation on whether a final agreement with wet signatures existed during the Class Period disregards well-pled SAC allegations that Cohen already knew a sale or spinoff of buybuy BABY was rejected.  *Id.*  Cohen does not even deny these facts in his brief.

Finally, BBBY's deteriorating financial performance made the need for such a financing arrangement urgent.  Under these circumstances, it was, at best, reckless for BBBY to proceed to make statements that suggested Cohen had not formed a plan to sell, and had not sold, his holdings. BBBY could have investigated whether Cohen had formed such a plan or sold his holdings, or refrained from making any statement.  But to make the August Statements while knowing or uncertain of Cohen's plan (or his actual sales) was reckless, at best.

Contrary to BBBY's contention, the SAC pleads the circumstances surrounding the August Statements in detail.  The 2022 Credit Agreement was necessary because of BBBY's dire financial situation both before and after the August Statements were made, as spelled out in the SAC.  ¶¶87-88, 90-91, 103-04, 108, 114-18, 121, 127-30, 197-209.  And BBBY does not dispute that the 2022

Credit Agreement precluded the sale of buybuy BABY, which was the keystone of Cohen's turnaround strategy. Apparently, BBBY objects to the implication that the Company and Gove knew that the 2022 Credit Agreement would destroy Cohen's incentive to retain his shareholdings. But this was the obvious result since Cohen had made his demands to the Company clear and the 2022 Credit Agreement conflicted with them.

Nor does the SAC engage in pleading based on hindsight. The 2022 Credit Agreement was finally executed on August 31, 2022, which means that it was being drafted and negotiated when BBBY made the misleading statements. And, Cohen himself admits the relationship between himself and the Company broke down "long before" then. Cohen Br. at 25. Likewise, the Company's dire financial conditions in the weeks following the August Statements continued the previous downward trend spelled out in the SAC. It is well-settled that acknowledging the existence of a major problem can support an inference that it existed months earlier. *See, e.g.*, *MF Glob., Ltd.*, 620 F.3d at 143 n.13; *Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 475-76 (N.D. Ill. 2021). The information BBBY ignores shows that serious issues, including supplier cutoffs and a basic failure to pay its bills, existed as far back as the beginning of 2021. *See supra* at 14.

With respect to Gove, the Court need not assume that she, as CEO, was unaware of the basic financial conditions of BBBY or the 2022 Credit Agreement and its implications for Cohen. *See, e.g.*, *TAL Educ. Grp.*, 837 F. App'x at 27 (inferring knowledge of fraudulent transactions given their magnitude and by virtue of defendants' specific positions at the company). In addition, Gove was obviously aware of Cohen's Form 144, as the August Statements were made in response to pointed media inquiries about it.

C.    **Gove was a Maker of the Company's Statements**

Gove was a maker of the August Statements because, "[f]or purposes of Rule 10b-5, the

maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).  The SAC makes specific allegations establishing that Gove was a maker of the August Statements.  It alleges that Gove, as the Interim CEO of BBBY in August 2022, had ultimate authority over the August Statements and authorized their release and dissemination.  ¶181.  Just before Gove's appointment as Interim CEO, BBBY entered into a settlement agreement for past improper practices acknowledging its CEO's "responsibility to oversee the accuracy, completeness and timeliness" of "material public disclosures made by the Company to its security holders or the investment community."  *Id.*  The settlement agreement also requires the CEO and CFO to comply with policies and procedures set by a Disclosure Committee "to ensure that information required to be disclosed by the Company in its filings with the SEC and other material information that the Company discloses to the investment community is reported accurately and timely."  *Id.*

Gove's motion fails to address these allegations and the Court should treat them as conceded.  *See* Rule 12(B) of the Court's Standing Order (stating that the Court may treat specific arguments as conceded if a party fails to address them); *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th at 709 (reversing dismissal of claims that were unchallenged in the proceedings below).  Moreover, Gove's reliance on *Glickenhaus & Co. v. Household Int'l, Inc.* is misplaced.  787 F.3d 408 (7th Cir. 2015).  The SAC does not allege that Gove "could have" exercised authority over the Company's statements.  *Id.*  It alleges conceded facts to support that she oversaw the accuracy and completeness of all material public disclosures.  ¶181.

Gove's remaining arguments are without merit.  After *Janus*, **ultimate authority**, including ***ratification and approval*** of a statement – even without further involvement in the challenged

statements – is sufficient.  *See SEC v. Levin*, No. 1:12-cv-21917-UU, 2014 U.S. Dist. LEXIS 197845, at *57-59 (S.D. Fla. Oct. 6, 2014) ("In the post-*Janus* world, an executive may be held accountable where the executive had ***ultimate authority*** over the company's statement; signed the company's statement; ***ratified and approved the company's statement***; or where the statement is attributed to the executive.").

Nor is Gove absolved from liability because the August 17th statement was attributed to a spokeswoman for BBBY and the August 18th statement to the company generally.  On the contrary, both of these attributions – which essentially attribute the August Statements *to the Company* rather than to any specific individual at the company – *support* liability for Gove.  She had ultimate authority over BBBY's statements and these statements were made by BBBY, including in a formal filing with the SEC on Form 8-K that contained its then-CFO's signature. ¶180; *see also* BBBY's Ex. B at 4.

## VII.   THE SAC ADEQUATELY PLEADS THAT COHEN ENGAGED IN A SCHEME TO DEFRAUD

In *Lorenzo v. SEC*, the Supreme Court held that the mere act of disseminating a false statement made by another person was sufficient to impose scheme liability on the defendant because subsections (a) and (c) of Rule 10b-5 "capture a wide range of conduct."  139 S. Ct. 1094, 1101 (2019).  Courts in this Circuit interpreted subsections (a) and (c) of Rule 10b-5 to impose broad liability for a scheme even before *Lorenzo* was decided.  *See, e.g.*, *SEC v. Familant*, 910 F. Supp. 2d 83, 94 (D.D.C. 2012) (observing that "the broad, sweeping language of subsections (a) and (c)" could not be squared with the narrow limitation defendant sought to impose like the one Cohen hopes may be imposed here).

Cohen concedes that his stock sales constitute acts separate from his misleading statements and omissions because insider trading is a deceptive device.  *Compare* ¶233 *with* Cohen Br. at 35.

The same is true for Cohen's delayed filing of Form 3 (not alleged as a predicate for omissions in the SAC, ¶156) and the amended Schedule 13D.  ¶233.  Cohen does not contest that he knew or recklessly disregarded facts about his ownership that required amendments to Schedule 13D to be made months before the Class Period began.  ¶¶156-58.  The SAC thus pleads a reasonable basis to infer that Cohen filed the delayed Forms as a strategic ploy to entice investors and affect the market price of BBBY's securities, and made sales to take advantage of the resulting artificial price increase.  ¶157.

Nor can Cohen dispute the SAC's well-pled allegation that he delayed the filing of these Forms to trick investors while he sold shares.  ¶¶193, 233.  Cohen's purposeful act of filing delayed Forms to stimulate both trading and price does not depend on whether any of these Forms otherwise contained misleading statements.  The same analysis applies to Cohen's purposeful decision to slow-walk the filing and publication of his Form 144, and Cohen's use of Twitter as an artifice to defraud investors in furtherance of his scheme.  *See, e.g.*, *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 393 (8th Cir. 2016) (holding that the act of paying someone else to make a misrepresentation cannot be recast as making a misrepresentation); *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 664-65 (E.D. Va. 2021) (correctly interpreting the broad language of the statute to conclude that actions taken to consummate a merger and to stimulate youth addiction to e-cigarettes were sufficient to state scheme liability claims); *In re FirstEnergy Corp. Sec. Litig.*, No. 2:20-cv-3785, 2022 U.S. Dist. LEXIS 39308, at *34-35 (S.D. Ohio Mar. 7, 2022) (agreeing that initiating bankruptcy to evade liability was an act that furthered a scheme to defraud).

Instead, Cohen narrowly focuses on market manipulation, but the SAC pleads that manipulating the market was only one of many of Cohen's acts that furthered his scheme.

*Compare* Cohen Br. at 33-35 *with* ¶233.  Cohen further presumes that markets can only be manipulated with wash sales, matched orders, and rigged prices, but courts have rejected similar attempts to limit claims in this way given the broad language of the statute.  *See, e.g.*, *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1195-96 (D. Or. 2015) (noting that a pump and dump scheme is a quintessential violation of subsections (a) and (c), and manipulative conduct "includes more than only wash sales, matched orders or rigged prices"); *see also Mausner v. Marketbyte LLC*, No. 3:12-CV-2461-JM (NLS), 2013 U.S. Dist. LEXIS 199521, at *19-21 (S.D. Cal. Jan. 4, 2013) (concluding that statements made to increase stock price followed by stock sales are tantamount to market manipulation); *Maz Partners v. First Choice Healthcare Sols.*, No. 6:19-cv-619-Orl-40LRH, 2019 U.S. Dist. LEXIS 184611, at *18 n.6 (M.D. Fla. Oct. 16, 2019) (same).

Cohen's assertions that the SAC does not allege that he engaged in "market activity" or "some other manipulative conduct" or otherwise injected inaccurate information into the market is also belied by well-pleaded allegations.  Cohen Br. at 34-35.  Unprecedented levels of trading in BBBY shares and options resulted from Cohen's *own* statements *and* manipulative acts, which caused massive increases in the Company's stock price, ¶¶143, 153-56, 163-64, 166, 175; *see also* Section V(A)(1)-(3).

For all of these reasons, the SAC sufficiently alleges a claim for scheme liability under subsections (a) and (c) of Rule 10b-5.

## VIII.   CONTROL PERSON CLAIMS ARE ADEQUATELY ALLEGED

Because the SAC adequately pleads claims under Section 10(b) of the Exchange Act, claims for control person liability should be sustained.  *See Forescout*, 2023 U.S. App. LEXIS 6285, at *73; *Six Flags*, 58 F.4th at 221.

## IX.    PLAINTIFF SUCCESSFULLY PLEADS SECTION 20A CLAIMS AGAINST COHEN

Ignoring well-pleaded SAC allegations, Cohen incorrectly claims that the Section 20A insider trading claim against him fails for lack of a predicate violation. Cohen, however, declines to mention even a single allegation or set forth any analysis supporting his argument. Actual SAC allegations plead that Cohen's pump-and-dump scheme violated numerous statutory provisions and SEC regulations. *See* ¶¶31-33, 119-30, 132-78, 219-38 (alleging violations of Section 10(b) and Rules 10b5(a)-(c)); ¶¶35-36, ¶¶132-38, 159-62, (alleging that Cohen violated Section 13(d) and rules promulgated thereunder); ¶¶39-40, 132-38, 165-66, 169-75 (alleging that scheme violated Rule 144); ¶¶ 37-38, 106-07, 110 (alleging that Cohen violated Section 16(d)); and ¶¶246-63 (alleging that Cohen violated Section 9).

Moreover, SAC allegations plausibly allege that Cohen possessed material non-public information at the time of his sales. First, Defendants knew or recklessly disregarded that Cohen's Form 13D and Form 144 filings, which were widely discussed among retail investors (*see, e.g.*, ¶¶159-62, 165-66, 169-75), omitted material adverse information. Second, Defendants knew that the "long-term" relationship between them touted only months earlier had soured. ¶¶119-137, 182, 186. Third, Defendants knew that Cohen's statements about the Company on Twitter were misleading. ¶¶148, 185, 187. Fourth, as a result of his appointed board members and Cooperation Agreement contemplating that he may receive material nonpublic information, as well as the timing of loan negotiations, the SAC plausibly alleges that Defendants already knew that the Company had rejected Cohen's rescue plan and instead was negotiating a refinancing, finalized soon after his sales, that expressly collateralized those assets. ¶¶119-37.

Accepting those allegations as true, as the Court must at this stage, Plaintiff has unquestionably ***alleged*** violations of Section 20A. Whether Plaintiff can ultimately prove those

allegations is an issue for trial.  *See Kaplan v. S.A.C. Capital Advisors, L.P.*, 40 F. Supp. 3d 332, 339 (S.D.N.Y. 2014) (refusing to dismiss Section 20A claim underpinned by factual issues "not determined through a public adversarial proceeding").

## X.   PLAINTIFF SUCCESSFULLY PLEADS CLAIMS UNDER SECTION 9

### A.   Section 9(a)(2)

Under Section 9(a)(2) of the Exchange Act, a defendant is liable for creating actual or *apparent* trading through a series of transactions to raise the price of a stock and induce others to purchase it.  *See Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 78 (S.D.N.Y. 2015).  Section 9 "outlaw[s] every device used to persuade the public that activity in a security is the reflection of a genuine demand instead of a mirage."  *Id.*  Contrary to Cohen's false assumption, the definition of "transactions" is not limited to actual purchases and sales.  *Compare* Cohen Br. at 37 *with SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 61–62 (S.D.N.Y. 2017) (observing that prohibition against manipulation "extend[s] beyond the actual consummation of purchases or sales.").  This is confirmed by the authority that Cohen cites.  *See In re January 2021 Short Squeeze Trading Litig.*, No. 21-2989-MDL, 2022 U.S. Dist. LEXIS 143699, at *42-51 (S.D. Fla. Aug. 10, 2022) (concluding that the term transaction is defined broadly to include unsuccessful bids that merely drive up the stock price regardless of whether a transaction is consummated).

Here, Cohen strategically filed a delayed Form 3 and Schedule 13D to create the appearance of trading activity, investors believed that he had bought or held on to his BBBY securities, and the price of the Company's stock price skyrocketed as a result when tens of thousands of investors traded hundreds of millions of BBBY securities.  ¶¶156-64.  Cohen also strategically filed a Form 144 to control the time of its publication and ensured the price of BBBY's securities remained high while he secretly sold his holdings.  ¶¶166-77.  These facts are sufficient

to plead a claim under Section 9(a)(2).  Cohen's assertion that the SAC does not plead any transactions occurred after his manipulative acts is unfounded.  Cohen Br. at 37-38.  Cohen's Form 144, which contained intentional omissions, was released after Cohen had already sold securities for total proceeds of over $105 million, and Cohen **then** sold additional securities for total proceeds of over $83 million on August 17, 2022 **after** he emailed the Form 144 to the SEC on August 16, 2022.  ¶¶165-68.  As such, Cohen's contentions yet again are inconsistent with facts that he cannot dispute.  *Compare id. with* Cohen Br. at 37.  Cohen, in fact, concedes that a "transaction" is an "act," Cohen Br. at 38 n.11, but disregards well-pled allegations that he slow-walked the release of his Form 144 to create liquidity for his own benefit, while the price of BBBY securities remained artificially high because of his scheme, and methodically unloaded his shares on unsuspecting investors after encouraging them to buy BBBY securities.  ¶¶176-78.[18]

Contrary to Cohen's conclusion, the SAC also pleads a strong inference of scienter to state a Section 9 claim as fully explained in Section V(B).

B.    Section 9(a)(3)

Cohen claims that Section 9(a)(3) applies only to "broker-dealers," Cohen Br. at 38, but he ignores the plain language of the statute, which prohibits any "person" from inducing the purchase of a security through the dissemination of misleading statements designed to affect the price of the security.  15 U.S.C. § 78i(a)(3).  Cohen's misconduct here squarely falls within the text of the statute, and he cites no authority holding otherwise.  *See* Cohen Br. at 38-39.  Cohen erroneously claims that his misleading tweet with a moon emoji did not communicate that the price of BBBY's

---

[18] Cohen's reliance on *Onel v. Top Ships, Inc.* is misplaced.  806 F. App'x 64, 67–68 (2d Cir. 2020).  That decision never addressed Section 9, and the lack of manipulation in *Onel* under Section 10(b) stemmed from transparent disclosure of the transactions.  *Id.*  Here, the SAC pleads numerous acts of manipulation, *see* Section V(A)(1)-(3), Section VI, concealing Cohen's share dump until August 18, 2022.

securities would rise, Cohen Br. at 39, but federal courts agree that such tweets objectively signal a financial return on investment.  *See* Section V(A)(1).  For this same reason, Cohen's tweet would be actionable even assuming that Section 9(a)(3) applies only to predicted stock values or trading since a moon emoji is a rallying cry to buy stock with the expectation that it will rise in the future. *See Chemetron Corp. v. Bus. Funds*, 682 F.2d 1149, 1158 n.10 (5th Cir. 1982), *judgment vacated*, 460 U.S. 1007 (1983).

### C.     Section 9(a)(4)

Cohen concedes that the analysis for claims brought under Section 9(a)(4) parallels the analysis for Plaintiff's claims under Section 10(b).  Cohen Br. at 39.  Because the SAC sufficiently pleads claims under Section 10(b) of the Exchange Act, the Section 9(a)(4) claims should be allowed to proceed.  *Sharette*, 127 F. Supp. 3d at 79 (sustaining Section 9(a)(4) claims because the complaint adequately alleged misleading statements under Section 10(b)).

### XI.    CONCLUSION

For all the reasons explained above, Plaintiff respectfully requests that the Court deny Defendants' Motions to Dismiss and direct the Parties to proceed to discovery without further delay.  Should the Court find any part of the SAC wanting in any respect, Plaintiff respectfully requests leave to replead.  *See Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) ("Complaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend."); *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003) (holding that leave to amend should be granted "with extreme liberality," especially in securities fraud cases).

Dated: April 12, 2023                    Respectfully submitted,

                                         /s/ *Omar Jafri*
                                         Omar Jafri

**POMERANTZ LLP**

Joshua B. Silverman (admitted *pro hac vice*)
Omar Jafri (admitted *pro hac vice*)
Christopher P.T. Tourek (admitted *pro hac vice*)
10 S. LaSalle Street, Suite 3505
Chicago, IL 60603
Tel: (312) 377-1181
Fax: (312) 377-1184
Email: jbsilverman@pomlaw.com
     ojafri@pomlaw.com
     ctourek@pomlaw.com

   *-and-*

Jeremy A. Lieberman (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
E-mail: jalieberman@pomlaw.com

*Counsel for Lead Plaintiff Bratya SPRL and Co-Lead Counsel for the Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**

Peretz Bronstein (admitted *pro hac vice*)
Yitzchak E. Soloveichik (admitted *pro hac vice*)
Eitan Kimelman (admitted *pro hac vice*)
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel: (212) 697-6484
Fax: (212) 697-7296
peretz@bgandg.com
soloveichik@bgandg.com
eitank@bgandg.com

*Counsel for Lead Plaintiff Bratya SPRL and Co-Lead Counsel for the Class*

**COHEN MILSTEIN SELLERS & TOLL PLLC**

Steven J. Toll (D.C. Bar No. 225623)
Daniel S. Sommers (D.C. Bar No. 416549)
Jan E. Messerschmidt (D.C. Bar No. 1031488)

1100 New York Avenue, N.W., Fifth Floor
Washington, D.C. 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
jmesserschmidt@cohenmilstein.com

*Liaison Counsel for Lead Plaintiff Bratya SPRL
and for the Class*