<pre>
1                        UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
2

3        *  *  *  *  *  *  *  *  *  *  *  *  *  *    )
                                                    )      Civil Action
4                                                   )      No. 22-02541
         IN RE: BED BATH & BEYOND                   )
5        CORPORATION SECURITIES                     )
         LITIGATION                                 )
6                                                   )
                                                    )      Washington, D.C.
7                                                   )      June 26, 2023
                                                    )      2:42 p.m.
8        *  *  *  *  *  *  *  *  *  *  *  *  *  *    )

9

10

11                      TRANSCRIPT OF MOTION HEARING
                 BEFORE THE HONORABLE TREVOR N. McFADDEN,
12                     UNITED STATES DISTRICT JUDGE

13

14       APPEARANCES:

15       FOR THE PLAINTIFFS:        OMAR JAFRI, ESQ.
                                    CHRISTOPHER TOUREK, ESQ.
16                                  JOSHUA B. SILVERMAN, ESQ.
                                    POMERANTZ
17                                  10 South LaSalle Street
                                    Suite 3505
18                                  Chicago, Illinois 60603

19
                                    JAN MESSERSCHMIDT, ESQ.
20                                  COHEN, MILSTEIN, SELLERS & TOLL
                                    1100 New York Avenue, Northwest
21                                  Fifth Floor
                                    Washington, D.C. 20005
22

23                                  EITAN KIMELMAN, ESQ.
                                    BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
24                                  60 East 42nd Street
                                    Suite 4600
25                                  New York, New York 10165
</pre>

1    <u>APPEARANCES, CONT'D:</u>

2    FOR THE DEFENDANTS        CLIFFORD THAU, ESQ.
      RYAN COHEN AND           MARISA ANTONELLI, ESQ.
3     RC VENTURES, LLC:        VINSON & ELKINS, LLP
                               1114 Avenue of the Americas
4                              32nd Floor
                               New York, New York 10036
5

6    FOR THE DEFENDANT         JARED GERBER, ESQ.
            SUE E. GOVE:       CLEARY, GOTTLIEB, STEEN & HAMILTON
7                              One Liberty Plaza
                               New York, New York 10006
8

9    REPORTED BY:              LISA EDWARDS, RDR, CRR
                               Official Court Reporter
10                             United States District Court for the
                                  District of Columbia
11                             333 Constitution Avenue, Northwest
                               Room 6706
12                             Washington, D.C. 20001
                               (202) 354-3269
13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              THE COURTROOM DEPUTY:  Your Honor, this is Civil

2     Action 22-2541, Pengcheng Si versus Bed Bath & Beyond

3     Corporation, et al.

4              Counsel, please come forward to identify

5     yourselves for the record, starting with the Plaintiff.

6              MR. JAFRI:  Good afternoon, your Honor.  Omar

7     Jafri from the law firm Pomerantz for the lead Plaintiff.

8              THE COURT:  Good afternoon, Mr. Jafri.

9              MR. SILVERMAN:  Good afternoon, your Honor.  Josh

10    Silverman from Pomerantz for the lead Plaintiff.

11             THE COURT:  Good afternoon, Mr. Silverman.

12             MR. TOUREK:  Good afternoon, your Honor.

13    Christopher Tourek for the lead Plaintiff, your Honor.

14             THE COURT:  Good afternoon, sir.

15             MR. MESSERSCHMIDT:  Good afternoon, your Honor.

16    Jan Messerschmidt from Cohen, Milstein for the Plaintiff.

17             THE COURT:  Good afternoon, sir.

18             MR. KIMELMAN:  Good afternoon, your Honor.  Eitan

19    Kimelman from Bronstein, Gewirtz & Grossman for the

20    Plaintiff.

21             THE COURT:  Good afternoon.

22             MR. THAU:  Good afternoon, your Honor.  Cliff Thau

23    from Vincent & Elkins for Ryan Cohen and RC Ventures.

24             THE COURT:  Good afternoon, Mr. Thau.

25             MS. ANTONELLI:  Good afternoon, your Honor.
```

1    Marisa Antonelli, also from Vincent & Elkins, for Ryan Cohen

2    and RC Ventures.

3              THE COURT:  Good afternoon, Ms. Antonelli.

4              MR. GERBER:  Good afternoon, your Honor.  Jared

5    Gerber from Cleary, Gottlieb on behalf of Bed Bath's CEO Sue

6    Gove.

7              THE COURT:  Good afternoon, sir.

8              Give me just a moment.

9              Thanks for your thorough briefing in this case.

10   I'll give you just a couple initial impressions and then I

11   do want to hear from the parties.

12             I'll tell you, my instinct -- I don't think

13   there's any question that I should be staying this case as

14   to Bed Bath & Beyond itself.  And I don't think we have

15   anyone from Bed Bath here.

16             My instinct is that -- and I think as to the Cohen

17   entities, I don't understand them to be arguing that the

18   case should be stayed against them.  So I think the only

19   question is as to Ms. Gove.  And my instinct is that this

20   probably can go forward as to her.

21             Having said that, I also -- my initial instinct is

22   that the complaint probably cannot stand as to Ms. Gove.  So

23   I can hear from the Plaintiffs on that, but that's my

24   initial instinct at this point.

25             As to the Cohen Defendants, I think that's a

1    trickier call.  It looks to me like probably some of the

2    counts probably do get over 12(b).  I'm not so sure about

3    all of them.

4         So I think that's probably where I want to spend

5    most of my time.  But I'm happy to hear from the parties on

6    any issues.  I just thought it would be useful for you to

7    know kind of my general instinct at the outset.

8         So, Mr. Jafri, are you presenting for Plaintiffs?

9         MR. JAFRI:  Yes, your Honor.

10        And with your permission, if it's okay, can

11   Mr. Tourek discuss the stay issue first?  We wanted to give

12   him an opportunity.  Mr. Christopher Tourek.

13        THE COURT:  The state issue?

14        MR. JAFRI:  The stay, with respect to Ms. Gove and

15   whether the case should be stayed with respect to her.

16        THE COURT:  So I'm inclined to agree with you, so

17   I don't think I need to hear that.  Perhaps if Ms. Gove's

18   counsel raises an issue.  Otherwise, I can hear from him

19   afterwards.  But let's keep going.  You don't need to try

20   to --

21        MR. JAFRI:  Okay, your Honor.  So I think I'll

22   start with the Ms. Gove issue, because you think the

23   complaint may not be sufficient with respect to her.

24        As far as whether she is the maker of the

25   statement, the basis that we pled in the complaint was the

1   fact that she had agreed in the settlement agreement --

2               THE COURT:  I saw that.

3               But why would she want to do this?  I mean, as I

4   understand this, at best she's delaying the inevitable for a

5   matter of hours.  It's very soon going to come out that the

6   Cohen Defendants are withdrawing all of their stocks.  Why

7   in the world would she want to perpetrate this fraud for the

8   sake of a 24-hour bump?

9               MR. JAFRI:  Right.  So two points on that, your

10  Honor.

11              First of all, whether there was a motive to commit

12  fraud here certainly helps in terms of getting to whether

13  there was scienter.  But it's not required.

14              So with respect to the question of why, it

15  certainly helps get us -- get somebody over the hurdle, but

16  it's not always a sufficient reason when you have sufficient

17  allegations of recklessness.  Recklessness doesn't entail

18  that we get into why someone did something or the other,

19  because obviously the whole idea is someone has been

20  reckless.

21              The second thing, your Honor -- but going to your

22  point about why would she do this, I think if you read their

23  briefs, they have conceded they didn't know whether

24  Mr. Cohen had sold any shares.  I believe the language that

25  they used was that they were uncertain about whether he had

1    sold or not.

2         And if that is the case, then that's a concession

3    that they had no basis to make the statements that they did,

4    because they didn't know whether he had sold --

5         THE COURT:  Sorry.  They said that in their

6    response?

7         MR. JAFRI:  Your Honor, it was in the motion to

8    dismiss, I believe, in -- they had -- we had also pointed

9    this out in our opposition.  I believe in the motion they

10   said that, at most, they were uncertain about Mr. Cohen's

11   intentions.

12        And so if that's the case, and if that has been

13   conceded, then there was no basis to make the statements

14   that they made.

15        THE COURT:  Which statement was -- I mean, the

16   statement as to the Cohen Defendants was about an agreement

17   they entered five months before.  Are you suggesting they

18   had -- Ms. Gove had an obligation to go back and check if

19   that was still true, ask him, "Are you planning to withdraw

20   your shares?"

21        MR. JAFRI:  Well, I think the company as well as

22   Ms. Gove should have at least made sure that whatever

23   statement they made wouldn't create a misleading impression

24   for an investor.

25        So, your Honor, there's no independent duty to go

1     and check with him.  They didn't have to say anything at all

2     about him.  If you think about what the question was, the

3     question was about the Form 144.

4            And thank you for giving us this opportunity,

5     because I saw in the reply brief they're making it sound

6     like, you know, there's these Reddit posts out there that

7     somehow agree that there's this grand conspiracy and

8     everyone is misleading -- creating a misleading impression

9     of what was said.

10            But in fact, what has happened is that the

11    statement was about the Form 144.  That was the media

12    inquiry.  That form only has two pages.  It talks about

13    whether you have already sold shares.

14            And the second issue was, as Mr. Cohen

15    represented, that there could be a potential sale.  That's

16    it.  Two pages.  A handful of lines.

17            The media inquiry is about the form.  So it was

18    nothing else but about whether he could or couldn't have

19    sold the shares.  And then the CNBC article was all about

20    speculation of how much money he would make or what his

21    losses would be had he sold or had he not sold.

22            Now, in response to that, their first inclination

23    was to say that they basically, you know -- they had entered

24    into a constructive relationship with him in March of that

25    year.  But it was no longer constructive.  No one wanted to

1   know what the status of their relationship was.  The issue

2   was, what's the issue with his Form 144?

3            So while, literally speaking, yes, it's about the

4   media statement, I think in context it is misleading.

5            And if you look at that Reddit post that we put

6   into the complaint, it was, in fact, interpreted in the same

7   way as the complaint identified it to be misleading.

8            So, for instance, that Reddit post, your Honor, it

9   had 1800 uploads, which is another way of saying that 1800

10  people liked the post.

11           The post itself has a link to the exact statement

12  that the company made.  So to the extent the company used

13  the words "was constructive," that was there, because the

14  link that was posted was to the article itself.

15           The Defendants would have you sort of credit this

16  idea that those 1800 people never viewed the link, never

17  read the story and just somehow blindly liked it.  They

18  have, for instance, pointed to two or three instances where

19  some people did point out that, Look, this is -- they're

20  talking about something that happened in March.

21           That may be true, your Honor.  But those are only

22  two or three people.  And even on just the face of that one

23  post, it shows that more than a thousand people understood

24  the statement to be misleading.  Then it was repeated again

25  the next day.

1          THE COURT:  Why isn't it better understood as just

2     kind of an unfortunate matter of timing that Bed Bath is

3     making that statement at the same time unbeknownst to them

4     Defendant Cohen is pulling out all of his shares?

5          MR. JAFRI:  Well, I think -- so this goes back to

6     your issue of, Why would they do this?  Right?

7          THE COURT:  Yes.

8          MR. JAFRI:  So if their intentions are unclear and

9     they don't know, they have no idea of knowing what the

10     reaction would be.

11          Because if they didn't know, they didn't know if

12     the -- any news about sales will come out within 24 hours or

13     four weeks later.

14          Now, this company is in a precarious situation at

15     this point.  It's about to declare bankruptcy.  It already

16     knows that Mr. Cohen and his activities are having a

17     dramatic impact on the stock price, as we've identified.

18          So I don't think it's irrational for them to make

19     the choice that they did in terms of trying to do damage

20     control at that point.  That's what I would say to you.

21          But obviously, they did not do anything to verify

22     whether the statement was accurate or not.  And that's

23     sufficient for it to be --

24          THE COURT:  But it had been accurate.  Right?  I

25     mean, they had a constructive agreement.  Why would a

1   reasonable reader think that an old constructive agreement

2   meant that Cohen and Bed Bath & Beyond were getting along

3   well five months later?

4           MR. JAFRI:  Well --

5           THE COURT:  It strikes me as it was true.

6   Probably -- I'm not sure that it meant much for a dated

7   statement.  But it just -- it doesn't feel like there's much

8   "there" there.

9           MR. JAFRI:  So, your Honor, I understand that you

10  may have already made up your mind on this.

11          But the only thing that I would say is, I think

12  again that context is critical on this issue.  So if it was

13  a straight question about "What is your relationship with

14  Mr. Cohen like?" and they said, "Yes, we were happy to enter

15  into a constructive agreement with him, regardless of

16  whatever is happening now," perhaps that wouldn't mislead

17  the investor.

18          But the question wasn't about the relationship; it

19  was about the Form 144 and the sales.  And it wasn't just

20  that --

21          THE COURT:  Sorry.  So are you saying that

22  statement was made in reaction to a question about this

23  form?

24          MR. JAFRI:  Yes.  Because the CNBC article was

25  about that.  And in the complaint what we had said is that

1    the statements are being made in response to the media

2    inquiries about the Form 144.

3            Now, what we don't know is what the specific

4    question was.  But I think, given that context, it would

5    mislead people when they respond and say, Well, we have --

6    we had a constructive relationship with them.

7            And then they also made present-tense statements

8    about the financing package and how they were looking

9    forward to basically solving the issue with respect to the

10   liquidity problems.  And that was the exact same financial

11   package that I -- that the complaint pleads a strong

12   inference to believe is the reason why Mr. Cohen sold his

13   shares.

14           So I think you have to take all of it together to

15   see what the context was.  And this is clear in many of the

16   cases, some of the ones we cited and we also put an asterisk

17   on, that sometimes there are statements that are literally

18   true that can still create a misleading impression and

19   mislead a reasonable investor.

20           So I think that's the landscape this statement is

21   in.

22           And the only final point on this, your Honor, that

23   I would say is even if you presume, for instance, that it

24   was a soft statement or an opinion, it basically is sort of

25   similar to the analogy in *Omnicare*, where the Court --

1    Supreme Court basically said that if you make a statement

2    about legal compliance, but you've never even spoken to a

3    lawyer, then that's misleading.

4         And I think that's basically what's happening over

5    here, given the concession that has been made that they had

6    no idea whether he had sold his shares or not and still made

7    the positive representations that they did.

8         Your Honor, if it's okay with you, can I move on

9    to the Cohen claims?

10        THE COURT:  Yes.  That would be great.

11        MR. JAFRI:  So, your Honor, on the Cohen claims,

12   I'm not sure which ones you are willing to allow to move

13   forward or --

14        THE COURT:  That's what I'm trying to figure out.

15        MR. JAFRI:  So I guess in that case I'll try to

16   basically go through the Section 10 claims first.

17        So when it comes to the Section 10 claims,

18   Mr. Cohen has admitted again in his brief, on Page 25 of his

19   brief, that he soured on the business long before he started

20   tweeting, long before he started sending tweets on Twitter.

21   That's there.

22        Recognizing the repercussions of this, they have

23   now come back and they've tried to backtrack and they're

24   saying, Well, no.  We were just trying to treat your

25   complaint allegations as true.

1           But if you look at what's on Page 25, what they

2     said is that the more cogent inference is that he sold

3     because he had already soured on the business before the

4     tweet.  And that's consistent with their new interpretation

5     that he was being sarcastic and shared in this pessimism.

6           Okay.  Now, when you think about the interview

7     that he had with Joe Fonicello -- this is several months

8     later -- Mr. Cohen admitted that he sold the shares because

9     his views of the business changed.  This is on Paragraph 194

10    and 195 of the SAC.  Now, that is consistent with this other

11    statement that they've made that he soured on the business

12    before he started tweeting.  So the reason why he sold is

13    because he soured on the business.  That's already there.

14    We don't need to go beyond just these facts to know that he

15    made the intention to sell the shares before he started

16    sending out these tweets.

17          So -- but beyond that, your Honor, there's also a

18    basis.  We only have to plead an inference.  This is not

19    about proving your case.  We don't need to plead evidence.

20    Obviously, we don't have a smoking gun.  And a smoking gun,

21    as the Supreme Court said in *Tellabs*, is not required.

22          But there are other facts that lead you to the

23    conclusion that he had already formed a plan to sell his

24    shares before he started tweeting.  It was the fact that he

25    was only interested in this company because of the Buy Buy

1   Baby asset.  That was locked up as collateral.  Some key

2   facts -- and I won't repeat all the details, but one of the

3   key factors is that under the old credit agreement they had

4   to pay $400 million to even think about selling the asset.

5   They didn't have any money.  They didn't have that kind

6   of --

7           THE COURT:  You don't need to convince me on the

8   Buy Buy Baby.  I get the point there.

9           MR. JAFRI:  Right.

10          So, your Honor, then when you go to the next

11  principles of law, basically, there are sufficient cases out

12  there that say if you go and tell people, "Go and buy

13  shares" while you're thinking of selling them, that's fraud.

14          With respect to the tweet itself, there are a lot

15  of conclusions made in the briefs about how it's inherently

16  ambiguous.  At one point, they also referred to it as a

17  cartoon.

18          You know, I mean, these are just opinions, but

19  they're not substantiated with any case law or any academic

20  research.

21          The case law and the academic research in fact

22  suggest and show that these are very powerful ways of

23  communicating.  And here, this is not just him sending out a

24  moon emoji to random people who wouldn't appreciate what it

25  meant.  He sent this out to thousands of people who follow

1    every one of his words.  So I think that that tweet was

2    clearly misleading.

3              And then the one thing that the Defendants

4    don't --

5              THE COURT:  Sorry, Mr. Jafri.

6              The moon emoji, is that the basis of a count or is

7    that -- I'm understanding that kind of more as a building

8    block in your overall kind of scheme to defraud.  Am I

9    correct on that?

10             MR. JAFRI:  Yes, your Honor.  Yes.  It is.

11             THE COURT:  Okay.

12             MR. JAFRI:  In fact, the first building block came

13   before then on August 5, when he tweeted and plagiarized

14   that Kennedy quote, which is interpreted to mean "Go and buy

15   the company stock."

16             Now, in the motion to dismiss and the reply

17   briefs, there's very little said about that.  So when they

18   come and say he couldn't predict, they don't want to discuss

19   that, days before, he already road-tested the scheme.  And

20   he learned that basically there was a favorable reaction.

21   So he already got confirmation there.  This didn't come out

22   of the blue.  And so that's what I would say about the

23   tweet.

24             Then the next thing is, when it comes to the

25   forms, the Schedule 13D form, one of the issues they've made

1    is that these -- this form is not actionable.  And I think

2    the cases that they are relying on are usually where people

3    have tried to sue under Section 13 or Section 18 of the

4    Exchange Act.

5            And the context over there is -- the suit was

6    about the idea that you didn't file the forms, so we can sue

7    you for damages simply for failing to file it; or it was the

8    company itself that was suing when it wasn't a purchase or a

9    sale of the securities.

10           This is a misrepresentation claim.  You know, the

11   idea that somehow there's a safe harbor for this form is

12   just not consistent with Supreme Court precedent.

13           So the whole notion behind market efficiency is

14   that all information is absorbed.  It doesn't mean -- matter

15   what medium it is in.  And it's kind of odd how they

16   would -- they wouldn't challenge that you can mislead people

17   on Twitter, that they obviously contest whether that's

18   misleading; but they don't have an issue with the idea that

19   you have actionable misstatements on Twitter, but somehow a

20   formal form filed with the SEC that contains false

21   statements or omits facts has a safe harbor.  That is just

22   not consistent, your Honor.

23           And I will --

24           THE COURT:  So on the 13(d) claim, *Kammerman* out

25   of the Second Circuit says one complaining of a false or

1     misleading statement in a Schedule 13D may seek damages only

2     under Section 18(a) of the act.

3            Would you lose if this was brought in the Second

4     Circuit?

5            MR. JAFRI:  No, your Honor.

6            And so in *Kammerman*, the Plaintiff was standing in

7     the shoes of Disney.  So it was a derivative complaint, and

8     so you don't have standing as an issue.

9            And yes.  Why that sentence is there?  If you look

10    at *Kammerman*, the Court then went and did an analysis of the

11    Section 10 claims.  And there are plenty of Southern

12    District of New York cases where people have made

13    misrepresentations in Form 13Ds and the Courts have found

14    them actionable.  And that was very recently.  So --

15            THE COURT:  Is that in your brief?

16            MR. JAFRI:  Yes, your Honor.

17            THE COURT:  I can find the Second Circuit cases

18    that postdate *Kammerman*?

19            MR. JAFRI:  Yes.

20            THE COURT:  On 13(d)?

21            MR. JAFRI:  On 13(d), yes.  I believe that we

22    cited a few SDNY cases in our brief.  Then we also cited

23    some from the Third Circuit.  So you can certainly go and

24    find those in the section where we discuss the Form 13D.

25            Now, when it comes to the form itself, there's no

1   dispute that Item 4 requires anyone who submits this form to

2   identify any plan or any intention to sell.  That's clear.

3   There's no dispute.

4         We've already discussed why he had a plan.  He did

5   not disclose this fact in the form.  So that's a material

6   omission right there.

7         He also claimed that the form was true, complete

8   and correct.  Given that he omitted the plan to sell, it

9   couldn't have been any of those things.

10         So I think those are the strongest reasons why

11   there were material omissions in the form.

12         Moving on to Form 144, I think this is the one

13   where I just do not understand how a material omission

14   couldn't be found.  And the reason why is, because as we

15   mentioned in our complaint, we went and looked at the

16   trading data.  He has sold his shares before he submitted

17   this form.

18         Now --

19         THE COURT:  You mean earlier in the day?

20         MR. JAFRI:  Earlier in the day, your Honor.  Yes.

21   That's correct.

22         THE COURT:  And so I think the defense suggests

23   that under the law a day is a day and we're not necessarily

24   looking kind of second by second what happens when it comes

25   to filing as long as it's accurate for the day.

1          Why are they wrong about that?

2          MR. JAFRI:  So, your Honor, because it wasn't

3    accurate for the day.  I mean, he had sold shares on the

4    16th.

5          THE COURT:  If the metadata showed that he had

6    signed this at 6:00 a.m. in the morning, would you lose on

7    this?

8          MR. JAFRI:  6:00 a.m. in the morning on the 17th?

9          THE COURT:  Well, whenever he initially signed it.

10   The 16th.

11         MR. JAFRI:  Right.  So no.  I don't believe so.

12   And so the reason why is because I think it's a distraction

13   to talk about, Well, when did he send the form?  And could

14   he have sent the form later?

15         The fact is, whether he sent the form in the

16   morning or in the evening, there is a material omission in

17   it.  Even if he sent it at 6:00 p.m., why did he omit the

18   fact that he sold shares on the form?  Right?

19         I mean --

20         THE COURT:  Aren't you saying that the problem --

21   I mean, he does talk about this.  You're saying the problem

22   is that he says it's a potential sale.  Correct?

23         MR. JAFRI:  Yes.  That's also part of the problem,

24   your Honor.  Yes.

25         And --

```
1              THE COURT:  Is there an additional problem other
2    than that?
3              MR. JAFRI:  Yes.  So before the fact that he said
4    there was a potential sale, there's a chart if you look at
5    the form that says:  Identify the amount you've already
6    sold.
7              And he left that blank.
8              THE COURT:  Right.  So he just puts it -- rather
9    than saying "Securities sold during the past three months,"
10   he has remarks afterwards saying "Potential sale."
11             MR. JAFRI:  Right.  And I think both of those in
12   combination are misleading, because he's already sold shares
13   at that point and they are no longer a potential --
14             THE COURT:  But again, now you're arguing about
15   minutes.  Right?  That's what I'm -- as I'm saying, if he
16   signed this at 6:00 a.m. on August 16th, would this have
17   been misleading?
18             MR. JAFRI:  Yes, because if he had already made a
19   plan to sell, which we believe --
20             THE COURT:  But that's different.  That's
21   different.  You're saying that he had sold them.
22             MR. JAFRI:  Yes.  He did sell.  He did sell before
23   he sent the form.
24             THE COURT:  But I'm saying -- I mean, it sounds
25   like a potential sale is a plan to sell.  And so aren't we
```

1     slicing the baloney pretty thinly if he's indicated that he

2     has a plan to sell and you're saying, Well, no, because a

3     couple minutes before he signed this he actually did sell?

4              MR. JAFRI:  So, your Honor, it wasn't just a

5     couple of minutes.  I think the sales probably happened

6     earlier in the day, in the morning.  And he submitted this

7     form when the market had closed.  And I think part of this

8     is also the allegations about the scheme that he is

9     slow-walking these.

10             THE COURT:  Which he's allowed to do, though,

11    right?  He didn't have to use EDGAR.  He could have emailed

12    them.

13             MR. JAFRI:  Yes.  He could have.  But, you know, I

14    mean, this is another way of saying, Well, you can have a

15    civil conspiracy or an obstruction-of-justice charge.

16    But -- and certain acts can be lawful.  But the means

17    itself, you know, the ends, for instance, are unlawful.

18             THE COURT:  I just feel like you're kind of

19    requiring -- is it really the law that a seller, a major

20    investor, has to tell everyone else that he intends to sell

21    something before he does it himself to give everybody else

22    an opportunity to pull out?  I mean, that feels like you're

23    creating a rule or a standard that to my knowledge doesn't

24    exist.

25             MR. JAFRI:  Right.  But we aren't saying every

 1    investor who must sell his shares has to go and announce it

 2    to everybody.

 3             The issue here is that Mr. Cohen encouraged

 4    everybody else to buy the shares when he had already decided

 5    to sell.  That's the issue.  I mean, if he hadn't done that,

 6    we wouldn't be here, your Honor.

 7             THE COURT:  Yes.  I get that.  I think you may

 8    well have a point on that.

 9             I'm more questioning your allegations around the

10    timing of the 144 form, if there's really anything

11    problematic about signing -- well, filing this, anyway,

12    hours after arguably he sold it.  And I'm not sure if there

13    is really evidence.  But I think you get the benefit of the

14    doubt at this stage on that.

15             But if there's all that much difference between a

16    potential sale and that it actually turns out maybe he did

17    sell it -- and I don't know quite how these work; but my

18    guess is he's not the one pushing the keys on a computer

19    somewhere, that he may well be signing this and have no

20    knowledge about whether somebody has just traded it or is

21    about to trade it an hour from now.

22             MR. JAFRI:  Right.

23             So, your Honor, I think on that point the one

24    point that I wanted to make also is that he sold 9 million

25    shares.  I mean, this is not something where he can just

 1    wake up in the morning and press a button and do it.  And

 2    there was a broker that was involved.

 3           So, you know, while we don't know this for certain

 4    and we're not required to know it, the most plausible

 5    inference is that he had already made this into -- he had

 6    already set this into motion long before these forms were

 7    being sold as a practical matter, because he couldn't have

 8    sold such a huge amount to create the kind of liquidity that

 9    he did just that morning.  And that's the inference that

10    they want you to draw, which is that suddenly somehow he saw

11    the price go sky high and then just sold it.

12           THE COURT:  Yes.  And I get you there.  And, you

13    know, this filing represents the potential sale of "up to."

14    That feels like he's -- I would have thought he's doing what

15    he's required to do, at least on that day.

16           What's your best case showing that this -- again,

17    my problem here is the timing, that you're suggesting that

18    he maybe signed this and it had happened earlier that day,

19    whereas if he'd signed this first thing in the morning he'd

20    be in the clear, but because according to you he signed it

21    later in the day after he'd sold it, it was now -- there's

22    liability.  What's your best case showing that?

23           MR. JAFRI:  So I think one of the ones that we

24    cited for this principle -- I don't think we found anything

25    that was directly on point on the Form 144.  There just

1      aren't that many cases on these issues.

2                  But I think what we tried --

3                  THE COURT:  Fair enough.

4                  But surely there are -- there's all these filings,

5      as you point out, that people have to make that -- there's

6      this close question of timing that's got to come up.

7                  Do you have anything where anybody has ever been

8      held liable for filing a form that says they're planning to

9      do something and it turns out that they actually did it

10     earlier that day?

11                 MR. JAFRI:  No, your Honor.  At least we weren't

12     able to locate anything specifically on this point.

13                 I think that I could analogize this to other

14     situations where -- the statute basically, as we mentioned,

15     says that the statement has to be false when made.  And, you

16     know, that's obviously before the statement is made.

17                 And I don't think there's any temporal requirement

18     as such.  So, for instance, you know, in our practice, you

19     usually have, like, variations of class period.  Sometimes

20     it's a five-year period because the Defendant has made

21     misstatements for five days.  But theoretically it can be

22     one day, too, you know?  For instance, you send out a press

23     release.  The stock drops.  Within 24 hours, someone sues

24     you.

25                 It's not as if the Court would say, Well, it's

1    only a 24-hour period.  Obviously, the damages would be

2    different for that 24-hour period as opposed to lying for

3    five years straight.

4            So I think that would be my most, I think,

5    indirect way of addressing your question, which is, you

6    know, there's no barrier over here that somehow if you're

7    within that 24-hour period, that you can basically lie all

8    you want, so long as you've done something, you know, to

9    rehabilitate yourself later in the day.

10           THE COURT:  So is your position that he had to

11   cause this Form 144 to actually appear on EDGAR before he

12   made the sales himself?  In other words, he had to let

13   everybody know that he's going to pull out all of his stocks

14   before he in fact did it?  Is that your position?

15           MR. JAFRI:  So I think I would say yes, except it

16   doesn't matter whether it was on EDGAR or it wasn't.  I

17   think what -- we would be in a different world if he had

18   sent this form when he sent it, but he disclosed that he

19   sold the shares.  Right?  But he didn't do that.

20           So as you probably saw in the complaint, we said

21   that he submitted this form once he scanned it and we saw

22   the metadata.  It was submitted when the market had closed.

23           THE COURT:  Yes.  You're saying he slow-walked it

24   by email?

25           MR. JAFRI:  Right.

1              THE COURT:  That's not allowed anymore.  Correct?

2     Is that what you said?  It's now got to go through EDGAR?

3              MR. JAFRI:  Well, I think that at the time that he

4     submitted the form, he wasn't required to file it through

5     EDGAR.  That's true.  Yes.

6              THE COURT:  I understand.

7              And now he would be?

8              MR. JAFRI:  Well, I'm not even sure that's the

9     case.  I think in the pandemic they had made an exception

10    and said, You can submit these through EDGAR.  But, your

11    Honor, to my knowledge, I don't believe that it is required.

12    But I could be wrong about that.

13             THE COURT:  Yes.  Again, the point I'm getting to

14    is, I find it hard to believe that the rule is he had to let

15    everybody else know that he was going to be selling all of

16    his shares before he did it himself.  That just seems

17    incredibly self-destructive.

18             MR. JAFRI:  Well, I think, you know, again, this

19    is within the context of the broader scheme and everything

20    else that's going on.  And this is just the part of it.

21    Right?

22             So if you look at the scheme claims, those don't

23    even -- those aren't even based on whether there's a

24    misrepresentation in here.  We're basically saying that he

25    was stimulating the market.  Right?  And as you've probably

1    seen in *Lorenzo* and some of these other cases, it just has

2    to be another act.  It's unclear what kinds of acts are

3    sufficient versus which ones aren't.  But here, there's

4    plenty of acts, including the fact that he sold shares.

5           So I think that it's basically within the context

6    of other misstatements that he also made in the Schedule 13D

7    where he clearly omitted that he had a plan to sell and he

8    didn't disclose it.  Right?  And then he sent out these

9    tweets in early August.

10          So I think that basically takes away the inference

11   that this was just some innocent mistake.

12          THE COURT:  So if I'm inclined to agree with you

13   that this could be a building block, one of these blocks in

14   this kind of scheme to defraud, but not convinced that

15   there's a violation in and of itself, where does that leave

16   you on your complaint?

17          MR. JAFRI:  Well, if you, for instance, conclude

18   that you don't believe that he made any misstatements in

19   here, but filing this form can be one building block towards

20   a scheme, I think that would mean that the scheme claim

21   would be upheld, even if you didn't find a misstatement in

22   this statement.

23          THE COURT:  So do you have a specific count as to

24   Form 144?

25          MR. JAFRI:  So we discussed the forms in the count

 1    where we allege that there was a scheme liability claim.

 2    That's 10b-5 A and C.  I believe there are certain bullet

 3    points in there which talk about his different acts.  This

 4    would be sort of part of that nucleus.

 5             THE COURT:  Okay.  So this box -- you talk about

 6    the box "securities sold during the last -- past three

 7    months," the Table 2?

 8             MR. JAFRI:  Right.

 9             THE COURT:  Isn't that just referring to

10    "securities other than those being discussed here"?  I mean,

11    it strikes me that that's looking to past history, not what

12    is actually the cause of the filing, and that you wouldn't

13    expect something filed earlier that day to be noted on

14    "securities sold during the past three months."

15             MR. JAFRI:  Well, I don't think that -- so that's

16    their position, which is he didn't sell anything in the

17    previous three months, so there's nothing false in this

18    form.  Or at least that's how I understand it.

19             But, your Honor, in their briefs, they have not

20    even said that he didn't -- that he didn't omit his sales

21    from here, that it wasn't true, for instance, when he said

22    that he hadn't sold any shares.

23             So I'm not even sure that that is in dispute, the

24    fact that he omitted material sales from this.

25             I guess with respect to your question, Is it still

1    true if you are representing in here that you haven't

2    sold -- because you haven't sold within the previous three

3    months, I don't think the form says that previous -- the

4    previous three months exclude the day that you're filing the

5    form.  I mean, if it said that, that would be one thing.

6            THE COURT:  Yes.  I agree.

7            But isn't that how a rational person would be

8    likely to understand it?  If the normal investor is trying

9    to fill this out, this sounds like the past tense, whereas

10   something I did today is present tense.

11           MR. JAFRI:  Well, I guess I -- what I would

12   disagree with you about is whether it really was present

13   tense.  If he's already sold the shares and then he fills

14   the form out, then he's not disclosing that he's already

15   sold them.

16           And, you know, again, this is in conjunction with

17   all his other statements and all his other acts, which

18   obviously bolstered this inference that he's trying to hide

19   something over here.

20           So I think maybe, your Honor, in isolation we

21   would be having a different discussion.  But we have to take

22   this in consideration with everything else that came before

23   this.  I mean, this was the final thing that he did.  And

24   everything else that happened -- came before this form was

25   basically disclosed to the public.

 1                Your Honor, unless you have other questions on

 2       this, I just wanted to quickly move on to the final two

 3       elements, loss causation and reliance.

 4                THE COURT:  Are you going to talk about

 5       fraud-on-the-market reliance?  Is that what you're --

 6                MR. JAFRI:  Yeah.  Right.

 7                So when it comes to -- and I start with that.

 8       Basically, when it comes to reliance, the pleading

 9       requirements are very bare-bones.  We cited some cases which

10       had far less than what we pled.

11                Usually, this is not something that is considered

12       on a motion to dismiss.  There's some language in the

13       company's reply brief that it doesn't care if that's the

14       standard because this is one of those cases which should be

15       dismissed, apparently because the affirmative defense is

16       clearcut.

17                That's just simply not the case.

18                I think they really overreach when they make that

19       claim.

20                The fact is that all the elements of what you

21       would typically find in an efficient market are present

22       here.  There were more than 18 million shares outstanding.

23       It's a NASDAQ stock.  It was widely covered by analysts and

24       the media, as the complaint shows.

25                And there was a huge short interest, which is

1   arbitrage.  And while the complaint didn't use that word, it

2   talks about short sellers; and all the facts are there for

3   you to at least conclude that we have pled fraud on the

4   market and the rebuttable presumption of reliance.

5          THE COURT:  If you're right that it's an efficient

6   market, why would the market react, though, when there's a

7   filing that has no new information in it?  The 13 --

8          MR. JAFRI:  Right.  So the thing is, it did have

9   new information.  The new information was that he had

10  finally disclosed that he had more than 10 percent of an

11  interest, which he never disclosed before.

12         THE COURT:  But you're saying everybody knew that

13  and it's an efficient market.  Right?

14         MR. JAFRI:  Well, so in an efficient market, you

15  don't have to have a perfect understanding of all the facts.

16  What it really means is informational efficiency.  Right?

17  Which is that it's rapidly being disseminated and it's

18  rapidly being absorbed into the stock price.

19         I think this idea that -- they basically have --

20  the Defendants have a narrow view of efficiency, which is,

21  well, you know, if the people aren't trading on how badly

22  the company is doing, then they're really not rational or

23  it's not an efficient market.

24         But the Supreme Court has never, ever narrowed the

25  definition in that way.  We cited some language from

1    *Halliburton II*, where the Supreme Court briefly discussed

2    efficiency.  And it basically said that it doesn't endorse

3    this kind of an approach.  I mean, what it really means is

4    that it's informationally efficient.

5              And while this is something that we will probably

6    get into at the certification stage or at summary judgment,

7    we did put in that study that recently came out showing that

8    when it comes to meme stocks, they are efficient because

9    there's so much information being shared online by various

10   investors.

11             And the other point I wanted to make on this, your

12   Honor, that may not have been clear in the briefs is that

13   this idea that all these people are just irrational or that

14   they don't know what they're doing or that it was somehow

15   silly for them to follow Mr. Cohen, what that I think

16   ignores or disregards is that he is an insider with more

17   than 10 percent of the stock.  He clearly has access to all

18   the people who have influence.

19             He goes and buys these huge stakes in the company

20   and then he disparages the executives who are running the

21   company and tells these investors that he is going to turn

22   them around.  You know, he's still sitting on a big

23   investment in GameStop and then he bought a huge stake in

24   this.  And he's done this with other companies as well.

25             So it's not irrational for them to believe what

1    Mr. Cohen is saying when he holds himself out as someone

2    with inside access and expertise.

3          So we also have to consider those facts.  It's not

4    just that this is just some person who's sending out random

5    information, you know, on the internet and there are just

6    these people who are mindlessly agreeing with whatever he

7    says.  That's just not what's happening over here.

8          THE COURT:  I understand that.

9          Are you arguing -- is fraud-on-the-market reliance

10   and *Affiliated Ute* reliance, is that in the alternative?

11         MR. JAFRI:  Yes, your Honor.  It's in the

12   alternative.  And *Affiliated Ute* doesn't require the

13   fraud-on-the-market presumption.  If most -- if at least the

14   gravamen of the complaint is based on omissions -- and we

15   think the gravamen of the complaint, with the exception of

16   the tweet, is based on omissions just for the reasons we

17   discussed.

18         THE COURT:  So if I agree with you on the

19   fraud-on-the-market reliance, I don't need to consider

20   *Affiliated Ute* reliance.  Is that fair?

21         MR. JAFRI:  Yes.  That's correct.

22         THE COURT:  If I disagreed with your accounting

23   and found the majority of your claims are affirmative

24   misrepresentations, do you agree that you cannot use

25   *Affiliated Ute* reliance?

```
 1                    MR. JAFRI:  Yes.  That's right.

 2                    THE COURT:  Okay.

 3                    MR. JAFRI:  But simultaneously, if you find that

 4      at the moment for pleading purposes there is an efficient

 5      market and the complaint shows it, then you don't need

 6      Affiliated Ute.  You get to the same result.

 7                    THE COURT:  Got it.

 8                    And if the Court dismisses the claims against

 9      Ms. Gove --

10                    Is it "Gove"?

11                    MR. JAFRI:  "Gove," I believe.

12                    THE COURT:  -- does it still need to count your

13      claims against Bed Bath for purposes of figuring out whether

14      Affiliated Ute applies?

15                    MR. JAFRI:  So, your Honor, if I understood the

16      question correctly, you're saying that if Ms. Gove is

17      dismissed, then does Affiliated Ute still apply to the

18      company?

19                    THE COURT:  Well, I guess some of your

20      misrepresentations that you count are misrepresentations

21      made by her and/or the company.  So we've got the company

22      stayed.  If I dismiss Gove, does your alleged

23      misrepresentations by the company still count for

24      Affiliated Ute calculations?

25                    MR. JAFRI:  Right.  Right.
```

1          I guess then I think -- well, if you dismiss those

2     statements and you think that they are not actionable, then

3     the only statements that would be relevant to that analysis

4     are the ones that are still in the case.

5          THE COURT:  But I think Bed Bath & Beyond would

6     still -- I mean, we all agree we're staying as to Bed Bath &

7     Beyond.  Right?

8          MR. JAFRI:  Right.  Yes.

9          THE COURT:  So I think as a technical matter, I'm

10    not going to touch claims -- your claims against Bed Bath.

11         MR. JAFRI:  Yes, your Honor.  I mean, that's also

12    correct.  That's another way of looking at it.  Yes.

13         THE COURT:  All right.  Can you respond to the

14    Defendants' argument that you failed to plead loss reliance

15    for the 13D omission because if the market was efficient,

16    then 13D would not have caused a spike because it didn't add

17    any new information?  Is that basically still your -- kind

18    of the point, that there's no new -- that the information is

19    the 10 percent ownership?

20         MR. JAFRI:  So, your Honor, when it comes to the

21    13D, nobody is saying that when the 13D came out there was a

22    market reaction.  So, you know, this is again another

23    instance where Ryan Cohen mixes up different elements.

24         So I think he's trying to say there couldn't be

25    reliance because -- there couldn't be an efficient market

1       since, for instance, people are reacting to this form.

2              But when you look at the complaint, the only

3       corrective disclosures that are alleged are the ones from

4       August 18th onwards.  Those are the ones that go towards

5       whether loss causation has been pled.  We never pled a stock

6       drop when the 13D came out.

7              So there's usually two ways of getting to loss

8       causation:  corrective disclosures or with the

9       materialization of the risk.  In this complaint, we have

10      specifically identified corrective disclosures.  And a

11      corrective disclosure is that -- when some information comes

12      out that would suggest that any statement made before was

13      misleading or untrue or omitted some material fact.

14             So whether the 13D is actionable or not has no

15      connection to the loss, which is on August 18th.  In other

16      words, if you have the tweet that's actionable, you have the

17      Form 144 that's actionable, then the issue really is:  Are

18      the disclosures on the 18th the corrective disclosures?

19             And under Rule 8, which is really notice

20      pleading -- and again, this is one element that's really

21      easy because it's not a heightened pleading standard.  We've

22      pled a massive stock drop on that date when his sales came

23      out.  And the whole theory is that he omitted the fact that

24      he was selling his shares.

25             So I think it's very difficult for, you know, the

1    Defendants to prevail on this even at later stages, your

2    Honor, given the actual information that came out and the

3    stock drop.

4              So I think when they made that statement about

5    whether, you know, Plaintiffs are basically trying to have

6    it both ways because they're saying the Schedule 13D

7    people -- that were reacting to it when it had no new

8    information, well, they can make that argument if they want

9    to make a reliance-based argument.

10             But we never pled that there was a stock drop on

11   August 16th.  We pled that the stock drop happened on the

12   18th.  And that has nothing to do with what information was

13   in the 13D.  The only thing that matters in the 13D is

14   whether there was a material omission, your Honor.

15             THE COURT:  Okay.  You've touched a bit on this

16   scheme liability and 10(b).  I think the Cohen Defendants

17   argue that *Lorenzo* doesn't apply because that case didn't

18   involve the person who actually made the misrepresentation.

19   And it looks to me like the Second Circuit might agree with

20   that view in *SEC versus Rio Tinto*.

21             Why is the Second Circuit wrong on that?

22             MR. JAFRI:  So I think -- so my understanding of

23   *Rio Tinto* was that just simply having statements and trying

24   to allege a scheme is not sufficient.  That's my

25   understanding of that case, where they said you cannot -- if

1   there's -- if there's nothing beyond a misstatement or a

2   misrepresentation or an omission, then you cannot have a

3   scheme.

4           I think -- I don't believe the law in the Second

5   Circuit is that, Well, if you have some other act, then you

6   cannot be liable for a scheme claim.

7           So, for instance, that Eighth Circuit case we

8   cited where they said paying someone to make a

9   misrepresentation is not the same as making a

10  misrepresentation -- right?  I mean, I think you have that.

11  And here, we have pled certain things that happened that

12  have nothing to do with a misrepresentation.

13          So, for instance, on the night of the 15th,

14  Mr. Cohen filed a Form 3, where he disclosed the fact that

15  he had more than a 10 percent interest.  And then there was

16  a reaction the next day.

17          There was no -- we never said that there was any

18  false statement in that form because that form, you know,

19  didn't say anything about his plans to sell.  And the plan

20  to sell had to be disclosed in the Schedule 13D.

21          So, for instance, you know, I think it would be

22  difficult for someone to say, Well, this is nothing but a

23  misrepresentation when we have that Form 3, which I don't

24  think anybody can say we've alleged has a misrepresentation.

25  He just simply filed it.  It was the act of filing it.

1          And then the second thing is, he sold shares here.

2     In *Rio Tinto*, I don't believe that was analyzed, whether

3     selling shares is an act.

4          You know, initially the Defendants called it a

5     manipulative act.  Now they're trying to say, Well, no.

6     Actually, it's not -- it doesn't actually fit within the

7     scheme claim.

8          But again, going back to *Lorenzo*, you know, it's

9     just -- it just has to be another act.  So here, I think

10    it's a pretty significant act, the fact that as part of this

11    scheme that Mr. Cohen sold shares and made a $68 million

12    profit, which is really the ultimate goal of the scheme

13    itself.

14         So that would be my response, which is I think

15    there are those two clear things where they cannot be

16    recharacterized as a misrepresentation, because there is no

17    misrepresentation at all with respect to these two things.

18         THE COURT:  I've got to tell you, I'm kind of

19    skeptical on the 9(a)(2) claim about a series of

20    transactions in any security, including an SEC filing.  I

21    want to give you a chance to convince me that I'm wrong.

22    But it looks to me like there's not a series of

23    transactions, that you only get a series by adding in the

24    various SEC filings.

25         MR. JAFRI:  Right, your Honor.

1          So one thing, frankly, what I'll tell you is there

2     isn't a lot of case law on this statute.  You know, we read

3     the statutory language.  We saw the handful of cases that

4     are there.  And we think that we have a credible good-faith

5     argument here.

6          And the reason why is, there is this one Southern

7     District case that we cited in our brief that stated the

8     real issue here is whether there's real trading happening or

9     it's a mirage.  Right?  Like is it a mirage?  And some of

10    the cases that the Defendants themselves cited said that you

11    don't have to have, like, actual sales or actual purchases.

12          I mean, if that's the case --

13          THE COURT:  But wasn't -- the Southern District

14    talks about bids and orders to purchase.  I mean, it looks

15    to me like they're talking about attempts to purchase and

16    maybe the transaction doesn't go through or something like

17    that, and whether I'd agree with that.  That seems kind of

18    different from a mere SEC filing.

19          MR. JAFRI:  It isn't exactly the same.  But I

20    think the SEC filing over here is about, you know, whether

21    he's going to sell or not sell and whether he has sold or he

22    hasn't sold.

23          So I mean, to the extent that we're saying, Well,

24    over there, there are these, like, artificial bids and not

25    real sales, I mean, over here, he's basically -- people are

1     interpreting his forms to -- as either signals of him

2     retaining more shares, which is what happened when he filed

3     the 13D, or whether he still is holding the shares, for

4     instance, when the Form 144 came out and people on Reddit

5     thought that he was still holding onto his shares because he

6     said that there were only potential sales.

7             He never said --

8             THE COURT:  But holding shares wouldn't be a

9     transaction.  Right?

10            MR. JAFRI:  Well, it wouldn't, except in this case

11    he disclosed that he had, you know, more than a 10 percent

12    interest, which came out for the first time.  And I think my

13    argument would be that he created that mirage, so to speak.

14    So that's what I would say.

15            Now, on 9(a)(4), your Honor, the only dispute is

16    whether there is a Section 10 claim for falsity.  And if you

17    find that there is a Section 10 claim against Mr. Cohen, at

18    least that's reasonably been pled, then 9(a)(4) also

19    survives.

20            And with respect to the final provision, when it

21    comes to the brokers, the Defendants argue that that only

22    applies to brokers or dealers.

23            THE COURT:  Sorry.  Is this the 9(a)(3)?

24            MR. JAFRI:  Yes, your Honor.  So it says -- if you

25    look at the statutory language, it says "brokers or dealers

1    or any other person who is purchasing or selling in the

2    ordinary course of business."

3            THE COURT:  Yes.  So you're not arguing that he's

4    a dealer, broker, security-based swap dealer, majority

5    security-based swap participant.  Correct?

6            MR. JAFRI:  No, your Honor.  But I think as any

7    other person who, like, is in the business of selling and

8    purchasing, my argument would be he fits there.  But given

9    that all he does is buy and sell large stakes in

10   companies -- so I don't think that the statute should be

11   narrowly construed to only apply to brokers or dealers.  I

12   think it can also apply to Mr. Cohen.  Now, that doesn't

13   mean it can apply to anyone.  But Mr. Cohen is in the

14   business of selling large amounts and purchasing large

15   amounts of stock.

16           THE COURT:  So you're not arguing that that

17   Section 3 "or other person" would apply to anybody else?

18           MR. JAFRI:  Yes, your Honor.  I think the argument

19   would be that it would apply to anybody to -- any person in

20   the ordinary course of selling and purchasing shares, which

21   is Mr. Cohen at least.

22           THE COURT:  So you're saying anyone -- Section 3,

23   this "or other person" covers anyone who sells or trades

24   stocks.  Is that correct?

25           MR. JAFRI:  Not any -- not -- I wouldn't say like

1    an individual investor, although I think it would really

2    depend on the circumstances.  But I'm not saying there's an

3    absolute rule.  I'm just saying that in this instance,

4    Mr. Cohen is not an ordinary investor.  He's somebody who

5    purchases 10 million shares of companies and he basically

6    tries to take control over them as he tried in this

7    instance, although he backed down.

8         And given that he sort of always has an insider

9    status, I would say that he's no different from a broker or

10   a dealer.  That would be the argument.

11        THE COURT:  I see.

12        So you're looking to the -- so you would claim

13   that you're not making the whole first-line surplusage,

14   then, because "or other person" is capturing some type of

15   professional trader who is not one of these other

16   individuals?

17        MR. JAFRI:  Yes.  Yes, your Honor.  We're saying

18   that even if it is -- even if the statutory language is

19   cabined, it fits what Mr. Cohen did here.  We're not saying

20   we're talking about any ordinary person selling and

21   purchasing shares on the street.

22        THE COURT:  Okay.  I think I understand.  Thank

23   you.

24        Anything else, sir?

25        MR. JAFRI:  No, your Honor.  Thank you very much

 1      for your time.

 2                  THE COURT:  Thank you.  I'll give you the last

 3      word.

 4                  Mr. Thau, do you represent Ms. Gove?

 5                  MR. THAU:  No.  Mr. Gerber does.

 6                  THE COURT:  I'll hear from you very briefly,

 7      Mr. Gerber.

 8                  MR. GERBER:  Thank you, your Honor.  Jared Gerber

 9      from Cleary, Gottlieb for Ms. Gove.  It does rhyme with

10      "stove," which helps me remember how to pronounce it.

11                  THE COURT:  Thank you.

12                  MR. GERBER:  So I'll try to be brief, since

13      obviously we're not the main players in this.  And I think

14      that from the Court's questions, you seem to be focused on

15      the right issues here.  So maybe I'll just respond to a

16      couple of points that Mr. Jafri made and then let Mr. Thau

17      take over.

18                  So I think as an initial matter, the statement

19      that's challenged here by Bed Bath & Beyond -- and I don't

20      think there are sufficient allegations that Ms. Gove herself

21      made that statement.  But even putting that aside, the

22      statement --

23                  THE COURT:  So on that, I don't think they are --

24      well, I agree with you, anyway.  I think the Plaintiffs

25      probably do, too.

1        But this settlement agreement appears to put her

2   on the hook to sign off on these.  I mean, aren't they

3   rightly imputed to her for our purposes now?

4        MR. GERBER:  Yes.  So I think the way that I read

5   the settlement agreement is that it's acknowledging that as

6   part of her role as interim CEO, that she has responsibility

7   to oversee company disclosures.  That's -- every CEO has

8   that responsibility.  That's part of their oversight of the

9   organization as a whole.

10       I do not read that settlement agreement as

11  imposing any special obligation on her to sign off on any

12  disclosures, to review every disclosure, to make her liable

13  for every disclosure.  I think it's just acknowledging that

14  general responsibility.

15       And if that were enough to create liability for a

16  CEO, then a CEO would be responsible for every disclosure

17  made by a company.  And that's clearly not what Justice

18  Thomas had in mind in *Janus* when he recognized the narrow

19  scope of liability under 10b-5 for makers of statements.

20       THE COURT:  Yes.  I think you'd be in a good place

21  but for that settlement agreement.  It says that she needs

22  to ensure that information required to be disclosed by the

23  company in its filings with the SEC and other material

24  information that the company discloses to the investment

25  community is reported accurately and timely.

 1          And that feels like it does raise -- put a

 2     heightened burden on her that may not be applied to other

 3     CEOs.

 4          MR. GERBER:  I understand the position, your

 5     Honor.  I do think that the agreement is just that:  It's a

 6     reflection of her general responsibility to oversee

 7     disclosures.

 8          She doesn't sign the disclosures.  The disclosures

 9     aren't attributed to her.  There's nothing attributing the

10     disclosures to her.  And that's really the analysis under

11     *Janus* in determining whether somebody is a maker of a

12     statement, not whether there's some general oversight

13     authority over all statements.

14          THE COURT:  Do you agree with Plaintiffs that the

15     statement was made in the context of a discussion over the

16     Form 144?

17          MR. GERBER:  So I think that the question did

18     arise at that time.  And the questions -- if you look back

19     at the article that raised the questions, it's talking about

20     Cohen's filings.  But it's not more specific than that.

21     It's not, you know, asking:  Did he sell?  Is he selling?

22     It's, you know:  Bed Bath, do you have any comment on what

23     he has filed?

24          THE COURT:  I'm sorry.  That's not what it's

25     asking?

1              MR. GERBER:  Well, it's just about, you know:  Do

2      you have a comment on the filing?  That's what the article

3      indicates the question was about.

4              It's not a more specific question, you know:  Did

5      he sell?  Or does he still hold shares?  That's not what it

6      was.  It's just:  Any comment on this filing?

7              THE COURT:  So why wouldn't this 144 kind of put

8      her on notice or the company on notice that maybe we should

9      double-check to make sure our constructive agreement is

10     still constructive?

11             MR. GERBER:  Right.  So I think there are two

12     steps to that.

13             The first one, I would say, is you have to look at

14     what the company said in response.  What the company said in

15     response was clearly limited to:  We had a constructive

16     agreement in March.  We were pleased to have had, in the

17     past tense, a constructive agreement in March.

18             It doesn't indicate anything about the current

19     state of the relationship, let alone the current state of

20     its shareholdings or absence of shareholdings.

21             And that's what an investor is going to look at

22     and take away from it.  It's not -- you can't just look at

23     the question and say, you know, What -- how do you read the

24     answer?  How could they have answered that question based on

25     the question itself?  You have to look at what the answer

1    said.  And here, the answer says:  We were pleased to have

2    reached a constructive agreement in March.

3             THE COURT:  Isn't that the type of careful lawyer

4    language that is meant to almost misdirect common people?

5             MR. GERBER:  I think it is -- it's fair to say it

6    is a corporate platitude of, you know, not wanting to say

7    something bad about somebody who might be on the way out.

8    They could have obviously said more directly, Yes, he still

9    holds or No, he doesn't hold.

10             That's not what they said.  What they said is:  We

11    were pleased to have worked with him in March.  And we're

12    continuing to work now going forward on maximizing

13    shareholder value, without saying anything about what

14    they're doing with Cohen now or not.  I think that's the

15    reasonable reading there.

16             THE COURT:  So your spin on this is that this was

17    actually -- this was not favorable, that this was kind of

18    almost tipping -- a hat tip to that there is a change?

19             MR. GERBER:  You know, there are different

20    inferences that can be drawn from it.  I think that is a

21    fair inference.

22             But I think what is not a fair inference is

23    reading it as saying, The agreement is -- or the

24    relationship is currently constructive.  That is not a

25    reasonable reading, because the only thing we addressed was

1     the status of the relationship in March.

2          THE COURT:  What do I say -- how do I consider

3     Plaintiffs' evidence, then, you know, that people reacted

4     positively to this and that there's not a bunch of tweets

5     saying, Oh, my goodness, this is bad news, but rather

6     saying, Oh, this is good news.  Look, everything's still

7     hunky-dory?

8          MR. GERBER:  Yeah.  So the only thing that they

9     point to there, they don't make an independent argument that

10    it can be read that way.

11         The only thing that they point to there are a

12    Reddit thread that did not accurately quote the statement

13    that the company made.  Instead of referring in the past

14    tense to the company being pleased to have reached the

15    agreement in March, the Reddit post said in the present

16    tense:  The company is pleased with its agreement with

17    Mr. Cohen.

18         And it was that statement that led to the Reddit

19    comments that the Plaintiffs point to that view it

20    incorrectly.

21         Also on that Reddit thread, although not cited by

22    the Plaintiffs, are a number of posters who say:  No.  You

23    have misquoted what Bed Bath said.  What Bed Bath said was

24    the -- in the past tense, was in March.  You left out the

25    "in March" part, which makes the statement misleading for no

1    reason, was actually what one of the posters said.

2            So it wasn't Bed Bath misleading or creating that

3    misimpression; it was an incorrect post on Reddit.

4            THE COURT:  I understand.

5            MR. GERBER:  The second point that I wanted to

6    make is a scienter point, which was off of one of your prior

7    questions.  It slipped my mind.  One second.

8            Yeah.  It was on the duty-to-monitor point, you

9    know, that we should have asked or somebody would have

10   expected us to ask.

11           There is no authority requiring a company to ask

12   about, inquire, check with a third party on something before

13   making a disclosure.  The Plaintiffs don't cite any case

14   requiring that.  All that they cite to is a case saying that

15   there can be recklessness where there is a duty to monitor

16   and you don't monitor.

17           Here, they don't point to any duty to monitor

18   Mr. Cohen's holdings, his stock holdings, or any way for us

19   to monitor that.  There's no duty for us to inquire.  So

20   there is no recklessness in not asking.

21           Mr. Jafri made an argument that we conceded that

22   we didn't ask.  I don't think we conceded any such thing.

23   We're just obviously assuming -- accepting as true his

24   argument that that's the case, even though I'm not sure that

25   there are any facts pled in support of that in the complaint

1    or particularized facts that are required by the heightened

2    pleading standards here.  We're just accepting it as true

3    and saying, even if it is the case, there's an innocent

4    competing inference from that that we had a duty to ask.  So

5    we made this generic statement that was not intended to

6    mislead people.

7                THE COURT:  Thank you.

8                MR. GERBER:  I will turn it over to Mr. Thau.

9    Thank you.

10                THE COURT:  Mr. Thau?

11                MR. THAU:  Thank you, your Honor.  I feel I have a

12    bunch of items to respond to.

13                Your Honor, if I may, I'd like to start with the

14    13(d) argument, because that's one of the focuses of your

15    Honor's attention.

16                I think your Honor actually asked the right

17    question with respect to the Second Circuit.  Would a

18    [indiscernible] --

19                THE COURT REPORTER:  Counsel, could you please

20    pull the microphone closer to you?

21                MR. THAU:  I think your Honor asked:  Would the

22    Second Circuit rule that a 13(d) claim exists?  And I think

23    the -- under *Kammerman.*  And I think the answer on that is

24    pretty clearly the Second Circuit would not recognize such a

25    claim.

1          Your Honor, I will acknowledge that Plaintiffs in

2     their briefing do cite authority on the issue, as do we, as

3     to whether a claim can even be brought here under Section

4     13(d).

5          I think the better authority is that a 13(d) claim

6     giving rise to a 10b-5 claim is not available.  We pointed

7     the Court to a decision last year out of the District of New

8     Jersey called *Takata*.  And the reason we point to a district

9     court case, your Honor, is because I think it's a very nice

10    analysis of the existence of whether a claim even exists.

11    Your Honor, if *Takata* is right, if *Kammerman* is right, we

12    don't have to go into a further discussion as to the ins and

13    outs of 13(d) because a claim -- there's no private cause of

14    action.

15         If your Honor will indulge me just for a minute.

16         "The text of Section 13" -- and I'm reading from

17    the *Takata* case, your Honor:  "The text of Section 13(d) and

18    Rule 13(d) do not provide clarification of whether a

19    shareholder may hold another shareholder liable for damages

20    due to an allegedly defective 13D.

21         "The trend in Section 13D cases indicates a strong

22    reluctance, if not an absolute bar, to allowing such suits

23    for damages both under 10(b) and 18(a)."

24         The Court goes on to rule:  "As such, the Court

25    finds that Section -- a 13D violation may not give rise to a

1    private cause of action for damages under Section 10b."

2              Your Honor, that's exactly what they're doing

3    here.  They're seeking to bring a 13(d) claim to

4    substantiate their 10b-5 claim.  And, your Honor, the law,

5    the better reading of the law, I believe, is no such claim

6    exists.

7              Let me move on, because -- but I do think that

8    point is dispositive.

9              Second, your Honor, you refer to -- and your

10   instinct on the law is correct -- there is no generalized

11   duty under the federal securities laws to disclose a

12   shareholder's future intent with respect to his or her

13   shares.

14             No obligation for Cohen to say, Here's what I'm

15   planning on doing.  Here's what I might do next.  The law

16   does not provide for that, and for good reason.

17             You asked about the Second Circuit.  I realize

18   we're not sitting in the Second Circuit.  But there's a lot

19   of good authority under federal securities law coming out of

20   that circuit, your Honor.

21             We rely on the *Azurite* case, A-Z-U-R-I-T-E:

22   "Disclosure is to be made of all definite plans; and there

23   is no requirement to make predictions or to disclose

24   tentative plans."

25             The complaint pleads no facts here, your Honor, no

1    facts that the Cohen Defendants had formed a definite plan

2    to sell before filing their 13D.

3         Your Honor, you talked about building blocks.  And

4    counsel for the Plaintiff talked generally about it.  It's

5    in there and there's a lot of stuff going on.

6         Your Honor, this is a pleading case.  They have to

7    plead facts showing three things at least.  And we talk

8    about reliance and causation.  But three things.  They have

9    to plead facts showing a false statement or omission, that

10   it's material and that there's scienter.

11        With respect to the 13D, I've talked about the

12   law.  The law requires facts pleaded to show that the Cohen

13   Defendants had a definite plan; not potential, not future,

14   not preliminary.  A definite plan.  And there are no such

15   facts pleaded in the complaint, your Honor.

16        THE COURT:  So to your mind, I mean, this rises

17   and falls over whether it's a definite plan versus a

18   tentative plan?  If --

19        MR. THAU:  Preliminary --

20        THE COURT:  -- it's a tentative plan, you're fine.

21   If it's a definite plan, you're not?

22        MR. THAU:  No, your Honor.  Plaintiff has to plead

23   facts showing the Cohen Defendants had a definite plan to

24   sell their stocks before they filed their Section 13D.  And

25   my position, your Honor, is there's nothing in the complaint

1    that pleads those facts.

2           They must plead factually a definite plan.  And

3    they don't do it.

4           THE COURT:  And this is kind of a 9(b)

5    particularity requirement?

6           MR. THAU:  It's a PSLRA.  Your Honor, we're

7    dealing with securities fraud.

8           You know, I had a preliminary statement.  We can

9    spare the Court on that, I think.  But the Seventh Circuit

10   has said this is the most stringent pleadings standard.  On

11   any case under American civil law, it's a securities fraud

12   case.  You have to plead facts.  You can't say, Cohen's a

13   bad guy or This is bad or There's something in the ether out

14   there.  You must plead facts showing something is false.

15   You must plead facts showing that there was an intent to

16   sell.

17          They just haven't done it.

18          And, your Honor, let me talk about what's in the

19   13D.  And I think your Honor alluded to it.  There are no

20   new facts in the 13D.  They talked about Mr. Cohen having

21   more than 10 percent.

22          Yes.  By August 16th, he held 11.8 percent of the

23   stock of Bed Bath.  That's because, your Honor -- and this

24   is not contested -- Bed Bath undertook a massive buy-back of

25   its own shares.  And just by action of that, Mr. Cohen did

1      not buy any -- the Cohen Defendants did not buy any more

2      shares simply by virtue of the buy-back.  His interest went

3      from 9.8 percent to 11.8 percent.

4              That fact was known to the public, your Honor.

5      That's not a new fact.

6              Bed Bath was required to and did file a 10-Q

7      saying:  We had a buy-back.  Cohen is the fourth biggest

8      shareholder.  He owns 11.8 percent.

9              THE COURT:  So is your position that basically

10     circumstantial evidence is never going to show a definite

11     plan?

12             MR. THAU:  Your Honor, I think the right question

13     here is -- I don't think we're talking at this stage about

14     circumstantial evidence.  I think that the burden on a

15     plaintiff in bringing a securities fraud claim under Rule

16     9(b) and the PSLRA is to plead facts showing falsity,

17     materiality and scienter and loss causation as well and

18     reliance as well.

19             But let's focus on the big three for starters.  We

20     can't talk about circumstantial evidence because they

21     haven't pleaded the basic facts which get them past a motion

22     to dismiss.

23             Under 13(d), your Honor -- it's an important one.

24     First of all, I think there's a reason why the law questions

25     a private cause of action, for the very reason -- the

1    questions you're asking, your Honor.  There's good reason to

2    think that there's not a private cause of action for the

3    very reason that we're dealing with subtleties.

4              But again, there's no new facts in that 13D.

5              Second, your Honor -- and this has been

6    overlooked -- when the Cohen Defendants bought their stock

7    on March 7th, the same year, five months earlier, they filed

8    a 13D, as they had to.

9              And in that 13D, they said:  Based on market

10   conditions, decisions made by Bed Bath's management, this --

11   market conditions generally, we may sell some or all of our

12   shares.  It's right there in the 13D.

13             They call it boilerplate.  I don't think it is.

14   And we looked really hard, your Honor.  We didn't find a

15   single case, not a case, finding that language like that was

16   boilerplate.

17             So the Cohen Defendants five months earlier said:

18   We're going to look at the market.  We're going to look at

19   decisions made by Bed Bath's management.  We're going to

20   look at the totality of the circumstances.  And we may sell

21   some or all of our shares.

22             That disclosure in the 13D existed all the way up

23   to August 16, your Honor.

24             Someone used the word -- I think it was

25   Plaintiffs' counsel -- you know, investors are silly or not

1   silly.

2            Investors are not silly, your Honor.  There's a

3   case out of the Fourth Circuit called *Boykin*.  What the

4   standard here is, we treat investors as reasonable people

5   exercising due care.  And they have to gather a false

6   impression in making an investment decision.  Reasonable,

7   rational people exercising due care.

8            A reasonable, rational shareholder, your Honor,

9   would not read that 13D and think, Oh, my God, what's going

10  on here?  They would understand exactly what's going on.

11  There's nothing misleading in that 13D.  There's nothing

12  false in that 13D, your Honor.

13           One last point:  scienter.  And scienter, your

14  Honor, I think is the death knell for this complaint on all

15  claims, your Honor, because regardless of the claim, they

16  have to show an intent to deceive.

17           And as your Honor well knows, under *Tellabs*, the

18  Supreme Court decision in *Tellabs*, the Court is faced with

19  dealing with different narratives and must make a

20  determination which is more cogent and compelling.  That's

21  the language of *Tellabs*.

22           Here's the narrative we're offering, your Honor:

23  On August 16th, Ryan Cohen -- we can call it the Cohen

24  Defendants, but RC Ventures is an entity -- Ryan Cohen, who

25  is a rational investor and a self-interested investor, as

1   all investors are, digested information about Bed Bath's

2   market conditions equally available to the market.

3            Your Honor, another fact that is not disputed here

4   is, there's lots of bad information about Bed Bath's

5   financial condition in the marketplace.  Quarter after

6   quarter, 10-Q after 10-Q, Bed Bath is saying:  We have been

7   having bad situations, bad financial conditions.  We're

8   burning through our cash.

9            The analysts following Bed Bath are agreeing with

10  that analysis.

11           So there's no question, your Honor, that there's a

12  lot of bad information out there at the time.  Mr. Cohen

13  digests that information.  And that information is available

14  to everybody.  That information is available to all

15  investors.

16           Counsel for Plaintiff referred to Mr. Cohen as an

17  insider.  He's not.  The information about Bed Bath's

18  financial condition, cash burn, is out there in the

19  marketplace.  Everyone can see.

20           He decides --

21           THE COURT:  Sorry.  But I mean, Plaintiffs have

22  alleged that he put several board members on, that he has

23  conversations with the CFO.

24           MR. THAU:  Yes.

25           THE COURT:  I mean, at least at this stage, don't

1    I need to credit all of those?

2         MR. THAU:  No, your Honor.  And let me tell you

3    why.

4         They are the most salacious allegations in the

5    complaint, because what Plaintiffs are saying is:  Pursuant

6    to a cooperation agreement, when Cohen bought his initial

7    shares between Cohen and Bed Bath -- it's called a

8    cooperation agreement -- he nominated three independent

9    board members.  These weren't his golf buddies; these

10   weren't his friends; this wasn't his uncle.  Three

11   independent board members.  No affiliation with Cohen; no

12   affiliation with Bed Bath.  They're independent.

13        To rebut the inference -- the cogent inference

14   that I'm offering, your Honor, of no fraud, what Plaintiffs

15   are saying is there had to be sharing of inside information

16   in breach of the fiduciary duty of these independent

17   directors, potentially in breach of the United States laws

18   against insider trading.  Plaintiffs' allegation is there

19   was insider trading between independent board members and

20   Mr. Cohen.  He was tipped.  He knew information.

21        Your Honor, there's not a single fact, not a

22   single fact in the complaint, substantiating that.  What

23   information?  When?  What director told Mr. Cohen about

24   insider information and when?

25        There are salacious, broad allegations.  What

1    Plaintiff says in their brief is it's not conceivable that

2    there wouldn't be sharing of insider information.

3              Your Honor, that's not a fact.  "Not conceivable"

4    is not a fact.

5              If you're going to say somebody engaged in insider

6    trading, if you're going to say that three independent

7    directors tipped Ryan Cohen with information, you'd better

8    come up with facts.  And there are none in this complaint,

9    your Honor.

10             And to the extent your Honor is considering, Well,

11   it's early and I need to consider -- give everybody a shot,

12   you have to come up with facts here, your Honor.  That's the

13   whole essence of the PSLRA.  That's the whole essence of

14   9(b).  You can't simply say there's insider trading going on

15   here.  You have to substantiate it with some facts.

16             If there's tipping, what day?  Who said what to

17   whom?  And did Cohen trade on it?  There's nothing in the

18   complaint, your Honor.  I beseech you to review the

19   complaint and look for a single fact pleaded -- specific

20   fact required in the PSLRA or under Rule 9(b) that

21   substantiates those allegations.

22             THE COURT:  Well, they talk about conversations

23   and they say also with the CFO and then we have this timing,

24   that he makes this decision a couple weeks before very bad

25   information comes out about Bed Bath & Beyond.  It's hard

1    for me to think of him as an average investor that's looking

2    at the same information that everybody else would be.

3          MR. THAU:  Well, your Honor, there's no -- you

4    still have to plead -- there still have to be facts pleaded

5    to show that.  Is he an average investor?  He owns more

6    stock.

7          But their allegation is something different, your

8    Honor.  Their allegation is it is not conceivable that the

9    independent directors would not tip.

10          THE COURT:  Well, you keep going back to the

11   independent directors.  What about the CFO, who I believe

12   sold stocks on the same day that he did?

13          MR. THAU:  The CFO is dead, your Honor.

14          THE COURT:  I get that.  But --

15          MR. THAU:  And, your Honor, what they're relying

16   on there, with all due respect, is one of my hometown

17   newspapers, is an article in the *New York Post*.

18          So again, you can make all kinds of salacious

19   statements:  He must have talked to him; he must have

20   learned from him.

21          There has to be some facts pleaded.  And on

22   insider trading, your Honor, breach of fiduciary duty,

23   illegal conduct, there needs to be more.  I think Plaintiff

24   said, Well, he soured on his investment.

25          Your Honor, you soured on your investment?  Is

1    that the equivalent as to what the Second Circuit requires

2    in *Azurite*?  A decision, a final decision to sell stock?  He

3    soured on his investment?

4              That's not a fact, your Honor.  That's not a

5    pleaded fact.

6              So again, I think what your Honor has to do on the

7    scienter point is gauge two competing narratives.  One is a

8    rational investor digested publicly available information

9    and did what he said he was going to do in his earlier 13D:

10   We may sell some or all of our shares.

11             And your Honor, it's also not disputed on August

12   16th, that day, the stock goes up 30 percent.  The stock

13   goes up 30 percent.  A rational investor could make the

14   decision on August 16th:  The stock just went up 30 percent.

15   I'm seeing all this terrible information being disclosed by

16   Bed Bath.  It makes sense to sell my shares.

17             THE COURT:  So how should I understand what

18   happened on August 16th in terms of timing?  Do you agree

19   that he had sold the stocks before he signed this form?

20             MR. THAU:  Can I get something?

21             I think, your Honor, the governing body's not --

22   for a reason, for a reason, does not get into the specific

23   which one was before.

24             It's not just Cliff Thau talking here.  It's not

25   just my firm talking here.  The SEC's division of corporate

1    finance, your Honor.  They are the authority on the rules

2    and regulations of the SEC.

3         They use the word "concurrently" as to what

4    governs under Rule 144.  That's the SEC's words; it's not my

5    creation.  "Concurrently," your Honor, under the SEC's

6    guidance, is the same day.

7         And, your Honor, respectfully, I think that that's

8    the reason to save people from going through the analysis

9    that you just asked.  Was it at 10:12 versus 10:14?  Was it

10   10:00 in the morning or 11:30?  There's a reason the SEC

11   says "concurrently" means we're going to treat the sale as

12   the same day.

13        And, your Honor, if I may, on the form itself,

14   because you asked a question about "proposed":  That's the

15   title of the form.  I mean, it's a notice of proposed sale

16   of securities.  I didn't catch that, your Honor, honestly,

17   until we were sitting here in court.  I had to go back and

18   look at it.

19        So we're talking about proposed sales, what's

20   meant by it.  That's what the form calls it.

21        And if I may, there's no ambiguity in the form,

22   because under 3C in the middle of the first page, it's

23   "number of sales or other units to be sold."  It's not

24   prospective, your Honor.  This is the form that is used to

25   indicate a sale.

1          Plaintiffs, I guess, would like to rewrite the

2     meaning of 144.  But that's not how the SEC construes the

3     rule.

4          "Concurrently" means you file the form the same

5     day that you sell.  That's what was done here, your Honor.

6     There's no false statement in the Form 144.  There's

7     certainly no scienter, your Honor, in the filing of a Rule

8     144.  There's no intent to deceive here.  There's no fraud

9     here in the filing of this form.

10         THE COURT:  So on the 13D, I think Plaintiffs also

11    suggest that he was supposed to state plans to sell on that.

12    Am I remembering that correctly?

13         MR. THAU:  Yes.

14         THE COURT:  And so --

15         MR. THAU:  But it's the definite -- the definite

16    part.  It's the definite plan.

17         THE COURT:  But you're saying that he kind of

18    hatched this plan all on August 16th.  Are you saying that

19    it just happened that he filed the 13D in the morning, then

20    hatched this definite plan and then executed it and then

21    filed the Form 144 all on the same day in that order?

22         MR. THAU:  Well, he asked counsel to assist in the

23    filing of the forms, your Honor.  So yes.  I don't like the

24    word "hatch."  But I am going to respond to it.

25         What the facts show -- and again, we're just

1    dealing with facts; we're not dealing with supposition --

2    what the facts show is he -- that he's a good investor.

3    There's a lot of bad information about Bed Bath.

4         On that day, August 16th, the stock goes up 30

5    percent.  He had disclosed just months earlier based on

6    market conditions he may sell some or all of his shares.

7    And that's what happened.

8         Your Honor, if I may, what's the contrary

9    narrative here?  What's the counter narrative?  What

10   Plaintiff would have you believe is that Mr. Cohen traded on

11   inside information.  That's the counter narrative.

12        What Cohen -- what the Plaintiffs would have you

13   believe, your Honor, is that Mr. Cohen had some type of

14   clairvoyance and could tell what his -- what was going to

15   happen in the marketplace.

16        And, your Honor, early on there was a reference to

17   an interview.

18        THE COURT:  Sorry.  So are you saying -- when you

19   say that he came up with this plan on August 16, are you

20   thinking of something in particular that --

21        MR. THAU:  There's nothing in the record, your

22   Honor, that says -- we don't have a record on, you know,

23   time of a -- time of a sale.

24        What I'm suggesting to your Honor is, based on

25   what we have before us now are two different narratives.  My

1    narrative is an investor looked at the marketplace on a day,

2    on a day.  He had previously told the market he might sell

3    based on market conditions, decisions made by Bed Bath,

4    overall macroeconomic situations.  He may sell all of his

5    stock.  He's told the market that.  That's not new

6    information.

7            On that day, the share price goes up 30 percent,

8    so he sells.  That is a reasonable set of facts based on

9    what we have before us.

10           THE COURT:  But for 12(b) at this point -- I mean,

11   I'm not sure.  Maybe I'm forgetting something.  But I'm not

12   sure I even necessarily need to believe there was inside

13   information.  I think it could just be that he arrived at

14   that same conclusion several weeks before and decided, Well,

15   why don't I juice the market, do kind of a pump and dump?

16   And it strikes me that the timeline here would certainly

17   support that inference.

18           Now, maybe that's wrong, and maybe through

19   discovery that allegation is disproved.  But I'd think at

20   this stage that I'm supposed to be crediting the Plaintiffs'

21   version of events.  And it strikes me they've got kind of a

22   plausible timeline here.

23           MR. THAU:  Let me respectfully push back, your

24   Honor, because I think -- and this is a key point,

25   obviously.

1                On scienter, on intent to deceive, they have to

2       come up with a contrary narrative.  Okay?  They have to come

3       up with, Here's what we think happened.

4                I've told you what I think happened.  I think

5       that's a plausible, cogent scenario.

6                Their scenario is completely different.  Their

7       scenario is three things:  One, Cohen must have known that

8       his actions would move the market.

9                And on that point, your Honor, they point to a

10      YouTube interview.  It's in the briefing.  It's in the

11      complaint.  That's their evidence.  That's their -- that's

12      what's supposed to convince you that Cohen knows how the

13      market's going to move.

14               That interview, your Honor, is about a different

15      company.  It's about GameStop.  It's a different company

16      that Cohen invested in.

17               And they quote language:  "Yeah, I look at what

18      had happened to the market when I file a 13D."

19               They leave out, your Honor -- they misquote, they

20      selectively quote here, your Honor, and they leave out the

21      most important part of the interview.

22               They quote Cohen as saying, "I noticed retail

23      activity in the stock."  The next line is, "Activity

24      following my 13D filings are impossible to predict."

25               Your Honor, they need to have an alternative

1    scenario.  I don't -- I suggest to you it is not enough to

2    simply say, Well, he soured on his stock when the Second

3    Circuit says that that's not enough.  You need a definite

4    plan.

5          It's not enough for them to say, "Cohen had some

6    knowledge what's going to move the market" and cite to you

7    part of an interview where the part they leave out is

8    exactly consistent with what I'm saying.

9          They can't say there must have been inside

10   information to convince you there's been a fraud.  It --

11   it's not -- your Honor, respectfully, it's not a 12(b)(6)

12   case.  It's a PSLRA case.  It's a 9(b) case.  And the burden

13   is exacting, as the Supreme Court said.  It's a heavy, heavy

14   burden.

15         You can't -- this is not a breach-of-contract

16   case, Judge.  This is the type of case where the pleadings

17   standard is much, much, much heavier.  And what the Supreme

18   Court tells us in *Tellabs* is, you need to weigh -- what is

19   the more cogent, more reasonable narrative here?

20         I'm offering one based on Cohen as an investor;

21   publicly available information; what he had said in his 13D

22   in March and the fact that the stock went up 30 percent on

23   August 16th.

24         Their countervailing argument, your Honor, is

25   insider trading and supposition about what Cohen knew based

1    on a partially selective interview.

2              So, your Honor, respectfully, when you say this is

3    a 12(b)(6) case and I need to credit their story, in this

4    type of case, your Honor, respectfully, I think the burden

5    is much, much higher.  And I don't think they've met it.

6              I've talked about 144, your Honor.  I'd also

7    like -- if you're at all interested, your Honor, I'll talk

8    about the tweet.

9              THE COURT:  Yes.

10             What's the name of that Supreme Court case?  It's

11   *Tellabs*?

12             MR. THAU:  T-E-L-L-A-B-S.

13             THE COURT:  *Tellabs*.  I see it.

14             MR. THAU:  *Tellabs*.

15             But, your Honor -- and I think this is critical

16   here.  As I said, I planned on starting with a couple-minute

17   dissertation which would bore the hell out of your Honor

18   about, you know, how stringent the pleadings standards are

19   here.

20             This is the type of case where the pleadings

21   standard does make a difference.  This is exactly the type

22   of case where pleaded facts does make sense.  And it is

23   important.

24             I want to talk about materiality for a second,

25   your Honor, because that's another grounds for why

1    Plaintiffs' claim fails.

2             The word "silly investors" was used.  We're not

3    talking about silly investors, your Honor.  We're talking

4    about what a reasonable investor exercising due care would

5    do.

6             And when reasonable investors exercising due care

7    look at the Form 13D -- and do what?  There's nothing

8    materially wrong -- there's nothing false there to start

9    with.  There's certainly nothing materially false there.

10            There's nothing -- the tweet, your Honor, the

11   standard on materiality, what a reasonable investor -- when

12   there's an investment decision of a reasonable investor be

13   significantly altered [sic], given the total mix of

14   information here, would the SEC filings here, your Honor,

15   move that total mix of information?  I suggest no.

16            What was going on here is, your Honor, Bed Bath is

17   failing.  No disrespect to Mr. Gerber, but it's a failing

18   company.  It's now in bankruptcy.  And that information is

19   out there in the public.

20            Plaintiffs are offering you a wildly different

21   scenario of manipulation, bad conduct, salacious conduct

22   without facts where what's really going on in the

23   marketplace, your Honor, is a bad set of financial

24   conditions at Bed Bath.

25            So there are a lot of reasons other than the wild

1    allegations of bad conduct, the fraudulent conduct of Ryan

2    Cohen at issue here.

3           Your Honor, they even drag in -- and it's in their

4    brief, and frankly it's not something that I would ever

5    write -- they claim that Mr. Cohen engaged in market

6    manipulation at GameStop and Chewy.  Those are two earlier

7    investments.  I think the expression Plaintiffs' counsel

8    used earlier was he had road-tested his plans before.

9           There's nothing in the record, your Honor, there's

10   not a fact pleaded, there's not a case, there's not an SEC

11   action, there's nothing pleaded that Mr. Cohen engaged in

12   any market manipulation at Chewy, an earlier investment, or

13   GameStop.  And Plaintiffs are dragging that in.

14          The whole purpose of 9(b), your Honor, is to

15   protect someone's reputation from scurrilous allegations.

16   They're alleging insider trading, market manipulation, not

17   limited to Bed Bath, but to other investments, too.  They've

18   thrown a lot of stuff against the wall, your Honor.

19          I implore you to think about what facts are

20   actually pleaded in support of falsity, materiality and most

21   importantly scienter, your Honor.  And I think when you

22   study what's actually pleaded, I think you'll come to the

23   conclusion that they have not sustained their pleading

24   burden on any of those elements.

25          You asked about market manipulation.  I want to

1    come to that briefly, and I won't ruin -- I won't keep on

2    going here.

3           On market manipulation, there must be a

4    manipulative act.  The Defendant charged must have done

5    something to manipulate the market.

6           In a lot of cases like this, the bad guy, the bad

7    actor, will pay -- tout services, will pay companies to

8    write stories to pump up the value of the stock.  That's a

9    typical pump and dump.  They will pay someone to write

10   stories to increase the value of the share.  That is a

11   manipulative act.  The Second Circuit talks about wash sales

12   and other kinds of manipulative acts.

13          There's no manipulative act here, your Honor,

14   except according to Plaintiff that the Cohen Defendants sold

15   their shares on August 16th.  Well, your Honor, the sale of

16   the shares can't be the same act that pumps up the stock.

17   It's got -- it's got to be a manipulative act that --

18          THE COURT:  I thought they would have -- they're

19   pointing to the tweet, the various prior filings.

20          MR. THAU:  But, your Honor, an SEC filing is

21   not -- is not an act -- it's not manipulating the market

22   like touting a stock would be or a certain kind of sale.

23          THE COURT:  So what about the tweet with the full

24   cart of groceries, the "Do for your company" quote, "Ask not

25   what your company can do for you"?

1          MR. THAU:  Let me talk about that first, your

2    Honor, that John F. Kennedy paraphrase.  That's not alleged

3    to be a false and misleading statement.  Plaintiffs --

4    that's just not -- you used the expression "building

5    blocks," your Honor.  That's not pleaded as a building

6    block.

7          The first alleged misrepresentation in the

8    complaint is the June 12th tweet.  So the "Do what's best

9    for your company," I don't want to --

10          THE COURT:  I agree.  I don't think that would be

11    misleading.

12          MR. THAU:  That doesn't count.  First of all, I

13    don't know what it means.  Frankly, your Honor, I'm not a

14    tweeter or a -- the August 12th tweet, let's talk about

15    that.

16          It's a reference to -- it's attached to an article

17    saying, "The share price of Bed Bath is going to a dollar."

18    That's what the tweet is referring to:  a pessimistic

19    statement that the stock price is going to a buck.

20          And there's a picture of a woman with a full

21    grocery cart.  And Mr. Cohen -- maybe you like his sense of

22    humor; maybe you don't -- says, "At least the cart is full."

23    And there's a cartoon of him --

24          THE COURT:  I saw the tweet.

25          MR. THAU:  I'm sure you have.

1          Your Honor, there's something to be -- and this
2    will come back to pleading -- a material misrepresentation.
3    A false and misleading statement.  It must be subject to
4    objective verification.  It must be something concrete.  And
5    that's -- that's in our briefing, your Honor, what's
6    required for a material misstatement.  It must be something
7    substantive.
8          And I would suggest to you, your Honor, that a
9    picture of a moon and saying, "At least the cart is full"
10   does not give rise to a material misrepresentation.
11         THE COURT:  What if he had said, "Let's take the
12   stocks to the moon"?  Would that be -- so is your quibble
13   over --
14         MR. THAU:  I think --
15         THE COURT:  -- the meme or --
16         MR. THAU:  I'm going to --
17         THE COURT:  Let me finish.
18         MR. THAU:  Sorry.  I beg your pardon, your Honor.
19         THE COURT:  Is your quibble with the emoji itself
20   or with what they are saying it means?
21         MR. THAU:  I have three quibbles.
22         My first quibble, your Honor, is that I don't
23   think the moon is substantive enough, is concrete enough, to
24   be a material misrepresentation.  I don't think it gives
25   rise to that.  That's A.

1            B, your Honor, their argument is that an

2     investor -- and I come back to what the Fourth Circuit said

3     in *Boykin* -- a reasonable investor exercising due care.

4     What would a reasonable investor exercising due care

5     construe from a moon emoji and saying, "At least the cart is

6     full"?  Would they get from that the stock's going to the

7     moon?  I don't think that's reasonable, your Honor.  I don't

8     think that's a reasonable construction of what an investor

9     would take from that.  So I'm still on Quibble 1.

10            Quibble 2, your Honor, is:  It's got to be

11     material.  On August 12th, the moon's not -- not going to

12     the moon -- the moon is crashing, Judge.  There's all kind

13     of bad information about Bed Bath.  Someone's predicting

14     it's going to a dollar.

15            The suggestion is, Cohen is saying it's going to

16     the moon?  That --

17            THE COURT:  But it does begin to rise right

18     afterwards, at least according to the complaint.

19            MR. THAU:  I can check the share price on August

20     12, your Honor.  I'm not certain -- that's August 12.  I'm

21     not certain that it does.

22            But third, your Honor, and I think perhaps most

23     importantly, there's certain statements that don't give rise

24     to liability under the federal securities laws.  And that is

25     nonactionable puffery.

1           So to your point, your Honor, let's say a

2      reasonable investor exercising due care actually did think,

3      notwithstanding all the bad financial information about Bed

4      Bath, but a reasonable investor exercising care I don't

5      think would construe that message; but let's say he or she

6      did.

7           Stock going to the moon is a prediction of what's

8      going to happen in the future.  And, your Honor, we have

9      cases -- and I don't have it at my fingertips; I wish I did;

10     but it's in the briefing -- that is nonactionable puffery,

11     Judge.

12          To say, "I think this stock price is moving up to

13     the moon," that's not a factual statement.  I think the

14     courts call it an imprecise statement of something happening

15     in the future.  And that does not give rise to liability,

16     your Honor.  That's just not a false statement here.

17          So I would suggest to you there are three things

18     that Plaintiffs are hanging their hats on to show this

19     terrible, terrible conduct, this fraudulent conduct, which

20     they must plead with specificity of falsity, materiality and

21     scienter:  a tweet and two SEC filings, your Honor, which I

22     would argue are not inaccurate, are not fraudulent and are

23     complete.  Based on a tweet and two SEC filings, your Honor,

24     they're trying to convince you of a market manipulation,

25     insider trading, securities fraud.

1          My point, your Honor, is if you search the

2     complaint, there are not facts that substantiate falsity,

3     materiality and most strongly scienter, because on scienter,

4     your Honor, it is most certainly not a 12(b)(6) standard.

5     It's a much, much higher standard that Plaintiff must meet.

6     And there are no facts showing that based on allegations of

7     insider trading, allegations of some gut reaction of

8     Mr. Cohen.

9          THE COURT:  Sir, can you talk about the efficient

10    market and --

11         MR. THAU:  Yeah.

12         THE COURT:  -- how that impacts the -- your case

13    here?

14         MR. THAU:  Yeah.  I think, your Honor, there are

15    numerous grounds.  I've spent my time on falsity and

16    materiality and scienter.

17         The efficient market:  Our position is, their

18    allegation is that there's an efficient market.  And we're

19    not saying that NASDAQ or the New York Stock Exchange are

20    not efficient markets.  Our point is, your Honor, the

21    efficient market is counter to their claim.  Our point is

22    that the filing of an accurate 13D doesn't move the market

23    because there's no new information in there.

24         Our argument is, your Honor, that what drives the

25    market is financial conditions, financial statements, of

1    which they are dismal; and that to suggest, as Plaintiffs

2    do, that conduct by Mr. Cohen drove the market is contrary

3    to the operation of an efficient market.

4          THE COURT:  Are you arguing that it's got to be a

5    perfectly efficient market, though?  I mean, I think --

6          MR. THAU:  It's -- it's got to be -- it's a

7    commonsensical point, I think, your Honor.  I think that

8    what most people understand "efficient market" to mean is

9    when significant material information is disclosed.  It's

10   digested by the market in an efficient way.  I don't think

11   any market is perfect, your Honor.  I think we've learned

12   that during the past decade or two.

13         But I think a reasonably efficient market, what's

14   called for and what our position is, your Honor, an

15   efficient -- a reasonably efficient market would not move

16   dramatically -- given the bad information about Bed Bath

17   would not move dramatically, materially, by the SEC filings

18   here.

19         THE COURT:  So doesn't *Halliburton* basically take

20   out the legs on your market argument?  I think the Supreme

21   Court held that the existence of value investors didn't

22   undercut the fraud-on-the-market test and that the stock

23   prices being -- even the stock prices being inaccurate did

24   not detract from the fact that false statements affected and

25   caused loss.

1      This feels like those issues kind of really

2   undercut what you're arguing here.

3      MR. THAU:  I don't think so, your Honor.

4      But that presupposes here that there were false

5   statements in the market that would move the market.

6      My point is, your Honor, there's not even new

7   information in the market that Plaintiffs claim is moving

8   it.  And I just -- I don't see how that sustains an

9   efficient market theory.

10      I will say, your Honor, on this point,

11   respectfully, I'm a little more comfortable with what we

12   have in our briefs on the point.  I intended to focus more

13   or falsity and materiality and scienter.

14      THE COURT:  Well, give it your best shot now.

15   I've had a lot of briefing on this, and I'm not sure that I

16   want to do another round.

17      MR. THAU:  Okay.  Then I will.  Just give me one

18   second, your Honor.

19      Two points:  You asked about *Affiliated Ute*.

20      THE COURT:  So I think that's the alternative --

21      MR. THAU:  Yes.

22      THE COURT:  -- side.  And frankly, I'm more with

23   you on that.

24      MR. THAU:  Okay.

25      THE COURT:  So don't -- let's not focus on

1    *Affilitated Ute.*

2           MR. THAU:  Okay.  Plaintiffs can show an efficient

3    market because an efficient market presumes rational,

4    reasonable, intelligent investors.  Okay?

5           Because Plaintiffs' theory is that was

6    notwithstanding all the negative financial information

7    disclosed publicly by Bed Bath in its SEC filings, the

8    market moved based on a tweet and the 13D, which contains no

9    new information, and the Form 144, which timely announced

10   the sale of the shares.

11          Their theory, your Honor, is that SEC filings,

12   which contained no information or information already in the

13   marketplace, moved the market and not the dismal financial

14   information about Bed Bath.  That's our argument on the

15   efficient market.

16          THE COURT:  And then you argue the Plaintiffs

17   cannot plead loss causation without undermining its reliance

18   allegations for the 13D because they claim that Bed Bath's

19   stock was traded in an efficient market.

20          But the 13D arguably stood for a new assertion

21   that as of that date, the Defendant -- or your client had no

22   solid plans to sell.  Why isn't that new information?

23          MR. THAU:  If your Honor is asking, should I

24   presuppose that there was a definitive plan on August 16th?

25          THE COURT:  Well, I thought you were saying --

1    your alternative theory was that on August 16 he did decide

2    to sell.  Right?

3              MR. THAU:  Correct.

4              THE COURT:  But shortly after he filed the 13D,

5    shortly after, anyway.  Is that how you square the peg

6    there?

7              MR. THAU:  The way I square the peg, your Honor,

8    is that on August 16 he decided when the stock price went up

9    30 percent, consistent with his prior disclosure that he

10   might sell, he sold on that day.  Yes.

11             THE COURT:  But after he filed the 13D?

12             MR. THAU:  Yes, your Honor.

13             THE COURT:  Okay.  It was a busy day.

14             MR. THAU:  Well, your Honor, again, this is not

15   the world that I live in either.  But this is the world that

16   investors do deal with.  I mean, all Mr. Cohen did is what

17   he said he was going to do in his 13D, that he was going to

18   evaluate the market; he was going to evaluate the decisions

19   made by Bed Bath; he was going to make considerations of his

20   own investment strategy.  He did what he said he was going

21   to do in his 13D.  And on that day, when the stock goes up

22   30 percent, he decides to sell his shares.

23             The 144, your Honor, just follows from the sale.

24   There's nothing potentially untoward about that.  I mean,

25   he's obligated to file a Rule 144 that day.

1          With all due respect, your Honor, we've both seen

2     the form now. It's not the type of form that takes a lot of

3     time to fill out.  Nor, your Honor, is the 13D.  I mean,

4     these are not complicated forms.

5          What I think is important, your Honor, on the 13D

6     that was filed just five months earlier, it does have

7     information about, you know, what he might do in the future.

8          So, you know, your Honor could -- I suppose -- you

9     know, I don't know if it's tongue in cheek or not:  It was a

10    busy day.  Mr. Cohen made an investment decision that day.

11    And he filed the Rule 144 that day because that's what he

12    was obligated to do concurrently with the sale.

13          THE COURT:  Yes.  But I think the Plaintiffs'

14    argument that seems kind of plausible to me is that the

15    reason it went up 30 percent was at least in part because of

16    that 13D.  And so this timing is not just happenstance, but

17    was created by your client.

18          MR. THAU:  Your Honor, there had -- that's --

19    there has to be some facts attached to that.  I mean, I

20    don't know how else to respond to it.

21          An efficient market, reasonable investors

22    exercising due care.  If someone filed a 13D, that 13D that

23    was filed that day was consistent with what he had said

24    before.  What would -- what would drive the market up on

25    that day?  The 13D that he filed that day did not say that

1    he was going to sell.

2           THE COURT:  No.  No.  I think that's their point.

3           MR. THAU:  I just -- your Honor, respectfully, I

4    don't -- I don't -- I don't see that as an untoward act by

5    Mr. Cohen.  I'm -- maybe I'm not following your Honor's

6    question.  I apologize.  But I'm not sure what the wrong is

7    there.

8           He followed what he was supposed to do.  He filed

9    the 13D, says that his holdings are now 11.8 percent.  When

10   he filed that form, he did not have a plan to sell.  During

11   the course of the day, he did decide to sell.  And he filed

12   the Rule 144.

13          That's -- that is a plausible -- that is my cogent

14   narrative here, a reasonable narrative here.  More

15   reasonable, more cogent than what Plaintiffs are offering

16   based on all kinds of fraudulent conduct.

17          THE COURT:  Sir, if I deny your motion to dismiss

18   the 10(b) claim, does that mean your 9(a)(4) claim fails,

19   too, or is there daylight between them?

20          MR. THAU:  Give me one second, your Honor.  I have

21   to take a look at the complaint.

22          THE COURT:  Sure.

23          MR. THAU:  Our argument, your Honor, on that is

24   that -- that for the same reasons we think the 10b-5 --

25          THE COURT:  They rise and fall together?

```
1            MR. THAU:  Yes.
2            THE COURT:  And the last question I wanted to ask
3    you on 9(a)(3), the "other person" point, so Mr. Jafri
4    helped me understand his construction of "other person"
5    would not just necessarily be anybody who's investing, but
6    someone like Mr. Cohen who is kind of in the business of
7    investing, but is not a dealer, broker or major
8    security-based swap participant.
9            MR. THAU:  I'm just reading the section, your
10   Honor.  It says broker-dealer.  So I don't think it applies
11   to someone like Mr. Cohen.
12           THE COURT:  Sorry.  9(a)(3)?
13           MR. THAU:  Yeah.
14           THE COURT:  It has "the other person."
15           MR. THAU:  "Other person selling in the ordinary
16   course of business."  That's not the ordinary course of
17   business of -- yeah.  They're using "any person" to mean any
18   person would make the prior -- yeah.  The way I read that,
19   your Honor, just one man's reading, is that in the ordinary
20   course -- the other person selling is consistent with the
21   broker-dealer language.  It's not opening up exposure to
22   people beyond those in that business.
23           THE COURT:  So is "or other person" doing any
24   work, then, in your definition?
25           MR. THAU:  It can't just be any person, your
```

1    Honor.  It has to be somebody in the industry, in the

2    securities industry.

3              THE COURT:  Yes.  I agree.  And I think that's why

4    Mr. Jafri's explanation was helpful to me, because he's

5    saying it doesn't just hit -- he's saying it doesn't just

6    hit anyone, but it's someone who is a significant investor

7    in the business of investing, i.e. like your client, but

8    perhaps not like you and me.

9              MR. THAU:  I don't -- I don't think -- I don't

10   read it that way, your Honor.  I read it as a dealer,

11   broker, swap dealer, major securities swap participant.  It

12   doesn't say "big investor."

13             THE COURT:  So who would "or other person" capture

14   other than a dealer, broker or major securities-based swap

15   participant?

16             MR. THAU:  I don't know, your Honor.  A hedge

17   fund?  You know, another securities firm, firms that make it

18   their business to buy and sell securities?  I don't read it

19   as broader than that.

20             THE COURT:  All right.  Anything else, Mr. Thau?

21             MR. THAU:  Yes, your Honor.  A very, very -- a

22   very strong request, your Honor.  And I'm trying to read

23   your Honor's body language and the tea leaves here.

24             And I appreciate that you're not of a mind to go

25   back.  You've read the briefs.  I get all that.

1          If I may -- because your Honor made the comment "I

2     think at this stage I have to give the Plaintiff" -- I don't

3     know if it was the benefit of the doubt -- or that it's a

4     12(b)(6).

5          Your Honor, this case is not.  It's just not.

6     It's a fraud claim.  And the obligation on the Plaintiff is

7     far different, far more rigorous, far more exacting than

8     that.

9          THE COURT:  I appreciate that.  And *Tellabs*, is

10    that the primary case you'd have me read on this standard,

11    the PSLRA standard?

12          MR. THAU:  Your Honor, I'm suggesting *Tellabs* is

13    important on the concept of which, Plaintiff or Defendant,

14    is offering a more cogent or more compelling set of

15    inferences.  That's what *Tellabs* is really important on.

16          There's a lot of case law that we cite in our

17    briefing more generally on the pleading obligations under

18    PSLRA as construed by the courts.

19          If your Honor would like -- I beg your indulgence,

20    your Honor.

21          *Tellabs* is an important case, your Honor.  There's

22    a case out of this Court, your Honor, *Plymouth County*

23    *Retirement Association versus Advisory Board,* on Page 15 of

24    our moving brief.  Again, it's the D.C. Circuit, your Honor.

25    I'm trying to stick with cases from this circuit.

1              Also on Page 15, *United States ex rel. Shea versus*

2       *Celco Partnership*, C-E-L-C-O.

3              Okay.  Yes.  One more, your Honor, if I may.

4       Again, top of 15, it's from the D.C. Circuit, your Honor:

5       *Hemp Industries Association versus Drug Enforcement*

6       *Administration*:  "Although courts may construe the complaint

7       in the Plaintiff's favor upon a motion to dismiss, this does

8       not entail accepting inferences unsupported by facts or

9       legal conclusions cast in the form of factual allegations."

10             THE COURT:  All right.  Yes.  That doesn't sound

11      like a PSLRA.  I'm familiar with 12(b).

12             MR. THAU:  Okay, your Honor.  If I may.  Another

13      D.C. -- a case from this court, your Honor:  *Shenk*,

14      S-H-E-N-K, *versus Mallinckrodt*, M-A-L-L-I-N-C-K-R-O-D-T.

15      And that one, your Honor, is just -- it's an important

16      decision, but it's quoting from the rule.

17             THE COURT:  All right.  Thank you, Mr. Thau.

18             MR. THAU:  Thank you, your Honor, for indulging

19      me.

20             THE COURT:  Mr. Jafri, I'll give you the last

21      word.

22             MR. JAFRI:  Thank you, your Honor.  I'll try to be

23      quick, but just a few points.

24             First, the easiest one, which is reliance.  Again,

25      you know, Mr. Thau says that an efficient market should only

1      be gauged based on what people are assessing are the

2      fundamentals of the company.  You know, things on Twitter

3      don't count.

4              This is completely divorced from reality.  If you

5      look at, for instance, Mr. Musk, most of the information

6      that he gives about himself or his company is on Twitter.

7      No one will go and say that whatever he's saying on Twitter

8      is not absorbed into the news or that somehow whatever he

9      says there is not relevant to his company or the

10     fundamentals of his enterprises.

11             So -- and the other points are already in the

12     brief and we already discussed them.

13             I just don't think that this narrow view is either

14     realistic in terms of what actually happens in the market

15     and it certainly is not consistent with Supreme Court

16     authority, whether it's *Basic* or *Halliburton* or *Goldman*

17     *Sachs*.

18             Moving on to scienter, your Honor, there was a lot

19     of discussion about fraud and what a stringent standard it

20     is and how difficult it is.

21             We have heard this in every single case.  Still,

22     50 percent of the cases we bring move on to the next stage.

23             When it comes to *Tellabs*, yes, by all means,

24     please go ahead and take a look at it.  It says that you

25     don't need to have any smoking guns.  It says that the

1    Plaintiff does not need to plead an inference of scienter

2    that's irrefutable.

3           If you look at the concurrence in *Tellabs* by

4    Justice Alito, he concurred, but he said that the Plaintiffs

5    should be forced to meet a standard that's something

6    tantamount to summary judgment.  The majority opinion said

7    that that was never the congressional intent and that

8    basically this is a 12(b)(6) standard.  And we cannot hold

9    Plaintiffs to a standard that would basically effectively

10   require them to plead evidence without any discovery.

11          So those are the standards.  And under those

12   standards, we've pled a circumstantial case.

13          Counsel said something about the board and how the

14   complaint pled that the board was feeding him inside

15   information and engaged in insider trading and was breaching

16   its fiduciary duties.

17          We never said any of that in the complaint.

18   That's not -- those aren't the allegations.  The allegation

19   is that he had two individuals -- three individuals on the

20   board, two of them were on the strategic committee, which

21   was going to decide what to do with Buy Buy Baby.  He had a

22   cooperation agreement that said that he was prevented from

23   acting on any insider information and using it for any

24   improper purpose.  He acknowledged it.  He signed it.

25          The fact that some board member will tell him that

1    his turnaround strategy is rejected is not illegal.  It

2    doesn't mean that they have violated their fiduciary duties,

3    especially if the understanding is that Mr. Cohen is not

4    going to do anything illegal.

5           So again, this -- I'm not even sure where this

6    comes from.  But it's certainly completely off base.

7           And again, under Delaware law, you can be an

8    independent director so long as you act in the best interest

9    of the company.

10          They can give Mr. Cohen this information and still

11   act in the best interest of the company.  In fact, I would

12   go so far as to suggest the facts suggest that they did,

13   because they rejected the sale of Buy Buy Baby.

14          Now, with respect to what Mr. Cohen knows or

15   doesn't know, I don't think there's any dispute, really,

16   that Mr. Cohen soured on the business and he did not

17   disclose that fact.

18          That's the information that the investors didn't

19   know.  That's what made his statements telling everybody

20   else to buy the stock while he sold reckless.

21          And this is -- you know, it goes back to the idea

22   of knowing information or having access to information that

23   undermines your representation or shows that what you are

24   saying is misleading.  That is a classic way of pleading

25   scienter.  And that's basically what we did in our case.

1              Moving on --

2              THE COURT:  Can you talk about the moon tweet

3     again?  Why is that not just puffery?

4              MR. JAFRI:  So, your Honor, this is -- I believe

5     their argument is that anytime anyone uses an emoji, it's

6     puffery.  And that's just not the case.  I think they cited

7     some academic research that shows that this is a powerful

8     means of communication depending on which culture you're in,

9     which country you're in, which community you belong to.

10             We also cited some academic research.  We cited

11    criminal cases where the evidence, the underlying evidence,

12    was that defendants --

13             THE COURT:  So I'm less interested in kind of an

14    emoji as an emoji.  But let's say that it -- he had actually

15    written "Take it to the moon" or "The stock should be on the

16    moon" or whatever it is.  Why isn't even a simple statement

17    like that puffery rather than a factual statement to which

18    liability attaches?

19             MR. JAFRI:  So the reason why is because it's an

20    indication of his present belief that the company's stock is

21    valuable and people should buy it.  That's really what it

22    means.

23             And I think to the extent that the defense is

24    suggesting that, Well, he didn't use those specific words,

25    so therefore he couldn't mislead, that's just not the

1    standard.  I mean --

2              THE COURT:  Yes.  I agree with you there.

3              But I'm saying -- I'm just trying to figure out:

4    What do you think he said there and why is that not puffery?

5              MR. JAFRI:  Right.

6              So, your Honor, it's just not the emoji also.  He

7    also sent out a tweet where he was undermining a CNBC

8    article by an analyst who said this company is headed for a

9    dollar a share.

10             And he responded to that -- as you're aware,

11   there's a picture of a woman who's buying so much from the

12   store that her -- you know, her shopping cart is

13   overflowing.  The sarcasm that they call, you know, with

14   respect to their reference is him talking about the picture,

15   right?  He's saying, Well, you think that the stock is

16   headed for a dollar.  But look at her.  God, she's buying so

17   much.

18             And then he sends the moon emoji.  So it's just

19   not the emoji; it's also the words that he used.  And

20   there's nothing predictive about what he said.  There's

21   nothing, you know, that would suggest that he didn't mean

22   anything --

23             THE COURT:  I thought the moon is often predictive

24   in that it's like, it's going to the moon.  Isn't that a

25   predictive statement?

1          MR. JAFRI:  Well, it could be if that's what he

2     had said.  But I think in context he was basically signaling

3     that you should go and buy the stock.

4          And, your Honor, on this point, when it comes to

5     predictions, there is a safe harbor in the statute.  The

6     Private Securities Litigation Reform Act has a safe harbor

7     for forward-looking statements.  And there is a different

8     set of rules that apply to it.

9          Mr. Cohen did not invoke that safe harbor.  It's

10    not in his motion.  So to the extent that there's an issue

11    about whether these are predictions or forward-looking

12    statements, that is waived because it was never raised in

13    the motion.

14          They don't challenge that the statement is a

15    statement of his present beliefs and they never claim that

16    he was expressing opinions either; in the briefs, that is.

17    So you don't even have to consider those arguments.

18          The other two or three points that I just wanted

19    to quickly make when it comes to the substantive nature of

20    the falsity of the allegations is, counsel said that he's

21    never seen a case where you have a representation, you know,

22    a boilerplate representation six months before you actually

23    sell stock.  And you say, Well, you know, I may sell it some

24    other time.  He's never seen a case, he said, where people

25    have been found liable.

1            Actually, there is a case.  It's called *SEC versus*

2     *Thompson*.  The cite is 238 F.Supp. 375.  In that case, they

3     use this language in an earlier form and -- where they had

4     said that "We may sell."  But they already intended to sell

5     the shares.  And the district court said that's not

6     sufficient, given that you already had this plan.  So the

7     language that you used was, in fact, misleading.

8            So that's what I would say with respect to this

9     idea that, Well, you know, he told people that he, you know,

10    may sell at some indefinite time six months before so he can

11    do whatever he wants.

12            That's just not the case.  And it's not consistent

13    with the law.  Telling investors that something may happen

14    when it is likely to happen is misleading in and of itself.

15            Relatedly, your Honor, there was a lot of

16    discussion about a reasonable investor exercising due

17    diligence, due care and things of that sort.

18            This is again not consistent with Supreme Court

19    authority.  So in *Basic*, the Supreme Court said that in

20    securities fraud cases there is no buyer beware doctrine.

21    There just simply isn't a buyer beware doctrine.  Right?

22    And the idea is that reliance is presumed.

23            So we don't have to come and say, Well, all our

24    Plaintiffs relied on it if, for instance, you find that

25    there are sufficient facts to suggest that there's an

1    efficient market.  So again, these are all distractions.

2            Finally, your Honor, the other point that I wanted

3    to make is the final point:  On the Form 144, I understand

4    that they have suggested that there's this guidance out, the

5    SEC guidance, and they have pointed to it, which talked

6    about, Well, if you mail the form through the U.S. mailing

7    system, then it's fine, so long as you do it on the same

8    day.

9            I mean, that was just one instance.  It was not --

10   that guidance is not the law.  The Court is not obligated to

11   follow it.  They insist that it's the law, but it isn't.

12           There's a *Bank of America* case that we cited that

13   talks about when these guidance -- when the SEC's guidance

14   is given any weight.  And it's only to the extent that it

15   has the power to persuade.

16           Over here, this guidance says nothing about, you

17   know, this instance, for instance, all the things that we

18   discussed, where someone has sold and then omits from the

19   form and that person is using email to send the form.  I

20   mean, that guidance doesn't provide any illumination on any

21   of these points.

22           Unless you have anything further, I'd rest with

23   those points.

24           THE COURT:  Thank you, gentlemen.  I appreciate

25   your thorough briefing.

1              MR. JAFRI:  Thank you.

2              THE COURT:  And the arguments give me a lot to

3      consider.

4              I'll take this under advisement.  I'll be back to

5      you shortly.

6              (Proceedings concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **CERTIFICATE**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8

9

10                   Dated this 28th day of June, 2023.

11

12                   /s/ Lisa Edwards, RDR, CRR
                     Official Court Reporter
13                   United States District Court for the
                       District of Columbia
14                   333 Constitution Avenue, Northwest
                     Washington, D.C. 20001
15                   (202) 354-3269

16

17

18

19

20

21

22

23

24

25

**$**

**$400** [1] - 15:4
**$68** [1] - 40:11

**/**

**/s** [1] - 99:12

**1**

**1** [1] - 77:9
**10** [13] - 1:16, 13:16, 13:17, 18:11, 32:10, 33:17, 36:19, 39:15, 42:11, 42:16, 42:17, 44:5, 56:21
**10(b** [2] - 53:23, 85:18
**10(b)** [1] - 38:16
**10-Q** [3] - 57:6, 60:6
**10006** [1] - 2:7
**10036** [1] - 2:4
**10165** [1] - 1:24
**10:00** [1] - 65:10
**10:12** [1] - 65:9
**10:14** [1] - 65:9
**10b** [1] - 54:1
**10b-5** [5] - 29:2, 46:19, 53:6, 54:4, 85:24
**11.8** [4] - 56:22, 57:3, 57:8, 85:9
**1100** [1] - 1:20
**1114** [1] - 2:3
**11:30** [1] - 65:10
**12** [2] - 77:20
**12(b** [1] - 68:10
**12(b)** [2] - 5:2, 89:11
**12(b)(6** [4] - 70:11, 71:3, 79:4, 91:8
**12(b)(6)** [1] - 88:4
**12th** [3] - 75:8, 75:14, 77:11
**13** [3] - 17:3, 32:7, 53:16
**13(d** [11] - 17:24, 18:20, 18:21, 52:14, 52:22, 53:5, 53:13, 53:17, 53:18, 54:3, 57:23
**13(d)** [1] - 53:4
**13D** [53] - 16:25, 18:1, 18:24, 28:6, 36:15, 36:16, 36:21, 37:6, 37:14, 38:6, 38:13, 39:20, 42:3, 53:20, 53:21, 53:25,

55:2, 55:11, 55:24, 56:19, 56:20, 58:4, 58:8, 58:9, 58:12, 58:22, 59:9, 59:11, 59:12, 64:9, 66:10, 66:19, 69:18, 69:24, 70:21, 72:7, 79:22, 82:8, 82:18, 82:20, 83:4, 83:11, 83:17, 83:21, 84:3, 84:5, 84:16, 84:22, 84:25, 85:9
**13Ds** [1] - 18:13
**144** [26] - 8:3, 8:11, 9:2, 11:19, 12:2, 19:12, 23:10, 24:25, 26:11, 28:24, 37:17, 42:4, 47:16, 48:7, 65:4, 66:2, 66:6, 66:8, 66:21, 71:6, 82:9, 83:23, 83:25, 84:11, 85:12, 97:3
**15** [3] - 88:23, 89:1, 89:4
**15th** [1] - 39:13
**16** [4] - 58:23, 67:19, 83:1, 83:8
**16th** [14] - 20:4, 20:10, 21:16, 38:11, 56:22, 59:23, 64:12, 64:14, 64:18, 66:18, 67:4, 70:23, 74:15, 82:24
**17th** [1] - 20:8
**18** [2] - 17:3, 31:22
**18(a** [1] - 18:2
**18(a)** [1] - 53:23
**1800** [3] - 9:9, 9:16
**18th** [4] - 37:4, 37:15, 37:18, 38:12
**194** [1] - 14:9
**195** [1] - 14:10

**2**

**2** [2] - 29:7, 77:10
**20001** [2] - 2:12, 99:14
**20005** [1] - 1:21
**202** [2] - 2:12, 99:15
**2023** [2] - 1:7, 99:10
**22-02541** [1] - 1:4
**22-2541** [1] - 3:2
**238** [1] - 96:2
**24** [2] - 10:12, 25:23
**24-hour** [4] - 6:8, 26:1, 26:2, 26:7
**25** [2] - 13:18, 14:1
**26** [1] - 1:7

**28th** [1] - 99:10
**2:42** [1] - 1:7

**3**

**3** [4] - 39:14, 39:23, 43:17, 43:22
**30** [9] - 64:12, 64:13, 64:14, 67:4, 68:7, 70:22, 83:9, 83:22, 84:15
**32nd** [1] - 2:4
**333** [2] - 2:11, 99:14
**3505** [1] - 1:17
**354-3269** [2] - 2:12, 99:15
**375** [1] - 96:2
**3C** [1] - 65:22

**4**

**4** [1] - 19:1
**42nd** [1] - 1:23
**4600** [1] - 1:24

**5**

**5** [1] - 16:13
**50** [1] - 90:22

**6**

**60** [1] - 1:23
**60603** [1] - 1:17
**6706** [1] - 2:11
**6:00** [4] - 20:6, 20:8, 20:17, 21:16

**7**

**7th** [1] - 58:7

**8**

**8** [1] - 37:19

**9**

**9** [1] - 23:24
**9(a)(2** [1] - 40:19
**9(a)(3** [3] - 42:23, 86:3, 86:12
**9(a)(4** [3] - 42:15, 42:18, 85:18
**9(b** [5] - 56:4, 57:16,

62:20, 70:12, 73:14
**9(b)** [1] - 62:14
**9.8** [1] - 57:3

**A**

**a.m** [3] - 20:6, 20:8, 21:16
**ability** [1] - 99:7
**able** [1] - 25:12
**absence** [1] - 48:20
**absolute** [2] - 44:3, 53:22
**absorbed** [3] - 17:14, 32:18, 90:8
**academic** [4] - 15:19, 15:21, 93:7, 93:10
**accepting** [3] - 51:23, 52:2, 89:8
**access** [3] - 33:17, 34:2, 92:22
**according** [3] - 24:20, 74:14, 77:18
**accounting** [1] - 34:22
**accurate** [6] - 10:22, 10:24, 19:25, 20:3, 79:22, 99:4
**accurately** [2] - 46:25, 50:12
**acknowledge** [1] - 53:1
**acknowledged** [1] - 91:24
**acknowledging** [2] - 46:5, 46:13
**Act** [2] - 17:4, 95:6
**act** [17] - 18:2, 28:2, 39:5, 39:25, 40:3, 40:5, 40:9, 40:10, 74:4, 74:11, 74:13, 74:16, 74:17, 74:21, 85:4, 92:8, 92:11
**acting** [1] - 91:23
**action** [6] - 53:14, 54:1, 56:25, 57:25, 58:2, 73:11
**Action** [2] - 1:3, 3:2
**actionable** [7] - 17:1, 17:19, 18:14, 36:2, 37:14, 37:16, 37:17
**actions** [1] - 69:8
**activities** [1] - 10:16
**activity** [1] - 69:23
**actor** [1] - 74:7
**acts** [6] - 22:16, 28:2, 28:4, 29:3, 30:17, 74:12

**actual** [3] - 38:2, 41:11
**add** [1] - 36:16
**adding** [1] - 40:23
**additional** [1] - 21:1
**addressed** [1] - 49:25
**addressing** [1] - 26:5
**Administration** [1] - 89:6
**admitted** [2] - 13:18, 14:8
**advisement** [1] - 98:4
**Advisory** [1] - 88:23
**affected** [1] - 80:24
**Affiliated** [2] - 35:6, 81:19
**affiliation** [2] - 61:11, 61:12
**Affilitated** [8] - 34:10, 34:12, 34:20, 34:25, 35:14, 35:17, 35:24, 82:1
**afternoon** [16] - 3:6, 3:8, 3:9, 3:11, 3:12, 3:14, 3:15, 3:17, 3:18, 3:21, 3:22, 3:24, 3:25, 4:3, 4:4, 4:7
**afterwards** [3] - 5:19, 21:10, 77:18
**agree** [15] - 5:16, 8:7, 28:12, 30:6, 34:18, 34:24, 36:6, 38:19, 41:17, 45:24, 47:14, 64:18, 75:10, 87:3, 94:2
**agreed** [1] - 6:1
**agreeing** [2] - 34:6, 60:9
**agreement** [21] - 6:1, 7:16, 10:25, 11:1, 11:15, 15:3, 46:1, 46:5, 46:10, 46:21, 47:5, 48:9, 48:16, 48:17, 49:2, 49:23, 50:15, 50:16, 61:6, 61:8, 91:22
**ahead** [1] - 90:24
**al** [1] - 3:3
**Alito** [1] - 91:4
**allegation** [6] - 61:18, 63:7, 63:8, 68:19, 79:18, 91:18
**allegations** [16] - 6:17, 13:25, 22:8, 23:9, 45:20, 61:4, 61:25, 62:21, 73:1, 73:15, 79:6, 79:7, 82:18, 89:9, 91:18,

95:20
 **allege** [2] - 29:1, 38:24
 **alleged** [6] - 35:22, 37:3, 39:24, 60:22, 75:2, 75:7
 **allegedly** [1] - 53:20
 **alleging** [1] - 73:16
 **allow** [1] - 13:12
 **allowed** [2] - 22:10, 27:1
 **allowing** [1] - 53:22
 **alluded** [1] - 56:19
 **almost** [2] - 49:4, 49:18
 **alone** [1] - 48:19
 **altered** [1] - 72:13
 **alternative** [5] - 34:10, 34:12, 69:25, 81:20, 83:1
 **ambiguity** [1] - 65:21
 **ambiguous** [1] - 15:16
 **America** [1] - 97:12
 **American** [1] - 56:11
 **Americas** [1] - 2:3
 **amount** [2] - 21:5, 24:8
 **amounts** [2] - 43:14, 43:15
 **analogize** [1] - 25:13
 **analogy** [1] - 12:25
 **analysis** [6] - 18:10, 36:3, 47:10, 53:10, 60:10, 65:8
 **analyst** [1] - 94:8
 **analysts** [2] - 31:23, 60:9
 **analyzed** [1] - 40:2
 **AND** [1] - 2:2
 **announce** [1] - 23:1
 **announced** [1] - 82:9
 **answer** [4] - 48:24, 48:25, 49:1, 52:23
 **answered** [1] - 48:24
 **Antonelli** [2] - 4:1, 4:3
 **ANTONELLI** [2] - 2:2, 3:25
 **anytime** [1] - 93:5
 **anyway** [3] - 23:11, 45:24, 83:5
 **apologize** [1] - 85:6
 **appear** [1] - 26:11
 **APPEARANCES** [1] - 2:1
 **aPPEARANCES** [1] - 1:13
 **applied** [1] - 47:2
 **applies** [3] - 35:14,

42:22, 86:10
 **apply** [8] - 35:17, 38:17, 43:11, 43:12, 43:13, 43:17, 43:19, 95:8
 **appreciate** [4] - 15:24, 87:24, 88:9, 97:24
 **approach** [1] - 33:3
 **arbitrage** [1] - 32:1
 **arguably** [2] - 23:12, 82:20
 **argue** [4] - 38:17, 42:21, 78:22, 82:16
 **arguing** [7] - 4:17, 21:14, 34:9, 43:3, 43:16, 80:4, 81:2
 **argument** [20] - 36:14, 38:8, 38:9, 41:5, 42:13, 43:8, 43:18, 44:10, 50:9, 51:21, 51:24, 52:14, 70:24, 77:1, 79:24, 80:20, 82:14, 84:14, 85:23, 93:5
 **arguments** [2] - 95:17, 98:2
 **arise** [1] - 47:18
 **arrived** [1] - 68:13
 **article** [8] - 8:19, 9:14, 11:24, 47:19, 48:2, 63:17, 75:16, 94:8
 **artificial** [1] - 41:24
 **aside** [1] - 45:21
 **assertion** [1] - 82:20
 **assessing** [1] - 90:1
 **asset** [2] - 15:1, 15:4
 **assist** [1] - 66:22
 **Association** [2] - 88:23, 89:5
 **assuming** [1] - 51:23
 **asterisk** [1] - 12:16
 **attached** [2] - 75:16, 84:19
 **attaches** [1] - 93:18
 **attempts** [1] - 41:15
 **attention** [1] - 52:15
 **attributed** [1] - 47:9
 **attributing** [1] - 47:9
 **August** [24] - 16:13, 21:16, 28:9, 37:4, 37:15, 38:11, 56:22, 58:23, 59:23, 64:11, 64:14, 64:18, 66:18, 67:4, 67:19, 70:23, 74:15, 75:14, 77:11, 77:19, 77:20, 82:24, 83:1, 83:8
 **authority** [8] - 47:13,

51:11, 53:2, 53:5, 54:19, 65:1, 90:16, 96:19
 **available** [6] - 53:6, 60:2, 60:13, 60:14, 64:8, 70:21
 **Avenue** [4] - 1:20, 2:3, 2:11, 99:14
 **average** [2] - 63:1, 63:5
 **aware** [1] - 94:10
 **Azurite** [2] - 54:21, 64:2
 **AZURITE** [1] - 54:21

**B**

 **Baby** [4] - 15:1, 15:8, 91:21, 92:13
 **backed** [1] - 44:7
 **backtrack** [1] - 13:23
 **bad** [18] - 49:7, 50:5, 56:13, 60:4, 60:7, 60:12, 62:24, 67:3, 72:21, 72:23, 73:1, 74:6, 77:13, 78:3, 80:16
 **badly** [1] - 32:21
 **baloney** [1] - 22:1
 **Bank** [1] - 97:12
 **bankruptcy** [2] - 10:15, 72:18
 **bar** [1] - 53:22
 **bare** [1] - 31:9
 **bare-bones** [1] - 31:9
 **barrier** [1] - 26:6
 **base** [1] - 92:6
 **based** [21] - 27:23, 34:14, 34:16, 38:9, 43:4, 43:5, 48:24, 58:9, 67:5, 67:24, 68:3, 68:8, 70:20, 70:25, 78:23, 79:6, 82:8, 85:16, 86:8, 87:14, 90:1
 **basic** [1] - 57:21
 **Basic** [2] - 90:16, 96:19
 **basis** [5] - 5:25, 7:3, 7:13, 14:18, 16:6
 **BATH** [1] - 1:4
 **Bath** [35] - 3:2, 4:14, 4:15, 10:2, 11:2, 35:13, 36:5, 36:6, 36:10, 45:19, 47:22, 50:23, 51:2, 56:23, 56:24, 57:6, 60:6, 60:9, 61:7, 61:12,

62:25, 64:16, 67:3, 68:3, 72:16, 72:24, 73:17, 75:17, 77:13, 78:4, 80:16, 82:7, 82:14, 83:19
 **Bath's** [7] - 4:5, 58:10, 58:19, 60:1, 60:4, 60:17, 82:18
 **BED** [1] - 1:4
 **Bed** [42] - 3:2, 4:5, 4:14, 4:15, 10:2, 11:2, 35:13, 36:5, 36:6, 36:10, 45:19, 47:22, 50:23, 51:2, 56:23, 56:24, 57:6, 58:10, 58:19, 60:1, 60:4, 60:6, 60:9, 60:17, 61:7, 61:12, 62:25, 64:16, 67:3, 68:3, 72:16, 72:24, 73:17, 75:17, 77:13, 78:3, 80:16, 82:7, 82:14, 82:18, 83:19
 **BEFORE** [1] - 1:11
 **beg** [2] - 76:18, 88:19
 **begin** [1] - 77:17
 **behalf** [1] - 4:5
 **behind** [1] - 17:13
 **belief** [1] - 93:20
 **beliefs** [1] - 95:15
 **belong** [1] - 93:9
 **benefit** [2] - 23:13, 88:3
 **beseech** [1] - 62:18
 **best** [8] - 6:4, 24:16, 24:22, 75:8, 81:14, 92:8, 92:11, 99:7
 **better** [4] - 10:1, 53:5, 54:5, 62:7
 **between** [4] - 23:15, 61:7, 61:19, 85:19
 **beware** [2] - 96:20, 96:21
 **beyond** [4] - 14:14, 14:17, 39:1, 86:22
 **BEYOND** [1] - 1:4
 **Beyond** [7] - 3:2, 4:14, 11:2, 36:5, 36:7, 45:19, 62:25
 **bids** [2] - 41:14, 41:24
 **big** [3] - 33:22, 57:19, 87:12
 **biggest** [1] - 57:7
 **bit** [1] - 38:15
 **blank** [1] - 21:7
 **blindly** [1] - 9:17
 **block** [5] - 16:8, 16:12, 28:13, 28:19,

75:6
 **blocks** [3] - 28:13, 55:3, 75:5
 **blue** [1] - 16:22
 **Board** [1] - 88:23
 **board** [8] - 60:22, 61:9, 61:11, 61:19, 91:13, 91:14, 91:20, 91:25
 **body** [1] - 87:23
 **body's** [1] - 64:21
 **boilerplate** [3] - 58:13, 58:16, 95:22
 **bolstered** [1] - 30:18
 **bones** [1] - 31:9
 **bore** [1] - 71:17
 **bought** [3] - 33:23, 58:6, 61:6
 **box** [2] - 29:5, 29:6
 **Boykin** [2] - 59:3, 77:3
 **breach** [4] - 61:16, 61:17, 63:22, 70:15
 **breach-of-contract** [1] - 70:15
 **breaching** [1] - 91:15
 **brief** [12] - 8:5, 13:18, 13:19, 18:15, 18:22, 31:13, 41:7, 45:12, 62:1, 73:4, 88:24, 90:12
 **briefing** [8] - 4:9, 53:2, 69:10, 76:5, 78:10, 81:15, 88:17, 97:25
 **briefly** [3] - 33:1, 45:6, 74:1
 **briefs** [8] - 6:23, 15:15, 16:17, 29:19, 33:12, 81:12, 87:25, 95:16
 **bring** [2] - 54:3, 90:22
 **bringing** [1] - 57:15
 **broad** [1] - 61:25
 **broader** [2] - 27:19, 87:19
 **broker** [8] - 24:2, 43:4, 44:9, 86:7, 86:10, 86:21, 87:11, 87:14
 **broker-dealer** [2] - 86:10, 86:21
 **brokers** [4] - 42:21, 42:22, 42:25, 43:11
 **Bronstein** [1] - 3:19
 **BRONSTEIN** [1] - 1:23
 **brought** [2] - 18:3, 53:3

**buck** [1] - 75:19
**buddies** [1] - 61:9
**building** [7] - 16:7, 16:12, 28:13, 28:19, 55:3, 75:4, 75:5
**bullet** [1] - 29:2
**bump** [1] - 6:8
**bunch** [2] - 50:4, 52:12
**burden** [6] - 47:2, 57:14, 70:12, 70:14, 71:4, 73:24
**burn** [1] - 60:18
**burning** [1] - 60:8
**business** [15] - 13:19, 14:3, 14:9, 14:11, 14:13, 43:2, 43:7, 43:14, 86:6, 86:16, 86:17, 86:22, 87:7, 87:18, 92:16
**busy** [2] - 83:13, 84:10
**button** [1] - 24:1
**Buy** [8] - 14:25, 15:8, 91:21, 92:13
**buy** [13] - 15:12, 16:14, 23:4, 43:9, 56:24, 57:1, 57:2, 57:7, 87:18, 92:20, 93:21, 95:3
**buy-back** [3] - 56:24, 57:2, 57:7
**buyer** [2] - 96:20, 96:21
**buying** [2] - 94:11, 94:16
**buys** [1] - 33:19
**BY** [1] - 2:9

**C**

**C-E-L-C-O** [1] - 89:2
**cabined** [1] - 44:19
**calculations** [1] - 35:24
**cannot** [8] - 4:22, 34:24, 38:25, 39:2, 39:6, 40:15, 82:17, 91:8
**capture** [1] - 87:13
**capturing** [1] - 44:14
**care** [11] - 31:13, 59:5, 59:7, 72:4, 72:6, 77:3, 77:4, 78:2, 78:4, 84:22, 96:17
**careful** [1] - 49:3
**cart** [6] - 74:24, 75:21, 75:22, 76:9, 77:5, 94:12

**cartoon** [2] - 15:17, 75:23
**case** [63] - 4:9, 4:13, 4:18, 5:15, 7:2, 7:12, 13:15, 14:19, 15:19, 15:21, 24:16, 24:22, 27:9, 31:17, 36:4, 38:17, 38:25, 39:7, 41:2, 41:7, 41:12, 42:10, 51:13, 51:14, 51:24, 52:3, 53:9, 53:17, 54:21, 55:6, 56:11, 56:12, 58:15, 59:3, 70:12, 70:16, 71:3, 71:4, 71:10, 71:20, 71:22, 73:10, 79:12, 88:5, 88:10, 88:16, 88:21, 88:22, 89:13, 90:21, 91:12, 92:25, 93:6, 95:21, 95:24, 96:1, 96:2, 96:12, 97:12
**cases** [19] - 12:16, 15:11, 17:2, 18:12, 18:17, 18:22, 25:1, 28:1, 31:9, 31:14, 41:3, 41:10, 53:21, 74:6, 78:9, 88:25, 90:22, 93:11, 96:20
**cash** [2] - 60:8, 60:18
**cast** [1] - 89:9
**catch** [1] - 65:16
**causation** [6] - 31:3, 37:5, 37:8, 55:8, 57:17, 82:17
**caused** [2] - 36:16, 80:25
**Celco** [1] - 89:2
**CEO** [5] - 4:5, 46:6, 46:7, 46:16
**CEOs** [1] - 47:3
**certain** [8] - 22:16, 24:3, 29:2, 39:11, 74:22, 77:20, 77:21, 77:23
**certainly** [9] - 6:12, 6:15, 18:23, 66:7, 68:16, 72:9, 79:4, 90:15, 92:6
**CERTIFICATE** [1] - 99:1
**certification** [1] - 33:6
**certify** [1] - 99:4
**CFO** [4] - 60:23, 62:23, 63:11, 63:13
**challenge** [2] - 17:16, 95:14
**challenged** [1] - 45:19

**chance** [1] - 40:21
**change** [1] - 49:18
**changed** [1] - 14:9
**charge** [1] - 22:15
**charged** [1] - 74:4
**chart** [1] - 21:4
**check** [5] - 7:18, 8:1, 48:9, 51:12, 77:19
**cheek** [1] - 84:9
**Chewy** [2] - 73:6, 73:12
**Chicago** [1] - 1:17
**choice** [1] - 10:19
**CHRISTOPHER** [1] - 1:15
**Christopher** [2] - 3:13, 5:12
**circuit** [2] - 54:20, 88:25
**Circuit** [21] - 17:25, 18:4, 18:17, 18:23, 38:19, 38:21, 39:5, 39:7, 52:17, 52:22, 52:24, 54:17, 54:18, 56:9, 59:3, 64:1, 70:3, 74:11, 77:2, 88:24, 89:4
**circumstances** [2] - 44:2, 58:20
**circumstantial** [4] - 57:10, 57:14, 57:20, 91:12
**cite** [6] - 51:13, 51:14, 53:2, 70:6, 88:16, 96:2
**cited** [14] - 12:16, 18:22, 24:24, 31:9, 32:25, 39:8, 41:7, 41:10, 50:21, 93:6, 93:10, 97:12
**Civil** [2] - 1:3, 3:1
**civil** [2] - 22:15, 56:11
**claim** [32] - 17:10, 17:24, 28:20, 29:1, 31:19, 39:6, 40:7, 40:19, 42:16, 42:17, 44:12, 52:22, 52:25, 53:3, 53:5, 53:6, 53:10, 53:13, 54:3, 54:4, 54:5, 57:15, 59:15, 72:1, 73:5, 79:21, 81:7, 82:18, 85:18, 88:6, 95:15
**claimed** [1] - 19:7
**claims** [12] - 13:9, 13:11, 13:16, 13:17, 18:11, 27:22, 34:23, 35:8, 35:13, 36:10, 59:15

**clairvoyance** [1] - 67:14
**clarification** [1] - 53:18
**class** [1] - 25:19
**classic** [1] - 92:24
**clear** [5] - 12:15, 19:2, 24:20, 33:12, 40:15
**clearcut** [1] - 31:16
**clearly** [6] - 16:2, 28:7, 33:17, 46:17, 48:15, 52:24
**Cleary** [2] - 4:5, 45:9
**CLEARY** [1] - 2:6
**client** [3] - 82:21, 84:17, 87:7
**Cliff** [2] - 3:22, 64:24
**CLIFFORD** [1] - 2:2
**close** [1] - 25:6
**closed** [2] - 22:7, 26:22
**closer** [1] - 52:20
**CNBC** [3] - 8:19, 11:24, 94:7
**cogent** [8] - 14:2, 59:20, 61:13, 69:5, 70:19, 85:13, 85:15, 88:14
**Cohen** [83] - 3:16, 3:23, 4:1, 4:16, 4:25, 6:6, 6:24, 7:16, 8:14, 10:4, 10:16, 11:2, 11:14, 12:12, 13:9, 13:11, 13:18, 14:8, 23:3, 33:15, 34:1, 36:23, 38:16, 39:14, 40:11, 42:17, 43:12, 43:13, 43:21, 44:4, 44:19, 49:14, 50:17, 54:14, 55:1, 55:12, 55:23, 56:20, 56:25, 57:1, 57:7, 58:6, 58:17, 59:23, 59:24, 60:12, 60:16, 61:6, 61:7, 61:11, 61:20, 61:23, 62:7, 62:17, 67:10, 67:12, 67:13, 69:7, 69:12, 69:16, 69:22, 70:5, 70:20, 70:25, 73:2, 73:5, 73:11, 74:14, 75:21, 77:15, 79:8, 80:2, 83:16, 84:10, 85:5, 86:6, 86:11, 92:3, 92:10, 92:14, 92:16, 95:9
**COHEN** [2] - 1:19, 2:2
**Cohen's** [4] - 7:10,

47:20, 51:18, 56:12
**collateral** [1] - 15:1
**Columbia** [2] - 2:10, 99:13
**COLUMBIA** [1] - 1:1
**combination** [1] - 21:12
**comfortable** [1] - 81:11
**coming** [1] - 54:19
**comment** [4] - 47:22, 48:2, 48:6, 88:1
**comments** [1] - 50:19
**commit** [1] - 6:11
**committee** [1] - 91:20
**common** [1] - 49:4
**commonsensical** [1] - 80:7
**communicating** [1] - 15:23
**communication** [1] - 93:8
**community** [2] - 46:25, 93:9
**companies** [4] - 33:24, 43:10, 44:5, 74:7
**company** [37] - 7:21, 9:12, 10:14, 14:25, 16:15, 17:8, 32:22, 33:19, 33:21, 35:18, 35:21, 35:23, 46:7, 46:17, 46:23, 46:24, 48:8, 48:14, 50:13, 50:14, 50:16, 51:11, 69:15, 72:18, 74:24, 74:25, 75:9, 90:2, 90:6, 90:9, 92:9, 92:11, 94:8
**company's** [2] - 31:13, 93:20
**compelling** [2] - 59:20, 88:14
**competing** [2] - 52:4, 64:7
**complaining** [1] - 17:25
**complaint** [37] - 4:22, 5:23, 5:25, 9:6, 9:7, 11:25, 12:11, 13:25, 18:7, 19:15, 26:20, 28:16, 31:24, 32:1, 34:14, 34:15, 35:5, 37:2, 37:9, 51:25, 54:25, 55:15, 55:25, 59:14, 61:5, 61:22, 62:8, 62:18, 62:19, 69:11, 75:8,

77:18, 79:2, 85:21, 89:6, 91:14, 91:17
**complete** [3] - 19:7, 78:23, 99:6
**completely** [3] - 69:6, 90:4, 92:6
**compliance** [1] - 13:2
**complicated** [1] - 84:4
**computer** [1] - 23:18
**conceded** [4] - 6:23, 7:13, 51:21, 51:22
**conceivable** [3] - 62:1, 62:3, 63:8
**concept** [1] - 88:13
**concession** [2] - 7:2, 13:5
**conclude** [2] - 28:17, 32:3
**concluded** [1] - 98:6
**conclusion** [3] - 14:23, 68:14, 73:23
**conclusions** [2] - 15:15, 89:9
**concrete** [2] - 76:4, 76:23
**concurred** [1] - 91:4
**concurrence** [1] - 91:3
**concurrently** [5] - 65:3, 65:5, 65:11, 66:4, 84:12
**condition** [2] - 60:5, 60:18
**conditions** [8] - 58:10, 58:11, 60:2, 60:7, 67:6, 68:3, 72:24, 79:25
**conduct** [9] - 63:23, 72:21, 73:1, 78:19, 80:2, 85:16
**confirmation** [1] - 16:21
**congressional** [1] - 91:7
**conjunction** [1] - 30:16
**connection** [1] - 37:15
**consider** [6] - 34:3, 34:19, 50:2, 62:11, 95:17, 98:3
**consideration** [1] - 30:22
**considerations** [1] - 83:19
**considered** [1] - 31:11
**considering** [1] -

62:10
**consistent** [11] - 14:4, 14:10, 17:12, 17:22, 70:8, 83:9, 84:23, 86:20, 90:15, 96:12, 96:18
**conspiracy** [2] - 8:7, 22:15
**constitutes** [1] - 99:4
**Constitution** [2] - 2:11, 99:14
**construction** [2] - 77:8, 86:4
**constructive** [13] - 8:24, 8:25, 9:13, 10:25, 11:1, 11:15, 12:6, 48:9, 48:10, 48:15, 48:17, 49:2, 49:24
**construe** [3] - 77:5, 78:5, 89:6
**construed** [2] - 43:11, 88:18
**construes** [1] - 66:2
**CONT'D** [1] - 2:1
**contained** [1] - 82:12
**contains** [2] - 17:20, 82:8
**contest** [1] - 17:17
**contested** [1] - 56:24
**context** [9] - 9:4, 11:12, 12:4, 12:15, 17:5, 27:19, 28:5, 47:15, 95:2
**continuing** [1] - 49:12
**contract** [1] - 70:15
**contrary** [3] - 67:8, 69:2, 80:2
**control** [2] - 10:20, 44:6
**conversations** [2] - 60:23, 62:22
**convince** [5] - 15:7, 40:21, 69:12, 70:10, 78:24
**convinced** [1] - 28:14
**cooperation** [3] - 61:6, 61:8, 91:22
**corporate** [2] - 49:6, 64:25
**Corporation** [1] - 3:3
**CORPORATION** [1] - 1:5
**correct** [11] - 16:9, 19:8, 19:21, 20:22, 27:1, 34:21, 36:12, 43:5, 43:24, 54:10, 83:3

**corrective** [5] - 37:3, 37:8, 37:10, 37:11, 37:18
**correctly** [2] - 35:16, 66:12
**counsel** [10] - 3:4, 5:18, 52:19, 55:4, 58:25, 60:16, 66:22, 73:7, 91:13, 95:20
**count** [8] - 16:6, 28:23, 28:25, 35:12, 35:20, 35:23, 75:12, 90:3
**counter** [3] - 67:9, 67:11, 79:21
**countervailing** [1] - 70:24
**country** [1] - 93:9
**counts** [1] - 5:2
**County** [1] - 88:22
**couple** [6] - 4:10, 22:3, 22:5, 45:16, 62:24, 71:16
**couple-minute** [1] - 71:16
**course** [6] - 43:2, 43:20, 85:11, 86:16, 86:20
**Court** [28] - 2:9, 2:10, 12:25, 13:1, 14:21, 17:12, 18:10, 25:25, 32:24, 33:1, 35:8, 53:7, 53:24, 56:9, 59:18, 70:13, 70:18, 71:10, 80:21, 88:22, 90:15, 96:18, 96:19, 97:10, 99:12, 99:13
**COURT** [152] - 1:1, 3:8, 3:11, 3:14, 3:17, 3:21, 3:24, 4:3, 4:7, 5:13, 5:16, 6:2, 7:5, 7:15, 10:1, 10:7, 10:24, 11:5, 11:21, 13:10, 13:14, 15:7, 16:5, 16:11, 17:24, 18:15, 18:17, 18:20, 19:19, 19:22, 20:5, 20:9, 20:20, 21:1, 21:8, 21:14, 21:20, 21:24, 22:10, 22:18, 23:7, 24:12, 25:3, 26:10, 26:23, 27:1, 27:6, 27:13, 28:12, 28:23, 29:5, 29:9, 30:6, 31:4, 32:5, 32:12, 34:8, 34:18, 34:22, 35:2, 35:7, 35:12, 35:19, 36:5, 36:9, 36:13, 38:15, 40:18, 41:13, 42:8,

42:23, 43:3, 43:16, 43:22, 44:11, 44:22, 45:2, 45:6, 45:11, 45:23, 46:20, 47:14, 47:24, 48:7, 49:3, 49:16, 50:2, 51:4, 52:7, 52:10, 52:19, 55:16, 55:20, 56:4, 57:9, 60:21, 60:25, 62:22, 63:10, 63:14, 64:17, 66:10, 66:14, 66:17, 67:18, 68:10, 71:9, 71:13, 74:18, 74:23, 75:10, 75:24, 76:11, 76:15, 76:17, 76:19, 77:17, 79:9, 79:12, 80:4, 80:19, 81:14, 81:20, 81:22, 81:25, 82:16, 82:25, 83:4, 83:11, 83:13, 84:13, 85:2, 85:17, 85:22, 85:25, 86:2, 86:12, 86:14, 86:23, 87:3, 87:13, 87:20, 88:9, 89:10, 89:17, 89:20, 93:2, 93:13, 94:2, 94:23, 97:24, 98:2
**court** [4] - 53:9, 65:17, 89:13, 96:5
**Court's** [1] - 45:14
**COURTROOM** [1] - 3:1
**Courts** [1] - 18:13
**courts** [3] - 78:14, 88:18, 89:6
**covered** [1] - 31:23
**covers** [1] - 43:23
**crashing** [1] - 77:12
**create** [4] - 7:23, 12:18, 24:8, 46:15
**created** [2] - 42:13, 84:17
**creating** [3] - 8:8, 22:23, 51:2
**creation** [1] - 65:5
**credible** [1] - 41:4
**credit** [4] - 9:15, 15:3, 61:1, 71:3
**crediting** [1] - 68:20
**criminal** [1] - 93:11
**critical** [2] - 11:12, 71:15
**CRR** [3] - 2:9, 99:3, 99:12
**culture** [1] - 93:8
**current** [2] - 48:18, 48:19

---

# D

**D.C** [7] - 1:6, 1:21, 2:12, 88:24, 89:4, 89:13, 99:14
**damage** [1] - 10:19
**damages** [6] - 17:7, 18:1, 26:1, 53:19, 53:23, 54:1
**data** [1] - 19:16
**date** [2] - 37:22, 82:21
**dated** [1] - 11:6
**Dated** [1] - 99:10
**daylight** [1] - 85:19
**days** [2] - 16:19, 25:21
**dead** [1] - 63:13
**deal** [1] - 83:16
**dealer** [6] - 43:4, 44:10, 86:7, 86:10, 86:21, 87:10, 87:11, 87:14
**dealers** [3] - 42:22, 42:25, 43:11
**dealing** [5] - 56:7, 58:3, 59:19, 67:1
**death** [1] - 59:14
**decade** [1] - 80:12
**deceive** [3] - 59:16, 66:8, 69:1
**decide** [3] - 83:1, 85:11, 91:21
**decided** [3] - 23:4, 68:14, 83:8
**decides** [2] - 60:20, 83:22
**decision** [10] - 53:7, 59:6, 59:18, 62:24, 64:2, 64:14, 72:12, 84:10, 89:16
**decisions** [4] - 58:10, 58:19, 68:3, 83:18
**declare** [1] - 10:15
**defective** [1] - 53:20
**Defendant** [5] - 10:4, 25:20, 74:4, 82:21, 88:13
**DEFENDANT** [1] - 2:6
**Defendants** [19] - 4:25, 6:6, 7:16, 9:15, 16:3, 32:20, 38:1, 38:16, 40:4, 41:10, 42:21, 55:1, 55:13, 55:23, 57:1, 58:6, 58:17, 59:24, 74:14
**defendants** [1] -

93:12
**DEFENDANTS** [1] - 2:2
**Defendants'** [1] - 36:14
**defense** [3] - 19:22, 31:15, 93:23
**definite** [14] - 54:22, 55:1, 55:13, 55:14, 55:17, 55:21, 55:23, 56:2, 57:10, 66:15, 66:16, 66:20, 70:3
**definition** [2] - 32:25, 86:24
**definitive** [1] - 82:24
**defraud** [2] - 16:8, 28:14
**Delaware** [1] - 92:7
**delaying** [1] - 6:4
**deny** [1] - 85:17
**DEPUTY** [1] - 3:1
**derivative** [1] - 18:7
**destructive** [1] - 27:17
**details** [1] - 15:2
**determination** [1] - 59:20
**determining** [1] - 47:11
**detract** [1] - 80:24
**difference** [2] - 23:15, 71:21
**different** [19] - 21:20, 21:21, 26:2, 26:17, 29:3, 30:21, 36:23, 41:18, 44:9, 49:19, 59:19, 63:7, 67:25, 69:6, 69:14, 69:15, 72:20, 88:7, 95:7
**difficult** [3] - 37:25, 39:22, 90:20
**digested** [3] - 60:1, 64:8, 80:10
**digests** [1] - 60:13
**diligence** [1] - 96:17
**directly** [2] - 24:25, 49:8
**director** [2] - 61:23, 92:8
**directors** [4] - 61:17, 62:7, 63:9, 63:11
**disagree** [1] - 30:12
**disagreed** [1] - 34:22
**disclose** [5] - 19:5, 28:8, 54:11, 54:23, 92:17
**disclosed** [12] - 26:18, 30:25, 32:10, 32:11, 39:14, 39:20, 42:11, 46:22, 64:15,

67:5, 80:9, 82:7
**discloses** [1] - 46:24
**disclosing** [1] - 30:14
**disclosure** [8] - 37:11, 46:12, 46:13, 46:16, 51:13, 54:22, 58:22, 83:9
**disclosures** [11] - 37:3, 37:8, 37:10, 37:18, 46:7, 46:12, 47:7, 47:8, 47:10
**discovery** [2] - 68:19, 91:10
**discuss** [3] - 5:11, 16:18, 18:24
**discussed** [7] - 19:4, 28:25, 29:10, 33:1, 34:17, 90:12, 97:18
**discussion** [5] - 30:21, 47:15, 53:12, 90:19, 96:16
**dismal** [2] - 80:1, 82:13
**dismiss** [8] - 7:8, 16:16, 31:12, 35:22, 36:1, 57:22, 85:17, 89:7
**dismissed** [2] - 31:15, 35:17
**dismisses** [1] - 35:8
**Disney** [1] - 18:7
**disparages** [1] - 33:20
**dispositive** [1] - 54:8
**disproved** [1] - 68:19
**dispute** [5] - 19:1, 19:3, 29:23, 42:15, 92:15
**disputed** [2] - 60:3, 64:11
**disregards** [1] - 33:16
**disrespect** [1] - 72:17
**disseminated** [1] - 32:17
**dissertation** [1] - 71:17
**distraction** [1] - 20:12
**distractions** [1] - 97:1
**DISTRICT** [3] - 1:1, 1:1, 1:11
**district** [3] - 53:8, 96:5, 99:13
**District** [7] - 2:10, 2:10, 18:12, 41:7, 41:13, 53:7, 99:13

**division** [1] - 64:25
**divorced** [1] - 90:4
**doctrine** [2] - 96:20, 96:21
**dollar** [4] - 75:17, 77:14, 94:9, 94:16
**done** [6] - 23:5, 26:8, 33:24, 56:17, 66:5, 74:4
**dory** [1] - 50:7
**double** [1] - 48:9
**double-check** [1] - 48:9
**doubt** [2] - 23:14, 88:3
**down** [1] - 44:7
**drag** [1] - 73:3
**dragging** [1] - 73:13
**dramatic** [1] - 10:17
**dramatically** [2] - 80:16, 80:17
**draw** [1] - 24:10
**drawn** [1] - 49:20
**drive** [1] - 84:24
**drives** [1] - 79:24
**drop** [6] - 37:6, 37:22, 38:3, 38:10, 38:11
**drops** [1] - 25:23
**drove** [1] - 80:2
**Drug** [1] - 89:5
**due** [13] - 53:20, 59:5, 59:7, 63:16, 72:4, 72:6, 77:3, 77:4, 78:2, 84:1, 84:22, 96:16, 96:17
**dump** [2] - 68:15, 74:9
**during** [5] - 21:9, 29:6, 29:14, 80:12, 85:10
**duties** [2] - 91:16, 92:2
**duty** [9] - 7:25, 51:8, 51:15, 51:17, 51:19, 52:4, 54:11, 61:16, 63:22
**duty-to-monitor** [1] - 51:8

## E

**early** [3] - 28:9, 62:11, 67:16
**easiest** [1] - 89:24
**East** [1] - 1:23
**easy** [1] - 37:21
**EDGAR** [6] - 22:11, 26:11, 26:16, 27:2,

27:5, 27:10
**Edwards** [1] - 99:12
**EDWARDS** [2] - 2:9, 99:3
**effectively** [1] - 91:9
**efficiency** [4] - 17:13, 32:16, 32:20, 33:2
**efficient** [30] - 31:21, 32:5, 32:13, 32:14, 32:23, 33:4, 33:8, 35:4, 36:15, 36:25, 79:9, 79:17, 79:18, 79:20, 79:21, 80:3, 80:5, 80:8, 80:10, 80:13, 80:15, 81:9, 82:2, 82:3, 82:15, 82:19, 84:21, 89:25, 97:1
**Eighth** [1] - 39:7
**EITAN** [1] - 1:22
**Eitan** [1] - 3:18
**either** [4] - 42:1, 83:15, 90:13, 95:16
**element** [1] - 37:20
**elements** [4] - 31:3, 31:20, 36:23, 73:24
**Elkins** [2] - 3:23, 4:1
**ELKINS** [1] - 2:3
**email** [2] - 26:24, 97:19
**emailed** [1] - 22:11
**emoji** [10] - 15:24, 16:6, 76:19, 77:5, 93:5, 93:14, 94:6, 94:18, 94:19
**encouraged** [1] - 23:3
**endorse** [1] - 33:2
**ends** [1] - 22:17
**Enforcement** [1] - 89:5
**engaged** [4] - 62:5, 73:5, 73:11, 91:15
**ensure** [1] - 46:22
**entail** [2] - 6:17, 89:8
**enter** [1] - 11:14
**entered** [2] - 7:17, 8:23
**enterprises** [1] - 90:10
**entities** [1] - 4:17
**entity** [1] - 59:24
**equally** [1] - 60:2
**equivalent** [1] - 64:1
**especially** [1] - 92:3
**ESQ** [8] - 1:14, 1:15, 1:15, 1:19, 1:22, 2:2, 2:2, 2:6
**essence** [2] - 62:13

**et** [1] - 3:3
**ether** [1] - 56:13
**evaluate** [2] - 83:18
**evening** [1] - 20:16
**events** [1] - 68:21
**evidence** [10] - 14:19, 23:13, 50:3, 57:10, 57:14, 57:20, 69:11, 91:10, 93:11
**ex** [1] - 89:1
**exact** [2] - 9:11, 12:10
**exacting** [2] - 70:13, 88:7
**exactly** [5] - 41:19, 54:2, 59:10, 70:8, 71:21
**except** [2] - 26:15, 42:10, 74:14
**exception** [2] - 27:9, 34:15
**Exchange** [2] - 17:4, 79:19
**exclude** [1] - 30:4
**executed** [1] - 66:20
**executives** [1] - 33:20
**exercising** [10] - 59:5, 59:7, 72:4, 72:6, 77:3, 77:4, 78:2, 78:4, 84:22, 96:16
**exist** [1] - 22:24
**existed** [1] - 58:22
**existence** [2] - 53:10, 80:21
**exists** [3] - 52:22, 53:10, 54:6
**expect** [1] - 29:13
**expected** [1] - 51:10
**expertise** [1] - 34:2
**explanation** [1] - 87:4
**exposure** [1] - 86:21
**expressing** [1] - 95:16
**expression** [2] - 73:7, 75:4
**extent** [6] - 9:12, 41:23, 62:10, 93:23, 95:10, 97:14

## F

**F.Supp** [1] - 96:2
**face** [1] - 9:22
**faced** [1] - 59:18
**fact** [36] - 6:1, 8:10, 9:6, 14:24, 15:21, 16:12, 19:5, 20:15,

20:18, 21:3, 26:14, 28:4, 29:24, 31:20, 37:13, 37:23, 39:14, 40:10, 57:4, 57:5, 60:3, 61:21, 61:22, 62:3, 62:4, 62:19, 62:20, 64:4, 64:5, 70:22, 73:10, 80:24, 91:25, 92:11, 92:17, 96:7

**factors** [1] - 15:3
**facts** [42] - 14:14, 14:22, 15:2, 17:21, 32:2, 32:15, 34:3, 51:25, 52:1, 54:25, 55:1, 55:7, 55:9, 55:12, 55:15, 55:23, 56:1, 56:12, 56:14, 56:15, 56:20, 57:16, 57:21, 58:4, 62:8, 62:12, 62:15, 63:4, 63:21, 66:25, 67:1, 67:2, 68:8, 71:22, 72:22, 73:19, 79:2, 79:6, 84:19, 89:8, 92:12, 96:25

**factual** [3] - 78:13, 89:9, 93:17
**factually** [1] - 56:2
**failed** [1] - 36:14
**failing** [3] - 17:7, 72:17
**fails** [2] - 72:1, 85:18
**fair** [5] - 25:3, 34:20, 49:5, 49:21, 49:22
**faith** [1] - 41:4
**fall** [1] - 85:25
**falls** [1] - 55:17
**false** [17] - 17:20, 17:25, 25:15, 29:17, 39:18, 55:9, 56:14, 59:5, 59:12, 66:6, 72:8, 72:9, 75:3, 76:3, 78:16, 80:24, 81:4
**falsity** [8] - 42:16, 57:16, 73:20, 78:20, 79:2, 79:15, 81:13, 95:20
**familiar** [1] - 89:11
**far** [6] - 5:24, 31:10, 88:7, 92:12
**favor** [1] - 89:7
**favorable** [2] - 16:20, 49:17
**federal** [3] - 54:11, 54:19, 77:24
**feeding** [1] - 91:14
**few** [2] - 18:22, 89:23
**fiduciary** [4] - 61:16, 63:22, 91:16, 92:2

**Fifth** [1] - 1:20
**figure** [2] - 13:14, 94:3
**figuring** [1] - 35:13
**file** [7] - 17:6, 17:7, 27:4, 57:6, 66:4, 69:18, 83:25
**filed** [20] - 17:20, 29:13, 39:14, 39:25, 42:2, 47:23, 55:24, 58:7, 66:19, 66:21, 83:4, 83:11, 84:6, 84:11, 84:22, 84:23, 84:25, 85:8, 85:10, 85:11
**filing** [20] - 19:25, 23:11, 24:13, 25:8, 28:19, 29:12, 30:4, 32:7, 39:25, 40:20, 41:18, 41:20, 48:2, 48:6, 55:2, 66:7, 66:9, 66:23, 74:20, 79:22
**filings** [12] - 25:4, 40:24, 46:23, 47:20, 69:24, 72:14, 74:19, 78:21, 78:23, 80:17, 82:7, 82:11
**fill** [2] - 30:9, 84:3
**fills** [1] - 30:13
**final** [6] - 12:22, 30:23, 31:2, 42:20, 64:2, 97:3
**finally** [2] - 32:10, 97:2
**finance** [1] - 65:1
**financial** [10] - 12:10, 60:5, 60:7, 60:18, 72:23, 78:3, 79:25, 82:6, 82:13
**financing** [1] - 12:8
**fine** [2] - 55:20, 97:7
**fingertips** [1] - 78:9
**finish** [1] - 76:17
**firm** [3] - 3:7, 64:25, 87:17
**firms** [1] - 87:17
**first** [16] - 5:11, 6:11, 8:22, 13:16, 16:12, 24:19, 42:12, 44:13, 48:13, 57:24, 65:22, 75:1, 75:7, 75:12, 76:22, 89:24
**first-line** [1] - 44:13
**fit** [1] - 40:6
**fits** [2] - 43:8, 44:19
**five** [8] - 7:17, 11:3, 25:20, 25:21, 26:3, 58:7, 58:17, 84:6
**five-year** [1] - 25:20
**Floor** [2] - 1:20, 2:4

**focus** [3] - 57:19, 81:12, 81:25
**focused** [1] - 45:14
**focuses** [1] - 52:14
**follow** [3] - 15:25, 33:15, 97:11
**followed** [1] - 85:8
**following** [3] - 60:9, 69:24, 85:5
**follows** [1] - 83:23
**Fonicello** [1] - 14:7
**FOR** [4] - 1:1, 1:14, 2:2, 2:6
**forced** [1] - 91:5
**foregoing** [1] - 99:4
**forgetting** [1] - 68:11
**Form** [21] - 8:3, 8:11, 9:2, 11:19, 12:2, 18:13, 18:24, 19:12, 24:25, 26:11, 28:24, 37:17, 39:14, 39:23, 42:4, 47:16, 66:6, 66:21, 72:7, 82:9, 97:3
**form** [50] - 8:12, 8:17, 11:23, 16:25, 17:1, 17:11, 17:20, 18:25, 19:1, 19:5, 19:7, 19:11, 19:17, 20:13, 20:14, 20:15, 20:18, 21:5, 21:23, 22:7, 23:10, 25:8, 26:18, 26:21, 27:4, 28:19, 29:18, 30:3, 30:5, 30:14, 30:24, 37:1, 39:18, 64:19, 65:13, 65:15, 65:20, 65:21, 65:24, 66:4, 66:9, 84:2, 85:10, 89:9, 96:3, 97:6, 97:19
**formal** [1] - 17:20
**formed** [2] - 14:23, 55:1
**forms** [7] - 16:25, 17:6, 24:6, 28:25, 42:1, 66:23, 84:4
**forward** [7] - 3:4, 4:20, 12:9, 13:13, 49:12, 95:7, 95:11
**forward-looking** [2] - 95:7, 95:11
**four** [1] - 10:13
**fourth** [1] - 57:7
**Fourth** [2] - 59:3, 77:2
**frankly** [4] - 41:1, 73:4, 75:13, 82:22
**fraud** [19] - 6:7, 6:12, 15:13, 31:5, 32:3,

34:9, 34:13, 34:19, 56:7, 56:11, 57:15, 61:14, 66:8, 70:10, 78:25, 80:22, 88:6, 90:19, 96:20
**fraud-on-the-market** [5] - 31:5, 34:9, 34:13, 34:19, 80:22
**fraudulent** [4] - 73:1, 78:19, 78:22, 85:16
**friends** [1] - 61:10
**full** [6] - 74:23, 75:20, 75:22, 76:9, 77:6, 99:5
**fund** [1] - 87:17
**fundamentals** [2] - 90:2, 90:10
**future** [5] - 54:12, 55:13, 78:8, 78:15, 84:7

---

## G

**GameStop** [4] - 33:23, 69:15, 73:6, 73:13
**gather** [1] - 59:5
**gauge** [1] - 64:7
**gauged** [1] - 90:1
**general** [4] - 5:7, 46:14, 47:6, 47:12
**generalized** [1] - 54:10
**generally** [3] - 55:4, 58:11, 88:17
**generic** [1] - 52:5
**gentlemen** [1] - 97:24
**GERBER** [14] - 2:6, 4:4, 45:8, 45:12, 46:4, 47:4, 47:17, 48:1, 48:11, 49:5, 49:19, 50:8, 51:5, 52:8
**Gerber** [5] - 4:5, 45:5, 45:7, 45:8, 72:17
**GEWIRTZ** [1] - 1:23
**Gewirtz** [1] - 3:19
**given** [10] - 12:4, 13:5, 19:8, 38:2, 43:8, 44:8, 72:13, 80:16, 96:6, 97:14
**goal** [1] - 40:12
**God** [1] - 59:9
**god** [1] - 94:16
**Goldman** [1] - 90:16
**golf** [1] - 61:9
**good-faith** [1] - 41:4

**goodness** [1] - 50:5
**Gottlieb** [2] - 4:5, 45:9
**GOTTLIEB** [1] - 2:6
**Gove** [15] - 4:6, 4:19, 4:22, 5:14, 5:22, 7:18, 7:22, 35:9, 35:10, 35:11, 35:16, 35:22, 45:4, 45:9, 45:20
**GOVE** [1] - 2:6
**Gove's** [1] - 5:17
**governing** [1] - 64:21
**governs** [1] - 65:4
**grand** [1] - 8:7
**gravamen** [2] - 34:14, 34:15
**great** [1] - 13:10
**groceries** [1] - 74:24
**grocery** [1] - 75:21
**GROSSMAN** [1] - 1:23
**Grossman** [1] - 3:19
**grounds** [2] - 71:25, 79:15
**guess** [7] - 13:15, 23:18, 29:25, 30:11, 35:19, 36:1, 66:1
**guidance** [8] - 65:6, 97:4, 97:5, 97:10, 97:13, 97:16, 97:20
**gun** [1] - 14:20
**guns** [1] - 90:25
**gut** [1] - 79:7
**guy** [2] - 56:13, 74:6

---

## H

**Halliburton** [3] - 33:1, 80:19, 90:16
**HAMILTON** [1] - 2:6
**handful** [2] - 8:16, 41:3
**hanging** [1] - 78:18
**happenstance** [1] - 84:16
**happy** [2] - 5:5, 11:14
**harbor** [5] - 17:11, 17:21, 95:5, 95:6, 95:9
**hard** [3] - 27:14, 58:14, 62:25
**hat** [1] - 49:18
**hatch** [1] - 66:24
**hatched** [2] - 66:18, 66:20
**hats** [1] - 78:18
**headed** [1] - 94:8,

94:16
**hear** [6] - 4:11, 4:23, 5:5, 5:17, 5:18, 45:6
**heard** [1] - 90:21
**HEARING** [1] - 1:10
**heavier** [1] - 70:17
**heavy** [2] - 70:13
**hedge** [1] - 87:16
**heightened** [3] - 37:21, 47:2, 52:1
**held** [3] - 25:8, 56:22, 80:21
**hell** [1] - 71:17
**helped** [1] - 86:4
**helpful** [1] - 87:4
**helps** [3] - 6:12, 6:15, 45:10
**hemp** [1] - 89:5
**hereby** [1] - 99:3
**herself** [1] - 45:20
**hide** [1] - 30:18
**high** [1] - 24:11
**higher** [2] - 71:5, 79:5
**himself** [5] - 22:21, 26:12, 27:16, 34:1, 90:6
**history** [1] - 29:11
**hit** [2] - 87:5, 87:6
**hold** [4] - 48:5, 49:9, 53:19, 91:8
**holding** [3] - 42:3, 42:5, 42:8
**holdings** [3] - 51:18, 85:9
**holds** [2] - 34:1, 49:9
**hometown** [1] - 63:16
**honestly** [1] - 65:16
**Honor** [226] - 3:1, 3:6, 3:9, 3:12, 3:13, 3:15, 3:18, 3:22, 3:25, 4:4, 5:9, 5:21, 6:10, 6:21, 7:7, 7:25, 9:8, 9:21, 11:9, 12:22, 13:8, 13:11, 14:17, 15:10, 16:10, 17:22, 18:5, 18:16, 19:20, 20:2, 20:24, 22:4, 23:6, 23:23, 25:11, 27:11, 29:19, 30:20, 31:1, 33:12, 34:11, 35:15, 36:11, 36:20, 38:2, 38:14, 40:25, 42:15, 42:24, 43:6, 43:18, 44:17, 44:25, 45:8, 47:5, 52:11, 52:13, 52:16, 52:21, 53:1, 53:9, 53:11, 53:15, 53:17, 54:2,

54:4, 54:9, 54:20, 54:25, 55:3, 55:6, 55:15, 55:22, 55:25, 56:6, 56:18, 56:19, 56:23, 57:4, 57:12, 57:23, 58:1, 58:5, 58:14, 58:23, 59:2, 59:8, 59:12, 59:14, 59:15, 59:17, 59:22, 60:3, 60:11, 61:2, 61:14, 61:21, 62:3, 62:9, 62:10, 62:12, 62:18, 63:3, 63:8, 63:13, 63:15, 63:22, 63:25, 64:4, 64:6, 64:11, 64:21, 65:1, 65:5, 65:7, 65:13, 65:16, 65:24, 66:5, 66:7, 66:23, 67:8, 67:13, 67:16, 67:22, 67:24, 68:24, 69:9, 69:14, 69:19, 69:20, 69:25, 70:11, 70:24, 71:2, 71:4, 71:6, 71:7, 71:15, 71:17, 71:25, 72:3, 72:10, 72:14, 72:16, 72:23, 73:3, 73:9, 73:14, 73:18, 73:21, 74:13, 74:15, 74:20, 75:2, 75:5, 75:13, 76:1, 76:5, 76:8, 76:18, 76:22, 77:1, 77:7, 77:10, 77:20, 77:22, 78:1, 78:8, 78:16, 78:21, 78:23, 79:1, 79:4, 79:14, 79:20, 79:24, 80:7, 80:11, 80:14, 81:3, 81:6, 81:10, 81:18, 82:11, 82:23, 83:7, 83:12, 83:14, 83:23, 84:1, 84:3, 84:5, 84:8, 84:18, 85:3, 85:20, 85:23, 86:10, 86:19, 87:1, 87:10, 87:16, 87:21, 87:22, 88:1, 88:5, 88:12, 88:19, 88:20, 88:21, 88:22, 88:24, 89:3, 89:4, 89:12, 89:13, 89:15, 89:18, 89:22, 90:18, 93:4, 94:6, 95:4, 96:15, 97:2
**Honor's** [3] - 52:15, 85:5, 87:23
**HONORABLE** [1] - 1:11
**hook** [1] - 46:2
**hour** [1] - 23:21

**hours** [4] - 6:5, 10:12, 23:12, 25:23
**huge** [4] - 24:8, 31:25, 33:19, 33:23
**humor** [1] - 75:22
**hunky** [1] - 50:7
**hunky-dory** [1] - 50:7
**hurdle** [1] - 6:15

---

**I**

**i.e** [1] - 87:7
**idea** [12] - 6:19, 9:16, 10:9, 13:6, 17:6, 17:11, 17:18, 32:19, 33:13, 92:21, 96:9, 96:22
**identified** [3] - 9:7, 10:17, 37:10
**identify** [3] - 3:4, 19:2, 21:5
**ignores** [1] - 33:16
**II** [1] - 33:1
**illegal** [3] - 63:23, 92:1, 92:4
**Illinois** [1] - 1:17
**illumination** [1] - 97:20
**impact** [1] - 10:17
**impacts** [1] - 79:12
**implore** [1] - 73:19
**important** [8] - 57:23, 69:21, 71:23, 84:5, 88:13, 88:15, 88:21, 89:15
**importantly** [2] - 73:21, 77:23
**imposing** [1] - 46:11
**impossible** [1] - 69:24
**imprecise** [1] - 78:14
**impression** [4] - 7:23, 8:8, 12:18, 59:6
**impressions** [1] - 4:10
**improper** [1] - 91:24
**imputed** [1] - 46:3
**IN** [1] - 1:4
**inaccurate** [2] - 78:22, 80:23
**inclination** [1] - 8:22
**inclined** [2] - 5:16, 28:12
**including** [2] - 28:4, 40:20
**incorrect** [1] - 51:3
**incorrectly** [1] - 50:20

**increase** [1] - 74:10
**incredibly** [1] - 27:17
**indefinite** [1] - 96:10
**independent** [11] - 7:25, 50:9, 61:8, 61:11, 61:12, 61:16, 61:19, 62:6, 63:9, 63:11, 92:8
**indicate** [2] - 48:18, 65:25
**indicated** [1] - 22:1
**indicates** [2] - 48:3, 53:21
**indication** [1] - 93:20
**indirect** [1] - 26:5
**indiscernible** [1] - 52:18
**individual** [1] - 44:1
**individuals** [3] - 44:16, 91:19
**indulge** [1] - 53:15
**indulgence** [1] - 88:19
**indulging** [1] - 89:18
**Industries** [1] - 89:5
**industry** [2] - 87:1, 87:2
**inevitable** [1] - 6:4
**inference** [14] - 12:12, 14:2, 14:18, 24:5, 24:9, 28:10, 30:18, 49:21, 49:22, 52:4, 61:13, 68:17, 91:1
**inferences** [3] - 49:20, 88:15, 89:8
**influence** [1] - 33:18
**information** [60] - 17:14, 32:7, 32:9, 33:9, 34:5, 36:17, 36:18, 37:11, 38:2, 38:8, 38:12, 46:22, 46:24, 60:1, 60:4, 60:12, 60:13, 60:14, 60:17, 61:15, 61:20, 61:23, 61:24, 62:2, 62:7, 62:25, 63:2, 64:8, 64:15, 67:3, 67:11, 68:6, 68:13, 70:10, 70:21, 72:14, 72:15, 72:18, 77:13, 78:3, 79:23, 80:9, 80:16, 81:7, 82:6, 82:9, 82:12, 82:14, 82:22, 84:7, 90:5, 91:15, 91:23, 92:10, 92:18, 92:22
**informational** [1] - 32:16
**informationally** [1] -

33:4
**inherently** [1] - 15:15
**initial** [5] - 4:10, 4:21, 4:24, 45:18, 61:6
**innocent** [2] - 28:11, 52:3
**inquire** [2] - 51:12, 51:19
**inquiries** [1] - 12:2
**inquiry** [2] - 8:12, 8:17
**inside** [6] - 34:2, 61:15, 67:11, 68:12, 70:9, 91:14
**insider** [16] - 33:16, 44:8, 60:17, 61:18, 61:19, 61:24, 62:2, 62:5, 62:14, 63:22, 70:25, 73:16, 78:25, 79:7, 91:15, 91:23
**insist** [1] - 97:11
**instance** [21] - 9:8, 9:18, 12:23, 22:17, 25:18, 25:22, 28:17, 29:21, 36:23, 37:1, 39:7, 39:13, 39:21, 42:4, 44:3, 44:7, 90:5, 96:24, 97:9, 97:17
**instances** [1] - 9:18
**instead** [1] - 50:13
**instinct** [4] - 4:12, 4:16, 4:19, 4:21, 4:24, 5:7, 54:10
**intelligent** [1] - 82:4
**intended** [3] - 52:5, 81:12, 96:4
**intends** [1] - 22:20
**intent** [6] - 54:12, 56:15, 59:16, 66:8, 69:1, 91:7
**intention** [1] - 14:15, 19:2
**intentions** [2] - 7:11, 10:8
**interest** [7] - 31:25, 32:11, 39:15, 42:12, 57:2, 92:8, 92:11
**interested** [4] - 14:25, 59:25, 71:7, 93:13
**interim** [1] - 46:6
**internet** [1] - 34:5
**interpretation** [1] - 14:4
**interpreted** [2] - 9:6, 16:14
**interpreting** [1] - 42:1
**interview** [7] - 14:6,

67:17, 69:10, 69:14, 69:21, 70:7, 71:1
**invested** [1] - 69:16
**investing** [3] - 86:5, 86:7, 87:7
**investment** [10] - 33:23, 46:24, 59:6, 63:24, 63:25, 64:3, 72:12, 73:12, 83:20, 84:10
**investments** [2] - 73:7, 73:17
**investor** [30] - 7:24, 11:17, 12:19, 22:20, 23:1, 30:8, 44:1, 44:4, 48:21, 59:25, 63:1, 63:5, 64:8, 64:13, 67:2, 68:1, 70:20, 72:4, 72:11, 72:12, 77:2, 77:3, 77:4, 77:8, 78:2, 78:4, 87:6, 87:12, 96:16
**investors** [16] - 33:10, 33:21, 58:25, 59:2, 59:4, 60:1, 60:15, 72:2, 72:3, 72:6, 80:21, 82:4, 83:16, 84:21, 92:18, 96:13
**invoke** [1] - 95:9
**involve** [1] - 38:18
**involved** [1] - 24:2
**irrational** [3] - 10:18, 33:13, 33:25
**irrefutable** [1] - 91:2
**isolation** [1] - 30:20
**issue** [19] - 5:11, 5:13, 5:18, 5:22, 8:14, 9:1, 9:2, 10:6, 11:12, 12:9, 17:18, 18:8, 23:3, 23:5, 37:17, 41:8, 53:2, 73:2, 95:10
**issues** [5] - 5:6, 16:25, 25:1, 45:15, 81:1
**Item** [1] - 19:1
**items** [1] - 52:12
**itself** [13] - 4:14, 9:11, 9:14, 15:14, 17:8, 18:25, 22:17, 28:15, 40:13, 48:25, 65:13, 76:19, 96:14

## J

**JAFRI** [76] - 1:14, 3:6, 5:9, 5:14, 5:21, 6:9, 7:7, 7:21, 10:5,

10:8, 11:4, 11:9, 11:24, 13:11, 13:15, 15:9, 16:10, 16:12, 18:5, 18:16, 18:19, 18:21, 19:20, 20:2, 20:8, 20:11, 20:23, 21:3, 21:11, 21:18, 21:22, 22:4, 22:13, 22:25, 23:22, 24:23, 25:11, 26:15, 26:25, 27:3, 27:8, 27:18, 28:17, 28:25, 29:8, 29:15, 30:11, 31:6, 32:8, 32:14, 34:11, 34:21, 35:1, 35:3, 35:11, 35:15, 35:25, 36:8, 36:11, 36:20, 38:22, 40:25, 41:19, 42:10, 42:24, 43:6, 43:18, 43:25, 44:17, 44:25, 89:22, 93:4, 93:19, 94:5, 95:1, 98:1
**jafri** [1] - 89:20
**Jafri** [7] - 3:7, 3:8, 5:8, 16:5, 45:16, 51:21, 86:3
**Jafri's** [1] - 87:4
**JAN** [1] - 1:19
**Jan** [1] - 3:16
**Janus** [2] - 46:18, 47:11
**JARED** [1] - 2:6
**Jared** [2] - 4:4, 45:8
**Jersey** [1] - 53:8
**Joe** [1] - 14:7
**John** [1] - 75:2
**Josh** [1] - 3:9
**JOSHUA** [1] - 1:15
**Judge** [3] - 70:16, 77:12, 78:11
**JUDGE** [1] - 1:11
**judgment** [2] - 33:6, 91:6
**juice** [1] - 68:15
**June** [3] - 1:7, 75:8, 99:10
**Justice** [2] - 46:17, 91:4
**justice** [1] - 22:15

## K

**Kammerman** [6] - 17:24, 18:6, 18:10, 18:18, 52:23, 53:11
**keep** [3] - 5:19, 63:10, 74:1
**Kennedy** [2] - 16:14,

75:2
**key** [3] - 15:1, 15:3, 68:24
**keys** [1] - 23:18
**Kimelman** [1] - 3:19
**KIMELMAN** [2] - 1:22, 3:18
**kind** [26] - 5:7, 10:2, 15:5, 16:7, 16:8, 17:15, 19:24, 22:18, 24:8, 28:14, 33:3, 36:17, 40:18, 41:17, 48:7, 49:17, 56:4, 66:17, 68:15, 68:21, 74:22, 77:12, 81:1, 84:14, 86:6, 93:13
**kinds** [4] - 28:2, 63:18, 74:12, 85:16
**knell** [1] - 59:14
**knowing** [2] - 10:9, 92:22
**knowledge** [4] - 22:23, 23:20, 27:11, 70:6
**known** [2] - 57:4, 69:7
**knows** [4] - 10:16, 59:17, 69:12, 92:14

## L

**landscape** [1] - 12:20
**language** [14] - 6:24, 31:12, 32:25, 41:3, 42:25, 44:18, 49:4, 58:15, 59:21, 69:17, 86:21, 87:23, 96:3, 96:7
**large** [3] - 43:9, 43:14
**LaSalle** [1] - 1:16
**last** [6] - 29:6, 45:2, 53:7, 59:13, 86:2, 89:20
**law** [22] - 3:7, 15:11, 15:19, 15:21, 19:23, 22:19, 39:4, 41:2, 54:4, 54:5, 54:10, 54:15, 54:19, 55:12, 56:11, 57:24, 88:16, 92:7, 96:13, 97:10, 97:11
**lawful** [1] - 22:16
**laws** [3] - 54:11, 61:17, 77:24
**lawyer** [2] - 13:3, 49:3
**lead** [4] - 3:7, 3:10,

3:13, 14:22
**learned** [3] - 16:20, 63:20, 80:11
**least** [15] - 7:22, 24:15, 25:11, 29:18, 32:3, 34:13, 42:18, 43:21, 55:7, 60:25, 75:22, 76:9, 77:5, 77:18, 84:15
**leave** [4] - 28:15, 69:19, 69:20, 70:7
**leaves** [1] - 87:23
**led** [1] - 50:18
**left** [2] - 21:7, 50:24
**legal** [2] - 13:2, 89:9
**legs** [1] - 80:20
**less** [2] - 31:10, 93:13
**liability** [8] - 24:22, 29:1, 38:16, 46:15, 46:19, 77:24, 78:15, 93:18
**liable** [5] - 25:8, 39:6, 46:12, 53:19, 95:25
**Liberty** [1] - 2:7
**lie** [1] - 26:7
**likely** [2] - 30:8, 96:14
**limited** [2] - 48:15, 73:17
**line** [2] - 44:13, 69:23
**lines** [1] - 8:16
**link** [3] - 9:11, 9:14, 9:16
**liquidity** [2] - 12:10, 24:8
**LISA** [2] - 2:9, 99:3
**Lisa** [1] - 99:12
**literally** [2] - 9:3, 12:17
**Litigation** [1] - 95:6
**LITIGATION** [1] - 1:5
**live** [1] - 83:15
**LLC** [2] - 1:23, 2:3
**LLP** [1] - 2:3
**locate** [1] - 25:12
**locked** [1] - 15:1
**look** [25] - 9:5, 14:1, 18:9, 21:4, 27:22, 37:2, 42:25, 47:18, 48:13, 48:21, 48:22, 48:25, 50:6, 58:18, 58:20, 62:19, 65:18, 69:17, 72:7, 85:21, 90:5, 90:24, 91:3, 94:16
**Look** [1] - 9:19
**looked** [3] - 19:15, 58:14, 68:1
**looking** [8] - 12:8,

19:24, 29:11, 36:12, 44:12, 63:1, 95:7, 95:11
**looks** [4] - 5:1, 38:19, 40:22, 41:14
**Lorenzo** [3] - 28:1, 38:17, 40:8
**lose** [2] - 18:3, 20:6
**loss** [8] - 31:3, 36:14, 37:5, 37:7, 37:15, 57:17, 80:25, 82:17
**losses** [1] - 8:21
**lying** [1] - 26:2

## M

**M-A-L-L-I-N-C-K-R-O-D-T** [1] - 89:14
**macroeconomic** [1] - 68:4
**mail** [1] - 97:6
**mailing** [1] - 97:6
**main** [1] - 45:13
**major** [4] - 22:19, 86:7, 87:11, 87:14
**majority** [3] - 34:23, 43:4, 91:6
**maker** [2] - 5:24, 47:11
**makers** [1] - 46:19
**Mallinckrodt** [1] - 89:14
**man's** [1] - 86:19
**management** [2] - 58:10, 58:19
**manipulate** [1] - 74:5
**manipulating** [1] - 74:21
**manipulation** [7] - 72:21, 73:6, 73:12, 73:16, 73:25, 74:3, 78:24
**manipulative** [6] - 40:5, 74:4, 74:11, 74:12, 74:13, 74:17
**March** [12] - 8:24, 9:20, 48:16, 48:17, 49:2, 49:11, 50:1, 50:15, 50:24, 50:25, 58:7, 70:22
**MARISA** [1] - 2:2
**Marisa** [1] - 4:1
**market** [72] - 17:13, 22:7, 26:22, 27:25, 31:5, 31:21, 32:4, 32:6, 32:13, 32:14, 32:23, 34:9, 34:13, 34:19, 35:5, 36:15, 36:22, 36:25, 58:9,

58:11, 58:18, 60:2, 67:6, 68:2, 68:3, 68:5, 68:15, 69:8, 69:18, 70:6, 73:5, 73:12, 73:16, 73:25, 74:3, 74:5, 74:21, 78:24, 79:10, 79:17, 79:18, 79:21, 79:22, 79:25, 80:2, 80:3, 80:5, 80:8, 80:10, 80:11, 80:13, 80:15, 80:20, 80:22, 81:5, 81:7, 81:9, 82:3, 82:8, 82:13, 82:15, 82:19, 83:18, 84:21, 84:24, 89:25, 90:14, 97:1

**market's** [1] - 69:13
**marketplace** [6] - 60:5, 60:19, 67:15, 68:1, 72:23, 82:13
**markets** [1] - 79:20
**massive** [2] - 37:22, 56:24
**material** [15] - 19:5, 19:11, 19:13, 20:16, 29:24, 37:13, 38:14, 46:23, 55:10, 76:2, 76:6, 76:10, 76:24, 77:11, 80:9
**materiality** [8] - 57:17, 71:24, 72:11, 73:20, 78:20, 79:3, 79:16, 81:13
**materialization** [1] - 37:9
**materially** [3] - 72:8, 72:9, 80:17
**matter** [7] - 6:5, 10:2, 17:14, 24:7, 26:16, 36:9, 45:18
**matters** [1] - 38:13
**maximizing** [1] - 49:12
**McFADDEN** [1] - 1:11
**mean** [47] - 6:3, 7:15, 10:25, 15:18, 16:14, 17:14, 19:19, 20:3, 20:19, 20:21, 21:24, 22:14, 22:22, 23:5, 23:25, 28:20, 29:10, 30:5, 30:23, 33:3, 36:6, 36:11, 39:10, 41:12, 41:14, 41:23, 41:25, 43:13, 46:2, 55:16, 60:21, 60:25, 65:15, 68:10, 80:5, 80:8, 83:16, 83:24, 84:3, 84:19, 85:18, 86:17, 92:2, 94:1,

94:21, 97:9, 97:20
**meaning** [1] - 66:2
**means** [10] - 22:16, 32:16, 33:3, 65:11, 66:4, 75:13, 76:20, 90:23, 93:8, 93:22
**meant** [5] - 11:2, 11:6, 15:25, 49:4, 65:20
**media** [5] - 8:11, 8:17, 9:4, 12:1, 31:24
**medium** [1] - 17:15
**meet** [2] - 79:5, 91:5
**member** [1] - 91:25
**members** [4] - 60:22, 61:9, 61:11, 61:19
**meme** [2] - 33:8, 76:15
**mentioned** [2] - 19:15, 25:14
**mere** [1] - 41:18
**message** [1] - 78:5
**Messerschmidt** [1] - 3:16
**MESSERSCHMIDT** [2] - 1:19, 3:15
**met** [1] - 71:5
**metadata** [2] - 20:5, 26:22
**microphone** [1] - 52:20
**middle** [1] - 65:22
**might** [6] - 38:19, 49:7, 54:15, 68:2, 83:10, 84:7
**million** [5] - 15:4, 23:24, 31:22, 40:11, 44:5
**MILSTEIN** [1] - 1:19
**Milstein** [1] - 3:16
**mind** [5] - 11:10, 46:18, 51:7, 55:16, 87:24
**mindlessly** [1] - 34:6
**minute** [2] - 53:15, 71:16
**minutes** [3] - 21:15, 22:3, 22:5
**mirage** [3] - 41:9, 42:13
**misdirect** [1] - 49:4
**misimpression** [1] - 51:3
**mislead** [6] - 11:16, 12:5, 12:19, 17:16, 52:6, 93:25
**misleading** [23] - 7:23, 8:8, 9:4, 9:7, 9:24, 12:18, 13:3, 16:2, 17:18, 18:1,

21:12, 21:17, 37:13, 50:25, 51:2, 59:11, 75:3, 75:11, 76:3, 92:24, 96:7, 96:14
**misquote** [1] - 69:19
**misquoted** [1] - 50:23
**misrepresentation** [15] - 17:10, 27:24, 38:18, 39:2, 39:9, 39:10, 39:12, 39:23, 39:24, 40:16, 40:17, 75:7, 76:2, 76:10, 76:24
**misrepresentations** [5] - 18:13, 34:24, 35:20, 35:23
**misstatement** [3] - 28:21, 39:1, 76:6
**misstatements** [4] - 17:19, 25:21, 28:6, 28:18
**mistake** [1] - 28:11
**mix** [2] - 72:13, 72:15
**mixes** [1] - 36:23
**moment** [2] - 4:8, 35:4
**money** [2] - 8:20, 15:5
**monitor** [5] - 51:8, 51:15, 51:16, 51:17, 51:19
**months** [15] - 7:17, 11:3, 14:7, 21:9, 29:7, 29:14, 29:17, 30:3, 30:4, 58:7, 58:17, 67:5, 84:6, 95:22, 96:10
**moon** [18] - 15:24, 16:6, 76:9, 76:12, 76:23, 77:5, 77:7, 77:12, 77:16, 78:7, 78:13, 93:2, 93:15, 93:16, 94:18, 94:23, 94:24
**moon's** [1] - 77:11
**morning** [9] - 20:6, 20:8, 20:16, 22:6, 24:1, 24:9, 24:19, 65:10, 66:19
**most** [14] - 5:5, 7:10, 24:4, 26:4, 34:13, 56:10, 61:4, 69:21, 73:20, 77:22, 79:3, 79:4, 80:8, 90:5
**motion** [10] - 7:7, 7:9, 16:16, 24:6, 31:12, 57:21, 85:17, 89:7, 95:10, 95:13
**MOTION** [1] - 1:10

**motive** [1] - 6:11
**move** [13] - 13:8, 13:12, 31:2, 54:7, 69:8, 69:13, 70:6, 72:15, 79:22, 80:15, 80:17, 81:5, 90:22
**moved** [2] - 82:8, 82:13
**moving** [6] - 19:12, 78:12, 81:7, 88:24, 90:18, 93:1
**MR** [149] - 3:6, 3:9, 3:12, 3:15, 3:18, 3:22, 4:4, 5:9, 5:14, 5:21, 6:9, 7:7, 7:21, 10:5, 10:8, 11:9, 11:24, 13:11, 13:15, 15:9, 16:10, 16:12, 18:5, 18:16, 18:19, 18:21, 19:20, 20:2, 20:8, 20:11, 20:23, 21:3, 21:11, 21:18, 21:22, 22:4, 22:13, 22:25, 23:22, 24:23, 25:11, 26:15, 26:25, 27:3, 27:8, 27:18, 28:17, 28:25, 29:8, 29:15, 30:11, 31:6, 32:8, 32:14, 34:11, 34:21, 35:1, 35:3, 35:11, 35:15, 35:25, 36:8, 36:11, 36:20, 38:22, 40:25, 41:19, 42:10, 42:24, 43:6, 43:18, 43:25, 44:17, 44:25, 45:5, 45:8, 45:12, 46:4, 47:4, 47:17, 48:1, 48:11, 49:5, 49:19, 50:8, 51:5, 52:8, 52:11, 52:21, 55:19, 55:22, 56:6, 57:12, 60:24, 61:2, 63:3, 63:13, 63:15, 64:20, 66:13, 66:15, 66:22, 67:21, 68:23, 71:12, 71:14, 74:20, 75:1, 75:12, 75:25, 76:14, 76:16, 76:18, 76:21, 77:19, 79:11, 79:14, 80:6, 81:3, 81:17, 81:21, 81:24, 82:2, 82:23, 83:3, 83:7, 83:12, 83:14, 84:18, 85:3, 85:20, 85:23, 86:1, 86:9, 86:13, 86:15, 86:25, 87:9, 87:16, 87:21, 88:12, 89:12, 89:18, 89:22, 93:4, 93:19, 94:5, 95:1, 98:1

**MS** [1] - 3:25
**musk** [1] - 90:5
**must** [16] - 23:1, 56:2, 56:14, 56:15, 59:19, 63:19, 69:7, 70:9, 74:3, 74:4, 76:3, 76:4, 76:6, 78:20, 79:5

---

## N

**name** [1] - 71:10
**narrative** [9] - 59:22, 67:9, 67:11, 68:1, 69:2, 70:19, 85:14
**narratives** [3] - 59:19, 64:7, 67:25
**narrow** [3] - 32:20, 46:18, 90:13
**narrowed** [1] - 32:24
**narrowly** [1] - 43:11
**NASDAQ** [2] - 31:23, 79:19
**nature** [1] - 95:19
**necessarily** [3] - 19:23, 68:12, 86:5
**need** [17] - 5:17, 5:19, 14:14, 14:19, 15:7, 34:19, 35:5, 35:12, 61:1, 62:11, 68:12, 69:25, 70:3, 70:18, 71:3, 90:25, 91:1
**needs** [2] - 46:21, 63:23
**negative** [1] - 82:6
**never** [16] - 9:16, 13:2, 32:11, 32:24, 37:5, 38:10, 39:17, 42:7, 57:10, 91:7, 91:17, 95:12, 95:15, 95:21, 95:24
**new** [16] - 14:4, 32:7, 32:9, 36:17, 36:18, 38:7, 56:20, 57:5, 58:4, 68:5, 79:23, 81:6, 82:9, 82:20, 82:22
**New** [1] - 1:20, 1:24, 2:4, 2:7, 18:12, 53:7, 63:17, 79:19
**news** [4] - 10:12, 50:5, 50:6, 90:8
**newspapers** [1] - 63:17
**next** [7] - 9:25, 15:10, 16:24, 39:16, 54:15, 69:23, 90:22
**nice** [1] - 53:9

**night** [1] - 39:13
**nobody** [1] - 36:21
**nominated** [1] - 61:8
**nonactionable** [2] - 77:25, 78:10
**none** [1] - 62:8
**normal** [1] - 30:8
**Northwest** [3] - 1:20, 2:11, 99:14
**noted** [1] - 29:13
**notes** [1] - 99:5
**nothing** [22] - 8:18, 29:17, 38:12, 39:1, 39:12, 39:22, 47:9, 55:25, 59:11, 62:17, 67:21, 72:7, 72:8, 72:9, 72:10, 73:9, 73:11, 83:24, 94:20, 94:21, 97:16
**notice** [4] - 37:19, 48:8, 65:15
**noticed** [1] - 69:22
**notion** [1] - 17:13
**notwithstanding** [2] - 78:3, 82:6
**nucleus** [1] - 29:4
**number** [2] - 50:22, 65:23
**numerous** [1] - 79:15

**O**

**objective** [1] - 76:4
**obligated** [3] - 83:25, 84:12, 97:10
**obligation** [4] - 7:18, 46:11, 54:14, 88:6
**obligations** [1] - 88:17
**obstruction** [1] - 22:15
**obstruction-of-justice** [1] - 22:15
**obviously** [11] - 6:19, 10:21, 14:20, 17:17, 25:16, 26:1, 30:18, 45:13, 49:8, 51:23, 68:25
**odd** [1] - 17:15
**OF** [2] - 1:1, 1:10
**offering** [6] - 59:22, 61:14, 70:20, 72:20, 85:15, 88:14
**Official** [1] - 2:9
**official** [1] - 99:12
**often** [1] - 94:23
**old** [2] - 11:1, 15:3
**OMAR** [1] - 1:14

**Omar** [1] - 3:6
**omission** [7] - 19:6, 19:13, 20:16, 36:15, 38:14, 39:2, 55:9
**omissions** [3] - 19:11, 34:14, 34:16
**omit** [2] - 20:17, 29:20
**omits** [2] - 17:21, 97:18
**omitted** [5] - 19:8, 28:7, 29:24, 37:13, 37:23
**Omnicare** [1] - 12:25
**once** [1] - 26:21
**one** [41] - 8:25, 9:22, 15:2, 15:16, 16:1, 16:3, 16:25, 17:25, 19:12, 23:18, 23:23, 24:23, 25:22, 28:13, 28:19, 30:5, 31:14, 37:20, 41:1, 41:6, 44:15, 48:13, 51:1, 51:6, 51:7, 52:14, 57:23, 59:13, 63:16, 64:7, 64:23, 69:7, 70:20, 81:17, 85:20, 86:19, 89:3, 89:15, 89:24, 90:7, 97:9
**One** [1] - 2:7
**ones** [7] - 12:16, 13:12, 24:23, 28:3, 36:4, 37:3, 37:4
**online** [1] - 33:9
**onwards** [1] - 37:4
**opening** [1] - 86:21
**operation** [1] - 80:3
**opinion** [1] - 12:24, 91:6
**opinions** [2] - 15:18, 95:16
**opportunity** [3] - 5:12, 8:4, 22:22
**opposed** [1] - 26:2
**opposition** [1] - 7:9
**order** [1] - 66:21
**orders** [1] - 41:14
**ordinary** [7] - 43:2, 43:20, 44:4, 44:20, 86:15, 86:16, 86:19
**organization** [1] - 46:9
**otherwise** [1] - 5:18
**outs** [1] - 53:13
**outset** [1] - 5:7
**outstanding** [1] - 31:22
**overall** [2] - 16:8, 68:4
**overflowing** [1] -

94:13
**overlooked** [1] - 58:6
**overreach** [1] - 31:18
**oversee** [2] - 46:7, 47:6
**oversight** [2] - 46:8, 47:12
**own** [2] - 56:25, 83:20
**ownership** [1] - 36:19
**owns** [2] - 57:8, 63:5

**P**

**p.m** [2] - 1:7, 20:17
**package** [1] - 12:8, 12:11
**page** [1] - 65:22
**Page** [4] - 13:18, 14:1, 88:23, 89:1
**pages** [2] - 8:12, 8:16
**pandemic** [1] - 27:9
**Paragraph** [1] - 14:9
**paraphrase** [1] - 75:2
**pardon** [1] - 76:18
**part** [13] - 20:23, 22:7, 27:20, 29:4, 40:10, 46:6, 46:8, 50:25, 66:16, 69:21, 70:7, 84:15
**partially** [1] - 71:1
**participant** [4] - 43:5, 86:8, 87:11, 87:15
**particular** [1] - 67:20
**particularity** [1] - 56:5
**particularized** [1] - 52:1
**parties** [2] - 4:11, 5:5
**Partnership** [1] - 89:2
**party** [1] - 51:12
**past** [10] - 21:9, 29:6, 29:11, 29:14, 30:9, 48:17, 50:13, 50:24, 57:21, 80:12
**pay** [4] - 15:4, 74:7, 74:9
**paying** [1] - 39:8
**peg** [2] - 83:5, 83:7
**Pengcheng** [1] - 3:2
**people** [33] - 9:10, 9:16, 9:19, 9:22, 9:23, 12:5, 15:12, 15:24, 15:25, 17:2, 17:16,

18:12, 25:5, 32:21, 33:13, 33:18, 34:6, 37:1, 38:7, 41:25, 42:4, 49:4, 50:3, 52:6, 59:4, 59:7, 65:8, 80:8, 86:22, 90:1, 93:21, 95:24, 96:9
**percent** [21] - 32:10, 33:17, 36:19, 39:15, 42:11, 56:21, 56:22, 57:3, 57:8, 64:12, 64:13, 64:14, 67:5, 68:7, 70:22, 83:9, 83:22, 84:15, 85:9, 90:22
**perfect** [2] - 32:15, 80:11
**perfectly** [1] - 80:5
**Perhaps** [1] - 5:17
**perhaps** [3] - 11:16, 77:22, 87:8
**period** [5] - 25:19, 25:20, 26:1, 26:2, 26:7
**permission** [1] - 5:10
**perpetrate** [1] - 6:7
**person** [21] - 30:7, 34:4, 38:18, 43:1, 43:7, 43:17, 43:19, 43:23, 44:14, 44:20, 86:3, 86:4, 86:14, 86:15, 86:17, 86:18, 86:20, 86:23, 86:25, 87:13, 97:19
**persuade** [1] - 9:15
**pessimism** [1] - 14:5
**pessimistic** [1] - 75:18
**picture** [4] - 75:20, 76:9, 94:11, 94:14
**place** [1] - 46:20
**plagiarized** [1] - 16:13
**plaintiff** [1] - 57:15
**Plaintiff** [19] - 3:5, 3:7, 3:10, 3:13, 3:16, 3:20, 18:6, 55:4, 55:22, 60:16, 62:1, 63:23, 67:10, 74:14, 79:5, 88:2, 88:6, 88:13, 91:1
**Plaintiff's** [1] - 89:7
**PLAINTIFFS** [1] - 1:14
**Plaintiffs** [27] - 4:23, 5:8, 38:5, 45:24, 47:14, 50:19, 50:22, 51:13, 53:1, 60:21, 61:5, 61:14, 66:1, 66:10, 67:12, 72:20,

73:13, 75:3, 78:18, 80:1, 81:7, 82:2, 82:16, 85:15, 91:4, 91:9, 96:24
**Plaintiffs'** [8] - 50:3, 58:25, 61:18, 68:20, 72:1, 73:7, 82:5, 84:13
**plan** [27] - 14:23, 19:2, 19:4, 19:8, 21:19, 21:25, 22:2, 28:7, 39:19, 55:1, 55:13, 55:14, 55:17, 55:18, 55:20, 55:21, 55:23, 56:2, 57:11, 66:16, 66:18, 66:20, 67:19, 70:4, 82:24, 85:10, 96:6
**planned** [1] - 71:16
**planning** [3] - 7:19, 25:8, 54:15
**plans** [6] - 39:19, 54:22, 54:24, 66:11, 73:8, 82:22
**platitude** [1] - 49:6
**plausible** [5] - 24:4, 68:22, 69:5, 84:14, 85:13
**players** [1] - 45:13
**Plaza** [1] - 2:7
**plead** [6] - 14:18, 14:19, 36:14, 55:7, 55:9, 55:22, 56:2, 56:12, 56:14, 56:15, 57:16, 63:4, 78:20, 82:17, 91:1, 91:10
**pleaded** [13] - 55:12, 55:15, 57:21, 62:19, 63:4, 63:21, 64:5, 71:22, 73:10, 73:11, 73:20, 73:22, 75:5
**pleading** [10] - 31:8, 35:4, 37:20, 37:21, 52:2, 55:6, 73:23, 76:2, 88:17, 92:24
**pleadings** [4] - 56:10, 70:16, 71:18, 71:20
**pleads** [3] - 12:11, 54:25, 56:1
**pleased** [5] - 48:16, 49:1, 49:11, 50:14, 50:16
**pled** [13] - 5:25, 31:10, 32:3, 37:5, 37:22, 38:10, 38:11, 39:11, 42:18, 51:25, 91:12, 91:14
**plenty** [2] - 18:11, 28:4

**Plymouth** [1] - 88:22
**point** [46] - 4:24,
6:22, 9:19, 10:15,
10:20, 12:22, 15:8,
15:16, 21:13, 23:8,
23:23, 23:24, 24:25,
25:5, 25:12, 27:13,
33:11, 36:18, 50:9,
50:11, 50:19, 51:5,
51:6, 51:8, 51:17,
53:8, 54:8, 59:13,
64:7, 68:10, 68:24,
69:9, 78:1, 79:1,
79:20, 79:21, 80:7,
81:6, 81:10, 81:12,
85:2, 86:3, 95:4, 97:2,
97:3
**pointed** [4] - 7:8,
9:18, 53:6, 97:5
**pointing** [1] - 74:19
**points** [9] - 6:9, 29:3,
45:16, 81:19, 89:23,
90:11, 95:18, 97:21,
97:23
**Pomerantz** [2] - 3:7,
3:10
**POMERANTZ** [1] -
1:16
**position** [8] - 26:10,
26:14, 29:16, 47:4,
55:25, 57:9, 79:17,
80:14
**positive** [1] - 13:7
**positively** [1] - 50:4
**post** [7] - 9:5, 9:8,
9:10, 9:11, 9:23,
50:15, 51:3
**Post** [1] - 63:17
**postdate** [1] - 18:18
**posted** [1] - 9:14
**posters** [2] - 50:22,
51:1
**posts** [1] - 8:6
**potential** [10] - 8:15,
20:22, 21:4, 21:10,
21:13, 21:25, 23:16,
24:13, 42:6, 55:13
**potentially** [2] -
61:17, 83:24
**power** [1] - 97:15
**powerful** [2] - 15:22,
93:7
**practical** [1] - 24:7
**practice** [1] - 25:18
**precarious** [1] -
10:14
**precedent** [1] - 17:12
**predict** [2] - 16:18,
69:24
**predicting** [1] -

77:13
**prediction** [1] - 78:7
**predictions** [3] -
54:23, 95:5, 95:11
**predictive** [3] -
94:20, 94:23, 94:25
**preliminary** [3] -
55:14, 55:19, 56:8
**present** [7] - 12:7,
30:10, 30:12, 31:21,
50:15, 93:20, 95:15
**present-tense** [1] -
12:7
**presenting** [1] - 5:8
**press** [2] - 24:1,
25:22
**presume** [1] - 12:23
**presumed** [1] - 96:22
**presumes** [1] - 82:3
**presumption** [2] -
32:4, 34:13
**presuppose** [1] -
82:24
**presupposes** [1] -
81:4
**pretty** [3] - 22:1,
40:10, 52:24
**prevail** [1] - 38:1
**prevented** [1] - 91:22
**previous** [4] - 29:17,
30:2, 30:3, 30:4
**previously** [1] - 68:2
**price** [9] - 10:17,
24:11, 32:18, 68:7,
75:17, 75:19, 77:19,
78:12, 83:8
**prices** [2] - 80:23
**primary** [1] - 88:10
**principle** [1] - 24:24
**principles** [1] - 15:11
**private** [4] - 53:13,
54:1, 57:25, 58:2
**Private** [1] - 95:6
**problem** [5] - 20:20,
20:21, 20:23, 21:1,
24:17
**problematic** [1] -
23:11
**problems** [1] - 12:10
**Proceedings** [1] -
98:6
**proceedings** [1] -
99:6
**produced** [1] - 99:6
**professional** [1] -
44:15
**profit** [1] - 40:12
**pronounce** [1] -
45:10
**proposed** [3] -

65:14, 65:15, 65:19
**prospective** [1] -
65:24
**protect** [1] - 73:15
**provide** [3] - 53:18,
54:16, 97:20
**proving** [1] - 14:19
**provision** [1] - 42:20
**PSLRA** [8] - 56:6,
57:16, 62:13, 62:20,
70:12, 88:11, 88:18,
89:11
**public** [3] - 30:25,
57:4, 72:19
**publicly** [1] - 64:8,
70:21, 82:7
**puffery** [6] - 77:25,
78:10, 93:3, 93:6,
93:17, 94:4
**pull** [3] - 22:22,
26:13, 52:20
**pulling** [1] - 10:4
**pump** [3] - 68:15,
74:8, 74:9
**pumps** [1] - 74:16
**purchase** [3] - 17:8,
41:14, 41:15
**purchases** [2] -
41:11, 44:5
**purchasing** [5] -
43:1, 43:8, 43:14,
43:20, 44:21
**purpose** [2] - 73:14,
91:24
**purposes** [1] - 35:4,
35:13, 46:3
**pursuant** [1] - 61:5
**push** [1] - 68:23
**pushing** [1] - 23:18
**put** [7] - 9:5, 12:16,
33:7, 46:1, 47:1, 48:7,
60:22
**puts** [1] - 21:8
**putting** [1] - 45:21

**Q**

**quarter** [2] - 60:5,
60:6
**questioning** [1] -
23:9
**questions** [7] - 31:1,
45:14, 47:18, 47:19,
51:7, 57:24, 58:1
**quibble** [4] - 76:12,
76:19, 76:22, 77:10
**Quibble** [1] - 77:9
**quibbles** [1] - 76:21
**quick** [1] - 89:23

**quickly** [2] - 31:2,
95:19
**quite** [1] - 23:17
**quote** [6] - 16:14,
50:12, 69:17, 69:20,
69:22, 74:24
**quoting** [1] - 89:16

**R**

**raise** [1] - 47:1
**raised** [2] - 47:19,
95:12
**raises** [1] - 5:18
**random** [2] - 15:24,
34:4
**rapidly** [2] - 32:17,
32:18
**rather** [3] - 21:8,
50:5, 93:17
**rational** [3] - 30:7,
32:22, 59:7, 59:8,
59:25, 64:8, 64:13,
82:3
**RC** [4] - 2:3, 3:23,
4:2, 59:24
**RDR** [3] - 2:9, 99:3,
99:12
**RE** [1] - 1:4
**reached** [2] - 49:2,
50:14
**react** [1] - 32:6
**reacted** [1] - 50:3
**reacting** [2] - 37:1,
38:7
**reaction** [6] - 10:10,
11:22, 16:20, 36:22,
39:16, 79:7
**read** [15] - 6:22, 9:17,
41:2, 46:4, 46:10,
48:23, 50:10, 59:9,
86:18, 87:10, 87:18,
87:22, 87:25, 88:10
**reader** [1] - 11:1
**reading** [7] - 49:15,
49:23, 49:25, 53:16,
54:5, 86:9, 86:19
**real** [3] - 41:8, 41:25
**realistic** [1] - 90:14
**reality** [1] - 90:4
**realize** [1] - 54:17
**really** [20] - 22:19,
23:10, 23:13, 30:12,
31:18, 32:16, 32:22,
33:3, 37:17, 37:19,
37:20, 40:12, 44:1,
47:10, 58:14, 72:22,
81:1, 88:15, 92:15,
93:21

**reason** [19] - 6:16,
12:12, 14:12, 19:14,
20:12, 41:6, 51:1,
53:8, 54:16, 57:24,
57:25, 58:1, 58:3,
64:22, 65:8, 65:10,
84:15, 93:19
**reasonable** [24] -
11:1, 12:19, 49:15,
49:25, 59:4, 59:6,
59:8, 68:8, 70:19,
72:4, 72:6, 72:11,
72:12, 77:3, 77:4,
77:7, 77:8, 78:2, 78:4,
82:4, 84:21, 85:14,
85:15, 96:16
**reasonably** [3] -
42:18, 80:13, 80:15
**reasons** [4] - 19:10,
34:16, 72:25, 85:24
**rebut** [1] - 61:13
**rebuttable** [1] - 32:4
**recently** [2] - 18:14,
33:7
**recharacterized** [1] -
40:16
**reckless** [2] - 6:20,
92:20
**recklessness** [4] -
6:17, 51:15, 51:20
**recognize** [1] - 52:24
**recognized** [1] -
46:18
**recognizing** [1] -
13:22
**record** [4] - 3:5,
67:21, 67:22, 73:9
**Reddit** [8] - 8:6, 9:5,
9:8, 42:4, 50:12,
50:15, 50:18, 50:21,
51:3
**refer** [1] - 54:9
**reference** [3] - 67:16,
75:16, 94:14
**referred** [2] - 15:16,
60:16
**referring** [3] - 29:9,
50:13, 75:18
**reflection** [1] - 47:6
**Reform** [1] - 95:6
**regardless** [2] -
11:15, 59:15
**regulations** [1] -
65:2
**rehabilitate** [1] - 26:9
**rejected** [2] - 92:1,
92:13
**rel** [1] - 89:1
**relatedly** [1] - 96:15
**relationship** [8] -

8:24, 9:1, 11:13,
11:18, 12:6, 48:19,
49:24, 50:1
  **release** [1] - 25:23
  **relevant** [2] - 36:3,
90:9
  **reliance** [17] - 31:3,
31:5, 31:8, 32:4, 34:9,
34:10, 34:19, 34:20,
34:25, 36:14, 36:25,
38:9, 55:8, 57:18,
82:17, 89:24, 96:22
  **reliance-based** [1] -
38:9
  **relied** [1] - 96:24
  **reluctance** [1] -
53:22
  **rely** [1] - 54:21
  **relying** [2] - 17:2,
63:15
  **remarks** [1] - 21:10
  **remember** [1] - 45:10
  **remembering** [1] -
66:12
  **repeat** [1] - 15:2
  **repeated** [1] - 9:24
  **repercussions** [1] -
13:22
  **reply** [3] - 8:5, 16:16,
31:13
  **REPORTED** [1] - 2:9
  **reported** [1] - 46:25
  **REPORTER** [1] -
52:19
  **Reporter** [2] - 2:9,
99:12
  **represent** [1] - 45:4
  **representation** [3] -
92:23, 95:21, 95:22
  **representations** [1] -
13:7
  **represented** [1] -
8:15
  **representing** [1] -
30:1
  **represents** [1] -
24:13
  **reputation** [1] -
73:15
  **request** [1] - 87:22
  **require** [2] - 34:12,
91:10
  **required** [11] - 6:13,
14:21, 24:4, 24:15,
27:4, 27:11, 46:22,
52:1, 57:6, 62:20,
76:6
  **requirement** [3] -
25:17, 54:23, 56:5
  **requirements** [1] -

31:9
  **requires** [3] - 19:1,
55:12, 64:1
  **requiring** [3] - 22:19,
51:11, 51:14
  **research** [4] - 15:20,
15:21, 93:7, 93:10
  **respect** [17] - 5:14,
5:15, 5:23, 6:14, 12:9,
15:14, 29:25, 40:17,
42:20, 52:17, 54:12,
55:11, 63:16, 84:1,
92:14, 94:14, 96:8
  **respectfully** [7] -
65:7, 68:23, 70:11,
71:2, 71:4, 81:11,
85:3
  **respond** [6] - 12:5,
36:13, 45:15, 52:12,
66:24, 84:20
  **responded** [1] -
94:10
  **response** [6] - 7:6,
8:22, 12:1, 40:14,
48:14, 48:15
  **responsibility** [4] -
46:6, 46:8, 46:14,
47:6
  **responsible** [1] -
46:16
  **rest** [1] - 97:22
  **result** [1] - 35:6
  **retail** [1] - 69:22
  **retaining** [1] - 42:2
  **Retirement** [1] -
88:23
  **review** [2] - 46:12,
62:18
  **rewrite** [1] - 66:1
  **rhyme** [1] - 45:9
  **rightly** [1] - 46:3
  **rigorous** [1] - 88:7
  **Rio** [3] - 38:20,
38:23, 40:2
  **rise** [8] - 53:6, 53:25,
76:10, 76:25, 77:17,
77:23, 78:15, 85:25
  **rises** [1] - 55:16
  **risk** [1] - 37:9
  **road** [2] - 16:19, 73:8
  **road-tested** [2] -
16:19, 73:8
  **role** [1] - 46:6
  **Room** [1] - 2:11
  **round** [1] - 81:16
  **ruin** [1] - 74:1
  **Rule** [9] - 37:19,
53:18, 57:15, 62:20,
65:4, 66:7, 83:25,
84:11, 85:12

  **rule** [7] - 22:23,
27:14, 44:3, 52:22,
53:24, 66:3, 89:16
  **rules** [2] - 65:1, 95:8
  **running** [1] - 33:20
  **RYAN** [1] - 2:2
  **Ryan** [7] - 3:23, 4:1,
36:23, 59:23, 59:24,
62:7, 73:1

**S**

  **SAC** [1] - 14:10
  **Sachs** [1] - 90:17
  **safe** [5] - 17:11,
17:21, 95:5, 95:6,
95:9
  **sake** [1] - 6:8
  **salacious** [4] - 61:4,
61:25, 63:18, 72:21
  **sale** [18] - 8:15, 17:9,
20:22, 21:4, 21:10,
21:25, 23:16, 24:13,
65:11, 65:15, 65:25,
67:23, 74:15, 74:22,
82:10, 83:23, 84:12,
92:13
  **sales** [13] - 10:12,
11:19, 22:5, 26:12,
29:20, 29:24, 37:22,
41:11, 41:25, 42:6,
65:19, 65:23, 74:11
  **sarcasm** [1] - 94:13
  **sarcastic** [1] - 14:5
  **save** [1] - 65:8
  **saw** [7] - 6:2, 8:5,
24:10, 26:20, 26:21,
41:3, 75:24
  **scanned** [1] - 26:21
  **scenario** [5] - 69:5,
69:6, 69:7, 70:1,
72:21
  **Schedule** [5] - 16:25,
18:1, 28:6, 38:6,
39:20
  **scheme** [16] - 16:8,
16:19, 22:8, 27:19,
27:22, 28:14, 28:20,
29:1, 38:16, 38:24,
39:3, 39:6, 40:7,
40:11, 40:12
  **scienter** [18] - 6:13,
51:6, 55:10, 57:17,
59:13, 64:7, 66:7,
69:1, 73:21, 78:21,
79:3, 79:16, 81:13,
90:18, 91:1, 92:25
  **scope** [1] - 46:19
  **scurrilous** [1] -

73:15
  **SDNY** [1] - 18:22
  **search** [1] - 79:1
  **SEC** [20] - 17:20,
38:20, 40:20, 40:24,
41:18, 41:20, 46:23,
65:2, 65:10, 66:2,
72:14, 73:10, 74:20,
78:21, 78:23, 80:17,
82:7, 82:11, 96:1,
96:20
  **SEC's** [4] - 64:25,
65:4, 65:5, 97:13
  **second** [12] - 6:21,
8:14, 19:24, 40:1,
51:5, 51:7, 54:9, 58:5,
71:24, 81:18, 85:20
  **Second** [14] - 17:25,
18:3, 18:17, 38:19,
38:21, 39:4, 52:17,
52:22, 52:24, 54:17,
54:18, 64:1, 70:2,
74:11
  **section** [2] - 18:24,
86:9
  **Section** [17] - 13:16,
13:17, 17:3, 18:2,
18:11, 42:16, 42:17,
43:17, 43:22, 53:3,
53:16, 53:17, 53:21,
53:25, 54:1, 55:24
  **SECURITIES** [1] -
1:5
  **Securities** [1] - 95:6
  **securities** [19] - 17:9,
21:9, 29:6, 29:10,
29:14, 54:11, 54:19,
56:7, 56:11, 57:15,
65:16, 77:24, 78:25,
87:2, 87:11, 87:14,
87:17, 87:18, 96:20
  **securities-based** [1]
- 87:14
  **security** [4] - 40:20,
43:4, 43:5, 86:8
  **security-based** [3] -
43:4, 43:5, 86:8
  **see** [6] - 12:15,
44:11, 60:19, 71:13,
81:8, 85:4
  **seeing** [1] - 64:15
  **seek** [1] - 18:1
  **seeking** [1] - 54:3
  **seem** [1] - 45:14
  **selective** [1] -
71:1
  **selectively** [1] -
69:20
  **self** [2] - 27:17, 59:25
  **self-destructive** [1] -
27:17

  **self-interested** [1] -
59:25
  **sell** [49] - 14:15,
14:23, 19:2, 19:8,
21:19, 21:22, 21:25,
22:2, 22:3, 22:20,
23:1, 23:5, 23:17,
28:7, 29:16, 39:19,
39:20, 41:21, 43:9,
47:21, 48:5, 55:2,
55:24, 56:16, 58:11,
58:20, 64:2, 64:10,
64:16, 66:5, 66:11,
67:6, 68:2, 68:4,
82:22, 83:2, 83:10,
83:22, 85:1, 85:10,
85:11, 87:18, 95:23,
96:4, 96:10
  **seller** [1] - 22:19
  **SELLERS** [1] - 1:19
  **sellers** [1] - 32:2
  **selling** [13] - 15:4,
15:13, 27:15, 37:24,
40:3, 43:1, 43:7,
43:14, 43:20, 44:20,
47:21, 86:15, 86:20
  **sells** [2] - 43:23, 68:8
  **send** [3] - 20:13,
25:22, 97:19
  **sending** [4] - 13:20,
14:16, 15:23, 34:4
  **sends** [1] - 94:18
  **sense** [4] - 64:16,
71:22, 75:21
  **sent** [9] - 15:25,
20:14, 20:15, 20:17,
21:23, 26:18, 28:8,
94:7
  **sentence** [1] - 18:9
  **series** [3] - 40:19,
40:22, 40:23
  **services** [1] - 74:7
  **set** [3] - 24:6, 68:8,
72:23, 88:14, 95:8
  **settlement** [5] - 6:1,
46:1, 46:5, 46:10,
46:21
  **Seventh** [1] - 56:9
  **several** [3] - 14:7,
60:22, 68:14
  **share** [5] - 68:7,
74:10, 75:17, 77:19,
94:9
  **shared** [2] - 14:5,
33:9
  **shareholder** [5] -
49:13, 53:19, 57:8,
59:8
  **shareholder's** [1] -
54:12

**shareholdings** [2] - 48:20

**shares** [50] - 6:24, 7:20, 8:13, 8:19, 10:4, 12:13, 13:6, 14:8, 14:15, 14:24, 15:13, 19:16, 20:3, 20:18, 21:12, 23:1, 23:4, 23:25, 26:19, 27:16, 28:4, 29:22, 30:13, 31:22, 37:24, 40:1, 40:3, 40:11, 42:2, 42:3, 42:5, 42:8, 43:20, 44:5, 44:21, 48:5, 54:13, 56:25, 57:2, 58:12, 58:21, 61:7, 64:10, 64:16, 67:6, 74:15, 74:16, 82:10, 83:22, 96:5

**sharing** [2] - 61:15, 62:2

**Shea** [1] - 89:1

**shenk** [1] - 89:13

**SHENK** [1] - 89:14

**shoes** [1] - 18:7

**shopping** [1] - 94:12

**short** [2] - 31:25, 32:2

**shortly** [3] - 83:4, 83:5, 98:5

**shot** [2] - 62:11, 81:14

**show** [9] - 15:22, 55:12, 57:10, 59:16, 63:5, 66:25, 67:2, 78:18, 82:2

**showed** [1] - 20:5

**showing** [10] - 24:16, 24:22, 33:7, 55:7, 55:9, 55:23, 56:14, 56:15, 57:16, 79:6

**shows** [5] - 9:23, 31:24, 35:5, 92:23, 93:7

**Si** [1] - 3:2

**sic** [1] - 72:13

**side** [1] - 81:22

**sign** [3] - 46:2, 46:11, 47:8

**signaling** [1] - 95:2

**signals** [1] - 42:1

**signed** [9] - 20:6, 20:9, 21:16, 22:3, 24:18, 24:19, 24:20, 64:19, 91:24

**significant** [3] - 40:10, 80:9, 87:6

**significantly** [1] - 72:13

**signing** [2] - 23:11,

23:19

**silly** [6] - 33:15, 58:25, 59:1, 59:2, 72:2, 72:3

**Silverman** [2] - 3:10, 3:11

**SILVERMAN** [2] - 1:15, 3:9

**similar** [1] - 12:25

**simple** [1] - 93:16

**simply** [8] - 17:7, 31:17, 38:23, 39:25, 57:2, 62:14, 70:2, 96:21

**simultaneously** [1] - 35:3

**single** [5] - 58:15, 61:21, 61:22, 62:19, 90:21

**sitting** [3] - 33:22, 54:18, 65:17

**situation** [1] - 10:14

**situations** [3] - 25:14, 60:7, 68:4

**six** [2] - 95:22, 96:10

**skeptical** [1] - 40:19

**sky** [1] - 24:11

**slicing** [1] - 22:1

**slipped** [1] - 51:7

**slow** [2] - 22:9, 26:23

**slow-walked** [1] - 26:23

**slow-walking** [1] - 22:9

**smoking** [3] - 14:20, 90:25

**soft** [1] - 12:24

**sold** [45] - 6:24, 7:1, 7:4, 8:13, 8:19, 8:21, 12:12, 13:6, 14:2, 14:8, 14:12, 19:16, 20:3, 20:18, 21:6, 21:9, 21:12, 21:21, 23:12, 23:24, 24:7, 24:8, 24:11, 24:21, 26:19, 28:4, 29:6, 29:14, 29:22, 30:2, 30:13, 30:15, 40:1, 40:11, 41:21, 41:22, 63:12, 64:19, 65:23, 74:14, 83:10, 92:20, 97:18

**solid** [1] - 82:22

**solving** [1] - 12:9

**someone** [13] - 6:18, 6:19, 25:23, 34:1, 39:8, 39:22, 58:24, 74:9, 84:22, 86:6, 86:11, 87:6, 97:18

**sometimes** [2] -

12:17, 25:19

**somewhere** [1] - 23:19

**soon** [1] - 6:5

**sorry** [9] - 7:5, 11:21, 16:5, 42:23, 47:24, 60:21, 67:18, 76:18, 86:12

**sort** [5] - 9:15, 12:24, 29:4, 44:8, 96:17

**sound** [2] - 8:5, 89:10

**sounds** [2] - 21:24, 30:9

**soured** [9] - 13:19, 14:3, 14:11, 14:13, 63:24, 63:25, 64:3, 70:2, 92:16

**South** [1] - 1:16

**Southern** [3] - 18:11, 41:6, 41:13

**spare** [1] - 56:9

**speaking** [1] - 9:3

**special** [1] - 46:11

**specific** [7] - 12:3, 28:23, 47:20, 48:4, 62:19, 64:22, 93:24

**specifically** [2] - 25:12, 37:10

**specificity** [1] - 78:20

**speculation** [1] - 8:20

**spend** [1] - 5:4

**spent** [1] - 79:15

**spike** [1] - 36:16

**spin** [1] - 49:16

**spoken** [1] - 23:12

**square** [2] - 83:5, 83:7

**stage** [7] - 23:14, 33:6, 57:13, 60:25, 68:20, 88:2, 90:22

**stages** [1] - 38:1

**stake** [1] - 33:23

**stakes** [2] - 33:19, 43:9

**stand** [1] - 4:22

**standard** [17] - 22:23, 31:14, 37:21, 56:10, 59:4, 70:17, 71:21, 72:11, 79:4, 79:5, 88:10, 88:11, 90:19, 91:5, 91:8, 91:9, 94:1

**standards** [4] - 52:2, 71:18, 91:11, 91:12

**standing** [2] - 18:6, 18:8

**start** [4] - 5:22, 31:7,

52:13, 72:8

**started** [5] - 13:19, 13:20, 14:12, 14:15, 14:24

**starters** [1] - 57:19

**starting** [2] - 3:5, 71:16

**state** [4] - 5:13, 48:19, 66:11

**statement** [46] - 5:25, 7:15, 7:16, 7:23, 8:11, 9:4, 9:11, 9:24, 10:3, 10:22, 11:7, 11:22, 12:20, 12:24, 13:1, 14:11, 18:1, 25:15, 25:16, 28:22, 37:12, 38:4, 39:18, 45:18, 45:21, 45:22, 47:12, 47:15, 50:12, 50:18, 50:25, 52:5, 55:9, 56:8, 66:6, 75:3, 75:19, 76:3, 78:13, 78:14, 78:16, 93:16, 93:17, 94:25, 95:14, 95:15

**statements** [20] - 7:3, 7:13, 12:1, 12:7, 12:17, 17:21, 30:17, 36:2, 36:3, 38:23, 46:19, 47:13, 63:19, 77:23, 79:25, 80:24, 81:5, 92:19, 95:7, 95:12

**STATES** [2] - 1:1, 1:11

**States** [4] - 2:10, 61:17, 89:1, 99:13

**status** [3] - 9:1, 44:9, 50:1

**statute** [4] - 25:14, 41:2, 43:10, 95:5

**statutory** [3] - 41:3, 42:25, 44:18

**stay** [2] - 5:11, 5:14

**stayed** [3] - 4:18, 5:15, 35:22

**staying** [2] - 4:13, 36:6

**STEEN** [1] - 2:6

**stenographic** [1] - 99:5

**steps** [1] - 48:12

**stick** [1] - 88:25

**still** [22] - 7:19, 12:18, 13:6, 29:25, 33:22, 35:12, 35:17, 35:23, 36:4, 36:6, 36:17, 42:3, 42:25, 48:5, 48:10, 49:8, 50:6, 63:4, 77:9,

90:21, 92:10

**stimulating** [1] - 27:25

**Stock** [1] - 79:19

**stock** [42] - 10:17, 16:15, 25:23, 31:23, 32:18, 33:17, 37:5, 37:22, 38:3, 38:10, 38:11, 43:15, 51:18, 56:23, 58:6, 63:6, 64:2, 64:12, 64:14, 67:4, 68:5, 69:23, 70:2, 70:22, 74:8, 74:16, 74:22, 75:19, 78:7, 78:12, 80:22, 80:23, 82:19, 83:8, 83:21, 92:20, 93:15, 93:20, 94:15, 95:3, 95:23

**stock's** [1] - 77:6

**stocks** [8] - 6:6, 26:13, 33:8, 43:24, 55:24, 63:12, 64:19, 76:12

**stood** [1] - 82:20

**store** [1] - 94:12

**stories** [2] - 74:8, 74:10

**story** [2] - 9:17, 71:3

**stove** [1] - 45:10

**straight** [2] - 11:13, 26:3

**strategic** [1] - 91:20

**strategy** [2] - 83:20, 92:1

**street** [1] - 44:21

**Street** [2] - 1:16, 1:23

**strikes** [4] - 11:5, 29:11, 68:16, 68:21

**stringent** [3] - 56:10, 71:18, 90:19

**strong** [3] - 12:11, 53:21, 87:22

**strongest** [1] - 19:10

**strongly** [1] - 79:3

**study** [2] - 33:7, 73:22

**stuff** [2] - 55:5, 73:18

**subject** [1] - 76:3

**submit** [1] - 27:10

**submits** [1] - 19:1

**submitted** [5] - 19:16, 22:6, 26:21, 26:22, 27:4

**substantiate** [3] - 54:4, 62:15, 79:2

**substantiated** [1] - 15:19

**substantiates** [1] - 62:21

**substantiating** [1] - 61:22
**substantive** [3] - 76:7, 76:23, 95:19
**subtleties** [1] - 58:3
**suddenly** [1] - 24:10
**Sue** [1] - 4:5
**sue** [2] - 17:3, 17:6
**SUE** [1] - 2:6
**sues** [1] - 25:23
**sufficient** [10] - 5:23, 6:16, 10:23, 15:11, 28:3, 38:24, 45:20, 96:6, 96:25
**suggest** [12] - 15:22, 37:12, 66:11, 70:1, 72:15, 76:8, 78:17, 80:1, 92:12, 94:21, 96:25
**suggested** [1] - 97:4
**suggesting** [5] - 7:17, 24:17, 67:24, 88:12, 93:24
**suggestion** [1] - 77:15
**suggests** [1] - 19:22
**suing** [1] - 17:8
**suit** [1] - 17:5
**Suite** [2] - 1:17, 1:24
**suits** [1] - 53:22
**summary** [2] - 33:6, 91:6
**support** [3] - 51:25, 68:17, 73:20
**suppose** [1] - 84:8
**supposed** [4] - 66:11, 68:20, 69:12, 85:8
**supposition** [2] - 67:1, 70:25
**Supreme** [13] - 13:1, 14:21, 17:12, 32:24, 33:1, 59:18, 70:13, 70:17, 71:10, 80:20, 90:15, 96:18, 96:19
**surely** [1] - 25:4
**surplusage** [1] - 44:13
**survives** [1] - 42:19
**sustained** [1] - 73:23
**sustains** [1] - 81:8
**swap** [6] - 43:4, 43:5, 86:8, 87:11, 87:14
**system** [1] - 97:7

# T

**T-E-L-L-A-B-S** [1] - 71:12

**Table** [1] - 29:7
**Takata** [3] - 53:8, 53:11, 53:17
**talks** [5] - 8:12, 32:2, 41:14, 74:11, 97:13
**tantamount** [1] - 91:6
**tea** [1] - 87:23
**technical** [1] - 36:9
**Tellabs** [14] - 14:21, 59:17, 59:18, 59:21, 70:18, 71:11, 71:13, 71:14, 88:9, 88:12, 88:15, 88:21, 90:23, 91:3
**temporal** [1] - 25:17
**tense** [8] - 12:7, 30:9, 30:10, 30:13, 48:17, 50:14, 50:16, 50:24
**tentative** [3] - 54:24, 55:18, 55:20
**terms** [4] - 6:12, 10:19, 64:18, 90:14
**terrible** [3] - 64:15, 67:18
**test** [1] - 80:22
**tested** [2] - 16:19, 73:8
**text** [2] - 53:16, 53:17
**THAU** [59] - 2:2, 3:22, 45:5, 52:11, 52:21, 55:19, 55:22, 56:6, 57:12, 60:24, 61:2, 63:3, 63:13, 63:15, 64:20, 66:13, 66:15, 66:22, 67:21, 68:23, 71:12, 71:14, 74:20, 75:1, 75:12, 75:25, 76:14, 76:16, 76:18, 76:21, 77:19, 79:11, 79:14, 80:6, 81:3, 81:17, 81:21, 81:24, 82:2, 82:23, 83:3, 83:7, 83:12, 83:14, 84:18, 85:3, 85:20, 85:23, 86:1, 86:9, 86:13, 86:15, 86:25, 87:9, 87:16, 87:21, 88:12, 89:12, 89:18
**thau** [1] - 45:16
**Thau** [9] - 3:22, 3:24, 45:4, 52:8, 52:10, 64:24, 87:20, 89:17, 89:25
**THE** [157] - 1:1, 1:11, 1:14, 2:2, 2:6, 3:1, 3:8, 3:11, 3:14, 3:17,

3:21, 3:24, 4:3, 4:7, 5:13, 5:16, 6:2, 7:5, 7:15, 10:1, 10:7, 10:24, 11:5, 11:21, 13:10, 13:14, 15:7, 16:5, 16:11, 17:24, 18:15, 18:17, 18:20, 19:19, 19:22, 20:5, 20:9, 20:20, 21:1, 21:8, 21:14, 21:20, 21:24, 22:10, 22:18, 23:7, 24:12, 25:3, 26:10, 26:23, 27:1, 27:6, 27:13, 28:12, 28:23, 29:5, 29:9, 30:6, 31:4, 32:5, 32:12, 34:8, 34:18, 34:22, 35:2, 35:7, 35:12, 35:19, 36:5, 36:9, 36:13, 38:15, 40:18, 41:13, 42:8, 42:23, 43:3, 43:16, 43:22, 44:11, 44:22, 45:2, 45:6, 45:11, 45:23, 46:20, 47:14, 47:24, 48:7, 49:3, 49:16, 50:2, 51:4, 52:7, 52:10, 52:19, 55:16, 55:20, 56:4, 57:9, 60:21, 60:25, 62:22, 63:10, 63:14, 64:17, 66:10, 66:14, 66:17, 67:18, 68:10, 71:9, 71:13, 74:18, 74:23, 75:10, 75:24, 76:11, 76:15, 76:17, 76:19, 77:17, 79:9, 79:12, 80:4, 80:19, 81:14, 81:20, 81:22, 81:25, 82:16, 82:25, 83:4, 83:11, 83:13, 84:13, 85:2, 85:17, 85:22, 85:25, 86:2, 86:12, 86:14, 86:23, 87:3, 87:13, 87:20, 88:9, 89:10, 89:17, 89:20, 93:2, 93:13, 94:2, 94:23, 97:24, 98:2
**themselves** [1] - 41:10
**theoretically** [1] - 25:21
**theory** [5] - 37:23, 81:9, 82:5, 82:11, 83:1
**therefore** [1] - 93:25
**they've** [6] - 13:23, 14:11, 16:25, 68:21, 71:5, 73:17

**thinking** [2] - 15:13, 67:20
**thinly** [1] - 22:1
**third** [2] - 51:12, 77:22
**Third** [1] - 18:23
**Thomas** [1] - 46:18
**Thompson** [1] - 96:2
**thorough** [2] - 4:9, 97:25
**thousand** [1] - 9:23
**thousands** [1] - 15:25
**thread** [2] - 50:12, 50:21
**three** [19] - 9:18, 9:22, 21:9, 29:6, 29:14, 29:17, 30:2, 30:4, 55:7, 55:8, 57:19, 61:8, 61:10, 62:6, 69:7, 76:21, 78:17, 91:19, 95:18
**thrown** [1] - 73:18
**timeline** [2] - 68:16, 68:22
**timely** [2] - 46:25, 82:9
**timing** [7] - 10:2, 23:10, 24:17, 25:6, 62:23, 64:18, 84:16
**Tinto** [3] - 38:20, 38:23, 40:2
**tip** [2] - 49:18, 63:9
**tipped** [2] - 61:20, 62:7
**tipping** [2] - 49:18, 62:16
**title** [1] - 65:15
**today** [1] - 30:10
**together** [2] - 12:14, 85:25
**TOLL** [1] - 1:19
**tongue** [1] - 84:9
**top** [1] - 89:4
**total** [2] - 72:13, 72:15
**totality** [1] - 58:20
**touch** [1] - 36:10
**touched** [1] - 38:15
**tourek** [1] - 5:11
**Tourek** [2] - 3:13, 5:12
**TOUREK** [2] - 1:15, 3:12
**tout** [1] - 74:7
**touting** [1] - 74:22
**towards** [2] - 28:19, 37:4
**trade** [2] - 23:21, 62:17

**traded** [3] - 23:20, 67:10, 82:19
**trader** [1] - 44:15
**trades** [1] - 43:23
**trading** [13] - 19:16, 32:21, 41:8, 61:18, 61:19, 62:6, 62:14, 63:22, 70:25, 73:16, 78:25, 79:7, 91:15
**transaction** [2] - 41:16, 42:9
**transactions** [2] - 40:20, 40:23
**transcript** [2] - 99:5, 99:6
**TRANSCRIPT** [1] - 1:10
**treat** [2] - 13:24, 59:4, 65:11
**trend** [1] - 53:21
**TREVOR** [1] - 1:11
**trickier** [1] - 5:1
**tried** [4] - 13:23, 17:3, 25:2, 44:6
**tries** [1] - 44:6
**true** [13] - 7:19, 9:21, 11:5, 12:18, 13:25, 19:7, 27:5, 29:21, 30:1, 51:23, 52:2, 99:4, 99:5
**try** [4] - 5:19, 13:15, 45:12, 89:22
**trying** [13] - 10:19, 13:14, 13:24, 30:8, 30:18, 36:24, 38:5, 38:23, 40:5, 78:24, 87:22, 88:25, 94:3
**turn** [2] - 33:21, 52:8
**turnaround** [1] - 92:1
**turns** [2] - 23:16, 25:9
**tweet** [19] - 14:4, 15:14, 16:1, 16:23, 34:16, 37:16, 71:8, 72:10, 74:19, 74:23, 75:8, 75:14, 75:18, 75:24, 78:21, 78:23, 82:8, 93:2, 94:7
**tweeted** [1] - 16:13
**tweeter** [1] - 75:14
**tweeting** [3] - 13:20, 14:12, 14:24
**tweets** [4] - 13:20, 14:16, 28:9, 50:4
**Twitter** [6] - 13:20, 17:17, 17:19, 90:2, 90:6, 90:7
**two** [20] - 6:9, 8:12, 8:16, 9:18, 9:22, 31:2, 37:7, 40:15, 40:17,

48:11, 64:7, 67:25, 73:6, 78:21, 78:23, 80:12, 81:19, 91:19, 91:20, 95:18
**type** [8] - 44:14, 49:3, 67:13, 70:16, 71:4, 71:20, 71:21, 84:2
**typical** [1] - 74:9
**typically** [1] - 31:21

## U

**U.S** [1] - 97:6
**ultimate** [1] - 40:12
**unbeknownst** [1] - 10:3
**uncertain** [2] - 6:25, 7:10
**uncle** [1] - 61:10
**unclear** [2] - 10:8, 28:2
**under** [26] - 15:3, 17:3, 18:2, 19:23, 37:19, 46:19, 47:10, 52:23, 53:3, 53:23, 54:1, 54:11, 54:19, 56:11, 57:15, 57:23, 59:17, 62:20, 65:4, 65:5, 65:22, 77:24, 88:17, 91:11, 92:7, 98:4
**undercut** [2] - 80:22, 81:2
**underlying** [1] - 93:11
**undermines** [1] - 92:23
**undermining** [2] - 82:17, 94:7
**understood** [3] - 9:23, 10:1, 35:15
**undertook** [1] - 56:24
**unfortunate** [1] - 10:2
**UNITED** [2] - 1:1, 1:11
**united** [1] - 2:10
**United** [3] - 61:17, 89:1, 99:13
**units** [1] - 65:23
**unlawful** [1] - 22:17
**unless** [2] - 31:1, 97:22
**unsupported** [1] - 89:8
**untoward** [2] - 83:24, 85:4

**untrue** [1] - 37:13
**up** [26] - 11:10, 15:1, 24:1, 24:13, 25:6, 36:23, 58:22, 62:8, 62:12, 64:12, 64:13, 64:14, 67:4, 67:19, 68:7, 69:2, 69:3, 70:22, 74:8, 74:16, 78:12, 83:8, 83:21, 84:15, 84:24, 86:21
**upheld** [1] - 28:21
**uploads** [1] - 9:9
**useful** [1] - 5:6
**uses** [1] - 93:5
**Ute** [10] - 34:10, 34:12, 34:20, 34:25, 35:6, 35:14, 35:17, 35:24, 81:19, 82:1

## V

**valuable** [1] - 93:21
**value** [4] - 49:13, 74:8, 74:10, 80:21
**variations** [1] - 25:19
**various** [3] - 33:9, 40:24, 74:19
**Ventures** [3] - 3:23, 4:2, 59:24
**VENTURES** [1] - 2:3
**verification** [1] - 76:4
**verify** [1] - 10:21
**version** [1] - 68:21
**versus** [10] - 3:2, 28:3, 38:20, 55:17, 65:9, 88:23, 89:1, 89:5, 89:14, 96:1
**view** [4] - 32:20, 38:20, 50:19, 90:13
**viewed** [1] - 9:16
**views** [1] - 14:9
**Vincent** [2] - 3:23, 4:1
**VINSON** [1] - 2:3
**violated** [1] - 92:2
**violation** [2] - 28:15, 53:25
**virtue** [1] - 57:2

## W

**waived** [1] - 95:12
**wake** [1] - 24:1
**walked** [1] - 26:23
**walking** [1] - 22:9
**wall** [1] - 73:18
**wants** [1] - 96:11
**wash** [1] - 74:11

**Washington** [4] - 1:6, 1:21, 2:12, 99:14
**ways** [3] - 15:22, 37:7, 38:6
**weeks** [3] - 10:13, 62:24, 68:14
**weigh** [1] - 70:18
**weight** [1] - 97:14
**whereas** [2] - 24:19, 30:9
**whole** [8] - 6:19, 17:13, 37:23, 44:13, 46:9, 62:13, 73:14
**widely** [1] - 31:23
**wild** [1] - 72:25
**wildly** [1] - 72:20
**willing** [1] - 13:12
**wish** [1] - 78:9
**withdraw** [1] - 7:19
**withdrawing** [1] - 6:6
**woman** [2] - 75:20, 94:11
**word** [7] - 32:1, 45:3, 58:24, 65:3, 66:24, 72:2, 89:21
**words** [7] - 9:13, 16:1, 26:12, 37:16, 65:4, 93:24, 94:19
**world** [4] - 6:7, 26:17, 83:15
**write** [3] - 73:5, 74:8, 74:9
**written** [1] - 93:15

## Y

**year** [4] - 8:25, 25:20, 53:7, 58:7
**years** [1] - 26:3
**York** [10] - 1:20, 1:24, 2:4, 2:7, 18:12, 63:17, 79:19
**yourself** [1] - 26:9
**yourselves** [1] - 3:5
**YouTube** [1] - 69:10