**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE BED BATH & BEYOND CORPORATION SECURITIES LITIGATION, | Case No. 1:22-cv-2541 (TNM) |

<u>**MEMORANDUM OPINION**</u>

Ryan Cohen is an entrepreneur-turned-investor.  A few years back, he bought a 10% stake in Bed Bath & Beyond.  Using his cachet with small-time investors, he sent the stock price soaring through a series of tweets and regulatory filings.  But those so-called meme stock investors had flown too close to the sun.  Once news broke that Cohen had sold his entire stake, the stock plummeted.  And when the dust settled investors were out millions.

So one of them filed this securities class action against Cohen, his company, Bed Bath, and its CEO.  All four now move to dismiss.  Most of the claims against Cohen will survive. The investor has adequately alleged that Cohen and his company misled investors and traded on inside information.  But the claims against Bed Bath's CEO must be dismissed; she did no such thing.  Finally, because Bed Bath has since declared bankruptcy, the Court must stay the claims against it for now.

**I.**

Ryan Cohen built an online pet store and sold it for over $3 billion.[1]  *See* Sec. Am. Compl. (Compl.) ¶¶ 41–43.  Using that big score, he turned to investing.  At first, he bought "mainstream" stocks.  *Id.* ¶ 45.  But he eventually turned to "meme stocks," stocks popular with certain "online" retail investors.  *See id.* ¶ 53.  Those meme stock investors gather on Twitter and

---

[1]  The following factual recitation is based on the Complaint's allegations, which the Court for now accepts as true.  *See L. Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir. 2017).

Reddit, often using memes and emojis to discuss their trades (thus the name "meme stock").  *See id.* ¶¶ 4, 46–51.  And they often battle "institutional investors who were shorting . . . meme stocks," coordinating to try to short squeeze them.  *Id*. ¶ 50.

A short squeeze happens when many investors bet that a stock's price will fall and instead the price rises.  That "squeezes" those betting against the stock who then try to cut their losses by buying shares of the rising stock, and that drives the price even higher.  *See id.* ¶ 26.

Cohen entered the fray in 2020 by buying a large stake in GameStop.  *See id.* ¶ 53.  After buying that stake, he made public business recommendations and selected several directors for its board.  *See id.* ¶¶ 55–56, 64.  The company had already been a hit with meme stock investors.  *See id.* ¶ 59.  But when they found out about Cohen's purchase, the company's stock price rose by over 40%.  *See id.* ¶ 53.  Cohen played into that online energy, interacting with his hundreds of thousands of followers on Twitter.  *See, e.g.*, *id.*, ¶¶ 8, 73–77, 83.  And he "quickly [became] the leader of" meme stock investors.  *Id.* ¶ 60.

Cohen used the same playbook with Bed Bath & Beyond.  A year ago, he bought a 9% stake, and with this leverage he made public business recommendations and picked several members for its board of directors.  *See id*. ¶¶ 92–101.  As with GameStop, Bed Bath's stock price soared.  *See id.* ¶ 97.  And it too became a meme stock.  *See id.* ¶¶ 96–97.

Still, Bed Bath faced serious financial headwinds.  For several years in a row, the company had been hemorrhaging money.  *See id.* ¶¶ 86–91.  To raise more, Cohen wanted Bed Bath to sell off its subsidiary store, buybuy BABY, which sells items for babies and children.  *See id.* ¶ 95.

But August 2022 brought more bad news for Cohen.  Though Bed Bath flirted with Cohen's proposal, its leadership did not acquiesce.  Rather than selling buybuy BABY, Bed Bath

used it as collateral to borrow money.  *See id.* ¶¶ 119–35.  When that credit agreement was finalized in late August 2022, Cohen's suggestion was dead in the water.  *See id.*

And there was more bad news.  Around the same time, Bed Bath announced that it was firing 20% of its workforce and closing 150 stores.  *Id.* ¶ 199.  And just one day later, Bed Bath's investment rating was downgraded.  *Id.* ¶ 200.

But before all that became public, Cohen hatched a plan to escape with a profit before the stock price tanked.  *See id.* ¶ 138.  Starting in early August, Cohen made a series of moves designed to increase the stock price so that he could sell high.  He fanned the meme stock flames.

First, Cohen tweeted.  On August 12, 2022, CNBC tweeted a negative story about Bed Bath, accompanied by a picture of a woman pushing a shopping cart.  Cohen fired back:



*Id.* ¶ 147.  Some online communities understand the smiley moon emoji to mean "to the moon" or "take it to the moon."  *See id.* ¶¶ 148–55.  In other words, according to Plaintiff, Cohen was telling his hundreds of thousands of followers that Bed Bath's stock was going up and that they should buy or hold.  They did so, sending the price soaring.  *See id.* ¶¶ 4, 153, 156.

Four days later, Cohen filed a document with the SEC stating that he had not recently sold any stock—called a 13D.  *See id.* ¶ 159.  If he had any concrete plans to sell, he needed to disclose that in the form.  But Cohen mentioned no such plans.  So some investors read this as Cohen's continued enthusiasm for Bed Bath.  *See id.* ¶ 162.  And again, the stock price went up. *See id.* ¶¶ 163–64.

Finally, later that same day Cohen filed a Form 144, which outlined his *potential* plan to sell stock. *See id.* ¶ 169. The stock price held. *See id.* ¶ 175.

Shortly after Cohen submitted that Form 144, Bed Bath received media questions about it. *See id.* ¶¶ 179–80. Presumably, reporters wanted to know if Cohen had soured on Bed Bath. In a published statement, Bed Bath told investors that it was "pleased to have reached a constructive agreement with RC Ventures in March." *Id.* And it offered some other corporate platitudes. *Id.* (discussing "execut[ing] on priorities" and "working expeditiously").

Meanwhile, on August 16 and 17, Cohen quietly sold his entire stake in Bed Bath. *See id.* ¶ 165–68. He made out handsomely, profiting $68 million. *See id.* ¶ 168.

Once news finally broke that Cohen had sold, Bed Bath's stock plunged. *Id.* ¶ 178. After closing at over $20 on August 16 and $23 on August 17, the stock plummeted to under $9 within the next few days. *Id.* ¶¶ 164, 166, 178. Many investors lost a lot of money.

One such investor, Bratya SPRL, sued. It alleges that this was a pump-and-dump-scheme. *See id.* ¶¶ 7–8. That happened in two steps. Cohen first drove up the price, using his influence to mislead investors into buying or holding Bed Bath stock. Then, once his fans drove the price up, he sold, leaving them holding the bag. *See id.* ¶¶ 31–33 (describing such schemes).

Bratya claims that Cohen; his company, RC Ventures; Bed Bath; and its CEO, Sue Gove, all violated various securities laws. All four Defendants move to dismiss.

## II.

To survive a motion to dismiss under Rule 12(b)(6), Bratya must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). So Bratya must plead facts "that allow[] the court to draw the reasonable inference that the

4

defendant is liable." *Id.*  The Court treats the Complaint's factual allegations as true and reads inferences in Bratya's favor.  *See Tillerson*, 865 F.3d at 649.

Bratya's securities fraud claims must also survive the heightened requirements of Rule 9(b) and the Private Securities Litigation Reform Act.  To satisfy Rule 9(b), Bratya must "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  And to satisfy the Reform Act, Bratya must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u–4(b)(1).  If Bratya's claims are "made on information and belief, [Bratya must] state with particularity all facts on which that belief is formed."  *Id.*  Plus, when alleging a defendant's mental state, Bratya must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* § 78u–4(b)(2)(A).

### III.

Start with Bratya's claims against Bed Bath and its CEO, Sue Gove.  Bed Bath has declared bankruptcy, so the case against it is automatically stayed.  *See* 11 U.S.C. § 362(a)(1)–(3).  And Bratya has stated no claim against Sue Gove, so the Court will grant her motion to dismiss.

Bratya's main claim against Bed Bath and Gove is that they violated "Section 10(b) of the Exchange Act and [SEC] Rule 10b–5(b)."  Compl. ¶ 228.  Those laws "prohibit making any material misstatement or omission in connection with the purchase or sale of any security." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).  To make out a Section 10(b) and Rule 10b–5 claim, Bratya must plausibly allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or

omission; (5) economic loss; and (6) loss causation." *Id.* (cleaned up).

Bratya says that Bed Bath and Gove violated those provisions when it gave the following

statement on August 17, 2022:

> We were pleased to have reached a constructive agreement with RC Ventures in March and are committed to maximizing value for all shareholders.  We are continuing to execute on our priorities to enhance liquidity, make strategic changes and improve operations to win back customers, and drive cost efficiencies; all to restore our company to its heritage as the best destination for the home, for all stakeholders.  Specifically, we have been working expeditiously over the past several weeks with external financial advisors and lenders on strengthening our balance sheet, and the Company will provide more information in an update at the end of this month.

Compl. ¶ 180.

In Bratya's view, this statement was misleading because Bed Bath and Gove failed "to

disclose that Cohen and RC Ventures had already formed a plan to liquidate all their holdings" at

that time.  *Id.* ¶ 182.  And Bed Bath's "relationship with Cohen was no longer 'constructive'"

because it had rejected Cohen's proposed "strategic plan."  *Id.*

The Court assumes, without deciding, that Gove can be held responsible for Bed Bath's

statement.  *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011)

(clarifying who counts as the "maker of a statement").  And the Court analyzes Bratya's claim

against both Gove *and* Bed Bath because Bratya's 20(b) claim, which will be discussed later,

hinges on whether this 10(b) claim survives.  Ultimately, the Court agrees with Gove that Bratya

has stated no claim.

*First*, the statement was not false, misleading, or actionable.  Bed Bath *had* "reached a

constructive agreement with RC Ventures in March."  Compl. ¶ 180.  As Bratya says in its

Complaint, Bed Bath's "Cooperation Agreement [with Cohen and RC Ventures] allowed Cohen

to obtain three new seats on the Board, and outsized influence over a new Board Strategy

Committee charged with evaluating options for buybuy BABY's future." *Id.* ¶ 5.  So that part of the statement was true.

Nor was that part of Bed Bath's statement misleading.  That is, it would not "mislead a reasonable investor regarding the nature of the securities offered." *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 178 (D.D.C. 2007) (cleaned up).  Bratya argues that "[t]he reference to a 'constructive agreement' signaled the exact opposite of the actual broken relationship at the time of the statement."  Opp'n at 52, ECF No. 79.  But the statement specifically says that the constructive agreement was from five months earlier.  No reasonable investor would assume that meant Bed Bath and Cohen remained in lock step.

Indeed, the much more plausible takeaway is that Bed Bath and Cohen were on the outs.  Imagine this:  You ask a coworker how he is getting along with a friend and he responds, "we had a solid relationship last year."  Would you assume that they are close now?  Of course not.  You would assume the opposite.  Dated praise implies current disgruntlement.

More, the rest of the statement is mere puffery, a "generalized statement[] of optimism." *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 109 (D.C. Cir. 2015) (cleaned up).  And puffery is not actionable.  *See id.*

*Second*, even if the statement were a material misrepresentation or omission, Bratya fails to plead scienter.  In plain English, that means a "defendant's intention to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007) (cleaned up).  To satisfy that element, Bratya's Complaint must give a "strong inference" of scienter.  15 U.S.C. § 78u–4(b)(2)(A).  And to figure out if Bratya adequately alleged scienter, the Court must "consider plausible, nonculpable explanations for [Gove's] conduct, as well as inferences favoring" Bratya. *Tellabs*, 551 U.S. at 324.  In the end, Bratya's claim survives "only if a

reasonable person would deem the inference of scienter cogent and at least as compelling as any" innocent one.  *Id.*

Here, Bratya says that Gove and Bed Bath "either (i) knew that Cohen and RC Ventures formed a plan to sell, and had sold much if not all of, his holdings; or (ii) recklessly disregarded the risk of misleading investors about Cohen's plan to sell."  Opp'n at 52.  Bratya claims Bed Bath and Gove should have checked whether Cohen had sold shares before saying anything positive about its past relationship with him.  In Bratya's words, that "is not tantamount to a duty to monitor Cohen," but it rather merely "requires that [Gove and Bed Bath], like any speaker, not make factual misrepresentations without verification."  Opp'n at 55.

But again, Gove and Bed Bath never lied.  Nor were they reckless to mention an old agreement in a generic corporate statement without first checking to make sure that the party to that old agreement still held stock in the company.  True, in "certain circumstances," courts have found recklessness "where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor."  *Novak v. Kasaks*, 216 F.3d 300, 308–09 (2d Cir. 2000).  But those cases involve explicit reassurances or clear lies.  *See id.* (citing examples).  This case is a bridge too far.

More, any inference of recklessness is less compelling than the "nonculpable explanations" for the statement: it was meant to describe Bed Bath's efforts to right the ship. *Tellabs, Inc.*, 551 U.S. at 324.  Indeed, had Gove known of Cohen's impending sale, she had no reason to hide this knowledge from investors.  A coverup would only help Cohen while further damaging the brand when investors learned the truth.  So Bratya fails to allege scienter too.

Because Bratya has stated no claim against Gove, the Court will dismiss it.  But because proceedings against Bed Bath are stayed, the Court will not dismiss the company now.

Bratya has one other claim against Gove—control person liability under § 20(a) of the Exchange Act.  In essence, the claim is that Gove is responsible for Bed Bath's securities fraud.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).  But because Bratya has alleged no underlying securities fraud by Bed Bath, its control person claim against Gove fails.  *See, e.g.*, *id.* (A plaintiff that "fails to allege any primary violation . . . cannot establish control person liability."); *see also* Opp'n at 61 (claiming that its control person claim should survive because it "adequately pleads claims under Section 10(b) of the Exchange Act").  And thus the Court will dismiss this claim too.[2]

## IV.

Turn next to the claims against Cohen.[3]  Most will survive.

## A.

Consider first Count I, Bratya's misrepresentation or omission claim.  *See* Compl. ¶¶ 219–29.  Cohen asks the Court to dismiss this claim, arguing that Bratya inadequately pled a few elements.  The Court disagrees.

## 1.

Cohen first claims that all three statements are not material misrepresentations or omissions.  But each is plausibly material and misleading.

*1. Cohen's Tweet*.  The moon-emoji tweet was plausibly misleading because it was perceived "as a rallying cry to buy Bed Bath's stock," even though Cohen had soured on Bed Bath.  Compl. ¶¶ 148–49; *accord Friel v. Dapper Labs, Inc.*, No. 21-cv-5837, 2023 WL

---

[2]  Gove also argues that Bratya failed to adequately plead reliance.  But because Bratya's claim fails on other grounds, the Court does not reach that one.

[3]  Except for when discussing § 20(a) (and in the conclusion), the Court refers throughout to Cohen and his company, RC Ventures, as simply "Cohen."

2162747, at *17 (S.D.N.Y. Feb. 22, 2023) (finding same for rocket ship emojis).

Cohen objects that emojis can *never* be actionable because they have no defined meaning.[4]  In his view, "there is no way to establish . . . the truth . . . of a tiny lunar cartoon."  Cohen MTD at 18.  And similarly, emojis are at the very least "ambiguous."  Cohen MTD at 17–18.  But those claims get him nowhere.

To understand why, zoom out.  Emojis are symbols.  Like symbols, language can be ambiguous.  If you say, "The Nats are going to win the World Series this year," and your friend replies, "Right," she may be agreeing with you, but it could also be a sarcastic reply.  Context and tone help elucidate meaning.  Just because language can be ambiguous does not mean it is not actionable or capable of being correctly understood.

So too with symbols.  People use symbols as "a primitive but effective way of communicating ideas."  *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943).  Sometimes, symbols are ambiguous.  If you texted your friend to ask him to have dinner with you and he responded with the steak emoji, you might reasonably wonder if he wanted to go to a steak house or fire up the grill.  But like language, a symbol's meaning may be clarified by "the context in which [the] symbol is used."  *Spence v. Washington*, 418 U.S. 405, 410 (1974); *see also Fairbanks v. Roller*, 314 F. Supp. 3d 85, 90–91 (D.D.C. 2018) (discussing whether "okay" hand sign was actually a white power gesture).  So if you knew that friend had sworn off restaurants, then you could be more certain that he was up for a cookout.

So the Court declines Cohen's blanket rule.  Emojis may be actionable if they communicate an idea that would otherwise be actionable.  A fraudster may not escape liability

---

[4]  Cohen does not make the textual argument that emojis cannot count as a "statement" within the meaning of the Rule 10b–5(b).  *See* 17 C.F.R. § 240.10b–5(b) (prohibiting "untrue statement[s] of . . . material fact").  So the Court does not consider this.

simply because he used an emoji.  Just like with words, liability will turn on the emoji's particular meaning in context.

The questions here thus become:  (1) Has Bratya plausibly alleged that the moon emoji has a particular meaning in the context in which it was used?  And if so, (2) is that meaning actionable?

First, Bratya has plausibly alleged that the moon tweet relayed that Cohen was telling his hundreds of thousands of followers that Bed Bath's stock was going up *and* that they should buy or hold.  In the meme stock "subculture," moon emojis are associated with the phrase "to the moon," which investors use to indicate "that a stock will rise."  Compl. ¶ 48.  So meme stock investors conceivably understood Cohen's tweet to mean that Cohen was confident in Bed Bath and that he was encouraging them to act.  For example, one investor replied to Cohen "buy $BBBY. Got it. Thanks."  *Id.* ¶ 150.  And Bratya plausibly alleges that Redditors gleaned the same message.  *Id.* ¶ 151.

Second, that meaning is actionable.  For one, it is plausibly material.  That is, there was a "substantial likelihood that a reasonable investor would consider it important."  *SEC v. Steadman*, 967 F.2d 636, 643 (D.C. Cir. 1992) (cleaned up).  Investors appear to have relied on it, driving Bed Bath's stock price up in the following days.  *See* Compl. ¶ 9 (alleging that "trading volume and the Company's stock price surged over the next few days"); ¶ 153.

Plus, that makes sense.  Investors may have reasonably seen Cohen as an insider sympathetic to the little guy's cause:  He interacted with his followers on Twitter.  *See, e.g.*, *id.* ¶ 74.  He appeared to speak truth to power, criticizing "compensation for the Corporate Power Brokers."  *Id.* ¶ 111.  He had a large stake himself.  He was "maniacally focused on [Bed Bath's] long-term."  *Id.* ¶ 94.  He had a public cooperation agreement with Bed Bath.  *See id.* ¶ 99.  He

allegedly had access to material, nonpublic information. *Id.* ¶ 100. And it seemed that he had helped oust Bed Bath's former CEO. *Id.* ¶¶ 111–12. So it was not crazy for retail investors to follow his lead.

Nor is the tweet mere puffery. *See In re Harman*, 791 F.3d at 109 (defining puffery as "the sort of generalized statements of optimism that are not capable of objective verification") (cleaned up). If Bratya had alleged only that the tweet expressed Cohen's hope that the stock would rise, that would not be actionable. *See id.* Likewise, if Bratya had alleged only that the tweet signaled Cohen's excitement about Bed Bath, Bratya would have no claim. *See id.* But Bratya has plausibly alleged that Cohen's tweet was more, an expert insider's direction to buy or hold.

So this claim survives.

*2. Cohen's 13D.* Taking the Complaint as true, Cohen's amended 13D was materially misleading as well. Investors filing 13Ds have a duty to disclose any solid plans to sell their stock. *See Azurite Corp. v. Amster & Co.*, 52 F.3d 15, 18 (2d Cir. 1995) ("[if] a course of action is decided upon or intended, it [must] be disclosed" in a 13D). Cohen has conceded as much. Motions Hr'g Tr. (Hr'g Tr.), 55:22–24, ECF No. 90 (acknowledging that "Plaintiff has to plead facts showing the Cohen Defendants had a definite plan to sell their stocks before they filed their Section 13D").

Bratya has plausibly alleged that Cohen had a definite plan to sell. For one, the timing of Cohen's sales suggests it. Cohen filed his 13D in the morning on August 16, 2022, and that very same day sold roughly $100 million in Bed Bath shares. *See* Compl. ¶ 165. It is no stretch to infer that Cohen likely hatched that plan some time before that morning. More, Bratya has plausibly alleged that Cohen filed the 13D as part of a broader plan to pump Bed Bath's price so

that he could dump his shares.  And that scheme necessarily includes a solidified plan to sell.  So Bratya has met its burden for now.

Despite the reporting requirement, Cohen did not mention his purported plan to sell in his amended 13D.  *See id.* ¶ 160.  That was misleading.  And it was material too:  meme stock investors "reacted positively to his filing," sending the stock price soaring "by over 70%" that same day.  *Id.* ¶¶ 162–63.

Cohen pushes back.  To start, he claims that Bratya cannot bring a 10(b) claim based on a misleading statement in a 13D.  *See* Cohen MTD at 19.  Not so.  As the Supreme Court has directed, when determining "the scope of conduct prohibited by § 10(b), the text of the statute controls."  *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173 (1994).  And Cohen points to nothing in 10(b)'s text to support a carveout for misleading 13Ds.  Ignoring the text, he tries a few other arguments.  But none persuade.

Cohen first argues that "[n]o private right of action for damages exists under Section 13(d)."  Cohen MTD at 19.  No matter.  Even if that is right, it does not follow that 10(b) claims may not be based on misleading 13D filings.  *Id.*  Those are two separate questions.

Cohen next says that a different section of the Exchange Act, 18(a), provides the exclusive remedy for claims based on "a false or misleading statement in a Schedule 13D."  Cohen Reply at 8, ECF No. 87 (quoting *Kamerman v. Steinberg*, 891 F.2d 424, 430 (2d Cir. 1989)).  The Court disagrees here too.

*Kamerman* relies on a district court case, which in turn relies on dated Supreme Court dicta.  *See* 891 F.2d at 430 (citing *Sanders v. Thrall Car Mfg. Co.*, 582 F. Supp. 945, 960 (S.D.N.Y. 1983), *aff'd,* 730 F.2d 910 (2d Cir. 1984)).  In *Touche Ross & Company v. Redington*, the Court noted that "[t]here is evidence to support the view that § 18(a) was intended to provide

the exclusive remedy for misstatements contained in" SEC filings.  442 U.S. 560, 573 (1979)
(citing legislative history).  But *Redington* expressly declined to decide that question.  *See id.* at
574 ("[W]e need not decide whether Congress expressly intended § 18(a) to provide the
exclusive remedy for misstatements contained in § 17(a) reports.").  Plus, it relied on legislative
history, a now discredited method of statutory interpretation.  *See id.* at 573 n.15.  The Court has
since directed that when determining "the scope of conduct prohibited by § 10(b), the text of the
statute controls."  *Cent. Bank of Denver*, 511 U.S. at 173.  So *Redington* and *Kamerman* do not
resolve the issue.

Nor is this Court persuaded by Cohen's other cases.  *Motient Corporation v. Dondero*
noted that "Section 18(a) provides the sole basis for a private right of action for damages
resulting from a violation of Section 13(d)."  529 F.3d 532, 536 (5th Cir. 2008) (citing *Hallwood
Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 620 (2d Cir. 2002)).  But *Motient*
dealt with a different issue—whether to imply a cause of action under 13(d) for money damages.
*See id.*  And the case *Motient* cites, *Hallwood*, dealt with that same question and relied on the
*Touche Ross* dicta.  *See* 286 F.3d at 619–20.  The question here is different; does 10(b) reach
misleading 13D filings?

Cohen could also be trying to argue that the Court should read 10(b) more narrowly in
light of 18(a).  That argument would run something like this:  10(b) is an implied cause of action,
whereas 18(a) is express.  And 18(a) clearly (and more narrowly) covers misleading statements
in SEC filings like 13Ds.  That poses two problems for Bratya's claim.  First, reading 10(b) to
also cover misleading statements in SEC filings would render 18(a) superfluous.  Second, "[t]he
express provision of one method of enforcing a substantive rule suggests that Congress intended

to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).  So the Court should read 10(b) to exclude conduct covered by 18(a).

But this line fails to persuade as well.  For one, *Sandoval* dealt with the question of whether to imply a cause of action in the first place, not the issue here—10(b)'s reach.  *See id.* at 279.  And the Supreme Court has rejected similar arguments for *narrowing* 10(b), refusing to do so despite 10(b)'s overlap with other securities laws.  *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983) ("The fact that there may well be some overlap is neither unusual nor unfortunate.") (cleaned up); *see also Lorenzo v. SEC*, 139 S. Ct. 1094, 1101–02 (2019) (finding same for intra-provision overlap in Rule 10b–5).  Ditto for the D.C. Circuit.  *See Wachovia Bank & Tr. Co., N. A. v. Nat'l Student Mktg. Corp.*, 650 F.2d 342, 354–359 (D.C. Cir. 1980) ("[T]he express remedies are totally different from the remedy implied under section 10(b), and . . . are meant to treat different problems and to be applied in different situations.").

Finally, Cohen claims that his disclosures in past 13Ds save him.  As he explains it, he "twice disclosed the possibility that [he] could sell . . . at any time."  Cohen MTD at 20.  But those generic warnings that he "may endeavor to increase or decrease [his] position," are different than his alleged concrete plan to dump $100 million in stock, a plan that Cohen failed to disclose.  *Id.*  Once that plan crystallized, he had a duty to report it.  And this case *may* show why; his failure to report the plan allegedly misled investors.

So Bratya's 13D theory may proceed.

*3. Cohen's Form 144*.  Cohen's Form 144 was materially misleading too.  Bratya's theory goes like this:  On the same day that Cohen began dumping stock, he filed a Form 144.  In that form he mentioned only "the potential sale" of Bed Bath stock and certified that he knew of no "material adverse information" about Bed Bath.  Compl. ¶ 173.

In Bratya's view, this was "materially false and misleading" for a few reasons.  First, Cohen referred only to a "potential sale," even though he had already sold stock.  Second, Cohen lied about knowing no material, nonpublic information about Bed Bath.  Third, he "submitted the Form 144 *after* placing a sell order with his broker in violation of SEC Rule 144."  *Id.* ¶ 174 (emphasis in original).  And fourth, Cohen had already sold the stock when he created the Form 144, yet he said on the form that he had sold none in the past three months.  *See id.* ¶¶ 170–71, 174.

Only Bratya's first two theories survive.  Bratya plausibly alleges that Cohen had sold his shares by the time he submitted his Form 144.  *See* Compl. ¶¶ 170–72 (analyzing metadata and "historical market data" to conclude that Cohen sold the share before he submitted the Form 144).  Thus, his reference to "*potential*" sales was misleading.  Those sales had likely already happened.  So he should have instead said something like "sales" or "past sales."

And Bratya's second theory lives on too.  Taking Bratya's allegations as true, it plausibly alleges that Cohen was privy to material adverse information that was nonpublic.  Most glaringly, Cohen's Cooperation Agreement with Bed Bath "acknowledged that Cohen would receive material, nonpublic information."  Compl. ¶ 100.

Plus, the timing of Cohen's trades was sketchy.  He dumped his entire stake on August 16 and 17.  Shortly after, the following became public:

- Bed Bath was failing to pay suppliers (August 19).  *See id.* ¶ 197.
- Bed Bath was firing 20% of its employees and closing 150 stores (August 31).  *See id.* ¶ 199.
- Bed Bath was not going to sell buybuy BABY (August 31).  *See id.* ¶ 199.
- Bed Bath's investment rating was downgraded (September 1).  *See id.* ¶ 200.

Cohen just barely beat this bad news, which suggests that he saw it coming.  Plus, Cohen had access to Bed Bath's board.  *See, e.g.*, *id.* ¶¶ 111–13 (suggesting that Cohen convinced the Board to fire Bed Bath's then-CEO).  And he handpicked three of its members.  *See id.* ¶ 99.  Finally,

he spoke with Bed Bath's CFO and "other executives." *Id.* ¶ 124.  So Cohen plausibly traded on material, adverse, and nonpublic information.

But Bratya's two other theories flop.  Start with Bratya's theory that Cohen violated SEC rules.  Cohen needed to submit his Form 144 only "concurrently" with the stock sales.  *See* 17 C.F.R. § 230.144(h); *see also* SEC, Div. Corp. Fin., Compliance and Disclosure Interpretations, Securities Act Rules, Question 136.09 (2017) (clarifying that a Form 144 must be submitted "on the same day as the . . . execution of the sale").  And he did just that, filing his Form 144 the same day that he began dumping shares.  *See* Compl. ¶ 169.  So he did not violate the SEC's requirement that the form be submitted concurrently with his trades.

Similarly, he did not lie when reporting "None" in the Form 144 Table labeled "SECURITIES SOLD DURING THE PAST 3 MONTHS."  Decl. of Clifford Thau, Ex. 10, ECF No. 71-10.  In context, that box clearly asks sellers to report only sales *other than the sale that prompted the filing*.  So Cohen need not have reported the Bed Bath sale from earlier that day in that particular table.

## 2.

Cohen next claims that Bratya fails to sufficiently allege element two—scienter.  Recall that to satisfy that element, Bratya's Complaint must give a "strong inference" of scienter. 15 U.S.C. § 78u–4(b)(2)(A).  And to figure out if it did, the Court must "consider plausible, nonculpable explanations for [Cohen's] conduct, as well as inferences favoring" Bratya.  *Tellabs, Inc*, 551 U.S. at 324.  In the end, Bratya's claim survives "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any" innocent one.  *Id.*  Bratya has alleged enough.

For one, Bratya has alleged a motive; Cohen's shares had lost over 80% of their value at the time his alleged scheme began.  *See* Compl. ¶ 188 (alleging that Cohen's investment was down 82%).  So he may have been keen to offset those losses.  And Cohen knew that meme stock investors would drive up the stock's price when he tweeted or submitted regulatory filings.  *See, e.g.*, *id.* ¶ 83 (awareness of tweets); *see id.* ¶ 193 (awareness of regulatory filings).  And that makes the timing of his sales suspicious:  Cohen tweets and files a 13D.  The stock skyrockets.  Cohen then dumps his stock.  And all this happens just weeks before bad news about Bed Bath breaks publicly.

Cohen offers a competing inference.  He "decided to exit his position when the price unexpectedly increased to a value that exceeded what he believed it was worth."  Cohen MTD at 25.  Plausible enough.  But to accept this story, the Court must view Cohen's amended 13D as a lucky happenstance.  In his telling, he had no concrete plans to sell on the morning of August 16.  He then filed a 13D, and, as it had in the past, the price surged.  Then (and only then) Cohen formed his plan to sell.  That is a stretch.  So considering the Complaint as a whole, Bratya's inference is more compelling.  *See Tellabs, Inc*, 551 U.S. at 324.  So the Court will not dismiss the 10(b) claim on scienter grounds either.

### 3.

Cohen also trains his sights on reliance, the claim's fourth element.  This element "ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury."  *Halliburton Co.*, 573 U.S. at 267 (cleaned up).  To meet it, Bratya points to two reliance presumptions.  First, under the fraud-on-the-market theory, courts presume reliance when a plaintiff shows "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff

traded the stock between the time the misrepresentations were made and when the truth was revealed." *Id.* at 268.  And second, courts presume reliance when a plaintiff's claims are based mainly on omissions (rather than affirmative lies).  *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

Bratya has adequately pled its fraud-on-the-market theory but not *Affiliated Ute* reliance.

*Fraud-on-the-market*.  Cohen urges that Bratya has failed to allege an efficient market. As he explains it, "[i]n an efficient market, all publicly available information is incorporated into [a company's] stock price."  Cohen MTD at 28.  But here, Bed Bath's stock rose after Cohen's tweets and filings, despite bleak reporting on Bed Bath's outlook.  *See id.*  Cohen says that is "fundamentally inconsistent with . . . an efficient market."  *Id.*  Cohen's terse argument appears to be that the market here cannot be efficient because a stock's price in an efficient market would reflect a company's fundamentals and not statements from one large investor.  And "rational, reasonable, intelligent investors" would not react to tweets and filings that contained no new information.  Hr'g Tr., 82:2–15.

But Supreme Court precedent is not so exacting.  For one, the Court has clarified that the existence of value investors does not undercut fraud-on-the-market reliance.  *See Halliburton Co.*, 573 U.S. at 273.  A value investor is one "who believes that certain stocks are undervalued or overvalued and attempts to 'beat the market' by buying the undervalued stocks and selling the overvalued ones."  *Id.* (cleaned up); *see also Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 124 (D.D.C. 2017) (discussing same).  More, "[d]ebates about the precise *degree* to which stock prices accurately reflect public information are . . . largely beside the point."  *Halliburton Co.*, 573 U.S. at 272 (emphasis in original).  As the Court explained, "[t]hat the price of a stock may

be inaccurate does not detract from the fact that false statements affect it, and cause loss." *Id.* (cleaned up).  So too here.

*Affiliated Ute*.  But Bratya cannot rely on *Affiliated Ute.*  That theory is available only if the brunt of its case concerns omissions, rather than affirmative lies.  *See* 406 U.S. at 153–54. That is not the case here.

By Bratya's count, four of its five claims involve omissions.  *See* Opp'n at 49.  But it counts two claims from the Bed Bath Defendants, neither of which should count at this point. The claims against Gove will be dismissed and proceedings against the company are stayed.  *Cf.* Hr'g Tr., 36:1–4 (Bratya conceding that "if you dismiss those statements . . ., then the only statements that would be relevant to that analysis are the ones that are still in the case").  And it counts its Form 144 claim as an omission, which misses the mark.  The heart of Bratya's Form 144 claim is that Cohen lied.  He called the stock sales potential when they had already closed. And he said he had received no insider information when he in fact had.  Those are affirmative lies, not omissions.  Indeed, Bratya basically admits as much.  *See, e.g.*, Opp'n at 28 ("Cohen Lied in his Form 144").  So two of Bratya's three live claims involve affirmative misrepresentations and thus *Affiliated Ute* does not apply.  406 U.S. at 153 (applying reliance presumption to a "case  . . . involving *primarily* a failure to disclose) (emphasis added).

**4.**

Last, Cohen says that Bratya fails to adequately plead 10(b)'s sixth element, loss causation.  To do that, Bratya "must simply give defendants some indication of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec. LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (cleaned up).

Bratya did so.  Start with Cohen's tweet.  "[A]n overwhelming majority of retail investors unambiguously understood his statements as a rallying cry to buy or hold" Bed Bath stock.  Compl. ¶ 151.  As a result, Bed Bath's stock rose from $10.63 to $12.95 the next day.  *Id.* ¶ 153.  And Cohen's 13D had a similar effect.  The day he filed it, Bed Bath's stock spiked 70%.  *Id.* ¶ 163.  Finally, his Form 144 served his alleged pump and dump scheme by delaying news of his exit.

None of Cohen's arguments persuade.  He first claims that Bed Bath's stock "was already experiencing extreme volatility" before he did anything.  Cohen MTD at 29.  And he notes that Bed Bath was doing poorly.  *See id.* at 31.  Because of this, he says that it is implausible that his misstatements would make Bed Bath's stock skyrocket.  The Court disagrees.  Bratya plausibly alleges that Cohen had a cult following of meme stock investors who enthusiastically followed his moves and invested accordingly.  *See, e.g.*, Compl. ¶ 142 (quoting a Cohen fan), ¶ 144 ("[U]sers on various Reddit forums continued to tweet about the importance of Cohen's holdings."),  ¶ 150 (Twitter user responding to Cohen tweet with "buy $BBBY. Got it. Thanks").

Finally, Cohen claims that Bratya "cannot plead loss causation without undermining its reliance allegations" for the 13D claim.  Cohen MTD at 32.  For reliance purposes Bratya claims that Bed Bath stock was traded in an efficient market.  But here, Cohen says, Bratya tries to claim that the 13D caused Bed Bath's price to spike, despite that filing offering no new information.  But as pled, the 13D *did* include new information; at the time of filing, Cohen had no solid plans to sell his stock.  In other words, it told investors that he was still confident in Bed Bath, despite bad news about the company's fundamentals.  So this argument also fails.

**B.**

Cohen next challenges Count II, Bratya's claim under § 10(b) of the Exchange Act and SEC Rules 10b–5(a) and (c).  But this claim survives too.

Section 10(b) of the Exchange Act prohibits using "any manipulative or deceptive device . . . in contravention of [SEC] rules and regulations."  15 U.S.C. § 78j(b).  Under that Section, the SEC promulgated Rule 10b–5.  Subsection (a) makes it unlawful to "employ any device, scheme, or artifice to defraud."  17 C.F.R. § 240.10b–5(a).  And subsection (c) makes it unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit."  17 C.F.R. § 240.10b–5(c).  Subsection (a) and (c) claims "are often called scheme liability" claims.  *SEC v. Familant*, 910 F. Supp. 2d 83, 93 (D.D.C. 2012) (cleaned up).  And to make out its scheme liability claim, Bratya "must satisfy both the statute and the regulation."  *Id.* at 92.

Cohen's main theory is that scheme liability claims "cannot be based solely upon misrepresentations or omissions."  Cohen MTD at 34 (quoting *ATSI Commc'ns*, 493 F.3d at 101).  And thus, Bratya's scheme claim fails because it alleges only misrepresentations or omissions.

But even if Cohen is right about that legal rule, his line of attack still fails.  Bratya has alleged a pump and dump scheme that relies on more than just misrepresentations or omissions. For instance, it claims that Cohen delayed filing two SEC forms "to stimulate demand in Bed Bath's securities knowing that the mere act of filing these documents" would spur trading and thus pump Bed Bath's stock price.  Compl. ¶ 233.  And Bratya also claims that Cohen slow-walked his Form 144 and then filed it in a way "designed to ensure that its release would be delayed."  *Id.*

Cohen's own cases concur.  Indeed, the Second Circuit has recently held that "misstatements and omissions can form *part* of a scheme liability claim, but an actionable scheme liability claim also requires something *beyond* misstatements and omissions, such as dissemination."  *SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) (emphasis in original).  So Bratya may rely (in part) on misrepresentations and omissions.

Pushing back, Cohen says the SEC forms cannot support Cohen's scheme liability claims because Bratya never plausibly alleges that those were misleading.  *See* Cohen Reply at 21.  But the 13D *was* plausibly misleading.  And besides, the point here is that Bratya alleges a course of conduct that includes more than *just* misrepresentations or omissions.  It does not rely on those delayed SEC filings alone.  *See* Compl. ¶¶ 231–33 (alleging that Cohen misled investors, concealed his plan to sell, and pumped Bed Bath's stock before dumping it).

Cohen's other arguments flounder too.  He first claims that he never "injected inaccurate information into the marketplace."  Cohen MTD at 35 (quoting *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 106 (2d Cir. 2022)).  But he never explains *why* the statute or regulation requires that judge-made element.  Nor does he explain why Bratya does not meet it.  Cohen's tweet gave the false impression that Cohen thought the stock would rise.  His 13D gave the false impression that he had no solid plans to sell.  And his Form 144 suggested that his plans to sell were merely "potential."  That is enough.

Finally, Cohen says that Bratya's scheme claim fails because it alleges no "market activity,"  like "wash sales, matched orders, or rigged prices."  Cohen MTD at 35 (quoting *ATSI*, 493 F.3d at 101).  But that distorts binding precedent.  True, the Supreme Court has given "wash sales, matched orders, or rigged prices" as general examples of actionable conduct.  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977).  But scheme liability is broader.  In *Lorenzo v.*

*SEC*, the Court held that simply emailing "false or misleading statements to potential investors with the intent to defraud" was enough.  139 S. Ct. 1094, 1099 (2019).  So this quibble fails too.[5]

## C.

The rest of Bratya's claims are a mixed bag.  Four survive; one does not.

### 1.

Start with Bratya's surviving claims.

*Section 20(a)*.  As with Gove, Bratya claims that Ryan Cohen is responsible for his company, RC Ventures's, securities fraud under § 20(a) of the Exchange Act.  Compl. ¶¶ 239–45 (Count III).  Cohen offers only one rebuttal; RC Ventures committed no securities fraud.  But the Court has found that Bratya has plausibly alleged that RC Ventures violated 10(b) of the Exchange Act and SEC Rule 10b–5.  So Bratya's claim against Ryan Cohen survives.

*Section 9(a)(4)*.  Cohen also moves to dismiss Bratya's claim under § 9(a)(4) of the Exchange Act.  *See* Compl. ¶¶ 257–63 (Count VI); 15 U.S.C. § 78i(a)(4).  Cohen says only that this claim essentially mirrors Bratya's 10(b) claim and thus must be dismissed for the same reasons.  But because the Court will not dismiss Bratya's 10(b) claim, it will not dismiss this one either.

*Section 20A*.  Cohen's argument against Bratya's § 20A claim for insider trading fares no better.  *See* Compl. ¶¶ 264–71 (Count VII).  Here, Cohen argues only that Bratya  (1) "has failed to allege any predicate violation of the Exchange Act" and (2) that Bratya has "failed to plausibly allege that Mr. Cohen possessed material, nonpublic information at the time of his trades."

---

[5]  Cohen also cites back to his failed loss causation and scienter arguments from the other 10(b) claim, adding nothing new.  For the reasons already discussed, the Court rejects those.

Cohen MTD at 40.  But, as explained, Bratya has done both.  So the Court will not dismiss this claim either.

*Section 9(a)(3)*.  Finally, Cohen urges that Bratya's claim under § 9(a)(3) of the Exchange Act should be dismissed because that provision "applies only to broker-dealers who make predictions in the ordinary course of that business," not professional traders like Cohen. Cohen MTD at 38–39; Compl. ¶¶ 251–56 (Count V).  Not so.

> Section 9(a)(3) reads as follows:
>
> If a dealer, broker, security-based swap dealer, major security-based swap participant, or other person selling or offering for sale or purchasing or offering to purchase the security, a security-based swap, or a security-based swap agreement with respect to such security, to induce the purchase or sale of any security registered on a national securities exchange, any security not so registered, any security-based swap, or any security-based swap agreement with respect to such security by the circulation or dissemination in the ordinary course of business of information to the effect that the price of any such security will or is likely to rise or fall because of market operations of any 1 or more persons conducted for the purpose of raising or depressing the price of such security.

15 U.S.C. § 78i(a)(3).  Start with the first two lines.  Bratya never claims that Cohen is "a dealer, broker, security-based swap dealer, major security-based swap participant."  Instead, it claims that Cohen falls in the catchall provision.  Cohen is an "*other person* selling or offering for sale or purchasing or offering to purchase the security."  *See* Hr'g Tr., 43–44 (Bratya claiming that Cohen is "no different from a broker or a dealer" and that "we're [not] talking about any ordinary person selling and purchasing shares").

Bratya has the better reading; "other person," includes non-listed professional stock traders.  For one, the general other-person phrase follows a more specific list.  In such cases, the canon of *ejusdem generis* holds that "the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  *Yates v. United States*, 574 U.S. 528, 545 (2015) (cleaned up).  That is a point in favor of reading "other person" to include other types of professional traders.

25

More, if the Court adopted Bratya's reading—only "broker-dealers"—it would render that "other person" phrase surplusage. *But see Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme"). That too suggests that "other person" means other market professionals. And this reading avoids liability for average day traders, so the list of market professionals continues to do work.

Language later in the provision bolsters Bratya's reading. For clarity, the provision's elements can be (roughly) broken down as follows:

"It shall be unlawful"
1. For a covered person
2. "to induce the purchase or sale of any security"
3. "by the circulation or dissemination [of information] in the ordinary course of business"
4. "to the effect that the price of any such security will or is likely to rise or fall because of market operations of any 1 or more persons"
5. "conducted for the purpose of raising or depressing the price of such security"

Note that the third element has an important condition; the "circulation or dissemination" must be done "in the ordinary course of business." Like the other textual clues, that language suggests that this provision is aimed at those who ordinarily circulate or disseminate information about stocks, those like professional traders. Because the provision's text supports reading "other person" as including professional traders, the Court will do so.

Bratya has also plausibly alleged that Cohen fits that bill. *See, e.g.*, Compl. ¶ 44 (alleging that since 2020 "Cohen has been primarily focused on private investments"); ¶ 55 (alleging that Cohen bought nearly 10% of GameStop); ¶ 92 (alleging that Cohen bought a large stake of Bed Bath). Cohen is no average trader. Because Bratya plausibly alleges that Cohen is a market professional, this claim survives as well.

**2.**

But another claim must be dismissed.

*Section 9(a)(2).*  Cohen argues that Bratya's claim under § 9(a)(2) of the Exchange Act should be dismissed because Bratya alleges no "series of transactions" in a security.  Cohen MTD at 37–38; Compl. ¶¶ 246–50 (Count IV).  The Court agrees.  As part of its § 9(a)(2) claim, Bratya needed to plead "a series of transactions in any security."  *See* 15 U.S.C. § 78i(a)(2).  Yet Bratya points to no "series of transactions in any security."

Bratya alleges that "Cohen strategically filed a delayed Form 3 and Schedule 13D to create the appearance of trading activity."  Opp'n at 63.  And it claims that Cohen "strategically filed a Form 144 to control the time of its publication and ensure[] the price of [Bed Bath's] securities remained high while he secretly sold his holdings."  *Id.*  Those are regulatory filings, not "transactions in" a security.  They are not stock purchases or sales, nor even "bids and orders to purchase or sell securities."  *SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 62 (S.D.N.Y. 2017).  Thus, the Court declines Bratya's invitation to read "transaction *in* any security" to include any regulatory filings related to that security.

**V.**

Bratya alleges no plausible claims against Gove, so those must be dismissed.  But because most of its claims against Cohen and RC Ventures are plausible, only Bratya's § 9(a)(2) claim against them will be dismissed.

A separate Order will issue today.

Dated: July 27, 2023                                          _____
                                                                        TREVOR N. McFADDEN, U.S.D.J.