# Exhibit A

**UNITED STATES DISTRICT COURT**

**DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re BED BATH & BEYOND CORPORATION SECURITIES LITIGATION | Case No. 1:22-cv-02541-TNM |
| | <u>CLASS ACTION</u> |
| *This Document Relates to:* ALL ACTIONS | |

EXPERT REPORT OF MATTHEW D. CAIN, PHD

February 15, 2024

**Table of Contents**

I.      Scope of Report and Opinions ................................................................1

II.     Qualifications...........................................................................................2

III.    Case Background and Alleged Fraud Scheme .........................................5

IV.     Bases for Opinions on Market Efficiency ...............................................6

V.      Evaluation of Market Efficiency Factors for BBBY Common Stock .........10

        A.      *Cammer* Factor 1: Average Weekly Trading Volume ................. 11

        B.      *Cammer* Factor 2: Analyst Coverage ......................................... 13

        C.      *Cammer* Factor 3: Market Makers ............................................. 16

        D.      *Cammer* Factor 4: SEC Form S-3 Filing Eligibility ................... 19

        E.      *Cammer* Factor 5: Cause and Effect Relationship Between
                Company Information and Stock Prices......................................... 20

        F.      Additional Factor 1: Market Capitalization ................................. 28

        G.      Additional Factor 2: Bid-Ask Spread.......................................... 29

        H.      Additional Factor 3: Public Float ............................................... 31

        I.      Additional Factor 4: Institutional Ownership............................... 31

        J.      Additional Factor 5: Autocorrelation .......................................... 32

        K.      Additional Factor 6: Active Options Trading .............................. 34

VI.     Evaluation of Market Efficiency for Options on BBBY Common Stock ...................37

        A.      Overview of Option Types and Pricing......................................... 38

        B.      The Academic Literature Strongly Supports the Presumption that
                Options Quickly Reflect Value-Relevant Information ................ 38

        C.      The *Cammer* and *Krogman* Factors are not Relevant for Gauging
                Market Efficiency of Options Markets......................................... 40

        D.      Multiple Additional Relevant Factors Support the Finding That
                the Market for BBBY Options Was Efficient .............................. 41

        E.      Market Efficiency in the Market for BBBY's Common Stock
                Strongly Reinforces the Conclusion that the BBBY Options Also
                Traded in an Efficient Market ..................................................... 43

VII.    Ability to Calculate Damages on a Class-Wide Basis ...............................43

        A.      Calculation of Damages for Violations of §10(b) and §20(a) of
                the Exchange Act......................................................................... 44

        B.      Calculating Damages for Violation of §20A of the Exchange Act............. 47

i

C.  Damage Methodologies are Flexible and Can Incorporate
    Alternative Findings ....................................................................... 49

**VIII.  Conclusion** ........................................................................................**50**

**Appendix A** ........................................................................................... **A-1**

**Appendix B** ........................................................................................... **B-1**

**Exhibits** ................................................................................................. **E-1**

## I.  Scope of Report and Opinions

1.      Plaintiffs, through their attorneys Pomerantz LLP ("Plaintiffs' Counsel") have asked me to determine whether the markets for Bed Bath & Beyond, Inc. ("BBBY" or the "Company") common stock ("Common Stock") and options ("Options") were efficient during the period August 12, 2022 to August 18, 2022, inclusive (the "Class Period").

2.      In addition, Plaintiffs have asked me to opine on whether damages for investors trading in BBBY Common Stock and Options during the Class Period can be calculated using a common methodology for all Class members that is consistent with Plaintiffs' claims under (i) §9(a)(3), (4), and (f) of the Securities Exchange Act of 1934 (the "Exchange Act"), (ii) §10(b) of the Exchange Act and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5(a), (b), and (c) adopted thereunder (collectively, the "§10(b) claims"), (iii) §20(a) of the Exchange Act, and (iv) §20A of the Exchange Act against the Defendants.[1]

3.      Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the following opinions:

   a.      The market for BBBY Common Stock was efficient throughout the Class Period.

   b.      The *Cammer*, *Krogman*, and other additional factors accepted and applied by courts throughout the federal bar to assess market efficiency corroborate that BBBY Common Stock traded in an efficient market.

   c.      Though not necessary for a finding of market efficiency, the cause-and-effect relationship between new Company disclosures and resulting

---

[1] I understand the Defendants to be Ryan Cohen ("Cohen") and RC Ventures LLC ("RC Ventures") (collectively the "Defendants"). I also understand that the case against Bed Bath & Beyond Inc. ("BBBY," or the "Company") has been stayed. *See* Second Amended Class Action Complaint (Doc. No. 66), dated January 30, 2023 (the "Complaint").

Common Stock price movements (which I analyze under the fifth *Cammer* factor) further demonstrates that BBBY Common Stock traded in an efficient market throughout the Class Period.

d.      The market for BBBY Options was efficient throughout the Class Period.

e.      Damages in this matter can be calculated on a class-wide basis subject to standard, common methodologies for each of Plaintiffs' pending claims. In particular, the out-of-pocket damages methodology, which is used in virtually all §10(b) class action securities cases, is appropriate and applicable here for damages under §10(b). The out-of-pocket damages methodology is also applicable for Class-wide damages under §9(a). Damages for the subset of Class members with insider trading claims under §20A can also be determined on a Class-wide basis based on common methodologies.

4.      The remainder of my report is organized as follows: **Section II** describes my qualifications. **Section III** summarizes the case background. **Section IV** briefly explains the bases for the reliance requirement and the "fraud on the market" theory relating to market efficiency. **Section V** presents my analyses of the market efficiency factors for the Common Stock during the Class Period. **Section VI** discusses how the market efficiency of common stock relates to the options markets, and why I conclude that the market for BBBY Options was also efficient. **Section VII** addresses how damages can be calculated on a class-wide basis subject to common methodologies under §10(b), §9(a) and §20A. **Section VIII** summarizes my conclusions.

## II.     Qualifications

5.      I hold a Ph.D. in Finance from Purdue University and am a Senior Fellow at the Berkeley Center for Law and Business at the University of California - Berkeley. I teach courses,

2

deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business.

6.      My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism. I previously held a fellowship with the Harvard Law School Program on Corporate Governance, where I participated in research seminars and related activities.

7.      Before my current roles, I worked at the U.S. Securities and Exchange Commission ("SEC") between 2014 and 2018 as a Financial Economist. During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, revenue recognition practices, and disclosure violations. I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including securities violations, revenue recognition practices, and corporate governance issues. Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research for which I was awarded the Chairman's Award for Economic Research.

8.      Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame. I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics. I have been engaged in academic research for over a decade and continue to publish in law reviews and peer-reviewed academic journals across these disciplines.

9.      Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007. Prior to those studies, I worked as an analyst in Debt Capital Markets at

3

National City Bank, where I assisted companies in raising syndicated loans and private placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes. I received a B.S. in Finance from Grove City College in 2001.

10.     In addition to teaching at UC Berkeley, Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law. I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached as **Appendix A**.

11.     I have published research in leading peer-reviewed journals in the fields of finance, accounting, law, and economics, including the *Journal of Financial Economics, Journal of Law and Economics*, *Journal of Accounting and Economics, Journal of Empirical Legal Studies*, and *Journal of Financial and Quantitative Analysis*. My curriculum vitae, attached as **Appendix A**, further details my publications.

12.     In addition to my teaching, research, and academic responsibilities, I provide consulting services and expert testimony in a variety of matters through my LLC, Cleveland Analytics, as well as in conjunction with other consulting firms. As an expert in financial economics, I have conducted analyses or presented expert opinions related to market efficiency, valuation, securities trading, corporate disclosures, and loss causation/damages in over 60 cases. My curriculum vitae, attached as **Appendix A**, further details my testimony experience.

13.     The materials I have considered in forming my opinions are listed and summarized in **Appendix B**. My time is billed at a rate of $950 per hour for my work on this matter. I have been assisted in this matter by staff at Fideres Partners LLP, working under my direction. I have no financial or other interest in Fideres Partners' billings in this matter. My compensation is in no way contingent on the outcome of this case.

14.     My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention.

### III.     Case Background and Alleged Fraud Scheme

15.     Bed Bath & Beyond operated as a big-box retail chain across the United States, Canada, and Mexico throughout the Class Period. The company specialized in offering a diverse range of home goods, including bed linens, bath accessories, kitchen textiles, dinnerware, and electric appliances.[2] During the Class Period, BBBY's Common Stock was traded in the U.S. on the NASDAQ.[3]

16.     Prior to the Class Period, Ryan Cohen, the former CEO of an online pet food retailer, invested in mainstream companies and eventually acquired significant stakes in GameStop and Bed Bath & Beyond.[4] The Complaint claims that through his engagement with retail investors, Cohen amassed a substantial following, enabling him to wield influence through regulatory filings and tweets.[5]

17.     The Complaint alleges that, throughout the Class Period, Cohen and his company RC ventures orchestrated a pump-and-dump scheme and took advantage of the potential for a short squeeze in BBBY's Common Stock, disseminating numerous materially false and misleading

---

[2] Complaint ¶ 86. The following overview section summarizes the allegations in the Complaint as context for Plaintiffs' claims. I make no findings or opinions as to these allegations, and the opinions I reach in other sections of this report regarding market efficiency and the calculation of damages are not tied to any specific allegations summarized herein.

[3] *Id.* ¶ 211.

[4] *Id.* ¶¶ 41-45

[5] *Id.* ¶¶ 53-56

statements and omissions concerning Cohen's holdings in the Company.[6] Specifically, the Complaint alleges that Cohen was divesting his entire stake in BBBY while artificially inflating the stock price by encouraging retail investors to acquire BBBY shares through misleading statements, deceptive filings, and a misleading Twitter post.[7]

18.    The complaint alleges that the truth about Cohen's sale of his stake was revealed to the market on August 18, 2022, after trading hours. At this time, Cohen filed an amended SEC Schedule 13D and Form 4, which both publicly disclosed that he had sold his entire stake in BBBY.[8]

19.    The Complaint alleges that, as a result of Defendants' allegedly wrongful acts and omissions, investors traded BBBY Common Stock and Options at artificially inflated prices during the Class Period.[9] **Exhibit 1** graphs the closing stock price and trading volume for BBBY's Common Stock shares throughout the Class Period.

## IV.    Bases for Opinions on Market Efficiency

20.    I understand that, with respect to their claims under §9 and §10(b), Plaintiffs assert the "fraud-on-the-market" theory of class-wide reliance, *e.g.*, that all BBBY shareholders relied on the alleged misstatements or material omissions of fact (and the fraudulent schemes and acts underlying such misstatements) through their effect on stock prices in an informationally efficient market.[10]

---

[6] I understand that the claims allowed to proceed to discovery allege that that Defendants violated §10(b) of the Exchange Act, SEC Rule 10b-5, and §20(a), §9(a)(3), (4), and (f), and §20A of the Exchange Act.

[7] Complaint ¶¶ 7-9.

[8] *Id*. ¶ 177

[9] Complaint ¶¶ 1, 221 (defining the Class to include Common Stock and Options).

[10] *Id.* ¶ 216.

21.     As courts, including the Supreme Court, have repeatedly explained, the "fraud-on-the-market" theory of class-wide reliance holds that investors in securities traded in an informationally efficient market rely on any misrepresentations or material omissions of fact because those statements or material omissions of fact have distorted the value of each class member's purchase price. As the Supreme Court explained in its *Basic Inc. v. Levinson* decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[11]

22.     The Supreme Court reaffirmed the availability of this theory to satisfy §10(b)'s reliance requirement on a class-wide basis in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[12]

23.     A market is considered informationally efficient when the market price of securities responds to publicly available information quickly.[13] Economic research and literature also support the concept of market efficiency for publicly traded securities. For example, Nobel Prize

---

[11] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

[12] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

[13] Academics often consider more stringent forms of market efficiency, *e.g.*, defining an efficient market as one in which prices reflect all material, widely available public information up to the point that any marginal profits to be gained from trading on existing information do not exceed trading costs. Eugene F. Fama, 1991, "Efficient Capital Markets: II," *Journal of Finance* 46, at 1575.

winner Eugene Fama has observed that "[t]he evidence in support of the efficient markets model is extensive, and (somewhat uniquely in economics) contradictory evidence is sparse."[14] More recently, Professor Fama reiterated that "the past research on market efficiency is among the most successful in empirical economics, with good prospects to remain so in the future."[15]

24.    Indeed, research continues to support the empirical soundness of the efficient market hypothesis, as modern scholars have concluded that, in fact, "capital markets are more efficient than previously recognized."[16] Academic research thus provides ample support for the concept of market efficiency of public exchange-traded securities.

25.    I understand that, in securities fraud cases, the Supreme Court has instructed that the "fraud on the market" theory applies when a market is "generally efficient," and "refused to endorse 'any particular theory of how quickly and completely publicly available information is reflected in market price.'"[17] Thus, application does not depend upon "the debate among economists" about various forms of efficiency. Instead, the "fraud on the market" theory is based "on the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'"[18] *Basic's* presumption of reliance thus does not rest on a "binary" view of market efficiency, but rather, market efficiency is a matter of degree.[19]

---

[14] Eugene F. Fama, 1970, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25, at 383, 416.

[15] Eugene F. Fama, 1991, "Efficient Capital Markets: II," *Journal of Finance* 46, at 1575, 1576.

[16] *See, e.g.*, Kewei Hou, Chen Xue, and Lu Zhang, 2020, "Replicating Anomalies," *Review of Financial Studies* 33, at 2071.

[17] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2404-2405 (2014) ("*Halliburton II*") (quoting *Basic*, 485 U.S., at 248, n. 28).

[18] *Halliburton II*, 134 S. Ct. at 2404 (*quoting Basic*, 485 U.S. at 247 n.24).

[19] *Halliburton II*, 134 S. Ct. at 2411.

26.     Courts and scholars have argued that the largest U.S. exchanges with continuous public reporting of stock prices and trading volume, including the New York Stock Exchange ("NYSE") and the NASDAQ, should be granted a presumption of efficiency for virtually all securities traded on them.[20] The continuous reporting of trading statistics, significant trading volumes, rapid information dissemination, and other rules for these exchanges practically guarantee a liquid market for securities traded on these exchanges.[21] The fact that BBBY's Common Stock traded on the NASDAQ therefore leads to a strong presumption of market efficiency.

27.     In securities fraud cases, courts have endorsed the widely-cited five-factor test laid out in *Cammer v. Bloom* to evaluate whether a market is efficient for the purposes of establishing the presumption of reliance[22] Courts also accept additional factors for evaluating market efficiency found in another widely cited opinion, *Krogman v. Sterritt*.[23]

28.     Principles of economics and finance support the factors cited by the *Cammer* and *Krogman* courts as indicators of market efficiency.[24] However, as explained below, it is important to understand that an assessment of market efficiency does not turn on any one single factor; rather,

---

[20] *See Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("*Cammer*") ("'We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.'" (quoting Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988))).

[21] *Id.*

[22] *Cammer*, 711 F. Supp. at 1292.

[23] 202 F.R.D. 467, 477 (N.D. Tex. 2001).

[24] *See, e.g.,* Miguel O. Villanueva and Steven Feinstein, 2021, "Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors," *Review of Quantitative Finance and Accounting* 57.

it is an assessment of all the factors together that allows one to reach the conclusion that a market for a security is efficient.[25]

## V.     Evaluation of Market Efficiency Factors for BBBY Common Stock

29.     In the following section, I discuss the *Cammer*, *Krogman*, and additional factors and evaluate them in relation to BBBY Common Stock. In doing so, I compare the factors' application to BBBY's Common Stock against: (1) benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed published academic research.

30.     As discussed below, my analyses and findings on the various market efficiency factors support the conclusion that BBBY Common Stock traded in an efficient market throughout the Class Period. As the Class Period only covers a single week, I also extend some of the analyses to cover the period beginning one year prior to the start of the Class Period (August 12, 2021) through the end of the Class Period (the "Analysis Period"). The results obtained within the larger sample of the Analysis Period also support the conclusion that BBBY Common Stock traded in an efficient market during the Analysis Period, and thus during the subperiod within it defined by the Class Period.

31.     One academic study that I use for comparison purposes was published by Simona Mola, P. Raghavendra Rau, and Ajay Khorana, and I refer to it as the "MRK Study."[26] In this study, these authors examined two samples of firms. One sample included companies that lost all analyst coverage (the "MRK Sample" firms); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage. The second sample included the

---

[25] *Id.*, at pp. 204-205.

[26] Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, "Is There Life After the Complete Loss of Analyst Coverage?," *Accounting Review* 88, at 667-705.

analyst-covered firms (the "MRK Covered" firms), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.[27]

32.     The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year. We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock. . . . Firms that lose all analyst coverage continue to suffer a significant deterioration in bid-ask spreads, trading volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.[28]

33.     The authors describe these variables as reflective of investor interest: after losing analyst coverage, "investor interest characteristics, such as market capitalization, trading volume, bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to [analyst-]covered peers."[29] Therefore, I interpret the sample of MRK Covered firms as those eliciting high investor interest and reflecting the common indicia of firms operating in efficient markets.

34.     Below, I compare several of BBBY's market efficiency factors to the samples of firms in the MRK Study to assess whether BBBY's characteristics are consistent with firms operating in efficient markets.

### A. *Cammer* Factor 1: Average Weekly Trading Volume

35.     Trading volume refers to the number of shares of a security transacted between market participants. The greater the amount of buying and selling activity of a security, the more

---

[27] MRK Study at 678, 681-682.

[28] MRK Study at 667.

[29] MRK Study at 681 (footnotes omitted).

likely it is that new information will be quickly incorporated into the price of that security.[30] Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock.[31] Thomas and Cotter have stated that "[t]rading volume was also considered as an eligibility standard [for exchange listing] because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[32]

36.     The first *Cammer* factor for stock trading volume has been defined by the *Cammer* court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

> "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[33]

37.     **Exhibit 2** graphs BBBY's Common Stock weekly trading volume as a fraction of shares outstanding throughout the Analysis Period.[34] The average weekly trading volume over the Analysis Period was 75.8% of BBBY's Common Stock shares outstanding, and the trading volume during the one-week Class Period was 1,346.6% of shares outstanding. This level of trading volume exceeds both the 1% and 2% thresholds established by the *Cammer* court. As a result,

---

[30] *See, e.g.,* Bhole, Bharat, Sunita Surana, and Frank Torchio, 2020, "Benchmarking Market Efficiency Indicators for Securities Litigation," *University of Illinois Law Review Online* (the "Bhole Study"), at 101-102; Randall S. Thomas and James F. Cotter, 2000, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63, at 108; MRK Study at 681.

[31] *Id.*

[32] Randall S. Thomas and James F. Cotter, 2000, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63, at 108.

[33] *Cammer*, 711 F. Supp. At 1293 (quoting Bromberg, § 8.6).

[34] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week. As the Class Period consists of five trading days, the final week in this analysis consists of the whole Class Period only.

BBBY's level of stock trading volume supports the conclusion that BBBY's Common Stock traded in an efficient market throughout the Class Period.

38.     I also note that the weekly trading volume of BBBY's Common Stock over the one-week Class Period was 1.1 billion shares on the NASDAQ, and averaged 65.1 million over the Analysis Period. According to the authors in the MRK Study, the median weekly trading volume for the MRK Sample firms was 0.034 million shares while the median for the MRK Covered firms was 0.215 million shares weekly.[35]

39.     Additionally, BBBY's average daily turnover rates of 269.3% during the Class Period and 15.3% over the Analysis Period placed it above the 95th percentile of all companies listed on the NASDAQ and the NYSE from 2016-2018.[36] BBBY's average weekly trading volume during the Class Period exceeds that of both the median MRK Sample firms and the MRK Covered firms. This further supports the conclusion that BBBY's Common Stock traded in an efficient market throughout the Class Period.

### B. *Cammer* Factor 2: Analyst Coverage

40.     An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or industry.  Analysts typically publish reports in which they assess recent company business developments, review historical financial performance and provide forecasts of future

---

[35] MRK Study at 678 (Table 3). The median annual trading volume for MRK sample firms was 1.75 million shares. 1.75 million divided by 52 weeks is approximately 0.034 million shares. The median annual trading volume for MRK covered firms was 11.19 million shares. 11.19 million divided by 52 weeks is approximately 0.215 million shares.

[36] Bhole Study, at 102. The 95th percentile of daily turnover for the 2016-2018 sample period is 2.95%. I note that the 2016-2018 subsample time period is the most recent period reported in this study.

operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock.[37]

41.     Analyst coverage can be indicative of market efficiency since research analysts help to ensure that new important company-specific information is disseminated to investors and thus impounded into stock prices quickly and efficiently. The *Cammer* court similarly stated:

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[38]

42.     In **Exhibit 3,** I summarize the analyst coverage of BBBY over both the Class Period and the Analysis Period. I identified a total of 8 reports issued by analysts at 8 separate firms during the Class Period, and 228 reports issued by analysts at 27 separate firms during the Analysis Period.[39] The list of analyst reports that I was able to identify includes reports by firms that conducted thorough and detailed research on BBBY and the industry within which it operated, such as the reports prepared by analysts at Wells Fargo and Wedbush Securities. Collectively, this is a significant degree of analyst coverage which served to disseminate important new publicly available information to investors, including company news, financial performance, forecasts, and analyst commentary and recommendations.

43.     This degree of analyst coverage compares favorably to that documented by academic research. For example, the MRK Study noted that 19% of U.S. firms covered by I/B/E/S

---

[37] MRK Study at 670-671.

[38] *Cammer*, 711 F. Supp. at 1286.

[39] These statistics represent a lower bound of the analyst coverage of BBBY because many analyst reports are provided directly to investors but are not captured by third-party data vendors.

received no analyst coverage in a given year.[40] A separate academic study by Charles M.C. Lee and Eric So documented that, on average, many firms are covered by zero, one, or two analysts.[41] BBBY's analyst coverage is consistent with the MRK Covered firms which elicited high investor interest.

44.     Moreover, BBBY's high level of analyst coverage across the Analysis Period also placed it above the 95th percentile when compared with all companies listed on the NASDAQ and the NYSE from 2016-2018.[42] Correspondingly, even during the short Class Period, BBBY's analyst coverage placed it above the 50th percentile.[43] This supports the conclusion that BBBY's Common Stock traded in an efficient market throughout the Class Period.

45.     In addition to the analyst coverage documented above, investors could access information about BBBY from a variety of other sources. For example, I conducted a search of press and news articles about BBBY using Factiva, a well-known provider of access to business news across a comprehensive set of publications. Factiva coverage includes *Dow Jones Newswires*, *Reuters News*, *PR Newswire*, *Associated Press Newswires*, *Business Wire*, and numerous other outlets. This search produced over 500 articles throughout the Class Period, or an average of more than 100 per day.[44] Investors can also receive information from online research forums, such as SeekingAlpha, social media, market commentators, and other investor research services.

---

[40] MRK Study at 668.

[41] Charles M.C. Lee and Eric C. So, 2017, "Uncovering Expected Returns: Information in Analyst Coverage Proxies," *Journal of Financial Economics* 124, at 336 (see Table 1, Panel B – "COV").

[42] Bhole Study, at 104: 95th percentile defined as 26 analysts.

[43] Bhole Study, at 104: 50th percentile defined as 6.2 analysts.

[44] The articles were identified through a Factiva search, including BBBY's company tag over all available sources. After excluding potential duplicates, 148 unique news articles were identified by my search.

46.     Moreover, BBBY produced numerous filings containing Company information which were immediately disseminated to the public through the SEC's online database, EDGAR, during the Class Period. In addition, BBBY's securities and Cohen's statements concerning BBBY were widely discussed and analyzed by investors on social media, including on Twitter and stock-oriented forums such as Reddit.[45] Individual and institutional investors thus had access to publicly available information about BBBY from a variety of sources during the Class Period.[46]

47.     As a result, the analyst coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about BBBY supports the conclusion that its Common Stock traded in a well-developed and informationally efficient market throughout the Class Period.

### C. *Cammer* Factor 3: Market Makers

48.     The third *Cammer* factor relates to securities trading outside of major exchanges, in over-the-counter markets without continuous reporting of trading volume. This factor examines market makers, which are firms that facilitate the buying and selling of shares among investors in a company's stock during trading hours.[47] Market makers are present on major exchanges as well as over-the-counter markets. In particular, market makers can facilitate market efficiency in an over-the-counter market because they are:

> [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in

---

[45] *See, e.g.*, Complaint ¶¶ 41-85, 92-97, 138-159, 162-164, 172-177.

[46] BBBY filed 7 forms with the SEC during the Class Period (including 2 form 4's, 2 form SC 13D/A's, 1 form SC 13G/A, 1 8-K, and 1 form 3), and filed 106 forms with the SEC during the Analysis Period.

[47] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

a given security, the more information is available about it and the quicker its dissemination in the price.[48]

49.     In evaluating market efficiency by looking at market makers, the *Cammer* court held:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[49]

The court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting. As reported above, BBBY had the benefit of a strong exchange listing and volume reporting. It also had numerous market makers to facilitate efficient trading.

50.     BBBY's Common Stock traded on the NASDAQ throughout the Class Period. Similar to other large, national exchanges, the NASDAQ reports volume, prices, bid-ask spreads, and other trading details which ensure the market for stocks remains well-developed, liquid, and efficient. The *Cammer* court stated:

> We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[50]

51.     A large, established stock exchange with market makers (such as the NASDAQ) is thus widely-considered by both academics and practitioners to be developed and informationally

---

[48] Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporate Law* 19, at 291.

[49] *Cammer*, 711 F. Supp. at 1293.

[50] *Id.* at 1292.

efficient. BBBY's public listings on the NASDAQ, a well-developed and established national exchange, thus satisfies the intent of this *Cammer* factor.

52.     BBBY had at least 58 market makers and brokers providing similar activity over the Class Period and had 104 market makers and brokers providing similar activity over the Analysis Period.[51]

53.     Moreover, academic research has similarly found that institutional investors can facilitate trading liquidity.[52] I understand that courts view institutional investors as potentially providing similar benefits to market makers by supplying trading liquidity and informationally efficient and informed trading.[53] As I discuss further in **Section V.I** below, BBBY's Common Stock was widely held by institutional investors around the Class Period.[54] In sum, BBBY easily

---

[51] *See* Bloomberg "RANK" function ("RANK <GO> provides brokers' advertised trade volume on a post-trade basis, so you can analyze which brokers provide the greatest liquidity, assess how you rank against your peers, and evaluate the greatest liquidity providers in a corporation. RANK generates historical broker ranking reports, comparing broker activity in a single security or across an exchange, index, or portfolio, helping you trade with minimal market impact…RANK provides the equity market share data that is critical to helping buy-side firms identify which brokers potentially are the market makers in a stock in which they are interested, so that trading decisions can be made more accurately. Additionally, sell-side firms can demonstrate their historical ability to source liquidity for clients, while investment bankers can market their ability to manage their corporate finance clients' flow").

[52] MRK Study at 678 (Table 3). Authors reported that Sample firms had a median of 9 institutional investors while Covered firms had a median of 40 institutional investors; Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, *Journal of Corporate Law* 19, at p. 302.

[53] *In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009) ("Similarly, the presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs: large investors, with more money at stake, may be more likely to inform themselves well before trading." (citations omitted)); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market.").

[54] BBBY Common Stock was held by at least 264 institutional investors during the quarter the Class Period is contained within, and 535 institutional owners across the Analysis Period (see **Exhibit 10**). Institutional ownership fluctuated on a quarterly basis throughout the Analysis Period,

satisfies this *Cammer* factor by virtue of the Common Stock's highly liquid and well-developed trading venues, the presence of market makers, and the widespread holdings by sophisticated institutional investors, further supporting the efficiency of the market for BBBY Common Stock throughout the Class Period.

### D.  *Cammer* Factor 4: SEC Form S-3 Filing Eligibility

54.     The fourth *Cammer* factor cited by the court is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[55]

55.     Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information. This eligibility includes the following requirements: the registrant has a class of securities subject to the Exchange Act, the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases, and the registrant has a public float of $75 million, as measured by the aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant.[56,57] The logic

---

from a minimum of 73.6% of shares outstanding on the quarter ending September 30, 2022 to a maximum of 118.89% of shares outstanding on the quarter July 30, 2022, according to data from Bloomberg and SEC Filings. Note, reported holdings can be above 100% due to short selling. These figures represent a conservative estimate of institutional holdings as some institutions may not be reflected in S&P Capital IQ's coverage.

[55] *Cammer*, 711 F. Supp. at 1287.

[56] *See* SEC Form 3, *available at* https://www.sec.gov/files/forms-3.pdf.

[57] SEC 1379, "Form S-3, Registration Statement under the Securities Act of 1933, General Instructions."

and intuition behind this factor as discussed by the *Cammer* court is that a company which makes timely financial filings with regulators implies that investors have ready and ample access to publicly available information about the issuer.

56.     BBBY filed Form S-3 filings with the SEC before and shortly after the Class Period.[58, 59] Based on my research, BBBY satisfied the Form S-3 eligibility requirements during the Class Period.[60]  For example, BBBY's Common Stock held by non-affiliates far exceeded the required $75 million threshold during the class period.[61] As a result, this factor is consistent with the efficiency of the market for BBBY Common Stock throughout the Class Period.

### E.  *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices

57.     The fifth *Cammer* factor relates to whether a company's stock price quickly responds to and incorporates new value-relevant information. The *Cammer* court held:

> [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[62]

58.     Below, I summarize my empirical analysis, which finds that BBBY's Common Stock exhibited the type of cause-and-effect relationship between company-specific information flow and price movement described in *Cammer*.  As part of my analysis, I compared the behavior of BBBY Common Stock on days when company-specific news was issued with its behavior on

---

[58] *See* SEC EDGAR, DK-Butterfly-1, Inc. Form S-3ASR, filed on July 7, 2014, *available at* https://www.sec.gov/Archives/edgar/data/886158/000157104914002880/t1401216-s3.htm.

[59] *See* SEC EDGAR, DK-Butterfly-1, Inc. Form S-3ASR, filed on August 31, 2022, *available at* https://www.sec.gov/Archives/edgar/data/886158/000119312522234511/d400374ds3asr.htm.

[60] *Id.*

[61] BBBY's float averaged $1.95  billion over the full Class Period. Market capitalization of float calculated as (Shares Outstanding + Short Interest – Shares held by Insiders) * Price of BBBY Common Stock.

[62] *Cammer,* 711 F. Supp. at 1291.

days when no such news was issued. This analysis demonstrates that BBBY's Common Stock price reacted rapidly to company-specific news, and thus further supports the conclusion that BBBY Common Stock traded in an efficient market throughout the Class Period.

### i.    Event Study Methodology

59.    To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price,"[63] I ran empirical tests using the results of an event study.

60.    Event studies are widely used by economists to measure the reaction of a security to the disclosure of new, issuer-specific information, including in connection with assessments of market efficiency in securities litigation.[64] As Professor Fama has explained:

> The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns. When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration. As a result, event studies can give a clear picture of the speed of adjustment of prices to information.

> There is a large event-study literature on issues in corporate finance. The results indicate that on average stock prices adjust quickly to information about investment decisions, dividend changes, changes in capital structure, and corporate-control transactions. This evidence tilts me toward the conclusion that prices adjust efficiently to firm-specific information. More important, the research uncovers empirical regularities, many surprising, that enrich our understanding of investment, financing, and corporate-control events, and give rise to interesting theoretical work.[65]

61.    To determine whether BBBY stock price movements on any given date are statistically significant, I performed an event study using generally accepted economic methods,

---

[63] *Id.*

[64] A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 13.

[65] Eugene F. Fama, 1991, "Efficient Capital Markets: II," *Journal of Finance* 46, at 1607.

specifying a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices.

62.     Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company-specific news. Finally, as part of an event study analysis, an economist tests whether the deviation from expected price movements (*i.e.*, the "abnormal return") is "statistically significant," *i.e.*, sufficiently large compared to the usual volatility in the Company stock price return such that simple random movement can be rejected as the cause.

63.     I applied these widely used and generally accepted econometric methodologies to perform my event study here.  Specifically, in order to isolate the impact of company-specific news on BBBY's stock price during the Class Period, I performed regression analyses to measure the relationship between BBBY's stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in BBBY's industry. By modeling how BBBY's stock price returns moved relative to an overall market index and an industry index, I was also able to measure the response of BBBY's Common Stock to announcements of company-specific news.

64.     Due to the short duration of the Class Period, I conducted my regression analysis across the Analysis Period rather than the Class Period. For each trading day, I constructed a

regression model using data from the previous 120 trading days (the "Estimation Window")[66], excluding any news days and corrective disclosures.

65.     To study the relationship between BBBY's stock price returns and overall market factors, I used the S&P 500 Index (the "Market Index"). This Market Index is commonly used by economists as a representation of the overall market. To study the relationship between BBBY's stock price returns and changes in industry-wide factors that would be expected to impact all stocks in BBBY's particular industry, I used the S&P 500 Specialty Retail Industry Index (the "Industry Index").[67] BBBY itself benchmarks its Common Stock performance against the S&P 500 and S&P 500 Specialty Retail Industry indices in its Annual Reports.[68]

66.     I established the relationship between the daily return of BBBY's Common Stock, the daily return on the Market Index, and the daily return on the Industry Index over the Estimation Window.[69] As shown in **Exhibit 4**, the event study models revealed an evolving relation between

---

[66] I utilized an Estimation Window of 120 trading days, which equates to approximately six calendar months. *See, e.g.,* Mark L. Mitchell and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *Business Lawyer* 49; A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, at 15 ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally, the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.").

[67] According to Bloomberg, this industry index had over 12 constituents during the Analysis Period, and BBBY was not a member of the index.

[68] *See* SEC EDGAR, DK-Butterfly-1 Inc. 10-K filed April 21, 2022, *available at* https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0000886158/000088615822000 047/bbby-20220226.htm.

[69] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35; Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, "Good News, Bad News, Volatility, and Betas," *Journal of Finance* 50, at 1597.

the daily returns of BBBY Common Stock and those of the overall stock market and industry indices throughout the Analysis Period, including a generally positive correlation between the Company's Common Stock and the Market Index and Industry Index. In other words, movements of the Market Index and the Industry Index help explain movements in BBBY's stock price.

67.     Consistent with generally accepted econometric methods, these observed relationships allowed me to construct a model to predict the expected daily return of the Company on any given date within the Analysis Period that controlled for that day's market and industry returns. Again, in accordance with standard event-study methodology, I then subtracted this predicted return from the actual return to get the "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

68.     Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in BBBY's Common Stock abnormal returns, or the "standard deviation of the regression errors." The standard deviation of errors provides a metric for how much idiosyncratic company-specific volatility (or "randomness") remains in the price movement of BBBY's common stock after controlling for the Market Index and the Industry Index. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Analysis Period.

           *ii.     Cause and Effect Analysis Comparing BBBY Common Stock Price Behavior on News Days versus No News Days*

69.     A generally-accepted and peer-reviewed approach to evaluating whether a stock price responds to news (including with regard to testing market efficiency in the securities class action context) is to compare the stock's behavior on "news days" with its behavior on other days with relatively little or no news.[70]  A showing that a security's price is statistically significantly

---

[70] Miguel O. Villanueva and Steven Feinstein, 2021, "Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors," *Review of Quantitative Finance and Accounting* 57.

more volatile on "news days" than on "no news days" is considered powerful evidence that the security responds promptly to news and, therefore, strongly supports a finding of efficiency.[71]

70.    Importantly, research has shown that in an efficient market, a security can exhibit some large price movements despite the absence of news and, conversely, there can be news without large price movements.[72]   For instance, a company may announce earnings (or a lack thereof) that are in line with investor expectations – and while such an expected announcement is clearly important to investors, it will often not alter the total mix of information significantly enough to elicit a statistically significant stock price movement. Likewise, a disclosure may contain a mix of positive and negative information, which may effectively offset each other, which again would result in no statistically significant price movement. Further, if a company's disclosure conceals important information, the effect of the concealment will generally not result in a significant stock price movement, but will instead simply maintain the price at its then-current level.

71.    Accordingly, to minimize the influence of random fluctuations, a generally accepted, peer-reviewed methodology accepted by numerous courts is to compare (i) a subject company's stock price behavior on a *group* of "news days" to (ii) its stock price behavior on a *group* of "no news days."[73]

---

[71]  *Id.*

[72]  Boudoukh, Jacob, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, "Information, Trading, and Volatility: Evidence from Firm-Specific News," *Review of Financial Studies* 32, at 1004; Ray Fair, 2002, "Events That Shook the Market," *Journal of Business* 75, at 713, 714.

[73]  Miguel O. Villanueva and Steven Feinstein, 2021, "Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors," *Review of Quantitative Finance and Accounting* 57. This approach been repeatedly accepted by courts evaluating market efficiency in the securities class action context. *See In re: Under Armour Securities Litigation*, 631 F.Supp.3d 285, 311-12 (D. Md. 2022); *Bond v. Clover Health Investments, Corp., et al*., 2023 WL 1999859, at *11 (M.D. Tenn. Feb. 14, 2023); *In re: QuantumScape Securities Class Action Litigation*, 2022 WL 17974629, at *10 (N.D. Cal. Dec. 19, 2022).

72.     Here, I performed such an analysis comparing the behavior of BBBY Common Stock on news versus least news days.  My analysis demonstrates that the price of BBBY stock was statistically significantly more volatile on news than on least news days.  This result supports the conclusion that there was a "cause and effect relationship between company disclosures and resulting movements in stock price" for BBBY Common Stock during the Analysis Period and, thus, further supports a finding of market efficiency.

73.     To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I analyzed dates of BBBY's quarterly earnings announcements during the Analysis Period (the "News Days")[74]. Such announcements are commonly studied by financial economists, both in litigation-related work and in academic papers. These announcements represent a potential opportunity for the public release of new value-relevant Company information to investors. One would not expect every earnings announcement to cause a significant stock price movement for a company because investors and analysts may anticipate the reported performance, or because the information may contain a mix of both positive and negative information.[75] However, the mix of unanticipated results, forward guidance, executive statements, analyst interpretations of this information, and other unanticipated company-specific news can cause company stock prices to move in an efficient market.

74.     As shown in **Exhibit 6a**, in total, BBBY released four quarterly earnings announcements during the Analysis Period.

---

[74] If the release were issued after the close of the market, or on a non-trading day, the relevant news day is appropriately deemed to be the next trading day.

[75] Boudoukh, Jacob, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, Information, Trading, and Volatility: Evidence From Firm-Specific News, *The Review of Financial Studies* 32.3, at 1004; Ray Fair, 2002, Events That Shook the Market, *Journal of Business* 75, at 713, 714.

75.     I then compared the stock returns and trading volume of BBBY's Common Stock on these "News Days" versus those metrics on the 132 trading days where there were no headlines from Dow Jones or SEC filings (the "No News Days").[76] The No News Days provide a benchmark measurement of days in which relatively little or no new BBBY-specific information was provided to the market. If BBBY's stock prices tend to move more significantly on News Days than on No News Days, this would support a conclusion of market efficiency.

76.     **Exhibit 6a** reports the list of four News Days (*i.e.*, their market impact dates and corresponding disclosure headlines). **Exhibit 6b** reports the results of my event study using BBBY Common Stock returns. The columns list the market impact dates, raw return, abnormal return from my event study, abnormal dollar change in stock price from my event study, the t-statistic, and the p-value corresponding to statistical significance. Overall, three out of four BBBY news days were associated with abnormal stock price movements that were statistically significant at the 95% level or greater.  I compare this rate with that on the No News Days in **Exhibit 7**.

77.     **Exhibit 7** summarizes the statistical comparison of BBBY's Common Stock returns and trading volume on the four News Days versus these metrics as measured on the 132 No News Days.[77] As shown in the **Exhibit 7**, 75.0% of the News Day disclosures caused stock movements that were statistically significant at the 95% level. This compares to 4.6% of the No News Days with statistically significant stock price movements. The difference between these two percentages is statistically significant at a level greater than 99%.  These results provide strong evidence of a cause-and-effect relationship between new information and BBBY Common Stock

---

[76] Dow Jones publishes articles from a number of reputable sources including Dow Jones Institutional News, The Wall Street Journal, Barron's, and MarketWatch. This resulted in 132 No News Days. For purposes of considering news to identify No News Days under this methodology, I exclude headlines that merely identify stock price or volume movements on a given date without discussing any other information (however, there were no such days in this sample).

[77] The four News Days and 132 No News Days combined cover 53% of the trading days (136 of 257) in the Analysis Period.

price movements. Moreover, relative to the No News Days, the News Days had a greater trading volume, the difference of which was statistically significant at the 95% level.

78.     In summary, relative to other trading days contained in each event study's Estimation Window, BBBY's News Days resulted in a greater proportion of statistically significant stock price movements at the 95% level, higher absolute abnormal returns, and higher trading volumes than BBBY's No News Days. These results establish a clear cause-and-effect relationship between the release of new company-specific information and BBBY Common Stock price movements. As a result, this *Cammer* Factor Five analysis supports the conclusion that BBBY Common Stock traded in an efficient market during the Class Period.

### F.  Additional Factor 1: Market Capitalization

79.     I have also considered several additional factors beyond the five *Cammer* factors, the first of which is the total value of stock outstanding, or market capitalization. The *Cammer* court acknowledged this factor as indicative of market efficiency, holding that "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency."[78] Similarly, the *Krogman* court stated that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[79]

80.     Conversely, as noted previously, the MRK Study found that companies that lack analyst coverage are also companies that are generally associated with other factors—such as relatively small market capitalization—that indicate that their shares trade in less developed and efficient markets. The median market capitalization of the MRK Sample firms was $27.91

---

[78] *Cammer*, 711 F. Supp. At 1287.

[79] *Krogman,* 202 F.R.D. at 478.

million.[80] By contrast, the MRK Covered firms had a median market capitalization of $243.97 million.[81] This study thus supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

81.    **Exhibit 8** reports BBBY's market capitalization throughout the Class Period.[82] This market capitalization averaged $1.46 billion over the Class Period. BBBY's total market capitalization places it between the 50th and 75th percentile of all companies listed on either the NASDAQ and the NYSE from 2016-2018.[83]   BBBY's market capitalization also exceeded the MRK Sample firms and Covered firms on an inflation-adjusted basis.[84] BBBY's number of shares outstanding was 80.0 million during the Class Period.

82.    BBBY's market capitalization, shares outstanding available for trading, and its sizeable float, as discussed below, are consistent with the conclusion that the Common Stock traded in an efficient market during the Class Period.

**G. Additional Factor 2: Bid-Ask Spread**

83.    The *Krogman* court considered the bid-ask spread as another factor that can indicate market efficiency: "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[85]

84.    The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid). This

---

[80] MRK Study at 678 (Table 3).

[81] MRK Study at 678 (Table 3).

[82] Market Capitalization is calculated as BBBY Common Stock price * Shares Outstanding. Shares Outstanding data is gathered from SEC filings.

[83] Bhole Study, at 107: 50th percentile of market capitalization defined as $781 million; 75th percentile defined as $3.3 billion.

[84] Source: U.S. Bureau of Labor Statistics, CPI Inflation Calculator, available at: https://www.bls.gov/data/inflation_calculator.htm.

[85] *Krogman*, 202 F.R.D. at 478.

spread can be expressed as the difference between these prices in their quoted currency, or as a percentage – for example relative to the bid-ask midpoint. A narrow bid-ask spread indicates lower transaction costs to trade in a given stock and is indicative of a more informationally efficient market. A wider bid-ask spread will cause investors to pay more money to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

85.    I analyzed the bid-ask spread of BBBY's Common Stock during the Analysis Period. **Exhibit 9** reports BBBY's bid-ask spread as a percentage of the bid-ask midpoint.[86] This spread averaged 0.19% over the Class Period, and 0.11% over the Analysis Period.

86.    By way of comparison, the MRK Study found that the MRK Sample firms had a median bid-ask spread of 4.55%, while the MRK Covered firms had a median bid-ask spread of 1.69%.[87] BBBY's bid-ask spread was smaller than both of these values, indicating that investors could trade BBBY's Common Stock at low relative cost. Additionally, BBBY's average bid-ask spread over the Analysis Period is narrower than the majority of companies listed on the NASDAQ and the NYSE from 2016-2018 (a lower percentile ranking corresponds to a narrower bid-ask spread).[88]

87.    As a result, BBBY's bid-ask spread also supports the conclusion that BBBY Common Stock traded in an efficient market throughout the Class Period.

---

[86] I calculated the percent bid-ask spread using daily closing bid and ask quotes. Kee H. Chung and Hao Zhang, "A Simple Approximation of Intraday Spreads Using Daily Data", 17 *J. Fin. Markets*, 94, Table 2 (2014). This study compared data using end-of-day prices to intraday data and documented that the spreads were very similar. *See also* Farshid Abdi and Angelo Ranaldo, 2017, A Simple Estimation of Bid-Ask Spreads from Daily Close, High, and Low Prices, *Review of Financial Studies* 30, at p. 4439: "An *approximation* of intraday bid-ask spreads with end-of-day quotes provides accurate measures and computational savings" (citations omitted).

[87] MRK Study at 678 (Table 3).

[88] Bhole Study, at 105, 50th percentile of bid-ask spread defined as 0.14%.

## H. Additional Factor 3: Public Float

88.    The *Krogman* court also considered the public float of a company in weighing market efficiency.[89]

89.    The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders. Even if a company has a large market capitalization, if the majority of the equity is held by its CEO and/or other insiders, then investors may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances, thereby hindering efficiency.

90.    **Exhibit 10** reports the shares outstanding, public float, and shares held by insiders for BBBY Common Stock for each quarter ending around the Analysis Period. I discuss the average statistics over this Analysis Period as well as the statistics for the single quarter encompassing the full Class Period, ending on September 30, 2022. As shown in that exhibit, BBBY insiders held 4.81% of the Common Stock around the Class Period and 10.38% over the Analysis Period. Approximately 55.26% of BBBY's public float was held by institutions and other large outside investors around the Class Period (87.70% over the Analysis Period). Overall, roughly 107.0 million shares of Common Stock were available for trading in the public float around the Class Period.

91.    This large degree of public float for BBBY's Common Stock supports the conclusion that it traded in an efficient market throughout the Class Period.[90]

## I.  Additional Factor 4: Institutional Ownership

92.    Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to

---

[89] "In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

[90] *Id.*

investing decisions. These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the new information to be quickly impounded into stock prices. Thus, the presence of institutional shareholders can be an indicator of market efficiency.

93.     I also report the total institutional ownership of BBBY Common Stock in **Exhibit 10**, which shows that roughly 264 institutions held the stock around the time of Class Period (with at least 535 institutions over the full Analysis Period). By comparison, the MRK Study found that the MRK Sample firms had a median of only nine institutional investors while the MRK Covered firms had a median of 40 institutional investors.[91] BBBY's institutional ownership base greatly exceeds both of these levels. Moreover, BBBY's institutional ownership as a percent of shares outstanding around the Class Period placed it above the 50th percentile of NYSE and NASDAQ traded companies.[92]

94.     Thus, the significant institutional ownership base for BBBY Common Stock supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

### J.   Additional Factor 5: Autocorrelation

95.     Autocorrelation refers to an anomaly by which stock returns over a given time period are able to predict future returns, a potential phenomenon that has been widely studied in the academic literature.[93] The interval over which autocorrelation is examined tends to be on a

---

[91] MRK Study at 678 (Table 3).

[92] Bhole Study, at 106: 50th percentile defined as institutional ownership of 68.26% of shares outstanding. BBBY had an institutional ownership of 73.56% around the class period (see **Exhibit 10**)

[93] *See, e.g.*: Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, "Liquidity and Autocorrelations in Individual Stock Returns," *Journal of Finance* 61, at 2367-68; Michael C. Jensen, 1978, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* 6, at 95-101.

daily basis. Thus, if the stock return today predicts tomorrow's stock return with a statistically significant correlation, the returns are said to be autocorrelated.

96.     A positive autocorrelation could give rise to "momentum" trading whereby an investor would purchase (sell or short sell) stock when returns are above (below) average in order to generate profits as the returns continue over subsequent trading days.[94] A negative autocorrelation could give rise to "reversal" trading whereby an investor would sell or short sell (purchase) stock when returns are above (below) average in order to capture profits when the returns reverse.[95]

97.     Autocorrelation may occur occasionally due to random patterns in aggregate stock return data or due to consecutive news days with different types of new information being publicly released. However, if statistically significant autocorrelation in stock returns persists over a sufficient time period such as several quarters, and if such autocorrelation is large enough in magnitude that a trader could earn riskless profits after trading costs, this would imply market inefficiency because publicly-available information about prior stock price movements would not be fully reflected in current stock prices.

98.     I use an established methodology, *i.e.*, a regression analysis, to test for autocorrelation in BBBY's Common Stock returns.[96] This evaluates whether, from a statistical perspective, the stock return on a given day can predict the stock return on the following trading

---

[94] *See, e.g.*: Adem Atmaz, Huseyin Gulen, Stefano Cassella, and Fangcheng Ruan, 2023, "Contrarians, Extrapolators, and Stock Market Momentum and Reversal," *Management Science*, at 1.

[95] *Id.*

[96] I evaluate abnormal returns, the calculation of which was described in the *Cammer* factor 5 analysis section of this report (**V.E**).

day.[97] After performing the regression to test for this pattern over the sample of trading days throughout the Analysis Period, if the regression produces a statistically significant result, then it becomes necessary to explore whether this pattern is sufficiently large in magnitude, consistent in direction, and persistent over time such that a trading arbitrage opportunity exists. If, however, the regression does not indicate a statistically significant pattern in the stock returns, then no evidence exists of an autocorrelation anomaly.

99.    **Exhibit 11** presents the results from the autocorrelation test for BBBY's Common Stock during the Analysis Period. The autocorrelation coefficient over the full Analysis Period is not statistically significant at the 95% level. Thus, I find no evidence of persistent autocorrelation in BBBY's Common Stock returns. This finding supports the conclusion that BBBY's Common Stock traded in an efficient market during the Class Period.

### K.  Additional Factor 6: Active Options Trading

100.    Academic studies have shown that options written on a company's shares of stock help to improve market depth and liquidity, investor interest, and overall market efficiency, as reflected by increases in trading volume, narrower bid-ask spreads, and improvements in transaction sizes and frequencies.[98] Thus, options trading on a company's stock can improve price discovery and support a finding of market efficiency, relative to a company without any options trading.[99]

---

[97] Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, "Liquidity and Autocorrelations in Individual Stock Returns," *Journal of Finance* 61, at 2367-68; Michael C. Jensen, 1978, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* 6, at 95-101.

[98] Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53. See also: Stephen A. Ross, 1976, "Options and Efficiency," *Quarterly Journal of Economics* 90.

[99] *See, e.g.*, Robert Jennings and Laura Starks, 1986, "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," *Journal of Finance* 41; Mihir Bhattacharya,

101.    BBBY Common Stock had 4,198,110 call option contracts and 2,317,461 put option contracts traded during the Class Period.[100] The presence of options trading supports the conclusion that BBBY Common Stock traded in an efficient market throughout the Class Period.

### L.    Information Environment During the Class Period

102.    I also considered the general information environment regarding BBBY during the Class Period. The Complaint alleges that Defendant Cohen took advantage of BBBY's potential as a meme stock and short squeeze candidate in order to perpetrate his scheme.[101] In my review of news and analyst coverage of BBBY discussed throughout this report, I noted commentary speculating on the potential for BBBY to represent a meme stock targeted by retail investors, as well as the potential for BBBY to represent a short squeeze candidate. I considered these aspects of the information environment for BBBY during the Class Period when conducting my market efficiency analyses.

103.    I also considered the difference between informational efficiency and fundamental efficiency. Informational efficiency refers to the market price of a stock reflecting available information about a security. This can include correct information about fundamental value, but also incorrect information caused by misstatements, omissions, or schemes, such as those alleged in the Complaint. The price of a stock can also reflect beliefs by different sets of investors – such as retail investors.[102] The informational environment can also be affected by meme stock status or

---

[100] 1987, "Price Changes of Related Securities: The Case of Call Options and Stocks," *Journal of Financial and Quantitative Analysis* 22; Stephen Figlewski and Gwendolyn P. Webb, 1993, "Options, Short Sales, and Market Completeness," *Journal of Finance* 48; Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53.

[100] Source: CBOE

[101] Complaint ¶¶ 24, 29, 30, 45, 105, 138, 144, 158, 163, 166.

[102] This could include retail investors allegedly courted by Cohen, who allegedly believed in his turnaround strategy based on his status as one of BBBY's largest shareholders, with influence and access to management that ordinary investors allegedly did not have. Complaint ¶¶ 3-12.

short squeeze dynamics. In contrast, fundamental efficiency dictates that a stock price is always accurate and reflects the true fundamental value of a company.  My understanding is that the Supreme Court rejected attempts to narrowly construe market efficiency in *Halliburton II*.

104.    Even before *Halliburton II*, my understanding is that courts routinely rejected fundamental efficiency as a prerequisite to invoke the fraud-on-the-market presumption of reliance.  For example, in *In re PolyMedica Corp. Sec. Litig.*, the United States Court of Appeals for the First Circuit held:

> For purposes of establishing the fraud-on-the-market presumption of reliance, we adopt the prevailing definition of market efficiency, which provides that an efficient market is one in which the market price of the stock fully reflects all publicly available information. By "fully reflect," we mean that market price responds so quickly to new information that ordinary investors cannot make trading profits on the basis of such information. This is known as "informational efficiency." We reject a second and much broader meaning of "fully reflect," known as "fundamental value efficiency," which requires that a market respond to information not only quickly but accurately, such that the market price of a stock reflects its fundamental value.[103]

105.    In my evaluation of the efficiency factors for BBBY's Common Stock, I considered whether the efficiency conclusion from these factors was undermined by other aspects of BBBY's public information environment such as retail investor interest, potential meme stock status, and short squeeze dynamics. If any of these aspects caused BBBY's Common Stock to be informationally inefficient, I would expect this inefficiency to be reflected in the various *Cammer*, *Krogman*, and other efficiency factors I evaluated. For example, if a short squeeze caused BBBY's stock to no longer be informationally efficient, I would expect to observe the absence of any relation between relevant news and corresponding stock price movements. Yet, as explained

---

[103] 432 F.3d 1, 16 (1st Cir. 2005).

above, my *Cammer* 5 analysis identified a statistically significant difference between returns on News Days versus those on No News Days. Moreover, these results were present prior to the Class Period, during the Analysis Period when retail and other investors considered BBBY's status as a potential meme stock and short squeeze candidate.[104] Because the *Cammer* and *Krogman* factors weigh in favor of market efficiency despite the status of BBBY as a potential meme stock and short squeeze candidate, I conclude that the market for BBBY's Common Stock was efficient throughout the Class Period.

## VI. Evaluation of Market Efficiency for Options on BBBY Common Stock

106.   I have also been asked to determine whether the market for BBBY Options was efficient during the Class Period.

---

[104] *See, e.g.*, "7 Heavily-Shorted Stocks Beg for Meme Buying Frenzies," Sep. 3, 2021, *Investor's Business Daily*: "Bed Bath & Beyond, a struggling home goods retailer, still hasn't shaken out all the shorts. It's one of the early Meme stocks, with its shares jumping more than 56% this year. Even so, more than 21% of its shares are controlled by shorts."; "Bed Bath & Beyond Stock Jumps 67% After Online, In-Store Retail Partnership With Kroger," Nov. 3, 2021, *Dow Jones Institutional News*: "Shares of Bed Bath & Beyond Inc. skyrocketed as much as 106% in the extended session Tuesday after the retailer announced a partnership to have some of its 'most sought-after' baby and home items available at Kroger Co.'s stores and site and said it was ahead of its share buyback schedule. Bed Bath & Beyond stock BBBY is one of the most heavily shorted, and is popular among 'meme' retail investors who post on Reddit. Tuesday's deal may have spurred a short squeeze, forcing hedge funds that had bet against the stock to buy back their shares to cut losses. After peaking above 106% in after-hours trading, shares ended the extended session up 67%, at $28.05, after closing the regular session at $16.75. Read: The meme stocks welcomed an old friend back to the fun after the markets closed."; "Short Sellers Get Cocky Again and 'Meme' Investors Pay Dearly," Feb. 16, 2022, *Investor's Business Daily*: "Short sellers are feeling cocky enough to take on the 'meme' investors again. But they're picking their spots more carefully this time. It's been roughly a year since meme stock investors flooded into highly shorted stocks like GameStop and Bed Bath & Beyond. Shorts got pounded when stocks they bet against soared instead and caused them to suffer large losses. But now, the shorts starting to get the upper hand again…Bed Bath & Beyond, for instance, is the second most shorted S&P 1500 stock at more than 32% of its shares trading in the control of shorts."

## A.     Overview of Option Types and Pricing

107.    There are two basic types of options: call options and put options. A call option gives the holder of the option the right to buy an asset (in this case, BBBY Common Stock) by a certain date (the expiration date), and at a certain price (the strike price or exercise price). A put option gives the holder the right to sell an asset (in this case, BBBY Common Stock) by an expiration date at the strike price. Options can be either American or European, with the distinction being that American options can be exercised at any time up until the expiration date, whereas European options can be exercised only on the expiration date itself.[105]

108.    The price of an option, also referred to as the "premium," depends on a number of factors, including how the current stock price compares to the exercise price, the amount of time to expiration, anticipated dividends, expected volatility of the underlying stock, and interest rates.[106]

## B.  The Academic Literature Strongly Supports the Presumption that Options Quickly Reflect Value-Relevant Information

109.    A wide body of academic literature has studied options pricing in relation to common stocks. For example, numerous studies have evaluated the potential for arbitrage profits to be earned from persistent mispricing opportunities between common stock and options prices and have concluded that such opportunities do not persist in general due to the efficiency of option pricing.[107]

---

[105] John Hull, *Options, Futures and Other Derivatives*, 7th Ed., Prentice Hall, 2009, at p. 6.

[106] *Id.*, at pp. 201-204.

[107] *See, e.g.,* Dan Galai, 1977, "Tests of Market Efficiency of the Chicago Board Options Exchange," *Journal of Business* 50; Robert C. Klemkosky and Bruce G. Resnick, 1979, "Put-Call Parity and Market Efficiency," *Journal of Finance* 34; Robert C. Klemkosky and Bruce G. Resnick, 1980, "An Ex-Ante Analysis of Put-Call Parity," *Journal of Financial Economics* 8; Robert E. Whaley, 1982, "On the Valuation of American Call Options on Dividend Paying Stocks: Empirical Tests," *Journal of Financial Economics* 19.

110. Many studies have documented that options prices quickly impound and reflect new information.[108] Other studies find that options enhance the overall stock market by making it more informationally efficient.[109] For example, a study by Jennings and Starks finds that stock prices react more quickly to earnings announcements when firms have options traded on the stocks.[110] A study by Kumar, Sarin, and Shastri concludes that: "Overall, our results suggest that option listings improve the market quality of the underlying stocks."[111]

111. From my review and experience, the academic literature strongly supports the presumption that options prices quickly reflect value-relevant information that is also reflected in common stock prices. Moreover, academic studies have concluded that options can enhance market efficiency of the underlying common stocks.[112] Options could not improve common-stock

---

[108] *See, e.g.*, James M. Patell and Mark A. Wolfson, 1981, "The Ex Ante and Ex Post Effects of Quarterly Earnings Announcements Reflected in Option and Stock Prices," *Journal of Accounting Research* 19; Steven Manaster and Richard J. Rendleman, Jr., 1982, "Option Prices as Predictors of Equilibrium Stock Prices," *Journal of Finance* 37; Joseph A. Anthony, 1988, "The Interrelation of Stock and Options Market Trading-Volume Data," *Journal of Finance* 43.

[109] *See, e.g.*, Robert Jennings and Laura Starks, 1986, "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," *Journal of Finance* 41; Mihir Bhattacharya, 1987, "Price Changes of Related Securities: The Case of Call Options and Stocks," *Journal of Financial and Quantitative Analysis* 22; Stephen Figlewski and Gwendolyn P. Webb, 1993, "Options, Short Sales, and Market Completeness," *Journal of Finance* 48; Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53.

[110] Robert Jennings and Laura Starks, 1986, "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," *Journal of Finance* 41, at p. 107.

[111] Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53, at p. 717.

[112] *See, e.g.*, Robert Jennings and Laura Starks, 1986, "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," *Journal of Finance* 41; Mihir Bhattacharya, 1987, "Price Changes of Related Securities: The Case of Call Options and Stocks," *Journal of Financial and Quantitative Analysis* 22; Stephen Figlewski and Gwendolyn P. Webb, 1993, "Options, Short Sales, and Market Completeness," *Journal of Finance* 48; Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53.

market efficiency if the options themselves were inefficient.[113] As a result, "where the underlying stock trades in an efficient market," academics consider market efficiency of options to be an "essentially settled" matter.[114]

### C. The *Cammer* and *Krogman* Factors are not Relevant for Gauging Market Efficiency of Options Markets

112.    While I understand that courts view the *Cammer* and *Krogman* factors as informative of stock market efficiency, these factors are not directly applicable to options as tests of market efficiency.[115] I summarize some of the reasons below:

  a.   Average Weekly Trading Volume: Stock options can be created, or "written" in unlimited quantities. As a result, the ability for investors to buy or sell options is not limited by the amount of trading volume in a given option series.

  b.   Analyst Coverage: Option trading counterparties include sophisticated, institutional traders and market makers who have significant financial interest in pricing options based on fundamental valuation techniques, regardless of existing analyst coverage regarding a company.[116]

  c.   Market Makers: Options trade on liquid national exchanges like the Chicago Board Options Exchange (CBOE), ensuring that investors can buy or sell options any time during normal trading hours. Because options can be created, or written, in unlimited quantities, trading in options differs from trading in stock, which is limited to the available float and thus benefits from the liquidity provision of market makers.

  d.   SEC Form S-3 Filing Eligibility: A company's ability to issue stock under the shortened registration requirements of Form S-3 has no bearing on investors' ability to trade options on that company's stock.

---

[113] *Id.*

[114]  *See In re Apple Inc. Sec. Litig.*, 2023 WL 2763952 (N.D. Cal. Mar. 28, 2023). *See also* preceding footnote.

[115] *Id.*

[116] *See, e.g.*, John Hull, *Options, Futures and Other Derivatives*, 7th Ed., Prentice Hall, 2009, pp. 201-204.

e.   Cause and Effect Relationship Between Company Information and Prices: While academic research establishes that option prices quickly impound new value-relevant information, it also explains that other factors affect option prices, sometimes in offsetting directions. For example, a sharp decline in the stock price may lower a call option's value due to the current stock price input to an option valuation formula, yet the option value may also increase if the implied volatility of the stock increases. A similar dynamic can occur in put option valuations when the stock price increases. Moreover, out-of-the-money option prices may not change in response to stock price changes if the options are likely to expire out-of-the-money (worthless), even though this lack of price movement would be expected in an efficient market. Nonetheless, below I present evidence demonstrating that BBBY's options prices moved in a manner consistent with the underlying stock price movements during the Class Period.

f.   Market Capitalization: Stock options can be created, or "written" in unlimited quantities. As a result, the ability for investors to buy or sell options is not limited by the existing market capitalization of any given option series.

g.   Bid-Ask Spread: Option prices are generally lower than the current trading prices of the underlying stocks, which causes the bid-ask spread to be wider as a percentage of the option prices. Options are traded less frequently, and the trading is facilitated by professional investors and market makers with fixed service provider costs. As a result, the bid-ask spreads of common stocks are not comparable to the bid-ask spreads of options.

h.   Public Float: Stock options can be created, or "written" in unlimited quantities. As a result, the ability for investors to buy or sell options is not limited by the existing public float of any given option series.

## D. Additional Relevant Factors Support the Finding That the Market for BBBY Options Was Efficient

113.   Because neither *Cammer* nor *Krogman* involved options, it is also important to note that there are additional factors supportive of a finding of efficiency in the options context that those courts would not have had cause to consider.  Most significantly, BBBY's Options benefited from significant trading opportunities on several national, liquid options exchanges – the NYSE ARCA, NASDAQ, EDGX, CBOE, among others – during the Class Period. As noted above, over 6 million Options contracts traded during the Class Period. Each contract covered 100 shares of

stock, indicating significant investor interest in trading options on millions of shares of BBBY Common Stock.

114.    Relevant here, I also evaluated whether the prices of BBBY Options tended to move in a directionally consistent manner with the underlying BBBY Common Stock price movements. All else equal, in an efficient market, one would expect call option prices to move in the same direction as underlying stock prices, and put options prices to move in the opposite direction as the underlying stock prices. However, this prediction is stronger for options that are in-the-money, than those that are out-of-the-money. I also note that if the volatility of the underlying stock price changes at the same time as a large stock return, this volatility input to option pricing may result in a movement in the option price that differs from the prediction based only on the underlying stock price input.

115.    In **Exhibit 12**, I report the stock log returns for any Analysis Period dates from my *Cammer* Factor 5 event studies which are statistically significant at the 95% level or better, as well as the corresponding Option log returns.[117] For each trading day, I report three different option series based on options that: a) have strike prices nearest the prior day's closing stock price, and b) are the nearest to expiration. As can be seen in the exhibit, 63 out of 66 call option series and 65 out of 66 put option series experienced price movements that are consistent with the underlying stock price movements. This includes 12 out of 12 call option series and 12 out of 12 put option series during the Class Period. This finding provides further support for the conclusion that the Options traded in an efficient market throughout the Class Period.

---

[117] **Exhibit 12** dates reported represent any trading days from the start of the Class period on August 12, 2022 until the end of the Class Period on August 18, 2022.

**E.  Market Efficiency in the Market for BBBY's Common Stock Strongly Reinforces the Conclusion that the BBBY Options Also Traded in an Efficient Market**

116.    In this case, during the Class Period, the pricing for the BBBY Options at issue was dependent on the market price of BBBY Common Stock.[118] When a market for common stock is found to be informationally efficient, reliance on misstatements or omissions can be presumed for the options, since their prices are derivative of the market prices for common stock, which in turn are also impacted by the disclosure of relevant company-specific news.[119] Moreover, courts have found efficiency for the options market when application of the *Cammer* Factors supports efficiency of the underlying stock.[120]

117.    As demonstrated above, BBBY Common Stock satisfied each of the efficiency factors I evaluated, and thus was informationally efficient. As a result, I conclude that BBBY Common Stock traded in an efficient market during the Class Period. Because I have concluded that the market for BBBY Common Stock was efficient, I also conclude – based on my review and analysis of (i) the academic literature, (ii) BBBY Options trading during the Class Period, and (iii) price movements in BBBY Options during the Class Period – that the BBBY Options traded in an efficient market.

**VII.    Ability to Calculate Damages on a Class-Wide Basis**

118.    I have also been asked to opine on whether per-share damages for traders of BBBY securities can be assessed for all Class members based upon a methodology common to all Class members and consistent with Plaintiffs' theories of liability. As discussed below, damages for each

---

[118] Indeed, the most widely used option valuation models, such as the Black-Scholes model, depend directly on the current underlying stock price. *See, e.g.*, John Hull, *Options, Futures and Other Derivatives*, 7th Ed., Prentice Hall, 2009, pp. 201, 291.

[119] *See, e.g., In re Priceline.com Inc. Sec. Litig.*, 236 F.R.D. 89, 100 (D. Conn. 2006); *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F.Supp.2d 1315, 1330 (N.D. Ga. 2007); *In re Fannie Mae Sec. Litig.*, 247 F.R.D. 32, 41-42 (D.D.C. 2008).

[120] *See Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.,* 2023 WL 4981716, at *5 (D.N.J. Aug. 3, 2023) (collecting cases).

of Plaintiffs' claims can be calculated on a class-wide basis through one or more common methodologies.

**A.    Calculation of Damages for Violations of §9(a), §10(b) and §20(a) of the Exchange Act**

119.    For the §9(a) and §10(b) claims, Plaintiffs allege that Cohen and RC Ventures carried out a plan, scheme, and course of conduct which deceived the investing public, artificially inflated the market price of BBBY securities, and caused Class members to purchase BBBY Common Stock at artificially inflated prices.[121] Plaintiffs also claim certain Defendants are liable as control persons under §20(a).[122]

120.    The "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology under §10(b) of the Exchange Act. This approach calculates damages formulaically as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale. If shares are not sold prior to the full revelation of the fraud, then the difference is relative to a 90-day lookback period under the Securities Litigation Reform Act of 1995 ("PSLRA").[123] This limit on damages can also be applied class-wide. The out-of-pocket methodology has been widely accepted for use across §10(b) matters. I understand

---

[121] Complaint ¶¶ 227, 247, 252, 258.

[122] *Id.* ¶ 243. §20(a) provides that control persons shall be "jointly and severally [liable] with and to the same extent" as the controlled person(s) that violated the securities law. *See* 15 U.S.C. §78t(a). Given §20(a)'s derivative nature, Plaintiffs have instructed me to assume that §20(a) damages can be calculated using the same methodologies for assessing §10(b) damages.

[123] The PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S. Code § 78u–4 (codifying language).

that the out-of-pocket methodology can also be applied to damages under §9(a) of the Exchange Act.

121.     The claims process produces information necessary for the calculation of damages for each Class member, including the purchase and sale information for the security. This information is available from brokerage statements and other documentation of securities transactions. Artificial inflation per share is quantified for each day of the Class period and then damages are calculated using the formula described above. As a result, the methodology for calculating damages in §10(b) matters such as this is well-established and formulaic across all Class members. For the same reasons, I understand that the described methodology is also applicable for calculating damages in §9(a) matters and is also formulaic across all Class members.

122.     The quantification of artificial inflation per share is based upon a detailed loss causation analysis. I have not been asked to perform a loss causation analysis at this time, and I understand that such analysis often incorporates information produced during discovery. Nonetheless, the method employed to calculate artificial inflation can be applied class-wide.

123.     Event studies are widely employed to calculate artificial inflation. Event studies measure stock price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged material omissions and/or misrepresentations.[124]

124.     To the extent that reliable evidence is introduced showing that a material portion of the difference in the estimated artificial inflation between the purchase and sale of the securities may be attributed to non-fraud related factors, the impact of such "confounding information" on the price of BBBY securities can be determined on a common, class-wide basis using various accepted methodologies.  The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation. This process may rely upon

---

[124] In this report I conducted an event study to assist with the evaluation of market efficiency. My event study in this report was not intended to quantify artificial inflation.

additional information learned during discovery and will be based on the specific set of facts and circumstances in a given case.

125.   A loss causation analysis also documents how artificial inflation per share evolved throughout the Class Period. This determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery.

126.   One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that per share inflation equaled a constant dollar amount above the correct share price over the Class Period. Alternatively, one can measure "constant percentage inflation," which assumes that each share price was inflated by a constant percentage amount above the correct stock price over the Class Period. In other instances, artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements. In any of these approaches, the calculation of artificial inflation is based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents.

127.   All of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual Class member identities or circumstances.

128.   Damages relating to BBBY's Options can also be calculated in a similar manner and utilizing the same techniques described above. Once artificial inflation is estimated, the embedded inflation contributing to an option's price can change based on a number of factors.[125] These factors include, but are not limited to, the level of the stock price in relation to the strike price, time to maturity, and volatility.

---

[125] Option valuation models, such as the Black-Scholes model, depend directly on the current underlying stock price. *See, e.g.*, John Hull, *Options, Futures and Other Derivatives*, 7th Ed., Prentice Hall, 2009, pp. 201, 291.

129.   One can employ various options pricing methodologies, such as the widely utilized Black-Scholes pricing model[126] or the binomial model[127], to infer the inflation at the time of each Class member's purchase and sale. These models provide a way to value an option as a function of the variables that influence option values: the strike price, time to expiration, risk-free interest rate, volatility of the underlying security, and the current market price of the underlying security.

130.   By changing the underlying price of the security in the equation to reflect the removal of the artificial inflation, one can assess how the value of the option would be impacted. Therefore, Options damages in this matter can be calculating using a standard, well-established methodology and can be applied on a class-wide basis.

### B. Calculating Damages for Violation of §20A of the Exchange Act

131.   As set forth in the Complaint, Plaintiffs allege that Cohen violated §20A of the Exchange Act.[128]

132.   §20A provides that:

> Any person who violates any provision of this title [15 USCS §§78a et seq.] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.[129]

---

[126] Fischer Black and Myron Scholes, 1973, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy* 81.

[127] John C. Cox, Stephen A. Ross, and Mark Rubinstein, 1979, "Option Pricing: A Simplified Approach," *Journal of Financial Economics* 7.

[128] Complaint ¶ 243.

[129] 15 U.S.C. §78t-1(a).

133.    §20A also imposes a limitation on defendants' liability:

> The total amount of damages imposed under this subsection (a) shall not exceed the profit gained or loss avoided in the transaction or transactions that are the subject of the violation.[130]

134.    Given these statutory provisions , it is my understanding that there are at least two methods for calculating damages for a violation of §20A of the Exchange Act – each of which is common to all Class members and applicable class-wide.

135.    Under the first method, damages are measured as "losses avoided" by the defendants by selling the shares during the Class Period, as opposed to selling the shares following the disclosure of the relevant truth at the end of the Class Period.[131] Under the second method, damages are measured as "profits gained"[132] in causal connection with defendants' unlawful acts, including prejudgment interest in the losses avoided and profits gained calculation. Both methods are relatively straightforward.[133] It is my understanding that the court or jury retains discretion regarding which methodology is the appropriate measure of damages in this case.

136.    According to previous court rulings, pre-judgement interest "is necessary to capture the full measure of the defendant's ill-gotten gains" because "a defendant has use of the unlawful

---

[130] 15 U.S.C. §78t-1(b)(1).

[131] *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 664-65 (E.D. Va. 2000); *Kaplan v. S.A.C. Capital Advisors, L.P.*, 40 F. Supp. 3d 332, 339 (S.D.N.Y. 2014) (in the context of §20A, "[p]rofits and losses are measured by determining the difference between the price the insider realizes and the market price of the securities . . . a reasonable time after the inside information ha[s] been disseminated").

[132] *In re Allergan, Inc. Proxy Violation Sec. Litig.*, 2018 WL 3912934, at *41 (C.D. Cal. Aug. 14, 2018).

[133] It is my understanding that courts may instead perform these calculations based on the difference in the levels of artificial inflation at the time of sale versus the time after the corrective disclosures, for example through the use of event studies to estimate artificial inflation. Using artificial inflation rather than prices does not affect the common damages methodology as it simply requires substituting the daily inflation measures for the prices in the mathematical formula.

profits from the time of the wrongdoing until entry of judgment."[134]   Using any appropriate measure of pre-judgement interest, the Losses Avoided or Profits Gained measures discussed above would be carried forward from the date of sale to the date of the award.  Post-judgement interest would be used from the date of the award to the date of distribution of the award.  This calculation of pre-judgement interest is also computed on a class-wide basis and is subject to a common methodology for all Class members.

### C.  Damage Methodologies are Flexible and Can Incorporate Alternative Findings

137.    The damages methodologies I have laid out above for §10(b), §9(a) and §20A are flexible and able to incorporate alternative findings regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the Class Period.  The methodologies I have described above to calculate §10(b), §9(a) and §20A can be modified based on alternative findings the finder of fact may determine, including, but not limited to any: (1) confounding information versus corrective information; (2) how to back-cast inflation over the Class Period; and (3) the first actionable fraudulent conduct.

138.    First, irrespective of what the ultimate finder of fact, *i.e.*, the jury, determines is the appropriate percentage of abnormal return that can be attributed to the release of corrective versus confounding information, this percentage can easily be inserted into the standard damages model that I have already described – the out-of-pocket formula. Regardless of how the jury weighs evidence, whether they find that any such disaggregation analysis I may conduct is the most appropriate, or they determine that based upon the evidence, a different amount is more appropriate, this finding can simply be incorporated into the damages calculation.

---

[134] *S.E.C. v. Universal Express, Inc.,* 646 F. Supp. 2d 552, 566 (S.D.N.Y.2009), aff'd 438 Fed. Appx. 23 (2d Cir. 2011).

139.    Second, should the jury determine that the true economic inflation evolved over the Class Period, my out-of-pocket damages model can still account for such a scenario and can mechanically calculate damages on a class-wide basis.

140.    Third, should the jury decide that the first actionable misstatement and/or omission or otherwise actionable fraudulent conduct happened at a date later than August 12, 2022, prior to such date, inflation could simply be set to zero.

141.    If the jury determines that a change to inflation would be necessary over the Class Period, any such change can easily be incorporated into the model.

142.    To summarize, I have not been asked to calculate damages in this matter. Such analysis would depend on information produced in discovery and development of the case record. Based on my experience and qualifications and my understanding of the nature of the claims in this matter, I conclude that Common Stock and Options damages in this case can, however, be calculated using a standard and well-established methodology, and can be applied on a class-wide basis.

## VIII.   Conclusion

143.    In conclusion, based on the market efficiency factors considered by courts and in academia, upon which I base my analyses, it is my opinion that both BBBY's Common Stock and BBBY Options traded in an efficient market throughout the Class Period. Moreover, it is my opinion that Common Stock and Options damages in this matter under §10(b), §9(a), §20(a), as well as damages under §20A for that subset of the Class that traded contemporaneously with Cohen's sales of BBBY Common Stock during the class period—can both be calculated on a class-wide basis utilizing common methodologies.

I declare under the penalty of perjury that the foregoing is true and correct.

Respectfully Submitted,

Matthew D. Cain

Date: February 15, 2024

**Appendix A**

# Matthew D. Cain, Ph.D. <span style="float:right">February 2024</span>

E-mail: mdcain@outlook.com <span style="float:right">Homepage</span>
Mobile: 574-485-8065 <span style="float:right">SSRN</span>

## <u>Education</u>

Ph.D., Finance, August 2007                    Purdue University, West Lafayette, IN
B.S., Finance, May 2001                         Grove City College, Grove City, PA

## <u>Professional and Academic Experience</u>

*Senior Fellow*, Berkeley Center for Law and Business, 2019-Present

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

## <u>Publications</u>

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

**Presentations**
- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group

- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Peregrine Economics
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**:  *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law
    LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2024
    LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2023

University of Notre Dame, Mendoza College of Business
    FIN 70400: Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013
    FIN 40410: Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management
    MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008
    MGMT 610: Financial Management I (MBA Core), Fall: 2007


**<u>Expert Witness Experience</u>**

- *In the Matter of Joshua Abrahams*, File No. 3-21214, (SEC Admin. Proc.). Rebuttal Report February 2024.

- *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.). Report February 2024.

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.). Report January 2024.

- *Jed Lemen, et al. v. Redwire Corporation, et al*., Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.). Report January 2024.

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024.

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.). Report January 2024.

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023. Deposition January 2024.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023. Deposition January 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023. Rebuttal Report January 2024.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

A-4

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al*., Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022.

- *Bond v. Clover Health Investments, Corp., et al*., Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al*., Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

A-5

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca) Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

**Appendix B**

## Documents Considered

**Court Documents:**

- Second Amended Complaint for Violations of the Federal Securities Laws, No. 1:22-cv-02541-TNM (Doc. 66).

**Court Decisions and Securities Law:**

- *In re Allergan, Inc. Proxy Violation Sec. Litig.*, WL 3912934, (C.D. Cal. Aug. 14, 2018).

- *In re Apple Inc. Sec. Litig.*, WL 2763952 (N.D. Cal. Mar. 28, 2023).

- *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

- Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, § 8.6. (Aug. 1988).

- *Bond v. Clover Health Investments, Corp., et al.*, WL 1999859 (M.D. Tenn. Feb. 14, 2023).

- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

- *In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009).

- *In re Fannie Mae Sec. Litig.*, No. 04-1639 (RJL).

- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

- *In re HealthSouth Corp. Sec. Litig., 257 F.R.D. 260, 281* (N.D. Ala. 2009*)*.

- *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 2023 WL 4981716 (D.N.J. 2023).

- *Kaplan v. S.A.C. Capital Advisors, L.P.*, 40 F. Supp. 3d 332, 339 (S.D.N.Y. 2014).

- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

- *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 664-65 (E.D. Va. 2000).

- *In re Priceline.com Inc. Sec. Litig.*, No. 3:00CV01884(DJS).

- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

- *In re QuantumScape Securities Class Action Litigation*, WL 17974629, (N.D. Cal. Dec. 19, 2022).

- *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F.Supp.2d 1315, 1330 (N.D. Ga. 2007).

- *S.E.C. v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 566 (S.D.N.Y.2009), aff'd 438 Fed. Appx. 23 (2d Cir. 2011).

- *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 312 (D. Md. 2022).

**Academic Literature:**

- Farshid Abdi and Angelo Ranaldo, 2017, "A Simple Estimation of Bid-Ask Spreads from Daily Close, High, and Low Prices", *Review of Financial Studies* 30.

- Joseph A. Anthony, 1988, "The Interrelation of Stock and Options Market Trading-Volume Data," *Journal of Finance* 43.

- Adem Atmaz, Huseyin Gulen, Stefano Cassella, and Fangcheng Ruan, 2023, "Contrarians, Extrapolators, and Stock Market Momentum and Reversal," *Management Science* (forthcoming).

- Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, "Liquidity and Autocorrelations in Individual Stock Returns," *Journal of Finance* 61.

- Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporate Law* 19.

- Mihir Bhattacharya, 1987, "Price Changes of Related Securities: The Case of Call Options and Stocks," *Journal of Financial and Quantitative Analysis* 22.

- Bharat Bhole, Sunita Surana, and Frank Torchio, 2020, "Benchmarking Market Efficiency Indicators for Securities Litigation," *University of Illinois Law Review Online*.

- Fischer Black and Myron Scholes, 1973, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy* 81.

- Jacob Boudoukh, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, "Information, Trading, and Volatility: Evidence from Firm-Specific News," *Review of Financial Studies* 32.

- Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, "Good News, Bad News, Volatility, and Betas," *Journal of Finance* 50.

- Kee H. Chung and Hao Zhang, 2014, "A Simple Approximation of Intraday Spreads using Daily Data," *Journal of Financial Markets* 17.

- John C. Cox, Stephen A. Ross, and Mark Rubinstein, 1979, "Option Pricing: A Simplified Approach," *Journal of Financial Economics* 7.

- Ray Fair, 2002, "Events That Shook the Market," *Journal of Business* 75.

- Eugene F. Fama, 1970, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25.

- Eugene F. Fama, 1991, "Efficient Capital Markets: II," *Journal of Finance* 46.

- Stephen Figlewski and Gwendolyn P. Webb, 1993, "Options, Short Sales, and Market Completeness," *Journal of Finance* 48.

- Dan Galai, 1977, "Tests of Market Efficiency of the Chicago Board Options Exchange," *Journal of Business* 50.

- Kewei Hou, Chen Xue, and Lu Zhang, 2020, "Replicating Anomalies," *Review of Financial Studies* 33.

B-2

- John Hull, *Options, Futures and Other Derivatives*, 7th Ed., Prentice Hall, 2009.

- Robert Jennings and Laura Starks, 1986, "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," *Journal of Finance* 41.

- Michael C. Jensen, 1978, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* 6.

- Robert C. Klemkosky and Bruce G. Resnick, 1979, "Put-Call Parity and Market Efficiency," *Journal of Finance* 34.

- Robert C. Klemkosky and Bruce G. Resnick, 1980, "An Ex-Ante Analysis of Put-Call Parity," *Journal of Financial Economics* 8.

- Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance* 53.

- Charles M.C. Lee and Eric C. So, 2017, "Uncovering Expected Returns: Information in Analyst Coverage Proxies," *Journal of Financial Economics* 124.

- A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 13.

- Steven Manaster and Richard J. Rendleman, Jr., 1982, "Option Prices as Predictors of Equilibrium Stock Prices," *Journal of Finance* 37.

- Mark L. Mitchell and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer* 49.

- Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, "Is There Life After the Complete Loss of Analyst Coverage?," *Accounting Review* 88.

- James M. Patell and Mark A. Wolfson, 1981, "The Ex Ante and Ex Post Effects of Quarterly Earnings Announcements Reflected in Option and Stock Prices," *Journal of Accounting Research* 19.

- Stephen A. Ross, 1976, "Options and Efficiency", *Quarterly Journal of Economics* 90.

- Randall S. Thomas and James F. Cotter, 2000, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63.

- Miguel O. Villanueva and Steven Feinstein, 2021, "Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors," *Review of Quantitative Finance and Accounting* 57.

- Robert E. Whaley, 1982, "On the Valuation of American Call Options on Dividend Paying Stocks: Empirical Tests," *Journal of Financial Economics* 19.

**Data Sources:**

- BBBY Press Releases and SEC Filings

- Bloomberg Terminal

- CBOE
- Factiva News
- Investext
- S&P Capital IQ
- SEC Edgar Online

**Other:**

- https://www.bls.gov/data/inflation_calculator.htm
- https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers
- https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/how-read-8
- http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess
- https://www.nyse.com/market-model
- https://www.sec.gov/files/forms-3.pdf
- "7 Heavily-Shorted Stocks Beg for Meme Buying Frenzies," Sep. 3, 2021, *Investor's Business Daily*
- "Bed Bath & Beyond Stock Jumps 67% After Online, In-Store Retail Partnership With Kroger," Nov. 3, 2021, *Dow Jones Institutional News*
- "Short Sellers Get Cocky Again and 'Meme' Investors Pay Dearly," Feb. 16, 2022, *Investor's Business Daily*
- All data and documents cited throughout this report

**Exhibits**

Exhibit 1. BBBY Common Stock Closing Stock Price and Daily Volume

Exhibit 2. BBBY Weekly Trading Volume

Exhibit 3. Analyst Coverage

Exhibit 4. Coefficients from Rolling Event Study Regressions

Exhibit 5. Root Mean Squared Error (RMSE) from Rolling Event Study Regressions

Exhibit 6a and Exhibit 6b. Description of BBBY News Days and Common Stock Abnormal Returns

Exhibit 7. Comparison of Statistical Significance on BBBY Common Stock for News Days vs. No News Days During the Analysis Period

Exhibit 8. BBBY Common Stock Market Capitalization

Exhibit 9. BBBY Common Stock Average Bid-Ask Spread

Exhibit 10. BBBY Common Stock Public Float, Insider Holdings, and Institutional Ownership

Exhibit 11. Test for Autocorrelation During the Analysis Period

Exhibit 12. Option Price Movements Around Significant Common Stock Price Movements

**Exhibit 1**



Bed Bath & Beyond Common Stock Closing Stock Price and Daily Trading Volume
July 1, 2021 – December 1, 2022

Data source: Bloomberg.

**Exhibit 2**



**Bed Bath & Beyond Weekly Trading Volume**
**August 12, 2021 – August 18, 2022**

Data source: Bloomberg. Note: Average weekly trading volume is calculated by analyzing each group of five consecutive trading days (rather than calendar weeks), going backwards starting from the end of the class period. Therefore, the entire 5 day Class Period is contained in a single week. The week starting August 12, 2021 contains only two trading days, so the volume has been scaled by a factor of 5/2 on this week.

**Exhibit 3**

**Analyst Coverage**
**Class Period: August 12, 2022 – August 18, 2022**
**Analysis Period: August 12, 2021 – August 18, 2022**

| Analyst Name | Reports Issued During the Class Period | Reports Issued During the Analysis Period |
|---|---|---|
| Zacks Equity Research | 1 | 33 |
| Stock Traders Daily Research | 1 | 31 |
| Wedbush Securities Inc. | 1 | 16 |
| BuySellSignals Research | 1 | 13 |
| Sadif Analytics Prime | 1 | 10 |
| Wells Fargo Securities, LLC | 1 | 8 |
| S3 Partners | 1 | 1 |
| Smart Insider | 1 | 1 |
| Marktfeld | 0 | 24 |
| Telsey Advisory Group | 0 | 19 |
| Trefis | 0 | 16 |
| Wright Reports | 0 | 8 |
| New Constructs, LLC | 0 | 6 |
| Guggenheim Securities LLC | 0 | 5 |
| William Blair & Company | 0 | 5 |
| Argus Research Corporation | 0 | 4 |
| GlobalData | 0 | 4 |
| JPMorgan Econ & FI | 0 | 4 |
| ValuEngine, Inc | 0 | 4 |
| Probes Reporter | 0 | 3 |
| Validea | 0 | 3 |
| Credit Suisse | 0 | 2 |
| JPMorgan | 0 | 2 |
| Paragon Intel | 0 | 2 |

| Analyst Name | Reports Issued During the Class Period | Reports Issued During the Analysis Period |
|---|---|---|
| PriceTarget Research | 0 | 2 |
| CRD Global | 0 | 1 |
| KB Securities | 0 | 1 |
| **Total** | **8** | **228** |

Data source: Investext

| Analyst Name | Earning Call Participation During the Analysis Period[135] |
|---|---|
| BofA Global Research | Q3 2021, Q4 2021, Q1 2022 |
| B. Riley Securities | Q2 2021, Q1 2022 |
| Goldman Sachs | Q3 2021 |
| Guggenheim Securities LLC | Q3 2021, Q4 2021 |
| Jefferies | Q2 2021, Q3 2021, Q4 2021, Q1 2022 |
| JPMorgan Chase & Co | Q2 2021, Q3 2021, Q1 2022 |
| KeyBanc Capital Markets Inc. | Q2 2021, Q3 2021 |
| Loop Capital | Q2 2021, Q3 2021 |
| Morgan Stanley | Q2 2021, Q3 2021, Q4 2021 |
| Raymond James | Q2 2021, Q3 2021 |
| Robert W. Baird % Co., Inc. | Q2 2021, Q3 2021, Q4 2021, Q1 2022 |
| Telsey Advisory Group | Q2 2021, Q3 2021, Q1 2022 |
| UBS Investment Research | Q2 2021, Q3 2021, Q4 2021, Q1 2022 |
| Wedbush Securities Inc. | Q2 2021, Q3 2021, Q4 2021, Q1 2022 |

Data source: Bloomberg

---

[135] No earnings calls occurred during the Class Period.

**Exhibit 4**



**Coefficients from Event Study Regressions
August 12, 2021 – August 18, 2022**

Data sources: Bloomberg, SEC filings, Factiva, Complaint.

Note:

Regression models described in notes below Exhibit 7.

**Exhibit 5**

**Root Mean Squared Error (RMSE) from Event Study Regressions**
**August 12, 2021 – August 18, 2022**



Data sources: Bloomberg, SEC filings, Factiva, Complaint. Note: Regression models described in notes below Exhibit 7.

**Exhibit 6a**

### Description of Bed Bath & Beyond News Days

|  | Market Impact Date | Description |
|---|---|---|
| [1] | Sep 30, 2021 | 2021 Q2 Bed Bath & Beyond Inc. Earnings Announcement |
| [2] | Jan 06, 2022 | 2021 Q3 Bed Bath & Beyond Inc. Earnings Announcement |
| [3] | Apr 13, 2022 | 2021 Q4 Bed Bath & Beyond Inc. Earnings Announcement |
| [4] | Jun 29, 2022 | 2022 Q1 Bed Bath & Beyond Inc. Earnings Announcement |

**Exhibit 6b**

### Bed Bath & Beyond News Days and Common Stock Abnormal Returns

|  | Market Impact Date | Log Return | Abnormal Return | Abnormal Dollar Change | t-Stat | p-Value |
|---|---|---|---|---|---|---|
| [1] | Sep 30, 2021 | -25.08% | -21.97% | - $4.38 | -3.538 | 0.001 |
| [2] | Jan 06, 2022 | 7.67% | 8.32% | $1.16 | 2.280 | 0.024 |
| [3] | Apr 13, 2022 | -1.18% | -3.56% | - $0.63 | -0.631 | 0.529 |
| [4] | Jun 29, 2022 | -26.90% | -27.08% | - $1.55 | -4.715 | 0.000 |

Data sources: Bloomberg, SEC filings, Factiva, Complaint.

Note:
Regression models described in notes below Exhibit 7.

**Exhibit 7**

**Comparison of Statistical Significance on Bed Bath & Beyond Common Stock
for News Days vs. No News Days During the Analysis Period**

| Statistic | News Days | No News Days | p-Value of Difference |
|---|---|---|---|
| N | 4 | 132 | |
| Significant Days at 95% Confidence Level | 3 | 6 | |
| % Significant Days at 95% Confidence Level | 75.00% | 4.55% | 0.001 |
| Average Absolute Abnormal Return | 15.23% | 3.29% | 0.120 |
| Average Volume (Millions) | 36.84 | 5.66 | 0.019 |

Data Sources: Bloomberg, Factiva, SEC filings

Notes:

(1) The event study estimations are based on rolling regressions of the 120 trading days preceding each date of analysis. The regression models control for the S&P 500 Index ("Market Index") and the S&P 500 Specialty Retail Industry Index ("Industry Index"). The estimations exclude the alleged Corrective Disclosures and News Days identified in Exhibit 6.

(2) The four News Days are listed in the previous exhibit. No News Days were identified as dates with no Factiva headlines from Dow Jones and no SEC filings during the Analysis Period. The statistical comparison of "% Significant Days at the 95% Confidence Level" is based on a Fisher's Exact Test. The statistical comparisons of "Average Absolute Abnormal Return" and "Average Volume (Millions)" are based on t-tests for difference of means.

**Exhibit 8**



Data sources: Bloomberg, S&P Capital IQ, SEC filings.

**Exhibit 9**



**Bed Bath & Beyond Common Stock Monthly Average Bid-Ask Spread**
**August 12, 2021 – August 18, 2022**

Data source: Bloomberg.

Notes:
(1) The percentage bid-ask spread was calculated as the a) the closing ask quote less the closing bid quote divided by b) the average of the closing bid and ask quotes.
(2) August 2021 and August 2022 data are limited to the Analysis Period.

**Exhibit 10**

**Bed Bath & Beyond Common Stock Public Float, Insider Holdings, and Institutional Ownership**

| Date | Shares Outstanding | Total Institutions Owning Stock | Insider Holdings | Short Interest | Public Float | Insider Holdings as % of Shares Outstanding | Institutional Holdings | Institutional Holdings as % of Shares Outstanding | Institutional Holdings as % of Public Float |
|------|------|------|------|------|------|------|------|------|------|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 30-Jun-21 | 104,513,541 | 350 | 7,434,484 | 21,601,186 | 118,680,243 | 7.11% | 121,389,533 | 116.15% | 102.28% |
| 30-Sep-21 | 101,060,177 | 345 | 7,302,664 | 21,725,712 | 115,483,225 | 7.23% | 120,146,661 | 118.89% | 104.04% |
| 31-Dec-21 | 96,337,713 | 343 | 7,539,510 | 24,561,370 | 113,359,573 | 7.83% | 100,149,369 | 103.96% | 88.35% |
| 31-Mar-22 | 79,845,789 | 310 | 15,369,237 | 14,843,162 | 79,319,714 | 19.25% | 75,824,829 | 94.96% | 95.59% |
| 30-Jun-22 | 79,957,649 | 284 | 12,833,542 | 21,557,016 | 88,681,123 | 16.05% | 71,563,341 | 89.50% | 80.70% |
| 30-Sep-22 | 80,362,695 | 264 | 3,863,964 | 30,478,801 | 106,977,532 | 4.81% | 59,111,623 | 73.56% | 55.26% |
| **Total Unique Institutions:** | | **535** | | | **Averages:** | **10.38%** | **91,364,226** | **99.50%** | **87.70%** |

Data Sources: Bloomberg, SEC Filings.

**Exhibit 11**

**Test for Autocorrelation During the Analysis Period**

| Quarter | Coefficient on previous Day's Abnormal Return | T-Statistic | p-Value | Sample Size |
|---|---|---|---|---|
| 2021Q3 | 0.38 | 1.216 | 0.224 | 35 |
| 2021Q4 | 0.20 | 1.851 | 0.064 | 64 |
| 2022Q1 | 0.05 | 0.649 | 0.516 | 62 |
| 2022Q2 | -0.12 | -1.359 | 0.174 | 62 |
| 2022Q3 | 0.21 | 0.790 | 0.430 | 34 |
| **Full Analysis Period** | **0.17** | **1.586** | **0.113** | **257** |

Data sources: Bloomberg, SEC filings, Factiva.

Note:

For this calculation, I only considered days that are within the Analysis Period.

**Exhibit 12**

### Option Price Movements Around Significant Common Stock Price Movements

| Date | Stock Return (Log) | Stock Price One Day Prior | Options Series | Call Option Return | Same Direction as Common Stock? (Calls) | Put Option Return | Opposite Direction as Common Stock? (Puts) |
|---|---|---|---|---|---|---|---|
| 30-Sep-2021 | -25.08% | $22.20 | $21.0 Strike, Expiring 01-Oct-2021 | -414.77% | **Yes** | 131.35% | **Yes** |
| 30-Sep-2021 | -25.08% | $22.20 | $22.0 Strike, Expiring 01-Oct-2021 | -442.78% | **Yes** | 116.83% | **Yes** |
| 30-Sep-2021 | -25.08% | $22.20 | $23.0 Strike, Expiring 01-Oct-2021 | -370.54% | **Yes** | 103.57% | **Yes** |
| 03-Nov-2021 | 14.17% | $16.75 | $16.0 Strike, Expiring 05-Nov-2021 | 111.04% | **Yes** | -189.26% | **Yes** |
| 03-Nov-2021 | 14.17% | $16.75 | $16.5 Strike, Expiring 05-Nov-2021 | 123.79% | **Yes** | -212.03% | **Yes** |
| 03-Nov-2021 | 14.17% | $16.75 | $17.0 Strike, Expiring 05-Nov-2021 | 126.20% | **Yes** | -198.74% | **Yes** |
| 10-Dec-2021 | -7.71% | $19.13 | $18.5 Strike, Expiring 10-Dec-2021 | -393.83% | **Yes** | 183.83% | **Yes** |
| 10-Dec-2021 | -7.71% | $19.13 | $19.0 Strike, Expiring 10-Dec-2021 | -309.10% | **Yes** | 147.00% | **Yes** |
| 10-Dec-2021 | -7.71% | $19.13 | $19.5 Strike, Expiring 10-Dec-2021 | -248.49% | **Yes** | 110.41% | **Yes** |
| 06-Jan-2022 | 7.67% | $13.37 | $13.0 Strike, Expiring 07-Jan-2022 | -7.56% | No | -309.10% | **Yes** |
| 06-Jan-2022 | 7.67% | $13.37 | $13.5 Strike, Expiring 07-Jan-2022 | -27.17% | No | -254.47% | **Yes** |
| 06-Jan-2022 | 7.67% | $13.37 | $14.0 Strike, Expiring 07-Jan-2022 | -56.92% | No | -204.63% | **Yes** |
| 13-Jan-2022 | 8.86% | $13.82 | $13.5 Strike, Expiring 14-Jan-2022 | 119.89% | **Yes** | -199.24% | **Yes** |
| 13-Jan-2022 | 8.86% | $13.82 | $14.0 Strike, Expiring 14-Jan-2022 | 151.29% | **Yes** | -212.39% | **Yes** |
| 13-Jan-2022 | 8.86% | $13.82 | $14.5 Strike, Expiring 14-Jan-2022 | 182.03% | **Yes** | -183.41% | **Yes** |
| 25-Jan-2022 | 6.95% | $14.04 | $13.5 Strike, Expiring 28-Jan-2022 | 42.39% | **Yes** | -92.43% | **Yes** |
| 25-Jan-2022 | 6.95% | $14.04 | $14.0 Strike, Expiring 28-Jan-2022 | 41.99% | **Yes** | -81.38% | **Yes** |
| 25-Jan-2022 | 6.95% | $14.04 | $14.5 Strike, Expiring 28-Jan-2022 | 41.47% | **Yes** | -74.49% | **Yes** |
| 24-Feb-2022 | 15.52% | $13.16 | $12.5 Strike, Expiring 25-Feb-2022 | 121.22% | **Yes** | -190.95% | **Yes** |
| 24-Feb-2022 | 15.52% | $13.16 | $13.0 Strike, Expiring 25-Feb-2022 | 164.53% | **Yes** | -236.71% | **Yes** |
| 24-Feb-2022 | 15.52% | $13.16 | $13.5 Strike, Expiring 25-Feb-2022 | 203.14% | **Yes** | -279.90% | **Yes** |
| 07-Mar-2022 | 29.40% | $16.18 | $15.5 Strike, Expiring 11-Mar-2022 | 163.40% | **Yes** | -103.85% | **Yes** |
| 07-Mar-2022 | 29.40% | $16.18 | $16.0 Strike, Expiring 11-Mar-2022 | 181.01% | **Yes** | -131.86% | **Yes** |
| 07-Mar-2022 | 29.40% | $16.18 | $16.5 Strike, Expiring 11-Mar-2022 | 201.73% | **Yes** | -124.80% | **Yes** |

| Date | Stock Return (Log) | Stock Price One Day Prior | Options Series | Call Option Return | Same Direction as Common Stock? (Calls) | Put Option Return | Opposite Direction as Common Stock? (Puts) |
|---|---|---|---|---|---|---|---|
| 28-Mar-2022 | 15.28% | $22.59 | $22.0 Strike, Expiring 01-Apr-2022 | 89.96% | Yes | -165.72% | Yes |
| 28-Mar-2022 | 15.28% | $22.59 | $22.5 Strike, Expiring 01-Apr-2022 | 93.81% | Yes | -143.85% | Yes |
| 28-Mar-2022 | 15.28% | $22.59 | $23.0 Strike, Expiring 01-Apr-2022 | 96.51% | Yes | -129.28% | Yes |
| 30-Mar-2022 | -18.00% | $27.23 | $26.5 Strike, Expiring 01-Apr-2022 | -178.60% | Yes | 134.23% | Yes |
| 30-Mar-2022 | -18.00% | $27.23 | $27.0 Strike, Expiring 01-Apr-2022 | -185.36% | Yes | 118.74% | Yes |
| 30-Mar-2022 | -18.00% | $27.23 | $27.5 Strike, Expiring 01-Apr-2022 | -171.44% | Yes | 108.47% | Yes |
| 07-Apr-2022 | -8.58% | $21.65 | $21.0 Strike, Expiring 08-Apr-2022 | -207.46% | Yes | 126.07% | Yes |
| 07-Apr-2022 | -8.58% | $21.65 | $21.5 Strike, Expiring 08-Apr-2022 | -220.41% | Yes | 109.86% | Yes |
| 07-Apr-2022 | -8.58% | $21.65 | $22.0 Strike, Expiring 08-Apr-2022 | -214.98% | Yes | 88.63% | Yes |
| 22-Apr-2022 | 6.63% | $16.34 | $16.0 Strike, Expiring 22-Apr-2022 | 120.20% | Yes | 57.54% | No |
| 22-Apr-2022 | 6.63% | $16.34 | $16.5 Strike, Expiring 22-Apr-2022 | 151.33% | Yes | -359.73% | Yes |
| 22-Apr-2022 | 6.63% | $16.34 | $17.0 Strike, Expiring 22-Apr-2022 | 177.41% | Yes | -424.85% | Yes |
| 29-Jun-2022 | -26.90% | $6.53 | $6.0 Strike, Expiring 01-Jul-2022 | -297.89% | Yes | 107.00% | Yes |
| 29-Jun-2022 | -26.90% | $6.53 | $6.5 Strike, Expiring 01-Jul-2022 | -323.47% | Yes | 94.54% | Yes |
| 29-Jun-2022 | -26.90% | $6.53 | $7.0 Strike, Expiring 01-Jul-2022 | -286.79% | Yes | 79.63% | Yes |
| 07-Jul-2022 | 19.64% | $4.47 | $4.0 Strike, Expiring 08-Jul-2022 | 100.11% | Yes | -69.31% | Yes |
| 07-Jul-2022 | 19.64% | $4.47 | $4.5 Strike, Expiring 08-Jul-2022 | 180.83% | Yes | -239.79% | Yes |
| 07-Jul-2022 | 19.64% | $4.47 | $5.0 Strike, Expiring 08-Jul-2022 | 211.30% | Yes | -232.06% | Yes |
| 22-Jul-2022 | -12.84% | $5.81 | $5.5 Strike, Expiring 22-Jul-2022 | -370.13% | Yes | 154.88% | Yes |
| 22-Jul-2022 | -12.84% | $5.81 | $6.0 Strike, Expiring 22-Jul-2022 | -286.22% | Yes | 83.13% | Yes |
| 22-Jul-2022 | -12.84% | $5.81 | $6.5 Strike, Expiring 22-Jul-2022 | -244.23% | Yes | 58.99% | Yes |
| 01-Aug-2022 | 13.73% | $5.03 | $4.5 Strike, Expiring 05-Aug-2022 | 73.93% | Yes | -102.17% | Yes |
| 01-Aug-2022 | 13.73% | $5.03 | $5.0 Strike, Expiring 05-Aug-2022 | 102.17% | Yes | -128.97% | Yes |
| 01-Aug-2022 | 13.73% | $5.03 | $5.5 Strike, Expiring 05-Aug-2022 | 106.09% | Yes | -106.25% | Yes |
| 05-Aug-2022 | 28.28% | $6.15 | $5.5 Strike, Expiring 05-Aug-2022 | 138.06% | Yes | -109.86% | Yes |
| 05-Aug-2022 | 28.28% | $6.15 | $6.0 Strike, Expiring 05-Aug-2022 | 211.08% | Yes | -244.23% | Yes |
| 05-Aug-2022 | 28.28% | $6.15 | $6.5 Strike, Expiring 05-Aug-2022 | 257.45% | Yes | -385.01% | Yes |
| 08-Aug-2022 | 33.52% | $8.16 | $7.5 Strike, Expiring 12-Aug-2022 | 125.65% | Yes | -169.03% | Yes |
| 08-Aug-2022 | 33.52% | $8.16 | $8.0 Strike, Expiring 12-Aug-2022 | 127.81% | Yes | -147.51% | Yes |

| Date | Stock Return (Log) | Stock Price One Day Prior | Options Series | Call Option Return | Same Direction as Common Stock? (Calls) | Put Option Return | Opposite Direction as Common Stock? (Puts) |
|---|---|---|---|---|---|---|---|
| 08-Aug-2022 | 33.52% | $8.16 | $8.5 Strike, Expiring 12-Aug-2022 | 131.78% | Yes | -145.23% | Yes |
| 12-Aug-2022 | 19.74% | $10.63 | $10.0 Strike, Expiring 12-Aug-2022 | 119.55% | Yes | -356.95% | Yes |
| 12-Aug-2022 | 19.74% | $10.63 | $10.5 Strike, Expiring 12-Aug-2022 | 160.94% | Yes | -411.90% | Yes |
| 12-Aug-2022 | 19.74% | $10.63 | $11.0 Strike, Expiring 12-Aug-2022 | 124.37% | Yes | -453.26% | Yes |
| 15-Aug-2022 | 21.15% | $12.95 | $12.0 Strike, Expiring 19-Aug-2022 | 60.76% | Yes | -113.50% | Yes |
| 15-Aug-2022 | 21.15% | $12.95 | $12.5 Strike, Expiring 19-Aug-2022 | 58.73% | Yes | -106.18% | Yes |
| 15-Aug-2022 | 21.15% | $12.95 | $13.0 Strike, Expiring 19-Aug-2022 | 58.17% | Yes | -95.18% | Yes |
| 16-Aug-2022 | 25.51% | $16.00 | $15.0 Strike, Expiring 19-Aug-2022 | 82.65% | Yes | -94.61% | Yes |
| 16-Aug-2022 | 25.51% | $16.00 | $16.0 Strike, Expiring 19-Aug-2022 | 87.49% | Yes | -88.97% | Yes |
| 16-Aug-2022 | 25.51% | $16.00 | $17.0 Strike, Expiring 19-Aug-2022 | 90.39% | Yes | -82.69% | Yes |
| 18-Aug-2022 | -21.85% | $23.08 | $22.5 Strike, Expiring 19-Aug-2022 | -167.88% | Yes | 17.09% | Yes |
| 18-Aug-2022 | -21.85% | $23.08 | $23.0 Strike, Expiring 19-Aug-2022 | -187.00% | Yes | 18.04% | Yes |
| 18-Aug-2022 | -21.85% | $23.08 | $24.0 Strike, Expiring 19-Aug-2022 | -190.16% | Yes | 21.69% | Yes |

Data sources: CBOE, Bloomberg, SEC filings, Factiva.