## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE BED BATH & BEYOND CORPORATION SECURITIES LITIGATION | Case No. 1:22-cv-02541-TNM Hon. Trevor N. McFadden CLASS ACTION |

## LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL

Lead Plaintiff Bratya SPRL ("Plaintiff"), respectfully moves, pursuant to Fed. R. Civ. P. 23, for an Order:

1. Certifying a Class consisting of all persons and entities who purchased or otherwise acquired Bed Bath & Beyond Inc.'s ("Bed Bath" or "BBBY" or the "Company") common stock and long call options between August 12, 2022 and August 18, 2022, both dates inclusive;

2. Appointing Plaintiff as Class Representative; and

3. Appointing Plaintiff's choice of counsel, Pomerantz LLP ("Pomerantz") and Bronstein, Gewirtz & Grossman, LLC ("Bronstein"), as Class Counsel.

Filed herewith in support of this motion are the supporting memorandum of law and the Declaration of Omar Jafri, Esq., with accompanying exhibits. Submitted herewith is a proposed Order granting Class certification.

Dated: February 15, 2024

Respectfully submitted,

**POMERANTZ LLP**

   */s/ Omar Jafri*
Joshua B. Silverman (admitted *pro hac vice*)
Omar Jafri (admitted *pro hac vice*)
Christopher P.T. Tourek (admitted *pro hac vice*)
Genc Arifi (admitted *pro hac vice*)

Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Tel: (312) 377-1181
jbsilverman@pomlaw.com
ojafri@pomlaw.com
ctourek@pomlaw.com
garifi@pomlaw.com

Jeremy A. Lieberman (admitted *pro hac vice*)
J. Alexander Hood II (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
(212) 661-1100
jalieberman@pomlaw.com
ahood@pomlaw.com

-and-

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein (admitted *pro hac vice*)
Yitzchak E. Soloveichik (admitted *pro hac vice*)
Eitan Kimelman (admitted *pro hac vice*)
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel: (212) 697-6484
Fax: (212) 697-7296
peretz@bgandg.com
soloveichik@bgandg.com
eitank@bgandg.com

***Counsel for Lead Plaintiff and Co-Lead Counsel
for the proposed Class***

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll (D.C. Bar No. 225623)
Daniel S. Sommers (D.C. Bar No. 416549)
Jan E. Messerschmidt (D.C. Bar No. 1031488)
1100 New York Avenue, N.W., Fifth Floor
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
jmesserschmidt@cohenmilstein.com

***Liaison Counsel for Lead Plaintiff and for the
proposed Class***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE BED BATH & BEYOND CORPORATION SECURITIES LITIGATION | Case No. 1:22-cv-02541-TNM<br><br>Hon. Trevor N. McFadden<br><br>CLASS ACTION |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS**
**REPRESENTATIVE AND CLASS COUNSEL**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   PRELIMINARY STATEMENT ...................................................................................1

II.   FACTUAL BACKGROUND ......................................................................................2

III.   PROCEDURAL HISTORY.........................................................................................4

IV.   ARGUMENT ..............................................................................................................5

      A.  Rule 23(a)'s Requirements Are Satisfied ...................................................6

           1.  The Proposed Class Is So Numerous That Joinder Of All Members Is Impracticable.................................................................................6

           2.  Questions Of Law Or Fact Are Common To The Class ..........................7

           3.  Plaintiff's Claims Are Typical Of The Class ...........................................8

           4.  Plaintiff Will Fairly And Adequately Protect The Interests Of The Class................................................................................................9

           5.  The Description Of The Class Is Definite................................................10

      B.  The Proposed Class Satisfies Requirements Of Rule 23(b)(3) ...........................11

           1.  Common Questions Of Law And Fact Predominate Over Individual Questions...............................................................................11

           2.  Reliance Is Presumed Under *Basic* ........................................................12

                a.  BBBY's NASDAQ Listing Is Strong Evidence Of Market Efficiency ....................................................................................13

                b.  The Five *Cammer* Factors Confirm Market Efficiency................13

                c.  The *Krogman* Factors Further Support A Finding Of Market Efficiency ..........................................................................17

                d.  The Market For BBBY's Options Was Efficient...........................18

            3.  The Market Was Informationally Efficient Throughout The Class Period ...................................................................................................19

i

4.   Mechanical Damage Tabulations For Individual Class Members Will Not Defeat Predominance ...................................................................20

5.   A Class Action Is Superior To Other Available Methods For The Fair And Efficient Adjudication Of The Controversy...................................22

V.   PLAINTIFF'S COUNSEL SHOULD BE APPOINTED CLASS COUNSEL .................23

VI.   CONCLUSION..................................................................................................................24

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997)................................................................................................6

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)..........................................................................................5, 13

*Artis v. Yellen*,
  307 F.R.D. 13 (D.D.C. 2014)..................................................................................8

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)..................................................................................5, 11, 12

*Basile v. Valeant Pharm. Int'l, Inc.*,
  No. SACV 14-2004-DOC (KES), 2017 U.S. Dist. Lexis 37400
  (C.D. Cal. Mar. 15, 2017) ....................................................................................21

*Binder v. Gillespie*,
  184 F.3d 1059 (9th Cir. 1999) ....................................................................11, 12, 16

*Bynum v. District of Columbia*,
  214 F.R.D. 27 (D.D.C. 2003)..................................................................................8

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ...............................................................13, 14, 15

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ...................................................................14, 16, 21

*Coleman through Bunn v. District of Columbia*,
  306 F.R.D. 68 (D.D.C. 2015)................................................................................6, 8

*Deutschman v. Beneficial*,
  841 F.2d 502 (3d Cir. 1988)..................................................................................18

*DL v. D.C.*,
  713 F.3d 120 (D.C. Cir. 2013) ................................................................................5

*DL v. D.C.*,
  302 F.R.D. 1 (D.D.C. 2013)..................................................................................10

*Freeport Partners, L.L.C. v. Allbritton*,
  Civil Action No. 04-2030 (GK), 2006 U.S. Dist. LEXIS 9710 (D.D.C. Mar. 13, 2006) ..........7

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) (*Halliburton II*)................................................................12, 19

*Howard v. Liquidity Servs. Inc.*,
  322 F.R.D. 103 (D.D.C. 2017)................................................................1, 7, 8, 20, 22

*Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*,
  No. 3:19-CV-00407, 2023 U.S. Dist. LEXIS 31022 (M.D. Tenn. Feb. 24, 2023)...........12, 13

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
  No. 2:20-cv-02155-SRC-CLW, 2023 U.S. Dist. LEXIS 136947 (D.N.J. Aug. 3, 2023)........18

*In re Apple Inc. Sec. Litig.*,
  No. 4:19-cv-02033-YGR, 2023 U.S. Dist. LEXIS 58603 (N.D. Cal. Mar. 28, 2023)............19

*In re Baan Co. Sec. Litig.*,
  No. 1:98cv2465 (ESH), 2002 U.S. Dist. LEXIS 27875 (D.D.C. July 19, 2002).....................8

*In re Bed Bath & Beyond Corp. Sec. Litig.*,
  No. 1:22-cv-2541 (TNM), 2023 U.S. Dist. LEXIS 129613 (D.D.C. July 27, 2023).........19, 20

*In re Deutsche Bank AG Sec. Litig.*,
  328 F.R.D. 71 (S.D.N.Y. 2018) ...........................................................................9

*In re Diamond Foods, Inc., Sec. Litig.*,
  295 F.R.D. 240 (N.D. Cal. 2013)..........................................................................20

*In re District of Columbia*,
  792 F.3d 96 (D.C. Cir. 2015)................................................................................7

*In re DVI, Inc. Sec. Litig.*,
  639 F.3d 623 (3d Cir. 2011)................................................................................13

*In re Emulex Corp.*,
  210 F.R.D. 717 (C.D. Cal. 2002) ..........................................................................11

*In re Fannie Mae*,
  No. 1:13-mc-1288-RCL, 2021 U.S. Dist. LEXIS 234503
  (D.D.C. Dec. 7, 2021) ......................................................................1, 9, 22, 23

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009)...................................................................................8

*In re IndyMac Mortg.-Backed Sec. Litig.*,
  286 F.R.D. 226 (S.D.N.Y. 2012) .........................................................................21

*In re Initial Pub. Offering Secs. Litig.*,
  544 F. Supp. 2d 277 (S.D.N.Y. 2008)...................................................................13

iv

*In re Merrill Lynch Auction Rate Sec. Litig.*,
  704 F. Supp. 2d 378 (S.D.N.Y. 2010) ...................................................................13

*In re Newbridge Networks Sec. Litig.*,
  926 F. Supp. 1163 (D.D.C. 1996) ...................................................................1, 8

*In re Petrobras Sec. Litig.*,
  862 F.3d 250 (2d Cir. 2017) ...............................................................................17

*\*In re PolyMedica Corp. Sec. Litig.*,
  432 F.3d 1 (1st Cir. 2005) ...................................................................................19

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
  571 F. Supp. 2d 1315 (N.D. Ga. 2007) .............................................................18

*In re Signet Jewelers Ltd. Sec. Litig.*,
  No. 16 Civ. 6728 (CM) (RWL), 2019 U.S. Dist. LEXIS 114695 (S.D.N.Y. July
  10, 2019) .....................................................................................................13, 15

*In re Visa Check/Mastermoney Antitrust Litig. v. Visa, United States*,
  280 F.3d 124 (2d Cir. 2001)..................................................................................9

*In re Vitamins Antitrust Litig.*,
  209 F.R.D. 251 (D.D.C. 2002)......................................................................20, 21

*\*In re Vivendi Universal, S.A. Sec. Litig.*,
  242 F.R.D. 76 (S.D.N.Y. 2007) ............................................................................6

*Kaplan v. S.A.C. Cap. Advisors, L.P.*,
  311 F.R.D. 373 (S.D.N.Y. 2015) ........................................................................21

*Kinard v. E. Capitol Fam. Rental, L.P.*,
  331 F.R.D. 206 (D.D.C. 2019)............................................................................23

*\*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) .......................................................................17

*Levie v. Sears Roebuck & Co.*,
  496 F. Supp. 2d 944 (N.D. Ill. 2007) .................................................................18

*Little v. Wash. Metro. Area Transit Auth.*,
  249 F. Supp. 3d 394 (D.D.C. 2017).....................................................................23

*\*Meijer, Inc. v. Warner Chilcott Holdings Co. III*,
  246 F.R.D. 293 (D.D.C. 2007).................................................................6, 7, 8, 9

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
  No. 08-CV-5310 (DAB), 2016 U.S. Dist. LEXIS 153804 (S.D.N.Y. Nov. 4, 2016)...............8

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985)........................................................................................................1

*Pigford v. Glickman*,
   182 F.R.D. 341 (D.D.C. 1998).......................................................................................10

*Smilovits v. First. Solar, Inc.*,
   295 F.R.D. 423 (D. Ariz. 2013) ....................................................................................13

*Teamsters Local 445 Freight. Div. Pension Fund v. Bombardier, Inc.*,
   05 Civ. 1898 (SAS), 2006 U.S. Dist. LEXIS 52991 (S.D.N.Y. Aug. 1, 2006) ......................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)........................................................................................................5

*Turocy v. El Pollo Loco Holdings, Inc.*,
   No. SA CV 15-1343-DOC (KESx), 2018 U.S. Dist. LEXIS 111442 (C.D. Cal.
   July 3, 2018).................................................................................................................21

*Vinh Nguyen v. Radient Pharm. Corp.*,
   287 F.R.D. 563 (C.D. Cal. 2012) ..................................................................................15

**Rules**

Fed. R. Civ. P. 23 ...............................................................................................1, 5, 10, 24

Fed. R. Civ. P. 23(a) .......................................................................................................1, 6

Fed. R. Civ. P. 23(a)(1)......................................................................................................6

Fed. R. Civ. P. 23(a)(4)...................................................................................................9, 10

Fed. R. Civ. P. 23(b)(1).......................................................................................................6

Fed. R. Civ. P. 23(b)(2).......................................................................................................6

Fed. R. Civ. P. 23(b)(3).............................................................................................. *passim*

Fed. R. Civ. P. 23(g)(1)(A)................................................................................................23

**Statutes and Regulations**

15 U.S.C.A. § 78i(f)..........................................................................................................22

15 U.S.C. § 78j(b)...............................................................................................................4

15 U.S.C. § 78t(a)...............................................................................................................4

15 U.S.C. § 78u–4(e) ........................................................................................11

17 C.F.R. § 240.10b-5 .........................................................................................4

SEC Rule 10b-5(a)-(c) .......................................................................................12

Section 9 of the Exchange Act of 1934 .........................................................13, 22

Section 9(a)(2)-(4) of the Exchange Act of 1934 .............................................4

Section 9(f) of the Exchange Act of 1934 .........................................................4

Section 10(b) of the Exchange Act of 1934 .............................................4, 12, 21, 22

Section 20A of the Exchange Act of 1934 ...........................................4, 21, 22

Plaintiff respectfully submits this memorandum in support of its motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.

## I.        PRELIMINARY STATEMENT

This lawsuit is ideally suited for class action treatment.  Plaintiff alleges it was injured by the same wrongs as other Class Members: Defendants Ryan Cohen's ("Cohen") and RC Ventures LLC's (collectively, the "Defendants") misrepresentations, omissions, manipulation of the market, and scheme to defraud other investors of Bed Bath common stock and long call options.  The issues of law and fact are substantially the same for each putative Class Member.  And Plaintiff has zealously advanced claims on behalf of all Class Members, and will continue to do so at every stage of the litigation.

Courts in this District have consistently found that securities fraud cases such as this one are "well-suited for class treatment."  *See Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 141 (D.D.C. 2017); *see also In re Fannie Mae*, No. 1:13-mc-1288-RCL, 2021 U.S. Dist. LEXIS 234503, at *30 (D.D.C. Dec. 7, 2021) ("The Court agrees with the parties that a class action is superior to individual actions or other available methods of adjudicating this [securities] controversy"); *In re Newbridge Networks Sec. Litig.*, 926 F. Supp. 1163, 1176 (D.D.C. 1996) ("[C]ourts have widely recognized the utility of, and the necessity for, class actions in securities litigation.").[1]  Indeed, "most of the plaintiffs would have no realistic day in court if a class action were not available."  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985).

As detailed herein, this Action satisfies all of the requirements for class certification under Rule 23(a):  numerosity, commonality, typicality, and adequacy.  It also satisfies Rule 23(b)(3)'s

---

[1] Unless otherwise noted, all internal citations and quotation marks are omitted and all emphasis is supplied.

requirements that common issues predominate over individual issues and that a class action is a superior device to fairly and efficiently adjudicate the Class's claims.  For these reasons, Plaintiff respectfully requests that the Court certify the proposed Class.

## II.      FACTUAL BACKGROUND

Cohen amassed a fortune from the sale of Chewy, Inc.  ¶¶41-44.[2]  After becoming a billionaire, Cohen started to invest in other companies through his one-man shop, RC Ventures LLC.  ¶44.  Shortly before the Class Period, Cohen bought large amounts of GameStop Corp.'s ("GameStop") securities, started to tweet about his investments in GameStop, and became one of the principal leaders of the meme stock movement.  ¶¶59-72.

Retail investors began to follow Cohen's every utterance and move, allowing Cohen to manipulate stock prices through SEC filings and social media posts.  ¶¶59-72.  In a December 2022 interview, Cohen publicly made a damaging admission that explicitly recognized his ability to move stock prices by merely filing forms with the SEC.  ¶¶53-54.  Specifically, Cohen described his first experience of the positive effect of his SEC filings on a company's stock price as equivalent to "the loss of [his] 13D virginity."  ¶193.  Over the subsequent months, Cohen continued to file Schedule 13D forms, filings that require the disclosure of the purchase of securities for large shareholders like himself, and repeatedly observed increases in the price of GameStop securities as meme stock investors followed his lead.  ¶¶55, 63, 82-84.  Throughout 2021 and 2022, Cohen also posted on social media to excite and direct investors to buy GameStop securities.  ¶¶46-51, 59-85.

In the beginning of 2022, Cohen shifted his attention to Bed Bath.  ¶¶86-91.  Between

---

[2] Citations to "¶__" or "¶¶__" are references to the numbered paragraphs of the Consolidated Second Amended Complaint (the "SAC") filed at Dkt. No. 66.

January and February 2022, Cohen purchased nearly 10% of Bed Bath's outstanding shares.  ¶92. In addition to disclosing this interest, Cohen also wrote to Bed Bath's Board of Directors, criticizing the Company and asking the Board to consider the sale or spin off a profitable subsidiary called buybuy BABY Inc. ("buybuy BABY").  ¶¶94-95.  In response to Cohen's foray into Bed Bath, the Company's stock price nearly doubled.  ¶97.  A few months later, Cohen announced that he and Bed Bath had entered into a Cooperation Agreement recognizing that Cohen would receive inside information as well as additional hand-picked Board seats.  ¶¶98-100.

In the summer of 2022, after mounting liquidity and credit concerns, the Company rejected the central aspect of Cohen's turnaround strategy focused on the sale and spin off of buybuy BABY.  ¶¶114-118.  At this point, Cohen lost interest and soured on his investment in Bed Bath. ¶¶119-137.  He then plotted to get out of his investment in the Company.  *Id*.  In August 2022, Cohen embarked on a scheme to pump and dump Bed Bath's securities while abandoning the retail investors he had embraced, and who looked to him for guidance.

On August 5, 2022, Cohen road-tested his scheme with a tweet that was well-received by his followers, and caused the Company's stock price to rise.  ¶¶138-143.  Then, on August 12, 2022, in response to a CNBC article about Bed Bath's stock price headed to $1 a share that was accompanied by a picture of a woman with an overflowing shopping cart, Cohen replied and said: "at least her cart is full" and added a smiley moon emoji.  ¶¶146-147.  This symbol is widely understood by meme stock investors to mean "to the moon" (i.e., the stock will rise in value). ¶¶48, 149-156.  Retail investors immediately understood Cohen's tweet as a positive endorsement of the Company's securities, causing both the trading volume and price of the Company's stock price to skyrocket.  ¶¶149-156.

On the night of August 15, 2022, Cohen filed a delinquent Initial Statement of Beneficial

Ownership on Form 3, emphasizing that he owned more than 10% of Bed Bath's outstanding shares of common stock – something that had been true since at least April 21, 2022.  ¶¶156-157. Retail investors took notice of Cohen's filing and responded as Cohen anticipated they would – rallying the price of Bed Bath's securities.  ¶158.  On the morning of August 16, 2022, Cohen filed an amendment to the Schedule 13D filed in March 2022, reiterating that he retained a large stake in the Company, but omitting to disclose that he had already decided to dump all his holdings. ¶¶159-160.  Retail investors again interpreted Cohen's SEC filings positively, driving the price of the Company's stock price to a high of $28.60 per share.  ¶¶162-164.  Later, on August 16th and on August 17th, Cohen unloaded his entire position.  ¶¶165-168.  Despite these sales, when Cohen filed a Form 144 on August 17, 2022 after the market had closed, he misleadingly referred to "potential sales" of his Bed Bath holdings, keeping the price of BBBY securities artificially high and leaving all other investors in the dark.  ¶¶169-176.  Indeed, Cohen signed the Form 144 on August 16th, apparently after he already sold a huge quantity of Bed Bath's securities.  ¶¶169-170.

On August 18, 2022, after Cohen turned his enormous losses into a $68 million profit, he filed another amendment to his Schedule 13D and Form 4, both of which disclosed that he had sold everything.  ¶177.  In response to this news, the Company's stock price plunged over the next three trading days, and fell from a high of $18.55 to $8.78 on August 23, 2022.  ¶178.

### III.      PROCEDURAL HISTORY

This Action was commenced on August 23, 2022 (Dkt. 1).  Plaintiff was appointed Lead Plaintiff on November 16, 2022 (Dkt. 21).  Plaintiff filed the SAC on January 30, 2023, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), Section 20A of the Exchange Act and Sections 9(a)(2)-(4) and 9(f) of the Exchange Act (Dkt. 66).  Thereafter, Defendants moved to dismiss, which Plaintiff successfully opposed (Dkts. 70, 79,

86).

On July 27, 2023, the Court sustained Plaintiff's most significant claims against Cohen, dismissing only two of four liability theories related to Cohen's Form 144, as well as Plaintiff's Section 9(a)(2) claim (Dkt. 91). On August 10, 2023, Cohen filed his Answer and Affirmative Defenses (Dkt. 93), later amended this filing on August 31, 2023 (Dkt. 96), and the Parties commenced discovery.

## IV.     ARGUMENT

### THE CLASS SHOULD BE CERTIFIED PURSUANT TO RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE

Plaintiff seeks to certify a Class consisting of:

> All persons or entities who purchased or otherwise acquired Bed Bath's common stock and long call options between August 12, 2022, and August 18, 2022, both dates inclusive (hereafter the "Class Period"). Excluded from the Class are Defendants, the current and former officers and directors of Bed Bath and RC Ventures LLC, any person or entity that had or currently holds a controlling interest in Bed Bath or RC Ventures LLC, members of the Defendants' immediate families and their legal representatives, heirs, successors or assigns, and any entity in which the Defendants or Bed Bath have or had a controlling interest.

The Supreme Court has repeatedly stressed the importance of class actions to redress violations of the federal securities laws. *See*, *e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 478 (2013); *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 313-14, 320 n.4 (2007); *Basic Inc. v. Levinson*, 485 U.S. 224, 230-31 (1988).

Critically, at this stage, ***courts continue to assume that the complaint's allegations are true and do not decide the merits***. *See, e.g.*, *DL v. D.C.*, 713 F.3d 120, 125-26 (D.C. Cir. 2013) (holding that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are

satisfied."); *Coleman through Bunn v. District of Columbia*, 306 F.R.D. 68, 77 (D.D.C. 2015) (same).

At class certification, the Court determines whether four threshold requirements of Fed. R. Civ. P. 23(a) are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). The Court also determines whether the Action is maintainable under Fed. R. Civ. P. 23(b)(1), (2) or (3). *Id.* This case is well-suited for class certification under Rule 23(b)(3) because common questions of law and fact predominate, making a class action the "superior" vehicle to "fairly and efficiently" decide the issues. Fed R. Civ. P. 23(b)(3).

### A.     Rule 23(a)'s Requirements Are Satisfied

#### 1.     The Proposed Class Is So Numerous That Joinder Of All Members Is Impracticable

To satisfy the numerosity requirement of Rule 23(a)(1), Plaintiff must establish that "the class is so numerous that joinder of all members is impracticable." *See* Fed. R. Civ. P. 23(a)(1). There is no minimum number that must be surpassed to establish numerosity, but courts generally find numerosity satisfied when a proposed class has at least forty (40) members. *See Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 305-06 (D.D.C. 2007); *Bunn*, 306 F.R.D. at 76. In securities actions involving nationally-listed public companies, numerosity "may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007).

That occurred here. During the Class Period, Bed Bath's common stock was listed on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol BBBY. As BBBY stated in its Form 10-K filed on April 21, 2022, it had approximately 1600 shareholders of record (which generally represents a far greater number of beneficial owners). For these reasons, Plaintiff

believes that there are thousands of geographically dispersed Class Members.  As the SAC also pled in detail, hundreds of millions of shares and options traded during the short Class Period. ¶¶156, 163-164, 166, 211.  Therefore, the Class is too large and joinder is impracticable.

### 2.    Questions Of Law Or Fact Are Common To The Class

The "commonality requirement is often easily met …"  *Meijer*, 246 F.R.D. at 300.  It exists "where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members."  *Freeport Partners, L.L.C. v. Allbritton*, Civil Action No. 04-2030 (GK), 2006 U.S. Dist. LEXIS 9710, at *17 (D.D.C. Mar. 13, 2006).  Commonality can be satisfied even if there are factual differences between the Class Members' claims.

Lawsuits such as this one are ideally suited for class treatment because all Class Members bring claims under the federal securities laws for common misrepresentations, omissions, manipulation of the market and a scheme to defraud all Class Members.  *See Howard,* 322 F.R.D. at 118 (opining that "where members of a class are subject to the same misrepresentations and omissions, and where alleged misrepresentations fit within a common course of conduct, common questions exist and a class action is appropriate."); *see also In re D.C.*, 792 F.3d 96, 100 (D.C. Cir. 2015) (noting that even a "single common question" satisfies commonality).

Here, there are several common questions of law and fact including: (i) whether Defendants made materially false or misleading statements, omitted material information from their public statements, manipulated the market for Bed Bath's securities, and engaged in a scheme to defraud in violation of the Exchange Act; (ii) whether the alleged underlying misrepresentations and omissions were made with scienter; (iii) whether the price of Bed Bath's securities during the Class Period were artificially inflated by Defendants' misconduct; (iv) to what extent the members of the Class have sustained damages; and (v) the proper measure of damages.

In comparable situations, courts have consistently found that the element of commonality

has been met.  *See, e.g.*, *Howard*, 322 F.R.D. at 118 (finding that the requirement was met because defendants' class period misrepresentations involved questions of fact and law common to the class); *Newbridge*, 926 F. Supp. at 1176 (same); *In re Baan Co. Sec. Litig.*, No. 1:98cv2465 (ESH), 2002 U.S. Dist. LEXIS 27875, at *18-19 (D.D.C. July 19, 2002) (same).

### 3.     Plaintiff's Claims Are Typical Of The Class

In securities cases, typicality is "not demanding."  *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, No. 08-CV-5310 (DAB), 2016 U.S. Dist. LEXIS 153804, at *13 (S.D.N.Y. Nov. 4, 2016).  It is satisfied when the class representative's claims arise from the same course of misconduct alleged in the complaint, and are based on the same legal theories.  *See Bunn*, 306 F.R.D. at 83.  Notably, the facts giving rise to claims of each Class Member do not need to be identical for typicality to be established as long as the injuries of the Class derive from Defendants' same course of conduct.  *See Meijer*, 246 F.R.D. at 301; *Bynum v. District of Columbia*, 214 F.R.D. 27, 35 (D.D.C. 2003) (ruling that factual variation does not defeat typicality); *Artis v. Yellen*, 307 F.R.D. 13, 27 (D.D.C. 2014) (ruling that plaintiffs need only allege that their injuries derived from the same course of conduct to establish typicality).  Ultimately, "[t]he requirement has been liberally construed by courts."  *Bynum*, 214 F.R.D. at 34

Here, Plaintiff's claims are not just typical of but identical to those of other Class Members. They arise from Defendants' misrepresentations, omissions, manipulation of the market for Bed Bath's securities, and a common scheme to defraud all Class Members including Plaintiff.  *See, e.g.*, *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (typicality satisfied when "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability").  Accordingly, typicality is satisfied.

### 4.      Plaintiff Will Fairly And Adequately Protect The Interests Of The Class

Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" is also met here.  As has been held in this District:

> "[t]wo criteria for determining the adequacy of representation are generally recognized: (1) the named representative must not have antagonistic or competing interests with the unnamed members of the class, and (2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel."

*Meijer*, 246 F.R.D. at 302.  Importantly, minor or speculative conflicts cannot render a representative inadequate.  *See In re Visa Check/Mastermoney Antitrust Litig. v. Visa, United States*, 280 F.3d 124, 145 (2d Cir. 2001); *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 81–82 (S.D.N.Y. 2018).

Both elements are easily satisfied here.  Plaintiff's interests are aligned with, not antagonistic to, the interests of other Class Members.  Nor are there any actual conflicts.  Because Plaintiff possesses the same interests, suffered the same injury, and brings the same claims based on the same legal theories as the Class, Plaintiff is more than adequate.  *See In re Fannie Mae*, 2021 U.S. Dist. LEXIS 234503, at *23-24.  Further, Plaintiff has been actively involved in this litigation, is willing to serve as a representative of the Class, understands its duties as a Class representative, and is willing and able to prosecute this Action on behalf of the Class to a successful conclusion.  *Id*. at *24; Dkt. 14-7.

The record in this case further demonstrates that Plaintiff's interests are aligned with those of the Class.  Plaintiff and all Class Members have suffered losses from purchasing Bed Bath securities at artificially inflated prices.  They have been injured by the identical wrongful acts and misconduct of the Defendants.  It is in Plaintiff's interest to vigorously prosecute this Action on behalf of the Class.  Accordingly, Plaintiff "will fairly and adequately protect the interests of the

class."  *See* Fed. R. Civ. P. 23(a)(4).

Plaintiff also has engaged qualified, experienced, and zealous attorneys in this matter – Pomerantz and Bronstein.  Proposed Class Counsel are highly experienced in complex class litigation, especially securities fraud actions, and have the ability and willingness to prosecute this Action vigorously.  *See* Firm Resumes, Dkts. 14-8, 14-9.  Pomerantz has recovered billions of dollars for its clients in some of the largest and most complex securities class actions, including the largest securities class action settlement in a decade and the fifth-largest securities class action settlement achieved in the United States—a $3 billion settlement in a securities class action against Petroleo Brasileiro S.A. and other defendants.  Dkt. 14-8 at 2.  Bronstein has similarly recovered more than $1 billion dollars for its clients in complex securities and other class actions all over the United States, including approximately $600 million resulting from the tainted water infrastructure in Flint, Michigan.  Dkt. 14-9 at 3.  Finally, the record further demonstrates that Plaintiff and its counsel have zealously advanced the Class's interests here.  Plaintiff sustained core claims over Defendants' motion to dismiss (Dkts. 91-92), and has thoroughly pursued relevant discovery, gathering evidence that will benefit the Class at trial.  Accordingly, Rule 23(a)(4) is satisfied.

### 5.    The Description Of The Class Is Definite

Definiteness is not mandated by Rule 23 but is a judicial creation of some courts requiring that the class be (1) "adequately defined," and (2) "clearly ascertainable."  *DL v. D.C.*, 302 F.R.D. 1, 16 (D.D.C. 2013).  The proposed Class meets this requirement.  *See Pigford v. Glickman*, 182 F.R.D. 341, 346 (D.D.C. 1998) ("The Court concludes that the parameters of the proposed class as defined by plaintiffs in this case are sufficiently clear to make the proposed class administratively manageable; by looking at the class definition, counsel and putative class members can easily ascertain whether they are members of the class.").  The Class is limited to only: (1) investors in Bed Bath common stock and long call options, (2) who acquired the securities

during the Class Period, and (3) excludes Defendants, Bed Bath officers, and any entity or person related to them.

### B. The Proposed Class Satisfies Requirements Of Rule 23(b)(3)

#### 1. Common Questions Of Law And Fact Predominate Over Individual Questions

Rule 23(b)(3) requires that "questions of law or fact common to the class predominate over questions affecting the individual members and, on balance, a class action is superior to other methods available for adjudicating the controversy." *In re Emulex Corp.*, 210 F.R.D. 717, 721 (C.D. Cal. 2002). As discussed above, there are many common questions of law and fact in this Action that predominate over individual issues because Defendants' misconduct affected all Class Members in the same manner and artificially inflated the price of BBBY's securities to the same extent. Once these questions are resolved, all that remains is the mechanical computation of damages for each Class Member, which will be the lesser of the magnitude of the several price declines attributable to Defendants' fraud, and the maximum damages permissible under the PSLRA. *See* 15 U.S.C. § 78u–4(e). In contrast, no significant individual issues predominate over the substantial common issues to be litigated.

Plaintiff's claims arising under the federal securities laws do not require proof of individual reliance. Plaintiff is entitled to the fraud-on-the-market presumption of reliance because BBBY's securities traded in an efficient market during the Class Period. *See* Expert Rept. of Dr. Matthew Cain (hereafter the "Cain Report") at ¶¶35-117, attached as Ex. A to the Jafri Decl. This presumption is based on the fact that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price." *Basic*, 485 U.S. at 247. Thus, Defendants' misconduct defrauded purchasers of securities ***regardless of whether the purchasers directly relied on*** Defendants' misstatements and omissions. *See Binder v. Gillespie*, 184 F.3d 1059, 1064

(9th Cir. 1999).

### 2.      Reliance Is Presumed Under *Basic*

When *Basic*'s presumption of reliance applies, the law assumes that issues common to the

Class predominate over any individual issues.   Plaintiff and the proposed Class are entitled to

*Basic*'s presumption of reliance under the "fraud-on-the-market" doctrine, 485 U.S. at 243-47,

which was reaffirmed in the Supreme Court's decision in *Halliburton Co. v. Erica P. John Fund,*

*Inc.*:

> [P]laintiffs [can] satisfy the reliance element of a Rule 10b-5 cause of action by
> invoking a presumption that a public, material misrepresentation will distort the
> price of stock traded in an efficient market, and that anyone who purchases the
> stock at the market price may be considered to have done so in reliance on the
> misrepresentation.

573 U.S. 258, 283-84 (2014) (hereafter "*Halliburton II*").   Plaintiff has demonstrated all of the

requirements for invoking the presumption because: "(i) the misrepresentation or omission of fact

was material,[3] (ii) was issued publicly, and (iii) the security traded in an efficient market."   *Id.* at

277-82.   Here, Defendants made material misrepresentations and omitted material facts from their

public statements, *e.g.*, ¶¶146-178, and BBBY shares traded on an efficient market.   This is

sufficient to invoke *Basic*'s presumption of reliance for all claims raised in this Action under

Section 10(b) of the Exchange Act and SEC Rule 10b-5(a)-(c).   *See, e.g.*, *Indiana Pub. Ret. Sys. v.*

*AAC Holdings, Inc.*, No. 3:19-CV-00407, 2023 U.S. Dist. LEXIS 31022, at *53-62 (M.D. Tenn.

---

[3] With respect to materiality, allegations suffice.   ***Proof*** of materiality or any other element of
Plaintiff's claim is not required at the class certification stage.   *Id.* at 282 ("Even though materiality
is a prerequisite for invoking the *Basic* presumption, we held that it should be left to the merits
stage, because it does not bear on the predominance requirement of Rule 23(b)(3). We reasoned
that materiality is an objective issue susceptible to common, classwide proof . . . We also noted
that a failure to prove materiality would necessarily defeat every plaintiff's claim on the merits; it
would not simply preclude invocation of the presumption and thereby cause individual questions
of reliance to predominate over common ones.").

Feb. 24, 2023) (applying *Basic*'s presumption of reliance to scheme liability claims brought under SEC Rule 10(b)-5(a) and (c)).  Market manipulation claims brought under Section 9 of the Exchange Act also require reliance.  Applying the *Basic* presumption to these claims also satisfies Rule 23(b)(3)'s requirement that issues common to the Class predominate.  *See, e.g.*, *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 394 (S.D.N.Y. 2010).

### a.   BBBY's NASDAQ Listing Is Strong Evidence Of Market Efficiency

BBBY was listed on the NASDAQ exchange, which has been found to be among the most open and efficient stock exchanges in the world.  "[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency."  *In re Initial Pub. Offering Secs. Litig.*, 544 F. Supp. 2d 277, 296 n.133 (S.D.N.Y. 2008); *see also Smilovits v. First. Solar, Inc.*, 295 F.R.D. 423, 430-31 (D. Ariz. 2013) (collecting cases to conclude that trading on the NASDAQ "weighs in favor of finding that the stock traded in an efficient market."); *Teamsters Local 445 Freight. Div. Pension Fund v. Bombardier, Inc.*, 05 Civ. 1898 (SAS), 2006 U.S. Dist. LEXIS 52991, at *43 (S.D.N.Y. Aug. 1, 2006) (similar). Clearly, then, the presumption that the market is efficient applies in this matter.  *See* Cain Report ¶¶50-51.

### b.   The Five *Cammer* Factors Confirm Market Efficiency

To assess market efficiency, courts generally also consider the factors outlined in the seminal case of *Cammer v. Bloom*. 711 F. Supp. 1264, 1295-87 (D.N.J. 1989).  *See, e.g.*, *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 633 n.14 (3d Cir. 2011), *abrogated on other grounds by Amgen*, 568 U.S. at 465; *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM) (RWL), 2019 U.S. Dist. LEXIS 114695, at *30-33 (S.D.N.Y. July 10, 2019).  The *Cammer* factors are as follows:

> (1) whether there existed an average weekly trading volume during the class period in excess of a certain number of shares; (2) whether a significant number of

securities analysts followed and reported on the company's stock during the class period; (3) whether the stock had numerous market makers; (4) whether the company was entitled to file an S-3 Registration Statement in connection with public offerings; and (5) whether empirical facts exist showing cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.

711 F. Supp. at 1286-87.  These factors are "an analytical tool rather than . . . a checklist." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015). A plaintiff need not establish all *Cammer* factors to demonstrate market efficiency, but all of them are present here.

*Factor One – Weekly Trading Volume.*  During the Class Period, the average weekly trading volume of BBBY common stock was 1,346.6% of total shares outstanding.  *See* Cain Report ¶37, Ex. 2.  "[T]urnover measured by an average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."  *Cammer*, 711 F. Supp. at 1293.  As the Cain Report indicates, the average weekly reported trading volume for BBBY's common stock is ***more than 670 times the strong presumption threshold*** established by the *Cammer* court and more than 1300 times the substantial presumption threshold.  *See* Cain Report ¶37.  Accordingly, the average weekly trading volume of BBBY's common stock during the Class Period strongly supports a finding of market efficiency.

*Factor Two – Analyst Coverage.*  Analyst coverage on a stock implies that information about the company reaches market participants, who can trade on that information.  *Cammer*, 711 F. Supp. at 1286.  During the brief Class Period, 8 analyst reports regarding BBBY were issued by 8 separate firms.  *See* Cain Report ¶¶40-44, Ex. 3.  Moreover, during the year prior to the Class Period, some 259 analyst reports regarding BBBY were issued by 29 separate firms.  *Id.*  This is more than the 15 analyst reports from 5 research firms deemed sufficient in *Cammer*.  *See* Aff. of

Norman Poser (the "Poser Aff.") submitted in support of plaintiffs in *Cammer* at 14, attached as Ex. B to the Jafri Decl.  Such broad coverage further shows that company-specific information reached market participants.

     ***Factor Three – Market Makers.***  NASDAQ employs market makers to maintain a competitive and efficient market for the securities assigned to the firm, supplemented by other market makers on other venues.  The court in *Cammer* found that a strong presumption of market efficiency attaches to a firm having ten or more market makers.  *Cammer*, 711 F. Supp. at 1293; Cain Report ¶¶48-51.  At least 58 market makers made markets in BBBY's common stock during the Class Period — well in excess of the 11 market makers the *Cammer* court found sufficient to satisfy Factor Three.  *Compare id.* at ¶52 *with* Poser Aff. at 12.  The presence of so many market makers satisfies *Cammer* Factor Three and supports a finding of market efficiency.  *See Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 572-73 (C.D. Cal. 2012).

     Additionally, the presence of institutional investors can also show market efficiency.  Cain Report ¶¶53, 92-94; *see also In re Signet Jewelers*, 2019 U.S. Dist. LEXIS 114695, at *32-33.  Some 264 institutions held BBBY's common stock during and around the Class Period, a number well above the median of forty (40) institutional investors for a sample of comparable firms.  *See* Cain Report ¶¶92-94, Ex. 10.  This significant institutional ownership base for BBBY common stock supports the conclusion that the common stock traded in an efficient market throughout the Class Period.

     ***Factor Four – Eligibility to File Form S-3.***  The *Cammer* court found that a company's eligibility to file a short-form registration statement on Form S-3 supports a finding of an efficient market.  711 F. Supp. at 1284-85.  A company is entitled to file Form S-3 if it filed financial reports with the SEC for twelve months and has over $75 million in equity held by non-affiliates.  Cain

Report ¶¶54-56.  BBBY's common stock held by non-affiliates exceeded the required $75 million threshold during the Class Period, and the Company made all required filings with the SEC in a timely manner during the Class Period.  *Id*. at ¶56.  Moreover, BBBY was not just eligible to file Forms S-3, but actually filed Forms S-3 both before and shortly after the Class Period.  *Id*. Accordingly, BBBY's Form S-3 eligibility is another factor consonant with a finding of market efficiency.

*Factor Five – Cause and Effect Relationship of Unexpected Material News and Stock Price.*  This factor requires showing that there are "empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in stock price."  *Binder*, 184 F.3d at 1065.  An event study is a multiple step process to test this response.  Event studies also provide substantially more rigorous analysis than was submitted in *Cammer*, which considered only anecdotal evidence of a cause-and-effect relationship.  *See generally* the Poser Aff.  Plaintiff's expert, Dr. Cain, performed a well-specified event study for BBBY common stock to determine whether new, material corporate events or financial releases promptly caused measurable stock price reactions.  Cain Report ¶¶57-78, Exs. 4-7.  To isolate the impact of Company-specific news on BBBY's stock price during the Class Period, Dr. Cain performed regression analyses to isolate Company-specific price movements from: (1) changes in market-wide factors that would be expected to impact all stocks, and (2) changes in industry-wide factors that would be expected to impact stocks in BBBY's industry.  *Id*. at ¶63; *see also Barclays PLC*, 310 F.R.D. at 92-93 (finding expert's event study analysis provided evidence of market efficiency).

Dr. Cain's event study showed that BBBY's common stock reacted to Company-specific news in a manner expected in an efficient market.  Cain Report ¶¶57-78, Exs. 4-7.  Dr. Cain's

event study also determined that on days when BBBY announced Company-specific news, the stock price reacted more frequently with statistically significant movements and exhibited increased volume than on days when no Company-specific news was delivered.  *Id.* at ¶¶69-78, Exs. 6, 7.  As a result, Dr. Cain concluded that there was a clear cause-and-effect relationship between new Company-specific information and BBBY common stock price movements, supporting the conclusion that BBBY's common stock traded in an efficient market throughout the Class Period.  *Id.*

### c.  The *Krogman* Factors Further Support A Finding Of Market Efficiency

In addition to the *Cammer* factors, a number of courts have also considered three additional factors, outlined in *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001), to determine market efficiency.  These factors are: (1) a company's market capitalization; (2) the bid-ask spread for stock sales; and (3) the public float.  *See, e.g.*, *In re Petrobras Sec. Litig.*, 862 F.3d 250, 276 (2d Cir. 2017).

Regarding the first of these, BBBY's market capitalization (the total value of a company's equity) averaged $1.46 billion over the Class Period.  Cain Report ¶¶79-82, Ex. 8.  As set forth in the Cain Report, capitalization that large, which places BBBY in the 50th to the 75th percentile of all companies listed on the NASDAQ and the NYSE, militates in favor of a finding of market efficiency.  *Id.*

Second, the average and median bid/ask spreads on BBBY's common stock during the Class Period were not only comparable to, but significantly lower than, those of comparable firms.  As noted in *Krogman,* the smaller the spread, the more efficient the market.  202 F.R.D. at 478; Cain Report ¶¶83-87, Ex. 9.  During the Class Period, BBBY's spread averaged 0.19%, while during the year prior to the Class Period, BBBY's spread averaged 0.11%.  *Id.* at ¶85, Ex. 9.  Both

of these figures are far lower than the median bid-ask spread of 1.69% for a set of comparable firms. *Id*. at ¶¶83-87, Ex. 9. This narrow BBBY bid/ask spread accordingly supports a finding of market efficiency.

Finally, the size of the "public float," that is, the number of BBBY shares held not by insiders, but by the public, further supports a finding of market efficiency. Insiders held less than 5% of the outstanding BBBY shares around the time of the Class Period, and less than 11% during the prior year. In the period surrounding the Class Period, 107 million BBBY shares were available to the public. This factor, too, militates strongly in favor of a finding of market efficiency. *Id*. at ¶¶88-91, Ex. 10.

### d.     The Market For BBBY's Options Was Efficient

It is well-settled that the market for derivatives such as long call options is efficient if the underlying common stock trades in an efficient market. *See, e.g.*, *Deutschman v. Beneficial*, 841 F.2d 502, 504 (3d Cir. 1988) (recognizing that the price of options is directly responsive to changes in the price of the underlying common stock and the information that affects its price); *In re Sci.-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1329-30 (N.D. Ga. 2007) (ruling that options holders are entitled to *Basic*'s presumption of reliance upon proof that the market for the underlying common stock is efficient); *Levie v. Sears Roebuck & Co.*, 496 F. Supp. 2d 944, 949 (N.D. Ill. 2007) (similar); *see also* Cain Report ¶¶106-11, 113-17. Assessments of the efficiency of each options series or volatility in options pricing are not considered at this stage, and cannot undercut predominance. *See, e.g.*, *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, No. 2:20-cv-02155-SRC-CLW, 2023 U.S. Dist. LEXIS 136947, at *16-17 (D.N.J. Aug. 3, 2023). Nor is Plaintiff required to show that each *Cammer* and *Krogman* factor is satisfied to demonstrate

the options' efficiency.  *See In re Apple Inc. Sec. Litig.*, No. 4:19-cv-02033-YGR, 2023 U.S. Dist. LEXIS 58603, at *5-6 (N.D. Cal. Mar. 28, 2023).

As such, *Basic*'s presumption of reliance can easily be invoked for the long call options that are part of the Class.

### 3.    The Market Was Informationally Efficient Throughout The Class Period

This Court has already rejected Defendants' improper attempt to narrowly construe the definition of market efficiency to a company's so-called "fundamentals."  As this Court observed, the Supreme Court instructs: "[t]hat the price of a stock may be inaccurate does not detract from the fact that false statements affect it, and cause loss."  *See In re Bed Bath & Beyond Corp. Sec. Litig.*, No. 1:22-cv-2541 (TNM), 2023 U.S. Dist. LEXIS 129613, at *28 (D.D.C. July 27, 2023) (quoting *Halliburton II*, 573 U.S. at 272).  Rather, "an efficient market is one in which the market price of the stock fully reflects all publicly available information," that is, the "market price responds so quickly to new information that ordinary investors cannot make trading profits on the basis of such information."  *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 19 (1st Cir. 2005).

Thus, under the law, market efficiency means **"*informational efficiency*,"** rather than **"*fundamental value efficiency*,"** which would require "that a market respond to information not only quickly but accurately, such that the market price of a stock reflects its fundamental value." *Id.*  In addition, the Supreme Court has clarified that the existence of value investors – who believe that certain stocks are undervalued or overvalued – does not undercut fraud-on-the-market reliance.  *See In re Bed Bath*, 2023 U.S. Dist. LEXIS 129613 at *28 (citing *Halliburton II*, 573 U.S. at 272-73).

Nor is BBBY's clear informational efficiency undermined by its "meme stock status" or purported "short squeeze dynamics."  Dr. Cain examined whether such circumstances interfered with the efficiency of BBBY common stock and determined they did not:

> In my evaluation of the efficiency factors for BBBY's Common Stock, I considered whether the efficiency conclusion from these factors was undermined by other aspects of BBBY's public information environment such as retail investor interest, potential meme stock status, and short squeeze dynamics. If any of these aspects caused BBBY's Common Stock to be informationally inefficient, I would expect this inefficiency to be reflected in the various *Cammer*, *Krogman*, and other efficiency factors I evaluated . . . Because the *Cammer* and *Krogman* factors weigh in favor of market efficiency despite the status of BBBY as a potential meme stock and short squeeze candidate, I conclude that the market for BBBY's Common Stock was efficient throughout the Class Period.

Cain Report ¶105.  So, on an empirical level, all of the market news and events examined by Dr. Cain, including those aspects claimed by BBBY, led singularly to the conclusion that BBBY's securities trade in an efficient market.  Thus, any argument at the class certification stage concerning "fundamental value efficiency" should fail just as it previously failed at the pleading stage.  *See In re Bed Bath & Beyond Corp. Sec. Litig.*, 2023 U.S. Dist. LEXIS 129613, at *28.

### 4. Mechanical Damage Tabulations For Individual Class Members Will Not Defeat Predominance

"[W]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."  *Howard*, 322 F.R.D. at 136.  This is especially true for securities fraud cases, where the process of computing damages after liability is established is "virtually a mechanical task."  *See In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 252 (N.D. Cal. 2013).  "At the certification stage, the preliminary inquiry in assessing the proposed methods [of calculating damages is] limited: [t]he inquiry is not whether the methods are valid, but is only to assess whether the methods are available to prove damages on a class-wide basis."

*In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 268 (D.D.C. 2002).

"Issues and facts surrounding damages have rarely been an obstacle to establishing predominance in section 10(b) cases," *see Barclays PLC*, 310 F.R.D. at 74, and will not be here. *See also Kaplan v. S.A.C. Cap. Advisors, L.P.*, 311 F.R.D. 373, 382–83 (S.D.N.Y. 2015) (finding predominance where, like here, plaintiffs brought Sections 10(b) and 20A claims and "have demonstrated that calculation of individual class members' damages will rely on objective class-wide methodology"). Indeed, speculative differences in the actual damage award Class Members may receive cannot defeat class certification. *See In re IndyMac Mortg.-Backed Sec. Litig.*, 286 F.R.D. 226, 235 (S.D.N.Y. 2012).

Similarly, "because the process of computing individual damages for Section 20A class action claims is relatively straightforward and guided by the statute and case law . . . individual damages issues do not predominate." *Turocy v. El Pollo Loco Holdings, Inc.*, No. SA CV 15-1343-DOC (KESx), 2018 U.S. Dist. LEXIS 111442, at *54 (C.D. Cal. July 3, 2018); *see also Basile v. Valeant Pharm. Int'l, Inc.*, No. SACV 14-2004-DOC (KES), 2017 U.S. Dist. Lexis 37400, at *44-45 (C.D. Cal. Mar. 15, 2017) (finding that a damages model for Section 20A claims was sufficient based on "a common formula that measures the difference between the selling price actually received and the true value of the shares had there been no material omissions and misconduct by Defendants").

As Dr. Cain explains, a damages model can determine the inflation present in Bed Bath securities during each day of the Class Period via an event study, and mechanically tabulate each Class Member's damages using his or her transactions, and apply a generally accepted out-of-pocket methodology incorporating the PSLRA's 90-day lookback period. Cain Report, ¶¶119-130. This out-of-pocket methodology is sufficient to calculate damages for claims brought under

Section 10(b) of the Exchange Act, and it has been repeatedly sustained by federal courts throughout the bar. *See*, *e.g.*, *Howard*, 322 F.R.D. at 139 (collecting cases). Section 9 of the Exchange Act allows recovery of damages sustained as a result of a manipulative act or transaction. *See* 15 U.S.C. § 78i(f). The out-of-pocket methodology used to calculate damages for claims brought under Section 10(b) of the Exchange Act can also be applied to calculate damages for the Section 9 claims. Cain Report, ¶¶119-121. Similarly, various options pricing methodologies, including the Black-Scholes pricing model and the binomial model, can be used to measure the inflation of each Class Member's purchase and sale of options. Cain Report, ¶¶128-130. As for claims brought under Section 20A of the Exchange Act, Dr. Cain explains that determining damages for them is also a mechanical task, and an event study can be used to calculate Class-wide damages, which are limited to the statutory cap of either the losses avoided or the profits gained by Defendants. Cain Report, ¶¶131-136 & n.133.

### 5. A Class Action Is Superior To Other Available Methods For The Fair And Efficient Adjudication Of The Controversy

"Rule 23(b)(3) also requires a determination that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Howard*, 322 F.R.D. at 141; Fed. R. Civ. P. 23(b)(3). Securities fraud actions, in particular, are "well-suited for class treatment." *Id.* Rule 23(b)(3) sets forth the following factors to be considered when assessing "superiority":

> (A) the class members' interest in individually controlling the prosecution … of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by … class members; (C) the desirability … of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. [Fed. R. Civ. P. 23(b)(3)]

These factors weigh in favor of class certification. *First*, many absent Class Members have small amounts of damages, rendering individual actions cost-prohibitive. "Many of the individual members of the classes may have suffered relatively small damages, so the expense and burden of

22

individual actions may make it impracticable for many of those class members to seek relief on their own." *In re Fannie Mae*, 2021 U.S. Dist. LEXIS 234503, at *30-31; *see also Little v. Wash. Metro. Area Transit Auth.*, 249 F. Supp. 3d 394, 424 (D.D.C. 2017) ("Individual litigants often do not have the incentive to shoulder the burden of a complex case, but when combined into a class, the risks can be shared."); *Kinard v. E. Capitol Fam. Rental, L.P.*, 331 F.R.D. 206, 215 (D.D.C. 2019) (same). *Second*, Plaintiff is unaware of any other pending litigation concerning the misrepresentations identified in the SAC. *Third*, concentrating the litigation of these claims in this forum is desirable. There are, at least, thousands of Class Members. "[A] class action would eliminate the risk of inconsistent adjudications . . . given that the common issues of law and fact predominate among the class members and are susceptible to common proof . . . it is efficient and otherwise desirable to litigate these claims in a single consolidated class action." *In re Fannie Mae*, 2021 U.S. Dist. LEXIS 234503, at *31. *Fourth*, Plaintiff anticipates no difficulties in managing this Action as a class action. As a result, a class action is not only the superior method of adjudication, but also perhaps the only feasible way to litigate the claims alleged in this Action.

## V.        PLAINTIFF'S COUNSEL SHOULD BE APPOINTED CLASS COUNSEL

Rule 23(g)(1)(A) sets forth the factors a court must consider in appointing Class Counsel, including: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class. *See* Fed. R. Civ. P. 23(g)(1)(A).

These considerations all weigh in favor of appointing Plaintiff's Counsel, Pomerantz and Bronstein, as Class Counsel. Class Counsel has devoted substantial time and resources to identifying and prosecuting the claims in this Action; investigating the legal and factual bases for those claims; drafting the SAC; defeating, in large part, Defendants' motion to dismiss; and

pursuing discovery.  All the foregoing work has been performed on a wholly contingent basis.

Both firms have extensive experience prosecuting securities claims and achieving substantial recoveries, including one of the largest-ever obtained recoveries for investors.  *See* Dkts. 14-8, 14-9.  The firms are prepared to continue to devote staff and substantial resources to advance the Action and the Class's interests through discovery, summary judgment, and trial.  For these reasons, Plaintiff respectfully requests that the Court appoint Pomerantz and Bronstein as Class Counsel.

## VI.      CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests that the Court issue an Order: (1) certifying this Action pursuant to Rule 23 as a class action and certifying the Class; (2) appointing Plaintiff as the Class Representative; (3) appointing Pomerantz and Bronstein as Class Counsel; and (4) granting such other and further relief as the Court may deem just and proper.

Dated: February 15, 2024                                Respectfully submitted,

                                                        /s/ *Omar Jafri*
                                                        Omar Jafri

                                                        **POMERANTZ LLP**
                                                        Joshua B. Silverman (admitted *pro hac vice*)
                                                        Omar Jafri (admitted *pro hac vice*)
                                                        Christopher P.T. Tourek (admitted *pro hac vice*)
                                                        Genc Arifi (admitted *pro hac vice*)
                                                        10 S. LaSalle Street, Suite 3505
                                                        Chicago, IL 60603
                                                        Tel: (312) 377-1181
                                                        Fax: (312) 377-1184
                                                        Email: jbsilverman@pomlaw.com
                                                                 ojafri@pomlaw.com
                                                                 ctourek@pomlaw.com
                                                                 garifi@pomlaw.com

                                                        *-and-*

Jeremy A. Lieberman (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
Email: jalieberman@pomlaw.com

*Counsel for Lead Plaintiff Bratya SPRL and Co-Lead Counsel for the proposed Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein (admitted *pro hac vice*)
Yitzchak E. Soloveichik (admitted *pro hac vice*)
Eitan Kimelman (admitted *pro hac vice*)
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel: (212) 697-6484
Fax: (212) 697-7296
Email: peretz@bgandg.com
        soloveichik@bgandg.com
        eitank@bgandg.com

*Counsel for Lead Plaintiff Bratya SPRL and Co-Lead Counsel for the proposed Class*

**COHEN MILSTEIN SELLERS & TOLL PLLC**

Steven J. Toll (D.C. Bar No. 225623)
Daniel S. Sommers (D.C. Bar No. 416549)
Jan E. Messerschmidt (D.C. Bar No. 1031488)
1100 New York Avenue, N.W., Fifth Floor
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
Email: stoll@cohenmilstein.com
        dsommers@cohenmilstein.com
        jmesserschmidt@cohenmilstein.com

*Liaison Counsel for Lead Plaintiff Bratya SPRL and for the proposed Class*