**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

IN RE BED BATH & BEYOND
CORPORATION SECURITIES
LITIGATION

Case No. 1:22-CV-02541 (TNM)

**MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND .................................................................................................. 3

      A.    Meme Stocks, Shorts, and Squeezes ................................................. 3

      B.    BBBY, Cohen, and Bratya ................................................................ 5

      C.    Procedural History ......................................................................... 17

LEGAL STANDARD ......................................................................................... 18

ARGUMENT ...................................................................................................... 19

      I.    This Court Should Deny Certification Because Individualized
           Questions of Reliance Would Swamp Common Ones ................................. 19

           A.    The *Basic* Presumption Is Unavailable Because Bratya
                Fails To Prove That BBBY Securities Traded in an
                Efficient Market During the Class Period .......................... 21

           B.    Even if Bratya Could Invoke *Basic* (It Cannot), the
                 Presumption Is Rebutted Because the Challenged
                 Statements Had No Price Impact ....................................... 33

      II.    This Court Should Deny Certification Because Bratya Offers No
           Way To Measure Class-Wide Damages ....................................... 36

      III.    This Court Should Deny Certification Because Bratya Cannot
           Represent the Class ................................................................... 37

           A.    Bratya Is Atypical (and there Is No Typical Class
                 Member) ............................................................................ 37

           B.    Bratya Is Inadequate ........................................................ 41

CONCLUSION .................................................................................................... 42

CERTIFICATE OF SERVICE ............................................................................ 43

# TABLE OF AUTHORITIES

## CASES

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013) ................................1, 19

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74 (2d Cir. 2023) ............................35

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) .......................................................................... *passim*

*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ..............................................................23, 24

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) .................................................................1, 18, 36

*Dakota Granite Co. v. BNSF Ry. Co. (In re Rail Freight Fuel Surcharge Antitrust Litig. – MDL No. 1869)*, 934 F.3d 619 (D.C. Cir. 2019) ......................................................................36

*Damus v. Nielsen*, 313 F. Supp. 3d 317 (D.D.C. 2018) .................................................................37

*Fleck v. Cablevision VII, Inc.*, 763 F. Supp. 622 (D.D.C. 1991) ..................................................38

*GAMCO Invs., Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88 (S.D.N.Y. 2013) *aff'd sub nom. GAMCO Invs., Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214 (2d Cir. 2016)..................38, 41

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) ............................................................18, 37

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113 (2021) ..........................20, 33, 35

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ....................................... *passim*

*IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ..........................................................................19

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174 (S.D.N.Y. 2012) .......................................................................................28

*In re Jan. 2021 Short Squeeze Trading Litig.*, 2023 WL 9035671 (S.D. Fla. Nov. 13, 2023)..............................................................29, 30

*J.D. v. Azar*, 925 F.3d 1291 (D.C. Cir. 2019) .............................................................................41

*Kas v. Fin. Gen. Bankshares, Inc.*, 105 F.R.D. 453 (D.D.C. 1984).............................................38

*Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).........................................................23, 24

*Livengood Feeds, Inc. v. Merck KGAA (In re Vitamins Antitrust Litig.)*, 209 F.R.D. 251 (D.D.C. 2002).................................................................................................36

*Loftin v. Bande (In re Flag Telecom Holdings, Ltd. Sec. Litig.)*,
574 F.3d 29 (2d Cir. 2009)................................................................................37

*Malriat v. QuantumScape Corp.*, 2022 WL 17974629 (N.D. Cal. Dec. 19, 2022) ......................24

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ..................................................18

## STATUTES AND RULES

Fed. R. Civ. P. 23(a) ......................................................................................41

Fed. R. Civ. P. 23(b) ...........................................................1, 17, 18, 19, 33, 36

## OTHER AUTHORITIES

Bailey Lipschultz, *Bed Bath & Beyond 402% Rally Is Supercharged by Retail Money*,
Bloomberg (Aug. 17, 2022)..............................................................................12

*BBBY: Downgrading to Underperform*, Wedbush (Aug. 18, 2022).......................................12, 25

*BBBY: Institutional Ownership Changes in the Third Quarter*,
Buy Sell Signals (Aug. 18, 2022) ......................................................................12, 25

*BBBY Makes it a Meme Troika*, S3 Analytics (Aug. 17, 2022)...........................................25

*BBBY Trading Report*, Stock Traders Daily (Aug. 15, 2022) ...........................................26

*Bed Bath & Beyond*, Zack's Equity Research (Aug. 16, 2022)..........................................26

*Bed Bath & Beyond Inc.*, Smart Insider (Aug. 18, 2022) ...............................................26

*Bed Bath & Beyond Inc. (BBBY)*, Wells Fargo (Aug. 18, 2022) ...........................................26, 27

Caitlin McCabe, *Meme Stocks AMC, Bed Bath & Beyond Soar on Retail-Investor
Enthusiasm*, Wall St. J. (Aug. 8, 2022) , https://on.wsj.com/4bcpfqH ....................................11

Caleb Mutua, *Bed Bath & Beyond Debt Falls After Surprise Fourth-Quarter Loss*,
Bloomberg (Apr. 13, 2022)................................................................................7

Carmen Reinicke, *Loop Capital says Bed Bath & Beyond Comeback Doesn't Make
Fundamental Sense, Stock Headed to $1*, CNBC (Aug. 12, 2022),
https://cnb.cx/44u3IIg ...................................................................................26

Chris McKhann, *What is a Short Squeeze and What Happened with GameStop, AMC*,
Investors.com (May 7, 2024), https://www.investors.com/how-to-invest/investors-
corner/short-squeeze/ .....................................................................................4

Connor Smith, *Bed Bath & Beyond Stock Is Pricey to Borrow. Short Sellers Are Doing It
Anyway.*, Barron's Online (Aug. 17, 2022) ...............................................................12

Dhruv Aggarwal, Albert H. Choi, Yoon-Ho Alex Lee, *The Meme Stock Frenzy: Origins and Implications*, 96 S. Cal. L. Rev. 1387 (2024) .................................................3, 5

Eddie Pan, *Ryan Cohen Just Gave Bed Bath & Beyond (BBBY) Stock a HUGE Boost*, Investor Place (Aug. 16, 2022), https://bit.ly/4a3V8AU ........................................15

Edward Helmore, *Winning Bets? Meme Stock Frenzy of 2021Makes a Return*, The Guardian (Aug. 13, 2022), https://www.theguardian.com/business/2022/aug/13/meme-stock-frenzy-gamestop-bed-bath-beyond-amc ................................................................................12

Gunjan Banerji, *Bed Bath & Beyond Options Trading Heats Up*, Wall St. J. (Aug. 16, 2022), https://tinyurl.com/5f5tp9sr ....................................................................12

Howard Gold, *Nobel Winner Eugene Fama on GameStop, Market Bubbles and Why Indexing Is King*, MarketWatch (Mar. 3, 2021), https://tinyurl.com/2xd536na .......................4

Jared Dillian, *Latest Meme-Stock War Is Hedge Fund Versus Hedge Fund*, Bloomberg (Aug. 10, 2022) ....................................................................................................11

J.B. Heaton, *GameStop Hype Exposes Securities Litigation Theory's Flaws*, Law 360 (Mar. 11, 2021), https://tinyurl.com/pzaumcrz .................................................24, 27

Jodi Xu Klein, Soma Biswas & Andrew Scurria, *Bed Bath & Beyond Shares Surge Despite Liquidity Concerns*, Wall St. J. (Aug. 16, 2022) , https://on.wsj.com/4a4WdZn ........12

John Authers, *Post-Pandemic Meets Postwar Era on a Blind Curve*, Bloomberg (Aug. 9, 2022) ..................................................................................................11, 26

Joshua Mitts, Robert H. Battalio, Jonathan Brogaard, Matthew D. Cain, Lawrence R. Glosten, Brent Kochuba, *A Report by the Ad Hoc Academic Committee on Equity and Options Market Structure Conditions in Early 2021* (July 2, 2022)...........................................3

Kevin P. Curran, *Bed Bath & Beyond Shares Soar 30%+ Amid Suspected Short Squeeze*, Seeking Alpha (Aug. 5, 2022, 11:02 AM), https://bit.ly/4aQr2lA .................................11, 23

Lasse Heje Pedersen, *Game on: Social Networks and Markets*, 146 J. Fin. Econ. 1097 (2022) ..........................................................................................................3

Lauren Thomas & Jesse Pound, *Bed Bath & Beyond Shares Fall After Investor Ryan Cohen Reveals Intent To Sell Entire stake*, CNBC (Aug. 17, 2022), https://cnb.cx/3JLxVZv ......................................................................................35

Matt Turner, *Bed Bath & Beyond Set to Extend Longest Winning Run Since 2007*, Bloomberg (Aug. 8, 2022) ......................................................................................11

*Meme*, MERRIAM-WEBSTER (last visited Apr. 19, 2024), https://bit.ly/3wbq2cW ...........................3

Myles Udland, *Bed Bath & Beyond, GameStop, AMC All Surge as Meme Stock Mania Makes a Comeback*, Yahoo! Fin. (Aug. 8, 2022), https://bit.ly/44iMGMT ...........................11

Nicole Goodkind, *Analysts accuse Bed Bath & Beyond of scaling back AC in stores to save money as sales plummet*, CNN (June 28, 2022), https://www.cnn.com/2022/06/28/investing/bed-bath--beyond-sales-decline/index.html............................................8

Paul R. La Monica, *The Meme Stock Craze Is Back: AMC, GameStop and Bed Bath & Beyond Soar*, CNN (Aug. 8, 2022), https://cnn.it/49Z1odi ....................................................11

*Rating Update for Bed Bath & Beyond Inc.*, Sadif Inv. Analytics (Aug. 17, 2022)...............12, 26

*RC Ventures Files for Right To Sell stake in Bed Bath & Beyond (update)*, Seeking Alpha (Aug. 17, 2022), https://bit.ly/3UKPKhV.........................................................................17, 36

Samantha Subin, *Bed Bath & Beyond Closes Nearly 40% Higher, AMC Surges as Meme Chatter on Message Boards Increases*, CNBC (Aug. 8, 2022), https://cnb.cx/44bJcMj ........11

SEC, Staff Report on Equity and Options Market Structure Conditions in Early 2021 (2021)........................................................................................................................................3

Sergei Klebnikov, *Bed Bath & Beyond Jumps 29% As Meme-Stock Traders Snap Up Shares Despite Analyst Warnings*, Forbes (Aug. 16, 2022), https://bit.ly/3QyXZuL .............12

Warren Shoulberg, *Bed Bath & Beyond Left $100 Million In Revenue On The Table Last Quarter Due To Supply Chain Issues*, Forbes (Jan. 6, 2022), https://www.forbes.com/sites/warrenshoulberg/2022/01/06/same-issues-different-gradient-supply-chain-trips-up-bed-bath--beyond-quarter-again/?sh=5deb0cb2319e ...........................................................5

Yun Li, Lauren Thomas, *Bed Bath & Beyond soars as much as 70% as meme traders talk up Ryan Cohen's call options purchase*, CNBC (Aug. 16, 2022), https://cnb.cx/4b3XlO8...................................................................................................15

**INTRODUCTION**

Lead Plaintiff Bratya SPRL hopes that the circumstances making this case unfit for class certification will escape this Court's notice.   That if it presents this case as a run-of-the-mill securities class action, then this Court will rubber stamp its motion.   But class certification "is proper only if 'the trial court is satisfied, after a rigorous analysis, that Rule 23's prerequisites have been satisfied.'"   *Comcast Corp. v. Behrend*, 569 U.S. 27, 33, 35 (2013) (alterations and citation omitted).   Bratya's assertion that this action is amenable to class-wide resolution cannot pass the smell test, much less this Court's "rigorous analysis."   *Id.*

Class certification under Rule 23(b)(3) is unwarranted for at least three reasons.

*First*, Bratya is not entitled to a presumption of class-wide reliance because the putative class did not "rely on the security's market price as an unbiased assessment of the security's value in light of all public information."   *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 462 (2013).   Before and during the putative Class Period, it was widely reported that the market price of securities for Bed Bath & Beyond, Inc. ("BBBY" or "the Company") moved as a result of a furious short squeeze, *not* the disclosure of value-relevant information.   During this time, market participants disavowed the integrity of the market.   Market participants boasted of their ability to manipulate the price of BBBY securities for fun and for profit and for no reason at all, and analysts and press extensively reported that BBBY's stock price had become disconnected from reality.   Even the Company acknowledged that the price of its securities had nothing to do with its performance.   Defendants RC Ventures LLC and Ryan Cohen (collectively "Cohen") did not create this maelstrom; it was underway before the Class Period began.   Thus, reliance cannot be dealt with on a class-wide basis, and individualized issues would swamp common ones.

*Second*, damages cannot be resolved on a class-wide basis.  The alleged misstatements made by Cohen had no impact on the price of BBBY securities.  But assuming they did, a putative class would only be entitled to losses caused by the alleged misstatements, *not* losses caused by the inevitable reversal of a short squeeze.  Bratya offers this Court nothing more than a promise that it will figure out some way to separate the former from the latter.  No such method exists.

*Third*, Bratya, operating through David Coti (76% owner) and Edouard Coti (24% owner), is a remarkably atypical plaintiff even for a remarkably atypical class.[1]  Bratya alleged a "textbook example" of a "pump-and-dump scheme."   Second Amended Complaint, ECF No. 66, ("SAC") ¶ 31.  Yet Bratya "dumped" BBBY stock during the alleged pump—initiating new *short* positions and betting against an increase in the BBBY share price—when the putative class supposedly should have been bullish.  Ex. 2 (David Coti Dep.) at 50:14-16.  Bratya plainly did not rely on Cohen's alleged misstatements or on the integrity of the market, and its lack of reliance betrays the broader flaws in its theory of class-wide reliance.  Moreover, Bratya should not represent a class of traders that its principals deride as "ape mongs" and "scum bags."  Ex. 3 (BRATYA_000747); Ex. 4 (BRATYA_000623).[2]

For all these reasons and those that follow, class certification should be denied.

---

[1] Bratya represents itself as "a family office incorporated in Belgium" managed by David Coti. ECF 14-7, at 1.  Edouard Coti previously owned a larger stake in Bratya, but his ownership "changed because it was at 30 percent.  And as the fact that he's resident in Russia, it was some questions of being a [ultimate beneficial owner] in European company." Ex. 2 (David Coti Dep.) at 50:14–51:2.  Bratya thus "reduced [Edouard's] shares in Bratya so that he fell underneath the threshold that to be considered an [ultimate beneficial owner]." *Id.* at 51:9–13.

[2] The chat messages between David and Edouard Coti have been translated from their original French.  Certifications attesting that the translated messages are true and accurate translations are included as Ex. 52.

## BACKGROUND

### A. Meme Stocks, Shorts, and Squeezes

In addition to being a purveyor of all things hearth and home, BBBY bears the ignominious distinction of a so-called meme stock.[3]  BBBY and other meme stocks gained prominence after "experienc[ing] a dramatic increase in their share price in January 2021 as bullish sentiments of individual investors filled social media."[4]  Analysts and academics—including Bratya's expert, Dr. Cain—concluded meme stocks' meteoric rises in share price were often the result of coordinated manipulations, including short squeezes.[5]

Meme stocks are new, but short selling, and short squeezes, are not.  Short sellers enhance market efficiency by prompting the incorporation of negative public information into a stock price. *See* Ex. 1 (Fischel Report) ¶¶ 29–30.  Ideally, investors who believe a security is undervalued can purchase stock, investors who believe a security is overvalued can short it, and the market price can reflect both of these bearish and bullish views, thereby reaching a consensus value consistent with an efficient market. *Id.*  In a market plagued by short sale constraints, it can be difficult if not

---

[3] There does not appear to be a consensus definition of a "meme stock."  A "meme" is "an amusing or interesting item (such as a captioned picture or video) or genre of items that is spread widely online especially through social media," or "an idea that becomes a fad and spreads by means of imitation in a social network."  *Meme*, MERRIAM-WEBSTER, (last visited Apr. 19, 2024), https://bit.ly/3wbq2cW (first quote); Lasse Heje Pedersen, *Game on: Social Networks and Markets*, 146 J. Fin. Econ. 1097, 1112 (2022) (second quote).

[4] SEC, Staff Report on Equity and Options Market Structure Conditions in Early 2021 (2021); *see also* Dhruv Aggarwal, Albert H. Choi, Yoon-Ho Alex Lee, *The Meme Stock Frenzy: Origins and Implications*, 96 S. Cal. L. Rev. 1387, 1389 (2024) (explaining that the meme stock label describes a group of individual stocks whose shareholder base "experienced a dramatic influx of retail investors" driven by idiosyncratic online communities on forums such as Reddit.).

[5] Joshua Mitts, Robert H. Battalio, Jonathan Brogaard, Matthew D. Cain, Lawrence R. Glosten, Brent Kochuba, *A Report by the Ad Hoc Academic Committee on Equity and Options Market Structure Conditions in Early 2021* (July 2, 2022).

impossible to sell a stock short and thus incorporate negative views into the stock price.  *Id.* ¶ 30. These frictions can culminate in a short squeeze—whereby coordinated trading activity artificially drives a stock price upward, which pressures short sellers to close their positions by buying the stock at an inflated price, which in turn pushes prices higher still.  *See id.* ¶ 44.

Constraints on short sales, and short squeezes, make markets inefficient in at least two distinct yet interrelated ways.  First, when short sales are constrained—because there are no available shares left to borrow and short, or borrowing is prohibitively expensive—traders with a bearish outlook are unable to express their views by shorting the stock.  Second, short sellers that choose to (or are forced to) close out a short position must do so by buying the stock at an artificially inflated price, which drives the price higher still and puts more pressure on hold outs trying to maintain their shorts.[6]  These waves of cascading pressures push the stock upward based on no facts at all, except the fact that one group of traders decided to inflict pain on another.

Academics broadly agree that short sale constraints and short squeezes can render a market for securities temporarily inefficient.  Ex. 1 (Fischel Report) ¶¶ 44–45.  Nobel laureate Eugene Fama, one of the founders of the efficient market theory, put it plainly:  "You take a tiny stock and people start piling in . . . If the demand goes crazy, the price can go crazy—temporarily."[7]  *See* Ex. 5 (Cain Dep.) at 14:18–22 (describing Fama as "one of the industry's leaders in market efficiency.").  In the wake of the January 2021 meme stock short squeeze, Fama opined that in

---

[6] *See* Chris McKhann, *What is a Short Squeeze and What Happened with GameStop, AMC*," Investors.com (May 7, 2024), https://www.investors.com/how-to-invest/investors-corner/short-squeeze/.

[7] Howard Gold, *Nobel Winner Eugene Fama on GameStop, Market Bubbles and Why Indexing Is King*, MarketWatch (Mar. 3, 2021), https://tinyurl.com/2xd536na.

"GameStop, that's a clear case where, for a couple of days, the market was inefficient."[8] Bratya's expert, Dr. Cain, concedes the same: "[T]here can be times when stock may not trade efficiently and that could include times when they are subject to short squeeze." Ex. 5. (Cain Dep.) at 33:14–23.

Short squeezes are dramatic, but temporary. Ex. 1 (Fischel Report) ¶ 32; SAC ¶ 26 (noting "short squeezes are temporary and the security's price decreases substantially within a short period of time."). Short squeezes, punctuated frenzies, and "social media-driven investing unrelated to [meme stocks'] financial fundamentals" are rare, but powerful, impediments to market efficiency.[9]

## B. BBBY, Cohen, and Bratya

In the early days of 2022, it was no secret that BBBY was performing poorly. In January 2022, BBBY filed with the SEC its quarterly report for third quarter 2021, disclosing that its net sales had plunged roughly 28% compared to the prior year. Ex. 6 (Jan. 6, 2022 BBBY Form 10-Q Filing) at 4. The Company partially blamed "supply chain constraints" but nonetheless was forced to admit the obvious, "our sales momentum was not where we wanted it to be." Ex. 7 (Jan. 6, 2022 BBBY Form 8-K Filing) at 1. Financial outlets were not impressed, reporting that "once again the company pointed to the dreaded supply chain meltdown as the source of its problems for the quarter."[10] The Company's total assets correspondingly dwindled, falling about 12% from the

---

[8] *Id.*

[9] Aggarwal et al., *supra* note 4, at 1391.

[10] Warren Shoulberg, *Bed Bath & Beyond Left $100 Million In Revenue On The Table Last Quarter Due To Supply Chain Issues*, Forbes (Jan. 6, 2022), https://www.forbes.com/sites/warrenshoulberg/2022/01/06/same-issues-different-gradient-supply-chain-trips-up-bed-bath--beyond-quarter-again/?sh=5deb0cb2319e.

prior quarter.  Ex. 6 (Jan. 6, 2022 BBBY Form 10-Q Filing) at 4.  The Company reported total assets ($5.6 billion), which barely outstripped its total liabilities ($5.1 billion).  *Id.*

Against this backdrop, Cohen entered.  Between January 13 and March 3, 2022, Cohen acquired 9,450,100 shares of BBBY, including 1,670,100 call options and 7,780,000 common stock.  Ex. 8 (Mar. 7, 2022 RCV Schedule 13D) at 8.  On March 7, 2022, Cohen filed a Schedule 13D with the SEC disclosing the purchases, which amounted to 9.8% beneficial ownership of the Company.  *Id.* at 2.  Cohen attached to his Schedule 13D an open letter to the Board, which detailed several potential strategies to enhance BBBY's performance and value.  Ex. 9 (Mar. 7, 2022 RCV Schedule 13D Ex. 1).

The market reacted positively to Cohen's involvement, pushing up the price of BBBY's stock in the days following his open letter.  Bratya, however, did not.  In ensuing days, Bratya initiated new short positions in the Company by selling call options.  Ex. 10 (BRATYA_000018).  Bratya pocketed roughly $108,000 from these new bearish trades.  *Id.*  Bratya's short position was consistent with its broader trading strategy.  The year before, Bratya bet against the "scum bags" on Reddit, and the "barbelai Reddit Robin Hood" betting on GameStop.[11]  Ex. 4 (BRATYA_000623); Ex. 11 (BRATYA_000613).  In Bratya's view at the time it was short on GameStop, "[i]t's just a game between reddits and wall street, we're at war."  Ex. 13

---

[11] David Coti testified that the terms "barbares," Ex. 4 (BRATYA_000623), and the plural "les barbelai" are not French for "barbarians," but rather a term of endearment for "a friend of ours" whose real name he could not recall.  Ex. 2 (David Coti Dep.) at 109:16–111:2; 123:6–22.  Bratya also supposedly was not demeaning anyone when Edouard asked "[is] the immigrant the one who said sell again," and David responded "🐵 🐵 🐵".  Ex. 12 (BRATYA_000611).  David testified that "the immigrant" is a nickname for a friend from the "islands of [the] Caribbean" who does "not really" have dark skin, and the monkey emojis were just "fun because it was the contrary."  Ex. 2 (David Coti Dep.) at 313:16–314:14.

(BRATYA_000658); *see also* Ex. 14 (BRATYA_000638) (noting "as long as the Fed gives away free money, everyone puts in their minimum wage at robinhood").

On March 24, 2022, Cohen and the Company executed a Cooperation Agreement, under which the Company agreed to appoint three new, independent directors—Marjorie Bowen, Benjamin Rosenzweig, and Shelly Lombard.  Ex. 15 (Mar. 24, 2022 BBBY Form 8-K Filing) at 2.  In exchange, Cohen agreed to be temporarily bound by a set of customary standstill provisions. *Id.*  Contrary to Bratya's assertion, the Agreement *did not* "acknowledge[] that Cohen would receive material, nonpublic information as part of his activities with" the Company.  SAC ¶ 100. Nor did the Agreement oblige or contemplate that the Company would provide Cohen with material, nonpublic information.   Rather, the Agreement merely memorialized Cohen's "aware[ness] that the United States securities laws may prohibit any person who has received from an issuer material, nonpublic information from purchasing or selling securities of such issuer."  Ex. 16 (Mar. 24, 2022, Cooperation Agreement) at 6.  Cohen disclosed the Cooperation Agreement in an amended Schedule 13D.  Ex. 17 (Mar. 25, 2022 RCV Sched. 13D).

In ensuing months, the Company continued to perform poorly.  In April 2022, the Company released financial results for its fiscal fourth quarter 2021, disclosing a 22% sales decline compared to the year before.  Ex. 18 (Apr. 13, 2022 BBBY Form 8-K Filing) at 4.  Management noted its "disappoint[ment] that our sales and gross margin performance does not reflect our team's hard work."  *Id.*  Financial press characterized the quarter as an "unexpected loss" for BBBY, even considering the Company's "string of weak quarterly reports."[12]  That same month, the Company issued a Form 10-K that exposed its deteriorating position—as of February 2022, BBBY's total

---

[12] Caleb Mutua, *Bed Bath & Beyond Debt Falls After Surprise Fourth-Quarter Loss*, Bloomberg (Apr. 13, 2022).

assets ($5.13 billion) outpaced its total liabilities ($4.95 billion) by only $174 million.  Ex. 19

(Apr. 21, 2022 BBBY Form 10-K filing) at 42.  The Company also disclosed that its securities

could be subject to periods of volatility, often fueled by misinformation—or no information at all:

> [W]e have received, and may continue to receive, significant media attention, including from blogs, articles, message boards and social media.  Information provided by third parties may not be reliable or accurate, or contain misleading, incomplete or otherwise damaging information, which could influence trading activity in our stock.  As a result, our stock has experienced, ***and could continue to experience, extreme price and volume fluctuations that may be unrelated to our operating performance, financial position or other business fundamentals***.  This activity along with other factors, including the involvement of short sellers or activist investors in our stock, has materially impacted in the past, and could materially impact in the future, the trading price of our stock, ***put pressure on the supply and demand for our stock, limit our stockholders from readily selling their shares*** and result in significant loss of investment.

*Id.* at 19 (emphases added).

The Company's poor performance persisted.  In June 2022, the Company issued its

financial results for fiscal first quarter 2021, in which its net sales tumbled 25%.  Ex. 20 (June 28,

2022 BBBY Form 8-K Filing) at 4.  The filing reflected that, in the prior three months alone, the

Company had managed to lose $358 million.  *Id.*  The filing also disclosed that BBBY's total

liabilities exceeded its assets by roughly $220,298.  *Id.*  BBBY's dire position was evident even to

its remaining customers.  The same day BBBY dated its financial results, reports emerged that the

Company was "scaling back AC in stores to save money as sales plummet."[13]

Unsurprisingly, given its publicly disclosed struggles, the Company's then-Chief

Executive, Mark Tritton, was terminated in late June 2022.  Ex. 21 (June 29, 2022 BBBY Form 8-

K Filing).  After market-close on the eve of the Company's public announcement, Harriet

---

[13] Nicole Goodkind, *Analysts accuse Bed Bath & Beyond of scaling back AC in stores to save money as sales plummet*, CNN (June 28, 2022), https://www.cnn.com/2022/06/28/investing/bed-bath--beyond-sales-decline/index.html.

Edelman, on behalf of the Company's Board of Directors, told Cohen about Tritton's impending departure.  Ex. 22 (COHEN0004417) at 3 (scheduling call at 5:00 PM (EST)).  Following BBBY's announcement of Tritton's ouster, Cohen asked Edelman to "please confirm that all MNPI [material nonpublic information] shared with me earlier this week has been completely disclosed and that I am no longer in possession of MNPI."  *Id.* at 1.  Edelman confirmed, "the substance of our conversations earlier this week was reflected in the press releases issued by the Company . . . and therefore, no longer constitutes MNPI."  *Id.*  Every Board member in connection with this action testified that—aside from the news of Tritton's ouster—he or she never provided Cohen with any other material nonpublic information, nor were they aware of anyone who had. Ex. 23 (Edelman Dep.) at 296:14–297:24; Ex. 24 (Bowen Dep.) at 224:3–19; Ex. 25 (Rosenzweig Dep.) at 25:1–7; Ex. 26 (Lombard Dep.) at 123:17–21.

In the second half of July 2022, short interest in the Company's securities climbed steadily upward.  *See* Ex. 27 (BBB00027788).  And then, despite a long trend of dismal financial results— and no positive intervening events—the Company's stock price also began to rise.  On July 15, 2022, the Company's stock price closed roughly 5% higher than the day before.  On July 19, BBBY's stock price rose nearly 6% from the day prior, and increased yet another 6.5% the next day.  These gains were wiped out by price dips on July 22 and 25.  But then, from July 27 onward, the price of BBBY stock went on an unabated run.  On August 1, BBBY's stock price increased roughly 15%.  On August 3, the price of BBBY stock rose nearly 5%.  On August 5, a 33% jump. Yet there was no cold water to throw on BBBY's improbable hot streak, because naysayers had run out of available stock to short.  Ex. 1 (Fischel Report) ¶ 31 (explaining that in July 2022 and continuing through the Class Period "BBBY's short interest utilization was at or near 100%, meaning that there were very few if any additional shares available to borrow and sell short").

The Company took notice.   Around 10:30 AM on August 5, the Company's head of investor relations, Susie Kim, alerted the Company's chief executive and chief financial officer that BBBY was "trading up 27% on elevated volume of 17M shares at $7.84 on no new news or rumors."[14] Ex. 28 (BBB00057454) at 2.  Later that day, Kim told the Company's executives that "[g]iven the continued elevation, a short squeeze is most likely in effect based on the options activity and we have also triggered MEME activity."  *Id.* at 1.  The next business day, Kim circulated a more robust analysis to the Company's Board of Directors.  Kim wrote:

> On Friday [August 5], we began the trading day in the $7-$8 (significantly above our recent $4-$6 range) on elevated volume of 17M with no immediate news or analyst catalysts.   In recent weeks, media speculation has continued to be focused on our liquidity (FILO, upsizing) and AMC has been in the news regarding their recent equity offerings.  We suspected trading was retail-driven/MEME-related and confirmed via our NASDAQ desk that BBBY was among the most active names mentioned across Reddit . . . .

Ex. 29 (BBBY_HE_00000049) at 1.  Kim closed, "[a]s a reminder, before the RCV-related events from this March, we experienced similar retail trading dynamics in January 2021 and June of 2021 when we traded in the 90–100M share range."  *Id.*  That same day, a representative from Nasdaq

---

[14]   Bratya claims Cohen precipitated the short squeeze when he tweeted "Ask not what your company can do for you—ask what you can do for your company" on August 5, 2022.  *See* SAC ¶¶138-143; ECF No. 109, at 3.  This defies reality for at least three reasons.  *First*, Cohen published the tweet around 6:00 PM (EST), after market close, and several hours after public reports that a BBBY short squeeze already was in effect.  *See* Seeking Alpha, note 15, *infra*.  *Second*, the BBBY squeeze received ample media attention in the first week of August 2022, but no reputable source reported on Cohen's tweet—much less ascribed some causation between the tweet and the squeeze.  *See*, note 17, *infra*.  *Third*, to the extent any retail investors ascribed any meaning to the tweeted aphorism, it was not a shared understanding.  A simple Google or Reddit search shows that as many (or more) online commenters thought the tweet concerned GameStop as thought it concerned BBBY as thought it concerned nothing at all.  Separate and aside from the facts, there is also the law.  Bratya has not alleged that Cohen's August 5 tweet was misleading or that the BBBY share price was artificially inflated by the alleged fraud.

contacted the Company's chief financial officer to discuss the frantic trading activity.  Ex. 30 (Kim Ex. 87) at 3.

Thus, in the first week of August 2022, it was well known that an attempted short squeeze—unlike any since January or June 2021—had seized the Company.  On the morning of August 5, *Seeking Alpha* reported that the Company was in the midst of a short squeeze.[15]  The article asserted that, per analyst data from S3 Partners, "short interest reached 52.80% of its float on Friday, bringing the [BBBY] stock a 100/100 'squeeze score' based on the crowded nature of the short."[16]  Over the ensuing days, a parade of news outlets reported BBBY was surging because "meme traders seemed to be betting on the stock despite the lack of any apparent catalyst" and "for no apparent reason."[17]  Realizing that the squeeze comes before the fall, analysts and press urged caution:  "[t]here isn't a fundamental reason for a lot of these price moves," BBBY stock

---

[15]  Kevin P. Curran, *Bed Bath & Beyond Shares Soar 30%+ Amid Suspected Short Squeeze*, Seeking Alpha (Aug. 5, 2022, 11:02 AM), https://bit.ly/4aQr2lA; *see also* SAC ¶ 24 ("Before Cohen pumped and dumped Bed Bath's securities, *Seeking Alpha* had already reported that a short squeeze was taking place.").

[16] Curran, *supra* note 15.

[17]  Samantha Subin, *Bed Bath & Beyond Closes Nearly 40% Higher, AMC Surges as Meme Chatter on Message Boards Increases*, CNBC (Aug. 8, 2022), https://cnb.cx/44bJcMj (first quote); Jared Dillian, *Latest Meme-Stock War Is Hedge Fund Versus Hedge Fund*, Bloomberg (Aug. 10, 2022) (second quote); *see also* Matt Turner, *Bed Bath & Beyond Set to Extend Longest Winning Run Since 2007*, Bloomberg (Aug. 8, 2022); Myles Udland, *Bed Bath & Beyond, GameStop, AMC All Surge as Meme Stock Mania Makes a Comeback*, Yahoo! Fin. (Aug. 8, 2022), https://bit.ly/44iMGMT; Paul R. La Monica, *The Meme Stock Craze Is Back: AMC, GameStop and Bed Bath & Beyond Soar*, CNN (Aug. 8, 2022), https://cnn.it/49Z1odi; Caitlin McCabe, *Meme Stocks AMC, Bed Bath & Beyond Soar on Retail-Investor Enthusiasm*, Wall St. J. (Aug. 8, 2022), https://on.wsj.com/4bcpfqH (noting the meme stocks' "The rally is reminiscent of last year's meme-stock mania"); John Authers, *Post-Pandemic Meets Postwar Era on a Blind Curve*, Bloomberg (Aug. 9, 2022) (opining "the struggling retailer has been mired in a deep sales slump and has had no corporate development . . . But that didn't stop the home-goods store from climbing for a ninth straight session.").

has "high information risk," BBBY has a "current valuation that is disconnected from the company's fundamentals," BBBY's share price is "defying recent analysts' warnings over the retailer's exaggerated valuation given its shrinking liquidity," and on and on and on.[18]

On August 12, CNBC tweeted about a report from one such analyst:



[18]Edward Helmore, *Winning Bets? Meme Stock Frenzy of 2021Makes a Return*, The Guardian (Aug. 13, 2022), https://www.theguardian.com/business/2022/aug/13/meme-stock-frenzy-gamestop-bed-bath-beyond-amc (first quote); *Ratings Update for Bed Bath & Beyond Inc.*, Sadif Inv. Analytics (Aug. 17, 2022) (second quote); *BBBY: Downgrading to Underperform*, Wedbush (Aug. 18, 2022) (third quote); Jodi Xu Klein, Soma Biswas & Andrew Scurria, *Bed Bath & Beyond Shares Surge Despite Liquidity Concerns*, Wall St. J. (Aug. 16, 2022), https://on.wsj.com/4a4WdZn (fourth quote); *see also* Gunjan Banerji, *Bed Bath & Beyond Options Trading Heats Up*, Wall St. J. (Aug. 16, 2022), https://tinyurl.com/5f5tp9sr; Sergei Klebnikov, *Bed Bath & Beyond Jumps 29% As Meme-Stock Traders Snap Up Shares Despite Analyst Warnings*, Forbes (Aug. 16, 2022), https://bit.ly/3QyXZuL; Connor Smith, *Bed Bath & Beyond Stock Is Pricey to Borrow. Short Sellers Are Doing It Anyway.*, Barron's Online (Aug. 17, 2022); Bailey Lipschultz, *Bed Bath & Beyond 402% Rally Is Supercharged by Retail Money*, Bloomberg (Aug. 17, 2022); *BBBY: Institutional Ownership Changes in the Third Quarter*, Buy Sell Signals (Aug. 18, 2022).

Ryan Cohen replied:[19]



Bratya frames this as the tweet heard round the world. Context makes clear, however, that the August 12 tweet was closer to a murmur than "a rallying cry." SAC ¶ 149. Compared to other posts around this time, the August 12 tweet received modest attention. Cohen earned twice as many reposts two days earlier, on August 10, when he tweeted a purple heart emoji (and nothing else). *See* @RyanCohen, Twitter (Aug. 10, 2022, 10:11 PM), https://x.com/ryancohen/status/ 1557550311786459136 (3.1K reposts). Cohen's musing on July 28 that "[t]he best time to be alive in human history is now," earned triple the reposts. *See* @RyanCohen, Twitter (Jul. 27, 2022, 8:51 PM), https://x.com/ryancohen/status/1552456736870928384 (4.9K reposts). Zooming out, the August 12 tweet appears even more ineffectual. Many of Cohen's tweets garnered far more likes than the August 12 tweet. *See* @RyanCohen, Twitter (Dec. 10, 2021, 2:55 PM), https:// x.com/ryancohen/status/1469395426839302145 (19K likes on a tweet stating "I'm cooler online than in real life"); @RyanCohen, Twitter (Apr. 3, 2022, 11:17 PM), https://x.com/ryancohen/

---

[19] The image is a screenshot of the tweet as it appears on Google Chrome's desktop format. By contrast, the image excerpted in Bratya's complaint, SAC ¶ 148, appears to have been screenshotted from "Twitter for iPhone" and subsequently uploaded to a desktop for insertion into the pleading. As Bratya has explained, emojis "can appear differently when originating on different browsers." *Id.* ¶ 48.

status/1510818828695052289 (25K likes on tweet with a photo of a sonogram with the caption "The last time people were excited to see me"). True, Cohen's August 12 tweet was not the least popular of his genre—Twitter did not, for instance, go wild over his Ben Franklin quote in December 2020. *See* @RyanCohen, Twitter (Dec. 31, 2020, 11:52 AM), https://x.com/ryancohen/ status/1344687817998401537 (598 reposts and 5.8K likes). But a skim of Cohen's twitter account indicates that his tweets are not intended to bear talismanic significance. They are nonetheless routinely reposted thousands of times. *See* SAC ¶ 149 (attaching weight to the August 12 tweet because it was reposted more than 1,600 times). In light of these facts, it is misleading, myopic (or both) to allege Cohen's August 12 tweet spurred a revolution.

In any event, Bratya saw Cohen's tweet the day it was published. Ex. 2 (David Coti Dep.) at 234:7–9. Also that day, Bratya initiated new *short* positions in the Company, selling 16,000 out-of-the-money call options totaling roughly $241,000. Ex. 10 (BRATYA_000018). Bratya also sold $14,000 of BBBY common stock.

Several days later, on advice of counsel, Cohen submitted three filings to the SEC so he could transact in BBBY shares.[20] *First*, on August 15, 2022, Cohen filed a Form 3 with the SEC after being advised that a Company share repurchase had nudged Cohen's effective beneficial ownership over 10%—the SEC reporting threshold—and necessitated the filing. Ex. 31 (Aug. 15, 2022 RCV Form 3); *see also* Ex. 32 (COHEN0017814); Ex. 33 (COHEN0017816); Ex. 34 (COHEN0017818); Ex. 35 (COHEN0006606). The Form 3 filing contained no new information about Cohen's trading activity, and instead reflected a "consistent combination of common stock

---

[20] Cohen waived attorney-client privilege over all legal advice regarding Forms 3, 4, and 144, and all Schedule 13D filings. ECF No. 112, at 1. Bratya and this Court thus have the benefit of contemporaneous communications establishing that these filings were prepared at counsel's behest, drafted by Cohen's counsel or his bank, and submitted for the sole purpose of fulfilling Cohen's legal and regulatory obligations.

(7.8m) and call options of 1.65M shares for a total beneficial ownership which is equivalent to the amount stated on his original 13D (9.45M)." Ex. 36 (Kim Dep. Ex. 82).  Reacting to the Form 3, multiple press outlets, published false (and apparently uncorrected) reports that Cohen had *purchased* 1.6 million *new* call options.[21]  In response, Bratya again initiated new short positions. On August 15, Bratya sold 2,200 out-of-the-money BBBY call options totaling roughly $600,000. Ex. 10 (BRATYA_000018).  David Coti told his brother, "BBBY WILL BE A NICE POSITION." Ex. 3 (BRATYA_000746).  Edouard responded, "Yes strong."  *Id.*

*Second*, on August 16, 2022, Cohen's counsel prepared an amended Schedule 13D, which it advised was necessary in light of the Company's share repurchase program, which had increased Cohen's ownership percentage even though his actual holdings had not changed.  Ex. 37 (COHEN0018012).  Cohen's counsel sent him a draft, amended Schedule 13D, which Cohen approved with no edits.  *Id.*  The amended Schedule 13D reflected that Cohen's unchanged holdings had grown to 11.8% beneficial ownership in the Company "solely due to a change in the number of outstanding shares of the issuer."  Ex. 38 (Aug. 16, 2022 RCV Sched. 13D).

Bratya saw Cohen's amended Schedule 13D the day it was filed, but did not buy the Company's stock or long call options.  Ex. 2 (David Coti Dep.) at 340:20–22, 342:5–7.  To the contrary, Bratya thought the price of BBBY stock that day was "unrealistic."  Ex. 3 (BRATYA_000746) (stating an article about BBBY's "unrealistic valuation" "is true").

*Third*, on August 16, 2022, counsel informed Cohen that he would be "in compliance" and could sell if Cohen's bank, JP Morgan, filed a Form 144 on Cohen's behalf.  Ex. 39

---

[21]  *E.g.*, Eddie Pan, *Ryan Cohen Just Gave Bed Bath & Beyond (BBBY) Stock a HUGE Boost*, Investor Place (Aug. 16, 2022), https://bit.ly/4a3V8AU; Yun Li, Lauren Thomas, *Bed Bath & Beyond soars as much as 70% as meme traders talk up Ryan Cohen's call options purchase*, CNBC (Aug. 16, 2022); https://cnb.cx/4b3XlO8.

(COHEN0018065).   Heeding that advice, JP Morgan prepared a Form 144 reflecting that "Beginning 8/16/22," Cohen may sell up to his entire holding of BBBY securities.   Ex. 40 (JPMC_00000776).   JP Morgan submitted Cohen's Form 144 via email, Ex. 41 (JPMC_00001999), and did so around 5:47 PM (EST) on August 16, Ex. 42 (JPMC_00000775).

Cohen sold his holdings in BBBY securities on August 16 and August 17, 2022.

The morning of August 17, Bratya watched the market for BBBY securities closely. Noting that BBBY's stock price was up in premarket trading, Edouard Coti remarked "that doesn't mean anything . . . [t]he premarket is the ape mongols."[22]   Ex. 3 (BRATYA_000747).   Hours before market-close on August 17, *Seeking Alpha* appears to have reported that Cohen's Form 144 disclosed his *completed* (rather than contemplated) sale of his entire stake in BBBY.   Ex. 3 (BRATYA_000748).[23]   David and Edouard Coti exchanged the article amongst themselves at 2:11 PM (EST).   Ex. 3 (BRATYA_000748).   Bratya was "[a]t that moment, obviously" "happy."   Ex. 2 (David Coti Dep.) at 373:2–7.   David Coti exclaimed "BROOO [t]his removes so much pressure [o]n the position 😂"—namely, on the short position Bratya had amassed since August 12, which was set to begin expiring on August 19.   Ex. 3 (BRATYA_000748).   Only then, on the day it

---

[22] During his deposition, David Coti explained that the term "ape mongols" refers to "Asian-type" retail investors because "they have the same type of eyes as people from a Mongolia country."   Ex. 2 (David Coti Dep.) at 90:2–91:9.   Edouard Coti, for his part, testified that he used phrases like "ape mongols" and "retards" because Reddit investors referred to themselves that way.   Ex. 43 (Edouard Coti Dep.) at 48:14–22.

[23] The article, shared in a chat between David and Edouard Coti, appears to have been titled "Ryan Cohen sells his entire stake in Bed Bath & Beyond," with the corresponding hyperlink: "https://seekingalpha.com/news/3874286-ryan-cohen-sells-his-entire-stake-in-bed-bath-beyond?utm_source=webull.com&utm_medium=referral."   Ex. 3 (BRATYA_000748).   That hyperlink now redirects to an updated and corrected story, published at 4:08 PM on August 17. *RC Ventures Files for Right To Sell stake in Bed Bath & Beyond (update)*, Seeking Alpha (Aug. 17, 2022), https://bit.ly/3UKPKhV.   The original *Seeking Alpha* article is not available on the Internet Archive or cached versions of the website.

learned Cohen was exiting his investment in BBBY, did Bratya purchase BBBY common stock and long call options.  Ex. 10 (BRATYA_000016).

On August 18, 2022, Cohen filed with the SEC an amended Schedule 13D and a Form 4, both of which reflected that Cohen had followed through on his earlier-stated intention to close out his investment in the Company.  Ex. 44 (Aug. 18, 2022 RCV Sched. 13D); Ex. 45 (Aug. 18, 2022 RCV Form 4).

Bratya, meanwhile, increased its long position in BBBY.  Ex. 10 (BRATYA_000016) (purchasing call options on August 22 and 26, and common stock on August 29 and 30).

**C. Procedural History**

This lawsuit was filed on August 23, 2022, alleging in operative part violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder; Section 20A of the Exchange Act, and Sections 9(a)(2)-(4) and 9(f) of the Exchange Act.  *See generally*, SAC.  This Court allowed this action to proceed based on three alleged misstatements by Cohen: (1) the tweet on August 12, (2) the amended Schedule 13D filed on August 16, and (3) the Form 144 filed on August 16.  ECF No. 91, at 9–17.

In November 2022, this Court appointed Bratya Lead Plaintiff.  ECF No. 21.  On February 15, 2024, Bratya moved to certify under Rule 23(b)(3) a class of investors in BBBY common stock and long call options who acquired the securities between August 12, 2022 and August 18, 2022.  ECF No. 109, at 5.  Notably, Bratya seeks to certify a class different from the one set out in its operative pleading, implicitly jettisoning investors that bought the Company's common stock "to cover a short position, bought call options other than 'long' call options," or "sold the Company's put options" during the Class Period.  *Compare* SAC ¶ 210 *with* ECF No. 109, at 5.  Bratya's new definition *excludes many of its own trades*, and eliminates roughly 36–42% of the damages that

Bratya represented to this Court in its bid to become lead Plaintiff.[24]  *See* ECF No. 14-4.  Under its new definition, Bratya's only qualifying transactions occurred on August 17 (the day Bratya learned Cohen was set to close his investment) and August 18 (after Bratya knew Cohen had sold).

In its motion for class certification, Bratya insists this Court should presume that "'[a]n investor who b[ought] or s[old] stock at the price set by the market d[id] so in reliance on the integrity of that price'" because "BBBY's securities traded in an efficient market during the Class Period."  ECF No. 109, at 11 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988)).  Bratya further asserts it is typical of the class it seeks to represent, and would do so adequately.

## LEGAL STANDARD

A plaintiff seeking to proceed through a class action must "prove—not simply plead—that their proposed class satisfies each requirement of [Federal Rule of Civil Procedure] 23,"— including numerosity, commonality, typicality, and adequacy—and, "[]if applicable[,] the predominance requirement of Rule 23(b)(3)."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) (emphasis omitted).

The Supreme Court repeatedly has emphasized that "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (same).  "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23[] have been satisfied.'"  *Wal-Mart Stores*, 564 U.S. at 350–51 (quoting *Gen. Tel. Co. of Sw.*, 457 U.S. at 160–61).

---

[24] The 36% figure represents a first-in, first-out method of calculation, whereas the 42% figure represents a last-in, first-out method.

## ARGUMENT

### I. This Court Should Deny Certification Because Individualized Questions of Reliance Would Swamp Common Ones

In securities lawsuits, class certification often hinges on Rule 23(b)(3)'s predominance requirement. Unless reliance (an essential element of many securities claims) can be proved on a class-wide basis, individual issues will overwhelm common ones and effectively prevent a plaintiff from proceeding under Rule 23(b)(3). *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988). Thus, in *Basic*, the Court held that "reliance of individual plaintiffs on the integrity of the market price may be presumed" if—at the time the defendant's alleged misstatements were made—the stock traded in an informationally efficient market that "reflect[ed] all publicly available information, and, hence, any material misrepresentations." *Id.* at 246–47.

The so-called *Basic* presumption rests on "the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 272 (2014) (quoting *Basic*, 485 U.S. at 246 n.24)). The *Basic* presumption is warranted if "most investors . . . rely on the security's market price as an unbiased assessment of the security's value in light of all public information." *Amgen*, 568 U.S. at 462.

*Basic* is "modest" but not "binary." *Halliburton Co.*, 573 U.S. at 272. Indeed, "*Basic* recognized that market efficiency is a matter of degree and accordingly made it a matter of proof." *Id.* The plaintiff bears this burden of proof. Thus, "[t]o defeat the presumption of reliance, defendants do not . . . have to show an inefficient market. Instead, they must demonstrate that plaintiffs' proffered proof of market efficiency falls short of the mark." *IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472, at *20 (S.D.N.Y. Oct. 29, 2013).

If a plaintiff shows it is entitled to the *Basic* presumption, a defendant may nonetheless "rebut this presumption in a number of ways, including by showing that the alleged misrepresentation did not actually affect the stock's price." *Halliburton Co.*, 573 U.S. at 263–64. "In assessing price impact at class certification, courts should be open to all probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 122 (2021) (emphasis and internal quotation marks omitted).

In its motion for class certification, Bratya avoids *Basic*'s central question:  Whether the market price for BBBY securities "reflect[ed] all publicly available information, and, hence, any material misrepresentations" allegedly made by Cohen between August 12 and August 18, 2022. 485 U.S. at 246.  Bratya instead points to an event study conducted by Dr. Cain, which purports to show that BBBY's stock price incorporated and was affected by value-relevant information.  But Dr. Cain's event study did not look at the Class Period.  The event study actually demonstrated that BBBY stock moved significantly on several "News Days"—each of which was *months* before the Class Period—compared to its price on 132 "No News Days'—*none* of which fell within the Class Period.  Thus, Bratya and Dr. Cain prove only a premise that Cohen does not dispute, that the market for BBBY securities was efficient before the Class Period began, under starkly different conditions than the Class Period.

Professor Daniel Fischel—a Professor of Law and Business Emeritus (and former Dean) at The University of Chicago Law School, and former Director of the Law and Economics Program at The University of Chicago—has examined and rejected Dr. Cain's assertions.  Ex. 1 (Fischel Report) ¶ 1.  In contrast to Dr. Cain, Professor Fischel's report examined the state of the market for BBBY securities during the relevant time period, when Cohen made the statements that Bratya

allege "affect[ed] it, and cause[d] loss."  *Halliburton Co.*, 573 U.S. at 272 (citation and internal quotation marks omitted).  From this analysis, Professor Fischel concluded:

- There is no reliable basis to conclude that BBBY stock, and therefore options, traded in an efficient market during the Class Period.

- The Tweet that allegedly introduced artificial inflation into BBBY's stock did not impact its price.

- Individual inquiry is required because some, if not many, Class members did not rely on the integrity of the market prices.

- Dr. Cain's conclusions are fundamentally flawed and unreliable because he fails to account for the changed circumstances around the proposed Class Period.

Ex. 1 (Fischel Report) ¶ 19.

As noted by Professor Fischel, Dr. Cain barely acknowledges the profound market distortions plaguing BBBY securities during the Class Period, analysts' warnings that BBBY's stock price reflected neither information nor reality, and the traders that deliberately exacerbated and exploited the inefficiencies of the market.  Dr. Cain's failure to meaningfully grapple with these distortions in the market for BBBY securities during the Class Period is fatal to Bratya's efforts to certify a class.

## A.  The *Basic* Presumption Is Unavailable Because Bratya Fails To Prove That BBBY Securities Traded in an Efficient Market During the Class Period

Before the Class Period, BBBY securities were seized by short sale constraints that impeded informational efficiency.  Ex. 1 (Fischel Report) ¶¶ 23–28; SAC ¶ 24 (alleging that "[b]efore Cohen pumped and dumped Bed Bath's securities, Seeking Alpha *had already reported that a short squeeze was taking place*" (emphasis added)).  Professor Fischel observed that "BBBY's closing stock prices increased by 111%, rising from $5.03 on the last trading day in July to $10.63 on August 11, 2022."  Ex. 1 (Fischel Report) ¶ 23.  This price change "was far in excess of the return experienced by either the market or BBBY's benchmark industry over the same time

period." *Id.* "[T]hese price distortions were temporary and contemporaneous with a corresponding spike in trading volume as well as a substantial increase in option implied volatility" consistent with a short squeeze. *Id.* ¶ 24; *see also* SAC ¶¶ 29 (acknowledging evidence of a short squeeze during the Class Period).

The dramatic price increases in BBBY securities shortly before and during the putative Class Period were not caused by new, value relevant information—a better explanation is that they reflected the actions of different groups of traders.[25] Professor Fischel opined "the Company did not issue any press releases, hold conference calls, or otherwise provide new value-relevant information to the market during the period when this increase occurred, let alone information that would cause the market to value BBBY by *more than twice* what it had several days earlier." Ex. 1 (Fischel Report) ¶ 25. These fluctuations flagrantly violated the principle of informational efficiency: That market prices *do* move in response to value-relevant information and *do not* "move substantially"—much less double in value—"in the absence of new value-relevant information." *Id.* ¶ 20. "The large stock price increase in the absence of new value-relevant information suggests that if the market was efficient on the last trading day in July when the price was \$5.03, it was not efficient by August 11, 2022 when the price was \$10.63." *Id.* ¶ 28. Bratya makes no attempt to refute these facts—it simply ignores them.

Cohen *did not* cause the inefficiencies that plagued the market for BBBY securities before and during the Class Period. Bratya's allegations to the contrary fall on the wrong side of both the facts and the law. *See* SAC ¶¶138-143; ECF No. 109, at 3 (asserting "[o]n August 5, 2022, Cohen road-tested his scheme with a tweet that was well-received by his followers, and caused the

---

[25] A short squeeze typically peaks after 12 days or so, followed by a decline with the next 3–4 days. Ex. 1 (Fischel Report) ¶ 33. The attempted short squeeze that rocked BBBY shortly before and during the Class Period is consistent with this observed timeline.

Company's stock price to rise."). Days before Cohen tweeted his generalized proverb, the price of BBBY common stock increased nearly 15% in a single day (August 1), and another 33% days later (August 5). Indeed, the attempted short squeeze had been the subject of financial reporting well before Cohen tweeted "Ask not what your company can do for you—ask what you can do for your company," after the market closed on August 5, 2022.[26] Ex. 46 (Aug. 5, 2022 tweet). Contemporaneous sources likewise undermine Bratya's assertion; no news outlet or analyst seems to have attributed the short squeeze already roiling the Company to Cohen's tweet. Bratya also lacks any expert support for its claim. Dr. Cain did "not set out to form any opinions or conclusions on whether or not [BBBY] was, in fact, subject to a short squeeze at any point in time"—nor did he opine on *when* such a squeeze began or *what* caused it. Ex. 5 (Cain Dep.) at 142:21–25.

Bratya finds no solace in the law, either. Bratya has not even attempted to allege that the August 5 tweet contained any actionable misrepresentation of material fact about BBBY. The tweet contained no information about the Company at all. Against all this, Bratya's insinuation—that Cohen is responsible for the frictions that had undermined BBBY's market efficiency for nearly *two weeks* before his earliest alleged misstatement—borders on ridiculous. Bratya cannot wave away the extraordinary frictions afflicting the market for BBBY securities during the Class Period by placing them at Cohen's feet.

### 1. Bratya's *Cammer* and *Krogman* Analysis is Simplistic and Uninformative

Bratya principally justifies its invocation of *Basic* using factors outlined in a pair of out-of-circuit, district court cases (neither of which have been mentioned by the Supreme Court or the D.C. Circuit): *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), and *Krogman v. Sterritt*, 202

---

[26] *E.g.*, Curran, *supra* note 15.

F.R.D. 467 (N.D. Tex. 2001).[27]  Bratya's application of the *Cammer* and *Krogram* factors relies on the "binary view of market efficiency" repudiated by the Supreme Court.  *Halliburton Co.*, 573 U.S. at 272 (internal quotation marks omitted).  Bratya reduces law and economics to a box-checking exercise that elides the glaring anomalies in the market for BBBY securities during the Class Period.[28]

Take for instance the first *Cammer* factor, which considers average weekly trading volume relative to outstanding shares during the Class Period.  711 F. Supp. at 1286.  During his deposition, Bratya's expert, Dr. Cain, agreed that he "simply look[ed] at the number, note[d] that it's above 1 or 2 percent, and sa[id] that the *Cammer* factor is satisfied."  Ex. 5 (Cain Dep.) at 100:14–18.  Accordingly, Bratya concludes this factor "strongly supports a finding of market efficiency" because "the average weekly reported trading volume for BBBY's common stock is *more than 670 times the strong presumption threshold* established by the *Cammer* court and more than 1300 times the substantial presumption threshold."  ECF No. 109, at 14.

---

[27]  Recent commentary suggests that although "[t]he *Cammer* factors have never rested on academic footing; the meme stock phenomenon should be their last gasp.  Any court accepting them now does so in the face of inarguable evidence that they do not indicate the market efficiency necessary for *Basic*'s fraud-on the-market presumption to apply."  J.B. Heaton, *GameStop Hype Exposes Securities Litigation Theory's Flaws*, Law 360 (Mar. 11, 2021), https://tinyurl.com/pzaumcrz.

[28]  Only one court appears to have applied *Cammer* in the context of a potential short squeeze—and at Dr. Cain's urging, no less.  *See Malriat v. QuantumScape Corp.*, 2022 WL 17974629 (N.D. Cal. Dec. 19, 2022).  The court in *QuantumScape* noted that "several of the defendants' arguments" attacking Dr. Cain's analysis "seem persuasive," but ultimately certified the class.  *Id.* at *11.  Notably, the purported squeeze in *QuantumScape* was a gentle wave compared to the tsunami observed here:  weekly trading volume in *QuantumScape*, for instance, was at 43% compared to the 1,346.6% here.  *Compare id.* at *7, *with* ECF No. 108-1 ¶ 37.  And in sharp contrast to this action, Dr. Cain opined that defendant's experts in *QuantumScape* "d[id] not directly examine the reported short selling interest to investigate this conjecture."  Expert Reply Rep. of Matthew D. Cain ¶ 31, *Malriat v. QuantumScape Corp.*, 2022 WL 17974629 (N.D. Cal 2022), (No. 3:21-cv-00058), ECF No. 176-2.

In the view of Bratya and its expert, a steak cooked to 160 degrees is well done, and a steak cooked to 107,200 degrees is strongly well done.  Common sense counsels otherwise, and even Bratya's expert acknowledged that during the putative class Period, BBBY stock experienced "a huge spike in trading volume." Ex. 5 (Cain Dep.) at 98:18–99:2; *see* Ex. 1 (Fischel Report) ¶ 44 (explaining that a spike in trading volume may be indicative of coordinated market manipulation). Yet Bratya offers no explanation for why BBBY's frantic trading volume—which Dr. Cain establishes is materially higher during the Class Period than the preceding year, and is on a different planet than *Cammer* contemplated—should bolster rather than undermine its claim of efficiency.  Bratya checks the box, moves on, and asks this Court to do the same.

Bratya ticks through other factors in a similar manner.  As for the second *Cammer* factor, Bratya argues, "[d]uring the brief Class Period, 8 analyst reports regarding BBBY were issued by 8 separate firms," which is "more than the 15 analyst reports from 5 research firms deemed sufficient in *Cammer*."  ECF No. 109, at 14.  Having tallied the analyst reports, Bratya ignores what they actually said.  Analysts cited by Bratya and Dr. Cain emphatically disavowed the integrity of BBBY's stock price, reporting:

- BBBY "has high information risk and high market risk."  *Rating Update for Bed Bath & Beyond Inc.*, Sadif Inv. Analytics (Aug. 17, 2022).

- "We expect the BBBY short squeeze to continue. . . . Meme stocks, and the retail long shareholders who have created them, continue to agitate, and confound the market and move stock prices based on momentum and not necessarily on fundamentals."  *BBBY Makes it a Meme Troika*, S3 Analytics (Aug. 17, 2022).

- BBBY has "a current valuation that is disconnected from the company's fundamentals."  *BBBY: Downgrading to Underperform*, Wedbush (Aug. 18, 2022).

- The share price of BBBY is up 273% since June 30, even as institutions decreased their holdings.  *BBBY: Institutional Ownership Changes in the Third Quarter*, Buy Sell Signals (Aug. 18, 2022).

- Given "yet another unfathomable 'meme squeeze' . . . we believe the writing is on the wall that BBBY shares have again decoupled from economic reality."  *Bed Bath & Beyond Inc. (BBBY)*, Wells Fargo (Aug. 18, 2022).[29]

These analysts' conclusions are consistent with articles reporting that BBBY's share price reflected "a meme stock short squeeze and isn't tied to any fundamental improvements."[30]  Dr. Cain insists he "did skim" these articles, but admits he did not "form[] any opinions on whether Bed Bath & Beyond was subject to a short squeeze at any point in time," including the Class Period.  Ex. 5 (Cain. Dep.) at 24:9–10, 115:8–12.

Indeed, Bratya affirmatively eschews any obligation to address the market dynamics for BBBY stock during the Class Period, asserting "any argument at the class certification stage concerning 'fundamental value efficiency' should fail just as it previously failed at the pleading stage."  ECF No. 109, at 20.  In doing so, Bratya confuses relevancy and determinacy.

Fundamental and informational efficiency are distinct because a mispriced stock may still be responding to information (although it may be impossible to tell if the stock is also moving on no information at all).  But it is nonetheless relevant that market professionals concluded BBBY's stock price did not reflect information about the Company's "deep sales slump," "heavily discounted private label merchandise," and plans for an "expensive," "asset-based credit line" that "might not change much for the Company."[31]  It defies commonsense to ignore analysts' assertions

---

[29] *See also BBBY Trading Report*, Stock Traders Daily (Aug. 15, 2022) (reporting BBBY's long term position is "weak."); *Bed Bath & Beyond*, Zack's Equity Research (Aug. 16, 2022) (asserting the Company is "underperform[ing]" and investors should "sell."); *Bed Bath & Beyond Inc.*, Smart Insider (Aug. 18, 2022) (encouraging investors to "sell" BBBY securities.).

[30] Carmen Reinicke, *Loop Capital says Bed Bath & Beyond Comeback Doesn't Make Fundamental Sense, Stock Headed to $1*, CNBC (Aug. 12, 2022), https://cnb.cx/44u3IIg.

[31] John Authers, *Post-Pandemic Meets Postwar Era on a Blind Curve*, Bloomberg (Aug. 9, 2022); Reinicke, *supra* note 30.

that BBBY's stock price bore no relationship to economic reality, or to disregard that the Company's stock price continued to skyrocket even as a wave of market professionals issued these warnings.  Neither Bratya nor Dr. Cain offers a plausible account for how BBBY's furiously ping-ponging stock price could have been caused by value-relevant information about the Company— nor do they explain how a short squeeze could have "decoupled" BBBY stock "from economic reality" without impeding informational efficiency.[32]  Unwilling to confront this fundamental issue, Bratya retreats to formalistic distinctions, erecting indefensible barriers between evidence bearing on differing kinds of efficiency.

As for the remaining factors, Bratya dutifully plods through them each, noting for instance that BBBY was listed on the Nasdaq exchange, had more than ten market makers, and was eligible to file a Form S-3 with the SEC.  ECF No. 109, at 13–15; *see also id.* at 17–18 (listing *Krogman* factors).  These findings may be consistent with, but are certainly not dispositive of, market efficiency.  That is because the *Cammer* and *Krogman* factors are largely time-agnostic; they are mostly static indicators that say nothing about whether a stock underwent a period of temporary inefficiency.  *See* Ex. 1 (Fischel Report) ¶ 52 n.105.  Indeed, a market for securities "can deviate wildly from any semblance of fundamental value . . . [T]hey can do so, invoking here the *Cammer* factors, . . . regardless of the number of analysts or the volume of trade or the presence of the best market makers."[33]

Save *Cammer* 5, none of these factors speak to whether a stock traded in an informationally sensitive market—they are not "direct test[s] of efficiency."  Ex. 1 (Fischel Report) ¶ 20.  And as

---

[32] *Bed Bath & Beyond Inc. (BBBY)*, Wells Fargo (Aug. 18, 2022).

[33] Heaton, *supra* note 27.

described below, Bratya's *only* direct test of efficiency (Dr. Cain's *Cammer* 5 analysis) amounts to little more than an analytical sleight of hand.

### 2. Bratya Did Not Test, Much Less Establish, Efficiency During the Five-Day Class Period, During Which BBBY Was Seized by a Short Squeeze

A hallmark of any form of market efficiency is that "stock prices reflect publicly available information" such that "prices can be shown to move following the release of new value-relevant information." Ex. 1 (Fischel Report) ¶ 20. "Evidence of a cause-and-effect relationship between unexpected news and market price . . . is the critical factor—the *sine qua non* of efficiency." *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 182 (S.D.N.Y. 2012). An event study is an accepted method to test whether a stock's price exhibits a causal relationship with efficiency. Ex. 1 (Fischel Report) ¶ 37. But not all event studies are created equal.

Dr. Cain's event study purports to assess whether BBBY's stock price exhibited an informational cause-and-effect relationship between August 12, 2021 and August 18, 2022 ("Analysis Period") using the volatility exhibited in the prior 120 trading days ("Estimation Window."). ECF No. 108-1, ¶¶ 30, 64. Within this year-long period, Dr. Cain identified several "News Days," and compared the behavior of BBBY stock on those days against its behavior no several defined "No News Days." *Id.* ¶¶ 69, 71–76. Using his regression model, Dr. Cain concluded that "relative to other trading days contained in each event study's Estimation Window, BBBY's News Days resulted in a greater proportion of statistically significant stock price movements . . . than BBBY's No News Days." *Id.* ¶ 78.

The problem with Dr. Cain's event study is that it *did not* study the Class Period. Instead, Dr. Cain's event study reflects 136 days within the Analysis Period—four "News Days" and 132 "No News Days"— *none* of which fall within the Class Period. Indeed, the most proximate "News Day" in Dr. Cain's study is on June 29, 2022, a full 51 days before the Class Period began. ECF

No. 108-1, at Ex. 6a, ¶ 75.  During his deposition, Dr. Cain acknowledged as much, explaining "all of the Class Period days sort of fell in between where there was some amount of news coverage.  So they were not put into the No-News Days bucket, but there were no earnings announcements.  So they were not put into the News Days bucket either."  Ex. 5 (Cain Dep.) 86:19–24.  That means Dr. Cain's event study—Bratya's only direct measure of informational efficiency—included *no data at all* from the Class Period itself.  At most, Dr. Cain showed that several months before the Class Period began, BBBY's stock price reacted to value-relevant news.  That kind of showing falls well short of *Basic*'s mark.  *Cf. In re Jan. 2021 Short Squeeze Trading Litig.*, 2023 WL 9035671, at *31 (S.D. Fla. Nov. 13, 2023) (denying class certification and rejecting argument that *Basic* can be invoked where "the markets for seven of the Affected Stocks were efficient in the one-year period *prior* to the Class Period." (citation omitted)).

Bratya thus attempts to prove efficiency, indirectly, by implication.  Bratya reasons that an event study about the Analysis Period can be used to show efficiency during the Class Period because BBBY was considered a "*potential* meme stock and short squeeze *candidate*" throughout them both. [34]  ECF No. 109, at 20 (emphases added) (quoting ECF No. 108-1, ¶ 105).  But conflating a short squeeze candidate with a short squeeze is like confusing a presidential candidate with the Commander-in-Chief.  Bratya's expert, Dr. Cain agrees: "people were talking about Bed Bath & Beyond as a short squeeze candidate.  So just because people talk about that *doesn't mean*

---

[34]  As support for this proposition, Dr. Cain referenced a smattering of news articles discussing BBBY stock as a potential short squeeze candidate or in the midst of a squeeze.  *See* ECF No. 108-1 at n.104.  Dr. Cain did nothing to corroborate the rumored short squeezes detailed in these articles.  Dr. Cain clarified during his deposition "I'm certainly not opining that Bed Bath & Beyond, in fact, was subject to a short squeeze on any day during the Analysis Period, but what I said is . . . that throughout the Analysis Period, people did characterize Bed Bath & Beyond as a meme stock and a potential short squeeze candidate.  That's all I said and provided some examples of that in Footnote 104."  Ex. 5 (Dr. Cain Dep.) at 162:11–163:20.

*that it actually was subject to a short squeeze.*"  Ex. 5 (Cain Dep.) at 21:12–20 (emphasis added); *See also* Ex. 1 (Fischel Report) at 13–14 (charting material differences between Analysis and Class Periods with regards to trading volume and options implied volatility).  Yet "nowhere in Dr. Cain's report does he analyze the 'short squeeze dynamics' present during the proposed Class Period." Ex. 1. (Fischel Report) ¶ 50.  These unique dynamics makes it inappropriate to apply conclusions about the Analysis Period to the Class Period, and Dr. Cain's event study only captured the former.

This fundamental shortcoming is not mitigated by the fact that Dr. Cain defined his Analysis Period to include (and end after) the five-day Class Period.  The Class Period comprised five of the 257 trading days (or roughly 5%) of the Analysis Period, and none of the days in the Class Period are among the 136 days selected for inclusion in Dr. Cain's event study.  Ex. 1 (Fischel Report) ¶ 52.  As Professor Fischel opined, "analyzing such a lengthy period to make inferences about a shorter period within it may be appropriate if the period is relatively stable throughout, i.e., there is not a fundamental shift in relevant metrics during the period."  *Id.*  But as indicated "by Dr. Cain's own analysis of trading volume, this is not the case for BBBY stock."  *Id.* Put simply, "you could say it snowed in 2023.  That doesn't mean it snowed in June of 2023."  Ex. 1 (Cain Dep.) at 154:11–13.

At most, Dr. Cain proved that at some point before the Class Period, the market price for BBBY securities was efficient.  That, however, is not the question.  Federal courts have rejected the contention that *Basic* "may apply if a market was generally efficient prior to any alleged manipulation, even if it was unquestionably inefficient when a plaintiff traded"—and have thus refused to certify classes that traded during a meme stock frenzy.  *In re Jan. 2021 Short Squeeze Trading Litig.*, 2023 WL 9035671, at *31.  The putative class in *In re Jan. 2021 Short Squeeze Trading Litig.* was not so bold as to claim (as Bratya does here) that the market for securities

remained informationally efficient even in the midst of a meme stock short squeeze.  Instead, the putative class argued that because the defendant, Robinhood, allegedly manipulated the market by disabling tools that encourage efficiency, the Court need only find "pre-Class Period" efficiency.  *Id.*  The court rejected the putative class's contention as "nonsense."  *Id.*  After all, "[i]f a market is not informationally efficient *when the plaintiff transacts*, how can a court presume that the price reflects the bad act?  The answer is simple: it cannot."  *Id*.  The court thus denied certification given the "dearth of evidence that the markets for the Affected Stocks were efficient when Plaintiffs transacted."  *Id.* at *32, 37.

Bratya has similarly offered a dearth of evidence suggesting the market for BBBY securities was efficient when the putative class transacted.  Certification is unwarranted.

### 3.  The Putative Class Did Not Rely on the Integrity of BBBY's Market Price

The presumption of class-wide reliance is appropriate only if "most investors" rely on the integrity of the market price for a security.  *Halliburton Co.*, 573 U.S. at 273 (emphasis omitted).  The presence of value investors seeking to "beat the market" does not preclude *Basic* so long as those investors "trade stock based on the belief that the market price will incorporate public information within a reasonable period."  *Id.* at 273–74 (citation omitted).

The problem for Bratya is that many putative class members decidedly *did not* "trade stock based on the belief that the market price will [soon] incorporate public information," *id.* at 274, but rather on a belief that the market price *did not* and *should not* reflect public information.  In online posts during the Class Period, putative class members bragged about their role in rendering BBBY's stock price arbitrary:

- My mom asked me if I'd jump off a bridge if all my friends jumped off it first.  I told her only if Cramer tweeted 4 times telling me not to do it.  $BBBY to $100.  Ex. 47 (BBBY Megathread) at 1.

- BBBY to $420 because why not.  *Id.* at 2.

31

- Just put 25k into BBBY, in 1.5 hours i will put another dollar in for every upvote comment gets.  *Id.* at 4.

- TIME TO FOMO BITCHES! WE HAVENT EVEN HIT THE 52 WEEK HIGH. THIS SQUEEZE IS JUST STARTING. TOINFINITY AND $BBBYONDDDDDD!!!  *Id.* at 5.

- Oh shit guys I'm getting a little nervous I think it's time to sell everything . . . MY GIRLFRIEND, MY DOG, MY HOUSE, CAR, CUM, ORGANS, TALENTS, MOM'S SECOND MORTGAGE, KIDS'COLLEGE FUND LETS GOOOOOOOOOOOOOOOOOO BUY MORE.  *Id.* at 8.

- BBBY 30% short float let's squeeze em. Really cheap stock market cap at 450MM. Ex 1 (Fischel Report) ¶ 46 (quoting Reddit posts).

These are not the sentiments of investors "trad[ing] stock based on the belief that the market price will incorporate public information within a reasonable period."  *Halliburton Co.*, 573 U.S. at 274.  These are retail investors buying in reliance "on a *lack of integrity* in the market price," treating their purchase as a gamble, and seeking to profit from a squeeze.  Ex 1 (Fischel Report) ¶ 47.  The Court in *Basic* asked "[w]ho would knowingly roll the dice in a crooked crap game?", 485 U.S. at 247 (citation omitted), and the investors raised their hands.  These putative class members knew the game was crooked because they were the ones trying to crook it.

Bratya, likewise, did not trade in reliance on the integrity of market prices.  Bratya believes "the stock market is crazy[,] nothing economical about it anymore" "but wars of financial nerves." Ex. 48 (BRATYA_000605) (discussing GameStop).  Bratya entered the fray believing that markets move with "no fundamentals" and "a trade price that corresponds to nothing, like bitcoin and twits [*sic*] and reddit that make it go up and down." Ex. 14 (BRATYA_000641).  If anything, during the Class Period, Bratya traded in reliance on what it believed to be the prolonged *inefficiency* of the market price for BBBY securities.  Asked whether "your belief that the squeeze would continue to drive the price up on August 17th was relevant to your decision to go long on

August 17th and August 18th," David Coti confirmed "[t]hat we were continuing to be long.  Yes." Ex. 2 (David Coti Dep.) at 366:21–367:3.[35]

Perhaps some traders read into and relied on Cohen's tweet or SEC filings.  Others, including Bratya, bet *against* those traders.  Still others hoped to time their trades profitably— riding the momentum of the short squeeze up, then hoping to sell before its inevitable collapse— without any regard for either Cohen's alleged misstatements or the relationship between BBBY's fundamentals and its share price.  Ex. 2 (David Coti Dep.) at 164:2–4 (musing "all this is a question of volatility . . . there is a—an opportunity") (discussing GameStop).  The putative class has exhibited an array of reliance interests not capable of generalization and not amenable to class-wide treatment.  "Each plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones, as required by Rule 23(b)(3)."  *Halliburton Co.*, 573 U.S. at 281–82 (citation omitted).

### B. Even if Bratya Could Invoke *Basic* (It Cannot), the Presumption Is Rebutted Because the Challenged Statements Had No Price Impact

Bratya cannot clear the hurdle of showing market efficiency during the Class Period; indeed it almost entirely sidestepped the inquiry.  But even if Bratya could invoke the *Basic* presumption, that presumption is rebutted by the fact that Cohen's alleged attempt to manipulate the stock did not "actually affect the stock's price."  *Halliburton Co*., 573 U.S. at 263–64. Qualitative evidence, quantitative evidence, and common sense uniformly compel the conclusion that Cohen's tweet had no measurable price impact. *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 122 (2021).

---

[35]  Bratya's dim view of Cohen further belies any suggestion that it relied on his alleged misstatements or mimicked his perceived trading strategies. Ex. 14 (BRATYA_000642) (stating that with Cohen "[t]here's going to be a constant flow of positive news, because that's what he specializes in.  [T]alk talk and make people dream.").

To assess the impact, if any, of Cohen's tweet, Professor Fischel conducted an event study based on the conditions present during the actual Class Period.  Professor Fischel studied the stock price return on the day of Cohen's tweet.   Ex 1 (Fischel Rep.) ¶¶ 36–38.   The results are unequivocal: the tweet is not associated with a statistically significant price movement.  *Id.*  There is no reliable quantifiable evidence distinguishing BBBY's price movement on the day of Cohen's tweet from other stock price movements during this period of heightened volatility.  *Id.*

Professor Fischel's finding is robust because he compared the event day in question (when Cohen's alleged misstatement was issued) to data from two appropriate estimation periods.[36]  Ex 1 (Fischel Rep.) ¶¶ 37–38.  To ensure an apples-to-apples comparison, Professor Fischel used an estimation period running 40 trading days beginning August 1, 2022 —a period in which BBBY stock exhibited increased volatility.  To verify his results, Professor Fischel also used an estimation period running 40 trading days, split equally around the Class Period (i.e. 20 trading days before the Class Period and 20 days after the Class Period).  Ex 1 (Fischel Rep.) ¶¶ 36, 36 n.77.  Dr. Cain has endorsed (and recently employed) such short estimations periods when "an abrupt shift in the volatility of stock returns," would render a longer, 120-day estimation window an inapt comparator to the time being studied.  Ex. 49 (Dr. Cain Vaxart Depo Excerpt); *see also* Ex 5 (Cain Dep.) at 136:21–138:25.  Professor Fischel's event studies demonstrate that during this frantic trading period, Cohen's tweet made no difference.[37]

---

[36] As Professor Fischel explained, it is important to select an estimation period akin to the analysis period, because the estimation period is used to determine a stock's benchmark (or normal) volatility during the analysis period being studied.  Ex. 1 (Fischel Rep.) ¶ 36.

[37] Despite recently using a short estimation window to reflect a stock's recent trading volatility, Dr. Cain only used a 120-day estimation window in his event study for this case.  ECF No. 108-1 ¶ 64.  Dr. Cain professed not to have tested any other estimation window, and had no idea whether his results would hold if he did so.  Ex. 5 (Dr. Cain Dep.) at 135:15–136:12.  Dr. Cain acknowledged that selecting an inappropriate estimation window may conclusively alter the results of an event study.  *Id.* at 133:3–135:14.

Qualitative evidence confirms this result.  No analyst covering BBBY mentioned the August 12 tweet that Bratya alleges is false.  *See* Ex. 1 (Fischel Report) ¶ 42.  Nor did financial publications or news outlets report Cohen's tweet.  That none of these sources referenced Cohen's tweets suggests "investors would not consciously rely on the [tweet] in making investment decisions."  *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 104 (2d Cir. 2023).  Likewise, Cohen's second alleged misrepresentation (contained in his August 16 Schedule 13D) went largely unnoticed by market professionals.  True, a couple press outlets connected the rise in BBBY's stock price to disclosures in Cohen's Form 3, but Bratya takes no issue with that filing.  What's more, these sources *falsely reported* that Cohen's Form 3 disclosed a purchase of new call options, when it did no such thing.[38]  To the extent that the price of BBBY stock reacted to third-parties' unfounded misstatements about Cohen, such impact is not attributable to Cohen.

As for Cohen's final alleged misrepresentation, there is no source attributing an increase in BBBY's stock price to Cohen's Form 144 on August 16, which disclosed a "potential" sale of his entire holdings in BBBY rather than an ongoing sale of the same.  Instead, news articles captured the relevant takeaway:  Cohen's Form 144 "reveal[ed] intent to sell [his] entire stake" in BBBY.[39]  Others went further, apparently misreporting that the Form 144 stated Cohen had already sold his stake.[40]  It defies credulity to assert that the price of BBBY stock was impacted by the inclusion of the word "potential" in the "Remarks" section of a form titled "Notice of Proposed Sale of Securities."  *Goldman Sachs Grp.*, 594 U.S. at 122–23 ("The generic nature of a

---

[38] *E.g.*, note 21, *supra*.

[39] Lauren Thomas & Jesse Pound, *Bed Bath & Beyond Shares Fall After Investor Ryan Cohen Reveals Intent To Sell Entire stake*, CNBC (Aug. 17, 2022), https://cnb.cx/3JLxVZv.

[40] *E.g.*, Seeking Alpha, *supra* note 23

misrepresentation often will be important evidence of a lack of price impact . . . " "regardless [of] whether the evidence is also relevant to a merits question like materiality."). BBBY stock price did not fluctuate based on a stray qualifier buried within an SEC filing disclosing Cohen's notice of a proposed sale of BBBY securities.

During the Class Period, the market price for BBBY securities did not reflect economic reality, much less material public information. Nor did that market price reflect the alleged misrepresentations on which Bratya bases its claims.

## II. This Court Should Deny Certification Because Bratya Offers No Way To Measure Class-Wide Damages

Although "[c]alculations need not be exact," a plaintiff at the class certification stage must provide "evidentiary support" sufficient to "establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33, 35 (2013). When considering whether damages are amenable to class-wide resolution, "Rule 23, as construed in *Comcast*, requires a hard look at the soundness of statistical models that purport to show predominance." *Dakota Granite Co. v. BNSF Ry. Co. (In re Rail Freight Fuel Surcharge Antitrust Litig. – MDL No. 1869)*, 934 F.3d 619, 621 (D.C. Cir. 2019) (internal quotation marks omitted).

This Court cannot take the requisite "hard look" at Bratya's damages methodology because Bratya offers none. Relying on pre-*Comcast* cases, Bratya asks this Court to accept its bare assurances that there exists a reliable and valid method to measure damages. ECF No. 109, at 20–21 (citing *Livengood Feeds, Inc. v. Merck KGAA (In re Vitamins Antitrust Litig.)*, 209 F.R.D. 251, 268 (D.D.C. 2002)). But Dr. Cain does not elucidate upon what this method might be. When asked how he could possibly disentangle price movements (and thus, damages) attributable to Cohen's alleged misrepresentations from those attributable to the maelstrom of market frictions

plaguing BBBY stock during the Class Period, Dr. Cain replied vaguely that he "would carry out a reasonable and appropriate analysis."  Ex. 5 (Cain. Dep.) at 165:1–167:21.  And when pressed, Dr. Cain conceded he could not describe the steps comprising this "reasonable and appropriate analysis."  *Id.*

Dr. Cain's admissions are understandable.  Like Dr. Cain, Professor Fischel is "not aware of any methodology, let alone a 'standard, common' one, that could be applied in this case to differentiate price movements caused by allegedly misstated information from the distorted price movements caused by the rumored short squeeze."  Ex. 1 (Fischel Report) ¶ 57.  Having failed to identify any appropriate model for class-wide damages, however, class-wide treatment is inappropriate.  Bratya's "trust us" theory of damages cannot satisfy *Comcast*.[41]

## III.   This Court Should Deny Certification Because Bratya Cannot Represent the Class

### A.  Bratya Is Atypical (and there Is No Typical Class Member)

"Typicality means that the representative plaintiff[] must 'possess the same interest and suffer the same injury' as the other class members."  *Damus v. Nielsen*, 313 F. Supp. 3d 317, 331 (D.D.C. 2018) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (citation omitted)).  A class representative is atypical of a class if its claims would be "subject to any unique defenses which threaten to become the focus of the litigation."  *Loftin v. Bande* (*In re Flag Telecom Holdings, Ltd. Sec. Litig.*), 574 F.3d 29, 40 (2d Cir. 2009) (internal quotation marks omitted).  Bratya is atypical of the class it seeks to represent.

---

[41] Dr. Cain's confidence that he can ascertain an appropriate damages methodology is particularly puzzling given his insistence that BBBY stock does not have to be fundamentally efficient to be informationally efficient.  ECF No. 108-1 ¶¶ 103-105.  As Professor Fischel explained, "if the market for BBBY stock was somehow informationally efficient but not fundamentally efficient during the putative Class Period, then changes in the stock price"—Dr. Cain's proposed damages methodology—"are not reliable measures of the value of the information related to Plaintiff's allegations."  Ex. 1 (Fischel Report) ¶ 59.

The incurable deficiency plaguing this case is that during the Class Period, there was no representative BBBY investor.  BBBY investors throughout the Class Period were driven by a diverse and contradictory array of motivations—pursuing different strategies for different reasons, with few (if any) relying on the integrity of the market price.  The putative class is typified only by its confident *distrust* in the integrity of the market price of BBBY securities.

If any plaintiff could be deemed typical of this varied group of investors, however, it would certainly not be Bratya.  Bratya is vulnerable to unique defenses on the issue of reliance, which renders it atypical, and precludes class certification.  The Court in *Basic* explained:

> [A] plaintiff who believed that [defendant]'s statements were false . . . and who consequently believed that [Company] stock was artificially underpriced, but sold his shares nevertheless because of other unrelated concerns, *e.g.*, potential antitrust problems, or political pressures to divest from shares of certain businesses, could not be said to have relied on the integrity of a price he knew had been manipulated.

485 U.S. at 249.

Thus, courts refuse to certify classes led by plaintiffs that did not themselves rely on a defendant's alleged misstatements.  *E.g.*, *Kas v. Fin. Gen. Bankshares, Inc.*, 105 F.R.D. 453, 462 (D.D.C. 1984); *Fleck v. Cablevision VII, Inc.*, 763 F. Supp. 622, 627 (D.D.C. 1991) (collecting cases); *see also GAMCO Invs., Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88, 97 (S.D.N.Y. 2013) (holding defendants had rebutted any presumption of reliance because the subject of defendant's alleged misstatements "was irrelevant to Plaintiffs' decision to purchase [Company] securities during the Relevant Period.") *aff'd sub nom. GAMCO Invs., Inc. v. Vivendi Universal*, S.A., 838 F.3d 214 (2d Cir. 2016).

Bratya did not rely on the veracity of Cohen's alleged misstatements when executing its trades in BBBY securities.[42]   To the contrary, Bratya bet against Cohen at every turn.  Take for instance, Cohen's tweet on August 12.  Bratya alleged the tweet was "a rallying cry to buy Bed Bath's stock," but Bratya did not heed it.  SAC ¶ 149.  Instead, Bratya responded to Cohen's tweet by initiating roughly $241,000 in new short positions and offloading $14,000 of BBBY common stock.  Ex. 10 (BRATYA_000018).  Bratya continued to short BBBY's stock in the days following Cohen tweet, selling call options on August 15 for more than $600,000.  *Id.*; *see also* Ex. 3 (BRATYA_000744) (writing "BBBY WILL BE A NICE POSITION" on August 15).

Nor did Bratya rely on Cohen's second alleged misstatement contained in his August 16 Schedule 13D.  To the contrary, Bratya thought the price of BBBY securities was "unrealistic."  Ex. 3 (BRATYA_000746).  It "d[id]n't mean anything" that premarket trading had driven the price of BBBY securities yet higher because "[t]he premarket is the ape mongols."  Ex. 3 (BRATYA_000747).  David Coti recalled that BBBY's stock price "it became, again, extravagant value at this level."  Ex. 2 (David Coti Dep.) 37:7–10.  Bratya thus maintained a strategy adverse to the retail traders allegedly relying upon Cohen's Schedule 13D and opposite of the class it seeks to represent.  Ex. 10 (BRATYA_000018).

---

[42] Bratya seems almost reflexively inclined to disbelieve Cohen.  Years earlier, when discussing Cohen's investment in GameStop, David Coti mused "I think Cohen will be a financial success, but reddit will suffer and so will the company."  Ex. 14 (BRATYA_000642).  Edouard responded "[t]here's going to be a constant flow of positive news, because that's what he specializes in. [T]alk talk and make people dream."  *Id.*  But Bratya never trusted Cohen's word, because "[r]eality comes back with numbers . . . and then it's shit for them I tell you."  *Id.*; *see also* Ex. 5 (David Coti Dep.) at 301:13–14 (musing "Cohen is a really fucking good marketer.").

Indeed, Bratya did not even become a member of the putative class until the next-to-last day of the Class Period, August 17.[43]  It did so almost by accident.  Upon reviewing a news article reporting Cohen had closed his investment in BBBY, the Coti brothers were gleeful, proclaiming "BROOO [t]his removes so much pressure [o]n the position."  Ex. 3 (BRATYA_000748); Ex. 2 (David Coti Dep.) at 373:2–7 (responding "[a]t that moment, obviously, it was good" when asked "[w]ere you happy when you saw a headline stating Ryan Cohen sold his entire stake in [BBBY]?").  It was only then, when retail investors began exiting their long positions, that Bratya became a member of the putative class by acquiring BBBY shares and long call options.  Ex. 10 (BRATYA_000018); ECF No. 109, at 5 (defining the putative class).  Even so, Bratya hedged by selling two tranches of call options on August 17 for roughly $335,000 and $485,000, respectively. Ex. 3 (BRATYA_000748).  Bratya netted more than $3.1 million when it sold 116,000 shares on August 17, at a price close to the highest that BBBY would hit during the Class Period.  *Id.*

Bratya is subject to a second unique defense:  It understood that Cohen had sold his shares on August 17, and cannot plausibly allege that it remained duped (or suffered damages) until after market-close on August 18.  *See* SAC ¶ 177 (identifying as collective disclosures Cohen's August 18 Form 4 and Schedule 13D).  Bratya thrice confirmed during sworn testimony that any misconception it had about Cohen's long-term investment in the Company had been corrected by

---

[43] Bratya's trading records reflect an "Investment," of BBBY stock at $20.65 per share on August 15, a curious entry given that the records otherwise uniformly use the term "Buy" to designate a purchase of common stock.  Ex. 10 (BRATYA_000016).  David Coti testified that the entry denotes a purchase of BBBY common stock on August 15 at a price of $20.65 per share, but conceded that his claim might be contradicted by the actual price of BBBY common stock on August 15.  Ex. 2 (David Coti Dep.) at 209:12–210:21.  Sure enough, the price of BBBY common stock never reached $20.65 on August 15—it peaked at around $17, or roughly $4 less than the price of Bratya's "Investment."  Ex. 50 (Aug. 15, 2022 Intraday Price Chart).  It thus remains a mystery whatever type of transaction this "Investment" reflects, which Bratya notably did not include in its November 7, 2022 calculation of alleged damages.  ECF No. 14-4.

August 17.  First, recalling an article exchanged between the brothers at 2:11 PM (EST), David Coti testified "on the 17th at 10 [PM local], 'Ryan Cohen sells his entire stake in Bed Bath & Beyond' . . . So we knew it."  Ex. 2 (David Coti Dep.) at 100:21–101:3.  Second, when asked again:  "As of 10:11 p.m. [local] on August 17th, 2022, you knew that Ryan Cohen has sold his entire stake?" David Coti confirmed "Yep."  *Id.* at 102:9–11.  And a third time, on redirect from his counsel, David Coti was asked:  "On August 17th, did you believe that Mr. Cohen had sold his shares?" to which Coti answered "Yes."  *Id.* at 408:2–5.  Given that Bratya's first qualifying transactions happened on August 17 (potentially after it became aware Cohen had exited BBBY), there are serious questions about whether Bratya is even *part* of the putative class, much less an appropriate representative.

Bratya's trading history makes clear that Cohen's alleged misstatements "was irrelevant to [Bratya's] investment decisions, except to the extent that each corrective disclosure made [BBBY] a more attractive investment."  *GAMCO*, 927 F. Supp. 2d at 97.  Indeed, after Cohen filed allegedly "corrective disclosures" in a Form 4 on August 18, Bratya pressed ahead with its new long strategy, executing additional stock and call option purchases.  Ex. 10 (BRATYA_000018).  This Court need not question whether "[Bratya] would have purchased [Company] securities even had it known of [Cohen's] alleged fraud" because—having learned of Cohen's alleged fraud during the putative class Period—*it actually did so*.  *GAMCO Invs., Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 218 (2d Cir. 2016).

### B.  Bratya Is Inadequate

To be adequate, a class representative must prove its ability "to vigorously prosecute the interests of the class through qualified counsel."  Fed. R. Civ. P. 23(a)(4); *J.D. v. Azar*, 925 F.3d 1291, 1312 (D.C. Cir. 2019) (citation omitted).  "Adequacy embraces two components: the class representative (i) must not have antagonistic or conflicting interests with the unnamed members

of the class and (ii) must appear able to vigorously prosecute the interests of the class through qualified counsel." *Id.* (citations and quotation marks omitted).  Bratya fails on the first count.

Bratya has made its antagonism to unnamed members of the putative class—namely, retail investors—abundantly clear.  Bratya has variously referred to retail investors as "ape mongols," "barbares," "scum bags", and those who "put[] in their minimum wage at robinhood."  Ex. 3 (BRATYA_000747);  Ex 4  (BRATYA_000623)  (second  and  third  quote);  Ex.  14 (BRATYA_000638) (fourth quote).  Bratya has evidenced no consideration for retail investors who "don't give a fuck about finance and don't understand a thing about it."  Ex. 51 (BRATYA_000625).  Bratya believes, "[i]t's just a game between reddits and wall street, we're at war." Ex. 13 (BRATYA_000658).  Bratya has made clear how it conceives itself in this ongoing "war," and it is not as the representative leader of investors going long on BBBY securities.

## CONCLUSION

For the reasons set forth above, Bratya's motion should be denied.

Dated: May 17, 2024                    Respectfully submitted,

*/s/ Steven M. Farina*_____
Dane H. Butswinkas (D.C. Bar # 425056)
Steven M. Farina (D.C. Bar # 437078)
Brian T. Gilmore (D.C. Bar # 1030601)
Madeline C. Prebil (D.C. Bar # 1778724)
680 Maine Avenue, S.W.
Washington, DC 20024
T: (202) 434-5000
F: (202) 434-5029
dbutswinkas@wc.com
sfarina@wc.com
bgilmore@wc.com
mprebil@wc.com

*Counsel for RC Ventures LLC and Ryan Cohen*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 17, 2024, I caused to be electronically transmitted a copy of the foregoing Notice of Appearance to the Clerk's Office using the CM/ECF No. system, and service was effected electronically to all counsel of record.

/s/ *Steven M. Farina*
Steven M. Farina