# EXHIBIT 19

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

_____

# FORM 10-K

**Annual Report Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

☒     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended February 26, 2022**

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission File Number 0-20214**

# BED BATH & BEYOND INC.

(Exact name of registrant as specified in its charter)

| **New York** | **11-2250488** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

**650 Liberty Avenue, Union, New Jersey 07083**
(Address of principal executive offices) (Zip Code)

Registrant's telephone number, including area code: **908/688-0888**

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Trading Symbol (s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common stock, $.01 par value | BBBY | The Nasdaq Stock Market LLC (Nasdaq Global Select Market) |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes X No __

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes __ No X

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes X No __

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes X No__

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Table of Contents

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ___

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No X

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. X

As of August 28, 2021, the aggregate market value of the common stock held by non-affiliates (which was computed by reference to the closing price on such date of such stock on the Nasdaq Global Select Market) was $2,838,477,804. *

The number of shares outstanding of the registrant's common stock (par value $0.01 per share) at March 26, 2022: 79,845,789.

**Documents Incorporated by Reference**

Portions of the Registrant's definitive proxy statement for the 2022 Annual Meeting of Shareholders to be filed pursuant to Regulation 14A are incorporated by reference in Part III hereof.

* For purposes of this calculation, all outstanding shares of common stock have been considered held by non-affiliates other than the 866,820 shares beneficially owned by directors and executive officers. In making such calculation, the Registrant does not determine the affiliate or non-affiliate status of any shares for any other purpose.

Table of Contents

# TABLE OF CONTENTS

**Form 10-K**

| Item No. | Name of Item | Page |
|---|---|---|
| | **PART I** | |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 11 |
| Item 1B. | Unresolved Staff Comments | 20 |
| Item 2. | Properties | 20 |
| Item 3. | Legal Proceedings | 22 |
| Item 4. | Mine Safety Disclosures | 23 |
| | **PART II** | |
| Item 5. | Market for Registrant's Common Equity, Related Shareholder Matters and Issuer Purchases of Equity Securities | 24 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 26 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 40 |
| Item 8. | Financial Statements and Supplementary Data | 41 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 76 |
| Item 9A. | Controls and Procedures | 76 |
| Item 9B. | Other Information | 76 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 76 |
| | **PART III** | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 77 |
| Item 11. | Executive Compensation | 77 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Shareholder Matters | 77 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 78 |
| Item 14. | Principal Accounting Fees and Services | 78 |
| | **PART IV** | |
| Item 15. | Exhibits, Financial Statement Schedules | 79 |
| Item 16. | Form 10-K Summary | 83 |

\*

Table of Contents

# PART I

*Unless otherwise indicated, references to "we," "our," "us," "ourselves" and the "Company" refer collectively to Bed Bath & Beyond Inc. and its subsidiaries as of February 26, 2022. Our fiscal year is comprised of the 52 or 53 week period ending on the Saturday nearest February 28. Accordingly, throughout this Annual Report on Form 10-K: (i) the term "Fiscal 2021" means our fiscal year beginning February 28, 2021 and ending February 26, 2022, (ii) the term "Fiscal 2020" means our fiscal year beginning March 1, 2020 and ending February 27, 2021 and (iii) the term "Fiscal 2019" means our fiscal year beginning March 3, 2019 and ending February 29, 2020. Unless otherwise indicated, all references herein to periods of time (e.g., quarters) are in relation to the fiscal years defined above.*

## ITEM 1 - BUSINESS

### Overview

We are an omni-channel retailer that makes it easy for our customers to feel at home. We sell a wide assortment of merchandise in the Home, Baby, Beauty & Wellness markets and operate under the names Bed Bath & Beyond, buybuy BABY ("BABY"), and Harmon, Harmon Face Values, or Face Values (collectively, "Harmon"). We also operate Decorist ("Decorist"), an online interior design platform that provides personalized home design services.

We offer a broad assortment of national brands and a growing assortment of proprietary Owned Brand merchandise - including eight new proprietary Owned Brands ("Owned Brands") launched in Fiscal 2021 - in key destination categories including bedding, bath, kitchen food prep, home organization, indoor décor, baby and personal care.

We operate a robust omni-channel platform consisting of various websites and applications and physical retail stores. Our e-commerce platforms include bedbathandbeyond.com, bedbathandbeyond.ca, harmondiscount.com, facevalues.com, buybuybaby.com, buybuybaby.ca and decorist.com. We also operate 953 retail stores, as of February 26, 2022, consisting of 771 Bed Bath & Beyond stores in all 50 states, the District of Columbia, Puerto Rico and Canada, 130 BABY stores in 37 states and Canada and 52 Harmon stores in 6 states. During Fiscal 2021, we opened 4 new stores and closed 70 stores. As of February 26, 2022, our total store square footage, net of openings and closings, was approximately 27.9 million square feet. In addition to our U.S. and Canadian operations, we are a partner in a joint venture that operates 11 stores in Mexico under the name Bed Bath & Beyond.

Starting in late 2019, we have created a more focused portfolio through the divestiture of non-core assets, including businesses and real estate, as part of the ongoing business transformation underway. See "Transformation," "Strategy" and "Divestitures" below.

Our merchandise and services are offered to customers through an omni-channel platform across our portfolio of banners, which consist of:

***Bed Bath & Beyond*** - a leading specialty home retailer in North America that sells a wide assortment of domestics merchandise and home furnishings. Bed Bath & Beyond is a preferred destination in the home space, particularly in key product categories including bedding, bath, kitchen food prep, home organization and indoor decor.

***buybuy BABY*** - a leading specialty baby retailer in North America that sells a wide assortment of baby essentials and nursery furnishings. BABY strives to build trust with parents by supporting them with what they need so families can celebrate every milestone - big and small - together.

***Harmon Health and Beauty*** - offers an expansive assortment of leading name brand and private label personal care and beauty brands at deep everyday value.

***Decorist*** - an online interior design company that makes decorating a home easy and affordable. Executed entirely online, Decorist's roster of over 190 professional interior designers help beautifully design any room in the home, staying within a client's style and budget. For customers not ready to start a full design project, they can consult Decorist's Design Bar to have quick design questions answered by Decorist's team of interior designers, completely free of charge.

We are driving a digital-first, omni-always growth strategy and optimizing our digital and physical store channels to provide our customers with a seamless omni-channel shopping experience. Digital purchases, including web and mobile, can be shipped to a

Table of Contents

customer from our distribution facilities, directly from vendors, or from a store. Store purchases are primarily fulfilled from that store's inventory or may also be shipped to a customer from one of our distribution facilities, from a vendor, or from another store. Customers can also choose to pick up orders using our Buy Online Pickup In Store ("BOPIS") and contactless Curbside Pickup services, as well as return online purchases to a store, or have an order delivered through one of our delivery partners, including DoorDash and Uber. Customers can also make purchases through one of our customer contact centers and in-store through The Beyond Store, our proprietary web-based platform.

As of February 26, 2022, we had distribution facilities totaling approximately 4.4 million square feet, including our first regional distribution center, an approximately one million square foot facility in Frackville, Pennsylvania, which became operational during Fiscal 2021. We also executed a lease for our second regional distribution center in Jurupa Valley, California, which is expected to be operational by late 2022. Ryder Systems, Inc. will operate these two regional distribution centers under a strategic partnership, with the objective of reducing product replenishment times and improving the customer experience. All of these capabilities allow us to better serve customers across our omni-channel network.

We account for our operations as one North American Retail reporting segment. In Fiscal 2020 and 2019, we accounted for our operations as two operating segments: North American Retail and Institutional Sales, the latter of which did not meet the quantitative thresholds under GAAP and, therefore, was not a reportable segment, and which was divested in October 2020. Net sales outside of the U.S. were not material for Fiscal 2021, 2020, or 2019.

**Transformation**

Since 2019, we have undertaken significant changes to transform our business and adapt to the dynamic retail environment and the evolving needs of our customers in order to position ourselves for long-term success. As part of these changes, our management team, led by President and Chief Executive Officer (CEO), Mark Tritton, has been focused on driving an omni-always, customer-inspired strategy to re-establish our authority in the Home, Baby, Beauty & Wellness markets. We have created a more focused portfolio through the divestiture of non-core assets and further strengthened our financial flexibility through key actions such as corporate restructurings and operating expense control to re-set our cost structure and support our ongoing business transformation.

We are implementing a growth strategy that will harness the power of data and insights to engage customers across our four core banners (Bed Bath & Beyond, buybuy BABY, Harmon and Decorist) in an enterprise-wide plan to accelerate our omni-channel transformation. Our strategy is underpinned by five key pillars of strategic focus and investment: product, price, promise, place and people. Through this approach, we are becoming a digital-first, customer-focused omni-channel retailer with a more curated, inspirational and differentiated product collection across categories, and creating a more convenient and inspirational shopping experience.

During 2020 and 2021, as the world responded to the unparalleled challenges of the COVID-19 pandemic, we took thoughtful steps to safeguard our people and communities while we continued to serve our customers and drive transformative change throughout the organization. Similar to many other businesses, COVID-19 served as a catalyst to accelerate the pace of change and innovation at our Company- to advance our ongoing efforts to reset our cost structure and build a modern, durable model for long-term profitable growth.

Highlights of our progress in Fiscal 2021 include:
•*Owned Brands.* We launched eight new Owned Brands, which include an assortment of thousands of new products across our key destination categories of Bed, Bath, Kitchen Food Prep, Home Organization and Indoor Décor:

| First Quarter | Second Quarter | Third Quarter |
|---|---|---|
| Nestwell™ | Our Table™ | Studio 3B™ |
| Haven™ | Wild Sage™ | H For Happy™ |
| Simply Essential™ | Squared Away™ | |

•*New York City Flagship Renovation.* We completed the renovation of our Bed Bath & Beyond flagship store in New York City, which reopened in July 2021 after undergoing a complete transformation since closing in December 2020. The renovated flagship store is an expression of the new Bed Bath & Beyond, with a significant focus on our five key destination categories of bed, bath, kitchen & dining, indoor décor and organization.
•*Omni-Channel Capabilities.* We continued our focus on being a digital-first, omni-always retailer:

Table of Contents

◦We announced separate partnerships with DoorDash and Uber to provide on-demand delivery of essential homeware products and items from more than 700 Bed Bath & Beyond locations and nearly 120 BABY locations nationwide.

◦In November 2021, we launched our new digital marketplace to build on our existing authority in key Home & Baby categories with an assortment of products from a highly curated selection of third-party brand partners that will be integrated into our digital platform.

◦In November 2021, we announced a strategic collaboration to directly offer Kroger customers an extensive selection of the most sought-after goods for the Home & Baby products carried by the Bed Bath & Beyond and buybuy BABY banners through Kroger.com as well as a small-scale physical store pilot at select Kroger Family of Companies stores beginning in Fiscal 2022.

•*Additional Product Initiatives.* Our Bed Bath & Beyond banner launched the ***Home, Happier Team***, the brand's first-ever curated advisory panel of industry experts who will serve as "host and hostesses of the home," providing ideas, innovative solutions and compelling content to help customers personalize their living spaces and make it easy to feel at home. Our buybuy BABY banner introduced its "**welcome to parenthood**" program in-store and online through educational resources, reimagined shopping experiences, a revised registry, new digital offerings and a new marketing campaign to inspire customers to embrace every aspect of parenthood. Additionally, we announced key partnerships with Casper Sleep Inc. (including a first branded shop-in shop in our New York City flagship store), and with Safely™, an eco-friendly line of home care and cleaning products which made its retail debut exclusively in Bed Bath & Beyond, buybuy BABY and Harmon stores nationwide.

•*Supply Chain Transformation.* In the second half of Fiscal 2021, we started operations at our first regional distribution center, an approximately one million square foot facility in Frackville, Pennsylvania, and executed a lease for our second regional distribution center in Jurupa Valley, California, which is expected to be operational by late 2022.

•*Store Fleet Optimization.* We continue to believe that our physical store channel is an asset for our transformation into a digital-first company, especially with omni-fulfillment capabilities in BOPIS, Curbside Pickup, Same Day Delivery and fulfill-from-store. During Fiscal 2021:

◦We commenced renovations on approximately 130 stores, of which approximately 80 were completed, to bring the expression of the new Bed Bath & Beyond to our customers in many of our markets.

◦We largely completed our initial plan for the optimization of our store fleet through the closure of 63 mostly Bed Bath & Beyond stores during Fiscal 2021, bringing the total closures over the life of the program to 207 as of February 26, 2022.

We will continue to build on this strong foundation as we execute our three-year growth strategy to further elevate the shopping experience, modernize our operations, and unlock strong and sustainable shareholder value.

## Strategy

In particular with respect to strategy, we have embraced a digital-first, omni-always growth strategy that supports our purpose - to make it easy to feel at home - and our mission to re-establish our authority and be the preferred omni-channel home destination, driven by teams consistently delivering balanced durable growth. The framework of our strategy is based on the principles of being customer inspired, omni-always, people-powered and performance driven. The business initiatives intended to drive our growth are rooted in the following five pillars:

1.**Product:** We are refining and amplifying an exciting omni-channel assortment that rebuilds authority and preference for Bed Bath & Beyond and creates energy through differentiation and curation.

2.**Price:** We are investing in and clarifying compelling value through more choice with opening price points, relevant owned brands and clear price communications in order to sharpen our value for quality proposition and to both acquire and win back customers.

3.**Place:** We are accelerating and optimizing connecting with, inspiring and energizing our customers by becoming a truly omni-always retailer to serve their preferred shopping needs.

4.**Promise:** We are clarifying and deepening our relationship with our customers by connecting, engaging and motivating them to strengthen loyalty and lifetime value.

6

Table of Contents

5. **People:** We are creating and sustaining a talent engine and culture that attracts, retains and develops high-performing teams who consistently deliver operational excellence and business results.

With these five pillars as our guide, we are embracing a commitment to reconstruct and modernize our operating model to drive efficiency and effectiveness, charting a new course for our Company.

•**Product.** We are pursuing three key initiatives across our product strategy: developing an inspirational and more productive assortment, working closely with suppliers to reduce product cost and improving inventory management. We are rebuilding our authority in destination categories such as bedding, bath, kitchen food prep and home organization, including the launch of eight new Owned Brands during Fiscal 2021 with several more planned over the next few years that will address a wide variety of customer needs, including value, style and destination categories. At the same time, we are elevating the customer experience both in-store and online to be more inspirational, focusing on destination rooms and making it easier to navigate and more convenient to shop. As we build out our new assortment, we expect to leverage our scale and volume to re-negotiate lower sourcing costs from our suppliers. In addition, we are strengthening our inventory management capabilities by moving to a centralized ordering and replenishment system expected to optimize inventory by channel and store, improve markdown management and drive overall productivity.

•**Price.** Our data-driven pricing strategy includes four key elements: ensuring our products are competitively priced, having a more value-driven assortment across a variety of price points, building more disciplined processes to drive effective and efficient promotions, and strengthening the way we communicate value to our customers. We regularly monitor price levels at our competitors in order to ensure that our prices are in accordance with our pricing philosophy. We will also continue to improve price competitiveness across key categories while also addressing assortment gaps in value tiers, to help us compete better with mass retailers and attract new customers to our business. We will use data-driven insights to build discipline into the use of promotions, to increase return on investment and reduce ineffective promotional activity.

•**Place.** Our growth strategy leads with digital across channels and leverages our stores to our competitive advantage to drive a seamless customer experience. We are enhancing our digital experience through improved storytelling, making our website and mobile site speeds faster, and making it easier for customers to find what they need and place an order more quickly. To create a more seamless experience across channels, we have grown our omni-channel services such as BOPIS, contactless Curbside pickup and Same Day Delivery. We have expanded our ship from store capabilities, leveraging our national footprint and local market proximity to demand, and we are enhancing our store experience through data-driven store remodels and improving the productivity of our stores through a fleet optimization program.

•**Promise.** With a large customer base of approximately 35 million, one in five homes in the U.S., is a Bed Bath & Beyond home. The addition of approximately 7 million new digital customers during 2021 highlights our strong potential to attract, retain and drive spend within the Home, Baby, Beauty & Wellness markets. As part of our strategic growth plans, we launched a new customer value proposition to deepen connections with five core customer segments. In addition, we are developing an enterprise-wide strategy to unlock value across our core brands, including plans for a reinvented loyalty program to deepen customer relationships and motivate increased shopping across categories, channels and banners.

•**People.** Since the appointment of our President and CEO, Mark Tritton, we have recruited highly energetic, experienced and innovative leaders and team members to work together, lead innovation and modernization, drive growth and accelerate the pace of change across our business. We are committed to creating and sustaining a talent engine and culture that attracts, retains and develops high performing team members who consistently deliver operational excellence and business results. As we consider how best to position associates to support our business and drive efficiency and effectiveness, we are guided by four principles: to be customer inspired, omni-always, people-powered and performance-driven.

**Divestitures**

During Fiscal 2020, we divested five non-core banners, including One Kings Lane in the first quarter, PersonalizationMall.com in the second quarter, Linen Holdings and Christmas Tree Shops in the third quarter and Cost Plus World Market in the fourth quarter, generating approximately $534 million in net proceeds, which were reinvested in our core business operations to drive growth, fund share repurchases and reduce our outstanding debt. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" for detailed information relating to these divestitures.

**Impact of the COVID-19 Pandemic**

Table of Contents

As discussed in more detail throughout this Annual Report on Form 10-K, the ongoing coronavirus (COVID-19) pandemic has materially disrupted our operations to date, most significantly in Fiscal 2020. In compliance with relevant government directives, we closed all of our retail banner stores across the U.S. and Canada as of March 23, 2020, except for most stand-alone BABY and Harmon stores, which were categorized as essential given the nature of their products. In May 2020, we announced a phased approach to re-open our stores in compliance with relevant government directives, and as of the end of July 2020, nearly all of our stores reopened. During portions of Fiscal 2021, a limited number of stores in Canada either closed temporarily or continued to operate under restrictions in compliance with local governmental orders. As of February 26, 2022, all of the Company's stores were operating without restriction subject to compliance with applicable mask and vaccine requirements. As of February 26, 2022, our BOPIS, contactless Curbside Pickup and Same Day Delivery services are in place at the vast majority of our stores. We cannot predict, however, whether our stores will remain open, particularly if the regions in which we operate experience potential resurgences of reported new cases of COVID-19 or increased rates of hospitalizations, or become subject to additional governmental regulatory actions.

**Competition**

We operate in a highly competitive business environment and compete with other national, regional, and local physical and online retailers that may carry similar lines of merchandise, including department stores, specialty stores, off-price stores, mass merchandise stores and online only retailers. We believe that the key to competing in our industry is to provide best-in-class customer service and customer experiences in stores and online, which includes providing compelling price and value; high-quality and differentiated products, services and solutions; convenience; technology; personalization; and appealing and experiential store environments.

**Suppliers**

Historically, we have purchased substantially all of our merchandise in the United States, with the majority from domestic sources (who may manufacture overseas) and the balance from importers. As we continue to expand our assortment of Owned Brand merchandise, the portion of our merchandise that we purchase directly from overseas sources is increasing, and represented approximately 22% of our total purchases in Fiscal 2021.

Further developing our direct importing and direct sourcing capabilities will allow for a higher penetration of sourced and developed Owned Brands in our merchandise assortment; however, this also exposes us more directly to the effects of global supply chain disruptions on costs of shipping as well as potential issues with product availability due to delays in product sourcing. See Item 1A "Risk Factors - Disruptions of our supply chain could have an adverse effect on our operating and financial" results for additional information.

In Fiscal 2021, we purchased our merchandise from approximately 4,600 suppliers with our largest supplier accounting for approximately 5% of our merchandise purchases and the ten largest suppliers accounting for approximately 23% of such purchases. We have no long-term contracts for the purchases of merchandise. We believe that most merchandise, other than brand name goods, is available from a variety of sources and that most brand name goods can be replaced with comparable merchandise.

**Distribution**

A substantial portion of our merchandise is shipped to stores through a combination of third-party facilities, including cross dock locations, or through our operated distribution facilities that are located throughout the United States. The remaining merchandise is shipped directly from vendors. Merchandise is shipped directly to customers from one of our distribution facilities, stores or from vendors. The majority of our shipments are made by contract carriers depending upon location. During Fiscal 2021, we started operations at our first regional distribution center, an approximately one million square foot facility in Frackville, Pennsylvania, and executed a lease for our second regional distribution center in Jurupa Valley, California, which is expected to be operational by late 2022. Ryder Systems, Inc. will operate these two regional distribution centers under a strategic partnership, with the objective of reducing product replenishment times and improving the customer experience. See "Item 2 - Properties" for additional information regarding our distribution facilities.

**Marketing**

We employ a digital-first, omni-channel approach to marketing that is strategically designed to deliver maximum consumer engagement. The customer-inspired marketing mix includes a comprehensive range of touchpoints, including social, search, mobile SMS, email, digital video, display, content and influencer marketing, online affiliate programs and public relations, as well as traditional broadcast and print media, circulars, catalogs and our well-known "big blue" coupons. We also continue to invest in

Table of Contents

and promote our Beyond+ membership program, which provides members with discounts on purchases, as well as free standard shipping for online purchases, exclusive offers and other benefits.

We continue to invest in new technology tools that we expect will allow us to make significant strides in integrating our extensive customer data with relevant third-party data, in order to better scale, tailor and personalize marketing communications for our key customer segments.

### Customer Care

Our omni-always strategy is rooted in elevating the end-to-end experience for our customers across all channels, brands and banners. Through a customer inspired lens, we invest in capabilities necessary to continuously evolve and deliver a seamless experience to our customers. Our digital-first customer care makes it easy for customers to connect with us through chat, phone and our digital properties including our newly relaunched mobile apps that offer quick access to self-serve capabilities. Our holistic approach to customer care is designed to make it convenient for our customers to access help wherever and whenever they need it.

### Tradenames, Service Marks and Domain Names

We use the service marks "Bed Bath & Beyond," "buybuy BABY," "Harmon," "Face Values" and "Decorist" in connection with our retail services. We have registered trademarks and service marks or are seeking registrations for these and other trademarks and service marks (including for our Owned Brands) with the United States Patent and Trademark Office. In addition, we have registered or have applications pending with the trademark registries of several foreign countries, including the "Bed Bath & Beyond" name and logo registered in Canada and Mexico and the "buybuy BABY" name and logo registered in Canada. We also own a number of product trademarks. We file patent applications and seek copyright registrations where we deem such to be advantageous to the business. We believe that our name recognition and service marks are important elements of our merchandising strategy.

We also own a number of domain names, including bedbathandbeyond.com, bedbathandbeyond.ca, buybuybaby.com, buybuybaby.ca, harmondiscount.com, facevalues.com and decorist.com.

### People & Culture

Our strategic transformation is based on five key pillars: product, price, promise, place and people. The people pillar of our transformation strategy communicates our commitment to creating and sustaining a talent engine and culture that attracts, retains and develops high performing team members who consistently deliver operational excellence and business results. Our associates are our greatest asset, and we are committed to creating a workforce where all associates thrive. By supporting our associates' physical, mental, social, and emotional well-being, we strive to establish an engaging workplace environment with opportunities and other tools, such as access to Headspace, a leading meditation and mindfulness app, and leadership development programs for future success.

Our Board of Directors, through the People, Culture & Compensation Committee (formerly referred to as the Compensation Committee), oversees our people and culture programs, including cultural initiatives, associate engagement and diversity, equity and inclusion ("DE&I") program, policies and initiatives.

As of February 26, 2022, we had approximately 32,000 associates, including approximately 26,000 store associates and approximately 3,500 supply chain associates. We invest a great deal of time and effort in our relationship with our associates, and consider that relationship to be good.

We are committed to continuous listening through regular engagement surveys and pulse surveys to ensure we have open channels to gather frequent feedback from our associates. Our engagement survey process is in addition to other two-way communication vehicles we will continue, such as listening circles.

*Associate Engagement and Retention*

Associate engagement and retention require an understanding of the needs of our teams. In furtherance of our goal to create an equitable, inclusive work environment where all associates feel at home and can thrive, we prioritize associate engagement. We want all associates to be proud to work at Bed Bath & Beyond. We promote a culture of listening and learning and offer opportunities for all associates to provide feedback. In 2021, we engaged associates through our first enterprise-wide associate survey, resulting in more than 70% associate participation. We shared the results from the survey - including key themes, top strengths, priority areas and next steps - with our Board of Directors, senior management, and associates to continue the dialogue and respond to the feedback we heard.

9

Table of Contents

As a result of our engagement activities, we strive to develop key programs and policies to support and retain our critical talent. This includes certain associate benefits and workplace programs, such as 100% paid parental leave, our flexible time off policy and dedicated wellness spaces in our corporate offices. We also held listening circles in response to social issues that arose throughout the year to provide a platform for our associates to share their experiences as well as provide ideas for how we can better support them.

*Associate Development & Training*

We strive to maintain an engaging workplace culture that provides development opportunities for associates as well as a performance management process that includes discussions of goals to set up our associates for future success.

We are building a comprehensive learning and development offering, which will include an expansion of our skill development programs and upskilling training courses designed to provide associates with technical and competency-based skills applicable across a range of career paths. We have also developed strategic partnerships with learning partners to produce development content on daily tools and provide on-demand learnings on topics such as meeting and communication effectiveness.

Our regional and district store leaders, as well as supply chain leaders, participate in a newly-launched Foundational Leadership Course, which supports their career development and provides them with the tools and resources needed to lead associates and create a strong culture in our stores and our Distribution/Fulfillment facilities Our role framework, completed in 2021, provides the foundation for career path options which in addition to performance management, serves as to further clarify the development and advancement opportunities for associates.

In addition, associates receive annual training on a variety of topics, which is targeted based on their roles and job function and focus on our commitment to high ethical standards and fostering a culture of honesty, integrity, and compliance.

*Diversity, Equity, and Inclusion*

We embrace DE&I and strive to model a culture of trust and accountability where all associates know they belong. By building upon our recruitment, development, and promotion practices, we are committed to equitably distributing opportunities and achieving a workforce that reflects the world we live in and the customers we serve. We monitor the representation of women and racially or ethnically diverse associates at all levels of our organization and continue to make progress toward our 2030 goals of 50% female and 25% racial and ethnic diversity at each level. In 2021, we appointed a Chief DE&I Officer, implemented educational programming to increase awareness, empathy and understanding and launched several associate resource groups aimed at building community, providing a platform for meaningful discussion and advancing a culture of DE&I to create safe and supportive spaces for our associates.

*Compensation and Benefits*

To support associate recruitment and retention, we recently redesigned our total rewards program to provide incentives, recognition and benefit programs that reflect the changing needs of our associates, with an emphasis on supporting the financial, physical, mental, social, and emotional well-being of our associates. Our compensation packages include, but are not limited to, competitive wage rates, an annual short-term incentive program, long-term incentive program, a 401(k) plan with matching contributions, paid vacation and holidays, a flexible time off policy, health, dental and vision insurance, paid parental leave, disability insurance, life insurance, health savings and flexible spending accounts, free health and wellness subscriptions and support via an associate relief fund. Eligibility for, and the level of, benefits vary depending on associates' full-time or part-time status, work location, role, and tenure.

*Associate Health & Safety*

The health and wellbeing of our customers and associates is one of our top priorities. We implement health, safety, and security programs and strive to maintain a safe and secure environment for our associates and customers. We tailor our programs to address potential risks in all our workplaces, from stores, distribution centers, and corporate offices, to business travel. This includes our safety and security standards and policies, emergency response and crisis management protocol and associate training related to the risks and exposures in their areas of responsibility.

In response to the COVID-19 pandemic, we expanded our policies to include a new vaccination time policy, and sick time policies as required by state and local law, associate rapid response programs with COVID-19 protocols and safety tips and a new store safety plan, which includes requirements with respect to masks, social distancing and cleaning measures, among others. We've also introduced other remote work benefits including a hybrid corporate office schedule and dedicated weekly focus time to create time to innovate.

Table of Contents

**Government Regulations**

We believe that we are in compliance with all applicable government regulations, including environmental regulations. We do not anticipate any material effects on our capital expenditures, earnings or competitive position as a result of our efforts to comply with applicable government regulations.

**Seasonality**

Our business is subject to seasonal influences. Generally, our sales volumes are higher in the calendar months of August (back to school/college), November and December (holiday), and lower in February.

**Available Information**

We make available as soon as reasonably practicable after filing with the Securities and Exchange Commission ("SEC"), free of charge, through our websites, www.bedbathandbeyond.com, and http://bedbathandbeyond.gcs-web.com/financial-information/sec-filings, our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports, electronically filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934. We may also use our websites as a distribution channel of material information about us including through press releases, investor presentations, and notices of upcoming events. We intend to utilize the investor relations section of our website as a channel of distribution to reach public investors and as a means of disclosing material non-public information for complying with disclosure obligations under Regulation FD. We also intend to use certain social media channels, including, but not limited to, Twitter, Facebook and LinkedIn, as means of communicating with the public, our customers and investors about us, our products, and other matters. While not all the information that we post to our website and social media channels may be deemed to be of a material nature, some information may be, and we therefore encourage investors, the media and others interested in us to review the information we make public in these locations.

# ITEM 1A - RISK FACTORS

**MACROECONOMIC AND INDUSTRY RISKS**

**General economic factors beyond our control, including the impact of COVID-19, and changes in the economic climate have materially adversely affected, and could continue to materially adversely affect, our business, results of operations, financial condition and liquidity.**

General economic factors that are beyond our control have materially adversely affected, and could continue to materially adversely affect, our business, results of operations, financial condition and liquidity. These factors include, but are not limited to, recent supply chain disruptions, labor shortages, wage pressures, rising inflation and the ongoing military conflict between Russia and Ukraine, as well as housing markets, consumer credit availability, consumer debt levels, fuel and energy costs (for example, the price of gasoline), interest rates, tax rates and policy, unemployment trends, the impact of natural disasters such as pandemics, civil disturbances and terrorist activities, foreign currency exchange rate fluctuations, conditions affecting the retail environment for products sold by us and other matters that influence consumer spending and preferences. Changes in the economic climate and the impact of the COVID-19 pandemic, including on global supply chains, labor markets and economic activity, have materially adversely affected, and could continue to materially adversely affect, our business, results of operations, financial condition and liquidity.

The COVID-19 pandemic continues to cause ongoing disruptions to our business. As the COVID-19 pandemic evolves, national and local governments in regions in which we operate have enacted various measures, including travel restrictions or bans, restrictions on events and gatherings, temporary closure of non-essential businesses, "social distancing" requirements, vaccine and mask mandates and various other requirements designed to slow the spread of COVID-19. While several of these measures have been eased, the extent, severity and overall duration of the COVID-19 pandemic, including its phases of resurgence and the introduction of new variants, some of which may be more transmissible or virulent, are unknown, and COVID-19 has had, and may continue to have, a material adverse effect, on our business and could also result in the recording of additional non-cash impairment charges. In future periods, our business, results of operations, financial condition and liquidity may be materially adversely impacted by reduced store traffic and consumer spending due to, among other things, significant continued unemployment and economic downturn, as well as consumer anxiety regarding shopping in physical stores.

The impacts and potential impacts from the COVID-19 pandemic and associated protective measures that have had, continue to have or could directly or indirectly have, a material adverse effect on our business, results of operations, financial condition and liquidity also include, but are not limited to:

Table of Contents

•Store and distribution center closures in compliance with certain regulations, orders or advisories and increased costs related to the operation of our stores and distribution centers. In particular, in Fiscal 2020, we temporarily closed all retail store locations (other than BABY and Harmon Face Values), which have since been reopened;

•Potential inability of third parties on which we rely, including our suppliers, commercial banks and other external business partners, to meet their obligations to us, or significant disruptions in their ability to do so, which may be caused by their own financial or operational difficulties, or by travel restrictions and border closures;

•Negative impact on our employees. The spread of COVID-19 has caused us to modify our business practices (including, at times, employee travel and work locations, cancellation of physical participation in meetings, events and conferences, and temporary furloughs), and we may take further actions as may be required by government authorities or that we determine are in the best interests of our employees;

•Potential impact on our ability to meet our obligations to business partners, including under our secured asset-based revolving credit facility (the "ABL Facility"), which contains a springing minimum fixed charge coverage ratio, customary representations, warranties and affirmative and negative covenants, and under our current lease obligations. We have renegotiated and may continue to renegotiate payment terms for goods, services and rent. Similar to other retailers, in Fiscal 2020, we had also withheld portions of and/or delayed payments to certain of our business partners as we negotiate revisions to our payment terms, in order to further maintain liquidity given the temporary store closures. There can be no assurance that we will continue to be able to successfully renegotiate payment terms with all such business partners, and the ultimate outcome of these activities, including the responses of all business partners, is not yet known;

•Significant reductions in demand or significant volatility in demand for our products, which have been and may continue to be caused by, among other things, the temporary inability or reluctance of consumers to shop at our stores or buy our products due to illness, quarantine or other travel restrictions, unemployment or other financial hardship, and change in consumer preferences and shifts in demand away from one or more of our more discretionary or higher priced products to lower priced products;

•Disruptions in the financial markets may materially adversely affect the value of our common stock and availability and cost of credit, which could negatively affect our liquidity;

•Delays, interruptions and disruptions in our supply chain and higher shipping charges have impacted, and could continue to impact our ability to maintain supplies of products and the costs associated with obtaining products;

•Labor shortages, wage pressures and competition for talent;

•The extent of dissemination and public acceptance of COVID-19 vaccines and their effectiveness against COVID-19 and its evolving strains, some of which may be more transmissible or virulent than the initial strain;

•Additional widespread resurgences in COVID-19 infections; and

•Evolving safety protocols such as mask mandates and requirements for proof of vaccination or regular testing in certain of our markets, including as may be set forth by the Occupational Safety and Health Administration.

The COVID-19 pandemic continues to evolve rapidly, and the extent of the adverse impact of COVID-19 on the economy and us will depend, in part, on the length and severity of the measures taken to limit the spread of the virus, and, in part, on the nature and effectiveness of the compensating measures taken by governments. The full extent of the impact of the COVID-19 pandemic on our business, financial position, and results of operations will depend on future developments, many of which are outside of our control, including the duration and spread of the COVID-19 pandemic, the emergence of variant strains, the availability, adoption, and effectiveness of the COVID-19 vaccines and COVID-19 testing, and government actions, which are uncertain and cannot be predicted. We are closely monitoring the potential effects and impact of the COVID-19 pandemic on our business, results of operations, financial condition and liquidity; however, the fluidity and evolving nature of the COVID-19 pandemic limits our ability to predict the ultimate impact on our business, financial condition, and financial performance, which could be material.

For more information on the impact of COVID-19 on our business, see "Item 1 - Business - Impact of the COVID-19 Pandemic."

12

Table of Contents

**We operate in the highly competitive retail business where the use of emerging technologies as well as unanticipated changes in the pricing and other practices of competitors may adversely affect our performance.**

The retail business is highly competitive. We compete for customers, employees, locations, merchandise, technology, services and other important aspects of the business with many other local, regional and national retailers. These competitors range from specialty retailers to department stores and discounters as well as online and multichannel retailers, some of which are larger than us with significantly greater financial resources. In recent years, competition has further intensified as a result of reduced discretionary consumer spending, increased promotional activity and deep price discounting.

Rapidly evolving technologies are also altering the manner in which we and our competitors communicate and transact with customers. Our execution of the elements of our transformation strategy is designed to adapt to these changes, in the context of competitors' actions, customers' adoption of new technology and related changes in customer behavior, and presents a specific risk in the event that we are unable to successfully execute our plans or adjust them over time as needed. Further, unanticipated changes in pricing and other practices of our competitors, including promotional activity (particularly during back-to-school/college and/or holiday periods), reduced thresholds for free shipping and rapid price fluctuation enabled by technology, may adversely affect our performance. If we are unable to adapt effectively and quickly to a changing competitive landscape and maintain our competitive position, we could experience downward pressure on prices, lower demand for our merchandise, reduced sales and margins, inability to take advantage of new business opportunities and loss of market share. For more information on our strategy, see "Item 1 - Business - Strategy."

**Our failure to anticipate and respond in a timely fashion to changes in consumer preferences and demographic factors may adversely affect our business, results of operations and financial condition.**

Our success depends on our ability to anticipate and respond in a timely manner to changing merchandise trends, customer demands and demographics in order to maintain and attract customers. We must continue to monitor and react to consumer expectations, such as the increased focus on environmental, social and governance ("ESG") matters, climate change, and sustainable products, and appropriately manage our brand to promote the right product lines (including our Owned Brands), drive customer loyalty and protect our reputation. Our failure to anticipate, identify or react appropriately to changes in customer tastes, preferences, shopping and spending patterns and other life interest decisions, including as a result of COVID-19, could lead to, among other things, excess inventories, a shortage of products or reputational damage, and may adversely affect our business, results of operations and financial condition.

In addition, we must manage our inventory effectively and commensurately with customer demand. Often, we need to order merchandise, and enter into contracts for the purchase and manufacturing of such merchandise, multiple seasons in advance of and frequently before customer trends and preferences are known. The extended lead times for many of our purchases may make it difficult for us to respond rapidly to new or changing trends and preferences. These extended lead times may also increase our exposure to the effects of global supply chain disruptions, increasing the risk that merchandise is not received when originally planned. As a result, we are vulnerable to demand and pricing shifts and to misjudgments in the selection and timing of merchandise purchases. If we do not accurately predict our customers' preferences and demands for our products, our inventory levels will not be appropriate, and our business, results of operations and financial condition may be negatively impacted.

**Our business is seasonal in nature, which could negatively affect our results of operations and financial performance.**

Our business is subject to seasonal influences, with a significant portion of sales and revenues historically realized during the back to school/college and holiday seasons. We must carry a significant amount of inventory during this time, and if we are not able to sell the inventory, we may be required to take significant inventory markdowns or write-offs, which could reduce profitability. Similarly, if we do not adequately stock or restock popular products, particularly during the back to school and holiday seasons, and fail to meet customer demand, revenue and customer loyalty may be adversely impacted.

In addition, our financial results during the holiday season may fluctuate significantly based on many factors, including holiday spending patterns and weather conditions, and any such fluctuation could have a disproportionate effect on our results of operations for the entire Fiscal year. Because of the seasonality of our business, our operating results vary considerably from quarter to quarter, and results from any quarter are not necessarily indicative of the results that may be achieved for a full fiscal year.

**STRATEGY RISKS**

**We may face challenges in executing our omni-channel and transformation strategy.**

Table of Contents

During Fiscal 2020, we began executing on elements of our transformation strategy. Our ability to implement our strategic direction is based on a number of key assumptions regarding the future economic environment and our ability to meet certain ambitions, goals and targets, among other things. If any of these assumptions (including but not limited to our ability to meet certain ambitions, goals and targets) prove inaccurate in whole or in part, our ability to achieve some or all of the expected benefits of this strategy could be limited, including our ability to meet our stated financial objectives and retain key employees. Factors beyond our control, including but not limited to market and economic conditions, execution risk related to the implementation of our strategy and other challenges and risk factors discussed in this annual report, could limit our ability to achieve some or all of the expected benefits of this strategy. If we are unable to implement this strategy successfully in whole or in part or should the components of the strategy that are implemented fail to produce the expected benefits, our business, results of operations, financial condition and financial performance may be materially and adversely affected.

Additionally, an important part of our strategy involves providing customers with a seamless omni-channel shopping experience. Customer expectations about the methods by which they purchase and receive products or services are evolving, including as a result of the COVID-19 pandemic, and they are increasingly using technology to compare and purchase products. Once products are purchased, customers are seeking alternate options for delivery of those products. The coordinated operation of our network of physical stores and online platforms is fundamental to the success of our omni-channel strategy, and our ability to compete and meet customer expectations may suffer if we are unable to provide relevant customer-facing technology and omni-channel experiences. In addition, execution of our omni-channel strategy and the expansion of our e-commerce business will require significant investments in technology. If we are unable to successfully implement our omni-channel strategy, our business, results of operations, financial condition and financial performance could be materially and adversely affected.

Our strategy also involves the introduction of certain new Owned Brand merchandise, and the associated removal from our existing product assortment of existing third-party merchandise. These Owned Brands and the associated changes to our product assortment may not be successful in terms of customer acceptance, and/or may not achieve the revenue or margin improvements we anticipate. In addition, maintaining a larger assortment of Owned Brand products exposes us to additional reputational and regulatory risks, including those related to compliance with product safety and marketing requirements.

For more information on our strategy, see "Item 1 - Business - Strategy."

**Successful execution of our omni-channel and transformation strategy is dependent, in part, on our ability to establish and profitably maintain the appropriate mix of digital and physical presence in the markets we serve.**

Successful execution of our omni-channel strategy depends, in part, on our ability to develop our digital capabilities in conjunction with optimizing our physical store operations and market coverage, while maintaining profitability. Our ability to develop these capabilities will depend on a number of factors, including our assessment and implementation of emerging technologies and our ability to manage a changing mix of in-store and online orders (including as a result of the COVID-19 pandemic) as well as our ability to drive store traffic. The success of our omni-channel strategy is also dependent on our ability to effectively manage inventory across our physical stores and online channels. Our ability to optimize our store operations and market coverage requires active management of our real estate portfolio in a manner that permits store sizes, layouts, locations and offerings to evolve over time, which to the extent it involves the relocation of existing stores, store remodels or the opening of additional stores will depend on a number of factors, including our identification and availability of suitable locations; our success in negotiating leases on acceptable terms; and our timely development of new stores, including the availability of construction materials and labor and the absence of significant construction and other delays based on weather or other events. These factors could potentially increase the cost of doing business and the risk that our business practices could result in liabilities that may adversely affect our performance, despite the exercise of reasonable care.

**There are risks associated with our store fleet optimization strategies, pursuant to which we have closed 207 mostly Bed Bath & Beyond stores as of the end of Fiscal 2021.**

As part of our ongoing business transformation, we have been executing a store fleet optimization program that included the closure of approximately 200 mostly Bed Bath & Beyond stores by the end of Fiscal 2021. In connection with this program, we incurred approximately $92.4 million in costs including contract termination costs, employee-related costs, professional fees and non-cash impairment charges, of which approximately $47.9 million was incurred in Fiscal 2021. The store fleet optimization program involves numerous risks, including, without limitation, the diversion of our attention from our businesses and operations. These or other factors may impair our ability to realize the anticipated benefits of the program, which may materially adversely affect our business, results of operations, financial condition and liquidity. As of February 26, 2022, 207 mostly Bed Bath & Beyond stores have been closed. We may also determine that additional store closures are warranted in the future.

Table of Contents

**Acquisitions, partnerships or investments, divestitures or other dispositions could negatively impact our business, and contingent liabilities from businesses that we have sold could adversely affect our financial statements.**

As part of our business transformation and omni-channel strategy, we may make significant investments in technology, acquire businesses aligned with our strategy and growth objectives or enter into strategic partnerships. If we are unable to successfully integrate and develop acquired businesses, establish and manage investments and partnerships or if such activities do not provide the anticipated benefits or desired rates of return, our financial condition or results of operation may be adversely affected.

We continually assess shareholder value and strategic fit of our existing businesses, and may divest or otherwise dispose of businesses that are deemed not to fit with our strategic plan or are not achieving the desired shareholder value or return on investment. Such transactions pose risks and challenges that could negatively impact our business, including, but not limited to, not being able to achieve the desired strategic and financial benefits or obtain satisfactory terms within our anticipated timeframe or at all. Even after reaching a definitive agreement to sell or dispose a business, the sale is typically subject to satisfaction of pre-closing conditions which may not become satisfied. In addition, divestitures or other dispositions may dilute our earnings per share or adversely impact corporate overhead contribution/allocation associated with divested brands, have other adverse financial and accounting impacts and distract management or result in disputes with buyers. We may also be required to indemnify buyers against known and unknown contingent liabilities related to any businesses we have sold or disposed. The resolution of these contingencies may have a material effect on our financial statements.

In addition, uncertainty about the effect of any potential divestiture on employees, business partners, suppliers and vendors may have an adverse effect on us. These uncertainties may impair our ability to retain and motivate key personnel and could cause business partners, suppliers, vendors and others that deal with us to defer or decline entering into contracts with us or seek to change existing business relationships with us. In addition, if key employees depart because of uncertainty about their future roles and the potential complexities of any potential divestiture, our business could be harmed. If we are unable to divest any such businesses, we may not be able to find another buyer on the same terms and will continue to be subject to the risks of operating such businesses. For more information on our strategy and recent divestitures, see "Item 1 - Business."

## OPERATIONAL RISKS

**A major disruption of, or failure to successfully implement or make changes to, our information technology systems could negatively impact results of operations.**

Our results of operations could be negatively impacted by a major disruption of our information technology systems. We rely heavily on these systems to process transactions with customers and vendors, manage inventory replenishment, summarize results and control distribution of products. Despite numerous safeguards and careful contingency planning, these systems are still subject to power outages, telecommunication failures, cybercrimes, cybersecurity attacks and other catastrophic events. A major disruption of the systems and their backup mechanisms may cause us to incur significant costs to repair the systems, experience a critical loss of data and/or result in significant business interruptions that could have a material adverse impact on our financial condition, results of operations or reputation.

In addition, in the ordinary course of business, we regularly evaluate and make changes and upgrades to our information systems. As part of our transformation strategy, we have commenced a multi-year effort to evaluate and, where appropriate, upgrade and/or replace certain of our information systems, including systems for inventory management, order management and our finance systems. These system changes and upgrades can require significant capital investments, dedication of resources and time to fully implement. During this transition, we may need to continue to operate on legacy infrastructure, which has had, and could continue to have, a material adverse impact on our business operations and financial results. While we follow a disciplined methodology when evaluating and making such changes, there can be no assurances that we will successfully implement such changes, that such changes will occur without disruptions to our operations or that the new or upgraded systems will achieve the desired business objectives.

**Security breaches and other disruptions to our information technology infrastructure (including third-party service providers) could interfere with our operations. These disruptions can lead to unplanned remediation costs to address enhancements to our IT systems and result in loss of consumer confidence and other negative consequences, which may include litigation and regulatory penalties.**

We collect, process, transmit and store relevant information about our customers and employees in the ordinary course of business in connection with certain activities, including, without limitation credit card processing, website hosting, data encryption and software support. As a result, we face risks associated with unauthorized access to our or our third-party service providers'

Table of Contents

information technology systems, loss or destruction of data, computer viruses, malware, distributed denial-of-service attacks or other malicious activities. These threats may result from human error, equipment failure or fraud or malice on the part of employees or third parties. We make significant resource investments to protect this information and continue to invest in resources to maintain confidentiality, integrity and availability of our data. As we migrate our legacy systems to cloud-based technologies hosted by third-parties, we also continue to develop systems and processes that are designed to protect our customer, associate, and company information. However, it is not always possible to anticipate the evolving threat landscape and mitigate all risks to our systems and information, and while these measures provide reasonable security, our efforts have not in the past, and may not in the future, prevent all incidents of data breach or theft. We could also be affected by risks to the systems and information of our vendors, service providers, counterparties and other third parties. Risks relating to cyberattacks on our vendors and other third parties have also been increasing due to more frequent and severe supply chain attacks impacting software and information technology service providers in recent years.

For example, in October 2019, we discovered that a third party acquired e-mail and password information from a source outside of our systems that was used to access our online customer accounts. On October 29, 2019, we sent notifications to certain customers as required by applicable legal requirements. None of our online customers' payment cards were compromised as a result of this incident.

Globally, the sophistication, frequency and severity of the techniques used to obtain unauthorized access to systems, sabotage systems or degrade system performance continue to evolve and become harder to detect. We are continuously evaluating and enhancing our cybersecurity and information security systems and creating new systems and processes. However, there can be no assurance that these measures will be effective in preventing or limiting the impact of future cybersecurity incidents. As techniques used to breach security grow in frequency and sophistication, and are generally not recognized until launched against a target, we, or our third-party service providers, may not be able to promptly detect that a cyber breach has occurred or, implement security measures in a timely manner or ensure that any such security measures will be effective. If we experience a material cybersecurity incident impacting the confidentiality and integrity of our data or operations of systems this could interfere with our operations and cause us to incur unplanned significant remediation costs to address enhancements to our IT resources, affect our ability to carry out our businesses, impair the trust of our customers or potential customers and expose us to increased risk of lawsuits, regulatory penalties and damage relating to loss of proprietary information, any of which could have a material adverse effect on our business, financial results and our brand and reputation.

**Damage to our reputation in any aspect of our operations could potentially impact our operating and financial results.**

Our reputation is based, in part, on perceptions of subjective qualities, so incidents involving our brand, our Owned Brands, our products or the retail industry in general that erode customer trust or confidence could adversely affect our reputation and our business.

As we increase the number of items available to be shipped directly from a vendor to a customer for home delivery or in-home assembly, we increasingly rely on the performance of these third-party merchandise vendors and service providers. Our focus on executing strategic partnerships also means that we will rely on the performance of those partners for activities that directly impact the customer experience. Any deficiencies in performance by these third parties or partners could have a material adverse effect on our reputation, despite our monitoring controls and procedures.

Federal, state and local governments, our customers and consumers and shareholders are becoming increasingly sensitive to environmental and other sustainability issues. In response, we have committed to an ambitious ESG strategy. In order to reach these ambitions and goals, we will need to incorporate ESG considerations into our business strategy, products and services, and may incur significant cost and effort in doing so. Failure to manage and successfully execute our ESG strategy or address ESG matters appropriately (or being able to do so only at a significant expense to our business), or failure to adapt our strategy and business to the changing regulatory requirements and market expectations, may result in reputational damage and materially and adversely affect our business, results of operations and financial results.

In addition, challenges to our compliance with various regulations, rules and laws, including but not limited to, those related to social, product, labor and environmental matters could also jeopardize our reputation and lead to adverse publicity, especially in the rapidly changing media environment. The increased use of digital platforms, such as social media, by us and consumers has also increased the risk that our reputation could be negatively impacted by information about or affecting us that is easily accessible and rapidly disseminated.

Damage to our brand and reputation could potentially impact our operating and financial results, diminish customer trust and generate negative customer sentiment, as well as require additional resources to rebuild our reputation.

Table of Contents

**Our success is dependent, in part, on managing costs of labor, merchandise and other expenses that are subject to factors beyond our control.**

Our success depends, in part, on our ability to manage operating costs and to look for opportunities to reduce costs. Our ability to meet our labor needs while controlling costs is subject to external factors such as unemployment levels, prevailing wage rates, minimum wage legislation, labor organizing activities and changing demographics. Our ability to find qualified merchandise vendors and service providers and obtain access to products in a timely, efficient and cost-effective manner can be adversely affected by trade restrictions, political instability, financial instability of suppliers, suppliers' noncompliance with applicable laws, transportation costs, disruptions to our supply chain network serving our stores, distribution facilities and customers due to labor disturbances and other items, and other factors beyond our control, including the impact of the COVID-19 pandemic.

**Disruptions of our supply chain could have an adverse effect on our operating and financial results.**

Disruption of our supply chain capabilities due to trade restrictions, port-related issues such as closures, congestion or delays, political instability, war (including the ongoing military conflict between Russia and Ukraine), changes in tax or trade policy, weather, natural disaster, pandemics (including COVID-19), terrorism, product recalls, labor supply or stoppages, financial and/or operational instability of key suppliers and carriers, or other reasons could impair our ability to distribute our products and adversely impact the costs we incur to distribute our products. To the extent we are unable to mitigate the likelihood or potential impact of such events, it could materially and adversely impact our business, results of operations, financial condition and liquidity.

Historically, we have purchased substantially all of our merchandise in the United States, with the majority from domestic sources (who may manufacture overseas) and the balance from importers. As we continue to expand our assortment of proprietary Owned Brand merchandise, the portion of our merchandise that we purchase directly from overseas sources is increasing, and represented approximately 22% of our total purchases in Fiscal 2021.

We have experienced in 2021, and expect to continue to experience in 2022, supply chain disruptions, including increased product costs, increased shipping and transportation costs, increased labor wages, labor shortages and port and other delivery delays and associated charges. In addition to increased costs, disruptions may also result in inventory management issues, such as slow replenishment, out-of-stocks and excessive inventory levels. In an effort to mitigate these risks, and as part of our business transformation and strategy, we plan to make capital investments in initiatives aimed to help modernize our supply chain and network operations. As part of this program, we have partnered with Ryder System, Inc. to develop and operate two new regional distribution centers to provide merchandise to regional stores for both in-store shopping and online shopping services such as BOPIS or Curbside, Same Day Delivery, and Ship from Store. The first of these facilities began operations in the second half of Fiscal 2021. Failure to effectively manage this and other supply chain modernization initiatives could materially and adversely impact our business.

In addition, any significant changes to trade policy, including implementation of additional tax or import restrictions, could result in additional costs to us or require us to seek alternative sources of supply, which could negatively impact our reputation and have a material adverse effect on our business and results of operations.

**Rising inflation may adversely affect us by increasing costs of materials, labor and other costs beyond what we can recover through price increases.**

Inflation can adversely affect us by increasing the costs of materials, labor and other costs required to manage and grow our business. In the current inflationary environment, depending on the terms of our contracts and other economic conditions, we may be unable to raise prices enough to keep up with the rate of inflation, which would reduce our profit margins and returns. If we are unable to increase our prices to offset the effects of inflation, our business, results of operations and financial condition could be materially and adversely affected.

In addition, inflation is often accompanied by higher interest rates. The impact of COVID-19 may increase uncertainty in the global financial markets, as well as the possibility of high inflation and extended economic downturn, which could reduce our ability to incur debt or access capital and impact our results of operations and financial condition even after these conditions improve.

**Inefficient management of relationships and dependencies on third-party service providers could adversely affect our operations.**

We rely on third parties to support our business and provide certain services, which include portions of our technology and operational infrastructure. As a result, our business model is complex and can be challenging to manage. If we do not properly

17

Table of Contents

manage these relationships, or if these third-party service providers fail to perform, meet expectations, or face disruptions, it could result in the loss of our competitive position and reputational damage and adversely affect our results of operations.

**Our success is dependent, in part, on the ability of our employees in all areas of the organization to execute our business plan and, ultimately, to satisfy our customers.**

We depend on the skills, working relationships, and continued services of key personnel. In addition, our ability to achieve our operating goals depends on our ability to identify, hire, train, and retain qualified individuals. Our ability to attract and retain qualified employees in all areas of the organization may be affected by a number of factors, including geographic relocation of employees, operations or facilities and the highly competitive markets in which we operate, including the markets for the types of skilled individuals needed to support our continued success. We compete with other companies both within and outside of our industry for talented personnel, and we may lose key personnel or fail to attract, train, and retain other talented personnel. Any such loss or failure could adversely affect our business, results of operations and financial condition.

In particular, our continued success will depend in part on our ability to retain the talents and dedication of key employees. If key employees terminate their employment, become ill (including as a result of the COVID-19 pandemic), or if an insufficient number of employees is retained to maintain effective operations, our business activities may be adversely affected and our management team's attention may be diverted. In addition, we may not be able to locate suitable replacements for any key employees who leave or offer employment to potential replacements on reasonable terms, all of which could adversely affect our business, results of operations and financial condition.

**Extreme or unusual weather patterns caused by climate change or otherwise, natural disasters, and other catastrophic events, as well as regulatory or market measures and changing consumer preferences in response to climate change and ESG matters, could adversely affect our business and results of operations.**

Our business is susceptible to risks associated with extreme weather patterns, including the impacts of climate change. Extreme weather conditions and natural disasters, such as heavy snow, ice or rain storms, hurricanes, floods, tornados, earthquakes, wild fires, or a combination of these and other factors, could have a material adverse effect on our business, financial condition and results of operation. For example, extreme weather conditions over a prolonged period of time in the areas in which our stores or distribution centers are located, especially in areas with a high concentration of our stores, may make it difficult for our customers or associates to travel to our stores or distribution centers and thereby reduce our sales and profitability. These conditions can have similar impacts to our supply chain operations causing delivery disruptions or delays in order fulfillment. Such extreme weather conditions or natural disasters could cause significant damage to, destroy and/or force the closure of our stores and distribution centers, as well as those of our third-party service providers.

In addition, our business is susceptible to unusual and unseasonable weather patterns, such as extended periods of warm temperatures in the fall and winter seasons or cool temperatures in the spring and summer seasons, which could result in inappropriate inventory levels, especially for our BABY business, and negatively impact our business, results of operations and financial condition.

There is also increased focus, including by investors, customers and other stakeholders, on climate change and other ESG and sustainability matters, including single use plastic, energy, waste and worker safety. Concern about climate and sustainability-related issues may result in changes in consumer preference, including moving away from products considered to have high climate change impact and toward products that are more sustainably made. If we fail to adapt to these changing consumer preferences, our business, results of operations and reputation may be materially adversely affected.

Concern over climate change may result in new or additional legal, legislative and regulatory requirements to reduce or mitigate the effects of climate change on the environment, which could result in future tax, transportation and utility cost increases that adversely affect our business. New or more stringent climate change-related mandates, laws or regulations, or stricter interpretations of existing mandates, law or regulations, could also require additional expenditures by us or our suppliers, which could have a material adverse effect on our business, results of operations, financial condition and cash flows.

## CAPITAL RISKS

**Disruptions in the financial markets could have a material adverse effect on the Company's ability to access our cash and cash equivalents.**

We may have amounts of cash and cash equivalents at financial institutions that are in excess of federally insured limits. While we closely manage our cash and cash equivalents balances to minimize risk, if there were disruptions in the financial markets

Table of Contents

(including as a result of the COVID-19 pandemic), we cannot be assured that we will not experience losses on our deposits, and it may negatively impact the availability and cost of capital.

**Our stock price has been and may continue to be subject to volatility, and this and other factors may affect elements of our capital allocation strategy such as share repurchases, future dividends and debt reduction.**

Our stock price has experienced volatility over time and this volatility may continue, in part due to factors such as those mentioned in this Item 1A. Stock volatility in itself may adversely affect shareholder confidence as well as employee morale and retention for those associates who receive equity grants as part of their compensation packages. The impact on employee morale and retention could adversely affect our business performance and financial results. Stock volatility and other factors may also affect elements of our capital allocation strategy, and our ability to use equity to fund acquisitions or raise capital.

In addition, we have received, and may continue to receive, significant media attention, including from blogs, articles, message boards and social media. Information provided by third parties may not be reliable or accurate, or contain misleading, incomplete or otherwise damaging information, which could influence trading activity in our stock. As a result, our stock has experienced, and could continue to experience, extreme price and volume fluctuations that may be unrelated to our operating performance, financial position or other business fundamentals. This activity along with other factors, including the involvement of short sellers or activist investors in our stock, has materially impacted in the past, and could materially impact in the future, the trading price of our stock, put pressure on the supply and demand for our stock, limit our stockholders from readily selling their shares and result in significant loss of investment.

As part of our capital allocation strategy, since December 2004, our Board of Directors has authorized several share repurchase programs, and in April 2016, the Board of Directors authorized a quarterly dividend program. Decisions regarding share repurchases and dividends are within the discretion of the Board of Directors, and will be influenced by a number of factors, including the price of our common stock, general business and economic conditions, our financial condition and operating results, the emergence of alternative investment or acquisition opportunities, changes in business strategy and other factors. Changes in, or the elimination of, our share repurchase programs or dividend could have a material adverse effect on the price of our common stock. Our share repurchase program could change, and would be influenced by several factors, including business and market conditions, such as the impact of the COVID-19 pandemic on our stock price. In response to the COVID-19 pandemic, in March 2020, we postponed our plans for share repurchases and suspended the payment of dividends and planned debt reductions. We recommenced share repurchase programs on October 28, 2020 and in Fiscal 2020 entered into accelerated share repurchase programs on October 28, 2020 and January 7, 2021 (as amended on January 29, 2021), totaling $375.0 million. In Fiscal 2021, we announced that we intended to complete our $1 billion three year repurchase plan by the end of Fiscal 2021, two years ahead of schedule, and completed share repurchases of $574.9 million, bringing cumulative repurchases under this plan to approximately $950.0 million through February 26, 2022. An additional approximately $40.0 million was repurchased in March of 2022. For more information on our dividends and share repurchase programs, see "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Our business would be adversely affected if we are unable to service our debt obligations.**

We have incurred indebtedness under senior unsecured notes and have entered into the ABL Facility. Our ability to pay interest and principal when due, comply with debt covenants or repurchase the senior unsecured notes if a change of control occurs, will depend upon, among other things, sales and cash flow levels and other factors that affect our future financial and operating performance, including prevailing economic conditions and financial and business factors, many of which are beyond our control. Given the current economic environment, and potential adverse effects of the COVID-19 pandemic, for example, we may be unable to maintain compliance with the springing minimum fixed charge coverage ratio covenant under the ABL Facility in future periods, to the extent the covenant is applicable under the terms of the ABL Facility, which would among other things, result in an event of default under the ABL Facility.

If we become unable in the future to generate sufficient cash flow to meet our debt service requirements, we may be forced to take remedial actions such as restructuring or refinancing our debt; seeking additional debt or equity capital; reducing or delaying our business activities, or selling assets. There can be no assurance that any such measures would be successful.

**LEGAL AND REGULATORY RISKS**

**Changes in statutory, regulatory, and other legal requirements at a local, state or provincial and national level, or deemed noncompliance with such requirements, could potentially impact our operating and financial results.**

We are subject to numerous statutory, regulatory and legal requirements at a local, state or provincial and national level, and this regulatory environment is subject to constant change. Our operating results could be negatively impacted by developments in

Table of Contents

these areas due to the costs of compliance in addition to possible government penalties and litigation, operating interruptions and reputational damage in the event of deemed noncompliance. Changes in the law or the regulatory environment, or deemed noncompliance with such laws or regulations, in the areas of customer, employee or product safety, environmental protection, privacy and information security, labor, wage and hour laws, and international trade policy, among others, could adversely impact our operations and financial results.

As part of our business transformation and strategy, we have expanded our product offerings to include a selection of Owned Brands. This expansion brings additional regulatory and compliance requirements, which require new resources and the development of new policies and procedures. Our failure to properly manage our expanded business or comply with these regulations could expose us to fines, penalties, litigation and other costs that could harm our reputation and adversely impact our financial results.

**Changes to accounting rules, regulations and tax laws, or new interpretations of existing accounting standards or tax laws could negatively impact our operating results and financial position.**

Our operating results and financial position could be negatively impacted by changes to accounting rules and regulations or new interpretations of existing accounting standards. Our effective income tax rate could be impacted by changes in accounting standards as well as changes in tax laws or the interpretations of these tax laws by courts and taxing authorities, which could negatively impact our financial results. Such changes would include for example, the possible adoption by the United States of additional tariffs, or the disallowance of tax deductions, with respect to imported merchandise.

**New, or developments in existing, litigation, claims or assessments could potentially impact our reputation, operating and financial results.**

We are involved in litigation, claims and assessments incidental to our business, the disposition of which is not expected to have a material effect on our reputation, financial position or results of operations. It is possible, however, that future results of operations for any particular quarterly or annual period could be materially adversely affected by changes in our assumptions related to these matters. While outcomes of such actions vary, any such claim or assessment against us could negatively impact our reputation, operations and financial results.

**A failure of our business partners to adhere to appropriate laws, regulations or standards could negatively impact our reputation.**

We engage with various third parties to meet business needs. These business partners include, among others, vendors, suppliers, and service providers. The failure of these business partners to comply with applicable regulations, rules, laws, and industry standards could negatively impact our reputation and have a material adverse effect on our business and results of operations.

## ITEM 1B - UNRESOLVED STAFF COMMENTS

None.

## ITEM 2 - PROPERTIES

Most of our stores are located in suburban areas of medium and large-sized cities. These stores are situated in strip and power strip shopping centers, as well as in major off-price and conventional malls, and in free standing buildings.

As of February 26, 2022, our 953 stores are located in all 50 states, the District of Columbia, Puerto Rico and Canada and range in size from approximately 4,000 to 84,000 square feet, but are predominantly between 18,000 and 50,000 square feet. Approximately 85% to 90% of store space is used for selling areas.

Table of Contents

The table below sets forth the locations of our stores as of February 26, 2022:

**STORE LOCATIONS**

| | | | |
|---|---|---|---|
| Alabama | 12 | New York | 60 |
| Alaska | 1 | North Carolina | 26 |
| Arizona | 22 | North Dakota | 2 |
| Arkansas | 6 | Ohio | 25 |
| California | 87 | Oklahoma | 9 |
| Colorado | 20 | Oregon | 11 |
| Connecticut | 14 | Pennsylvania | 25 |
| Delaware | 4 | Rhode Island | 2 |
| Florida | 69 | South Carolina | 13 |
| Georgia | 25 | South Dakota | 2 |
| Hawaii | 1 | Tennessee | 18 |
| Idaho | 6 | Texas | 76 |
| Illinois | 31 | Utah | 7 |
| Indiana | 13 | Vermont | 2 |
| Iowa | 8 | Virginia | 26 |
| Kansas | 10 | Washington | 18 |
| Kentucky | 8 | West Virginia | 1 |
| Louisiana | 12 | Wisconsin | 9 |
| Maine | 4 | Wyoming | 2 |
| Maryland | 14 | District of Columbia | 1 |
| Massachusetts | 21 | Puerto Rico | 2 |
| Michigan | 30 | Alberta, Canada | 17 |
| Minnesota | 9 | British Columbia, Canada | 11 |
| Mississippi | 5 | Manitoba, Canada | 2 |
| Missouri | 15 | New Brunswick, Canada | 2 |
| Montana | 6 | Newfoundland and Labrador, Canada | 1 |
| Nebraska | 5 | Nova Scotia, Canada | 2 |
| Nevada | 9 | Ontario, Canada | 27 |
| New Hampshire | 9 | Prince Edward Island, Canada | 1 |
| New Jersey | 70 | Saskatchewan, Canada | 2 |
| New Mexico | 5 | **Total** | **953** |

We lease substantially all of our existing stores. The leases provide for original lease terms that generally range from 10 to 15 years and most leases provide for a series of 5 year renewal options, often at increased rents, the exercise of which is at our sole discretion. We evaluate leases on an ongoing basis which may lead to renegotiated lease provisions, including rent and term duration, or the possible relocation or closing of stores. We have approximately 150 store leases that are up for renewal in 2022, which provide opportunity to evaluate additional store closures and relocations. Certain leases provide for scheduled rent increases (which, in the case of fixed increases, we account for on a straight-line basis over the committed lease term, beginning when we obtain possession of the premises) and/or for contingent rent (based upon store sales exceeding stipulated amounts).

We have distribution facilities, which ship merchandise to stores and customers, totaling approximately 4.4 million square feet, including our first regional distribution center, an approximately one million square foot facility in Frackville, Pennsylvania, which became operational during Fiscal 2021. We also executed a lease for our second regional distribution center in Jurupa Valley, California, which is expected to be operational by late 2022. Ryder Systems, Inc. will operate these two regional distribution centers under a strategic partnership, with the objective of reducing product replenishment times and improving the customer experience.

As of February 26, 2022, we have approximately 704,000 square feet within 9 leased and owned facilities for corporate office functions.

Table of Contents

# ITEM 3 - LEGAL PROCEEDINGS

A putative securities class action was filed on April 14, 2020 against our Company and three of our officers and/or directors (Mark Tritton, Mary Winston (the Company's former Interim Chief Executive Officer) and Robyn D'Elia (the Company's former Chief Financial Officer and Treasurer)) in the United States District Court for the District of New Jersey (the "New Jersey federal court"). The case, which is captioned *Vitiello v. Bed Bath & Beyond Inc., et al.*, Case No. 2:20-cv-04240-MCA-MAH, asserts claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of a putative class of purchasers of our securities from October 2, 2019 through February 11, 2020. The Complaint alleges that certain of our disclosures about financial performance and certain other public statements during the putative class period were materially false or misleading. A similar putative securities class action, asserting the same claims on behalf of the same putative class against the same defendants, was filed on April 30, 2020. That case, captioned *Kirkland v. Bed Bath & Beyond Inc., et al.*, Case No. 1:20-cv-05339-MCA-MAH, is also pending in the United States District Court for the District of New Jersey. On August 14, 2020, the court consolidated the two cases and appointed Kavin Bakhda as lead plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 (as consolidated, the "Securities Class Action"). Lead plaintiff and additional named plaintiff Richard Lipka filed an Amended Class Action Complaint on October 20, 2020, on behalf of a putative class of purchasers of the Company's securities from September 4, 2019 through February 11, 2020. Defendants moved to dismiss the Amended Complaint on December 21, 2020.

After a mediation held in August 2021, a settlement in principle was reached between the Company and lead plaintiff in the Securities Class Action. The settlement has been executed and was preliminarily approved by the New Jersey Federal Court in February 2022. If the settlement is granted final approval, the Securities Class Action will be fully resolved and the matter will be dismissed. The Company has recorded a liability for the Securities Class Action, based on the agreed settlement amount and insurance coverage available.

On July 10, 2020, the first of three related shareholder derivative actions was filed in the New Jersey federal court on behalf of our Company against various present and former directors and officers. The case, which is captioned *Salu v. Tritton, et al.*, Case No. 2:20-cv-08673-MCA-MAH (D.N.J.), asserts claims under §§ 10(b) and 20(a) of the Exchange Act and for breach of fiduciary duty, unjust enrichment, and waste of corporate assets under state law arising from the events underlying the securities class actions described above and from our repurchases of our own shares during the class period pled in the securities cases. The two other derivative actions, which assert similar claims, are captioned *Grooms v. Tritton, et al.*, Case No. 2:20-cv-09610-SDW-RDW (D.N.J.) (filed July 29, 2020), and *Mantia v. Fleming, et al.*, Case No. 2:20-cv-09763-MCA-MAH (D.N.J.) (filed July 31, 2020). On August 5, 2020, the court signed a stipulation by the parties in the *Salu* case to stay that action pending disposition of a motion to dismiss in the Securities Class Action, subject to various terms outlined in the stipulation. The parties in all three derivative cases have moved to consolidate them and to apply the *Salu* stay of proceedings to all three actions. The court granted the motion on October 14, 2020, but the stay was subsequently lifted. On January 4, 2022, the defendants filed a motion to dismiss this case.

On August 28, 2020, another related shareholder derivative action, captioned *Schneider v. Tritton, et al.*, Index No. 516051/2020, was filed in the Supreme Court of the State of New York, County of Kings. The claims pled in the *Schneider* case are similar to those pled in the three federal derivative cases, except that the *Schneider* complaint does not plead claims under the Exchange Act. On September 21, 2020, the parties filed a stipulation seeking to stay that action pending disposition of a motion to dismiss in the securities class action, subject to various terms and conditions.

On June 11, 2021, an additional related derivative action was filed on behalf of the Company against certain present and former directors and officers. This Complaint is entitled *Michael Anthony v Mark Tritton et. al.*, Index No. 514167/2021 and was filed in the Supreme Court of the State of New York, Kings County. The claims are essentially the same as in the other two derivative actions. On October 26, 2021, the court consolidated the Schneider and Anthony actions, and the plaintiffs subsequently filed a consolidated complaint. On January 10, 2022, the defendants filed a motion to dismiss this case.

The derivative cases were not included in the August 2021 settlement referred to above, but after mediation, a settlement in principle was reached subsequent to year-end. The settlement remains subject to documentation and must be approved by the Court.

While no assurance can be given as to the ultimate outcome of these matters, we do not believe that the final resolution will have a material adverse effect on the Company's consolidated financial position, results or liquidity. We are also a party to various legal proceedings arising in the ordinary course of business, which we do not believe to be material to the Company's consolidated financial position, results of operations or liquidity.

Table of Contents

## ITEM 4 - MINE SAFETY DISCLOSURES

Not Applicable.

23

Table of Contents

# PART II

## ITEM 5 - MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED SHAREHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

Our common stock is traded on The Nasdaq Global Select Market under the symbol BBBY.  On March 26, 2022, there were approximately  1,600 shareholders of record of the common stock (without including individual participants in nominee security position listings). On March 26, 2022, the last reported sale price of the common stock was $22.59.

During Fiscal 2016, our Board of Directors authorized a quarterly dividend program. During Fiscal 2021, 2020, and 2019, total cash dividends of $0.7 million, $23.1 million, and $85.5 million were paid, respectively. As a result of the COVID-19 pandemic, in Fiscal 2020 we suspended our quarterly cash dividend payments to support plans to build long-term shareholder value and further strengthen our financial flexibility. Any quarterly cash dividends to be paid in the future are subject to the determination by the Board of Directors, based on an evaluation of our earnings, financial condition and requirements, business conditions and other factors.

Since 2004 through the end of Fiscal 2021, we have repurchased approximately $11.685 billion of our common stock through share repurchase programs. Our purchases of our common stock during the fourth quarter of Fiscal 2021 were as follows:

| Period | Total Number of Shares Purchased (1) | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs (1) | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs (1) (2) |
|---|---|---|---|---|
| November 28, 2021 - December 25, 2021 | 5,386,300 $ | 17.93 | 5,386,300 $ | 1,401,159,241 |
| December 26, 2021 - January 22, 2022 | 2,431,100 $ | 14.26 | 2,431,100 $ | 1,366,479,614 |
| January 23, 2022 - February 26, 2022 | 6,547,200 $ | 15.14 | 6,547,200 $ | 1,267,377,844 |
| Total | 14,364,600 $ | 16.04 | 14,364,600 $ | 1,267,377,844 |

[1] Between December 2004 and April 2021, our Board of Directors authorized, through several share repurchase programs, the repurchase of $12.950 billion of our shares of common stock. We have authorization to make repurchases from time to time in the open market or through other parameters approved by the Board of Directors pursuant to existing rules and regulations. Shares purchased, as indicated in this table, include shares withheld to cover employee related taxes on vested restricted shares, restricted stock units and performance stock unit awards, as well as shares purchased pursuant to accelerated share repurchase agreements. Our share repurchase program could change, and any future share repurchases will be subject to the determination of the Board of Directors, based on an evaluation of our earnings, financial condition and requirements, business and market conditions and other factors, including the restrictions on share repurchases under our secured asset-based revolving credit facility.

[2] Excludes brokerage commissions paid by us, if any.

Table of Contents

**Stock Price Performance Graph**

The graph shown below compares the performance of our common stock with that of the S&P 500 Index, the S&P Retail Composite Index and the S&P 500 Specialty Retail Index over the same period (assuming the investment of $100 in our common stock and each of the three Indexes on February 25, 2017, and the reinvestment of dividends, if any).



Table of Contents

# ITEM 7 - MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

**OVERVIEW**

Bed Bath & Beyond Inc. and subsidiaries (the "Company", "we", "our", "us", or "ourselves") is an omni-channel retailer that makes it easy for our customers to feel at home. We sell a wide assortment of merchandise in the Home, Baby, Beauty & Wellness markets and operate under the names Bed Bath & Beyond, buybuy BABY ("BABY"), and Harmon, Harmon Face Values, or Face Values (collectively, "Harmon"). We also operate Decorist, an online interior design platform that provides personalized home design services. In addition, we are a partner in a joint venture, which operates retail stores in Mexico under the name Bed Bath & Beyond.

We account for our operations as one North American Retail reporting segment. For Fiscal 2020 and 2019, we accounted for our operations as two operating segments: North American Retail and Institutional Sales, the latter of which did not meet the quantitative thresholds under GAAP and, therefore, was not a reportable segment, and which was divested in October 2020.

We are driving a digital-first, omni-always growth strategy and optimizing our digital and physical store channels to provide our customers with a seamless omni-channel shopping experience. Digital purchases, including web and mobile, can be shipped to a customer from our distribution facilities, directly from vendors, or from a store. Store purchases are primarily fulfilled from that store's inventory or may also be shipped to a customer from one of our distribution facilities, from a vendor, or from another store. Customers can also choose to pick up orders using our BOPIS and contactless Curbside Pickup services, as well as return online purchases to a store. Customers can also make purchases through one of our customer contact centers and in-store through The Beyond Store, our proprietary web-based platform. These capabilities allow us to better serve our customers across various channels.

Across our banners, we carry a wide variety of domestics and home furnishings merchandise. Domestics merchandise includes categories such as bed linens and related items, bath items and kitchen textiles. Home furnishings include categories such as kitchen and tabletop items, fine tabletop, basic housewares, general home furnishings (including furniture and wall décor), consumables and certain juvenile products.

*Business Transformation and Restructuring*

Since 2019, we have undertaken significant changes to transform our business and adapt to the dynamic retail environment and the evolving needs of our customers in order to position ourselves for long-term success. As part of these changes, our management team, led by President and Chief Executive Officer (CEO) Mark Tritton, has been focused on driving an omni-always, customer-inspired strategy to re-establish our authority in the Home, Baby, Beauty & Wellness markets. We have created a more focused portfolio through the divestiture of non-core assets and further strengthened our financial flexibility through key actions such as corporate restructurings and operating expense control to re-set our cost structure and support our ongoing business transformation.

We are implementing a growth strategy that will harness the power of data and insights to engage customers across our four core banners (Bed Bath & Beyond, buybuy BABY, Harmon and Decorist) in an enterprise-wide plan to accelerate our omni-channel transformation. Our strategy is underpinned by five key pillars of strategic focus and investment: product, price, promise, place and people. Through this approach, we are becoming a digital-first, customer-focused omni-channel retailer with a more curated, inspirational and differentiated product collection across categories, and creating a more convenient and inspirational shopping experience.

In March 2021, we announced our plan to introduce at least eight new Owned Brands during Fiscal 2021. During Fiscal 2021 the following Owned Brands were launched:

| First Quarter | Second Quarter | Third Quarter |
|---|---|---|
| Nestwell™ | Our Table™ | Studio 3B™ |
| Haven™ | Wild Sage™ | H For Happy™ |
| Simply Essential™ | Squared Away™ | |

Table of Contents

The assortment for these Owned Brands includes thousands of new products across our key destination categories of Bed, Bath, Kitchen Food Prep, Home Organization and Indoor Decor. We also continue to redefine certain of our existing Owned Brands, such as Bee & Willow™ and Marmalade™, including new brand imagery and packaging as well as refined product assortment and presentation.

We will continue to build on this strong foundation as we execute our three-year growth strategy to further elevate the shopping experience, modernize our operations and unlock strong and sustainable shareholder value.

As part of our business transformation plan, we are also pursuing a comprehensive cost restructuring program, to drive improved financial performance. We expect to reinvest a portion of the expected cost savings into future growth initiatives. Key components of the expected financial improvement include:

•Approximately $100 million in annual savings from our previously disclosed store fleet optimization program which included the planned closure of approximately 200 mostly Bed Bath & Beyond stores. This program was largely completed by February 26, 2022. During Fiscal 2021, we closed 63 stores (bringing the total store closures to 207 since the program's inception). We continue to believe that our physical store channel is an asset for our transformation into a digital-first company, especially with new omni-fulfillment capabilities in BOPIS, Curbside Pickup, Same Day Delivery and fulfill-from-store.

•Approximately $200 million in annual savings from product sourcing, through renegotiations with existing vendors.

•Approximately $100 to $150 million in annual selling, general and administrative expense savings from continued optimization of our corporate overhead cost structure and reductions in other discretionary expense. During the second quarter of Fiscal 2020, we implemented a workforce reduction of approximately 2,800 roles from across our corporate headquarters and retail stores, designed to further reduce layers at the corporate level, significantly reposition field operations to better serve customers in a digital-first environment and realign our technology, supply chain and merchandising teams to support our strategic growth initiatives.

•In the fourth quarter of Fiscal 2021, we announced that we are pursuing additional expense optimization measures of approximately $100 million annualized that will explore areas such as additional store fleet optimization, fixed costs and discretionary savings opportunities.

In connection with the above restructuring and transformation initiatives, during Fiscal 2021, we recorded total expense of $281.2 million including $137.2 million in cost of sales, primarily associated with the transition of our product assortment to Owned Brands and, to a lesser extent, to redefine certain existing Owned Brands, as well as $144.0 million in restructuring and transformation initiative expenses for costs associated with our planned store closures as part of the store fleet optimization program and other transformation initiatives. We also recorded impairment charges of approximately $36.5 million, primarily related to store assets. At this point, we are unable to estimate the amount or range of amounts expected to be incurred in connection with future restructuring and transformation initiatives, including additional Owned Brand introductions and further store closures, and will provide such estimates as they become available.

Additionally, as part of these efforts, we completed the divestitures of the following banners:

•In December 2020, we entered into a definitive agreement to sell Cost Plus World Market to Kingswood Capital Management.

•In October 2020, we entered into definitive agreements to sell Christmas Tree Shops ("CTS") to Handil Holdings LLC.

•In October 2020, we entered into a definitive agreement to sell Linen Holdings to The Linen Group, LLC, an affiliate of Lion Equity Partners.

•In February 2020, we entered into a definitive agreement to sell PersonalizationMall.com ("PMall") to 1-800-FLOWERS.COM.

•During the first quarter of Fiscal 2020, we also sold One Kings Lane to a third party.

Table of Contents

The net proceeds from these transactions have been reinvested in our core business operations to drive growth, fund share repurchases and reduce our outstanding debt.

During Fiscal 2021, we recognized a charge of approximately $18.2 million in loss on sale of businesses in the consolidated statement of operations, primarily associated with the Fiscal 2021 settlement of the CTS pension plan (see "Employee Benefit Plans," Note 11 to the accompanying consolidated financial statements) and certain working capital and other adjustments related to the above divestitures. During Fiscal 2020, we recognized a loss of approximately $1.1 million on the sale of businesses related to certain of the above divestitures.

***Executive Summary***

The following represents a summary of key financial results and related business developments for the periods indicated:
•Net sales for Fiscal 2021 were $7.868 billion, a decrease of approximately 14.8% as compared with Fiscal 2020.

•Excluding the impact of the business divestitures described above, which represented net sales of $1.290 billion for Fiscal 2020, net sales for our four core banners for Fiscal 2021 decreased by approximately 1% compared with Fiscal 2020.

•During Fiscal 2021, we continued to execute against key initiatives under our transformation program, including:

•*Owned Brands.* We launched eight new Owned Brands, under which there are thousands of new products across our key Destination Categories of Bed, Bath, Kitchen Food Prep, Home Organization and Indoor Decor.

| First Quarter | Second Quarter | Third Quarter |
|---|---|---|
| Nestwell™ | Our Table™ | Studio 3B™ |
| Haven™ | Wild Sage™ | H For Happy™ |
| Simply Essential™ | Squared Away™ | |

•*New York City Flagship Renovation.* We completed the renovation of our Bed Bath & Beyond flagship store in New York City, which reopened in July 2021 after undergoing a complete transformation since closing in December 2020. The renovated flagship store is an expression of the new Bed Bath & Beyond, with a significant focus on our five core destination categories of bed, bath, kitchen & dining, indoor décor and organization.
◦*Omni-Channel Capabilities.* We continued our focus on being a digital-first, omni-always retailer:
▪We announced separate partnerships with DoorDash and Uber to provide on-demand delivery of essential homeware products and items from more than 700 Bed Bath & Beyond locations and nearly 120 BABY locations nationwide**.**
▪In November 2021, we launched our new digital marketplace to build on our existing authority in key Home & Baby categories, with an assortment of products from a highly curated selection of third-party brand partners that will be integrated into our digital platform.
▪In November 2021, we announced a strategic collaboration to directly offer Kroger customers an extensive selection of the most sought-after goods for the Home & Baby products carried by the Bed Bath & Beyond and buybuy BABY banners through Kroger.com as well as a small-scale physical store pilot at select Kroger Family of Companies stores beginning in Fiscal 2022.

•*Additional Product Initiatives.* Our Bed Bath & Beyond banner launched the ***Home, Happier Team***, the brand's first-ever curated advisory panel of industry experts who will serve as "host and hostesses of the home," providing ideas, innovative solutions and compelling content to help customers personalize their living spaces and make it easy to feel at home. Our buybuy BABY banner introduced its "**welcome to parenthood**" program in-store and online through educational resources, reimagined shopping experiences, a revised registry, new digital offerings and a new marketing campaign to inspire customers to embrace every aspect of parenthood. Additionally, we announced key partnerships with Casper Sleep Inc. (including a first branded shop-in shop in our New York City flagship store), and with Safely™, an eco-friendly line of home care and cleaning products which made its retail debut exclusively in Bed Bath & Beyond, buybuy BABY and Harmon stores nationwide.

•*Supply Chain Transformation.* In the second half of Fiscal 2021, we started operations at our first regional distribution center, an approximately one million square foot facility in Frackville, Pennsylvania, and executed a lease for our second regional distribution center in Jurupa Valley, California, which is expected to be operational by late 2022. Ryder

Table of Contents

Systems, Inc. will operate these two regional distribution centers under a strategic partnership, with the objective of reducing product replenishment times and improving the customer experience.

•*Store Fleet Optimization.* We continue to believe that our physical store channel is an asset for our transformation into a digital-first company, especially with omni-fulfillment capabilities in BOPIS, Curbside Pickup, Same Day Delivery and fulfill-from-store. During Fiscal 2021:
◦We commenced renovations on approximately 130 stores, of which approximately 80 were completed, to bring the expression of the new Bed Bath & Beyond to our customers in many of our markets.
◦We largely completed the planned optimization of our store fleet through the closure of 63 mostly Bed Bath & Beyond stores during Fiscal 2021, bringing total store closures for the overall program to 207 as of February 26, 2022.

We plan to continue to actively manage our real estate portfolio to permit store sizes, layouts, locations and offerings to evolve over time to optimize market profitability and to renovate, remodel or reposition stores within markets as appropriate.

•In connection with these restructuring and transformation initiatives, during Fiscal 2021, we recorded total expense of $281.2 million including $137.2 million in cost of sales and $144.0 million in restructuring and transformation initiative expenses in the consolidated statement of operations, as well as $36.5 million of impairments and $18.2 million of losses on sales of businesses.

•During Fiscal 2021, we announced plans to complete our $1 billion three-year repurchase plan by the end of Fiscal 2021, which was two years ahead of schedule. During Fiscal 2021, we repurchased approximately 27.7 million shares of our common stock under the share repurchase plan approved by our Board of Directors, at a total cost of approximately $574.9 million, which combined with the accelerated share repurchase programs entered into in Fiscal 2020 totaling $375.0 million, resulted in the repurchase of $950.0 million shares under this plan as of February 26, 2022. An additional approximately $40.0 million was repurchased in March of 2022.

•Net loss for Fiscal 2021 was $559.6 million, or $5.64 per diluted share, compared with net loss of $150.8 million, or $1.24 per diluted share, for Fiscal 2020. Net loss for Fiscal 2021 included a net unfavorable impact of $4.66 per diluted share associated with restructuring and other transformation initiatives, non-cash impairments, loss on sale of business and loss on debt extinguishment, as well as the impact of recording a valuation allowance against the Company's U.S. federal and state deferred tax assets (see "Provision for Income Taxes," Note 8 to the accompanying consolidated financial statements). Net loss for Fiscal 2020 included a net unfavorable impact of $0.23 per diluted share associated with the loss on sale of business, non-cash impairments and charges recorded in connection with the restructuring program and transformation initiatives offset by a gain on extinguishment of debt and decrease in the incremental inventory reserve for future markdowns recorded in Fiscal 2019, as well as the associated tax effects.

### Impact of the COVID-19 Pandemic

In March 2020, the World Health Organization declared the COVID-19 outbreak a global pandemic. That same month, as a result of the COVID-19 pandemic, we began to temporarily close certain store locations that did not have a health and personal care department, and as of March 23, 2020, all of our retail stores across the U.S. and Canada were temporarily closed except for most stand-alone buybuy BABY and Harmon stores, subject to state and local regulations. In May 2020, we announced a phased approach to re-open our stores in compliance with relevant government directives, and as of the end of July 2020, nearly all of our stores re-opened. During portions of Fiscal 2021, a limited number of stores in Canada either closed temporarily or continued to operate under restrictions in compliance with local governmental orders. As of February 26, 2022, all of our stores were operating without restriction subject to compliance with applicable mask and vaccine requirements.

The COVID-19 pandemic materially adversely impacted our results of operations and cash flows for Fiscal 2021. We are continuing to closely monitor the impact of the COVID-19 pandemic on our business, results of operations, and financial results, as numerous significant uncertainties continue to surround the pandemic and its ultimate impact on us, including but not limited to:

•the timing and extent of recovery in consumer traffic and spending;

•potential delays, interruptions and disruptions in our supply chain, including higher freight charges;

•labor shortages, wage pressures and competition for talent;

Table of Contents

•the extent of dissemination and public acceptance of COVID-19 vaccines and their effectiveness against COVID-19 and its evolving strains, some of which may be more transmissible or virulent than the initial strain;

•additional widespread resurgences in COVID-19 infections; and

•evolving safety protocols such as requirements for proof of vaccination or regular testing in certain of our markets.

Further discussion of the risks and uncertainties posed by the COVID-19 pandemic is included in "Risk Factors" under "Part I, Item 1A" of this Form 10-K.

**RESULTS OF OPERATIONS**

The fiscal years discussed below were each comprised of 52 weeks.

*Net Sales*

| (in millions) | Fiscal Year Ended | | | Change from Prior Year | | | |
| | February 26, 2022 | February 27, 2021 | February 29, 2020 | February 26, 2022 | | February 27, 2021 | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Net sales | $ 7,867.8 | $ 9,233.0 | $ 11,158.6 | $ (1,365.2) | (14.8)% | $ (1,925.6) | (17.3)% |
| | | | | | | | |
| Sales from divested banners | - | 1,290.1 | 2,151.1 | (1,290.1) | (100.0)% | (861.0) | (40.0)% |

Excluding the impact of the divestitures described above, which represented net sales of $1.290 billion for Fiscal 2020, net sales for our four core banners for Fiscal 2021 decreased by approximately 1% compared with Fiscal 2020, as net sales improvements in the first half of Fiscal 2021, including due to the impact of the COVID-19 pandemic in the first quarter of 2020, were offset by the impact of traffic declines and the supply chain disruptions in the second half of the year. Store closures as part of our store fleet optimization program also contributed to the decline in sales from Fiscal 2020 to Fiscal 2021.

The decrease in net sales for Fiscal 2020 was primarily due to the impact of the COVID-19 pandemic during the first quarter of Fiscal 2020, as well as the impact of our transformation initiatives, primarily our store fleet optimization program and the business divestitures described above (see Business Transformation and Restructuring).

During Fiscal 2021, Fiscal 2020 and Fiscal 2019, net sales consummated through digital channels represented approximately 37%, 38% and 17%, respectively, of our sales. Sales consummated on a mobile device while physically in a store location and BOPIS orders are recorded as customer facing digital channel sales. Customer orders taken in-store by an associate through The Beyond Store, our proprietary, web-based platform, are recorded as in-store sales. Prior to implementation of BOPIS and contactless Curbside Pickup services, customer orders reserved online and picked up in a store were recorded as in-store sales. Sales originally consummated from customer facing digital channels and subsequently returned in-store are recorded as a reduction of in-store sales.

As a result of the extended closure of the majority of our stores in the first quarter and in June of Fiscal 2020 due to the COVID-19 pandemic and our policy of excluding extended store closures from our comparable sales calculation, we believe that comparable sales* was not a meaningful metric for the first quarter of Fiscal 2020 as well as for the month of June in Fiscal 2020 and, therefore, are not a meaningful metric for Fiscal 2021 and Fiscal 2020.

* Comparable sales normally include sales consummated through all retail channels that have been operating for twelve full months following the opening period (typically six to eight weeks), excluding the impact of store fleet optimization program. We are an omni-channel retailer with capabilities that allow a customer to use more than one channel when making a purchase, including in-store, online, with a mobile device or through a customer contact center, and have it fulfilled, in most cases, either through in-store customer pickup or by direct shipment to the customer from one of our distribution facilities, stores or vendors.

Our comparable sales metric considers sales consummated through all retail channels - in-store, online, with a mobile device or through a customer contact center. Our omni-channel environment allows our customers to use more than one channel when making a purchase. We believe in an integrated and seamless customer experience. A few examples are: a customer may be assisted by an in-store associate to create a wedding or baby registry, while the guests may ultimately purchase a gift from our websites; or a customer may research a particular item, and read other customer reviews on our websites before visiting a store to consummate the actual purchase; or a customer may buy an item online for in-store or curbside pickup; or while in a store, a

Table of Contents

customer may make the purchase on a mobile device for in home delivery from either a distribution facility, a store or directly from a vendor. In addition, we accept returns in-store without regard to the channel in which the purchase was consummated, therefore resulting in reducing store sales by sales originally consummated through customer facing digital channels. As our retail operations are integrated and we cannot reasonably track the channel in which the ultimate sale is initiated, we can however, provide directional information on where the sale was consummated.

Sales of domestics merchandise accounted for approximately 37.4%, 34.7%, and 35.2%, of net sales in Fiscal 2021, 2020 and 2019, respectively. Sales of home furnishings accounted for approximately 62.6%, 65.3% and 64.8% of net sales, respectively, for Fiscal 2021, 2020, and 2019.

*Gross Profit*

| (in millions) | Fiscal Year Ended | | | Change from Prior Year | | | | |
|---|---|---|---|---|---|---|---|---|
| | February 26, 2022 | February 27, 2021 | February 29, 2020 | February 26, 2022 | | | February 27, 2021 | |
| Gross profit | $ 2,483.5 | $ 3,118.1 | $ 3,541.7 | $ (634.6) | (20.4)% | $ | (423.6) | (12.0)% |
| Gross profit percentage | 31.6% | 33.8% | 31.7% | (2.2)% | (6.5)% | | 2.1% | 6.6% |

Gross profit in Fiscal 2021 was negatively impacted by markdown activity associated with inventory being removed from our assortment in connection with the launches of new Owned Brands and, to a lesser extent, the redefinition of certain existing Owned Brands, as well as markdown activity associated with store closures as part of our store fleet optimization program. Gross profit for Fiscal 2021 included the impact of charges of $137.2 million for these higher markdowns on inventory sold, as well as an adjustment to reduce the cost of inventory on hand to be removed from the product assortment as part of these initiatives to its estimated realizable value. In addition, higher freight expenses, both for inbound product shipments and direct-to-customer fulfillment and in part due to industry wide, global supply chain challenges, negatively impacted gross margin in Fiscal 2021 compared with Fiscal 2020, which offset the favorable impact of a shift in product assortment toward new Owned Brands and a more normalized mix of digital sales.

The increase in the gross margin between Fiscal 2020 and Fiscal 2019 was primarily attributable to a shift in product mix and the leverage of distribution and fulfillment costs, partially offset by the impact of channel mix, including higher net-direct-to-customer shipping expense. In addition, our gross margin for Fiscal 2020 included the impact of a net benefit of $20.2 million from the reduction of incremental markdown reserves taken in Fiscal 2019, partially offset by restructuring and transformation initiatives.

Table of Contents

*Selling, General and Administrative Expenses*

| (in millions) | Fiscal Year Ended | | | | | Change from Prior Year | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | February 26, 2022 | | February 27, 2021 | | February 29, 2020 | | February 26, 2022 | | February 27, 2021 |
| Selling, general and administrative expenses | $ | 2,692.3 | $ | 3,224.4 | $ | 3,732.5 | $ (532.1) | (16.5)% $ | (508.1) | (13.6)% |
| As a percentage of net sales | | 34.2% | | 34.9% | | 33.4% | (0.7)% | (2.0)% | 1.5% | 4.5% |

The decrease in SG&A expenses for Fiscal 2021 was primarily attributable to cost reductions resulting from our transformation initiatives, including reductions in corporate overhead, divestitures of non-core assets and lower rent and occupancy expenses as a result of our store fleet optimization program. The decrease in SG&A expenses as a percentage of net sales for Fiscal 2021 was also largely due to the factors above, as well as the de-leveraging effect caused by sales declines in Fiscal 2020 as a result of the COVID-19 pandemic.

For Fiscal 2020, the increase was primarily attributable to increases in fixed costs such as rent and occupancy and depreciation, and consulting costs related to our strategic initiatives, partially offset by decreases in payroll and payroll-related expenses and advertising.

In addition, during Fiscal 2021 and Fiscal 2020, we recorded credits of approximately $7.8 million and $33.3 million, respectively, as an offset to SG&A expenses as a result of the employee retention credits made available under the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") for U.S. employees and under the Canada Emergency Wage Subsidy for Canadian employees.

*Goodwill and Other Impairments*

Goodwill and other impairments were $36.5 million for Fiscal 2021, $127.3 million in Fiscal 2020 and $509.2 million in Fiscal 2019. For Fiscal 2021, impairment charges included $30.8 million related to certain store-level assets (including leasehold improvements and operating lease assets) and tradename impairments of $5.7 million. For Fiscal 2020, impairment charges included $92.9 million related to certain store-level assets (including leasehold improvements and operating lease assets) and tradename impairments of $35.1 million. For Fiscal 2019, impairment charges included goodwill impairments of $391.1 million (primarily as the result of a sustained decline in our market capitalization), tradename impairments of $41.8 million, long-lived assets impairments of $75.1 million and other impairments of $1.2 million.

*Restructuring and Transformation Initiative Expenses*

During Fiscal 2021 and Fiscal 2020, we recorded charges of $144.0 million and $102.2 million, respectively, in connection with our restructuring and transformation initiatives. In Fiscal 2021, these charges were primarily for costs associated with the store fleet optimization program described above, including for the termination of facility leases, as well as technology transformation and business strategy and operating model transformation programs across core functions, including merchandising, supply chain and finance. In Fiscal 2020, these costs primarily related to severance costs recorded in connection with our workforce reduction and store fleet optimization programs as well as other restructuring activities (see "Restructuring and Transformation Activities," Note 3 to the accompanying consolidated financial statements).

Table of Contents

*Loss on Sale of Businesses*

During Fiscal 2021, we recognized approximately $18.2 million in loss on sale of businesses in the consolidated statement of operations, primarily related to a $13.5 million charge associated with the Fiscal 2021 settlement of the CTS pension plan (see "Assets Held for Sale and Divestitures," Note 16 to the accompanying consolidated financial statements), as well as certain working capital and other adjustments related to the Fiscal 2020 divestitures. During Fiscal 2020, we recognized a loss of approximately $1.1 million on the sale of businesses related to these divestitures discussed above (see Business Transformation and Restructuring).

*Operating Loss*

| (in millions) | Fiscal Year Ended | | | | | Change from Prior Year | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | February 26, 2022 | | February 27, 2021 | | February 29, 2020 | February 26, 2022 | | February 27, 2021 | |
| Operating Loss | $ | (407.6) | $ | (336.9) | $ | (700.1) | $ | (70.7) | 21.0% | $ | 363.2 | (51.9)% |
| As a percentage of net sales | | (5.2)% | | (3.6)% | | (6.3)% | | (1.6)% | 44.4% | | 2.7% | (42.9)% |

Operating loss for Fiscal 2021 included the impact of pre-tax charges of $137.2 million included in gross profit primarily associated with the transition of our product assortment to Owned Brands and, to a lesser extent, our store fleet optimization program, as well as $144.0 million associated with restructuring and other transformation initiatives, $36.5 million for non-cash impairments and $18.2 million for loss on sale of business (each as described above). The change in operating loss as a percentage of net sales between Fiscal 2021 and 2020 was primarily due to the decline in gross margin, as discussed above, as well as higher restructuring and transformation expenses in Fiscal 2021 compared to Fiscal 2020.

The favorable change in operating loss as a percentage of net sales between Fiscal 2020 and Fiscal 2019 was primarily due to an increase in the gross margin, lower goodwill and other impairments compared to the prior year period, partially offset by increased SG&A expenses and restructuring and transformation initiative expenses as well as the impact of reductions of net sales, which reflected the impact of the temporary nationwide closure of the majority of our stores due to COVID-19, nearly all of which reopened as of July 2020, and of the divestitures discussed above (see Business Transformation and Restructuring).

*Interest Expense, net*

Interest expense, net was $64.7 million, $76.9 million, and $64.8 million in Fiscal 2021, 2020, and 2019, respectively. The decrease in Fiscal 2021 interest expense, net was primarily driven by decreased interest costs attributable to our revolving credit facilities and the impact of the repurchase of a portion of our senior unsecured notes in Fiscal 2020. For Fiscal 2020, the increase in interest expense, net was primarily driven by lower interest income on investments and increased interest costs attributable to our revolving credit facilities, primarily relating to the ABL Facility entered into in Fiscal 2020, partially offset by lower interest costs for our senior unsecured notes, primarily related to the repurchase of a portion of the senior unsecured notes in August 2020. For Fiscal 2019, interest expense, net primarily related to interest on the senior unsecured notes issued in July 2014.

*(Loss) Gain on Extinguishment of Debt*

During Fiscal 2021, we recorded a $0.4 million loss on the partial repayment of senior unsecured notes. During Fiscal 2020, we recorded a $77 million gain on the repurchase of $75 million principal amount of 4.915% senior unsecured notes due August 1, 2034 and $225 million principal of 5.165% senior unsecured notes due August 1, 2044 (see "Long Term Debt," Note 7 to the accompanying consolidated financial statements).

*Income Taxes*

The effective tax rate was (18.4)% for Fiscal 2021, 55.2% for Fiscal 2020, and 19.7% for Fiscal 2019.

For Fiscal 2021, the effective tax rate reflects the recording of a valuation allowance against our U.S federal and state deferred tax assets (discussed below), as well as a benefit resulting from an adjustment to the estimated net operating loss incurred in Fiscal 2020 which was carried back, under the provisions of the CARES Act, to a year in which the tax rate was 35%.

33

Table of Contents

For Fiscal 2020, the effective tax rate reflected the carry back of the net operating loss to a year in which the tax rate was 35% under the CARES Act, and included the impact of the benefit of certain tax planning strategies the Company deployed, in addition to the losses from the divestitures of CTS, Linen Holdings and Cost Plus, partially offset by the impact of impairment charges for tradename and certain store-level assets, the gain on the divestiture of PMall, a benefit related to the carry back of the Fiscal 2019 net operating loss under the CARES Act, and other discrete tax items resulting in net after tax benefits.

For Fiscal 2019, the effective tax rate reflected the impact of charges, portions of which are non-deductible for tax purposes, for goodwill and other impairments, an incremental charge for markdowns, severance costs, shareholder activity costs and a loss from a sale-leaseback transaction, including transaction costs.

In assessing the recoverability of our deferred tax assets, we evaluated the available objective positive and negative evidence to estimate whether it is more likely than not that sufficient future taxable income will be generated to permit use of existing deferred tax assets in each taxpaying jurisdiction. A valuation allowance is a non-cash charge, and does not limit our ability to utilize our deferred tax assets, including our ability to utilize tax loss and credit carryforward amounts, against future taxable income.

During Fiscal 2021, we concluded that, based on our evaluation of available objective positive and negative evidence, it is no longer more likely than not that our net U.S. federal and state deferred tax assets are recoverable. In assessing the realizability of deferred tax assets, the key assumptions used to determine positive and negative evidence included our cumulative taxable loss for the past three years, current trends related to actual taxable earnings or losses, and expected future reversals of existing taxable temporary differences, as well as timing and cost of our transformation initiatives and their expected associated benefits. Accordingly, we recorded a charge of $181.5 million in the third quarter of Fiscal 2021 as a reserve against our net U.S. federal and state deferred tax assets. As of February 26, 2022, the total valuation allowance relative to U.S. federal and state deferred tax assets was $224.3 million.

The amount of the deferred tax assets considered realizable, and the associated valuation allowance, could be adjusted in a future period if estimates of future taxable income change or if objective negative evidence in the form of cumulative losses is no longer present and additional weight is given to subjective evidence such as projections for future growth.

On March 27, 2020, the CARES Act was enacted in the United States, which provided for certain changes to tax laws which impacted our results of operations, financial position and cash flows. We implemented certain provisions of the CARES Act, such as deferring employer payroll taxes and utilizing the ability to carry back and deduct losses to offset prior income in previously filed tax returns. As of February 27, 2021, the Company had deferred $3.1 million of employer payroll taxes, which were deposited by December 2021. As of February 26, 2022 and February 27, 2021, under the CARES Act, we recorded income tax benefits of $18.7 million and $152.0 million, respectively, as a result of the Fiscal 2020 and Fiscal 2019 net operating losses were carried back to prior years during which the federal tax rate was 35%.

For Fiscal 2021, 2020, and 2019, the effective tax rate included net benefit of approximately $6.0 million, net benefit of approximately $2.1 million, and net expense of approximately $4.3 million, respectively, due to the recognition of discrete federal and state tax items.

Potential volatility in the effective tax rate from year to year may occur as we are required each year to determine whether new information changes our assessment of both the probability that a tax position will effectively be sustained and the appropriateness of the amount of recognized benefit.

*Net Loss*

As a result of the factors described above, the net loss for Fiscal 2021, 2020, and 2019, was $559.6 million, $150.8 million, and $613.8 million, respectively.

**LIQUIDITY AND CAPITAL RESOURCES**

We ended Fiscal 2021 in a solid cash and liquidity position, which we anticipate maintaining, to provide us the flexibility to fund our ongoing initiatives and act upon other opportunities that may arise. As of February 26, 2022, we had approximately $439.5 million in cash and cash equivalents, a decrease of approximately $913.5 million as compared with February 27, 2021, which included $589.4 million for share repurchases. We believe that existing and internally generated funds, as well as availability under our existing credit facilities, will be sufficient to continue to finance our operations for the next twelve months. If necessary, we have the ability to borrow under our ABL Facility, which matures on August 9, 2026. Our ability to borrow under the ABL Facility is subject to customary conditions, including no default, the accuracy of representations and warranties and borrowing

Table of Contents

base availability. Borrowing base availability under the ABL Facility is based upon a specified borrowing base consisting of a percentage of our eligible inventory and credit card receivables as defined in the ABL Facility, net of applicable reserves (see "Long Term Debt," Note 7 to the accompanying consolidated financial statements). As of February 26, 2022, the Company had no loans outstanding and had outstanding letters of credit of $96.4 million under the ABL Facility.

In Fiscal 2020, similar to other retailers, we withheld portions of and/or delayed payments to certain of our business partners as we sought to renegotiate payment terms, in order to further maintain liquidity during the period of temporary store closures. In some instances, the renegotiations of lease terms have led to agreements with landlords for rent abatements or rental deferrals. Total payments withheld and/or delayed or deferred as of February 26, 2022 were approximately $1.9 million and are included in current liabilities. During Fiscal 2021, we recognized reduced rent expense of $2.7 million related to rent abatement concessions. Additional negotiations of payment terms are still in process, and there can be no assurance that we will be able to successfully renegotiate payment terms with all such business partners, and the ultimate outcome of these activities including the responses of certain business partners are not yet known. We are also executing on our business transformation program, which includes the closure, as of February 26, 2022, of 207 mostly Bed Bath & Beyond stores under our store fleet optimization program and the introduction of new Owned Brand products in a number of categories.

Our liquidity may continue to be negatively impacted by the uncertainty regarding the spread of COVID-19 and the timing of economic recovery (see "Item 1A - Disruptions in the financial markets could have a material adverse effect on the Company's ability to access our cash and cash equivalents").

*Capital Expenditures*

Capital expenditures for Fiscal 2021 were $354.2 million, and for Fiscal 2022 are projected to be approximately $390.0 million to $410.0 million. Our capital expenditures in Fiscal 2021 were related to digital and omni-channel capabilities, store remodels and investments in technology across a number of areas including supply chain, merchandising and finance.

We continue to review and prioritize our capital needs and remain committed to making the required investments in our infrastructure to help position us for continued growth and success. Key areas of investment include: continuing to improve the presentation and content as well as the functionality, general search and navigation across our customer facing digital channels; improving customer data integration and customer relations management capabilities; continuing to enhance service offerings to our customers; continuing to strengthen and deepen our information technology, analytics, marketing, e-commerce, merchandising and finance capabilities; and creating more flexible fulfillment options designed to improve our delivery capabilities and lower our shipping costs. These and other investments are expected to, among other things, provide a seamless and compelling customer experience across our omni-channel retail platform.

*Stock Repurchases*

During Fiscal 2021, we repurchased approximately 28.3 million shares of our common stock, at a total cost of approximately $589.4 million, which included approximately 27.7 million shares at a total cost of approximately $574.9 million repurchased under our share repurchase programs as authorized by our Board of Directors, as well as approximately 0.6 million shares, at a total cost of approximately $14.5 million to cover employee related taxes withheld on vested restricted stock, restricted stock unit awards and performance stock unit awards.

During Fiscal 2021, we announced that we intended to complete our $1 billion three-year share repurchase plan two years ahead of schedule. The repurchases made during Fiscal 2021 of $574.9 million, combined with the accelerated share repurchase programs entered into in Fiscal 2020 totaling $375.0 million (discussed below), resulted in the repurchase of $950.0 million under this plan as of February 26, 2022. An additional approximately $40.0 million was repurchased in March of 2022.

In the first quarter of Fiscal 2020, the Company had postponed share repurchases, but lifted this postponement in October 2020. In October 2020, the Company entered into an accelerated share repurchase agreement with JPMorgan Chase Bank, National Association to repurchase $225.0 million of its common stock, subject to market conditions, which settled in the fourth quarter of Fiscal 2020, resulting in the repurchase of a total of 10.8 million shares. In January 2021, the Company entered into a second accelerated share repurchase agreement to repurchase an aggregate $150.0 million of its common stock, subject to market conditions. This resulted in the repurchase of 5.0 million shares in the fourth quarter of Fiscal 2020, and an additional 0.2 million shares received upon final settlement in the first quarter of Fiscal 2021. During Fiscal 2020, the Company also repurchased approximately 0.6 million shares of its common stock, at a total cost of approximately $5.1 million, to cover employee related taxes withheld on vested restricted stock, restricted stock unit awards and performance stock unit awards.

Table of Contents

Between December 2004 and April 2021, the Company's Board of Directors authorized, through several share repurchase programs, the repurchase of $12.950 billion of its shares of common stock. Since 2004 through the end of Fiscal 2021, the Company has repurchased approximately $11.685 billion of its common stock through share repurchase programs. The Company also acquires shares of its common stock to cover employee related taxes withheld on vested restricted stock, restricted stock units and performance stock unit awards. Since the initial authorization in December 2004, the aggregate total of common stock repurchased is approximately 262.2 million shares for a total cost of approximately $11.685 billion. The Company had approximately $1.267 billion remaining of authorized share repurchases as of February 26, 2022.

Decisions regarding share repurchases are within the discretion of the Board of Directors, and are influenced by a number of factors, including the price of our common stock, general business and economic conditions, our financial condition and operating results, the emergence of alternative investment or acquisition opportunities, changes in business strategy and other factors. Our share repurchase program could change, and could be influenced by several factors, including business and market conditions, such as the impact of the COVID-19 pandemic on our business operations or stock price. We review our alternatives with respect to our capital structure on an ongoing basis. Any future share repurchases will be subject to the determination of the Board of Directors, based on an evaluation of our earnings, financial condition and requirements, business conditions and other factors, including the restrictions on share repurchases under the ABL Facility (see "Long Term Debt," Note 7 to the accompanying consolidated financial statements).

*Debt Repurchases*

During Fiscal 2021 we purchased approximately $11.0 million aggregate principal amount of our outstanding 3.749% senior unsecured notes due August 1, 2024. During Fiscal 2020, we purchased approximately $300.0 million aggregate principal amount of our outstanding 4.915% Senior Notes due 2034 and 5.165% Senior Notes due 2044.

*Cash flow from operating activities*

Net cash provided by operating activities for Fiscal 2021 was $17.9 million, compared with net cash provided by operating activities of $268.1 million in Fiscal 2020. The year-over-year change in operating cash flow was primarily due to higher net loss, adjusted for non-cash expenses, which included the impact of higher restructuring and transformation expenses in Fiscal 2021, as well as investments in inventory, including as a result of changing the timing of purchasing in response to the potential impact of global supply chain disruptions on timing of inventory receipts and availability of product in our stores and on our websites, and lower accounts payable, due primarily to timing of payments for merchandise, and accrued liabilities, including lower incentive compensation accruals. There were partially offset by a decrease in other current assets primarily due to the receipt of income tax refunds in Fiscal 2021. For Fiscal 2020, the decrease in cash provided by operating activities was primarily due to the net decrease in cash provided by components of working capital (primarily merchandise inventories and other current assets, partially offset by accounts payable). This decrease was partially offset by a decrease in net loss, adjusted for non-cash expenses.

Retail inventory, which includes inventory in our distribution facilities for direct to customer shipments, was approximately $1.725 billion at February 26, 2022, an increase of 3.2% compared with retail inventory at February 27, 2021. We continue to focus on our inventory optimization strategies while also responding to the potential impact of global supply chain disruptions on product availability. Retail inventory at February 27, 2021 decreased approximately 18.0% compared to retail inventory at February 29, 2020, which was primarily related to the Fiscal 2020 divestitures.

*Cash flow from investing activities*

Net cash used in investing activities for Fiscal 2021 was $349.2 million, compared with net cash provided by investing activities of $737.9 million in Fiscal 2020. For Fiscal 2021, net cash used in investing activities included $354.2 million of capital expenditures. For Fiscal 2020, net cash provided by investing activities was comprised of $386.5 million of redemptions of investment securities and $534.5 million in proceeds from the sale of PMall, CTS and Linen Holdings businesses, partially offset by $183.1 million of capital expenditures.

*Cash flow from financing activities*

Net cash used in financing activities for Fiscal 2021 was $606.0 million, compared with net cash used in financing activities of $632.3 million in Fiscal 2020. Net cash used in financing activities in Fiscal 2021 was primarily comprised of repurchases of common stock of $589.4 million, of which $574.9 million was related to our share repurchase program, repayments of long-term debt of $11.4 million and payments of deferred financing costs of $3.4 million. Net cash used in financing activities in Fiscal 2020 was comprised of net repayments of long-term debt of $221.4 million, a $47.6 million prepayment under an accelerated

Table of Contents

share repurchase agreement with JPMorgan Chase Bank, National Association entered into in October 2020, repurchases of our common stock of $332.5 million, payments of deferred financing costs of $7.7 million and dividend payments of $23.1 million.

*Contractual Obligations*

Our contractual obligations as of February 26, 2022 consist mainly of (i) principal and interest related to our senior unsecured notes (see "Long Term Debt," Note 7 to the Consolidated Financial Statements), (ii) leases for stores, offices, distribution facilities and equipment (see "Leases," Note 10 to the Consolidated Financial Statements) and (iii) purchase obligations, primarily under purchase orders issued for merchandise and for certain capital expenditures. Total capital expenditures for Fiscal 2021 were $354.2 million, and for Fiscal 2022 are projected to be approximately $390.0 million to $410.0 million.

Approximately $284.4 million in principal amount of our senior unsecured notes are due August 1, 2024, with the remaining principal balances due August 1, 2034 and August 1, 2044. Our lease obligations include both operating and finance leases, and have various terms extending through 2041, with approximately $451.9 million in minimum lease payments due in Fiscal 2022, and declining amounts due each year thereafter.

These obligations are considered as part of our overall capital allocation and liquidity management processes referred to above.

**SEASONALITY**

Our business is subject to seasonal influences. Generally, our sales volumes are higher in the calendar months of August, November, and December, and lower in February.

**INFLATION**

In Fiscal 2021, we experienced inflationary pressures in various parts of our business, including, but not limited to, product cost pressure as well as increased freight and shipping costs across our supply chain. We continue to monitor the impact of inflation on the costs of materials, labor, and other costs required to manage our business in order to minimize its effects through pricing strategies, productivity improvements and cost reductions. There can be no assurance, however, that our operating results will not be affected by inflation in the future. See also Risk Factor "Rising inflation may adversely affect us by increasing costs of materials, labor and other costs beyond what we can recover through price increases".

**CRITICAL ACCOUNTING POLICIES**

The preparation of consolidated financial statements in conformity with U.S. generally accepted accounting principles requires us to establish accounting policies and to make estimates and judgments that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. We base our estimates on historical experience and on other assumptions that we believe to be relevant under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources. In particular, judgment is used in areas such as inventory valuation, impairment of long-lived assets, goodwill and other indefinite lived intangible assets, accruals for self-insurance and income and certain other taxes. Actual results could differ from these estimates.

*Inventory Valuation*: Merchandise inventories are stated at the lower of cost or market. Inventory costs are primarily calculated using the weighted average retail inventory method.

Under the retail inventory method, the valuation of inventories at cost and the resulting gross margins are calculated by applying a cost-to-retail ratio to the retail values of inventories. The inputs associated with determining the cost-to-retail ratio include: merchandise purchases, net of returns to vendors, discounts and volume and incentive rebates; inbound freight expenses; import charges, including duties, insurance and commissions.

The retail inventory method contains certain management judgments that may affect inventory valuation. At any one time, inventories include items that have been written down to our best estimate of their realizable value. Judgment is required in estimating realizable value and factors considered are the age of merchandise, anticipated demand based on factors such as customer preferences and fashion trends and anticipated changes in product assortment (including related to the launch of our Owned Brands), as well as anticipated markdowns to reduce the price of merchandise from its recorded retail price to a retail price at which it is expected to be sold in the future. These estimates are based on historical experience and current information about future events which are inherently uncertain. Actual realizable value could differ materially from this estimate based upon future customer demand or economic conditions, including the duration and severity of the COVID-19 pandemic.

Table of Contents

We estimate our reserve for shrinkage throughout the year based on historical shrinkage and any current trends, if applicable. Actual shrinkage is recorded at year end based upon the results of our physical inventory counts for locations at which counts were conducted. For locations where physical inventory counts were not conducted in the fiscal year, an estimated shrink reserve is recorded based on historical shrinkage and any current trends, if applicable. Historically, our shrinkage has not been volatile.

We accrue for merchandise in transit once we take legal ownership and title to the merchandise; as such, an estimate for merchandise in transit is included in our merchandise inventories.

*Impairment of Long-Lived Assets*: We review long-lived assets for impairment when events or changes in circumstances indicate the carrying value of these assets may exceed their current fair values. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the estimated undiscounted future cash flows expected to be generated by the asset. If the carrying amount of an asset exceeds its estimated future cash flows, an impairment charge is recognized for the amount by which the carrying amount of the asset exceeds the fair value of the assets. Judgment is required in estimating the fair value of the assets including assumptions related to sales growth rates and market rental rates. These estimates are based on historical experience and current information about future events which are inherently uncertain.

In Fiscal 2021, 2020, and 2019, we recorded $30.8 million, $92.9 million, and $75.1 million, respectively, of non-cash pre-tax impairment charges within goodwill and other impairments in the consolidated statement of operations for certain store-level assets, including leasehold improvements and operating lease assets. Of the stores impaired during Fiscal 2021, partial impairments were recorded at 50 stores resulting in a remaining net book value of long-lived assets at risk of $46.4 million as of February 26, 2022, inclusive of leasehold improvements and right-of-use assets. We will continue to monitor these stores closely. If actual results differ from the estimated undiscounted future cash flows or the estimated price market participants would be willing to pay to sublease store operating leases and acquire remaining store assets, which among other factors, may be impacted by the duration and severity of the COVID-19 pandemic, we may be exposed to additional impairment losses that may be material. If events or market conditions affect the estimated fair value to the extent that a long-lived asset is impaired, we will adjust the carrying value of these long-lived assets in the period in which the impairment occurs.

*Other Indefinite Lived Intangible Assets*: We review other intangibles that have indefinite lives for impairment annually as of the end of the fiscal year or when events or changes in circumstances indicate the carrying value of these assets might exceed their current fair values. Impairment testing is based upon the best information available, including estimates of fair value which incorporate assumptions marketplace participants would use in making their estimates of fair value. Significant assumptions and estimates are required, including, but not limited to, projecting future cash flows, determining appropriate discount rates, margins, growth rates, and other assumptions, to estimate the fair value of indefinite lived intangible assets. Although we believe that the assumptions and estimates made are reasonable and appropriate, different assumptions and estimates could materially impact our reported financial results.

Other indefinite lived intangible assets were recorded as a result of acquisitions and primarily consist of tradenames. We value our tradenames using a relief-from-royalty approach, which assumes the value of the tradename is the discounted cash flows of the amount that would be paid by a hypothetical market participant had they not owned the tradename and instead licensed the tradename from another company. For Fiscal 2021, 2020, and 2019, for certain tradenames within other indefinite lived intangible assets, we completed a quantitative impairment analysis by comparing the fair value of the tradenames to their carrying value and recognized non-cash pre-tax tradename impairment charges of $5.7 million, $35.1 million, and $41.8 million, respectively, within goodwill and other impairments in the consolidated statement of operations. For the remaining other indefinite lived intangible assets, we assessed qualitative factors as of February 26, 2022 in order to determine whether any events and circumstances existed which indicated that it was more likely than not that the fair value of these other indefinite lived assets did not exceed their carrying values and concluded no such events or circumstances existed which would require an impairment test be performed. As of February 26, 2022, we have $16.3 million of remaining other indefinite lived intangible assets. If actual results differ from the estimated future cash flows, which, among other factors, may be impacted by the duration and severity of the COVID-19 pandemic, we may be exposed to additional impairment losses that may be material. In the future, if events or market conditions affect the estimated fair value to the extent that an asset is impaired, we will adjust the carrying value of these assets in the period in which the impairment occurs.

Table of Contents

*Self-Insurance*: We utilize a combination of third-party insurance and self-insurance for a number of risks including workers' compensation, general liability, cyber liability, property liability, automobile liability and employee related health care benefits (a portion of which is paid by our employees). Liabilities associated with the risks we retain are not discounted and are estimated by considering historical claims experience, demographic factors, severity factors and other actuarial assumptions. Although our claims experience has not displayed substantial volatility in the past, actual experience could materially vary from our historical experience in the future. Factors that affect these estimates include but are not limited to: inflation, the number and severity of claims and regulatory changes. In the future, if we conclude an adjustment to self-insurance accruals is required, the liability will be adjusted accordingly.

Beginning in the fourth quarter of Fiscal 2020, we began insuring portions of our workers' compensation and medical insurance through a wholly owned captive insurance subsidiary (the "Captive") to enhance our risk financing strategies. The Captive is subject to regulations in Vermont, including those relating to its levels of liquidity. The Captive was in compliance with all regulations as of February 26, 2022.

*Taxes*: The Company accounts for its income taxes using the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to the differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carry-forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the year in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in earnings in the period that includes the enactment date.

In assessing the recoverability of our deferred tax assets, we evaluate the available objective positive and negative evidence to estimate whether it is more likely than not that sufficient future taxable income will be generated to permit use of existing deferred tax assets in each taxpaying jurisdiction. For any deferred tax asset in excess of the amount for which it is more likely than not that we will realize a benefit, we establish a valuation allowance. A valuation allowance is a non-cash charge, and does not limit our ability to utilize our deferred tax assets, including our ability to utilize tax loss and credit carryforward amounts, against future taxable income.

During Fiscal 2021, we concluded that, based on our evaluation of available objective positive and negative evidence, it is no longer more likely than not that our net U.S. federal and state deferred tax assets are recoverable. In assessing the realizability of deferred tax assets, the key assumptions used to determine positive and negative evidence included our cumulative book loss for the past three years, current trends related to actual taxable earnings or losses, and expected future reversals of existing taxable temporary differences, as well as timing and cost of our transformation initiatives and their expected associated benefits. Accordingly, we recorded a charge of $181.5 million in the third quarter of Fiscal 2021 as a reserve against our net U.S. federal and state deferred tax assets. As of February 26, 2022, the total valuation allowance relative to U.S. federal and state deferred tax assets was $224.3 million.

The amount of the deferred tax assets considered realizable, and the associated valuation allowance, could be adjusted in a future period if estimates of future taxable income change or if objective negative evidence in the form of cumulative losses is no longer present and additional weight is given to subjective evidence such as projections for future growth.

On December 22, 2017, the U.S. government enacted comprehensive tax legislation commonly referred to as the Tax Act. The Tax Act included a mandatory one-time tax on accumulated earnings of foreign subsidiaries, and as a result, all previously unremitted earnings for which no U.S. deferred tax liability had been previously accrued has now been subject to U.S. tax. Notwithstanding the U.S. taxation of these amounts, the Company intends to continue to reinvest the unremitted earnings of its Canadian subsidiary. Accordingly, no additional provision has been made for U.S. or additional non-U.S. taxes with respect to these earnings, except for the transition tax resulting from the Tax Act. In the event of repatriation to the U.S., it is expected that such earnings would be subject to non-U.S. withholding taxes offset, in whole or in part, by U.S. foreign tax credits.

The Company recognizes the tax benefit from an uncertain tax position only if it is at least more likely than not that the tax position will be sustained on examination by the taxing authorities based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position are measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon settlement with the taxing authorities.

Potential volatility in the effective tax rate from year to year may occur as the Company is required each year to determine whether new information changes the assessment of both the probability that a tax position will effectively be sustained and the appropriateness of the amount of recognized benefit.

Table of Contents

The Company also accrues for certain other taxes as required by its operations.

Judgment is required in determining the provision for income and other taxes and related accruals, and deferred tax assets and liabilities. In the ordinary course of business, there are transactions and calculations where the ultimate tax outcome is uncertain. Additionally, the Company's various tax returns are subject to audit by various tax authorities. Although the Company believes that its estimates are reasonable, actual results could differ from these estimates.

**FORWARD-LOOKING STATEMENTS**

This Form 10-K and Management's Discussion and Analysis of Financial Condition and Results of Operations contain forward-looking statements within the meaning of Section 21 E of the Securities Exchange Act of 1934 including, but not limited to, our progress and anticipated progress towards our long-term objectives, as well as more generally the status of our future liquidity and financial condition and our outlook for our 2022 Fiscal year. Many of these forward-looking statements can be identified by use of words such as may, will, expect, anticipate, approximate, estimate, assume, continue, model, project, plan, goal, preliminary, and similar words and phrases, although the absence of those words does not necessarily mean that statements are not forward-looking. Our actual results and future financial condition may differ materially from those expressed in any such forward-looking statements as a result of many factors. Such factors include, without limitation: general economic conditions including the recent supply chain disruptions, labor shortages, wage pressures, rising inflation and the ongoing military conflict between Russia and Ukraine; a challenging overall macroeconomic environment and a highly competitive retailing environment; risks associated with the ongoing COVID-19 pandemic and the governmental responses to it, including its impacts across our businesses on demand and operations, as well as on the operations of our suppliers and other business partners, and the effectiveness of our and governmental actions taken in response to these risks; changing consumer preferences, spending habits and demographics; demographics and other macroeconomic factors that may impact the level of spending for the types of merchandise sold by us; challenges in executing our omni-channel and transformation strategy, including our ability to establish and profitably maintain the appropriate mix of digital and physical presence in the markets we serve; our ability to successfully execute our store fleet optimization strategies, including our ability to achieve anticipated cost savings and to not exceed anticipated costs; our ability to execute on any additional strategic transactions and realize the benefits of any acquisitions, partnerships, investments or divestitures; disruptions to our information technology systems, including but not limited to security breaches of systems protecting consumer and employee information or other types of cybercrimes or cybersecurity attacks; damage to our reputation in any aspect of our operations; the cost of labor, merchandise, logistical costs and other costs and expenses; potential supply chain disruption due to trade restrictions or otherwise, and other factors such as natural disasters, pandemics, including the COVID-19 pandemic, political instability, labor disturbances, product recalls, financial or operational instability of suppliers or carriers, and other items; inflation and the related increases in costs of materials, labor and other costs; inefficient management of relationships and dependencies on third-party service providers; our ability to attract and retain qualified employees in all areas of the organization; unusual weather patterns and natural disasters; including the impact of climate change; uncertainty and disruptions in financial markets; volatility in the price of our common stock and its effect, and the effect of other factors, including the COVID-19 pandemic, on our capital allocation strategy; changes to statutory, regulatory and other legal requirements or deemed noncompliance with such requirements; changes to accounting rules, regulations and tax laws, or new interpretations of existing accounting standards or tax laws; new, or developments in existing, litigation, claims or assessments; and a failure of our business partners to adhere to appropriate laws, regulations or standards. Except as required by law, we do not undertake any obligation to update our forward-looking statements.

## ITEM 7A - QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Our exposure to market risk for changes in interest rates relates primarily to our investment securities and the ABL Facility. As of February 26, 2022, our investments include cash and cash equivalents of approximately $439.5 million, restricted cash of $31.4 million, and long term investments in auction rate securities of approximately $19.2 million, at weighted average interest rates of 0.01% and 0.30%, respectively. The book value of these investments is representative of their fair values.

Our senior unsecured notes have fixed interest rates and are not subject to interest rate risk. As of February 26, 2022, the fair value of the senior unsecured notes was $956.0 million, which is based on quoted prices in active markets for identical instruments compared to the carrying value of approximately $1.184 billion.

Table of Contents

## ITEM 8 - FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

The following are included herein:

1)   Consolidated Balance Sheets as of February 26, 2022 and February 27, 2021

2)   Consolidated Statements of Operations for the fiscal years ended February 26, 2022, February 27, 2021, and February 29, 2020

3)   Consolidated Statements of Comprehensive Loss for the fiscal years ended February 26, 2022, February 27, 2021, and February 29, 2020

4)   Consolidated Statements of Shareholders' Equity for the fiscal years ended February 26, 2022, February 27, 2021, and February 29, 2020

5)   Consolidated Statements of Cash Flows for the fiscal years ended February 26, 2022, February 27, 2021, and February 29, 2020

6)   Notes to Consolidated Financial Statements

7)   Reports of Independent Registered Public Accounting Firm (PCAOB ID: 185)

Table of Contents

## BED BATH & BEYOND INC. AND SUBSIDIARIES
### Consolidated Balance Sheets
#### (in thousands, except per share data)

| | February 26, 2022 | February 27, 2021 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 439,496 | $ 1,352,984 |
| Merchandise inventories | 1,725,410 | 1,671,909 |
| Prepaid expenses and other current assets | 198,248 | 595,152 |
| Total current assets | 2,363,154 | 3,620,045 |
| Long term investment securities | 19,212 | 19,545 |
| Property and equipment, net | 1,027,387 | 918,418 |
| Operating lease assets | 1,562,857 | 1,587,101 |
| Other assets | 157,962 | 311,821 |
| Total assets | $ 5,130,572 | $ 6,456,930 |
| | | |
| **Liabilities and Shareholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 872,445 | $ 986,045 |
| Accrued expenses and other current liabilities | 529,371 | 636,329 |
| Merchandise credit and gift card liabilities | 326,465 | 312,486 |
| Current operating lease liabilities | 346,506 | 360,061 |
| Total current liabilities | 2,074,787 | 2,294,921 |
| Other liabilities | 102,438 | 82,279 |
| Operating lease liabilities | 1,508,002 | 1,509,767 |
| Income taxes payable | 91,424 | 102,664 |
| Long term debt | 1,179,776 | 1,190,363 |
| Total liabilities | 4,956,427 | 5,179,994 |
| | | |
| Shareholders' equity: | | |
| Preferred stock - $0.01 par value; authorized - 1,000 shares; no shares issued or outstanding | - | - |
| Common stock - $0.01 par value; authorized - 900,000 shares; issued 344,146 and 343,241, respectively; outstanding 81,979 and 109,621 shares, respectively | 3,441 | 3,432 |
| Additional paid-in capital | 2,235,894 | 2,152,135 |
| Retained earnings | 9,666,091 | 10,225,253 |
| Treasury stock, at cost; 262,167 and 233,620 shares, respectively | (11,685,267) | (11,048,284) |
| Accumulated other comprehensive loss | (46,014) | (55,600) |
| Total shareholders' equity | 174,145 | 1,276,936 |
| Total liabilities and shareholders' equity | $ 5,130,572 | $ 6,456,930 |

See accompanying Notes to Consolidated Financial Statements.

Table of Contents

## BED BATH & BEYOND INC. AND SUBSIDIARIES
### Consolidated Statements of Operations
#### (in thousands, except per share data)

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | February 26, 2022 | February 27, 2021 | February 29, 2020 |
| Net sales | $ 7,867,778 | $ 9,233,028 | $ 11,158,580 |
| Cost of sales | 5,384,287 | 6,114,947 | 7,616,920 |
| Gross profit | 2,483,491 | 3,118,081 | 3,541,660 |
| Selling, general and administrative expenses | 2,692,292 | 3,224,363 | 3,732,498 |
| Impairments, including on assets held for sale | 36,531 | 127,341 | 509,226 |
| Restructuring and transformation initiative expenses | 144,025 | 102,202 | - |
| Loss on sale of businesses | 18,221 | 1,062 | - |
| Operating loss | (407,578) | (336,887) | (700,064) |
| Interest expense, net | 64,702 | 76,913 | 64,789 |
| Loss (gain) on extinguishment of debt | 376 | (77,038) | - |
| Loss before provision (benefit) from income taxes | (472,656) | (336,762) | (764,853) |
| Provision (benefit) from income taxes | 86,967 | (185,989) | (151,037) |
| Net loss | $ (559,623) | $ (150,773) | $ (613,816) |
| Net loss per share - Basic | $ (5.64) | $ (1.24) | $ (4.94) |
| Net loss per share - Diluted | $ (5.64) | $ (1.24) | $ (4.94) |
| Weighted average shares outstanding - Basic | 99,249 | 121,446 | 124,352 |
| Weighted average shares outstanding - Diluted | 99,249 | 121,446 | 124,352 |
| Dividends declared per share | $ - | $ - | $ 0.68 |

See accompanying Notes to Consolidated Financial Statements.

43

Table of Contents

**BED BATH & BEYOND INC. AND SUBSIDIARIES**
*Consolidated Statements of Comprehensive Loss*
*(in thousands)*

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | February 26, 2022 | February 27, 2021 | February 29, 2020 |
| Net loss | $ (559,623) | $ (150,773) | $ (613,816) |
| | | | |
| Other comprehensive (loss) income: | | | |
| Change in temporary impairment of auction rate securities, net of tax | (251) | (617) | 276 |
| Pension adjustment, net of tax | (1,562) | (1,396) | (4,791) |
| Reclassification adjustment on settlement of the pension plan, net of tax | 9,938 | 1,522 | - |
| Currency translation adjustment | 1,461 | 9,800 | (1,784) |
| Other comprehensive income (loss) | 9,586 | 9,309 | (6,299) |
| | | | |
| Comprehensive loss | $ (550,037) | $ (141,464) | $ (620,115) |

See accompanying Notes to Consolidated Financial Statements.

44

Table of Contents

# BED BATH & BEYOND INC. AND SUBSIDIARIES
### Consolidated Statements of Shareholders' Equity
### (in thousands)

| | Common Stock | | Additional Paid-in Capital | Retained Earnings | Treasury Stock | | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | Shares | Amount | | |
| Balance at March 2, 2019 | 342,582 $ | 3,426 $ | 2,118,673 $ | 11,112,887 | (210,349) $ | (10,616,045) $ | (58,610) $ | 2,560,331 |
| Net loss | - | - | - | (613,816) | - | - | - | (613,816) |
| Other comprehensive loss, net of tax | - | - | - | - | - | - | (6,299) | (6,299) |
| Effect of Adoption of ASU 2016-02 | - | - | - | (40,700) | - | - | - | (40,700) |
| Dividends declared | - | - | - | (83,545) | - | - | - | (83,545) |
| Shares sold under employee stock option plans, net of tax | 139 | 1 | 2,345 | - | - | - | - | 2,346 |
| Issuance of restricted shares, net | 370 | 4 | (4) | - | - | - | - | - |
| Payment and vesting of performance stock units | 580 | 5 | (5) | - | - | - | - | - |
| Stock-based compensation expense, net | - | - | 46,159 | - | - | - | - | 46,159 |
| Director fees paid in stock | 12 | - | 169 | - | - | - | - | 169 |
| Repurchase of common stock, including fees | - | - | - | - | (6,806) | (99,710) | - | (99,710) |
| **Balance at February 29, 2020** | **343,683** | **3,436** | **2,167,337** | **10,374,826** | **(217,155)** | **(10,715,755)** | **(64,909)** | **1,764,935** |
| Net loss | - | - | - | (150,773) | - | - | - | (150,773) |
| Other comprehensive income, net of tax | - | - | - | - | - | - | 9,309 | 9,309 |
| Dividends forfeited | - | - | - | 1,200 | - | - | - | 1,200 |
| Forfeiture of restricted shares, net | (786) | (8) | 8 | - | - | - | - | - |
| Payment and vesting of performance stock units | 344 | 4 | (4) | - | - | - | - | - |
| Stock-based compensation expense, net | - | - | 32,344 | - | - | - | - | 32,344 |
| Accelerated share repurchase program | - | - | (47,550) | - | (15,833) | (327,450) | - | (375,000) |
| Repurchase of common stock, including fees | - | - | - | - | (632) | (5,079) | - | (5,079) |
| **Balance at February 27, 2021** | **343,241** | **3,432** | **2,152,135** | **10,225,253** | **(233,620)** | **(11,048,284)** | **(55,600)** | **1,276,936** |
| Net loss | - | - | - | (559,623) | - | - | - | (559,623) |
| Other comprehensive income, net of tax | - | - | - | - | - | - | 9,586 | 9,586 |
| Dividends forfeited | - | - | - | 461 | - | - | - | 461 |
| Issuance of restricted shares, net | 624 | 6 | (6) | - | - | - | - | - |
| Payment and vesting of performance stock units | 274 | 3 | (3) | - | - | - | - | - |
| Stock-based compensation expense, net | - | - | 36,080 | - | - | - | - | 36,080 |
| Accelerated share repurchase program | - | - | 47,550 | - | (200) | (47,550) | - | - |
| Director fees paid in stock | 7 | - | 138 | - | - | - | - | 138 |
| Repurchase of common stock, including fees | - | - | - | - | (28,347) | (589,433) | - | (589,433) |
| **Balance at February 26, 2022** | **344,146** $ | **3,441** $ | **2,235,894** $ | **9,666,091** | **(262,167)** $ | **(11,685,267)** $ | **(46,014)** $ | **174,145** |

See accompanying Notes to Consolidated Financial Statements.

45

Table of Contents

## BED BATH & BEYOND INC. AND SUBSIDIARIES
### Consolidated Statements of Cash Flows
### (in thousands)

| | Fiscal Year Ended | | |
|---|---|---|---|
| | February 26, 2022 | February 27, 2021 | February 29, 2020 |
| Cash Flows from Operating Activities: | | | |
| Net loss | $ (559,623) | $ (150,773) | $ (613,816) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | | |
| Depreciation and amortization | 293,626 | 340,912 | 342,511 |
| Impairments, including on assets held for sale | 36,531 | 127,341 | 509,226 |
| Stock-based compensation | 35,061 | 31,594 | 45,676 |
| Deferred income taxes | 125,711 | 148,741 | (145,543) |
| Loss on sale of businesses | 18,221 | 1,062 | - |
| Loss (gain) on debt extinguishment | 376 | (77,038) | - |
| Loss on sale leaseback transaction | - | - | 27,357 |
| Other | (8,298) | (396) | (3,446) |
| Decrease (increase) in assets: | | | |
| Merchandise inventories | (53,339) | 64,947 | 506,334 |
| Other current assets | 387,746 | (387,172) | (4,781) |
| Other assets | 607 | 1,519 | 239 |
| Increase (decrease) in liabilities: | | | |
| Accounts payable | (132,785) | 168,556 | (124,206) |
| Accrued expenses and other current liabilities | (100,356) | 15,538 | 61,864 |
| Merchandise credit and gift card liabilities | 13,981 | (12,110) | 1,154 |
| Income taxes payable | (11,257) | 54,958 | (22,783) |
| Operating lease assets and liabilities, net | (14,162) | (32,813) | (2,899) |
| Other liabilities | (14,186) | (26,758) | 14,054 |
| Net cash provided by operating activities | 17,854 | 268,108 | 590,941 |
| Cash Flows from Investing Activities: | | | |
| Purchases of held-to-maturity investment securities | (29,997) | - | (443,500) |
| Redemption of held-to-maturity investment securities | 30,000 | 386,500 | 545,000 |
| Net proceeds from sales of businesses | - | 534,457 | - |
| Net proceeds from sales of property | 5,000 | - | - |
| Proceeds from sale-leaseback transaction | - | - | 267,277 |
| Capital expenditures | (354,185) | (183,077) | (277,401) |
| Net cash (used in) provided by investing activities | (349,182) | 737,880 | 91,376 |
| Cash Flows from Financing Activities: | | | |
| Borrowing of long-term debt | - | 236,400 | - |
| Repayments of long-term debt | (11,360) | (457,827) | - |
| Repayments of finance leases | (1,033) | - | - |
| Prepayment under share repurchase agreement | - | (47,550) | - |
| Repurchase of common stock, including fees | (589,433) | (332,529) | (99,710) |
| Payment of dividends | (749) | (23,108) | (85,482) |
| Payment of deferred financing fees | (3,443) | (7,690) | - |
| Proceeds from exercise of stock options | - | - | 2,346 |
| Net cash used in financing activities | (606,018) | (632,304) | (182,846) |
| Effect of exchange rate changes on cash, cash equivalents, and restricted cash | 1,006 | 5,075 | (977) |
| Net (decrease) increase in cash, cash equivalents and restricted cash | (936,340) | 378,759 | 498,494 |
| Change in cash balances classified as held-for-sale | - | 4,815 | (4,815) |
| Net (decrease) increase in cash, cash equivalents and restricted cash | (936,340) | 383,574 | 493,679 |
| Cash, cash equivalents and restricted cash: | | | |
| Beginning of period | 1,407,224 | 1,023,650 | 529,971 |
| End of period | $ 470,884 | $ 1,407,224 | $ 1,023,650 |

See accompanying Notes to Consolidated Financial Statements.

Table of Contents

**Notes to Consolidated Financial Statements**
*Bed Bath & Beyond Inc. and Subsidiaries*

## 1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES AND RELATED MATTERS

A. Nature of Operations

Bed Bath & Beyond Inc. and subsidiaries (the "Company") is an omni-channel retailer that makes it easy for its customers to feel at home. The Company sells a wide assortment of merchandise in the Home, Baby, Beauty & Wellness markets and operates under the names Bed Bath & Beyond ("BBB"), buybuy BABY ("BABY"), and Harmon, Harmon Face Values, or Face Values (collectively, "Harmon"). Customers can purchase products either in-store, online, with a mobile device or through a customer contact center. The Company generally has the ability to have customer purchases picked up in-store, curbside or shipped direct to the customer from the Company's distribution facilities, stores or vendors. The Company also operates Decorist ("Decorist"), an online interior design platform that provides personalized home design services. In addition, the Company is a partner in a joint venture which operates retail stores in Mexico under the name Bed Bath & Beyond.

We offer a broad assortment of national brands and a growing assortment of proprietary Owned Brand merchandise - including eight new Owned Brands launched in Fiscal 2021 - in key destination categories including bedding, bath, kitchen food prep, home organization, indoor décor, baby and personal care.

We account for our operations as one North American Retail reporting segment. In Fiscal 2020 and 2019, we accounted for our operations as two operating segments: North American Retail and Institutional Sales, the latter of which was divested in October 2020, did not meet the quantitative thresholds under GAAP and, therefore, was not a reportable segment. Net sales outside of the U.S. for the Company were not material for Fiscal 2021, 2020, and 2019. As the Company operates in the retail industry, its results of operations are affected by general economic conditions and consumer spending habits.

B.
Fiscal Year

The Company's Fiscal year is comprised of the 52 or 53-week period ending on the Saturday nearest February 28th. Accordingly, Fiscal 2021, Fiscal 2020, and Fiscal 2019 represented 52 weeks and ended on February 26, 2022, February 27, 2021, and February 29, 2020, respectively.

C. Principles of Consolidation

The accompanying consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. The Company accounts for its investment in the joint venture referred to above under the equity method.

All significant intercompany balances and transactions have been eliminated in consolidation.

D. Recent Accounting Pronouncements

In March 2020, the Financial Accounting Standards Board ("FASB") issued ASU 2020-04 Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting. The amendment provides optional guidance for a limited period of time to ease the potential burden in accounting for (or recognizing the effects of) reference rate reform on contracts, hedging relationships and other transactions that reference LIBOR. These updates are effective immediately and may be applied prospectively to contract modifications made and hedging relationships entered into or evaluated on or before December 31, 2022. The Company is currently evaluating its contracts and the optional expedients provided by this update, but does not expect the adoption of this guidance to have a material impact to the financial statements.

In December 2019, the FASB issued ASU No. 2019-12, Income Taxes, to simplify the accounting for income taxes. The guidance eliminates certain exceptions related to the approach for intraperiod tax allocations, the methodology for calculating income taxes in an interim period, and the recognition of deferred tax liabilities for outside basis differences related to changes in ownership of equity method investments and foreign subsidiaries. The guidance also simplifies aspects of accounting for franchise taxes, enacted changes in tax laws or rates and clarifies the accounting for transactions that result in a step-up in the tax basis of goodwill. The standard is effective for fiscal years beginning after December 15, 2020 and interim periods within those fiscal years with early adoption permitted. The Company adopted this standard in Fiscal 2021; upon adoption, this guidance did not have a material impact on its consolidated financial statements.

Table of Contents

E. Use of Estimates

The preparation of consolidated financial statements in conformity with U.S. generally accepted accounting principles requires the Company to establish accounting policies and to make estimates and judgments that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. The Company bases its estimates on historical experience and on other assumptions that it believes to be relevant under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources. In particular, judgment is used in areas such as inventory valuation, impairment of long-lived assets, impairment of auction rate securities, goodwill and other indefinite lived intangible assets, accruals for self-insurance, litigation, store opening, expansion, relocation and closing costs, the provision for sales returns, vendor allowances, stock-based compensation and income and certain other taxes. Actual results could differ from these estimates.

F. Cash and Cash Equivalents

The Company considers all highly liquid instruments purchased with original maturities of three months or less to be cash equivalents. Included in cash and cash equivalents are credit and debit card receivables from banks, which typically settle within five business days, of $47.9 million and $64.0 million as of February 26, 2022 and February 27, 2021, respectively.

Short-term restricted cash was zero and $5.0 million as of February 26, 2022 and February 27, 2021, respectively, and is included in prepaid expenses and other current assets on the consolidated balance sheet. Long-term restricted cash of $31.4 million and $49.2 million as of February 26, 2022 and February 27, 2021, respectively, is included in other long-term assets on the consolidated balance sheet.

G. Investment Securities

Investment securities consist primarily of auction rate securities, which are securities with interest rates that reset periodically through an auction process, and U.S. Treasury Bills, when outstanding. The U.S. Treasury Bills with original maturities of greater than three months were classified as short term held-to-maturity securities and stated at their amortized cost which approximated fair value. Auction rate securities are classified as available-for-sale and are stated at fair value, which had historically been consistent with cost or par value due to interest rates which reset periodically, typically every 7, 28 or 35 days. As a result, there generally were no cumulative gross unrealized holding gains or losses relating to these auction rate securities. However, during the global financial crisis of 2008 the auction process for the Company's auction rate securities failed and continues to fail. These failed auctions result in a lack of liquidity in the securities and affect their estimated fair values at February 26, 2022 and February 27, 2021, but do not affect the underlying collateral of the securities (see "Fair Value Measurements," Note 4 and "Investment Securities," Note 5). All income from these investments is recorded as interest income.

Those investment securities which the Company has the ability and intent to hold until maturity are classified as held-to-maturity investments and are stated at amortized cost.

Premiums are amortized and discounts are accreted over the life of the security as adjustments to interest income using the effective interest method. Dividend and interest income are recognized when earned.

H. Inventory Valuation

Merchandise inventories are stated at the lower of cost or market. Inventory costs are primarily calculated using the weighted average retail inventory method.

Under the retail inventory method, the valuation of inventories at cost and the resulting gross margins are calculated by applying a cost-to-retail ratio to the retail values of inventories. The inputs associated with determining the cost-to-retail ratio include: merchandise purchases, net of returns to vendors, discounts and volume and incentive rebates; inbound freight expenses; and import charges, including duties, insurance and commissions.

Table of Contents

The retail inventory method contains certain management judgments that may affect inventory valuation. At any one time, inventories include items that have been written down to the Company's best estimate of their realizable value. Judgment is required in estimating realizable value and factors considered are the age of merchandise, anticipated demand based on factors such as customer preferences and fashion trends, and anticipated changes in product assortment (including related to the launch of Owned Brands) as well as anticipated markdowns to reduce the price of merchandise from its recorded retail price to a retail price at which it is expected to be sold in the future. These estimates are based on historical experience and current information about future events which are inherently uncertain. Actual realizable value could differ materially from this estimate based upon future customer demand or economic conditions, including uncertainty related to the ongoing COVID-19 pandemic (see "Impact of the COVID-19 Pandemic," Note 2).

The Company estimates its reserve for inventory shrinkage throughout the year based on historical shrinkage and any current trends, if applicable. Actual shrinkage is recorded at fiscal year end based upon the results of the Company's physical inventory counts for locations at which counts were conducted. For locations where physical inventory counts were not conducted in the fiscal year, an estimated shrink reserve is recorded based on historical shrinkage and any current trends, if applicable. Historically, the Company's shrinkage has not been volatile.

The Company accrues for merchandise in transit once it takes legal ownership and title to the merchandise; as such, an estimate for merchandise in transit is included in the Company's merchandise inventories.

I. Property and Equipment

Property and equipment are stated at cost and are depreciated primarily using the straight-line method over the estimated useful lives of the assets (40 years for buildings; 5 to 20 years for furniture, fixtures and equipment; and 3 to 10 years for computer equipment and software). Leasehold improvements are amortized using the straight-line method over the lesser of their estimated useful life or the life of the lease. Depreciation expense is primarily included within selling, general and administrative expenses. (see "Property and Equipment," Note 6).

The cost of maintenance and repairs is charged to earnings as incurred; significant renewals and betterments are capitalized. Maintenance and repairs amounted to $80.0 million, $117.7 million, and $133.9 million for Fiscal 2021, 2020, and 2019, respectively.

J. Impairment of Long-Lived Assets

The Company reviews long-lived assets for impairment when events or changes in circumstances indicate the carrying value of these assets may exceed their current fair values. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the estimated undiscounted future cash flows expected to be generated by the asset. If the carrying amount of an asset exceeds its estimated future cash flows, an impairment charge is recognized for the amount by which the carrying amount of the asset exceeds the fair value of the asset. Assets to be disposed of would be separately presented in the balance sheet and reported at the lower of the carrying amount or fair value less costs to sell, and are no longer depreciated. The assets and liabilities of a disposal group classified as held for sale are separately presented in the appropriate asset and liability sections of the balance sheet (see "Assets Held for Sale and Divestitures," Note 16). In Fiscal 2021 and Fiscal 2020, the Company recorded non-cash pre-tax impairment charges of $30.8 million and $92.9 million, respectively, for certain store-level assets, including leasehold improvements and operating lease assets. In the future, if events or market conditions affect the estimated fair value to the extent that a long-lived asset is impaired, the Company will adjust the carrying value of these long-lived assets in the period in which the impairment occurs.

K Goodwill and Other Indefinite Lived Intangible Assets

Included within other assets in the accompanying consolidated balance sheets as of February 26, 2022 and February 27, 2021, respectively, are $16.3 million and $22.0 million for indefinite lived tradenames and trademarks.

The Company reviews its intangible assets that have indefinite lives for impairment annually as of the end of the fiscal year or when events or changes in circumstances indicate the carrying value of these assets might exceed their current fair values. Impairment testing is based upon the best information available including estimates of fair value which incorporate assumptions marketplace participants would use in making their estimates of fair value. Significant assumptions and estimates are required, including, but not limited to, projecting future cash flows, determining appropriate discount rates and terminal growth rates, and other assumptions, to estimate the fair value of goodwill and indefinite lived intangible assets. Although the Company believes the assumptions and estimates made are reasonable and appropriate, different assumptions and estimates could materially impact its reported financial results.

Table of Contents

Other indefinite lived intangible assets were recorded as a result of acquisitions and primarily consist of tradenames. The Company values its tradenames using a relief-from-royalty approach, which assumes the value of the tradename is the discounted cash flows of the amount that would be paid by a hypothetical market participant had they not owned the tradename and instead licensed the tradename from another company. For the fiscal years ended February 26, 2022, February 27, 2021, and February 29, 2020, the Company completed a quantitative impairment analysis for certain other indefinite lived intangible assets, by comparing the fair value of the tradenames to their carrying value and recognized non-cash pre-tax tradename impairment charges of $5.7 million, $35.1 million, and $41.8 million, respectively, within goodwill and other impairments in the consolidated statement of operations. As of February 26, 2022, for the remaining other indefinite lived intangible assets, the Company assessed qualitative factors in order to determine whether any events and circumstances existed which indicated that it was more likely than not that the fair value of these other indefinite lived assets did not exceed their carrying values and concluded no such events or circumstances existed which would require an impairment test be performed. In the future, if events or market conditions affect the estimated fair value to the extent that an asset is impaired, the Company will adjust the carrying value of these assets in the period in which the impairment occurs.

As of June 1, 2019, the Company completed a quantitative impairment analysis of goodwill related to its reporting units by comparing the fair value of a reporting unit with its carrying amount. The Company performed a discounted cash flow analysis and market multiple analysis for each reporting unit. Based upon the analysis performed, the Company recognized non-cash pre-tax goodwill impairment charges of $391.1 million for the North American Retail reporting unit. Cumulatively, the Company has recognized non-cash pre-tax goodwill impairment charges of $676.2 million and $40.1 million for the North American Retail and Institutional Sales reporting units, respectively. The Institutional Sales unit was divested in October 2020. As of February 26, 2022 and February 27, 2021, the Company did not have any goodwill recorded on its consolidated balance sheet.

L. Self-Insurance

The Company utilizes a combination of insurance and self-insurance for a number of risks including workers' compensation, general liability, cyber liability, property liability, automobile liability and employee related health care benefits (a portion of which is paid by its employees). Liabilities associated with the risks that the Company retains are not discounted and are estimated by considering historical claims experience, demographic factors, severity factors and other actuarial assumptions. Although the Company's claims experience has not displayed substantial volatility in the past, actual experience could materially vary from its historical experience in the future. Factors that affect these estimates include but are not limited to: inflation, the number and severity of claims and regulatory changes. In the future, if the Company concludes an adjustment to self-insurance accruals is required, the liability will be adjusted accordingly.

Beginning in the fourth quarter of Fiscal 2020, the Company began insuring portions of its workers' compensation and medical insurance through a wholly owned captive insurance subsidiary (the "Captive") to enhance its risk financing strategies. The Captive is subject to regulations in Vermont, including those relating to its levels of liquidity and other requirements. The Captive was in compliance with all regulations as of February 26, 2022.

M. Shareholders' Equity

The Company has authorization to make repurchases of its common shares from time to time in the open market or through other programs approved by the Board of Directors pursuant to existing rules and regulations (see "Shareholders' Equity," Note 14).

N. Fair Value of Financial Instruments

The Company's financial instruments include cash and cash equivalents, investment securities, accounts payable, long term debt and certain other liabilities. The Company's investment securities consist primarily of U.S. Treasury securities, which are stated at amortized cost, and auction rate securities consisting of preferred shares of closed end municipal bond funds, which are stated at their approximate fair value. The book value of the financial instruments, excluding the Company's long term debt, is representative of their fair values (see "Fair Value Measurements," Note 4).

Table of Contents

O. Leases

The Company determines if an arrangement is a lease or contains a lease at the inception of the contract. The Company's leases generally contain fixed and variable components. Variable components are primarily contingent rents based upon store sales exceeding stipulated amounts. Lease agreements may also include non-lease components, such as certain taxes, insurance and common area maintenance, which the Company combines with the lease component to account for both as a single lease component. Lease liabilities, which represent the Company's obligation to make lease payments arising from the lease, and corresponding right-of-use assets, which represent the Company's right to use an underlying asset for the lease term, are recognized at the commencement date of the lease, which is typically the date the Company obtains possession of the leased premises, based on the present value of fixed future payments over the lease term. The Company utilizes the lease term for which it is reasonably certain to use the underlying asset, including consideration of options to extend or terminate the lease. Incentives received from landlords are recorded as a reduction to the lease right-of-use assets. The Company does not recognize lease right-of-use assets and corresponding lease liabilities for leases with initial terms of 12 months or less.

The Company calculates the present value of future payments using the discount rate implicit in the lease, if available, or its incremental borrowing rate. The incremental borrowing rate is the rate of interest that a lessee would have to pay to borrow on a collateralized basis over a similar term at an amount equal to the lease payments in a similar economic environment. The Company determined discount rates based on the rates of its unsecured borrowings, which are then adjusted for the appropriate lease term and effects of full collateralization. In determining the Company's operating lease assets and operating lease liabilities, the Company applied these incremental borrowing rates to the minimum lease payments within each lease agreement.

For operating leases, lease expense relating to fixed payments is recognized on a straight-line basis over the lease term and lease expense relating to variable payments is expensed as incurred. For finance leases, the amortization of the asset is recognized over the shorter of the lease term or useful life of the underlying asset (see "Leases," Note 10).

P. Prepaid Expenses and Other Current Assets

Prepaid expenses and other current assets in the accompanying consolidated balance sheets as of February 26, 2022 and February 27, 2021, respectively, are $198.2 million and $595.2 million, which includes income tax receivables as of February 26, 2022 and February 27, 2021 of $26.5 million and $318.1 million, respectively (see "Provision for Income Taxes," Note 8).

Q. Revenue Recognition

Sales are recognized upon purchase by customers at the Company's retail stores or upon delivery for products purchased from its websites. The value of point-of-sale coupons and point-of-sale rebates that result in a reduction of the price paid by the customer are recorded as a reduction of sales. Shipping and handling fees that are billed to a customer in a sale transaction are recorded in sales. Taxes, such as sales tax, use tax and value added tax, are not included in sales.

Revenues from gift cards, gift certificates and merchandise credits are recognized when redeemed. Gift cards have no provisions for reduction in the value of unused card balances over defined time periods and have no expiration dates. In Fiscal 2021 and Fiscal 2020, the Company recognized net sales for gift card and merchandise credit redemptions of approximately $72.3 million and $98.0 million, which were included in merchandise credit and gift card liabilities on the consolidated balance sheet as of February 27, 2021 and February 29, 2020, respectively.

Sales returns are provided for in the period that the related sales are recorded based on historical experience. Although the estimate for sales returns has not varied materially from historical provisions, actual experience could vary from historical experience in the future if the level of sales return activity changes materially. In the future, if the Company concludes that an adjustment is required due to material changes in the returns activity, the liability for estimated returns and the corresponding right of return asset will be adjusted accordingly. As of February 26, 2022 and February 27, 2021, the liability for estimated returns of $23.6 million and $36.2 million is included in accrued expenses and other current liabilities and the corresponding right of return asset for merchandise of $14.6 million and $23.4 million, respectively, is included in prepaid expenses and other current assets, respectively.

The Company sells a wide assortment of domestics merchandise and home furnishings. Domestics merchandise includes categories such as bed linens and related items, bath items and kitchen textiles. Home furnishings include categories such as kitchen and tabletop items, fine tabletop, basic housewares, general home furnishings (including furniture and wall décor), consumables and certain juvenile products. Sales of domestics merchandise and home furnishings accounted for approximately

Table of Contents

37.4% and 62.6% of net sales, respectively, for Fiscal 2021, 34.7% and 65.3% of net sales, respectively, for Fiscal 2020 and 35.2% and 64.8% of net sales, respectively, for Fiscal 2019.

R. Cost of Sales

Cost of sales includes the cost of merchandise, buying costs and costs of the Company's distribution network including inbound freight charges, import charges (including duties), distribution facility costs, receiving costs, internal transfer costs and shipping and handling costs.

S. Vendor Allowances

The Company receives allowances from vendors in the normal course of business for various reasons including direct cooperative advertising, purchase volume and reimbursement for other expenses. Annual terms for each allowance include the basis for earning the allowance and payment terms, which vary by agreement. All vendor allowances are recorded as a reduction of inventory cost, except for direct cooperative advertising allowances which are specific, incremental and identifiable. The Company recognizes purchase volume allowances as a reduction of the cost of inventory in the quarter in which milestones are achieved. Advertising costs were reduced by direct cooperative allowances of $35.8 million, $28.9 million, and $30.9 million for Fiscal 2021, 2020, and 2019, respectively.

T. Store Opening, Expansion, Relocation and Closing Costs

Store opening, expansion, relocation and closing costs, including markdowns, asset residual values and projected occupancy costs, are charged to earnings as incurred.

U. Advertising Costs

Advertising expenses related to direct response advertising are expensed on the first day of the direct response advertising event. All other advertising expenses associated with store advertising are charged to earnings as incurred. Net advertising costs amounted to $407.1 million, $347.8 million, and $478.5 million for Fiscal 2021, 2020, and 2019, respectively.

V. Stock-Based Compensation

The Company measures all employee stock-based compensation awards using a fair value method and records such expense, net of estimated forfeitures, in its consolidated financial statements. The Company's stock-based compensation relates to restricted stock awards, stock options, restricted stock units and performance stock units. The Company's restricted stock awards are considered nonvested share awards (see "Stock-Based Compensation," Note 15).

W. Income Taxes

The Company files a consolidated federal income tax return. Income tax returns are also filed with each taxable jurisdiction in which the Company conducts business.

The Company accounts for its income taxes using the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to the differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carry-forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the year in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in earnings in the period that includes the enactment date.

In assessing the recoverability of its deferred tax assets, the Company evaluates the available objective positive and negative evidence to estimate whether it is more likely than not that sufficient future taxable income will be generated to permit use of existing deferred tax assets in each taxpaying jurisdiction. For any deferred tax asset in excess of the amount for which it is more likely than not that the Company will realize a benefit, a valuation allowance is established. A valuation allowance is a non-cash charge, and does not limit the Company's ability to utilize its deferred tax assets, including its ability to utilize tax loss and credit carryforward amounts against future taxable income.

Table of Contents

On December 22, 2017, the U.S. government enacted comprehensive tax legislation commonly referred to as the Tax Act. The Tax Act included a mandatory one-time tax on accumulated earnings of foreign subsidiaries, and as a result, all previously unremitted earnings for which no U.S. deferred tax liability had been previously accrued has now been subject to U.S. tax. Notwithstanding the U.S. taxation of these amounts, the Company intends to continue to reinvest the unremitted earnings of its Canadian subsidiary. Accordingly, no additional provision has been made for U.S. or additional non-U.S. taxes with respect to these earnings, except for the transition tax resulting from the Tax Act. In the event of repatriation to the U.S., it is expected that such earnings would be subject to non-U.S. withholding taxes offset, in whole or in part, by U.S. foreign tax credits.

The Company recognizes the tax benefit from an uncertain tax position only if it is at least more likely than not that the tax position will be sustained on examination by the taxing authorities based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position are measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon settlement with the taxing authorities.

Judgment is required in determining the provision for income and other taxes and related accruals, and deferred tax assets and liabilities. In the ordinary course of business, there are transactions and calculations where the ultimate tax outcome is uncertain. Additionally, the Company's various tax returns are subject to audit by various tax authorities. Although the Company believes that its estimates are reasonable, actual results could differ from these estimates (see "Provision for Income Taxes", Note 8).

X. Earnings per Share

The Company presents earnings per share on a basic and diluted basis. Basic earnings per share is computed by dividing net earnings by the weighted average number of shares outstanding. Diluted earnings per share is computed by dividing net earnings by the weighted average number of shares outstanding, including the dilutive effect of stock-based awards as calculated under the treasury stock method.

Stock-based awards of approximately 2.9 million, 2.4 million, and 5.4 million shares were excluded from the computation of diluted earnings per share as the effect would be anti-dilutive for Fiscal 2021, 2020, and 2019, respectively.

**2.**
**IMPACT OF THE COVID-19 PANDEMIC**

In March 2020, the World Health Organization declared the COVID-19 outbreak a global pandemic. That same month, as a result of the COVID-19 pandemic, the Company began to temporarily close certain store locations that did not have a health and personal care department, and as of March 23, 2020, all of the Company's retail stores across the U.S. and Canada were temporarily closed except for most stand-alone buybuy BABY and Harmon stores, subject to state and local regulations. In May 2020, the Company announced a phased approach to re-open its stores in compliance with relevant government directives, and as of the end of July 2020, nearly all of its stores re-opened. During portions of Fiscal 2021, a limited number of stores in Canada either closed temporarily or continued to operate under restrictions in compliance with local governmental orders. As of February 26, 2022, all of the Company's stores were operating without restriction subject to compliance with applicable mask and vaccine requirements.

In the first half of Fiscal 2020, the Company had also suspended its plans for debt reduction and postponed share repurchases, but lifted the debt repurchase suspension in August 2020 and the postponement of share repurchases in October 2020.

Similar to other retailers, the Company also withheld portions of and/or delayed payments to certain of its business partners as the Company negotiated revisions to its payment terms, in order to further maintain liquidity given the temporary store closures (see "Leases," Note 10).

Further, on March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was enacted in the United States. The CARES Act is an emergency economic aid package to help mitigate the impact of the COVID-19 pandemic. Among other things, the CARES Act provides certain changes to tax laws, which may impact the Company's results of operations, financial position and cash flows. The Company is currently implementing certain provisions of the CARES Act such as deferring employer payroll taxes. As of February 27, 2021, the Company had deferred $3.1 million of employer payroll taxes, which were deposited by December 2021. In addition, during Fiscal 2021 and 2020, the Company recorded credits of approximately $
7.8 million and $33.3 million, respectively, as an offset to selling, general and administrative expenses as a result of the employee retention credits and rent and property expense support made available under the CARES Act for U.S. employees and under the Canada Emergency Wage Subsidy for Canadian employees and the Canada Emergency Rent Subsidy.

Table of Contents

During the Fiscal years ended February 26, 2022 and February 27, 2021, under the CARES Act, the Company recorded income tax benefits of $18.7 million and $152.0 million, respectively, as a result of the Fiscal 2020 and Fiscal 2019 net operating losses that were carried back to prior years during which the federal tax rate was 35%.

The COVID-19 pandemic materially adversely impacted the Company's results of operations and cash flows for the fiscal year ended February 27, 2021. Numerous uncertainties continue to surround the pandemic and its ultimate impact on the Company. Further discussion of the risks and uncertainties posed by the COVID-19 pandemic is disclosed in "Risk Factors" under Part I, Item 1A of this Form 10-K.

## 3. RESTRUCTURING AND TRANSFORMATION ACTIVITIES

*Fiscal 2021 Restructuring and Transformation Initiative Expenses*

The Company recorded $281.2 million in its consolidated statements of operations for the fiscal year ended February 26, 2022 for costs associated with restructuring and other transformation initiatives, of which approximately $137.2 million is included in cost of sales and approximately $144.0 million is included in restructuring and transformation initiative expenses in the consolidated statements of operations. These charges were comprised of, and classified in the Company's consolidated statement of operations, as follows:

*Cost of Sales*

•$125.2 million primarily related to the Company's initiatives to introduce certain new Owned Brand merchandise and, to a lesser extent, to redefine certain existing Owned Brands and to rationalize product assortment across the Bed Bath & Beyond banner store base. The costs incurred in connection with these activities included higher markdowns on inventory sold in Fiscal 2021, as well as an adjustment to reduce its estimated realizable value inventory on hand that will be removed from the product assortment as part of these initiatives.

•$12.0 million related to store closures for which the closing process had commenced, related primarily to higher markdowns on inventory sold during the period between final announcement of closing and the final closure of the store.

*Restructuring and Transformation Initiative Expenses*

•*Store Closures*. During Fiscal 2021, the Company closed 63 mostly Bed Bath & Beyond stores as part of its store fleet optimization program which commenced in Fiscal 2020 and included the closure of
207 mostly Bed Bath & Beyond stores through the end of Fiscal 2021 (including the 144 stores closed in Fiscal 2020). For the fiscal year ended February 26, 2022, the Company recorded costs associated with store closures for which the store closing process has commenced of $2.4 million of severance costs and $45.5 million of lease-related and other costs within restructuring and transformation initiative expenses in its consolidated statements of operations. At this point, the Company is unable to estimate the amount or range of amounts expected to be incurred in connection with future store closures.

•*Other transformation initiatives*. During the fiscal year ended February 26, 2022, the Company recorded costs of $96.1 million which include costs recorded in connection with other transformation initiatives, including technology transformation and business strategy and operating model transformation programs across core functions including merchandising, supply chain and finance.

*Fiscal 2020 Restructuring Charges*

The Company recorded $149.3 million within cost of sales and restructuring and transformation initiative expenses in its consolidated statement of operations for Fiscal 2020 for costs associated with planned store closures as part of the fleet optimization plan for which the store closure process has commenced, workforce reduction and other transformation initiatives.

As part of the Company's ongoing business transformation, on July 6, 2020, the Board of Directors of the Company approved the planned closure of approximately 200 mostly Bed Bath & Beyond stores by the end of Fiscal 2021 as part of the Company's store fleet optimization program, 144 of which were closed as of February 27, 2021. In Fiscal 2020, the Company recorded costs associated with its planned store closures for which the store closing process has commenced of $21.0 million within cost of sales,

Table of Contents

$5.3 million of severance costs and $39.2 million of lease-related and other costs within restructuring and transformation initiative expenses in its consolidated statements of operations.

In addition, during the second quarter of Fiscal 2020, the Company announced a realignment of its organizational structure as part of its transformation initiative, to further simplify the Company's operations, support investment in its strategic growth plans, and provide additional financial flexibility. In connection with the organizational realignment, the Company implemented a workforce reduction of approximately 2,800 roles from across its corporate headquarters and retail stores. During the second quarter of Fiscal 2020, the Company recorded pre-tax restructuring charges of approximately $23.1 million within restructuring and transformation initiative expenses in its consolidated statements of operations, related to severance and associated costs for this workforce reduction, all of which have been paid during Fiscal 2020.

During Fiscal 2020, the Company also recorded costs of approximately $26.1 million within cost of sales and $34.6 million within restructuring and transformation initiative expenses in its consolidated statements of operations related to other transformation initiatives.

*Fiscal 2019 Restructuring Charges*

During Fiscal 2019, the Company expensed pre-tax restructuring charges of approximately $102.5 million, primarily for severance and related costs in conjunction with its transformation initiatives and extensive leadership changes, within selling, general and administrative expenses in its consolidated statement of operations.

As of February 26, 2022 and February 27, 2021, the remaining accrual for severance and related costs related to these various initiatives was $15.0 million and $23.0 million, respectively.

**4.**
**FAIR VALUE MEASUREMENTS**

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., "the exit price") in an orderly transaction between market participants at the measurement date. In determining fair value, the Company uses various valuation approaches, including quoted market prices and discounted cash flows. The hierarchy for inputs used in measuring fair value maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that the most observable inputs be used when available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from independent sources. Unobservable inputs are inputs that reflect a company's judgment concerning the assumptions that market participants would use in pricing the asset or liability developed based on the best information available under the circumstances. In certain cases, the inputs used to measure fair value may fall into different levels of the fair value hierarchy. In such cases, an asset or liability must be classified in its entirety based on the lowest level of input that is significant to the measurement of fair value. The fair value hierarchy is broken down into three levels based on the reliability of inputs as follows:

•Level 1 - Valuations based on quoted prices in active markets for identical instruments that the Company is able to access. Since valuations are based on quoted prices that are readily and regularly available in an active market, valuation of these products does not entail a significant degree of judgment.
•Level 2 - Valuations based on quoted prices in active markets for instruments that are similar, or quoted prices in markets that are not active for identical or similar instruments, and model-derived valuations in which all significant inputs and significant value drivers are observable in active markets.
•Level 3 - Valuations based on inputs that are unobservable and significant to the overall fair value measurement.

The Company's financial instruments include cash and cash equivalents, investment securities, accounts payable, long term debt and certain other liabilities. The book value of the Company's financial instruments, excluding long term debt, is representative of their fair values. The Company's investment securities at February 26, 2022 consisted primarily of U.S. Treasury securities, which are stated at amortized cost and are based on quoted prices in active markets for identical instruments (Level 1 valuation). As of February 26, 2022 and February 27, 2021, the fair value of the Company's long term debt was approximately $
956.0 million and $1.118 billion, respectively, which is based on quoted prices in active markets for identical instruments (i.e., Level 1 valuation), compared to the carrying value of approximately $1.184 billion and $1.195 billion, respectively.

The Company did not have any financial assets utilizing Level 2 inputs. Financial assets utilizing Level 3 inputs included long term investments in auction rate securities consisting of preferred shares of closed end municipal bond funds (see "Investment Securities," Note 5).

Table of Contents

**5.**
**INVESTMENT SECURITIES**

As of both February 26, 2022 and February 27, 2021, the Company's long term available-for-sale investment securities represented approximately $ 20.3 million par value of auction rate securities, less temporary valuation adjustments of approximately $1.1 million and $0.8 million, respectively. Since these valuation adjustments are deemed to be temporary, they are recorded in accumulated other comprehensive loss, net of a related tax benefit, and did not affect the Company's net earnings. The Company had no short-term available-for-sale investment securities as of February 26, 2022 or February 27, 2021.

**6.**
**PROPERTY AND EQUIPMENT**

Property and equipment consist of the following:

| *(in thousands)* | | February 26, 2022 | | February 27, 2021 |
|---|---|---|---|---|
| Land and buildings | $ | 21,597 | $ | 24,840 |
| Furniture, fixtures and equipment [(1)] | | 594,443 | | 502,869 |
| Leasehold improvements | | 746,365 | | 721,039 |
| Computer equipment and software | | 1,494,457 | | 1,355,758 |
| Total | | 2,856,862 | | 2,604,506 |
| Less: Accumulated depreciation [(1)] | | (1,829,475) | | (1,686,088) |
| Property and equipment, net | $ | 1,027,387 | $ | 918,418 |

_____

[(1)] Furniture, fixtures and equipment includes $39.0 million in assets held under finance leases as of February 26, 2022. Accumulated depreciation includes $0.2 million in accumulated depreciation for assets held under finance leases as of February 26, 2022.

Depreciation expense was $ 292.3 million, $338.7 million, $339.0 million in Fiscal 2021, 2020, and 2019, respectively.

**7.**
**LONG TERM DEBT**

*Senior Unsecured Notes*

On July 17, 2014, the Company issued $300.0 million aggregate principal amount of 3.749% senior unsecured notes due August 1, 2024, $300.0 million aggregate principal amount of 4.915% senior unsecured notes due August 1, 2034 and $900.0 million aggregate principal amount of 5.165% senior unsecured notes due August 1, 2044 (collectively, the "Notes"). Interest on the Notes is payable semi-annually on February 1 and August 1 of each year.

The Notes were issued under an indenture (the "Base Indenture"), as supplemented by a first supplemental indenture (together, with the Base Indenture, the "Indenture"), which contains various restrictive covenants, which are subject to important limitations and exceptions that are described in the Indenture. The Company was in compliance with all covenants related to the Notes as of February 26, 2022.

During Fiscal 2021, the Company purchased approximately $11.0 million aggregate principal amount of its outstanding 3.749% senior unsecured notes due August 1, 2024. The total consideration paid for the notes accepted for purchase of $11.4 million during the fiscal year ended February 26, 2022 included accrued and unpaid interest up to, but not including, the early settlement date. The Company recorded a loss on extinguishment of debt of $ 0.4 million in its consolidated statement of operations for the fiscal year ended February 26, 2022, including the write off of unamortized debt financing costs related to the extinguished portion of the notes accepted for purchase and reacquisition costs.

Table of Contents

During Fiscal 2020, the Company purchased $75.0 million aggregate principal amount of its outstanding 4.915% senior unsecured notes due 2034 and approximately $225.0 million aggregate principal amount of its outstanding 5.165% senior unsecured notes due 2044. The total consideration paid for the notes accepted for purchase of $220.9 million included an early tender premium of $50 per $1,000 principal amount of the notes accepted for purchase, plus accrued and unpaid interest up to, but not including, the early settlement date. The Company recorded a gain on extinguishment of debt of $77.0 million in its consolidated statement of operations for the fiscal year ended February 27, 2021, including the write off of unamortized debt financing costs related to the extinguished portion of the notes accepted for purchase and reacquisition costs. The Company did not purchase any of its outstanding unsecured notes during Fiscal 2019.

As of February 26, 2022 and February 27, 2021, unamortized deferred financing costs associated with the Company's 3.749% senior unsecured notes due 2024, 4.915% senior unsecured notes due 2034 and 5.165% senior unsecured notes due 2044 were $4.6 million and $5.0 million, respectively, and are included in long-term debt in the Company's consolidated balance sheets.

*Asset-Based Credit Agreement*

On August 9, 2021, the Company amended its asset-based credit agreement (the "Amended Credit Agreement") among the Company, certain of the Company's U.S. and Canadian subsidiaries party thereto, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in such capacity, the "Agent"), and the lenders party thereto, which replaced the Company's previous $850.0 million Credit Agreement which was due to mature on June 19, 2023.

The Amended Credit Agreement provides for an asset-based revolving credit facility (the "ABL Facility") with aggregate revolving commitments established at closing of $1.0 billion, including a swingline subfacility and a letter of credit subfacility. The Amended Credit Agreement has an uncommitted expansion feature which allows the borrowers to request, at any time following the delivery of an initial field exam and appraisal, an increase in aggregate revolving commitments under the ABL Facility or elect to enter into a first-in-last-out loan facility, collectively, in an aggregate amount of up to $375.0 million, subject to certain customary conditions. The Amended Credit Agreement matures on August 9, 2026.

As of February 26, 2022, the Company had no loans outstanding under the ABL Facility, but had outstanding letters of credit of $96.4 million.

The ABL Facility is secured on a first priority basis (subject to customary exceptions) on all accounts receivable (including credit card receivables), inventory, certain deposit accounts and securities accounts, and certain related assets, of the Company and its subsidiaries that are borrowers or guarantors under the ABL Facility. Amounts available to be drawn from time to time under the ABL Facility (including, in part, in the form of letters of credit) are equal to the lesser of (i) outstanding revolving commitments under the Amended Credit Agreement and (ii) a borrowing base equal to the sum of (a) 90% of eligible credit card receivables plus (b) 90% of eligible inventory, valued at the lower of cost or market value, determined on a weighted average cost basis, minus (c) customary reserves.

Subject to customary exceptions and restrictions, the Company may voluntarily repay outstanding amounts under the ABL Facility at any time without premium or penalty. Any voluntary prepayments made will not reduce commitments under the ABL Facility. If at any time the outstanding amount under the ABL Facility exceeds the lesser of (i) the aggregate revolving commitments and (ii) the borrowing base, the Company will be required to prepay outstanding amounts or cash collateralize letter of credit obligations under the ABL Facility.

Outstanding amounts under the Amended Credit Agreement bear interest at a rate per annum equal to, at the applicable borrower's election: (i) in the case of loans denominated in U.S. dollars, such loans shall be comprised entirely of Alternate Base Rate ("ABR") loans and London Inter-Bank Offered ("LIBO") Rate loans and (ii) in the case of loans denominated in Canadian dollars, such loans shall be comprised entirely of Canadian Prime Rate loans and Canadian Dollar Offered Rate ("CDOR") loans, in each case as set forth in the Amended Credit Agreement, plus an interest rate margin based on average quarterly availability ranging from (i) in the case of ABR loans and Canadian Prime Rate loans, 0.25% to 0.75%; provided that if ABR or the Canadian Prime Rate is less than 1.00%, such rate shall be deemed to be 1.00%, as applicable, and (ii) in the case of LIBO Rate loans and CDOR Loans, 1.25% to 1.75%; provided that if the CDOR or LIBO Rate is less than 0.00%, such rate shall be deemed to be 0.00%, as applicable.

The Amended Credit Agreement contains customary representations and warranties, events of default and financial, affirmative and negative covenants for facilities of this type, including but not limited to a springing financial covenant relating to a fixed charge coverage ratio, and restrictions on indebtedness, liens, investments and acquisitions, asset dispositions, restricted payments

Table of Contents

and prepayment of certain indebtedness. The Company was in compliance with all covenants related to the Amended Credit Agreement as of February 26, 2022.

As of February 26, 2022 and February 27, 2021, unamortized deferred financing costs associated with the Company's revolving credit facilities were $7.4 million and $6.1 million, respectively, and were recorded in other assets in the Company's consolidated balance sheets.

The Company amortizes deferred financing costs for the Notes and the ABL Facility over their respective terms and such amortization is included in interest expense, net in the consolidated statements of operations. Interest expense related to the Notes and the revolving credit facilities, including the commitment fee and the amortization of deferred financing costs, was approximately $ 64.1 million, $73.6 million, and $73.0 million for the fiscal years ended February 26, 2022, February 27, 2021, and February 29, 2020, respectively.

**8.**
**PROVISION FOR INCOME TAXES**

The components of the (benefit) provision for income taxes are as follows:

| | | Fiscal Year Ended | | | | |
|---|---|---|---|---|---|---|
| (in thousands) | | February 26, 2022 | | February 27, 2021 | | February 29, 2020 |
| Current: | | | | | | |
| Federal | $ | (43,740) | $ | (336,506) | $ | 2,455 |
| State and local | | 3,397 | | 1,211 | | (7,973) |
| | | (40,343) | | (335,295) | | (5,518) |
| | | | | | | |
| Deferred: | | | | | | |
| Federal | | 73,006 | | 150,861 | | (124,578) |
| State and local | | 54,304 | | (1,555) | | (20,941) |
| | | 127,310 | | 149,306 | | (145,519) |
| | $ | 86,967 | $ | (185,989) | $ | (151,037) |

Table of Contents

At February 26, 2022 and February 27, 2021, included in other assets are net deferred income tax assets of $(0.1) million and $130.0 million, respectively. These amounts represent the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. The significant components of the Company's deferred tax assets and liabilities consist of the following:

| (in thousands) | February 26, 2022 | February 27, 2021 |
|---|---:|---:|
| Deferred tax assets: | | |
| Inventories | $ 4,077 | $ 13,040 |
| Operating lease liabilities | 473,397 | 484,290 |
| Insurance | 6,416 | 9,086 |
| Stock-based compensation | 1,592 | 1,014 |
| Merchandise credits and gift card liabilities | 56,690 | 52,584 |
| Accrued expenses | 23,412 | 31,914 |
| Intangibles | 1,685 | 1,008 |
| Goodwill | 90 | 1,596 |
| Carryforwards and other tax credits | 189,746 | 86,914 |
| Other | 34,991 | 34,104 |
| | | |
| Valuation allowance: | (249,529) | (26,011) |
| | | |
| Deferred tax liabilities: | | |
| Depreciation | (146,970) | (105,649) |
| Prepaid expenses | (1,155) | (26,356) |
| Operating lease assets | (376,079) | (409,535) |
| Other | (18,499) | (17,977) |
| | $ (136) | $ 130,022 |

At February 26, 2022, the Company has federal net operating loss carryforwards of $67.2 million (tax effected), of which $4.6 million will expire between 2025 and 2039, state net operating loss carryforwards of $87.1 million (tax effected), which will expire between 2021 and 2041, California state enterprise zone credit carryforwards of $2.1 million (tax effected), which will expire in 2023, but require taxable income in the enterprise zone to be realizable.

In assessing the recoverability of its deferred tax assets, the Company evaluates the available objective positive and negative evidence to estimate whether it is more likely than not that sufficient future taxable income will be generated to permit use of existing deferred tax assets in each taxpaying jurisdiction. For any deferred tax asset in excess of the amount for which it is more likely than not that the Company will realize a benefit, the Company establishes a valuation allowance. A valuation allowance is a non-cash charge, and does not limit the Company's ability to utilize its deferred tax assets, including its ability to utilize tax loss and credit carryforward amounts, against future taxable income.

The Company assessed all available positive and negative evidence to estimate whether sufficient future taxable income will be generated to permit use of existing deferred tax assets in each taxpaying jurisdiction. On the basis of this evaluation, as of February 26, 2022, a valuation allowance of $224.3 million was recorded against the Company's net federal and state deferred tax assets as it is not more likely than not that these assets would be realized.

As of February 26, 2022 and February 27, 2021, the Company had also recorded a valuation allowance of $25.2 million and $15.5 million, respectively, relative to the Company's Canadian net deferred tax asset, as the Company did not believe the deferred tax assets in that jurisdiction were more likely than not to be realized.

Table of Contents

The following table summarizes the activity related to the gross unrecognized tax benefits from uncertain tax positions:

| (in thousands) | February 26, 2022 | | February 27, 2021 |
|---|---|---|---|
| Balance at beginning of year | $ | 105,749 | $ | 51,781 |
| Increase related to current year positions | | 1,125 | 69,106 |
| Decrease related to prior year positions | | (1,902) | (2,797) |
| Settlements | | (2,340) | (4,981) |
| Lapse of statute of limitations | | (7,114) | (7,360) |
| Balance at end of year | $ | 95,518 | $ | 105,749 |

Gross unrecognized tax benefits are classified in non-current income taxes payable (or a contra deferred tax asset) on the consolidated balance sheet for uncertain tax positions taken (or expected to be taken) on a tax return. As of February 26, 2022 and February 27, 2021, approximately $95.5 million and $105.7 million, respectively, of gross unrecognized tax benefits would impact the Company's effective tax rate. As of February 26, 2022 and February 27, 2021, the liability for gross unrecognized tax benefits included approximately $8.6 million and $8.1 million, respectively, of accrued interest. The Company recognizes interest and penalties for unrecognized tax benefits, as applicable, in income tax expense. The Company recorded an increase to accrued interest of approximately $0.5 million for the fiscal year ended February 26, 2022 and a decrease of approximately $1.5 million for the fiscal year ended February 27, 2021 for gross unrecognized tax benefits in the consolidated statement of earnings.

The Company anticipates that any adjustments to gross unrecognized tax benefits which will impact income tax expense, due to the expiration of statutes of limitations, could be approximately $5.8 million in the next twelve months. However, actual results could differ from those currently anticipated.

As of February 26, 2022, the Company operated in all 50 states, the District of Columbia, Puerto Rico, Canada, and Mexico and files income tax returns in the United States and various state, local and international jurisdictions. The Company is currently under examination by the Internal Revenue Service for the tax year 2017. The Company is open to examination for state, foreign and local jurisdictions with varying statutes of limitations, generally ranging from 3 to 5 years.

The following table summarizes the reconciliation between the effective income tax rate and the federal statutory rate:

| | Fiscal Year Ended | | |
|---|---|---|---|
| | February 26, 2022 | February 27, 2021 | February 29, 2020 |
| Federal statutory rate | 21.00% | 21.00% | 21.00% |
| State income tax rate, net of federal impact | 3.87 | 3.94 | 4.28 |
| Uncertain tax positions | 2.16 | 1.63 | 1.33 |
| Goodwill non-deductible impairment charges | - | - | (4.84) |
| Tax deficiencies related to stock-based compensation | (0.81) | (3.18) | (3.07) |
| Tax credits | 0.38 | 0.41 | 0.49 |
| CARES Act | 0.94 | 35.98 | - |
| Valuation Allowance | (48.01) | (7.74) | - |
| Canadian Branch Earnings | 1.60 | 0.78 | 0.90 |
| Other | 0.47 | 2.35 | (0.34) |
| | (18.40)% | 55.17% | 19.75% |

Table of Contents

**9.**
**TRANSACTIONS AND BALANCES WITH RELATED PARTIES**

On April 21, 2019, Warren Eisenberg and Leonard Feinstein transitioned to the role of Co-Founders and Co-Chairmen Emeriti of the Board of Directors of the Company. As a result of this transition, Messrs. Eisenberg and Feinstein ceased to be officers of the Company effective as of April 21, 2019, and became entitled to the payments and benefits provided under their employment agreements that apply in the case of termination without cause, which generally include continued senior status payments until May 2027 and continued participation for Co-Founders (and their spouses, if applicable) at the Company's expense in employee plans and programs. In addition, the Co-Founders remain entitled to supplemental pension payments specified in their employment agreements of $
200,000 per year (as adjusted for a cost of living increase), until the death of the survivor of the applicable Co-Founder and his spouse, reduced by the continued senior status payments referenced above.

Pursuant to their respective restricted stock and performance stock unit agreements, shares of restricted stock and performance-based stock units granted to Messrs. Eisenberg and Feinstein vested upon their resignation as members of the Board of Directors effective May 1, 2019, subject, however, to attainment of any applicable performance goals and the certification of the applicable performance-based tests by the Compensation Committee, as provided under their award agreements.

**10.**
**LEASES**

The Company leases retail stores, as well as distribution facilities, offices and equipment, under agreements expiring at various dates through 2041. The leases provide for original lease terms that generally range from 10 to 15 years and most leases provide for a series of five year renewal options, often at increased rents, the exercise of which is at the Company's sole discretion. Certain leases provide for contingent rents (which are based upon store sales exceeding stipulated amounts and are immaterial in Fiscal 2021, 2020, and 2019), scheduled rent increases and renewal options. The Company is obligated under a majority of the leases to pay for taxes, insurance and common area maintenance charges.

The Company subleases certain real estate to unrelated third parties, all of which have been classified as operating leases. The Company recognizes sublease income on a straight-line basis over the sublease term, which generally ranges from 5 to 10 years. Most sublease arrangements provide for a series of five year renewal options, the exercise of which are at the Company's sole discretion.

The Company regularly negotiates lease terms with landlords, including in connection with its transformation initiatives. Beginning in the first quarter of Fiscal 2020, in order to maintain liquidity given temporary store closures as a result of the COVID-19 pandemic (see "Impact of the COVID-19 Pandemic," Note 2), the Company withheld portions of and/or delayed or deferred payments to certain landlords, including in connection with renegotiations of lease terms. In some instances, the renegotiations led to agreements with landlords for rent abatements or rental deferrals. In Fiscal 2021, the Company has continued to withhold payments to certain landlords in connection with certain negotiations of payment terms. Total payments withheld and/or delayed or deferred as of February 26, 2022 and February 27, 2021 were approximately $
1.9 million and $9.6 million, respectively, and are included in current liabilities.

In accordance with the FASB's Staff Q&A regarding rent concessions related to the effects of the COVID-19 pandemic, the Company has elected to account for the concessions agreed to by landlords that do not result in a substantial increase in the rights of the lessor or the obligations of the lessee as though enforceable rights and obligations for those concessions existed in the original lease agreements and the Company has elected to not remeasure the related lease liabilities and right-of-use assets. For qualifying rent abatement concessions, the Company has recorded negative lease expense for the amount of the concession during the period of relief, and for qualifying deferrals of rental payments, the Company has recognized a non-interest bearing payable in lieu of recognizing a decrease in cash for the lease payment that would have been made based on the original terms of the lease agreement, which will be reduced when the deferred payment is made in the future. During the fiscal year ended February 26, 2022 and February 27, 2021, the Company recognized reduced rent expense of $2.7 million and $10.3 million, respectively, related to rent abatement concessions.

Table of Contents

The components of total lease cost for the fiscal year ended February 26, 2022 and February 27, 2021 were as follows:

| (in thousands) | Statement of Operations Location | February 26, 2022 | February 27, 2021 |
|---|---|---|---|
| Operating lease cost | Cost of sales and SG&A | $ 449,394 | $ 582,168 |
| Finance lease cost: | | | |
| Depreciation of property | SG&A | 184 | 2,500 |
| Interest on lease liabilities | Interest expense, net | 1,886 | 7,755 |
| Variable lease cost | Cost of sales and SG&A | 152,259 | 189,485 |
| Sublease income | SG&A | (43,922) | (12,574) |
| Total lease cost | | $ 559,801 | $ 769,334 |

As of February 26, 2022 and February 27, 2021, assets and liabilities related to the Company's operating and finance leases were as follows:

| (in thousands) | Consolidated Balance Sheet Location | February 26, 2022 | February 27, 2021 |
|---|---|---|---|
| **Assets** | | | |
| Operating leases | Operating lease assets | $ 1,562,857 | $ 1,587,101 |
| Finance leases | Property and equipment, net | 38,790 | - |
| Total Lease assets | | $ 1,601,647 | $ 1,587,101 |
| | | | |
| **Liabilities** | | | |
| Current: | | | |
| Operating leases | Current operating lease liabilities | $ 346,506 | $ 360,061 |
| Finance leases | Accrued expenses and other current liabilities | 2,494 | - |
| Noncurrent: | | | |
| Operating leases | Operating lease liabilities | 1,508,002 | 1,509,767 |
| Finance leases | Other liabilities | 35,447 | - |
| Total lease liabilities | | $ 1,892,449 | $ 1,869,828 |

At February 26, 2022, the Company has entered into two operating leases, which have not yet commenced, for a regional distribution center and a store, both expected to open in Fiscal 2022. The aggregate minimum rental payments over the term of the lease of approximately $107.2 million and $4.1 million, respectively, are not included in the above table.

As of February 26, 2022, the Company's lease liabilities mature as follows:

| (in thousands) | Operating Leases | Finance Leases |
|---|---|---|
| Fiscal Year: | | |
| 2022 | $ 444,562 | $ 7,369 |
| 2023 | 388,183 | 11,636 |
| 2024 | 334,178 | 11,636 |
| 2025 | 272,790 | 11,636 |
| 2026 | 202,690 | 11,636 |
| Thereafter | 643,824 | 59,531 |
| Total lease payments | $ 2,286,227 | $ 113,444 |
| Less imputed interest | (431,719) | (75,503) |
| Present value of lease liabilities | $ 1,854,508 | $ 37,941 |

Table of Contents

The Company's lease terms and discount rates were as follows:

| | February 26, 2022 | February 27, 2021 |
|---|---|---|
| Weighted-average remaining lease term (in years) | | |
| Operating leases | 7.0 years | 6.8 years |
| Finance leases | 10.0 years | - |
| Weighted-average discount rate | | |
| Operating leases | 6.0% | 6.4% |
| Finance leases | 8.4% | -% |

Other information with respect to the Company's leases is as follows:

| (in thousands) | | February 26, 2022 | | February 27, 2021 |
|---|---|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities | | | | |
| Operating cash flows from operating leases | $ | 450,082 | $ | 646,981 |
| Operating cash flows from finance leases | | 1,886 | | 9,295 |
| Financing cash flows from finance leases | | 1,033 | | - |
| Operating lease assets obtained in exchange for new operating lease liabilities | | 359,933 | | 305,614 |
| Financing lease assets obtained in exchange for new financing lease liabilities | | 38,974 | | - |

In Fiscal 2019, the Company completed a sale-leaseback transaction on approximately 2.1 million square feet of owned real estate, which generated approximately $267.3 million in proceeds. As a result of the transaction, the Company recorded a loss, including transaction costs of approximately $5.7 million, of approximately $33.1 million which is included in selling, general and administrative expenses in the consolidated statement of operations for the fiscal year ended February 29, 2020. All leases entered into as a result of the sale-leaseback transaction were classified as operating leases. For certain assets included in the transaction, the Company determined that the fair value of the assets was less than the consideration received. As a result, the Company recognized a financing obligation in the amount of $14.5 million, for the additional financing obtained from the buyer. As of February 26, 2022 and February 27, 2021, the financing obligation amounted to approximately $13.0 million and $13.8 million, respectively, of which approximately $0.7 million and $0.7 million, respectively, is included in accrued expenses and other current liabilities, and approximately $12.3 million and $13.1 million, respectively, is included in other liabilities, in the consolidated balance sheets.

**11.**
**EMPLOYEE BENEFIT PLANS**

*Defined Contribution Plans*

The Company has
three defined contribution savings plans covering all eligible employees of the Company (the "Plans"). Participants of the Plans may defer annual pre-tax compensation subject to statutory and Plan limitations. In addition, a certain percentage of an employee's contributions are matched by the Company and vest over a specified period of time, subject to certain statutory and Plan limitations. The Company's match was approximately $6.2 million, $10.6 million, and $13.7 million for Fiscal 2021, 2020, and 2019, respectively, which was expensed as incurred.

*Defined Benefit Plan*

During Fiscal 2020, upon the divestiture of CTS, the Company retained liability for a non-contributory defined benefit pension plan for CTS employees hired on or before July 31, 2003, who met specified age and length-of-service requirements.

During Fiscal 2021, the Company received final approval to terminate the plan, upon which the Company contributed $5.1 million to the plan. Using plan assets, the Company purchased a non-participating group annuity contract for certain participants and made lump sum distributions to all remaining participants. Net periodic pension cost included in the consolidated statement of operations includes the pre-tax release of $13.5 million from other comprehensive income in connection with the settlement of the plan, which is recorded within loss on sale of businesses. As of February 26, 2022, the Company had no liability remaining related to the plan.

Table of Contents

During Fiscal 2020, the Company released $2.1 million from other comprehensive income in connection with the partial settlement of the plan, recorded within loss on sale of businesses, including impairment of assets held for sale, in the consolidated statements of operations. In addition, as of February 27, 2021, the Company recognized a loss of $8.4 million, net of tax of $3.0 million, within accumulated other comprehensive loss. As of February 27, 2021, the Company had liabilities of $3.6 million, which is included in other liabilities in the Company's consolidated balance sheets.

The remaining net periodic pension cost recorded during Fiscal 2021, 2020, and 2019 was not material to the Company's results of operations.

**12.**
**COMMITMENTS AND CONTINGENCIES**

A putative securities class action was filed on April 14, 2020 against the Company and three of its officers and/or directors (Mark Tritton, Mary Winston (the Company's former Interim Chief Executive Officer) and Robyn D'Elia (the Company's former Chief Financial Officer and Treasurer)) in the United States District Court for the District of New Jersey (the "New Jersey federal court"). The case, which is captioned *Vitiello v. Bed Bath & Beyond Inc., et al.*, Case No. 2:20-cv-04240-MCA-MAH, asserts claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of a putative class of purchasers of the Company's securities from October 2, 2019 through February 11, 2020. The Complaint alleges that certain of the Company's disclosures about financial performance and certain other public statements during the putative class period were materially false or misleading. A similar putative securities class action, asserting the same claims on behalf of the same putative class against the same defendants, was filed on April 30, 2020. That case, captioned *Kirkland v. Bed Bath & Beyond Inc., et al.*, Case No. 1:20-cv-05339-MCA-MAH, is also pending in the United States District Court for the District of New Jersey. On August 14, 2020, the court consolidated the two cases and appointed Kavin Bakhda as lead plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 (as consolidated, the "Securities Class Action"). Lead plaintiff and additional named plaintiff Richard Lipka filed an Amended Class Action Complaint on October 20, 2020, on behalf of a putative class of purchasers of the Company's securities from September 4, 2019 through February 11, 2020. Defendants moved to dismiss the Amended Complaint on December 21, 2020.

After a mediation held in August 2021, a settlement in principle was reached between the Company and lead plaintiff in the Securities Class Action. The settlement has been executed and was preliminarily approved by the New Jersey Federal Court in February 2022. If the settlement is granted final approval, the Securities Class Action will be fully resolved and the matter will be dismissed. The Company has recorded a liability for the Securities Class Action, based on the agreed settlement amount and insurance coverage available.

On July 10, 2020, the first of three related shareholder derivative actions was filed in the New Jersey federal court on behalf of the Company against various present and former directors and officers. The case, which is captioned *Salu v. Tritton, et al.*, Case No. 2:20-cv-08673-MCA-MAH (D.N.J.), asserts claims under §§ 10(b) and 20(a) of the Exchange Act and for breach of fiduciary duty, unjust enrichment, and waste of corporate assets under state law arising from the events underlying the securities class actions described above and from the Company's repurchases of its own shares during the class period pled in the securities cases. The two other derivative actions, which assert similar claims, are captioned *Grooms v. Tritton, et al.*, Case No. 2:20-cv-09610-SDW-RDW (D.N.J.) (filed July 29, 2020), and *Mantia v. Fleming, et al.*, Case No. 2:20-cv-09763-MCA-MAH (D.N.J.) (filed July 31, 2020). On August 5, 2020, the court signed a stipulation by the parties in the *Salu* case to stay that action pending disposition of a motion to dismiss in the Securities Class Action, subject to various terms outlined in the stipulation. The parties in all three derivative cases have moved to consolidate them and to apply the *Salu* stay of proceedings to all three actions. The court granted the motion on October 14, 2020, but the stay was subsequently lifted. On January 4, 2022, the defendants filed a motion to dismiss this case.

On August 28, 2020, another related shareholder derivative action, captioned *Schneider v. Tritton*, et al., Index No 516051/2020, was filed in the Supreme Court of the State of New York, County of Kings. The claims pled in the Schneider case are similar to those pled in the three federal derivative cases, except that the Schneider complaint does not plead claims under the Exchange Act. On September 21, 2020, the parties filed a stipulation seeking to stay that action pending disposition of a motion to dismiss in the securities class action, subject to various terms and conditions.

On June 11, 2021, an additional related derivative action was filed on behalf of the Company against certain present and former directors and officers. This Complaint is entitled *Michael Anthony v Mark Tritton et. al.*, Index No. 514167/2021 and was filed in the Supreme Court of the State of New York, Kings County. The claims are substantially the same as in the other two derivative actions. On October 26, 2021, the court consolidated the *Schneider* and *Anthony* actions, and the plaintiffs subsequently filed a consolidated complaint. On January 10, 2022, the defendants filed a motion to dismiss this case.

Table of Contents

The derivative cases were not included in the August 2021 settlement referred to above, but after mediation, a settlement in principle was reached subsequent to year-end. The settlement remains subject to documentation and must be approved by the Court.

The District Attorney's office for the County of Ventura, together with District Attorneys for other counties in California (together, the "District Attorneys"), recently concluded an investigation regarding the management and disposal at the Company's stores in California of certain materials that may be deemed hazardous or universal waste under California law. On March 19, 2019, the District Attorneys provided the Company with a settlement demand that included a proposed civil penalty, reimbursement of investigation costs, and certain injunctive relief, including modifications to the Company's existing compliance program, which already includes associate training, ongoing review of disposal rules applicable to various product categories, and specialized third-party disposal. During Fiscal 2020, the Company and the District Attorneys agreed to final terms on a settlement payment of approximately $
1.5 million to resolve the matter. The Company has also agreed to spend $171,000 over the next 36 months on refinements to its compliance program. The Company and District Attorneys executed a Stipulated Judgment to this effect, which was recently filed with the court. As of February 29, 2020, the Company had recorded an accrual for the estimated probable loss for this matter, and the Company made the related settlement payment during the fourth quarter of Fiscal 2020.

On April 21, 2019, Warren Eisenberg and Leonard Feinstein transitioned to the role of Co-Founders and Co-Chairmen Emeriti of the Board of Directors of the Company. As a result of this transition, Mr. Eisenberg and Mr. Feinstein ceased to be officers of the Company effective as of April 21, 2019, and became entitled to the payments and benefits provided under their employment agreements that apply in the case of a termination without cause, which generally include continued senior status payments until May 2027 and continued participation for the Co-Founders (and their spouses, if applicable) at the Company's expense in employee plans and programs. In addition, the Co-Founders remain entitled to supplemental pension payments specified in their employment agreements of $200,000 per year (as adjusted for a cost of living increase), until the death of the survivor of the applicable Co-Founder and his spouse, reduced by the continued senior status payments referenced above.

Pursuant to their respective restricted stock and performance stock unit agreements, shares of restricted stock and performance-based stock units granted to Messrs. Eisenberg and Feinstein vested upon their resignation as members of the Board of Directors effective May 1, 2019, subject, however, to attainment of any applicable performance goals and the certification of the applicable performance-based tests by the Compensation Committee, as provided under their award agreements.

The Company's former Chief Executive Officer (the "Former CEO") departed the Company effective as of May 12, 2019. In accordance with the terms of the Former CEO's employment and equity award agreements, the Former CEO was entitled to three times his then-current salary, payable over three years in normal payroll installments, except that any amount due prior to the six months after his departure, was paid in a lump sum after such six month period. Such amounts will be reduced by any compensation earned with any subsequent employer or otherwise and will be subject to the Former CEO's compliance with a one-year non-competition and non-solicitation covenant. On October 21, 2019, the Former CEO entered into an agreement (the "Former CEO PSU Settlement Agreement") with the Company to reduce the PSUs held by him by an excess amount of outstanding PSUs granted to the Former CEO in the Company's 2018 fiscal year as a result of the use of the Fiscal 2017 peer group in lieu of the Fiscal 2018 peer group. Further, as a result of this departure, the time-vesting component of the Former CEO's stock-based awards accelerated, including (i) stock options (which were "underwater" and expired without having been exercised by the Former CEO), (ii) PSU awards which had previously met the related performance-based test, had been certified by the Compensation Committee, and remained subject solely to time-vesting, and (iii) PSU awards (assuming target level of performance) which remain subject to attainment of any performance goals and the certification of the applicable performance-based tests by the Compensation Committee, as provided under his award agreements and subject to the terms of the Former CEO PSU Settlement Agreement.

In addition, the Company maintains employment agreements with other executives which provide for severance pay.

In connection with the sale of PMall (see "Assets Held for Sale and Divestitures", Note 16), the Company agreed to indemnify 1-800-FLOWERS.COM for certain litigation matters then existing at the time of the close of the transaction, including certain matters for which the Company is entitled to indemnification from the former owner of PMall in connection with the Company's purchase of PMall in Fiscal 2016. During Fiscal 2021, the Company recorded a liability for one such matter and a corresponding asset based on the Company's assessment of the ability to recover the expected loss under the indemnification provided at the time of its purchase of PMall.

Table of Contents

The Company records an estimated liability related to its various claims and legal actions arising in the ordinary course of business when and to the extent that it concludes a liability is probable and the amount of the loss can be reasonably estimated. Such estimated loss is based on available information and advice from outside counsel, where appropriate. As additional information becomes available, the Company reassesses the potential liability related to claims and legal actions and revises its estimated liabilities, as appropriate. The Company expects the ultimate disposition of these matters will not have a material adverse effect on the Company's consolidated financial position, results of operations or liquidity. The Company also cannot predict the nature and validity of claims which could be asserted in the future, and future claims could have a material impact on its earnings.

**13.**
**SUPPLEMENTAL CASH FLOW INFORMATION**

The Company paid income taxes of $
5.2 million, $4.8 million, and $44.8 million in Fiscal 2021, 2020, and 2019, respectively. In addition, the Company had interest payments of approximately $66.0 million, $75.5 million, and $81.2 million in Fiscal 2021, 2020, and 2019, respectively.

In Fiscal 2021, the Company acquired property, plant and equipment of approximately $39.0 million under finance lease arrangements.

The Company recorded an accrual for capital expenditures of $63.4 million, $44.6 million, and $36.9 million as of February 26, 2022, February 27, 2021, and February 29, 2020, respectively.

In addition, the Company recorded an accrual for dividends payable of $0.9 million, $2.1 million, $26.4 million as of February 26, 2022, February 27, 2021, and February 29, 2020, respectively.

**14.**
**SHAREHOLDERS' EQUITY**

The Company has authorization to make repurchases of shares of the Company's common stock from time to time in the open market or through other parameters approved by the Board of Directors pursuant to existing rules and regulations.

Between December 2004 and April 2021, the Company's Board of Directors authorized, through several share repurchase programs, the repurchase of $
12.950 billion of its shares of common stock. The Company also acquires shares of its common stock to cover employee related taxes withheld on vested restricted stock, restricted stock units and performance stock unit awards. Since the initial authorization in December 2004, the aggregate total of common stock repurchased is approximately 262.2 million shares for a total cost of approximately $11.685 billion. The Company had approximately $1.267 billion remaining of authorized share repurchases as of February 26, 2022.

Decisions regarding share repurchases are within the discretion of the Board of Directors, and are influenced by a number of factors, including the price of the Company's common stock, general business and economic conditions, the Company's financial condition and operating results, the emergence of alternative investment or acquisition opportunities, changes in business strategy and other factors. The Company's share repurchase program could change, and could be influenced by several factors, including business and market conditions, such as the impact of the COVID-19 pandemic. The Company reviews its alternatives with respect to its capital structure on an ongoing basis. Any future share repurchases will be subject to the determination of the Board of Directors, based on an evaluation of the Company's earnings, financial condition and requirements, business conditions and other factors, including the restrictions on share repurchases under the ABL Facility (see "Long Term Debt," Note 7).

In connection with its share repurchase program, during the twelve months ended February 26, 2022, the Company repurchased approximately 27.7 million shares of its common stock, at a total cost of approximately $574.9 million, including fees. Additionally, during the twelve months ended February 26, 2022, the Company repurchased approximately 0.6 million shares of its common stock, at a total cost of approximately $14.5 million, to cover employee related taxes withheld on vested restricted stock, restricted stock unit awards and performance stock unit awards.

In the first quarter of Fiscal 2020, the Company had postponed share repurchases, but lifted this postponement in October 2020. In October 2020, the Company entered into an accelerated share repurchase agreement with JPMorgan Chase Bank, National Association to repurchase $225.0 million of its common stock, subject to market conditions, which settled in the fourth quarter of Fiscal 2020, resulting in the repurchase of a total of 10.8 million shares. In January 2021, the Company entered into a second accelerated share repurchase agreement to repurchase an aggregate $150.0 million of its common stock, subject to market conditions. This resulted in the repurchase of 5.0 million shares in the fourth quarter of Fiscal 2020, and an additional 0.2 million shares received upon final settlement in the first quarter of Fiscal 2021.

Table of Contents

During Fiscal 2016, the Company's Board of Directors authorized a quarterly dividend program. In March 2020, the Company suspended its future quarterly declarations of cash dividends as a result of the COVID-19 pandemic. During Fiscal 2021, 2020, and 2019, total cash dividends of $0.7 million, $23.1 million, and $85.5 million, respectively, were paid. Any future quarterly cash dividend payments on its common stock will be subject to the determination by the Board of Directors, based on an evaluation of the Company's earnings, financial condition and requirements, business conditions and other factors, including the restrictions on the payment of dividends contained in the Amended Credit Agreement (see "Long Term Debt," Note 7).

Cash dividends, if any, are accrued as a liability on the Company's consolidated balance sheets and recorded as a decrease to retained earnings when declared.

**15.**
**STOCK-BASED COMPENSATION**

The Company measures all stock-based compensation awards for employees and non-employee directors using a fair value method and records such expense, net of estimated forfeitures, in its consolidated financial statements. Currently, the Company's stock-based compensation relates to restricted stock awards, restricted stock units, performance stock units, and stock options. The Company's restricted stock awards are considered nonvested share awards.

Stock-based compensation expense for the fiscal year ended February 26, 2022, February 27, 2021, and February 29, 2020 was approximately $35.1 million, $31.6 million, and $45.7 million, respectively. In addition, the amount of stock-based compensation cost capitalized for the years ended February 26, 2022 and February 27, 2021 was approximately $1.0 million and $0.8 million, respectively.
*Incentive Compensation Plans*

The Company may grant awards under the Bed Bath & Beyond 2018 Incentive Compensation Plan (the "2018 Plan") and the Bed Bath & Beyond 2012 Incentive Compensation Plan (the "2012 Plan"). The 2018 Plan includes an aggregate of 4.6 million common shares authorized for issuance of awards permitted under the 2018 Plan, including stock options, stock appreciation rights, restricted stock awards, performance awards and other stock based awards. The 2018 Plan supplements the 2012 Plan, which amended and restated the Bed Bath & Beyond 2004 Incentive Compensation Plan (the "2004 Plan"). The 2012 Plan includes an aggregate of 43.2 million common shares authorized for issuance of awards permitted under the 2012 Plan (similar to the 2018 Plan). Outstanding awards that were covered by the 2004 Plan continue to be in effect under the 2012 Plan.

The terms of the 2012 Plan and the 2018 Plan are substantially similar and enable the Company to offer incentive compensation through stock options (whether nonqualified stock options or incentive stock options), restricted stock awards, stock appreciation rights, performance awards and other stock based awards, and cash-based awards. Grants are determined by the Compensation Committee of the Board of Directors of the Company for those awards granted to executive officers, and by the Board of Directors of the Company for awards granted to non-employee directors. Stock option grants generally become exercisable in either three or five equal annual installments beginning one year from the date of grant. Restricted stock awards generally become vested in five to seven equal annual installments beginning one to three years from the date of grant. Restricted stock units generally become vested in one to three equal annual installments beginning one year from the date of grant. Performance stock units generally vest at the end of the performance period dependent on the Company's achievement of performance-based tests. Vesting of each of these types of awards is subject, in general, to the recipient remaining in the Company's service on specified vesting dates.

The Company generally issues new shares for stock option exercises, restricted stock awards and vesting of restricted stock units and performance stock units. The 2018 Plan expires in May 2028. The 2012 Plan expires in May 2022.

As described in further detail below, in Fiscal 2020 and 2019, the Company granted stock-based awards to certain of the Company's new executive officers as inducements material to their commencement of employment and entry into an employment agreement with the Company. The inducement awards were made in accordance with Nasdaq Listing Rule 5635(c)(4) and were not made under the 2012 Plan or the 2018 Plan.

Table of Contents

*Restricted Stock Awards*

Restricted stock awards are issued and measured at fair market value on the date of grant and generally become vested in five to seven equal annual installments beginning one to three years from the date of grant, subject, in general, to the recipient remaining in the Company's service on specified vesting dates. Vesting of restricted stock is based solely on time vesting. As of February 26, 2022, unrecognized compensation expense related to the unvested portion of the Company's restricted stock awards was $8.9 million, which is expected to be recognized over a weighted average period of 2.3 years.

Changes in the Company's restricted stock awards for the fiscal year ended February 26, 2022 were as follows:

| *(Shares in thousands)* | Number of Restricted Shares | | Weighted Average Grant-Date Fair Value |
|---|---|---|---|
| Unvested restricted stock awards, beginning of period | 935 | $ | 34.34 |
| Granted | 47 | | 29.58 |
| Vested | (324) | | 39.01 |
| Forfeited | (186) | | 29.96 |
| Unvested restricted stock awards, end of period | 472 | $ | 32.38 |

*Restricted Stock Units ("RSUs")*

RSUs are issued and measured at fair market value on the date of grant and generally become vested in one to three equal annual installments beginning one year from the date of grant, subject, in general, to the recipient remaining in the Company's service on specified vesting dates. RSUs are converted into shares of common stock upon vesting. As of February 26, 2022, unrecognized compensation expense related to the unvested portion of the Company's RSUs was $29.7 million, which is expected to be recognized over a weighted average period of 1.9 years.

Changes in the Company's RSUs for the fiscal year ended February 26, 2022 were as follows:

| *(Shares in thousands)* | Number of Restricted Stock Units | | Weighted Average Grant-Date Fair Value |
|---|---|---|---|
| Unvested restricted stock units, beginning of period | 2,270 | $ | 14.04 |
| Granted | 1,108 | | 24.91 |
| Vested | (420) | | 17.03 |
| Forfeited | (358) | | 22.16 |
| Unvested restricted stock units, end of period | 2,600 | $ | 17.07 |

*Performance Stock Units ("PSUs")*

PSUs are issued and measured at fair market value on the date of grant using the following performance periods and performance metrics. The performance metrics generally include one or more of Earnings Before Interest and Taxes ("EBIT"), Total Shareholder Return relative to a peer group ("TSR"), Return on Invested Capital ("ROIC") or Gross Margin Percentage ("GM") compared with the Company's peer groups as determined by the Compensation Committee of the Company's Board of Directors.

| Fiscal Year | Performance Period | Performance Metrics | Target Achievement Range (%) |
|---|---|---|---|
| 2019 | 3 years | TSR and EBIT | 0% - 150% |
| 2020 | 3 years | TSR | 0% - 150% |
| 2021 | 3 years | TSR and GM | 0% - 200% |

For the PSUs granted in Fiscal 2018, the three year performance-based tests based on a combination of EBIT margin and ROIC were not met in the first quarter of Fiscal 2021 and therefore, there was no payment of these awards following vesting.

Table of Contents

Vesting of PSUs awarded to certain of the Company's executives is dependent on the Company's achievement of a performance-based test from the date of grant, during the performance period and, assuming achievement of the performance-based test, vest at the end of the performance period noted above, subject, in general, to the executive remaining in the Company's service on specified vesting dates. PSUs are converted into shares of common stock upon payment following vesting. Upon grant of the PSUs, the Company recognizes compensation expense related to these awards based on the Company's estimate of the percentage of the award that will be achieved. The Company evaluates the estimate on these awards on a quarterly basis and adjusts compensation expense related to these awards, as appropriate. As of February 26, 2022, there was $15.8 million of unrecognized compensation expense associated with these awards, which is expected to be recognized over a weighted average period of 2.0 years.

The fair value of the PSUs granted in Fiscal 2021 for which performance during the three-year period will be based on a relative three-year Total Shareholder Return ("TSR") goal relative to a peer group was estimated on the date of the grant using a Monte Carlo simulation that uses the assumptions noted in the following table.

| | Fiscal Year Ended |
|---|---|
| **Monte Carlo Simulation Assumptions** | **February 26, 2022** |
| Risk Free Interest Rate | 0.29% |
| Expected Dividend Yield | -% |
| Expected Volatility | 52.21% |
| Expected Term (in years) | 3 years |

Changes in the Company's PSUs for the fiscal year ended February 26, 2022 were as follows:

| (Shares in thousands) | Number of Performance Stock Units | | Weighted Average Grant-Date Fair Value |
|---|---|---|---|
| Unvested performance stock units, beginning of period | 1,475 | $ | 14.36 |
| Granted | 634 | | 29.00 |
| Vested | (17) | | 12.38 |
| Forfeited | (794) | | 17.62 |
| Unvested performance stock units, end of period | 1,298 | $ | 19.55 |

*Stock Options*

Stock option grants were issued at fair market value on the date of grant and generally became exercisable in either three or five equal annual installments beginning one year from the date of grant, subject, in general, to the recipient remaining in the Company's service on specified vesting dates. Option grants expired eight years after the date of grant. All option grants were nonqualified. During the fiscal year ended February 27, 2021, the remaining 822,633 options outstanding were forfeited and there were no options outstanding as of February 27, 2021.

For the fiscal years ended February 26, 2022 and February 27, 2021, no stock options were granted. For stock options granted in Fiscal 2019, the fair value of these stock options granted were estimated on the date of grant using a Black-Scholes option-pricing model that used the assumptions noted in the table below. The weighted average fair value for the stock options granted in Fiscal 2019 was $4.18.

| | Fiscal Year Ended |
|---|---|
| **Black-Scholes Valuation Assumptions** [1] | **February 29, 2020** |
| Weighted Average Expected Life (in years) [2] | 7.6 years |
| Weighted Average Expected Volatility [3] | 39.41% |
| Weighted Average Risk Free Interest Rates [4] | 2.39% |
| Expected Dividend Yield [5] | 4.34% |

---

[1] Forfeitures were estimated based on historical experience.
[2] The expected life of stock options was estimated based on historical experience.

Table of Contents

[3] Expected volatility was based on the average of historical and implied volatility. The historical volatility was determined by observing actual prices of the Company's stock over a period commensurate with the expected life of the awards. The implied volatility represented the implied volatility of the Company's call options, which were actively traded on multiple exchanges, had remaining maturities in excess of twelve months, had market prices close to the exercise prices of the employee stock options and were measured on the stock option grant date.
[4] Based on the U.S. Treasury constant maturity interest rate whose term was consistent with the expected life of the stock options.
[5] Expected dividend yield was estimated based on anticipated dividend payouts.

No stock options were exercised during Fiscal 2021 and 2020. The total intrinsic value for stock options exercised during Fiscal 2019 was $0.1 million.

*Inducement Awards*

In Fiscal 2020 and 2019, the Company granted stock-based awards to certain of the Company's new executive officers as inducements material to their commencement of employment and entry into an employment agreement with the Company. These inducement awards were approved by the Compensation Committee of the Board of Directors of the Company and did not require shareholder approval in accordance with Nasdaq Listing Rule 5635(c)(4).

RSUs granted as inducement awards are issued and measured at fair market value on the date of grant and generally become vested in one to three equal annual installments beginning one year from the date of grant, subject, in general, to the recipient remaining in the Company's service on specified vesting dates. Changes in the RSUs granted as inducement awards for the fiscal year ended February 26, 2022 were as follows:

| (Shares in thousands) | Number of Restricted Stock Units | | Weighted Average Grant-Date Fair Value |
|---|---|---|---|
| Unvested restricted stock units, beginning of period | 949 | $ | 7.36 |
| Granted | - | | - |
| Vested | (512) | | 8.43 |
| Forfeited | - | | - |
| Unvested restricted stock units, end of period | 437 | $ | 6.10 |

On November 4, 2019, in connection with the appointment of the Company's President and Chief Executive Officer, the Company also granted inducement awards consisting of 273,735 PSU awards, which are not included above. The PSUs vested over two years, based on performance goals requiring the President and CEO to prepare and deliver to the Board of Directors key objectives and goals for the Company and the strategies and initiatives for the achievement of such objectives and goals, and the President and CEO's provision of updates to the Board of Directors regarding achievement of such goals and objectives. Vesting of the PSUs was also subject, in general, to the President and CEO remaining in the Company's service through the vesting date of November 4, 2021. On November 2, 2021, the Compensation Committee of the Board of Directors determined that the performance goals established for the awards had been met, and the awards vested in full.

Other than with respect to the vesting terms described above for the inducement awards to the Company's President and Chief Executive Officer, inducement awards are generally subject to substantially the same terms and conditions as awards that are made under the 2018 Plan.

During Fiscal 2020, the Company granted 816,158 RSUs to executive officers of the Company, pursuant to inducement award agreements. During Fiscal 2021, an executive officer's employment with the Company was terminated and, as a result, 160,255 awards vested in accordance with the terms of the awards.

As of February 26, 2022, unrecognized compensation expense related to the unvested portion of the Company's inducement awards was $1.6 million and is expected to be recognized over a weighted average period of 1.2 years. Each inducement award recipient must hold at least fifty percent (50%) of the after-tax shares of common stock received pursuant to the inducement awards until they have satisfied the terms of the Company's stock ownership guidelines.

Table of Contents

**16.**
**ASSETS HELD FOR SALE AND DIVESTITURES**

*Assets Held for Sale*

The Company has included businesses classified as held for sale within its continuing operations as their dispositions do not represent a strategic shift that will have a major effect on the Company's operations and financial results. As of February 26, 2022 and February 27, 2021, the Company did not have any businesses classified as held for sale.

Prior to the end of Fiscal 2020, certain assets and liabilities of Cost Plus World Market, Personalization Mall.com ("PMall") and One Kings Lane ("OKL") were classified as held for sale on the Company's consolidated balance sheet. CPWM, PMall, and OKL were sold during Fiscal 2020, as further described below.

*Divestitures*

<u>Cost Plus World Market.</u> On December 14, 2020, the Company announced that it entered into a definitive agreement to sell Cost Plus World Market to Kingswood Capital Management. On January 15, 2021, the Company completed the sale of Cost Plus World Market. Proceeds from the sale were approximately $63.7 million, subject to certain working capital and other adjustments. The Company recognized a loss on sale of approximately $72.0 million in loss on sale of businesses including impairment of assets held for sale in its consolidated statements of operations for the fiscal year ended February 27, 2021. The $72.0 million loss on sale includes an impairment of $54.0 million recorded in the third quarter of Fiscal 2020 to remeasure the disposal group that was classified as held for sale to the lower of carrying value or fair value less costs to sell, recorded in impairments, including on assets held for sale.

<u>Christmas Tree Shops.</u> On October 11, 2020, the Company entered into definitive agreements to sell Christmas Tree Shops ("CTS") to Handil Holdings LLC and to sell one of the CTS distribution facilities to an institutional buyer, with a leaseback term of nine months, to provide business continuity to the Company for some of its operations currently using the facility. These transactions were completed during the third quarter of Fiscal 2020, generating approximately $233.3 million in proceeds, subject to certain working capital and other adjustments, and the Company recognized a loss on sale of approximately $53.8 million, which was recorded in loss on sale of businesses including impairment of assets held for sale in its consolidated statements of operations for the fiscal year ended February 27, 2021. In Fiscal 2021, the Company recorded an additional loss of sale of CTS of $13.5 million related to the settlement of the CTS Pension Plan.

<u>Linen Holdings.</u> On October 11, 2020, the Company entered into a definitive agreement to sell Linen Holdings to The Linen Group, LLC, an affiliate of Lion Equity Partners. On October 24, 2020, the Company completed the sale of Linen Holdings for approximately $10.1 million, subject to certain working capital and other adjustments, and recognized a loss on the sale of $64.6 million, which was recorded in loss on sale of businesses including impairment of assets held for sale in its consolidated statements of operations for the fiscal year ended February 27, 2021.

<u>PersonalizationMall.com.</u> On February 14, 2020, the Company entered into a definitive agreement to sell PersonalizationMall.com ("PMall") to 1-800-FLOWERS.COM, Inc. for $252.0 million, subject to certain working capital and other adjustments. The buyer was required to close the transaction on March 30, 2020, but failed to do so. Accordingly, the Company had filed an action to require the buyer to close the transaction. On July 20, 2020, the Company entered into a settlement agreement with respect to the litigation. Under this agreement, 1-800-FLOWERS.COM agreed to move forward with its purchase of PMall from the Company for $245.0 million, subject to certain working capital and other adjustments. The transaction closed on August 3, 2020. Net proceeds from the sale of PMall were $244.6 million, subject to certain working capital and other adjustments, and the Company recognized a gain on the sale of approximately $189.3 million, which was recorded in loss on sale of businesses including impairment of assets held for sale in its consolidated statement of operations for the fiscal year ended February 27, 2021. Upon the close of the transaction, Bed Bath & Beyond withdrew the litigation against 1-800-FLOWERS.COM and 800-FLOWERS, INC.

In connection with the sale of PMall, the Company agreed to indemnify 1-800-FLOWERS.COM for certain litigation matters then existing at the time of the close of the transaction, including certain matters for which the Company is entitled to indemnification from the former owner of PMall in connection with the Company's purchase of PMall in Fiscal 2016 (see "Commitments and Contingencies" Note 12 for additional information.)

<u>One Kings Lane.</u> On April 13, 2020, the Company completed the sale of One Kings Lane ("OKL"). Proceeds from the sale were not material.

Table of Contents

During the fiscal year ended February 26, 2022, the Company recognized approximately $18.2 million of loss on the sale of these businesses primarily associated with the Fiscal 2021 settlement of the CTS pension plan (see "Employee Benefit Plans" Note 11) and certain working capital and other adjustments related to the above divestitures.

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and Board of Directors
Bed Bath & Beyond Inc.:

*Opinion on the Consolidated Financial Statements*

We have audited the accompanying consolidated balance sheets of Bed Bath & Beyond Inc. and subsidiaries (the Company) as of February 26, 2022 and February 27, 2021, the related consolidated statements of operations, comprehensive loss, shareholders' equity, and cash flows for each of the years in the three-year period ended February 26, 2022 and the related notes and financial statement schedule (collectively, the consolidated financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of February 26, 2022 and February 27, 2021, and the results of its operations and its cash flows for each of the years in the three-year period ended February 26, 2022, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of February 26, 2022, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our report dated April 21, 2022 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

*Basis for Opinion*

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

*Critical Audit Matter*

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the consolidated financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of a critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

*Assessment of impairment of store-level long-lived assets*

As discussed in Note 1 to the consolidated financial statements, the Company reviews long-lived assets for impairment when events or changes in circumstances indicate the carrying value of these assets may exceed their current fair values. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the estimated undiscounted future cash flows expected to be generated by the asset. If the carrying amount of an asset exceeds its estimated future cash flows, an impairment charge is recognized for the amount by which the carrying amount of the asset exceeds the fair value of the assets. Based upon the analysis performed, the Company recognized pre-tax impairment charges for store-level long-lived assets of $30.8 million in Fiscal 2021.

We identified the assessment of impairment of store-level long-lived assets as a critical audit matter. Specifically, complex auditor judgment was required to assess the sales growth rates used to estimate the forecasted cash flows as they involve a

Table of Contents

high degree of subjectivity. In determining the fair value of certain store-level long-lived assets, specialized knowledge was required to assess the Company's assumption of market rental rates from sub-lessors.

The following are the primary procedures we performed to address this critical audit matter. We evaluated the design and tested the operating effectiveness of certain internal controls over the Company's store-level impairment assessment process, including controls related to the assumptions described above. We evaluated the sales growth rates by comparing to historical results, the Company's future operating plans, and industry reports. We involved valuation professionals with specialized skills and knowledge who assisted in evaluating the market rental rates for certain stores by comparing the sublease income to an independently developed range using publicly available market data for comparable store sites.

*/s/ KPMG LLP*

We have served as the Company's auditor since 1992.

Short Hills, New Jersey
April 21, 2022

<div align="center">74</div>

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

To the Shareholders and Board of Directors
Bed Bath & Beyond Inc.:

*Opinion on Internal Control Over Financial Reporting*

We have audited Bed Bath & Beyond Inc. and subsidiaries' (the Company) internal control over financial reporting as of February 26, 2022, based on criteria established in *Internal Control - Integrated Framework (2013),* issued by the Committee of Sponsoring Organizations of the Treadway Commission. In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of February 26, 2022, based on criteria established in *Internal Control - Integrated Framework (2013),* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of February 26, 2022 and February 27, 2021, the related consolidated statements of operations, comprehensive loss, shareholders' equity, and cash flows for each of the years in the three-year period ended February 26, 2022, and the related notes and financial statement schedule (collectively, the consolidated financial statements), and our report dated April 21, 2022 expressed an unqualified opinion on those consolidated financial statements.

*Basis for Opinion*

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

*Definition and Limitations of Internal Control Over Financial Reporting*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention, or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent, or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ KPMG LLP

Short Hills, New Jersey
April 21, 2022

Table of Contents

## ITEM 9  - CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## ITEM 9A - CONTROLS AND PROCEDURES

(a) Disclosure Controls and Procedures

Based on their evaluation as of February 26, 2022, our Principal Executive Officer and Principal Financial Officer have concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) were effective to ensure that the information required to be disclosed by our management in the reports that we file or submit under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to our management, including our Principal Executive Officer and Principal Financial Officer, to allow timely decisions regarding required disclosure.

Our management, including our Principal Executive Officer and Principal Financial Officer, does not expect that our disclosure controls and procedures or our internal controls will prevent all error and all fraud. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Our disclosure controls and procedures are designed to provide such reasonable assurance of achieving their objectives, and our Principal Executive Officer and Principal Financial Officer have concluded that our disclosure controls and procedures are effective at that reasonable assurance level.

(b) Management's Report on Internal Control over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934, as amended). Our management assessed the effectiveness of our internal control over financial reporting as of February 26, 2022. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), released in 2013, Internal Control-Integrated Framework.

Our management has concluded that, as of February 26, 2022, our internal control over financial reporting is effective based on these criteria.

(c) Attestation Report of the Independent Registered Public Accounting Firm

KPMG LLP issued an audit report on the effectiveness of our internal control over financial reporting, which is included herein.

(d) Changes in Internal Control over Financial Reporting

There were no changes in our internal controls over financial reporting during the quarter ended February 26, 2022 that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

## ITEM 9B - OTHER INFORMATION

On April 20, 2022, as part of the Company's annual review process that began in 2021, the People, Culture and Compensation Committee of the Company's Board of Directors approved the adoption of an Executive Change in Control Severance Plan (the "Change in Control Plan"). This plan, similar to those of benchmarked peers, provides for enhanced cash severance to be paid to members of the Company's executive leadership team and specific other employees as a result of certain events that would trigger a change in control of the Company, as defined in the Change in Control Plan. A copy of the Change in Control Plan, including the form of participation agreement is filed as an exhibit hereto.

## ITEM 9C - DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS

Not applicable.

Table of Contents

# PART III

## ITEM 10 - DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

(a)Directors of the Company

Information relating to the Directors of the Company is set forth under the section captioned "Our Board of Directors and Corporate Governance" in the registrant's definitive proxy statement for the 2022 Annual Meeting of Shareholders (the "Proxy Statement") and is incorporated herein by reference.

(b)Executive Officers of the Company

Information relating to the Executive Officers of the Company is set forth under the section captioned "Information About Our Executive Officers" in the Proxy Statement and is incorporated herein by reference.

(c)Compliance with Section 16(a)

Information with respect to compliance with Section 16(a) of the Securities Exchange Act of 1934 is set forth under the section captioned "Delinquent Section 16(a) Reports" in the Proxy Statement and is incorporated herein by reference, to the extent responsive disclosure is required.

(d) Audit Committee

Information on our audit committee and the audit committee financial expert is set forth under the section captioned "Audit Committee" in the Proxy Statement and is incorporated herein by reference.

(e) Code of Ethics

The Company has adopted a code of ethics entitled "Policy of Ethical Standards For Business Conduct" that applies to all of its employees, including Executive Officers and the Board of Directors, the complete text of which is available through the Investor Relations section of the Company's website, www.bedbathandbeyond.com. Amendments to, and waivers granted under, the Policy of Ethical Standards for Business Conduct, if any, will be posted to the Company's website.

## ITEM 11 - EXECUTIVE COMPENSATION

The information required by this item is set forth under the section captioned "Executive Compensation" in the Proxy Statement and is incorporated herein by reference.

## ITEM 12 - SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED SHAREHOLDER MATTERS

The Equity Compensation Plan Information required by this item is included below; other information required by this item is set forth under the section captioned "Security Ownership of Certain Beneficial Owners and Management" in the Proxy Statement and is incorporated herein by reference. Additional information regarding our equity compensation plans appears in Note 1 and Note 15 to the Company's consolidated financial statements.

Table of Contents

The following table provides certain information as of February 26, 2022 with respect to the Company's equity compensation plans:

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by shareholders (1) | 4,898,746 (2) | $ - (3) | 13,512,808 (4) |
| Equity compensation plans not approved by shareholders | 437,268 (5) | - (3) | 20 (6) |
| Total | 5,336,014 (2) | $ - (3) | 13,512,828 |

(1) These plans consist of the Company's 2012 Incentive Compensation Plan (the "2012 Plan"), which amended and restated and assumed certain shares under the 2004 Incentive Compensation Plan (the "2004 Plan") and the Company's 2018 Incentive Compensation Plan (the "2018 Plan"), which is generally based on the terms of the 2012 Plan. No further shares of common stock will be issued or distributed under the 2004 Plan, and no equity-settled awards are outstanding under the 2018 Plan as of February 26, 2022.

(2) This amount represents the number of underlying shares of common stock associated with outstanding performance stock units and restricted stock units under shareholder approved plans and includes 2,263,551 shares that may be issued upon the vesting of performance stock units granted under the 2012 Plan and 2,635,195 shares that may be issued upon the vesting of restricted stock units granted under the 2012 Plan. The amount of shares that may be issued upon the vesting of the performance stock units represents the estimated maximum number of shares that may be issued upon the vesting of the performance stock units; however the actual number of shares that will be issued will depend on the achievement of performance metrics. As of February 26, 2022, there are no outstanding equity-settled awards under the 2018 Plan.

(3) We have not indicated a weighted-average exercise price as no outstanding awards as of February 26, 2022 under the Company's equity plans, whether or not approved by shareholders, have an exercise price.

(4) This amount represents the aggregate amount of common stock available for future issuance under shareholder approved equity compensation plans and is comprised of 8,912,808 shares of common stock available for future issuance under the 2012 Plan and 4,600,000 shares of common stock available for future issuance under the 2018 Plan. Under the 2012 Plan and the 2018 Plan, any shares of common stock that are subject to equity-settled awards other than options or stock appreciation rights, including restricted stock awards, restricted stock units and performance stock units, shall be counted against the aggregate number of shares of common stock that may be issued as 2.20 shares for every share granted. Shares of common stock underlying awards that may be settled solely in cash are not deemed to use shares that may be issued under the 2018 Plan.

(5) This amount represents the number of underlying shares of common stock associated with 437,268 restricted stock units outstanding pursuant to inducement grants to certain executives of the Company.

(6) This amount represents 20 shares of common stock registered pursuant to an inducement award for the Company's CEO, which were never granted.

## ITEM 13 - CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The information required by this item is set forth under the sections captioned "Director Independence" and "Certain Relationships and Related Transactions" in the Proxy Statement and is incorporated herein by reference.

## ITEM 14 - PRINCIPAL ACCOUNTING FEES AND SERVICES

The information required by this item is set forth under the sections captioned "Fees Paid to KPMG LLP for Services and Products" and "Pre-Approval Policies and Procedures" in the Proxy Statement and is incorporated herein by reference.

Table of Contents

# PART IV

# ITEM 15 - EXHIBITS, FINANCIAL STATEMENT SCHEDULES

**(a) (1) Consolidated Financial Statements of Bed Bath & Beyond Inc. and subsidiaries are incorporated under Item 8 of this Form 10-K.**

**(a) (2) Financial Statement Schedules**

For the Fiscal Years Ended February 26, 2022, February 27, 2021 and February 29, 2020.

Schedule II - Valuation and Qualifying Accounts

**(a) (3) Exhibits**

Unless otherwise indicated, exhibits are incorporated by reference to the correspondingly numbered exhibits to the Company's Registration Statement on Form S-1 (Commission File No. 33-47250).

| Exhibit No. | Exhibit |
|---|---|
| 3.1 | Company's Amended and Restated Certificate of Incorporation as amended through June 30, 2009 (incorporated by reference to the Company's Form 10-K for the year ended February 27, 2021 filed on April 22, 2021) |
| 3.2 | Amended and Restated By-Laws of Bed Bath & Beyond Inc. (incorporated by reference to Exhibit 3.1 to the Company's Form 8-K filed with the Commission on June 19, 2019) |
| 4.1 | Indenture, dated as of July 17, 2014, relating to the 3.749% senior unsecured notes due 2024, the 4.915% senior unsecured notes due 2034 and the 5.165% senior unsecured notes due 2044, between the Company and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.1 to the Company's Form 8-K filed with the Commission on July 17, 2014) |
| 4.2 | First Supplemental Indenture, dated as of July 17, 2014, relating to the 3.749% senior unsecured notes due 2024, the 4.915% senior unsecured notes due 2034 and the 5.165% senior unsecured notes due 2044, between the Company and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.2 to the Company's Form 8-K filed with the Commission on July 17, 2014) |
| 4.3 | Form of 3.749% senior unsecured notes due 2024 (incorporated by reference to Exhibit 4.3 to the Company's Form 8-K filed with the Commission on July 17, 2014) |
| 4.4 | Form of 4.915% senior unsecured notes due 2034 (incorporated by reference to Exhibit 4.4 to the Company's Form 8-K filed with the Commission on July 17, 2014) |
| 4.5 | Form of 5.165% senior unsecured notes due 2044 (incorporated by reference to Exhibit 4.5 to the Company's Form 8-K filed with the Commission on July 17, 2014) |
| 4.6** | Description of the registrant's securities registered pursuant to section 12 of the Securities Exchange Act of 1934 |
| 4.7 | Credit Agreement, dated as of June 19, 2020, among Bed Bath & Beyond Inc., certain of the Company's U.S. and Canadian subsidiaries party thereto, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, and the lenders party thereto (incorporated by reference to Exhibit 10.1 to the Company's Form 8-K filed on June 22, 2020) |
| 4.8 | Amended and Restated Credit Agreement, dated as of August 9, 2021, among the Company, certain of the Company's US and Canadian subsidiaries party thereto, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, and the lenders party thereto (incorporated by reference to Exhibit 10.1 to the Company's 8-K filed August 10, 2021) |
| 10.1* | Employment Agreement between the Company and Steven H. Temares (dated as of December 1, 1994) (incorporated by reference to Exhibit 10.16 to the Company's Form 10-K for the year ended February 28, 1998) |
| 10.2* | Company's 2004 Incentive Compensation Plan (incorporated by reference to Exhibit B to the Registrant's Proxy Statement dated May 28, 2004) |
| 10.3* | Amended and Restated Employment Agreement between the Company and Warren Eisenberg, dated as of December 31, 2008 (incorporated by reference to Exhibit 10.1 to the Company's Form 10-Q for the quarter ended November 29, 2008) |

Table of Contents

| 10.4* | Amended and Restated Employment Agreement between the Company and Leonard Feinstein, dated as of December 31, 2008 (incorporated by reference to Exhibit 10.2 to the Company's Form 10-Q for the quarter ended November 29, 2008) |
|---|---|
| 10.5* | Bed Bath & Beyond Inc. Policy on Recovery of Incentive Compensation (incorporated by reference to Exhibit 10.1 to the Company's Form 10-Q for the quarter ended May 30, 2009) |
| 10.9* | Amendment dated as of August 13, 2010 to Amended and Restated Employment Agreement between the Company and Warren Eisenberg, dated as of December 31, 2008 (incorporated by reference to Exhibit 10.1 to the Company's Form 10-Q for the quarter ended August 28, 2010) |
| 10.10* | Amendment dated as of August 13, 2010 to Amended and Restated Employment Agreement between the Company and Leonard Feinstein, dated as of December 31, 2008 (incorporated by reference to Exhibit 10.2 to the Company's Form 10-Q for the quarter ended August 28, 2010) |
| 10.11* | Bed Bath & Beyond Inc. 2012 Incentive Compensation Plan (incorporated by reference to Exhibit 10.1 to the Company's Form 8-K filed with the Commission on June 26, 2012) |
| 10.12* | Performance-Based Form of Restricted Stock Agreement under 2012 Stock Incentive Plan (incorporated by reference to Exhibit 10.39 to the Company's Form 10-K for the year ended March 1, 2013) |
| 10.13* | Notice of Amendment to Restricted Stock Agreements, dated on or before June 11, 2012 (incorporated by reference to Exhibit 10.41 to the Company's Form 10-K for the year ended March 1, 2013) |
| 10.16* | Amendment dated as of February 26, 2014 to Amended and Restated Employment Agreement between the Company and Warren Eisenberg, dated as of December 31, 2008, as previously amended as of June 29, 2010 and August 13, 2010 (incorporated by reference to Exhibit 10.1 to the Company's Form 8-K filed with the Commission on February 28, 2014) |
| 10.17* | Amendment dated as of February 26, 2014 to Amended and Restated Employment Agreement between the Company and Leonard Feinstein, dated as of December 31, 2008, as previously amended as of June 29, 2010 and August 13, 2010 (incorporated by reference to Exhibit 10.2 to the Company's Form 8-K filed with the Commission on February 28, 2014) |
| 10.18* | Form of Standard Performance Unit Agreement under 2012 Stock Incentive Plan (incorporated by reference to Exhibit 10.1 to the Company's Form 8-K filed with the Commission on May 9, 2014) |
| 10.19* | Form of Performance Stock Unit Agreement under 2012 Incentive Compensation Plan (effective 2016) (incorporated by reference to Exhibit 10.3 to the Company's Form 10-Q filed with the Commission on July 6, 2016) |
| 10.20* | Letter agreement dated February 7, 2017 between the Company and Warren Eisenberg (incorporated by reference to Exhibit 10.1 to the Company's Form 8-K filed with the Commission on February 9, 2017) |
| 10.21* | Letter agreement dated February 7, 2017 between the Company and Leonard Feinstein (incorporated by reference to Exhibit 10.2 to the Company's Form 8-K filed with the Commission on February 9, 2017) |
| 10.22* | Form of Standard Performance Stock Unit Agreement under 2012 Incentive Compensation Plan (effective 2017) (incorporated by reference to Exhibit 10.1 to the Company's Form 10-Q filed with the Commission on June 30, 2017) |
| 10.23* | Form of Performance Stock Unit Agreement under 2012 Incentive Compensation Plan (effective 2017) for Steven H. Temares (incorporated by reference to Exhibit 10.2 to the Company's Form 10-Q filed with the Commission on June 30, 2017) |
| 10.24* | Amendment to Employment Agreement of Steven H. Temares, dated August 21, 2009 (incorporated by reference to Exhibit 10.60 to the Company's Form 10-K filed with the Commission on May 2, 2018) |
| 10.26* | Employment Agreement between the Company and Robyn M. D'Elia (dated as of June 4, 2018) (incorporated by reference to Exhibit 10.1 to the Company's Form 8-K filed with the Commission on June 5, 2018) |
| 10.27* | Bed Bath & Beyond Inc. 2018 Incentive Compensation Plan (incorporated by reference to Exhibit 10.1 to the Company's Form 8-K filed with the Commission on June 29, 2018) |
| 10.28* | Form of Standard Performance Stock Unit Agreement under 2018 or 2012 Incentive Compensation Plan (incorporated by reference to Exhibit 10.1 to the Company's Form 8-K filed with the Commission on June 19, 2019) |
| 10.29* | Employment Agreement between the Company and Mark J. Tritton (dated as of October 6, 2019) (incorporated by reference to Exhibit 10.1 to the Company's Form 8-K filed with the Commission on October 10, 2019) |

Table of Contents

| 10.30* | Sign-On Restricted Stock Unit Agreement between the Company and Mark J. Tritton (dated as of November 4, 2019) (incorporated by reference to Exhibit 10.2 to the Company's Form 10-Q filed with the Commission on January 9, 2020) |
| 10.31* | Make-Whole Restricted Stock Unit Agreement between the Company and Mark J. Tritton (dated as of November 4, 2019) (incorporated by reference to Exhibit 10.3 filed with the Commission on January 9, 2020) |
| 10.32* | Make-Whole Performance Stock Unit Agreement between the Company and Mark J. Tritton (dated as of November 4, 2019) (incorporate by reference to Exhibit 10.4 to the Company's Form 10-Q filed with the Commission on January 9, 2020) |
| 10.33 | Cooperation and Support Agreement (dated as of May 28, 2019) (incorporated by reference to Exhibit 99.2 to the Company's Form 8-K filed with the Commission on June 3, 2019) |
| 10.34 * | Employment Agreement between the Company and John Hartmann (dated April 1, 2020) (incorporated by reference to Exhibit 10.1 to the Company's Form 8-K filed with the Commission on April 21, 2020) |
| 10.35* | Employment Agreement between the Company and Gustavo Arnal (dated April 24, 2020) (incorporated by reference to Exhibit 10.1 to the Company's Form 8-K filed with the Commission on April 30, 2020) |
| 10.36 * | Employment Agreement between the Company and Cindy Davis (dated April 30, 2020) (incorporated by reference to Exhibit 99.1 to the Company's Form S-8 filed with the Commission on May 26, 2020) |
| 10.37 * | Make-Whole Restricted Stock Unit Agreement between the Company and John Hartmann (incorporated by reference to Exhibit 10.3 to the Company's Form 10-Q filed with the SEC on July 8, 2020) |
| 10.38 * | Sign-On Restricted Stock Unit Agreement between the Company and Gustavo Arnal (incorporated by reference to Exhibit 10.4 to the Company's Form 10-Q filed with the SEC on July 8, 2020) |
| 10.40 | Master Confirmation between JPMorgan Chase Bank, National Association and Bed Bath & Beyond Inc., dated October 28, 2020 (incorporated by reference to Exhibit 10.1 to the Company's Form 8-K filed with the SEC on October 28, 2020) |
| 10.41 * | Employment Agreement between the Company and Joe Hartsig, dated March 4, 2020 (incorporated by reference to Exhibit 10.41 to the Company's Form 10-K filed with the SEC on April 22, 2021) |
| 10.42 * | Make-Whole Restricted Stock Unit Agreement between the Company and Joe Hartsig, dated March 4, 2020 (incorporated by reference to Exhibit 10.42 to the Company's Form 10-K filed with the SEC on April 22, 2021) |
| 10.43 * | Bed Bath & Beyond Inc. Compensation Recoupment Policy, dated as of January 2021 (incorporated by reference to Exhibit 10.43 to the Company's Form 10-K filed with the SEC on April 22, 2021) |
| 10.44 * | Sign-On Restricted Stock Unit Agreement between the Company and Cindy Davis, dated May 26, 2020 (incorporated by reference to Exhibit 10.44 to the Company's Form 10-K filed with the SEC on April 22, 2021) |
| 10.45 * | Form of Performance Unit Award Agreement (incorporated by reference to Exhibit 10.1 to the Company's 8-K filed on May 14, 2021) |
| 10.46 * | Form of Restricted Unit Award Agreement (incorporated by reference to Exhibit 10.2 to the Company's 8-K filed on May 14, 2021) |
| 10.48 * | Separation and General Release Agreement Between the Company and Cindy Davis (Dated as of August 30, 2021) (incorporated by reference to Exhibit 10.2 to the Company's Form 10-Q filed September 30, 2021) |
| 10.49 *** | Bed Bath & Beyond Inc. Executive Change in Control Severance Plan, dated as of April 20, 2022 |
| 10.50 *** | Employment Agreement between the Company and Rafeh Masood, dated April 22, 2020 |
| 10.51 *** | Amended Employment Agreement between the Company and Rafeh Masood, dated November 2, 2021 |
| 10.52 * | Cooperation Agreement, by and among Bed Bath & Beyond Inc., RC Ventures LLC and Ryan Cohen, dated as of March 24, 2022 (incorporated by reference to Exhibit 10.1 to the Company's Form 8-K filed with the SEC on March 25, 2022) |
| 10.53 *** | Bed Bath & Beyond Amended and Restated Short-Term Incentive Plan, dated April 13, 2022 |
| 21** | Subsidiaries of the Company |
| 23** | Consent of Independent Registered Public Accounting Firm |
| 31.1** | Certification of Principal Executive Officer Pursuant to Section 302 of the Sarbanes - Oxley Act of 2002 |
| 31.2** | Certification of Principal Financial Officer Pursuant to Section 302 of the Sarbanes - Oxley Act of 2002 |
| 32** | Certification of Principal Executive Officer and Principal Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes - Oxley Act of 2002 |

Table of Contents

| 101.INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document |
|---|---|
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 104 | The cover page of Bed Bath & Beyond Inc.'s Annual Report on Form 10-K for the year ended February 26, 2022, formatted in Inline XBRL (included within Exhibit 101 attachments) |

_____

| * | This is a management contract or compensatory plan or arrangement. |
| ** | Filed herewith. |
| *** | This is a management contract or compensatory plan or arrangement and filed herewith. |

82

Table of Contents

## ITEM 16 - FORM 10-K SUMMARY

None.

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**BED BATH & BEYOND INC.**

**By:** */s/ Mark J. Tritton*
**Mark J. Tritton**
**Chief Executive Officer**
April 21, 2022

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

Table of Contents

| Signature | Capacity | Date |
|-----------|----------|------|
| /s/ Mark J. Tritton<br>**Mark J. Tritton** | President and Chief Executive Officer<br>and Director | April 21, 2022 |
| /s/ Gustavo Arnal<br>**Gustavo Arnal** | Chief Financial Officer<br>(Principal Financial Officer) | April 21, 2022 |
| /s/ John S. Barresi<br>**John S. Barresi** | Chief Accounting Officer<br>(Principal Accounting Officer) | April 21, 2022 |
| /s/ Marjorie Bowen<br>**Marjorie Bowen** | Director | April 21, 2022 |
| /s/ Harriet Edelman<br>**Harriet Edelman** | Director | April 21, 2022 |
| /s/ John E. Fleming<br>**John E. Fleming** | Director | April 21, 2022 |
| /s/ Sue E. Gove<br>**Sue E. Gove** | Director | April 21, 2022 |
| /s/ Jeffrey A. Kirwan<br>**Jeffrey A. Kirwan** | Director | April 21, 2022 |
| /s/ Shelly Lombard<br>**Shelly Lombard** | Director | April 21, 2022 |
| /s/ Benjamin Rosenzweig<br>**Benjamin Rosenzweig** | Director | April 21, 2022 |
| /s/ Virginia P. Ruesterholz<br>**Virginia P. Ruesterholz** | Director | April 21, 2022 |
| /s/ Joshua E. Schechter<br>**Joshua E. Schechter** | Director | April 21, 2022 |
| /s/ Minesh Shah<br>**Minesh Shah** | Director | April 21, 2022 |
| /s/ Andrea Weiss<br>**Andrea Weiss** | Director | April 21, 2022 |
| /s/ Mary A .Winston<br>**Mary A. Winston** | Director | April 21, 2022 |

Table of Contents

| | | |
|---|---|---|
| */s/ Ann Yerger* | Director | April 21, 2022 |
| **Ann Yerger** | | |

86

Table of Contents

**Bed Bath & Beyond Inc. and Subsidiaries**

**Schedule II - Valuation and Qualifying Accounts**
**Fiscal Years Ended February 26, 2022, February 27, 2021, and February 29, 2020**
*(amounts in millions)*

| Column A | Column B | Column C | Column D | Column E |
|---|---|---|---|---|
| Description | Balance at Beginning of Period | Additions Charged to Income | Adjustments and/or Deductions | Balance at End of Period |
| Sales Returns and Allowance | | | | |
| Year Ended: | | | | |
| February 26, 2022 | $ 36.2 | $ 227.1 | $ (241.1) | $ 22.2 |
| February 27, 2021 | 71.6 | 259.8 | (295.2) | 36.2 |
| February 29, 2020 | 90.5 | 403.1 | (422.0) | 71.6 |

87

Exhibit 4.6

**DESCRIPTION OF THE REGISTRANT'S SECURITIES
REGISTERED PURSUANT TO SECTION 12 OF THE
SECURITIES EXCHANGE ACT OF 1934**

Bed Bath & Beyond Inc. ("Bed Bath" or the "Company") has one class of securities registered under Section 12 of the Securities Exchange Act of 1934, as amended: the Company's common stock, par value $.01 per share ("Common Stock").

**Description of Common Stock**

The following summary description sets forth some of the general terms and provisions of the Common Stock. Because this is a summary description, it does not contain all of the information that may be important to you. For a more detailed description of the Company's Common Stock, you should refer to the provisions of the Company's Certificate of Incorporation (as amended, the "Certificate of Incorporation") and the Company's Amended and Restated By-Laws (the "By-laws"), each of which is an exhibit to the Annual Report on Form 10-K to which this description is an exhibit.

**Authorized Capital Shares**

Under the Certificate of Incorporation, Bed Bath's capital stock consists of 900,000,000 shares of Common Stock and 1,000,000 shares of preferred stock, par value $.01 per share.

**Common Stock**

Holders of Common Stock are entitled to one vote for each share held on all matters submitted to a vote of shareholders, and do not have cumulative voting rights. Holders of Common Stock are entitled to receive ratably such dividends, if any, as may be declared by the Company's board of directors (the "Board") out of funds legally available therefor, and subject to any preferential dividend rights of any then outstanding preferred stock. Upon the Company's liquidation, dissolution or winding up, the holders of Common Stock are entitled to receive ratably the Company's net assets available after the payment of all debts and other liabilities and subject to any liquidation preference of any then outstanding preferred stock. Holders of Common Stock have no preemptive, subscription or conversion rights. There are no redemption or sinking fund provisions applicable to the Common Stock.

The Board has the authority, subject to certain restrictions, without further shareholder approval, to issue, at any time and from time to time, up to 1,000,000 shares of preferred stock in one or more series. Each such series shall have such number of shares, designations, preferences, voting powers, qualifications and special or relative rights or privileges as shall be determined by the Board, which may include, among others, dividend rights, voting rights, redemption and sinking fund provisions, liquidation preferences, conversion rights and preemptive rights, to the full extent now or hereafter permitted by the laws of the State of New York.

The rights of the holders of Common Stock will be subject to, and may be adversely affected by, the rights of holders of any preferred stock that may be issued in the future. Such rights may include voting and conversion rights which could adversely affect the holders of the Common Stock. Satisfaction of any dividend or liquidation preferences of outstanding preferred stock would reduce the amount of funds available, if any, for the payment of dividends or liquidation amounts on Common Stock. Holders of preferred stock would typically be entitled to receive a preference payment.

**New York Law and Some By-Law Provisions**

The By-laws contain certain provisions that might have the effect of deterring a hostile takeover attempt of the Company. These By-law provisions have the following effects:

•they provide that only persons who are nominated in accordance with the procedures set forth in the By-laws shall be eligible for election as a director of the Company, except as may be otherwise provided in the By-laws;

•they provide that only business brought before the annual meeting by the Board or by a shareholder who complies with the procedures set forth in the By-laws may be transacted at an annual meeting of shareholders;

• they provide that only the chairman of the board, if any, the chief executive officer, the Board or, at the written request of record holders of at least 50% of the voting power of the Company's outstanding shares, the secretary may call special meetings of the Company's shareholders; and

• they establish a procedure for the Board to fix the record date whenever shareholder action by written consent is undertaken.

Furthermore, the Company is subject to the provisions of Section 912 of the New York Business Corporation Law, an anti-takeover law. In general, the statute prohibits a publicly held New York corporation from engaging in a "business combination" with an "interested shareholder" for a period of five years after the date of the transaction in which the person became an interested shareholder, unless the business combination is approved in a prescribed manner. For purposes of Section 912, a "business combination" includes a merger, asset sale or other transaction resulting in a financial benefit to the interested shareholder, and an "interested shareholder" is a person who, together with affiliates and associates, owns, or within five years prior, did own, 20% or more of the corporation's voting stock.

**Proxy Access Nominations**

Under the By-laws, a shareholder (or a group of up to 20 shareholders) who has held at least 3% of the Common Stock for three years or more may nominate a director and have that nominee included in the Company's proxy materials, provided that the shareholder and nominee satisfy the requirements specified in the By-laws. Any shareholder who intends to use these procedures to nominate a candidate for election to the Board for inclusion in the Company's proxy statement must satisfy the requirements specified in the By-laws.

Exhibit 10.49

## BED BATH & BEYOND INC.

## EXECUTIVE CHANGE IN CONTROL SEVERANCE PLAN

### Effective as of April 20, 2022

**Section 1.**     **Purpose.**

The Bed Bath & Beyond Inc. Executive Change in Control Severance Plan (the "Plan") is effective as of April 20, 2022 (the "Effective Date"), pursuant to the authorization of the Board of Directors of Bed Bath & Beyond Inc., a New York corporation (the "Company", which, as used throughout this Plan, shall be deemed to include any successor thereto). The Plan has been established to provide financial security to the Company's Executives (as defined below) in the event of a Change in Control (as defined below) and upon certain terminations of employment with the Company. Except as expressly contemplated herein, this Plan replaces in full and supersedes any other change in control severance provided to the Executives, including without limitation, any offer letters or other plans.

**Section 2.**     **Definitions and Construction**

(a)     Definitions. Where the following words and phrases appear in the Plan, they shall have the respective meanings set forth below, unless their context clearly indicates to the contrary.

(i)     "Affiliate" means each of the following: (A) any Subsidiary; (B) any Parent; (C) any corporation, trade or business (including, without limitation, a partnership or limited liability company) that is directly or indirectly controlled fifty percent (50%) or more (whether by ownership of stock, assets or an equivalent ownership interest or voting interest) by the Company or one of its Affiliates; (D) any corporation, trade or business (including, without limitation, a partnership or limited liability company) that directly or indirectly controls fifty percent (50%) or more (whether by ownership of stock, assets or an equivalent ownership interest or voting interest) of the Company; and (E) any other entity in which the Company or any of its Affiliates has a material equity interest and that is designated as an "Affiliate" by resolution of the Committee.

(ii)     "Annual Pay" means the annual rate of base compensation of an Executive in effect immediately prior to the Change in Control or at the time of his or her Termination of Employment, whichever is greater.

(iii)     "Award" means any award under a Company long-term incentive compensation plan of any option, stock appreciation right, restricted stock award, performance award or other stock-based award.

(iv)     "Board" means the Board of Directors of the Company or its successor.

(v)     "Bonus" means annual incentive compensation payable under the Company's annual incentive award plan as in effect from time to time.

(vi)     "Cause" means, with respect to an Executive's Termination of Employment, the following: (A) in the case where there is an employment agreement, severance agreement, or similar agreement in effect between the Company or an Affiliate and the Executive that defines "cause" (or words or a concept of like import), "cause" shall be as defined under such agreement; or (B) in the case where there is no employment agreement, severance agreement, or similar agreement in effect between the Company or an Affiliate and the Executive (or where there is such an agreement but it does not define "cause" (or words or a concept of like import)), the Executive's: (1) indictment for or plea of *nolo contendere* to a felony or commission of an act involving moral turpitude; (2) commission of fraud, theft, embezzlement, self-dealing, misappropriation or other malfeasance against the business of the Company Group; (3) indictment for or plea of *nolo contendere* to any serious offense that results in or would reasonably be expected to result in material financial harm, materially negative publicity or other material harm to any member of the Company Group; (4) failure to perform any material aspect of his or her lawful duties or responsibilities for the Company or the Company Group (other than by reason of disability), and if curable, failure to cure in a timely manner; (5) failure to comply with any lawful written policy of the Company, any reasonable directive of the Chief Executive Officer of the Company (the "CEO") (with respect to participants other than the CEO) or the Board, or, for any Executive who is not a direct report to the CEO, any reasonable directive of the Executive's direct supervisor, and in each case, if curable, failure to cure in a timely manner; (6) commission of acts or omissions constituting gross negligence or gross misconduct in the performance of any aspect of his or her lawful duties or responsibilities; (7) breach of any fiduciary duty owed to the Company Group; (8) violation or breach of any restrictive covenant or any material term of the applicable employment or other agreement, and, if curable, failure to cure in a timely manner; or (9) commission of any act or omission that damages or is reasonably likely to damage the financial condition or business of the Company or materially damages or is reasonably likely to materially damage the reputation, public image, goodwill, assets or prospects of the Company. In addition, the Executive's employment will be deemed to have terminated for "Cause" if, on the date the Executive's employment terminates, facts and circumstances exist that would have justified a termination for Cause, to the extent that such facts and circumstances are discovered within four (4) months after such termination.

(vii)     "Change in Control" means, the occurrence of any one or more of the following events: (A) any "person" as such term is used in Sections 13(d) and 14(d) of the Exchange Act (other than the Company, any trustee or other fiduciary holding securities under any employee benefit plan of the Company, or any company owned, directly or indirectly, by the shareholders of the Company in substantially the same proportions as their ownership of Common Stock of the Company), becoming the beneficial owner (as defined in Rule 13d-3 under the

Exchange Act), directly or indirectly, of securities of the Company representing more than fifty percent (50%) of the combined voting power of the Company's then outstanding securities, excluding a person that is an "affiliate" (as such term is used in the Exchange Act) of the Company on the date of effectiveness of this Plan, or any affiliate of any such person; (B) during any period of twelve (12) months, the majority of the Board consists of individuals other than "Incumbent Directors" which term means the members of the Board at the beginning of such period, and any new director (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in subsections (A), (C), or (D) or a director whose initial assumption of office occurs as a result of either an actual or threatened election contest or other actual or threatened solicitation of proxies or consents by or on behalf of a person other than the Board) whose election by the Board or nomination for election by the Company's shareholders was approved by a vote of a majority of the directors who comprised the Incumbent Directors or whose election or nomination for election was previously so approved; (C) upon the consummation of a merger or consolidation of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) fifty percent (50%) or more of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation; provided, however, that a merger or consolidation effected to implement a recapitalization of the Company (or similar transaction) in which no person (other than those covered by the exceptions in (A) above) acquires more than fifty percent (50%) of the combined voting power of the Company's then outstanding securities shall not constitute a Change in Control of the Company; (D) upon approval by the shareholders of the Company, the Company adopts any plan of liquidation providing for the distribution of all or substantially all its assets; or (E) upon the consummation of a sale or disposition by the Company of all or substantially all of the Company's assets other than the sale or disposition of all or substantially all of the assets of the Company to a person or persons who beneficially own, directly or indirectly, at least fifty percent (50%) or more of the combined voting power of the then outstanding voting securities of the Company at the time of the sale.

Further and for the avoidance of doubt, a transaction will not constitute a Change in Control if: (1) its sole purpose is to change the state of the Company's incorporation, or (2) its sole purpose is to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately before such transaction. The Committee shall have the sole discretion to determine if a Change in Control has occurred for purposes of the Plan.

(viii)   "Change in Control Period" means the period beginning three (3) months prior to the consummation of the first instance of a Change in Control and

ending on the date that is twenty-four (24) months after the consummation of the first instance of a Change in Control.

(ix)     "Code" means the Internal Revenue Code of 1986, as amended.

(x)     "Committee" means the Compensation Committee of the Board, or, if no Compensation Committee exists, the Board.

(xi)     "Company Group" means the Company, its subsidiaries and affiliates, collectively.

(xii)     "Employer" means the Company and each eligible entity designated as an Employer in accordance with the provisions of Section 5(d) of the Plan.

(xiii)     "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(xiv)     "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(xv)     "Executive" means any individual who, on or immediately prior to a Change in Control or at the time of his or her Involuntary Termination, if earlier, has been designated by the Committee as a Tier I Executive, Tier II Executive or Tier III Executive. The Committee will review and designate the Tier I Executives, Tier II Executives and Tier III Executives on an annual basis.

(xvi)     "Good Reason" means, with respect to an Executive's Termination of Employment, the following, without the Executive's consent: (a) in the case where there is an employment agreement, severance agreement, or similar agreement in effect between the Company or an Affiliate and the Executive that defines "good reason" (or words or a concept of like import), "good reason" as defined under such agreement; or (b) in the case where there is no employment agreement, severance agreement, or similar agreement in effect between the Company or an Affiliate and the Executive (or where there is such an agreement but it does not define "good reason" (or words or a concept of like import)): (A) a reduction of the Executive's base salary, other than a reduction of less than ten percent in connection with a comparable decrease applicable to all similarly situated executives of the Company; (B) the Company's relocation of the Executive's place of employment by more than thirty-five miles to a location not closer to the Executive's residence; or (C) a material diminution in the executive's duties, authority or responsibilities;

provided, in each case, that a resignation will be with "Good Reason" only if the Executive provides the Company with written notice detailing the specific circumstances alleged to constitute "Good Reason" within sixty (60) calendar days after the occurrence of such circumstances, the Company fails to cure such circumstances in all material respects within thirty (30) days of receipt of notice,

and the applicable executive actually resigns within one hundred and twenty (120) days following the first occurrence of any grounds for "Good Reason."

(xvii)  "Health Benefit Coverages" means coverage under each group health plan sponsored or contributed to by the Employer (or following the Change in Control, by any affiliate of the Employer that employs the Executive) for its similarly situated active employees.

(xviii)  "Involuntary Termination" means during the Change in Control Period (i) a termination of the Executive's employment by the Employer without Cause or (ii) a termination of the Executive's employment by the Executive for Good Reason.

(xix)  "Parent" means any parent corporation of the Company within the meaning of Code Section 424(e).

(xx)  "Participation Schedule" means the schedule evidencing the Executive's participation in the Plan, attached hereto as Exhibit A.

(xxi)  "Release" means a general release in the form provided by the Company from the Executive that releases the Company and its Affiliates (including all members of the Company Group) and interested parties from actual or contingent claims.

(xxii)  "Subsidiary" means any subsidiary corporation of the Company within the meaning of Code Section 424(f).

(xxiii)  "Target Bonus" means the greater of (A) the Executive's target Bonus in effect immediately prior to the Change in Control or (B) the Executive's target Bonus in effect at the time of his or her Termination of Employment; provided, however, that for purposes of this Plan, "Target Bonus" shall not include any special bonuses, retention awards, sign-on bonuses or other similar bonus payments.

(xxiv)  "Termination of Employment" means (a) a termination of employment (not including a military or personal leave of absence granted by the Company, except as otherwise determined by the Committee) of an Executive from the Company and its Affiliates, or (b) when an entity employing an Executive ceases to be an Affiliate, unless the Executive otherwise is, or thereupon becomes, employed by the Company or another Affiliate at the time the entity ceases to be an Affiliate.

(xxv)  "Tier I Executive" means an individual who is, at the relevant time, the CEO of the Company or is otherwise designated as a Tier I Executive by the Committee.

(xxvi) "Tier II Executive" means an individual who is, at the relevant time, a senior executive of the Company who is designated as a Tier II Executive by the Committee.

(xxvii) "Tier III Executive" means an individual who is designated as a Tier III Executive by the Committee.

(b)　　Number and Gender. Wherever appropriate herein, words used in the singular shall be considered to include the plural and the plural to include the singular. The masculine gender, where appearing in the Plan, shall be deemed to include the feminine gender.

(c)　　Headings. The headings of Sections herein are included solely for convenience and if there is any conflict between such headings and the text of the Plan, the text will control.

**Section 3.**　　**Change in Control Severance Benefits.**

(a)　　Severance Payments and Benefits. Subject to the provisions of Sections 3(b), 3(d), 3(e), 5(e), 5(f) and 5(o) hereof, if an Executive incurs an Involuntary Termination, then on the date upon which his or her Release becomes irrevocable (which must within the applicable time period noted in Section 3(b)), the Executive shall be eligible to receive the following severance benefits:

(i)　　Cash Severance Pay. The Company shall pay Executive cash severance equal to (A) in the case of a Tier I Executive, 2.0 times the sum of the Tier I Executive's Annual Pay and Target Bonus; (B) in the case of a Tier II Executive, 1.5 times the sum of the Tier II Executive's Annual Pay and Target Bonus; and (C) in the case of a Tier III Executive, 0.5 times the sum of the Tier III Executive's Annual Pay and Target Bonus (the "Cash Severance Payment") payable in a lump sum, subject to the requirements of Section 5(n) below. The Cash Severance Payment shall be paid on the sixtieth (60th) day following the Involuntary Termination.

(ii)　　Pro Rata Bonus. The Company shall pay Executive a pro rata share of the Executive's Bonus for the performance period in which the termination date occurs, at the target level of performance and paid at such time as other executives receive their Bonuses, in accordance with the terms of the applicable Bonus plan. For the avoidance of doubt, any Bonus payment hereunder shall be in lieu of, and not in addition to, any Bonus payment pursuant to the applicable Bonus plan.

(iii)　　Equity and Long-Term Incentives. Any equity or long-term compensation grant or award outstanding to the Executive shall be treated as specified by the terms of the applicable equity or long-term incentive compensation plan under which the grant or award was made and the applicable award agreement.

(iv)　　Health Benefit Coverages. Executive shall be entitled to the continuation of his or her Health Benefit Coverages and, where applicable, his or

her eligible dependents (i) in the case of a Tier I Executive, for a period of up to twenty-four (24) months following the date of Involuntary Termination; (ii) in the case of a Tier II Executive, for a period of up to eighteen (18) months following the date of Involuntary Termination; and (iii) in the case of a Tier III Executive, for a period of up to six (6) months following the date of Involuntary Termination, and in each of cases (i) through (iii), at a cost to the Executive that is equal to the cost for an active employee for similar coverage. The Executive may choose to continue some or all of such Health Benefit Coverages. If at any time on or after an Executive's Involuntary Termination, any health benefit plan in which he or she has elected to continue his or her coverage either is terminated or ceases to provide coverage to the Executive's covered beneficiaries for any reason, including, without limitation, by its terms or the terms of an insurance contract providing the benefits of such plan or, with respect to a group health plan, such plan no longer being subject to the Consolidated Omnibus Reconciliation Act of 1985 ("COBRA"), then Health Benefit Coverages shall mean an economically equivalent cash payment for coverage equivalent to the coverage that is provided (or if the plan has been terminated, that would have been provided but for such termination) for similarly situated active employees. With respect to the obligation of the Company to provide continued health plan coverage hereunder, the Company shall take all actions necessary such that the coverage is provided in a manner that satisfies the requirements of Sections 105 and 106 of the Code such that the health benefits received are not includible in the individual's taxable income. The subsidized COBRA Health Benefit Coverage(s) provided hereunder shall immediately end upon the Executive's obtainment of new employment and eligibility for health benefit plan coverage(s) similar to that being continued (with the Executive being obligated hereunder to promptly report such eligibility to the Employer).

(v)    Outplacement. Subject to the requirements of Section 5(n), and at the sole discretion of the Committee, within sixty (60) days following the date of the Executive's Involuntary Termination, the Employer may make available a twelve (12) month executive outplacement services package for the Executive from a provider generally used by the Employer for such purposes.

(vi)    Accrued Obligations. Without regard to the Release requirement, a lump sum amount, within thirty (30) days of such termination, equal to (A) the earned, but unpaid, portion of the Executive's Annual Pay as of the date of his or her Involuntary Termination, (B) Executive's earned, but unpaid, Bonus, if any, for the year prior to the date of Executive's Involuntary Termination and (C) reimbursement of any business expenses incurred by Executive through the date of Executive's Involuntary Termination in accordance with then current Company policy.

(b)    Release and Full Settlement. Notwithstanding anything to the contrary herein, as a condition to the receipt of any severance payments or benefits under Section 3(a)(i) through (v) above, an Executive whose employment has been subject to an Involuntary Termination must, within forty-five (45) days of his or her Involuntary Termination, execute, deliver and not revoke

a Release. The performance of the Employer's obligations hereunder and the receipt of any benefits provided hereunder by such Executive shall constitute full settlement of all such claims and causes of action.

(c)     No Mitigation. An Executive shall not be required to mitigate the amount of any payment or benefit provided for in this Section 3 by seeking other employment or otherwise, nor shall the amount of any payment or benefit provided for in this Section 3 be reduced by any compensation or benefit earned by the Executive as the result of employment by another employer or by retirement benefits, except as provided in Section 3(a)(iv) with respect to Health Benefit Coverage and in Section 3(d) with respect to the coordination of severance benefits hereunder with other agreements providing severance benefits.

(d)     Replacement of Other Arrangements. Any Executive who is a party to an individual employment or severance agreement or covered by another similar change in control or severance plan ("Other Plan") of the Employer and who becomes eligible for severance payments and benefits as provided in Section 3(a) of this Plan, shall receive such severance payments and benefits as provided under Section 3(a) of this Plan, and such payments and benefits received under this Plan shall replace in full and supersede any payments or benefits payable to such Executive under any such Other Plan. For the avoidance of doubt, the payments and benefits under this Plan do not supersede, enlarge or diminish any severance or termination payments or benefits payable to such Executive pursuant to an Other Plan to the extent applicable to a termination of employment that does not occur within the Change in Control Period. Any notice or pay in lieu of notice, severance benefits or other benefits that are required by any federal, state or local law relating to severance, plant closures, terminations, reductions-in-force, or plant relocations will reduce the Cash Severance Payment.

(e)     Parachute Taxes. Notwithstanding anything to the contrary herein, in the event any payment, distribution or provision of a benefit to an Executive pursuant to the terms of the Plan, when aggregated with any other payment, distribution or provision of a benefit to or on behalf of such Executive outside of the Plan, would be subject to the excise tax imposed by Section 4999 of the Code, or any interest or penalties with respect to such excise tax (such excise tax, together with any such interest or penalties, are hereinafter collectively referred to as the "Excise Tax") as determined by the Company, the Company shall reduce the payments and/or benefits (by reducing the total payments payable, if applicable, (including reducing a payment to zero)) to such Executive in whole or in part so that no part of the payments or benefits received under the Plan by such Executive will be subject to the Excise Tax; provided, however, that such reduction(s) shall be made only if by reason of such reduction(s) the Executive's net after-tax benefit (as determined in good faith by the Company), after all such reduction(s), will exceed the Executive's net after-tax benefit if such reduction(s) were not made. Such calculations shall be made by a nationally recognized accounting firm selected by the Company (the "Accounting Firm") and shall be binding on the Executive. In the event that the payments and/or benefits are to be reduced pursuant to this Section 3(e), such payments and benefits shall be reduced such that the reduction of cash compensation to be provided to the Executive as a result of this Section 3(e) is minimized. In applying this principle, the reduction shall be made in a manner consistent with the requirements of Section 409A of the Code and where two economically equivalent amounts are subject to reduction but payable at different times, such amounts shall be reduced on a pro rata basis but not below zero. For purposes of making the calculations required

by this Section, the Accounting Firm may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith interpretations concerning the application of Sections 280G and 4999 of the Code. The Accounting Firm shall provide detailed supporting calculations both to the Company and the affected Executive within fifteen (15) business days of the receipt of notice that there has been a parachute payment, or such earlier time as is requested by the Company. Nothing in this Section 3(e) shall require the Company to be responsible for, or have any liability or obligation with respect to, Executive's tax liability, including in respect of excise tax liabilities under Section 4999 of the Code.

(f)      Reductions to Payments Pursuant to Company Policies. The maximum payments and benefits described in Section 3(a)(i)-(v) under the Plan shall be reduced to the extent necessary to be consistent with the Company's applicable policies as in effect from time to time, such that no shareholder ratification of such payments and benefits shall be required. Any reduction pursuant to this Section 3(f) shall be made in the sole discretion of the [Committee], with the intention but not guarantee that any such reduction will be made in a manner consistent with the requirements of Section 409A of the Code and, where two economically equivalent amounts are subject to reduction but payable at different times, such amounts shall be reduced on a pro rata basis but not below zero.

**Section 4.      Administration of Plan.**

(a)      Committee's Powers and Duties. The Company shall be the named fiduciary and shall have full power to administer the Plan in all of its details, subject to applicable requirements of law. The duties of the Company shall be performed by the Committee. It shall be a principal duty of the Committee to see that the Plan is carried out in accordance with its terms, for the exclusive benefit of persons entitled to participate in the Plan. For this purpose, the Committee's powers shall include, but not be limited to, the following authority, in addition to all other powers provided by the Plan:

(i)      to make and enforce such rules and regulations as it deems necessary or proper for the efficient administration of the Plan;

(ii)      to interpret the Plan and all facts with respect to a claim for payment or benefits, its interpretation thereof to be final and conclusive on all persons claiming payment or benefits under the Plan;

(iii)      to decide all questions concerning the Plan and the eligibility of any person to participate in the Plan;

(iv)      to make a determination as to the right of any person to a payment or benefit under the Plan (including, without limitation, to determine whether and when there has been a termination of an Executive's employment and the cause of such termination and the amount of such payment or benefit);

(v)      to appoint such agents, counsel, accountants, consultants, claims administrator and other persons as may be required to assist in administering the Plan;

      (vi)    to allocate and delegate its responsibilities under the Plan and to designate other persons to carry out any of its responsibilities under the Plan, any such allocation, delegation or designation to be in writing;

      (vii)    to sue or cause suit to be brought in the name of the Plan; and

      (viii)    to obtain from the Employer and from Executives such information as is necessary for the proper administration of the Plan.

(b)    <u>Participation</u>. The Committee shall designate those key employees of the Company entitled to participate in the Plan. Each Executive eligible to participate in the Plan shall receive a Participation Schedule in substantially the form attached as Exhibit A hereto. Such Participation Schedule shall specify whether the Executive shall be designated as a Tier I Executive, a Tier II Executive or a Tier III Executive. Notwithstanding anything in this Plan to the contrary, as a condition to participation, an Executive must execute his or her Participation Schedule evidencing the Executive's agreement to be bound by all the terms of the Plan, including, without limitation, the provisions of Section 3(d) and Section 5(f) hereof. No member of the Committee may act or vote in a decision of the Committee specifically relating to himself or herself as a participant in the Plan.

(c)    <u>Indemnification</u>. The Employer shall indemnify and hold harmless each member of the Committee against any and all expenses and liabilities arising out of his or her administrative functions or fiduciary responsibilities, including any expenses and liabilities that are caused by or result from an act or omission constituting the negligence of such member in the performance of such functions or responsibilities, but excluding expenses and liabilities that are caused by or result from such member's own gross negligence or willful misconduct. Expenses against which such member shall be indemnified hereunder shall include, without limitation, the amounts of any settlement or judgment, costs, counsel fees, and related charges reasonably incurred in connection with a claim asserted or a proceeding brought or settlement thereof.

(d)    <u>Claims Procedure</u>. Any Executive that the Committee determines is entitled to a benefit under the Plan is not required to file a claim for benefits. Any Executive who is not paid a benefit and who believes that he or she is entitled to a benefit, or who has been paid a benefit and who believes that he or she is entitled to a greater benefit, may file a claim for benefits under the Plan in writing with the Committee. In any case in which a claim for Plan benefits by an Executive is denied or modified, the Committee shall furnish notice to the claimant of the specific reason or reasons for the denial, along with reference to the pertinent plan provisions on which the denial is based. The Committee will also indicate what additional material or information, if any, is required to perfect the claim. The Committee's notice shall also explain the Plan's claim review procedure as contained herein and describe the Executive's right to bring an action under Section 502(a) of ERISA following a denial or modification on review. The Committee will generally provide notice of any decision denying the claim within ninety (90) days after the claim is filed. If special circumstances require an extension of time to act on the claim, another ninety (90) days will be allowed. If such extension is required, the Committee will notify the employee before the end of the initial ninety (90) day period. If the Executive desires to appeal a claim denial because there is disagreement about the reason the claim is denied, the Executive must notify the Committee in writing within sixty (60) days after the date the claim

denial was sent to the Executive. A request for a review of the claim and for examination of any pertinent documents may be made by the Executive or by anyone authorized to act on the Executive's behalf. The Executive or his or her representative should submit the reasons that he or she believes the claim should not have been denied, as well as any data, questions, or appropriate comments, in writing. The Committee will notify the Executive of the final decision within sixty (60) days after receipt of a written request for review unless special circumstances require an extension of time for processing, in which case a further sixty (60) days will be allowed. Any claim for benefits, or appeal of the denial of a claim for benefits, shall be filed with:

> Human Resources Department
> Bed Bath & Beyond Inc.
> 650 Liberty Avenue
> Union, NJ 07083

With a copy to:

> General Counsel
> Bed Bath & Beyond Inc.
> 650 Liberty Avenue
> Union, NJ 07083

If the Committee fails to follow these procedures consistent with the requirements of ERISA with respect to any claim, the claimant will be deemed to have exhausted all administrative remedies under the Plan and will have the right to bring a civil action under ERISA Section 502(a). This Section 4(d) shall be interpreted such that the claims procedures applicable under the Plan conform to the claims review requirements of Part 5, Title I, of ERISA, and the applicable provisions set forth in Department of Labor regulation section 2560.503-1.

**Section 5.      General Provisions.**

(a)      Funding. The benefits provided herein shall be unfunded and shall be provided from the Employer's general assets.

(b)      Cost of Plan. Except as provided in Section 3(a)(iv), the entire cost of the Plan shall be borne by the Employer and no contributions shall be required of the Executives.

(c)      Plan Year. The Plan shall operate on the basis of the Company's fiscal year.

(d)      Other Participating Employers. The Committee may designate any entity eligible by law to participate in the Plan as an Employer by written instrument delivered to the Secretary of the Company and the designated Employer. Such written instrument shall specify the effective date of such designated participation, may incorporate specific provisions relating to the operation of the Plan which apply to the designated Employer only and shall become, as to such designated Employer and its employees, a part of the Plan. Each designated Employer shall be conclusively presumed to have consented to its designation and to have agreed to be bound by the terms of the Plan and any and all amendments thereto upon its submission of information to the Committee required by the terms of or with respect to the Plan; provided, however, that the

terms of the Plan may be modified so as to increase the obligations of an Employer only with the consent of such Employer, which consent shall be conclusively presumed to have been given by such Employer upon its submission of any information to the Committee required by the terms of or with respect to the Plan.

(e)      Amendment and Termination.

(i)      The Plan may be terminated or amended from time to time at the discretion of the Committee; provided, however, that, subject to the provisions of Section 5(e)(ii), the Plan may not be amended or terminated (A) during the Change in Control Period without the prior written consent of all Executives who were designated as Executives at such time or (B) during the period in which any Executive is eligible to receive severance and benefits provided in Section 3(a), without the prior written consent of such Executive. Notwithstanding anything to the contrary herein, the Board, in its sole discretion, may amend or terminate the coverage of any Executive under the Plan by giving prior written notice to the Executive at least six (6) months in advance of such amendment or termination of coverage; provided, however, that any amendment or termination of coverage which occurs within six (6) months before the Change in Control Period will not become effective until the later of (x) the first day following the end of the Change in Control Period or (y) the first day following the end of the period described in Section 5(e)(ii)(B). The Employer's obligation to make all payments and provide benefits that have become payable as a result of an Involuntary Termination occurring during the existence of the Plan shall survive any termination of the Plan.

(ii)      The provisions set forth in Section 5(e)(i) that otherwise restrict amendments to the Plan during the Change in Control Period shall not apply to (A) an amendment to the administrative provisions of the Plan that is required pursuant to applicable law or (B) an amendment that increases the benefits payable under the Plan or otherwise constitutes a bona fide improvement of an Executive's rights under the Plan, as determined by the Committee in its sole discretion.

(f)      Restrictive Covenants Agreement.

(i)      Existing Agreement. This Plan shall have no effect on the continued effectiveness of existing restrictive covenants entered into between the Company and Executive. By executing his or her Participation Schedule, the Executive agrees and affirms that any violation of Executive's existing restrictive covenant agreement contained in the Executive's employment agreement or any other agreement entered into with any member of the Company Group will result in forfeiture of Executive's benefits under this Plan.

(ii)      New Agreement. For any Executive entitled to benefits under this Plan who is not already party to an existing restrictive covenants agreement, such Executive shall be required to enter into a new restrictive covenants agreement

with the Company as a condition to participation in this Plan. The Executive's agreement to this requirement shall be effected by the Participant's execution of his or her Participation Schedule.

(iii)    Reasonable Compensation Under Section 280G. The Executives agree and acknowledge that a portion of any parachute payment payable hereunder is reasonable compensation in respect of restrictive covenant agreements entered into by the Executive and the Company.

(g)    Not a Contract of Employment. The adoption and maintenance of the Plan shall not be deemed to be a contract of employment between the Employer and any person or to be consideration for the employment of any person. Nothing herein contained shall be deemed to give any person the right to be retained in the employ of the Employer or to restrict the right of the Employer to discharge any person at any time nor shall the Plan be deemed to give the Employer the right to require any person to remain in the employ of the Employer or to restrict any person's right to terminate his or her employment at any time.

(h)    Severability. Any provision in the Plan that is prohibited or unenforceable in any jurisdiction by reason of applicable law shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating or affecting the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(i)    Nonalienation. Executives shall not have any right to pledge, hypothecate, anticipate or assign benefits or rights under the Plan, except by will or by the laws of descent and distribution.

(j)    Effect of Plan. The Plan is intended to supersede all prior oral or written policies of the Employer and all prior oral or written communications to Executives with respect to the subject matter hereof, and all such prior policies or communications are hereby null and void and of no further force and effect. Further, the Plan shall be binding upon the Employer and any successor of the Employer, by merger or otherwise, and shall inure to the benefit of and be enforceable by the Employer's Executives.

(k)    Taxes. The Employer or its successor may withhold from any amounts payable to an Executive under the Plan such federal, state or local taxes as shall be required to be withheld pursuant to any applicable law or regulation.

(l)    Disputes; Enforcement Costs.

(i)    All actions or proceedings arising out of or relating to this Plan shall be tried and litigated only in the New York State or Federal courts located in the County of New York, State of New York. The Executives shall irrevocably submit to the exclusive jurisdiction of such courts for the purpose of any such action or proceeding. Notwithstanding the foregoing, either an Executive or the Company may seek injunctive or equitable relief to enforce the terms of this Plan in any court of competent jurisdiction.

(ii)     All reasonable expenses of an Executive or the Company, as applicable, incurred in enforcing such party's rights and/or in the recovery of the benefits under this Plan, including but not limited to, attorneys' fees, court costs, arbitration costs, and other reasonable expenses shall be paid by the other party if a party prevails on at least one material substantive issue in such proceeding.

(m)     Governing Law. The Plan shall be interpreted and construed in accordance with the laws of the State of New York without regard to conflict of laws principles, except to the extent pre-empted by federal law.

(n)     Section 409A.

(i)     General. To the extent applicable, this Plan shall be interpreted and applies so that the payments of benefits set forth herein shall either be exempt from, or in the alternative, comply with, and incorporate the terms and conditions required by, Section 409A. Notwithstanding any provision of this Plan to the contrary, in the event that the Company determines that any amounts payable hereunder will be immediately taxable to any Executive under Section 409A, the Company reserves the right to (without any obligation to do so or to indemnify the Executive for failure to do so) (A) adopt such amendments to this Plan or adopt such other policies and procedures (including amendments, policies and procedures with retroactive effect) that it determines to be necessary or appropriate to preserve the intended tax treatment of the benefits provided by this Plan, to preserve the economic benefits of this Plan and to avoid less favorable accounting or tax consequences for the Company and/or (B) take such other actions it determines to be necessary or appropriate to exempt the amounts payable hereunder from Section 409A or to comply with the requirements of Section 409A and thereby avoid the application of penalty taxes thereunder.

(ii)     Separation from Service under Section 409A. Notwithstanding anything herein to the contrary: (A) no termination or other similar payments and benefits hereunder shall be payable to an Executive unless such Executive's Termination of Employment constitutes a "separation from service" within the meaning of Section 1.409A-1(h) of the Department of Treasury Regulations; (B) if an Executive is deemed at the time of the Executive's separation from service to be a "specified employee" for purposes of Section 409A(a)(2)(B)(i) of the Code, to the extent delayed commencement of any portion of any termination or other similar payments and benefits to which such Executive may be entitled hereunder (after taking into account all exclusions applicable to such payments or benefits under Section 409A) is required in order to avoid a prohibited distribution under Section 409A(a)(2)(B)(i) of the Code, such portion of such payments and benefits shall not be provided to such Executive prior to the earlier of (x) the expiration of the six-month period measured from the date of the Executive's "separation from service" with the Company (as such term is defined in the Department of Treasury Regulations issued under Section 409A) and (y) the date of such Executive's death; provided that upon the earlier of such dates, all payments and benefits deferred pursuant to this Section 5(n)(ii) shall be

paid in a lump sum to such Executive, and any remaining payments and benefits due hereunder shall be provided as otherwise specified herein; and (C) the determination of whether an Executive is a "specified employee" for purposes of Section 409A(a)(2)(B)(i) of the Code as of the time of such Executive's separation from service shall be made by the Company in accordance with the terms of Section 409A (including, without limitation, Section 1.409A-1(i) of the Department of Treasury Regulations and any successor provision thereto).

(iii)  *Reimbursements and Installments*. To the extent that any reimbursements or corresponding in-kind benefits provided to an Executive under this Plan are deemed to constitute "deferred compensation" under Section 409A, (A) such reimbursements or benefits shall be provided reasonably promptly, but in no event later than December 31 of the year following the year in which the expense was incurred, and in any event in accordance with Section 1.409A-3(i)(1)(iv) of the Department of Treasury Regulations; and (B) the amount of any such payments or expense reimbursements in one calendar year shall not affect the expenses or in-kind benefits eligible for payment or reimbursement in any other calendar year, other than an arrangement providing for the reimbursement of medical expenses referred to in Section 105(b) of the Code, and the Executive's right to such payments or reimbursement of any such expenses shall not be subject to liquidation or exchange for any other benefit. To the extent that any installment payments under this Plan are deemed to constitute "nonqualified deferred compensation" within the meaning of Section 409A, for purposes of Section 409A (including, without limitation, for purposes of Section 1.409A-2(b)(2)(iii) of the Department of Treasury Regulations), each such installment payment that an Executive may be eligible to receive under this Plan shall be treated as a separate and distinct payment.

(o)  *Recoupment*. Notwithstanding anything herein to the contrary, all incentive-based cash and equity compensation grants awarded to the Executive, including, without limitation, annual bonuses and other short- and long-term cash incentives, stock options, restricted stock, restricted stock units, performance shares, and performance share units are subject to the Bed Bath & Beyond Inc. Compensation Recoupment Policy, as amended from time to time. Further, if the Executive is retroactively deemed terminated for Cause, or commits a breach of the restrictive covenants described in Section 5(f), the benefits described in Section 3(a)(i)-(v) are subject to forfeiture and/or recoupment by the Company.

## EXHIBIT A

## PARTICIPATION SCHEDULE

[Date]

[Executive Name]

[Address of Executive]

We are offering you the opportunity to become a participant in the Bed Bath & Beyond Inc. Executive Change in Control Severance Plan. All defined terms used herein shall have the meaning ascribed to them in the Plan.

As a condition to your participation in the Plan, you must execute this Participation Schedule evidencing your agreement to be bound by all the terms of the Plan, including, without limitation, the provisions of Section 3(d) and Section 5(f) thereof.

Except as may be provided under any other agreement between you and the Company, your employment by the Company is "at will." The Plan does not constitute a contract of employment or impose on the Company any obligation to retain you as an employee, to change the status of your employment, or to change the policies of the Company regarding termination of employment.

For purposes of the Plan, your participation shall be designated as a **Tier [●] Executive**. Notwithstanding the foregoing, the Committee may amend your designation as a Tier [●] Executive pursuant to Section 5(e) of the Plan.

By executing this Participation Schedule, you agree and acknowledge that your participation in this Plan constitutes an amendment to your employment agreement, to the extent applicable, solely with regard to severance and benefits due to you upon a qualifying termination within the Change in Control Period.

Executed as of this [●] day of [●], 20[●].

 

 

_____

[Executive]

[BED BATH & BEYOND INC.][1]

_____

By:

Title:

---

[1] If the Executive is employed by an entity other than Bed Bath & Beyond Inc., to add a signature for that Employer.

Exhibit 10.50
EXECUTION COPY

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement"), dated as of April 22, 2020, is made by and between Bed Bath & Beyond Inc., a New York corporation (the "Company"), and Rafeh Masood ("Executive"). This Agreement shall govern the relationship between Executive and the Company from and after May 11, 2020 (the "Start Date").

WHEREAS, the Company desires to employ Executive pursuant to the terms and conditions set forth in this Agreement; and

WHEREAS, Executive is willing and able to be employed by the Company and desires to do so on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the above recitals incorporated herein and the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the parties agree as follows:

1. **Retention and Duties.**

(a)     The Company hereby engages and employs Executive for the Term (as defined in Section 2) on the terms and conditions expressly set forth in this Agreement. Executive hereby accepts and agrees to such engagement and employment, on the terms and conditions expressly set forth in this Agreement.

(b)     During the Term, Executive shall serve as Executive Vice President and Chief Digital Officer of the Company, and shall perform such duties, responsibilities, and have those authorities consistent with such position and as may from time to time be assigned to Executive by the Company's Chief Executive Officer ("CEO"), including, without limitation, management of the PnL of the Company's digital business. As Executive Vice President and Chief Digital Officer of the Company, Executive shall report directly to the CEO. In addition, the CEO may from time to time, in his or her sole discretion, assign to the Executive such other duties, authorities and responsibilities that are not inconsistent with the Executive's position as Executive Vice President and Chief Digital Officer of the Company, including without limitation, service as an officer and/or on the boards of directors and committees of one or more of the Company's subsidiaries, in each case, without additional compensation.

(c)     Executive shall be located and perform his principal duties hereunder at the Company's principal headquarters located in Union, New Jersey. Executive acknowledges and agrees that he will be expected to relocate to the New York metropolitan area as soon as reasonably practicable following the Start Date, but in no event later than six (6) months following the Start Date (subject to Exhibit A hereof). Notwithstanding the foregoing, Executive agrees and acknowledges that significant travel may be part of the performance of his services hereunder.

(d)     During the Term, Executive shall devote his entire working time, attention, and energies to the Company and shall not be engaged in any other business activity, whether or not such business activity is pursued for gain, profit or other pecuniary advantage, without the prior written consent of the Company's Board of Directors (the "Board"). While Executive serves as Executive Vice President and Chief Digital Officer of the Company, the foregoing is not intended to restrict Executive's ability to serve on the boards of professional, educational, religious, civic or charitable organizations, engage in community affairs and/or managing Executive's (or Executive's family's) personal investments and affairs; provided, that the foregoing activities are not competitive with the business of the Company and do not interfere or conflict with Executive's duties and obligations on behalf of the Company or create a

potential business or fiduciary conflict of interest. Executive agrees to use best efforts to perform his duties and responsibilities within, and agrees to abide by, the Company's written general employment policies and practices and such other reasonable policies, practices and restrictions as the Company shall from time to time establish and maintain for its executives, including, without limitation, the Company's Corporate Governance Guidelines and Policy of Ethical Standards for Business Conduct.

(e)     For the avoidance of doubt, and notwithstanding anything herein to the contrary, prior to the date on which the Company makes a public announcement regarding Executive's appointment as Executive Vice President and Chief Digital Officer, Executive agrees and acknowledges that he shall treat the existence and terms of this Agreement and his pending employment with the Company as confidential and shall not disclose or discuss this Agreement with anyone, other than with his immediate family, current employer (solely for the purpose of providing notice of his resignation of employment therefrom), and his legal and/or financial advisors.

**2.     Term.** The "Term" shall be the period commencing on the Start Date and ending at the close of business on the day before the third (3rd) anniversary of the Start Date, unless Executive's employment with the Company terminates earlier pursuant to Section 5. The Term shall be extended automatically by successive one (1) year periods unless either party provides the other party with written notice of an intention not to renew the Term at least thirty (30) days prior to such renewal date. The "Term" shall include any such automatic one (1) year extensions. The Term may be further modified only by a written agreement between the parties and in such case, the term "Term" shall be deemed to mean the Term as so modified. Notwithstanding anything to the contrary in this Agreement, Executive's employment with the Company shall be "at will."

**3.     Compensation and Reimbursement of Expenses.**

(a)     **Base Salary.** During the Term, Executive's annual base salary (the "Base Salary") shall be $550,000.00, payable in accordance with the Company's regular payroll practices in effect from time to time and subject to all applicable taxes and withholdings, but no less frequently than in semi-monthly installments. The Base Salary may be increased by the Compensation Committee of the Board (the "Compensation Committee") in its sole discretion. The parties acknowledge and agree that a portion of Executive's Base Salary shall constitute consideration for Executive's compliance with the restrictions and covenants set forth in Section 6 of this Agreement.

(b)     **Annual Bonus.** Beginning with respect to fiscal year 2021 and for each completed fiscal year thereafter during the Term, Executive shall be eligible to receive an annual cash performance bonus (the "Annual Bonus"), with a target Annual Bonus opportunity equal to seventy percent (70%) of his Base Salary. The Annual Bonus earned, if any, with respect to a fiscal year will be subject to the performance of Executive and the Company during such year, relative to performance goals established for such fiscal year by the Compensation Committee, and may, for the avoidance of doubt, be less than the target Annual Bonus opportunity with respect to such year. The Compensation Committee shall determine the level of attainment of performance goals and the amount of the Annual Bonus following the end of each fiscal year, and the Company shall pay the Annual Bonus, to the extent payable in accordance with this Section 3(b), on or before the date that is two and one-half (2½) months following the end of the fiscal year with respect to which it is earned, provided that Executive's employment with the Company has not terminated on or prior to such date (except as expressly provided in Section 5(c) below). For the avoidance of doubt, Executive shall not be eligible to earn an Annual Bonus with respect to fiscal year 2020.

(c)     **Sign-On Cash Awards.**

2

(i)     On the Company's first payroll payment date following thirty (30) days after the Start Date, the Company shall pay to Executive a lump-sum cash payment of $692,500.00, subject to all applicable taxes and withholdings, as a one-time make-whole cash bonus (the "Make-Whole Bonus"). Notwithstanding anything herein to the contrary, in the event that Executive resigns his employment without Good Reason or if Executive's employment is terminated involuntarily by the Company for Cause, in each case, prior to the first (1st) anniversary of the Start Date, Executive shall repay the Make-Whole Bonus to the Company, net of taxes. In such case, Executive (i) expressly agrees and authorizes the Company to deduct such net amount from Executive's final paycheck and any other amounts that the Company might otherwise pay Executive upon termination, and (ii) agrees to reasonably cooperate with the Company to facilitate the Company's recoupment of taxes withheld and remitted to the applicable taxing authorities with respect to the Make-Whole Bonus.

(ii)     The Company shall pay to Executive a one-time retention bonus equal to $192,500.00 on the Company's first payroll payment date in April 2021, subject to all applicable taxes and withholdings (such aggregate amount, the "Retention Bonus"), provided that Executive's employment with the Company has not terminated on or prior to such payment date (except as expressly provided in Section 5(c) below).

(d)     **Sign-on RSU Award.**

(i)     On the Start Date, as an inducement material to Executive entering into this Agreement and commencing employment with the Company, the Company shall grant to Executive, and Executive shall receive, a one-time, sign-on award of time-vesting restricted stock units ("RSUs") pursuant to, as determined by the Compensation Committee in its sole discretion, (x) the inducement grant exception to shareholder approval of equity plans set forth in Nasdaq Listing Rule 5635(c)(4), (y) the Company's 2012 Incentive Compensation Plan, as amended from time to time or any successor plan (the "2012 Plan"), or (z) the Company's 2018 Incentive Compensation Plan, as amended from time to time or any successor plan (the "2018 Plan") (the "Sign-on RSU Award"). The Sign-on RSU Award will have an aggregate value at grant equal to $500,000.00 and will vest on the first anniversary of the Start Date, subject to Executive's continued employment with the Company from the Start Date through the vesting date (except as otherwise expressly provided in Sections 5(c)(ii) and 5(c)(iii) below), and subject to the terms and conditions of the applicable equity award agreement and the 2012 Plan or 2018 Plan, as applicable.

(ii)     The number of RSUs subject to the Sign-on RSU Award will be determined by dividing the grant value set forth above by the volume-weighted average closing price of a share of the Company's common stock over the twenty (20) trading day period ending immediately prior to the Start Date.

(e)     **Long-Term Equity Incentive Awards.** In fiscal year 2020, at the same time as such awards are granted to other members of the Company's senior management team, the Company shall grant Executive a long-term equity incentive award(s) under the 2012 Plan or the 2018 Plan, as determined by the Compensation Committee in its sole discretion (the "2020 Equity Award"). The 2020 Equity Award will have a target value at grant equal to $962,500.00. The target award value set forth in this Section 3(d) will be reviewed annually for adjustment by the Compensation Committee in its sole discretion for long-term equity incentive awards to be granted to Executive after fiscal year 2020. The form, vesting criteria and forfeiture provisions, and other terms and conditions with respect to the 2020 Equity Award and any other future long-term equity incentive awards to be granted to Executive will be determined by the Compensation Committee in its sole discretion, and such awards will be subject to the

3

terms and conditions of the 2012 Plan or 2018 Plan, as applicable, and any applicable award agreements thereunder. The determination of the number of shares subject to the 2020 Equity Award based on the value set forth above and any other long-term equity incentive awards granted hereunder, and the timing for such grants, will be made in accordance with the Compensation Committee Procedures for Equity Grants as in effect from time to time.

(f)     **Relocation Benefits.** In connection with the commencement of Executive's employment and Executive's relocation to the New York metropolitan area, the Company shall provide Executive with the relocation benefits summarized on Exhibit A hereto.

(g)     **Reimbursement of Legal Expenses.** The Company shall pay or reimburse Executive for his reasonable out-of-pocket legal expenses incurred in connection with the negotiation and execution of this Agreement, up to a maximum of $10,000.00. Executive shall provide the Company with such receipts or invoices as the Company deems reasonably necessary to verify the amount of such expenses.

(h)     **Reimbursement of Business Expenses.** Executive is authorized to incur reasonable expenses in carrying out his duties hereunder and shall, upon receipt by the Company of proper documentation with respect thereto (setting forth the amount, business purpose and establishing payment) be reimbursed for all such reasonable business expenses incurred during the Term, subject to the Company's written expense reimbursement policies and any written pre-approval policies in effect from time to time.

4.     **Employee Benefits.**

(a)     **Company Employee Benefit Plans.** During the Term, Executive shall be provided the opportunity to participate in all standard employee benefit programs made available by the Company to the Company's senior executive employees generally, in accordance with the terms and conditions of such plans, including the eligibility and participation provisions of such plans and programs, as such plans or programs may be in effect from time to time. The Company reserves the right to amend any employee benefit plan, policy, program or arrangement from time to time, or to terminate such plan, policy, program or arrangement, consistent with the terms thereof at any time and for any reason without providing Executive with notice.

(b)     **Financial Planning Benefit.** During the Term, upon presentation of appropriate documentation, the Company will reimburse Executive for up to $10,000.00 annually for assistance with tax preparation and financial planning.

(c)     **Automobile Allowance.** During the Term, the Company will provide Executive with an automobile allowance of $1,000.00 per month on an after-tax basis, which may be applied toward the cost of leasing or purchasing an automobile, or toward the cost of a car service or other similar transportation service.

(d)     **Vacation and Other Leave.** During the Term, Executive shall be entitled to take up to four (4) weeks of paid vacation time per calendar year, or such greater amount as may be provided pursuant to the Company's vacation policies in effect from time to time, provided that such time will not carry over from one year to the next. Such paid vacation time will accrue on a monthly basis, but Executive may take the paid vacation time with respect to a given calendar year anytime in such calendar year, prior to or following accrual thereof (to the extent not previously used). Executive shall also be eligible for all other holiday and leave pay generally available to other executives of the Company.

5.     **Termination of Employment.**

4

(a)      **Termination by the Company; Termination Due to Death.** Executive's employment with the Company, and the Term, may be terminated by the Company immediately upon notice to Executive for an involuntary termination of employment for Cause (as defined in Section 5(f)(ii)), without Cause or due to Executive's Disability (as defined in Section 5(f)(iii)). Executive's employment with the Company, and the Term, shall automatically terminate upon Executive's death.

(b)      **Termination by Executive.** Executive's employment with the Company, and the Term, may be terminated by Executive without Good Reason (as defined in Section 5(f)(iv)) with no less than thirty (30) calendar days' advance written notice to the Company. If Executive's employment with the Company is terminated by Executive for Good Reason, the notice requirement set forth in Section 5(f)(iv) shall apply.

(c)      **Benefits Upon Termination.** If Executive's employment with the Company is terminated during the Term for any reason by the Company or by Executive, the Company shall have no further obligation to make or provide to Executive, and Executive shall have no further right to receive or obtain from the Company, any payments or benefits except as follows:

(i)      Any Termination. The Company shall pay Executive (or, in the event of his death, Executive's estate) any Accrued Obligations (as defined in Section 5(f)(i)) within the thirty (30) day period (or such earlier or later period as required by law or the applicable governing documents) following the date Executive's employment terminates (the "Separation Date"), and Executive shall receive any vested accrued benefits for which Executive remains eligible under the Company's employee welfare benefit and defined contribution retirement plans, payable according to the terms of such plans.

(ii)     Death or Disability. If Executive's employment with the Company ends due to Executive's death or Disability, then, in addition to the amounts payable under Section 5(c)(i), subject to Executive's (or his estate's or legal representative's) timely execution, delivery, and non-revocation of the general release described in Section 5(e) (the "General Release"): (A) the Sign-on RSU Award will immediately vest in full as of the Separation Date; (B) the Company will pay Executive (or his estate or legal representative) any earned but unpaid Annual Bonus for any fiscal year ending prior to the fiscal year in which the Separation Date occurs, which will be paid when otherwise payable under Section 3(b) even though Executive's employment had terminated on or prior to that date, or if later, as soon as reasonably practicable following the expiration of the applicable revocation period for the General Release; and (C) to the extent unpaid, the Company will pay Executive (or his estate or legal representative) the Retention Bonus within thirty (30) days following the Separation Date.

(iii)    Non-Renewal by the Company; Without Cause; For Good Reason.   If Executive's employment with the Company ends as a result of a non-renewal of the Term by the Company (and conditions for a Cause termination do not otherwise exist), an involuntary termination by the Company without Cause or due to Executive's resignation for Good Reason, then, in addition to the amounts payable under Section 5(c)(i), subject to Executive's timely execution, delivery, and non-revocation of the General Release and the other conditions and limitations herein, the Company shall pay or provide Executive with the following benefits:

(A)      Cash severance equal to, in the aggregate, one (1) times the sum of (x) Executive's Base Salary (at the rate in effect immediately prior to the Separation Date), and (y) Executive's target Annual Bonus (at the rate in effect with respect to the fiscal year in which the Separation Date occurs), subject to all applicable taxes and withholdings (collectively, the "Severance Payment"), payable in substantially equal

5

installments over the twelve (12) months following the Separation Date in accordance with the Company's regular payroll payment schedule; provided, that no installment or portion of the Severance Payment shall be payable or paid prior to the expiration of the applicable revocation period for the General Release; and provided further, that if the Severance Payment is subject to Section 409A (as defined in Section 5(f)(v)) and the timing of Executive's execution and delivery of the General Release could affect the calendar year in which any amount of the Severance Payment is paid because the Separation Date occurred toward the end of a calendar year, then no portion of the Severance Payment shall be paid until the Company's first payroll payment date in the year following the year in which the Separation Date occurs, and any amount that is not paid prior to such date due to such restriction shall be paid (subject to the applicable conditions) along with the installment scheduled to be paid on that date;

(B)     Any earned but unpaid Annual Bonus for a fiscal year ending prior to the fiscal year in which the Separation Date occurs, which will be paid when otherwise payable under Section 3(b) even though Executive's employment had terminated on or prior to that date, or if later, as soon as reasonably practicable following the expiration of the applicable revocation period for the General Release;

(C)     Within thirty (30) days following the Separation Date, the Retention Bonus, to the extent unpaid;

(D)     As of the Separation Date, full and immediate accelerated vesting of the Sign-on RSU Award; and

(E)     If Executive elects continued health coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), Executive will only be responsible for paying a portion of the COBRA premium that is equal to Executive's contribution rate in effect immediately prior to the Separation Date for Executive's applicable Medical, Dental, and Vision coverage under the Company's group health plan for himself, his spouse, and his dependents for the first fifty-two (52) weeks of COBRA. If Executive elects COBRA and does not pay the applicable portion of the COBRA premium within the time frame stipulated under COBRA, Executive's coverage will be cancelled and all costs incurred will be the responsibility of Executive. Following the aforementioned fifty-two (52)-week period, any continued health coverage pursuant to COBRA shall solely be at Executive's cost.

(d)     **Cooperation Upon Termination.** Upon the Executive's termination of employment for any reason, Executive shall, for the twelve (12) month period following his termination, reasonably cooperate as reasonably requested by the Board to effect an orderly transition. The Company's request for reasonable cooperation shall take into consideration Executive's personal and business commitments and the amount of notice provided to Executive. The Company will reimburse Executive for reasonable out-of-pocket expenses and other incidental expenses that Executive incurs as a result of Executive's cooperation pursuant to this paragraph (including reasonable attorneys' fees, if reasonably necessary).

(e)     **Release; No Other Severance Benefits.**

(i)     This Section 5(e) shall apply notwithstanding anything else in this Agreement to the contrary. As a condition precedent to any Company obligation pursuant to Section 5(c)(ii) or Section 5(c)(iii) (collectively, the "Severance Benefits"), Executive (or his estate or legal representative) shall provide the Company with a valid, executed General Release in substantially

6

the form attached hereto as Exhibit B (as reasonably revised by the Company to comply with applicable law changes or interpretations or as otherwise necessary to ensure or bolster enforceability or tax effectiveness), and not revoke such General Release prior to the expiration of any revocation rights afforded under applicable law. The Company shall provide Executive (or his estate or legal representative) with the General Release prior to the Separation Date, and Executive (or his estate or legal representative) must deliver the executed General Release to the Company within twenty-one (21) calendar days (or, if greater, the minimum period required by applicable law) after the Separation Date, failing which Executive (or his estate or legal representative) will forfeit all rights to the Severance Benefits.

(ii)     Executive agrees that the Severance Benefits shall be in lieu of any other severance benefit or other right or remedy to which Executive would otherwise be entitled under the Company's plans, policies or programs in effect on the Start Date or thereafter; provided, that for the avoidance of doubt, upon a termination of Executive's employment, except as otherwise expressly provided herein with respect to the Sign-on RSU Award, any equity awards held by him will be treated in accordance with the terms of the 2012 Plan, 2018 Plan, or any successor plan, as applicable, and the award agreements governing such awards. Executive acknowledges and agrees that in the event Executive breaches any provision of Section 6 or the General Release, his right to receive the Severance Benefits shall automatically terminate and Executive shall repay, return and restore any and all Severance Benefits received.

(f)     **Certain Defined Terms.** As used in this Agreement:

(i)     "Accrued Obligations" means (A) any Base Salary that had accrued but had not been paid (including any amount for accrued and unused vacation time payable in accordance with Section 4(b) or applicable law) on or before the Separation Date, (B) any reimbursement due to Executive pursuant to Sections 3 or 4 for expenses incurred by Executive on or before the Separation Date and (C) any other vested benefits or vested amounts due and owed to Executive under the terms of any plan, program or arrangement of the Company.

(ii)     "Cause" means (A) Executive's indictment for or plea of *nolo contendere* to a felony or commission of an act involving moral turpitude; (B) Executive's commission of fraud, theft, embezzlement, self-dealing, misappropriation or other malfeasance against the business of the Company, its subsidiaries or affiliates (individually, a "Company Group Member" and collectively, the "Company Group"); (C) Executive's indictment for or plea of *nolo contendere* to any serious offense that results in or would reasonably be expected to result in material financial harm, materially negative publicity or other material harm to any Company Group Member; (D) Executive's failure to perform any material aspect of his lawful duties or responsibilities for the Company or the Company Group (other than by reason of Disability), and if curable, fails to cure, in all material aspects, within thirty (30) calendar days after receiving notice from the Company identifying such failure; (E) Executive's failure to comply with any lawful written policy of the Company (including, without limitation, the Company's Corporate Governance Guidelines or Policy of Ethical Standards for Business Conduct) or reasonable directive of the CEO or the Board, and in either case, if curable, fails to cure, in all material aspects, within thirty (30) calendar days after receiving notice from the Company identifying such failure; (F) Executive's commission of acts or omissions constituting gross negligence or gross misconduct in the performance of any aspect of his lawful duties or responsibilities; (G) Executive's breach of any fiduciary duty owed to the Company Group; (H) Executive's violation or breach of any Restrictive Covenant (as defined in Section 7(a)) or any material term of the Agreement (including, without limitation, Section 7(b) hereof and the requirement that Executive relocate to the New York metropolitan area as set forth in Exhibit A), and, if curable, fails to cure such

7

violation or breach within thirty (30) calendar days after receiving notice from the Company identifying such violation or breach; or (I) Executive's commission of any act or omission that damages or is reasonably likely to damage the financial condition or business of the Company or materially damages or is reasonably likely to materially damage the reputation, public image, goodwill, assets or prospects of the Company. In addition, Executive's employment shall be deemed to have terminated for "Cause" if, on the date Executive's employment terminates, facts and circumstances exist that would have justified a termination for Cause, to the extent that such facts and circumstances are discovered within four (4) months after such termination.

(iii)    "Disability" means a physical or mental impairment that renders Executive unable to perform the essential functions of his employment with the Company, even with reasonable accommodation that does not impose an undue hardship on the Company, for more than ninety (90) calendar days, whether consecutive or not consecutive, in any consecutive twelve (12) month period, unless a longer period is required by federal or state law, in which case the longer period would apply.

(iv)    "Good Reason" means, subject to Section 11(b), without Executive's written consent, (A) a reduction in the Base Salary, other than a reduction of less than ten percent (10%) in connection with a comparable decrease applicable to all senior executives of the Company; (B) a requirement by the Company that Executive relocate his primary place of employment more than thirty-five (35) miles from its location as of the Start Date; or (C) a material diminution in Executive's duties, authority or responsibilities of employment; provided, in each case, that Executive has given the Company written notice detailing the specific circumstances alleged to constitute Good Reason within sixty (60) calendar days after the first occurrence of such circumstances, and the Company shall have thirty (30) calendar days following receipt of such notice to cure such circumstances in all material respects; provided further, that no termination due to Good Reason shall occur after the one-hundred twentieth (120th) calendar day following the first occurrence of any grounds for Good Reason.

(v)    "Section 409A" means Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") and the regulations, rules and other guidance promulgated thereunder.

(g)    **Officer/Board/Committee Resignations.** Upon the termination of Executive's employment for any reason, Executive will be deemed to have resigned, without any further action by Executive, from any and all positions (including, but not limited to, any officer and/or director positions or positions as a fiduciary of any of the Company Group's employee benefit plans) that Executive, immediately prior to such termination, (i) held within the Company Group and (ii) held with any other entities at the direction of, or as a result of Executive's affiliation with, the Company Group. If, for any reason, this Section 5(g) is deemed to be insufficient to effectuate such resignations, then Executive will, upon the Company's request, execute any documents or instruments that the Company may deem necessary or desirable to effectuate such resignations.

(h)    **Section 409A.**

(i)    It is intended that any amounts payable under this Agreement shall be exempt from and avoid the imputation of any tax, penalty or interest under Section 409A to the fullest extent permissible under applicable law; provided that if any such amount is or becomes subject to the requirements of Section 409A, it is intended that those amounts shall comply with such requirements. This Agreement shall be construed and interpreted consistent with that intent. In furtherance of that intent, if payment or provision of any amount or benefit hereunder that is subject to Section 409A at the time specified herein would subject such amount or benefit to any

8

additional tax under Section 409A, the payment or provision of such amount or benefit shall be postponed to the earliest commencement date on which the payment or provision of such amount or benefit could be made without incurring such additional tax. In no event, however, shall the Company be liable for any tax, interest or penalty imposed on Executive under Section 409A or any damages for failing to comply with Section 409A.

(ii)     A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment that are considered "nonqualified deferred compensation" under Section 409A unless such termination is also a "separation from service" within the meaning of Section 409A and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." If Executive is a "specified employee" within the meaning of Treasury Regulation Section 1.409A-1(i) as of the Separation Date, Executive shall not be entitled to any payment or benefit pursuant to this Agreement that constitutes nonqualified deferred compensation for purposes of Section 409A and that is payable upon a separation from service (within the meaning of Section 409A) until the earlier of (A) the date which is six (6) months after his separation from service for any reason other than death, or (B) the date of Executive's death; provided that this paragraph shall only apply if, and to the extent, required to avoid the imputation of any tax, penalty or interest pursuant to Section 409A. Any amounts otherwise payable to Executive upon or in the six (6) month period following Executive's separation from service that are not so paid by reason of this Section 5(h)(ii) shall be paid (without interest) as soon as practicable (and in any event within thirty (30) calendar days) after the date that is six (6) months after Executive's separation from service (provided that in the event of Executive's death after such separation from service but prior to payment, then such payment shall be made as soon as practicable, and in all events within thirty (30) calendar days, after the date of Executive's death).

(iii)     Any reimbursement payment or in-kind benefit due to Executive pursuant to Sections 3 or 4, to the extent that such reimbursements or in-kind benefits are taxable to him, shall be paid on or before the last day of Executive's taxable year following the taxable year in which the related expense was incurred. Executive agrees to provide prompt notice to the Company of any such expenses (and any other documentation that the Company may reasonably require to substantiate such expenses) in order to facilitate the Company's timely reimbursement of the same. Reimbursements and in-kind benefits pursuant to Sections 3 or 4 are not subject to liquidation or exchange for another benefit and the amount of such benefits that Executive receives in one taxable year shall not affect the amount of such reimbursements or benefits that Executive receives in any other taxable year.

(iv)     For purposes of Section 409A, Executive's right to receive any installment payments hereunder shall be treated as a right to receive a series of separate and distinct payments. Whenever a payment under this Agreement specifies a payment period with reference to a number of days (e.g., payment shall be made within thirty (30) calendar days following the Separation Date), the actual date of payment within the specified period shall be within the sole discretion of the Company.

**6.     Restricted Covenants.**

(a)     **Non-Disclosure and Non-Use of Confidential Information.**

(i)     Executive shall not use or disclose to any individual or natural person, partnership (including a limited liability partnership), corporation, limited liability company,

9

association, joint stock company, trust, joint venture, unincorporated organization or governmental authority (each, a "Person"), either during the Term or thereafter, any Confidential Information (as defined below) of which Executive is or becomes aware, whether or not such information is developed by him, for any reason or purpose whatsoever, nor shall he make use of any of the Confidential Information for his own purposes or for the benefit of any Person except for the Company Group, except (A) to the extent that such disclosure or use is directly related to and required by Executive's performance in good faith of duties assigned to Executive by the Company or (B) to the extent required to do so by a law or legal process, including a court of competent jurisdiction. Executive shall not modify, reverse engineer, decompile, create other works from or disassemble any software programs contained in the Confidential Information of the Company unless permitted in writing by the Company. Executive will, at the sole expense of the Company, take all reasonable steps to safeguard Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft.

(ii)     For purposes of this Agreement, "Confidential Information" means information that is not generally known to the public and that is used, developed or obtained by any Company Group Member in connection with its business, including, but not limited to, information, observations and data obtained by Executive during the Term concerning (A) the business or affairs of the Company Group (or any predecessor thereof) and (B) products, services, fees, costs, pricing structures, analyses, drawings, photographs and reports, computer software (including operating systems, applications and program listings), data bases, accounting and business methods, inventions, devices, new developments, methods and processes (whether patentable or unpatentable and whether or not reduced to practice), customers and clients and customer and client lists, information on current and prospective independent sales agents, software vendors or partners and sponsor banks, all technology and trade secrets, and all similar and related information in whatever form. Notwithstanding the foregoing, "Confidential Information" will not include any information in Executive's possession or known to Executive prior to employment with the Company, information that has been published in a form generally available to the public or the industry prior to the date Executive proposes to disclose or use such information (except where such public disclosure was made by Executive without authorization), or Executive's contact lists, whether in electronic or paper form (e.g. rolodex, Outlook contacts, etc.).

(iii)    For the avoidance of doubt, this Section 6(a) does not prohibit or restrict Executive (or Executive's attorney) from responding to any inquiry about this Agreement or its underlying facts and circumstances by the Securities and Exchange Commission, the Financial Industry Regulatory Authority, or any other self-regulatory organization or governmental entity, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation. Executive understands and acknowledges that he does not need the prior authorization of the Company to make any such reports or disclosures and that he is not required to notify the Company that he has made such reports or disclosures.

(iv)     Under the Defend Trade Secrets Act of 2016, Executive shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is (A) made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and solely for the purpose of reporting or investigating a suspected violation of law; or (B) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Further, an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the employer's trade secrets to the attorney and use the trade secret information in the court proceeding if the individual: (x) files any document containing the trade secret under seal; and (y) does not disclose

10

the trade secret, except pursuant to court order. Notwithstanding anything herein to the contrary and for the avoidance of doubt, nothing herein shall preclude the Company from disclosing the existence and/or terms and conditions of this Agreement, including without limitation, to the extent required by applicable law (including, without limitation, under applicable securities laws) or by judicial or administrative process.

(b)     **Intellectual Property Rights.**

(i)     Executive hereby assigns, transfers and conveys to the Company all of Executive's right, title and interest in and to all Work Product (as defined below). Executive agrees that all Work Product belongs in all instances to the Company. Executive will promptly disclose such Work Product to the Company and perform all actions reasonably requested by the Company (whether during or after the Term) to establish and confirm the Company's ownership of such Work Product (including, without limitation, the execution and delivery of assignments, consents, powers of attorney and other instruments) and to provide reasonable assistance to the Company (whether during or after the Term) in connection with the prosecution of any applications for patents, trademarks, trade names, service marks or reissues thereof or in the prosecution or defense of interferences relating to any Work Product. Executive recognizes and agrees that the Work Product, to the extent copyrightable, constitutes works for hire under the copyright laws of the United States.

(ii)     For purposes of this Agreement, "<u>Work Product</u>" means all inventions, innovations, improvements, technical information, systems, software developments, methods, designs, analyses, drawings, reports, service marks, trademarks, trade names, trade dress, logos and all similar or related information (whether patentable or unpatentable) which relates to the actual or anticipated business, operations, research and development of existing or future products or services of the Company Group and which are conceived, developed or made by Executive (whether or not during usual business hours and whether or not alone or in conjunction with any other Person) during the Term together with all patent applications, letters patent, trademark, trade name and service mark applications or registrations, copyrights and reissues thereof that may be granted for or upon any of the foregoing. Notwithstanding the foregoing, "Work Product" shall not include the patents and other assets set forth on <u>Exhibit C</u> hereto. Executive hereby represents and warrants that the patents and other assets owned by Executive set forth on <u>Exhibit C</u> are not related in any way to the Company Group, except as stated therein.

(c)     **Non-Competition.** During the Term and for twelve (12) months following the termination of Executive's employment for any reason, whether or not Executive is entitled to severance (the "<u>Restricted Period</u>"), Executive shall not, and shall cause his controlled affiliates not to, directly or indirectly, through or in association with any third party, engage or be interested in any Competitive Business in the United States as a shareholder, director, officer, employee, agent, broker, partner, individual proprietor, lender, consultant or in any other capacity (<u>provided</u>, that nothing herein contained will prevent Executive from owning less than one percent (1%) of any class of equity or debt securities of any publicly traded company). For purposes of this Agreement, "<u>Competitive Business</u>" means (i) any business or enterprise that includes the operation of any retail store which utilizes (or intends to utilize) more than thirty percent (30%) of the selling space of the store for the sale of any combination of: giftware; housewares; linens and domestics; home furnishings; <u>and/or</u> health and beauty care products; <u>and/or</u> products for infants and young children (including, without limitation, cribs and juvenile furniture, toys and games, infant's and young children's clothing, strollers, car seats, carriers, bedding, bath and safety accessories, and feeding and eating accessories); and/or (ii) any business or enterprise that includes the operation of any non-traditional retail format (such as, but not limited to, any online, internet, catalog or television format) which allocates (or intends to allocate) more than thirty percent (30%) of

such format's listing space or time slots to the sale of any combination of: giftware; housewares; linens and domestics; home furnishings; and/or health and beauty care products; and/or products for infants and young children (including, without limitation, cribs and juvenile furniture, toys and games, infant's and young children's clothing, strollers, car seats, carriers, bedding, bath and safety accessories, and feeding and eating accessories); and/or (iii) any other material business or enterprise of the Company Group.

     (d)    **Non-Solicitation and Non-Interference.** During the Restricted Period, Executive shall not, and shall cause his controlled affiliates not to, directly or indirectly, through or in association with any third party, (i) call on, solicit or service, engage or contract with or take any action which may interfere with, impair, subvert, disrupt or alter the relationship, contractual or otherwise, between any Company Group Member and any current or prospective customer, supplier, distributor, developer, service provider, licensor or licensee, or other material business relation of such Company Group Member, (ii) solicit, induce, recruit or encourage any employees of or consultants to the Company Group to terminate their relationship with the Company Group or take away or hire such employees or consultants, (iii) divert or take away the business or patronage (with respect to products or services of the kind or type developed, produced, marketed, furnished or sold by the Company Group) of any of the clients, customers or accounts, or prospective clients, customers or accounts, of the Company Group or (iv) attempt to do any of the foregoing, either for Executive's own purposes or for any other third party.

     (e)    **Non-Disparagement.** Executive shall not, in any manner, directly or indirectly, make any oral or written statement to any Person that disparages or places any Company Group Member or any of their respective officers, shareholders, members or advisors, any member of the Board, or any agents or others with whom the Company has business relationships, in a false or negative light; provided, however, that Executive shall not be required to make any untruthful statement or to violate any law.

     7.    **Acknowledgment and Enforcement of Covenants; Representations.**

     (a)    **Acknowledgment.** Executive acknowledges that he will become familiar with the Company Group Members' trade secrets and with other confidential and proprietary information concerning the Company Group Members and their respective predecessors, successors, customers and suppliers, and that his services are of special, unique and extraordinary value to the Company. Executive acknowledges and agrees that the Company would not enter into this Agreement, providing for compensation and other benefits to Executive on the terms and conditions set forth herein, but for Executive's agreements herein (including those set forth in Section 6). Furthermore, Executive acknowledges and agrees that the Company will be providing Executive with additional special knowledge after the Start Date, with such special knowledge to include additional Confidential Information and trade secrets. Executive agrees that the covenants set forth in Section 6 (collectively, the "Restrictive Covenants") are reasonable and necessary to protect the Company Group's trade secrets and other Confidential Information, proprietary information, good will, stable workforce and customer relations.

     (b)    **Representations.**

     (i)    Without limiting the generality of Executive's agreement with the provisions of Section 7(a), Executive (A) represents that he is familiar with and has carefully considered the Restrictive Covenants; (B) represents that he is fully aware of his obligations hereunder; (C) agrees to the reasonableness of the length of time, scope and geographic coverage, as applicable, of the Restrictive Covenants; and (D) agrees that the Restrictive Covenants will continue in effect for the applicable periods set forth above regardless of whether Executive is then entitled to receive severance pay or benefits from the Company. Executive understands that the Restrictive Covenants may limit his ability to earn a livelihood in a business similar to the business of the

Company Group, but he nevertheless believes that he has received and will receive sufficient consideration and other benefits as an employee of the Company and as otherwise provided hereunder or as described in the recitals hereto to clearly justify such restrictions which, in any event (given his education, skills and ability), Executive does not believe would prevent him from otherwise earning a living. Executive agrees that the Restrictive Covenants do not confer a benefit upon the Company disproportionate to the detriment of Executive.

(ii)     Executive hereby represents and warrants to the Company that: (A) the information that Executive provided to the Company regarding his background is truthful and accurate; the execution and delivery of this Agreement and the performance by Executive of his duties hereunder do not and shall not constitute a breach of, conflict with, or otherwise contravene or cause a default under, the terms of any other agreement or policy to which Executive is a party or otherwise bound or any judgment, order or decree to which Executive is subject; (B) Executive has no information (including, without limitation, confidential information and trade secrets) relating to any other person or entity that would prevent Executive under the terms of any other agreement or arrangement from entering into this Agreement or carrying out his duties hereunder, or would give rise to a violation of such other agreement or arrangement; (C) Executive is not bound by any employment, consulting, non-competition, confidentiality, trade secret or similar agreement (other than this Agreement) with any other person or entity that would prevent Executive under the terms of any other agreement or arrangement from entering into this Agreement or carrying out his duties hereunder, or would give rise to a violation of such other agreement or arrangement; (D) Executive has, in good faith, informed the Company about and has provided the Company with a true and complete copy of his contractual post-employment obligations with his most recent employer as of the date hereof; (E) Executive is not currently and has never been the subject of any allegation or complaint of harassment, discrimination, retaliation, or sexual or other misconduct in connection with any prior employment or otherwise, and has never been a party to any settlement agreement or nondisclosure agreement relating to such matters; and (F) Executive understands the Company will rely upon the accuracy and truth of the representations and warranties of Executive set forth herein and Executive consents to such reliance.

(c)     **Enforcement.** Executive agrees that a breach by Executive of any of the Restrictive Covenants may cause immediate and irreparable harm to the Company or another Company Group Member that would be difficult or impossible to measure, and that damages to the Company or the Company Group Member for any such injury may therefore be an inadequate remedy for any such breach. Therefore, Executive agrees that in the event of any breach or threatened breach of any provision of the Restrictive Covenants, the Company shall be entitled, in addition to and without limitation upon all other remedies the Company may have under this Agreement at law or otherwise, to seek to obtain from any court of competent jurisdiction specific performance, injunctive relief and/or other appropriate relief (without posting any bond or deposit) in order to enforce or prevent any violations of the Restrictive Covenants, or require Executive to account for and pay over to the Company all compensation, profits, moneys, accruals, increments or other benefits derived from or received as a result of any transactions constituting a breach of the Restrictive Covenants if and when final judgment of a court of competent jurisdiction is so entered against Executive.

(d)     **Severability.** If, at the time of enforcement of the Restrictive Covenants, a court or arbitrator holds that the Restrictive Covenants are unreasonable under the circumstances then existing, the parties agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area determined to be reasonable under the circumstances by such court or arbitrator, as applicable. Executive covenants and agrees that Executive shall not assert as a defense to any action seeking enforcement of the Restrictive Covenants (including an

13

action seeking injunctive relief) that such provisions are not enforceable due to lack of sufficient consideration received by Executive.

(e) **Tolling.** In the event of any violation of the provisions of Section 6, Executive acknowledges and agrees that the post-termination restrictions contained in Section 6 shall be extended by a period of time equal to the period of such violation, it being the intention of the parties hereto that the running of the applicable post-termination restriction period shall be tolled during any period of such violation.

(f) **Survival of Provisions**. The obligations contained in Sections 6, 7, 9, 10 and 11 hereof shall survive any termination of Executive's employment with the Company and shall be fully enforceable thereafter.

(g) **Arrangement with Prior Employer**. In the event that Executive's most recent employer as of the date hereof brings a claim against Executive for a breach of his contractual post-employment obligations therewith as a result of or in connection with Executive's entry into this Agreement or commencement of employment with the Company, and provided that Executive has not acted in bad faith or misappropriated confidential or proprietary information from such prior employer, the Company agrees to pay or reimburse Executive for any reasonable attorneys' fees incurred by him in defending such a claim, up to a maximum of $250,000. Notwithstanding anything herein to the contrary, the parties hereto agree that counsel representing the Company with respect to any such claim shall also represent Executive, provided that such representation does not give rise to any conflicts of interest. For the avoidance of doubt, Executive agrees and acknowledges that the grant of injunctive relief by a court of competent jurisdiction that prevents Executive from providing the services to the Company as set forth in this Agreement shall not be deemed a breach by the Company of this Agreement and shall not entitle Executive to any severance benefits hereunder.

8. **Withholding Taxes/Authorized Deductions.** Notwithstanding anything herein to the contrary, the Company may withhold (or cause to be withheld) from any amounts otherwise due or payable under or pursuant to this Agreement such federal, state and local income, social security, employment or other taxes as may be required to be withheld pursuant to any applicable law or regulation, and make such deductions as may be applicable pursuant to the Company's policies and employee benefit plans.

9. **Cooperation.** During and after the Term, Executive shall reasonably cooperate with any investigation or inquiry by the Company, or any governmental or regulatory agency or body concerning the Company or any other member of the Company Group; provided, that the Company shall reimburse Executive's reasonable expenses incurred in providing such cooperation subject to Executive's delivery of written notice to the Company prior to the time such expenses are incurred (including attorneys' fees, if reasonably necessary).

10. **Clawback.** To the extent required by applicable law or regulation, any applicable stock exchange listing standards or any clawback policy adopted by the Company pursuant to any such law, regulation or stock exchange listing standards, or to comport with good corporate governance practices, the Annual Bonus and any other incentive compensation granted to Executive (whether pursuant to this Agreement or otherwise) shall be subject to the provisions of any applicable clawback policies or procedures, which may provide for forfeiture and/or recoupment of such amounts paid or payable under this Agreement or otherwise, including the incentive equity awards granted or to be granted to Executive under Sections 3(d) and 3(e) of this Agreement or any other incentive equity awards granted to Executive.

11. **Miscellaneous.**

(a)     **Insurance.** The Company may, at its option and for its benefit, obtain insurance with respect to Executive's death, disability or injury. Executive agrees to submit to such physical examinations and supply such information as may be reasonably required in order to permit the Company to obtain such insurance.

(b)     **Governing Law.** This Agreement shall be construed and enforced in accordance with the internal laws of the State of New York, without regard to principles of conflicts of laws. Notwithstanding anything herein or otherwise to the contrary, the Executive agrees and acknowledges that all compensation and benefits provided to the Executive by the Company, whether under this Agreement or otherwise, shall be subject to all applicable requirements under law or regulation, including without limitation, the Coronavirus Aid, Relief, and Economic Security Act, and any actions taken by the Company to comply with any such laws or regulations shall not be a breach of this Agreement or constitute Good Reason under this Agreement or any other agreements between the Company and the Executive.

(c)     **Consent to Jurisdiction.** All actions or proceedings arising out of or relating to this Agreement shall be tried and litigated only in the New York State or Federal courts located in the County of New York, State of New York. The parties hereto hereby irrevocably submit to the exclusive jurisdiction of such courts for the purpose of any such action or proceeding. Notwithstanding the foregoing, either party may seek injunctive or equitable relief to enforce the terms of this Agreement in any court of competent jurisdiction.

(d)     **Waiver of Jury Trial.** Each of the parties hereto hereby irrevocably waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement.

(e)     **Severability.** It is the desire and intent of the parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular provision of this Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable under applicable law, such provision, as to such jurisdiction, shall be ineffective without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

(f)     **Entire Agreement; Amendment.** This Agreement embodies the entire agreement of the parties hereto respecting the matters within its scope and supersedes all prior agreements (including, without limitation, any offer letters, term sheets and correspondence relating thereto), whether written or oral, that directly or indirectly bear upon the subject matter hereof. This Agreement may not be amended, modified or changed (in whole or in part), except by written agreement executed by both of the parties hereto.

(g)     **Offsets.** To the extent not prohibited under applicable law, the Company, in its sole and absolute discretion, has the right to set off (or cause to be set off) any amounts otherwise due to Executive from the Company in satisfaction of any repayment obligation of Executive under this Agreement or otherwise, provided that any such amounts are exempt from, or set off in a manner intended to comply with, the requirements of Section 409A.

(h)     **Waiver.** No waiver of any of any provision of this Agreement will constitute or be deemed to constitute a waiver of any other provision of this Agreement, nor will any such waiver constitute a continuing waiver unless otherwise expressly provided in a writing executed by the party against whom it is sought to be enforced.

15

(i)      **Successors and Assigns.** Neither party hereto may assign its rights or delegate its duties hereunder, except that the Company may assign its rights hereunder to any person that (i) acquires substantially all of the business and assets of the Company (whether by merger, consolidation, purchase of assets or other acquisition transaction), and (ii) agrees in writing to assume the obligations of the Company hereunder. This Agreement shall be binding on the successors and assigns of the Company and shall inure to the benefit of Executive's heirs, executors, administrators, or beneficiaries. Nothing in this Agreement shall create, or be deemed to create, any third-party beneficiary rights in any Person, including, without limitation, any employee of the Company, other than Executive.

(j)      **Notices.** Any notice or other communication required or permitted to be given hereunder shall be deemed to have been duly given when personally delivered or when sent by registered mail, return receipt requested, postage prepaid, as follows:

If to the Company, at:

> Bed Bath & Beyond Inc.
> 650 Liberty Avenue
> Union, NJ 07083
> Attention: Chief Legal Officer and General Counsel

If to Executive, at:

> Executive's home address on file with the Company

> With a copy to Executive's counsel, at:

> Outten & Golden LLP (attention Wendi S. Lazar)
> 685 Third Avenue, Floor 25
> New York, NY 10017

Either party hereto may change its or his address for the purpose of this paragraph by written notice similarly given.

(k)      **Legal Counsel; Mutual Drafting.** Each party recognizes that this is a legally binding contract and acknowledges and agrees that they have had the opportunity to consult with legal counsel of their choice. Each party has cooperated in the drafting, negotiation and preparation of this Agreement. Hence, in any construction to be made of this Agreement, the same shall not be construed against either party on the basis of that party being the drafter of such language. Executive agrees and acknowledges that he has read and understands this Agreement, is entering into it freely and voluntarily, and has been advised to seek counsel prior to entering into this Agreement and has had ample opportunity to do so.

(l)      **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original as against any party whose signature appears thereon, and all of which together shall constitute one and the same instrument. Signatures delivered as a "pdf" attachment to an email to the other party shall be sufficient for all purposes.

[*Signatures on Following Page*]

16

**IN WITNESS WHEREOF**, the Company and Executive have executed this Agreement as of the date first written above.

**COMPANY**

BED BATH & BEYOND INC.

By: _/s/ Mark J. Tritton_
Name: Mark J Tritton
Title: President and Chief Executive Officer

**EXECUTIVE**

_/s/ Rafeh Masood_
Rafeh Masood

[*Signature Page to Employment Agreement*]

**EXHIBIT A**

**RELOCATION BENEFITS**

To assist you with your relocation from the Boston, MA area to the Union, NJ area, you will be eligible for relocation assistance ("Relocation Assistance"). This Relocation Assistance will be provided for the eligible relocation expenses outlined below. Relocation Assistance will be delivered to you in the form of a reimbursement based on original receipts or expense documents submitted, except where a direct bill arrangement has been established. The Company will also "gross up" for tax purposes your eligible relocation expenses that are not tax deductible.

The items listed below are eligible for Relocation Assistance:

- **HOME SALE CLOSING COSTS** - Closing costs related to the sale of your primary residence in the Boston, MA area up to 7% of your home sale price (i.e., maximum 5% realtor's commission and other reasonable and customary closing costs). Discount points, escrows, warranties, past due items, expenses or costs incurred prior to or at closing resulting from home improvements/repairs or seller incentives are excluded from reimbursement. You must submit your settlement statement signed by at least one of the following: closing agent, escrow company, or attorney. Please contact the Company if you have any questions regarding closing costs that are included/excluded from reimbursement. To be eligible for this reimbursement, your home sale must be completed within the Relocation Completion Period. For purposes of this Agreement, the "Relocation Completion Period" is the six (6) month period immediately following your Start Date; provided, that notwithstanding the foregoing, the Post-Commencement Period may be extended by up to two (2) additional consecutive three-month periods (for a maximum aggregate Relocation Completion Period of twelve (12) months following your Start Date), so long as (i) the Company reasonably believes that you are using reasonable best efforts to relocate to the Union, NJ area, and (ii) you submit a request in writing for extension of the Relocation Completion Period to the Company's HR department reasonably in advance of the expiration of the original six (6) month period (or the first three (3) month extension, as applicable).

- **HOME PURCHASE CLOSING COSTS** - Closing costs related to the purchase of your new primary residence in the greater Union, NJ area, up to 2% of your home purchase price (i.e., reasonable and customary closing costs; discount points and escrows are not eligible for reimbursement). You must submit your settlement statement signed by at least one of the following: closing agent, escrow company, or attorney. Please contact the Company if you have any questions regarding closing costs that are included/excluded from reimbursement. To be eligible for this reimbursement, your home sale must be completed within the Relocation Completion Period.

- **TEMPORARY LODGING** – To assist you during your housing transition from the Boston, MA area to the greater Union, NJ area, the Company will provide you with temporary lodging during the Relocation Completion Period that will be arranged and paid for by the Company, assuming you are maintaining the costs associated with your departure housing.

- **HOUSEHOLD GOODS** - To assist you with the movement of your household goods from your residence in the Boston, MA area to your new residence in the greater Union, NJ area, the Company will arrange and pay for the full pack and movement of your household goods (some exclusions apply).

A-1

- **HOME FINDING TRIPS -** To assist you in finding a home in the greater Union, NJ area, the Company will provide you, your spouse and your children living with you at home up to two (2) home finding trips to the greater Union, NJ area for up to 3 days/2 nights per trip. Eligible expenses include airfare, rental car, lodging (if your temporary housing is not suitable), and meals. All covered items are subject to the Company's travel and expense policy.

- **FINAL TRIP -** To assist you with the transportation expenses associated with your final trip to the Union, NJ, the Company will reimburse you for your final trip mileage (at the current Company rate), tolls, Company-approved destination lodging for one (1) night, if needed, and meal expenses for one (1) day for yourself, your spouse/partner and children. All covered items are subject to the Company's travel and expense policy.

- **TRIPS HOME DURING RELOCATION COMPLETION PERIOD** – To assist you with the cost of your roundtrip airfare between Boston, MA and Newark, NJ, with respect to up to one (1) roundtrip per week during your Relocation Completion Period, the Company will reimburse you for eligible related expenses (e.g., airfare, baggage fees, airport parking, transportation to and from the airport). All covered items are subject to the Company's travel and expense policy.

- **MISCELLANEOUS -** In addition to the assistance outlined above, the Company will reimburse your expenses for a new driver's license, auto registration, utility hookups and/or utility disconnection expenses or forfeited utility deposits up to a total of $2,500.

**For expenses that are not direct billed to the Company, please submit all eligible relocation related expenses, with receipts, to Paul Dombek for processing no later than thirty (30) days after each applicable relocation expense is incurred. Such amounts shall be reimbursed within thirty (30) days after receipt of expenses and related documentation by the Company.**

If you voluntarily resign your employment without Good Reason or if you are involuntarily terminated by the Company for Cause (i) prior to the first (1st) anniversary of the Start Date, you agree to repay the full gross amount (including any tax gross-up) of all payments, benefits and expense reimbursements paid by the Company pursuant to this Exhibit A, or (ii) on or after the first (1st) anniversary of the Start Date but prior to the second (2nd) anniversary of the Start Date, you agree to repay fifty percent (50%) of the full gross amount (including any tax gross-up) of all payments, benefits and expense reimbursements paid by the Company pursuant to this Exhibit A. To the extent permitted by applicable law, you hereby expressly agree and authorize the Company to deduct any amounts owed to the Company pursuant to this Exhibit A from your final paycheck and any other amounts that the Company might otherwise pay upon termination.

A-2

**EXHIBIT B**

**FORM OF AGREEMENT AND GENERAL RELEASE**

THIS AGREEMENT AND GENERAL RELEASE (the "Agreement and General Release") is made and entered into on _____, 20__ by and between Rafeh Masood ("Executive") and Bed Bath & Beyond Inc., a New York corporation (the "Company").

WHEREAS, Executive has been employed by the Company and the parties wish to resolve all outstanding claims and disputes between them relating to such employment;

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements set forth in this Agreement and General Release, the sufficiency of which the parties acknowledge, it is agreed as follows:

1.  In consideration for Executive's promises, covenants and agreements in this Agreement and General Release, the Company agrees to provide the Severance Benefits set forth in Section 5(c)(ii) of that certain employment agreement between Executive and the Company, dated as of April 22, 2020 (the "Employment Agreement"), in accordance with the terms and subject to the conditions of such Employment Agreement. Executive would not otherwise be entitled to such payments but for his promises, covenants and agreements in this Agreement and General Release.

2.  The parties agree that the payments described in Section 1 of this Agreement and General Release are in full, final and complete settlement of all Claims (as defined below) Executive, and Executive's heirs, beneficiaries, personal representatives, executors, administrators, successors and assigns (collectively, the "Releasors") may have against the Company, its past and present affiliates, parents, subsidiaries, divisions, joint ventures and/or partnerships, their predecessors, successors and assigns, and all of their past and present respective officers, directors, owners, shareholders, members, managers, supervisors, employees, agents, advisors, consultants, insurers, attorneys, representatives, and employee benefit or pension plans or funds (and the trustees, administrators, fiduciaries and insurers of such programs) as well as any predecessors, successors and/or assigns of each of the foregoing (collectively, the "Releasees"), arising out of or in any way connected with Executive's employment with the Company or any of its affiliates or the termination of such employment. Executive understands and acknowledges that except for the Accrued Obligations (as defined in the Employment Agreement) and except as otherwise specifically provided under this Agreement and General Release, Executive is entitled to no payments or any other benefits from Company. Except to the extent of the Accrued Benefits and the benefits otherwise payable in accordance with Section 1 of this Agreement and General Release, Executive acknowledges that Executive has received all wages for work performed, overtime compensation, bonuses, commissions, vacation pay and all other benefits and compensation due to Executive by virtue of Executive's employment with and termination of employment with the Company up through the effective date of this Agreement and General Release.

3.  Nothing in this Agreement and General Release shall be construed as an admission of liability by the Company or any other Releasee, and the Company specifically disclaims liability to or wrongful treatment of Executive on the part of itself and all other Releasees. Executive expressly acknowledges and agrees that Executive has not asserted and does not have, the basis for asserting any claim, the factual foundation of which involves sexual harassment or sexual abuse, against the Company, and as such no portion of the consideration paid to Executive as part of this Agreement and General Release is attributable to any such claims; thus, Executive acknowledges

B-1

and agrees that this Agreement and General Release does not constitute the settlement of a sexual harassment or sexual abuse claim.

4.  Executive hereby represents and warrants to Company that (a) Executive has not filed, caused or permitted to be filed any pending proceeding (nor has Executive lodged a complaint with any governmental or quasi-governmental authority) against Company, nor has Executive agreed to do any of the foregoing, (b) Executive has not assigned, transferred, sold, encumbered, pledged, hypothecated, mortgaged, distributed, or otherwise disposed of or conveyed to any third party any right or Claim against Company which has been released in this Agreement and General Release, and (c) Executive has not directly or indirectly encouraged or assisted any third party in filing, causing or assisting to be filed, any Claim against Company.  In addition, Executive hereby represents and warrants to Company that Executive shall not encourage or solicit or voluntarily assist or participate in any way in the filing, reporting or prosecution by Executive or any third party of a proceeding or Claim against Company based upon or relating to any Claim released by Executive in this Agreement and General Release, unless expressly allowed by Section 7. If any court has or assumes jurisdiction of any action against the Company or any of its affiliates on behalf of Executive, Executive will request that court to withdraw from or dismiss the matter with prejudice.

5.  Executive represents that he has not filed any complaints or charges against the Company or any of its affiliates with the Equal Employment Opportunity Commission ("EEOC"), or with any other federal, state or local agency or court, and covenants that he will not seek to recover on any claim released in this Agreement and General Release. Executive further represents that he has reported to the Company in writing any and all work-related injuries that he has suffered or sustained during his employment with the Company or its affiliates.

6.  Executive, on his behalf and on behalf of each of the Releasors, hereby covenants not to sue, and fully and forever releases and discharges the Company and all other Releasees from any and all legally waivable Claims which Executive may have against any of the Releasees, arising on or prior to the date hereof, including those of which Executive is not aware and those not mentioned in this Agreement and General Release up to the effective date of this Agreement and General Release. "Claims" means any and all actions, controversies, demands, causes of action, suits, rights, and/or claims whatsoever for debts, sums of money, wages, salary, severance pay, vacation pay, sick pay, fees and costs, attorneys' fees, losses, penalties, damages, including damages for pain and suffering and emotional harm, arising, directly or indirectly, out of Executive's employment with the Company, the terms and conditions of such employment, the termination of such employment and/or any of the events relating directly or indirectly to or surrounding the termination of that employment, including, but not limited to, Claims arising directly, or indirectly, from any promise, agreement, offer letter, contract, understanding, common law, tort, the laws, statutes, and/or regulations of the State of New Jersey, or any other state, and the United States, including, but not limited to, federal, state and local wage and hour laws, federal, state and local whistleblower laws, federal, state and local fair employment laws, federal, state and local anti-discrimination laws, federal, state and local labor laws, Section 1981 of the Civil Rights Act of 1866, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Equal Pay Act, the Americans with Disabilities Act, the Employment Retirement Income Security Act of 1974 ("ERISA"), the Vietnam Era Veterans Readjustment Assistance Act, the Fair Credit Reporting Act, the Fair Labor Standards Act, the Age Discrimination in Employment Act ("ADEA"), as amended by the Older Workers Benefit Protection Act, the Worker Adjustment and Retraining Notification Act of 1988, the Occupational Safety and Health Act, the Sarbanes-Oxley Act of 2002, the Family and Medical Leave Act, the Genetic

B-2

Information Nondiscrimination Act of 2008, the New Jersey Law Against Discrimination, the New Jersey Family Leave Act, the New Jersey Civil Rights Act, the New Jersey Wage Payment Law, the New Jersey Conscientious Employee Protection Act, the New Jersey Millville Dallas Airmotive Plant Loss Job Notification Act, the New Jersey Paid Sick Leave Act, the New Jersey Equal Pay Act, and the New Jersey Workers' Compensation Anti-Retaliation Law, as each has been or may be amended from time to time, and Claims premised on any other legal theory, whether arising directly or indirectly from any act or omission, whether intentional or unintentional. Executive acknowledges that he is releasing claims based on age, race, color, sex, sexual orientation or preference, marital status, religion, national origin, citizenship, veteran status, disability and other legally protected categories. This provision is intended to constitute a general release of all of each Releasor's presently existing covered claims against the Releasees, to the maximum extent permitted by law.

7. Nothing in this Agreement and General Release shall be construed to: (a) waive any rights or claims of Executive that arise after Executive signs this Agreement and General Release; (b) waive any rights or claims of Executive to enforce the terms of this Agreement and General Release; (c) waive any claim for worker's compensation or unemployment benefits (the application for which shall not be contested by the Company); (d) waive any rights or claims for the provision of accrued benefits conferred to Executive or his beneficiaries under the terms of the Company's medical, dental, life insurance or defined contribution retirement benefit plans; (e) waive or affect any claim that cannot be released by an agreement voluntarily entered into between private parties; (f) limit Executive's ability to file a charge or complaint with the EEOC, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission or any other federal, state or local governmental agency or commission ("Government Agencies"); (g) limit Executive's ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the Company; (h) release claims challenging the validity of this Agreement under the ADEA; (i) disclose any allegations relating to a claim under the New Jersey Law against Discrimination; (j) release the Releasees or any of them from any claim that by law cannot be waived or released; (k) release any existing rights that Executive may have to indemnification pursuant to the Company's or an affiliate's governing documents and/or any directors' and officers' insurance policy of the Company for acts committed during the course of Executive's employment; or (l) waive any rights of Executive with respect to vested equity held by him in the Company. Executive expressly waives and agrees to waive any right to recover monetary damages for personal injuries in any charge, complaint or lawsuit filed by Executive or anyone else on behalf of Executive for any released claims. This Agreement and General Release does not limit Executive's right to receive an award for information provided to any Government Agencies.

8. Executive acknowledges that (a) he has been given at least twenty-one (21)[1] calendar days to consider this Agreement and General Release and that modifications hereof which are mutually agreed upon by the parties hereto, whether material or immaterial, do not restart the twenty-one (21) day period; (b) he has been advised to, and has had the opportunity to, consult Executive's independent counsel with respect to this Agreement and General Release; (c) he has seven (7) calendar days from the date he executes this Agreement and General Release in which to revoke it; (d) he executes this Agreement and General Release freely and voluntarily and that he understands the significance of this Agreement and General Release; and (e) this Agreement and

---

[1] To be extended to 45 days in the event of a group termination under the ADEA.

B-3

General Release will not be effective or enforceable, nor the Severance Benefits paid, unless the seven-day revocation period ends without revocation by Executive. Revocation can be made by delivery and receipt of a written notice of revocation to Bed Bath & Beyond, 650 Liberty Avenue, Union, NJ 07083, Attention: [INSERT NAME/TITLE], by midnight on or before the seventh calendar day after Executive signs this Agreement and General Release.

9. This Agreement and General Release shall be binding on, and shall inure to the benefit of, the Releasees and Executive and their respective heirs, representatives, successors and assigns.

10. This Agreement and General Release (and, to the extent explicitly provided herein, the Employment Agreement) sets forth the entire agreement between Executive and the Company, and fully supersede any and all prior agreements or understandings among them regarding its subject matter; provided, however, that nothing in this Agreement and General Release is intended to or shall be construed to limit, impair or terminate any obligation of Executive pursuant to any non-competition, non-solicitation, confidentiality or intellectual property agreements that have been signed by Executive where such agreements by their terms continue after Executive's employment with the Company terminates (including, but not limited to, the Restrictive Covenants in the Employment Agreement). This Agreement and General Release may only be modified by written agreement signed by both parties.

11. The Company and Executive agree that in the event any provision of this Agreement and General Release is deemed to be invalid or unenforceable by any court or administrative agency of competent jurisdiction, or in the event that any provision cannot be modified so as to be valid and enforceable, then that provision shall be deemed severed from the Agreement and General Release and the remainder of the Agreement and General Release shall remain in full force and effect.

12. This Agreement and General Release shall be construed and enforced in accordance with the internal laws of the State of New York, without regard to principles of conflicts of laws.

13. All actions or proceedings arising out of or relating to this Agreement and General Release shall be tried and litigated only in the New York State or Federal courts located in the County of New York, State of New York. The parties hereto hereby irrevocably submit to the exclusive jurisdiction of such courts for the purpose of any such action or proceeding. Notwithstanding the foregoing, either party may seek injunctive or equitable relief to enforce the terms of this Agreement and General Release in any court of competent jurisdiction.

14. Each of the parties hereto hereby irrevocably waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement and General Release.

15. The language of all parts of this Agreement and General Release in all cases shall be construed as a whole, according to its fair meaning, and not strictly for or against any of the parties.

*[Signature Page Follows]*

B-4

**PLEASE READ CAREFULLY. THIS
AGREEMENT AND GENERAL RELEASE INCLUDES A
RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.**

**COMPANY**

**Bed Bath & Beyond Inc.**

By: _____

Name: _____

Title: _____

**EXECUTIVE**

_____

Rafeh Masood

Date: _____

B-5

**EXHIBIT C**

**EXCLUDED WORK PRODUCT**

_____      I have no inventions.

_____      The following is a complete list of all Work Product relative to the subject matter of my employment with the Company that have been created by me, alone or jointly with others, prior to the Start Date, which might relate to the Company Group's present business:

N/A

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____      Additional sheets attached.

Executive Signature _/s/ Rafeh Masood_____      Date: _4/22/2020_____

C-1

Exhibit 10.51

## AMENDMENT TO EMPLOYMENT AGREEMENT

THIS AMENDMENT (this "Amendment"), effective as of November 2, 2021, to the Employment Agreement, dated as of April 22, 2020, by and between Bed Bath & Beyond Inc., a New York corporation (the "Company"), and Rafeh Masood ("Executive") (the "Employment Agreement") is made and entered into by and between the Company and Executive. Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Employment Agreement. This Amendment shall supersede any contrary provisions set forth in the Employment Agreement.

WHEREAS, the Company and Executive are parties to the Employment Agreement; and

WHEREAS, the Company and Executive mutually desire to amend the terms and conditions of the Employment Agreement as set forth in this Amendment.

NOW, THEREFORE, in consideration of the above recitals incorporated herein and the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the parties agree as follows:

1.  The first sentence of Section 1(b) of the Employment Agreement is hereby amended and restated in its entirety as follows, effective November 2, 2021:

    "During the Term, Executive shall serve as Executive Vice President and Chief Customer Officer of the Company, and shall perform such duties, responsibilities, and have those authorities consistent with such position and as may from time to time be assigned to Executive by the Company's Chief Executive Officer ("CEO"), including, without limitation, management of the PnL of the Company's digital business."

    In addition, the Employment Agreement is hereby amended by replacing all references to "Executive Vice President and Chief Digital Officer" with "Executive Vice President and Chief Customer Officer".

2.  The first sentence of Section 3(a) of the Employment Agreement is hereby amended to reflect the Executive's current Base Salary by replacing "$550,000.00" with "650,000.00".

3.  The first sentence of Section 3(b) of the Employment Agreement is hereby amended and restated in its entirety as follows, effective November 2, 2021:

    "Beginning with respect to fiscal year 2021 and for each completed fiscal year thereafter during the Term, Executive shall be eligible to receive an annual cash performance bonus (the "Annual Bonus"), with a target Annual Bonus opportunity equal to eighty percent (80%) of his Base Salary; provided, that the Annual Bonus with respect to fiscal year 2021 shall be prorated for the portion of fiscal year 2021 during which Executive was employed by the Company as the Chief Customer Officer (it being understood that Executive will

also be eligible to receive an annual cash bonus payment with respect to the applicable bonus plan, and terms and conditions related thereto, in which he participated in fiscal year 2021 prior to November 2, 2021, prorated for the portion of fiscal year 2021 prior to November 2, 2021 during which he served as Chief Digital Officer."

4. Section 3(e) of the Employment Agreement is hereby amended by adding the following as a new third fourth sentences thereof:

"In fiscal year 2022, at the same time as such awards are granted to other members of the Company's senior management team, the Company shall grant Executive a long-term equity incentive award(s) under the 2012 Plan or the 2018 Plan, as determined by the Compensation Committee in its sole discretion (the "2022 Equity Award"). The 2022 Equity Award will have a target value at grant equal to $1,625,000.00."

5. Section 3 of the Employment Agreement is hereby amended by adding the following as a new paragraph (i):

"**(i)   One-Time Long-Term Equity Incentive Award.**  As soon as reasonably practicable after the effective date of his promotion to Executive Vice President and Chief Customer Officer and subject to all necessary approvals by the Compensation Committee, the Company shall grant to you a one-time award comprised 60% of performance stock units (the "One-Time PSU Award) and 40% of time-vesting restricted stock units (the "One-Time RSU Award"), subject to and in accordance with the terms of the 2012 Plan or the 2018 Plan, as determined by the Compensation Committee in its sole discretion and the applicable award agreements thereunder.  The total value of the One-Time RSU Award and One-Time PSU Award at the date of grant will be $350,000.00, as determined by the Compensation Committee in its sole discretion.  The One-Time RSU Award will vest in substantially equal installments on each of the first, second and third anniversaries of the grant date, subject to your continued employment with the Company from the Effective Date through the applicable vesting date, and the One-Time PSU Award will vest following completion of the applicable three-year performance period and based on achievement of the applicable goals, in each case, and subject to the terms of the 2012 Plan or the 2018 Plan, as applicable, and the applicable award agreements.  The Company expects that the One-Time RSU Award and the One-Time PSU Award will be substantially consistent with the terms and conditions of such awards made to similarly situated executives in 2021."

6. **Effect of Amendment.**  Except as set forth herein, all provisions of the Employment Agreement shall remain in full force and effect.

7. **Modifications**.  This Amendment may not be amended, modified, or changed (in whole or in part) except by a formal, definitive written agreement expressly referring to this Amendment, which agreement is executed by both of the Company and Executive.

8. **Miscellaneous**. The references to the "Agreement" throughout the Employment Agreement are hereby understood to incorporate by reference this Amendment.

[*Signature page follows*]

3

IN WITNESS WHEREOF, the Company and Executive have executed this Amendment as of the day and year first written above.

**COMPANY**

BED BATH & BEYOND INC.

By: */s/ Mark J. Tritton* _

Name: Mark J. Tritton

Title: President and Chief Executive Officer

**EXECUTIVE**

*/s/ Rafeh Masood* _

Rafeh Masood

4

Exhibit 10.53

**BED BATH & BEYOND INC.**
**SHORT-TERM INCENTIVE PLAN**

**Amended and Restated as**
**of April 13, 2022**

**Section 1.      Purpose.**

The compensation policies of Bed Bath & Beyond Inc., a New York corporation (the "Company"), are intended to support the Company's overall objective of enhancing shareholder value. In furtherance of this philosophy, the Bed Bath & Beyond Inc. Short-Term Incentive Plan (the "Plan") is designed to provide incentives for business performance, reward contributions towards goals consistent with the Company's business strategy and enable the Company to attract and retain highly qualified Corporate Officers and other Eligible Employees.

**Section 2.      Definitions.**

The terms used in the Plan include the feminine as well as the masculine gender and the plural as well as the singular, as the context in which they are used requires. The following terms, unless the context requires otherwise, are defined as follows:

"409A Covered Bonus" has the meaning set forth in Section 7(k)(ii) of the Plan.

"Affiliate" means each of the following: (a) any Subsidiary; (b) any Parent; (c) any corporation, trade or business (including, without limitation, a partnership or limited liability company) that is directly or indirectly controlled fifty percent (50%) or more (whether by ownership of stock, assets or an equivalent ownership interest or voting interest) by the Company or one of its Affiliates; (d) any corporation, trade or business (including, without limitation, a partnership or limited liability company) that directly or indirectly controls fifty percent (50%) or more (whether by ownership of stock, assets or an equivalent ownership interest or voting interest) of the Company; and (e) any other entity in which the Company or any of its Affiliates has a material equity interest and that is designated as an "Affiliate" by resolution of the Committee.

"Board" means the Board of Directors of the Company.

"Bonus" means the incentive compensation payable in cash, as determined by the Committee under Section 4 of the Plan.

"Cause" means, with respect to a Participant's Termination of Employment, the following: (a) in the case where there is an employment agreement, severance agreement, change in control agreement or similar agreement in effect between the Company or an Affiliate and the Participant that defines "cause" (or words or a concept of like import), "cause" as defined under such agreement; provided, however, that with regard to any agreement under which the definition of "cause" applies only on occurrence of a change in control, such definition of "cause" shall not apply until a change in control actually takes place and then only with regard to a termination in connection therewith; or

1

(b) in the case where there is no employment agreement, severance agreement, change in control agreement or similar agreement in effect between the Company or an Affiliate and the Participant (or where there is such an agreement but it does not define "cause" (or words or a concept of like import)), termination due to a Participant's insubordination, dishonesty, fraud, incompetence, moral turpitude, willful misconduct, breach of any policy, agreement or arrangement of the Company (including as pertains to restrictive covenants or sexual or discriminatory conduct or related matters), refusal to perform his or her duties or responsibilities for any reason other than illness or incapacity or materially unsatisfactory performance of his or her duties for the Company or an Affiliate, as determined by the Committee in its sole discretion.  In addition, the Committee may deem any Termination of Employment to have been for Cause, including after such Termination of Employment occurs, if it discovers facts or circumstances that would constitute Cause if known or existing at the time of such Termination of Employment.

"Change in Control" means the occurrence of one or more of the following events:

(a) any "person" as such term is used in Sections 13(d) and 14(d) of the Exchange Act (other than the Company, any trustee or other fiduciary holding securities under any employee benefit plan of the Company, or any company owned, directly or indirectly, by the shareholders of the Company in substantially the same proportions as their ownership of common stock of the Company), becoming the beneficial owner (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing more than fifty percent (50%) of the combined voting power of the Company's then outstanding securities, excluding a person that is an "affiliate" (as such term is used in the Exchange Act) of the Company on the Effective Date, or any affiliate of any such person;

(b) during any period of twelve (12) months, the majority of the Board consists of individuals other than "Incumbent Directors," which term means the members of the Board at the beginning of such period, and any new director (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in subsections (a), (c), or (d) or a director whose initial assumption of office occurs as a result of either an actual or threatened election contest (as such term is used in Rule 14a-11 of Regulation 14A promulgated under the Exchange Act) or other actual or threatened solicitation of proxies or consents by or on behalf of a person other than the Board) whose election by the Board or nomination for election by the Company's shareholders was approved by a vote of a majority of the directors who comprised the Incumbent Directors or whose election or nomination for election was previously so approved;

(c) upon the consummation of a merger or consolidation of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) fifty percent (50%) or more of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation; provided, however, that a merger or consolidation effected to implement a recapitalization of the Company (or similar transaction) in which no person (other than those covered by the exceptions in (a) above) acquires more than fifty percent (50%) of the combined voting power of the Company's then outstanding securities shall not constitute a Change in Control of the Company;

2

(d)     upon approval by the shareholders of the Company, the Company adopts any plan of liquidation providing for the distribution of all or substantially all its assets, provided that this paragraph (d) shall not constitute a Change in Control with respect to a 409A Covered Bonus; or

(e)     upon the consummation of a sale or disposition by the Company of all or substantially all of the Company's assets other than the sale or disposition of all or substantially all of the assets of the Company to a person or persons who beneficially own, directly or indirectly, at least fifty percent (50%) or more of the combined voting power of the then outstanding voting securities of the Company at the time of the sale.

Notwithstanding the foregoing, with respect to a Bonus that provides for payment or settlement upon a Change in Control and that constitutes a 409A Covered Bonus, a transaction will not be deemed a Change in Control unless the transaction qualifies as a change in control event within the meaning of Code Section 409A.

Further and for the avoidance of doubt, a transaction will not constitute a Change in Control if: (i) its sole purpose is to change the state of the Company's incorporation, or (ii) its sole purpose is to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately before such transaction.  A determination of whether a Change in Control has occurred will be made in the discretion of the Committee.

"Code" means the Internal Revenue Code of 1986, as amended. Any reference to any section of the Code shall also be a reference to any successor provision and any Treasury Regulation promulgated thereunder.

"Committee" means the Compensation Committee of the Board appointed from time to time by the Board (or another committee or committees of the Board appointed for purposes of administering the Plan). Each Committee shall be comprised of two or more non-employee directors, each of whom is an "independent director" as defined and to the extent required under the rules and regulations of the Nasdaq Stock Market or such other applicable securities exchange on which the Company's common stock is then listed, listed or any national securities exchange system upon whose system the Company's common stock is then quoted, and, as may be applicable, "independent" as provided pursuant to rules promulgated by the Securities and Exchange Commission under the Dodd-Frank Wall Street Reform and Consumer Protection Act; provided, however, that any delegation to an individual will be respected to the full extent of such delegation provided that such delegation is consistent with the terms and conditions of this Plan and applicable law.

"Company" has the meaning set forth in Section 1 hereof, including any successors to the Company by operation of law.

"Corporate Officer" means any Company employee who is subject to Section 16(b) of the Exchange Act.

"Disability" (a) shall have the meaning given to such term in an employment agreement, severance agreement, change in control agreement, or other similar agreement in effect between the Company or an Affiliate and the Participant to the extent that "disability" (or words or a concept of

3

like import) is defined therein, or (b) if such an agreement does not exist or if "disability" is not defined in any such agreement, shall mean, unless otherwise determined by the Committee at the time that a Bonus opportunity is granted, a Participant's "disability" or term of like import) as such term is defined in the long-term disability plan of the Company applicable to such Participant or, in the absence of such a definition, the inability of a Participant to perform the major duties of his or her occupation for at least ninety (90) days in any one-hundred eighty (180)-day period because of sickness or injury. Notwithstanding the foregoing, for Bonuses under the Plan that provide for payments that are triggered upon a Disability and that constitute "non-qualified deferred compensation" pursuant to Code Section 409A, Disability shall mean that a Participant is disabled under Code Section 409A(a)(2)(C)(i).

"Effective Date" means July 16, 2020; provided, however, that the effective date of the plan as amended and restated is as of May 10, 2021.

"Eligible Employee" means each employee of the Company or an Affiliate, including each Corporate Officer, in each case as determined by the Committee in its sole discretion.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Parent" means any parent corporation of the Company within the meaning of Code Section 424(e).

"Participant" means a Corporate Officer or other Eligible Employee described in Section 3 of the Plan.

"Performance Period" means the period for which a Bonus may be made. Unless otherwise specified by the Committee, the Performance Period shall be the Company's fiscal year.

"Plan" has the meaning set forth in Section 1 hereof.

"Subsidiary" means any subsidiary corporation of the Company within the meaning of Code Section 424(f).

"Termination of Employment" means (a) a termination of employment (not including a military or personal leave of absence granted by the Company, except as otherwise determined by the Committee) of a Participant from the Company and its Affiliates, or (b) when an entity employing a Participant ceases to be an Affiliate, unless the Participant otherwise is, or thereupon becomes, employed by the Company or another Affiliate at the time the entity ceases to be an Affiliate.

**Section 3.    Participation.**

A Corporate Officer or other Eligible Employee designated by the Committee shall be a Participant in the Plan and shall continue to be a Participant until advised or determined otherwise.

**Section 4.    Bonuses.**

(a)    Performance Measures and Goals. The Committee shall establish the performance measures and goals for the earning of Bonuses based on a Performance Period applicable to each

Participant or class of Participants in writing prior to the beginning of the applicable Performance Period or, at such later date as determined by the Committee in its sole discretion, provided that the outcome of such performance goals is substantially uncertain at the time they are established. The performance goals may be based upon the attainment of specified levels of Company (or subsidiary, division or other operational unit of the Company) performance either on an absolute basis or relative to the performance of other corporations and/or on an individual Participant's performance, in any event, as determined by the Committee in its sole discretion.

(b)  Adjustments. In evaluating whether and to what extent a performance goal has been satisfied with respect to a Performance Period, the Committee may, in its sole discretion, adjust the performance goals to reflect, or disregard and exclude the impact of, unanticipated, external or other items, events, occurrences or circumstances determined by the Committee, including, but not limited to: (i) restructurings, discontinued operations, disposal of a business, extraordinary items, and other unusual or non-recurring charges, events or circumstances, (ii) an event either not directly related to the operations of the Company (or a subsidiary, division or other operational unit of the Company) or not within the reasonable control of the Company's management, (iii) the operations of any business acquired by the Company (or a subsidiary, division or other operational unit of the Company), (iv) a change in accounting standards required by generally accepted accounting principles, or (v) the effect of changes in laws or provisions affecting reported results.

(c)  Performance Evaluation. Within a reasonable time after the close of a Performance Period, the Committee shall determine whether the performance goals established for that Performance Period have been met.

(d)  Bonuses. The amount of the Bonus paid to each Participant shall be determined by the Committee. For the avoidance of doubt, for any Performance Period, and despite the established performance goals, the Committee shall retain the discretion to increase or decrease the amount of, or eliminate entirely, the Bonus to any Participant based on its review of the performance goals for each Participant pursuant to Section 4(c) and the individual performance of such Participant or such other factors as it deems necessary or appropriate.

(e)  Payment or Deferral of the Bonus.

(i)  Payment; Withholding. Subject to Section 4(e)(ii), the Company shall pay the Bonus to the Participant following the Committee's determination under Section 4(d) of the amount of the Bonus, but in any event, within the two and one-half month period following the end of the Performance Period. The Company shall have the right to deduct from any Bonus any applicable income and employment taxes and any other amounts that the Company is otherwise required or permitted to deduct.

(ii)  Deferral. Subject to Section 7(k) (regarding Code Section 409A) and subject to the Committee's approval and applicable law, a Participant may request that payment of a Bonus be deferred under a deferred compensation arrangement maintained by the Company by making a deferral election prior to, or as permitted, during the Performance Period, pursuant to such rules and procedures as the Committee may establish from time to time with respect to such arrangement.

5

(f)     Eligibility for Payments; Effect of Termination of Employment; Effect of Change in Control.

(i)     Except as otherwise determined by the Committee or provided in Section 4(f)(ii), (iii) or (iv) below, a Participant shall be eligible to receive a Bonus for a Performance Period only if such Participant is employed in good standing by the Company continuously from the beginning of the Performance Period through the payment of the Bonus.  Accordingly, except as expressly provided otherwise in an employment agreement, severance agreement, change in control agreement, or other similar agreement in effect between the Company or an Affiliate and a Participant, in the event of a Termination of Employment, a Participant's Bonus will be  immediately and automatically forfeited and canceled for no consideration to the Participant.  Notwithstanding the foregoing, the Committee retains the discretion to accelerate or provide for payment in whole or part of any Bonus. For the avoidance of doubt, if a Participant has an employment agreement, severance agreement, change in control agreement, or other similar agreement in effect with the Company or an Affiliate that addresses the treatment of the Participant's Bonuses in the event of a particular Termination of Employment, and either such agreement or the Plan provides for more favorable treatment with respect to a specific type of Termination of Employment, the more favorable treatment (in such agreement or in the Plan) shall control as to the Participant and such Bonus with respect to such Termination of Employment; provided, however, that there will be no duplication of benefits (i.e., the Participant will not receive a Bonus payout for a Performance Period under both the Plan and such other employment, severance, or change in control agreement).

(ii)     *Termination of Employment due to death or Disability.* In the event of a Participant's Termination of Employment due to death or Disability, the Participant will receive payment of (I) any Bonus for a Performance Period that ended prior to the Termination of Employment, based on actual performance and payable at the time set forth in Section 4(e)(i), and (II) if the date of the Termination of Employment occurs within the last six (6) months of a Performance Period, any Bonus for the Performance Period in which the termination date occurs, based on actual performance and payable at the time set forth in Section 4(e)(i), prorated for the number of full calendar months the Participant was employed by the Company during the Performance Period.

(iii)     *Termination of Employment by the Company without Cause*. In the event of a Participant's Termination of Employment by the Company without Cause that occurs following the end of any applicable Performance Period but prior to the date of payment for the Bonus in respect of such Performance Period, to the extent that the Participant timely executes, delivers, and does not revoke a general waiver and release of claims in a form provided by the Company (the "Release"), the Participant will receive payment of such Bonus for such Performance Period that ended prior to the date on which the Termination of Employment occurs, based on actual performance and payable at the time set forth in Section 4(e)(i). For the avoidance of doubt, if the date of the Termination of Employment without Cause by

6

the Company occurs within a Performance Period, the Participant shall forfeit any Bonus for the Performance Period in which the termination date occurs.

(iv)     *Termination of Employment in Connection with a Change in Control*. Unless an employment agreement, severance agreement, change in control agreement, or other similar agreement in effect between the Company or an Affiliate and a Participant provides for more favorable treatment, in the event of a Participant's Termination of Employment by the Company without Cause, within the ninety (90) days prior to or the two (2) years following a Change in Control and to the extent that the Participant timely executes, delivers, and does not revoke a Release, then notwithstanding anything herein to the contrary, the Participant will receive payment of (i) any Bonus for a Performance Period that ended prior to the Termination of Employment, based on actual performance and payable within thirty (30) days following the later of the effective date of the Change in Control or the expiration of the applicable revocation period for the Release, and (ii) any Bonus for the Performance Period in which the termination date occurs, at the target level of performance and payable within thirty (30) days following the later of the effective date of the Change in Control or the expiration of the applicable revocation period for the Release, prorated for the number of full calendar months the Participant was employed by the Company during the Performance Period.

(g)     <u>Breach of Restrictive Covenants</u>. Notwithstanding anything herein to the contrary, in the event that a Participant breaches any written confidentiality, intellectual property rights assignment, non-competition, non-solicitation, non-disparagement or other written restrictive covenant agreement between the Participant and the Company or an Affiliate thereof prior to the date of payment of any Bonus, the Participant shall forfeit such Bonus.

**Section 5.     Administration.**

(a)     <u>General Administration</u>. The Plan shall be administered by the Committee. Subject to the terms and conditions of the Plan, the Committee is authorized and empowered in its sole discretion to select or approve Participants and to award potential Bonuses in such amounts and upon such terms and conditions as it shall determine.

(b)     <u>Delegation</u>. The Chief Executive Officer (or his or her designee) shall possess all of the Committee's duties and authority under the Plan with respect to Bonuses that may be payable to Participants who are not Corporate Officers, including but not limited to such duties and authority as are set forth in Sections 3 and 4, provided that the Committee shall have the power and authority to remove from the Chief Executive Officer any and all duties and authority provided for under this Section 5(b).  For purposes of this Plan, references to the Committee shall be deemed to refer to the applicable duly authorized delegate or designee with respect to matters delegated to such person.

(c)     <u>Administrative Rules</u>. The Committee shall have full power and authority to adopt, amend and rescind administrative guidelines, rules and regulations pertaining to the Plan and to interpret the Plan and rule on any questions respecting any of its provisions, terms and conditions.

7

(d)     Committee Members Not Liable. The Committee and each of its members shall be entitled to rely upon certificates of appropriate officers of the Company with respect to financial and statistical data in order to determine if the performance goals for a Performance Period have been met. Neither the Committee nor any member thereof shall be liable for any action or determination made in good faith with respect to the Plan or any Bonus made hereunder.

(e)     Decisions Binding. All decisions, actions and interpretations of the Committee concerning the Plan shall be final and binding on the Company and its Affiliates and their respective boards of directors, and on all Participants and other persons claiming rights under the Plan, and all such decisions, actions and interpretations of the Committee concerning the Plan shall be afforded the maximum deference under applicable law.

**Section 6.     Amendment; Termination.**

The Plan may be amended or terminated by the Board or the Committee, and any such amendment shall require shareholder approval only to the extent required by applicable law, including for these  purposes Department of the Treasury or Securities and Exchange Commission regulations, the rules of the Nasdaq Stock Market or any other applicable exchange or any other applicable law or regulations. All amendments to the Plan, including an amendment to terminate the Plan, shall be in writing. Unless otherwise expressly provided by the Board or the Committee, no amendment to the Plan shall apply to potential Bonuses with respect to a Performance Period that began before the effective date of such amendment.

**Section 7.     Other Provisions.**

(a)     Duration of the Plan. The Plan is effective as of the Effective Date. The Plan shall remain in effect until all Bonuses made under the Plan have been paid or forfeited under the terms of the Plan and all Performance Periods related to Bonuses made under the Plan have expired.

(b)     Bonuses Not Assignable. No Bonus or any right thereto shall be assignable or transferable by a Participant except by will or by the laws of descent and distribution. Any other attempted assignment or alienation shall be void and of no force or effect.

(c)     Rights of Participants. The right of any Participant to receive any payments under a Bonus granted to such Participant and approved by the Committee pursuant to the provisions of the Plan shall be an unsecured claim against the general assets of the Company. The Plan shall not create, nor be construed in any manner as having created, any right by a Participant to any Bonus for a Performance Period because of a Participant's participation in the Plan for any prior Performance Period or otherwise. The application of the Plan to one Participant shall not create, nor be construed in any manner as having created, any right by another Participant to similar or uniform treatment under the Plan. Solely with respect to a Participant who is party to an employment agreement, severance agreement, change in control agreement, or other similar agreement in effect between the Company or an Affiliate and such Participant, the provisions of the Plan are in all respects subject to the terms and conditions of such agreement as if they were set forth fully herein.

8

(d)      Termination of Employment. The Company retains the right to terminate the employment of any Participant or other employee at any time for any reason or no reason, and a Bonus is not, and shall not be construed in any manner to be, a waiver of such right.

(e)      Exclusion from Benefits. Bonuses under the Plan shall not constitute compensation for the purpose of determining participation or benefits under any other plan of the Company unless specifically included as compensation in such plan.

(f)      Successors. Any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the Company's business or assets, shall assume the Company's liabilities under the Plan and perform any duties and responsibilities in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

(g)      Governing Law. The Plan and actions taken in connection herewith shall be governed and construed in accordance with the laws of the State of New York (regardless of the law that might otherwise govern under applicable New York principles of conflict of laws).

(h)      Headings. Any headings preceding the text of the several sections, subsections, or paragraphs hereof are inserted solely for convenience of reference and shall not constitute a part of the Plan, nor shall they affect its meaning, construction or effect.

(i)      Severability. If any provision of the Plan is determined to be void by any court of competent jurisdiction, the Plan shall continue to operate and, for the purposes of the jurisdiction of the court only, shall be deemed not to include the provision determined to be void.

(j)      Offsets. To the extent permitted by law, the Company shall have the right to offset from any Bonus payable hereunder any amount that the Participant owes to the Company or any Affiliate without the consent of the Participant (or the Participant's beneficiary, in the event of the Participant's death).

(k)      Code Section 409A.

(i)      Although the Company does not guarantee the particular tax treatment of any Bonus awarded under the Plan, amounts paid under the Plan are intended to comply with, or be exempt from, the applicable requirements of Code Section 409A and the Plan and any Bonus shall be limited, construed and interpreted in accordance with such intent. In no event whatsoever shall the Company or any of its Affiliates be liable for any additional tax, interest or penalties that may be imposed on a Participant by Code Section 409A or any damages for failing to comply with Code Section 409A.

(ii)      Notwithstanding anything herein to the contrary, the following provisions shall apply to any Bonus under the Plan that constitutes nonqualified deferred compensation pursuant to Section 409A (a "409A Covered Bonus"):

(A)      A termination of employment shall not be deemed to have occurred for purposes of any provision of a 409A Covered Bonus providing for payment upon or following a termination of the Participant's employment

9

unless such termination is also a "Separation from Service" within the meaning of Code Section 409A and, for purposes of any such provision of the 409A Covered Bonus, references to a "termination," "termination of employment" or like terms shall mean Separation from Service. Notwithstanding any provision herein to the contrary, if the Participant is deemed on the date of the Participant's Termination of Employment to be a "specified employee" within the meaning of that term under Code Section 409A(a)(2)(B) and using the identification methodology selected by the Company from time to time, or if none, the default methodology set forth in Code Section 409A, then with regard to any such payment under a 409A Covered Bonus, to the extent required to be delayed in compliance with Code Section 409A(a)(2)(B), such payment shall not be made prior to the earlier of (i) the expiration of the six (6)-month period measured from the date of the Participant's Separation from Service, and (ii) the date of the Participant's death. All payments delayed pursuant to this Section 7(k)(ii)(A) shall be paid to the Participant on the first day of the seventh month following the date of the Participant's Separation from Service or, if earlier, on the date of the Participant's death.

(B)     Whenever a payment under a 409A Covered Bonus specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Company. In no event shall the timing of a Participant's execution of the Release, directly or indirectly, result in the Participant's designating the calendar year of payment, and if a payment that is subject to execution of the Release could be made in more than one taxable year, payment shall be made in the later taxable year. Each amount or benefit payable pursuant to this Plan shall be treated as a separate and distinct payment for purposes of Code Section 409A.

(l)     Incentive Compensation Recoupment Policy. Notwithstanding anything herein to the contrary, all Bonuses are subject to any incentive compensation recoupment or clawback policy maintained by the Company from time to time, including the Bed Bath & Beyond Inc. Compensation Recoupment Policy, as amended from time to time.

10

**Exhibit 21**

**SUBSIDIARIES OF BED BATH & BEYOND INC.**

The following are all of the subsidiaries of Bed Bath & Beyond Inc. other than: (i) 100% owned subsidiaries of Bed 'n Bath Stores Inc. holding no assets other than a single store lease and, in some cases, fully depreciated fixed assets; (ii) 100% owned subsidiaries of Harmon Stores, Inc. holding no assets other than a single store lease and, in some cases, fully depreciated fixed assets; (iii) 100% owned subsidiaries of buybuy BABY, Inc. holding no assets other than a single store lease and, in some cases, fully depreciated fixed assets; and (iv) omitted subsidiaries which in the aggregated would not constitute a significant subsidiary.

| Name | Jurisdiction |
| --- | --- |
| Bed Bath & Beyond of California Limited Liability Company | Delaware |
| Bed Bath & Beyond Canada L.P. | Ontario |
| buybuy BABY, Inc. | Delaware |
| Harmon Stores, Inc. | Delaware |
| Liberty Procurement Co. Inc. | New York |

**Exhibit 23**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors

Bed Bath and Beyond Inc.:

We consent to the incorporation by reference in the registration statements (Nos. 33-63902, 33-87602, 333-18011, 333-75883, 333-64494, 333-126169, 333-182528, 333-227939, 333-234457, 333-238697, and 333-237972) on Form S-8 and in the registration statement (No. 333-197267) on Form S-3 of our reports dated April 21, 2022, with respect to the consolidated financial statements of Bed Bath & Beyond Inc. and the effectiveness of internal control over financial reporting.

/s/ KPMG LLP

Short Hills, New Jersey
April 21, 2022

**Exhibit 31.1**

**CERTIFICATION**

I, Mark J. Tritton, certify that:

1. I have reviewed this annual report on Form 10-K of Bed Bath & Beyond Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: April 21, 2022

*/s/ Mark J. Tritton*
Mark J. Tritton
President and Chief Executive Officer

**Exhibit 31.2**

**CERTIFICATION**

I, Gustavo Arnal, certify that:

1. I have reviewed this annual report on Form 10-K of Bed Bath & Beyond Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: April 21, 2022

*/s/ Gustavo Arnal*
Gustavo Arnal
Chief Financial Officer
(Principal Financial Officer)

**Exhibit 32**

**CERTIFICATION**

The undersigned, the Principal Executive Officer and Principal Financial Officer of Bed Bath & Beyond Inc. (the "Company"), hereby certify, to the best of their knowledge and belief, that the Form 10-K of the Company for the annual period ended February 26, 2022, (the "Periodic Report") accompanying this certification fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)) and that the information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company. The foregoing certification is provided solely for purposes of complying with the provisions of Section 906 of the Sarbanes - Oxley Act and is not intended to be used for any other purposes.

Date: April 21, 2022

*/s/ Mark J. Tritton*
Mark J. Tritton
President and Chief Executive Officer

*/s/ Gustavo Arnal*
Gustavo Arnal
Chief Financial Officer
(Principal Financial Officer)

# EXHIBIT 20

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

_____

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15 (d) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported) **June 28, 2022**

# BED BATH & BEYOND INC.

(Exact name of registrant as specified in its charter)

| **New York** | **0-20214** | **11-2250488** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**650 Liberty Avenue**
**650 Liberty Avenue, Union, New Jersey 07083**
(Address of principal executive offices) (Zip Code)

**(908) 688-0888**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4 (c))

**Securities registered pursuant to section 12(b) of the Act:**

| **Title of each class** | **Trading Symbol** | **Name of each exchange on which registered** |
|---|---|---|
| Common stock, $.01 par value | BBBY | The Nasdaq Stock Market LLC |
| | | (Nasdaq Global Select Market) |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.
☐

**Item 2.02**   **Results of Operations and Financial Condition**

On June 28, 2022, Bed Bath & Beyond Inc. (the "Company") issued a press release announcing the Company's financial results for its fiscal first quarter ended May 28, 2022. A copy of this press release is attached hereto as Exhibit 99.1.

**Item 7.01**   **Regulation FD Disclosure**

On June 28, 2022, the Company published an Investor Presentation for its fiscal first quarter ended May 28, 2022 as noted in the press release described in Item 2.02 above. The Investor Presentation is attached hereto as Exhibit 99.2. Additionally, the Company has posted the Investor Presentation on the investor relations section of its website at www.bedbathandbeyond.com.

The information in this Current Report on Form 8-K (including the exhibits attached hereto) is being furnished under Items 2.02 and 7.01 and shall not be deemed "filed" for the purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liability of such section or incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference in such a filing.

**Item 9.01**   **Financial Statements and Exhibits**

(d) Exhibits:

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press Release issued by Bed Bath & Beyond Inc. on June 29, 2022. |
| 99.2 | Investor Presentation for the fiscal first quarter ended May 28, 2022. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

*SIGNATURES*

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

<u>**BED BATH & BEYOND INC.**</u>

(Registrant)

Date: June 28, 2022

By:   */s/ Gustavo Arnal*

Gustavo Arnal
Chief Financial Officer

Exhibit 99.1



### BED BATH & BEYOND INC. REPORTS FISCAL 2022 FIRST QUARTER RESULTS (ENDING MAY 28th, 2022)

*Net Sales of $1,463M; Comparable Sales of (23)% Consistent with Early Quarter Trends as Previously Shared*
*GAAP Gross Margin of 23.9%; Adjusted Gross Margin of 23.8% including 840bps Impact from Transient Costs Related to Inventory*
*Markdown Reserves and Port-Related Supply Chain Fees*
*Excluding the Two Aforementioned Impacts, Q1 Adjusted Gross Margin of 32.2%*
*Announcing Aggressive Actions on Inventory, Cost and Capex*

UNION, New Jersey, June 29, 2022 --- Bed Bath & Beyond Inc. (Nasdaq: BBBY) today reported financial results for the first quarter of Fiscal 2022 ended May 28, 2022.

| ($ in millions, except per share data) | Reported (GAAP) | | | | | | Adjusted[2] | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Three months ended | | | | | | Three months ended | | | | | |
| | May 28, 2022 | | May 29, 2021 | | Diff | | May 28, 2022 | | May 29, 2021 | | Diff | |
| Net Sales | $ | 1,463 | $ | 1,954 | | (25)% | $ | 1,463 | $ | 1,954 | | (25)% |
| Comparable[1] Sales | | | | | | | | | | | | (23)% |
| Gross Margin | | 23.9% | | 32.4% | | -850bps | | 23.8% | | 34.9% | | -1,110bps |
| SG&A Margin | | 43.6% | | 33.7% | | 990bps | | 43.6% | | 33.7% | | 990bps |
| Net (Loss) Income | $ | (358) | $ | (51) | $ | (307) | $ | (225) | $ | 5 | $ | (230) |
| Adjusted[2] EBITDA | | | | | | | $ | (224) | $ | 86 | $ | (310) |
| Adjusted[2] EBITDA Margin | | | | | | | | (15.3)% | | 4.4% | | -1,970bps |
| EPS - Diluted | $ | (4.49) | $ | (0.48) | $ | (4.01) | $ | (2.83) | $ | 0.05 | $ | (2.88) |

As announced earlier today in a separate press release, Sue Gove has been named Interim Chief Executive Officer, replacing Mark Tritton, who will leave his role as President and Chief Executive Officer and as a member of the Board.

Ms. Gove commented, "I step into this role keenly aware of the macro-economic environment. In the quarter there was an acute shift in customer sentiment and, since then, pressures have materially escalated. This includes steep inflation and fluctuations in purchasing patterns, leading to significant dislocation in our sales and inventory that we will be working to actively resolve. The simple reality though is that our first quarter's results are not up to our expectations, nor are they reflective of the Company's true potential. The initiatives we are instituting today are just the first steps in putting our business on firm footing to drive our future success. I look forward to working with the Board, the management team, and our Associates to immediately address our supply chain challenges, market share recapture, inventory and cash optimization, and cost structure alignment."

#### Q1 Highlights

- Net Sales of $1,463M declined (25)%, reflecting a Comparable[1] Sales decline of (23)% and (2)% related to the impact from fleet optimization activity
    - Bed Bath & Beyond banner Comparable[1] Sales decline of (27)% reflecting rapid shift in consumer spending patterns and declining demand in Home sector
    - buybuy BABY Comparable[1] Sales of down mid-single digits commensurate with current market decline; Market share remains stable

- GAAP Gross Margin of 23.9%; Adjusted[2] Gross Margin of 23.8%
  - Adjusted[2] Gross Margin reflects 840bps of negative transient costs vs. Q1 2021
  - Transient costs reflect the impact of an inventory markdown reserve of (620bps) and supply chain-related port fees of (220bps)
  - Excluding the aforementioned 840bps of transient costs, Q1 Adjusted[2] Gross Margin of 32.2%
- Cash Flow from Operations of approximately $(0.4) billion, Cash Flow from Investing Activities of $(0.1) billion and Cash Flow from Financing Activities of $0.2 billion

**Fiscal 2022 First Quarter Results (ending May 28, 2022)**

Net sales of $1,463M declined (25)%, reflecting a Comparable[1] Sales decline of (23)% and (2)% related to the impact from fleet optimization activity.

- By channel, Comparable[1] Sales declined (24)% in Stores and (21)% in Digital versus the fiscal 2021 first quarter.
- Bed Bath & Beyond banner Comparable[1] Sales decreased (27)% compared to the prior year period. Results exclude the impact from the Company's previously announced store fleet optimization program, which began in the second half of fiscal 2020.
- The buybuy BABY banner Comparable[1] Sales decreased in the mid-single digits compared to the Fiscal 2021 first quarter consistent with market trends.

GAAP Gross Margin was 23.9% for the quarter. Excluding special items, Adjusted[2] Gross Margin was 23.8%, inclusive of transient costs associated with a 620 basis point negative impact from markdown inventory reserves and 220 basis point negative impact from supply chain-related port fees compared to last year. Excluding the aforementioned 840 basis points of transient costs, Q1 Adjusted[2] Gross Margin was 32.2%. The Company is proactively working with suppliers to adjust future inventory receipts and accelerating markdowns in order to right-size inventory levels commensurate with the declining sales trends.

SG&A expense on both a GAAP and Adjusted[2] basis remain at lower levels compared to the prior year period, primarily due to cost reductions and lower rent and occupancy expenses on a lower store base following the Company's fleet optimization program. SG&A Margin for the quarter increased on a GAAP and Adjusted[2] basis versus last year due to lower Net Sales. Bed Bath & Beyond is in the midst of further refining its supply chain infrastructure and adjusting cost structure to reflect lower sales levels. At the same time, the Company is pausing its new store and remodel programs for the remainder of fiscal 2022 which is expected to reduce its Fiscal 2022 planned capital expenditures by a minimum of approximately $100 million to $300 million from a prior expectation of approximately $400 million.

Adjusted[2] EBITDA for the period was ($224) million reflecting lower Net Sales and lower Adjusted[2] Gross Margin.

Net Loss per diluted share of ($4.49) for the quarter reflected approximately $1.66 of special items for the quarter. Excluding special items, Adjusted[2] Net Loss per diluted share was ($2.83). Special items during the first quarter included restructuring and costs associated with the Company's transformation initiatives. Adjusted[2] Net Loss per diluted share also reflects an income tax benefit on the Company's Adjusted[2] Pre-Tax Loss.

During the quarter, the Company reported operating cash flow of approximately $(0.4) billion. Investing cash flow of $(0.1) billion was primarily driven by planned capital expenditures in connection with store remodels, supply chain and information technology systems.

Cash, cash equivalents, restricted cash and investments totaled approximately $0.2 billion in the Fiscal 2022 first quarter. Total Liquidity[3] was approximately $0.9 billion as of the Fiscal 2022 first quarter, including the Company's asset based revolving credit facility less borrowings of $0.2 billion.

**Fiscal 2022 Outlook Commentary**

At this time, the Company is providing the following outlook parameters for Fiscal 2022:

- Sequential Comparable[1] Sales recovery to occur in the second half of Fiscal 2022 versus the first half of Fiscal 2022 driven by inventory optimization plans, including incremental clearance activity
- Adjusted[2] SG&A expense for Fiscal 2022 below last year, reflecting aggressive actions to align cost structure to sales
- Capital Expenditures of approximately $300 million (from $400 million previously) for Fiscal 2022, reflecting a minimum reduction of $100 million

The Company will provide further commentary and context for its Fiscal 2022 outlook during its conference call as well as in its investor presentation available on the investor relations section of the Company's website at http://bedbathandbeyond.gcs-web.com/investor-relations.

**Fiscal 2022 First Quarter Conference Call and Investor Presentation**

Bed Bath & Beyond Inc.'s Fiscal 2022 first quarter conference call with analysts and investors will be held today at 8:15am EDT and may be accessed by dialing 1-404-400-0571, or if international, 1-866-374-5140, using conference ID number 80961020#. A live audio webcast of the conference call, along with the earnings press release, investor presentation and supplemental financial disclosures, will also be available on the investor relations section of the Company's website at http://bedbathandbeyond.gcs-web.com/investor-relations. The webcast will be available for replay after the call.

The Company has also made available an Investor Presentation on the investor relations section of the Company's website at http://bedbathandbeyond.gcs-web.com/events-and-presentations.

---

(1)   Comparable Sales reflects the year-over-year change in sales from the Company's retail channels, including stores and digital, that have been operating for twelve full months following the opening period (typically six to eight weeks). Comparable Sales excludes the impact of the Company's store network optimization program.

(2)   Adjusted items refer to comparable sales as well as financial measures that are derived from measures calculated in accordance with GAAP, which have been adjusted to exclude certain items. Adjusted Gross Margin, Adjusted SG&A, Adjusted EBITDA, Adjusted EBITDA Margin, and Adjusted EPS - Diluted are non-GAAP financial measures. For more information about non-GAAP financial measures, see "Non-GAAP Information" below.

(3)   Total Liquidity includes cash & investments and availability under the Company's asset-based revolving credit facility.

**About the Company**

Bed Bath & Beyond Inc. and subsidiaries (the "Company") is an omnichannel retailer that makes it easy for our customers to feel at home. The Company sells a wide assortment of merchandise in the Home, Baby, Beauty and Wellness markets. Additionally, the Company is a partner in a joint venture which operates retail stores in Mexico under the name Bed Bath & Beyond.

The Company operates websites at bedbathandbeyond.com, bedbathandbeyond.ca, buybuybaby.com, buybuybaby.ca, harmondiscount.com, facevalues.com, and decorist.com. As of May 28, 2022, the Company had a total of 955 stores, including 769 Bed Bath & Beyond stores in all 50 states, the District of Columbia, Puerto Rico and Canada, 135 buybuy BABY stores and 51 stores under the names Harmon, Harmon Face Values or Face Values. During the Fiscal 2022 first quarter, the Company opened 5 buybuy BABY stores. Additionally during the fiscal 2022 first quarter, the Company closed 3 stores including 2 Bed Bath & Beyond stores and 1 Harmon store. The joint venture to which the Company is a partner operates 12 stores in Mexico under the name Bed Bath & Beyond.

**Non-GAAP Information**

This press release contains certain non-GAAP information, including adjusted earnings before interest, income taxes, depreciation and amortization ("EBITDA"), adjusted EBITDA margin, adjusted gross margin, adjusted SG&A, adjusted net earnings per diluted share, and free cash flow. Non-GAAP information is intended to provide visibility into the Company's core operations and excludes special items, including non-cash impairment charges related to certain store-level assets and tradenames, loss on sale of businesses, loss on the extinguishment of debt, charges recorded in connection with the restructuring and transformation initiatives, which includes accelerated markdowns and inventory reserves related to the planned assortment transition to Owned Brands and costs associated with store closures related to the Company's fleet optimization and the income tax impact of these items. The Company's definition and calculation of non-GAAP measures may differ from that of other companies. Non-GAAP financial measures should be viewed in addition to, and not as an alternative for, the Company's reported GAAP financial results. For a reconciliation to the most directly comparable US GAAP measures and certain information relating to the Company's use of Non-GAAP financial measures, see "Non-GAAP Financial Measures" below.

**Forward-Looking Statements**

This press release contains forward-looking statements within the meaning of Section 21 E of the Securities Exchange Act of 1934 including, but not limited to, our progress and anticipated progress towards our long-term objectives, as well as more generally the status of our future liquidity and financial condition and our outlook for our 2022 Fiscal second quarter and 2022 Fiscal year. Many of these forward-looking statements can be identified by use of words such as may, will, expect, anticipate, approximate, estimate, assume, continue, model, project, plan, goal, preliminary, and similar words and phrases, although the absence of those words does not necessarily mean that statements are not forward-looking. Our actual results and future financial condition may differ materially from those expressed in any such forward-looking statements as a result of many factors. Such factors include, without limitation: general economic conditions including the recent supply chain disruptions, labor shortages, wage pressures, rising inflation and the ongoing military conflict between Russia and Ukraine; a challenging overall macroeconomic environment and a highly competitive retailing environment; risks associated with the ongoing COVID-19 pandemic and the governmental responses to it, including its impacts across our businesses on demand and operations, as well as on the operations of our suppliers and other business partners, and the effectiveness of our and governmental actions taken in response to these risks; changing consumer preferences, spending habits and demographics; demographics and other macroeconomic factors that may impact the level of spending for the types of merchandise sold by us; challenges in executing our omni-channel and transformation strategy, including our ability to establish and profitably maintain the appropriate mix of digital and physical presence in the markets we serve; our ability to successfully execute our store fleet optimization strategies, including our ability to achieve anticipated cost savings and to not exceed anticipated costs; our ability to execute on any additional strategic transactions and realize the benefits of any acquisitions, partnerships, investments or divestitures; disruptions to our information technology systems, including but not limited to security breaches of systems protecting consumer and employee information or other types of cybercrimes or cybersecurity attacks; damage to our reputation in any aspect of our operations; the cost of labor, merchandise, logistical costs and other costs and expenses; potential supply chain disruption due to trade restrictions or otherwise, and other factors such as natural disasters, pandemics, including the COVID-19 pandemic, political instability, labor disturbances, product recalls, financial or operational instability of suppliers or carriers, and other items; inflation and the related increases in costs of materials, labor and other costs; inefficient management of relationships and dependencies on third-party service providers; our ability to attract and retain qualified employees in all areas of the organization; unusual weather patterns and natural disasters, including the impact of climate change; uncertainty and disruptions in financial markets; volatility in the price of our common stock and its effect, and the effect of other factors, including the COVID-19 pandemic, on our capital allocation strategy; changes to statutory, regulatory and other legal requirements or deemed noncompliance with such requirements; changes to accounting rules, regulations and tax laws, or new interpretations of existing accounting standards or tax laws; new, or developments in existing, litigation, claims or assessments; and a failure of our business partners to adhere to appropriate laws, regulations or standards. Except as required by law, we do not undertake any obligation to update our forward-looking statements.

**Contacts**

INVESTOR CONTACT: Susie Kim, IR@bedbath.com

MEDIA CONTACT: Eric Mangan, media@bedbath.com

**BED BATH & BEYOND INC. AND SUBSIDIARIES**
*Consolidated Statements of Operations*
*(in thousands, except per share data)*
*(unaudited)*

| | Three Months Ended | |
| --- | --- | --- |
| | May 28, 2022 | May 29, 2021 |
| Net sales | $ 1,463,418 | $ 1,953,812 |
| Cost of sales | 1,114,106 | 1,320,118 |
| Gross profit | 349,312 | 633,694 |
| Selling, general and administrative expenses | 637,508 | 658,762 |
| Impairments | 26,699 | 9,129 |
| Restructuring and transformation initiative expenses | 24,263 | 33,686 |
| Loss on sale of businesses | - | 3,989 |
| Operating loss | (339,158) | (71,872) |
| Interest expense, net | 16,448 | 16,000 |
| Loss on extinguishment of debt | - | 265 |
| Loss before provision (benefit) for income taxes | (355,606) | (88,137) |
| Provision (benefit) for income taxes | 2,060 | (37,263) |
| Net loss | $ (357,666) | $ (50,874) |
| Net loss per share - Basic | $ (4.49) | $ (0.48) |
| Net loss per share - Diluted | $ (4.49) | $ (0.48) |
| Weighted average shares outstanding - Basic | 79,611 | 106,772 |
| Weighted average shares outstanding - Diluted | 79,611 | 106,772 |

**Non-GAAP Financial Measures**

The following table reconciles non-GAAP financial measures presented in this press release or that may be presented on the Company's first quarter conference call with analysts and investors. The Company believes that these non-GAAP financial measures provide management, analysts, investors and other users of the Company's financial information with meaningful supplemental information regarding the performance of the Company's business. These non-GAAP financial measures should not be considered superior to, but in addition to other financial measures prepared by the Company in accordance with GAAP, including comparisons of year-to-year results. The Company's method of determining these non-GAAP financial measures may be different from other companies' methods and, therefore, may not be comparable to those used by other companies. As such, the Company does not recommend the sole use of these non-GAAP measure to assess its financial and earnings performance. For reasons noted above, the Company is presenting certain non-GAAP financial measures for its Fiscal 2022 first quarter. In order for investors to be able to more readily compare the Company's performance across periods, the Company has included comparable reconciliations for the 2021 period in the reconciliation tables below. The Company is not providing a reconciliation of its guidance with respect to Adjusted EBITDA because the Company is unable to provide this reconciliation without unreasonable effort due to the uncertainty and inherent difficulty of predicting the occurrence, the financial impact, and the periods in which the adjustments may be recognized. For the same reasons, the Company is unable to address the probable significance of the unavailable information, which could be material to future results.

**Non-GAAP Reconciliation**
*(in thousands, except per share data)*
*(unaudited)*

| | | | | Three Months Ended May 28, 2022 | | | | |
| | | | | Excluding | | | | |
| | Reported | Loss on Sale of Businesses | Loss on extinguishment of debt | Restructuring and Transformation Expenses | Impairments charges | Total income tax impact | Total Impact | Adjusted |
|---|---|---|---|---|---|---|---|---|
| Gross Profit | $ 349,312 | $ - | $ - | $ (1,167) | $ - | $ - | $ (1,167) | $ 348,145 |
| *Gross margin* | *23.9%* | *-%* | *-%* | *(0.1)%* | *-%* | *-%* | *(0.1)%* | *23.8%* |
| Restructuring and transformation initiative expenses | **24,263** | - | - | (24,263) | - | - | (24,263) | - |
| (Loss) earnings before provision (benefit) for income taxes | **(355,606)** | - | - | 23,096 | 26,699 | - | 49,795 | **(305,811)** |
| Provision (benefit) for income taxes | **2,060** | - | - | - | - | (82,636) | (82,636) | **(80,576)** |
| *Effective tax rate* | *(0.6)%* | | | | | *26.9%* | *26.9%* | *26.3%* |
| Net (loss) income | **$ (357,666)** | $ - | $ - | $ 23,096 | $ 26,699 | $ 82,636 | $ 132,431 | **$ (225,235)** |
| Net loss per share - Diluted | $ (4.49) | | | | | | $ 1.66 | $ (2.83) |
| Weighted average shares outstanding- Basic | **79,611** | | | | | | 79,611 | 79,611 |
| Weighted average shares outstanding- Diluted | 79,611 (1) | | | | | | 79,611 | 79,611 |
| ***Reconciliation of Net Income (loss) to EBITDA and Adjusted EBITDA*** | | | | | | | | |
| Net (loss) income | **$ (357,666)** | $ - | $ - | $ 23,096 | $ 26,699 | $ 82,636 | 132,431 | **$ (225,235)** |
| Depreciation and amortization | **71,103** | - | - | (5,275) | - | - | (5,275) | 65,828 |
| Interest expense | **16,448** | - | - | - | - | - | - | **16,448** |
| Provision (benefit) for income taxes | **2,060** | - | - | - | - | (82,636) | (82,636) | **(80,576)** |
| **EBITDA** | **$ (268,055)** | $ - | $ - | $ 17,821 | $ 26,699 | $ - | $ 44,520 | **$ (223,535)** |
| *EBITDA as % of net sales* | | | | | | | | *(15.3)%* |

(1) If a company is in a net loss position, then for earnings per share purposes, diluted weighted average shares outstanding are equivalent to basic weighted average shares outstanding.

**Three Months Ended May 29, 2021**

| | Reported | Loss on Sale of Businesses | Loss on extinguishment of debt | Excluding Restructuring and Transformation Expenses | Impairment charges | Total income tax impact | Total Impact | Adjusted |
|---|---|---|---|---|---|---|---|---|
| Gross Profit | $ 633,694 | $ - | $ - | $ 47,344 | $ - | $ - | $ 47,344 | $ 681,038 |
| *Gross margin* | *32.4%* | *-%* | *-%* | *2.4%* | *-%* | *-%* | *2.4%* | *34.9%* |
| Restructuring and transformation initiative expenses | 33,686 | - | - | (33,686) | - | - | (33,686) | - |
| (Loss) earnings before (benefit) provision for income taxes | (88,137) | 3,989 | 265 | 81,030 | 9,129 | - | 94,413 | 6,276 |
| (Benefit) provision for income taxes | (37,263) | - | - | - | - | 38,614 | 38,614 | 1,351 |
| *Effective tax rate* | *42.3%* | | | | | *(20.8)%* | *(20.8)%* | *21.5%* |
| Net (loss) income | $ (50,874) | $ 3,989 | $ 265 | $ 81,030 | $ 9,129 | $ (38,614) | $ 55,799 | $ 4,925 |
| Net (loss) earnings per share - Diluted | $ (0.48) | | | | | | $ 0.53 | $ 0.05 |
| Weighted average shares outstanding- Basic | 106,772 | | | | | | 106,772 | 106,772 |
| Weighted average shares outstanding- Diluted | 106,772(1) | | | | | | 106,772 | 109,029 |

*Reconciliation of Net (Loss) Income to EBITDA and Adjusted EBITDA*

| | Reported | Loss on Sale of Businesses | Loss on extinguishment of debt | Excluding Restructuring and Transformation Expenses | Impairment charges | Total income tax impact | Total Impact | Adjusted |
|---|---|---|---|---|---|---|---|---|
| Net (loss) income | $ (50,874) | $ 3,989 | $ 265 | $ 81,030 | $ 9,129 | $ (38,614) | $ 55,799 | $ 4,925 |
| Depreciation and amortization | 68,278 | - | - | (4,484) | - | - | (4,484) | 63,794 |
| Loss on extinguishment of debt | 265 | - | (265) | - | - | - | (265) | - |
| Interest expense | 16,000 | - | - | - | - | - | - | 16,000 |
| (Benefit) provision for income taxes | (37,263) | - | - | - | - | 38,614 | 38,614 | 1,351 |
| **EBITDA** | $ (3,594) | $ 3,989 | $ - | $ 76,546 | $ 9,129 | $ - | $ 89,664 | $ 86,070 |
| *EBITDA as % of net sales* | | | | | | | | *4.4%* |

(1) If a company is in a net loss position, then for earnings per share purposes, diluted weighted average shares outstanding are equivalent to basic weighted average shares outstanding.

**BED BATH & BEYOND INC. AND SUBSIDIARIES**
*Condensed Consolidated Balance Sheets*
*(in thousands, except per share data)*

| | May 28, 2022 | | February 26, 2022 | | May 29, 2021 |
|---|---|---|---|---|---|
| | (unaudited) | | | | (unaudited) |
| **Assets** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 107,543 | $ | 439,496 | $ | 1,097,267 |
| Short term investment securities | - | | - | | 29,997 |
| Merchandise inventories | 1,759,586 | | 1,725,410 | | 1,563,602 |
| Prepaid expenses and other current assets | 190,179 | | 198,248 | | 515,993 |
| Total current assets | 2,057,308 | | 2,363,154 | | 3,206,859 |
| Long term investment securities | 18,983 | | 19,212 | | 19,458 |
| Property and equipment, net | 1,119,247 | | 1,027,387 | | 929,335 |
| Operating lease assets | 1,597,461 | | 1,562,857 | | 1,584,144 |
| Other assets | 156,103 | | 157,962 | | 313,493 |
| Total Assets | $ 4,949,102 | $ | 5,130,572 | $ | 6,053,289 |
| **Liabilities and Shareholders' (Deficit) Equity** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 816,578 | $ | 872,445 | $ | 889,883 |
| Accrued expenses and other current liabilities | 549,754 | | 529,371 | | 506,674 |
| Merchandise credit and gift card liabilities | 325,232 | | 326,465 | | 309,576 |
| Current operating lease liabilities | 334,891 | | 346,506 | | 347,365 |
| Total current liabilities | 2,026,455 | | 2,074,787 | | 2,053,498 |
| Other liabilities | 111,085 | | 102,438 | | 78,353 |
| Operating lease liabilities | 1,561,870 | | 1,508,002 | | 1,529,173 |
| Income taxes payable | 90,120 | | 91,424 | | 102,905 |
| Long term debt | 1,379,870 | | 1,179,776 | | 1,182,566 |
| Total liabilities | 5,169,400 | | 4,956,427 | | 4,946,495 |
| Shareholders' (deficit) equity: | | | | | |
| Preferred stock - $0.01 par value; authorized - 1,000 shares; no shares issued or outstanding | - | | - | | - |
| Common stock - $0.01 par value; authorized - 900,000 shares; issued 344,621, 344,146 and 343,570, respectively; outstanding 79,958, 81,979 and 104,513 shares, respectively | 3,446 | | 3,441 | | 3,435 |
| Additional paid-in capital | 2,243,378 | | 2,235,894 | | 2,208,052 |
| Retained earnings | 9,308,530 | | 9,666,091 | | 10,174,656 |
| Treasury stock, at cost; 264,663, 262,167 and 239,057 shares, respectively | (11,728,295) | | (11,685,267) | | (11,234,529) |
| Accumulated other comprehensive loss | (47,357) | | (46,014) | | (44,820) |
| Total shareholders' (deficit) equity | (220,298) | | 174,145 | | 1,106,794 |
| Total liabilities and shareholders' (deficit) equity | $ 4,949,102 | $ | 5,130,572 | $ | 6,053,289 |

**BED BATH & BEYOND INC. AND SUBSIDIARIES**
*Consolidated Statements of Cash Flows*
*(in thousands, unaudited)*

| | Three Months Ended | |
|---|---|---|
| | May 28, 2022 | May 29, 2021 |
| Cash Flows from Operating Activities: | | |
| Net loss | $ (357,666) | $ (50,874) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 71,103 | 68,278 |
| Impairments | 26,699 | 9,129 |
| Stock-based compensation | 7,123 | 7,918 |
| Deferred income taxes | (2,299) | (22,135) |
| Loss on sale of businesses | - | 3,989 |
| Loss on debt extinguishment | - | 265 |
| Other | 590 | (2,197) |
| (Increase) decrease in assets: | | |
| Merchandise inventories | (34,757) | 113,366 |
| Other current assets | 7,971 | 78,544 |
| Other assets | (106) | 68 |
| (Decrease) increase in liabilities: | | |
| Accounts payable | (47,597) | (102,201) |
| Accrued expenses and other current liabilities | (38,038) | (129,327) |
| Merchandise credit and gift card liabilities | (1,176) | (3,421) |
| Income taxes payable | (1,304) | 277 |
| Operating lease assets and liabilities, net | (13,096) | 3,125 |
| Other liabilities | (998) | (3,545) |
| Net cash used in operating activities | (383,551) | (28,741) |
| Cash Flows from Investing Activities: | | |
| Purchases of held-to-maturity investment securities | - | (29,997) |
| Capital expenditures | (104,852) | (73,521) |
| Net cash used in investing activities | (104,852) | (103,518) |
| Cash Flows from Financing Activities: | | |
| Borrowing of long-term debt | 200,000 | - |
| Repayments of long-term debt | - | (8,173) |
| Repurchase of common stock, including fees | (43,028) | (138,695) |
| Payment of dividends | (271) | (560) |
| Net cash provided by (used in) financing activities | 156,701 | (147,428) |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | (251) | 6,117 |
| Net decrease in cash, cash equivalents and restricted cash | (331,953) | (273,570) |
| Cash, cash equivalents and restricted cash: | | |
| Beginning of period | 470,884 | 1,407,224 |
| End of period | $ 138,931 | $ 1,133,654 |

Exhibit 99.2



First Quarter Fiscal 2022
Earnings Presentation
(PERIOD ENDING May 28, 2022)
Harriet Edelman, Chair of the Board of Directors
Sue Gove, Director & Interim Chief Executive Officer
Gustavo Arnal, Executive Vice President, Chief Financial Officer
Susie A. Kim, Investor Relations
June 29, 2022

BED BATH &
BEYOND

## Forward Looking Statements

This presentation contains forward-looking statements within the meaning of Section 21 E of the Securities Exchange Act of 1934 including, but not limited to, our progress and anticipated progress towards our long-term objectives, as well as more generally the status of our future liquidity and financial condition and our outlook for our 2022 Fiscal second quarter and 2022 Fiscal year. Many of these forward-looking statements can be identified by use of words such as may, will, expect, anticipate, approximate, estimate, assume, continue, model, project, plan, goal, preliminary, and similar words and phrases, although the absence of those words does not necessarily mean that statements are not forward-looking. Our actual results and future financial condition may differ materially from those expressed in any such forward-looking statements as a result of many factors. Such factors include, without limitation: general economic conditions including the recent supply chain disruptions, labor shortages, wage pressures, rising inflation and the ongoing military conflict between Russia and Ukraine; a challenging overall macroeconomic environment and a highly competitive retailing environment; risks associated with the ongoing COVID-19 pandemic and the governmental responses to it, including its impacts across our businesses on demand and operations, as well as on the operations of our suppliers and other business partners, and the effectiveness of our and governmental actions taken in response to these risks; changing consumer preferences, spending habits and demographics; demographics and other macroeconomic factors that may impact the level of spending for the types of merchandise sold by us; challenges in executing our omni-channel and transformation strategy, including our ability to establish and profitably maintain the appropriate mix of digital and physical presence in the markets we serve; our ability to successfully execute our store fleet optimization strategies, including our ability to achieve anticipated cost savings and to not exceed anticipated costs; our ability to execute on any additional strategic transactions and realize the benefits of any acquisitions, partnerships, investments or divestitures; disruptions to our information technology systems, including but not limited to security breaches of systems protecting consumer and employee information or other types of cybercrimes or cybersecurity attacks; damage to our reputation in any aspect of our operations; the cost of labor, merchandise, logistical costs and other costs and expenses; potential supply chain disruption due to trade restrictions or otherwise, and other factors such as natural disasters, pandemics, including the COVID-19 pandemic, political instability, labor disturbances, product recalls, financial or operational instability of suppliers or carriers, and other items; inflation and the related increases in costs of materials, labor and other costs; inefficient management of relationships and dependencies on third-party service providers; our ability to attract and retain qualified employees in all areas of the organization; unusual weather patterns and natural disasters, including the impact of climate change; uncertainty and disruptions in financial markets; volatility in the price of our common stock and its effect, and the effect of other factors, including the COVID-19 pandemic, on our capital allocation strategy; changes to statutory, regulatory and other legal requirements or deemed noncompliance with such requirements; changes to accounting rules, regulations and tax laws, or new interpretations of existing accounting standards or tax laws; new, or developments in existing, litigation, claims or assessments; and a failure of our business partners to adhere to appropriate laws, regulations or standards. Except as required by law, we do not undertake any obligation to update our forward-looking statements.

## Agenda

- Executive Transition

- Q1'22 Results (ending May 28th)

- Commercial Update & Outlook Commentary

- Appendix

BED BATH & BEYOND





Executive
Transition

Q1'FY22 RESULTS                                                                                    PERIOD ENDING MAY 28, 2022

## Executive Leadership Changes

| Name / Title | Qualifications | Prior Experience |
|---|---|---|
|  **Sue Gove** <br> Director, Interim CEO | • More than 30 years of retail industry experience including President and CEO of Golfsmith and COO of Zale Corporation <br> • Independent Director of Board since May 2019; served two years on the Audit and three years on the Nominating and Corporate Governance Committees; named Chair of the Board's Strategy Committee in March 2022 <br> • Board member of The Fresh Market, IAA, Conn's HomePlus <br> • Served as a Senior Advisor for Alvarez & Marsal, a global advisory firm primarily focused on retail turnarounds |   |
|  **Mara Sirhal** <br> EVP, Chief Merchandising Officer | • 20 years of retail industry experience, merchandising, store operations, beauty, and wellness <br> • Served as SVP, General Manager for Harmon <br> • Prior VP, Divisional Business Manager for Licensed, Retail as a Service and Retail Diversity Strategy at Macy's, and various strategic merchandising roles including VP, Divisional Business Manager for Fragrances, Bath and Body Merchandising in the Beauty division |   |



Q1'22 RESULTS

**Q1'FY22 RESULTS**                                                                                                **PERIOD ENDING MAY 28, 2022**

## First Quarter Highlights

- Net Sales of approx. $1.5B; Comparable[1] sales of (23)% consistent with early quarter trends, as previously shared
  - Bed Bath & Beyond banner Comparable[1] Sales decline of (27)% reflecting rapid shift in consumer spending patterns and declining demand in Home sector
  - buybuy BABY Comparable[1] Sales of negative mid-single digits consistent with market trends; stable market share
- GAAP Gross Margin of 23.9%; Adjusted[2] Gross Margin of 23.8% including 840bps of transient costs related to an inventory markdown charge and port-related fees
  - Adjusted[2] Gross Margin of 32.2%, excluding transient inventory markdown charge (620bps) and supply chain costs such as port-related fees (220bps) referenced above which are considered transient
- Announcing aggressive actions on inventory, cost and capex to align with rapidly changing environment and performance
  - Significantly optimizing inventory through adjustments to future receipts, additional markdowns, and focused assortment planning
  - Acutely right-sizing overall cost structure to sales volumes, including within supply chain
  - Substantially reducing planned capex by a minimum of $100M (to approximately $300M) by pausing remodels and new store openings for remainder of FY22

## First Quarter Results – Key Financial Metrics



Note: The Company's four Core banners include Bed Bath & Beyond, buybuy BABY, Harmon Face Values and Decorist.

## Net Sales to Comparable Sales vs. LY (Q1'22 vs. Q1'21)

- Total Net Sales decline of -25%, including -2% impact from previous store fleet optimization
- Comparable[1] sales decline of -23%
  - Bed Bath & Beyond -27%; buybuy BABY -MSD%; Harmon positive
  - Driven by declining demand in destination Home categories, which represent approximately 70% of Bed Bath & Beyond banner Net Sales
- Digital channel continues to represent approximately 40% of Total Net Sales



Note: The Company's four core banners include Bed Bath & Beyond, buybuy BABY, Harmon Face Values and Decorist.

## Adjusted[2] Gross Margin Bridge – Q1'21 to Q1'22

- **Adj. Gross Margin[2] of 23.8% reflects (-840bps) impact from transient costs related to an inventory markdown charge and port-related fees**
  - Adj. Gross Margin[2] continues to reflect transient costs such as supply chain-related port fees, in addition to an inventory markdown reserve charge
  - Excluding the aforementioned 840bps of transient items, adj. gross margin[2] of 32.2%



Note: numbers may not foot due to rounding
[1] Not expected to continue by end of 2022

10

## Cash Flow & Liquidity



### Total Liquidity of $0.9B as of Q1

Q4'21 Total Cash & Invest. $0.5B

Operating Cash Flow ($0.4B)

Investing & Financing Cash Flow [1] $0.1B

Q1'22 Total Cash & Investments $0.2B

ABL $0.7B [2]

Total Cash & Investments $0.2B

[1] Footing impacted by rounding
[2] Including $102.3M of outstanding LCs and $200.0M of borrowings as of Q1'2022

11



COMMERCIAL UPDATE &
OUTLOOK
COMMENTARY

FISCAL 2022

## Commercial Update

| | | Current Update |
|---|---|---|
| **Fiscal 2022** | Digital & Customer Engagement | • Launched retail media network, MOMENTS AD NETWORK™<br>• Launched reimagined loyalty program, WELCOME REWARDS™ |
| | Store Remodel & Fleet Optimization | • Approx. 50 remodels (BBB) initiated in Q1'22<br>• Current total of approx. **200 remodels** representing approx. 30% of sales<br>• New remodels paused for remainder of FY22 |
| | Supply Chain and Technology | • Ramping automation at **East Coast RDC** in PA<br>• Construction begun at **West Coast RDC** in CA<br>• **Central RDC** location chosen<br>• **ERP** Phase II launched |

FISCAL 2022

## OUTLOOK COMMENTARY

| | | FISCAL 2022 |
|---|---|---|
| Qualitative Guidance | Comp Sales vs. LY | **Q2'QTD trends: negative 20s;**<br>**Improvement in 2H vs. 1H based on inventory optimization, including**<br>**incremental clearance activity** |
| | Adjusted SG&A | **Lower $ vs. LY reflecting aggressive actions to**<br>**align cost structure to sales** |
| | Capital Expenditures | **Approximately $300M (from $400M previously),**<br>**a minimum reduction of $100M** |

**Key Assumptions:**
- Depreciation & Amortization (approx.): $260M (no change)

Note: Adj. gross margin, adj. SG&A, adj. EBITDA & adj. EPS are non-GAAP financial measures. For a reconciliation to comparable GAAP measures, see Appendix of this presentation.



## Non-GAAP Information

This presentation contains certain non-GAAP information, including adjusted earnings before interest, income taxes, depreciation and amortization ("EBITDA"), adjusted EBITDA margin, adjusted gross margin, adjusted SG&A, adjusted net earnings per diluted share, and free cash flow. Non-GAAP information is intended to provide visibility into the Company's core operations and excludes special items, including non-cash impairment charges related to certain store-level assets and tradenames, loss on sale of businesses, loss on the extinguishment of debt, charges recorded in connection with the restructuring and transformation initiatives, which includes accelerated markdowns and inventory reserves related to the planned assortment transition to Owned Brands and costs associated with store closures related to the Company's fleet optimization and the income tax impact of these items. The Company's definition and calculation of non-GAAP measures may differ from that of other companies. Non-GAAP financial measures should be viewed in addition to, and not as an alternative for, the Company's reported GAAP financial results. For a reconciliation to the most directly comparable US GAAP measures and certain information relating to the Company's use of Non-GAAP financial measures, see "Non-GAAP Financial Measures" below.

## Footnotes

[1] Comparable Sales reflects the year-over-year change in sales from the Company's retail channels, including stores and digital, that have been operating for twelve full months following the opening period (typically six to eight weeks). Comparable Sales excludes the impact of the Company's store network optimization program.

[2] Adjusted items refer to comparable sales as well as financial measures that are derived from measures calculated in accordance with GAAP, which have been adjusted to exclude certain items. Adjusted Gross Margin, Adjusted SG&A, Adjusted EBITDA, Adjusted EBITDA Margin, and Adjusted EPS - Diluted are non-GAAP financial measures.  For more information about non-GAAP financial measures, see "Non-GAAP Information" below.

[3] Total Liquidity includes cash & investments and availability under the Company's asset-based revolving credit facility.

APPENDIX

## Q1'22 Non-GAAP Reconciliation

| | Reported | Gain on Sale of Businesses | Gain on extinguishment of debt | Restructuring and Transformation Expenses | Impairments charges | Total income tax impact | Total Impact | Adjusted |
|---|---|---|---|---|---|---|---|---|
| | | | | *Excluding* | | | | |
| Gross Profit | $ 349,312 | $ — | $ — | $ (1,167) | $ — | $ — | $ (1,167) | $ 348,145 |
| *Gross margin* | *23.9 %* | *— %* | *— %* | *(0.1)%* | *— %* | *— %* | *(0.1)%* | *23.8 %* |
| Restructuring and transformation initiative expenses | 24,263 | — | — | (24,263) | — | — | (24,263) | — |
| (Loss) earnings before provision (benefit) for income taxes | (355,606) | — | — | 23,096 | 26,699 | — | 49,795 | (305,811) |
| (Benefit) provision for income taxes | 2,060 | — | — | — | — | (82,636) | (82,636) | (80,576) |
| *Effective tax rate* | *(0.6)%* | | | | | *26.9 %* | *26.9 %* | *26.3 %* |
| Net (loss) income | $ (357,666) | $ — | $ — | $ 23,096 | $ 26,699 | $ 82,636 | $ 132,431 | $ (225,235) |
| Net loss per share - Diluted | $ (4.49) | | | | | | $ 1.66 | $ (2.83) |
| Weighted average shares outstanding- Basic | 79,611 | | | | | | 79,611 | 79,611 |
| Weighted average shares outstanding- Diluted | 79,611 | (1) | | | | | 79,611 | 79,611 |
| ***Reconciliation of Net Income (loss) to EBITDA and Adjusted EBITDA*** | | | | | | | | |
| Net (loss) income | $ (357,666) | $ — | $ — | $ 23,096 | $ 26,699 | $ 82,636 | $ 132,431 | $ (225,235) |
| Depreciation and amortization | 71,103 | — | — | (5,275) | — | — | (5,275) | 65,828 |
| Interest expense | 16,448 | — | — | — | — | — | — | 16,448 |
| (Benefit) provision for income taxes | 2,060 | — | — | — | — | (82,636) | (82,636) | (80,576) |
| EBITDA | $ (268,055) | $ — | $ — | $ 17,821 | $ 26,699 | $ — | $ 44,520 | $ (223,535) |
| *EBITDA as % of net sales* | | | | | | | | *(15.3)%* |

(1) If a company is in a net loss position, then for earnings per share purposes, diluted weighted average shares outstanding are equivalent to basic weighted average

APPENDIX

## Q1'21 Non-GAAP Reconciliation

|  | | Three Months Ended May 29, 2021 | | | | | | |
|  | | Excluding | | | | | | |
|  | Reported | Loss on Sale of Businesses | Loss on extinguishment of debt | Restructuring and Transformation Expenses | Impairment charges | Total income tax impact | Total Impact | Adjusted |
|---|---|---|---|---|---|---|---|---|
| Gross Profit | $ 633,694 | $ — | $ — | $ 47,344 | $ — | $ — | $ 47,344 | $ 681,038 |
| *Gross margin* | *32.4 %* | *— %* | *— %* | *2.4 %* | *— %* | *— %* | *2.4 %* | *34.9 %* |
| Restructuring and transformation initiative expenses | 33,686 | — | — | (33,686) | — | — | (33,686) | — |
| (Loss) earnings before (benefit) provision for income taxes | (88,137) | 3,989 | 265 | 81,030 | 9,129 | — | 94,413 | 6,276 |
| (Benefit) provision for income taxes | (37,263) | — | — | — | — | 38,614 | 38,614 | 1,351 |
| *Effective tax rate* | *42.3 %* | | | | | *(26.8)%* | *(26.8)%* | *21.5 %* |
| Net income (loss) | $ (50,874) | $ 3,989 | $ 265 | $ 81,030 | $ 9,129 | $ (38,614) | $ (38,614) | $ 4,925 |
| Net (loss) earnings per share - Diluted | $ (0.48) | | | | | | $ 0.53 | $ 0.05 |
| Weighted average shares outstanding- Basic | 106,772 | | | | | | 106,772 | 106,772 |
| Weighted average shares outstanding- Diluted | 106,772 (1) | | | | | | 106,772 | 109,029 |
| ***Reconciliation of Net (Loss) Income to EBITDA and Adjusted EBITDA*** | | | | | | | | |
| Net (loss) income | $ (50,874) | $ 3,989 | $ 265 | $ 81,030 | $ 9,129 | $ (38,614) | $ 55,799 | $ 4,925 |
| Depreciation and amortization | 68,278 | — | — | (4,484) | — | — | (4,484) | 63,794 |
| Loss on extinguishment of debt | 265 | — | (265) | — | — | — | (265) | — |
| Interest expense | 16,000 | — | — | — | — | — | — | 16,000 |
| (Benefit) provision for income taxes | (37,263) | — | — | — | — | 38,614 | 38,614 | 1,351 |
| EBITDA | $ (3,594) | $ 3,989 | $ — | $ 76,546 | $ 9,129 | $ — | $ 89,664 | $ 86,070 |
| *EBITDA as % of net sales* | | | | | | | | *4.4 %* |

(1) If a company is in a net loss position, then for earnings per share purposes, diluted weighted average shares outstanding are equivalent to basic weighted average shares outstanding.



# EXHIBIT 21

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15 (d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of Report (Date of earliest event reported) June 23, 2022**

# BED BATH & BEYOND INC.

(Exact name of registrant as specified in its charter)

| New York | 0-20214 | 11-2250488 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**650 Liberty Avenue, Union, New Jersey 07083**
(Address of principal executive offices) (Zip Code)

**(908) 688-0888**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4 (c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common stock, $.01 par value | BBBY | The Nasdaq Stock Market LLC (Nasdaq Global Select Market) |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 5.02   Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On June 29, 2022, Bed Bath & Beyond Inc. (the "Company") announced that Mark Tritton ceased serving as President and Chief Executive Officer of the Company and as a member of the Board of Directors (the "Board"), effective June 23, 2022. Mr. Tritton is eligible for separation payments and benefits provided upon a termination of employment without "cause" pursuant to his employment agreement and outstanding time- and performance-based restricted stock unit award agreements. Following his separation, Mr. Tritton will continue to be subject to certain restrictive covenants, including non-competition and non-solicitation covenants.

Effective June 23, 2022, Sue Gove, a Director of the Company, was appointed Interim Chief Executive Officer. In connection therewith, the Company entered into an employment agreement (the "Employment Agreement") with Ms. Gove. The Employment Agreement provides for at-will employment for a one-year term, an annual base salary equal to $1,400,000, and a grant (made on June 29, 2022) of cash-settled restricted stock units under the Company's 2018 Incentive Compensation Plan equal in value to $2,600,000 based on the trailing twenty (20) trading day average of the daily volume weighted average price of a share of the Company's common stock prior to the grant date (the "RSU Award"). The RSU Award will vest on June 23, 2023, subject, in general, to Ms. Gove remaining in the Company's employ on the vesting date. In addition, the RSU Award will vest in full if, prior to the vesting date, (i) the Company terminates Ms. Gove's employment other than for "cause", (ii) a "constructive termination" of Ms. Gove's employment occurs, (iii) Ms. Gove's employment is terminated due to her death or disability, or (iv) Ms. Gove's employment is terminated following the hiring of a replacement chief executive officer and Ms. Gove having provided transitional services to the Company for six weeks, in each case, subject to Ms. Gove's execution and non-revocation of a release of claims. In the event that any of the foregoing terminations take place prior to the six (6) month anniversary of the grant date of the RSU Award, then Ms. Gove will forfeit 20% of the RSU Award; provided, however, that the number of restricted stock units forfeited will be limited such that in no event shall Ms. Gove forfeit a portion of the restricted stock units if, after giving effect to such forfeiture, the fair market value of the restricted stock units (based on the closing price of a share of the Company's common stock on the employment termination date) that otherwise would vest in connection with such termination would be less than $2,080,000. Ms. Gove will also be entitled to reimbursement on a tax neutral basis for all reasonable out-of-pocket business, entertainment and travel expenses incurred by her in connection with the performance of her duties.

The description of the Employment Agreement and RSU Award in this Current Report on Form 8-K is a summary of, and is qualified in its entirety by, the terms of the Employment Agreement and RSU Award grant agreement. A copy of the Employment Agreement and RSU Award grant agreement will be filed with the Company's Quarterly Report on Form 10-Q for the period ending August 27, 2022.

There is no arrangement or understanding between Ms. Gove and any other person pursuant to which Ms. Gove has been appointed as Interim Chief Executive Officer. There are no family relationships between Ms. Gove and any of the Company's other directors or executive officers, and Ms. Gove is not a party to any transaction, or any proposed transaction, required to be disclosed pursuant to Item 404(a) of Regulation S-K.

In connection with her appointment as Interim Chief Executive Officer, Ms. Gove has resigned from the Audit Committee, the Nominating and Corporate Governance Committee and the Strategy Committee of the Board. Andrea Weiss has been appointed chair of, and Joshua Schechter has been added to, the Strategy Committee.

Effective June 27, 2022, Joseph Hartsig ceased to serve as Executive Vice President and Chief Merchandising Officer of the Company and President, Harmon Stores Inc. Mr. Hartsig is eligible for separation payments and benefits provided upon a termination of employment without "cause" pursuant to his employment agreement and outstanding time- and performance-based restricted stock unit award agreements. Following his separation, Mr. Hartsig will continue to be subject to certain restrictive covenants, including non-competition and non-solicitation covenants. Mara Sirhal, the Company's Senior Vice President and General Manager for Harmon, has been appointed as Executive Vice President and Chief Merchandising Officer.

In addition, effective June 27, 2022, the Company appointed Laura Crossen as the Senior Vice President, Chief Accounting Officer of the Company. Ms. Crossen joined the Company in 2001 and most recently served as the Company's Senior Vice President, Tax, Treasury and Transformation since May 2021. Previously, Ms. Crossen served as Vice President, Financial Management of the Company since 2001. In connection with her appointment, Ms. Crossen will receive a one-time restricted stock unit grant with a value of $150,000 that will vest in equal installments on each anniversary of the grant date over a three-year period. All other terms of her compensation will remain the same.

Ms. Crossen assumes the role of principal accounting officer from Gustavo Arnal, the Company's Executive Vice President and Chief Financial Officer who has temporarily served in such position since the resignation of John Barresi the Company's former Chief Accounting Officer on June 10, 2022. As previously disclosed, Mr. Barresi's resignation was not the result of any disagreement with the Company on any matter relating to the Company's operations, policies or practices, including the Company's accounting principles and practices and internal controls. There is no arrangement or understanding between Ms. Crossen and any other person pursuant to which Ms. Crossen has been appointed as Chief Accounting Officer. There are no family relationships between Ms. Crossen and any of the Company's directors or executive officers, and Ms. Crossen is not a party to any transaction, or any proposed transaction, required to be disclosed pursuant to Item 404(a) of Regulation S-K.

### Item 7.01  Regulation FD Disclosure.

A copy of the Company's press release announcing Ms. Gove's appointment and related matters is attached hereto as Exhibit 99.1.

The information furnished herewith pursuant to this Item 7.01 of this Form 8-K shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section, and shall not be incorporated by reference into any registration statement or other document under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference in such filing.

### Item 9.01  Financial Statements and Exhibits.

(d) Exhibits:

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press Release issued by Bed Bath & Beyond Inc. on June 29, 2022. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

### *SIGNATURES*

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**BED BATH & BEYOND INC.**

(Registrant)

Date: June 29, 2022

By: */s/ Gustavo Arnal*

Gustavo Arnal

Chief Financial Officer

Exhibit 99.1



**Bed Bath & Beyond Inc. Announces Executive Leadership Changes**

*Independent Board Member Sue Gove Appointed Interim CEO*

*Company Appoints New Chief Merchandising Officer*

*Adjusting Strategy and Focusing Resources to Improve Company Performance*

UNION, N.J., June 29, 2022 /PRNewswire/ -- Bed Bath & Beyond Inc. (NASDAQ: BBBY) today announced significant changes to the Company's senior leadership to focus on reversing recent results, addressing supply chain and inventory, and strengthening its balance sheet. Sue Gove, an Independent Director on the Company's Board of Directors and Chair of the Board's Strategy Committee, has been named Interim Chief Executive Officer, replacing Mark Tritton, who has left his role as President and Chief Executive Officer and as a member of the Board.

Harriet Edelman, Independent Chair of the Bed Bath & Beyond Inc. Board of Directors, said: "After thorough consideration, the Board determined that it was time for a change in leadership. Our banner's heritage is built on the premise that when customers are shopping for the home, Bed Bath & Beyond is the perfect destination for unique solutions and inspiration. We must deliver that proposition for customers, drive growth, and unlock the value of the banners. Today's actions address company performance, the macroeconomic conditions under which we are operating, and the expectations of the Board on behalf of shareholders. We are committed to addressing the urgent issues that have been impacting sales, profitability, and cash flow generation. We are confident Sue brings the right combination of industry experience and knowledge of Bed Bath & Beyond's operations to lead the Company, focus our resources, and revise strategy, as appropriate."

Ms. Gove said, "We must deliver improved results. Our shareholders, Associates, customers, and partners all expect more. We are committed to providing customers with a one-stop destination to meet their needs through our assortment, experience, and services, whether online or in stores. Top-tier execution, careful management of costs, greater supply chain reliability, prudent capital spending, a stronger balance sheet, and robust digital capabilities will all be important to our success. I'm eager to start working more closely with our leaders and our Associates across all banners to make the necessary strategy adjustments and create a brighter future for Bed Bath & Beyond Inc."

**Executive Changes**
The Company further announced that it has named Mara Sirhal as Executive Vice President and Chief Merchandising Officer. Ms. Sirhal, who most recently served as Bed Bath & Beyond's Senior Vice President and General Manager for Harmon, as well as General Merchandise Manager of Health, Beauty & Consumables, will be responsible for driving the Company's omnichannel merchandising, planning, and Owned Brands strategies, while also retaining her position as General Manager for the Harmon retail banner. Ms. Sirhal will report directly to Ms. Gove. She replaces Joe Hartsig, who is leaving the company.

Ms. Edelman continued, "We appreciate Mark's contributions over the past two and a half years. These include launching our transformation strategy, delivering returns to shareholders through the divestiture of non-core assets, investing in technology, infrastructure and digital capabilities and introducing Owned Brands. Under his leadership, the Company navigated well through the COVID-19 pandemic, keeping our Associates, customers, and communities safe and served. Joe was also a key member of our senior leadership team and instrumental in developing and implementing our product strategy. The Board of Directors recognizes and thanks both Mark and Joe for their leadership and wish them all the best for the future."

These changes reflect the decision of the Company's thirteen independent members of the Board of Directors.

To support its work, the Board has retained Berkeley Research Group (BRG), a leading retail advisory firm, to focus on cash, inventory and balance sheet optimization. In addition, Russell Reynolds, a nationally recognized search firm, has been retained to commence a search process for the permanent Chief Executive Officer role.

**Strategy Committee Update**

As previously announced, the Strategy Committee of the Board has been evaluating options for buybuy BABY over the past several months. The Committee is working closely with management and strategic and financial advisors to properly assess inherent value potential. While the Committee's work continues, the analysis to-date has confirmed the potential of buybuy BABY and has identified several strategies to further increase the synergies and compelling growth potential to be unlocked within Bed Bath & Beyond, Inc. The Committee will continue its work and provide support while the Company focuses on near-term actions that primarily involve improved execution. These include focus on key offerings, recapturing the power of its registry program and an improved digital platform.

In line with the executive transition, the Strategy Committee will be reconfigured as Sue Gove steps down from her role as Chair. Effective immediately, current Committee member Andrea Weiss has assumed the role of Chair and Joshua Schechter, Chair of the Audit Committee, will join the Strategy Committee.

**First Quarter 2022 Financial Results**

In a separate release today, the Company is disclosing its financial results for the quarter ended May 28, 2022. The Company will host a conference call with investors and analysts today at 8:15am EDT to review this announcement and the Company's financial results.

**About Sue Gove**

Ms. Gove has been an Independent Director of Bed Bath & Beyond Inc. since May 2019. Throughout her tenure, Sue served two years as a member of the Audit Committee and three years as a member of the Nominating and Corporate Governance committee. In March, she was named Chair of the Board's Strategy Committee. Sue has spent more than 30 years within the retail industry serving a variety of senior financial, operating and strategic roles that included President and Chief Executive Officer of Golfsmith International Holdings and Chief Operating Officer of Zale Corporation. She has also served as a Senior Advisor for Alvarez & Marsal, a global professional services firm, from March 2017 to March 2019, where she primarily focused on advisory and turnaround for retail companies. She is the President of Excelsior Advisors, LLC, a retail consulting and advisory firm founded in August 2014.

**About Mara Sirhal**

Ms. Sirhal has 20 years of experience in retail, merchandising, store operations, beauty, and wellness. Prior to Bed Bath & Beyond and Harmon, she worked at Macy's Inc., most recently as Vice President and Divisional Business Manager for Licensed, Retail as a Service and Retail Diversity Strategy, and previously held a number of strategic merchandising roles at the retailer, including Vice President and Divisional Business Manager for Fragrances, Bath and Body Merchandising in the Beauty division. In this role she was responsible for buying, planning, digital and inventory management, and delivered significant growth in comp sales and market share. Prior to her current role as EVP and CMO, Ms. Sirhal was Senior Vice President and General Manager of Harmon Health and Beauty Stores, as well as General Merchandise Manager of Health, Beauty & Consumables, where she was responsible for leading all operational aspects of this value-driven business.

**About Bed Bath & Beyond Inc**

Bed Bath & Beyond Inc. and subsidiaries (the "Company") is an omnichannel retailer that makes it easy for our customers to feel at home. The Company sells a wide assortment of merchandise in the Home, Baby, Beauty and Wellness markets. Additionally, the Company is a partner in a joint venture which operates retail stores in Mexico under the name Bed Bath & Beyond.

The Company operates websites at be
dbathandbeyond.com, bedbathandbeyond.ca, buybuybaby.com, buybuybaby.ca, facevalues.com and decorist.com.

**Forward-Looking Statements**

This press release contains forward-looking statements within the meaning of Section 21 E of the Securities Exchange Act of 1934 including, but not limited to, our progress and anticipated progress towards our long-term objectives, potential changes in our strategy and management changes, as well as more generally our future outlook. Many of these forward-looking statements can be identified by use of words such as may, will, expect, anticipate, approximate, estimate, assume, continue, model, project, plan, goal, preliminary, and similar words and phrases, although the absence of those words does not necessarily mean that statements are not forward-looking. Our actual results and future financial condition may differ materially from those expressed in any such forward-looking statements as a result of many factors. Such factors include, without limitation: general economic conditions including the recent supply chain disruptions, labor shortages, wage pressures, rising inflation; a challenging overall macroeconomic environment and a highly competitive retailing environment; the ongoing military conflict between Russia and Ukraine; risks associated with the ongoing COVID-19 pandemic and the governmental responses to it, including its impacts across our businesses on demand and operations, as well as on the operations of our suppliers and other business partners, and the effectiveness of our and governmental actions taken in response to these risks; changing consumer preferences, spending habits and demographics; demographics and other macroeconomic factors that may impact the level of spending for the types of merchandise sold by us; challenges in executing our omni-channel and transformation strategy, including our ability to establish and profitably maintain the appropriate mix of digital and physical presence in the markets we serve; our ability to successfully execute our store fleet optimization strategies, including our ability to achieve anticipated cost savings and to not exceed anticipated costs; our ability to execute on any additional strategic transactions and realize the benefits of any acquisitions, partnerships, investments or divestitures; disruptions to our information technology systems, including but not limited to security breaches of systems protecting consumer and employee information or other types of cybercrimes or cybersecurity attacks; damage to our reputation in any aspect of our operations; the cost of labor, merchandise, logistical costs and other costs and expenses; potential supply chain disruption due to trade restrictions or otherwise, and other factors such as natural disasters, pandemics, including the COVID-19 pandemic, political instability, labor disturbances, product recalls, financial or operational instability of suppliers or carriers, and other items; inflation and the related increases in costs of materials, labor and other costs; inefficient management of relationships and dependencies on third-party service providers; our ability to attract and retain qualified employees in all areas of the organization; unusual weather patterns and natural disasters, including the impact of climate change; uncertainty and disruptions in financial markets; volatility in the price of our common stock and its effect, and the effect of other factors, including the COVID-19 pandemic, on our capital allocation strategy; changes to statutory, regulatory and other legal requirements or deemed noncompliance with such requirements; changes to accounting rules, regulations and tax laws, or new interpretations of existing accounting standards or tax laws; new, or developments in existing, litigation, claims or assessments; and a failure of our business partners to adhere to appropriate laws, regulations or standards. Except as required by law, we do not undertake any obligation to update our forward-looking statements.

**Contacts:**
MEDIA: Julie Strider, Media@bedbath.com
INVESTORS: Susie A. Kim, IR@bedbath.com

# EXHIBIT 22

Message

| | |
|---|---|
| **From:** | Harriet Edelman [Harriet.Edelman@Consultant.Bedbath.com] |
| on behalf of | Harriet Edelman <Harriet.Edelman@Consultant.Bedbath.com> [Harriet.Edelman@Consultant.Bedbath.com] |
| **Sent**: | 7/1/2022 2:19:43 PM |
| **To**: | Ryan Cohen [ryan@rcmail.com] |
| **Subject**: | Re: Schedule conversation later today? |

Ryan, thank you.

From a "housekeeping perspective:" in our view, the substance of our conversations earlier this week was reflected in the press releases issued by the Company on Wednesday, 6/27/22; and therefore, no longer constitutes MNPI.

I hope you have a good holiday weekend,
H

Get Outlook for iOS

---

**From:** Ryan Cohen <ryan@rcmail.com>
**Sent:** Thursday, June 30, 2022 10:00:02 PM
**To:** Harriet Edelman <Harriet.Edelman@Consultant.Bedbath.com>
**Subject:** Re: Schedule conversation later today?


CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Harriet,

From a housekeeping perspective, please confirm that all MNPI shared with me earlier this week has been completely disclosed and that I am no longer in possession of MNPI.

Thank you
Ryan


> On Jun 29, 2022, at 12:23 PM, Harriet Edelman <Harriet.Edelman@consultant.bedbath.com> wrote:
>
> Okay, Ryan.
> Will do immediately.  Thank you.
>
> H
>
> Get Outlook for iOS

---

**From:** Ryan Cohen <ryan@rcmail.com>
**Sent:** Wednesday, June 29, 2022 3:21 PM

CONFIDENTIAL

**To:** Harriet Edelman
**Subject:** Re: Schedule conversation later today?


CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Harriet

Please have my call with Sue cancelled for today. I'll follow up with some proposed times for early next week.

Ryan


> On Jun 29, 2022, at 9:42 AM, Ryan Cohen <ryan@rcmail.com> wrote:
>
> Harriet - thanks for the discussion yesterday.
>
> It's important for the full board to recognize its accountability for this unacceptable trajectory. Firing Mark only reinforces the board's mistakes with regard to ineffective oversight and poor capital allocation. Given I'm the company's largest active shareholder and the only shareholder with operating expertise, I am expecting the board to promptly respond to my request after getting through today.
>
> Ryan
>
>
>> On Jun 29, 2022, at 6:30 AM, Harriet Edelman <Harriet.Edelman@consultant.bedbath.com> wrote:
>>
>>
>> Good morning.  Thank you for our conversations last night and I conveyed the key points to the full Board.
>>
>> I know a meeting invite has been sent to you for your conversation with Sue Gove at 4:00 pm ET today.   You will also receive notice that the originally scheduled call tomorrow (Thursday) is canceled.
>>
>> Thanks…have a good day…talk soon.
>> H
>>
>> Get Outlook for iOS
>> _____
>> **From:** Ryan Cohen <ryan@rcmail.com>
>> **Sent:** Tuesday, June 28, 2022 6:55:52 PM
>> **To:** Harriet Edelman <Harriet.Edelman@Consultant.Bedbath.com>
>> **Subject:** Re: Schedule conversation later today?

CONFIDENTIAL                                                    COHEN0004418

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

I'm on when you're ready

On Jun 28, 2022, at 6:52 PM, Harriet Edelman <Harriet.Edelman@Consultant.Bedbath.com> wrote:

Yes I can.
Do you want a zoom invite or just call
914-263-8879

Get Outlook for iOS

**From:** Ryan Cohen <ryan@rcmail.com>
**Sent:** Tuesday, June 28, 2022 6:34:07 PM
**To:** Harriet Edelman <Harriet.Edelman@Consultant.Bedbath.com>
**Subject:** Re: Schedule conversation later today?

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Harriet

Do you have a chance to get back on the line now?

On Jun 28, 2022, at 12:15 PM, Harriet Edelman <Harriet.Edelman@consultant.bedbath.com> wrote:

Thank you.
Meeting invite has been sent.
Speak soon,
H

Get Outlook for iOS

CONFIDENTIAL

COHEN0004419

**From:** Ryan Cohen <ryan@rcmail.com>
**Sent:** Tuesday, June 28, 2022 1:59:29 PM
**To:** Harriet Edelman <Harriet.Edelman@Consultant.Bedbath.com>
**Subject:** Re: Schedule conversation later today?

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hi Harriet,

5 et today works.

*Acknowledged and Agreed.*

> On Jun 28, 2022, at 4:54 AM, Harriet Edelman <Harriet.Edelman@consultant.bedbath.com> wrote:
>
> Good morning, Ryan and I hope you are well.
>
> I would like to share information with you that we will announce tomorrow morning…and ask if you are available, and would like to have a discussion, starting 5:00 pm ET or later, today.
>
> The information I will share is non-public and highly confidential. Therefore, in advance of the call, I will request

COHEN0004420

your confirmation that you will keep the information confidential and not trade in BBBY securities until the information is publicly announced tomorrow.  If you would like to talk today, we can keep this simple by your replying *"Acknowledged and Agreed"* to this email.  And please let me know what time works for you and I will send an invite and look forward to speaking with you later.

If you prefer to wait, we can talk briefly just before the announcement tomorrow morning or any time afterwards.

Thank you,
Harriet

CONFIDENTIAL

COHEN0004421

# EXHIBIT 23

## Page 1

C O N F I D E N T I A L
UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
---------------------------------x
In Re BED BATH & BEYOND        Master File No.
CORPORATION SECURITIES LITIGATION   1:22-cv-02541-TNM

---------------------------------x

April 30, 2024
9:32 a.m.

Videotaped Deposition of HARRIET

EDELMAN, taken by Plaintiffs, pursuant to

Subpoena, held at the offices of Pomerantz

LLP, 600 Third Avenue, New York, New York,

before Joseph R. Danyo, a Shorthand Reporter

and Notary Public within and for the State

of New York.

HUDSON COURT REPORTING & VIDEO    (212) 273-9911

## Page 2

```
 1
 2   A P P E A R A N C E S :
 3     POMERANTZ LLP
         Counsel for Lead Plaintiff Bratya SPRL and
 4       Co-Lead Counsel for the Class
         10 South LaSalle Street
 5       Suite 3505
         Chicago, Illinois 60603
 6       (312)377-1181
 7     By:  OMAR JAFRI, ESQ.
         ojafri@pomlaw.com
 8
 9
       WILLIAMS & CONNOLLY LLP
10       Attorneys for RC Ventures LLC and Ryan Cohen
         680 Maine Avenue, S.W.
11       Washington, D.C. 20024
         (202)434-5000
12
       By:  BRIAN T. GILMORE, ESQ.
13       bgilmore@wc.com
         STEVEN FARINA, ESQ.
14
15
       CLEARY GOTTLIEB STEEN & HAMILTON LLP
16       Attorneys For the Witness
         One Liberty Plaza
17       New York, New York 10006
         (212)225-2000
18
       By:  JARED GERBER, ESQ.
19       jgerber@cgsh.com
         PETER CARZIS, ESQ. (Not Admitted)
20
21   Also Present:
22     VINCENT FALCETANO, Videographer
23            ~oOo~
24
25
```

## Page 3

```
 1            Edelman - Confidential
 2        THE VIDEOGRAPHER:  Good morning.  We are
 3   now on the record at 9:32 a.m. Eastern Time
 4   on Tuesday, April 30, 2024 for the
 5   stenographically reported and videotaped
 6   deposition of Harriet Edelman taken in the
 7   matter of Bed Bath & Beyond Corporation
 8   Securities Litigation.  My name is Vincent
 9   Falcetano, the videographer, and Mr. Joseph
10   Danyo is the court reporter.  We are both
11   with Hudson Reporting & Video Nationwide.
12   This deposition is being taken at Pomerantz
13   LLP, 600 Third Avenue, New York City.
14        Would counsel please introduce
15   themselves for the record.
16        MR. JAFRI:  Omar Jafri from Pomerantz
17   for the Plaintiff.
18        MR. GILMORE:  Brian Gilmore and Steven
19   Farina from Williams & Connolly on behalf of
20   the Defendants.
21        MR. GERBER:  Jared Gerber and Peter
22   Carzis on behalf of the witness.
23   H A R R I E T   E D E L M A N, having been first
24   duly sworn by Joseph R. Danyo, a Notary Public, was
25   called as a witness and testified as follows:
```

## Page 4

```
 1            Edelman - Confidential
 2   EXAMINATION BY MR. JAFRI:
 3        Q.  Good morning, Ms. Edelman.  My name is
 4   Omar.  We met earlier.  Have you ever been deposed
 5   before?
 6        A.  Yes.
 7        Q.  How many times?
 8        A.  Four.
 9        Q.  And in what cases were those?
10        A.  One was a manufacturing and distribution
11   facility closing.  One was a wrongful termination.
12   Another was a partial impairment of a large
13   information system.  And the final was a contract
14   dispute over payments.
15        Q.  Were you a defendant in any of these
16   cases?
17        A.  No.
18        Q.  So you were only a fact witness?
19        A.  Yes.  Sorry.  Some of these are old.
20   Actually I'm not sure.  I just was in four
21   depositions.
22        Q.  Okay.  Have you ever testified in court?
23        A.  No.
24        Q.  Have you ever testified in any kind of
25   regulatory proceeding?
```

Pages 1 to 4

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 293

1          Edelman - Confidential
2      A.   And before Mr. Cohen's approach in
3  December.
4      Q.   There were other inbound offers?
5      A.   November-ish Sue was meeting with
6  people.
7      Q.   Understood.  You talked quite a bit
8  about your call with Mr. Cohen on June 28th.  I
9  just have one question about that.  Did you share
10  with Mr. Cohen during that call any MNPI that was
11  not disclosed by the company the following day?
12          MR. JAFRI:  Objection.  Calls for a
13      legal conclusion.
14      Q.   You can answer.
15      A.   I don't believe so.
16      Q.   I want to draw your attention back to
17  Exhibit 111, if you could pull that out.  I want to
18  focus on the same e-mail that Mr. Jafri focused on,
19  the last e-mail on the back page.  I know you
20  testified that you didn't think that it was likely
21  that he would sell, but the possibility that you
22  wanted to be ready for.
23          When you considered that possibility
24  that Mr. Cohen might sell at this time in August
25  2022, were you aware of any reason he would be

Page 294

1          Edelman - Confidential
2  legally prohibited from doing so?
3          MR. JAFRI:  Objection to form.
4      A.   I was not aware of any legal reason why
5  he couldn't sell.
6      Q.   You didn't think he would be breaking
7  the law if he exited his position?
8          MR. JAFRI:  Objection to form.
9      A.   I know of no legal limitation to his
10  selling.
11      Q.   Okay.  You can put that aside.  I have
12  one last document and we will be out of here.  I am
13  passing around what has been marked as Exhibit 116.
14          (Exhibit 116, e-mail from Harriet
15      Edelman to the Board dated August 12, 2022,
16      was so marked for identification, as of this
17      date.)
18      Q.   The Bates stamp is BBBY_HE 00000014.
19  Let me know once you have had a chance to review,
20  please.
21      A.   Thank you.
22      Q.   You wrote starting at the top of the
23  back page, "We have energy behind the stock
24  'without a catalyst' as the pundits call it."  What
25  did you mean by that?

Page 295

1          Edelman - Confidential
2      A.   The stock was moving.  We were in an
3  MNPI period ourselves.  We were two and a half
4  weeks from a public communication as well as no
5  quarterly releases, so, when I was saying that
6  there's no catalyst, we were not communicating
7  anything that should have driven the shares either
8  way.
9      Q.   So you were not aware of any
10  company-driven reason at this time in August 12,
11  2022?
12      A.   That's correct, emanating from the
13  company.
14      Q.   Why the stock price would be moving?
15      A.   Emanating from the company.
16      Q.   Okay.  With that in mind, did you come
17  to any conclusions about what might have been
18  causing the share price to move at that time?
19      A.   No.
20      Q.   Have you heard of a phenomenon called a
21  short squeeze?
22      A.   Yes.
23      Q.   What is your understanding of a short
24  squeeze?
25      A.   The short squeeze is when investors who

Page 296

1          Edelman - Confidential
2  have taken short positions on a bet that a
3  company's stock is going to go down is that other
4  shareholders' actions might cause the stock to go
5  up, in which case they have financial
6  responsibilities to cover the gap.
7      Q.   And was there any discussion around the
8  time of this August 12, 2022 e-mail within Bed
9  Bath & Beyond about whether a short squeeze might
10  be happening with regard to Bed Bath stock?
11      A.   I don't recall.
12      Q.   You don't recall?
13      A.   No.
14      Q.   You can put that to the side.  For my
15  remaining questions, I want to put to one side your
16  June 28th call with Mr. Cohen.  Aside from that
17  call, did you ever provide Mr. Cohen material
18  non-public information about Bed Bath's financial
19  performance?
20          MR. JAFRI:  Objection, calls for a legal
21      conclusion.
22      A.   I do not believe I did.
23      Q.   Did you ever provide Mr. Cohen material
24  non-public information about Bed Bath's efforts to
25  raise capital?

Pages 293 to 296

Page 297

1              Edelman - Confidential
2         MR. JAFRI:  Same objection.
3    A.  I do not believe I did.
4         Q.  Did you ever provide Mr. Cohen material
5    non-public information about a potential sale of
6    buybuy BABY?
7         MR. JAFRI:  Same objection.
8    A.  I do not believe I did.
9         Q.  Did you ever provide Mr. Cohen material
10   non-public information about a potential spin-off
11   of buybuy BABY?
12        MR. JAFRI:  Same objection.
13   A.  I do not believe I did.
14        Q.  Did you ever provide Mr. Cohen any
15   material non-public information whatsoever about
16   Bed Bath & Beyond?
17        MR. JAFRI:  Same objection.
18   Q.  Aside from the June 28 call?
19   A.  I do not believe I did.
20        Q.  Are you aware of anyone else from Bed
21   Bath & Beyond providing Mr. Cohen any material
22   non-public information whatsoever about Bed Bath?
23        MR. JAFRI:  Same objection.
24   A.  I'm not aware of anyone else.
25        MR. GILMORE:  Thank you, ma'am.  I have

Page 298

1              Edelman - Confidential
2    no further questions.  I really appreciate
3    your time.
4         MR. GERBER:  I ask that the transcript
5    be marked confidential.
6         THE VIDEOGRAPHER:  This is the end of
7    the deposition.  The time is 5:24 p.m.  We
8    are off the record.
9         (Time noted:  5:24 p.m.)
10   _____
11
12   Subscribed and sworn to
13   before me this____day of_____, 2024.
14   _____
15
16
17
18
19
20
21
22
23
24
25

Page 299

1
2         C E R T I F I C A T I O N
3
4         I, JOSEPH R. DANYO, a Shorthand Reporter
5    and Notary Public, within and for the State of New
6    York, do hereby certify:
7         That I reported the proceedings in the
8    within entitled matter, and that the within transcript
9    is a true record of such proceedings.
10        I further certify that I am not related, by
11   blood or marriage, to any of the parties in this
12   matter and that I am in no way interested in the
13   outcome of this matter.
14        IN WITNESS WHEREOF, I have hereunto set my
15   hand this 1st day of May, 2024.
16
17   _____
18              JOSEPH R. DANYO
19              STATE OF NEW YORK
20              My Commission Expires 2/20/2027
21
22
23
24
25

Page 300

1
2              I N D E X
3    Witness                               Page
4    HARRIET EDELMAN                          3
5
6            E X H I B I T S
7    No.                                   Page
8    Exhibit 93  e-mail chain from Harriet    43
         Edelman to Arlene Hong dated
9        March 14, 2022
10   Exhibit 94  e-mail chain from Harriet Edelman to   63
         Arlene Hong dated March 29,
11       2022
12   Exhibit 95  e-mail chain from Mark Tritton   68
         to Harriet Edelman dated
13       March 29, 2022
14   Exhibit 96  e-mail chain from Harriet    70
         Edelman of Tarita Jones dated
15       March 29, 2022
16   Exhibit 97  Letter from Harriet Edelman to   71
         Ben Rosenzweig dated March 29,
17       2022
18   Exhibit 98  e-mail chain from Mark Tritton   79
         to Harriet Edelman dated
19       April 8, 2022
20   Exhibit 99  e-mail chain from Mark Tritton   89
         to Harriet Edelman dated
21       April 11, 2022
22   Exhibit 100  e-mail from Susie Kim to Julie   94
         Strider dated April 12, 2022
23
24   Exhibit 101  e-mail from Susie Kim re Teams   99
         Meeting
25

Pages 297 to 300

# EXHIBIT 24

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
- - -

_____
                        )
        Plaintiff       )
                        )
        vs.             ) Civil Action No. 1:22-cv-02541
                        )
In Re Bed Bath & Beyond )
Corporation Securities  )
Litigation              )
                        )
        Defendant       )
_____)

C O N F I D E N T I A L
VIDEOTAPED DEPOSITION OF MARJORIE BOWEN
SANTA MONICA, CALIFORNIA
FRIDAY, MARCH 1, 2024

CONFIDENTIAL PORTIONS (PAGES 28, 37-38, 51)

REPORTED BY:  DENISE D. ISON
CSR NUMBER 6964, RPR, CLR
HUDSON COURT REPORTING & VIDEO      (800) 310-1769

---

Page 2

1   UNITED STATES DISTRICT COURT
2   FOR THE DISTRICT OF COLUMBIA
3                - - -
4   _____
                            )
5        Plaintiff          )
                            )
6        vs.                ) Civil Action No. 1:22-cv-02541
                            )
7   In Re Bed Bath & Beyond )
    Corporation Securities  )
8   Litigation              )
                            )
9        Defendant          )
10  _____)
11
12
13          VIDEOTAPED DEPOSITION OF MARJORIE BOWEN,
14  taken pursuant to Subpoena, on behalf of Plaintiff, at
15  the offices of Bryan, Cave, Leighton, Paisner, LLP,
16  120 Broadway, Suite 300, Santa Monica, California 90401,
17  on Friday, March 1, 2024, at 9:40 a.m., before
18  Denise D. Ison, CSR No. 6964, RPR, CLR.
19
20
21
22
23
24
25

---

Page 3

1                    APPEARANCES
2
3   ON BEHALF OF PLAINTIFF:
4
5       POMERANTZ, LLP
6       BY:  GENC ARIFI, ESQ.
7            OMAR JAFRI, ESQ.
8       10 South LaSalle
9       Suite 3505
10      Chicago, Illinois 60603
11      Phone:  (312) 377-1181
12      E-mail:  garifi@pomlaw.com
13               ojafri@pomlaw.com
14
15   |  BRONSTEIN, GEWIRTZ & GROSSMAN
16      BY:  PERETZ BRONSTEIN, ESQ.
17      60 East 42nd Street
18      Suite 4600
19      New York, New York 10165
20      Phone:  (212) 697-6484
21      E-mail:  peretz@bgandg.com
22
23
24
25

---

Page 4

1                    APPEARANCES
2                    (Continued)
3
4   ON BEHALF OF DEFENDANT RYAN COHEN -and- RC VENTURES,
5   LLC:
6
7    |  WILLIAMS & CONNOLLY, LLP
8       BY:  STEVEN M. FARINA, ESQ.
9            MADELINE PREBIL, ESQ.
10      680 Maine Avenue SW
11      Washington, D.C. 20024
12      Phone:  (202) 434-5526
13      E-mail:  sfarina@wc.com
14               mprebil@wc.com
15
16   ON BEHALF OF MARJORIE BOWEN:
17
18      BRYAN, CAVE, LEIGHTON, PAISNER, LLP
19      BY:  MICHAEL P. CAREY, ESQ.
20      One Atlantic Center
21      1201 West Peachtree Street, NW
22      14th Floor
23      Atlanta, Georgia 30309
24      Phone: (404) 572-6600
25      E-mail:  michael.carey@bclplaw.com

Pages 1 to 4

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 221

1  all his shares was discussed by the board?
2      A.  I don't recall if that was discussed by
3  the board -- and I'm sorry.  Are you referring to
4  before or after?
5      Q.  I'm asking about whether the board
6  discussed Mr. Cohen selling all his shares.
7      A.  After the fact.
8      Q.  After the fact?
9      A.  I mean, I think other than an
10  acknowledgment, I -- I just don't recall.  It was
11  acknowledged.
12      Q.  Did anybody else -- strike that.
13          Are you aware of any other reaction by any
14  of the other board members?
15      A.  I mean, I -- I don't really recall.  We
16  would -- I don't really recall.
17      Q.  After Mr. Cohen sold all of his shares,
18  did you speak with Mr. Rosenzweig?
19      A.  Quite possibly, but I don't recall.  I
20  mean, we spoke regularly.
21      Q.  Did you speak with Ms. Lombard regarding
22  Mr. Cohen selling all his shares?
23      A.  I don't recall specifically if we talked
24  about it or not.
25      Q.  Did either one of them have an opinion as

Page 222

1  to Mr. Cohen selling all his shares?
2      MR. CAREY:  Objection.  Form.
3      THE WITNESS:  Yeah.  I just -- I don't
4  recall what our reaction -- what their reaction was.
5  I recall my own reaction.
6  BY MR. ARIFI:
7      Q.  Sure.
8          And do you have an opinion regarding
9  Mr. Cohen selling his shares when the price tag
10  appreciated considerably in relation to the price in
11  July of 2022?
12      MR. FARINA:  Object to form.
13      THE WITNESS:  I think I said I was
14  frustrated and disappointed.  It's never helpful
15  when a large shareholder sells their shares.
16      MR. ARIFI:  I think that's it.  Thank you.
17
18          EXAMINATION
19  BY MR. FARINA:
20      Q.  Good afternoon, Ms. Bowen.  My name is
21  Steve Farina.  I represent Mr. Cohen and RC
22  Ventures.
23          You and I have never met before today;
24  correct?
25      A.  That's correct.

Page 223

1      Q.  We've never spoken before today; correct?
2      A.  That's correct.
3      Q.  Okay.
4          So a moment ago, I asked you if you could
5  take a look at Exhibit 6.  Do you have that in front
6  of you?
7      A.  Yes.
8      Q.  Exhibit 6, at the very top is an e-mail
9  from you to Mr. Marose, and it copies Ryan Cohen.
10          Do you see that?
11      A.  Yes.
12      Q.  And you note there:
13          "Ryan - looking forward to meeting
14          you at 2:30 east."
15          Does that indicate to you that you had
16  never met Mr. Cohen prior to March 16, 2022?
17      A.  Oh, I can tell you definitively I never
18  met Mr. Cohen prior to March 16th, 2022.
19      Q.  Okay.
20          And am I right that your best recollection
21  is that you've only ever spoken with Mr. Cohen
22  twice; is that correct?
23      A.  That is correct.
24      Q.  And both of those times were prior to you
25  joining the Bed Bath board; is that correct?

Page 224

1      A.  That is 100 percent correct.
2      Q.  All right.
3          Did you ever provide Mr. Cohen or anyone
4  acting on Mr. Cohen's behalf with material,
5  non-public information about buybuy BABY?
6      A.  Absolutely not.
7      Q.  Did you ever provide Mr. Cohen any
8  material, non-public information about the company's
9  debt situation?
10      A.  No.
11      Q.  Did you ever provide Mr. Cohen or anyone
12  acting on his behalf any material, non-public
13  information about the company's financial
14  performance?
15      A.  No.
16      Q.  Did you ever provide Mr. Cohen or anyone
17  acting on his behalf any material, non-public
18  information about anything related to Bed Bath?
19      A.  No.
20      Q.  Okay.
21      A.  Nor anyone else.
22      Q.  We've talked -- you talked a little bit
23  today about the performance of the company over the
24  period that you were a director; correct?
25      A.  Yes.

Pages 221 to 224

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 225

1     Q.   And you joined the board in March of 2022;
2  is that correct?
3     A.   The very end of March, I believe.
4     Q.   All right.
5          And I think you testified that it was --
6  it was apparent to you that the company's
7  performance was suffering at the time that you
8  joined the board; is that fair?
9     A.   Yes.
10    Q.   And the company -- Bed Bath is a -- is a
11 public company; correct?
12    A.   Yes.
13    Q.   And as a public company, Bed Bath files on
14 a quarterly basis financial information with the
15 SEC; is that correct?
16    A.   Yes.
17    Q.   All right.
18         And one of those documents is called a
19 Form 10-Q; is that correct?
20    A.   Yes.
21    Q.   And the Form -- the Forms 10-Q include
22 financial information for the immediately preceding
23 quarter; correct?
24    A.   Yes.
25    Q.   All right.

Page 226

1          And as a member of the board of directors,
2  would you review the Forms 10-Q, or at least the
3  financial information that is going in those forms?
4     A.   Yes, although I was not on the audit
5  committee.  And that's usually the purview of the
6  audit committee.
7     Q.   Understood.
8          I'm not suggesting that you were reviewing
9  it in a capacity of having to approve it, but you
10 were generally familiar with what the company was
11 reporting as to its financial performance?
12    A.   Yes.
13    Q.   All right.
14         And the financial performance of the
15 company during the entire period you were on the
16 board was pretty bad?
17    A.   Abysmal.
18    Q.   Okay.
19         And let me just ask you to take a look at
20 one of those Forms 10-Q.  And this is the one for
21 the quarter ended May 28th, 2022.
22         (Defendants' Exhibit 27 was marked
23         for identification and is attached
24         hereto.)
25 ///

Page 227

1  BY MR. FARINA:
2     Q.   All right.  I'm going to ask you to take a
3  look at the third page of the exhibit.
4          And it's Exhibit 27; is that correct?
5     A.   Um-hmmm.  The balance sheet.
6     Q.   Correct.  So this is a balance sheet for
7  the company as of May 28, 2022; correct?
8     A.   Yes.
9     Q.   And there's a comparison to the balance
10 sheet of the company as of the prior quarter; is
11 that correct?
12    A.   Yes.
13    Q.   All right.
14         And if you take a look, there's a line
15 item for cash and cash equivalence.  Do you see
16 that?
17    A.   Yes.
18    Q.   And it's evident from the publicly
19 available financial statements that the cash and
20 cash equivalence for the company had actually gone
21 down from the prior quarter; correct?
22    A.   It was hemorrhaging cash.  That was my
23 testimony earlier.
24    Q.   Exactly.
25         And the fact that it was hemorrhaging cash

Page 228

1  is evident from the publicly available financial
2  statements; correct?
3     A.   Yes.
4     Q.   All right.
5          And if you take a look at the balance
6  sheet as of May 28, 2022, you can see from the face
7  of the balance sheet that the total liabilities of
8  the company at that point exceeded the total assets;
9  is that fair?
10    A.   Yes.
11    Q.   All right.
12         And that wasn't true as of February 26,
13 2022; correct?
14    A.   Yes.
15    Q.   So, again, that reflected -- reflected the
16 continuing deterioration of the company's
17 performance?
18    A.   Balance sheets aren't overly meaningful in
19 terms of their correlation to fair market value, but
20 sure.
21    Q.   All right.  Well, let's take a look
22 then --
23    A.   It's going to get better.
24    Q.   Let's take a look at the consolidated
25 statement of operations, which is page 4.

Pages 225 to 228

# EXHIBIT 25



Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Civil Action No. 1:22-cv-02541-TNM

IN RE BED BATH & BEYOND
CORPORATION SECURITIES
LITIGATION

_____/

DEPOSITION OF
BENJAMIN ROSENZWEIG

Wednesday, March 20, 2024
9:49 a.m. - 5:03 p.m.

Remote Location
Via Zoom Videoconference
All Parties Remote

Stenographically reported by:
Erica Field, RPR, CRR, CA-CSR, GA-CSR, WA-CSR,
NM-CCR, IL-CSR, NJ-CCR, FL-FPR, NY Notary, FL
Notary, AK Notary
HUDSON COURT REPORTING & VIDEO      (800) 310-1769

Page 2

1    VIDEOTAPED REALTIME STENOGRAPHIC DEPOSITION of
2    BENJAMIN ROSENZWEIG, taken in the above-entitled
3    matter before ERICA FIELD, RPR, CRR, California
4    Certified Shorthand Reporter (License No. 14515),
5    New Jersey Certified Court Reporter (License No.
6    30XI00244800), New Mexico Certified Court Reporter
7    (License No. 575), Washington Certified Shorthand
8    Reporter (License No. 22020479), Illinois
9    Certified Shorthand Reporter (License No.
10   084004952), Georgia Certified Court Reporter
11   (License No. 5338-8044-2296-7296), Florida
12   Professional Reporter (Licence No. 1109), New York
13   Notary, Florida Notary, Alaska Notary taken, via
14   remote videoconference on Wednesday,
15   March 20, 2024, commencing at 9:49 a.m.
16
17
18
19
20
21
22
23
24
25

Page 3

1                    APPEARANCES:
2
3
4    On behalf of the Bratya SPRL and the Class:
5       BRONSTEIN GEWIRTZ & GROSSMAN
        60 East 42nd Street
6       Suite 4600
        New York, New York 10165
7       (212) 697-6484
        BY: PERETZ BRONSTEIN, ESQUIRE
8       peretz@bgandg.com
9    -and-
10
11      POMERANTZ
        10 S. LaSalle Street
12      Suite 3505
        Chicago, Illinois 60603
13      (312) 377-1181
        BY: OMAR JAFRI, ESQUIRE
14      ojafri@pomlaw.com
15
16
17   On behalf of RC Ventures:
        WILLIAMS & CONNOLLY
18      680 Maine Avenue S.W.
        Washington, DC 20024
19      (202) 434-5000
        BY: BRIAN GILMORE, ESQUIRE
20      DANE BUTSWINKAS, ESQUIRE
        bgilmore@wc.com
21      Dbutswinkas@wc.com
22
23
24
25

Page 4

1    APPEARANCES CONTINUED:
2
3
4    On behalf of the Witness:
5       BRYAN CAVE LEIGHTON PAISNER
        1201 Peachtree Street NW
6       Suite 14
        Atlanta, Georgia 30309
7       (404) 572-6600
        BY: MICHAEL CAREY, ESQUIRE
8       michael.carey@bclplaw.com
9
10
11   VIDEOGRAPHER:
        Pasha Korneychuk
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Pages 1 to 4

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 21

1    A  I don't know.
2    Q  We'll get -- I think it's -- we're going
3  to get to it later, but it makes sense to ask now.
4        You mentioned in web and maybe in the
5  earlier company that you were there involved as a
6  representative of an invest- -- of Privet in both
7  cases.
8        Have you been on a board or board
9  committee or had any management involvement, and
10  being a director is included, in any other company
11  on behalf of Privet?
12    A  Yes.
13    Q  Could you tell me how many?
14    A  Seven.
15    Q  You know it's seven, or you're estimating?
16    A  I'm confident that it is seven.
17    Q  And have you ever been an investor
18  representative -- I'm not saying like in the legal
19  sense, but just involved on behalf of an investor
20  for any other investor other than Privet?
21    A  Only Bed Bath & Beyond.
22    Q  Okay.  So other than Bed Bath & Beyond,
23  which was -- you originally were proposed by
24  Mr. Cohen and Privet and -- I guess it's nine
25  other situations because you said other than the

Page 22

1  two.  You said seven --
2    A  Sorry.  I did not.  Seven through Privet
3  in totality inclusive of PFSweb, not inclusive of
4  J. Alexanders.  I did not join the board of
5  J. Alexanders as we discussed.
6        Seven in totality where I joined boards
7  proposed or through cooperation agreements
8  including Privet.  One where I joined the board
9  through a cooperation agreement or proposal
10  through another investor, not including Privet;
11  that one being Bed Bath & Beyond.
12    Q  Could you list the -- so it's five, right?
13        Other than Alexanders, BBBY, and web,
14  there were five others that were all through
15  Privet; is that correct?
16    A  Six.  Get rid of J. Alexanders.
17        (Simultaneous unreportable crosstalk.)
18        THE STENOGRAPHER:  One at a time, please.
19  BY MR. BRONSTEIN:
20    Q  You can say it again, but I understand.
21    A  Eight boards that I joined in totality,
22  seven of which were affiliated in some manner with
23  Privet.  One in which Privet did not have any role
24  or shareholding, and that one is Bed Bath &
25  Beyond.

Page 23

1    Q  I understand.
2        And J. Alexanders was an insider trading
3  allegation, and it had nothing to do with you
4  being on the board?
5    A  Correct.
6    Q  Could you list the six?
7    A  I will do my best.
8    Q  Name of the company, yes.
9    A  StarTek Inc., Relm Wireless.
10    Q  What was that, the first word?
11    A  Relm, R-E-L-M.
12    Q  Yes.
13    A  Wireless.
14    Q  Yes.
15    A  Cicero Inc.
16    Q  Is that with a C or S?
17    A  C.  C-I-C-E-R-O.
18        Hardinge Inc., H-A-R-D-I-N-G-E.  I don't
19  know.  They're all in my LinkedIn profile.
20    Q  Okay.
21    A  Yeah.  I mean, I'm missing one or two just
22  because it's been 15 years that I've been on
23  boards.
24    Q  So if you could remind me, Bed Bath is
25  part of the seven, or it's in addition to the

Page 24

1  seven?
2    A  In addition.
3    Q  So in StarTek -- you were a director in
4  all of these companies?
5    A  Correct.
6    Q  And were you permitted by agreement to
7  share information with Privet in each of them?
8    A  Yes.
9    Q  So in none of these companies did you have
10  to deal with or struggle with the issue of whether
11  you can disclose or not disclose private non --
12  private material information of the subject
13  company with Privet?
14        MR. GILMORE:  Objection to form.
15    A  As an employee and shareholder of Privet,
16  Privet and I were often treated as one and the
17  same, so if I were an insider of a company, Privet
18  was de facto an insider of the company for
19  reporting purposes.  So it made that distinction
20  much easier.
21  BY MR. BRONSTEIN:
22    Q  What about with Bed Bath & Beyond?  Did
23  you have that liberty to be able to share
24  information with Mr. Cohen?
25    A  No.

Pages 21 to 24

Page 25

1      Q  So it was your understanding from the time
2  you became a director that material nonpublic
3  information you were not permitted to share with
4  Mr. Cohen?
5      A  Correct, not permitted to share.
6      Q  Did you?
7      A  I did not.
8      Q  Okay.  We'll go through each issue later.
9  Give me a second here.  I'm sorry.
10         When did you first become aware of this
11  lawsuit?
12      A  I can't remember exactly.  Sometime since
13  late '23 or -- I don't even remember.  Late '22 or
14  early '23.
15      Q  How did you become aware of it?
16      A  I believe through Bed Bath & Beyond
17  counsel, although I honestly don't remember.  I
18  may have just received a notification directly.
19      Q  After the lawsuit was filed, did you speak
20  to Mr. Cohen?
21      A  I did not.
22      Q  Is he a friend of yours?
23      A  He's not.
24      Q  Did you know him before you became --
25  before you became a nominee under the cooperation

Page 26

1  agreement?
2      A  I had spoken to him, yes.
3      Q  We'll talk about that later.
4         MR. BRONSTEIN:  Court reporter, Erica,
5  could we just go off the record for a moment
6  while I mark an exhibit.
7         THE VIDEOGRAPHER:  Okay.  Off the record
8  at -- off the record at 10:14.
9         (A brief recess was held from 10:14 a.m.
10  to 10:20 a.m.)
11         THE VIDEOGRAPHER:  Back on the record at
12  10:20.
13         MR. BRONSTEIN:  Are we on the record?
14         THE VIDEOGRAPHER:  We are.  Back on the
15  record at 10:20.
16         (Exhibit 28 was marked for
17  identification.)
18  BY MR. BRONSTEIN:
19      Q  Mr. Rosenzweig, can you look at Page 1 of
20  118.
21         When I refer to page numbers, I mean the
22  electronic page number.
23      A  Yes.
24      Q  Have you seen this document before?
25      A  Yes.

Page 27

1      Q  Do you know that this is a subpoena for
2  documents -- for you to produce documents?
3      A  Yes.
4      Q  Did you comply with the subpoena?
5      A  Yes.
6      Q  Can you tell me what you did to comply
7  with the subpoena?
8      A  I searched e-mail records and text message
9  and call log records.
10      Q  So e-mail, text, and call logs, correct?
11      A  Correct.
12      Q  So you wouldn't have any other documents
13  that could have been -- let's say, a Word or Excel
14  document on the server of your computer that
15  wasn't an e-mail, text, or call log?
16         MR. GILMORE:  Objection to form.
17      A  Correct.
18  BY MR. BRONSTEIN:
19      Q  So everything would have been communicated
20  via e-mail at least or one of the other media that
21  you just mentioned?
22      A  Correct.
23      Q  Did you search yourself or did someone
24  else?
25      A  I did.

Page 28

1      Q  So your attorney -- attorneys or their
2  representative didn't go into your instruments and
3  look; you did?
4      A  Correct.
5      Q  Okay.  What words did you search for --
6  let me take that back.
7         How did you search for e-mails or
8  documents responsive to this subpoena?
9      A  Keyword searches for things like Cohen,
10  RC Ventures, Ryan Cohen, Marjorie Bowen, Shelly --
11  I forget her last name.
12      Q  Lombard?
13      A  Yes.  That's correct.  Thank you.
14         Shelly Lombard.  And then other Bed Bath &
15  Beyond directors like Harriet Edelman, Sue Gove,
16  Josh Schechter, things like that.  Also keywords
17  like buybuy BABY, strategy committee, anything
18  that was relevant through the body of the
19  subpoena.
20      Q  Did you -- just to make sure it was
21  thorough, for Bed Bath & Beyond, did you search
22  BBBY?
23      A  I did.
24      Q  And the word "Bed Bath"?
25      A  Yes.

# EXHIBIT 26

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
--------------------------------x

In Re BED BATH & BEYOND            Master File No.
CORPORATION SECURITIES LITIGATION  1:22-cv-02541-TNM

--------------------------------x


                    May 13, 2024

                    10:04 a.m.



          Videotaped Deposition of SHELLY LOMBARD,

taken by Plaintiffs, pursuant to Subpoena, held

at the offices of Pomerantz LLP, 600 Third Avenue,

New York, New York, before Joseph R. Danyo, a

Shorthand Reporter and Notary Public within and

for the State of New York.




HUDSON COURT REPORTING & VIDEO   (212) 273-9911

Page 122

Lombard

1
2      A.  I do not -- I can't comment on that.
3  I'm not familiar with that.  In December of 2022?
4  Oh, I'm sorry.  I'm thinking December 2021.
5  December 2022 I think I recall that, yes.
6      Q.  And his offer was for approximately
7  $400 million, correct?
8      A.  I don't recall the amount.
9      Q.  Were you involved with evaluating Mr.
10  Cohen's offer for the company?
11      A.  No.
12      Q.  What occurred with his offer?
13          MR. GILMORE:  Objection to form.
14      A.  I don't think anything occurred with his
15  offer.
16      Q.  Did the company accept his offer?
17      A.  No.  We were basically shopping it, so
18  his was not the only discussion going on.
19      Q.  Why didn't the company accept Mr.
20  Cohen's offer?
21      A.  I can't recall.  Probably because we
22  thought maybe we could get a better offer from
23  someone else.
24      Q.  We have seen a number of text message
25  conversations and e-mails among you, Ms. Bowen and

Page 123

Lombard

1
2  Mr. Rosenzweig.  During your time on the board, did
3  you communicate with Ms. Bowen and Mr. Rosenzweig
4  more than any other board members?
5      A.  Yes.
6      Q.  To be clear, I mean did you communicate
7  with them more than you communicated with other
8  board members?
9      A.  Yes.
10      Q.  Why was that?
11      A.  We were, the three of us were probably
12  more financially savvy than the rest of the board
13  were really retail experts and they were more
14  business and operating, and we communicated on the
15  balance sheet and the financial aspects of the
16  company where I am sure the other people were
17  communicating with each other on the operating
18  aspects of the company.  I don't know that for a
19  fact, but that would make sense.
20      Q.  Did you think the other members of the
21  board wouldn't understand your comments about the
22  financial aspects of the company?
23      A.  Some of them probably might not have.
24      Q.  But some of them would have?
25      A.  Possibly.

Page 124

Lombard

1
2      Q.  Is there a reason you didn't communicate
3  with those board members as well as Ms. Bowen and
4  Mr. Rosenzweig?
5      A.  Some of it is just relationship-driven.
6  I communicated with Josh.  He is a finance person
7  so when he was also chair of the audit committee,
8  so I had multiple conversations with him.
9      Q.  Your written communications with Ms.
10  Bowen and Mr. Rosenzweig frequently related to Mr.
11  Cohen, correct?
12          MS. WEBSTER:  Objection to form.
13      A.  I would not say that.
14      Q.  Did the three of you discuss any other
15  shareholder as frequently as you discussed Mr.
16  Cohen?
17          MS. WEBSTER:  Objection to form.
18          MR. GILMORE:  Objection to form.
19      A.  No, I don't think so.
20      Q.  Why is that?
21      A.  If any other shareholder had been large
22  and had operating experience and launching and
23  running a specialty retailer, we might have talked
24  about them as well.  I was not aware of anyone that
25  did.

Page 125

Lombard

1
2          MR. SOLOVEICHIK:  Thank you very much.
3  I have no further questions.
4          MR. GILMORE:  If we can go off the
5  record for ten minutes, I may have a few
6  questions, but I want to get my notes in
7  order.
8          THE VIDEOGRAPHER:  We are going off the
9  record at 3 p.m.
10          (Recess taken)
11          THE VIDEOGRAPHER:  The time is 3:11 p.m.
12  We are back on the record.
13  EXAMINATION BY MR. GILMORE:
14      Q.  Good afternoon, Ms. Lombard.  I'm Brian
15  Gilmore, I represent the Cohen defendants in this
16  case.  Thank you very much for your time today.  I
17  know these things can be like a root canal, and the
18  good news is that the root canal is almost over.
19          Ma'am, you were not a member of the
20  strategy committee, correct?
21      A.  No.
22      Q.  Okay.  Were you personally involved in
23  any deliberations about what the company should do
24  with buybuy BABY in 2022?
25          MR. SOLOVEICHIK:  Objection.

Pages 122 to 125

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

# EXHIBIT 27

| | |
|---|---|
| **From:** | Freedman, David <dfreedman@jpmorgan.com> |
| **Sent:** | Tuesday, August 16, 2022 8:31 PM |
| **To:** | Harriet Edelman <Harriet.Edelman@Consultant.Bedbath.com>; Sue Gove <Sue.Gove@bedbath.com>; Gustavo Arnal <Gustavo.Arnal@bedbath.com>; Arlene Hong <Arlene.Hong@bedbath.com>; Susie Kim <Susie.Kim@bedbath.com> |
| **Cc:** | LaGere, Jack C <jack.c.lagere@jpmorgan.com>; Gibson, Gina <gina.gibson@jpmorgan.com>; Johnston, Nik <nik.johnston@jpmorgan.com>; Dilwali, Kapil A <kapil.a.dilwali@jpmorgan.com> |
| **Subject:** | Even by meme stock standards, a wild day |

---

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Team,

I have not been sending emails about the meme-stock trading we have been seeing because we had no real insight into which investors were driving it – other than to say we did not see institutional investor participation.  I am emailing today because we saw 386mm shares of reported volume today after trading almost 165mm yesterday.

- The furious buying in the morning may have been driven by some quant fund buying on the "increased" stake reported by Ryan (even though his number of shares did not change, some services reported a 1.7mm share increase because they included the call options now but not below).
- The reports of Ryan's increased stake also probably caused retail buying again
- Retail also may be trying to fight the short position:  I told you at the end of July that short interest in BBBY had hit 28.5mm share, up from 21.5mm on Jun-30, representing ~42% of the BBY float.  The cost to borrow BBBY had **not** skyrocketed then; it stood at ~1% on an annualized cost rate.
- The shares on loan took an even further jump to 61.5mm shares coming into today (up from ~50mm shares in mid-July), and the cost to borrow had started to elevate last week and reached 9% coming into today.  Yes that is almost the size of your public float.  Implication:  even as your stock price rose over the past 9 trading days, the shares on loan had increased (which means the short interest probably had too).
- I would conclude that today may have represented some capitulation by the shorts in BBBY.  I would note the stock peaked near $28 before 11:30 this morning, stayed in a channel between $26-$28 until 14:30, and then fell sharply back down to the ~$20 level.  145mm shares of reported volume traded between 11:20-14:30 at a volume-weighted average price (VWAP) of $25.90.

It will be interesting to check the shares on loan data Friday morning to see how much of this may have been short covering.  We'll let you know.

Regards,

David Freedman, CFA
Vice Chairman
Global Head of Shareholder Engagement and M&A Capital Markets
J.P. Morgan
383 Madison Avenue, 28th Floor
New York, NY 10179
david.freedman@jpmorgan.com
Office:  212-272-4209
Mobile:  917-406-9889

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

# EXHIBIT 28

| | |
|---|---|
| **From:** | Susie Kim <Susie.Kim@bedbath.com> |
| **Sent:** | Friday, August 5, 2022 6:55 PM |
| **To:** | Sue Gove <Sue.Gove@bedbath.com>; Gustavo Arnal <Gustavo.Arnal@bedbath.com> |
| **Subject:** | RE: Trading Update |

As a follow-up to my earlier note… we are continue to trade up considerably, +32% at $8.11 on 42m shares of volume. Given the continued elevation, a short squeeze is most likely in effect based on the options activity and we have also triggered MEME activity. Our NASDAQ trader has also noted we are among the most active names mentioned on the Reddit boards today and AMC is now trading up more than 20% as well after opening negatively.

The broader markets are flat to slightly down broader market, and the peer group is trading mixed (+/- LSD).

For your reference, here are some screenshots for additional context.

Susie A. Kim
**SVP, INVESTOR RELATIONS & TREASURY**
**NASDAQ: BBBY**
650 Liberty Avenue | Union, NJ 07083
susie.kim@bedbath.com

---

**From:** Susie Kim
**Sent:** Friday, August 5, 2022 10:29 AM
**To:** Sue Gove <Sue.Gove@bedbath.com>; Gustavo Arnal <Gustavo.Arnal@bedbath.com>
**Subject:** Trading Update

Sue/Gustavo,

On the open, we are trading up 27% on elevated volume of 17M shares at $7.84 on no new news or rumors.  The trading thus far has been retail-driven (little block volume), and surveillance team believes is day trading and triggered/driven by options activity ($6, $8 and $10 contracts are the most active).   Due to this activity, it has also likely triggered short covering, creating a "double whammy" effect.

I will be back with more but wanted to let you know what I am aware of right now.

Thank you,
Susie

Susie A. Kim
**SVP, INVESTOR RELATIONS & TREASURY**

**NASDAQ: BBBY**
650 Liberty Avenue | Union, NJ 07083
susie.kim@bedbath.com

# EXHIBIT 29

| From: | Susie Kim Susie.Kim@bedbath.com |
|---|---|
| To: | Board board@bedbath.com |
| Cc: | Gustavo Arnal Gustavo.Arnal@bedbath.com, Arlene Hong Arlene.Hong@bedbath.com, Julie Strider julie.strider@bedbath.com, Katherine Walden katherine.walden@bedbath.com |
| Date: | Mon, Aug 8, 2022, 5:58 PM |
| | BBBY Media Monitor_8.8.2022.pdf 182 KB |

Dear Board of Directors,

Sue wanted to ensure we sent some perspective regarding our recent stock price and trading activity.

On Friday, we began the trading day in the $7-$8 (significantly above our recent $4-$6 range) on elevated volume of 17M with no immediate news or analyst catalysts.  In recent weeks, media speculation has continued to be focused on our liquidity (FILO, upsizing) and AMC has been in the news regarding their recent equity offerings.  We suspected trading was retail-driven/MEME-related and confirmed via our NASDAQ desk that BBBY was among the most active names mentioned across Reddit (along with AMC), triggering a short squeeze and options activity that further contributed to higher volume.  Ultimately, we closed Friday at $8.16 (up +33% on 53M shares vs. $6.15 on average volume of 9M shares).  AMC closed +20%, for additional context.

Today, we saw an acceleration of Friday's activity as we continued to be active on the Reddit boards as we opened above $13 (+60%) since Friday and ultimately closed at $11.41 (+40%) on even higher volume of 122M shares.  While trading levels eventually pulled back as the day progressed, we did see similar activity extend to other highly shorted retail names such as Wayfair (+15%) and BIG (+8%) against the backdrop of a flattish broader market and modestly higher retail sector.

As a reminder, before the RCV-related events from this March, we experienced similar retail trading dynamics in January 2021 and June of 2021 when we traded in the 90-100M share range.  I have included charts from all three trading periods for your reference, as well as today's media monitoring report covering BBBY's trading activity today.

We will continue to monitor activity over the coming days.

Please let me know if you have any questions.

Kindest Regards,
Susie

**THIS WEEK**

Confidential    BBBY_HE_00000049



## FROM 2021 (HISTORICAL)



Confidential

BBBY_HE_00000050



**BBBY Stock Price and Volume Movement**
**January 19 – February 5**

**Susie A. Kim**
**SVP, INVESTOR RELATIONS & TREASURY**
**NASDAQ: BBBY**
650 Liberty Avenue l Union, NJ 07083
susie.kim@bedbath.com

**BED BATH & BEYOND**®

3 / 3

Confidential

Confidential

# EXHIBIT 30

**To:**      Susie Kim[Susie.Kim@bedbath.com]
**From:**   Gustavo Arnal[/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=375e1dea3e484c71b70ce42da17f14c6-Gustavo Arn]
**Sent:**    Tue 8/16/2022 5:52:06 PM (UTC-04:00)
**Subject:** Re: Trading Activity in BBBY's Stock

DEPOSITION
EXHIBIT
37
4-12-24 gm

Thank you

---

**From:** Susie Kim <Susie.Kim@bedbath.com>
**Sent:** Tuesday, August 16, 2022 5:30:06 PM
**To:** Gustavo Arnal <Gustavo.Arnal@bedbath.com>; Arlene Hong <Arlene.Hong@bedbath.com>
**Subject:** FW: Trading Activity in BBBY's Stock

Gustavo/Arlene,

For your awareness, I connected with the Marketwatch dept. of NASDAQ this afternoon given our recent trading.  In case you aren't aware, this is Nasdaq's surveillance arm that monitors our dissemination of material information and disclosures, observes listed company trading activity and has the power to halt trading for up to 30 minutes (not to be confused with the automated halting that can occur as a result of price or volume in a normal trading day).

Their inquiry was related to our trading from 1-2 weeks ago, in addition to today's trading and whether I was aware of any material, non-public drivers.  I factually noted last night and today's RC Ventures filings (they were not familiar with any of our RC history or any historical MEME coverage).  I also noted the many changes that transpired with our Q1 earnings call and the broad media and market/analyst speculation that has been published since then (i.e. CEO change, turnaround prospects, liquidity speculation).

Based on my conversation with NASDAQ, I believe this satisfied their questions.  Of course, I will follow-up if I hear anything else from them.

Thank you,
Susie

**Susie A. Kim**
**SVP, INVESTOR RELATIONS & TREASURY**
**NASDAQ: BBBY**
650 Liberty Avenue | Union, NJ 07083
susie.kim@bedbath.com



---

**From:** Susie Kim <Susie.Kim@bedbath.com>
**Sent:** Tuesday, August 16, 2022 1:13 PM
**To:** Marleine Zakharia <Marleine.Zakharia@nasdaq.com>
**Subject:** Re: Trading Activity in BBBY's Stock

**WARNING - External email; exercise caution.**
Hi Marleine - following up on the below. Please let me know if/when you are available. Thank you.

**Susie A. Kim**
**SVP, INVESTOR RELATIONS & TREASURY**
**NASDAQ: BBBY**
650 Liberty Avenue | Union, NJ 07083
susie.kim@bedbath.com



**From:** Susie Kim
**Sent:** Wednesday, August 10, 2022 5:09:29 PM
**To:** Marleine Zakharia <Marleine.Zakharia@nasdaq.com>
**Subject:** RE: Trading Activity in BBBY's Stock

Moving Gustavo to bcc to control email traffic.

Hi Marleine – Please call me at your earliest convenience at 917-880-8738 to discuss.  I will make myself available at any time.

Thank you,
Susie

Susie A. Kim
**SVP, INVESTOR RELATIONS & TREASURY**
NASDAQ: BBBY
650 Liberty Avenue | Union, NJ 07083
susie.kim@bedbath.com



**From:** Gustavo Arnal <Gustavo.Arnal@bedbath.com>
**Sent:** Wednesday, August 10, 2022 1:08 PM
**To:** Marleine Zakharia <Marleine.Zakharia@nasdaq.com>; Susie Kim <Susie.Kim@bedbath.com>
**Subject:** Re: Trading Activity in BBBY's Stock

Now copying Susie.
Thank you

**From:** Marleine Zakharia <Marleine.Zakharia@nasdaq.com>
**Sent:** Wednesday, August 10, 2022 12:19 PM
**To:** Gustavo Arnal <Gustavo.Arnal@bedbath.com>
**Subject:** RE: Trading Activity in BBBY's Stock

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Thank you sir for your response. Please let me know Ms. Kim's direct number and I will call her today.

Thanks,

**Marleine Zakharia**
Senior Surveillance Analyst
MarketWatch

 Nasdaq

| | |
|---|---|
| **Main** | + 1 301 978 8500,  800 537 3929 |
| **Email** | marleine.zakharia@nasdaq.com |
| **Address** | 1100 New York Avenue NW, DC 20005 |

    

rewritetomorrow.com

**From:** Gustavo Arnal <Gustavo.Arnal@bedbath.com>

**Sent:** Monday, August 8, 2022 4:22 PM
**To:** Marleine Zakharia <Marleine.Zakharia@nasdaq.com>
**Subject:** Re: Trading Activity in BBBY's Stock

**WARNING - External email; exercise caution.**

Hi Marleine,
I am traveling this week and on a different time zone.
By copy, I am kindly asking Susie Kim, our SVP of Investor Relations to contact you no later than tomorrow.
Thank you.
Gustavo

---

**From:** Marleine Zakharia <Marleine.Zakharia@nasdaq.com>
**Sent:** Monday, August 8, 2022 8:30 PM
**To:** Gustavo Arnal <Gustavo.Arnal@bedbath.com>
**Subject:** Trading Activity in BBBY's Stock

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Dear Mr. Arnal,

My name is Marleine Zakharia and I am writing to you from the NASDAQ MarketWatch Department.  We have been monitoring the activity in your stock as we do with all of our listed companies.

Today, August 8, 2022, the stock traded to a high of $13.34 on over 106 million shares and was up over 37% for the day. I would like to have the opportunity to discuss the recent trading activity with you.

Please contact NASDAQ MarketWatch as soon as possible as this inquiry is time-sensitive at +1-301-978-8500 between the hours of 6:30 a.m. and 8:00 p.m. Eastern Time.

Sincerely,


**Marleine Zakharia**
Senior Surveillance Analyst
MarketWatch



| | |
|---|---|
| **Main** | + 1 301 978 8500,  800 537 3929 |
| **Email** | marleine.zakharia@nasdaq.com |
| **Address** | 1100 New York Avenue NW, DC 20005 |

    

rewritetomorrow.com

# EXHIBIT 31

SEC Form 3

## FORM 3

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**INITIAL STATEMENT OF BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0104 |
| Estimated average burden hours per response: | 0.5 |

| 1. Name and Address of Reporting Person[*] | 2. Date of Event Requiring Statement (Month/Day/Year) | 3. Issuer Name **and** Ticker or Trading Symbol |
|---|---|---|
| Cohen Ryan | 04/21/2022 | BED BATH & BEYOND INC [ BBBY ] |

| (Last) | (First) | (Middle) |
|---|---|---|
| PO BOX 25250 PMB 30427 | | |

| 4. Relationship of Reporting Person(s) to Issuer (Check all applicable) | | 5. If Amendment, Date of Original Filed (Month/Day/Year) |
|---|---|---|
| Director X | 10% Owner | |
| Officer (give title below) | Other (specify below) | |

| (Street) | | |
|---|---|---|
| MIAMI | FL | 33102 |

| (City) | (State) | (Zip) |
|---|---|---|

| 6. Individual or Joint/Group Filing (Check Applicable Line) |
|---|
| ☐ Form filed by One Reporting Person |
| X Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Beneficially Owned

| 1. Title of Security (Instr. 4) | 2. Amount of Securities Beneficially Owned (Instr. 4) | 3. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 4. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|
| Common Stock, $.01 par value[(1)] | 7,780,000 | I | By RC Ventures LLC[(2)] |

### Table II - Derivative Securities Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 4) | 2. Date Exercisable and Expiration Date (Month/Day/Year) | | 3. Title and Amount of Securities Underlying Derivative Security (Instr. 4) | | 4. Conversion or Exercise Price of Derivative Security | 5. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 6. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|---|---|---|---|
| | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | |
| American-Style Call Option[(1)] | (3) | 01/20/2023 | Common Stock, $.01 par value | 1,125,700 | 60 | I | By RC Ventures LLC[(2)] |
| American-Style Call Option[(1)] | (3) | 01/20/2023 | Common Stock, $.01 par value | 44,400 | 75 | I | By RC Ventures LLC[(2)] |
| American-Style Call Option[(1)] | (3) | 01/20/2023 | Common Stock, $.01 par value | 500,000 | 80 | I | By RC Ventures LLC[(2)] |

| 1. Name and Address of Reporting Person[*] | | |
|---|---|---|
| Cohen Ryan | | |

| (Last) | (First) | (Middle) |
|---|---|---|
| PO BOX 25250 PMB 30427 | | |

| (Street) | | |
|---|---|---|
| MIAMI | FL | 33102 |

| (City) | (State) | (Zip) |
|---|---|---|

1. Name and Address of Reporting Person[*]

RC Ventures LLC

| (Last) | (First) | (Middle) |

PO BOX 25250
PMB 30427

| (Street) | | |

MIAMI                  FL                  33102

| (City) | (State) | (Zip) |

**Explanation of Responses:**

1. This Form 3 is filed jointly by RC Ventures LLC ("RC Ventures") and Ryan Cohen ("Mr. Cohen" and together with RC Ventures, the "Reporting Persons"). Each of the Reporting Persons may be deemed to be a member of a Section 13(d) group that collectively beneficially owns more than 10% of the Issuer's outstanding shares of Common Stock. Each Reporting Person disclaims beneficial ownership of the securities of the Issuer reported herein except to the extent of his or its pecuniary interest therein, and this report shall not be deemed to be an admission that any Reporting Person is the beneficial owner of such securities for purposes of Section 16 or for any other purpose.

2. Securities of the Issuer owned directly by RC Ventures. Mr. Cohen, as the Manager of RC Ventures, may be deemed to beneficially own the securities of the Issuer which are owned directly by RC Ventures.

3. The American-style call options are currently exercisable.

| | |
|---|---|
| /s/ Ryan Cohen | 08/15/2022 |
| RC Ventures LLC, By: /s/ Ryan Cohen, Manager | 08/15/2022 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 5 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 32

| Message | |
| --- | --- |

| **From:** | Ryan Cohen [ryan@rcmail.com] |
| **on behalf of** | Ryan Cohen <ryan@rcmail.com> [ryan@rcmail.com] |
| **Sent:** | 8/15/2022 7:32:44 PM |
| **To:** | Ryan P. Nebel [RNebel@olshanlaw.com] |
| **Subject:** | Re: Bbby |

Correct but the company repurchased shares and threw me over

On Aug 15, 2022, at 3:32 PM, Nebel, Ryan P. <RNebel@olshanlaw.com> wrote:

Huh? Not aware of you purchasing any shares since settlement agreement which disclosed under 10%.
Also never filed a Form 3 or 4.

Ryan

On Aug 15, 2022, at 3:29 PM, Ryan Cohen <ryan@rcmail.com> wrote:

Your email says I am not a 10% holder but I own over 10%

On Aug 15, 2022, at 3:25 PM, Nebel, Ryan P. <RNebel@olshanlaw.com> wrote:

Ok

Ryan

>

Ryan Nebel

O L S H A N

OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
(Entrance is on 53rd Street between Sixth and Seventh Avenues)
New York, NY 10019
Direct: 212.451.2279
Facsimile: 212.451.2222
**Email: RNebel@olshanlaw.com**
Web: **www.olshanlaw.com**

On Aug 15, 2022, at 3:23 PM, Ryan Cohen <ryan@rcmail.com> wrote:
>
> Ryan, can you send me an email in a separate thread confirming

Confidential

COHEN0017814

I am NOT an affiliate or affiliate status with respect to Bed Bath &
Beyond. This is time sensitive. My bank is asking for this.
>
> Thank you
> Ryan
>
>
>

--------------------------------------------------------------------------------
------------------------------------

Electronic transmissions by the law firm of Olshan Frome Wolosky LLP may contain information
that is confidential or proprietary, or protected by the attorney-client privilege or work product
doctrine. If you are not the intended recipient, be aware that any disclosure, copying, distribution
or use of the contents hereof is strictly prohibited. If you have received this transmission in error,
please notify Olshan Frome Wolosky LLP at once at 212.451.2300.

Confidential

# EXHIBIT 33

Message

| | |
|---|---|
| **From:** | Ryan Cohen [ryan@rcmail.com] |
| **on behalf of** | Ryan Cohen <ryan@rcmail.com> [ryan@rcmail.com] |
| **Sent:** | 8/15/2022 7:32:59 PM |
| **To:** | Ryan P. Nebel [RNebel@olshanlaw.com] |
| **Subject:** | Re: Bbby |

79.96m outstanding

On Aug 15, 2022, at 3:32 PM, Nebel, Ryan P. <RNebel@olshanlaw.com> wrote:

Huh? Not aware of you purchasing any shares since settlement agreement which disclosed under 10%.
Also never filed a Form 3 or 4.

Ryan

On Aug 15, 2022, at 3:29 PM, Ryan Cohen <ryan@rcmail.com> wrote:

Your email says I am not a 10% holder but I own over 10%

On Aug 15, 2022, at 3:25 PM, Nebel, Ryan P. <RNebel@olshanlaw.com> wrote:

Ok

Ryan

>

Ryan Nebel

O L S H A N

OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
(Entrance is on 53rd Street between Sixth and Seventh Avenues)
New York, NY 10019
Direct: 212.451.2279
Facsimile: 212.451.2222
**Email: RNebel@olshanlaw.com**
Web: **www.olshanlaw.com**

On Aug 15, 2022, at 3:23 PM, Ryan Cohen <ryan@rcmail.com> wrote:
>
> Ryan, can you send me an email in a separate thread confirming

COHEN0017816

I am NOT an affiliate or affiliate status with respect to Bed Bath &
Beyond. This is time sensitive. My bank is asking for this.
>
> Thank you
> Ryan
>
>
>

---

---

Electronic transmissions by the law firm of Olshan Frome Wolosky LLP may contain information
that is confidential or proprietary, or protected by the attorney-client privilege or work product
doctrine. If you are not the intended recipient, be aware that any disclosure, copying, distribution
or use of the contents hereof is strictly prohibited. If you have received this transmission in error,
please notify Olshan Frome Wolosky LLP at once at 212.451.2300.

COHEN0017817

# EXHIBIT 34

Message

| | |
|---|---|
| **From:** | Nebel, Ryan P. [RNebel@olshanlaw.com] |
| on behalf of | Nebel, Ryan P. <RNebel@olshanlaw.com> [RNebel@olshanlaw.com] |
| **Sent:** | 8/15/2022 7:34:09 PM |
| **To:** | Ryan Cohen [ryan@rcmail.com] |
| **CC:** | Mahmoud, Bachar [BMahmoud@olshanlaw.com] |
| **Subject:** | Re: Bbby |

Then you would be affiliate if over 10%.
Bachar can help with Form 3.

Ryan


> On Aug 15, 2022, at 3:32 PM, Ryan Cohen <ryan@rcmail.com> wrote:
>
> 79.96m outstanding


>> On Aug 15, 2022, at 3:32 PM, Nebel, Ryan P. <RNebel@olshanlaw.com> wrote:
>>
>> Huh? Not aware of you purchasing any shares since settlement agreement which
>> disclosed under 10%.
>> Also never filed a Form 3 or 4.
>>
>> Ryan


>>> On Aug 15, 2022, at 3:29 PM, Ryan Cohen <ryan@rcmail.com>
>>> wrote:
>>>
>>> Your email says I am not a 10% holder but I own over 10%


>>>> On Aug 15, 2022, at 3:25 PM, Nebel, Ryan P.
>>>> <RNebel@olshanlaw.com> wrote:
>>>>
>>>> Ok
>>>>
>>>> Ryan
>>>>
>>>> >
>>>>
>>>>
>>>> Ryan Nebel
>>>>
>>>> O L S H A N

Confidential

OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
(Entrance is on 53rd Street between Sixth and Seventh Avenues)
New York, NY 10019
Direct: 212.451.2279
Facsimile: 212.451.2222
**Email: RNebel@olshanlaw.com**
Web: **www.olshanlaw.com**

On Aug 15, 2022, at 3:23 PM, Ryan Cohen
<ryan@rcmail.com> wrote:
>
> Ryan, can you send me an email in a separate
thread confirming I am NOT an affiliate or affiliate
status with respect to Bed Bath & Beyond. This is
time sensitive. My bank is asking for this.
>
> Thank you
> Ryan
>
>
>

Electronic transmissions by the law firm of Olshan Frome Wolosky LLP may
contain information that is confidential or proprietary, or protected by the
attorney-client privilege or work product doctrine. If you are not the intended
recipient, be aware that any disclosure, copying, distribution or use of the
contents hereof is strictly prohibited. If you have received this transmission
in error, please notify Olshan Frome Wolosky LLP at once at 212.451.2300.

Confidential

# EXHIBIT 35

Message

| | |
|---|---|
| **From:** | Nebel, Ryan P. [RNebel@olshanlaw.com] |
| **on behalf of** | Nebel, Ryan P. <RNebel@olshanlaw.com> [RNebel@olshanlaw.com] |
| **Sent:** | 8/15/2022 11:32:40 PM |
| **To:** | 'Ryan Cohen' [ryan@rcmail.com] |
| **CC:** | Mahmoud, Bachar [BMahmoud@olshanlaw.com] |
| **Subject:** | FW: Ryan Cohen, BBBY Status |

sent

Ryan Nebel

O L S H A N

OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
(Entrance is on 54th Street between Sixth and Seventh Avenues)
New York, NY 10019
Direct: 212.451.2279
Facsimile: 212.451.2222
Email: RNebel@olshanlaw.com
Web: www.olshanlaw.com

---

**From:** Nebel, Ryan P.
**Sent:** Monday, August 15, 2022 7:32 PM
**To:** 'susan.lim-herlyn@jpmorgan.com' <susan.lim-herlyn@jpmorgan.com>; 'james.wrenn@jpmchase.com' <james.wrenn@jpmchase.com>; 'alonso.garza@jpmorgan.com' <alonso.garza@jpmorgan.com>; 'diandra.i.weaver@jpmorgan.com' <diandra.i.weaver@jpmorgan.com>
**Cc:** Mahmoud, Bachar <BMahmoud@olshanlaw.com>
**Subject:** RE: Ryan Cohen, BBBY Status

Hi Susan,

For some reason I never received your email and Ryan just forwarded it to us.

Ryan will be a Section 16 filer shortly...we just became aware of the fact that he is now over 10% due to a change in the number of outstanding shares.

We are unable to confirm that Ryan is not an affiliate for purposes of Rule 144 now that he is above 10% given his prior settlement with the company that resulted in changes to the composition of the Board.

Thanks,
Ryan

Ryan Nebel

O L S H A N

OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
(Entrance is on 54th Street between Sixth and Seventh Avenues)
New York, NY 10019
Direct: 212.451.2279
Facsimile: 212.451.2222
Email: RNebel@olshanlaw.com
Web: www.olshanlaw.com

CONFIDENTIAL

**From:** "Weaver, Diandra I" <diandra.i.weaver@jpmorgan.com>
**Date:** August 15, 2022 at 7:06:40 PM EDT
**To:** Ryan Cohen <ryan@rcmail.com>
**Subject:** FW: Ryan Cohen, BBBY Status

Diandra Weaver  |  Executive Director  |  Investment Specialist  |  **J.P. Morgan Private Bank**  |
1450 Brickell Ave, Floor 33  |  Miami, FL 33131  |  T: 305 579 9603  |  diandra.i.weaver@jpmorgan.com  |
privatebank.jpmorgan.com

**From:** Lim-Herlyn, Susan (WM, USA) <susan.lim-herlyn@jpmorgan.com>
**Date:** Monday, Aug 15, 2022, 5:46 PM
**To:** RNebel@olshanlaw.com <RNebel@olshanlaw.com>
**Cc:** Wrenn, James (Legal, USA) <james.wrenn@jpmchase.com>, Weaver, Diandra I (WM, USA)
<diandra.i.weaver@jpmorgan.com>, Garza, Alonso (WM, USA) <alonso.garza@jpmorgan.com>
**Subject:** Ryan Cohen, BBBY Status

Hi Ryan,

Our client, Ryan Cohen, has expressed interest in transacting tomorrow on shares of Bed Bath & Beyond
(BBBY) through his entity, RC Ventures LLC.

As part of our standard due diligence, could you please confirm the following:
- Ryan Cohen is not a Section 16 Insider of BBBY
- He is also not considered an Affiliate of BBBY for purposes of Rule 144

If Ryan Cohen is not considered an Affiliate of BBBY, could you please provide some color on how this
conclusion was made?

We appreciate your advice and assistance, and please do not hesitate to contact me with any questions.

Regards,
Susan

Susan Lim-Herlyn (she/her/hers)  |  Executive Director  |  **J.P. Morgan Private Bank**  |
390 Madison Ave, Floor 6  |  New York, NY 10017  |  T: 212 270 2307  |  susan.lim-
herlyn@jpmorgan.com  |  privatebank.jpmorgan.com

## J.P.Morgan
PRIVATE BANK

J.P. Morgan Securities LLC  |  JPMorgan Chase Bank, N.A.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not
be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an
official account of the holdings, balances, or transactions made in your account. Please refer to your monthly
account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan
representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting
advice. You should consult your own tax, legal and accounting advisors before engaging in any financial
transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message
Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment**

COHEN0006607

products and asset classes can be found **HERE.**

INVESTMENT PRODUCTS: NOT FDIC INSURED ● NO BANK GUARANTEE ● MAY LOSE VALUE

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer
including on confidential, privileged or legal entity information, malicious content and
monitoring of electronic messages. If you are not the intended recipient, please delete this
message and notify the sender immediately. Any unauthorized use is strictly prohibited.

CONFIDENTIAL

# EXHIBIT 36

**To:** Susie Kim[Susie.Kim@bedbath.com]
**Cc:** Gustavo Arnal[Gustavo.Arnal@bedbath.com]
**From:** Arlene Hong[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=36252E38C53A4162A4289DAC4B337F5E-ARLENE HONG]
**Sent:** Tue 8/16/2022 8:28:45 AM (UTC-04:00)
**Subject:** FW: New Form 3 for New SEC Document(s) for Bed Bath & Beyond Inc.



Susie, appreciate if you connect with Harriet on this per Sue's note. Thank you.

**From:** Sue Gove <Sue.Gove@bedbath.com>
**Sent:** Tuesday, August 16, 2022 8:28 AM
**To:** Arlene Hong <Arlene.Hong@bedbath.com>; Susie Kim <Susie.Kim@bedbath.com>; Gustavo Arnal <Gustavo.Arnal@bedbath.com>
**Cc:** Katherine Walden <katherine.walden@bedbath.com>; Julie Strider <julie.strider@bedbath.com>
**Subject:** RE: New Form 3 for New SEC Document(s) for Bed Bath & Beyond Inc.

Please share with Harriet and get her direction if she wants to share more broadly.
Sue

**Sue Gove**
**Interim Chief Executive Officer**
650 Liberty Avenue | Union, NJ 07083
sue.gove@bedbath.com | o: 214.415.1714

**From:** Arlene Hong <Arlene.Hong@bedbath.com>
**Sent:** Tuesday, August 16, 2022 8:04 AM
**To:** Susie Kim <Susie.Kim@bedbath.com>; Sue Gove <Sue.Gove@bedbath.com>; Gustavo Arnal <Gustavo.Arnal@bedbath.com>
**Cc:** Katherine Walden <katherine.walden@bedbath.com>; Julie Strider <julie.strider@bedbath.com>
**Subject:** RE: New Form 3 for New SEC Document(s) for Bed Bath & Beyond Inc.

Susie thank you.  If Sue agrees, it might be helpful to share this with the Board also as directors may pick up on the filing.

**From:** Susie Kim <Susie.Kim@bedbath.com>
**Sent:** Monday, August 15, 2022 9:21 PM
**To:** Sue Gove <Sue.Gove@bedbath.com>; Gustavo Arnal <Gustavo.Arnal@bedbath.com>; Arlene Hong <Arlene.Hong@bedbath.com>
**Cc:** Katherine Walden <katherine.walden@bedbath.com>; Julie Strider <julie.strider@bedbath.com>
**Subject:** Fwd: New Form 3 for New SEC Document(s) for Bed Bath & Beyond Inc.

Sue/Gustavo/Arlene - RC Ventures filed a Form 3 now indicating 10%+ ownership via a consistent combination of common stock (7.8m) and call options of 1.65M shares for a total beneficial ownership which is equivalent to the amount stated on his original 13D (9.45M).  At that time, his ownership was below 10% (9.8%) on the same basis.

**Susie A. Kim**
**SVP, INVESTOR RELATIONS & TREASURY**
**NASDAQ: BBBY**
650 Liberty Avenue | Union, NJ 07083
susie.kim@bedbath.com

**From:** no-reply@notification.gcs-web.com <no-reply@notification.gcs-web.com>
**Sent:** Monday, August 15, 2022 8:07 PM
**To:** Susie Kim <Susie.Kim@bedbath.com>

**Subject:** New Form 3 for New SEC Document(s) for Bed Bath & Beyond Inc.

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.



August 15, 2022

A **Form 3** has been filed with the United States Securities and Exchange Commission.

View this filing →

Or click here to view all filings.

You are subscribed to Bed Bath & Beyond Inc. Investor Relations' email alerts.
To unsubscribe from all alerts, please click here

Bed Bath & Beyond Inc.
650 Liberty Avenue   NJ  Union 07083  USA
Service provided by Notified

# EXHIBIT 37

Message

| | |
|---|---|
| **From**: | Ryan Cohen [ryan@rcmail.com] |
| on behalf of | Ryan Cohen <ryan@rcmail.com> [ryan@rcmail.com] |
| **Sent**: | 8/16/2022 11:36:27 AM |
| **To**: | Nebel, Ryan P. [RNebel@olshanlaw.com] |
| **CC**: | Mahmoud, Bachar [BMahmoud@olshanlaw.com]; Ferrone, Joseph G. [JFerrone@olshanlaw.com] |
| **Subject**: | Re: Bbby |
| **Attachments**: | BBBY - Schedule 13D_A2 (change in outstanding)_8210795(1).DOCX; ATT00002.bin |

Please file

On Aug 16, 2022, at 7:34 AM, Nebel, Ryan P. <RNebel@olshanlaw.com> wrote:

Ryan,

We also need to file the attached 13D/A since your position has changed 2% since prior filing due to change in the outstanding.

Please advise if you have any questions/comments or if we can get this filed as soon as processed by Edgar operators.

Thanks,
Ryan

**Ryan Nebel**

**O L S H A N**

OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
(Entrance is on 54th Street between Sixth and Seventh Avenues)
New York, NY 10019
Direct: 212.451.2279
Facsimile: 212.451.2222
Email: **RNebel@olshanlaw.com**
Web: **www.olshanlaw.com**

---

**From:** Nebel, Ryan P.
**Sent:** Tuesday, August 16, 2022 7:08 AM
**To:** 'Ryan Cohen' <ryan@rcmail.com>; Mahmoud, Bachar <BMahmoud@olshanlaw.com>
**Cc:** Ferrone, Joseph G. <JFerrone@olshanlaw.com>
**Subject:** RE: Bbby

Can speak now if necessary

**Ryan Nebel**

**O L S H A N**

OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
(Entrance is on 54th Street between Sixth and Seventh Avenues)
New York, NY 10019
Direct: 212.451.2279
Facsimile: 212.451.2222
Email: **RNebel@olshanlaw.com**
Web: **www.olshanlaw.com**

Confidential

**From:** Ryan Cohen [mailto:ryan@rcmail.com]
**Sent:** Tuesday, August 16, 2022 6:05 AM
**To:** Mahmoud, Bachar <BMahmoud@olshanlaw.com>; Nebel, Ryan P. <RNebel@olshanlaw.com>
**Cc:** Ferrone, Joseph G. <JFerrone@olshanlaw.com>
**Subject:** Re: Bbby

Ryan. What is earliest  time I can call you?

On Aug 15, 2022, at 11:31 PM, Ryan Cohen <ryan@rcmail.com> wrote:

The bank needs confirmation I am not an affiliate in order to trade.

On Aug 15, 2022, at 9:32 PM, Mahmoud, Bachar <BMahmoud@olshanlaw.com> wrote:

Ryan – please find a link to the BBBY Form 3 filing below and the filing confirmation attached.

https://www.sec.gov/Archives/edgar/data/0000886158/000119380522001197/xslF345X02/e621885_3-bbby.xml

Thank you.

**Bachar Mahmoud**
**O L S H A N**
OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
(Entrance is on 53rd Street between Sixth and Seventh Avenues)
New York, NY 10019
Direct: 212.451.2215
Facsimile: 212.451.2222
Email: BMahmoud@olshanlaw.com
Web: www.olshanlaw.com

---

**From:** Ryan Cohen [mailto:ryan@rcmail.com]
**Sent:** Monday, August 15, 2022 8:06 PM
**To:** Mahmoud, Bachar <BMahmoud@olshanlaw.com>
**Cc:** Ferrone, Joseph G. <JFerrone@olshanlaw.com>; Nebel, Ryan P. <RNebel@olshanlaw.com>
**Subject:** Re: Bbby

I have no comments. Please provide a copy once filed.

Thanks.

On Aug 15, 2022, at 7:59 PM, Mahmoud, Bachar <BMahmoud@olshanlaw.com> wrote:

Ryan,

COHEN0018013

Please see the Form 3 we have prepared for you at BBBY.  The date in Box 2 (4/21/22) is based on the filing date of the 10-K first disclosing a share count that pushed you over 10%.  Please let us know if you have any comments. We can get this filed tonight before 10pm with your approval.

Thanks,
Bachar

**Bachar Mahmoud**
**O L S H A N**
OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
(Entrance is on 53rd Street between Sixth and Seventh Avenues)
New York, NY 10019
Direct: 212.451.2215
Facsimile: 212.451.2222
Email: BMahmoud@olshanlaw.com
Web: www.olshanlaw.com

---

**From:** Ryan Cohen [mailto:ryan@rcmail.com]
**Sent:** Monday, August 15, 2022 6:09 PM
**To:** Mahmoud, Bachar <BMahmoud@olshanlaw.com>; Nebel, Ryan P. <RNebel@olshanlaw.com>
**Cc:** Ferrone, Joseph G. <JFerrone@olshanlaw.com>
**Subject:** Re: Bbby

thank you.

Ryan - has JPM reached out to you? Can you talk to them today? I need to get this resolved tonight so I can trade tomorrow.

On Aug 15, 2022, at 5:23 PM, Mahmoud, Bachar <BMahmoud@olshanlaw.com> wrote:

7pm.  Thanks.

**Bachar Mahmoud**
**O L S H A N**
OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
(Entrance is on 53rd Street between Sixth and Seventh Avenues)
New York, NY 10019
Direct: 212.451.2215
Facsimile: 212.451.2222
Email: BMahmoud@olshanlaw.com
Web: www.olshanlaw.com

---

**From:** Ryan Cohen [mailto:ryan@rcmail.com]
**Sent:** Monday, August 15, 2022 5:11 PM
**To:** Nebel, Ryan P. <RNebel@olshanlaw.com>
**Cc:** Mahmoud, Bachar <BMahmoud@olshanlaw.com>
**Subject:** Re: Bbby

What is the ETA on this?

Confidential

On Aug 15, 2022, at 3:53 PM, Nebel, Ryan P. <RNebel@olshanlaw.com> wrote:

Should be able to trade tomorrow then.
Bachar will send you Form 3 once available, but it won't be in next few minutes.

**Ryan Nebel**
**OLSHAN**
OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
(Entrance is on 54th Street between Sixth and Seventh Avenues)
New York, NY 10019
Direct: 212.451.2279
Facsimile: 212.451.2222
Email: RNebel@olshanlaw.com
Web: www.olshanlaw.com

---

**From:** Ryan Cohen [mailto:ryan@rcmail.com]
**Sent:** Monday, August 15, 2022 3:52 PM
**To:** Nebel, Ryan P. <RNebel@olshanlaw.com>
**Cc:** Mahmoud, Bachar <BMahmoud@olshanlaw.com>
**Subject:** Re: Bbby

The bank won't let me trade until I either file the form or you confirm I'm not an affiliate…

On Aug 15, 2022, at 3:51 PM, Nebel, Ryan P. <RNebel@olshanlaw.com> wrote:

Cannot. You are an affiliate if above 10%. You also put directors on the Board so you cannot rebut the presumption that you are an affiliate once above 10%.

**Ryan Nebel**
**OLSHAN**
OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
(Entrance is on 54th Street between Sixth and Seventh Avenues)
New York, NY 10019
Direct: 212.451.2279
Facsimile: 212.451.2222
Email: RNebel@olshanlaw.com
Web: www.olshanlaw.com

---

**From:** Ryan Cohen [mailto:ryan@rcmail.com]
**Sent:** Monday, August 15, 2022 3:50 PM
**To:** Nebel, Ryan P. <RNebel@olshanlaw.com>
**Cc:** Mahmoud, Bachar <BMahmoud@olshanlaw.com>
**Subject:** Re: Bbby

Can you email me confirming I am not an affiliate in a separate thread

Confidential

That should clear me with the bank

On Aug 15, 2022, at 3:49 PM, Nebel, Ryan P. <RNebel@olshanlaw.com> wrote:

Not prevented from trading in meantime.
It is something that can be done today.

**Ryan Nebel**
**O L S H A N**
OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
(Entrance is on 54th Street between Sixth and Seventh Avenues)
New York, NY 10019
Direct: 212.451.2279
Facsimile: 212.451.2222
Email: RNebel@olshanlaw.com
Web: www.olshanlaw.com

**From:** Ryan Cohen [mailto:ryan@rcmail.com]
**Sent:** Monday, August 15, 2022 3:38 PM
**To:** Nebel, Ryan P. <RNebel@olshanlaw.com>
**Cc:** Mahmoud, Bachar <BMahmoud@olshanlaw.com>
**Subject:** Re: Bbby

How long will this take? Am I prevented from trading in the meantime? Can this be done today?

On Aug 15, 2022, at 3:34 PM, Nebel, Ryan P. <RNebel@olshanlaw.com> wrote:

Then you would be affiliate if over 10%.
Bachar can help with Form 3.

Ryan

On Aug 15, 2022, at 3:32 PM, Ryan Cohen <ryan@rcmail.com> wrote:

Confidential

79.96m outstanding

On Aug 15, 2022, at 3:32 PM, Nebel, Ryan P. <RNebel@olshanlaw.com> wrote:

Huh? Not aware of you purchasing any shares since settlement agreement which disclosed under 10%. Also never filed a Form 3 or 4.

Ryan

On Aug 15, 2022, at 3:29 PM, Ryan Cohen <ryan@rcmail.com> wrote:

 Your email says I am not a 10% holder but I own over 10%

On Aug 15, 2022, at 3:25 PM, Nebel, Ryan P. <RNebel@olshanlaw.com> wrote:

Ok

Ryan

>

**Ryan Nebel**

**O L S H A N**

Confidential

**OLSHAN FROME WOLOSKY LLP**
**1325 Avenue of the Americas**
**(Entrance is on 53rd Street between Sixth and Seventh Avenues)**
**New York, NY 10019**
**Direct: 212.451.2279**
**Facsimile: 212.451.2222**
**Email: RNebel@olshanlaw.com**
**Web: www.olshanlaw.com**

On Aug 15, 2022, at 3:23 PM, Ryan Cohen <ryan@rcmail.com> wrote:
>
> Ryan, can you send me an email in a separate thread confirming I am NOT an affiliate or affiliate status with respect to Bed Bath & Beyond. This is time sensitive. My bank is asking for this.
>
> Thank you
> Ryan
>
>
>

Electronic transmissions by the law firm of Olshan Frome Wolosky LLP may contain information that is confidential or proprietary, or protected by the attorney-client privilege or work product doctrine. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents hereof is strictly prohibited. If you have received this transmission in error, please notify Olshan Frome Wolosky LLP at once at 212.451.2300.

<BBBY - SEC FORM 3.pdf>

Confidential

# EXHIBIT 38

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 13D**
(Rule 13d-101)

INFORMATION TO BE INCLUDED IN STATEMENTS FILED PURSUANT
TO § 240.13d-1(a) AND AMENDMENTS THERETO FILED PURSUANT TO
§ 240.13d-2(a)

(Amendment No. 3)[1]

Bed Bath & Beyond Inc.
(Name of Issuer)

Common Stock, $0.01 par value per share
(Title of Class of Securities)

075896100
(CUSIP Number)

RYAN NEBEL
OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300
(Name, Address and Telephone Number of Person
Authorized to Receive Notices and Communications)

August 16, 2022
(Date of Event Which Requires Filing of This Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of §§ 240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box ☐.

*Note:* Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. *See* § 240.13d-7 for other parties to whom copies are to be sent.

---

[1]   The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, *see* the *Notes*).

| 1 | NAME OF REPORTING PERSON<br><br>RC VENTURES LLC | |
|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP | (a) ☐<br>(b) ☐ |
| 3 | SEC USE ONLY | |
| 4 | SOURCE OF FUNDS | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM 2(d) OR 2(e) | ☐ |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>DELAWARE | |

| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7 | SOLE VOTING POWER<br><br>- 0 - |
|---|---|---|
| | 8 | SHARED VOTING POWER<br><br>- 0 - |
| | 9 | SOLE DISPOSITIVE POWER<br><br>- 0 - |
| | 10 | SHARED DISPOSITIVE POWER<br><br>- 0 - |

| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>- 0 - | |
|---|---|---|
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES | ☐ |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br><br>0% | |
| 14 | TYPE OF REPORTING PERSON<br><br>OO | |

2

| 1 | NAME OF REPORTING PERSON RYAN COHEN | |
|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP | (a) ☐ (b) ☐ |
| 3 | SEC USE ONLY | |
| 4 | SOURCE OF FUNDS | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM 2(d) OR 2(e) | ☐ |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION CANADA | |

| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7 | SOLE VOTING POWER - 0 - |
|---|---|---|
| | 8 | SHARED VOTING POWER - 0 - |
| | 9 | SOLE DISPOSITIVE POWER - 0 - |
| | 10 | SHARED DISPOSITIVE POWER - 0 - |

| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON - 0 - | |
|---|---|---|
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES | ☐ |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11) 0% | |
| 14 | TYPE OF REPORTING PERSON IN | |

3

The following constitutes Amendment No. 3 to the Schedule 13D filed by the undersigned ("Amendment No. 3"). This Amendment No. 3 amends the Schedule 13D as specifically set forth herein.

Item 5.        <u>Interest in Securities of the Issuer.</u>

Items 5 (a) – (c) and (e) are hereby amended and restated to read as follows:

(a), (b) As of the date hereof, none of the Reporting Persons beneficially owned any Shares, constituting 0% of the Shares outstanding.

(c)        Schedule A annexed hereto lists all transactions in securities of the Issuer by the Reporting Persons since the filing of Amendment No. 2 to the Schedule 13D. All of such transactions were effected in the open market.

(e)        As of August 17, 2022, the Reporting Persons ceased to beneficially own more than 5% of the outstanding Shares.

Item 6.        <u>Contracts, Arrangements, Understandings or Relationships With Respect to Securities of the Issuer</u>.

Item 6 is hereby amended to add the following:

Following the transactions reported in Schedule A annexed hereto, the Reporting Persons no longer owned any options with respect to the Issuer.

<u>SIGNATURES</u>

After reasonable inquiry and to the best of his knowledge and belief, each of the undersigned certifies that the information set forth in this statement is true, complete and correct.

Dated: August 18, 2022

<div style="margin-left: 40%;">

RC Ventures LLC

By:   /s/ Ryan Cohen
         Name:    Ryan Cohen
         Title:     Manager


/s/ Ryan Cohen
Ryan Cohen

</div>

5

## SCHEDULE A

### Transactions in Securities of the Issuer Since the Filing of Amendment No. 2 to the Schedule 13D

| Nature of the Transaction | Securities Sold | Price Per Security($) | Date of Sale |
|---|---|---|---|

#### RC VENTURES LLC

| Nature of the Transaction | Securities Sold | Price Per Security($) | Date of Sale |
|---|---|---|---|
| Sale of Common Stock | 446,399 | 18.6848[1] | 08/16/2022 |
| Sale of Common Stock | 812,448 | 19.4817[2] | 08/16/2022 |
| Sale of Common Stock | 1,443,818 | 20.7834[3] | 08/16/2022 |
| Sale of Common Stock | 1,059,021 | 21.4209[4] | 08/16/2022 |
| Sale of Common Stock | 795,559 | 22.7093[5] | 08/16/2022 |
| Sale of Common Stock | 169,335 | 23.3293[6] | 08/16/2022 |
| Sale of Common Stock | 103,901 | 24.8685[7] | 08/16/2022 |
| Sale of Common Stock | 104,077 | 25.5918[8] | 08/16/2022 |
| Sale of Common Stock | 65,442 | 26.2713[9] | 08/16/2022 |
| Sale of Common Stock | 189,689 | 23.7337[10] | 08/17/2022 |
| Sale of Common Stock | 512,185 | 24.6266[11] | 08/17/2022 |
| Sale of Common Stock | 896,238 | 25.4997[12] | 08/17/2022 |
| Sale of Common Stock | 610,828 | 26.4432[13] | 08/17/2022 |
| Sale of Common Stock | 323,483 | 27.5756[14] | 08/17/2022 |
| Sale of Common Stock | 140,788 | 28.5122[15] | 08/17/2022 |
| Sale of Common Stock | 106,789 | 29.2192[16] | 08/17/2022 |
| Sale of January 2023 Call Option ($60 Exercise Price)[17] | 7,475 | 6.5466[18] | 08/17/2022 |
| Sale of January 2023 Call Option ($60 Exercise Price)[17] | 3,782 | 8.6177[19] | 08/17/2022 |
| Sale of January 2023 Call Option ($75 Exercise Price)[17] | 444 | 5.6596[20] | 08/17/2022 |
| Sale of January 2023 Call Option ($80 Exercise Price)[17] | 3,826 | 5.3433[21] | 08/17/2022 |
| Sale of January 2023 Call Option ($80 Exercise Price)[17] | 1,174 | 7.0264[22] | 08/17/2022 |

---

[1] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $18.0600 to $19.0500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[2] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $19.0600 to $20.0100, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[3] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $20.1200 to $21.1100, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[4] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $21.1200 to $22.1100, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[5] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $22.1300 to $23.1200, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[6] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $23.1300 to $23.8400, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[7] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $24.1500 to $25.1400, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[8] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $25.1500 to $26.0600, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[9] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $26.1500 to $26.4500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[10] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $23.0600 to $24.0500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[11] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $24.0600 to $25.0500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[12] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $25.0600 to $26.0500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[13] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $26.0600 to $27.0500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[14] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $27.0600 to $28.0500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[15] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $28.0600 to $29.0500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[16] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $29.0600 to $29.9900, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[17] Exchange-listed American-style call options with expiration date of January 20, 2023.

[18] Represents a weighted average price. These call options were sold in multiple transactions at prices ranging from $6.4000 to $6.9500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of call options sold at each separate price within the range set forth in this footnote.

[19] Represents a weighted average price. These call options were sold in multiple transactions at prices ranging from $8.5000 to $8.9000, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of call options sold at each separate price within the range set forth in this footnote.

[20] Represents a weighted average price. These call options were sold in multiple transactions at prices ranging from $5.6500 to $5.7000, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of call options sold at each separate price within the range set forth in this footnote.

[21] Represents a weighted average price. These call options were sold in multiple transactions at prices ranging from $5.2000 to $5.8500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of call options sold at each separate price within the range set forth in this footnote.

[22] Represents a weighted average price. These call options were sold in multiple transactions at prices ranging from $6.9000 to $7.4500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of call options sold at each separate price within the range set forth in this footnote.

# EXHIBIT 39

Message
---

| **From**: | Ryan Cohen [ryan@rcmail.com] |
| on behalf of | Ryan Cohen <ryan@rcmail.com> [ryan@rcmail.com] |
| **Sent**: | 8/16/2022 12:55:43 PM |
| **To**: | Ryan P. Nebel [RNebel@olshanlaw.com] |
| **Subject**: | Re: BBBY |

Should I share this with JPM? Can I call you?

On Aug 16, 2022, at 8:25 AM, Nebel, Ryan P. <RNebel@olshanlaw.com> wrote:

Average weekly trading volume is 27.5M shares.
Way to solve this is for JPM to file 144 on your behalf and then you are in compliance and can sell.

Ryan Nebel
O L S H A N
OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
(Entrance is on 54th Street between Sixth and Seventh Avenues)
New York, NY 10019
Direct: 212.451.2279
Facsimile: 212.451.2222
Email: RNebel@olshanlaw.com
Web: www.olshanlaw.com

---

Electronic transmissions by the law firm of Olshan Frome Wolosky LLP may contain information that is confidential or proprietary, or protected by the attorney-client privilege or work product doctrine. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents hereof is strictly prohibited. If you have received this transmission in error, please notify Olshan Frome Wolosky LLP at once at 212.451.2300.

<BBBY Trading Volume_8213158(1).XLS>

Confidential

# EXHIBIT 40

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 144

### NOTICE OF PROPOSED SALE OF SECURITIES
### PURSUANT TO RULE 144 UNDER THE SECURITIES ACT OF 1933

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0101 |
| Expires: | July 31, 2023 |
| Estimated average burden hours per response................. | 1.00 |

| SEC USE ONLY |
|---|
| DOCUMENT SEQUENCE NO. |
| CUSIP NUMBER |
| WORK LOCATION |

**ATTENTION:** *Transmit for filing 3 copies of this form concurrently with either placing an order with a broker to execute sale or executing a sale directly with a market maker.*

| 1 (a) NAME OF ISSUER *(Please type or print)* | | (b) IRS IDENT. NO. | (c) S.E.C. FILE NO. |
|---|---|---|---|
| Bed Bath & Beyond, Inc. | | 11-2250488 | 0-20214 |

| 1 (d) ADDRESS OF ISSUER | STREET | CITY | STATE | ZIP CODE | (e) TELEPHONE NO. AREA CODE | NUMBER |
|---|---|---|---|---|---|---|
| 650 Liberty Avenue | | Union | NJ | 07083 | ( 908 ) | 688-0888 |

| 2 (a) NAME OF PERSON FOR WHOSE ACCOUNT THE SECURITIES ARE TO BE SOLD | | (b) RELATIONSHIP TO ISSUER | (c) ADDRESS STREET | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|
| RC Ventures LLC | | 10% Stockholder | P.O. Box 25250, PMB 30427 | Miami | FL | 33102 |

*INSTRUCTION: The person filing this notice should contact the issuer to obtain the I.R.S. Identification Number and the S.E.C. File Number.*

| 3 (a) Title of the Class of Securities To Be Sold | (b) Name and Address of Each Broker Through Whom the Securities are to be Offered or Each Market Maker who is Acquiring the Securities | SEC USE ONLY Broker-Dealer File Number | (c) Number of Shares or Other Units To Be Sold *(See instr. 3(c))* | (d) Aggregate Market Value *(See instr. 3(d))* | (e) Number of Shares or Other Units Outstanding *(See instr. 3(e))* | (f) Approximate Date of Sale *(See instr. 3(f))* (MO. DAY YR.) | (g) Name of Each Securities Exchange *(See instr. 3(g))* |
|---|---|---|---|---|---|---|---|
| Common | J.P. Morgan Securities LLC 390 Madison Avenue, Floor 6 New York, NY 10017 | | 9,450,100* | $148,555,572* | 79,957,649* | Beginning 08/16/22 | Nasdaq |
| | | | * See REMARKS | * As of 08/15/22 | * As of 08/15/22 | | |

**INSTRUCTIONS:**
1. (a) Name of issuer
   (b) Issuer's I.R.S. Identification Number
   (c) Issuer's S.E.C. file number, if any
   (d) Issuer's address, including zip code
   (e) Issuer's telephone number, including area code

2. (a) Name of person for whose account the securities are to be sold
   (b) Such person's relationship to the issuer (e.g., officer, director, 10% stockholder, or member of immediate family of any of the foregoing)
   (c) Such person's address, including zip code

3. (a) Title of the class of securities to be sold
   (b) Name and address of each broker through whom the securities are intended to be sold
   (c) Number of shares or other units to be sold (if debt securities, give the aggregate face amount)
   (d) Aggregate market value of the securities to be sold as of a specified date within 10 days prior to the filing of this notice
   (e) Number of shares or other units of the class outstanding, or if debt securities the face amount thereof outstanding, as shown by the most recent report or statement published by the issuer
   (f) Approximate date on which the securities are to be sold
   (g) Name of each securities exchange, if any, on which the securities are intended to be sold

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

SEC 1147 (08-07)

Confidential

JPMC_00000776

## TABLE I - SECURITIES TO BE SOLD

*Furnish the following information with respect to the acquisition of the securities to be sold*
*and with respect to the payment of all or any part of the purchase price or other consideration therefor:*

| Title of the Class | Date you Acquired | Nature of Acquisition Transaction | Name of Person from Whom Acquired (If gift, also give date donor acquired) | Amount of Securities Acquired | Date of Payment | Nature of Payment |
|---|---|---|---|---|---|---|
| **Common** | **1/13/2022 – 3/3/2022 (Various Dates)** | **Open Market Purchases** | **Nasdaq Exchange** | **9,450,100\*** <br><br> **\*See Remarks** | **1/13/2022 – 3/3/2022** | **Cash** |

**INSTRUCTIONS:** If the securities were purchased and full payment therefor was not made in cash at the time of purchase, explain in the table or in a note thereto the nature of the consideration given. If the consideration consisted of any note or other obligation, or if payment was made in installments describe the arrangement and state when the note or other obligation was discharged in full or the last installment paid.

## TABLE II - SECURITIES SOLD DURING THE PAST 3 MONTHS

*Furnish the following information as to all securities of the issuer sold during the past 3 months by the person for whose account the securities are to be sold.*

| Name and Address of Seller | Title of Securities Sold | Date of Sale | Amount of Securities Sold | Gross Proceeds |
|---|---|---|---|---|
| **( None )** | | | | |

**REMARKS:** This filing represents the potential sale of up to 7,780,000 common stock and the following call options: 11,257 BBBY CALLS 01/20/23 @ $60, 5,000 BBBY CALLS 01/20/23 @ $80, 444 BBBY CALLS 01/20/23 @ $75.

**INSTRUCTIONS:**
See the definition of "person" in paragraph (a) of Rule 144. Information is to be given not only as to the person for whose account the securities are to be sold but also as to all other persons included in that definition. In addition, information shall be given as to sales by all persons whose sales are required by paragraph (e) of Rule 144 to be aggregated with sales for the account of the person filing this notice.

**ATTENTION:**
*The person for whose account the securities to which this notice relates are to be sold hereby represents by signing this notice that he does not know any material adverse information in regard to the current and prospective operations of the Issuer of the securities to be sold which has not been publicly disclosed. If such person has adopted a written trading plan or given trading instructions to satisfy Rule 10b5-1 under the Exchange Act, by signing the form and indicating the date that the plan was adopted or the instruction given, that person makes such representation as of the plan adoption or instruction date.*

8/16/2022
DATE OF NOTICE

N/A
DATE OF PLAN ADOPTION OR GIVING OF INSTRUCTION,
IF RELYING ON RULE 10B5-1


(SIGNATURE)
**RYAN COHEN**

*The notice shall be signed by the person for whose account the securities are to be sold. At least one copy of the notice shall be manually signed. Any copies not manually signed shall bear typed or printed signatures.*

**ATTENTION: Intentional misstatements or omission of facts constitute Federal Criminal Violations (See 18 U.S.C. 1001)**

SEC 1147 (02-08)

Confidential                                                      JPMC_00000777

# EXHIBIT 41

Message

| | |
|---|---|
| **From:** | Weaver, Diandra I [diandra.i.weaver@jpmorgan.com] |
| **Sent:** | 8/16/2022 8:28:58 PM |
| **To:** | Nebel, Ryan P. [rnebel@olshanlaw.com] |
| **CC:** | Ryan Cohen [ryan@rcmail.com]; Mahmoud, Bachar [bmahmoud@olshanlaw.com]; Ferrone, Joseph G. [jferrone@olshanlaw.com] |
| **BCC:** | Lim-Herlyn, Susan (WM, USA) [susan.lim-herlyn@jpmorgan.com] |
| **Subject:** | RE: Drafts for your review |
| **Attachments:** | RE_ Drafts for your review.eml |

Ryan,

Our team will take care of filing the Form 144 to both the SEC and NASDAQ via email. They are unable to mail the forms.

I sent you an email addressing your requested edits shortly before yours below – attached here for reference.

Best,
Diandra

---

Diandra Weaver  |  Executive Director  |  Investment Specialist  |  **J.P. Morgan Private Bank**  |
1450 Brickell Ave, Floor 33  |  Miami, FL 33131  |  T: 305 579 9603  |  diandra.i.weaver@jpmorgan.com  |
privatebank.jpmorgan.com

---

**From:** Nebel, Ryan P. [mailto:RNebel@olshanlaw.com]
**Sent:** Tuesday, August 16, 2022 4:23 PM
**To:** Weaver, Diandra I (WM, USA) <diandra.i.weaver@jpmorgan.com>
**Cc:** Ryan Cohen <ryan@rcmail.com>; Mahmoud, Bachar <BMahmoud@olshanlaw.com>; Ferrone, Joseph G. <JFerrone@olshanlaw.com>
**Subject:** RE: Drafts for your review

Diandra,

Can you please confirm that your team is taking care of mailing three copies of the Form 144 to NASDAQ?

Thanks,
Ryan

Ryan Nebel

O L S H A N

OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
(Entrance is on 54th Street between Sixth and Seventh Avenues)
New York, NY 10019
Direct: 212.451.2279
Facsimile: 212.451.2222
Email: RNebel@olshanlaw.com
Web: www.olshanlaw.com

---

**From:** Nebel, Ryan P.
**Sent:** Tuesday, August 16, 2022 2:12 PM
**To:** Weaver, Diandra I <diandra.i.weaver@jpmorgan.com>
**Cc:** Ryan Cohen <ryan@rcmail.com>; Mahmoud, Bachar <BMahmoud@olshanlaw.com>; Ferrone, Joseph G.

Confidential

<JFerrone@olshanlaw.com>
**Subject:** Re: Drafts for your review

Would also include the asterisk and see remarks in Table 1.
Also include the range of dates when securities were acquired since should have that info as broker.

Ryan

> On Aug 16, 2022, at 2:10 PM, Weaver, Diandra I <diandra.i.weaver@jpmorgan.com> wrote:
>
> Ryan,
>
> As discussed, a wet signature was requested for the SEC Form 144. I will be on the lookout for an updated version of the document.
>
> Best,
> Diandra
>
> ------------------------------------------------------------------------
> **Diandra Weaver** ǀ Executive Director ǀ Investment Specialist ǀ **J.P. Morgan Private Bank** ǀ
> 1450 Brickell Ave, Floor 33 ǀ Miami, FL 33131 ǀ T: 305 579 9603 ǀ diandra.i.weaver@jpmorgan.com
> privatebank.jpmorgan.com
>
> **Team Contact:** Team Weaver ǀ Team_Weaver@jpmorgan.com
>
> J.P. Morgan Securities LLC ǀ JPMorgan Chase Bank, N.A.
>
> Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.
>
> **NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**
>
> Swap related material subject to the **Swap Dealer Associated Persons Disclosure** has been prepared by a Swap Dealer Associated Person of JPMorgan
>
> INVESTMENT PRODUCTS: NOT FDIC INSURED ● NO BANK GUARANTEE ● MAY LOSE VALUE

**From:** Ryan Cohen [mailto:ryan@rcmail.com]
**Sent:** Tuesday, August 16, 2022 1:58 PM
**To:** Weaver, Diandra I (WM, USA) <diandra.i.weaver@jpmorgan.com>
**Cc:** Ryan P. Nebel <RNebel@olshanlaw.com>; Bachar Mahmoud <BMahmoud@olshanlaw.com>; Ferrone, Joseph G. <JFerrone@olshanlaw.com>
**Subject:** Re: Drafts for your review

Confidential

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

JPMC_00002001

# EXHIBIT 42

Message

| | |
|---|---|
| **From:** | Lim-Herlyn, Susan [susan.lim-herlyn@jpmorgan.com] |
| **Sent:** | 8/16/2022 9:47:17 PM |
| **To:** | 'PaperForms144@SEC.GOV' [PaperForms144@SEC.GOV] |
| **CC:** | 'SECFilings@nasdaq.com' [SECFilings@nasdaq.com] |
| **Subject:** | Copy of SEC Form 144 (Nasdaq): Bed Bath & Beyond, Inc. (RC Ventures LLC) |
| **Attachments:** | BBBY - RC Ventures LLC - Form 144, SIGNED.pdf |

**Susan Lim-Herlyn** (she/her/hers)  |  Executive Director  |  **J.P. Morgan Private Bank**  |  390 Madison Ave, Floor 6
New York, NY 10017  |  T: 212 270 2307  |  susan.lim-herlyn@jpmorgan.com  |  privatebank.jpmorgan.com

J.P. Morgan Securities LLC  |  JPMorgan Chase Bank, N.A.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted
through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings,
balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your
account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees
do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in
any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message
Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and
asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED ● NO BANK GUARANTEE ● MAY LOSE VALUE**

JPMC_00000775

# EXHIBIT 43

Page 1

1                    IN THE DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA

2

3        _____

                                    :
4    IN RE BED BATH & BEYOND   :
     CORPORATION SECURITIES    : Case No.
5    LITIGATION                :   1:22-cv-02541-TNM
         _____:

6

7

8

9                    Wednesday, May 15, 2024

10

                     Remote Zoom Video Deposition of EDOUARD
11
         COTI, taken with the witness participating from
12
         his residence in Moscow, Russia, beginning at
13
         10:02 a.m., EDT, before, Ryan K. Black,
14
         RPR, CLR, Notary Public in and for the
15
         the Commonwealth of Pennsylvania.
16

17

18

19

20

21

22

Page 46

1     open, Brian?
2            MR. GILMORE: I -- I -- I didn't get it
3     out.
4            MR. BRONSTEIN: So ask your question,
5     please.
6            MR. GILMORE: Thanks, Peretz.
7            MR. BRONSTEIN: I want to get my
8     objection in.
9     BY MR. GILMORE:
10          Q.   In your opinion, was BBBY a meme stock
11    during August of 2022?
12           MR. BRONSTEIN: Objection. Answered
13    several times already.
14           THE WITNESS: I should answer one more
15    time? Yes?
16           MR. BRONSTEIN: Yes.
17           THE WITNESS: Yes. BBBY at that time
18    was a stock for me, as it was before and after.
19    BY MR. GILMORE:
20          Q.   Is it your testimony that BBBY was not a
21    meme stock during August of 2022?
22           MR. BRONSTEIN: Objection. Asked and

Page 47

1     answered.
2            Please don't harass him.
3            THE WITNESS: No, I didn't say that.
4     I said that, for me, BBBY was a stock. For some
5     other investors, I think it was a -- possibly a
6     meme stock.
7     BY MR. GILMORE:
8          Q.   But it was not a meme stock for you?
9          A.   For me, no, it was a stock, as I said.
10         Q.   Okay. Sir, you don't have much respect
11    for retail investors, do you?
12           MR. BRONSTEIN: Objection.
13           THE WITNESS: I have a lot of respect
14    for retail investors. There are some investors
15    -- retail investors far more successful than I
16    am, and I have a lot of respect for everyone.
17    BY MR. GILMORE:
18         Q.   Okay. Do you think you're smarter than
19    meme stock -- retail investors?
20           MR. BRONSTEIN: Objection.
21           THE WITNESS: Of course not.
22    BY MR. GILMORE:

Page 48

1          Q.   You've referred to retail investors as
2     ape mongols, correct?
3          A.   As?
4          Q.   Ape mongols.
5          A.   Are you using "mongol" in the French
6     term? Yes?
7          Q.   Yes.
8          A.   Okay. In fact, I didn't invented [sic]
9     anything here. I just took the terms that retail
10    investors and use -- are using in Reddit to call
11    themselves. So I took their nickname that they
12    are using and just translate in French as mongol
13    is an idiot, so nothing more.
14         Q.   Okay. So if I go on Reddit, I will find
15    retail investors referring to themselves as ape
16    mongols?
17         A.   Because, as I said, mongol is the French
18    term. But in English, if I remember, they used
19    the regards -- retards, some other words, I
20    think. I don't remember well, but -- so I just
21    used the French term, as I am French.
22         Q.   Okay.

Page 49

1          A.   Didn't inventing -- invented anything
2     here.
3          Q.   Okay. When you used the term mongols to
4     refer to retail investors, you were doing so in
5     an insulting way, correct?
6            MR. BRONSTEIN: Objection.
7            THE WITNESS: Not at all.
8            As I said, I'm just using the terms.
9     They are defining themselves. So I didn't
10    express anything from my side.
11    BY MR. GILMORE:
12         Q.   A moment ago I think you mentioned the
13    term "retard." Have you ever referred to retail
14    investors at "retards"?
15           MR. BRONSTEIN: Objection.
16           THE WITNESS: I said that is the term
17    that retail investors are -- are using for
18    themselves. I can't remember if I used this
19    word. But I say no, because I -- well, I don't
20    think so.
21    BY MR. GILMORE:
22         Q.   It's your testimony you've never called

13 (Pages 46 - 49)

# EXHIBIT 44

SC 13D/A 1 sc13da313351002_08182022.htm AMENDMENT NO. 3 TO THE SCHEDULE 13D

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 13D**
(Rule 13d-101)

INFORMATION TO BE INCLUDED IN STATEMENTS FILED PURSUANT
TO § 240.13d-1(a) AND AMENDMENTS THERETO FILED PURSUANT TO
§ 240.13d-2(a)

(Amendment No. 3)[1]

<u>Bed Bath & Beyond Inc.</u>
(Name of Issuer)

<u>Common Stock, $0.01 par value per share</u>
(Title of Class of Securities)

<u>075896100</u>
(CUSIP Number)

RYAN NEBEL
OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
New York, New York 10019
<u>(212) 451-2300</u>
(Name, Address and Telephone Number of Person
Authorized to Receive Notices and Communications)

<u>August 16, 2022</u>
(Date of Event Which Requires Filing of This Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of §§ 240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box ☐.

*Note:* Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. *See* § 240.13d-7 for other parties to whom copies are to be sent.

---

[1]  The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, *see* the *Notes*).

10/17/23, 12:15 PM
Case 1:22-cv-02541-TAM Document 147-3 Filed 05/16/24 Page 283 of 381
sec.gov/Archives/edgar/data/1822844/000092189522002496/sc13da313351002_08182022.htm

CUSIP No. 075896100

| 1 | NAME OF REPORTING PERSON RC VENTURES LLC | |
|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP | (a) ☐ (b) ☐ |
| 3 | SEC USE ONLY | |
| 4 | SOURCE OF FUNDS | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM 2(d) OR 2(e) | ☐ |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION DELAWARE | |

| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7 | SOLE VOTING POWER - 0 - |
|---|---|---|
| | 8 | SHARED VOTING POWER - 0 - |
| | 9 | SOLE DISPOSITIVE POWER - 0 - |
| | 10 | SHARED DISPOSITIVE POWER - 0 - |

| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON - 0 - | |
|---|---|---|
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES | ☐ |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11) 0% | |
| 14 | TYPE OF REPORTING PERSON OO | |

2

CUSIP No. 075896100

| 1 | NAME OF REPORTING PERSON | |
| | RYAN COHEN | |
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP | (a) ☐ |
| | | (b) ☐ |
| 3 | SEC USE ONLY | |
| 4 | SOURCE OF FUNDS | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM 2(d) OR 2(e) | ☐ |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION | |
| | CANADA | |

| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7 | SOLE VOTING POWER |
| | | - 0 - |
| | 8 | SHARED VOTING POWER |
| | | - 0 - |
| | 9 | SOLE DISPOSITIVE POWER |
| | | - 0 - |
| | 10 | SHARED DISPOSITIVE POWER |
| | | - 0 - |

| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON | |
| | - 0 - | |
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES | ☐ |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11) | |
| | 0% | |
| 14 | TYPE OF REPORTING PERSON | |
| | IN | |

3

CUSIP No. 075896100

The following constitutes Amendment No. 3 to the Schedule 13D filed by the undersigned ("Amendment No. 3"). This Amendment No. 3 amends the Schedule 13D as specifically set forth herein.

Item 5.     Interest in Securities of the Issuer.

Items 5 (a) – (c) and (e) are hereby amended and restated to read as follows:

(a), (b) As of the date hereof, none of the Reporting Persons beneficially owned any Shares, constituting 0% of the Shares outstanding.

(c)     Schedule A annexed hereto lists all transactions in securities of the Issuer by the Reporting Persons since the filing of Amendment No. 2 to the Schedule 13D. All of such transactions were effected in the open market.

(e)     As of August 17, 2022, the Reporting Persons ceased to beneficially own more than 5% of the outstanding Shares.

Item 6.     Contracts, Arrangements, Understandings or Relationships With Respect to Securities of the Issuer.

Item 6 is hereby amended to add the following:

Following the transactions reported in Schedule A annexed hereto, the Reporting Persons no longer owned any options with respect to the Issuer.

4

CUSIP No. 075896100

<u>SIGNATURES</u>

After reasonable inquiry and to the best of his knowledge and belief, each of the undersigned certifies that the information set forth in this statement is true, complete and correct.

Dated: August 18, 2022

RC Ventures LLC

By:    /s/ Ryan Cohen
       Name:    Ryan Cohen
       Title:    Manager


/s/ Ryan Cohen
Ryan Cohen

5

CUSIP No. 075896100

**SCHEDULE A**

**Transactions in Securities of the Issuer Since the Filing of Amendment No. 2 to the Schedule 13D**

| Nature of the Transaction | Securities Sold | Price Per Security($) | Date of Sale |
|---|---|---|---|
| **RC VENTURES LLC** | | | |
| Sale of Common Stock | 446,399 | 18.6848[1] | 08/16/2022 |
| Sale of Common Stock | 812,448 | 19.4817[2] | 08/16/2022 |
| Sale of Common Stock | 1,443,818 | 20.7834[3] | 08/16/2022 |
| Sale of Common Stock | 1,059,021 | 21.4209[4] | 08/16/2022 |
| Sale of Common Stock | 795,559 | 22.7093[5] | 08/16/2022 |
| Sale of Common Stock | 169,335 | 23.3293[6] | 08/16/2022 |
| Sale of Common Stock | 103,901 | 24.8685[7] | 08/16/2022 |
| Sale of Common Stock | 104,077 | 25.5918[8] | 08/16/2022 |
| Sale of Common Stock | 65,442 | 26.2713[9] | 08/16/2022 |
| Sale of Common Stock | 189,689 | 23.7337[10] | 08/17/2022 |
| Sale of Common Stock | 512,185 | 24.6266[11] | 08/17/2022 |
| Sale of Common Stock | 896,238 | 25.4997[12] | 08/17/2022 |
| Sale of Common Stock | 610,828 | 26.4432[13] | 08/17/2022 |
| Sale of Common Stock | 323,483 | 27.5756[14] | 08/17/2022 |
| Sale of Common Stock | 140,788 | 28.5122[15] | 08/17/2022 |
| Sale of Common Stock | 106,789 | 29.2192[16] | 08/17/2022 |
| Sale of January 2023 Call Option ($60 Exercise Price)[17] | 7,475 | 6.5466[18] | 08/17/2022 |
| Sale of January 2023 Call Option ($60 Exercise Price)[17] | 3,782 | 8.6177[19] | 08/17/2022 |
| Sale of January 2023 Call Option ($75 Exercise Price)[17] | 444 | 5.6596[20] | 08/17/2022 |
| Sale of January 2023 Call Option ($80 Exercise Price)[17] | 3,826 | 5.3433[21] | 08/17/2022 |
| Sale of January 2023 Call Option ($80 Exercise Price)[17] | 1,174 | 7.0264[22] | 08/17/2022 |

---

[1] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $18.0600 to $19.0500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[2] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $19.0600 to $20.0100, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[3] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $20.1200 to $21.1100, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[4] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $21.1200 to $22.1100, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[5] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $22.1300 to $23.1200, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[6] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $23.1300 to $23.8400, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[7] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $24.1500 to $25.1400, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[8] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $25.1500 to $26.0600, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[9] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $26.1500 to $26.4500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[10] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $23.0600 to $24.0500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[11] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $24.0600 to $25.0500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[12] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $25.0600 to $26.0500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[13] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $26.0600 to $27.0500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[14] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $27.0600 to $28.0500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[15] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $28.0600 to $29.0500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and

Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[16] Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $29.0600 to $29.9900, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

[17] Exchange-listed American-style call options with expiration date of January 20, 2023.

[18] Represents a weighted average price. These call options were sold in multiple transactions at prices ranging from $6.4000 to $6.9500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of call options sold at each separate price within the range set forth in this footnote.

[19] Represents a weighted average price. These call options were sold in multiple transactions at prices ranging from $8.5000 to $8.9000, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of call options sold at each separate price within the range set forth in this footnote.

[20] Represents a weighted average price. These call options were sold in multiple transactions at prices ranging from $5.6500 to $5.7000, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of call options sold at each separate price within the range set forth in this footnote.

[21] Represents a weighted average price. These call options were sold in multiple transactions at prices ranging from $5.2000 to $5.8500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of call options sold at each separate price within the range set forth in this footnote.

[22] Represents a weighted average price. These call options were sold in multiple transactions at prices ranging from $6.9000 to $7.4500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of call options sold at each separate price within the range set forth in this footnote.

# EXHIBIT 45

SEC Form 4

| FORM 4 | UNITED STATES SECURITIES AND EXCHANGE COMMISSION | OMB APPROVAL |
|---|---|---|

Washington, D.C. 20549

| | OMB Number: | 3235-0287 |
|---|---|---|
| | Estimated average burden | |
| | hours per response: | 0.5 |

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

[X] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934 or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person[*] | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Cohen Ryan | BED BATH & BEYOND INC [ BBBY ] | Director ___ X 10% Owner |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | Officer (give title below) ___ X Other (specify below) ___ |
| PO BOX 25250 | 08/16/2022 | See Footnote 1 |
| PMB 30427 | | |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| MIAMI FL 33102 | | ___ Form filed by One Reporting Person |
| (City) (State) (Zip) | | X Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock, $.01 par value[1] | 08/16/2022 | | S | | 446,399 | D | $18.6848[3] | 7,333,601 | I | By RC Ventures LLC[2] |
| Common Stock, $.01 par value[1] | 08/16/2022 | | S | | 812,448 | D | $19.4817[4] | 6,521,153 | I | By RC Ventures LLC[2] |
| Common Stock, $.01 par value[1] | 08/16/2022 | | S | | 1,443,818 | D | $20.7834[5] | 5,077,335 | I | By RC Ventures LLC[2] |
| Common Stock, $.01 par value[1] | 08/16/2022 | | S | | 1,059,021 | D | $21.4209[6] | 4,018,314 | I | By RC Ventures LLC[2] |
| Common Stock, $.01 par value[1] | 08/16/2022 | | S | | 795,559 | D | $22.7093[7] | 3,222,755 | I | By RC Ventures LLC[2] |
| Common Stock, $.01 par value[1] | 08/16/2022 | | S | | 169,335 | D | $23.3293[8] | 3,053,420 | I | By RC Ventures LLC[2] |
| Common Stock, $.01 par value[1] | 08/16/2022 | | S | | 103,901 | D | $24.8685[9] | 2,949,519 | I | By RC Ventures LLC[2] |
| Common Stock, $.01 par value[1] | 08/16/2022 | | S | | 104,077 | D | $25.5918[10] | 2,845,442 | I | By RC Ventures LLC[2] |
| Common Stock, $.01 par value[1] | 08/16/2022 | | S | | 65,442 | D | $26.2713[11] | 2,780,000 | I | By RC Ventures LLC[2] |

### Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

| 1. Name and Address of Reporting Person* |
|---|
| Cohen Ryan |
| (Last)          (First)          (Middle) |
| PO BOX 25250 |
| PMB 30427 |
| (Street) |
| MIAMI          FL          33102 |
| (City)          (State)          (Zip) |

| 1. Name and Address of Reporting Person* |
|---|
| RC Ventures LLC |
| (Last)          (First)          (Middle) |
| PO BOX 25250 |
| PMB 30427 |
| (Street) |
| MIAMI          FL          33102 |
| (City)          (State)          (Zip) |

**Explanation of Responses:**

1. This Form 4 is filed jointly by RC Ventures LLC ("RC Ventures") and Ryan Cohen ("Mr. Cohen" and together with RC Ventures, the "Reporting Persons"). The Reporting Persons previously may have been deemed members of a Section 13(d) group that no longer beneficially owns more than 10% of the Issuer's outstanding shares of Common Stock ("Shares"). Each Reporting Person disclaims beneficial ownership of the securities of the Issuer reported herein except to the extent of his or its pecuniary interest therein, and this report shall not be deemed to be an admission that any Reporting Person is the beneficial owner of such securities for purposes of Section 16 or for any other purpose.

2. Securities of the Issuer owned directly by RC Ventures. Mr. Cohen, as the Manager of RC Ventures, may be deemed to beneficially own the securities of the Issuer which are owned directly by RC Ventures.

3. Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $18.0600 to $19.0500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

4. Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $19.0600 to $20.0100, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

5. Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $20.1200 to $21.1100, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

6. Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $21.1200 to $22.1100, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

7. Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $22.1300 to $23.1200, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

8. Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $23.1300 to $23.8400, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

9. Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $24.1500 to $25.1400, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

10. Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $25.1500 to $26.0600, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

11. Represents a weighted average price. These Shares were sold in multiple transactions at prices ranging from $26.1500 to $26.4500, inclusive. The Reporting Persons undertake to provide the Issuer, any security holder of the Issuer or the staff of the Securities and Exchange Commission, upon request, full information regarding the number of Shares sold at each separate price within the range set forth in this footnote.

/s/ Ryan Cohen          08/18/2022

RC Ventures LLC, By: /s/
Ryan Cohen, Manager                08/18/2022
** Signature of Reporting Person        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 46



← Post

**Ryan Cohen** ✓
@ryancohen

···

Ask not what your company can do for you – ask what you can do for your company

6:04 PM · Aug 5, 2022

**3,231** Reposts   **349** Quotes   **20.6K** Likes   **50** Bookmarks

💬   🔁   ♡   🔖 50   ⬆️



New to X?

Sign up now to get your own personalized timeline!

Ⓖ Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

### Relevant people

**Ryan Cohen** ✓
@ryancohen

Follow

Trends are unavailable.

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More ···
© 2023 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in   Sign up

# EXHIBIT 47

Skip to main content   🥷 r/wallstreetbets ⊗   Search in r/wallstreetbets          Log In   •••

---

😎 **r/wallstreetbets** • 2 yr. ago
OPINION_IS_UNPOPULAR                                                      •••

## BBBY Megathread for Wednesday August 17th, 2022 🍉 🚀

YOLO

## WELCOME TO THE FUCKIN CASINO R/ALL

⬆ 15K ⬇      💬 47K      ⬆ Share

Sort by:  Top ⌄

---

＋ Add a Comment

---

🐷 **TheLedgerMan0** • 2y ago

40USD today and ill talk to a girl

⊖   ⬆ 1.3K ⬇   💬 Reply   ⬆ Share   •••

🐹 **DataScience-FTW** • 2y ago

$80 and we get him laid

⬆ 565 ⬇   💬 Reply   ⬆ Share   •••

⊕ 24 more replies

⊕ 32 more replies

---

🦊 **NoFeature5845** • 2y ago

My mom asked me if I'd jump off a bridge if all my friends jumped off it first.

I told her only if Cramer tweeted 4 times telling me not to do it.

$BBBY to $100

⬆ 1.2K ⬇   💬 Reply   ⬆ Share   •••

⊕ 13 more replies

---

⊕ [deleted] • 2y ago

🐙 **gxrdon** • 2y ago

Skip to main content

Log In

⊕ 22 more replies

**Baron_runs** · 2y ago

Fuck you work I got things to do.

↑ 405 ↓    💬 Reply    ↑ Share    •••

⊕ 4 more replies

**GurpsCheema** · 2y ago

BBBY to $420 because why not

↑ 400 ↓    💬 Reply    ↑ Share    •••

⊕ 5 more replies

**modcaleb** · 2y ago

If this hits $70 tomorrow I will tell my parents I'm gay

⊖    ↑ 373 ↓    💬 Reply    ↑ Share    •••

**Wizzlebonk** · 2y ago

I'll also tell mine you're gay

↑ 329 ↓    💬 Reply    ↑ Share    •••

⊕ 2 more replies

⊕ 15 more replies

**TheOnlySafeCult** · 2y ago

# who else likes the stock?

↑ 312 ↓    💬 Reply    ↑ Share    •••

⊕ 9 more replies

**PineappleLord72** · 2y ago

Is this the end?

Of POVERTY?

↑ 303 ↓    💬 Reply    ↑ Share    •••

⊕ 5 more replies

4/2/24, 9:35 AM
BBBY Megathread for Wednesday August 17th, 2022 : r/wallstreetbets
Case 1:22-cv-02541-TNM · Document 117-3 · Filed 05/17/84 · Page 299 of 381

Skip to main content

Log In

⬆ 301 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 4 more replies

🦌 [deleted] · 2y ago

Y'all panicking when BBBY is trading flat at +25% while the whole market is red. Stop doomscrolling.

Go flip a few burgers and come back, the drive thru line is getting backed up.

⬆ 293 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 3 more replies

👤 Ok_Inevitable_9901 · 2y ago

CNBC coverage this morning is so bearish on the meme "manipulation" as they call it. Cramer even calling out for an SEC investigation. Aren't the shorties the real manipulators here?

⬆ 279 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 14 more replies

🐻 TheOnlySafeCult · 2y ago

# STOP ASKING "IF IT'S TOO LATE?". ALSO STOP ANSWERING.

# STOP ASKING "SHOULD I BUY BBBY?" ALSO STOP ANSWERING.

# SQUEEZE HYPE 101; WE ARE NOT FINANCIAL ADVISORS

# That being said.....

# WE JUST LIKE THE STOCK

⬆ 210 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 6 more replies

⊕ [deleted] · 2y ago

🎁 PregnantPickle_ · 2y ago

JIM CRAMER SHITS STANDING UP

⬆ 193 ⬇   💬 Reply   ↑ Share   ⋯

Skip to main content  Log In

 **aexolthum** · 2y ago · Edited 2y ago

Just put 25k into BBBY, in 1.5 hours i will put another dollar in for every upvote comment gets

⬆ 181 ⬇  💬 Reply  ↑ Share  ···

⊕ 9 more replies

**ATiBright** · 2y ago

Repost from main thread of my thoughts:

I'm playing bed bath for fun. Currently still up ~1000$. Just want to point out all the negativity and shaming going on now was going on with GME after round 1 as well. Then we all saw it go from 40$ back to 360$. Will Ryan sell? Maybe, does it really matter outside of narrative? Not really, he could sell every share he owns and it still wouldn't be 5% of the volume between yesterday and today. It would suck but if you think it's a squeeze with 50%+ shorting that thesis really shouldn't change unless all the other insiders would dump too.

It's a meme stock that is heavily shorted. If you aren't here for the roller coaster ride, you shoulda been willing to take profits or set a stop loss. If you are here for the ride, just kick back and see where it takes you. Don't gamble with money that's essential to your life if it causes you emotional distress.

⊖ ⬆ 158 ⬇  💬 Reply  ↑ Share  ···



**livestreamerr** · 2y ago

well said

⬆ 9 ⬇  💬 Reply  ↑ Share  ···

**[deleted]** · 2y ago

But I did set a stop loss...

At $1000/share.

⊖ ⬆ 8 ⬇  💬 Reply  ↑ Share  ···

**Dntdi3** · 2y ago

Baller 

⬆ 1 ⬇  💬 Reply  ↑ Share  ···

**SemiSweetStrawberry** · 2y ago

Big mood. The highs feel great but you need to get off this ride yesterday if you can't handle the lows because it's not gonna be a straight shot to the top

⬆ 7 ⬇  💬 Reply  ↑ Share  ···

 **Slimjimpapicholo** · 2y ago

Dont panic sell if BBBY dips

Skip to main content 

Log In

---

 **thrill-a** • 2y ago

Changed the language on my app to japanese so i couldn't sell even if i wanted to

↑ 157 ↓    💬 Reply    ⬆ Share    •••

⊕ 6 more replies

⊕ [deleted] • 2y ago

**Replyafterme** • 2y ago

If you're holding and not selling, upvote this so the shills understand we aren't the ones selling

↑ 147 ↓    💬 Reply    ⬆ Share    •••

**harleyray** • 2y ago

TIME TO FOMO BITCHES! WE HAVENT EVEN HIT THE 52 WEEK HIGH. THIS SQUEEZE IS JUST STARTING. TO INFINITY AND $BBBYONDDDDDD!!!

↑ 148 ↓    💬 Reply    ⬆ Share    •••

⊕ 3 more replies

⊕ [deleted] • 2y ago

**DxLaughRiot** • 2y ago

It was literally $30 this morning, why tf would anyone sell at $23???

This is GME all over again now's your fucking chance boys. Either grow some ape nuts or go back to working at wallmart

↑ 120 ↓    💬 Reply    ⬆ Share    •••

⊕ 9 more replies

**Major_Fang** • 2y ago

UPVOTE IF YOU ARE NOT SELLING

↑ 118 ↓    💬 Reply    ⬆ Share    •••

⊕ 2 more replies

 **mnlmr** • 2y ago

Skip to main content                                                                           Log In

↑ 116 ↓     💬 Reply     ⬆ Share     •••

⊕ 7 more replies

**Alarming_Associate47** · 2y ago

Just bought the top again. Doing my part.

↑ 113 ↓     💬 Reply     ⬆ Share     •••

⊕ 3 more replies

**mangothemonk** · 2y ago

if you actually read the filing. Ryan is just reporting his shares he did not sell them

upvote for visibility

↑ 113 ↓     💬 Reply     ⬆ Share     •••

⊕ 3 more replies

**OGPink** · 2y ago

35-40 eod easily

↑ 115 ↓     💬 Reply     ⬆ Share     •••

⊕ 3 more replies

**gimmethemshoes11** 🍪 · 2y ago

You hear that?

CRAMER JUST CALLED US ALL DUMB LOSERS

↑ 112 ↓     💬 Reply     ⬆ Share     •••

⊕ 7 more replies

**[deleted]** · 2y ago

My kids are either going to Harvard or I am losing full custody when this is all over

↑ 114 ↓     💬 Reply     ⬆ Share     •••

**freehouse_throwaway** · 2y ago

Guys I'm starting to think BBBY shorts are getting squeezed a bit

Duno just a hunch.

Skip to main content                                                                                    Log In

**aaron_9921** · 2y ago

The amount of people not doing shit at work rn is astronomical

⬆ 102 ⬇      💬 Reply      ↥ Share      ⋯

⊕ 2 more replies

**OB1KENOB** · 2y ago

For anyone who is anxious: we've closed green EVERY DAY for the last several days. That's the perspective to think with.

⬆ 104 ⬇      💬 Reply      ↥ Share      ⋯

⊕ 6 more replies

**Just-Commission9594** · 2y ago

Had 5k saved up for a ring for my gf... Either I buy a lambo next week, or she kills me. In bobby we trust.

⬆ 98 ⬇      💬 Reply      ↥ Share      ⋯

**DataScience-FTW** · 2y ago

Already up pre-market. Thank you to the Europoors. America, let's fucking go! To the moon or bust.

⬆ 97 ⬇      💬 Reply      ↥ Share      ⋯

⊕ 2 more replies

**Pleasant-Truth4672** · 2y ago

The update from BBBY management we have all been waiting for.

https://www.webull.com/news/52523835

The squeeze will come between tomorrow and Monday.

Mark my words

Vote this up to the top of WSB

BBBY will be sitting on a hefty pile of e-commerce cash soon.

⬆ 97 ⬇      💬 Reply      ↥ Share      ⋯

⊕ 11 more replies

**Kingsley-Zissou** · 2y ago

Some of ya'll never squeezed nuts and it shows.

4/2/24, 9:35 AM                    BBBY Megathread for Wednesday August 17th, 2022 : r/wallstreetbets

Skip to main content                                                                          Log In

**adruno** · 2y ago

Bought 100k shares at $28.06... BBBY to the moon... 🔺 🔺 🔺

⬆ 94 ⬇   💬 Reply   ⬆ Share   ···

⊕ 9 more replies

**TallDarkandHandstand** · 2y ago

Went fully regarded. Didn't wire my funds on last Thursday- did electronic fund on Friday. Finally available this morning.

70k @ 26.32/share

BBBY 👌🙏🚀🚀🚀

⬆ 93 ⬇   💬 Reply   ⬆ Share   ···

⊕ 6 more replies

**Comprehensive_Poem59** · 2y ago

If bbby hits $50 eow I'll get it tattooed on my fucking body

⬆ 90 ⬇   💬 Reply   ⬆ Share   ···

⊕ 1 more reply

**[deleted]** · 2y ago

Oh shit guys I'm getting a little nervous I think it's time to sell everything...

MY GIRLFRIEND, MY DOG, MY HOUSE, CAR, CUM, ORGANS, TALENTS, MOM'S SECOND MORTGAGE, KIDS' COLLEGE FUND LETS GOOOOOOOOOOOOOOOOOOO

BUY MORE

⬆ 90 ⬇   💬 Reply   ⬆ Share   ···

⊕ 2 more replies

**silencethethoughts** · 2y ago

I don't look at the price I look at the reactions of this thread

⬆ 92 ⬇   💬 Reply   ⬆ Share   ···

⊕ 3 more replies

**Mesmeryze** · 2y ago

4/2/24, 9:35 AM
Case 1:22-cv-02541-TNM Document 117-3 Filed 05/17/84 Page 305 of 381
BBBY Megathread for Wednesday August 17th, 2022 : r/wallstreetbets

Skip to main content  Log In

## FUCKING UP 20% I KNOW VERTICAL LINES UP ARE GREAT BUT CAN'T HAVE THAT 24/7 JUST CONTINUE TO BUY AND HODLLLL


⬆ 86 ⬇   💬 Reply   ⬆ Share   ⋯

⊕ 5 more replies

 **Noxhero2134** • 2y ago

RC did NOT sell you fucking regards. He had to file that form once his ownership went over 10% and he became an insider! If he wanted to retain the RIGHT TO SELL he has to file the 144. Jesus you paperhanded crybabies. Don't believe everything you see on Twitter. SHORT AND DISTORT

⬆ 85 ⬇   💬 Reply   ⬆ Share   ⋯

⊕ 6 more replies

**nightingle26** • 2y ago

Why is everyone bitching? I've seen gme go from 20% down AH to 80% up by morning. Calm your tits

⬆ 87 ⬇   💬 Reply   ⬆ Share   ⋯

⊕ 4 more replies

**heathermyllz** • 2y ago

Like if your BBBY position is in the red so I don't feel so alone

⬆ 84 ⬇   💬 Reply   ⬆ Share   ⋯

⊕ 5 more replies

**Fit-Needleworker-997** • 2y ago • Edited 2y ago

Skip to main content  Log In

Short-Swing Profit Rule, TLDR, if you buy and sell something within the same 6 month period then you must return 100% of the profits to the company. See the rule here
https://www.investopedia.com/terms/s/shortswingprofitrule.asp

So, anything that he bought on 02/17 or after he would lose 100% of his profits on, which begs the question how much did he invest between 02/17 and 03/03? In the link below, scroll to the bottom of the page and you can see his transaction history for BBBY. Ive also tried my best to paste the transactions made after 02/16/22 below as well, the 2nd column is the number of securities he purchased (Shares or call options), the 3rd column is the price per share or price per call option (x100, dont forget) and the 4th column is the date of purchase.

https://bedbathandbeyond.gcs-web.com/node/15731/html

Purchase of Common Stock 75,000 14.0310 02/22/2022

Purchase of Common Stock 367,833 15.2060 02/24/2022

Purchase of Common Stock 500,000 13.6600 02/24/2022

Purchase of Common Stock 500,000 14.5770 02/24/2022

Purchase of Common Stock 300,000 13.4260 02/24/2022

Purchase of Common Stock 542,621 16.2230 02/25/2022

Purchase of Common Stock 115,000 16.1140 02/25/2022

Purchase of Common Stock 500,000 16.6010 02/28/2022

Purchase of January 2023 Call Option ($60 Exercise Price)* 4,757 0.9324 02/28/2022

Purchase of January 2023 Call Option ($75 Exercise Price)* 243 0.7603 02/28/2022

Purchase of January 2023 Call Option ($60 Exercise Price)* 5,000 1.4693 03/01/2022

Purchase of January 2023 Call Option ($60 Exercise Price)* 1,500 1.4115 03/01/2022

Purchase of January 2023 Call Option ($75 Exercise Price)* 201 1.0803 03/01/2022

Purchase of January 2023 Call Option ($80 Exercise Price)* 5,000 0.7103 03/01/2022

Purchase of Common Stock 307,341 16.9429 03/01/2022

Purchase of Common Stock 311,660 16.7564 03/01/2022

Purchase of Common Stock 70,545 16.6800 03/01/2022

Purchase of Common Stock 69,516 17.2540 03/02/2022

Purchase of Common Stock 20,484 16.8090 03/03/2022

Case 1:22-cv-02541-TNM    Document 117-3    Filed 05/17/84    Page 307 of 381

Skip to main content                                                        Log In

Edit: Here is the 6 month period for those curious.

https://calculat.io/date/count/6--months--from--16-february-2022

Edit: Also for summary, between 02/22/22 and 03/03/22 he bought 3,680,000 shares of stock for a price between $14 and $17 a share. He also bought 16,701 Call options for a price between $93 a contract and $146 a contract. 3,680,000 shares at an average of $15.50 would be $54,040,000 and 16,701 call options at an average of $120 would be $2,004,120.

⬆ 87 ⬇    💬 Reply    ⬆ Share    •••

⊕ 12 more replies

**Gminsta** • 2y ago

My portfolios now 100% BBBY 

⬆ 78 ⬇    💬 Reply    ⬆ Share    •••

⊕ 5 more replies

**Mesmeryze** • 2y ago

## 2 dollars is fucking nothing I seriously hope nobody here is selling. We are GREEN in a bloodbath day overall. Untie your panties you pussies

⬆ 81 ⬇    💬 Reply    ⬆ Share    •••

⊕ 1 more reply

⊕ [deleted] • 2y ago

**No-Pumpkin-6946** • 2y ago

OPEN LETTER TO ELON MUSK: you like money, We like money, lets make some money.

⬆ 79 ⬇    💬 Reply    ⬆ Share    •••

⊕ [deleted] • 2y ago

⊕ [deleted] • 2y ago • Edited 2y ago

Each upvote is 10 cents I put into bbby EDIT 4 bucks going in, can't afford to put more.

⬆ 75 ⬇    💬 Reply    ⬆ Share    •••

⊕ 1 more reply

Skip to main content

Log In

⬆ 74 ⬇    💬 Reply    ↑ Share    •••

⊕ 2 more replies

**bout_that_rahrah** · 2y ago

We have more volume than TSLA, APPL, MSFT, META + more combined.... THIS IS NOT A DRILL!!

⬆ 74 ⬇    💬 Reply    ↑ Share    •••

⊕ 1 more reply

**ibuycsgoskins** · 2y ago

Thinking about buying 5872 shares (all my money) should I?

⬆ 73 ⬇    💬 Reply    ↑ Share    •••

⊕ 14 more replies

**Im_Blind_And_Deaf** · 2y ago

# Patience, cunts.

- **Warren Buffet**

⬆ 76 ⬇    💬 Reply    ↑ Share    •••

**blyatkowitsch** · 2y ago

As a german i can only say thx for the discount tomorrow at PM you paperhanded bitches

⬆ 77 ⬇    💬 Reply    ↑ Share    •••

⊕ 2 more replies

**yao97ming** · 2y ago

Upvote this if you diamond handed today AH

⬆ 77 ⬇    💬 Reply    ↑ Share    •••

⊕ 1 more reply

**GrowthElectronic8147** · 2y ago

Skip to main content                                                                                           Log In

ARE PAYING A LOT OF MONEY TO CONTINUOUSLY KEEP THEIR SHORT POSITIONS OPEN. they want us to get bored quickly, sell and move on. keep holding what you have and don't lose faith. gme didn't happen in a week!! 😭

⬆ 71 ⬇   💬 Reply   ↑ Share   •••

⊕ 2 more replies

[deleted] • 2y ago

So for those from r/all wondering what's up with BBBY here's the low down:

Bed Bath and Beyond is shorted to oblivion like GameStop was (is), and the people who did the shorting are finding themselves even more underwater this time.

So the bad guys (short hedge funds) used mass media to bring attention to the stock along with GameStop and AMC, and today, after hours when retail trader where out of the game, they shorted all three into the ground.

So now they have survived another day but they are deeper underwater, and they can only kick the can so far.

And that's not even the tip of the iceberg. All because a bunch of degenerates outsmarted wall street and are putting a wedge between the criminals and their criminal means.

Thank you for coming to my TED talk.

⬆ 72 ⬇   💬 Reply   ↑ Share   •••

⊕ 22 more replies

 **IllbeyaPuddinpop** • 2y ago

If Ryan Cohen tweets that BBBY will begin selling watermelons: 🌕 🚀

⬆ 72 ⬇   💬 Reply   ↑ Share   •••

⊕ 1 more reply

 **yao97ming** • 2y ago

I am officially out of money. Bought 10k worth of BBBY, this is the best I can do. Wake me up when we hit 3 digits.

⬆ 68 ⬇   💬 Reply   ↑ Share   •••

⊕ [deleted] • 2y ago

 **NewHome_PaleRedDot** • 2y ago

The prophecy has been foretold, this will end at $39 today.

Skip to main content



Log In



**FootballCareful863** · 2y ago

Listen here you fuckin cunts.... Here is the truth. That was a savage ass back handed play and it worked. I would bet that son of a bitch dips again in the morning. There's is probably a small percentage of everyone commenting about their diamond hands that are really gonna walk the walk when it comes down to the brass tacks of it. But this shit has and will work if everyone sticks to the strategy. For everyone of the fuckin tools flappin their gums wishing for regular ass people just like yourself to fail so that a bunch of big ego corrupt fuck wads stay rich y'all can eat a whole bag of dicks. If you can't afford to lose it dont play? There's a whole bunch of people who see a shot at getting something they haven't ever had a chance at having. Maybe y'all don't know how that feels but a bunch of us do. I don't know fuck about shit and I would never give financial advice to anyone, but I do get the concept and from my point a view we still got these fuckin pricks by the balls. I could lose that money at this point in my life and shrug it off but if y'all want to eat if their plate then we all have to snatch up shares and hold them for real.

⬆ 66 ⬇     💬 Reply     ↗ Share     ···

⊕ 8 more replies



**landmanpgh** · 2y ago

Just dropped $30k into BBBY.

Figure you sons of bitches are the reason I have GME money, so might as well dance with you all again.

⬆ 66 ⬇     💬 Reply     ↗ Share     ···

⊕ 3 more replies



**Noobtradegod** · 2y ago

I sold just as many shares as Ryan Cohen did. 0

⬆ 66 ⬇     💬 Reply     ↗ Share     ···



**Mesmeryze** · 2y ago

WHOLE MARKET IS DOWN DONT BE A FUCKING PUSSY EITHER BUY ON SALE OR HOLD IT'S QUITE OBVIOUS ACTUALLY

⬆ 66 ⬇     💬 Reply     ↗ Share     ···

⊕ 1 more reply



**taffy_laffy** · 2y ago

Skip to main content                                                                          Log In



every single indicator is telling you this is rocketing.

↑ 64 ↓     💬 Reply     ⬆ Share     •••

⊕  1 more reply

⊕  [deleted] • 2y ago

**Intelligent_Zone3408** • 2y ago

**Cohen is holding Jan23 $80c** and you noobs are worried about a few flat hours. You don't deserve the tendies.

↑ 65 ↓     💬 Reply     ⬆ Share     •••

⊕  4 more replies

**Moist_Lunch_5075** • 2y ago

Case 1:22-cv-02541-TNM Document 117-3 Filed 05/17/84 Page 312 of 381



Skip to main content

Log In

Anyone who believes that that's true is an absolute fucking moron.

These people have trillions of dollars and MMs and prop funds are backed by cheap bank capital and the banks are flush with cash right now... many of the MMs actually ARE bank departments.

They're not undercapitalized, they're overleveraged. Today he was lamenting that covered call writers didn't have the money to hedge... that's call risk. They don't deserve to have low delta wins, they're gambling on them.

To act like delta hedging is a right that we're taking from them is an absolute butchering of the idea of a free market, and while him pumping stock he owns is shill enough, there's nothing more shill than trying to convince people that retail - who can't largely delta hedge their positions - are somehow treating overleveraged hedge funds opening multiple contracts per hundred share lot unfairly.

It is possibly one of the dumbest, most anti-market arguments ever made. At no point should these people be free from leverage risk, but that's at the heart of his argument.

If they delta hedge and the stock goes up and they lose as a result, that's on them, not us. That was their decision to not cover earlier like we are forced by brokerages to do. And to try to tie market crashes to these is just intellectually bankrupt even though there's a kernel of truth to the idea that some funds may have to de-leverage because of losses, but the money from our plays is not actually leaving the market in any net fashion, so the argument is bullshit.

It's just great watching him freak out and make shit up to protect his friends and his interests. He's such a corrupt moron.

⬆ 63 ⬇     💬 Reply     ↑ Share     ⋯

⊕ 10 more replies

 **Original-Baki** • 2y ago • Edited 2y ago

# FUD in full effect!

# RYAN COHEN HAS NOT SOLD HIS FUCKING BBBY SHARES. HE NEEDS TO FILE A FORM 144 TO EVENTUALLY SELL HIS OTM JAN 2023 CALLS BEFORE THEY EXPIRE.

⬆ 63 ⬇     💬 Reply     ↑ Share     ⋯

⊕ 6 more replies

 **Ecstatic_Patient_857** • 2y ago

I PUT MY LIFE SAVING IN THIS LETS GOOOOOOOO 🚀🚀🚀🚀🚀

⬆ 61 ⬇     💬 Reply     ↑ Share     ⋯

Skip to main content                                                                        Log In

**Valcreee** • 2y ago

It's clear a lot of you haven't experienced the thrill of GME, to crash to $70, and then moon to $300. STOP PAPER HANDING AND EMBRACE THE RETARDATION

⬆ 60 ⬇     💬 Reply     ↗ Share     ⋯

**Campbell27** • 2y ago

I said the same thing with GME that I'll say for BBBY, this is an absolute lotto play with huge upside, why would I take $500 profit? Why $1000 profit? I'm not a dumbass, I'm playing with money I can afford to lose, so why not just go for it all? Why not change my life financially? I'm holding until $100+ if we get there great, if not at least I can say I enjoyed the ride

⬆ 62 ⬇     💬 Reply     ↗ Share     ⋯

⊕ 12 more replies

**[deleted]** • 2y ago

If BBBY hits 80, ill get pegged by a trans stripper and post it on reddit

⬆ 61 ⬇     💬 Reply     ↗ Share     ⋯

⊕ 7 more replies

⊕ **[deleted]** • 2y ago

**OB1KENOB** • 2y ago

I will say it again, because it needs to be heard again:

If BBBY fails to squeeze, there will never be another opportunity like this again because everyone will lose faith in WSB.

HODL!

⬆ 62 ⬇     💬 Reply     ↗ Share     ⋯

⊕ 1 more reply

**TheOnlySafeCult** • 2y ago

# UPVOTE THIS THREAD SO IT REACHES R/ALL

# THIS IS NOT FINANCIAL ADVICE, IT IS HYPE ADVICE

⬆ 59 ⬇     💬 Reply     ↗ Share     ⋯

⊕ 2 more replies

Skip to main content

Log In

↑ 62 ↓    💬 Reply    ↑ Share    ⋯

⊕ 3 more replies

**Final_Historian7309** • 2y ago

30 EOD believe it or not

↑ 59 ↓    💬 Reply    ↑ Share    ⋯

⊕ 3 more replies

**masterofmeh42** • 2y ago

Cohen didn't sell shit

↑ 59 ↓    💬 Reply    ↑ Share    ⋯

**beardofwar884** • 2y ago

I'm in the hospital dying if these meds don't work and I just dropped everything from my last work check I had on this let's get it. I'll have another g or so in a week to dump in from my va pension. If you don't stand for something you'll fall for anything.

↑ 58 ↓    💬 Reply    ↑ Share    ⋯

⊕ 7 more replies

**Youlittle-rascal** • 2y ago

Upvote this if you're buying more at open too

↑ 61 ↓    💬 Reply    ↑ Share    ⋯

**2donuts4elephants** • 2y ago

FOMO people, listen up. Is iT tOo lAtE tO gEt iN? No. You don't even qualify as being in the fear of missing out stage. Right now you're just flat out missing out. If this is GME 2.0 the market cap for BBBY Has to hit ~22 billion. That's about $250 a share. We know you're watching all the gain porn thinking you missed the rocket ship. You haven't. Get in now. We need you. Apes strong together. We will drive this shit to the motherfuckin Andromeda galaxy. Before you know it, Ole Kenny G will be giving you a blowie behind the Wendy's dumpster.

↑ 58 ↓    💬 Reply    ↑ Share    ⋯

⊕ 2 more replies

**anonymouspp7** • 2y ago

If you guys are still in, I'm still in

Skip to main content

Log In

**Aromatic-Maximum442**  • 2y ago

i have two children and no money why can't i have no children and two money

⬆ 60 ⬇     💬 Reply     ⬆ Share     ⋯

⊕  1 more reply

**OGPink**  • 2y ago

If bbby hits $33 i'm gonna tell my coworker shes a b$tch

⬆ 56 ⬇     💬 Reply     ⬆ Share     ⋯

⊕  1 more reply

**Fresh_Function8700**  • 2y ago

Dont forget to Upvote every Comment and Thread to push the Stocks Trending algorithm + Add #BBBY to anything 💪 we are one Team 🫶 bog love ❤️

# BBBY

UPVOTEcommentsANDthreads

⬆ 57 ⬇     💬 Reply     ⬆ Share     ⋯

**masterofmeh42**  • 2y ago

Bbby just announced cohen didn't sell anything. You idiots who believed such lies don't deserve tendies anyways.

⬆ 58 ⬇     💬 Reply     ⬆ Share     ⋯

⊕  6 more replies

**SecureDropTheWhistle**  • 2y ago  • Edited 2y ago

Skip to main content  Log In

What happened today is:

1. Retail stopped trading (day traders left in the morning / never came and apes cuz it's Wednesday and everyone is either in or out with no cash to use til Friday unless they sell other stocks)
2. Shorts slowly covered throughout the day letting their foot off the gas as this was already on the website
3. At the end of the day, shorts did a mega short where they opened all of their closed positions within a 10 minute window to make it look like RC sold when in reality it was them re-opening their shorts.

Point of the matter - they knew this was filed sometime before 12 PM ET and their whole plan after that was to slowly cover their shorts and then open them all at once to make it look like someone dumped their shares.

How can we confirm this?

RC is selling his shares through JP Morgan. JPM isn't sloppy, they don't dump a million shares at once. JPM uses algorithms to sell shares over a few trading days as to maximize the price at which their client sells the shares at. This not only maximizes profits, but it helps price stability.

What we saw today was not RC offloading shares through JPM, we saw shorts playing their games.

⬆ 58 ⬇   💬 Reply   ↗ Share   •••

⊕ 4 more replies

**TheKrazyKrab23** • 2y ago

Upvote this if you are buying more at open

⬆ 56 ⬇   💬 Reply   ↗ Share   •••

**After-Suspect-7206** • 2y ago

Hopefully everyone learned their lesson from selling after halts yesterday

⬆ 56 ⬇   💬 Reply   ↗ Share   •••

**thisonelife83** • 2y ago

I'm FOMOing into BBBY today, super late, no whammies please

⬆ 56 ⬇   💬 Reply   ↗ Share   •••

⊕ 4 more replies

**Tinykun** • 2y ago

4/2/24, 9:35 AM
bbby Megathread for Wednesday August 17th 2022 : r/wallstreetbets
Case 1:22-cv-02541-TNM Document 117-3 Filed 05/17/84 Page 317 of 381



Skip to main content

Log In

That is my Tedtalk thanks

⬆ 55 ⬇   💬 Reply   ↑ Share   •••

⊕ 3 more replies

**poopbuttredditsucks** · 2y ago

Just went from 25.27 to 25.28 🚀

⬆ 57 ⬇   💬 Reply   ↑ Share   •••

⊕ [deleted] · 2y ago

**Trionappa** · 2y ago

Thats it. Im tired of it trading sideways. Ill take care of this

⬆ 56 ⬇   💬 Reply   ↑ Share   •••

⊕ 5 more replies

**Supakimchee** · 2y ago

From Bloomberg:

"Meme stocks rallies in a bear market are generally not sustainable," he said by email. "Any retracements will scare retail traders, as they can't cope with additional losses given the terrible 2022 performance."

THEY JUST CALLED ALL OF US PUSSIES. ARE YOU GONNA TAKE THAY SHIT FROM SOME HF COCKNIBBLER?

⬆ 53 ⬇   💬 Reply   ↑ Share   •••

⊕ 4 more replies

**PS_Alchemist** · 2y ago · Edited 2y ago

# For the paperhands staring at 1min chart all day:

- Tons of options contracts expire friday
- Borrowing fees are >50%
- Reg SHO put a doomsday clock on the shorts scheduled to end in less than 2 weeks from now.

# Just. Hold.

⬆ 55 ⬇   💬 Reply   ↑ Share   •••

⊕ 4 more replies

Skip to main content                                                                               Log In

⬆ 53 ⬇     💬 Reply     ⬆ Share     ···

**No_Procedure_7485** · 2y ago

No way Ryan sold, he just filing for right to sell. Doesn't make sense to piss off the same demographic that supports his GME... no logical sense to piss off the group that gave GME its fame. Why would he make enemies out of millions of people like that. He has enough money.

⬆ 54 ⬇     💬 Reply     ⬆ Share     ···

⊕ 7 more replies

**Good-Panic9706** · 2y ago

GME plummeted 50% before going up 400% get back in while you can apes

⬆ 56 ⬇     💬 Reply     ⬆ Share     ···

⊕ 3 more replies

**[deleted]** · 2y ago

Some of you didn't watch GME go from $400 to $42 to $400 and it shows

⬆ 55 ⬇     💬 Reply     ⬆ Share     ···

⊕ 5 more replies

**Accomplished_Fish_57** · 2y ago

I feel sick, why does everyone believe this story and if he sells down the road, why should I give two shits? This is squeezing shorts and the big guys havent been touched. They are screwed at $30 and constantly manage to smash it back down. Why don't people want to beat these assholes? It's fucking exhausting having a pair of balls among all these sheeple.

⬆ 53 ⬇     💬 Reply     ⬆ Share     ···

⊕ 1 more reply

⊕ **[deleted]** · 2y ago

⊕ **[deleted]** · 2y ago

**Sactorno** · 2y ago

RC did 'NOT' SELL!

Mods need to pin this.

4/2/24, 9:35 AM
BBBY Megathread for Wednesday August 17th, 2022 : wallstreetbets
Case 1:22-cv-02541-TNM   Document 117-3   Filed 05/17/24   Page 319 of 381

Skip to main content

Log In

**orockers** · 2y ago

144 filing was an Easter egg by Cohen. He's saying not to sell until $144

⬆ 52 ⬇    💬 Reply    ⬆ Share    ···

⊕ 2 more replies

**Icy_Firefighter_6464** · 2y ago

If we hit 40 today imma gonna visit my daughter in jail

⬆ 54 ⬇    💬 Reply    ⬆ Share    ···

⊕ 5 more replies

**Gamestonk5** · 2y ago

Lol I convinced my dad to buy in, and now currently trying to convince him not to sell like a paper handed bitch. Can't believe a stud like me came from such a small sack

⬆ 54 ⬇    💬 Reply    ⬆ Share    ···

⊕ 3 more replies

**CameraWheels** · 2y ago

"I'm scared" posts, "I'm confused guys" posts. "I don't know guys" posts

Fear. Uncertainty. Doubt.

Immediately coordinated at the same time the price dips. Comon people. Just use your head for a second.

⬆ 55 ⬇    💬 Reply    ⬆ Share    ···

⊕ 1 more reply

**livestreamerr** · 2y ago

everyone who is selling is going to be so mad tomorrow

⬆ 51 ⬇    💬 Reply    ⬆ Share    ···

⊕ 3 more replies

**Pleasant-Truth4672** · 2y ago

Skip to main content 

Log In

The squeeze will come between tomorrow and Monday.

Mark my words

Vote this up to the top of WSB

BBBY will be sitting on a hefty pile of e-commerce cash soon.

⬆ 52 ⬇　💬 Reply　↱ Share　⋯

⊕ 2 more replies

 **_Mehoy_Minoy** • 2y ago

Who is actually holding this? Thumbs up

⬆ 51 ⬇　💬 Reply　↱ Share　⋯

⊕ 4 more replies

⊕ [deleted] • 2y ago

 **Pap3rchasr** • 2y ago

PSA for all you newbies... the entire market is selling off. The fact that we have the volume we have and are green today is amazing. If the market was green, this shit would be $50 right now. HODL

⬆ 54 ⬇　💬 Reply　↱ Share　⋯

⊕ 1 more reply

 **No-Audience1039** • 2y ago

First post ever, just bought 100 shares. Let's do this.

⬆ 53 ⬇　💬 Reply　↱ Share　⋯

⊕ 3 more replies

 **toothpastetiger** • 2y ago

That was fun lol same tactics as GME. The media shit should be illegal

⬆ 50 ⬇　💬 Reply　↱ Share　⋯

⊕ 3 more replies

 **Upstairs_Working2773** • 2y ago

If this doesn't go up i will genuinely be bankrupt.Not a fucking joke

Skip to main content

Log In

⊕ [deleted] • 2y ago

**ElonTaxiDriver** • 2y ago

You guys realize that 30 mins before close yesterday this same drop happened and we recovered this morning it's fine chill smoke some weed go jerk off. Rocket leaves tomorrow

⬆ 51 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 4 more replies

**Hyper129** • 2y ago

STOP SELLING FUCKING PUSSIES

⬆ 49 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 1 more reply

**Pooping_ATM_** • 2y ago

WHERE ARE THE WEST COAST BADDIES AT WAKE THE FUCK UP

⬆ 48 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 5 more replies

**TankyRebel** • 2y ago

Yolo'd 20k at $25. It was supposed to be for a deck. Soon I'll be able to build MEGA DECK

⬆ 52 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 7 more replies

**pleasesolvefory** • 2y ago

If this hits $40 today I will smash my PS5 with a hammer.

⬆ 52 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 8 more replies

**spliixy** • 2y ago

If we can hit $30 today I'll post a video of me throwing my ps5 out my window

⬆ 51 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 17 more replies

4/2/24, 9:35 AM
BBBY Megathread for Wednesday August 17th, 2022 : r/wallstreetbets
Case 1:22-cv-02541-TNM · Document 117-3 · Filed 05/17/84 · Page 322 of 381

Skip to main content



for my marriage.

⬆ 51 ⬇ 💬 Reply ⬆ Share •••

⊕ 5 more replies

[deleted] • 2y ago • Edited 2y ago

Tell me right here right now, do I sell my 700 amc shares I have in a separate account (up 82% on them) and put it all in BBBY? I swear I'll fucking do it

Edit: done. Hadn't sold a single amc share till then. Will be putting it all into BBBY. Thank you my friends

⬆ 52 ⬇ 💬 Reply ⬆ Share •••

⊕ 37 more replies

neprietenos • 2y ago

You nimwits freaking out over this movement forget

1. This volatility is part of the casino ride of meme stocks
2. Either you believe the DD or not, and if you do, you know it's still going to climb
3. You haven't lost any money unless you sold, just like you have actually gained any until you've sold.

Just chill 🧘

⬆ 49 ⬇ 💬 Reply ⬆ Share •••

⊕ 1 more reply

ssaxamaphone • 2y ago

Oh shit! https://news-static.webullfintech.com/us/news-html/20220817/52523835.html

We don't need an RC tweet now!

⬆ 51 ⬇ 💬 Reply ⬆ Share •••

⊕ 13 more replies

Big-University5876 • 2y ago

I truly think Wall Street is doing its damnedest to deter us. All these articles I've read today are trying to make people who bought into this short squeeze play look like idiots. I truly think Wall Street knows it will blow up but they want to do their best to make us look like we're the suckers for taking advantage of their own bullshit.

IM NOT FUCKIN LEAVIN

⬆ 51 ⬇ 💬 Reply ⬆ Share •••

Case 1:22-cv-02541-TNM   Document 117-3   Filed 05/17/84   Page 223 of 381

Skip to main content      Log In

**xheyoooo** · 2y ago

Cohen can't sell for 2 months. Don't listen to the FUD

⬆ 48 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 4 more replies

**aka0007** · 2y ago

BBBY is at 1.5B market cap... GME is about 12B.

That is 8X... Retail interest in this alone can take BBBY there and Beyond. 8X would be $150 per share.

In a squeeze we can go much higher and enjoy tendies.

The people that wanted out at $20-$25 have left the building. Going forward this is going to be driven by regard power. Once again all the smart people, saying this is going to backfire will be at a loss.

Tomorrow this goes to $40+. Friday to Valhalla.

⬆ 48 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 7 more replies

⊕ **[deleted]** · 2y ago

**LonelySteak5644** · 2y ago

ILL GET A WSB TATTOO ON MY FACE IF IT HITS $30 BY TODAY

⬆ 46 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 12 more replies

**BigBodyBrax** · 2y ago

Comment removed by Reddit

⬆ 47 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 3 more replies

**bobbyjeweler** · 2y ago

just spent 4 hours doing technical analysis. BBBY should hit between $4,700-5,000 by the end of the day

⬆ 46 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 6 more replies

Case 1:22-cv-02541-TNM   Document 117-3   Filed 05/17/84   Page 324 of 381

Skip to main content                                                   Log In

Edit: article is up but they changed the headline.

⬆ 46 ⬇    💬 Reply    ⬆ Share    •••

⊕ 7 more replies

**No-Statistician-2509** • 2y ago

People are starting to realize this RC news is fake. See yall back at $28 tomorrow :)

⬆ 50 ⬇    💬 Reply    ⬆ Share    •••

⊕ [deleted] • 2y ago

⊕ [deleted] • 2y ago

**PM_ME_UR_GUN_PICS** • 2y ago

# DUMPED IN AN EXTRA $1k YESTERDAY TO THE MOOOOON🚀🚀🚀🚀🚀🚀

⬆ 48 ⬇    💬 Reply    ⬆ Share    •••

**thm2130** • 2y ago

Shills in here spreading FUD that they lost money with thousands of shares.

If you have 3000 shares and somehow lost money on a stock that's been green for the past two weeks, you're legitimately fucking retarded. Even today, we're still up 20% since close.

How fucking brain dead are you

Don't listen to these pieces of shit

⬆ 49 ⬇    💬 Reply    ⬆ Share    •••

⊕ 3 more replies

⊕ [deleted] • 2y ago

**pleasesolvefory** • 2y ago

I'm an idiot who bought $83k worth at $26 today. I'm honestly nervous that I'm reading so many "tomorrow we gonna fly!" comments because it reminds me of when everyone thought BB was gonna fly and it totally Fucking didn't lol. I may have just ruined my own life. Man all I wanted to do was pay off my Rav 4. I don't even want a lambo. Fuck me.

Skip to main content

Log In

**SpaceGypsyInLaws** · 2y ago

It was a shit day for every stock. But all the energy spent trying to sabotage BBBY tells me the hedgies are scared shitless.

⬆ 47 ⬇   💬 Reply   ⬆ Share   ···

⊕ 1 more reply

**supremojoe** · 2y ago

Cramer has 1.9 million followers on Twitter. His tweets get an average of 200 likes. That there should tell you nobody gives a fuck about this loser.

⬆ 45 ⬇   💬 Reply   ⬆ Share   ···

⊕ 1 more reply

**Lijpe_Tjap** · 2y ago

I'm sitting in a plane, next to a crying child and soon I will have no internet to watch the ticker. Pray for me please.

⬆ 49 ⬇   💬 Reply   ⬆ Share   ···

⊕ 6 more replies

**TooMuchRGB** · 2y ago

Guys this is exactly like GME why would you freak out lmao

⬆ 45 ⬇   💬 Reply   ⬆ Share   ···

⊕ 2 more replies

**Fresh_Function8700** · 2y ago

Skip to main content                                                           Log In

If we believe in something, we should all hold on to it together, right?

If that's the case, why are so many of us still asking themselves whether to buy or wait and see?

What do you have to lose? 50-200$?

If the price goes up and you're still waiting, don't you think you'd regret not getting in before?

# Look at the damn chart of the last week and month.

The question is not whether to get in, but "do I want to be in?" If yes, just do it.

One Group, One Family - All APES 🦍

RETARDS LETS GO 🚀🚀🚀

# #BBBY

⬆ 44 ⬇        💬 Reply        ⬆ Share        •••

   ⊕ 2 more replies

🦌 **TheGuildedCunt** • 2y ago

A fucking 8 figure sell order and massive put buying at close that just happened to coincide with fud from news outlets w/ a single parent company had people spooked? C'mon, act like you've been here before.

⬆ 46 ⬇        💬 Reply        ⬆ Share        •••

🦌 **[deleted]** • 2y ago

 On August 17, 2022, in response to certain media inquiries, Bed Bath & Beyond Inc. (the "Company") made the following statement: "We were pleased to have reached a constructive agreement with RC Ventures in March and are committed to maximizing value for all shareholders. We are continuing to execute on our priorities to enhance liquidity, make strategic changes and improve operations to win back customers, and drive cost efficiencies; all to restore our company to its heritage as the best destination for the home, for all stakeholders. Specifically, we have been working expeditiously over the past several weeks with external financial advisors and lenders on strengthening our balance sheet, and the Company will provide more information in an update at the end of this month." 🧑

⬆ 45 ⬇        💬 Reply        ⬆ Share        •••

   ⊕ 1 more reply

 **Dakotadabbz** • 2y ago

Skip to main content

Log In

⬆ 44 ⬇ 💬 Reply ⬆ Share ···

⊕ 3 more replies

**Banshee_Mac** · 2y ago

Just popped 10 shares, sitting in the office in the UK.

10 @ $27.5

I'm here for a good time. Can't stop watching the ticker and the price fluctuate. So erotic.

🍉

⬆ 47 ⬇ 💬 Reply ⬆ Share ···

**Networkishard00** · 2y ago

I'm late to the party, but I put in my full stack. $38,000. Glad to be here boyos. Lets do it! (mix of stock / options)

⬆ 45 ⬇ 💬 Reply ⬆ Share ···

⊕ 4 more replies

**aab4kmt** · 2y ago

Guy made news lol

"One trader on Reddit claims he took out a $27,000 loan to go all in on Bed, Bath & Beyond shares nine days ago on Aug. 8—a bet that could have made him $20,000, had he not pulled his investment two days later when the stock dipped."

https://fortune.com/2022/08/17/bed-bath-beyond-share-price-jump-ryan-cohen-bet/

⬆ 46 ⬇ 💬 Reply ⬆ Share ···

⊕ 2 more replies

**ubiquitous-magoo** · 2y ago

Why would Ryan Cohen buy calls at 60-80 dollars and buy 9% stake in $BBBY if he didn't expect shorties to shit the bed, bath and beyond

⬆ 43 ⬇ 💬 Reply ⬆ Share ···

**OB1KENOB** · 2y ago

Let me remind you that if we surpass $60, Ryan Cohen will most likely exercise his bajillion calls and we will FUCKING MOOOOOON

Skip to main content 

Log In

 **yaMomsChestHair** • 2y ago

idk why people are getting all ancy, it's holding above 25 lmao that's pretty incredible.

⬆ 45 ⬇   💬 Reply   ⬆ Share   •••

⊕ 3 more replies

 **Campbell27** • 2y ago

98% float, the hedgies have essentially DOUBLED their short positions, when they can't cover they'll have to buy the shares, pushing more into the market rising the price, we're essentially pulling back the slingshot and once that happens BBBY SHOOTS to the moon, maybe to Pluto

⬆ 45 ⬇   💬 Reply   ⬆ Share   •••

⊕ 4 more replies

 **YoloTendies** • 2y ago

We are "only" up 22% today and it's boring.

Friendly reminder that a high performing index fund typically yields less than that every two years

⬆ 46 ⬇   💬 Reply   ⬆ Share   •••

 **KotikKekV2** • 2y ago • Edited 2y ago

Is anyone expecting $30 today ?

⬆ 44 ⬇   💬 Reply   ⬆ Share   •••

⊕ 10 more replies

 **[deleted]** • 2y ago

I wish my parents loved me like BBBY loves $25.00

⬆ 45 ⬇   💬 Reply   ⬆ Share   •••

⊕ 1 more reply

 **RCEast** • 2y ago

Sentiment in here is garbage from some of you all. If we close up 20% on a big red day on the markets that's prime for another explosion tomorrow

⬆ 44 ⬇   💬 Reply   ⬆ Share   •••

⊕ 2 more replies

Skip to main content 

Log In

# RYAN COHEN HAS NOT SOLD HIS FUCKING BBBY SHARES. HE NEEDS TO FILE A FORM 144 TO EVENTUALLY SELL HIS OTM JAN 2023 CALLS BEFORE THEY EXPIRE.

⬆ 43 ⬇    💬 Reply    ⬆ Share    ⋯

⊕ 6 more replies

⊕ [deleted] • 2y ago

**ImADegenerateGambler** • 2y ago

No one sold, Citadel sent their bots in here to scare us. The objective remains the same, get BBBY to $420.69. New objective too, make Ken Griffin sob like a little bitch.

⬆ 43 ⬇    💬 Reply    ⬆ Share    ⋯

⊕ 2 more replies

**BabisAllos** • 2y ago

Ryan Cohen cannot sell before September without returning any capital gains to BBBY because of the short swing rule.

https://www.reddit.com/r/wallstreetbets/comments/wqzdz0/ryan_cohen_did_not_sell_shares_he_filed_a_form/?utm_source=share&utm_medium=ios_app&utm_name=iossmf

⬆ 44 ⬇    💬 Reply    ⬆ Share    ⋯

[deleted] • 2y ago

Ha. I've made bigger mistakes in life than this. Up or down I'm riding this one out. Show me the way boys

⬆ 43 ⬇    💬 Reply    ⬆ Share    ⋯

**Traditional-Cattle62** • 2y ago

you're literally retarded if you sell here at a loss if you look at the chart this same thing happened yesterday. They don't want it at $25 or higher on friday at 3pm because a lot of options will get exercised and they'll have to buy back shares at the current price it's at 3pm pushing the stock up because they will have to cover lmao. If the stock was sitting at $2-5 then shit your pants but if you sell on a $3-5 pullback then that's weak. Lol and don't buy more then you can afford to lose.

⬆ 43 ⬇    💬 Reply    ⬆ Share    ⋯

⊕ 8 more replies

4/2/24, 9:35 AM
BBBY Megathread for Wednesday August 17th 2022 : r/wallstreetbets
Case 1:22-cv-02541-TNM · Document 117-3 · Filed 05/17/84 · Page 330 of 381

Skip to main content

Log In

emotional. One must first step back and analyze the situation. After careful analysis, I have decided to panick buy instead.

⬆ 46 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 5 more replies

**origami_asshole** • 2y ago

You do realize this was basically 26-29 dollars before the fake news, and now we actually have bullish news from BBBY management itself. 🚀🚀🚀

⬆ 44 ⬇   💬 Reply   ↑ Share   ⋯

**Return_Viper** • 2y ago

It's not much but I'm putting 500$ into bbby, to the moon 🚀

⬆ 44 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 5 more replies

**abbycat1590** • 2y ago

Just yoloed my kids college fund on this

⬆ 44 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 18 more replies

**SubtleRedditIcon** • 2y ago • Edited 2y ago

Upvote if you're holding! Downvote if you want to date Cramer!

⬆ 45 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 2 more replies

**InventTimesNewRoman** • 2y ago

Do NOT place limit sells at $30 or $28 or whatever. Hold them free. Limit sells hurt trajectory! 👆🫲🚀🚀

⬆ 41 ⬇   💬 Reply   ↑ Share   ⋯

⊕ 1 more reply

**bankingbets** • 2y ago

# Just remember they're losing billions trying to bore you out of your position in hopes you think it's over.

⬆ 42 ⬇   💬 Reply   ↑ Share   ⋯

Skip to main content                                                                    Log In

 **seamus_mcfly86** • 2y ago

Man they are going all out with FUD on social media right now. People posting RC sold (not true), that BBBY announced massive layoffs and negative guidance (not that I can tell), and BBBY to issue millions of new shares (outright lie).

Fuck these dirtbags. To me that shit is a sign of desperation.

⬆ 44 ⬇        💬 Reply      ⬆ Share      ⋯

⊕ 3 more replies

 **taffy_laffy** • 2y ago

We expect the BBBY short squeeze to **continue as mark-to-market losses continue to mount and more new short sellers get in at these higher stock prices** looking for a whipsaw of stock prices down," Dusaniwsky added.

here is all u need to know about what happened today

# new shorts at new price levels + fud about RC timed to make it look like a rugpull

shorts have opened new positions at those higher prices and piled in

# squeeze basically got bigger

trying to make sense of it all for you smooth apes.

loading up more tomorrow

⬆ 43 ⬇        💬 Reply      ⬆ Share      ⋯

⊕ 5 more replies

 **MSAPPLIEDSTATS** • 2y ago

I use to panick and sell now I'm calm

⬆ 44 ⬇        💬 Reply      ⬆ Share      ⋯

⊕ 5 more replies

**Lijpe_Tjap** • 2y ago

I'm always offended when they call us 'retail investors'. We are retard investors, get your facts straight!

⬆ 44 ⬇        💬 Reply      ⬆ Share      ⋯

Skip to main content                                                                                    Log In

**Every_Builder2615** · 2y ago

Im tired of seeing $25.25, can we see $35.35 instead?

⬆ 44 ⬇   💬 Reply   ↑ Share   ⋯

➕ 4 more replies

**ConferenceParking214** · 2y ago

EVERYONE calm the FUCK down; RYAN COHEN DID NOT SELL

⬆ 44 ⬇   💬 Reply   ↑ Share   ⋯

➕ 4 more replies

**Similar_Jelly** · 2y ago

COHEN DID NOT SELL YOU FUCKING REGARDS

⬆ 44 ⬇   💬 Reply   ↑ Share   ⋯

➕ 2 more replies

**origami_asshole** · 2y ago

They're literally creating fake news from ordinary sec filings to stop the pump

⬆ 44 ⬇   💬 Reply   ↑ Share   ⋯

➕ 1 more reply

**Mindless-Wrongdoer11** · 2y ago

Cohen has 5000 calls @80 . Don't be dumb.

⬆ 40 ⬇   💬 Reply   ↑ Share   ⋯

➕ 1 more reply

**RudeJudeDETROIT** · 2y ago

# COHENS STILL IN :)

# GET THE WORD OUT TO THE PEOPLE

⬆ 40 ⬇   💬 Reply   ↑ Share   ⋯

➕ 1 more reply

[deleted] · 2y ago

Skip to main content

Log In

suck my clit and balls

↑ 44 ↓   💬 Reply   ↱ Share   ···

⊕ 1 more reply

⊕ [deleted] · 2y ago

**Mgentile4** · 2y ago

We're hitting 35 tomorrow

↑ 44 ↓   💬 Reply   ↱ Share   ···

⊕ 1 more reply

[deleted] · 2y ago

Can't wait for bbby to rocket tomorrow when everyone figures out the 144 was actually bullish

↑ 44 ↓   💬 Reply   ↱ Share   ···

⊕ 1 more reply

[deleted] · 2y ago

Tomorrow is going to be massive

↑ 42 ↓   💬 Reply   ↱ Share   ···

**Autistic-Ape-followr** · 2y ago

I am appalled by the number of paper hands here. Sack up or gtfo

↑ 44 ↓   💬 Reply   ↱ Share   ···

⊕ 1 more reply

**duanleag** · 2y ago

Stock has a single -10% day after a face ripping rally and people are acting like cucks over it. Harden the fuck up gentlemen

↑ 41 ↓   💬 Reply   ↱ Share   ···

**Terrible_memory1** · 2y ago

Bbby hits 80 this Friday I'll staple my balls to a piece of wood

↑ 41 ↓   💬 Reply   ↱ Share   ···

4/2/24, 9:35 AM
BBBY Megathread for Wednesday August 17th, 2022 : wallstreetbets
Case 1:22-cv-02541-TNM · Document 117-3 · Filed 05/17/84 · Page 334 of 381

Skip to main content

Log In

[deleted] · 2y ago

**Hot-Goal2240** · 2y ago

Europe pushed it yesterday so hard and you fucked it down. Today is your last chance to win.

⬆ 40 ⬇    💬 Reply    ⬆ Share    ⋯

⊕ 1 more reply

**TheGentleman87** · 2y ago

Not gonna lie... almost paper hands.... BUT WAIT 🤚.... the more i see everyone unite the more i feel like saying FUCK IT!!! TO THE MOON OR TO THE FUCKIN SUN!!! I'M NOT SELLING... I'LL HOLD UNTIL THOSE CUCKS PAY!!!! I believe my inner ape has awakened this day 🦍 🦍 #BBBY

⬆ 40 ⬇    💬 Reply    ⬆ Share    ⋯

⊕ 3 more replies

**Fresh_Function8700** · 2y ago

# Dont forget to UPVOTE EVERY COMMENT + THREAD to push the Stocks Trending Algorithm & add #BBBY to anything after you wrote 💪 one team - one goal 👏 BIG LOVE ❤️

**#BBBY**

**#UPVOTE**

⬆ 41 ⬇    💬 Reply    ⬆ Share    ⋯

**Somerandomperson21** · 2y ago

RC didn't sell a single damn share

Cramer is a piece of shit

BBBY and GME will 🚀 🙂 🔜

⬆ 44 ⬇    💬 Reply    ⬆ Share    ⋯

**ContentEmploy3404** · 2y ago

Petition to rename the thread to Thursday, August, 18th, 2022 💚

⬆ 43 ⬇    💬 Reply    ⬆ Share    ⋯

⊕ 2 more replies

Skip to main content                                                                                      Log In

rocking chair.

⌃ 39 ⌄        💬 Reply        ↑ Share        ···

⊕ 4 more replies

**Select-Excuse-9948** • 2y ago

Citadel held over $100m worth of derivates that held BBBY short at the beginning of the month and currently is only holding $20-30m left, they know they're f**ked on the position (you didnt hear this from me )

⌃ 39 ⌄        💬 Reply        ↑ Share        ···

⊕ 2 more replies

**colonia25** • 2y ago

Same trajectory as GME 2 years ago. Now is the time to buy.. the real squeeze is coming! 💎

⌃ 39 ⌄        💬 Reply        ↑ Share        ···

⊕ 3 more replies

**addam875** • 2y ago

This squeeze has not yet been fully squozen

⌃ 41 ⌄        💬 Reply        ↑ Share        ···

⊕ 2 more replies

**[deleted]** • 2y ago

$100 EOW?

⊖ ⌃ 39 ⌄        💬 Reply        ↑ Share        ···

**NewHome_PaleRedDot** • 2y ago

End of Wednesday?

⌃ 42 ⌄        💬 Reply        ↑ Share        ···

⊕ 1 more reply

⊕ 2 more replies

**Loadingexperience** • 2y ago

Lol at shills saying take profit. Cramer is working overtime

⌃ 41 ⌄        💬 Reply        ↑ Share        ···

⊕ 1 more reply

Skip to main content                                                Log In

⬆ 40 ⬇   💬 Reply   ↱ Share   ···

**Outrageous-Thing6841** · 2y ago

Just doubled my investment at $25.... Fuck it 🚀

⬆ 38 ⬇   💬 Reply   ↱ Share   ···

⊕ 1 more reply

⊕ **[deleted]** · 2y ago

**jimdye88** · 2y ago

I'm sorry guys I just bought 5 grand worth

⬆ 39 ⬇   💬 Reply   ↱ Share   ···

**PrimaryAccording9162** · 2y ago

Why sell at $25 when you can sell at $100

⬆ 41 ⬇   💬 Reply   ↱ Share   ···

⊕ 3 more replies

**[deleted]** · 2y ago

Is this the right time to take out a loan for BBBY?

⬆ 39 ⬇   💬 Reply   ↱ Share   ···

⊕ 9 more replies

View more comments

# More posts you may like

 r/wallstreetbets

Sofi

54 upvotes · 57 comments



Skip to main content                                                                                      Log In

149 upvotes  ·  20 comments

---

r/GME

**r/GME Megathread for August 06, 2022**

69 upvotes  ·  54 comments

---

r/Treaty_Creek

**AUG 10, 2022 TREATY CREEK DAILY UPDATE**



2 upvotes  ·  10 comments

---

r/GME

**r/GME Megathread for July 27, 2022**

134 upvotes  ·  122 comments

---

r/GME

**r/GME Megathread for Thursday - January 06, 2022**

185 upvotes  ·  494 comments

---

r/GME

**r/GME Megathread for March 01, 2022**

119 upvotes  ·  89 comments

---

r/BeamNG

**I just found something. Should I be concearned?**

14 upvotes  ·  5 comments

---

r/winnipegjets

**ODT - Aug 8, 2022**

43 upvotes  ·  129 comments

---

r/wallstreetbetsOGs

**What Are Your Moves Tomorrow - August 10, 2022**

27 upvotes  ·  660 comments

---

                                            Log In

reReddit: Top posts of August 17, 2022

  Reddit

reReddit: Top posts of August 2022

  Reddit

reReddit: Top posts of 2022

# EXHIBIT 48

01/27/2021, 14:07 p.m. - David: We have 6,200 contracts on Unib 🙈 🙈 🙈 🙈

01/27/2021, 14:07 p.m. - David: 60 on average is madness - we don't even realize what it's doing

01/27/2021, 14:08 p.m. - David: It will have taken JP out of the picture... and all the cash needed and a deleverage on the crazy lines...

01/27/2021, 14:17 p.m. - BO RUSSE NEW: 🤩 🙏🏼 🤗 yes that's clear

01/27/2021, 14:17 p.m. - BO RUSSE NEW: this deal is crazy

01/27/2021, 14:22 p.m. - BO RUSSE NEW: have your guys heard the news?

01/27/2021, 14:22 p.m. - BO RUSSE NEW: nothing on the radars?

01/27/2021, 14:22 p.m. - David: Nothing for now

01/27/2021, 14:23 p.m. - BO RUSSE NEW: the rynoks are suffering

01/27/2021, 14:24 p.m. - BO RUSSE NEW: great we're going to bring back some crazy stuff

01/27/2021, 14:24 p.m. - BO RUSSE NEW: However, the results are shitty

01/27/2021, 14:27 p.m. - David: But the cash isn't bad

01/27/2021, 14:35 p.m. - David: Did you get out of urw?

01/27/2021, 14:36 p.m. - David: 2,400 contracts got out in late February I would say keep your line

01/27/2021, 14:36 p.m. - David: That way there is always stream

01/27/2021, 14:37 p.m. - BO RUSSE NEW: I'll keep it

01/27/2021, 14:37 p.m. - David: Yes great

01/27/2021, 14:37 p.m. - BO RUSSE NEW: news about to be released

01/27/2021, 14:38 p.m. - BO RUSSE NEW: I'm going to take back car at 25 😏

01/27/2021, 14:38 p.m. - David: In theory, the Robin Robinwooders are going after all the shortlisted companies in Europe and the US

01/27/2021, 14:38 p.m. - David: With the Serena Reddit guy's website, they are spreading the word about the need to smash shorter funds

01/27/2021, 14:39 p.m. - BO RUSSE NEW: 🙈

01/27/2021, 14:39 p.m. - BO RUSSE NEW: the stock market is crazy

01/27/2021, 14:39 p.m. - BO RUSSE NEW: nothing economical about it anymore

01/27/2021, 14:42 p.m. - David: But wars of financial nerves

01/27/2021, 14:42 p.m. - David: 💩 He phoned me I told him when you told me 40 I was thinking we're going to 80

01/27/2021, 14:42 p.m. - BO RUSSE NEW: 😂

01/27/2021, 14:42 p.m. - BO RUSSE NEW: hahaha

01/27/2021, 14:43 p.m. - David: He laughed out loud and told me that as long as I was making you money, that was my job

01/27/2021, 14:46 p.m. - BO RUSSE NEW: 😉

01/27/2021, 14:47 p.m. - BO RUSSE NEW: you're actually the one who's making it happen

01/27/2021, 14:48 p.m. - BO RUSSE NEW: don't let the uc back explode

01/27/2021, 14:48 p.m. - BO RUSSE NEW: at 60

01/27/2021, 14:48 p.m. - BO RUSSE NEW: 🙈

01/27/2021, 14:49 p.m. - David: He's carrying out orders...

01/27/2021, 14:49 p.m. - David: As long as I gain us some, that's what counts

01/27/2021, 14:49 p.m. - David: Results on 02.10...

01/27/2021, 14:49 p.m. - David: But a return to 60 is not also not bad

01/27/2021, 14:49 p.m. - David: To recharge

01/27/2021, 14:50 p.m. - BO RUSSE NEW: yes

01/27/2021, 14:50 p.m. - David: Because with the releases coming up between now and the results, you need new opportunities

CONFIDENTIAL

01/27/2021, 14:53 p.m. - David: Tesla is publishing after the closing...
01/27/2021, 15:03 p.m. - David: 65.44 is great
01/27/2021, 15:03 p.m. - David: Don't get carried away for bow either
01/27/2021, 15:03 p.m. - David: Now
01/27/2021, 15:05 p.m. - BO RUSSE NEW: Yes of course
01/27/2021, 15:05 p.m. - BO RUSSE NEW: there is still plenty to be had
01/27/2021, 15:07 p.m. - David: That's it, I'd like 2 more hot units
01/27/2021, 15:07 p.m. - David: Stay until the end of February Titi and Ela are still on their way
01/27/2021, 15:09 p.m. - BO RUSSE NEW: 😂
01/27/2021, 15:10 p.m. - BO RUSSE NEW: It's going to be tense. 3 weeks is already a lot 😂
01/27/2021, 15:10 p.m. - BO RUSSE NEW: when are they coming?
01/27/2021, 15:10 p.m. - David: What is tense?
01/27/2021, 15:10 p.m. - David: The weather?
01/27/2021, 15:11 p.m. - David: End of next week when it's going better for Ela and Titi they'll get into it, so they'll be fine.
01/27/2021, 16:18 p.m. - David: I sold puts on gamestop at 70 the volume is at 1,000
01/27/2021, 16:18 p.m. - David: It's paying 50k usd
01/27/2021, 16:18 p.m. - David: Until the day after tomorrow
01/27/2021, 16:18 p.m. - BO RUSSE NEW: 😂
01/27/2021, 16:18 p.m. - BO RUSSE NEW: great at least there will have been a ticket made
01/27/2021, 16:19 p.m.-BO RUSSE NEW: ☐
01/27/2021, 19:30 p.m. - David: 8 billion in quarterly losses at boeing that hurts
01/27/2021, 22:04 p.m. - David: <Media omitted>
01/27/2021, 22:04 p.m. - David: Look at the after....it's going at 500....
01/27/2021, 22:05 p.m. - David: <Media omitted>
01/27/2021, 22:05 p.m. - David: I'm going to keep an eye on it
01/28/2021, 00:59 - BO RUSSE NEW: the guys are saying that when the short % falls back below 100%, it will have to drop
01/28/2021, 01:16 - BO RUSSE NEW: Tesla's results aren't great
01/28/2021, 05:46 - BO RUSSE NEW: I saw a guy had rented the C8 corvette. it still looks a bit Jacky, 😂 not Fefe or Lambo.
01/28/2021, 06:09 - David: It dove by 5 points have to wait and see if more during the session
01/28/2021, 06:09 - David: It lost 15 points to 292 at the end of after hours...
01/28/2021, 06:10 - David: It's not Italian or German, it's American, so be careful
01/28/2021, 06:10 - BO RUSSE NEW: yes it is Jacky 😂
01/28/2021, 06:11 - BO RUSSE NEW: we'll have to see it would be great to return to 700
01/28/2021, 06:12 - David: We'll have to wait and see what happens today uni and the rest of the market....are the buyers running out of steam or not???
01/28/2021, 06:12 - David: Are new short sellers arriving
01/28/2021, 06:12 - BO RUSSE NEW: I think the US will go green again
01/28/2021, 06:12 - BO RUSSE NEW: they're sitting themselves
01/28/2021, 06:12 - BO RUSSE NEW: shitting
01/28/2021, 06:13 - David: After the possible small purge
01/28/2021, 06:13 - David: It was brutal, so we'll have to wait and see, because if there are fewer short sells, stocks will also fall less
01/28/2021, 06:14 - BO RUSSE NEW: yes
01/28/2021, 06:18 - David: <Media omitted>

BRATYA_000606

01/28/2021, 06:18 - David: Things are going to get messy if Tesla gets liquidated
01/28/2021, 06:19 - BO RUSSE NEW: if it drops on Uni you have to rebalance it
01/28/2021, 06:19 - David: Yes but on 60 not on 70 too hot what happened without sale of assets without announcements
01/28/2021, 06:20 - BO RUSSE NEW: yes on 60 directly
01/28/2021, 06:21 - David: We'll see what the impact of today's option will be, and whether it will hold on the 65....if we already have this and the rest are released
01/28/2021, 06:21 - BO RUSSE NEW: yes clearly
01/28/2021, 06:21 - BO RUSSE NEW: but there is no reason for it to go down now
01/28/2021, 06:21 - BO RUSSE NEW: the results aren't disastrous
01/28/2021, 06:22 - BO RUSSE NEW: Luxury and techs are all booming
01/28/2021, 06:22 - BO RUSSE NEW: that's perhaps where it will go down 😂
01/28/2021, 06:22 - BO RUSSE NEW: the markets are incomprehensible
01/28/2021, 06:23 - David: They sell without charges they cut everything ....so they like it
01/28/2021, 06:25 - BO RUSSE NEW: yes
01/28/2021, 07:05 - BO RUSSE NEW: we're going to ozon 1:30 p.m.
01/28/2021, 07:05 - BO RUSSE NEW: are you coming?
01/28/2021, 07:05 - David: EAUZONE
01/28/2021, 07:05 - David: With who all?
01/28/2021, 07:05 - BO RUSSE NEW: yes
01/28/2021, 07:06 - David: Am I booking are you booking??
01/28/2021, 07:06 - BO RUSSE NEW: changes of mask 🙊
01/28/2021, 07:07 - BO RUSSE NEW: yes call bublik had booking a 1:30 p.m.
01/28/2021, 07:07 - BO RUSSE NEW: ask for a big table
01/28/2021, 07:07 - BO RUSSE NEW: it must have slipped her mind
01/28/2021, 07:23 - David: 6 adults 1 baby
01/28/2021, 07:23 - David: I'll be there shortly
01/28/2021, 07:57 - BO RUSSE NEW: ☐
01/28/2021, 09:48 - David: Did your unib exit go well
01/28/2021, 09:50 - BO RUSSE NEW: kind of
01/28/2021, 09:50 - BO RUSSE NEW: -4.5 it's nothing
01/28/2021, 09:55 - BO RUSSE NEW: should I buy or not 🙄
01/28/2021, 09:58 - David: Not yet
01/28/2021, 09:59 - BO RUSSE NEW: I'm waiting for 80 😂
01/28/2021, 09:59 - BO RUSSE NEW: the US is on fire
01/28/2021, 10:39 - BO RUSSE NEW: we're leaving
01/28/2021, 14:59 p.m. - David: Curvac at minus 8
01/28/2021, 15:00 p.m. - David: May be worth a look but crap volumes in options
01/28/2021, 15:00 p.m. - BO RUSSE NEW: yes I see so
01/28/2021, 15:01 p.m. - BO RUSSE NEW: fuck they're still going
01/28/2021, 15:01 p.m. - BO RUSSE NEW: on american airlines
01/28/2021, 15:01 p.m. - BO RUSSE NEW: first majestic silver
01/28/2021, 15:02 p.m. - BO RUSSE NEW: shortsqueez
01/28/2021, 15:06 p.m. - BO RUSSE NEW: leaving the game for tomorrow?
01/28/2021, 15:28 p.m. - David: Yes I'm preparing something for that
01/28/2021, 15:33 p.m. - David: https://www.marketwatch.com/story/reddit-co-founder-alexis-

BRATYA_000607

ohanian-
compares-gamestops-epic-ride-to-occupy-wall-street-i-dont-think-we-go-back-to-a-world-before-this-
11611843100

01/28/2021, 15:34 p.m. - BO RUSSE NEW: yes it's clear that it hurst

01/28/2021, 15:34 p.m. - BO RUSSE NEW: but the funds have more cash and more power

01/28/2021, 15:35 p.m. - BO RUSSE NEW: so they're going to smash my robinhoods

01/28/2021, 15:35 p.m. - David: That's not why you never get screwed

01/28/2021, 15:35 p.m. - BO RUSSE NEW: they're hiding behind reddit traders, but in reality it's funds screwing other funds

01/28/2021, 15:36 p.m. - David: That's what I'm thinking

01/28/2021, 15:39 p.m. - BO RUSSE NEW: it's obvious. they're using the social trend

01/28/2021, 15:39 p.m. - BO RUSSE NEW: but the big money is the funds they put on the table

01/28/2021, 15:42 p.m. - BO RUSSE NEW: <Media omitted>

01/28/2021, 15:42 p.m. - BO RUSSE NEW: the guys are crazy

01/28/2021, 15:42 p.m. - BO RUSSE NEW: Robin has blocked the transactions

01/28/2021, 15:43 p.m. - BO RUSSE NEW: <Media omitted>

01/28/2021, 15:44 p.m. - BO RUSSE NEW: <Media omitted>

01/28/2021, 15:44 p.m. - BO RUSSE NEW: 😂

01/28/2021, 15:50 p.m. - BO RUSSE NEW: it's still crazy that Robin has blocked the purchases

01/28/2021, 15:50 p.m. - BO RUSSE NEW: imagine the manipulations to not lose cash

01/28/2021,15:51 p.m. - David: The guys have a lot of other platforms and the Indians are on the attach on GME

01/28/2021, 15:51 p.m. - BO RUSSE NEW: it's really great 🤪

01/28/2021, 15:52 p.m. - David: Options trading is madness

01/28/2021, 15:52 p.m. - David: I'm busy scraping together another 50k

01/28/2021, 15:57 p.m. - BO RUSSE NEW: 😂🤭🤭

01/28/2021, 15:57 p.m. - BO RUSSE NEW: fuck it still has to hold

01/28/2021, 15:57 p.m. - BO RUSSE NEW: tomorrow

01/28/2021, 15:57 p.m. - David: Until Monday

01/28/2021, 15:57 p.m. - David: It's still pulling

01/28/2021, 15:57 p.m. - BO RUSSE NEW: don't let them make a mess

01/28/2021, 15:57 p.m. - David: They can't it's only announcements

01/28/2021, 15:57 p.m. - David: The market is free

01/28/2021, 15:58 p.m. - BO RUSSE NEW: you'll see with Robin hoods it's not as free as you think) 🍌

01/28/2021, 15:58 p.m. - David: The guys got their asses kicked, which is a world first in this proportion, but that's what Carl did to Billy on Herba

01/28/2021, 15:58 p.m. - BO RUSSE NEW: yes

01/28/2021, 16:02 p.m. - BO RUSSE NEW: curevac check if it's paying

01/28/2021, 16:03 p.m. - David: I can't right now

01/28/2021, 16:03 p.m. - David: Game stop biggest of the russel 2000 tomorrow risks returning to the SP 🙈🙈🙈

01/28/2021, 16:03 p.m. - David: I'm squeezing

01/28/2021, 16:03 p.m. - BO RUSSE NEW: hahahahahaha

01/28/2021, 16:04 p.m. - BO RUSSE NEW: 🙈😂

01/28/2021, 16:19 p.m. - BO RUSSE NEW:  How are you guys buying my brokers are not submitting my orders, not even Hargreaves

BRATYA_000608

01/28/2021, 16:20 p.m. - BO RUSSE NEW: a lot of platforms are blocking purchases
01/28/2021, 16:20 p.m. - BO RUSSE NEW: the assholes
01/28/2021, 16:21 p.m. - BO RUSSE NEW: the guys are holding
01/28/2021, 16:21 p.m. - BO RUSSE NEW: so it's great
01/28/2021, 16:21 p.m. - David: 🙈🙈🙈
01/28/2021, 16:21 p.m. - BO RUSSE NEW: 👊 tomorrow it's going to be great
01/28/2021, 16:42 p.m. - BO RUSSE NEW: <Media omitted>
01/28/2021, 16:42 p.m. - BO RUSSE NEW: BB 🙈
01/28/2021, 16:43 p.m. - BO RUSSE NEW: <Media omitted>
01/28/2021, 16:47 p.m. - BO RUSSE NEW: the 👆 are going to take the profits if it goes to shit.
01/28/2021, 16:47 p.m. - David: 🤣🤣🤣
01/28/2021, 16:47 p.m. - BO RUSSE NEW: it has to hold for 2 days
01/28/2021, 16:48 p.m. - BO RUSSE NEW: did you put 70?
01/28/2021, 16:48 p.m. - David: 115
01/28/2021, 16:48 p.m. - David: Yes
01/28/2021, 16:49 p.m. - BO RUSSE NEW: it's running out of steam a bit. as soon as it drops, guys are afraid to buy.
01/28/2021, 16:49 p.m. - BO RUSSE NEW: it's ÷2.5
01/28/2021, 16:49 p.m. - David: Keep calm
01/28/2021, 16:49 p.m. - BO RUSSE NEW: it will hold
01/28/2021, 16:50 p.m. - David: Yes of course
01/28/2021, 16:59 p.m. - BO RUSSE NEW: <Media omitted>
01/28/2021, 17:00 p.m. - BO RUSSE NEW: apparently the Americans can't buy anymore
01/28/2021, 17:00 p.m. - BO RUSSE NEW: not GME or Bb
01/28/2021, 17:00 p.m. - BO RUSSE NEW: everything is blocked
01/28/2021, 17:00 p.m. - David: There are foreign relays
01/28/2021, 17:00 p.m. - BO RUSSE NEW: war is crazy
01/28/2021, 17:00 p.m. - David: This short squeeze is a world-wide project
01/28/2021, 17:07 p.m. - BO RUSSE NEW: they're giving up at Nokia and Ame
01/28/2021, 17:07 p.m. - BO RUSSE NEW: they are focused on gamestop
01/28/2021, 17:18 p.m. - David: At Revlon too
01/28/2021, 17:22 p.m. - BO RUSSE NEW: fuck it's a race, it's a march 🤠
01/28/2021, 17:22 p.m. - David: It's tense 🙈
01/28/2021, 17:23 p.m. - BO RUSSE NEW: fuck
01/28/2021, 17:23 p.m. - BO RUSSE NEW: should I keep it?
01/28/2021, 17:24 p.m. - David: Let's see what happens
01/28/2021, 17:25 p.m. - BO RUSSE NEW: should let go 200k better right?
01/28/2021, 17:25 p.m. - David: With the loc we don't have a price
01/28/2021, 17:31 p.m. - BO RUSSE NEW: fuck it's time to buy back
01/28/2021, 17:32 p.m. - David: It's madness it jumps every time
01/28/2021, 17:34 p.m. - David: 🙈🙈🙈
01/28/2021, 17:45 p.m. - BO RUSSE NEW: this is not over 👊✌️
01/28/2021, 17:45 p.m. - BO RUSSE NEW: fuck
01/28/2021, 17:45 p.m. - BO RUSSE NEW: 😂🙈
01/28/2021, 18:20 p.m. - BO RUSSE NEW: it's picking up nicely

BRATYA_000609

01/28/2021, 18:20 p.m. - BO RUSSE NEW: fuck the stress

01/28/2021, 18:21 p.m. - BO RUSSE NEW: still haven't found my cards 🙄
01/28/2021, 18:34 p.m. - David:  I asked he's going to call me back
01/28/2021, 18:34 p.m. - David:  It's shit

01/28/2021, 18:35 p.m. - BO RUSSE NEW: I found it 💅🏻
01/28/2021, 18:35 p.m. - David:  The cards
01/28/2021, 18:35 p.m. - David:  Good
01/28/2021, 18:36 p.m. - BO RUSSE NEW: fuck sorry. thanks for the call

01/28/2021, 18:38 p.m. - David: 👍🏻

01/28/2021, 18:40 p.m. - BO RUSSE NEW: it's already better now at 120 🙄
01/28/2021, 18:51 p.m. - BO RUSSE NEW: do you think it will hold at this level?
01/28/2021, 18:51 p.m. - BO RUSSE NEW: even at the start of tomorrow's session
01/28/2021, 18:52 p.m. - BO RUSSE NEW: time will have been wasted
01/28/2021, 18:52 p.m. - BO RUSSE NEW: way to buy back with premium
01/28/2021, 18:52 p.m. - BO RUSSE NEW: profit

01/28/2021, 19:02 p.m. - David:  No it will end up in a loss 🤕
01/28/2021, 19:02 p.m. - David:  But I'm not keeping 6 bars of expo for 200k
01/28/2021, 19:02 p.m. - BO RUSSE NEW: are you getting out now?
01/28/2021, 19:02 p.m. - David:  I'm running again on Uni for cash in grave but we can't risk it
01/28/2021, 19:03 p.m. - BO RUSSE NEW: fuck
01/28/2021, 19:03 p.m. - David:  Too hard to recup if open at 50 dol

01/28/2021, 19:03 p.m. - David:  I'm not playing against the 👆
01/28/2021, 19:03 p.m. - David:  Who do everything in their power not to get caught
01/28/2021, 19:03 p.m. - BO RUSSE NEW: 400 to fold here?
01/28/2021, 19:04 p.m. - David:  350
01/28/2021, 19:04 p.m. - David:  Minus the premiums
01/28/2021, 19:04 p.m. - David:  It's easy to make up for losing 6 bars

01/28/2021, 19:04 p.m. - BO RUSSE NEW: here they are, the 2 gtrs 🤑 but in the other direction
01/28/2021, 19:04 p.m. - David:  Error in judgement
01/28/2021, 19:04 p.m. - BO RUSSE NEW: already out?
01/28/2021, 19:05 p.m. - David:  We're trying to get the market makers over price
01/28/2021, 19:05 p.m. - BO RUSSE NEW: keep it
01/28/2021, 19:05 p.m. - BO RUSSE NEW: it will hold
01/28/2021, 19:10 p.m. - BO RUSSE NEW: you think it's folded
01/28/2021, 19:16 p.m. - BO RUSSE NEW: reddit has blocked it it seems

01/28/2021, 19:20 p.m. - David:  I can't 🙍
01/28/2021, 19:20 p.m. - David:  The options are blocked it's a fucking mess
01/28/2021, 19:21 p.m. - David:  Instruction
01/28/2021, 19:22 p.m. - BO RUSSE NEW: impossible to buy?
01/28/2021, 19:30 p.m. - BO RUSSE NEW: it's not holding too badly
01/28/2021, 19:30 p.m. - BO RUSSE NEW: have to watch out at the closing
01/28/2021, 19:35 p.m. - BO RUSSE NEW:  <Media omitted>
01/28/2021, 19:37 p.m. - BO RUSSE NEW:  <Media omitted>
01/28/2021, 19:39 p.m. - BO RUSSE NEW: that's it, I can go back to their page
01/28/2021, 19:45 p.m. - BO RUSSE NEW:  Missed voice call

BRATYA_000610

01/28/2021, 20:19 p.m. - BO RUSSE NEW:  <Media omitted>
01/28/2021, 20:20 p.m. - BO RUSSE NEW: the funds are doing all they can to avoid the real squeeze to come. nothing has been bought up yet, apparently.
01/28/2021, 20:28 p.m. - BO RUSSE NEW: how is this going Bro?????
01/28/2021, 23:47 p.m. - David:  I've cut it, and I'll be recovering it with Beyond and moderna.... in a fortnight, but you can't lose out on a malfunction
01/28/2021, 23:48 p.m. - David:  Until tomorrow no stress we have seen it so many times the ups and downs…and up again

CONFIDENTIAL

BRATYA_000611

27/01/2021, 14:07 - David: On a 6200 contrats sur Unib 🙈 🙈 🙈 🙈

27/01/2021, 14:07 - David: 60 en moyenne cest de la folie on se rend meme pas compte de la pose ce qu'elle produit

27/01/2021, 14:08 - David: Ca aura sorti JP qui etait mal embringué... et tout le besoin cash et un deleverage sur les ligne de folie

27/01/2021, 14:17 - BO RUSSE NEW: 🤩 🙏 🤗 yes c'est clair

27/01/2021, 14:17 - BO RUSSE NEW: dingue ce deal

27/01/2021, 14:22 - BO RUSSE NEW: tes mecs savent pas la news?

27/01/2021, 14:22 - BO RUSSE NEW: rien sur les radars?

27/01/2021, 14:22 - David: Pour l'instant rien

27/01/2021, 14:23 - BO RUSSE NEW: les rynoks douillent

27/01/2021, 14:24 - BO RUSSE NEW: kaiff on va remettre des trucs de dingue

27/01/2021, 14:24 - BO RUSSE NEW: Bo par contre résultats de merde

27/01/2021, 14:24 - David: Mais cash pas mal

27/01/2021, 14:35 - David: Tu es sorti de urw?

27/01/2021, 14:36 - David: 2400 contrats qui sortent a fon fevrier je te dirais garde ta ligne

27/01/2021, 14:36 - David: Comme ca ya tjs du stream

27/01/2021, 14:37 - BO RUSSE NEW: je garde

27/01/2021, 14:37 - David: Yes kaiff

27/01/2021, 14:37 - BO RUSSE NEW: une news va debarquer

27/01/2021, 14:38 - BO RUSSE NEW: je vais reprendre du car a 25 😉

27/01/2021, 14:38 - David: A priori les Robin Robinwooders sattaquent a toutes les boites shortées en europe et US

27/01/2021, 14:38 - David: Avec le site du mec de Serena Reddit ils diffusent quils faut defoncer les fonds shorters

27/01/2021, 14:39 - BO RUSSE NEW: 🙈

27/01/2021, 14:39 - BO RUSSE NEW: dingue la bourse

27/01/2021, 14:39 - BO RUSSE NEW: plus rien deconomique

27/01/2021, 14:42 - David: Mais des guerres de financiers de nerfs

27/01/2021, 14:42 - David: 🐷 il ma call je lui ai dis quand tu mas dis 40 jai pensé on va a 80

27/01/2021, 14:42 - BO RUSSE NEW: 😂

27/01/2021, 14:42 - BO RUSSE NEW: ahaha

27/01/2021, 14:43 - David: Il a rigolé jaune en me disant tant que hmje te fais gagner de l'argent cest mon boulot

27/01/2021, 14:46 - BO RUSSE NEW: 😉

27/01/2021, 14:47 - BO RUSSE NEW: toi qui lui en fait gagner plutôt

27/01/2021, 14:48 - BO RUSSE NEW: faut pas qu'elle se fasse exploser le uc back

27/01/2021, 14:48 - BO RUSSE NEW: a 60

27/01/2021, 14:48 - BO RUSSE NEW: 🙈

27/01/2021, 14:49 - David: Il execute les ordres....

27/01/2021, 14:49 - David: Tant que je nous en fait gagner cest ca qui compte

27/01/2021, 14:49 - David: Résultats le 10.02.....

27/01/2021, 14:49 - David: Mais un retour a 60 est pas mal aussi

27/01/2021, 14:49 - David: Pour recharger

27/01/2021, 14:50 - BO RUSSE NEW: yes

27/01/2021, 14:50 - David: Car avec les sorties a venir d'ici les résultats faut avoir des new opportunities

27/01/2021, 14:53 - David: Tesla publie aprea clôture....

BRATYA_000605

27/01/2021, 15:03 - David: 65.44 ca kaiff
27/01/2021, 15:03 - David: Faut pas s'envoler non plus for bow
27/01/2021, 15:03 - David: Now
27/01/2021, 15:05 - BO RUSSE NEW: Yes claro
27/01/2021, 15:05 - BO RUSSE NEW: ya encore a bouffer
27/01/2021, 15:07 - David: C'est ca je reprendrais bien 2 unités chaudes
27/01/2021, 15:07 - David: Restez jusqu'à fin fevrier ya Titi et Ela qui vont debarquer
27/01/2021, 15:09 - BO RUSSE NEW: 😂
27/01/2021, 15:10 - BO RUSSE NEW: Ca va etre chaud. 3 weeks deja pas mal 😂
27/01/2021, 15:10 - BO RUSSE NEW: ils viennent qd?
27/01/2021, 15:10 - David: Qu'est-ce qui est chaud?
27/01/2021, 15:10 - David: The weather?
27/01/2021, 15:11 - David: Fin next week quand ca va mieux pour Ela et Titi ca y est rentre dedans donc va s'en sortir
27/01/2021, 16:18 - David: Jai vendu des put sur gamestop a 70 la vol est a 1000
27/01/2021, 16:18 - David: Ca paye 50k usd
27/01/2021, 16:18 - David: A apres demain
27/01/2021, 16:18 - BO RUSSE NEW: 😂
27/01/2021, 16:18 - BO RUSSE NEW: kaiff au moins yaura eu un billet de fait
27/01/2021, 16:19 - BO RUSSE NEW: 👌🤩
27/01/2021, 19:30 - David: 8 billions de perte trimestrielle chez boeing ca fait mal
27/01/2021, 22:04 - David: <Media omitted>
27/01/2021, 22:04 - David: Mattes lafter....elle part a 500....
27/01/2021, 22:05 - David: <Media omitted>
27/01/2021, 22:05 - David: Je vais suivre ca de près
28/01/2021, 00:59 - BO RUSSE NEW: les mecs disent que qd le short % va repasser sous 100% alors elle doit baisser
28/01/2021, 01:16 - BO RUSSE NEW: Tesla qui a des résultats pas ouf
28/01/2021, 05:46 - BO RUSSE NEW: J'ai vu un tronc qui avait loué la C8 corvette. elle fait qd même Jacky 😂 c'est pas de Fefe ou Lambo
28/01/2021, 06:09 - David: Elle plonge de 5 points a voir si plus pendant la séance
28/01/2021, 06:09 - David: Elle perdait 15 points a 292 en fin d'after hours...
28/01/2021, 06:10 - David: C'est de la ricaine pas de l'italienne ou allemande, faut faire gaffe
28/01/2021, 06:10 - BO RUSSE NEW: yes elle est Jacky 🤩
28/01/2021, 06:11 - BO RUSSE NEW: a voir ca serait kaiff un retour a 700
28/01/2021, 06:12 - David: A voir ce que va donner today uni et le reste c'est sous haute tension la le marché....est ce que les racheteur sont a bout de souffle ou pas???
28/01/2021, 06:12 - David: Est ce que de nouveaux short sellers arrivent
28/01/2021, 06:12 - BO RUSSE NEW: les US vont repasser green je pense
28/01/2021, 06:12 - BO RUSSE NEW: ils se client dessus
28/01/2021, 06:12 - BO RUSSE NEW: chient
28/01/2021, 06:13 - David: Apres la petite purge possible
28/01/2021, 06:13 - David: Ça a été violent donc a voir car si moins de short sell moins de baisse aussi des titres
28/01/2021, 06:14 - BO RUSSE NEW: yes
28/01/2021, 06:18 - David: <Media omitted>
28/01/2021, 06:18 - David: Ca va debaler si Tesla se fait dessouder

BRATYA_000606

28/01/2021, 06:19 - BO RUSSE NEW: si ca baisse sur Uni faut en rebalancer
28/01/2021, 06:19 - David: Oui mais sur 60 pas sur 70 trop hot ce qui s'est passé sans vente d'actifs sans annonces
28/01/2021, 06:20 - BO RUSSE NEW: yes sur 60 direct
28/01/2021, 06:21 - David: On va voir l'impact option deja today et que ca tienne sur les 65....si deja on a ca et que le reste sort
28/01/2021, 06:21 - BO RUSSE NEW: yes claro
28/01/2021, 06:21 - BO RUSSE NEW: mais ya pas de raison de baisse la
28/01/2021, 06:21 - BO RUSSE NEW: les résultats sont pas cata
28/01/2021, 06:22 - BO RUSSE NEW: Le luxe et les techs explosent tout
28/01/2021, 06:22 - BO RUSSE NEW: c'est peut être la que ca va baisser 😂
28/01/2021, 06:22 - BO RUSSE NEW: les marchés incompréhensibles
28/01/2021, 06:23 - David: Ils vendent sans charges ils coupent tout....donc ils kaiffent
28/01/2021, 06:25 - BO RUSSE NEW: yes
28/01/2021, 07:05 - BO RUSSE NEW: on va a ozon 13.30
28/01/2021, 07:05 - BO RUSSE NEW: tu viens?
28/01/2021, 07:05 - David: EAUZONE
28/01/2021, 07:05 - David: Avec qui tous??
28/01/2021, 07:05 - BO RUSSE NEW: yes 🙄 😂
28/01/2021, 07:06 - David: Je book tu book??
28/01/2021, 07:06 - BO RUSSE NEW: changes de masque 🧖🏽
28/01/2021, 07:07 - BO RUSSE NEW: yes call bublik avait reza a 13.30.
28/01/2021, 07:07 - BO RUSSE NEW: demande une grande table
28/01/2021, 07:07 - BO RUSSE NEW: elle a du se faire passer dessus
28/01/2021, 07:23 - David: 6 adultes 1 baby
28/01/2021, 07:23 - David: Je viens a l'instant
28/01/2021, 07:57 - BO RUSSE NEW: 👌🏻
28/01/2021, 09:48 - David: Bien ta sortie unib
28/01/2021, 09:50 - BO RUSSE NEW: mouai
28/01/2021, 09:50 - BO RUSSE NEW: -4.5 c'est rien
28/01/2021, 09:55 - BO RUSSE NEW: je rachete ou pas 🤷🏻‍♂️
28/01/2021, 09:58 - David: Pas encore
28/01/2021, 09:59 - BO RUSSE NEW: j'attends 80 🤩
28/01/2021, 09:59 - BO RUSSE NEW: ca douille aux US
28/01/2021, 10:39 - BO RUSSE NEW: on part
28/01/2021, 14:59 - David: Curvac a moins 8
28/01/2021, 15:00 - David: Peut être a regarder mais volumes de merde en options
28/01/2021, 15:00 - BO RUSSE NEW: yes je vois ca
28/01/2021, 15:01 - BO RUSSE NEW: putain ils continuent
28/01/2021, 15:01 - BO RUSSE NEW: sur american airlines
28/01/2021, 15:01 - BO RUSSE NEW: first majestic silver
28/01/2021, 15:02 - BO RUSSE NEW: shortsqueez
28/01/2021, 15:06 - BO RUSSE NEW: remets du game a demain ?
28/01/2021, 15:28 - David: Yes ca je prépare un truc
28/01/2021, 15:33 - David: https://www.marketwatch.com/story/reddit-co-founder-alexis-ohanian-compares-gamestops-epic-ride-to-occupy-wall-street-i-dont-think-we-go-back-to-a-world-before-this-11611843100

BRATYA_000607

28/01/2021, 15:34 - BO RUSSE NEW: yes c'est clair que ca fait mal
28/01/2021, 15:34 - BO RUSSE NEW: mais les fonds ont plus d'oseille et de power
28/01/2021, 15:35 - BO RUSSE NEW: donc ils vont péter mes robinhoods
28/01/2021, 15:35 - David: Cest pas pour ca que tu te fais jamais niquer
28/01/2021, 15:35 - BO RUSSE NEW: c'est masqué dernière les reddit traders mais en réalité c'est des fonds qui niquent d'autres fonds
28/01/2021, 15:36 - David: Cest ce que je pense
28/01/2021, 15:39 - BO RUSSE NEW: c'est clair. ils utilisent le trend social
28/01/2021, 15:39 - BO RUSSE NEW: mais la big money c'est les fonds qui la mettent sur la table
28/01/2021, 15:42 - BO RUSSE NEW: <Media omitted>
28/01/2021, 15:42 - BO RUSSE NEW: les mecs sont dingues
28/01/2021, 15:42 - BO RUSSE NEW: Robin a queblo les opérations
28/01/2021, 15:43 - BO RUSSE NEW: <Media omitted>
28/01/2021, 15:44 - BO RUSSE NEW: <Media omitted>
28/01/2021, 15:44 - BO RUSSE NEW: 😂
28/01/2021, 15:50 - BO RUSSE NEW: dingue qd même que Robin ai queblo les achats
28/01/2021, 15:50 - BO RUSSE NEW: imagines les manipulations pour pas perdre d'oseille
28/01/2021, 15:51 - David: Les mecs ont plein d'autres platforms et les indiens passent a lattaque sur GME
28/01/2021, 15:51 - BO RUSSE NEW: ca kaiff tellement 😂
28/01/2021, 15:52 - David: Sur les options cest la folie a trader
28/01/2021, 15:52 - David: Suis en train de racler encore 50k
28/01/2021, 15:57 - BO RUSSE NEW: 😂😋😋
28/01/2021, 15:57 - BO RUSSE NEW: putain faut que ca tienne encore
28/01/2021, 15:57 - BO RUSSE NEW: demain
28/01/2021, 15:57 - David: Jusqu'à lundi
28/01/2021, 15:57 - David: Ca tire encore
28/01/2021, 15:57 - BO RUSSE NEW: que la sec foutent pas le bordel
28/01/2021, 15:57 - BO RUSSE NEW: Ils peuvent pas cest que des annonces
28/01/2021, 15:57 - David: Le marché est libre
28/01/2021, 15:58 - BO RUSSE NEW: tu vois avec Robin hood qu'il est pas si libre que ca) 👌
28/01/2021, 15:58 - David: Les mecs se sont fait poutrer point c'est une première mondiale dans cette proportion mais cest ce qu a fait Carl a Billy sur herba
28/01/2021, 15:58 - BO RUSSE NEW: yes
28/01/2021, 16:02 - BO RUSSE NEW: curevac mattes si ca paye
28/01/2021, 16:03 - David: Je peux pas la
28/01/2021, 16:03 - David: Game stop biggest du russel 2000 demain risque de rentrer au SP 🙈 🙈 🙈
28/01/2021, 16:03 - David: Je bourre
28/01/2021, 16:03 - BO RUSSE NEW: ahahahahaha
28/01/2021, 16:04 - BO RUSSE NEW: 🙈😂
28/01/2021, 16:19 - BO RUSSE NEW: How are you guys buying my brokers are not submitting my orders, not even Hargreaves
28/01/2021, 16:20 - BO RUSSE NEW: pleins de plates-formes bloquent les achats
28/01/2021, 16:20 - BO RUSSE NEW: les salopes
28/01/2021, 16:21 - BO RUSSE NEW: les mecs hold
28/01/2021, 16:21 - BO RUSSE NEW: donc ça kaif
28/01/2021, 16:21 - David: 🙈 🙈 🙈
28/01/2021, 16:21 - BO RUSSE NEW: 👊  demain ca va kaif

BRATYA_000608

28/01/2021, 16:42 - BO RUSSE NEW: <Media omitted>
28/01/2021, 16:42 - BO RUSSE NEW: BB 🙈
28/01/2021, 16:43 - BO RUSSE NEW: <Media omitted>
28/01/2021, 16:47 - BO RUSSE NEW: les 🤞 vont prendre les profits si ca part en couille.
28/01/2021, 16:47 - David: 🤣🤣
28/01/2021, 16:47 - BO RUSSE NEW: 2 days faut que ca tienne
28/01/2021, 16:48 - BO RUSSE NEW: re du 70 t'as mis?
28/01/2021, 16:48 - David: Du 115
28/01/2021, 16:48 - David: Yes
28/01/2021, 16:49 - BO RUSSE NEW: ca s'essouffle un peu. des que ca baisse les mecs ont peur d'acheter
28/01/2021, 16:49 - BO RUSSE NEW: c'est du ÷2.5
28/01/2021, 16:49 - David: Calmos
28/01/2021, 16:49 - BO RUSSE NEW: ca va tenir
28/01/2021, 16:50 - David: Yes bien sûr
28/01/2021, 16:59 - BO RUSSE NEW: <Media omitted>
28/01/2021, 17:00 - BO RUSSE NEW: apparemment les ricains peuvent plus acheter
28/01/2021, 17:00 - BO RUSSE NEW: ni GME ni Bb
28/01/2021, 17:00 - BO RUSSE NEW: tt est bloqué
28/01/2021, 17:00 - David: Ya le relais des etrangers
28/01/2021, 17:00 - BO RUSSE NEW: dingue la guerre
28/01/2021, 17:00 - David: C'est un projet mondial ce short squeeze
28/01/2021, 17:07 - BO RUSSE NEW: ils abandonnent chez Nokia et Amc
28/01/2021, 17:07 - BO RUSSE NEW: ils focused sur gamestop
28/01/2021, 17:18 - David: Chez Revlon aussi
28/01/2021, 17:22 - BO RUSSE NEW: putain ca race ca defile 😬
28/01/2021, 17:22 - David: C'est chaud 🙈
28/01/2021, 17:23 - BO RUSSE NEW: fuck
28/01/2021, 17:23 - BO RUSSE NEW: faut garder?
28/01/2021, 17:23 - David: On regarde ce que ca donne
28/01/2021, 17:25 - BO RUSSE NEW: faut lacher 200k de mieux la non?
28/01/2021, 17:25 - David: Avec le loc on a pas de prix
28/01/2021, 17:31 - BO RUSSE NEW: faut que ca rachete putain
28/01/2021, 17:32 - David: C'est de la folie ca saute  la chaque fois
28/01/2021, 17:34 - David: 🙈🙈🙈
28/01/2021, 17:45 - BO RUSSE NEW: this is not over 👆💅
28/01/2021, 17:45 - BO RUSSE NEW: fuck putain
28/01/2021, 17:45 - BO RUSSE NEW: 😂🙈
28/01/2021, 18:20 - BO RUSSE NEW: ca reprend bien
28/01/2021, 18:20 - BO RUSSE NEW: putain le stress
28/01/2021, 18:21 - BO RUSSE NEW: tjs pas retrouvé mes cartes 😌
28/01/2021, 18:34 - David: Jai demandé il va me recall
28/01/2021, 18:34 - David: Cest la merde
28/01/2021, 18:35 - BO RUSSE NEW: j'ai trouvé 💅
28/01/2021, 18:35 - David: Les cartes
28/01/2021, 18:35 - David: Kaifff
28/01/2021, 18:36 - BO RUSSE NEW: putain sorry. thanks d'avoir call
28/01/2021, 18:38 - David: 👆

BRATYA_000609

28/01/2021, 18:40 - BO RUSSE NEW: c'est mieux qu'à 120 la deja 🙄
28/01/2021, 18:51 - BO RUSSE NEW: ca se tient a ce level tu crois?
28/01/2021, 18:51 - BO RUSSE NEW: même début de seance demain
28/01/2021, 18:52 - BO RUSSE NEW: le temps aura été bouffé
28/01/2021, 18:52 - BO RUSSE NEW: moyen de racheter avec premium
28/01/2021, 18:52 - BO RUSSE NEW: profit
28/01/2021, 19:02 - David: Non ca finit en perte 🤡
28/01/2021, 19:02 - David: Mais 6 barres dexpo je les gardes pas pour 200k
28/01/2021, 19:02 - BO RUSSE NEW: tu sors now?
28/01/2021, 19:02 - David: Je reboure sur Uni pour cash in grave mais on peut pas risquer
28/01/2021, 19:03 - BO RUSSE NEW: fuck
28/01/2021, 19:03 - David: Trop dur a recup si open a 50 dol
28/01/2021, 19:03 - David: Je play pas contre les 👋
28/01/2021, 19:03 - David: Qui mettent tout en branle pour pas se faire coincer
28/01/2021, 19:03 - BO RUSSE NEW: 400 de plié la?
28/01/2021, 19:04 - David: 350
28/01/2021, 19:04 - David: Moins les primes
28/01/2021, 19:04 - David: Ca se ratrappe easy je perd pas 6 barres
28/01/2021, 19:04 - BO RUSSE NEW: les voila les 2 gtr 😂 mais ds l'autre sens
28/01/2021, 19:04 - David: Erreur de jugement
28/01/2021, 19:04 - BO RUSSE NEW: deja sorti?
28/01/2021, 19:05 - David: On essaie de mettre mais les market makers over price
28/01/2021, 19:05 - BO RUSSE NEW: gardes
28/01/2021, 19:05 - BO RUSSE NEW: ca va tenir
28/01/2021, 19:10 - BO RUSSE NEW: tu crois c'est plié
28/01/2021, 19:16 - BO RUSSE NEW: reddit les a keblo on dirait
28/01/2021, 19:20 - David: Je peux pas 🙈
28/01/2021, 19:20 - David: Les options sont bloquées cest le bordel
28/01/2021, 19:21 - David: Enseignement
28/01/2021, 19:22 - BO RUSSE NEW: impossible de racheter?
28/01/2021, 19:30 - BO RUSSE NEW: ca tient pas trop mal
28/01/2021, 19:30 - BO RUSSE NEW: faut faire gaffe a la cloture
28/01/2021, 19:35 - BO RUSSE NEW: <Media omitted>
28/01/2021, 19:37 - BO RUSSE NEW: <Media omitted>
28/01/2021, 19:39 - BO RUSSE NEW: ca y est je peux retourner sur leur page
28/01/2021, 19:45 - BO RUSSE NEW: Missed voice call
28/01/2021, 20:19 - BO RUSSE NEW: <Media omitted>
28/01/2021, 20:20 - BO RUSSE NEW: les fonds font tt pour eviter le vrai squeeze a venir. rien encore n'a été racheté apparemment
28/01/2021, 20:28 - BO RUSSE NEW: ca en est ou Bro?????
28/01/2021, 23:47 - David: J'ai coupé, je recup avec Beyond et moderna.... en deux semaines tout sera d'équerre mais on ne peut pas perdre sur un deraillage
28/01/2021, 23:48 - David: A demain no stress on la tellement vecu de fois le up le down....le re up

BRATYA_000610

# EXHIBIT 49

Videotaped Deposition of

# Dr. Matthew D. Cain

January 10, 2024

In re: Vaxart, Inc. Securities Litigation



www.aptusCR.com | 866.999.8310

1

2                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF CALIFORNIA
3                    SAN FRANCISCO DIVISION
                     Case No. 3:20-cv-05949-VC
4     - - - - - - - - - - - - - - - - - - - - - - - -
5     In Re VAXART, INC. SECURITIES LITIGATION

6     - - - - - - - - - - - - - - - - - - - - - - - -

7

8

9              TRANSCRIPT of the stenographic notes of

10    the videotaped deposition of DR. MATTHEW D. CAIN, in

11    the above-entitled matter, as taken by and before

12    LORRAINE B. ABATE, a Certified Shorthand Reporter and

13    Notary Public of the State of New York, and

14    Registered Professional Reporter, held at the offices

15    of Akin Gump Strauss Hauer & Feld, LLP, One Bryant

16    Park, New York, New York, on January 10, 2024,

17    commencing at time 9:11 a.m., pursuant to Notice.

18

19

20

21

22

23

24

25    Job No. 10133367

```
 1
 2   A P P E A R A N C E S:
 3   (In New York)
 4
 5              HAGEN BERMAN SOBOL SHAPIRO, LLP
 6              Attorneys for Wei Huang and
 7              Langdon Elliott
 8                  1 Faneuil Hall Square, 5th Floor
 9                  Boston, Massachussetts 02109
10              BY: RAFFI MELANSON, ESQ.
11                  (617)482-3700
12                  raffim@hbsslaw.com
13
14              SCOTT & SCOTT ATTORNEYS AT LAW, LLP
15              Attorneys for Ani Hovhannisyan
16                  230 Park Avenue, 17th Floor
17                  New York, New York  10169
18              BY:  WILLIAM FREDERICKS, ESQ.
19                  (212) 223-6444
20                  wfredericks@scott-scott.com
21
22
23
24
25
```

1

2    A P P E A R A N C E S:

3    (CONTINUED)

4

5                 AKIN GUMP STRAUSS HAUER & FELD , ESQS.

6                 Attorneys for the Defendants

7                 Armistice Capital, LLC, Armistice

8                 Master Fund, Ltd., Steven J. Boyd,

9                 And Keith Maher, M.D.

10                   1999 Avenue of the Stars, Suite 600

11                   Los Angeles, California 90067

12                BY:   JOSHUA A. RUBIN, ESQ.

13                      NEAL R. MARDER, ESQ.

14                      (310)229-1000

15                   rubinj@akingump.com

16                   nmarder@akingump.com

17

18   A L S O   P R E S E N T:

19                 Jeremy Kovacs, Videographer

20

21   (Via Video Conference)

22                 Charles Barwick, Esq.

23                 Jeffrey P. Jacobson, Esq.

24                 Reed Kathrein, Esq.

25                 Samar Semaan

```
 1
 2                      I N D E X
 3  WITNESS            EXAMINATION BY              PAGE
 4  Dr. Matthew Cain
 5                    Mr. Rubin                 5
 6
 7                    E X H I B I T S
 8  CAIN                                          PAGE
 9  Exhibit 1  Notice of Deposition               6
10  Exhibit 2  Objections and Responses to
11             Notice of Deposition               9
12  Exhibit 3  LinkedIn Profile                  18
13  Exhibit 4  LinkedIn Profile Skills Page      19
14  Exhibit 5  Vaxart, Inc. Expert Report        21
15  Exhibit 6  Invoices                          83
16  Exhibit 7  E-Mail Chain                      90
17  Exhibit 8  Corrected Second Amended
18             Consolidated Class Action Complaint  107
19  Exhibit 9  Exhibit A, AdaptHealth Corp.
20             Expert Report                    181
21  Exhibit 10 Exhibit A, Homyk versus ChemoCentryx
22             Expert Report                    194
23  Exhibit 11 Excel File (DEEMED)              236
24  Exhibit 12 Document Entitled
25             High Volatility - Options (DEEMED)  250
```

```
 1                   Cain - January 10, 2024
 2    one case, in a merger and acquisition context, when
 3    they disclosed the fairness opinions and proxy
 4    statements.
 5                   And then the other case, I'll have to go
 6    back and review.  It was certain dates I think where
 7    the courts maybe came out with certain rulings or
 8    updates to the rulings and how companies reacted to
 9    -- the stock prices of companies reacted to those
10    rulings.
11        Q.     For purposes of a report assessing
12    whether or not a stock traded in an efficient market,
13    what's the shortest estimation window that you've
14    ever used?
15        A.     Within a market efficiency report like
16    this?
17        Q.     Yes.
18        A.     I believe that this was the shortest
19    estimation window that I've encountered because of
20    the situations of the information environment that
21    were related to this case.
22        Q.     And you said it's the shortest.  Just to
23    be clear, had you ever used, in a prior report, an
24    estimate of the same length?
25        A.     I may have in other reports or other
```

```
 1                    Cain - January 10, 2024
 2    work, but -- and like I said, obviously in my
 3    academic work, I have used shorter estimates.
 4              But in terms of the market efficiency
 5    reports, I think I've used 120 days, 60 days, and now
 6    40 days.  I've been more and more encountering
 7    companies during the COVID time period which has
 8    necessitated pushing me towards shorter estimation
 9    windows because of the unique situations that I have
10    been encountering recently in cases.
11         Q.   Just to make sure I understand your
12    answer correctly, prior to your report in this case,
13    had you ever offered an opinion on market efficiency
14    in which you utilized an estimation period of
15    40 days?
16         A.   So I think I answered that with the
17    previous question.  So I think that you're limiting
18    it only to market efficiency reports that have
19    proceeded to this stage of disclosure.  I think this
20    is the first one for 40 days.
21              Like I said, I have used much shorter
22    time periods in my academic work and other work.  But
23    this I think is the first market efficiency report
24    that I have encountered where the dynamics of the
25    information environment necessitated or at least
```

```
 1                    Cain - January 10, 2024
 2    pushed me to use a 40-day window.
 3         Q.      So what is the methodology that you used
 4    that led you to the 40-day estimation window in this
 5    case?
 6         A.      So I evaluated Vaxart as a company to
 7    understand the company itself.  I also looked at the
 8    time period during which the class period falls and
 9    the dynamics of the information environment, both
10    during the class period as well as the months leading
11    up to the class period, because that's really what
12    we're talking about in terms of the estimation
13    window.
14              And I know from my professional work and
15    my academic work that in March of 2020, there was an
16    abrupt shift in the volatility of stock returns, not
17    just for Vaxart, but for the overall marketplace, due
18    to the COVID pandemic.  And therefore, a wide variety
19    of companies, the majority of companies, had a
20    certain level of volatility prior to March 2020, and
21    for some companies, their volatility increased in
22    earlier months as well, but for a wide variety of
23    companies, the volatility increased in March of 2020.
24              And then for different companies,
25    volatility drifted back down in the subsequent
```

```
 1              Cain - January 10, 2024
 2   months.  So because there was such an abrupt shift in
 3   volatility for many companies, and also just changes
 4   in how companies' stock prices moved in conjunction
 5   with the market and the industry indices of the beta
 6   coefficients, that was one factor that was important
 7   to consider in the case of Vaxart.
 8              Also -- and then obviously, the class
 9   period starts on June 15th, so when we're talking
10   about March of 2015, that's just a few months prior
11   to the start of the class period.
12              So if you use too long of an estimation
13   window, then you're actually going to be going back
14   to before the COVID pandemic, increased volatility,
15   and then to during March of 2020, which was a unique
16   type of volatility to after March of 2020 when it
17   started decreasing.  So that was one factor.
18              And then another factor was just the
19   fact that Vaxart itself was a vaccine-based
20   biotechnology company attempting to develop vaccines,
21   including a -- pivoting to -- attempting to develop a
22   COVID vaccine.  So the company's specific volatility
23   actually interacts with the information environment,
24   both at a macro level and an industry level, that was
25   caused by the COVID pandemic.
```

1      Cain - January 10, 2024

2           So these were some of the factors that

3  led me to determine that an estimation window of

4  roughly two months of volatility was the most

5  appropriate baseline for Vaxart.

6      **Q.     What specific analysis did you do to**

7  **determine that the volatility of Vaxart's stock**

8  **returns were rapidly changing during the COVID-19**

9  **period?**

10          MR. MELANSON:   Objection to form.

11     A.     So I think that one of the ways that

12  that can be seen is when you run a rolling regression

13  model, you can look at the root mean squared error,

14  which is something that's graphed in Exhibit 5 of the

15  report.

16          So you can see in Exhibit 5 that the

17  root mean squared error means basically how volatile

18  were the stock prices over the past couple of months,

19  that -- really, over the past 40 days, because that's

20  the estimation window.

21          And so you can see that it starts out --

22  like a 7 percent root mean square error is fairly

23  high.  A lot of companies made have a root mean

24  squared error of 1 or 2 or 3 percent.  So 7 percent

25  is actually quite high.

# EXHIBIT 50

YQ US Equity (Bed Bath & Beyond Inc)

YQ US Equity (Bed Bath & Beyond Inc)

Bloomb



| Last Price | |
|---|---|
| BBBYQ US Equity | 16.00 |
| Close on 08/12 ---- | 12.95 |
| BBBYQ US Equity | 16.00 |

23.55%
+3.05

10:00  10:30  11:00  11:30  12:00  12:30  13:00  13:30  14:00  14:30  15:00  15:30  16:00

15 Aug 2022

OMBERG PROFESSIONAL service, BLOOMBERG Data and BLOOMBERG Order Management Systems (the "Services") are owned and distributed locally by Bloomberg Finance L.P. ("BFLP") and its subsidiaries in all jurisdictions other than Argentina, Bermuda, China, India, Japan and
ntries). BFLP is a wholly-owned subsidiary of Bloomberg L.P. ("BLP"). BLP provides BFLP with all global marketing and operational support and service for the Services and distributes the Services either directly or through a non-BFLP subsidiary in the BLP Countries. The Services include
d order-routing services, which are available only to sophisticated institutional investors and only where necessary legal clearances have been obtained. BFLP, BLP and their affiliates do not provide investment advice or guarantee the accuracy of prices or information in the Service
rvices shall constitute an offering of financial instruments by BFLP, BLP or their affiliates. BLOOMBERG, BLOOMBERG PROFESSIONAL, BLOOMBERG MARKET, BLOOMBERG NEWS, BLOOMBERG ANYWHERE, BLOOMBERG TRADEBOOK, BLOOMBERG BONDTRADER, BLOOMBERG
ON, BLOOMBERG RADIO, BLOOMBERG PRESS and BLOOMBERG.COM are trademarks and service marks of BFLP, a Delaware limited partnership, or its subsidiaries.

# EXHIBIT 51

03/25/2021, 05:04 a.m. - David: https://pub.webull.com/us/news-html/9c18b74450c448f39a33e8280bc0b333.html?theme=1&_v=1&color=1&hl=en&sp=1&theme=1

03/25/2021, 05:04 a.m. - David: Everyone's doing the same thing... we have to get out

03/25/2021, 05:04 a.m. - David: There was minus 10 points in the after market

03/25/2021, 06:37 a.m. - BO RUSSE NEW: yes it's clear you need cash

03/25/2021, 06:43 a.m. - David: They're burning cash

03/25/2021, 06:43 a.m. - David: I'm expecting the risks, but I'm going to try get the transaction up and running as soon as possible

03/25/2021, 07:06 a.m. - David: Bro urgent meeting

03/25/2021, 07:06 a.m. - David: Are you available?

03/25/2021, 07:36 a.m. - BO RUSSE NEW: yes

03/25/2021, 09:14 a.m. - BO RUSSE NEW: <Media omitted>

03/25/2021, 11:13 a.m. - BO RUSSE NEW: <Media omitted>

03/25/2021, 11:13 a.m. - BO RUSSE NEW: what squeeze are they talking about?

03/25/2021, 11:13 a.m. - BO RUSSE NEW: I don't understand

03/25/2021, 11:37 a.m. - David: The 26%

03/25/2021, 11:38 a.m. - BO RUSSE NEW: that's not how you pump

03/25/2021, 11:57 a.m. - David: No

03/25/2021, 11:57 a.m. - David: I have a hearing with Stef for an hour

03/25/2021, 11:57 a.m. - David: To review the possibilities

03/25/2021, 11:57 a.m. - BO RUSSE NEW: so?

03/25/2021, 11:58 a.m. - BO RUSSE NEW: are you at the office?

03/25/2021, 11:58 a.m. - BO RUSSE NEW: can I call you?

03/25/2021, 2:40 p.m. - David: You have to be fit to work with these 💩 💩 💩

03/25/2021, 2:41 p.m. - BO RUSSE NEW: 🤪

03/25/2021, 2:43 p.m. - BO RUSSE NEW: what information did he come back with?

03/25/2021, 2:56 p.m. - BO RUSSE NEW: <Media omitted>

03/25/2021, 3:47 p.m. - David: https://www.cnbc.com/2021/03/24/cramer-says-gamestop-remains-overvalued-despite-promising-q4-report.html

03/25/2021, 4:51 p.m. - David: The spoke isn't very nice...

03/25/2021, 5:08 p.m. - BO RUSSE NEW: seriously

03/25/2021, 5:08 p.m. - BO RUSSE NEW: not cool

03/25/2021, 5:08 p.m. - BO RUSSE NEW:  GME however likes it, going to have to look for more

03/25/2021, 5:16 p.m. - David: Yeahhh

03/25/2021, 5:17 p.m. - BO RUSSE NEW: does this have a big influence on the price of options?

03/25/2021, 5:19 p.m. - David: Not here

03/25/2021, 5:19 p.m. - David: Those from May yes 2 euros but not April now is the time and the delta that are working

03/25/2021, 5:22 p.m. - BO RUSSE NEW: it's logical

03/25/2021, 10:09 p.m. - David: https://seekingalpha.com/news/3675903-biogen-shares-could-jump-25-75-with-potential-tecfidera-appeals-court-reversal?utm_source=webull.com&utm_medium=referral

03/25/2021, 10:09 p.m. - David: With what is going to come out

03/25/2021, 10:10 p.m. - David: And the vol on the other one...at 6 months we can do even as much as Uni

03/25/2021, 10:11 p.m. - BO RUSSE NEW: read today

03/25/2021, 10:11 p.m. - BO RUSSE NEW: yes exact

03/25/2021, 10:11 p.m. - BO RUSSE NEW: that'll do it Bro. You've come up with an amazing idea for surfing

BRATYA_000625

the vol

03/25/2021, 01:17 p.m. - BO RUSSE NEW: for me, the only risk is a capital increase with the creation of shares open to the market, with all the suckers signing up, and at that price it can bring in a fuck load of cash.

03/26/2021, 12:58 p.m. - David: It's going to be tough already 2.4 overtaking line...

03/26/2021, 12:58 p.m. - David: But we've got some positive stuff, so I can take it out and put it back higher again later

03/26/2021, 12:59 p.m. - BO RUSSE NEW: have to hold or roll because given the vol if you get out and it loses 40% in 1 day you've lost the deal

03/26/2021, 12:59 p.m. - David: Yes

03/26/2021, 12:59 p.m. - David: Exactly

03/26/2021, 1:00 p.m. - David: But rolling is doubling the expos

03/26/2021, 1:00 p.m. - David: From 400 to 800 🤩

03/26/2021, 1:00 p.m. - BO RUSSE NEW: yes pushing it up

03/26/2021, 1:01 p.m. - David: We'll see with the figures

03/26/2021, 1:01 p.m. - BO RUSSE NEW: all the money you have

03/26/2021, 1:01 p.m. - David: You can already take everything out that is Green

03/26/2021, 1:01 p.m. - David: The next weeks can get out sold 5 they are worth 2

03/26/2021, 1:02 p.m. - BO RUSSE NEW: true

03/26/2021, 1:02 p.m. - BO RUSSE NEW: it won't go sky high

03/26/2021, 1:03 p.m. - David: The deal is crazy just imr rises because the delta rises as we get closer

03/26/2021, 1:03 p.m. - David: Maos in absolute there is already 72 bar in nominal they are freaking out

03/26/2021, 1:04 p.m. - David: Have to steer it

03/26/2021, 1:04 p.m. - David: It pisses me off that it would have gone back to 15 20 and today it has to get up and go

03/26/2021, 1:05 p.m. - BO RUSSE NEW: it's always the same

03/26/2021, 1:05 p.m. - BO RUSSE NEW: have to deal with the situation

03/26/2021, 1:05 p.m. - BO RUSSE NEW: but not abandoned

03/26/2021, 1:06 p.m. - David: No way

03/26/2021, 1:36 p.m. - BO RUSSE NEW: Ponvory accepted in Europe

03/26/2021, 1:36 p.m. - BO RUSSE NEW: that is why Idi is exploding 😊 😂

03/26/2021, 1:36 p.m. - David: -3 -4 % 🤪

03/26/2021, 1:36 p.m. - BO RUSSE NEW: +1,71%

03/26/2021, 1:36 p.m. - BO RUSSE NEW: ☐

03/26/2021, 1:36 p.m. - BO RUSSE NEW: it's unfolding

03/26/2021, 1:37 p.m. - BO RUSSE NEW: it's going to be madness

03/26/2021, 1:37 p.m. - BO RUSSE NEW: so many positive things

03/26/2021, 1:39 p.m. - David: Excellent

03/26/2021, 1:39 p.m. - David: And with GME we are also going to send it

03/26/2021, 1:40 p.m. - BO RUSSE NEW: seriously

03/26/2021, 1:40 p.m. - BO RUSSE NEW: 💎 we're going to fight to take the title of Diamond hands 😂

03/26/2021, 1:41 p.m. - BO RUSSE NEW: the WS bet are saying the creator of a channel that has Diamond hands on GME

03/26/2021, 1:42 p.m. - BO RUSSE NEW: well it's not wrong either)

03/26/2021, 1:44 p.m. - BO RUSSE NEW: <Media omitted>

CONFIDENTIAL

BRATYA_000626

03/26/2021, 1:44 p.m. - BO RUSSE NEW: Probably Cramer 👍🏻
03/26/2021, 1:45 p.m. - David: It's true
03/26/2021, 1:45 p.m. - David: And today it's going to make +15 and end @-30%
03/26/2021, 1:45 p.m. - David: Have to be strong
03/26/2021, 1:45 p.m. - David: We're going to rock
03/26/2021, 1:45 p.m. - BO RUSSE NEW: yes have
03/26/2021, 1:45 p.m. - BO RUSSE NEW: have to
03/26/2021, 1:46 p.m. - BO RUSSE NEW: follow and hold the pause
03/26/2021, 1:46 p.m. - David: It's a big move, but I'm confident about our strategy

03/26/2021, 1:46 p.m. - BO RUSSE NEW: it's when it's hardest that it brings in the most money
03/26/2021, 1:46 p.m. - David: Risk reward of course

03/26/2021, 1:47 p.m. - BO RUSSE NEW: 💎

03/26/2021, 1:48 p.m. - David: Cramer is brutal he smashes them every time to get back to 70 🤣🤣🤣
03/26/2021, 1:49 p.m. - BO RUSSE NEW: he plays dirty
03/26/2021, 1:49 p.m. - BO RUSSE NEW: in options
03/26/2021, 1:54 p.m. - David: I think it's worth 100 coins so with US imports he got out double
03/26/2021, 1:56 p.m. - BO RUSSE NEW: easy
03/26/2021, 1:56 p.m. - BO RUSSE NEW: plus what he trades via his mifa or his buddies in Singapore or Dub

03/26/2021, 1:59 p.m. - David: And his fund management buddies 🤣🤣🤣🥕
03/26/2021, 2:01 p.m. - BO RUSSE NEW: yes
03/26/2021, 2:04 p.m. - David: It's Jeffrey that went from 15 to 175 yesterday who put the squeeze on
03/26/2021, 2:04 p.m. - David: Otherwise it would only take back 10-15 points max
03/26/2021, 2:05 p.m. - David: So today with Mad Money
03/26/2021, 2:05 p.m. - David: We can go back down
03/26/2021, 2:07 p.m. - BO RUSSE NEW: we hope
03/26/2021, 2:07 p.m. - BO RUSSE NEW: we're dealing with guys who don't give a fuck about finance and don't understand a thing about it
03/26/2021, 2:08 p.m. - BO RUSSE NEW: we're telling them it can go up to 2,000
03/26/2021, 2:08 p.m. - BO RUSSE NEW: buy and never sell
03/26/2021, 2:08 p.m. - BO RUSSE NEW: to save video games
03/26/2021, 2:11 p.m. - David: On the other hand, you have guys like Bill Gross or Cramer who can score 50 points in two days
03/26/2021, 2:12 p.m. - BO RUSSE NEW: exactly
03/26/2021, 2:12 p.m. - BO RUSSE NEW: you have to keep calm
03/26/2021, 2:12 p.m. - BO RUSSE NEW: and move forward with the strategy
03/26/2021, 2:50 p.m. - BO RUSSE NEW: the only shit thing is that none of these holders are selling
03/26/2021, 2:52 p.m. - BO RUSSE NEW: to bring it down, you need a market slop. the guys need the cash
03/26/2021, 7:11 p.m. - BO RUSSE NEW: Missed voice call
03/26/2021, 9:09 p.m. - BO RUSSE NEW: did you buy the mods?
03/26/2021, 9:09 p.m. - BO RUSSE NEW: it has a crazy shape

03/26/2021, 9:09 p.m. - BO RUSSE NEW: 🙈
03/26/2021, 9:24 p.m. - David: Yes, because Chris told me that we're showing that we're pro-active in order to keep the GMEs
03/26/2021, 9:24 p.m. - David: Which behaved well today

CONFIDENTIAL

03/26/2021, 9:25 p.m. - David: Serious drop in vol
03/26/2021, 9:25 p.m. - David: May lost 20%
03/26/2021, 9:25 p.m. - David: The 1.04 lost 50%
03/26/2021, 9:25 p.m. - BO RUSSE NEW: good then
03/26/2021, 9:26 p.m. - David: April lost 30%…yes it's great

03/26/2021, 9:26 p.m. - BO RUSSE NEW: everything is on track 👌🏻
03/26/2021, 9:26 p.m. - David: An opening at minus 10 Monday would be a great support
03/26/2021, 9:26 p.m. - BO RUSSE NEW: I'm surprised
03/26/2021, 9:27 p.m. - David: This means we can avoid buying Moderna and Unib
03/26/2021, 9:27 p.m. - BO RUSSE NEW: clearly
03/26/2021, 9:28 p.m. - David: But anyway we are positive on the lines and GME pays more so we're making a decision
03/26/2021, 9:28 p.m. - David: We're pulling out all the stops to find more crazy stuff

03/26/2021, 9:29 p.m. - David: Spoke not bad tesla resumes but it's rubbish
03/26/2021, 9:30 p.m. - David: It's going to dive again on Monday and next week before the long week end
03/26/2021, 9:30 p.m. - David: There is going to be a sell-off
03/26/2021, 10:03 p.m. - BO RUSSE NEW: we'll see. the vol is so high on the rynoks
03/26/2021, 10:03 p.m. - BO RUSSE NEW: gme is going to like it

03/26/2021, 10:03 p.m. - BO RUSSE NEW: 💎
03/27/2021, 06:47 a.m. - David: "'The price of Bitcoin 'is nothing compared to what it will be' in the future according to C. Woods"

https://fr.investing.com/news/cryptocurrency-news/le-prix-du-bitcoin-nest-rien-compare-a-ce-quil-sera-dans-le-futur-selon-c-woods-2011181
03/27/2021, 06:50 a.m. - David: "Bitcoin could be banned like gold was, according to the world's biggest Hedge Fund"

https://fr.investing.com/news/cryptocurrency-news/le-bitcoin-pourrait-etre-interdit-comme-lor-la-ete-selon-le-plus-gros-hedge-fund-2011183
03/27/2021, 06:52 a.m. - David: It's obvious that the states are going to get their hands on this again sooner or later! Otherwise it's open to all possibilities
03/27/2021, 07:19 a.m. - David: https://www.cnbc.com/video/2021/03/26/video-game-michael-pachter-analyst-weighs-in-on-gamestops-earnings-call.html
03/27/2021, 07:25 a.m. - BO RUSSE NEW: yes everyone wants it to go in the direction in which they have invested

03/27/2021, 07:25 a.m. - BO RUSSE NEW: 😂
03/27/2021, 07:27 a.m. - David: Of course, just for GME 29 or 37 wouldn't necessarily suit me.
03/27/2021, 07:28 a.m. - David: I'd prefer it if we stuck to the shitty value
03/27/2021, 07:28 a.m. - BO RUSSE NEW: it's logical
03/27/2021, 07:28 a.m. - David: Because it's very low can repop suddenly
03/27/2021, 07:28 a.m. - BO RUSSE NEW: if the markets hold there is no reason
03/27/2021, 07:31 a.m. - David: https://www.reuters.com/article/us-usa-stocks-gamestop/gamestop-swings-between-gains-and-losses-capping-volatile-week-idUSKBN2BI2HJ
03/27/2021, 07:31 a.m. - David: There are many of us going on the Vol

BRATYA_000628

03/27/2021, 07:31 - BO RUSSE NEW: pineapples looking for a high return - there's no shortage of that
03/27/2021, 07:36 a.m. - David: Short interest in GameStop has fallen to about 15% of the stock's float from a peak of 141% in the first week of 2021, according to data from financial analytics firm S3 Partners.
03/27/2021, 07:37 a.m. - David: Yes, but you need to look at the precise details of the Tomasulo article, who are playing on the volume, yes, we are too 🤣
03/27/2021, 07:39 a.m. - David: Annual meeting in June it might not be a bad idea to buy one or more shares to get in on the action when you have puts of this level
03/27/2021, 07:39 a.m. - David: It's played out as it always has been
03/27/2021, 07:50 a.m. - BO RUSSE NEW:  Buy gme?
03/27/2021, 07:50 a.m. - David: Yes 2 shares
03/27/2021, 07:50 a.m. - David: To get access to the shareholder's communications
03/27/2021, 07:51 a.m. - BO RUSSE NEW: it is communicated directly
03/27/2021, 07:51 a.m. - BO RUSSE NEW: to the market
03/27/2021, 07:51 a.m. - David: Is the Annual General meeting public??
03/27/2021, 07:52 a.m. - David: I don't think so at Berkshire the buys buy a share to go there
03/27/2021, 07:52 a.m. - BO RUSSE NEW: if you want to go there yes
03/27/2021, 07:53 a.m. - BO RUSSE NEW: at Berk it costs a bit more)

03/27/2021, 07:55 a.m. - David: You must have seen the pause 🙈🙈🙈

 03/27/2021, 07:55 a.m. - David: It's more than unib and Idia 🤣
03/27/2021, 07:55 a.m. - BO RUSSE NEW: the only thing you need to know is when the capital increase is launched
03/27/2021, 07:56 a.m. - BO RUSSE NEW: I don't think they'll wait long given the level
03/27/2021, 07:56 a.m. - David: And I think we'll still have vol for a while so we'll be settling in for a while
03/27/2021, 07:56 a.m. - David: Possible
03/27/2021, 07:56 a.m. - BO RUSSE NEW: that's not cool
03/27/2021, 07:56 a.m. - David: What they vote on in the GM is the issuance of securities to make the dilution
03/27/2021, 07:57 a.m. - David: Before that you can't do anything
03/27/2021, 07:57 a.m. - David: They won't make an ABB without having the available shares
03/27/2021, 07:57 a.m. - BO RUSSE NEW: yes it's in the articles of incorporation
03/27/2021, 07:57 a.m. - David: Point to be verified how many do they have
03/27/2021, 07:57 a.m. - BO RUSSE NEW: no worries
03/27/2021, 07:58 a.m. - BO RUSSE NEW: yes
03/27/2021, 07:58 a.m. - David: In the articles you don't have the number of shares issued pending transactions
03/27/2021, 07:59 a.m. - David: You have the basic number
03/27/2021, 07:59 a.m. - David: But then, as the life of the company goes on, things change
03/27/2021, 08:00 a.m. - David: So before it reappears, the GM is issuing and then there's investment
03/27/2021, 7:22 p.m. - David: https://www.capital.fr/entreprises-marches/le-cac-40-cale-et-la-pause-risque-de-durer-le-conseil-bourse-du-jour-1398345
03/27/2021, 7:23 p.m. - David: Conso conso consolidate
03/27/2021, 7:23 p.m. - David: So Rafa did you play like crazy?
03/27/2021, 7:25 p.m. - BO RUSSE NEW: came out at 1/2
03/27/2021, 7:25 p.m. - BO RUSSE NEW: but it was great
03/27/2021, 7:25 p.m. - BO RUSSE NEW: 4 matches I am dead

BRATYA_000629

03/27/2021, 7:25 p.m. - BO RUSSE NEW: but dead

03/27/2021, 7:25 p.m. - BO RUSSE NEW: 😂
03/27/2021, 7:50 p.m. - David: Bravo Bro!!! We can do it in Dubai and you can play against Vassily
03/27/2021, 7:50 p.m. - David: He loves it
03/27/2021, 7:50 p.m. - David: Original letter from Alexander for me a priori is the only thing to bring back
for me
03/27/2021, 7:53 p.m. - BO RUSSE NEW: yes already planned
03/27/2021, 7:54 p.m. - David: There it is last line on the right

03/27/2021, 7:56 p.m. - BO RUSSE NEW: 😊 you're doing very very well

BRATYA_000630

25/03/2021, 05:04 - David: https://pub.webull.com/us/news-html/9c18b74450c448f39a33e8280bc0b333.html?theme=1&_v=1&color=1&hl=en&sp=1&theme=1
25/03/2021, 05:04 - David: Tous font la même....oufff quon soit sorti
25/03/2021, 05:04 - David: Moins 10 points en after market y a eu
25/03/2021, 06:37 - BO RUSSE NEW: yes c'est clair faut du cash
25/03/2021, 06:43 - David: Ils burnent du cash
25/03/2021, 06:43 - David: J'attends les risques, mais je vais tenter de mettre loperation sur les rails au plus vite
25/03/2021, 07:06 - David: Bro reunion d'urgence
25/03/2021, 07:06 - David: Tes dispo???
25/03/2021, 07:36 - BO RUSSE NEW: yes
25/03/2021, 09:14 - BO RUSSE NEW: <Media omitted>
25/03/2021, 11:13 - BO RUSSE NEW: <Media omitted>
25/03/2021, 11:13 - BO RUSSE NEW: de quel squeeze ils parlent?
25/03/2021, 11:13 - BO RUSSE NEW: je comprends rien
25/03/2021, 11:37 - David: Les 26%
25/03/2021, 11:38 - BO RUSSE NEW: c'est pas avec ça que tu fais pumper
25/03/2021, 11:57 - David: Non
25/03/2021, 11:57 - David: Je passé en audition avec Stef pendant une heure
25/03/2021, 11:57 - David: Pour faire la review des possibilités
25/03/2021, 11:57 - BO RUSSE NEW: alors?
25/03/2021, 11:58 - BO RUSSE NEW: t'es à l'office?
25/03/2021, 11:58 - BO RUSSE NEW: te call?
25/03/2021, 14:40 - David: Faut etre en forme pour bosser avec ces 💩 💩 💩
25/03/2021, 14:41 - BO RUSSE NEW: 😂
25/03/2021, 14:43 - BO RUSSE NEW: il est revenu avec quelle information?
25/03/2021, 14:56 - BO RUSSE NEW: <Media omitted>
25/03/2021, 15:47 - David: https://www.cnbc.com/2021/03/24/cramer-says-gamestop-remains-overvalued-despite-promising-q4-report.html
25/03/2021, 16:51 - David: Pas jojo le spoke....
25/03/2021, 17:08 - BO RUSSE NEW: grave
25/03/2021, 17:08 - BO RUSSE NEW: pas kaiff
25/03/2021, 17:08 - BO RUSSE NEW: GME kaiff par contre va y avoir d'aller chercher more
25/03/2021, 17:16 - David: Yeahhh
25/03/2021, 17:17 - BO RUSSE NEW: ca joue beaucoup sur le prix des options ?
25/03/2021, 17:19 - David: La non
25/03/2021, 17:19 - David: Celles de mai oui 2 euro mais pas avril cest le temps et le delta qui bossent
25/03/2021, 17:22 - BO RUSSE NEW: logique
25/03/2021, 22:09 - David: https://seekingalpha.com/news/3675903-biogen-shares-could-jump-25-75-with-potential-tecfidera-appeals-court-reversal?utm_source=webull.com&utm_medium=referral
25/03/2021, 22:09 - David: Avec ce qui va sortir
25/03/2021, 22:10 - David: Et la vol sur l'autre....a 6 mois on peut faire meme autant que Uni
25/03/2021, 22:11 - BO RUSSE NEW: lu today
25/03/2021, 22:11 - BO RUSSE NEW: yes exact
25/03/2021, 22:11 - BO RUSSE NEW: ca va le faire Bro. tu as eu une idée de ouf pour surfer sur la vol
25/03/2021, 22:17 - BO RUSSE NEW: pour moi le seul risk c'est une augmentation de capital avec une création d'action ouverte au marché, tt les gogos qui signent et à ce prix elle peut rentrer un cash denculer
26/03/2021, 12:58 - David: Ca va etre musclor deja 2.4 de dépassement ligne...

BRATYA_000625

26/03/2021, 12:58 - David: Mais on a des trucs positifs donc je peux les sortir et remettre plus haut apres
26/03/2021, 12:59 - BO RUSSE NEW: faut tenir ou roller car vu la vol si tu sors et qu'elle perd 40% en 1 journée t'as raté le deal
26/03/2021, 12:59 - David: Yes
26/03/2021, 12:59 - David: Exact
26/03/2021, 13:00 - David: Mais roller c'est doubler les expos
26/03/2021, 13:00 - David: De 400 a 800 🤩
26/03/2021, 13:00 - BO RUSSE NEW: yes la montante
26/03/2021, 13:01 - David: On va voir avec les chiffres
26/03/2021, 13:01 - BO RUSSE NEW: tt que tu as du blé
26/03/2021, 13:01 - David: Sortir ce qui est Green deja
26/03/2021, 13:01 - David: Les next weeks peuvent sortir vendus 5 ils valent 2
26/03/2021, 13:02 - BO RUSSE NEW: propre
26/03/2021, 13:02 - BO RUSSE NEW: ca va pas monter qu ciel
26/03/2021, 13:03 - David: Le deal est ouff juste imr monte car le delta monte comme on se rapproche
26/03/2021, 13:03 - David: Maos en absolut ya 72barres de nominal ils flippent
26/03/2021, 13:04 - David: Faut piloter
26/03/2021, 13:04 - David: Ca fait chier elle aurait repris 15 20 et la today faut qu'elle se pete
26/03/2021, 13:05 - BO RUSSE NEW: c'est tjs pareil
26/03/2021, 13:05 - BO RUSSE NEW: faut faire avec la situation
26/03/2021, 13:05 - BO RUSSE NEW: mais pas abandoned
26/03/2021, 13:06 - David: No way
26/03/2021, 13:36 - BO RUSSE NEW: Ponvory accepté en Europe
26/03/2021, 13:36 - BO RUSSE NEW: c'est pour ca que ldi explose 😊 😂
26/03/2021, 13:36 - David: -3 -4 % 🤣
26/03/2021, 13:36 - BO RUSSE NEW: +1,71%
26/03/2021, 13:36 - BO RUSSE NEW: 🚀
26/03/2021, 13:36 - BO RUSSE NEW: ca déroule
26/03/2021, 13:37 - BO RUSSE NEW: ca va etre fou
26/03/2021, 13:37 - BO RUSSE NEW: tellement de positif
26/03/2021, 13:39 - David: Excellent
26/03/2021, 13:39 - David: Et avec GME on va envoyer aussi
26/03/2021, 13:40 - BO RUSSE NEW: grave
26/03/2021, 13:40 - BO RUSSE NEW: 💎 on va se battre pour prendre le titre de Diamond hands 😂
26/03/2021, 13:41 - BO RUSSE NEW: les WS bet qui disent du créateur du canal qu'il a les Diamond hands sur GME
26/03/2021, 13:42 - BO RUSSE NEW: bon ce qui est pas faux non plus)
26/03/2021, 13:44 - BO RUSSE NEW: <Media omitted>
26/03/2021, 13:44 - BO RUSSE NEW: Bien Cramer 👊🏻
26/03/2021, 13:45 - David: C'est vrai
26/03/2021, 13:45 - David: Et today elle va faire +15 et finir @-30%
26/03/2021, 13:45 - David: Faut etre solide
26/03/2021, 13:45 - David: On va cartonner
26/03/2021, 13:45 - BO RUSSE NEW: yes faux
26/03/2021, 13:45 - BO RUSSE NEW: faut
26/03/2021, 13:46 - BO RUSSE NEW: suivre et tenir la pause
26/03/2021, 13:46 - David: Ca fait des gros moves mais suis confiant sur notre strategie

BRATYA_000626

26/03/2021, 13:46 - BO RUSSE NEW: c'est qd c'est le plus hard que ca ramène le plus
26/03/2021, 13:46 - David: Risk reward of course
26/03/2021, 13:47 - BO RUSSE NEW: 💎
26/03/2021, 13:48 - David: Cramer il est violent il les defonce a chaque fois pour retour a 70 🤣 🤣 🤣
26/03/2021, 13:49 - BO RUSSE NEW: il joue comme une pute
26/03/2021, 13:49 - BO RUSSE NEW: en options
26/03/2021, 13:54 - David: Je pense il pèse 100 pièces donc avec impots US il en a sorti le double
26/03/2021, 13:56 - BO RUSSE NEW: easy
26/03/2021, 13:56 - BO RUSSE NEW: plus ce qu'il trade via sa mifa ou ses potes à Singapour ou Dub
26/03/2021, 13:59 - David: Et ses potes patrons de fonds 🤣 🤣 🤣 👏
26/03/2021, 14:01 - BO RUSSE NEW: yes
26/03/2021, 14:04 - David: Cest Jeffrey's qui est passe de 15 a 175 hier qui a mis le coup de bourre
26/03/2021, 14:04 - David: Sinon elle reprenait que 10 15 points max
26/03/2021, 14:05 - David: Donc today avec Mad Money
26/03/2021, 14:05 - David: On peut repartir a la baisse
26/03/2021, 14:07 - BO RUSSE NEW: on espère
26/03/2021, 14:07 - BO RUSSE NEW: on a à faire à des mecs qui en ont rien à branler de la finance et n'y comprennent rien
26/03/2021, 14:08 - BO RUSSE NEW: on leur dit ça va monter a 2000
26/03/2021, 14:08 - BO RUSSE NEW: acheter et jamais vendre
26/03/2021, 14:10 - BO RUSSE NEW: pour sauver des jeux vidéo
26/03/2021, 14:11 - David: En face tu as des mecs comme Bill Gross ou Cramer qui peuvent peter la tole de 50 points en deux jours
26/03/2021, 14:12 - BO RUSSE NEW: exact
26/03/2021, 14:12 - BO RUSSE NEW: faut rester calme
26/03/2021, 14:12 - BO RUSSE NEW: et avancer dans la stratégie
26/03/2021, 14:50 - BO RUSSE NEW: la seule merde c'est que tt ces holders vendent pas
26/03/2021, 14:52 - BO RUSSE NEW: pour la faire baisser faut une ratatouille des marchés. que les mecs aient besoin d'oseille
26/03/2021, 19:11 - BO RUSSE NEW: Missed voice call
26/03/2021, 21:09 - BO RUSSE NEW: t'as racheté les mods?
26/03/2021, 21:09 - BO RUSSE NEW: elle a v shape de ouf
26/03/2021, 21:09 - BO RUSSE NEW: 🙊
26/03/2021, 21:24 - David: Oui car Chris ma dit on montre quon est pro actif pour garder les GME
26/03/2021, 21:24 - David: Qui se sont bien comportees today
26/03/2021, 21:25 - David: Baisse grave de vol
26/03/2021, 21:25 - David: Le mai a perdu 20%
26/03/2021, 21:25 - David: Le 1.04 a perdu 50%
26/03/2021, 21:25 - BO RUSSE NEW: bien alors
26/03/2021, 21:26 - David: Les avril ont perdu 30%....oui ca kaiff
26/03/2021, 21:26 - BO RUSSE NEW: tt est en piste 👌🏻
26/03/2021, 21:26 - David: Une ouverture a moins 10 lundi serait un grand soutiens
26/03/2021, 21:26 - BO RUSSE NEW: tu m'étonnes
26/03/2021, 21:27 - David: Ca permet deviter de racheter les Moderna et des Unib
26/03/2021, 21:27 - BO RUSSE NEW: claro
26/03/2021, 21:28 - David: Mais anyway on est positif sur les lignes et GME rapporte plus donc arbitrage
26/03/2021, 21:28 - David: On sort des trucs pour aller chercher plus rien de tres crazy

BRATYA_000627

26/03/2021, 21:29 - David: Spoke pas mal tesla reprend mais cest nimporte quoi
26/03/2021, 21:30 - David: Ca va replonger lundi et next week avant les long week end
26/03/2021, 21:30 - David: Il va y avoir un sell-off
26/03/2021, 22:03 - BO RUSSE NEW: on va voir. la vol est tellement high sur les rynoks
26/03/2021, 22:03 - BO RUSSE NEW: gme ça va kaiff
26/03/2021, 22:03 - BO RUSSE NEW: 💎
27/03/2021, 06:47 - David: "Le prix du Bitcoin "n'est rien comparé à ce qu'il sera" dans le futur selon C. Woods"

https://fr.investing.com/news/cryptocurrency-news/le-prix-du-bitcoin-nest-rien-compare-a-ce-quil-sera-dans-le-futur-selon-c-woods-2011181
27/03/2021, 06:50 - David: "Le Bitcoin pourrait être interdit comme l'Or l'a été selon le plus gros Hedge Fund"

https://fr.investing.com/news/cryptocurrency-news/le-bitcoin-pourrait-etre-interdit-comme-lor-la-ete-selon-le-plus-gros-hedge-fund-2011183
27/03/2021, 06:52 - David: C'est évident que les etats vont remettre la main a un moment ou l'autre la dessus!!! Sinon cest open a toutes les possibilités
27/03/2021, 07:19 - David: https://www.cnbc.com/video/2021/03/26/video-game-michael-pachter-analyst-weighs-in-on-gamestops-earnings-call.html
27/03/2021, 07:25 - BO RUSSE NEW: yes chacun veut qu'il aille dans la direction ou il a investi
27/03/2021, 07:25 - BO RUSSE NEW: 🤷
27/03/2021, 07:27 - David: Of course, juste pour GME 29 ou 37 m'arrangerait pas forcément en fait.
27/03/2021, 07:28 - David: Je prefere qu'on reste la sur de lexcrementiel de valo
27/03/2021, 07:28 - BO RUSSE NEW: logique
27/03/2021, 07:28 - David: Car tres bas ca peut repop violent
27/03/2021, 07:28 - BO RUSSE NEW: si les marchés tiennent ya pas de raison
27/03/2021, 07:31 - David: https://www.reuters.com/article/us-usa-stocks-gamestop/gamestop-swings-between-gains-and-losses-capping-volatile-week-idUSKBN2BI2HJ
27/03/2021, 07:31 - David: On est nombreux a aller sur de la Vol
27/03/2021, 07:31 - BO RUSSE NEW: de l'ananas qui cherche du high return c'est pas ça qui manque
27/03/2021, 07:36 - David: Short interest in GameStop has fallen to about 15% of the stock's float from a peak of 141% in the first week of 2021, according to data from financial analytics firm S3 Partners.
27/03/2021, 07:37 - David: Oui mais il faut regarder les éléments precis de l'article Tomasulo qui joue la vol oui nous aussi 🤣
27/03/2021, 07:39 - David: Annual meeting en juin cest peut etre pas mal d'acheter une ou des actions pour rentrer dedans quand on a des poses de ce niveau
27/03/2021, 07:39 - David: Ca se joue comme on a tjs fait
27/03/2021, 07:50 - BO RUSSE NEW: Acheter du gme?
27/03/2021, 07:50 - David: Oui 2 actions
27/03/2021, 07:50 - David: Pour avoir l'accès aux communications shareholder's
27/03/2021, 07:51 - BO RUSSE NEW: c'est directement communiqué
27/03/2021, 07:51 - BO RUSSE NEW: au marché
27/03/2021, 07:51 - David: Le Annual Général meeting est public??
27/03/2021, 07:52 - David: Je crois pas chez Berkshire les mecs achetent une action pour y aller
27/03/2021, 07:52 - BO RUSSE NEW: si tu veux y aller yes
27/03/2021, 07:53 - BO RUSSE NEW: chez Berk ca te coute un peu plus cher en plus)

BRATYA_000628

27/03/2021, 07:55 - David: Obligé t'as vu la pause 🙈 🙈 🙈

27/03/2021, 07:55 - David: C'est plus que unib et Idia 🤣

27/03/2021, 07:55 - BO RUSSE NEW: la seule chose à savoir c'est quand est lancée l'augmentation de capital

27/03/2021, 07:56 - BO RUSSE NEW: je pense ils vt pas tarder vu le level

27/03/2021, 07:56 - David: Et je pense qu'on va avoir encore de la vol un moment donc on va s'installer dans le temps

27/03/2021, 07:56 - David: Possible

27/03/2021, 07:56 - BO RUSSE NEW: c'est pas kaif

27/03/2021, 07:56 - David: Ca c'est ce qui se vote en AG  l'émission de titres  pour faire la dillu

27/03/2021, 07:57 - David: Avant tu peux rien faire

27/03/2021, 07:57 - David: Il va pas faire une ABB sans avoir les actions disponibles

27/03/2021, 07:57 - BO RUSSE NEW: si c'est dans les status

27/03/2021, 07:57 - David: Point a vérifier combiens il en ont

27/03/2021, 07:57 - BO RUSSE NEW: no soucy

27/03/2021, 07:58 - BO RUSSE NEW: yes

27/03/2021, 07:58 - David: Dans les statuts tu as pas le nb d'actions émises en attente d operation

27/03/2021, 07:59 - David: Tu as le nombre de base

27/03/2021, 07:59 - David: Mais apres au fur et a mesure de la vie de la boite ca bouge

27/03/2021, 08:00 - David: Donc avant que ca réapparaîsse il y a AG qui emet et apres il y a placement

27/03/2021, 19:22 - David: https://www.capital.fr/entreprises-marches/le-cac-40-cale-et-la-pause-risque-de-durer-le-conseil-bourse-du-jour-1398345

27/03/2021, 19:23 - David: Conso conso consolider

27/03/2021, 19:23 - David: Alors Rafa tu as joué de ouff?

27/03/2021, 19:25 - BO RUSSE NEW: sortie en 1/2

27/03/2021, 19:25 - BO RUSSE NEW: mais kaiff de ouf

27/03/2021, 19:25 - BO RUSSE NEW: 4 matchs je suis dead

27/03/2021, 19:25 - BO RUSSE NEW: mais dead

27/03/2021, 19:25 - BO RUSSE NEW: 😂

27/03/2021, 19:50 - David: Bravo Bro!!! On pourra sen faire a Dubai tu joueras Vassily

27/03/2021, 19:50 - David: Il kaiff

27/03/2021, 19:50 - David: Lettre Alexander en original pour moi a priori c'est le seul truc a me ramener

27/03/2021, 19:53 - BO RUSSE NEW: yes déjà prévu

27/03/2021, 19:54 - David: Ca y est dernière ligne droite

27/03/2021, 19:56 - BO RUSSE NEW: 😊  tu fais très très bien

BRATYA_000629

# EXHIBIT 52

I, Danelle Shaw, hereby certify that I am competent to translate from French to English and that the attached translations are, to the best of my knowledge and belief, a true and accurate translation of the documents listed below from French to English.

- BRATYA_000638
- BRATYA_000676
- BRATYA_000678
- BRATYA_000679
- BRATYA_000680
- BRATYA_000681
- BRATYA_000682
- BRATYA_000683
- BRATYA_000684
- BRATYA_000685
- BRATYA_000687
- BRATYA_000688
- BRATYA_000689
- BRATYA_000690
- BRATYA_000692
- BRATYA_000694
- BRATYA_000695
- BRATYA_000696

- BRATYA_000697
- BRATYA_000698
- BRATYA_000699
- BRATYA_000700
- BRATYA_000702
- BRATYA_000703
- BRATYA_000704
- BRATYA_000705
- BRATYA_000707
- BRATYA_000708
- BRATYA_000709
- BRATYA_000710
- BRATYA_000711
- BRATYA_000605
- BRATYA_000619
- BRATYA_000625
- BRATYA_000663

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 26/04/2024

Danelle Shaw
[name]

[Signature]

I, Gabriela P. Rivera, hereby certify that I am competent to translate from French to English and that the attached translations are, to the best of my knowledge and belief, a true and accurate translation of the documents listed below from French to English.

- BRATYA_000611
- BRATYA_000612
- BRATYA_000613
- BRATYA_000614
- BRATYA_000618
- BRATYA_000630
- BRATYA_000632
- BRATYA_000633
- BRATYA_000635
- BRATYA_000637
- BRATYA_000645
- BRATYA_000646
- BRATYA_000647
- BRATYA_000648
- BRATYA_000650
- BRATYA_000652
- BRATYA_000653
- BRATYA_000655
- BRATYA_000656
- BRATYA_000657
- BRATYA_000659
- BRATYA_000661
- BRATYA_000670
- BRATYA_000672
- BRATYA_000675

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on   April 26, 2024

   Gabriela P. Rivera
Name


Signature

I, Jacob Cuttler, hereby certify that I am competent to translate from French to English and that the attached translations are, to the best of my knowledge and belief, a true and accurate translation of the documents listed below from French to English.

- BRATYA_000712
- BRATYA_000713
- BRATYA_000715
- BRATYA_000716
- BRATYA_000718
- BRATYA_000719
- BRATYA_000720
- BRATYA_000723
- BRATYA_000724
- BRATYA_000725
- BRATYA_000726
- BRATYA_000729
- BRATYA_000730
- BRATYA_000731
- BRATYA_000732
- BRATYA_000734
- BRATYA_000735
- BRATYA_000736
- BRATYA_000737
- BRATYA_000738
- BRATYA_000739
- BRATYA_000740
- BRATYA_000741
- BRATYA_000742
- BRATYA_000743
- BRATYA_000744

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 4/26/2024

Jacob Cuttler