# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE BED BATH & BEYOND CORPORATION SECURITIES LITIGATION | Case No. 1:22-cv-02541-TNM <br><br> Hon. Trevor N. McFadden <br><br> CLASS ACTION |

## LEAD PLAINTIFF'S REPLY IN SUPPORT OF
## MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS
## <u>REPRESENTATIVE AND CLASS COUNSEL</u>

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ................................................................................ ii

I.  PRELIMINARY STATEMENT ................................................................... 1

II.  FACTS RELEVANT TO CLASS CERTIFICATION ..................................... 2

III.  EXAMPLES OF COMMON EVIDENCE THAT WILL BE USED AT TRIAL TO SUPPORT CLASS CLAIMS ....................................................................... 5

IV.  ARGUMENT ............................................................................................. 7

    A.  Cohen Fails to Refute that Plaintiff and the Class are Entitled to a Presumption of Reliance Under the Fraud on the Market Doctrine ........................................... 8

        1.  BBBY's Securities Traded In an "Informationally Efficient" Market ..... 8

        2.  Cohen Concedes Most Cammer and Krogman Factors Are Met .......... 10

        3.  Cohen Fails to Show any Deficiencies in Cammer III and V ................ 10

    B.  Cohen Fails to Carry his Heavy Burden to Rebut the Basic Presumption ............ 16

    C.  Cohen's Claims Concerning Damages Are Meritless ........................................... 18

V.  Plaintiff's Claims Are Typical of the Class .................................................... 20

VI.  Plaintiff Will Fairly and Adequately Protect the Interests of the Class ............................. 23

VII.  Conclusion ................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)...............................................................................................19

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013)...............................................................................................13

*Ap-Fonden v. Goldman Sachs Grp., Inc.*,
  No. 18-CV-12084 (VSB) (KHP), 2024 U.S. Dist. LEXIS 64060
  (S.D.N.Y. Apr. 5, 2024)....................................................................................21, 23

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988).................................................................................................1

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
  No. 3:16-cv-2127 (AWT), 2023 U.S. Dist. LEXIS 64812 (D. Conn. Apr. 13, 2023)............16

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ............................................................................1

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ........................................................................12, 15

*Cheney v. Cyberguard Corp.*,
  213 F.R.D. 484 (S.D. Fla. 2003) ...........................................................................12

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*,
  322 F. Supp. 3d 676 (D. Md. 2018) ........................................................................9

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
  No. 18-cv-04844-BLF, 2022 U.S. Dist. LEXIS 83836 (N.D. Cal. May 9, 2022) ...................19

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)............................................................................................18, 19

*Del. Cty. Emples. Ret. Sys. v. Cabot Oil & Gas Corp.*,
  No. H-21-2045, 2023 U.S. Dist. LEXIS 172506 (S.D. Tex. Sep. 27, 2023) ..........................18

*Di Donato v. Insys Therapeutics, Inc.*,
  333 F.R.D. 427 (D. Ariz. 2019) .............................................................................15

*Ferris v. Wynn Resorts Ltd.*,
  No. 2:18-cv-00479-APG-DJA, 2023 U.S. Dist. LEXIS 35374 (D. Nev. Mar. 1, 2023) .........19

*FindWhat Inv'r Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ...................................................................20

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ("*Halliburton II*") ...........................................................9, 10

*Hatamian v. Advanced Micro Devices, Inc.*,
No. 14-cv-00226 YGR, 2016 U.S. Dist. LEXIS 34150 (N.D. Cal. Mar. 16, 2016)...............19

*In re Banc of Cal. Sec. Litig.*,
326 F.R.D. 640 (C.D. Cal. 2018) ....................................................................19, 20

*In re Bed Bath & Beyond Corp. Sec. Litig.*,
687 F. Supp. 3d 1 (D.D.C. 2023) ...................................................................8, 9

*In re CenturyLink Sales Practices & Sec. Litig.*,
337 F.R.D. 193 (D. Minn. 2020) ....................................................................17

*In re DVI Inc. Sec. Litig.*,
249 F.R.D. 196 (E.D. Pa. 2008)......................................................................12

*In re Groupon Inc. Sec. Litig.*,
No. 12 C 2450, 2015 U.S. Dist. LEXIS 27334 (N.D. Ill. Mar. 5, 2015) ..........................12, 13

*In re Initial Pub. Offering Sec. Litig.*,
260 F.R.D. 81 (S.D.N.Y. 2009) ......................................................................12

*In re January 2021 Short Squeeze Trading Litig* is completely misplaced.
No. 21-2989-MDL-ALTONAGA/Torres, 2023 U.S. Dist. LEXIS 231860 (S.D. Fla. Nov. 13,
2023) ...................................................................................................16

*In re Monster Worldwide, Inc.*,
251 F.R.D. 132 (S.D.N.Y. 2008) .....................................................................23

*In re New Century*,
No. CV 07-0931 DDP (FMOx), 2009 U.S. Dist. LEXIS 144557
(C.D. Cal. Dec. 7, 2009) ...............................................................................23

*In re Petrobras Sec. Litig.*,
312 F.R.D. 354 (S.D.N.Y. 2016) .....................................................................21

*In re PolyMedica Corp. Sec. Litig.*,
432 F.3d 1 (1st Cir. 2005).............................................................................9

*In re Qualcomm Inc. Sec. Litig.*,
No. 17cv121-JO-MSB, 2023 U.S. Dist. LEXIS 47016 (S.D. Cal. Mar. 20, 2023) ................19

*In re Snap Inc. Sec. Litig.*,
334 F.R.D. 209 (C.D. Cal. 2019)......................................................................19

*In re Teva Sec. Litig.*,
No. 3:17-cv-558 (SRU), 2021 U.S. Dist. LEXIS 43316 (D. Conn. Mar. 9, 2021)................15

*In re Vale S.A. Sec. Litig.*,
No. 1:15-cv-9539-GHW, 2019 U.S. Dist. LEXIS 234514 (S.D.N.Y. Sep. 27, 2019).......10, 19

*In re Xcelera.com Sec. Litig.*,
No. 00-11649-RWZ, 2004 U.S. Dist. LEXIS 29064 (D. Mass. Sep. 30, 2004)....................11

*Karinski v. Stamps.com, Inc.*,
No. CV 19-1828-MWF (SKx), 2020 U.S. Dist. LEXIS 209256 (C.D. Cal. Nov. 9, 2020) ....19

*KB Partners I, L.P. v. Barbier*,
No. A-11-CA-1034-SS, 2013 U.S. Dist. LEXIS 78108 (W.D. Tex. June 3, 2013) .................9

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ..................................................................................1

*Loritz v. Exide Techs.*,
No. 2: 13-cv-02607-SVW-E, 2015 U.S. Dist. LEXIS 100471 (C.D. Cal. July 21, 2015).........9

*Malriat v. QuantumScape Corp.*,
No. 3:21-cv-00058-WHO, 2022 U.S. Dist. LEXIS 232497 (N.D. Cal. Dec. 19, 2022)....10, 13

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ..........................................................................................................7

*McGuire v. Dendreon Corp.*,
267 F.R.D. 690 (W.D. Wash. 2010) ................................................................................21

*McIntire v. China MediaExpress Holdings, Inc.*,
38 F. Supp. 3d 415 (S.D.N.Y. 2014) .....................................................................11, 12, 13

*Meijer, Inc. v. Warner Chilcott Holdings Co. III*,
246 F.R.D. 293 (D.D.C. 2007)........................................................................................23

*Monroe Cty. Employees' Ret. Sys. v. S. Co.*,
332 F.R.D. 370 (N.D. Ga. 2019)................................................................................15, 18

*Nat'l Veterans Legal Servs. Program v. U.S.*,
235 F. Supp. 3d 32 (D.D.C. 2017).................................................................................23

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
No. 08-CV-5310 (DAB), 2016 U.S. Dist. LEXIS 153804 (S.D.N.Y. Nov. 4, 2016).............20

*Petrie v. Elec. Game Card, Inc.*,
308 F.R.D. 336 (C.D. Cal. 2015) ...............................................................................9, 12

*Rooney v. EZCORP, Inc.*,

330 F.R.D. 439 (W.D. Tex. 2019) ............................................................................14

*Sayce v. Forescout Techs., Inc.*,
   No. 20-cv-00076-SI, 2024 U.S. Dist. LEXIS 94700 (N.D. Cal. May 28, 2024).....................19

*Smilovits v. First Solar, Inc.*,
   295 F.R.D. 423 (D. Ariz. 2013) ............................................................................12

*St. Clair Cty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*,
   No. 3:18-cv-00988, 2022 U.S. Dist. LEXIS 178750 (M.D. Tenn. Sep. 30, 2022)...........15, 18

*Strougo v. Barclays PLC*,
   312 F.R.D. 307 (S.D.N.Y. 2016) ............................................................................16

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017)....................................................................................10

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
   No. 13-6731, 2016 U.S. Dist. LEXIS 102304 (E.D. Pa. Aug. 4, 2016) .................................21

**Rules & Regulations**

Fed. R. Civ. P. 23 ......................................................................................................1

Plaintiff respectfully submits this reply in further support of its motion for Class Certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.

## I.      PRELIMINARY STATEMENT

Plaintiff and the Class are entitled to a presumption of reliance because Defendant Ryan Cohen ("Cohen") committed a fraud on the market. *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988).[1]  Cohen and his expert, Professor ("Prof.") Daniel Fischel ("Fischel"), cannot contest that the market for Bed Bath & Beyond's ("BBBY") securities was "informationally efficient" as that term is defined by the federal courts.  Nor do they even dispute that almost all the *Cammer* and *Krogman* factors existed during the Class Period.  *See Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989); *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001); Ex. 2 (Fischel Dep.) at 85:19-92:22.  These concessions are alone sufficient to find that BBBY securities traded in an efficient market during the Class Period.

Cohen asks the Court to take the unprecedented step of throwing out most of the *Cammer* and *Krogman* factors because of the unique circumstances of a "furious short squeeze," Cohen's Opposition ("Opp.") at 1, that he caused or at least exacerbated himself.  But each of Cohen's arguments has previously been rejected.  Volatility, short-selling constraints and criticisms of a Plaintiff's expert's event study are insufficient to overcome *Basic's* presumption of reliance. Regardless, even if Cohen's arguments were considered, Prof. Fischel relies on inaccurate and incomplete data to conclude shorting BBBY securities was impossible during the Class Period. There were no significant short-selling constraints.  Prof. Fischel's alternate event study is also deeply flawed because the period he tests was contaminated by Cohen's fraudulent statements. Plaintiff's expert, Dr. Matthew Cain ("Cain"), demonstrates that there is a causal link between Cohen's misrepresentations and the price movements in BBBY's securities during the Class

---

[1] Unless otherwise noted, all internal citations and quotation marks are omitted and all emphasis is supplied.  Citations to "¶__" or "¶¶__" are references to the numbered paragraphs of the Consolidated Second Amended Complaint (the "Complaint") filed at Dkt. No. 66.

Period.  Ex. 1 (Cain Reply) at ¶¶44-50.

Cohen must show that his misrepresentations had no price impact whatsoever to rebut *Basic*'s presumption of reliance.  Cohen does not even attempt to do that because Prof. Fischel's Report does not address all but one of Cohen's statements, and Prof. Fischel conceded that the price of BBBY securities continued to rise for over 24 hours after Cohen told investors that he was bullish on the stock on August 12, 2022.  Ex. 2 (Fischel Dep.) at 168:15-170:5.  Dozens of court decisions over the years have also rejected Cohen's claim that damages cannot be calculated on a Class-wide basis in securities fraud cases.

Cohen's 49-page brief is remarkably thin on legal citations because the law is overwhelmingly in Plaintiff's favor.  For this reason, Cohen attempts to pound the facts, but the facts are not on his side either.  Veering inappropriately into the merits, Cohen presents his alternative version of events to influence the Court's decision on matters not before it, but the facts developed to date have only strengthened Plaintiff's claims, and Cohen faces an inevitable loss at the next stage of litigation.  To the extent Cohen discusses facts relevant to class certification, he relies on slander and misleading omissions of the record to claim Plaintiff is atypical and inadequate to represent the Class.  But an objective assessment of the facts shows that Plaintiff is an ideal Class Representative because it considered Cohen's turnaround strategy and misrepresentations exactly like other investors, and like other investors traded on a price that reflected the benefit of Cohen's involvement when he had secretly threatened to sell his shares.

For all of these reasons and the reasons explained below, Plaintiff respectfully requests that the Court grant Plaintiff's motion for Class Certification.

## II.      FACTS RELEVANT TO CLASS CERTIFICATION

Undisputed facts are enough for the Court to certify the Class.  Prof. Fischel admitted at his deposition that 6 out of 8 *Cammer* and *Krogman* factors existed during the Class Period.  Ex. 2 (Fischel Dep.) at 91:15-96:19.  His Report contains a conclusory footnote stating that none of these factors allow Dr. Cain to test efficiency during the Class Period, but he admitted most of

these factors existed during the Class Period, and even conceded that he never analyzed them. *Id.* He further admitted that all *Cammer* factors are not required to find efficiency, and that volatility by itself is not sufficient to find inefficiency. *Id.* at 105:22-106:9.

Prof. Fischel's speculative opinions about what he repeatedly refers to as a "rumored short squeeze" fare no better. His Report carefully and repeatedly hedges that the short squeeze was "rumored," because he did not analyze the existence or cause of any short squeeze. Ex. 3 (Fischel Report) at ¶¶20-22, 26-28, 32, 35, 40, 50, 52, 56-58. Recognizing this weakness, at his deposition, he stressed that the Report contains the phrase "actual short squeeze," but that is false. Ex. 2 (Fischel Dep.) 200:25-201:16. It does not. While Prof. Fischel relies on "rumors," facts discovered in this case show that, on July 26, 2022, David Freedman ("Freedman"), an expert on activist investors BBBY hired to deal with Cohen, told management that Cohen could "rally the Reddit crowd" and "try to ignite a short squeeze" to increase BBBY's stock price. Ex. 4 (Kim Dep.) at 195:2-196:6; Ex. 5. BBBY's CEO, Sue Gove ("Gove"), agreed that Cohen was capable of doing that. Ex. 6 (Gove Dep.) at 232:4-13. Prof. Fischel also relies on incomplete and unreliable data from a single vendor to claim that there were significant short-selling constraints. Likely more complete data provided by another vendor shows that is factually inaccurate. Ex. 1 (Cain Reply) at ¶ 24. Contrary to Prof. Fischel's claim, ***hundreds of thousands of shares were available to short and were shorted*** during the Class Period. Ex. 1 (Cain Reply) at ¶24.

This leaves Prof. Fischel's speculative opinion based on seven anonymous social media posts that "some, if not many, potential Class Members" did not rely on the integrity of the market because they were crooked manipulators all in it for the squeeze. Ex. 2 (Fischel Dep.) at 188:18-201:16. At deposition, however, Prof. Fischel admitted that he did not even know whether any of the individuals he referenced purchased BBBY securities or held BBBY securities during the Class Period. Ex. 2 (Fischel Dep.) at 188:18-190:10. He also disregarded the sub-Reddit /BBBY specifically dedicated to the Company, as well as tens of thousands of comments, likes, posts and reposts showing ***retail investors bought BBBY securities because Cohen told them to do so***. *E.g.*, ¶¶149-55. Indeed, Cohen's own Board appointees pushed the Company to "pay special attention"

to retail investors in early 2022.  *See* Ex. 6 (Gove Dep.) at 100:18-101:20.  Shelly Lombard ("Lombard") said that retail investors were more important than analysts.  Ex. 7.  Marjorie Bowen ("Bowen") believed that investors on Reddit were "sophisticated," and she was "addicted" to their posts.  *See* Ex. 6 (Gove Dep.) at 257:11-259:4; Exs. 8, 9, 10.  On another occasion, Bowen told Lombard and Ben Rosenzweig ("Rosenzweig") that retail investors were "not as dumb as the media makes them out to be" and were "actually experts[.]"  *See* Ex. 8.

Prof. Fischel's price impact analysis is also deeply flawed.  He admitted that the price of BBBY's securities went up after Cohen tweeted on August 12, 2022 and continued to rise on August 15, 2022.  Ex. 2 (Fischel Dep.) at 168:15-169:21.  That concession of price impact is fatal, because Defendants must show no price impact whatsoever.  His speculative opinion that the stock price rose exclusively because of a "rumored short squeeze" in August 2022 also flies in the face of reality.  He ignores all the investors online who started to buy stock on August 5, 2022 because of Cohen.  ¶¶153-56.  As Bowen observed: "It must be nice to be a billionaire and have a legion of followers on social media pumping a stock price for you"  *See* Ex. 8.  BBBY executives also noted the direct correlation between Cohen's SEC filings and the increase in BBBY's stock price.  Ex. 4 (Kim Dep.) at 224:2-24, 228:10-229:14; Ex. 6 (Gove Dep. 272:2-10); Exs. 11, 12.  Rosenzweig testified that the moon emoji in Cohen's tweet was "a good thing for [BBBY's] stock" and that Cohen did not intend to sell his BBBY holdings.  *See* Ex. 13 (Rosenzweig Dep.) 220:14-18, 221:23-222:4.[2]

Prof. Fischel completely ignores the impact of Cohen's filings with the SEC on August 16, 2022 and August 18, 2022.  When Cohen filed a Schedule 13D on August 16, 2022, the stock price increased over 70%, reaching an intraday high of $28.60 per share.  ¶¶162-64.  After seeing

---

[2] Rosenzweig's attempt to backtrack on his comments later in his deposition at Defendants' Counsel's prodding is nothing new, as he attempted to do the same when he revealed his intent to be Cohen's proxy in his interview with BBBY for a spot as a Board member before backtracking at the behest of Cohen's attorneys.  *See infra* at 7.  Regardless, Rosenzweig's alternate testimony is also helpful to Plaintiff because he agreed other individuals were misled by Cohen's tweet.  Ex. 13 (Rosenzweig Dep.) at 239:15-240:3.

Cohen's 13D, Bowen texted Lombard and Rosenzweig to say "it was great to see [Cohen] buying" more BBBY securities.  *See* Ex. 8; *see also* Ex. 9 ("***Holy crap just looked at our stock price. Ryan buying more obviously egg them all on.***").  Cohen's own attorney believed that Cohen was increasing his BBBY holdings, rather than liquidating them.  Ex. 14 (Nebel Dep.) 127:15-128:2; 129:7-130.  Cohen's claim that investors knew about his actual sales when his Form 144 was released on August 17, 2022 also lacks credibility.  Opp. at 16-17.  Cohen's own appointees interpreted the Form 144 as a signal that Cohen would exercise his call options within the subsequent three months.  *See* Ex. 10.  Gove also testified that even after viewing the Form 144, she did not have any reason to believe Cohen sold his holdings.  Ex. 6 (Gove Dep.) 281:1-282:18.

Prof. Fischel also fails to dispute the enormous back-end impact of Cohen's false statements.  On August 18, 2022, when news of Cohen's dump began to emerge, BBBY's stock price plunged over the next three days, falling from its previous day closing price of $18.55 to close at $8.78 on August 23, 2022.  ¶178.  Prof. Fischel extensively relied on news articles, including several *Bloomberg Opinion* pieces, to make claims about a "rumored short squeeze," but his Report disregards *Bloomberg* news stories directly attributing the massive decline in BBBY's stock price to Cohen's dump.  Ex. 15; Ex. 2 (Fischel Dep.) at 154:13-159:22.  Gove agreed that there was no news except for Cohen's SEC filings to explain either the massive rise in price on August 16, 2022 or the massive fall in price on August 19, 2022.  Ex. 6 (Gove Dep.) at 281:1-282:18.

### III.     EXAMPLES OF COMMON EVIDENCE THAT WILL BE USED AT TRIAL TO SUPPORT CLASS CLAIMS

***Pre-existing Plan to Sell***:  Very strong circumstantial evidence exists to show that Cohen soured on his investment in BBBY more than a month before the Class Period began, and was highly motivated to exit his position.  On April 27, 2022, Cohen expressed alarm at the Company's financial results, and asked the Board to "be laser-focused on cost containment" to "stem[] the bleeding."  Ex. 16.  By June 1, 2022, Cohen had repeatedly communicated with BBBY executives, asking them to reveal material information concerning plans to "conserve cash," share information

about the balance sheet and inventory, and suggesting that the Company dramatically cuts costs because "drawing down" on the Asset Based Lending ("ABL") Facility would be catastrophic. *See, e.g.*, Ex. 17 (written record of Cohen's communications with management and a Board member with no request for a non-disclosure agreement).

By June 21, 2022, the Company decided not to sell or spin off buybuy BABY. Ex. 18. On June 28, 2022, Cohen told Harriet Edelman ("Edelman"), the Chair of the Board, that he was "taken aback" by BBBY's poor results, asked how much time the Company had left, and whether it was considering selling shares or upsizing the ABL. Ex. 19; Ex. 20. On that same day, Cohen secretly demanded to Edelman that he be placed on a reconstituted 7-member Board, along with 4 of his other proxies, Edelman and Gove, giving Cohen control. Ex. 19. He also secretly threatened to sell his shares if he did not get control. *Id.* Edelman immediately rejected the request. *Id.* He had little recourse because the Cooperation Agreement did not provide him the control he demanded. *Id.* On July 15, 2022, Cohen expressed surprise to Gove about "how quickly it collapsed," asked "how bad" the Company's liquidity position was, Ex. 6 (Gove Dep.) at 159:15-164:9; 171:2-172:15; Ex. 21, stated that he was against any actions that would dilute his interest, and demanded to be told in advance should the Company consider any dilutive strategies. Ex. 6 (Gove Dep.) at 164:10-169:12; Edelman Dep at 248:17-251:19. At this point, the Company was already considering dilutive actions. Ex. 6 (Gove Dep.) at 164:10-169:12. Fearing that Cohen may become adversarial, on July 21, 2022, Edelman and Gove offered to meet with him in Florida. Ex. 22. He declined the offer. *Id.* After that, Cohen went completely "dark," his appointees stopped pestering the Board to give him inside information, and he never again communicated with any independent director or BBBY's management before the Class Period commenced. Ex. 23 (Edelman Dep.) at 254:19-256:15; Ex. 6 (Gove Dep.) at 158:11-159:8; 204:3-18.

***Material Non-Public Information ("MNPI")***:  Cohen did not disclose to BBBY investors that he had serious concerns about the Company's future, made a play for the Board, threatened to sell his shares if he lost, and stopped communicating with BBBY's Board and management after his attempted coup failed. None of this was public. And it would certainly be material to the

thousands of investors who bought shares because they believed in Cohen, his publicized turnaround strategy, and his false Twitter posts suggesting continued support of the Company. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38-40 (2011) (holding that information significant to the trading decision of investors is material); Ex. 6 (Gove Dep.) at 89:10-14 (agreeing these facts are material). And, there is common evidence that Board members gave him additional MNPI. According to Gove, Cohen's appointees to the Board were obsessively focused on Cohen's interests. Ex. 6 (Gove Dep.) at 74:14-75:16. During the vetting process, Rosenzweig stated that he was Cohen's proxy. Ex. 24. He continued to make similarly troubling statements to BBBY's CEO, CFO and general counsel. Ex. 6 (Gove Dep.) at 80:1-17. Cohen's appointees came with a "mandate" to push his plan to sell or spin-off buybuy BABY. Ex. 6 (Gove Dep.) at 55:7-13; 56:21-23; 59:5-18; Ex. 25 (Bowen Dep.) at 202:1-205:3. And when Cohen shifted his focus to BBBY's liquidity crisis, his appointees also changed their tune and did the same. Ex. 25 (Bowen Dep.) at 142:5-17.

Cohen's appointees repeatedly approached BBBY's management with proposals to share MNPI with Cohen. Ex. 13 (Rosenzweig Dep.) at 82:4-20, 83:10-22; Ex. 26; Ex. 6 (Gove Dep.) at 93:4-11, at 94:20-25, 99:16-100:8; Ex. 25 (Bowen Dep.) at 156:3-21, 174:16-175:9; Ex. 27 (Lombard Dep.) at 102:21-103:18; Ex. 13 (Rosenzweig Dep.) at 110:3-5, 111:4-23. This bizarre behavior led Gove and most of the independent members of the Board to believe that they were sharing MNPI with Cohen. Ex. 6 (Gove Dep.) at 288:11-293:18. Ignoring that what constitutes MNPI is a legal issue, Cohen relies mostly on the bare denials of his compromised appointees to claim no MNPI was shared with him. Opp. at 9. He is wrong. In violation of BBBY's policy, Rosenzweig privately phoned Cohen while he was on the Board, Ex. 28, admitted he talked to Cohen about "interpersonal workings of the board," and that he shared with Cohen his "opinions of the other board members" and whether "they were receptive to new ideas." Ex. 13 (Rosenzweig Dep.) at 51:11-52:4, 72:9-24. Informed of some of Rosenzweig's testimony, Gove agreed that Rosenzweig indeed did share MNPI with Cohen. Ex. 6 (Gove Dep.) at 81:19-84:7. Lombard also violated Company policy, met with Cohen on Zoom on May 21, 2022, and testified that she

discussed "turning the company around" with Cohen.  Ex. 27 (Lombard Dep.) at 80:22-81:8.  That too is MNPI.  As for Bowen, she admittedly destroyed text messages and emails, hampering Plaintiff's efforts to learn the facts.  Nevertheless, evidence concerning her behavior is consistent.  Ex. 25 (Bowen Dep.) at 32:21-33:9, 121:6-12, 122:2-7.  On March 21, 2022, Bowen sent an e-mail to a third party, Jonathan Heller, asking for a professional reference and followed up by stating that "[w]hat is not public is that RC Ventures is working collaboratively with the company to refresh the board and conduct a strategic alternatives review."  Ex. 29; Ex. 25 (Bowen Dep.) at 102:13-19.  That was MNPI as well.

***False Statements in SEC Filings***:  Evidence that Cohen made false statements in SEC filings is straightforward.  He does not dispute that he ordered his broker to sell shares before any of the Forms were filed on August 16, 2022.  ¶¶159-78.  Shortly after noon on August 16, 2022, the day Cohen filed a Schedule 13D omitting his plan to sell, he sent a CNBC article to his attorney, which reported that BBBY's stock price rose because of him.  Ex. 30.  Despite knowing this fact, he did nothing to correct the misleading picture he had created in the marketplace for days.  Cohen now claims that he filed false SEC filings with the assistance of counsel, Opp. at 14-16, but Cohen never received any advice on whether stating the sales were "potential" when he had already sold was legal.  In fact, his attorney repeatedly testified that he believed Cohen was "buying," not "selling," BBBY securities on August 16, 2022.  Ex. 14 (Nebel Dep.) 128:3-129:21.

## IV.    ARGUMENT

### A.    Cohen Fails to Refute that Plaintiff and the Class are Entitled to a Presumption of Reliance Under the Fraud on the Market Doctrine

#### 1.    BBBY's Securities Traded In an "Informationally Efficient" Market

Cohen and his expert provide no reason to disregard the legal definition of "informational efficiency": that markets are efficient when stock prices reflect available information about the security even if the prices do not accurately or correctly reflect the fundamental value of the security.  Ex. 1 (Cain Reply) at ¶¶15-19.  *See also In re Bed Bath & Beyond Corp. Sec. Litig.*, 687

F. Supp. 3d 1, 16 (D.D.C. 2023) (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 273–74 (2014) ("*Halliburton II*")).  Prof. Fischel's Report does not mention this critical distinction even though, at least, one Circuit has repeatedly cited his seminal work to reject that a plaintiff must show "fundamental value efficiency" at the class certification stage.  *See In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 14–17 (1st Cir. 2005).

In a conclusory paragraph lacking any analytical support, Prof. Fischel claims that damages cannot be calculated for a stock that is informationally, but not fundamentally, efficient.  Fischel Rep. at ¶59.  The federal courts have repeatedly rejected similar arguments for over a decade.  *See infra* at 19-20.   Moreover, Prof. Fischel fails to explain why a reasonable jury could not accept a damage calculation assessing common evidence of artificial inflation following Cohen's tweets and the large increase in price after Cohen filed a misleading Schedule 13D on August 16, 2022 or the crash in price after news of his dump emerged on August 18, 2022.  It can, just as juries often do.

Cohen's 49-page tome mentions the legal definition of "informational efficiency" only once in passing.  Opp. at 28.  Cohen rehashes the same claim that only strict fundamental value efficiency will suffice, despite this Court's ruling at the pleading stage.  *Compare* Opp. at 26 (repeating claim that stock price did not reflect information about a sales slump, discounted merchandise, and poor liquidity position) *with In re Bed Bath & Beyond Corp. Sec. Litig.*, 687 F. Supp. 3d at 16 (rejecting claim that an efficient market must reflect "bleak reporting on Bed Bath's outlook").  Cohen's position is overwhelmingly rejected by courts.  *See, e.g.*, *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*, 322 F. Supp. 3d 676, 688 (D. Md. 2018) (rejecting similar arguments and ruling that "informational efficiency" "is the efficiency standard of greatest concern to courts."); *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 354-55 (C.D. Cal. 2015) (same); *Loritz v. Exide Techs.*, No. 2: 13-cv-02607-SVW-E, 2015 U.S. Dist. LEXIS 100471, at *41-43 (C.D. Cal. July 21, 2015) (same);  *KB Partners I, L.P. v. Barbier*, No. A-11-CA-1034-SS, 2013 U.S. Dist. LEXIS 78108, at *27 (W.D. Tex. June 3, 2013) (same).  *See also Halliburton II*, 573 U.S. at 272 ("the modest premise underlying the presumption of reliance"

9

is simply "that public information generally affects stock prices.").

Plaintiff is not aware of any federal decision that has gone the other way.  The Court should find that the *Basic* presumption applies because Cohen and his expert cannot dispute that the legal definition of market efficiency has been met.  Moreover, Cohen cannot challenge that most of his Class Period statements impacted the price of BBBY stock, and fails to carry his burden to rebut the *Basic* presumption, rendering his opposition an exercise in futility.  *See infra* at 16-19.

### 2.    Cohen Concedes Most *Cammer* and *Krogman* Factors Are Met

Cohen and his expert do not contest that, **during the Class Period**, Ex. 1 (Cain Rep.) at ¶¶32-34,  BBBY's securities traded on the NASDAQ with weekly trading volume that requires a strong presumption of reliance (*Cammer I*), were covered by analysts (*Cammer II*), and held by 58 market makers and 264 institutional investors (*Cammer III*).  Nor can they dispute that BBBY was eligible to file Form S-3 (*Cammer IV*) or that all three *Krogman* factors further support efficiency.  Prof. Fischel did not test these factors, but he baselessly claims in a footnote that most of the factors "do not allow [Dr. Cain] to analyze discrete periods within the Cain Analysis Period and thus are incapable of supporting his conclusion."  Fischel Rep. at 32 n.105.  This argument makes no sense.  BBBY continued to trade with high volume on the same trading venue with the same market makers and the same eligibility to file Form S-3 during the Class Period.  Ex. 1 (Cain Reply) at ¶¶ 32-34.

Plaintiff is entitled to a presumption of reliance because most *Cammer* and *Krogman* factors are uncontested, and no single factor is dispositive.  *See, e.g.*,  *Waggoner v. Barclays PLC*, 875 F.3d 79, 98-99 (2d Cir. 2017) (affirming decision to certify class when most of the *Cammer* and *Krogman* factors were met, and holding that plaintiffs are not required to show direct evidence of price impact through event studies under *Cammer V*); *Malriat v. QuantumScape Corp.*, No. 3:21-cv-00058-WHO, 2022 U.S. Dist. LEXIS 232497, at *36-37 (N.D. Cal. Dec. 19, 2022) (ruling that plaintiffs were entitled to a presumption of reliance even if the "cause and effect test" or *Cammer V* was unmet); *In re Vale S.A. Sec. Litig.*, No. 1:15-cv-9539-GHW, 2019 U.S. Dist.

LEXIS 234514, at *41-43 (S.D.N.Y. Sep. 27, 2019) (same).

### 3.    Cohen Fails to Show any Deficiencies in *Cammer III* and *V*

Cohen derisively refers to *Cammer* and *Krogman* as "out of circuit, district court cases," Opp. at 23, but both decisions have been overwhelmingly followed throughout the country for decades.  He asks the Court to throw out virtually all their factors, but cites nothing to support his request to rewrite the law.  His argument is also internally inconsistent because he overemphasizes two *Cammer* factors he incorrectly believes favor him.  They do not.

***Cammer III: Market Makers.***  Courts analyze the short interest, if at all, as a subset of *Cammer III*.  *See McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 432 (S.D.N.Y. 2014).  Cohen and his expert claim the unique circumstances presented by a "rumored short squeeze," Fischel Rep. at 14, produced high volatility in BBBY's stock price during the Class Period, and the squeeze was caused by irrational manipulators on Reddit who did not rely on the integrity of the market.  Opp. at 32.  Ignoring that thousands of his followers on Reddit and Twitter bought stock because of his false statements and manipulative acts, Cohen instead defames retail investors as irrational manipulators who "knew the game was crooked because they were trying to crook it."  *Id.*   But the only thing novel about this case is the meme stock movement that Cohen attempted to lead and exploit.  Each of Cohen's arguments has been rejected by the federal courts consistently and repeatedly, and almost unanimously.

Courts have rejected claims that a market should be deemed inefficient because of the existence of "irrational investors" when, like here, Plaintiff has shown that most of the *Cammer* and *Krogman* factors are met.  *Compare* Opp. at 31-33 *with In re Xcelera.com Sec. Litig.*, No. 00-11649-RWZ, 2004 U.S. Dist. LEXIS 29064, at *9 (D. Mass. Sep. 30, 2004).[3]  They have also

---

[3] Cohen's unsubstantiated assertion that "most investors" did not rely on the integrity of the market is frivolous.  Opp. at 31-33.  Six comments about a squeeze on Reddit stripped from context are evidence of nothing when Plaintiff as well as thousands of Cohen's followers on Twitter and Reddit bought shares and lost money because of his false statements and scheme to defraud.  ¶¶138-78.  Prof. Fischel's speculative opinions on this topic are completely inappropriate and

rejected claims that volatility renders a market inefficient. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 91 (S.D.N.Y. 2015) (rejecting claim that increased volatility created inefficiencies during the relevant time period); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 500-01 (S.D. Fla. 2003) (rejecting that volatility weighed against efficiency where, as here, the price was impacted when the defendant made false statements and when a corrective disclosure emerged).

And, courts have rejected claims that short-selling constraints trump the established *Cammer* factors. *See, e.g.*, *In re Groupon Inc. Sec. Litig.*, No. 12 C 2450, 2015 U.S. Dist. LEXIS 27334, at *28-30 (N.D. Ill. Mar. 5, 2015) (ruling that the high cost of taking short positions does not demonstrate inefficiency when the stock, like here, is affected by defendant's false statements); *McIntire*, 38 F. Supp. 3d at 432 (finding that short-selling constraints in and of themselves are not sufficient to show inefficiency in the absence of systematic regulatory bans). In fact, courts have certified classes even after finding that short-selling constraints existed, so long as the other factors favor the Class. *See, e.g.*, *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 433-34 (D. Ariz. 2013). Prof. Fischel is well-aware of this fact. He has served as an expert witness for plaintiffs, applied the *Cammer* factors to conclude the market was efficient, and had a court certify a class despite finding that obstacles to arbitrage weighed in favor of inefficiency. *See In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 100-01 (S.D.N.Y. 2009).

Short-selling constraints are also not particularly relevant when, like here, the market expected a security's price to rise. *See, e.g.*, *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 212-13 (E.D. Pa. 2008); *Petrie*, 308 F.R.D. at 357-58. Cohen created those expectations with his misleading Twitter post and his false SEC filings. ¶¶146-78. Still, even if the Court indulged Cohen's irrelevant arguments, he is wrong about the facts too. Prof. Fischel's claim that the short

---

inadmissible. Fischel Rep. at 28-30. Plaintiff did not move to strike only to avoid burdening the Court with motion practice. Prof. Fischel has no expertise in social media, and his conjecture that "some, if not many potential class members" lacked reliance is groundless. *Id.* He does not know the specific identity of any Class Member except Plaintiff. Ex. 2 (Fischel Dep.) at 188:4-17.

interest utilization was "at or near 100%" is incorrect.  Ex. 3 (Fischel Rep.) at 17.  Prof. Fischel relied on unreliable and incomplete data because it excludes information from banks and exchanges.  Ex. 1 (Cain Reply) at ¶¶21-22.  More robust data shows that the short interest increased and hundreds of thousands of shares were available to short during the Class Period.  *Id.* at 24-25.[4] This is consistent with what Bed Bath's retained expert on activist investor engagement told management and the Board.  Ex. 31.  Gove also testified that there was no prohibition on shorting BBBY securities, and it merely became more expensive to engage in such transactions.  Ex. 6 (Gove Dep.) at 275:20-278:25.  That is not enough to rebut *Basic*'s presumption of reliance.  *See In re Groupon Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 27334, at *28-30; *McIntire*, 38 F. Supp. 3d at 432.

Cohen's request that the Court assume as a matter of law that he was unconnected with any short squeeze is both improper and illogical.  Opp. at 23; *but see Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013) (holding that courts should not "engage in free-ranging merits inquiries" at the certification stage); *QuantumScape Corp.*, 2022 U.S. Dist. LEXIS 232497, at *8 (noting that complaint allegations are treated as true at the class certification stage).  But Cohen fails to disclose to the Court that he made a play to control BBBY's board, threatened to sell his shares if he lost, expressed alarm at the prospect of being diluted, and then stopped communicating completely with BBBY management at least six weeks before he engaged in a scheme to defraud investors.  *See supra* at 6-7.  That MNPI would have altered the total mix of information available to investors, and impacted their decision to buy or sell BBBY securities.

The evidence also shows that Cohen had extensive conversations with BBBY management, and that either he or his Board appointees repeatedly sought inside information for him even when there was no sensible end or purpose to do so.  *See supra* at 7-8.  Gove testified that Cohen's caginess and lack of trustworthiness combined with the bizarre behavior of his inexperienced or

---

[4] Notably, Cohen references positively in his brief the robust data source used by Dr. Cain, S3 Partners.  Opp. at 11.  It is unclear why Prof. Fischel disregarded S3 Partners and instead used a less robust and incomplete source for short selling data.

unfit nominees led her to believe that they were feeding inside information to him.  Ex. 6 (Gove Dep.) at 285:24-291:4.  In fact, two of Cohen's nominees unwittingly admitted at their depositions that they provided Cohen with MNPI, and Gove agreed that, at least, one of them did so based on his testimony in this case.  Ex. 13 (Rosenzweig Dep.) at 51:11-52:4; Ex. 27 (Lombard Dep.) at 80:22-81:8; Ex. 6 (Gove Dep.) at 81:9-84:7.  Plaintiff could go on and on, but these facts are sufficient to show that Cohen was highly motivated to exacerbate, if not cause, a short squeeze and pump up the price of BBBY's securities.

Cohen quotes a few news stories to claim that a short squeeze already occurred before he started tweeting about BBBY, but he ignores market participants who stated that Cohen created an option gamma squeeze.  ¶29.  As early as July 26, 2022, an expert hired by the company (Freedman) also warned BBBY management that Cohen may "ignite a short squeeze."  Ex. 4 (Kim Dep.) at 195:2-196:6; Ex. 5.  Edelman testified that she was concerned that Cohen's tweets would impact the price of BBBY securities.  Ex. 23 (Edelman Dep.) at 22:13-24:12; *see also* ¶29.

In addition, Prof. Fischel concedes that BBBY's stock price increased by nearly 40% the next trading after Cohen road-tested his scheme on August 5, 2022, Ex. 3 (Fischel Rep.) at ¶9, but he never bothered to look at any of Cohen's tweets except for the misleading statements Cohen posted on August 12, 2022.  Ex. 2 (Fischel Dep.) at 154:13-159:22.  Even if signs of a squeeze emerged before Cohen started tweeting, that would not be relevant because Cohen exacerbated it.  Cohen ignores tens of thousands of likes on Twitter, and hundreds of comments on Reddit from his followers who believed that he encouraged them to buy BBBY securities before the Class Period, showing that his road-test was successful.  ¶¶143-44.  Cohen's argument that Plaintiff did not plead the August 5th tweet was false is a non-sequitur.  Opp. at 21.  He tweeted to test the waters and see if he could move the stock; upon learning he did he proceeded to make the concrete Class Period misrepresentations alleged.[5]  Plaintiff does not need to allege the tweet was false for

---

[5] Delving further into the merits, Cohen opines that his August 12, 2022 misrepresentations encouraging BBBY investors to take the stock price to the moon were a "murmur," Opp. at 13, because other tweets also received significant attention.  Putting aside the fact that the Tweet sent

the Court to draw that reasonable inference.

**Cammer V: Cause and Effect**.  Cohen's argument that this is the only factor that speaks to efficiency has repeatedly been rejected.  *See supra* at 11.  Cohen criticizes Dr. Cain for using earnings announcements in his event study, but courts credit that approach as objective.  *See In re Teva Sec. Litig.*, No. 3:17-cv-558 (SRU), 2021 U.S. Dist. LEXIS 43316, at *105 (D. Conn. Mar. 9, 2021).  He further criticizes Dr. Cain for not providing proof of previous short squeezes, but relies on Prof. Fischel's speculative and hedged opinions concerning a "rumored short squeeze." *Compare* Opp. at 29 n.24 *with* Fischel Rep. at 14.  At any rate, courts often do not even require cause and effect tests for cases with short class periods like the one here.  *See Barclays*, 310 F.R.D. at 82-86.  Dr. Cain did not choose an event during the Class Period because BBBY did not release an earnings report during the Class Period, the objective event criteria he selected and regularly uses.

Prof. Fischel's purported event study is also flawed because he fails to test for efficiency over time, and his event window is contaminated by Cohen's fraud, which caused the volatility in price he complains about.  Ex. 1 (Cain Reply) at ¶¶31-32.  Even assuming Prof. Fischel found a lack of statistical significance, that fact means nothing because event studies are not required, and the mere absence of statistical significance does not prove an absence of price impact.  *See, e.g.*, *Monroe Cty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 393 (N.D. Ga. 2019); *St. Clair Cty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, No. 3:18-cv-00988, 2022 U.S. Dist. LEXIS 178750, at *18-20 (M.D. Tenn. Sep. 30, 2022) (similar).[6]

---

during the Class Period was liked or reposted tens of thousands of times on Twitter alone, and discussed or liked by thousands more on Reddit, some of the other Tweets Cohen points to were **also** interpreted as endorsements of BBBY securities. Ex. 32.

[6] *See also Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 450 (W.D. Tex. 2019) (ruling that "the absence of a statistically significant price adjustment does not show the stock price was unaffected by the misrepresentation."); *Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 444 (D. Ariz. 2019) ("The lack of statistically significant proof that a statement affected the stock price is not statistically significant proof of the opposite, i.e., that it did not actually affect the stock price.").

Regardless, Dr. Cain has also analyzed stock price movements on the days Cohen made false statements (August 12th and August 16th) as well as when news of Cohen's dump began to emerge (August 19th). Ex. 1 (Cain Reply) at ¶¶39-41. All of them are statistically significant at the 95% confidence level. *Id*. BBBY's former CEO further confirmed there was no news about the Company on August 16th or August 18th except for Cohen's false statements in SEC filings and news about his pump and dump scheme. Ex. 6 (Gove Dep.) at 35:22-38:15. Of note, Prof. Fischel did not test for statistical significance on August 16th and August 19th because he knows that no amount of tweaking the inputs could render those dates non-significant.[7]

### B.   Cohen Fails to Carry his Heavy Burden to Rebut the *Basic* Presumption

Proving the absence of price impact is a "difficult task." *Strougo v. Barclays PLC*, 312 F.R.D. 307, 324 (S.D.N.Y. 2016) (collecting cases). A defendant must prove that there was ***no price impact whatsoever***, and "must make this showing as to all of the alleged corrective disclosures." *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, No. 3:16-cv-2127 (AWT), 2023 U.S. Dist. LEXIS 64812, at *39 (D. Conn. Apr. 13, 2023). Cohen cannot even approach the required showing, and does not refute that the market tracked his every word. He does not contest that, days before the Class Period, his tweet received over 21,000 likes from investors and sent the stock up 40%. ¶¶139-43. And his own expert agrees that in the hours after Cohen sent the "to the moon" emoji tweet to encourage his followers to buy, Bed Bath shares rose about $2. Ex. 2 (Fischel Dep.) at 168:11-169:21. Nor does he challenge that when the truth about Cohen's pump and dump was

---

[7] Cohen's reliance on *In re January 2021 Short Squeeze Trading Litig* is completely misplaced. No. 21-2989-MDL-ALTONAGA/Torres, 2023 U.S. Dist. LEXIS 231860 (S.D. Fla. Nov. 13, 2023). The plaintiffs there moved for class certification incorrectly asserting that the *Basic* presumption does not apply to manipulation claims, and pled themselves out by contending that the market was inefficient during the class period. *Id.* at 99-100. The district court explained that *Basic* equally applies to manipulation claims. *Id.* Having argued that the market was inefficient during the class period, the plaintiffs asked the district court to look outside the class period to find market efficiency. The district court refused to do so given the illogical concession made in the litigation. Plaintiff did not similarly misstate the law, and Dr. Cain's initial analysis ***ran through the Class Period***, and all of the *Cammer* and *Krogman* factors are met, most of which Cohen cannot contest.

revealed, shares dropped from $18.50 to $11.03, and dropped further to $8.78 over the next two trading days.  ¶12.  Cohen's inability to prove an alternate cause for each of these price movements is fatal to his price impact argument: "Because price impact can be observed on the 'front-end' (*i.e.*, misstatements causing or maintaining inflation) or on the 'back-end' (*i.e.*, a decline in price caused by the corrective disclosures), Defendants must affirmatively disprove both to satisfy their burden."  *In re CenturyLink Sales Practices & Sec. Litig.*, 337 F.R.D. 193, 209 (D. Minn. 2020); *see also Alexion Pharms.,* 2023 U.S. Dist. LEXIS 64812, at *39.

Instead, Prof. Fischel addresses only a single "front end" representation: Cohen's misleading August 12, 2022 tweet.  But a chart in his report admits that shares ***rose more than $2 in the three hours following the tweet***, thereafter leveling off at a gain of over 18%:



**Intraday Stock Price and Trading Volume
August 12, 2022**

Fischel Rep. at ¶40 (annotations added).  Numerous investors attributed the rise directly to Cohen's tweet.  ¶¶150-52.  Remarkably, although the 18+% ramp is visible to the naked eye and is larger than many stocks move ***in an entire year***, Prof. Fischel says that he does not consider it "distinguishable from zero."  Fischel Rep. at ¶39.  Cohen cites no authority for this proposition, and the federal courts have rejected these kinds of arguments repeatedly.  *See, e.g., Del. Cty.*

*Emples. Ret. Sys. v. Cabot Oil & Gas Corp.*, No. H-21-2045, 2023 U.S. Dist. LEXIS 172506, at *33-34 (S.D. Tex. Sep. 27, 2023) (rejecting claim that price reaction was caused by an earlier event when defendant could not dispute that the market also reacted after defendants' disclosure); *Acadia Healthcare Co.*, 2022 U.S. Dist. LEXIS 178750, at *22-24 (similar).

That Prof. Fischel was able to manipulate inputs to argue a lack of statistical significance cannot show the absence of price impact.  Lack of statistical significance "***does not prove that information had no role in the observed stock price adjustment***.  Rather, [n]on-significance means indeterminate with respect to finding the cause of a stock price movement…." *Monroe Cnty. Employees' Ret. Sys.*, 332 F.R.D. at 393; *see also supra* at 16 n.7.

Cohen's naked assertions about his false Schedule 13D and Form 144 filings fare no better.  Cohen's attempt to portray the Schedule 13D as "largely unnoticed" defies the record.  Opp. at 35.  BBBY's stock price went up several times the following day, and its management concluded the movement "was likely driven by RCV's filings."  Ex. 33.  Cohen likewise asserts he did not find anyone confused by the fact that he lied about his sales being "potential" when he had ***already*** sold millions of shares.  Opp. at 35.  But even the news he cites only refers to an "intent" to sell, not that actual sales had already occurred.  *Id.*  Moreover, as Cohen well knows, the record confirms that "more than 10" news outlets reached out to the Company for clarification, and its own advisor indicated that he could not tell whether sales were occurring or might later occur at any time "as late as Jul 31, 2023."  Ex. 34.[8]  Regardless, Cohen cannot dispute the huge back-end decline on August 19, 2022 when investors learned the truth of his actual sales, thwarting any price impact argument.  ¶12.

### C.    Cohen's Claims Concerning Damages Are Meritless

In reliance on a widely discredited misinterpretation of *Comcast Corp. v. Behrend*, Cohen

---

[8] Defendants also assert Cohen's lie about sales being merely potential was a "general" statement unworthy of attention.  Opp. at 35.  Not so.  Both that statement and the ultimate disclosure of the truth went precisely to the same narrow, highly relevant information: whether Cohen had actually dumped his entire stake.

claims that damages cannot be calculated on a Class-wide basis.  Opp. at 36-37 (citing 569 U.S. 27, 33, 35 (2013)).  The Supreme Court has held that the out-of-pocket measure described by Dr. Cain is the "correct measure of damages" in securities fraud cases.  *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  Since *Comcast* was decided, federal courts have unanimously rejected the argument Cohen advances by ruling that the out-of-pocket measure of damages is consistent with *Comcast*, with damages easily measured on a class-wide basis regardless of the purported new or unique circumstances a defendant alleges exist.  *See, e.g.*, *Sayce v. Forescout Techs., Inc.*, No. 20-cv-00076-SI, 2024 U.S. Dist. LEXIS 94700, at \*23-41 (N.D. Cal. May 28, 2024) (concluding that an out-of-pocket damages model is flexible enough to control for investors' reaction to a merger and differentiate between corrective disclosures); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-cv-04844-BLF, 2022 U.S. Dist. LEXIS 83836, at \*26-28 (N.D. Cal. May 9, 2022) (collecting cases where securities classes were certified and identical arguments concerning damages were rejected).[9]

Cohen's claim that price movements attributable to the short squeeze cannot be disentangled from price movements related to his misrepresentations is equally meritless.  There is no need to disentangle anything because Cohen exacerbated the short squeeze and is responsible for it.  Still, even assuming disentanglement ultimately proves necessary, it is irrelevant now because that is a merits inquiry into loss causation.  *See, e.g.*, *Hatamian v. Advanced Micro Devices, Inc.*, No. 14-cv-00226 YGR, 2016 U.S. Dist. LEXIS 34150, at \*27-28 (N.D. Cal. Mar. 16, 2016) (observing that disentanglement has nothing to do with a damages model).  Dr. Cain does not need to disaggregate inflation, opine on loss causation, or calculate damages because none are required at this stage.  *See, e.g.*, *In re Banc of Cal. Sec. Litig.*, 326 F.R.D. 640, 651 (C.D. Cal.

---

[9] *See also In re Qualcomm Inc. Sec. Litig.*, No. 17cv121-JO-MSB, 2023 U.S. Dist. LEXIS 47016, at \*53 (S.D. Cal. Mar. 20, 2023) (ruling that an event study is sufficient to isolate different misrepresentations and measure damages that stem from each); *Ferris v. Wynn Resorts Ltd.*, No. 2:18-cv-00479-APG-DJA, 2023 U.S. Dist. LEXIS 35374, at \*37-38 (D. Nev. Mar. 1, 2023); *In re Vale S.A. Sec. Litig.*, 2022 U.S. Dist. LEXIS 6433, at \*68-71; *Karinski v. Stamps.com, Inc.*, No. CV 19-1828-MWF (SKx), 2020 U.S. Dist. LEXIS 209256, at \*21-22 (C.D. Cal. Nov. 9, 2020); *In re Snap Inc. Sec. Litig.*, 334 F.R.D. 209, 217-18 (C.D. Cal. 2019).

2018) (emphasizing that plaintiffs have no burden to disaggregate confounding information at class certification).

### V.        Plaintiff's Claims Are Typical of the Class

Plaintiff's claims are typical because they all arise from Cohen's misrepresentations, omissions, manipulation of BBBY securities, and a common scheme to defraud the Class.  The standard for typicality is "not demanding," and these facts are sufficient to meet it.  *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, No. 08-CV-5310 (DAB), 2016 U.S. Dist. LEXIS 153804, at \*13 (S.D.N.Y. Nov. 4, 2016).   Cohen relies on irrelevant information, key omissions of the record, and slanderous insinuations to allege that Plaintiff is atypical because it did not rely on his false statements.

First, Cohen erroneously suggests that Plaintiff did not rely on the veracity of the misstatements when purchasing securities during the Class Period because Plaintiff engaged in other transactions in BBBY securities during the Class Period.  As an initial matter, Cohen lends a misleading hue to these other transactions.  At the start of the Class Period, Plaintiff was ***already*** long on BBBY.  Cohen holds the illogical position that investors should buy shares immediately after a statement is made.  Opp. at 40.  Law and reality contradict this assumption.  Plaintiff held shares throughout the Class Period that it could have otherwise sold if it had actual knowledge of Cohen's pump and dump scheme.   "There is no reason to draw any legal distinction between fraudulent statements that wrongfully prolong the presence of inflation in a stock price and fraudulent statements that initially introduce that inflation."   *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1316 (11th Cir. 2011).  And real-world investors do not buy shares the minute a fraudulent statement.

Far from "bet[ting] against Cohen at every turn," Cohen Opp. at 39, Plaintiff ***increased*** its long position during the Class Period.  At no time during the Class Period was Plaintiff net short on BBBY securities.  Instead, Plaintiff had a net ***increase*** in its holdings by 99,111 BBBY shares during the Class Period (purchasing 226,611 shares while selling, on two different days, 11,500

shares and 116,700 shares), in addition to purchasing many call options during the Class Period. ECF No. 14-4 at 2.

Ignoring the positive side of the ledger, Cohen points to Plaintiff's (i) sale of 11,500 shares (Cohen incorrectly wrote $14,000) of BBBY securities on August 12, 2022 – out of 50,900; (ii) sale of covered calls on August 12 15, and 17, 2022; and (iii) sale of 116,700 Bed Bath shares on August 17.  Opp. at 39-41; ECF No. 14-4 at 2.  These transactions do not in any way undercut reliance given that Plaintiff increased its holdings during the Class Period.  On August 17, 2022, in particular, Plaintiff purchased 85,000 BBBY shares on net; the sale of 116,700 shares that day was a result of the bank not allowing Plaintiff to keep that exposure.  Ex. 35 (David Coti ("D. Coti") Dep.) at 229.  The sale of covered calls during the Class Period served to generate a premium, and a partial hedge for Plaintiff's long position in BBBY securities.  Ex. 35 (D. Coti Dep.) at 158, 198-99, 203-04, 237-38, 356-58, 360-61.  Nothing about any of this is controversial or could possibly render Plaintiff atypical.

Courts have routinely rejected similar arguments where a class representative is a net purchaser of defendants' shares.  *See, e.g.*, *Ap-Fonden v. Goldman Sachs Grp., Inc.*, No. 18-CV-12084 (VSB) (KHP), 2024 U.S. Dist. LEXIS 64060, at *31 (S.D.N.Y. Apr. 5, 2024); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. 13-6731, 2016 U.S. Dist. LEXIS 102304, at *27-29 (E.D. Pa. Aug. 4, 2016).  Courts have even granted class certification when a class representative is an "in-and-out" trader who sold all shares prior to a corrective disclosure.  *See, e.g.*, *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 360 (S.D.N.Y. 2016) (ruling that in-and-out trading is not atypical in securities class actions); *McGuire v. Dendreon Corp.*, 267 F.R.D. 690, 699 (W.D. Wash. 2010) (similar).

Second, Cohen erroneously suggests that, after the Schedule 13D was filed on August 16, 2022, Plaintiff maintained a strategy adverse to the Class.  This makes little sense and is unsupported by the record.  Plaintiff purchased additional BBBY shares on August 17 and 18, 2022.  ECF No. 14-4 at 2.  Plaintiff also testified that he relied on Cohen's Tweet and 13D filing in deciding to purchase additional securities.  Ex. 35 (D. Coti Dep.) at 244-45, 250-51, 343-45.

Contrary to Cohen's mischaracterization of admittedly confusing deposition testimony from a native French speaker, Plaintiff never conceded that BBBY's stock price during the Class Period was unrealistic.[10]   And, indeed, Plaintiff went on to increase its position in BBBY securities.   ECF No. 14-4 at 2.

Third, Cohen erroneously states that Plaintiff first purchased stock during the Class Period only after seeing a news article stating Cohen had sold his shares.  Opp. at 40.  Not so.  The news article referenced by Plaintiff in a WhatsApp exchange was based on the Form 144 filing, which became public ***after the market closed*** on August 17, 2022.  *See* Cohen's Ex. 3 at BRATYA 000748 (dated 8/17/2022; 10:11 pm) (including link to incorrect article—later corrected—that Cohen had sold his shares).  Plaintiff's purchases thus took place during trading hours on August 17th prior to seeing the article.

Fourth, Cohen argues that because Plaintiff speculated that Cohen may have sold his shares on August 17, 2022, Plaintiff could not have relied upon Cohen's false statements.  This argument is mistaken on several levels.  Plaintiff's purchases on August 17, 2022 were made before Plaintiff saw the news article Cohen cites.  *Id.*  Record evidence demonstrates that, on August 17, 2022, Plaintiff's two members D. Coti and Edouard Coti ("E. Coti") also were fooled by the false reference to potential sales in Cohen's Form 144, just like other class members: "it's [i.e., the Form 144] just the right to sell within 6 months,"  Cohen's Ex. 3 at BRATYA_000749,  … and "so [Cohen] doesn't want the stock price to drop before selling."  *Id.*  More importantly, Plaintiff speculated that a potential sale of Cohen's holdings was a harbinger for ***a sale or spinoff of buybuy BABY***.  *See* Cohen's Ex. 3 at BRATYA_000749 (stating that "I think they will sell Buybuybaby and on the announcement he will get out.");  Ex. 35 (D. Coti Dep.) at 407-09.  Cohen further

---

[10] D. Coti. Dep. at 359-60 ("Q. I'm not sure what you mean.  Are you saying it's true that other people were saying Bed Bath & Beyond is a sell or that you agreed that Bed Bath & Beyond is a sell?  A. No, it is true that these people say, for them, that it's an irrealistic [sic] valuation.  What they have said, they are prone to give their opinion, but -- so because some analyst, what they say is true, their understanding of the situation is true, but it doesn't mean that there is not unlocked potential").

confuses corrective disclosures with actual knowledge of the fraud. A corrective disclosure does not mean the full truth has been revealed, and the Coti brothers were not clairvoyants with advance knowledge of Cohen's pump and dump scheme. The worst that can be said about Plaintiff is that it was duped a few days longer than some other investors. Ex. 35 (D. Coti Dep.) at 408-09. They then realized that Cohen had "**stabbed [them] in the back**." Ex. 35 (D. Coti Dep.) at 409.

Cohen also argues that Plaintiff is atypical because it purchased BBBY securities at much lower prices after August 18, 2022. Opp. at 41. But courts have repeatedly rejected this argument because such purchases "are irrelevant to the class claims and issues before the court." *Ap-Fonden*, 2024 U.S. Dist. LEXIS 64060, at *32; *see also In re Monster Worldwide, Inc.*, 251 F.R.D. 132, 135 (S.D.N.Y. 2008) (post-disclosure purchases have "no bearing on whether or not [the class representative] relied on the integrity of the market during the class period").

## VI.     Plaintiff Will Fairly and Adequately Protect the Interests of the Class

Cohen does not challenge that Plaintiff can prosecute the "interests of the class through qualified counsel," and fails to show "**any antagonistic or competing interests with the unnamed members of the Class**." *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 302 (D.D.C. 2007). Speculative conflicts are never enough, and Cohen hasn't shown even a speculative conflict—just slander cooked up by his counsel. *Nat'l Veterans Legal Servs. Program v. U.S.*, 235 F. Supp. 3d 32, 41 (D.D.C. 2017).

All but one of the WhatsApp chats that Cohen relies on are from 2021 and relate to the Coti brothers' discussion concerning **GameStop, not BBBY**. *See* Cohen's Ex. Nos. 4, 11, 12, 13, 14, 48, 51.[11] Cohen has produced zero evidence to support that **any** of the individuals discussed

---

[11] The only reason Cohen has these documents is because Plaintiff offered to produce them if Cohen produced GameStop related documents relevant to this case. Cohen refused to comply, forcing Plaintiff to seek relief from the Court, but Plaintiff kept its end of the bargain despite no compulsion. These documents are not even discoverable. Courts " . . . **routinely deny general discovery into a plaintiff's trading and investment strategy in other securities**." *In re New Century*, No. CV 07-0931 DDP (FMOx), 2009 U.S. Dist. LEXIS 144557, at *13 (C.D. Cal. Dec. 7, 2009).

in these chats are **Class Members**.  To distort the record, Cohen omits that Plaintiff **shorted** GameStop stock because it believed the stock's value became detached from reality, but did not believe or act the same about BBBY.  Ex. 35 (D. Coti Dep.) at 118, 309.  These hard facts directly contradict Cohen's conjecture that most investors in BBBY during the Class Period were crooked manipulators who did not rely on his misleading statements.

Moreover, the WhatsApp chat during the Class Period Cohen references shows that Plaintiff continued to buy shares because of Cohen and his turnaround strategy, just like other Class Members: "they will sell Buybuybaby and on the announcement [Cohen] will get out." Cohen Ex. 3 at BRATYA_000749.  In a subsequent conversation in the same exhibit, the Coti brothers discussed a CNBC article reporting that the Company may still sell buybuy BABY, and sent each other smiling face emojis.  *Id.* at BRATYA_000750.  The exhibit also shows that "Barbelaii" is indeed the nickname of a friend just as David Coti testified.  *Id.* at BRATYA_000751.  It also shows the brothers used the see no evil monkey emoji to express disbelief, *id.*; *see* https://emojipedia.org/see-no-evil-monkey, contradicting Cohen's slanderous accusations and false insinuations about their motives.  Opp. at 6 n.11.  As for the phrase "ape mongols," D. Coti testified that he was speculating about its meaning, Ex. 35 (D. Coti Dep.) at 383-85, 410-12, and E. Coti testified that he used the phrase because meme stock investors use these types of derogatory terms in jest.  Ex. 36 (E. Coti Dep.) at 48-50.  He is right.  *See* https://en.wikipedia.org/wiki/R/wallstreetbets (explaining that r/ WallStreetBets is known for its profane humor with members often referring to themselves as "autists," "retards," "degenerates," and "apes").  On top of citing no authority to support his arguments, Cohen also distorts the facts with cherry-picked, isolated quotes to concoct antagonism with the Class that simply does not exist.  Cohen's real complaint is that Plaintiff has zealously litigated this case to develop the claims and advance this litigation forward, and Cohen cannot avoid facing either a certified Class of defrauded investors or a trial before a jury of his peers.

**VII.      Conclusion**

For all of these reasons and for the reasons explained in the opening brief, Plaintiff respectfully requests that the Court certify the Class, appoint Plaintiff as the Class Representative, and appoint Pomerantz LLP and Bronstein, Gewirtz & Grossman, LLC as Class Counsel.

Dated: June 21, 2024                     Respectfully submitted,

/s/ *Omar Jafri*
Omar Jafri

**POMERANTZ LLP**
Joshua B. Silverman (admitted *pro hac vice*)
Omar Jafri (admitted *pro hac vice*)
Christopher P.T. Tourek (admitted *pro hac vice*)
Genc Arifi (admitted *pro hac vice*)
10 S. LaSalle Street, Suite 3505
Chicago, IL 60603
Tel: (312) 377-1181
Fax: (312) 377-1184
Email: jbsilverman@pomlaw.com
            ojafri@pomlaw.com
            ctourek@pomlaw.com
            garifi@pomlaw.com

             *-and-*

Jeremy A. Lieberman (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
Email: jalieberman@pomlaw.com

*Counsel for Lead Plaintiff Bratya SPRL and Co-Lead Counsel for the proposed Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein (admitted *pro hac vice*)
Yitzchak E. Soloveichik (admitted *pro hac vice*)
Eitan Kimelman (admitted *pro hac vice*)
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel: (212) 697-6484

Fax: (212) 697-7296
Email: peretz@bgandg.com
        soloveichik@bgandg.com
        eitank@bgandg.com

*Counsel for Lead Plaintiff Bratya SPRL and Co-Lead Counsel for the proposed Class*


**COHEN MILSTEIN SELLERS & TOLL PLLC**

Steven J. Toll (D.C. Bar No. 225623)
Daniel S. Sommers (D.C. Bar No. 416549)
Jan E. Messerschmidt (D.C. Bar No. 1031488)
1100 New York Avenue, N.W., Fifth Floor
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
Email: stoll@cohenmilstein.com
        dsommers@cohenmilstein.com
        jmesserschmidt@cohenmilstein.com

*Liaison Counsel for Lead Plaintiff Bratya SPRL and for the proposed Class*