Exhibit 1

**UNITED STATES DISTRICT COURT**

**DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re BED BATH & BEYOND<br>CORPORATION SECURITIES LITIGATION | Case No. 1:22-cv-02541-TNM<br><br>CLASS ACTION |
| *This Document Relates to:*<br>    *ALL ACTIONS* | |

EXPERT REPLY REPORT OF MATTHEW D. CAIN, PHD

June 21, 2024

**CONFIDENTIAL**

**Table of Contents**

1.   Introduction ........................................................................................................ 1

2.   Summary of Opinions ........................................................................................ 1

3.   Market Efficiency of BBBY Securities ............................................................ 4

   3.1   Overview of BBBY Common Stock Market Efficiency ............................ 4
   3.2   Prof. Fischel Confuses Informational Efficiency and Fundamental Efficiency ................ 5
   3.3   Short Interest in BBBY Does Not Indicate Market Inefficiency as Speculated by Prof. Fischel 7
   3.4   Prof. Fischel's Efficiency Opinions are Irrelevant Because He Fails to Properly Consider and Apply the *Cammer* and *Krogman* Factors ...................................................... 10
   3.5   Prof. Fischel's Opinion of My Efficiency Report's *Cammer* 5 Analysis is Flawed and Unsupported ............................................................................................. 14

4.   Prof. Fischel Fails To Establish a Lack of Price Impact ................................ 17

5.   Damages Can Be Calculated On A Class-Wide Basis Subject To A Common Methodology Consistent with Plaintiff's Theory of Liability ................................................... 21

   5.1   An Event Study can Reliably Estimate the Artificial Inflation of BBBY's Common Stock in Relation to the Allegations in this Case ............................................................ 22
   5.2   Changes in BBBY's Stock Price are a Reliable Measure for Determining Artificial Inflation in an Informationally Efficient Environment ........................................ 23

6.   Conclusion ....................................................................................................... 23

Appendix A ............................................................................................................ 24

Appendix B ............................................................................................................ 31

Exhibit 1 ................................................................................................................ 33

Exhibit 2 ................................................................................................................ 34

Exhibit 3a .............................................................................................................. 35

Exhibit 3b .............................................................................................................. 35

Exhibit 4 ................................................................................................................ 36

# 1.  INTRODUCTION

1. On February 15, 2024, I submitted an expert report on market efficiency in this matter ("Efficiency Report"), in which I concluded that: a) the market for shares of BBBY Common Stock was efficient throughout the course of the Class Period, b) the market for BBBY's Options (together with BBBY Common Stock, "BBBY Securities") was efficient throughout the course of the Class Period, and c) Common Stock and Options damages in this matter can be calculated on a class-wide basis subject to a common methodology.[1]

2. Following the submission of my Efficiency Report, Counsel provided me with the May 17, 2024 Expert Report of Professor Daniel R. Fischel ("Fischel Report") in conjunction with Defendants' Opposition to Class Certification ("Def's Opp Brief").[2] I have been asked to review, evaluate, and respond to the opinions in the Fischel Report and Def's Opp Brief.

3. My qualifications and rate of compensation for work in this matter are identified in my Efficiency Report, and I attach an updated version of my curriculum vitae as **Appendix A**. I reserve the right to amend this report to reflect new information that becomes available to me in light of the discovery process or future rulings from the Court.

4. In formulating my opinions set forth in this Expert Rebuttal Reply Report, I have relied upon the analyses already described in my Efficiency Report, as well as my knowledge, professional experience, and formal training in economics, finance, and statistics, in addition to the allegations and facts in this matter. All of the materials I considered in forming my opinions are identified in **Appendix B** to this report in addition to **Appendix B** of my Efficiency Report.

# 2.  SUMMARY OF OPINIONS

5. None of Prof. Fischel's or Def's Opp. Brief criticisms disturb my Efficiency Report conclusions. I continue to affirm my conclusion that BBBY's Securities traded in an efficient market throughout the Class Period, and my conclusion that damages in this matter can be calculated using a common methodology across Class Members in a manner consistent with

---

[1] Efficiency Report ¶3.

[2] Memorandum in Opposition to Plaintiff's Motion for Class Certification, May 17, 2024 (Dkt. 117).

Plaintiff's theory of liability. Moreover, I demonstrate that the alleged misrepresentations had an impact on the price of BBBY Securities.

6. Prof. Fischel opines that "[t]here is no reliable basis to conclude that BBBY stock, and therefore options, traded in an efficient market during the Class Period."[3] However, Prof. Fischel rejects the reliable and widely-accepted application of the *Cammer* and *Krogman* factors to evaluate market efficiency. Because his market efficiency opinions do not stem from a reliable application of these factors, his subjective and unscientific conclusions are flawed and irrelevant. Prof. Fischel also advocates for a standard of market efficiency – fundamental efficiency – which has been rejected by the U.S. Supreme Court, further undermining any relevance of his opinions.

7. Numerous courts, including those within this Circuit, accept the *Cammer* and *Krogman* factors as reasonable, reliable, and relevant for inquiries into market efficiency. Moreover, these factors are grounded in academic research, which supports their applicability to tests of market efficiency. My Efficiency Report evaluates these factors in the same objective manner that I have applied to over 25 prior market efficiency reports. These analyses have been accepted by various courts.[4]

8. Prof. Fischel does not conclude that BBBY's Securities traded in an *inefficient* market. Yet he speculates that many investors believed the market for BBBY's Securities was inefficient, necessitating individual inquiry into questions of reliance.[5] Because he applies an incorrect standard of market efficiency – fundamental efficiency – his opinion is flawed and irrelevant. None of Prof. Fischel's critiques disturb my Efficiency Report conclusions, and I reaffirm my market efficiency findings regarding BBBY's Securities.

9. Def's Opp Brief points to the Fischel Report in arguing that there was no price impact of the

---

[3] Fischel Report ¶19.

[4] *See, e.g.*, *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.); *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.); *Homyk v. ChemoCentryx, Inc. et al.*, Case No. 4:21-cv-03343-JST. (N.D. Ca.)

[5] Fischel Report ¶¶19; 43-47.

challenged statements.[6] However, the Fischel Report conducts a flawed event study analysis of the front-end price impact of only the Tweet,[7] and it does not evaluate the price impact of the alleged corrective disclosure. Def's Opp Brief claims that I used a similar event study approach in another matter;[8] however, Prof. Fischel fails to reliably apply that methodology to his event study. Moreover, my Efficiency Report event study reveals statistically significant stock price increases upon the front-end alleged misrepresentations as well as a statistically significant decline following the back-end alleged corrective disclosure. I further find that the alleged corrective disclosure is economically linked to the alleged misrepresentations. Thus, I conclude that the alleged misrepresentations had price impact.[9]

10. Def's Opp Brief points to the Fischel Report to falsely claim that I am "not aware of any methodology, let alone a 'standard, common' one, that could be applied in this case" to control for potential confounding information and measure class-wide damages.[10] In my Efficiency Report and testimony, I explained that the out-of-pocket methodology is a standard, common methodology for measuring damages, it is capable of controlling for confounding information (if necessary), and that it is reasonable and appropriate to apply this methodology here. Prof. Fischel's and Def's Opp Brief critiques relate to the specific calculations of the artificial inflation *inputs* into the out-of-pocket methodology formula, which I understand are not required at this stage. None of these critiques disturb my Efficiency Report conclusion that the out-of-pocket methodology represents a reliable methodology to calculate damages and can be applied across Class members.

11. In summary, none of Prof. Fischel's or Def's Opp. Brief criticisms disturb my Efficiency

---

[6] Def's Opp Brief, p. 33: "Even if Bratya Could Invoke Basic (It Cannot), the Presumption Is Rebutted Because the Challenged Statements Had No Price Impact." At p. 34: "Professor Fischel studied the stock price return on the day of Cohen's tweet."

[7] On August 12, 2022, at 10:42 AM, Defendant Cohen replied to a post on X (formerly Twitter) regarding BBBY's plummeting sales prior to the Class Period. The post, which was responding to a thumbnail of a woman leaving a BBBY store with a full shopping cart, read "At least her cart is full 😊," which allegedly signaled for retail investors to pump BBBY's stock through large volume purchases (the "Tweet").

[8] Def's Opp Brief, p. 34.

[9] I have made no independent investigation of the issues of liability and loss causation in this case, as neither is required for the opinions expressed herein. Nor have I been asked to calculate damages or the relevant artificial inflation ribbon required for such calculations, as likewise, neither is required for my opinions here.

[10] Def's Opp Brief, p. 37.

Report conclusions, which I reaffirm herein. The following sections explain the various flaws in the Fischel Report.

## 3.  MARKET EFFICIENCY OF BBBY SECURITIES

### 3.1  Overview of BBBY Common Stock Market Efficiency

12. In my Efficiency Report, I conclude that the market for shares of BBBY Common Stock and BBBY Options was efficient throughout the course of the Class Period.[11] I base this conclusion on my evaluation of the *Cammer*, *Krogman*, and additional factors. I also considered BBBY's status as a potential meme stock and short squeeze candidate – both before and during the Class Period.[12] I explained these analyses and considerations in my Efficiency Report as well as during my deposition. For example:

> Q. And you're looking to see whether or not at least those sources are saying that there's a short squeeze, and that would be probative of whether there was a short squeeze?
>
> A. Well, it can be.
>
> Like I said, in this case, for example, for at least a year leading up to the actual class period, people were talking about Bed Bath & Beyond as a short squeeze candidate. So just because people talk about that doesn't mean that it actually was subject to a short squeeze because we see that ongoing type of commentary for a number of companies over long periods of time even though it may not be true. So it can be a component.
>
> Again, for me, when I evaluate a company, a starting point is to understand the information environment, but just because somebody says that a company is going through a short squeeze right now does not necessarily mean that it's the case, but it can be informative.[13]

13. As explained in my Efficiency Report and in my testimony above, I considered BBBY's information environment and circumstances when conducting my analysis of BBBY's market efficiency.

14. In the following sections, I demonstrate that Prof. Fischel's criticisms of my efficiency

---

[11] Efficiency Report ¶3.

[12] Efficiency Report ¶102.

[13] Cain Deposition Transcript 21:7-22:1.

analyses are flawed and irrelevant. Specifically, a) he confuses informational efficiency and fundamental efficiency, b) he fails to properly consider and apply the widely-accepted *Cammer* and *Krogman* factors, and c) his opinions are based on subjective and flawed assessments of BBBY's circumstances before and during the Class Period.

## 3.2    Prof. Fischel Confuses Informational Efficiency and Fundamental Efficiency

15. Prof. Fischel acknowledges the difference between informational and fundamental efficiency.[14] In reaching his flawed opinion that "there is no reliable basis to conclude that BBBY stock, and therefore options, traded in an efficient market during the Class Period,"[15] Prof. Fischel focuses on a definition of fundamental market efficiency. Specifically, he requires BBBY's market price to reflect its true value for the fraud-on-the-market-theory to be applicable and he speculates that at least some potential Class Members made their investment decisions based on a belief of an inefficient market.[16]

16. Prof. Fischel's opinion is irrelevant as he relies on a definition of fundamental market efficiency which has been routinely rejected by courts in evaluating whether reliance can be presumed under the fraud-on-the-market theory.  For example, in my Efficiency Report, I point to *Halliburton II,* which notes that the presumption of reliance is based on "the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" In addition, the Supreme Court in *Halliburton II* also recognized that the debate about fundamental efficiency has "not refuted the modest premise underlying the presumption of reliance."[17]

---

[14] *See e.g.,* Fischel Report ¶59.

[15] Fischel Report ¶19.

[16] Fischel Report ¶43.

[17] *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 270-72 (2014). *See also In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 16 (1st Cir. 2005). ["For purposes of establishing the fraud-on-the-market presumption of reliance, we adopt the prevailing definition of market efficiency, which provides that an efficient market is one in which the market price of the stock fully reflects all publicly available information. By 'fully reflect,' we mean that market price responds so quickly to new information that ordinary investors cannot make trading profits on the basis of such information. This is known as 'informational efficiency.' We reject a second and much broader meaning of 'fully reflect,' known as 'fundamental value efficiency,' which requires that a market respond to information not only quickly but accurately, such that the market price of a stock reflects its fundamental value."]; *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 354 (C.D. Cal. 2015)[quoting *In re PolyMedica Corp. Sec.*

17. Instead, when assessing market efficiency, courts have adopted the definition of "informational efficiency." In an informationally efficient market, the stock price quickly reflects all publicly available information.[18] As agreed by financial economists, this market efficiency "does not require that markets be anywhere near perfectly efficient."[19] I elaborated further on the difference between Prof. Fischel's definition of market efficiency and the one routinely adopted by Courts in my deposition:

> Q: What about as an economist?
>
> Putting aside the Cammer and – Cammer factors, as an economist, have you had occasion to look at whether the market for GameStop was inefficient for brief periods of time?
>
> A: So I think that it's important to understand that quite frequently when economists talk about market efficiency in a more general context, they are frequently talking about fundamental efficiency, whether the stock price is connected – is fully reflective of the fundamental value of a company.
>
> So that's actually very different from market efficiency within a securities class action case because, in at least every securities class action case that I've ever worked on, there's an allegation that the stock price was actually distorted away from the fundamental value by virtue of alleged misrepresentations or omissions.[20]

18. Moreover, the evidence Prof. Fischel documents in his report is also consistent with informational efficiency. During the Class Period, there were large spikes in BBBY's Common

---

*Litig.*, 432 F.3d 1, 16 (1st Cir. 2005), "In response, Plaintiffs contend that they do not need to prove the direction of the price movement because, to prove Cammer market efficiency, a plaintiff need not show 'fundamental efficiency,' only 'informational efficiency.' That is, plaintiffs need not show that, as a result of incorporating information, the market price reflected the intrinsic value of the stock. Rather, plaintiffs need only show that the price absorbs and reflects 'all available information (and misinformation)' in a way that justifies an inference of investor reliance."]; *In re VeriFone Sec. Litig.*, 784 F.Supp. at 1479 n. 7 (stating that the fraud-on-the-market theory does not require "proof that the market correctly reflects some 'fundamental value' of the security. To apply the fraud-on-the-market theory, it is sufficient that the market for a security is 'efficient' only in the sense that market prices reflect the available information about the security.").

[18] *See*, *e.g.*, *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 511 (1st Cir. 2005). The Appeals Court for the First Circuit explained, "[t]he district court was right to worry about these implications of Defendants' efficiency arguments; it did not err by rejecting Defendants' proposed definition of market efficiency requiring consistency with fundamental value. By drawing on the standard of efficiency in Cammer and holding that 'a share's market price [must] reflect publicly available information, not . . . perfectly and correctly incorporate it,' the district court adopted the correct standard of efficiency." Id.

[19] Brief of Financial Economists as *Amici Curiae* in Support of Respondents for the Supreme Court of the United States, *Halliburton Co. v. Erica P. John Fund, Inc.* 573 U.S. 258 (2014).

[20] Cain Deposition Transcript 78:1-78:21.

Stock trading volume and Option implied volatility.[21, 22] Additionally, there was investor interest in the Company, as indicated by increased postings following the Tweet. As BBBY executives acknowledged, the large investor base the Company had amassed interpreted Cohen's disclosures as value-relevant, indicating increased investor interest in reaction to publicly available information about the Company.[23] This is clearly indicative of informational efficiency.

19. Additionally, Prof. Fischel's attestation that the stock price for BBBY being informationally efficient rather than fundamentally efficient "contradicts [my] claim that [I] can reliably calculate alleged inflation in this matter" is fundamentally flawed.[24] Virtually every securities class action case alleges that the defendant company's stock price was distorted away from its fundamental value due to alleged misrepresentations or omissions – meaning the market for the stock in question was not fundamentally efficient during the relevant Class Period. However, the out-of-pocket damages methodology is commonly employed in such cases and is capable of calculating damages based on the difference between the but-for correct value of the stock and the artificially inflated stock price during the Class Period.[25]

**3.3  Short Interest in BBBY Does Not Indicate Market Inefficiency as Speculated by Prof. Fischel**

20. Prof. Fischel claims that "there were very few **if any** additional [BBBY] shares available to borrow and sell short" during the Class Period because the data source he relied on shows that BBBY's short interest utilization was **at or near 100%**. Prof. Fischel characterizes this

---

[21] Fischel Report pp. 24-25.

[22] *See* Efficiency Report ¶37 ["The average weekly trading volume over the Analysis Period was 75.8% of BBBY's Common Stock shares outstanding, and the trading volume during the one-week Class Period was 1,346.6% of shares outstanding"].

[23] *See, e.g.*, COVY_CTL00214472 ["I think we are in a situation where we need to have a full media strategy so that we at least have a chance to partially control the narrative. Some of this plays to our vendors, and some to the fact that our stock is still heavily supported by Reddit retail types. (I'll be an optimist until it is futile to have that view!)"]; COVY_CTL00213865 ["But separate and apart from communication around the CFO issue, we need a communications strategy with regard to the Reddit crowd. The sell side stock analysts probably don't matter much at this point. Our ATM will not be successful without the Reddit audience"].

[24] Fischel Report ¶59.

[25] *See, e.g., In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.); *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.); *Homyk v. ChemoCentryx, Inc. et al.*, Case No. 4:21-cv-03343-JST. (N.D. Ca.).

observation as a "constraint on short selling" and opines that this condition is "inconsistent with market efficiency."[26]

21. Firstly, Prof. Fischel's opinion is flawed because it relies on a single, incomplete data source for the entire securities lending market for BBBY stocks. When analyzing securities lending activities, it is important to acknowledge gaps in the data and the extent of data source coverage. As noted by a Federal Reserve staff report, "there is no systematic, targeted data collection of securities lending activity by regulators. Private vendors collect detailed data on securities lending activities from a wide range of market participants. These data collections are voluntary and are thus incomplete."[27]

22. Prof. Fischel's flawed conclusion that "BBBY's short interest utilization was at or near 100%" is based solely on Nasdaq FIS Astec Analytics Short Lending Data. According to the data provider, this data likely only includes "positions held by institutional investors that are part of their securities lending programs." [28] This limitation explains why Prof. Fischel's observation is contradicted by other data sources such as S3 Partners, which includes data from banks and exchanges.[29]

23. Secondly, even if Prof. Fischel had analyzed a broader range of securities lending data (which he did not), his opinion remains irrelevant because numerous courts have ruled that the ability to engage in short selling through securities lending is not a requirement for market efficiency.[30]

---

[26] Fischel Report ¶30-31 (emphasis added).

[27] Baklanova, V., Copeland, A. M., & McCaughrin, R. (2015). Reference guide to US repo and securities lending markets. *FRB of New York Staff Report*, (740).

[28] *See* https://data.nasdaq.com/databases/SLD.

[29] *See* https://www.s3partners.com/articles/market-structure-sentiment-portfolio-impact.

[30] *See, e.g., In re Groupon Inc. Sec. Litig.*, No. 12 C 2450, 2015 U.S. Dist. LEXIS 27334, at *28-30 (N.D. Ill. Mar. 5, 2015) ["The Court is satisfied that Dr. Feinstein's methodology satisfies Daubert. While Dr. Gompers concern about the high cost of short selling Groupon shares during the Subclass period may suggest that the market for Groupon [*30] shares was not perfectly efficient, Dr. Feinstein's methodology established that the price of Groupon stock was affected by false statements, which is all that Basic requires.6 See Halliburton, 134 S. Ct. at 2410. In any event, there is no evidence that the high cost of short selling Groupon shares affected the market. Dr. Gompers acknowledged on cross-examination that during the Subclass period, (1) millions of shares shorted every day, (2) Groupon shares were shorted both before and during the Subclass period, (3) short interest grew

24. While Prof. Fischel argues that short selling constraints during the Class Period "[prevented] market participants with bearish views about [the] company's prospects and market valuation to trade on those views,"[31] a review of the data shows that prior to and during the Class Period millions of BBBY shares were shorted every day, and traders were also able to bet against BBBY in the options market if they desired.[32] Additionally, hundreds of thousands of additional shares of BBBY were available for further shorting during the Class Period if investors had so desired. Therefore, despite Prof. Fischel's claims, investors were able to trade on bearish views of BBBY's Common Stock in the weeks leading up to and during the Class Period.

**Table 1: Indicators of Investors' Ability to Engage in BBBY Short-Selling: Aug. 2022**

| Date | Shares Available for Shorting | Short Interest | Options Trading Volume |
|---|---|---|---|
| Aug 01, 2022 | 1,469,173 | 29,070,583 | 131,931 |
| Aug 02, 2022 | 1,320,405 | 29,123,565 | 184,536 |
| Aug 03, 2022 | 967,521 | 29,238,015 | 105,065 |
| Aug 04, 2022 | 1,148,047 | 29,164,456 | 106,900 |
| Aug 05, 2022 | 943,079 | 29,423,306 | 508,728 |
| Aug 06, 2022 | 1,074,316 | 29,334,382 | n/a |
| Aug 07, 2022 | 1,074,316 | 29,334,382 | n/a |
| Aug 08, 2022 | 1,074,316 | 29,334,382 | 545,317 |
| Aug 09, 2022 | 968,344 | 29,457,416 | 517,919 |
| Aug 10, 2022 | 825,773 | 29,806,319 | 360,659 |
| Aug 11, 2022 | 798,275 | 30,434,220 | 294,934 |
| Aug 12, 2022 | 500,769 | 31,167,806 | 835,641 |
| Aug 13, 2022 | 454,693 | 31,511,919 | n/a |
| Aug 14, 2022 | 454,693 | 31,511,919 | n/a |
| Aug 15, 2022 | 454,693 | 31,511,919 | 848,544 |
| Aug 16, 2022 | 504,181 | 30,755,869 | 1,992,660 |
| Aug 17, 2022 | 604,889 | 30,609,064 | 1,419,617 |
| Aug 18, 2022 | 686,713 | 30,649,769 | 1,400,948 |
| Aug 19, 2022 | 555,271 | 30,818,176 | 1,857,499 |
| Aug 20, 2022 | 658,878 | 30,747,906 | n/a |

during the Subclass period, (4) traders were able to bet against Groupon in the options market if they desired, and (5) no actual traders were identified who were unable to short Groupon stock. (Tr. 123, 132, 134, 139, 142)"].

[31] Fischel Report ¶30.

[32] *In re Groupon Inc. Sec. Litig*., No. 12 C 2450, 2015 U.S. Dist. LEXIS 27334, at *28-30 (N.D. Ill. Mar. 5, 2015).

| Date | Shares Available for Shorting | Short Interest | Options Trading Volume |
|---|---|---|---|
| Aug 21, 2022 | 658,878 | 30,747,906 | n/a |
| Aug 22, 2022 | 658,878 | 30,747,906 | 796,213 |
| Aug 23, 2022 | 944,521 | 30,404,724 | 478,939 |
| Aug 24, 2022 | 1,534,050 | 29,875,148 | 724,711 |
| Aug 25, 2022 | 1,570,074 | 29,806,530 | 392,940 |
| Aug 26, 2022 | 1,091,091 | 29,727,292 | 638,375 |
| Aug 27, 2022 | 1,129,699 | 30,396,693 | n/a |
| Aug 28, 2022 | 1,129,699 | 30,396,693 | n/a |
| Aug 29, 2022 | 1,129,699 | 30,396,693 | 839,097 |
| Aug 30, 2022 | 5,365,808 | 30,041,369 | 693,118 |
| Aug 31, 2022 | 2,484,578 | 29,465,168 | 715,028 |

25. Finally, as noted in my Efficiency Report, commentators speculated about a potential short squeeze in the Common Stock for many months prior to the start of the Class Period.[33] Yet my *Cammer* 5 analysis demonstrates an efficient reaction to earnings announcements during this same period. This demonstrates the falsity of Prof. Fischel's assertion that "[t]he unconstrained ability to sell short is necessary for market efficiency."[34]

### 3.4 Prof. Fischel's Efficiency Opinions are Irrelevant Because He Fails to Properly Consider and Apply the *Cammer* and *Krogman* Factors

26. In his report, Prof. Fischel does not provide his own analysis of the widely accepted *Cammer* and *Krogman* factors when assessing market efficiency. He opines that *Cammer* and *Krogman* factors such as the "presence of analyst coverage, market makers, institutional ownership, an appropriately sized public float, and options trading, as well as the eligibility to file SEC Form S-3" are incapable of supporting a conclusion about market efficiency.[35] In addition, he simply rejects the applicability of the average weekly trading volume *Cammer* factor because he speculates that a rumored short squeeze existed during the Class Period.[36]

27. Prof. Fischel ignores that virtually all securities class action cases since the *Cammer* Court

---

[33] Efficiency Report ¶102.

[34] Fischel Report ¶28-29.

[35] Fischel Report fn.105.

[36] Fischel Report fn. 33.

decision, including those heard in this Circuit, have relied on these factors when determining market efficiency. During my deposition I also emphasized that these factors are calibrated to adjust for fundamental changes in the stock over the Class Period and are reliable tests in determining market efficiency:

> Q: Okay. Do you think that's – do you think that that analysis is consistent with economic principles?
>
> If you look at the Cammer factors and it's stuff like float and these other factors, and it's pretty binary, yes or no, regardless of what else is happening with the stock, what other extrinsic factors might be affecting the price of the stock or the incorporation of information into the stock, you're not going to – that's not going to change your opinion as long as those factors are present?
>
> A: Again, I think this is, I think, the same question, but all of these factors reflect everything else that is going on with a company's stock. So I don't think this is some sort of narrow view to the exclusion of everything else that's going on because everything else that's going on is going to show up in the factors that we evaluate, and that's the power of the factors themselves. That's why I think they form a reliable basis for an assessment of market efficiency.[37]

28. My reliance on this set of factors is not based solely on the *Cammer* Court's decision however, as numerous academic sources have also assessed these factors in relation to investor interest and as indicia of efficiency. In my Efficiency Report, I compare BBBY's *Cammer* and *Krogman* factors to the relevant thresholds articulated by courts, but I also compare BBBY to market-wide thresholds established in academic studies, such as the MRK Study and the Bhole Study.

29. As I explain in my Efficiency Report, the authors of the MRK Study documented significant differences in *Cammer* and *Krogman* factor variables — such as trading volume, bid-ask spread, analyst coverage, institutional ownership, and market capitalization — across two different samples of firms: one sample that was covered actively by analysts and one sample that had lost all analyst coverage. The authors used these factor comparisons to gauge varying investor interest between the two samples, finding that the differences in average market capitalization, trading volume, bid-ask spread and institutional ownership were all significant

---

[37] Cain Deposition Transcript 84:17-85:14.

at the 99% level.[38] The results of the MRK Study support the conclusion that the *Cammer* and *Krogman* factors test for meaningful differences in investor interest across companies, consistent with the focus of inquiry into market efficiency..

30. I also refer to another academic paper in my Efficiency Report which established market wide benchmarks for efficiency analysis: the Bhole Study. The authors of the Bhole Study applied a subset of the *Cammer* and *Krogman* factors — trading volume, analyst coverage, bid-ask spread, institutional ownership, market capitalization, and market maker presence — to all stocks listed on the NYSE and the NASDAQ. As I explain in my Efficiency Report, stocks traded on large established exchanges such as the NYSE or NASDAQ generally benefit from a presumption that they trade efficiently.[39] Therefore, by comparing the results of the *Cammer* and *Krogman* factor analysis for BBBY during the Class Period to the results of the Bhole Study, I can observe how the Company compared to others that benefit from such presumptions of efficiency.

31. Additionally, during deposition, Prof. Fischel mischaracterized the analysis I conducted in my Efficiency Report, stating that I provided "no analysis whatsoever of efficiency during the actual Class Period in the case other than one statement about volume, which by itself is just as consistent under the facts and circumstances of this case with inefficiency rather than efficiency."[40]

32. The analysis I conducted in my Efficiency Report covers not only the longer Analysis Window, but also the exact Class Period alleged in this case, and this analysis supports the conclusion that BBBY's Securities traded in an efficient market during the Class Period. For example, in addition to *Cammer* Factor 5 (discussed separately in the following section), my Efficiency Report analyses include:

- *Cammer* Factor 1, Average Weekly Trading Volume: BBBY's trading volume exceeded the 1% and 2% thresholds established by the *Cammer* court during

---

[38] Efficiency Report ¶¶31-33.

[39] Efficiency Report ¶26.

[40] Fischel Deposition Transcript 46:17-46:23.

the Class Period.[41]

- *Cammer* Factor 2, Analyst Coverage: BBBY was covered in 8 separate reports issued by analysts at 8 separate firms during the Class Period, placing it above the 50th percentile of firms listed on the NASDAQ and NYSE, and also comparing favorably to academic research indicating that many firms are covered by zero, one, or two analysts.[42]

- *Cammer* Factor 3, Presence of Market Makers: BBBY was covered by at least 58 market makers and brokers providing similar activity over the Class Period, comparing favorably to the *Cammer* court threshold of 5 to 10 market makers.[43]

- *Cammer* Factor 4, SEC Form S-3 Filing Eligibility: By virtue of its high float and timely filings with the SEC, BBBY was eligible to file a Form S-3 during the Class Period, satisfying the *Cammer* court's S-3 filing eligibility factor.[44]

- Market Capitalization: BBBY's market capitalization averaged $1.46 billion over the Class Period placing it above the 50th percentile of firms listed on the NASDAQ and NYSE, and also comparing favorably to academic research firm samples.[45]

- Bid-Ask Spread: BBBY's bid-ask spread averaged 0.19% during the Class Period (smaller spreads indicate lower trading costs for investors), better than the majority of firms listed on the NASDAQ and NYSE, and also comparing favorably to samples of companies in academic research.[46]

- Active Options Trading: BBBY Common Stock had 4,198,110 call option contracts and 2,317,461 put option contracts traded during the Class Period, which academic research documents improves market depth and liquidity, investor interest, and overall market efficiency, as reflected by increases in trading volume, narrower bid-ask spreads, and improvements in transaction sizes and frequencies.[47]

33. Prof. Fischel further admitted that, despite his claim that "most of the eleven factors – including the presence of analyst coverage, market makers, institutional ownership, an appropriately sized public float, and options trading, as well as the eligibility to file SEC Form S-3 – do not

[41] Efficiency Report ¶37.

[42] Efficiency Report ¶¶42-44.

[43] Efficiency Report ¶¶49; 52.

[44] Efficiency Report ¶56.

[45] Efficiency Report ¶81.

[46] Efficiency Report ¶¶85-86.

[47] Efficiency Report ¶¶100-101.

allow [me] to analyze discreet period within the Cain Analysis Period,"[48] he himself did not perform any analysis of the aforementioned factors during the Class Period, and he does not provide any basis as to why analysis of these factors should be excluded when considering whether BBBY's Securities traded in an efficient market during the Class Period:

> Q. Except for this footnote, have you addressed any of these factors anywhere else in your report? You haven't, right?
>
> A. I haven't analyzed them other than pointing out there's no analysis of them other than volume in any of Dr. Cain's analysis of the Class Period.
>
> Q. Earlier on you said that you didn't analyze whether the company was eligible to file an S-3.
>
> A. Correct, I didn't.
>
> Q. So if you didn't even do it, how are you opining on what he did?
>
> A. I'm not opining on what he did. I'm just stating what he did in the absence of any analysis during the Class Period.[49]

34. Prof. Fischel mischaracterizes the analysis I conducted in my Efficiency Report when he repeatedly claims that I have conducted no analysis regarding the *Cammer* and *Krogman* Factors during the Class Period, other than observing average weekly turnover. Additionally, he performs no analysis of these factors himself, other than an inappropriately calibrated *Cammer* 5 test, which I elaborate on further below.

### 3.5 Prof. Fischel's Opinion of My Efficiency Report's *Cammer* 5 Analysis is Flawed and Unsupported

35. Prof. Fischel speculates that my Efficiency Report *Cammer* 5 analysis "appear[s] to be designed to minimize the fundamental changes leading into the proposed Class Period."[50] This is simply incorrect because the earnings announcements I analyze in my Efficiency Report are routinely relied upon as News Days for *Cammer* 5 analyses.[51] Moreover, the *Cammer* Court explained:

---

[48] Fischel Report fn. 105.

[49] Fischel Deposition Transcript 92:6-92:22.

[50] Fischel Report ¶52.

[51] *See, e.g.*, *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.)

> As previously noted, one of the most convincing ways to demonstrate efficiency would be to illustrate, ***over time***, a cause and effect relationship between company disclosures and resulting movements in stock price.[52]

36. As the *Cammer* Court noted, price movements should be analyzed "over time" when determining whether those movements react to significant company disclosures. Because the Class Period in this case consists of only 5 trading days, I chose to extend my Analysis Period to include a sample large enough and "over time" to allow for sufficient power to conduct a reliable statistical test. I explained further why this approach is reliable and objective in my testimony:

> Q. There's no other analysis that you did on the reaction of stock price to information other than your event study which looked at four information days or four news days, whatever you call them, and none of those are in the class period?
>
> A. So the event study does provide abnormal return calculations for every day during the class period. So that is part of the output of the event study.
>
> But in terms of the — and that's something that I considered just when looking over the results of the event study. But in terms of the Cammer 5 test itself, my goal with the Cammer 5 test is to always be as objective as possible. So I often typically start out by looking at earnings announcements, if those seem to be a relevant testing ground for a company, and I determined that those were relevant for Bed Bath & Beyond.
>
> I could have certainly looked at the alleged misrepresentations and the alleged corrective disclosures and documented statistically significant price movements in response to those, but, again, my Cammer 5 analysis, my goal is to be agnostic and step away from the actual misreps and the alleged corrective disclosures and to focus on something like earnings announcements as the appropriate testing ground.[53]

37. Therefore, Prof. Fischel's opinion regarding my *Cammer* 5 analysis is unfounded. Nonetheless, to address Prof. Fischel's critique that my Efficiency Report *Cammer* 5 test does not include any News Days within the Class Period, below I conduct an alternative event study by analyzing disclosures during the Class Period (my "Alternative Event Study").

---

[52] *Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) (emphasis added).

[53] Cain Deposition Transcript 88:10-89:15.

38. For this analysis, I consider BBBY's stock price reactions on days when news was released regarding Defendant Cohen's stake in BBBY (the "Alternative News Days") versus those on days absent such disclosures (the "Alternative No News Days").

39. Due to the short duration of the Class Period, I conducted my regression analysis across an analysis period of August 10, 2022 to August 23, 2022 (two trading days preceding the start of the Class Period and two trading days following the market impact date of the corrective disclosure, the "Alternative Analysis Period"). As shown in **Exhibit 3a**, I identified 4 days which meet the criterion for Alternative News Days during the Alternative Analysis Period.

40. Consistent with my Efficiency Report, for each trading day, I constructed a regression model using data from the previous 120 trading days (the "Estimation Window"),[54] excluding any Alternative News Days, earnings announcements, alleged misrepresentations and alleged corrective disclosure.

41. I use the same Market Index and Industry Index as my Efficiency Report Event Study to account for price movements in BBBY's Common Stock attributable to market and industry-wide factors when calculating Abnormal Returns. **Exhibit 1** shows the evolving relationship between BBBY's Common Stock and the Market Index and Industry Index during the Alternative Analysis Period. **Exhibit 2** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Alternative Analysis Period.

42. **Exhibit 3a** reports the list of four Alternative News Days (*i.e.*, their market impact dates and corresponding disclosure headlines). **Exhibit 3b** reports the results of my Alternative Event Study using BBBY Common Stock returns. The columns list the market impact dates, raw return, abnormal return from my Alternative Event Study, abnormal dollar change in stock price from my event study, the t-statistic, and the p-value corresponding to statistical

---

[54] I utilized an Estimation Window of 120 trading days, which equates to approximately six calendar months. *See, e.g.,* Mark L. Mitchell and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *Business Lawyer* 49; A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, at 15 ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally, the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.").

significance.[55] Overall, four out of four BBBY Alternative News Days were associated with abnormal stock price movements that were statistically significant at the 95% level or greater. I compare this rate with that on the Alternative No News Days in **Exhibit 4**.

43. **Exhibit 4** summarizes the statistical comparison of BBBY's Common Stock returns and trading volume on the four Alternative News Days versus these metrics as measured on the 6 Alternative No News Days.[56] As shown in **Exhibit 4**, 100.0% of the Alternative News Day disclosures caused stock movements that were statistically significant at the 95% level. This compares to 16.7% of the Alternative No News Days with statistically significant stock price movements. The difference between these two percentages is statistically significant at a level greater than 95%.  These results provide strong evidence of a cause-and-effect relationship between news related to disclosures regarding Defendant Cohen's stake in the Company and BBBY Common Stock price movements.

## 4.  PROF. FISCHEL FAILS TO ESTABLISH A LACK OF PRICE IMPACT

44. Prof. Fischel's argument that the alleged misrepresentation on August 12, 2022, did not have any impact on the price of BBBY stock is unreliable, as it is based on a flawed event study model. Furthermore, both my Efficiency Report Event Study and Alternative Event Study models demonstrate statistically significant front-end price increases on the relevant market impact dates of the alleged misrepresentations on August 12, 2022, and August 16, 2022, as well as a statistically significant back-end price decrease on the market impact date of the alleged corrective disclosure, August 19, 2022. Prof. Fischel does not dispute the front-end price impact of the alleged misrepresentation on August 16, 2022, nor does he dispute the back-end price impact of the August 18, 2022, corrective disclosure, aside from a vague allusion to these dates when saying that "because a rumored short squeeze had begun before the first alleged misstatement on August 12, 20222, all price movements during the Class Period are

---

[55] The p-value reflects the probability that the observed abnormal return would have occurred due to random chance and in the absence of the information disclosed. One minus the p-value represents the level of statistical significance, or probability that the disclosed information caused the stock price to change. For example, a p-value of 0.05 indicates that there is a 95% probability (one minus 0.05) that the information disclosed caused the change in the stock price.

[56] The four Alternative News Days and 6 Alternative No News Days combined cover all trading days in the Alternative Analysis Period.

confounded by the distortions caused by the short squeeze."[57] After reviewing the information environment on these dates in further detail, I have determined that there is an economic link between the alleged misrepresentations and the increases in BBBY's stock prices on August 12, 2022 and August 16, 2022, and the decrease on August 19, 2022.[58] This, coupled with the statistically significant price increases on August 12, 2022, and August 16, 2022, and the statistically significant decrease on August 19, 2022, leads me to conclude that the alleged misrepresentations impacted the prices of BBBY's Securities during the Class Period. Table 2 reports this price impact:

**Table 2: Efficiency Report *Cammer* 5 Results on the Market Impact Dates of the Alleged Misrepresentations and the Alleged Corrective Disclosure**

|  | Market Impact Date | Log Return | Abnormal Return | Abnormal Dollar Change | t-Stat | p-Value |
|---|---|---|---|---|---|---|
| [1] | Aug 12, 2022 | 19.74% | 16.82% | $1.95 | 2.310 | 0.023 |
| [2] | Aug 16, 2022 | 25.51% | 20.67% | $3.67 | 2.697 | 0.008 |
| [3] | Aug 19, 2022 | -51.99% | -49.75% | - $7.27 | -6.261 | 0.000 |

45. The event study model Prof. Fischel employs is based on a fixed 40-day in-sample window spanning the period of August 1, 2022, to September 26, 2022, a period he selects to account for his observation that "BBBY's option implied volatility substantially increased leading up to the Class Period."[59] However, Prof. Fischel's estimation window is contaminated by the alleged misconduct, which allegedly ***caused*** the increase in BBBY's volatility during the Class Period. To avoid this flaw when assessing statistical significance, financial literature generally supports the view that using data ***prior*** to the event being analyzed is most appropriate when possible.[60]

---

[57] Fischel Report ¶56.

[58] My review of the information environment includes the Complaint, the alleged misrepresentations, and the alleged corrective disclosure.

[59] Fischel Report ¶48.

[60] A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, at 15 ("Given the selection of a normal performance model, the estimation window needs to be defined. The most

46. Prof. Fischel further motivates his model by noting that I have used a 40-day estimation window in prior reports. However, in each report in which I have been asked to assess the efficiency of a relevant security's markets and employed a 40-day estimation window in my *Cammer* 5 analysis, I have used a rolling 40-day window that only includes data ***prior*** to each date being analyzed. I also clarified during my deposition that I had used different estimation windows in different cases, based on the specifics of the relevant information environment in each case:

> Q. So during the time period when you're doing the report in this case, you were defending your use of a 40-day estimation window; correct?
>
> A. Yes.
>
> Q. Recognizing that in that particular case, if you had used 120-day estimation window, it might have given you a different result?
>
> A. Like I said, I'm not sure what the results on the Cammer 5 test would have looked like, whether they would have been different at all in the Vaxart case under a different estimation window.
>
> But like I said in both that deposition and this deposition, the starting point for any case is for me to understand the information environment for a given company. That's the starting point.
>
> And what I would say is Vaxart, and I think the other one was Emergent BioSolutions, were very unique in the sense that they were trying to manufacture or produce or market COVID vaccines right after the COVID pandemic hit, which was a very unique and interesting information environment and change in the information environment over time, which pushed me to consider a shorter estimation window.
>
> I've also used shorter estimation windows in other cases, too. I don't want to limit it to only those two cases. But each time I carried out a Cammer 5 analysis for any company, I want to understand the information environment for that company, and that's what dictates the parameters for the event study itself.[61]

47. For the reasons explained above, Prof. Fischel mischaracterizes the applicability of my use of the 40-day estimation window in this case when relying on my use of such a methodology in

---

common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally, the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.").

[61] Cain Deposition Transcript 143:21-145:3.

other reports.

48. As I explained in **Section 3.5**, the event study I conducted in my Efficiency Report, as well as the Alternative Event Study, are both reliable and demonstrate a statistically significant increase in BBBY's Common Stock on August 12, 2022, indicating front-end price impact in relation to that alleged misrepresentation. Additionally, both of my event studies, as well as Prof. Fischel's (flawed) event study, show a statistically significant decrease in BBBY's Common Stock price following the alleged corrective disclosure, indicating back-end price impact of the alleged corrective disclosure.

49. Prof. Fischel tries to obscure the connection between the Tweet and the increase in BBBY's stock price on August 12, 2022 by claiming that BBBY's Common Stock was already increasing between market open and the posting of the Tweet. However, his own chart and deposition testimony show that the price of BBBY's Common Stock increased dramatically following the Tweet: [62]

> Q. Now I think you are just criticizing the facts. What I'm saying is you agree that the stock price closed at a higher price than what it was when he tweeted, correct?

> A. Yes, I agree with that.[63]

50. Prof. Fischel points to a few Reddit posts leading up to and during the Class Period, claiming that "evidence of extreme social media enthusiasm on the Reddit platform"[64] is somehow problematic. Yet even a cursory review shows that some posts indicated a strong investor response to the Tweet; one poster commented: "[w]hy is everyone freaking out about Cohen selling?"[65] Moreover, Prof. Fischel's selective reliance on a few Reddit posts is subjective,

---

[62] Fischel Report p. 25.

[63] Fischel Deposition Transcript 169:17-169:21.

[64] Fischel Report ¶46.

[65] Fischel Report ¶46, citing 2022-08-18 16:46:54 ET WallStreetBets Subreddit post by user BIRDZILLA26. *See also*: "So Ryan Cohen selling his BBBY two days ago didn't make BBBY nosedive, but the apes finding out he sold his BBBY made it nosedive. You guys are unbelievable" 2022-08-18 19:43:12 ET WallStreetBets Subreddit post by user TheOnlySafeCult; "Ryan Cohen sells entire BBBY stake on 16th and 17th of August…Confirmed. As expected. Apes wrong forever. Enjoy your bags apes." 2022-08-18 16:22:39 ET WallStreetBets Subreddit post by user works_best_alone; "Ryan Cohen Is Not Your Friend. To think he really cares about you is hilarious. He left the following investors holding the bag so far in his illustrious career: CHWY, GME, BBBY. and for

unscientific, and not replicable. While he claims that these posts are indicative of investor views about BBBY,[66] nowhere in his report does he assess whether any of these posts were made by actual investors or Class Members. Furthermore, similar posts can be found regarding the securities of other companies that have been found to trade efficiently, further undermining the relevance of Prof. Fischel's opinions.[67]

## 5.  DAMAGES CAN BE CALCULATED ON A CLASS-WIDE BASIS SUBJECT TO A COMMON METHODOLOGY CONSISTENT WITH PLAINTIFF'S THEORY OF LIABILITY

51. Prof. Fischel opines that one cannot calculate damages in this matter due to the specifics of the case.  He bases his opinion on two main arguments. First, Prof. Fischel asserts that the drop in BBBY's stock price on August 19, 2022 was not based on the alleged corrective disclosure, but rather caused by the unwinding of a short squeeze.[68] He therefore claims that one cannot reliably estimate artificial inflation in this case using an event study.

52. Second, Prof. Fischel argues that, because I do not establish that the market for BBBY's Common Stock was fundamentally efficient during the Class Period, "changes in the stock

---

those of you who thought he didn't sell yesterday, you should've realized that edgar always has a one day delay in reporting information…Edit 3: I think it's time folks like Ryan Cohen have to answer for their lack of transparency. There is a difference between being an activist investor and being someone who creates a cult like following and financially ruins people. You don't see EngineOne (XOM activist) buying 2500% upside calls do you? Nor do they tweet hidden messages to their followers. Think about that." 2022-08-18 16:30:37 ET WallStreetBets Subreddit post by user Chance_succotash_927.

[66] *E.g.*, Fischel Report ¶46: "For example, retail investors posted…"

[67] *See, e.g.*, *In re Tesla Inc. Securities Litigation*, Case No. 18-cv-04865-EMC (N.D. Ca.), alleged Class Period covered August 7, 2018 – August 17, 2018 (inclusive, "Tesla Class Period"). Class was certified on November 25, 2020, despite similar market commentary regarding a potential short squeeze of the relevant securities during the Tesla Class Period: "Could Tesla Stock Power to $500 on Short-Squeeze Fuel?" 2018-08-07 13:27 ET Twitter post by user @Trend_Snips; "Check out the Tesla stock's moving up. It's called a short squeeze. If enough #ltc short sellers join, we can see something like that." 2018-08-08 3:57 ET Twitter post by user @yensonking; "Theory – there is no deal on the table to privatize Tesla - @elonmusk tweeted today to cause a short squeeze and have all his enemies lose money.. could he possible be so self absorbed that he's willing to brazenly flout SEC regulations for some minor payback?" 2018-08-08 11:49 ET Twitter post by user @LaFlameD; "Say what you will, but he sure knows how to engineer a short squeeze https://www.tesla.com/blog/taking-tesla-private" 2018-08-08 1:40 ET Twitter post by user @kehli; The VW short squeeze was 5x share price. 13% of shares were loaned to shortsellers. Compared to (based on memory, could be wrong) 26% for Tesla. This will truly be the short squeeze of the century. Probably of the millennium. 5x current price is 1800$. I would be very scared" 2018-08-10 16:21 ET Twitter post by user @chimjanos; https://www.cbc.ca/news/business/elon-musk-twitter-1.4776528.

[68] Fischel Report ¶58: "However, Dr. Cain cannot establish that any price declines that coincide with alleged corrective disclosures were anything more than an indication that the rumored short squeeze – which, as explained supra ¶ 33, typically is short-lived – was ending."

price are not reliable measures of the value of the information related to Plaintiff's allegations."[69] As I explain below, both of Prof. Fischel's critiques are misguided.

**5.1    An Event Study can Reliably Estimate the Artificial Inflation of BBBY's Common Stock in Relation to the Allegations in this Case**

53. Prof. Fischel claims that I have not "not provided any methodology that allows for the finder of fact to distinguish the price declines…caused by the alleged corrective disclosure from those caused by the distortions in the price from the rumored short squeeze."[70] To the extent that any confounding information unrelated to the alleged fraud contributed to BBBY's Common Stock price decline following the alleged corrective disclosure, it is my understanding that I am not required to conduct a loss causation analysis of artificial inflation versus confounding information at this stage. Moreover, as explained in my Efficiency Report:

> To the extent that reliable evidence is introduced showing that a material portion of the difference in the estimated artificial inflation between the purchase and sale of the securities may be attributed to non-fraud related factors, the impact of such "confounding information" on the price of BBBY securities can be determined on a common, class-wide basis using various accepted methodologies.  The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation. This process may rely upon additional information learned during discovery and will be based on the specific set of facts and circumstances in a given case.[71]

54. Nevertheless, Prof. Fischel does not argue against the applicability of the out-of-pocket methodology for calculating damages in this case. Rather, his critique relates to the calculation of the ***inputs*** of the formulaic methodology. Moreover, his critique is premised upon his unfounded assertion that the statistically significant decrease in BBBY's price was due to the unwinding of a short squeeze during the Class Period.

55. As I explained in **Section 4**, there is evidence of an economic link between the alleged corrective disclosure and the drop in BBBY's Common Stock price on August 19, 2022. Therefore, Prof. Fischel's opinion that I am unable to calculate artificial inflation in relation to

---

[69] Fischel Report ¶59.

[70] Fischel Report ¶56.

[71] Efficiency Report ¶124.

the alleged corrective disclosure is flawed and unreliable.

**5.2    Changes in BBBY's Stock Price are a Reliable Measure for Determining Artificial Inflation in an Informationally Efficient Environment**

56. As I explained in **Section 3.2**, virtually all securities class actions are based on a finding of informational efficiency rather than a finding of fundamental efficiency, and the out-of-pocket methodology has been established as the standard for calculating damages in such cases.

57. Because he ignores established precedent when considering stock price changes as a reliable measure of artificial inflation in an informationally efficient market, Prof. Fischel's opinions regarding my ability to use such price changes to estimate artificial inflation in this matter are flawed and unreliable.

## 6.  CONCLUSION

58. In summary, none of Prof. Fischel's criticisms disturb my Efficiency Report conclusions, which I reaffirm herein.

I declare under penalty of perjury that the foregoing is true and correct.

   RESPECTFULLY SUBMITTED

Matthew D. Cain, Ph.D.

APPENDIX A

## Matthew D. Cain, Ph.D. <span style="float:right">June 2024</span>

E-mail: mdcain@outlook.com <span style="float:right">Homepage</span>
Mobile: 574-485-8065 <span style="float:right">SSRN</span>

### Education

Ph.D., Finance, August 2007          Purdue University, West Lafayette, IN
B.S., Finance, May 2001              Grove City College, Grove City, PA

### Professional and Academic Experience

*Senior Fellow*, Berkeley Center for Law and Business, 2019-Present

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

### Publications

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).


**Presentations**
- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group

- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Peregrine Economics
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**:  *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law

    LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2024

    LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2023

University of Notre Dame, Mendoza College of Business
    FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013
    FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management
    MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008
    MGMT 610: Financial Management I (MBA Core), Fall: 2007

## Expert Witness Experience

- *Securities and Exchange Commission v. Kevin A. Van de Grift and Gil Friedman*, Case No. 1:23-cv-01491 (S.D. N.Y.). Report June 2024.

- *El Paso Firemen & Policemen's Pension Fund, et al. v. InnovAge Holding Corp., et al.*, Case No. 21-cv-02770-WJM-SKC (D. Co.). Report May 2024.

- *In re Bed Bath & Beyond Corporate Securities Litigation*, Case No. 1:22-cv-02541-TNM (D.D.C.). Report February 2024. Deposition April 2024.

- *In the Matter of Joshua Abrahams*, File No. 3-21214, (SEC Admin. Proc.). Rebuttal Report February 2024.

- *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.). Report February 2024.

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.). Report January 2024. Deposition April 2024.

- *Jed Lemen, et al. v. Redwire Corporation, et al*., Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.). Report January 2024. Deposition March 2024.

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024.

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.). Report January 2024.

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023. Deposition January 2024. Rebuttal Report March 2024.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023. Deposition January 2024. Rebuttal Report February 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023. Rebuttal Report January 2024.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022. Report March 2024.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021. Rebuttal Report March 2024.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

## APPENDIX B

### Documents Considered

**Case Related Documents:**

Expert Report of Matthew D. Cain, Ph.D., February 15, 2024.

Expert Report of Daniel R. Fischel, May 17, 2024.

Memorandum in Opposition to Plaintiff's Motion for Class Certification, May 17, 2024 (Dkt. 117).

**Deposition Testimony:**

Deposition of Matthew D. Cain, Ph.D., April 4, 2024.

Deposition of Daniel R. Fischel, June 17, 2024.

**Court Documents:**

*Cammer v. Bloom*, 711 F. *Supp.* 1264, 1292 (D.N.J. 1989).

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 270-72 (2014).

*Homyk v. ChemoCentryx, Inc. et al.*, Case No. 4:21-cv-03343-JST. (N.D. Ca.).

*In re Groupon Inc. Sec. Litig.*, No. 12 C 2450, 2015 U.S. Dist. LEXIS 27334, at *28-30 (N.D. Ill. Mar. 5, 2015).

*Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 354 (C.D. Cal. 2015).

*In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 16 (1st Cir. 2005).

*In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.).

*In re Tesla Inc. Securities Litigation*, Case No. 18-cv-04865-EMC (N.D. Ca.).

*In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.).

*In re VeriFone Sec. Litig.*, 784 F.Supp. at 1479 n. 7.

*In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 511 (1st Cir. 2005).

**Academic Articles:**

A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, at 15.

Baklanova, V., Copeland, A. M., & McCaughrin, R. (2015). Reference guide to US repo and securities lending markets. *FRB of New York Staff Report*, (740).

Mark L. Mitchell and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *Business Lawyer* 49.

**Data Sources:**

Bloomberg, Factiva, Reddit, S3, SEC Edgar, Twitter

**Other:**

All other data and documents cited or referred to within this report.

**EXHIBIT 1**



**Coefficients from Alternative Event Study Regressions**
**August 10, 2022 – August 23, 2022**

Data sources: Bloomberg, SEC filings, Factiva, Complaint.

Note:
Regression models described in notes below Exhibit 4.

33

**EXHIBIT 2**



**Root Mean Squared Error (RMSE) from Event Study Regressions**
**August 10, 2022 – August 23, 2022**

Data sources: Bloomberg, SEC filings, Factiva, Complaint.

Note:
Regression models described in notes below Exhibit 4.

34

**EXHIBIT 3A**

**Description of Bed Bath & Beyond Alternative News Days**

| | Market Impact Date | Description |
|---|---|---|
| [1] | Aug 12, 2022 | Defendant Cohen posts the Tweet, allegedly alerting retail investors of his intent to maintain his stake in BBBY. |
| [2] | Aug 16, 2022 | Defendant Cohen files a delinquent Form 3 and Amended Schedule 13D, allegedly suggesting an increase in his overall stake in BBBY. In reality, the increase had allegedly occurred in April 2022. |
| [3] | Aug 18, 2022 | BBBY files an 8-k stating it had reached a "constructive agreement" with RC Ventures regarding Cohen's stake in the Company. |
| [4] | Aug 19, 2022 | Defendant Cohen files a Form 4 and Amended Schedule 13D reflecting his complete divestment from BBBY |

**EXHIBIT 3B**

**Bed Bath & Beyond Alternative News Days and Common Stock Abnormal Returns**

| | Market Impact Date | Log Return | Abnormal Return | Abnormal Dollar Change | t-Stat | p-Value |
|---|---|---|---|---|---|---|
| [1] | Aug 12, 2022 | 19.74% | 16.82% | $1.95 | 2.310 | 0.023 |
| [2] | Aug 16, 2022 | 25.51% | 20.90% | $3.72 | 2.779 | 0.006 |
| [3] | Aug 18, 2022 | -21.85% | -21.99% | - $4.56 | -2.901 | 0.004 |
| [4] | Aug 19, 2022 | -51.99% | -49.69% | - $7.26 | -6.555 | 0.000 |

Data sources: Bloomberg, SEC filings, Factiva, Complaint.

Note:
Regression models described in notes below Exhibit 4.

35

**EXHIBIT 4**

**Comparison of Statistical Significance on Bed Bath & Beyond Common Stock**
**for Alternative News Days vs. Alternative No News Days During the Alternative Analysis Period**

| Statistic | News Days | No News Days | p-Value of Difference |
|---|---|---|---|
| N | 4 | 6 | |
| Significant Days at 95% Confidence Level | 4 | 1 | |
| % Significant Days at 95% Confidence Level | 100.00% | 16.67% | 0.024 |
| Average Absolute Abnormal Return | 27.35% | 8.86% | 0.085 |
| Average Volume (Millions) | 196.72 | 105.47 | 0.299 |

Data Sources: Bloomberg, Factiva, SEC filings

Notes:

(1) The event study estimations are based on rolling regressions of the 120 trading days preceding each date of analysis. The regression models control for the S&P 500 Index ("Market Index") and the S&P 500 Specialty Retail Industry Index ("Industry Index"). The estimations exclude the alleged Corrective Disclosure, Earnings Releases by the Company, and the Alternative News Days identified in Exhibit 3.

(2) The four Alternative News Days are listed in the previous exhibit. Alternative No News Days were identified as dates on which no news was published regarding Defendant Cohen's stake in BBBY during the Alternative Analysis Period. The statistical comparison of "% Significant Days at the 95% Confidence Level" is based on a Fisher's Exact Test. The statistical comparisons of "Average Absolute Abnormal Return" and "Average Volume (Millions)" are based on t-tests for difference of means.