# Exhibit 2

1    called Superstonk?

2         A.  I don't know.  Again, same issue; I'd

3    have to see it to know.

4         Q.  So you didn't identify any posts from

5    there in this report either, correct?

6         A.  What I identified is what's listed.

7         Q.  Are these seven posts the only ones

8    that you rely upon to provide opinions in this

9    case about Reddit and the integrity of the

10   market?

11        A.  Well, they're the only ones that I rely

12   on.  I don't want to say that that's the only

13   thing I relied on to analyze what you refer to

14   as the integrity of the market.

15        Q.  Okay.  We'll talk about that later.  I

16   know that's a subsection in your report, though,

17   right?

18        A.  Correct.

19        Q.  Okay.  I wanted to discuss some general

20   things about the Cammer factors.  You don't

21   dispute that the company traded on the Nasdaq

22   exchange during the analysis period of your

23   report?

24        A.  No, I think that's what happened.

25        Q.  Yeah, okay.  And you also agreed that

1    it was covered by some analysts during the Class

2    Period, right?

3        A.  Yes, I believe that's correct.

4        Q.  And you agree with me that weekly

5    trading volume during the Class Period was

6    higher than the weekly turnover found by the

7    Cammer court to be sufficient?

8        A.  Yes, I would agree with that too.

9        Q.  And you also agree that there were 58

10   market makers in the Class Period and 246

11   institutional investors?

12           MR. FARINA:  Objection, form.

13           THE WITNESS:  I'd have to check that.

14   BY MR. JAFRI:

15       Q.  You haven't contested that there were

16   58 market makers and 246 institutional investors

17   in your report?

18       A.  I've neither contested it or endorsed

19   it.  I haven't said anything about it.

20       Q.  Okay.  And you also do not contest that

21   the company was eligible to file an S-3 form

22   during the Class Period, right?

23       A.  Again, I don't have an opinion on that

24   one way or the other.

25       Q.  So you're saying -- I'm sorry,

1    Professor Fischel.  This is an objectively

2    verifiable fact.  You're aware that the company

3    was eligible to file an S-3 during the Class

4    Period, right?

5            MR. FARINA:  Objection, form,

6    foundation.

7            THE WITNESS:  I'm actually not aware of

8    it.  Again, I'm not disputing it, but I'm not

9    aware of it.

10   BY MR. JAFRI:

11      Q.  Okay.  So you're not aware of that at

12   all?

13      A.  It sounds like a legal question of what

14   the application of a particular regulation is,

15   so I don't have an opinion on that one way or

16   the other.

17      Q.  Isn't the fact of whether a company is

18   eligible to file or not file an S-3 a Cammer

19   factor?

20      A.  It is.

21      Q.  All right.  So you know what it is,

22   right?

23      A.  I know what it is.  I'm just saying I

24   don't have an opinion about the application of

25   that factor under the facts and circumstances of

1    this case.

2         Q.   Did you do anything to verify whether

3    the company could file an S-3 during the Class

4    Period?

5         A.   No.

6         Q.   Okay.  You don't disagree with me that

7    the market capitalization of the company was

8    pretty large during the Class Period, right?

9              MR. FARINA:  Objection, form.

10             THE WITNESS:  I'm not sure what "pretty

11   large" means, but I don't dispute that it was a

12   publicly-traded company traded on the Nasdaq.

13   BY MR. JAFRI:

14        Q.   Well, I'll specify.  You don't dispute

15   that at some point during the Class Period, it

16   averaged around nearly $1.5 million, right?

17        A.   I didn't calculate it, and "at some

18   point during the Class Period" covers a lot of

19   possibilities given the volatility of stock

20   price movements during the Class Period and

21   leading up to the Class Period.

22        Q.   In your report you also do not contest

23   that the company had a large public float during

24   the Class Period?

25        A.   Do not.

1    Q.  And I don't think that in your report

2    you specifically address anything about Dr.

3    Cain's assessment of the bid-ask spread, right?

4    A.  Correct.

5    Q.  I do think that -- I mean, you do have

6    criticisms of Dr. Cain's event study, and you

7    believe that the cause and effect based on the

8    Cammer 5 has not been demonstrated?

9    A.  Among other things, correct.

10    Q.  Right.  And the other thing is that you

11    believe --

12    A.  Not just hasn't been demonstrated.  It

13    hasn't even been attempted.  There's no analysis

14    whatsoever of market efficiency during the Class

15    Period in Dr. Cain's report.

16    Q.  But one -- but that's the Cammer 5

17    factor?

18    A.  That is the Cammer 5 factor.

19    Q.  And you said the other thing which is

20    you have this extensive analysis on short

21    selling constraints, correct?

22    A.  I have the analysis on short selling

23    constraints that I referred to that's contained

24    in my report.

25    Q.  Right.  And you agree that courts

1    typically analyze short selling constraints

2    pursuant to Cammer 3?

3         A.   I don't have an opinion one way or the

4    other on what courts typically do.

5         Q.   On short sellers' market makers?

6         A.   They can be.

7         Q.   Right and Cammer 3 analyzes market

8    makers?

9         A.   Correct.

10        Q.   Now, we talked a little bit about the

11   IPO case and how your opinions about the short

12   interest there, at least with respect to the

13   focus group, was rejected.

14        A.   I'm not sure I agree with that.

15        Q.   Well, the Court said that there

16   was -- with respect to the arbitragers, as we

17   discussed earlier, there was in fact a

18   suggestion of inefficiency with respect to that

19   factor, right?

20        A.   You referred to a discussion in an

21   opinion of the Court which, at least the part

22   that you referred to, I did not interpret as a

23   rejection of my opinion.

24        Q.   Okay.  Putting aside your opinions --

25        A.   Let me just say whatever the Court did

1    the Court did.  I'm not in any way contesting

2    what the Court did, disputing what the Court

3    did.  All I'm saying is what you read to me or

4    what you had me read, I did not interpret as a

5    rejection of my opinions.

6        Q.  Okay.  Well, let's let that speak for

7    itself.

8            Can we move on to a very specific thing

9    that I wanted to discuss with you.  Can you

10   please turn to page 32, footnote 105 of your

11   report?

12       A.  Page 32, footnote 105?

13       Q.  Yeah, footnote 105.  Are you there?

14       A.  Yes, I am.

15       Q.  So in footnote 105, you wrote:  "I note

16   that although Dr. Cain claims that he

17   'considered' 'the various Cammer, Krogman, and

18   other efficiency factors' in reaching his

19   conclusions about the impact of short squeeze

20   dynamics during the Class Period, most of the

21   eleven factors - including the presence of

22   analysts coverage, market makers, institutional

23   ownership, an appropriately sized public float,

24   and options trading, as well as the eligibility

25   to file SEC Form S-3 - do not allow him to

1    analyze discreet periods within the Cain

2    Analysis Period and thus are incapable of

3    supporting his conclusion."

4        I read that right?

5    A.  Yes, you did.

6    Q.  Except for this footnote, have you

7    addressed any of these factors anywhere else in

8    your report?  You haven't, right?

9    A.  (Reviewing document.)

10       I haven't analyzed them other than

11   pointing out there's no analysis of them other

12   than volume in any of Dr. Cain's analysis of the

13   Class Period.

14   Q.  Earlier on you said that you didn't

15   analyze whether the company was eligible to file

16   an S-3.

17   A.  Correct, I didn't.

18   Q.  So if you didn't even do it, how are

19   you opining on what he did?

20   A.  I'm not opining on what he did.  I'm

21   just stating what he did in the absence of any

22   analysis during the Class Period.

23   Q.  I think you are, Professor Fischel.  I

24   mean, let's read this again.

25   A.  Okay.

1    Q.  So I think in the -- if you look at the

2    fifth line, you talked earlier about the

3    factors, and then you wrote this, that these

4    factors "do not allow him to analyze discreet

5    periods within the Cain Analysis Period and thus

6    are incapable of supporting his conclusion."

7         That's not an opinion?

8    A.  That is an opinion.

9    Q.  Right.  You had that opinion, but you

10   yourself never even determined whether the

11   company was eligible to file an S-3 based on

12   what you just said.

13   A.  I'm not -- the opinion that I stated

14   does not depend on my having an independent

15   opinion on whether the company was eligible to

16   form -- to submit an SEC Form S-3.

17   Q.  So what is the factual basis here in

18   your report for saying that he cannot rely on

19   any of these factors?  Can you show me where you

20   talked about the factual basis?

21   A.  That's a mischaracterization of the

22   footnote.

23   Q.  I think the footnote is a conclusion.

24   You don't agree with that?

25   A.  The footnote is a conclusion with

1   respect to a point that I've made multiple times

2   that, notwithstanding Dr. Cain's analysis of all

3   these different Cammer factors, and that's what

4   most of his report is about, none of it analyzes

5   efficiency during the Class Period which is a

6   relevant question for purposes of the conclusion

7   that he reached.

8        Q.   Earlier on you agreed with me that the

9   company was trading on the Nasdaq during the

10  Class Period, right?

11       A.   Correct.

12       Q.   And you also agreed with me, I think,

13  that it had a large public float?

14       A.   Correct.

15       Q.   Public float is a Cammer factor?

16       A.   Right.

17       Q.   Correct.  Courts look towards whether a

18  company trades on a large exchange to analyze

19  whether a market is efficient?

20       A.   Correct.

21       Q.   Okay.  So can you point me to anywhere

22  else in your report where you discussed any of

23  these other eleven factors that you mentioned,

24  with the exception of -- well, there's eleven in

25  total.  You mentioned two, which you analyzed,

 1   Cammer 3 and Cammer 5.  Other than this

 2   footnote, where did you analyze the other

 3   factors?

 4        A.  I don't think I did other than to point

 5   out that Dr. Cain's analysis completely ignored

 6   the question of efficiency during the Class

 7   Period, which is the conclusion that he reached,

 8   notwithstanding the complete lack of any

 9   evidence in support of it during the Class

10   Period.

11        Q.  But that's based on your analysis of

12   Cammer 3 and Cammer 5?

13        A.  No, it's based on my analysis of

14   Dr. Cain's report where none of his analysis,

15   other than what he says about volume, which

16   actually -- as I said before, it doesn't say

17   anything about efficiency.  He doesn't provide

18   any support, zero, notwithstanding his lengthy

19   discussion of all these Cammer factors of market

20   efficiency during the Class Period, which is

21   what he purports to be expressing an opinion

22   about.

23        Q.  Do you agree that his analysis period

24   ran through the Class Period, right?

25        A.  Yes, I do agree with that.

1     Q.   Okay.  Right.  And we're discussing

2  Krogman and Cammer factors based on what you

3  talked about in this footnote that overlap with

4  the Class Period?

5     A.   That's true.

6     Q.   And it was trading on the Nasdaq during

7  the Class Period, right?

8     A.   That's true.

9     Q.   It did have a big public float?

10     A.   That's true.

11     Q.   Okay, and it did, for instance, have a

12  market capitalization in excess of a million

13  dollars, right?

14     A.   That's true.

15     Q.   You have not talked about how none of

16  those things were true anywhere in your report,

17  right?

18     A.   I've not talked about whether any of

19  those things were true, correct.

20     Q.   Okay.  I wanted to move on to another

21  topic.  Now I want to talk about your specific

22  opinions, and I want to talk about short

23  squeezes and constraints.

24          Can you please turn your attention to

25  page 11?

154

1      Q.  And this is what these assistants

2   pulled and printed for you?

3      A.  I think I've covered that subject.

4           MR. JAFRI:  I want to mark this as

5   Exhibit 243.

6                    (Deposition Exhibit 243 was

7                     marked for ID.)

8           MR. FARINA:  What was Exhibit 242?

9           THE REPORTER:  (Indicating to

10   document.)

11           MR. FARINA:  Oh, his report.  Got it.

12   BY MR. JAFRI:

13      Q.  Have you ever seen this document

14   before?

15      A.  One second.  Let me just look at it.

16   (Reviewing document.)

17           Okay.

18      Q.  Okay.  So have you ever seen this

19   before?

20      A.  I've either seen it or other documents

21   that essentially say the same thing.

22      Q.  But you never mentioned it in your

23   report?

24      A.  Did not.

25      Q.  Okay.  Now, if you look at the first

1  sentence right here underneath those two bullet

2  points which begins with "Five months..."

3     A.  Okay.

4     Q.  Okay.  So over here it says:  "Five

5  months after disclosing a stake in Bed Bath &

6  Beyond, Inc., active shareholder Ryan Cohen

7  wants out, sparking a selloff in the shares of

8  the home goods retailer."

9        Do you see that?

10     A.  I do.

11     Q.  And this is the type of information

12  that you've relied on in your report to form

13  conclusions about whether or not there was a

14  short squeeze like those Bloomberg op-ed pieces

15  we discussed earlier.

16     A.  (Reviewing document.)

17        I'm sorry.  What do you think is

18  related to what?  I didn't follow what your

19  question was.

20     Q.  What I'm saying is -- I'll try to be

21  more specific.  You gave an opinion in this case

22  about a rumored short squeeze, right?

23     A.  That's right.

24     Q.  And some of the stuff you relied on to

25  form that conclusion were opinion pieces from

1   Bloomberg, right?

2       A.  I cited a couple of pieces from

3   Bloomberg.

4       Q.  Yeah, and one of the other key pieces

5   you cited was a Seeking Alpha article

6   speculating that there was a suspected short

7   squeeze on August 5th, correct, August 5th of

8   2022?

9       A.  I think that is correct.

10      Q.  Right.  And this is an article saying

11  that the stock has collapsed because of Cohen's

12  sales, isn't it?

13      A.  (Reviewing document.)

14          Well, the article speaks for itself.

15  The heading suggests that the article itself --

16  it says what it says.

17      Q.  I don't follow what you mean.

18      A.  I mean, the article says his article

19  "sparked a selloff".  Whether that means caused

20  a selloff, why it caused -- assuming it did

21  cause a selloff, why it caused a selloff, not

22  clear from the article.

23      Q.  Did you ask yourself these types of

24  questions when you looked at that --

25      A.  I did, I absolutely did, and I talked

1    about how manipulated prices as a result of

2    rumored short squeezes are temporary.  They only

3    last for a limited point -- they only last for a

4    limited period of time.  They end typically in a

5    relatively short period of time.

6            One of the things that can caused the

7    end of a short squeeze is selling pressure that

8    both demonstrates the belief by investors that

9    the manipulated prices are too high temporarily

10   and need to be brought back down.  Also the

11   entry of new shares into the marketplace that

12   are available for short selling.  So I thought

13   about all these things and also that it's a

14   rational reason to sell if you think that prices

15   are too high.

16       Q.  But I think now you're talking about

17   what -- about facts that would occur once you've

18   already assumed that there was a short squeeze.

19   I'm talking about a stage before that, which is

20   you relying on that Seeking Alpha article to say

21   there's a rumored short squeeze, when the title

22   of the article said suspected short squeeze,

23   correct?  You relied on something like that to

24   assume there was a, quote, rumored short

25   squeeze, correct?

1    A.  I don't think that's a fair

2  characterization of my report, which is full of

3  analysis of unexplained price reactions, volume

4  increases, volatility increases, commentary,

5  analysis of the lack of availability of stocks

6  that are available for short selling, a huge

7  amount of commentary attempting to explain the

8  unexplained price increases as a result of a

9  short squeeze, certainly not a fair

10  characterization of the article to say that my

11  opinions were based on a single article

12  published on August 5th.

13    Q.  But it was one of the factors that you

14  looked at articles like that, right, to make a

15  determination as to whether you think there was

16  a rumored short squeeze?

17    A.  I would say I included a lot of market

18  commentary in addition to all the other things

19  that I discussed.

20    Q.  Okay.  But I think you're describing a

21  holistic approach here, which is you looked at

22  several different components, right?

23    A.  I don't know what you mean by a

24  holistic approach.  I looked at what I analyzed

25  in my report.

1      Q.  I mean, I think you would probably
2  agree that any of these things you mention on
3  their own are not sufficient to show that
4  there's a short squeeze, correct?
5      A.  I don't know.  I didn't analyze them on
6  their own.  If they were on their own, it would
7  be a different case, so it would require an
8  analysis of the facts and circumstances of that
9  case.
10      Q.  Be that as it may, even though you
11  claim that you searched through August 19th in
12  the Bloomberg database, you did not mention what
13  I showed you in your report, correct?
14      A.  I did not mention that article, but I
15  did show the collapse in prices on August 19th.
16  I have several exhibits which show that.
17      Q.  Yeah, that's not my -- that wasn't my
18  question.  My question is you did not mention
19  this article in your report, you did not discuss
20  this article in your report, right?
21      A.  I do not recall discussing this
22  specific article in my report.
23      Q.  Can we please go back to your report,
24  Exhibit 242.
25      A.  (Witness complying.)

1          You have a several-day class period.

2     You're saying that there's statistically

3     significant results on every day during the

4     class -- that several-day class period?

5          Q.  Correct.

6          A.  But there's no events.

7          Q.  There is no event to study.

8          A.  Okay.  Well, that's unusual.  What

9     inference you would draw from that, again, would

10    depend on the relevant facts and circumstances.

11         Q.  Okay.  Let's go back to page 25 where

12    you have this chart.  I have a couple of

13    questions here.

14         A.  Okay.

15         Q.  What was the opening stock price on

16    August 12th?

17         A.  That's the blue dot, so it looks like

18    it's around $11.

19         Q.  What was the stock price around the

20    time that Cohen sent his tweet at 10:42 a.m.?

21         A.  Um... (reviewing document.)

22         It's hard to tell, but it looks like a

23    little bit below $11.

24         Q.  What did the stock price close at?

25         A.  At the end of the day?

1      Q.  Yes.

2      A.  Looks like a little bit less than $13.

3      Q.  So it increased further once he

4  tweeted, correct?

5      A.  If you're asking just as a matter of

6  time sequence, the time of his tweet, the price

7  was lower than what the price was at the end of

8  the day.  But for the reasons that I describe in

9  my report, to assume that that establishes cause

10  and effect, which coincidentally is Cammer

11  factor number 5, but even if there was no such

12  thing as Cammer factors, to assume that one

13  caused the other just because the price was

14  higher at the end of the day than it was at the

15  time of the tweet, that's really just a

16  fundamental error in interpreting stock prices.

17      Q.  Now I think you are just criticizing

18  the facts.  What I'm saying is you agree that

19  the stock price closed at a higher price than

20  what it was when he tweeted, correct?

21      A.  Yes, I agree with that.

22      Q.  Okay.

23      A.  But I think it proves nothing.

24      Q.  That's fine.  I just wanted to make

25  sure that at least we have an understanding

1    about these facts.

2         You're aware that the stock price rose

3    again on the next trading day which is

4    August 15th?

5         A.  I am aware of that.

6         Q.  You don't address that in your report

7    here?

8         A.  It's really the same answer that I gave

9    you before.  I do address it.  I don't have a

10   specific subsection dealing with August 15th,

11   but I very much do address it.

12        Q.  That's what I meant, no specific

13   representations in your report about August 15,

14   2022.

15        A.  Again, I -- that's a

16   mischaracterization of what I just said.  There

17   is no specific section that focuses on

18   August 15th analogous to the specific section

19   that focuses on August 12th, but the discussion

20   about August 15th and why August 15th, like all

21   at other days in the Class Period, do not

22   establish efficiency particularly in the context

23   where Dr. Cain provides no analysis, let alone

24   evidence that the stock traded in an efficient

25   market during the particular class period is

1      A.  We may have been through it many times,
2   but that's not an accurate characterization of
3   my opinion or the basis for my opinion.
4      Q.  Okay, but let's go back to my question.
5          You don't know how -- let's just focus
6   on these seven people.  You don't know how many
7   shares they bought?
8      A.  With respect to those seven people?
9   Again, I don't think that's relevant for the
10  purposes of my opinion, but I don't know how
11  many shares they without.
12     Q.  You don't know that they are actually
13  retail investors?
14     A.  No, I do not.
15     Q.  You don't even know whether they held
16  any stock in Bed Bath?
17     A.  That's correct.
18     Q.  Right.  Okay.  You mentioned that you
19  are not giving any opinions on potential class
20  members because that's a legal question.
21          But over here, Professor Fischel, in
22  your heading, you talked about on page 28
23  "Commentary from Potential Class Members
24  Demonstrates that Some, if Not Many, Potential
25  Class Members Did Not Rely Upon the Integrity of

1   the Market Price."  So you're giving a legal

2   opinion?

3       A.  I'm giving the opinion that is stated,

4   that there are going to be -- in a situation

5   like this, for the reasons that I've stated,

6   there are going to be some investors presumably

7   that purchased based on a belief that the market

8   price is not distorted, and other investors who

9   purchased trying to profit by the fact that the

10  market price is distorted.

11          And the only way to know who fits in

12  which category is to have individualized inquiry

13  and individualized proof, and therefore a

14  statement that the entire Class would be

15  accurate under the facts and circumstances of

16  this case as a matter of economic evidence, to

17  say that the entire Class relied on the

18  integrity of the market price, I don't believe

19  is consistent with the relevant economic

20  evidence.

21      Q.  You didn't do any statistical analysis

22  to determine how many -- what percentage of

23  investors on these -- on that one single Reddit

24  forum that you discussed were manipulators who

25  are in it for the short squeeze, correct?

1      A.  I didn't do that analysis, but I don't

2  think it has any relevance to the opinion that

3  I've just been expressing.

4      Q.  And you have no idea whether a majority

5  of people or a minority of people on

6  WallStreetBets said that they were buying shares

7  because Cohen sent out moon emojis, right?

8      A.  I didn't conduct that analysis, and

9  again, it's completely irrelevant for the

10  purposes of the opinion that I just expressed.

11      Q.  But what if the analysis actually shows

12  that a majority of people on Reddit bought

13  shares because Cohen sent out moon emojis.  You

14  would still have the same opinion based on these

15  seven posts?

16      A.  I don't have any opinion that's based

17  on the seven posts, just to be clear about that.

18          And with respect to whatever the proof

19  is with respect to those investors, if they are

20  investors, or any other investors, it is what it

21  is.  But it's not really relevant in terms of

22  the basis for my opinion on the absence of an

23  assumption that the Class members relied on the

24  integrity of the market price.

25      Q.  So on pages 28 -- from pages 28 to 30,

1    you've cited sources.  Other than these Reddit

2    posts, what else did you rely on to come up with

3    this basis in these pages?

4        A.  (Reviewing document.)

5            There's a discussion about how the

6    Class Member definition includes investors who

7    knowingly purchased at artificial inflated

8    prices as a result of or in the hopes of

9    creating a short squeeze.  That's how short

10   squeezes are created, in the hope of being able

11   to sell at even more inflated prices but were

12   unable to do so.  That's what a short squeeze

13   is.

14       Q.  Yeah.

15       A.  A short squeeze is created by investors

16   who believe in the lack of integrity in the

17   market price, but attempt to take advantage of

18   the shorts by purchasing, pushing up prices,

19   making it harder for the shorts to cover, more

20   expenses for the shorts to cover in the hope

21   that they will be able to sell at even greater

22   inflated prices before the entire manipulation

23   effect on prices collapses.

24       Q.  Except you omitted the complaint's

25   allegation here that Cohen caused or exacerbated

1    the short squeeze.

2         A.  Well, I don't believe there's any

3    evidence of that, but even if I accept that at

4    face value just for sake of argument -- the rest

5    of my report I think demonstrates that there's

6    no basis to conclude that, but even if I accept

7    that at face value, there's still going to be

8    investors who traded -- even under that

9    assumption, who traded really for the reasons

10   that you just said, based on the lack of

11   integrity of the market price as opposed to a

12   belief in the integrity of the market price, and

13   individualized inquiry would still be necessary

14   to determine which investors should not be --

15   properly be in the Class because they did not

16   trade on the integrity of the market price.  And

17   the entire Class should not be entitled to a

18   presumption of reliance on the -- based on

19   purchasing as a result of a belief in the

20   integrity of the market price.

21        Q.  And just to recap, on pages 28 through

22   30, this opinion of yours is based on the seven

23   posts that somebody else found for you on

24   Reddit, on one forum, and certain allegations of

25   the complaint that you chose to discuss,

1   correct?

2        A.  Not correct.

3        Q.  Well, what else is cited over here

4   on -- between footnotes 88 and 98?  What else do

5   you think supports the view that you have in

6   this section?

7        A.  The entire report and the opinions in

8   the report that there was price distortion

9   unrelated to fundamental value leading up to the

10  Class Period and continuing through the Class

11  Period, and that distortion was created by a

12  rumored short squeeze, possibly an actual short

13  squeeze.

14          And the way a short squeeze or an

15  actual short squeeze works is retail investors

16  or institutional investors, for that matter,

17  purchasing to drive prices up, to take advantage

18  of the shorts who are in a position they are not

19  really able to cover their position easily

20  without incurring huge losses, and the result of

21  that is that those investors who fit that

22  definition, whether retailer investors or

23  institutional investors -- because the volume

24  here is very high, so it's very hard to say it's

25  all retail investors -- that some class of those

1  invest- -- of all the investors who purchased

2  during the Class Period were not purchasing

3  based upon a belief in the integrity of the

4  market price.

5     Q.  And there's -- I'm not talking about

6  your general opinions.  I'm talking about these

7  footnotes that, except for the two things I

8  mentioned, there's nothing else in these

9  footnotes that supports this belief of yours

10  about a lack of integrity in the marketplace?

11     A.  Well --

12     Q.  I'm talking about the footnotes.  I'm

13  not talking about general opinions, the

14  footnotes.

15     A.  Which footnotes are you talking about?

16     Q.  Between 88 and 98.

17     A.  (Reviewing document.)

18         Well, first of all, the discussion of

19  the section starts with text beginning on

20  paragraph 43, which is prior to the subsection

21  where the footnotes that you're referring to are

22  included.

23         The part of the opinion that predates

24  the part that you were asking me about not only

25  has textual discussion, but it also has other

1   footnotes of how short squeezes work.

2         And particularly footnote 86, in

3   connection with the discussion in the text and

4   what the purpose was of Section B of this

5   opinion -- which, again, it speaks for itself --

6   is that there was a recognition in the

7   marketplace that that's what was going on and

8   investors were encouraged to purchase based on a

9   lack of integrity -- a belief in the lack of

10  integrity of the market price in order to take

11  advantage of the short sellers, the existing

12  short sellers who were in a vulnerable position.

13        So I don't think your question really

14  fairly characterized this particular opinion,

15  the support for the opinion and how it fits in

16  with the rest of the report.

17      Q.  I know what you're talking about.

18        In paragraph 44, you had a general

19  description of squeezers as parasitic traders,

20  and the footnote that you cite is about general

21  market micro structures for practitioners.

22        And then you have an article about

23  GameStop, correct, from January 2021?  Isn't

24  that right?

25      A.  No, that's not right.

1       Q.   Why is that wrong?

2       A.   Well, first of all, the article in the

3   footnotes speak for itself.

4            But if you look at footnote 86, it

5   talks about particular price reactions that can

6   occur when there is a heavy short interest where

7   the existing shorts are vulnerable, and it talks

8   about how "it can quickly turn into a buying

9   frenzy as the short sellers trip over one

10  another to buy the shares" to be able to cover.

11  "Panic-buying begets more panic-buying, egged on

12  by speculators who know the situation the short

13  sellers are in and actively try to put the

14  screws to them.  This is a short squeeze in

15  action.  And it's exactly what happened in the

16  shares of GameStop."  That's what it says.

17      Q.   Right.

18      A.   And what that means in the context of

19  the short squeeze that's discussed in the

20  context of my report is that this panic-buying

21  that begets other panic-buying -- and it doesn't

22  necessarily even have to be panic-buying.  It

23  can just be buying.  Panic-buying could be by

24  the shorts to try and cover their position.  I

25  think that's actually what the quote actually

1   refers to.

2          But the point is that there is a

3   recognition in the marketplace that the existing

4   investors who are holding short positions are

5   vulnerable and can be taken advantage of if

6   actions taken to price -- let's push prices up,

7   to take the distorted prices and make them more

8   distorted, and those are exactly the class of

9   investors who are included in your class

10  definition who trade based on a lack of

11  integrity of the market price as opposed to what

12  the presumption purports to be about, which is

13  investors who trade based on a belief in the

14  integrity of the market price.

15     Q.  Footnote 86, which you have so much to

16  say about, cites two things.  One of them is

17  from the Oxford University Press in 2003, and

18  the other one is an article about GameStop from

19  January 28, 2021, correct?

20     A.  Well, when you say the article is about

21  two things, no, I don't think that's right.

22          I mean, I think the opinion -- the

23  footnote, again, it's just a footnote in the

24  context of a larger discussion of the same point

25  in the text.  But the footnote talks about the

1    conditions that can apply when there is a very

2    heavy short interest, and it -- then it uses as

3    an example of when that can occur.

4           But the phenomena that's discussed is

5    not meant -- it doesn't mean to -- it's not

6    meant to suggest that the only time that could

7    ever happen is with GameStop.  It's meant to be

8    a more general -- at least as I understand it, a

9    more general illustration of how artificial

10   price movements can become more artificial in a

11   situation where there's a perception in the

12   marketplace that short sellers, where there's

13   very heavy short selling interest and they are

14   in a vulnerable position and could be exploited

15   by buying, to push prices higher to make prices

16   even more distorted, more artificial.

17       Q.  Larry Harris's publication from 2003

18   and this GameStop article that you again have

19   talked so much about at length from

20   January 28th, 2021 never mentioned anything

21   about Bed Bath & Beyond, correct?

22       A.  It doesn't mention them by name, that's

23   correct.

24       Q.  All right.  One thing that I just

25   wanted to clarify, I think in one of your

1  responses you said that there could have been a

2  rumored short squeeze or an actual short

3  squeeze.

4          So is it your testimony that it could

5  be either one of those two things and you're

6  just not sure which one it is?

7      A.  You know, I have covered this at

8  length.  I would say there is a rumored short

9  squeeze and then there is an also economic data

10  both in terms of unexplained price movements and

11  data about short interest relative to the number

12  of shares that could be shorted that is very

13  consistent with the rumor or may be responsible

14  for the rumor.

15      Q.  Right.  But despite all this data and

16  everything else you've discussed, you've

17  testified that it could be either a rumored

18  short squeeze or an actual short squeeze,

19  correct?

20      A.  I would say it's a rumored short

21  squeeze that's supported by a lot of data

22  suggesting that it's an actual short squeeze.

23      Q.  But it could be either one of the two

24  according to your prior testimony, right, just

25  now?

1       A.  You could have a price reaction or

2    price reactions like the ones that occurred in

3    this case as a result of a rumored short

4    squeeze, but the rumors are obviously going to

5    be more credible if they are supported by

6    objective economic data.  And that's exactly

7    what existed in this case with the large

8    unexplained price increases as well as the lack

9    of shares available to short in light of the

10   data that I reported in my report.

11       Q.  But you did draw a distinction between

12   a rumored short squeeze and an actual short

13   squeeze, correct?

14       A.  I'm not sure I'd call it a distinction.

15   I would say in the marketplace there was a

16   perception of a short squeeze that was supported

17   by real economic data demonstrating the

18   possibility of an actual short squeeze.

19       Q.  Is there a difference between an actual

20   short squeeze and a rumored short squeeze?

21       A.  There may or may not be a difference,

22   depending on whether the rumored short squeeze

23   is supported by data demonstrating that it's an

24   actual short squeeze.

25       Q.  Okay, but you never called it "an

1    actual short squeeze" in your report, correct?

2        A.  Well, that's not true either, as we've

3    talked about earlier in the questioning.  But I

4    discuss both the rumored short squeeze and the

5    actual economic data supporting the idea that

6    it's an actual short squeeze which is generating

7    the rumor of a short squeeze.

8        Q.  Okay, but you didn't use the phrase

9    "actual short squeeze" in this report?

10           MR. FARINA:  Objection, asked and

11   answered.

12           THE WITNESS:  Also not true.

13   BY MR. JAFRI:

14       Q.  Is it your testimony that you used the

15   phrase "actual short squeeze"?

16       A.  Yes.

17           MR. JAFRI:  All right.  Thank you.  I'm

18   done, and thank you very much for your time.

19           THE WITNESS:  Thank you.  Safe travels,

20   everybody.

21           MR. FARINA:  All right.  Thank you.

22           THE VIDEOGRAPHER:  We are now going off

23   the record at 2:42 p.m. with the end of the

24   testimony of Mr. Daniel Fischel; all video media

25   will be retained by Hudson Court Reporting

Exhibit 3

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| |
|---|
| IN RE BED BATH & BEYOND CORPORATION SECURITIES LITIGATION |

Case No. 1:22-cv-02541-TNM

**EXPERT REPORT OF DANIEL R. FISCHEL**

**May 17, 2024**

## I. QUALIFICATIONS

1.      I am President and Chairman of Compass Lexecon, a consulting firm that specializes in the application of economics to a variety of legal and regulatory issues.  I am also the Lee and Brena Freeman Professor of Law and Business Emeritus at The University of Chicago Law School.  I previously served as Dean of The University of Chicago Law School, Director of the Law and Economics Program at The University of Chicago, and as Professor of Law and Business at The University of Chicago Graduate School of Business (by courtesy), the Northwestern University Law School, and the Kellogg School of Management at Northwestern University (by courtesy).

2.      Both my research and teaching have concerned the economics of corporate law and financial markets.  I have published approximately fifty articles in leading legal and economics journals and am coauthor, with Judge Frank Easterbrook of the Seventh Circuit Court of Appeals, of the book The Economic Structure of Corporate Law (Harvard University Press).  Courts of all levels, including the Supreme Court of the United States, have cited my articles as authoritative.  My curriculum vitae, which contains a list of my publications, is attached hereto as **Appendix A**.

3.      I have served as a consultant or advisor on economic issues to the United States Department of Justice, the United States Securities and Exchange Commission, the National Association of Securities Dealers, the New York Stock Exchange, the Chicago Board of Trade, the Chicago Board Options Exchange, the Chicago Mercantile Exchange, the New York Mercantile Exchange, the United States Department of Labor, the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, the Federal Housing Finance Agency, and the Federal Trade Commission, among others.

1

4.      I am a member of the American Economic Association and the American Finance Association.  I am also a former member of the Board of Governors of the Becker Friedman Institute at The University of Chicago, a former Advisor to the Corporate Governance Project at Harvard University, a former member of the Board of Directors of the Center for the Study of the Economy and the State at The University of Chicago, and former Chairman of the American Association of Law Schools' Section on Law and Economics.  I have testified as an expert witness in multiple proceedings in federal and state courts across the country, as detailed in **Appendix A**, including as an expert in multiple securities fraud litigations.

5.      I have been assisted by Compass Lexecon's professional staff.  **Appendix B** lists materials that I have relied upon in forming my opinions in this matter.[1]  Compass Lexecon bills my time at a rate of $1,950 per hour.  My compensation is not contingent on the outcome of this case.

## II.  BACKGROUND

6.      Bed Bath & Beyond, Inc. ("BBBY" or the "Company") was a specialty home retailer in North America that sold a wide assortment of merchandise for the home and home furnishings through physical retail stores and e-commerce platforms.[2]  In addition to Bed Bath & Beyond stores, the Company operated buybuy BABY stores which sold baby essentials and nursery furnishings.[3]  In 2019, the Company started divesting non-core business and real estate as part of an ongoing business transformation with the goal of adapting to the changing retail market and meeting the evolving needs of its customers.[4]  BBBY common stock traded on the

---

1.      I reserve the right to update my analyses and conclusions if additional information is made available to me.

2.      BBBY Form 10-K for the fiscal year ended February 26, 2022 ("2022 10-K") at 4.

3.      2022 10-K at 4.

4.      2022 10-K at 4-5.  For the fiscal years ending February 2020, 2021 and 2022, the Company had operating losses of $700.1 million, $336.9 million and $407.6 million, respectively.  *Id.* at 33.

Nasdaq stock market until April 23, 2023 when the Company filed for bankruptcy.[5]  BBBY started liquidating its stores shortly thereafter.[6]

7.      On March 7, 2022, Ryan Cohen and RC Ventures LLC ("RC Ventures"), an investment fund owned by Mr. Cohen,[7] filed a Schedule 13D with the Securities and Exchange Commission ("SEC") indicating that they had acquired a 9.8% equity stake in BBBY comprised of 7,780,000 shares of common stock and 1,670,100 out-of-the-money call options expiring January 20, 2023.[8]  Attached to the 13D filing was a letter from Mr. Cohen to BBBY's board of directors (the "Board") encouraging the Board to explore strategic alternatives including selling the Company, selling or spinning off the buybuy BABY banner, or selling part of its businesses or other assets.[9]

8.      On March 25, 2022, Mr. Cohen and RC Ventures filed an amended Schedule 13D, which disclosed that Mr. Cohen, RC Ventures, and BBBY had entered into a cooperation agreement.[10]  Pursuant to this agreement, BBBY increased the size of its Board by three additional members, Mr. Cohen and RC Ventures agreed not to acquire more than 19.9% of

---

5.      2022 10-K at 24; BBBY Form 12b-25, April 26, 2023.

6.      "UPDATE 3-Bed Bath & Beyond files for bankruptcy protection after long struggle, begins liquidation sale," *Reuters*, April 23, 2023, 7:12 AM ET.

7.      Ryan Cohen co-founded pet supply company Chewy, Inc. and served as its chief executive officer ("CEO") until the company was sold to PetSmart, Inc. in 2017.  In September, 2020, through RC Ventures, Mr. Cohen disclosed an equity stake of almost 10 percent in GameStop.  Mr. Cohen was named a member of GameStop's Board of Directors in January 2021, elected Chairman of the Board in June 2021, and appointed CEO in September 2023.  *See* "PetSmart's Latest Bite at E-Commerce: Chewy.com," *Wall Street Journal*, April 18, 2017, 8:37 PM ET. "GameStop Rises on Investor's Plan to Make It an Amazon Rival," *Bloomberg*, September 21, 2020, 7:22 PM ET. "Biography – Ryan Cohen," available at https://investor.gamestop.com/board-member/ryan-cohen, accessed May 17, 2024.

8.      RC Ventures Schedule 13D, March 7, 2022.  The January 20, 2023 call options consisted of 1,125,700 call options with an exercise price of $60, 44,400 options with an exercise price of $75, and 500,000 options with an exercise price of $80.

9.      RC Ventures Schedule 13D, March 7, 2022.

10.     RC Ventures Schedule 13D, Amendment No. 1, March 25, 2022. *See also* BBBY Form 8-K, March 25, 2022.

3

BBBY common stock, and Mr. Cohen and RC Ventures agreed to vote for directors nominated

and proposals recommended by the Board.[11]  In addition, two of the Board members nominated

by Mr. Cohen and RC Ventures joined a four-member Strategy Committee of the Board formed

to support the Board's oversight and review of a strategic analysis of the buybuy BABY

business.[12]

       9.     On June 1, 2022, the Company filed a Proxy Statement with the SEC, which

disclosed that, while RC Ventures owned the exact same number of shares and options reported

in the March 7, 2022 13D filing, the ownership interest had increased to 11.8% because of a

decline in the Company's shares outstanding from Company share repurchases.[13]  BBBY issued

an earnings report dated June 28, 2022 disclosing a Q2 2022 loss of $2.83 per share, significantly

larger than the expected loss of $1.39 per share.[14]

       10.    On August 5, 2022, *Seeking Alpha* published an article titled "Bed Bath &

Beyond shares soar 30%+ amid suspected short-squeeze."[15]  On August 8, 2022, *Barrons.com*

reported:  "Bed Bath & Beyond, a former meme stock, appears to once again be a favorite of the

Reddit investing crowd.  With some 46% of the shares shorted, and a seemingly endless stream

of bad news souring sentiment on Wall Street, Bed Bath & Beyond looks like many other

---

11.    RC Ventures Schedule 13D, Amendment No. 1, March 25, 2022.  Prior to the agreement,
       BBBY's board of directors consisted of 11 members.  Mr. Cohen and RC Ventures were not
       required to vote on the board's nominated directors and recommended proposals if Glass Lewis, a
       proxy advisor company, recommended against them.  *Id.*
12.    RC Ventures Schedule 13D, Amendment No. 1, March 25, 2022.
13.    BBBY Schedule 14A, June 1, 2022 at 74.  BBBY Form 10-Q for the quarterly period ended May
       28, 2022 at 15; BBBY Form 10-Q for the quarterly period ended August 27, 2022 at 17 (stating
       that the repurchase program was completed in the first quarter of fiscal 2022).
14.    BBBY Form 8-K, June 29, 2022 (Earnings Press Release); "Bed Bath & Beyond Stock Slumps as
       CEO Steps Down and Loss Wider Than Expected," *Dow Jones Institutional News*, June 29, 2022,
       7:50 AM ET.
15.    "Bed Bath & Beyond shares soar 30%+ amid suspected short-squeeze," *Seeking Alpha*, August 5,
       2022, 12:01 PM ET.

unloved meme stocks that have been adopted by retail investors posting online in places like the Wall Street Bets subReddit."[16]

11.     On August 12, 2022, before market open, CNBC tweeted a link to its article titled "Loop Capital says Bed Bath & Beyond comeback doesn't make fundamental sense, stock headed to $1."[17]  At 10:42 AM ET, Mr. Cohen replied to the CNBC tweet with a tweet stating: "At least her cart is full 🙂."[18]  On August 15, 2022, after market close, Mr. Cohen and RC Ventures filed a Form 3 repeating that they owned 7,780,000 common shares of BBBY and beneficially owned 1,670,100 shares underlying call options.[19]  On August 16, 2022, before market open, Mr. Cohen and RC Ventures filed an amendment to their March 7, 2022 Schedule 13D reflecting that their equity stake in BBBY common stock had increased to 11.8% "solely due to a change in the number of outstanding Shares of the Issuer."[20]  On August 17, 2022, the SEC's website published RC Ventures' Form 144, dated August 16, 2022 indicating a "proposed sale" of its entire position in BBBY beginning August 16, 2022.[21]  On August 18, 2022, after market close, Mr. Cohen and RC Ventures filed a Schedule 13D amendment disclosing that on August 16 and 17, 2022 they had sold their entire position (both stock and options) in BBBY.[22]

---

16.     "Bed Bath & Beyond Stock Is Flying. Thank the Meme Trade," *Barron's Online*, August 8, 2022, 3:57 PM ET.

17.     CNBC, Twitter Post, August 12, 2022, 7:04 AM ET, available at https://twitter.com/CNBC/status/1558046723053953025 (accessed May 17, 2024).

18.     Ryan Cohen, Twitter Post, August 12, 2022, 10:42 AM ET, available at https://twitter.com/ryancohen/status/1558101541453795329?lang=en (accessed May 17, 2024).

19.     RC Ventures Form 3, August 15, 2022.  Note that these are the exact same positions previously reported in RC Ventures Schedule 13D, Amendment No. 1, March 25, 2022.

20.     RC Ventures Schedule 13D, Amendment No. 2, August 16, 2022. Note that this is the same ownership percentage that was disclosed in the June 1, 2022 Proxy filing by the Company.

21.     RC Ventures Form 144, August 16, 2022, available at https://www.sec.gov/files/forms-144-2022-08-16.zip.

22.     RC Ventures Schedule 13D, Amendment No. 3, August 18, 2022.  Mr. Cohen and RC Ventures sold 5,000,000 common shares on August 16, 2022 at an average price of $21.17, and 2,780,000 common shares on August 17, 2022 at an average price of $25.96.  They sold all 1,670,100 options on August 17, 2022 at an average price of $6.75.

## III.  ALLEGATIONS, ASSIGNMENT, AND SUMMARY OF CONCLUSIONS

12.     Bratya SPRL ("Plaintiff") filed a securities class action lawsuit seeking to recover

damages allegedly caused by Defendants Mr. Cohen, RC Ventures, BBBY, and Sue E. Gove[23]

on behalf of all persons who purchased or otherwise acquired BBBY's common stock and long

call options between August 12, 2022 and August 18, 2022 (the "Class Period").[24]  Specifically,

Plaintiff claims violations under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934

("Exchange Act") and Rule 10b-5 promulgated thereunder against all Defendants, as well as

under Sections 9(a), 9(f), and 20(A) of the Exchange Act against Mr. Cohen and RC Ventures.[25]

13.     Plaintiff alleges that, prior to selling their BBBY stock and options, Mr. Cohen

and RC Ventures received material non-public information about the Company's liquidity and

credit crises, and its inability to sell or spinoff buybuy BABY.[26]  Plaintiff further alleges that Mr.

Cohen engaged in a "pump-and-dump scheme," artificially inflating the price of BBBY's

common stock throughout the Class Period by publicly encouraging retail investors to buy shares

of BBBY by issuing misleading statements and SEC filings while he planned on selling RC

Ventures' equity stake and options.[27]

14.     In particular, Plaintiff alleges that Mr. Cohen's moon-emoji Twitter post on

August 12, 2022 (the "Tweet") and RC Ventures' amended Schedule 13D filed before market

---

23.     *In Re Bed Bath & Beyond Corporation Securities Litigation*, Case No. 1:22-cv-02541-TNM,
        Second Amended Class Action Complaint, January 30, 2023 ("SAC") at 1.  The claims against
        Ms. Gove were dismissed from the lawsuit, and the claims against BBBY were stayed pending
        bankruptcy.  *See In Re Bed Bath & Beyond Corporation Securities Litigation*, Case No. 1:22-cv-
        02541-TNM, Memorandum Opinion, July 27, 2023 at 1, 8, 9, & 20.
24.     SAC ¶ 1.  *In Re Bed Bath & Beyond Corporation Securities Litigation*, Case No. 1:22-cv-02541-
        TNM, Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative
        and Class Counsel ("Plaintiff's Memo") at ¶ 1.
25.     SAC ¶ 1.
26.     SAC ¶¶ 196, 233 & 240.
27.     SAC ¶¶ 8 & 31.

hours on August 16, 2022 inflated the price of BBBY's common stock and options.[28]  Plaintiff

further alleges that Mr. Cohen hid his intent to sell and his sales by (i) filing a Form 144

disclosing that he may sell his BBBY position via email on August 16, 2022, thereby delaying

public disclosure until after market close on August 17, 2022; [29] and (ii) failing to disclose in the

same Form 144 that he had already sold "substantial quantities" of common stock and options at

the time he signed the Form 144.[30]

15.    In support of its motion for class certification, Plaintiff has submitted the Expert

Report of Matthew D. Cain, Ph.D. dated February 15, 2024 ("Cain Report").[31]  Dr. Cain's

principal opinions are that (i) the markets for BBBY common stock and options were efficient

throughout the Class Period and (ii) damages can be "calculated on a class-wide basis subject to

standard, common methodologies for each of Plaintiffs' pending claims."[32]

16.    Dr. Cain's opinion of market efficiency for BBBY common stock is based on his

analysis of eleven factors, principally those described in the *Cammer* and *Krogman* cases, over

the period August 12, 2021 to August 18, 2022 (the "Cain Analysis Period").[33]  Among other

things, he opines that "[t]hough not necessary for a finding of market efficiency [under his

understanding of caselaw], the cause-and-effect relationship between new Company disclosures

and resulting Common Stock price movements (which [he] analyze[d] under the fifth *Cammer*

---

28.    SAC ¶¶ 8-9 & 162.
29.    SAC ¶ 10.
30.    SAC ¶ 174.
31.    *See* Exhibit A to Plaintiff's Memo.
32.    Cain Report ¶ 3.e.
33.    Cain Report ¶¶ 30 & 105.  The *Cammer* factors are Average Weekly Trading Volume, Analyst
       Coverage, Market Makers, SEC Form S-3 Filing Eligibility, and Cause and Effect Relationship
       Between Company Information and Stock Prices.  *Id.* ¶¶ 35, 40, 48, 54 & 57.  The additional
       factors (including the *Krogman* factors) are Market Capitalization, Bid-Ask Spread, Public Float,
       Institutional Ownership, Autocorrelation, and Active Options Trading.  *Id.* ¶¶ 79, 83, 88, 92, 95 &
       100.

factor) further demonstrates that BBBY Common Stock traded in an efficient market throughout the Class Period."[34]

17.     Dr. Cain notes that "the *Cammer* and *Krogman* factors are not relevant for gauging market efficiency of options markets," and concludes that the markets for BBBY's options were efficient in part because BBBY's common stock traded in an efficient market.[35]

18.     Dr. Cain also opines that he can apply the "out-of-pocket" methodology to estimate per-share damages class-wide for violations of Sections 9(a) and 10(b) of the Exchange Act in this matter.[36]  He states that "[t]his approach calculates damages formulaically as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale."[37]  Dr. Cain explains that "event studies" that "measure stock price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged material omissions and/or misrepresentations … are widely employed to calculate artificial inflation."[38]  He claims that the impact of "'confounding information' [i.e., 'non-fraud related factors'] on the price of BBBY securities can be determined on a common, class-wide basis using various accepted methodologies."[39, 40]

---

34.     Cain Report ¶ 3.c.
35.     Cain Report § VI.C. & ¶¶ 113-117.
36.     Cain Report ¶¶ 118-121.
37.     Cain Report ¶ 120.
38.     Cain Report ¶ 123.
39.     Cain Report ¶ 124.
40.     Dr. Cain also concludes that class-wide damages for violation of Section 20A of the Exchange Act can be measured based on the statutory provisions as (i) "losses avoided" from selling shares during the Class Period as opposed to selling shares after the relevant truth at the end of the Class Period; or (ii) "profits gained" in "causal connection with defendants' unlawful acts, including prejudgment interest in the losses avoided and profits gained calculation." Cain Report ¶¶ 134-135.  Dr. Cain notes that event studies also can be used to estimate alleged damages under Section 20A.  *Id.* ¶ 135 n.133.

19.     I have been asked by counsel for Mr. Cohen and RC Ventures to evaluate Plaintiff's claims in light of the relevant economic evidence and to review and respond to the Cain Report. Based on my review and analysis of the materials listed in **Appendix B**, I have reached the following principal conclusions:[41]

- There is no reliable basis to conclude that BBBY stock, and therefore options, traded in an efficient market during the Class Period.

- The Tweet that allegedly introduced artificial inflation into BBBY's stock did not impact its price.

- Individual inquiry is required because some, if not many, Class members did not rely on the integrity of the market prices.

- Dr. Cain's conclusions are fundamentally flawed and unreliable because he fails to account for the changed circumstances around the proposed Class Period.

I elaborate on and provide the bases for these opinions in the remainder of this report.

## IV.   THERE IS NO RELIABLE BASIS TO CONCLUDE THAT BBBY STOCK, AND THEREFORE OPTIONS, TRADED IN AN EFFICIENT MARKET DURING THE CLASS PERIOD

20.     A hallmark of market efficiency – regardless of how it is defined – is that stock prices reflect publicly available information, hence the only direct test of efficiency is whether prices can be shown to move following the release of new value-relevant information.[42]  As a corollary, prices are not expected to move substantially in the absence of new value-relevant information except in rare instances by chance.  While BBBY stock, like other stocks trading on national exchanges, may be efficient by this metric during most periods, this was not case for the

---

41.     My analysis in this report focuses on BBBY's stock.  Because BBBY's option prices are derivative of BBBY's stock prices, my opinions are equally applicable to BBBY's options.

42.     I note that in analyzing whether BBBY's stock price responded to new value-relevant information, Dr. Cain analyzes the Company's quarterly earnings announcements prior to the Class Period.  Cain Report ¶ 73.

stock leading up to and during the five-day Class Period when it was subject to a rumored short squeeze.

21.     Plaintiff acknowledges that this rumored short squeeze occurred but fails to analyze the implications of that recognition for market efficiency.  Moreover, as will be explained below in Section VII, Plaintiff's expert Dr. Cain failed to conduct any discrete analysis of market efficiency during the Class Period.[43]  The principal implications of the rumored short squeeze ignored by Plaintiff and Dr. Cain are that it:  (i) distorted BBBY stock prices and volatility in the absence of any new value-relevant information inconsistent with market efficiency; (ii) limited the ability of investors to short sell the stock during this period, which is necessary for market efficiency; and (iii) was understood to have only a temporary impact on BBBY stock prices inconsistent with the random walk necessary for market efficiency.

22.     Before discussing each of these implications in turn, I note that Professor Fama, a pioneer of the efficient market hypothesis for which he received the Nobel prize (and whose work is cited repeatedly by Dr. Cain[44]), opined that the market for another meme stock that was subject to a rumored short squeeze was *inefficient*:

> Perceptions are important when people act on them. If you were to look at, for example, GameStop, that's a clear case where, for a couple of days, the market was inefficient. You take a tiny stock and people start piling in. Well, finance is no different from any other branch of economics.  It's all supply and demand.  If the demand goes crazy, the price can go crazy — temporarily.[45]

---

43.     Plaintiff relied on Dr. Cain to "show[] that BBBY's common stock reacted to Company-specific news in a manner expected in an efficient market," but Dr. Cain in fact did not include in his report any analysis of any of the price movements during the Class Period.  Plaintiff's Memo at 16.

44.     Cain Report ¶¶ 23 & 60.

45.     "Nobel winner Eugene Fama on GameStop, market bubbles and why indexing is king," *MarketWatch*, March 3, 2021, last updated 2:01 PM ET.

**A. Price Movements Leading up to and During the Five-Day Class Period Were Distorted Because of a Rumored Short Squeeze**

23.     In the days leading up to the Class Period, BBBY's closing stock prices increased by 111%, rising from $5.03 on the last trading day in July to $10.63 on August 11, 2022; in fact, it increased almost 40% on August 8, 2022 alone.[46]  As shown in the chart below, this price change was far in excess of the return experienced by either the market or BBBY's benchmark industry over the same time period.[47]



**Stock Price Change from Market Close on July 29, 2022 to Market Close on August 11, 2022**

Source: Bloomberg L.P.

---

46.     Bloomberg, L.P.
47.     *See* 2022 10-K at 25.

11

24.     As demonstrated by the following charts, these price distortions were temporary and contemporaneous with a corresponding spike in trading volume as well as a substantial increase in option implied volatility.[48]



**Closing Stock Price and Daily Trading Volume**
**August 1, 2021 - September 30, 2022**

Notes & Source: Shaded region indicates August 2022. Data per Bloomberg L.P.

---

48.     *See e.g.,* Berk, Jonathan and Peter DeMarzo, *Corporate Finance*, 5th Ed. (Pearson 2020) at 810 ("[O]ne parameter, σ, the volatility of the stock price, is not directly observable. Practitioners use two strategies to estimate the value of this variable. The first, most straightforward approach is to use historical data on daily stock returns to estimate the volatility of the stock over the past several months. Because volatility tends to be persistent, such estimates can provide a reasonable forecast for the stock's volatility in the near future. The second approach is to use the current market prices of traded options to 'back out' the volatility that is consistent with these prices based on the Black-Scholes formula. An estimate of a stock's volatility that is implied by an option's price is known as an implied volatility."); Chen, Sipeng and Gang Li, "Why does option-implied volatility forecast realized volatility? Evidence from news events," 156 *Journal of Banking and Finance* (2023) at 1 ("Chen and Li (2023)") ("Numerous studies suggest that the volatility implied from option prices offers a more efficient forecast of future stock volatility compared with alternative approaches, such as historical volatility and model-based methods.  In other words, option prices subsume the information contained in other forecasting variables.").

**Closing Stock Price and Option Implied Volatility**
**August 1, 2021 - September 30, 2022**



Notes & Source: The historical put implied volatility is calculated by Bloomberg as the at the money put implied volatility of the first listed expiry that is at least 20 business days out from the respective date, based on the Listed Implied Volatility Engine (LIVE) calculator. Shaded region indicates August 2022. Per Bloomberg L.P.

As shown, these trends, including the upward price move, began before and continued during the Class Period.

25.     However, the Company did not issue any press releases, hold conference calls, or otherwise provide new value-relevant information to the market during the period when this increase occurred, let alone information that would cause the market to value BBBY by *more than twice* what it had several days earlier.  We did not find any news that could explain this rise in the Company's stock price.  Instead, we found market commentary pointing out the substantial price increase in the absence of new value relevant information that could explain it.  For example:

- Pandemic darling Bed Bath & Beyond Inc., not part of the index [Roundhill Solactive Meme Index] but another notorious favorite of meme-driven investors, rocketed 40% Monday.  The struggling retailer has been mired in a deep sales

13

slump and has had no corporate development that may seemingly move shares. But that didn't stop the home-goods store from climbing for a ninth straight session.[49]

- Meme stocks have enjoyed something of a renaissance in recent days.  A prime example is Bed Bath & Beyond Inc., which soared as much as 75% between Friday and early Tuesday for no apparent reason.[50]

- "There isn't a fundamental reason for a lot of these price moves [large stock price movements in meme stocks including Bed Bath & Beyond]," [Managing Director at S3 Partners Ihor] Dusaniwsky told the Guardian.  "A lot of it is fomo [fear of missing out] on the rally."[51]

26.    Unable to find value-relevant information to explain the price increase, market commentators at the time attributed BBBY's upward movement to a rumored short squeeze.[52] For example:

- Bed Bath & Beyond shares soar 30%+ amid suspected short squeeze.[53]

- Bed Bath & Beyond stock has jumped over 70% over the past several trading days, which we believe has been driven by a "meme stock-driven" short squeeze as opposed to any significant fundamental catalyst.[54]

27.    Market commentators also noted that this trend of upward price movements absent any company news was likely attributable to a rumored short squeeze that continued during the Class Period.  For example:

- In recent weeks, it's caught the attention of loosely organized traders on Reddit and elsewhere on the Internet, who have sent the stock soaring more than 400%

---

49.    "Post-Pandemic Meets Postwar Era on a Blind Curve: John Authers," *Bloomberg Opinion,* August 9, 2022, 12:37 AM ET.

50.    "Meme-Stock War Is Hedge Fund Versus Hedge Fund: Jared Dillian," *Bloomberg Opinion*, August 10, 2022, 8:30 AM ET.

51.    "Winning bets? Meme stock frenzy of 2021 makes a return," *The Guardian*, August 13, 2022, 3:01 AM ET.

52.    Plaintiff acknowledges that BBBY's stock was subject to a short squeeze that started prior to the Class Period.  *See* SAC ¶¶ 24-28.

53.    "Bed Bath & Beyond shares soar 30%+ amid suspected short-squeeze," *Seeking Alpha*, August 5, 2022, 12:01 PM ET.

54.    "Maintain Sell Rating As Meme Stock Short Squeeze Doesn't Alter Fundamental View," *Loop Capital*, August 12, 2022.

from July lows, similarly befuddling trading action that's previously been seen in shares of AMC Entertainment Holdings Inc. and GameStop Corp.[55]

- Bed Bath & Beyond stock has exploded. Since the start of the month, shares in the company rose more than 300%. On Wednesday alone, the stock soared 11.8% on heavy volume. Analysts attribute the rise in stock price to the meme stock craze in which retail investors drive up the share price in order to force hedge funds who have shorted the stock to either cut their losses and sell or buy up more shares - thus inflating the stock price further.[56]

- Bed Bath & Beyond stock rose about 360% between then [June 29] and Aug. 17, with little in the way of news to propel the shares. In fact, few traditional buy and sell signals used by both value and growth investors -- from the prices of company bonds and insider buying of stock to management turnover -- seem to work once shares are caught up in a meme-stock frenzy.[57]

28.　　The large stock price increase in the absence of new value-relevant information suggests that if the market was efficient on the last trading day in July when the price was $5.03, it was not efficient by August 11, 2022 when the price was $10.63. As described in the next section, this anomaly can be explained by the rumored short squeeze when conditions curtailed the ability of short sellers to act on an inefficiently priced stock.

### B. The Unconstrained Ability to Sell Short Is Necessary for Market Efficiency

29.　　In a well-functioning market, i.e., where there are no short sale constraints, the price of a stock reflects the consensus view of market participants about the value of the security based on the available public information about the issuer's prospects. Market participants who expect the stock price to increase can trade on information by purchasing the security while

---

55.　"DISTRESSED DAILY: Memestock Traders Help Bed Bath & Beyond Bonds," *Bloomberg First Word*, August 18, 2022, 8:13 AM ET.

56.　"Bed Bath & Beyond success College kid's $110M 'meme stock' win," *New York Post*, August 19, 2022.

57.　"What the Bed Bath & Beyond Trade Says About Meme Stocks -- Barrons.com," *Dow Jones Institutional News*, August 19, 2022, 1:52 PM ET.

market participants who do not own the stock but believe that it is overvalued can short it.[58]
Consequently, the absence of short sale constraints allows market prices to incorporate bullish as
well as bearish views about a company's prospects and market valuation into its stock price
through the trading activity of the investors who hold these views, allowing the price to reflect
the market consensus view of the value of all publicly available information.[59]

30.     Short sale constraints impede price discovery by preventing market participants
with bearish views about a company's prospects and market valuation to trade on those views.
These constraints can occur when there is a lack of sufficient shares available to borrow for
shorting and/or the costs of borrowing are prohibitively expensive.[60]  Consequently, as
recognized in the academic literature, prices of stocks subject to short sale constraints do not
reflect the consensus view of market participants.[61]  As one academic study summarizes, "[a]

---

[58].    Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments*, 10th Ed. (McGraw-Hill Education 2014) at 80 ("An investor borrows a share of stock from a broker and sells it.  Later, the short-seller must purchase a share of the same stock in order to replace the share that was borrowed…The short-seller anticipates the stock price will fall, so that the share can be purchased later at a lower price than it initially sold for; if so, the short-seller will reap a profit.").

[59].    Note that there are a number of costs and risks associated with short selling, including (i) the cost to borrow shares; (ii) the risk that a lender recalls the borrowed security forcing the borrower to locate other shares to borrow or cover the short position if there are no or very limited shares to borrow; (iii) the risk of potentially unlimited (temporary or permanent) losses as a result of sharp increases in the stock price; and (iv) the risk of being forced to cover a short position as a result of insufficient funds to post collateral or margin after price increases (including when the investor was correct and the price eventually declines). *See e.g.,* Engelberg, Joseph E., Adam V. Reed, and Matthew C. Ringgenberg, "Short-Selling Risk," 73 *Journal of Finance* (2018); Fabozzi, Frank J, *Short Selling Strategies, Risks, and Rewards,* 2nd Ed. (John Wiley & Sons, Inc. 2004) at pp. 13-16.

[60].    Short sellers are one type of arbitrageur in that they seek to profit from securities they view as overvalued.  As noted in Cain Report ¶ 53 n.53, the presence of arbitrageurs is part of the concept behind one of the *Cammer* factors.

[61].    *See, e.g.*, Miller, Edward M., "Risk, Uncertainty, and Divergence of Opinion," 32 *The Journal of Finance* (1977), and Jones, Charles M. and Owen A. Lamont, "Short-sale constraints and stock returns," 66 *Journal of Financial Economics* (2002), among others.

key insight from these studies is that when short constraints are binding, the underlying stock will be over-priced, and subsequent returns will be low."[62]

31.     Market evidence indicates that the ability to short BBBY stock was constrained leading up to and during the Class Period, thus providing conditions under which a short squeeze could occur.  The chart below documents the stock's short interest utilization, a metric that measures the number of shares that are sold short as a percentage of the shares available to borrow.[63]  As the chart shows, starting in July 2022 and continuing through the Class Period, BBBY's short interest utilization was at or near 100%, meaning that there were very few if any additional shares available to borrow and sell short.  For the reasons stated above, this constraint on short selling is inconsistent with market efficiency.

---

62.     Beneish, M.D., C.M.C. Lee, and D.C. Nichols, "In short supply: Short-sellers and stock returns." 60 *Journal of Accounting and Economics* (2015) at 35 ("Beneish (2015)").  One famous example of mispricing due to short sale constraints involves Palm and 3Com.  3Com owned Palm and sold 5% to the public and retained 95% which it planned to give to 3Com shareholders such that they would receive 1.5 shares of Palm for each share of 3Com they owned.  This would imply that a share of 3Com should be worth at least 1.5 shares of Palm.  Yet on the day of the IPO Palm closed at $95.06 per share while 3Com closed at $81.81 per share.  The mispricing was widely publicized, yet persisted for months due to the lack of availability of shares to short Palm.  *See* Lamont, Owen A. and Richard H. Thaler, "Can the Market Add and Subtract?  Mispricing in Tech Stock Carve-Outs," 111 *Journal of Political Economy* (2003) at 265 ("[I]n this case any investor who can multiply by 1.5 should be able to tell that Palm is overpriced relative to 3Com. The evidence from options markets shows that these stocks were unambiguously overpriced, and it is difficult to explain why in equilibrium anyone would own these shares. The mispricing persisted because of the sluggish functioning of the shorting market.").

63.     *See e.g.,* Ramachandran, Lakshmi Shankar and Jitendra Tayal, "Mispricing, short-sale constraints, and the cross section of option returns," 141 *Journal of Financial Economics* (2021). I note that not all shares outstanding are made available to be shorted.

### Short Interest Utilization
### August 1, 2021 - September 30, 2022



Notes & Source: Short interest utilization is calculated as the ratio between the number of shares on loan to the number of shares available for lending. Shaded region indicates August 2022. Data per Nasdaq FIS Astec Analytics Short Lending Data (SLD).

### C. Price Movements Understood to Be Temporary Are Inconsistent with a Random Walk Necessary for Market Efficiency

32.     As discussed above, market evidence supports the view expressed in the contemporaneous news that the distortion of BBBY's price prior to the Class Period was likely the result of a rumored short squeeze.[64]  A "short squeeze" like the one suspected by market commentators for BBBY stock before and during the Class Period is a form of market manipulation that results in a temporary distortion of market prices and causes them to no longer reflect value-relevant information in an efficient manner.[65]  So-called "meme" stocks, like

---

64.     Plaintiff also acknowledges that a rumored short squeeze started prior to the Class Period.  *See* SAC ¶¶ 24-28.

65.     *See infra* ¶ 44.

BBBY, are subject to short squeezes under certain conditions, which can flare up unexpectedly due to chatter on social media.[66]

33.    The economic literature establishes that short squeezes are typically brief and end with a sharp price decline.[67]  For example, one article references a study of short squeezes between 2008 and 2021 and notes that "[s]hort squeezes typically don't last long…. The average short squeeze in this data set lasted approximately 12 days from the onset to the peak," and that "[w]hen a short squeeze eventually exhausts itself, the stock price typically declines by -50% [sic] within the next 3-4 days."[68]

34.    During the run-up in BBBY's stock price in August 2022, market commentators anticipated that the price increases would be temporary and followed by sharp price declines. For example:

- Shares of Bed Bath & Beyond Inc [sic] jumped 39.0% on Monday as retail investors flocked to the highly shorted stock of the home goods maker, likely piling pressure on those with bearish bets on it. "We do believe there is currently a short squeeze playing out in BBBY," said Evan Niu, analyst at Ortex, adding that 45% of the firm's free float was shorted…. "These types of extremely large moves are outliers but they do happen time and time again," said Adam Sarhan,

---

66.    *See infra* ¶ 44.

67.    *See e.g.,* Adair, Troy and John R. Nofsinger, *Foundations of Investments*, (Cengage 2024) at 563 ("The rise of the retail meme stock investors in 2021 shows another way to use short-sale interest. These investors identified stocks with very high short interest and then tried to squeeze the short sellers by buying the stock and pressuring it to rise in price. This is known as a short squeeze. As the price rises, short sellers lose money. Eventually, some of them will start buying the stock to close their short position, causing even further prices increases. That squeezes the remaining short seller [sic] even more. This cycle can create a dramatic, though usually temporary, price increase."); DeRosa, David, "Bursting the Bubble. Rationality in a Seemingly Irrational Market." *CFA Institute Research Foundation* (2021) at 13-14 ("[A] successful squeeze could cause the share price to violently but temporarily rise to levels otherwise thought unachievable. More to our point, such a successful squeeze would violate fundamental valuation and may contradict other neoclassical postulates but only for a brief period of time… the squeeze could drive up the share price to seemingly crazy levels. We do not see this as a regular feature of stock price behavior, and when it happens it is not permanent.").

68.    "When Will The Ride End? Analyzing GameStop Short Squeeze By Looking At History," *Seeking Alpha*, February 1, 2021, 10:35 AM ET.

chief executive officer at 50 Park Investments. "But most of the time these exaggerated moves are short-lived and the stocks tend to go back down."[69]

- When a little-known company's stock witnesses an unimaginable price for no apparent reason and has a large investor's interest, it's a perfect case of a meme stock. But, with the speed with which the price of these stocks goes up, the fall in share price in them is equally stronger …. A few recent additions to the meme stock list could be the stocks of AMTD Digital (HKD) and Bed, Bath and Beyond (BBBY).[70]

35.    Price increases that are known to be temporary and inevitably followed by price declines, such as the rumored short squeeze which distorted BBBY's share price leading up to and during the Class Period, are inconsistent with a random walk required for market efficiency. As discussed in a widely used textbook:

> One implication of the efficient markets hypothesis is that stock prices should follow a random walk. This means that changes in stock prices are impossible to predict from available information. If, based on publicly available information, a person could predict that a stock price would rise by 10 percent tomorrow, then the stock market must be failing to incorporate that information today. According to this theory, the only thing that can move stock prices is news that changes the market's perception of the company's value. But news must be unpredictable otherwise, it wouldn't really be news. For the same reason, changes in stock prices should be unpredictable.[71]

For this and all the reasons stated above, there is no reasonable basis to conclude that BBBY stock, and therefore options, traded in an efficient market during the Class Period.

## V.    THE TWEET THAT ALLEGEDLY INTRODUCED ARTIFICIAL INFLATION INTO BBBY'S STOCK DID NOT IMPACT ITS PRICE

36.    In the previous section I discussed a number of reasons why there is no reliable basis to conclude that BBBY's stock traded in an efficient market during the Class Period due to the highly unusual conditions leading up to and during the Class Period. Despite acknowledging

---

69.    "Bed Bath & Beyond jumps as retail investors chase highly shorted stocks," *Reuters News*, August 8, 2022, 11:01 AM ET.

70.    "Meme Stocks Phenomenon: Bed, Bath and Beyond & other stocks that more than doubled money in quick-time," *Financial Express Online*, August 13, 2022, 8:50 AM ET.

71.    Mankiw, N. Gregory, *Principles of Economics*, 8th Ed. (Cengage Learning 2018) at 572.

these highly unusual circumstances and failing to provide any direct evidence that the stock price reacted to new value-relevant information in this environment during the Class Period, Plaintiff alleges that the Tweet was the beginning of a "pump-and-dump scheme" by artificially inflating BBBY's stock price.[72]  In this section, I demonstrate that this allegation is contradicted by the economic evidence.  For the reasons explained below, the Tweet cannot be characterized as a "pump" because of the absence of any scientific and reliable evidence of a price reaction.[73]  And if the Tweet did not constitute a "pump," then subsequent disclosures which are alleged to correct that Tweet also cannot be understood to constitute a "dump."

### A. Event Study Analysis Demonstrates that There Is No Scientific and Reliable Basis to Establish That BBBY's Stock Price Increased Following Mr. Cohen's Tweet on August 12, 2022

37.    The accepted method to test whether a stock price was impacted by information is to perform an event study.[74]  Event study analysis is a statistical method commonly used in financial economics to measure the impact of events on stock prices (e.g., to test if BBBY's stock prices reacted to new potentially value-relevant information).[75]  It is standard practice in event studies to take into account the effect of market factors on stock price changes (or "returns"), which is typically done by: (i) estimating the relationship between changes in a company's stock price and changes in the performance of a market and/or industry index; (ii)

---

72.    SAC ¶¶ 8-9, 31-33 & 147-153; Plaintiff's Memo at 3.
73.    *See infra* ¶ 39.
74.    I discuss the uses of event study methodology in securities litigation in my article "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," 38 *The Business Lawyer* (1982).
75.    *See, e.g.*, Fama, Eugene F., et al., "The Adjustment of Stock Prices to New Information." 10 *International Economic Review* (1969); MacKinlay, A. Craig, "Event Studies in Economics and Finance." 35 *Journal of Economic Literature* (1997); Tabak, David and Frederick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom." *Litigation Services Handbook: The Role of the Financial Expert,* Weil, Roman L. et al. eds., 3rd Ed. (John Wiley & Sons 2001) at Chapter 19.

using this relationship and the actual performance of the market and/or industry index on the day

or days in question to calculate an expected return; and (iii) subtracting the expected return from

the actual return to derive a residual return.[76, 77]

38.     A key factor in an event study is the selection of the estimation period.  An

estimation period underlying an event study analysis determines, among other things, the normal

volatility of a stock's residual returns and assumes that this volatility is stationary during the

event being analyzed, i.e., the volatility does not change.[78]  As shown in the chart in the previous

---

[76]    The residual return is a "direct measure of the (unexpected) change in securityholder wealth associated with the event." Kothari, Sagar P., and Jerold B. Warner. "Econometrics of Event Studies," *Handbook of Empirical Corporate Finance* (Elsevier 2007) at 9.  When performing event studies, the conventional practice in finance is to test the "null hypothesis" that the residual return is zero against either the alternative hypothesis that the residual return is different from zero, or the alternative hypothesis that the residual has a particular sign (i.e., positive or negative). If the null hypothesis is rejected at conventional levels of significance, then the residual returns are considered to be statistically significant, i.e., they are considered to be significantly different from zero.  Under these circumstances, one can conclude that the observed stock return on a particular date cannot be fully explained by the independent variable(s) considered in the estimation model and/or the stock's volatility and is likely attributable to the firm-specific events which occurred on that date.  *See, e.g.*, Mendenhall, William, James E. Reinmuth and Robert J. Beaver. *Statistics for Management and Economics*. 7th Ed. (Duxbury Press 1993) at 327.

[77]    The statistical significance of the residual returns is typically assessed by calculating a standardized measure of the size of the residual return known as a "t-statistic."  A t-statistic with an absolute value of 1.96 or greater denotes statistical significance at the five percent level of significance in a "two-tailed" test of statistical significance (i.e., testing whether the residual return is significantly different from zero in either direction), while a t-statistic with an absolute value of 1.65 or greater denotes statistical significance at the five percent level of significance in a "one-tailed" test of statistical significance (i.e., testing whether the residual return is significantly different from zero in a particular direction) and the ten percent level in a "two-tailed" test of statistical significance.  *See, e.g.*, Mendenhall, William, James E. Reinmuth and Robert J. Beaver. *Statistics for Management and Economics*. 7th Ed. (Duxbury Press 1993) at 330-331, 345-346; MacKinlay, A. Craig, "Event Studies in Economics and Finance," 35 *Journal of Economic Literature* (1997); Schwert, G. William. "Using Financial Data to Measure Effects of Regulation," 24 *The Journal of Law and Economics* (1981); Fischel, Daniel R., "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," 38 *The Business Lawyer* (1982) at 18-19.

[78]    *See, e.g.,* Feinstein, Steven P. and O. Miguel Villanueva, "Securities Litigation Event Studies in the Covid Volatility Regime," *Journal of Forensic Economics* (2022) at 3 ("To produce reliable results and valid inferences, however, the t-test requires that the volatility of the residual returns estimated by the linear regression in the pre-event estimation period, equals the volatility of the

section, BBBY's option implied volatility substantially increased leading up to the Class Period

and remained elevated during the month of August 2022.[79]  The short-lived nature of these

highly unusual circumstances presents a challenge in selecting the appropriate estimation period.

While one wants to select a period in which the volatility and the relationship between the

stock's returns and the market and/or industry index returns are similar to those during which the

event at issue occurred,[80] it is also important that the estimation period is long enough to capture

---

residual returns in the subsequent out-of-sample event period. A spike in volatility at the outset of the period in which the important case events reside can render the standard event study methodology unreliable."); Gold, Kevin L., Eric Korman, and Ahmer Nabi, "Federal Securities Acts and Areas of Expert Analysis," in *Litigation Services Handbook: The Role of the Financial Expert*, 6th Ed., Weil, Roman L. et al., eds. (John Wiley & Sons 2017) at n. 71  ("It is important that the underlying properties of the model (that is, the coefficients and standard error) be similar during the estimation and event periods (see, for example, John Binder, "The Event Study Methodology since 1969," *Review of Quantitative Finance and Accounting*, 1998, p. 113), which states that "[i]t is assumed that the coefficients are constant during the estimation and event periods." The security price's sensitivity to the market (that is, its beta) during the estimation period of the event study model should be similar to its sensitivity during the event period. Otherwise, the benchmark daily returns may be based on a relationship between the security and the market that no longer holds true during the event period, which could introduce bias into estimated abnormal returns.").

79. *See e.g.,* Berk, Jonathan and Peter DeMarzo, *Corporate Finance*, 5th Ed. (Pearson Education 2020) at 810 ("[O]ne parameter, σ, the volatility of the stock price, is not directly observable. Practitioners use two strategies to estimate the value of this variable. The first, most straightforward approach is to use historical data on daily stock returns to estimate the volatility of the stock over the past several months. Because volatility tends to be persistent, such estimates can provide a reasonable forecast for the stock's volatility in the near future. The second approach is to use the current market prices of traded options to 'back out' the volatility that is consistent with these prices based on the Black-Scholes formula. An estimate of a stock's volatility that is implied by an option's price is known as an implied volatility."); Chen & Li (2023) at 1 ("Numerous studies suggest that the volatility implied from option prices offers a more efficient forecast of future stock volatility compared with alternative approaches, such as historical volatility and model-based methods. In other words, option prices subsume the information contained in other forecasting variables.").

80. Peterson, Pamela P., "Event Studies: A Review of Issues and Methodology," 28 *Quarterly Journal of Business and Economics* (1989) at 37-38 ("For applications in which the determinants of the normal return are not expected to change due to the event, an estimation period typically is chosen prior to the event period.  For applications in which these determinants are expected to change due to the event (e.g., arising from capital structure changes), the estimation period may follow the event or represent some form of average of pre- and post-event period information."); Henderson, Jr., Glenn V., "Problems and Solutions in Conducting Event Studies," 57 *The Journal*

a sufficient sample of the stock's movements.  To balance these factors, I selected a 40-day period starting on August 1, 2022 as my estimation period,[81] and estimated the relationship between BBBY's stock price and the S&P 500 Index and the S&P 500 Specialty Retail Industry Index, which are the indices to which BBBY compared its stock price performance.[82]

39.     My event study finds that the residual return on August 12, 2022 is not statistically significant because the t-statistic is only 1.06.[83]  Consequently, there is no reliable, scientific evidence that the stock price movement on this day is distinguishable from zero during this period of heightened volatility, hence there is no reliable, scientific evidence that the Tweet actually "pumped" up BBBY's stock price and introduced artificial price inflation into it.

40.     But even if the price increase was statistically significant, it would still be necessary to determine whether the Tweet that occurred on that day was responsible for any price increase on that day.  For that reason, I also examined the intraday price movement of BBBY stock on August 12, 2022.  If the market was efficient and the Tweet "pumped" up the stock as Plaintiff claims, I would expect to see a marked increase in the price following the Tweet.  Instead, as shown in the chart below, the stock price had begun rising shortly after the

---

*of Risk and Insurance* (1990) at 291-292 ("There are essentially four choices for the estimation period:  before the event window, during the window, after the window, and around the window.  The majority of events studies use an estimation period before the event… A strong case can be made for a post-event estimation period if the event is expected fundamentally to alter the firms' sensitivity to market returns.  If the event is important enough to change alpha and beta, then values from before the event are not appropriate.  Evidence of alpha or beta changes may be used as evidence of an event… If there is evidence or reason to question parameter stability, then a post-event estimation period may be appropriate.").  Evidence of beta changes are presented in Cain Report, Exhibit 4.

81.     I understand that Dr. Cain has also used a 40-day estimation period in prior event study analysis.

82.     *See* 2022 10-K at 25.

83.     The t-statistic on August 12, 2022 is calculated as the residual return divided by the standard error of the residual value; in this instance, $14.47\% / 13.62\% = 1.06$.  As a robustness check of the results, we also used an estimation period of 20 days before the beginning of the Class Period and 20 days after August 19, 2022, thereby removing the Class Period and associated days entirely from the analysis. We again find that the residual return on August 12, 2022 is not statistically significant, with an associated t-statistic of only 1.36.

24

market opened and continued to rise at approximately the same gradual pace after the Tweet was issued. Consequently, the pre-existing rumored short squeeze provides a better explanation than the Tweet for the observed price increase on August 12, 2022 (which, again, is not statistically different from zero because of the increased price volatility in August 2022).



### Intraday Stock Price and Trading Volume
### August 12, 2022



Sources: Tick Data, LLC; U.S. Stock and Index Databases ©2024 Center for Research in Security Prices (CRSP), The University of Chicago Booth School of Business.

41. The results of the above analyses contradict Plaintiff's allegation that the Tweet artificially "pumped" up BBBY's stock price. If it had caused an increase, I would expect to observe a statistically significant price increase associated with it. Alternatively, consistent with my conclusion above regarding the lack of efficiency of the market for BBBY stock during the Class Period, my event study result further demonstrates that the market for BBBY stock was not

efficient during this period.[84]  It is entirely possible that both are true – the market for BBBY

stock was not efficient and the Tweet had no impact on the stock price.

### B. Contemporaneous Market Commentary Does Not Attribute a Price Movement to the Tweet

42.     To further test the results of my finding that the Tweet had no impact on BBBY's

stock price, we also reviewed financial news articles about the Company available from

Bloomberg, Factiva and *Seeking Alpha* as well as analyst reports dated from August 12, 2022

through August 15, 2022, the following trading day.  We found none that attributed the stock's

price increase on August 12, 2022 to the Tweet, consistent with the findings above.

## VI.  INDIVIDUAL INQUIRY IS REQUIRED BECAUSE SOME, IF NOT MANY, CLASS MEMBERS DID NOT RELY ON THE INTEGRITY OF THE MARKET PRICE

43.     In my experience, plaintiffs in securities fraud class actions can avoid having to

demonstrate actual reliance on the alleged false or misleading statements or other alleged

misconduct on an individualized basis if they can invoke a presumption that they made their

investment decisions by relying on the integrity of the market price in an efficient market.  In this

case, however, some, perhaps many potential Class Members in all likelihood made their

investment decisions based on a belief of an inefficient market for reasons unrelated – and often

contrary – to a belief in the integrity of the market price as reflecting the true value of BBBY

stock.  This reality makes it impossible for Plaintiff to demonstrate that potential Class Members

are entitled to the presumption that they relied on the integrity of the market price on a class-

wide basis.  Whether potential Class Members did or did not rely on the integrity of the market

---

84.     As Dr. Cain himself states, "[I]f a short squeeze caused BBBY's stock to no longer be informationally efficient, I would expect to observe the absence of any relation between relevant news and corresponding stock price movements." Cain Report ¶ 105.

price in making their investment decisions can therefore only be determined on an individualized basis.

**A. The Economic Literature Recognizes That Short Squeezes Are a Form of Market Manipulation Divorced from Reliance on the Integrity of the Market Price**

44.     The economic literature recognizes that short squeezes are a form of "market manipulation."  For example, Putniņš (2012) states: "'Corners' and 'squeezes' are techniques in which the manipulator secures a controlling position in the supply of an asset and/or derivative contract.  The manipulator then uses this position to manipulate the price by exploiting investors that need the underlying asset to close out short positions."[85]  Similarly, Harris (2003) comments: "Squeezers are parasitic traders because they design trading strategies that profit only when they can exploit other traders.  Their manipulations make prices less informative, and their trades greatly increase transaction costs for other traders."[86]  Moreover, Costola, Iacopini and Santagiustina (2021) investigates meme stocks in particular and finds "the 'mementum', or meme period, of stocks, that is, the momentum when synchronized buying signals that originate on social media have an effect on a stock's price and trading volume… can be counted as a market manipulation strategy.... The meme-based coordination mechanisms originated in social media allow small investors to act as a single large trader, able to successfully manipulate prices."[87]

---

85.     Putniņš (2012) at 956.
86.     Harris, Larry, *Trading and Exchanges – Market Microstructure for Practitioners* (Oxford University Press, 2003) at 256.  Another article states that if a heavily shorted stock experiences a price increase for any reason, "it can quickly turn into a buying frenzy as the short sellers trip over one another to buy the shares…Panic-buying begets more panic-buying, egged on by speculators who *know* the situation the short sellers are in and actively try to put the screws to them.  This is a short squeeze in action.  And it's exactly what happened in the shares of GameStop."  (Emphasis in original.)  *See* "What Exactly Is a Short Squeeze?" *Kiplinger.com*, January 28, 2021.
87.     Costola, Iacopini and Santagiustina (2021) at 1 & 6.

45.     As demonstrated below, commentary from potential class members suggests that some, if not many, who were purchasing BBBY shares during the Class Period were doing so in the hopes of manipulating BBBY's share price higher to create a short squeeze.  This has important implications for determining whether potential Class members relied on the integrity of the market price in an efficient market on a class-wide basis.

**B.  Commentary from Potential Class Members Demonstrates that Some, if Not Many, Potential Class Members Did Not Rely Upon the Integrity of the Market Price**

46.     During the period leading up to and throughout the Class Period, there was evidence of extreme social media enthusiasm on the Reddit platform for retail investors to participate in a BBBY short squeeze.  For example, retail investors posted:

- "BBBY 30% short float let's squeeze em. Really cheap stock market cap at 450MM."[88]

- "Happy you're eyeing $bbby, but it isn't a pump and dump. Those here believe it's massively undervalued and Gamma and short squeeze are catalyst to help Ignite that."[89]

- "In this very extreme example, if the short sellers got margin called then they would need to either buy back the share it's declare bankruptcy. But the reality is that most of the hedge funds taking short positions have wayyyy too much capital to worry about margin calls and will end up getting stopped out anyway. Even GME, which was the craziest thing to happen in years, only managed to take out a small hedge fund.

  BBBY is a risky play but it could very well pay off (and already has for a lot of people). Retail buying pressure is through the roof and the shorts who haven't covered yet will probably be forced to buy back if the price continues to rise rapidly. The big risk is that a major institutional investor or two decides to dump. Market makers have definitely caught on as well and they have a lot of tools at their disposal to prevent a squeeze. I just really don't like it when people who don't know shit about the stock market start screeching about naked shorts and crime the second they see a number that doesn't make sense to them.

---

88.     2022-08-05 08:59:09 ET WallStreetBets Subreddit post by user: Piano-Calm (accessed May 17, 2024).
89.     2022-08-05 09:14:11 ET WallStreetBets Subreddit post by user: lil_Dik_ThRoBn_stock (accessed May 17, 2024).

28

Also shorting in general absolutely needs to be legal. It's essential in order for markets to fairly price stocks."[90]

- "I heard BBBY is about to go to moon, let's gamble that remaining 2625.02. U either win everything back or leave this sub with $0 balance."[91]

- "Just in time to yolo it in the BBBY squeeze 🚀 🤑."[92]

- "I'm seriously thinking this could be much bigger than GME short squeeze. These yolos are insane and BBBY is just getting started. Plus the fact this sub now has like X5 the members since GME squeeze 2021 January. Could just keep going parabolic!!! Buy and hold! Buy any dip! Keep it up Apes!!! ❤️ 💎 🙌."[93]

- "Why is everyone freaking out about Cohen selling? He never had anything to do with this movement. The stock was heavily shorted in the $5-9 range and hedge fund brokers are sitting on hundreds of millions of dollars in losses and paying interest on it everyday. Last indicator I saw was 55% of the float was shorted as of yesterday. This was always the play and with the amount of option activity going on there is a real opportunity for a GAMMA ringer. Cohen selling changes none of this. Stay the course Apes!"[94]

47.     As the quotes above make clear, some and perhaps many market participants (i.e. potential Class members), may not have been buying in reliance of the integrity of the market price of BBBY but rather may have been buying in reliance on a *lack of integrity* in the market price, purchasing at inflated prices in the hope of being able to sell at even higher prices.[95]

---

90.     2022-08-06 00:29:27 ET WallStreetBets Subreddit post by user: [deleted user] (accessed May 17, 2024).

91.     2022-08-06 19:52:40 ET WallStreetBets Subreddit post by user: hitpopking (accessed May 17, 2024).

92.     2022-08-12 16:02:58 ET WallStreetBets Subreddit post by user: NitrousXpress (accessed May 17, 2024).

93.     2022-08-12 19:10:51 ET WallStreetBets Subreddit post by user: spicy_chimp5 (accessed May 17, 2024).

94.     2022-08-18 16:46:54 ET WallStreetBets Subreddit post by user: BIRDZILLA26 (accessed May 17, 2024).

95.     "Here's What Investment Gurus Including Michael Steinhardt And Jeremy Siegel Say About The Meme Stock Bubble," *Forbes*, January 31, 2021 ("GameStop is nowhere near worth what it was trading at [in January 2021] but it's a perfect example of the greater fools theory where it's possible to make money on something if it's overvalued so long as there's someone willing to pay a higher price….").

29

Because of this possibility, reliance on the integrity of the market price cannot be determined on a class-wide basis and individualized inquiry is necessary.[96]

## VII.  DR. CAIN'S CONCLUSIONS ARE FUNDAMENTALLY FLAWED AND UNRELIABLE BECAUSE HE FAILS TO ACCOUNT FOR THE CHANGED CIRCUMSTANCES AROUND THE PROPOSED CLASS PERIOD

48.  Dr. Cain offers two principal conclusions: (i) the markets for BBBY stock and options were efficient throughout the proposed Class Period; and (ii) "[d]amages in this matter can be calculated on a class-wide basis subject to standard, common methodologies for each of Plaintiffs' pending claims."[97]  His conclusions are fundamentally flawed and unreliable because he fails to account for the changed circumstances around the proposed Class Period documented above.

### A.  Dr. Cain Does Not Reliably Establish That the Market for BBBY Stock and Options Was Efficient Because He Fails to Account for the Changed Circumstances Around the Proposed Class Period

49.  In his report, Dr. Cain includes a section explaining that he "considered the general information environment regarding BBBY during the Class Period."[98]  Dr. Cain states:

> In my evaluation of the efficiency factors for BBBY's Common Stock, I considered whether the efficiency conclusion from these factors was undermined by other aspects of BBBY's public information environment such as retail investor interest, potential meme stock status, and short squeeze dynamics.  If any of these aspects caused BBBY's Common Stock to be informationally inefficient, I would expect this inefficiency to be reflected in the various *Cammer*, *Krogman*, and other efficiency factors I evaluated.  For example, if a short squeeze caused BBBY's stock to no longer be informationally efficient, I would expect to observe the absence of any relation between relevant news and corresponding stock price movements.

---

96.  The class is defined as investors who purchased BBBY stock or calls during the Class Period and subsequently sold at a loss after Mr. Cohen "dumped" his stake. *See* Plaintiff's Memo at 5, 9-11. Plaintiff's Class definition therefore includes investors who knowingly purchased at artificially inflated prices as a result of – or in the hopes of creating – a short squeeze in the hope of being able to sell at even more inflated prices but were unable to do so.

97.  Cain Report ¶ 3.e.

98.  Cain Report ¶ 102.

> Yet, as explained above, my *Cammer* 5 analysis identified a statistically significant difference between returns on News Days versus those on No News Days.  Moreover, these results were present prior to the Class Period, during the Analysis Period when retail and other investors considered BBBY's status as a potential meme stock and short squeeze candidate. Because the *Cammer* and *Krogman* factors weigh in favor of market efficiency despite the status of BBBY as a potential meme stock and short squeeze candidate, I conclude that the market for BBBY's Common Stock was efficient throughout the Class Period.[99]

Dr. Cain's "consider[ation]" of the "general information environment" regarding BBBY during the Class Period, including "short squeeze dynamics," is fundamentally flawed and unreliable for several reasons, and does not support his opinion of market efficiency during the Class Period.

50.     First, nowhere in Dr. Cain's report does he analyze the "short squeeze dynamics" present during the proposed Class Period.  Rather, for the only instance in which Dr. Cain reports discrete data relevant to short squeeze dynamics specifically during the Class Period – stating that "[t]he average weekly trading volume over the Analysis Period was 75.8% of BBBY's Common Stock shares outstanding, and the trading volume during the one-week Class Period was 1,346.6% of shares outstanding" (i.e., 18 times higher than the average[100]) – he simply concludes that "[t]his level of trading volume exceeds both the 1% and 2% thresholds established by the *Cammer* court,"[101] ignoring the obvious implication of his own analysis that trading during the Class Period was substantially different from the period beforehand and indicative of a rumored short squeeze.

51.     Second, Dr. Cain's "*Cammer* 5 analysis" (i.e., the "cause-and-effect relationship between new Company disclosures and resulting Common Stock price movements" using the results of an event study[102]) – which is the only analysis he conducted for which he describes

---

99.     Cain Report ¶ 105 (footnote omitted).
100.    1,346.6 / 75.8 = 17.8.
101.    Cain Report ¶ 37.
102.    Cain Report ¶¶ 3.c., 57 & 59.

how he "considered" it before reaching his conclusion regarding short squeeze dynamics during the Class Period – fails to analyze *any* days during the proposed Class Period.[103]  Consequently, the only analysis he uses to support his opinion does nothing to account for the changed circumstances during the Class Period that I document above, and his conclusion is unfounded.[104]

52.     Finally, the limited and rote analyses Dr. Cain does conduct appear to be designed to minimize the fundamental changes leading into the proposed Class Period that I document above.  Specifically, as explained *supra* ¶ 16, his market efficiency opinion regarding BBBY stock is based on his analysis of eleven factors during the Cain Analysis Period, i.e., from August 12, 2021 through August 18, 2022.  Aside from his analysis of stock trading volume, Dr. Cain does not distinguish the Class Period, conflating the results of his analyses over the entire Cain Analysis Period.[105]  Because this period consists of 257 trading days of which the proposed Class Period comprises only the five days at the end, *95%* of the Cain Analysis Period lies outside the Class Period as well as the period shortly beforehand during the rumored short squeeze.[106]

---

103.    Dr. Cain's "*Cammer* 5 analysis" purports to compare the behavior of BBBY Common Stock on four "News Days," which he defines as "dates of BBBY's quarterly earnings announcements during the Analysis Period," none of which occurred during the proposed Class Period, versus "No News Days," which he defines as "the 132 trading days where there were no headlines from Dow Jones or SEC filings," none of which occurred during the Class Period.  Cain Report ¶¶ 72-75 & Exhibit 6a (showing that the last "News Day" Dr. Cain analyzed occurred on June 29, 2022).

104.    Even if Dr. Cain had analyzed the days during the Class Period, his event study of these days is fundamentally flawed and the results from it are unreliable because he fails to account for the fundamental change in the volatility of BBBY's stock price that occurred shortly beforehand.  *See infra* ¶ 53.

105.    I note that although Dr. Cain claims that he "considered" "the various *Cammer*, *Krogman*, and other efficiency factors" in reaching his conclusion about the impact of short squeeze dynamics during the Class Period, most of the eleven factors – including the presence of analyst coverage, market makers, institutional ownership, an appropriately sized public float, and options trading, as well as the eligibility to file SEC Form S-3 – do not allow him to analyze discrete periods within the Cain Analysis Period and thus are incapable of supporting his conclusion.

106.    (257 - 5) / 257 = 98.1%.  There are 14 trading days from August 1, 2022 through August 18, 2022, the last day of the Cain Analysis Period.  (257 - 14) / 257 = 94.6%.

Analyzing such a lengthy period to make inferences about a shorter period within it may be appropriate if the period is relatively stable throughout, i.e., there is not a fundamental shift in relevant metrics during the period. However, as demonstrated *supra* § IV and by Dr. Cain's own analysis of trading volume, this is not the case for BBBY stock. Consequently, the vast majority of Dr. Cain's analysis regards a period prior to the occurrence of the fundamental changes described above and so his conflation of the Class Period with the entire Cain Analysis Period does not support his conclusion regarding short squeeze dynamics and market efficiency during the Class Period. In other words, Dr. Cain's assumption that the Cain Analysis Period is an appropriate barometer for the Class Period – upon which his entire analysis of market efficiency is based – is incorrect.

53.     In particular, Dr. Cain's event study analysis uses a rolling 120-day estimation period prior to the event date, i.e., he determines statistical significance based upon the residual returns of BBBY stock during the 120 days prior to the day being measured.[107] As explained *supra* ¶ 38, this estimation period fails to account for the considerable increase in volatility that began shortly before the Class Period because the volatility of BBBY's stock price during the substantial majority of his estimation period was much lower than it was in August. To illustrate, Bloomberg reports that the implied volatility on August 11, 2022 is 207.7 while the average implied volatility during Dr. Cain's estimation period for this date is only 132.5, hence the volatility had increased by 1.57 times (= 207.7 / 132.5) before the beginning of the Class Period relative to his estimation period. By using a period of lower volatility to test for statistical significance in a period of higher volatility, Dr. Cain's event study is highly likely to find false

---

107.     Cain Report ¶ 64.

positives, i.e., determinations that residual returns are statistically significant when they are in fact not unusual in the context of an increase in stock price volatility.

**B. Dr. Cain's Claim That Alleged Damages in This Matter Can Be Calculated on a Class-Wide Basis Subject to Standard, Common Methodologies Fails to Account for the Changed Circumstances Around the Proposed Class Period**

54.     I understand that Dr. Cain described in his deposition how in working on pump and dump schemes at the SEC, he observed increases in stock prices.  Because there is no reliable, scientific evidence to support Plaintiff's claim that the Tweet caused BBBY's stock price to increase as explained *supra* ¶ V, Dr. Cain cannot establish that a "pump" occurred hence there is no predicate for a "dump" and so he cannot calculate alleged damages on a class-wide basis under Plaintiff's claims.

55.     Dr. Cain further claims that the damages methods he describes "are flexible and able to incorporate alternative findings regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the Class Period" because, among other things, "the appropriate percentage of abnormal return that can be attributed to the release of corrective versus confounding information" and how "the true economic inflation evolved over the Class Period" determined by the finder of fact "can simply be incorporated into the damages calculation."[108]  However, he fails to provide any methodology for the finder of fact to determine the "appropriate" amount of alleged artificial inflation net of confounding information or how the "true" amount of alleged artificial inflation evolved over the Class Period.

56.     The ability to reliably determine the "appropriate" and "true" amount of alleged damages is an exceptionally difficult issue given the facts and circumstances of this case. Because a rumored short squeeze had begun before the first alleged misstatement on August 12,

---

108.     Cain Report ¶¶ 137-141.

2022, all price movements during the proposed Class Period are confounded by the distortions caused by the short squeeze. In other words, the finder of fact needs a reliable model that can distinguish the amounts of artificial prices caused by the short squeeze from the amounts purportedly caused by the alleged misstatements, if any. But Dr. Cain has not provided any methodology that allows the finder of fact to distinguish the price increases, if any, caused by the alleged affirmative misstatements or the price declines, if any, caused by the alleged corrective disclosure from those caused by the distortions in the price from the rumored short squeeze.[109]

57.     I am not aware of any methodology, let alone a "standard, common" one, that could be applied in this case to differentiate price movements caused by allegedly misstated information from the distorted price movements caused by the rumored short squeeze. Accordingly, even if Dr. Cain could establish that BBBY's stock price increased by a statistically significant amount on August 12, 2022 contrary to the economic evidence presented above, he could not establish that any of it was caused by the Tweet as opposed to the pre-existing rumored short squeeze.

58.     For the same reason, Dr. Cain cannot reliably estimate alleged damages under the method he proposes. Specifically, he states that he would employ an event study to calculate alleged artificial inflation based on the "stock price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged material omissions and/or misrepresentations."[110] However, Dr. Cain cannot establish that any price declines that coincide with alleged corrective disclosures were anything more than an indication that the rumored short squeeze – which, as explained *supra* ¶ 33, typically is short-lived – was ending.

---

109.   This conclusion holds true for any information that may have been disclosed during the Class Period.
110.   Cain Report ¶ 123.

59.     Finally, Dr. Cain's claim that the market for BBBY stock does not have to be fundamentally efficient to be informationally efficient[111] contradicts his claim that he can reliably calculate alleged inflation in this matter.  He proposes to measure alleged inflation based on changes in the stock price.  However, if the market for BBBY stock was somehow informationally efficient but not fundamentally efficient during the putative Class Period, then changes in the stock price are not reliable measures of the value of the information related to Plaintiff's allegations.  Consequently, Dr. Cain cannot simultaneously opine that the market was informationally efficient but not fundamentally efficient *and* that he can reliably estimate alleged inflation.

Daniel R. Fischel

May 17, 2024

---

111.     Cain Report ¶¶ 103-105.

Appendix A

**DANIEL R. FISCHEL**                                                                                    **May 2024**

Business Address:

Compass Lexecon
332 South Michigan Avenue
Chicago, Illinois 60604
Tel: 312-322-0209
dfischel@compasslexecon.com

## PROFESSIONAL EXPERIENCE

Lee and Brena Freeman Professor of Law and Business, University of Chicago Law School (1/84 – 12/2005, chair awarded in 7/89, emeritus as of 1/1/2006); Dean of Law School (1/99 – 2/01); Visiting Professor of Law, University of Chicago Law School (7/82 - 6/83).

Professor of Law and Business, Northwestern University School of Law (1/1/2006 – 5/2011). Professor, Kellogg School of Management (courtesy appointment, 1/1/2006 – 5/2011).

Jack N. Pritzker Distinguished Visiting Professor of Law, Northwestern University School of Law (6/02-6/03).

Professor of Law and Business, University of Chicago Graduate School of Business (courtesy appointment, 7/87 - 6/90).

Director, Law and Economics Program, University of Chicago (1/84 - 6/91).

Assistant Professor of Law, Northwestern University School of Law (6/80 - 6/81); Associate Professor of Law, Northwestern University School of Law (6/81 - 6/82); promoted to full professor in 6/82.

Attorney with Levy and Erens, Chicago, Illinois (7/79 - 6/80).

Law Clerk for Associate Justice Potter Stewart of the United States Supreme Court (1978 - 1979).

Law Clerk for Judge Thomas E. Fairchild, Chief Judge of the Seventh Circuit Court of Appeals (1977 - 1978).

## CONSULTING EXPERIENCE

Chairman, Compass Lexecon (Chairman and President until 12/2023).

## AREAS OF SPECIALIZATION

Securities and Financial Markets, Valuation and Financial Analysis, Bankruptcy and Financial Distress Litigation, ERISA Litigation, Class Certification, Damages, Corporate Governance.

## PUBLICATIONS

Payback: The Conspiracy to Destroy Michael Milken and His Financial Revolution, Harper Business (1995).

The Economic Structure of Corporate Law, Harvard University Press (1991) (with Frank H. Easterbrook).

## ARTICLES

The Use of Trading Models to Estimate Aggregate Damages in Securities Fraud Litigation: An Update, Briefly… Perspectives on Legislation, Regulation, and Litigation, Vol. 10, No. 3 (National Legal Center for the Public Interest, 2006) (with David J. Ross and Michael A. Keable).

The Hewlett-Packard Merger: A Case Study, in The New Investor Relations, Expert Perspectives on The State Of The Art (Bloomberg Press Princeton, 2004) (with Kenneth R. Cone, Gregory J. Pelnar and David J. Ross).

Market Evidence in Corporate Law, 69 U. Chi. L. Rev. 941 (2002).

Multidisciplinary Practice, The Business Lawyer, Vol. 55, (May 2000).

Government Liability for Breach of Contract, American L. & Econ. Rev. V1 N1/2 313 (1999) (with Alan Sykes).

Lawyers and Confidentiality, 65 U. Chi. L. Rev. 1 (1998).

The Law and Economics of Vanishing Premium Life Insurance, 22 Del. J. Corp. Law 1 (1997) (with Robert S. Stillman).

Clustering and Competition in Asset Markets, 20 J. Law & Econ. 23 (1997) (with Sanford J. Grossman, Merton H. Miller, Kenneth R. Cone and David J. Ross).

Corporate Crime, 25 J. Legal Studies 319 (1996) (with Alan O. Sykes).

The Use of Trading Models to Estimate Aggregate Damages in Securities Fraud Litigation: A Proposal for Change, in Securities Class Actions: Abuses and Remedies (The National Legal Center for the Public Interest, 1994) (with David J. Ross).

Civil Rico After Reves: An Economic Commentary, 1993 Sup. Ct. Rev. 157 (with Alan O. Sykes).

Contract and Fiduciary Duty, 36 J. Law & Econ. 425 (1993) (with Frank H. Easterbrook).

Should the Law Prohibit "Manipulation" in Financial Markets?, 105 Harv. L. Rev. 503 (1991) (with David J. Ross).

Efficient Capital Markets, the Crash, and the Fraud on the Market Theory, 74 Cornell L. Rev. 907 (1989).

The Corporate Contract, 89 Colum. L. Rev. 1416 (1989) (with Frank H. Easterbrook); also published in Corporate Law and Economic Analysis (Cambridge University Press 1990) (Lucian Bebchuk ed.).

The Economics of Lender Liability, 99 Yale L. J. 131 (1989).

Should One Agency Regulate Financial Markets, in Black Monday and the Future of Financial Markets (R. Kormendi, R. Kamphuis & J. W. H. Watson, ed.) (Dow Jones-Irwin Inc., 1988).

ERISA's Fundamental Contradiction: The Exclusive Benefit Rule, 55 U. Chi. L. Rev. 1105 (1988) (with John H. Langbein).

From MITE to CTS: Takeovers, the Williams Act and the Commerce Clause, 1987 Sup. Ct. Rev. 47.

The Regulation of Banks and Bank Holding Companies, 73 Va. L. Rev. 301 (1987) (with Andrew M. Rosenfield and Robert S. Stillman).

The Regulation of Accounting: Some Economic Issues, 52 Brooklyn L. Rev. 1051 (1987).

Organized Exchanges and the Regulation of Dual Class Common Stock, 54 U. Chi. L. Rev. 119 (1987).

Comparable Worth and Discrimination in Labor Markets, 53 U. Chi. L. Rev. 891 (1986) (with Edward P. Lazear).

Comparable Worth: A Rejoinder, 53 U. Chi. L. Rev. 950 (1986) (with Edward P. Lazear).

Close Corporations and Agency Costs, 38 Stan. L. Rev. 271 (1986) (with Frank H. Easterbrook).

The Role of Liability Rules and the Derivative Suit in Corporate Law: A Theoretical and Empirical Analysis, 71 Corn. L. Rev. 261 (1986) (with Michael Bradley).

Regulatory Conflict and Entry Regulation of New Futures Contracts, 59 J. Bus. S85 (1985).

Optimal Damages in Securities Cases, 52 U. Chi. L. Rev. 611 (1985) (with Frank H. Easterbrook).

The Business Judgment Rule and the Trans Union Case, 40 Bus. Law. 1437 (1985).

Insider Trading and Investment Analysts: An Economic Analysis of Dirks v. SEC, 13 Hofstra L. Rev. 127 (1984).

Limited Liability and the Corporation, 52 U. Chi. L. Rev. 89 (1985) (with Frank H. Easterbrook).

Labor Markets and Labor Law Compared with Capital Markets and Corporate Law, 51 U. Chi. L. Rev. 1061 (1984).

Customer Protection in Futures and Securities Markets, 4 J. Futures Markets 273 (1984) (with Sanford J. Grossman).

Mandatory Disclosure and the Protection of Investors, 70 Va. L. Rev. 669 (1984) (with Frank H. Easterbrook).

The Appraisal Remedy In Corporate Law, 1983 Am. Bar Found. Res. J. 875.

The Regulation of Insider Trading, 35 Stan. L. Rev. 857 (1983) (with Dennis W. Carlton).

Voting in Corporate Law, 26 J. Law & Econ. 395 (1983) (with Frank H. Easterbrook).

Auctions and Sunk Costs in Tender Offers, 35 Stan. L. Rev. 1 (1982) (with Frank H. Easterbrook).

The Corporate Governance Movement, 35 Vand. L. Rev. 1259 (1982).

Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities, 38 Bus. Law 1 (1982).

Antitrust Suits By Targets of Tender Offers, 80 Mich. L. Rev. 1155 (May 1982) (with Frank H. Easterbrook).

Corporate Control Transactions, 91 Yale L. J. 698 (1982) (with Frank H. Easterbrook).

The "Race to the Bottom" Revisited: Reflections on Recent Developments in Delaware Corporation Law, 76 Nw. Univ. L. Rev. 913 (1982).

Takeover Bids, Defensive Tactics and Shareholders' Welfare, 36 Bus. Law 1733 (1981) (with Frank H. Easterbrook).

The Law and Economics of Dividend Policy, 67 Va. L. Rev. 699 (1981).

The Proper Role of a Target's Management in Responding to a Tender Offer, 94 Harv. L. Rev. 1161 (1981) (with Frank H. Easterbrook) (awarded prize by Emory University for best paper written in law and economics for the year 1981).

Secondary Liability Under Section 10(b) of the Securities Act of 1934, 69 California L. Rev. 80 (1981).

Efficient Capital Market Theory, the Market for Corporation Control, and the Regulation of Cash Tender Offers, 57 Tex. L. Rev. 1 (1978); reprinted in K. Scott and R. Posner ed., Economic Perspectives on Corporation Law and Securities Regulation (Little Brown 1980).

Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine, 45 U. Chi. L. Rev. 80 (1977).

Comment, The Demand and Standing Requirements in Stockholder Derivation Actions, 44 U. Chi. L. Rev. 168 (1977).

Comment, The Use of Government Judgments in Private Antitrust Litigation: Clayton Act Section 5(a), Collateral Estoppel, and Jury Trial, 43 U. Chi. L. Rev. 338 (1976).


## **EDUCATION**

University of Chicago Law School, Chicago, Illinois; J.D. 1977, cum laude; Order of the Coif; Comment Editor, Vol. 44, University of Chicago Law Review; Approximately top 1% of the Class. Awarded Casper Platt Award for best paper written by a student of the University of Chicago Law School; awarded Jerome N. Frank Prize for excellence in legal writing while a member of the University of Chicago Law Review, 1975 - 1977. Studied law and economics with Richard Posner and other members of the faculty.

Brown University, Providence, Rhode Island; M.A. 1974 in American History.

Cornell University, Ithaca, New York; major-American History; minor-Economics; B.A. 1972.

**TESTIMONY**

Declaration of Daniel R. Fischel In Re: Richard J. Tornetta et al., vs. Elon Musk, et al., In the Court of Chancery of the State of Delaware, C.A. No. 2018-0408-KSJM, (May 8, 2024).

Deposition of Daniel R. Fischel In Re: Sjunde AP-Fonden et al., vs. General Electric, et al., In the United States District Court, Southern District of New York, Case No. 17-cv-08457 (JMF), (May 3, 2024).

Deposition of Daniel R. Fischel In Re: Maxmillian Klein, et al. on behalf of themselves and all others similarly situated v. Meta Platforms, Inc., In the United States District Court, Northern District of California, San Francisco Division, Case No. 20-cv-08570-JD, (March 20, 2024).

Deposition of Daniel R. Fischel In Re: Federal Trade Commission v. Meta Platforms, Inc., In the United States District Court for the District of Columbia, No. 1:20-cv-03590-JEB, (February 15, 2024).

Deposition of Daniel R. Fischel In Re: Stewart N. Goldstein, individually and on behalf of all others similarly situated v. Sarissa Capital Management, L.P., et al., In the Court of Chancery for the State of Delaware, Case No. 2020-1061-JTL, (January 25, 2024).

Deposition of Daniel R. Fischel In Re: Solar Eclipse Investment Fund III, LLC, Solar Eclipse Investment Fund IV, LLC, et al. v Cohnreznick LLP, Cohnreznick Capital Markets Securities LLC, et al., In the Superior Court of the State of California, County of Los Angeles, Case No. 19STCV45775, (October 31, 2023).

Deposition of Daniel R. Fischel In Re: Alta Partners, LLC v. Getty Images Holdings, Inc., No. 1:22-cv-08916-JSR and CRCM Institutional Master Fund (BVI) LTD., and CRCM SPAC Opportunity Fund LP, In the United States District Court, Southern District of New York, No. 1:23-cv-01074-JSR, (August 28, 2023).

Testimony of Daniel R. Fischel In Re: Petersen Energia Inversora, S.A.U. and Petersen Energia S.A.U. v. Argentine Republic and YPF S.A., In the United States District Court, Southern District of New York, 15 Civ. 2739 (LAP), (July 27, 2023).

Deposition of Daniel R. Fischel In Re: January 2021 Short Squeeze Trading Litigation, In The United States District Court, Southern District of Florida, Case No. 21-2989-MDL-ALTONAGA, (April 12, 2023).

Testimony of Daniel R. Fischel In Re: Sanchez Energy Corporation, et al., Debtors, In The United States Bankruptcy Court, Southern District of Texas, Houston Division, Chapter 11, Case No. 19-34508 (MI), (March 28, 2023).

Deposition of Daniel R. Fischel In Re: Sanchez Energy Corporation, et al., Debtors, In The United States Bankruptcy Court, Southern District of Texas, Houston Division, Chapter 11, Case No. 19-34508 (MI), (February 10, 2023).

Testimony of Daniel R. Fischel In Re: The Boeing Company and Boeing Brasil Servicos Tecnicos Aeronauticos LTDA. v. Embraer S.A. and Yabora Industria Aeronautica S.A., American Arbitration Association, Case No. 01-20-0005-0591, (February 6, 2023).

Testimony of Daniel R. Fischel In Re: Straight Path Communications Inc. Consolidated Stockholder Litigation, In the Court of Chancery of the State of Delaware, C.A. No. 2017-0486-SG, (December 9, 2022).

Testimony of Daniel R. Fischel In Re: Oracle Corporation Derivative Litigation, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 2017-0337-SG, (July 28, 2022).

Testimony of Daniel R. Fischel In Re: United States of America v. Gregg Smith, Michael Nowak, and Jeffrey Ruffo, In The United States District Court, Northern District of Illinois, Eastern Division, No. 19 CR 00669, (July 25 and 26, 2022).

Deposition of Daniel R. Fischel In Re: Sjunde Ap-Fonden, et al. vs. General Electric, et al. In The United States District Court, Southern District of New York, Index No. 17-cv-08457 (JMF), (July 14, 2022).

Deposition of Daniel R. Fischel In Re: Sanchez Energy Corporation, et al., and Delaware Trust Company v. Mesquite Energy Inc. f/k/a Sanchez Energy Corporation, Apollo Commodities Management, L.P., Fidelity Management and Research Company, et al. In the United States Bankruptcy Court, Southern District of Texas, Houston Division, Chapter 11, Case No. 19-34508 (MI), Adv. Pro. No. 21-3862 (MI), (May 17, 2022).

Deposition of Daniel R. Fischel In Re: Tesla, Inc., Securities Litigation, In the United States District Court for the Northern District of California, San Francisco Division, Civil Action No. 3:18-cv-04865-EMC, (March 28, 2022).

Deposition of Daniel R. Fischel In Re: Petersen Energia Inversora, S.A.U. and Petersen Energia S.A.U. v. Argentine Republic and YPF S.A., In the United States District Court, Southern District of New York, 15 Civ. 2739 (LAP), (March 17, 2022).

Testimony of Daniel R. Fischel In Re: Mindbody, Inc. Stockholder Litigation, In the Court of Chancery of the State of Delaware, C.A. No. 2019-0442-KSJM, (March 9, 2022).

Testimony of Daniel R. Fischel In Re: The Official Committee of Unsecured Creditors of Allied Systems Holdings, Inc. and its affiliated debtors et al. v. Yucaipa, et al., In the U.S. Bankruptcy Court for the District of Delaware, Bankr., D. Del., Proc. Nos. 13-50530-KBO, 14-50971-KBO (March 4, 2022).

Deposition of Daniel R. Fischel In Re: Securities and Exchange Commission v. Ripple Labs, Inc. et al., In the United States District Court, Southern District of New York, Case No. 20-Civ-10832 (AT) (SN) (February 28, 2022).

Deposition of Daniel R. Fischel In Re: Mindbody, Inc. Stockholder Litigation, In the Court of Chancery of the State of Delaware, C.A. No. 2019-0442-KSJM, (February 4, 2022).

Declaration of Daniel R. Fischel In Re: Mylan N.V. Securities Litigation, In the United States District Court, Southern District of New York, Case No. 1:16-cv-07926 (JPO), (December 22, 2021).

Deposition of Daniel R. Fischel In Re: JUUL Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation, In the United States District Court, Northern District of California, Case No.: 19-md-02913-WHO, (December 13, 2021).

Deposition of Daniel R. Fischel In Re: Oracle Corporation Derivative Litigation, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 2017-0337-SG, (December 8, 2021).

Deposition of Daniel R. Fischel In Re: Straight Path Communications Inc. Consolidated Stockholder Litigation, In the Court of Chancery of the State of Delaware, C.A. No. 2017-0486-SG, (October 21, 2021).

Deposition of Daniel R. Fischel In Re: Abu Dhabi Investment Authority vs. Mylan N.V. and Mylan Inc., In the United States District Court, Southern District of New York, Civil Action No. 1:20-cv-01342-JPO, (August 18, 2021).

Deposition of Daniel R. Fischel In Re: Mylan N.V. Securities Litigation, In the United States District Court, Southern District of New York, Case No. 1:16-CV-07926 (JPO), (August 17, 2021).

Deposition of Daniel R. Fischel In Re: Hawaii Structural Ironworkers Pension Trust Fund, Individually and on Behalf of All Others Similarly Situated vs. AMC Entertainment Holdings, Inc., et al., In the United States District Court, Southern District of New York, Case No.1:18-cv-00299-AJN-SLC, (August 12, 2021).

Deposition of Daniel R. Fischel In Re: Sjunde Ap-Fonden, et al, vs. General Electric, et al., In the United States District Court, Southern District of New York, Index No. 17-cv-08457 (JMF), (August 9, 2021).

Testimony of Daniel R. Fischel In Re: United States of America vs. Edward Bases and John Pacilio, In the United States District Court, Northern District of Illinois, Eastern Division, Docket No. 18 CR 48, (July 29, 2021).

Testimony of Daniel R. Fischel In Re: Ahmed D. Hussein vs. Sheldon Razin, Steven Plochocki, Quality Systems, Inc., And Does 1-10, Inclusive, In the Superior Court of California, County of Orange, NO. 30-2013-00679600, CU-NP-CJC (July 27, 2021).

Testimony of Daniel R. Fischel In Re: Tesla Motors, Inc. Stockholders Litigation, In the Court of Chancery of the State of Delaware, Consolidated Civil Action No. 12711-VCS (July 23, 2021).

Testimony of Daniel R. Fischel In Re: Huntsman International, LLC vs. Albemarle Corporation, Rockwood Specialties Group, Inc., and Rockwood Holdings, Inc., American Arbitration Association, AAA Case No. 01-17-001-4588 (May 10, 2021).

Testimony of Daniel R. Fischel In Re: Resolution Life L.P. and Resolution Life (Parallel) Partnership vs. GBIG Holdings, Inc. f/k/a Southland National Holdings, Inc.; SNH Acquisition, LLC and Greg Lindberg, In the Supreme Court of the State of New York, Civil Division, Index Nos. 650575/19, 653258/19, (April 19, 2021).

Deposition of Daniel R. Fischel In Re: Matthew Sciabacucchi and Hialeah Employees' Retirement System vs. John Malone, et al., and Charter Communications, Inc., In the Court of Chancery for the State of Delaware, C.A. No. 11418-VCG, (April 16, 2021).

Deposition of Daniel R. Fischel In Re: Jeld-Wen Holdings, Inc. Securities Litigation, In the United States District Court for The Eastern District of Virginia, Richmond Division, Civil Action No. 3:20-cv-00112-JAG, (February 26, 2021).

Testimony of Daniel R. Fischel In Re: The Pacific Gas and Electric Company Administration of Stress Test Methodology Developed Pursuant to Public Utilities Code Section 451.2(b) and (2) Determination That $7.5 Billion of 2017 Catastrophic Wildfire Costs and Expenses Are Stress Test Costs That May Be Financed Through Issuance of Recovery Bonds Pursuant to Section 451.2(c) and Section 850 et Seq.(U39E), Before the Public Utilities Commission of the State of California, Application No. 20-04-023, (December 15, 2020).

Deposition of Daniel R. Fischel In Re: Resolution Life L.P. and Resolution Life (Parallel) Partnership vs. GBIG Holdings, Inc. f/k/a Southland National Holdings, Inc.; SNH Acquisition, LLC and Greg Lindberg, In the Supreme Court of the State of New York, Index No. 650575/2019, (November 24, 2020).

Deposition of Daniel R. Fischel In Re: SH 130 Concession Company, LLC, Zachry Toll Road – 56 LP Cintra Texas 56 LLC et al. vs. Central Texas Highway Constructors, LLC, et al., In the United States Bankruptcy Court, Western District of Texas, Austin Division, Case No. 16-10262-TMD, Adversary No. 18-01030, (November 5, 2020).

Deposition of Daniel R. Fischel In Re: Ahmed D. Hussein versus Sheldon Razin, Steven Plochocki, Quality Systems, Inc., et al., In the Superior Court of the State of California, County of Orange, Case No. 302013-00679600 CUNPCJC, (October 22, 2020).

Deposition of Daniel R. Fischel In Re: Deutsche Bank National Trust Company, Solely in its Capacity as Trustee of the Harborview Mortgage Loan Trust Mortgage Loan Pass-Through Certificates, Series 2006-9, In the Supreme Court of the State of New York County of New York, Index No. 654208/2018 (September 25, 2020).

Testimony of Daniel R. Fischel In Re: Fairstone Financial Holdings Inc., J.C. Flowers IV L.P. and VP Canada Acquisition, L.P. vs. Duo Bank of Canada, Court File No. CV-20-00641857-00CL and Duo Bank of Canada vs. Fairstone Financial Holdings Inc., J.C. Flowers IV L.P. and VP Canada Acquisition, L.P., Court File No. CV-20-00643629-00CL, In the Ontario Superior Court of Justice, (September 11, 2020).

Testimony of Daniel R. Fischel In Re: AB Stable VIII LLC vs. Maps Hotels and Resorts One LLC, et al., In the Court of Chancery of the State of Delaware, C. A. No. 2020-0310-JTL (August 28, 2020).

Deposition of Daniel R. Fischel In Re: AB Stable VIII LLC vs. Maps Hotels and Resorts One LLC, et al., In the Court of Chancery of the State of Delaware, Case No. 2020-0130-JTL (August 14, 2020).

Deposition of Daniel R. Fischel In Re: Willis Towers Watson PLC Proxy Litigation, In the United States District Court for the Eastern District of Virginia, Alexandria Division, Master File No. 1:17-cv-1338-AJT-JFA (August 12, 2020).

Deposition of Daniel R. Fischel In Re: Forescout Technologies, Inc. et al. vs. Ferrari Group Holdings, LP, and Ferrari Merger Sub, Inc., et al., In the Court of Chancery of the State of Delaware, Civil Action No. 2020-0385-SG (July 13, 2020).

Deposition of Daniel R. Fischel In Re: Brigade Leveraged Capital Structures Fund Ltd. et al. vs. Kindred Healthcare, Inc., et al., In the Circuit Court of Chancery of the State of Delaware, Case No. 2018 0165 (February 5, 2020).

Testimony of Daniel R. Fischel In Re: Gannaway Entertainment, Inc. et al vs. Frankly Inc. et al., American Arbitration Association, Case No. 01-18-0003-9480 (December 17, 2019).

Deposition of Daniel R. Fischel In Re: The Official Committee of Unsecured Creditors of Allied Systems Holdings, Inc. and its affiliated debtors et al. v. Yucaipa, et al., In the U.S. Bankruptcy Court for the District of Delaware, Bankr., D. Del., Proc. Nos. 13-50530-KBO, 14-50971-KBO (December 16, 2019).

Testimony of Daniel R. Fischel In Re: Nord Anglia Education, Inc., In the Grand Court of The Cayman Islands, Financial Services Division, Cause No. FSD 235 of 2017 (IKJ). (December 6, 9, 10 and 11, 2019).

Deposition of Daniel R. Fischel In Re: Lindie L. Banks and Erica LeBlanc, individually and on behalf of all others similarly situated vs. Northern Trust Corporation and Northern Trust Company, In the United States District Court, Central District of California, Case No. 2: 16-cv-09141-JFK (JCx) (November 22, 2019).

Deposition of Daniel R. Fischel In Re: Tesla Motors, Inc. Stockholder Litigation, In the Court of Chancery of the State of Delaware, C.A. No. 12711-VCS (November 19, 2019).

Deposition of Daniel R. Fischel In Re: Melina N. Jacobs, On Behalf of Herself and All Others Similarly Situated vs. Verizon Communications, Inc., et al., In the United States District Court for the Southern District of New York, Civil Action No. 1:16-cv-01082 (August 28, 2019).

Deposition of Daniel R. Fischel In Re: American Realty Capital Properties, Inc. Litigation, In the United States District Court, Southern District of New York, Civil Action No. 1:15-mc-00040-AKH Class Action (July 25, 2019).

Deposition of Daniel R. Fischel In Re: Rajesh M. Shah, et al vs. Zimmer Biomet Holdings, Inc., et al, In the United States District Court, Northern District of Indiana, South Bend Division, Case No. 3:16-cv-815-PPS-MGG (May 17, 2019).

Testimony of Daniel R. Fischel In Colonial Chevrolet Co., Inc., et al., Alley's of Kingsport, Inc., et al., and Union Dodge, Inc., et al. vs. The United States (Nos. 10-647C, 11-100C, and 12-900L – Consolidated), In the United States Court of Federal Claims (May 8, 2019).

Testimony of Daniel R. Fischel In Anthem, Inc. vs. Cigna Corporation, In the Court of Chancery of the State of Delaware, C.A. No. 2017-0114-JTL (March 8, 2019).

Deposition of Daniel R. Fischel In Re: Nine West holdings, Inc., et al., Debtors, United States Bankruptcy Court, Southern District of New York, Chapter 11 Case No. 18-10947 (SCC) (January 16, 2019).

Deposition of Daniel R. Fischel In Re: Sandisk LLC Securities Litigation, United States District Court, Northern District of California, San Francisco Division, Case No. 3:15-cv-01455-VC (November 16, 2018).

Deposition of Daniel R. Fischel In Re: Colonial Chevrolet Co., Inc., Alley's of Kingsport, Inc. and Union Dodge, Inc., et al vs. The United States, In the United States Court of Federal Claims, Nos. 10-647C, 11-100C and 12-900L (Consolidated) (November 15, 2018).

Testimony of Daniel R. Fischel In Re: United States of America, et al., vs. J-M Manufacturing Co., Inc., United States District Court, Central District of California – Western Division, No. CV 6-55 GW (November 5, 2018).

Deposition of Daniel R. Fischel In Re: Appraisal of Air Methods Corp., In the Court of Chancery of the State of Delaware, C.A. No.: 2017-0317-JRS (September 27 and 28, 2018).

Testimony of Daniel R. Fischel In Re: Akorn, Inc., v. Fresenius Kabi, AG, et al., In the Court of Chancery of the State of Delaware, C.A. No. 2018-0300-JTL (July 13, 2018).

Deposition of Daniel R. Fischel In Re: Starz Stockholder Litigation, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 12584-VCG (July 12, 2018).

Deposition of Daniel R. Fischel In Re: Akorn, Inc. vs. Fresenius Kabi AG, Quercus Acquisition, Inc. and Fresenius SE & Co. KGaA, In the Court of Chancery of the State of Delaware, Index No. 2018-0300 (June 30, 2018).

Deposition of Daniel R. Fischel In Re: Physiotherapy Holdings, Inc., et al., Debtors; PAH Litigation Trust v. Water Street Healthcare Partners, L.P., et al., In the United States Bankruptcy Court for the District of Delaware, Case No. 13-12965 (KG) (Jointly Administered) (June 5, 2018).

Deposition of Daniel R. Fischel In Re: Facebook, Inc. Class C Reclassification Litigation, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 12286-VCL (May 18, 2018).

Testimony of Daniel R. Fischel <u>In Re: Dr. Alan Sacerdote, et al. vs. New York University</u>, In the United States District Court for the Southern District of New York, Civil Action No. 1:16-cv-6284-KBF (April 24, 25 and 26, 2018).

Deposition of Daniel R. Fischel <u>In Re: Daniel Turocy, et al. vs. El Pollo Loco Holdings, Inc., et al.</u>, In the United States District Court, Central District of California, Southern Division, Case No. 8:15-cv-01343-DOC-KES (April 12, 2018).

Deposition of Daniel R. Fischel <u>In Re: United States of America v. AT&T Inc., Directv Group Holdings, LLC, and Time Warner Inc.</u>, In the United States District Court for the District of Columbia, Case No. 1:17-cv-02511-RJL (March 9, 2018).

Deposition of Daniel R. Fischel <u>In Re: Dr. Alan Sacerdote, et al. vs. New York University</u>, In the United States District Court for the Southern District of New York, Civil Action No. 1:16-cv-6284-KBF (March 1, 2018).

Testimony of Daniel R. Fischel In <u>Re: Lehman Brothers Holdings Inc., et al.</u>, In the United States Bankruptcy Court, Southern District of New York, Chapter 11, Case No. 08-13555 (SCC) (December 4, 2017).

Deposition of Daniel R. Fischel <u>In Re: Lehman Brothers Holdings Inc., et al.</u>, In the United States Bankruptcy Court, Southern District of New York, Chapter 11, Case No. 08-13555 (SCC) (October 17, 2017).

Testimony of Daniel R. Fischel <u>In Re: Genon Energy, Inc., et al, Debtors</u>, In the United States Bankruptcy Court for the Southern District of Texas Houston Division, Chapter 11, Case No. 17-33695 (DRJ) (October 6, 2017).

Deposition of Daniel R. Fischel <u>In Re: Genon Energy, Inc., et al, Debtors</u>, In the United States Bankruptcy Court for the Southern District of Texas Houston Division, Chapter 11, Case No. 17-33695 (DRJ) (August 25, 2017).

Deposition of Daniel R. Fischel <u>In Re: United States ex re. Hendrix et al., vs. JM Manufacturing Company, Inc., et al.</u>, In the United States District Court, Central District of California, Case No. ED CV 06-00055-GW (July 20, 2017).

Testimony of Daniel R. Fischel In <u>Re: Saguaro Power Co. v. Pioneer Americas LLC d/b/a Olin Chlor Alkali Products</u>, In AAA Case No. 01-16-0005-1073 (June 30, 2017).

Testimony of Daniel R. Fischel <u>In Re: Syngenta AG MIR 162 Corn Litigation</u>, In the United States District Court for the District of Kansas, Master File No. 2:14-MD-02591-JWL-JPO (June 19, 2017).

Testimony of Daniel R. Fischel <u>In Re: Motors Liquidation Company, f/k/a General Motors Corporation, et al., Debtors</u>, United States Bankruptcy Court, Southern District of New York, Chapter 11, Case No.:09-50026 (MG) and <u>Motors Liquidation Company Avoidance Action Trust, et al vs. JPMorgan Chase Bank, N.A.</u>, et al., United States Bankruptcy Court, Southern District of New York, Case No.: 09-00504 (MG) (May 2 and 3, 2017).

Deposition of Daniel R. Fischel <u>In Re: Alere-Abbott Merger Litigation</u>, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 12963-VCG (April 4, 2017).

Testimony of Daniel R. Fischel <u>In Re: Appraisal of AOL Inc.</u>, In the Court of Chancery of the State of Delaware, Consol C.A. No. 11204-VCG (March 20, 2017).

Deposition of Daniel R. Fischel <u>In Re: City of Daytona Beach Policy and Fire Pension Fund, et al vs. Examworks Group, Inc., et al.</u>, In the Court of Chancery of the State of Delaware, C.A. No. 12481-VCL (February 22, 2017).

Deposition of Daniel R. Fischel <u>In Re: Appraisal of AOL Inc.</u>, In the Court of Chancery of the State of Delaware, Consol C.A. No. 11204-VCG (February 14 and 15, 2017).

Deposition of Daniel R. Fischel <u>In Re: Motors Liquidation Company, f/k/a General Motors Corporation, et al., Debtors</u>, United States Bankruptcy Court, Southern District of New York, Chapter 11, Case No.:09-50026 (MG) and <u>Motors Liquidation Company Avoidance Action Trust, et al vs. JPMorgan Chase Bank, N.A., et al.</u>, United States Bankruptcy Court, Southern District of New York, Case No.: 09-00504 (MG) (January 31, 2017).

Deposition of Daniel R. Fischel <u>In Re: Syngenta Litigation</u>, In the State of Minnesota District Court, County of Hennepin Fourth Judicial District, Court File No. 27-CV-15-3785 and <u>In Re: Syngenta AG MIR 162 Corn Litigation</u>, In the United States District Court for the District of Kansas, Case No. 2:14-md-2591-JWL-JPO (January 20, 2017).

Testimony of Daniel R. Fischel <u>In the Matter of Motiva Enterprises LLC vs. Bechtel Corporation</u>, <u>Jacobs Engineering Group, Inc. and Bechtel-Jacobs CEP Port Arthur Joint Venture</u>, International Institute for Conflict Prevention and Resolution (October 20, 2016)

Deposition of Daniel R. Fischel in <u>Beaver County Employees Retirement Fund, et al., vs. Cyan, Inc., et al.</u>, Superior Court of the State of California, County of San Francisco, Lead Case No. CGC-14-538355 (Consolidated with No. CGC-14-539008) (October 11, 2016).

Testimony of Daniel R. Fischel <u>In Re: Paragon Offshore PLC, et al, Debtors</u>, In the United States Bankruptcy Court, District of Delaware, Case No. 16-10386 (September 23, 2016).

Deposition of Daniel R. Fischel <u>In the Matter of Motiva Enterprises LLC vs. Bechtel Corporation</u>, <u>Jacobs Engineering Group, Inc. and Bechtel-Jacobs CEP Port Arthur Joint Venture</u>, International Institute for Conflict Prevention and Resolution (August 25, 2016)

Deposition of Daniel R. Fischel <u>In Re: Syngenta AG MIR162 Corn Litigation</u>, In the United States District Court for the District of Kansas; Case No. 2;14-MD-02591-JWL-JPO and <u>In Re: Syngenta Litigation</u>, In the State of Minnesota District Court, County of Hennepin, Fourth Judicial District, Case No. 27-CV-15-385 (August 11, 2016).

Deposition of Daniel R. Fischel in <u>The Western and Southern Life Insurance Company vs. The Bank of New York Mellon</u>, Court of Common Pleas, Hamilton County, Ohio, Case No. A 1302490 (July 27, 2016).

Testimony of Daniel R. Fischel in <u>Herbalife, Ltd., vs. KPMG LLP</u>, Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution, CPR Case No. 1100076998 (May 19, 2016).

Testimony of Daniel R. Fischel in <u>iHeart Communications, Inc., f/k/a Clear Channel Communications, Inc. vs. Benefit Street Partners, et al.</u>, In the District Court of Bexar County, Texas, Cause No. 2016 CI 04006 (May 17, 2016).

Deposition of Daniel R. Fischel in <u>iHeart Communications, Inc., f/k/a Clear Channel Communications, Inc. vs. Benefit Street Partners, et al.</u>, In the District Court of Bexar County, Texas, Cause No. 2016 CI 04006 (May 12, 2016).

Testimony of Daniel R. Fischel in <u>U.S. Commodity Futures Trading Commission v. Igor B. Oystacher and 3 Red Trading, LLC</u>, In the United States District Court for the Northern District of Illinois, Eastern Division, Docket No. 15 C 9196 (May 6, 2016).

Testimony of Daniel R. Fischel in <u>Merion Capital LP and Merion Capital II, LP vs. Lender Processing Services, Inc.</u>, In the Court of Chancery of the State of Delaware, C.A. No. 9320-VCL (May 4 and 5, 2016).

Testimony of Daniel R. Fischel in <u>iHeart Communications, Inc., f/k/a Clear Channel Communications, Inc. v. Benefit Street Partners LLC, et al.</u>, In the District Court of Bexar County, Texas, 285th Judicial District, Cause No. 2016-CI 04006 (April 5, 2016).

Deposition of Daniel R. Fischel in <u>iHeart Communications, Inc., f/k/a Clear Channel Communications, Inc. v. Benefit Street Partners LLC, et al.</u>, In the District Court of Bexar County, Texas, 285th Judicial District, Cause No. 2016-CI 04006 (April 2, 2016).

Deposition of Daniel R. Fischel in <u>Herbalife Ltd. vs. KPMG LLP</u>, Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution, CPR Case No.1100076998 (March 31, 2016).

Deposition of Daniel R. Fischel in <u>U.S. Commodity Futures Trading Commission v. Igor B. Oystacher and 3 Red Trading, LLC</u>, In the United States District Court, Northern District of Illinois, Eastern Division, No. 15-cv-09196 (March 25, 2016).

Deposition of Daniel R. Fischel in <u>Merion Capital LP and Merion Capital II, LP vs. Lender Processing Services, Inc.</u>, In the Court of Chancery of the State of Delaware, C.A. No. 9320-VCL (March 15, 2016).

Deposition of Daniel R. Fischel in <u>Lawrence E. Jaffe Pension Plan, On Behalf of Itself and All</u> <u>Others Similarly</u> <u>Situated v. Household International, Inc., et al.</u>, In the United States District Court, Northern District of Illinois Eastern Division, Lead Case No. 02-C-5893 (February 24, 2016).

Deposition of Daniel R. Fischel in <u>Robert E. Morley, Jr. and REM Holdings 3, LLC vs. Square,</u> <u>Inc., Jack Dorsey,</u> <u>and James McKelvey, Jr.</u>, United States District Court for the Eastern District of Missouri, Eastern Division, Civil Action No. 14-CV-00172-SNLJ (February 19, 2016).

Testimony of Daniel R. Fischel <u>In the Matter of the Application of U.S. Bank National</u> <u>Association, The Bank of</u> <u>New York Mellon, et al.</u>, Supreme Court of the State of New York, County of New York, Index No. 652382/2014 (January 20 and 21, 2016).

Testimony of Daniel R. Fischel in <u>Sangeeth Peruri v. Ameriprise Financial, Inc., et al</u>, American Arbitration Association, Case No. 01-15-0002-3991 (December 7, 2015).

Deposition of Daniel R. Fischel <u>In the Matter of the Application of U.S. Bank National</u> <u>Association, The Bank of</u> <u>New York Mellon, The Bank of New York Mellon Trust Company, N.A., et al</u>, In the Supreme Court of the State of New York, County of New York, Index No. 652382/2014 (December 3, 2015).

Testimony of Daniel R. Fischel in <u>Securities and Exchange Commission v. Arkadiy Dubovoy, et al</u>, In the United States District Court for the District of New Jersey, Civil Case No. 15-cv- 6076-MCA (October 8, 2015).

Deposition of Daniel R. Fischel in <u>Steven A. Stender, Harold Silver and Infinity Clark Street</u> <u>Operating, L.L.C.,</u> <u>on behalf of themselves and all others similarly situated v. Archstone-</u> <u>Smith Operating Trust, et al.</u>, in the United States District Court for the District of Colorado, Case No. 07-CV-02503-WJM-MJW (July 24, 2015).

Testimony of Daniel R. Fischel <u>In Re: Determination of Royalty Rates and Terms for Ephemeral</u> <u>Recording and</u> <u>Digital Performance of Sound Recordings (Web IV)</u>, in the United States Copyright Royalty Judges, The Library of Congress, Docket No. 14-CRB-0001-WR (2016-2020) (May 21 and 22, 2015).

Deposition of Daniel R. Fischel in <u>In Re: Determination of Royalty Rates and Terms for Ephemeral</u> <u>Recording and</u> <u>Digital Performance of Sound Recordings (Web IV)</u>, in the United States Copyright Royalty Judges, The Library of Congress, Docket No. 14-CRB-0001-WR (2016-2020) (April 1, 2015).

Deposition of Daniel R. Fischel in <u>MacDermid, Incorporated vs. Cookson Group, PLC, Cookson</u> <u>Electronics and</u> <u>Enthone, Inc.</u>, in the Superior Court, Judicial District of Waterbury, Docket No. UWY-CV-12-6016356-S (January 21, 2015).

Testimony of Daniel R. Fischel in the <u>Securities and Exchange Commission vs. Samuel E. Wyly</u> <u>and Donald R.</u> <u>Miller, Jr., in his capacity as the Independent Executor of the Will and</u> <u>Estate of Charles J. Wyly, Jr.</u>, in the United States District Court, Southern District of New York, 10 Civ. 5760 (SAS) (November 17, 2014).

Deposition of Daniel R. Fischel <u>In Re: Activision Blizzard, Inc. Stockholder Litigation</u>, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 8885-VCL (October 17, 2014).

Testimony of Daniel R. Fischel in <u>Hugh M. Caperton, Harman Development Corporation,</u> <u>Harman Mining</u> <u>Corporation, and Sovereign Coal Sales, Inc. v. A.T. Massey Coal</u> <u>Company, Inc.</u>, In the Circuit Court for Buchanan County, Case No. 027CL10000771-00 (May 20 and 21, 2014).

Deposition of Daniel R. Fischel in <u>Center Partners, Ltd., et al v. Urban Shopping Centers, L.P.,</u> <u>et al.</u>, In the Circuit Court of Cook County, Illinois, County Department, Law Division, Case No. 04 L 012194 (April 24, 2014).

Deposition of Daniel R. Fischel in <u>Third Point LLC v. William F. Ruprecht, et al and Sotheby's</u>, In the Court of Chancery of the State of Delaware, C.A. No. 9469-VCP (April 19, 2014).

Deposition of Daniel R. Fischel in <u>Hugh M. Caperton, Harman Development Corporation,</u> <u>Harman Mining</u> <u>Corporation, and Sovereign Coal Sales, Inc. v. A.T. Massey Coal</u> <u>Company, Inc.</u>, In the Circuit Court for Buchanan County, Case No. 027CL10000771-00 (March 14, 2014).

Deposition of Daniel R. Fischel in <u>Corre Opportunities Fund, LP, Zazove Associates LLC, DJD</u> <u>Group LLLP,</u> <u>First Derivative Traders LP, and Kevan A. Fight vs. Emmis Communications</u> <u>Corporation</u>, United States District Court, Southern District of Indiana, Indianapolis Division, Case No. 1:12-cv-0491-SEB-TAB (October 4, 2013).

Testimony of Daniel R. Fischel In the Matter of the Application of The Bank of New York Mellon, (As Trustee Under Various Pooling and Servicing Agreements and Indenture Trustee under various indentures), Petitioner, for an order, pursuant to CPLR §7701, seeking judicial instructions and approval of a proposed settlement, Index No. 651786/11, Supreme Court of the State of New York, County of New York: Trial Term Part 39 (September 9 and 10, 2013).

Testimony of Daniel R. Fischel In Re: September 11 Litigation, Case No. 21 MC 97 (AKH), United States District Court for the Southern District of New York, (July 16, 2013).

Deposition of Daniel R. Fischel in Cantor Fitzgerald & Co., et al v. American Airlines, Inc., et al, Case No. 21 MC 101 (AKH), 04 CV 7318 (AKH), United States District Court, Southern District of New York (July 1,2013).

Deposition of Daniel R. Fischel In Re: Pfizer Inc. Securities Litigation, Case No. 04 Civ. 9866 (RO) in The United States District Court for the Southern District of New York (June 28, 2013).

Testimony of Daniel R. Fischel in William T. Esrey, Julie C. Esrey, Ronald T. LeMay and Casondra C. Lemay v. Ernst & Young LLP Arbitration, Case No. 13 107 Y 02332 11 (May 29, 2013).

Deposition of Daniel R. Fischel in Christine Bauer-Ramazani and Carolyn B. Duffy, on behalf of themselves and all other similarly situated v. Teachers Insurance and Annuity Association of America – College Retirement and Equities Fund (TIAA-CREF), et al, in the United States District Court, District of Vermont, Docket No. 1:09-cv-190 (May 21, 2013).

Deposition of Daniel R. Fischel In Re: Google Inc. Class C Shareholder Litigation, In the Court of Chancery of the State of Delaware, Case No. 7469CS (May 17, 2013).

Deposition of Daniel R. Fischel In the Matter of the application of The Bank of New York Mellon (as Trustee under various Pooling and Servicing Agreements and Indenture Trustee under various Indentures), et al., Supreme Court of the State of New York, County of New York, Index No. 651786/2011 (May 9, 2013).

Deposition of Daniel R. Fischel in William T. Esrey, Julie C. Esrey, Ronald T. Lemay, and Casondra C. Lemay v. Ernst & Young, L.L.P., Before the American Arbitration Association, Case No. 1234 (May 7, 2013).

Deposition of Daniel R. Fischel in Archer Well Company, Inc. v. GW Holdings LLC and Wexford Capital LP, in the United States District Court, Southern District of New York, ECF Case No. 1 1:12-cv-06762-JSR (April 5, 2013).

Testimony of Daniel R. Fischel in Meso Scale Diagnostics, LLC , Meso Scale Technologies, LLC v. Roche Diagnostics GmbH, et al., In the Court of Chancery of the State of Delaware, Civil Action No. 5589-VCP (February 27, 2013).

Deposition of Daniel R. Fischel in Center Partners, Ltd. et al v. Urban Shopping Centers, L.P., et al, Circuit Court of Cook County, Illinois, No. 04 L 012194 (February 6 and 7, 2013).

Deposition of Daniel R. Fischel In Re: September 11 Litigation, United States District Court, Southern District of New York, Civil Action No. 21 MC 101 (AKH) (January 11, 2013).

Deposition of Daniel R. Fischel in Meso Scale Diagnostics, LLC, Meso Scale Technologies, LLC v. Roche Diagnostics GmbH, et al., In the Court of Chancery of the State of Delaware, Case No: 5589-VCP (November 12, 2012).

Testimony of Daniel R. Fischel in Stuart Bederman, et al. v. Archstone, f/k/a Archstone-Smith Operating Trust, Arbitration before the Honorable Bruce W. Kauffman (October 17, 2012).

Deposition of Daniel R. Fischel in David E. Brown, et al. v. Authentec, Inc. et al., In the Circuit Court of the Eighteenth Judicial Circuit in and for Brevard County, Florida, Civil Division, Case No. 05-2012-CA-57589 (September 18, 2012).

Deposition of Daniel R. Fischel in Stuart Bederman, et al. v. Archstone, f/k/a Archstone-Smith Operating Trust, Arbitration before the Honorable Bruce W. Kauffman (September 14, 2012).

Testimony of Daniel R. Fischel in Tronox, Incorporated, et al., v. Kerr-McGee Corporation, et al., United States Bankruptcy Court, Southern District of New York, Adversary Proceeding No. 09-10098(ALG) (August 7, 8 and 9, 2012).

Deposition of Daniel R. Fischel <u>In re McAfee, Inc. Shareholder Litigation</u>, Superior Court of the State of California, County of Santa Clara, Lead Case No. 1:10-cv-180413 (August 2, 2012).

Testimony of Daniel R. Fischel in <u>Kraft Foods Global, Inc., v. Starbucks Corporation</u>, Arbitration Before JAMS, Arbitration No. 1340008345 (July 31, 2012).

Deposition of Daniel R. Fischel in <u>Altana Pharma AG, and Wyeth v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries, Ltd.</u>, In the United States District Court, District of New Jersey, Consolidated Civil Action Nos. 04-2355 (JLL)(CCC), 05-1966 (JLL)(CCC), 05-3920 (JLL)(CCC) and 05-3672 (JLL)(CCC) (June 1, 2012).

Deposition of Daniel R. Fischel in <u>Kraft Foods Global, Inc. v. Starbucks Corporation</u>, Arbitration before JAMS, Arbitration No. 1340008345 (May 15, 2012).

Deposition of Daniel R. Fischel in <u>Capital One Financial Corporation v. John A. Kanas and John Bohlsen</u>, In the United States District Court for the Eastern District of Virginia, Alexandria Division, Civil Action No. 1:11-cv-750 (LO/TRJ) (May 10, 2012).

Deposition of Daniel R. Fischel in <u>In Re: Pfizer Inc. Securities Litigation</u>, In the United States District Court, Southern District of New York, Case 1:04-cv-09866-LTS-HBP (May 3, 2012).

Deposition of Daniel R. Fischel in <u>Willie R. Pittman, Susan B. Seales and Stephen T. Selzer vs. J. Coley Clark, Moneygram International, Inc., et al.</u>, In the Court of Chancery of the State of Delaware, C.A. No. 6387-VCL (April 26, 2012).

Deposition of Daniel R. Fischel in <u>Chona Allison, et al v. CRC Insurance Services, Inc.</u>, In the United States District Court for the Northern District of Illinois, Eastern Division, Case No. 10-3313 (March 14 and 15, 2012).

Deposition of Daniel R. Fischel <u>In Re: Tronox Incorporated, et al., Debtors</u>, In the United States Bankruptcy Court, Southern District of New York, Chapter 11, Case No. 09-10156 (ALG) (February 24, 2012).

Testimony of Daniel R. Fischel <u>In Re: BankAtlantic Bancorp, Inc. Litigation</u>, In the Court of Chancery of the State of Delaware, Consolidated Civil Action No. 7068-VCL (January 27 and 30, 2012).

Deposition of Daniel R. Fischel in <u>Hildene Capital Management, LLC et al v. BankAtlantic Bancorp, Inc., et al</u>, In the Court of Chancery of the State of Delaware, C.A. No. 7068- VCL (January 19, 2012).

Deposition of Daniel R. Fischel in <u>Advanced Analogic Technologies, Incorporated v. Skyworks Solutions, Inc. and Powerco Acquisition Corp.</u>, In the Court of Chancery of the State of Delaware, Arbitration No. 005-A-CS (November 18, 2011).

Testimony of Daniel R. Fischel in <u>Prudential Retirement Insurance and Annuity Company v. State Street Bank and Trust Company and State Street Global Advisors, Inc.</u>, United States District Court, Southern District of New York, Case No. 07-CV-8488 (October 13, 2011).

Deposition of Daniel R. Fischel <u>In Re: Inkeepers USA Trust, et al v. Cerberus Series Four Holdings, LLC.</u>, et al, United States Bankruptcy Court, Southern District of New York, Case No. 10-13800 (SCC) (October 5, 2011).

Deposition of Daniel R. Fischel in <u>Mary K. Jones, et al v. Pfizer, Inc., et al</u>, United States District Court, Southern District of New York, Civil Action No. 10-cv-03864 (AKH) ECF (October 4, 2011

Testimony of Daniel R. Fischel in <u>Marina Del Rey Country Club Apartments, et al. vs. Archstone and Archstone Multifamily Series I Trust</u>, Ruby/Archstone Arbitration (August 30, 2011).

Deposition of Daniel R. Fischel in <u>Maher Terminals, LLC v. The Port Authority of New York and New Jersey</u>, Before the Federal Maritime Commission, FMC Docket No. 08-03 (August 25, 2011).

Testimony of Daniel R. Fischel in <u>Securities and Exchange Commission v. Joseph P. Nacchio, Robert S. Woodruff, Afshin Mohebbi, James J. Kozlowski and Frank T. Noyes</u>, United States District Court for the District of Colorado, Civil Action No. 05-cv-480-MSK-CBS (August 16, 2011).

Affidavit of Daniel R. Fischel of <u>Glenhill Capital LP, et al v. Porsche Automobil Holding, SE, f/k/a Dr. Ing. h.c. F. Porsche AG</u>, Supreme Court of the State of New York, County of New York, Index Number 650678/2011 (August 15, 2011).

Deposition of Daniel R. Fischel in <u>Fairfax Financial Holdings Limited and Crum & Forster Holdings Corp. v. S.A.C. Capital Management, LLC, et al.</u>, Superior Court of New Jersey, Law Division: Morris County, Docket No. MRS-L-2032-06 (July 27, 2011).

Deposition of Daniel R. Fischel <u>In Re: Lyondell Chemical Company, et al v. Leonard Blavatnik</u>, et al., United States Bankruptcy Court, Southern District of New York, Chapter 11 Case No. 09-10023 – (REG) (Jointly Administered) (July 25, 2011).

Deposition of Daniel R. Fischel <u>In Re: Constar Int'l Inc. Securities Litigation</u>, United States District Court, Eastern District of Pennsylvania, Master File No. 03cv05020 (June 28, 2011).

Affidavit of Daniel R. Fischel <u>In Re: Massey Energy Co. Derivative and Class Action Litigation</u>, in The Court of Chancery of the State of Delaware, C.A. No. 5430-VCS (May 20, 2011).

Deposition of Daniel R. Fischel in <u>Marina Del Rey Country Club, et al v. Archstone and Archstone Multifamily Series I Trust</u>, Ruby/Archstone Arbitration (May 9, 2011).

Testimony of Daniel R. Fischel in <u>The Dow Chemical Company v. Petrochemical Industries Company (K.S.C.)</u>, International Chamber of Commerce, International Court of Arbitration, ICC Case No. 16127/JEM/MLK (April 7, 2011).

Testimony of Daniel R. Fischel <u>In Re: Tribune Company, et al., Debtors</u>, In the United States Bankruptcy Court for the District of Delaware, Chapter 11, Case No. 08-13141 (KJC) (March 10, 2011).

Deposition of Daniel R. Fischel <u>In Re: Tribune Company, et al., Debtors</u>, In the United States Bankruptcy Court for the District of Delaware, Chapter 11, Case No. 08-13141 (KJC) (March 2, 2011).

Deposition of Daniel F. Fischel <u>In Re: Genetically Modified Rice Litigation</u>, In the United States District Court for the Eastern District of Missouri, Eastern Division, Case No. 4:06 MD 1811 CDP (February 15, 2011)

Deposition of Daniel R. Fischel in <u>Riceland Food, Inc. v. Bayer Cropscience LP, et al</u>, In the United States District Court, Eastern District of Missouri, Eastern Division, Case No. 4:09- cv-00433 CDP (January 18, 2011).

Deposition of Daniel R. Fischel <u>In Re: Genetically-Modified Rice Litigation</u>, In the United States District Court for the Eastern District of Missouri, Case No. 4:06-MD-1811 (November 11, 12, 2010).

Deposition of Daniel R. Fischel in <u>Coleen Witmer, Individually, and on Behalf of All Others Similarly Situated v. Dynegy Inc.</u>, In the District Court of Harris County, Texas, 234th Judicial District (November 6, 2010).

Testimony of Daniel R. Fischel in <u>Terra Firma (GP) 2 Investments Limited v. Citigroup Inc.</u>, United States District Court for the Southern District of New York, No. 1:09-CV-10459 (JSR) (November 2, 2010).

Testimony of Daniel R. Fischel in <u>Terra Firma (GP) 2 Investments Limited v. Citigroup Inc.</u>, United States District Court for the Southern District of New York, No. 1:09-CV-10459 (JSR) (October 22, 2010).

Testimony of Daniel R. Fischel in <u>Air Products and Chemicals, Inc. v. Airgas, Inc., Peter McCausland, et al</u>, In the Court of Chancery of the State of Delaware, C.A. No. 5249-CC (October 5, 2010)

Deposition of Daniel R. Fischel in <u>Air Products and Chemicals, Inc. v. Airgas, Inc., Peter McCausland, et al</u>, In the Court of Chancery of the State of Delaware, C.A. No. 5249-CC (September 8, 2010).

Deposition of Daniel R. Fischel in <u>Terra Firma (GP) 2 Investments Limited v. Citigroup Inc.</u>, United States District Court for the Southern District of New York, No. 1:09-CV-10459 (JSR) (July 28, 2010).

Deposition of Daniel R. Fischel in <u>Citadel Investment Group, L.L.C. et al v. Mikhail Malyshev and Jace Kohlmeier</u>, In the American Arbitration Association, Case No.AAA No. 51 166 00969 09 (July 13, 2010).

Testimony of Daniel R. Fischel <u>In Re: United States of America v. Joseph P. Nacchio</u>, in the United States District Court for the District of Colorado, Case No. 05-CR-00545-EWN (June 23, 2010).

Deposition of Daniel R. Fischel in Cantor Fitzgerald Securities, Cantor Fitzgerald & Co., Cantor Fitzgerald Partners v. The Port Authority of New York and New Jersey, in the Supreme Court of the State of New York, County of New York, Case No. 105447/94 (June 4, 2010).

Deposition of Daniel R. Fischel in Alaska Retirement Management Board on behalf of State of Alaska Public Employees' Retirement System and State of Alaska Teachers' Retirement System v. Mercer (US), Inc., Mercer Human Resources Consulting, Inc., and William M. Mercer, Inc., in The Superior Court for the State of Alaska, First Judicial District at Juneau, Case No. 1JU-07-974CI (April 29, 2010).

Deposition of Daniel R. Fischel in In Re: ACS Shareholders Litigation, in The Court of Chancery of the State of Delaware, Consolidated Case No. 4940-VCP (April 26, 2010).

Testimony of Daniel R. Fischel in Securities and Exchange Commission v. Carl W. Jasper, in the United States District Court for the Northern District of California, San Jose Division, Case No. C-07-06122-JW (April 16, 2010).

Deposition of Daniel R. Fischel in Prudential Retirement Insurance and Annuity Company v. State Street Bank and Trust Company and State Street Global Advisors, Inc., in the United States District Court, Southern District of New York, Case No. 07 CIV 8488 (April 9, 2010).

Deposition of Daniel R. Fischel in In re: Lyondell Chemical Company, et al., Debtors. Official Committee of Unsecured Creditors, on behalf of the Debtors' Estates v. Citibank, N.A., et al., in the United States Bankruptcy Court, Southern District of New York, Chapter 11 Case No. 09-10023 – (RED) (December 2, 2009).

Deposition of Daniel R. Fischel in Securities and Exchange Commission v. Carl W. Jasper, In the United States District Court, Northern District of California, San Jose Division, Case No. CV 07-6122 (HRL) (October 22, 2009).

Testimony of Daniel R. Fischel in Ventas, Inc. v. HCP, Inc., In the United States District Court of the Western District of Kentucky at Louisville, Civil Action No. 3:07-cv-00238-JGH (September 2, 2009).

Deposition of Daniel R. Fischel in Frank K. Cooper Real Estate #1, Inc., et al vs. Cendant Corporation f/k/a Hospitality Franchise Systems and Century 21 Real Estate Corporation, Superior Court of New Jersey, Law Division: Morris County, Docket No. MRS-L-377-02 (August 10, 2009).

Deposition of Daniel R. Fischel in Ventas, Inc. v. HCP, Inc., In the United States District Court of the Western District of Kentucky at Louisville, Civil Action No. 3:07-cv-00238-JGH (August 3, 2009).

Deposition of Daniel R. Fischel in U.S. Commodity Futures Trading Commission v. Amaranth Advisors, L.L.C., Amaranth Advisors (Calgary) and Brian Hunter, in the United States District Court, Southern District of New York, Case No. 07 CIV 6682 (July 8, 2009).

Declaration and Expert Surrebutal Report of Daniel R. Fischel in Ventas, Inc. v. HCP, Inc., In The United States District Court for the Western District of Kentucky at Louisville, Case No. 3:07-CV-00238-JGH (June 22, 2009).

Testimony of Daniel R. Fischel in NRG Energy, Inc. v. Exelon Corporation and Exelon Exchange Corporation, in the United States District Court, Southern District of New York, Case No. 09-CV-2448 (JGK) (DFE), (June 3, 2009).

Deposition of Daniel R. Fischel In Re: Delphi Corporation v. Appaloosa Management L.P., et al., In the United States Bankruptcy Court, Southern District of New York; Chapter 11, Case No. 05-44481(RDD) (Jointly administered), (June 2, 2009).

Deposition of Daniel R. Fischel in NRG Energy, Inc. v. Exelon Corporation and Exelon Exchange Corporation, in the United States District Court, Southern District of New York, Case No. 09-CV-2448 (JGK) (DFE), (May 31, 2009).

Deposition of Daniel R. Fischel in e-Bay Domestic Holdings, Inc. v. Craig Newmark and James Buckmaster and Craigslist, Inc., in the Court of Chancery of the State of Delaware, Case No. 3705-CC (May 29, 2009)

Testimony of Daniel R. Fischel In Re: Lawrence E. Jaffe Pension Plan, et al v. Household International, Inc., et al, in the United States District Court for the Northern District of Illinois, Eastern Division, No. 02-C-5893 (April 16, 20, 28 and 29, 2009).

Deposition of Daniel R. Fischel <u>In Re: Rohm and Haas Company v. The Dow Chemical Company and Ramses Acquisition Corp.</u>, In the Court of Chancery of the State of Delaware, C.A. No. 4309-CC (March 4, 2009).

Deposition of Daniel R. Fischel <u>In the Matter of Hoffman, et al. v. American Express Travel Related Services Company, Inc., et al.</u>, in the Superior Court of the State of California, in and for the County of Alameda, Case No. 2001-022881 (January 15, 2009).

Deposition of Daniel R. Fischel <u>In Re: TyCom Ltd. Securities Litigation</u>, in the United States District Court, District of New Hampshire, Docket No. 03-CV-1352 (September 22, 2008).

Deposition of Daniel R. Fischel <u>In Re: Hexion Specialty Chemicals, Inc., et al v. Huntsman Corp.</u>, in the Court of Chancery of the State of Delaware, Civil Action No. 3841-VCL (September 4, 2008).

Deposition of Daniel R. Fischel <u>In Re: Stone Energy Corp. Securities Litigation</u>, in the United States District Court, Western District of Louisiana, Lafayette-Opelousas Division, Civil Action No. 6:05CV2088 (LEAD) (July 16, 2008).

Deposition of Daniel R. Fischel <u>In Re: Initial Public Offering Securities Litigation</u>, in the United States District Court, Southern District of New York, Master File No. 21 MC 92 (SAS) (April 3 and 4, 2008).

Deposition of Daniel R. Fischel <u>In Re: Lawrence E. Jaffe Pension Plan, et al v. Household International, Inc., et al</u>, in the United States District Court for the Northern District of Illinois, Eastern Division, No. 02-C-5893 (March 21, 2008).

Deposition of Daniel R. Fischel <u>In Re: IAC/InteractiveCorp and Barry Diller v. Liberty Media Corporation</u>, in the Court of Chancery of the State of Delaware in and for New Castle County, Consolidated Case Number 3486-VCL (February 29, 2008).

Testimony of Daniel R. Fischel <u>In Re: Immunicon Corporation v. Veridex LLC</u>, before the American Arbitration Association (Commercial Arbitration Rules), Case Number 50 180T 00192 07 (January 17, 2008).

Deposition of Daniel R. Fischel <u>In Re: Unitedglobalcom Shareholders Litigation</u>, in the Court of Chancery of the State of Delaware in and for New Castle County, Consolidated C.A. No. 1012-N (November 19, 2007).

Deposition of Daniel R. Fischel <u>In Re: Cendant Corporation Litigation</u>, in the United States District Court for the District of New Jersey, Master File No. 98-1664 (WHW) (November 15, 2007).

Deposition of Daniel R. Fischel <u>In Re: Cendant Corporation Litigation</u>, in the United States District Court for the District of New Jersey, Master File No. 98-1664 (WHW) (October 16, 2007).

Deposition of Daniel R. Fischel <u>In Re: Schering-Plough Corporation Securities Litigation</u>, in the United States District Court for the District of New Jersey, Master File No. 01-CV-0829 (KSH/RJH) (October 12, 2007).

Deposition of Daniel R. Fischel <u>In Re: Carpenters Health & Welfare Fund, et al. vs. The Coca-Cola Company</u>, in the United States District Court, Northern District of Georgia, Atlanta Division, File No. 1:00-CV-2838-WBH (Consolidated) (September 26, 2007).

Deposition of Daniel R. Fischel <u>In Re: Parker Freeland, et al., vs. Iridium World Communications, Ltd., et al.</u>, in the United States District Court for the District of Columbia, Civil Action No. 99-1002 (August 7, 2007)

Deposition of Daniel R. Fischel <u>In Re: Chuck Ginsburg v. Philadelphia Stock Exchange, Inc., et al.</u>, In the Court of Chancery of the State of Delaware in and for New Castle County, C.A. No. 2202-N (June 12, 2007).

Testimony of Daniel R. Fischel <u>In Re: Holcombe T. Green and HTG Corp. v. McKesson, Inc., et al</u>, In the Superior Court for the County of Fulton, State of Georgia, Civil Action File No. 2002-CV-48407 (June 5, 2007).

Affidavit of Daniel R. Fischel <u>In Re: Lear Corporation Shareholders Litigation</u>, In the Court of Chancery of the State of Delaware, Consolidated C.A. No. 2728-VCS (May 30, 2007).

Affidavit of Daniel R. Fischel <u>In Re: Aeroflex, Inc. Shareholder Litigation</u>, in the Supreme Court of the State of New York, County of Nassau: Commercial Division, Index No. 07-003943 (May 23, 2007).

Deposition of Daniel R. Fischel In Re: Holcombe T. Green and HTG Corp. v. McKesson, Inc., HBO & Company, Albert Bergonzi, and Jay Gilbertson, in the Superior Court for the County of Fulton, State of Georgia, Civil Action File No. 2002W48407 (May 21, 2007).

Deposition of Daniel R. Fischel In Re: Adelphia Communications Corp. v. Deloitte & Touche LLP, et al, in the Court of Common Pleas, Philadelphia County, Pennsylvania, Case No. 000598 (May 3 and 4, 2007).

Testimony of Daniel R. Fischel In Re: United States of America v. Joseph P. Nacchio, in the United States District Court for the District of Colorado, Case No. 05-CR-00545-EWN (April 9, 2007).

Deposition of Daniel R. Fischel In Re: MK Resources Company Shareholders Litigation, in the Court of Chancery for the State of Delaware in and for New Castle County, C.A. No. 1692- N (February 22, 2007).

Deposition of Daniel R. Fischel In Re: Starr International Company, Inc. v. American International Group, Inc., In the United States District Court, Southern District of New York, Case No. 05 CV 6283 (January 26, 2007).

Written testimony of Daniel R. Fischel In Re: Verizon Communications Inc. and Verizon Services Corp. v. Christopher G. Pizzirani, In the United States District Court for the Eastern District of Pennsylvania, Case No. 2:06-cv-04645-MK (November 6, 2006).

Testimony of Daniel R. Fischel In Re: Northeast Savings, F.A. v. United States of America, In the United States Claims Court, Case No. 92-550 C (November 2 and 9, 2006).

Testimony of Daniel R. Fischel In Re: United States of America v. Sanjay Kumar and Stephen Richards, United States District Court, Eastern District of New York, 04 Civ. 4104 (ILG) (October 25, 2006).

Affidavit of Daniel R. Fischel In Re: Lionel I. Brazen and Nancy Hammerslough, et al v. Tyco International Ltd., et al, In the Circuit Court of Cook County, Illinois County Department, Chancery Division, No. 02 CH 11837 (September 18, 2006).

Deposition of Daniel R. Fischel In Re: Tele-Communications, Inc. Shareholders Litigation, in the Court of Chancery of the State of Delaware in and for New Castle County, Consolidated C.A. No. 16470 (September 15, 2006).

Affidavit of Daniel R. Fischel In Re: United States of America v. Sanjay Kumar and Stephen Richards, United States District Court, Eastern District of New York, 04 Civ. 4104 (ILG) (September 8, 2006).

Deposition of Daniel R. Fischel In Re: James Gilbert v. McKesson Corporation, et al., in the State Court of Fulton County, State of Georgia, Civil Action File No. 02VS032502C (September 7, 2006).

Supplemental Declaration of Daniel R. Fischel In Re: United States of America v. Jeffrey K. Skilling, in the United States District Court, Southern District of Texas, Houston Division, Crim. No. H-04-25 (Lake, J.) (August 25, 2006).

Affidavit of Daniel R. Fischel In Re: United States of America v. Sanjay Kumar and Stephen Richards, United States District Court, Eastern District of New York, 04 Civ. 4104 (ILG) (August 22, 2006).

Declaration of Daniel R. Fischel In Re: United States of America v. Jeffrey K. Skilling, in the United States District Court, Southern District of Texas, Houston Division, Crim. No. H-04- 25 (Lake, J.) (August 3, 2006).

Deposition of Daniel R. Fischel In Re: Enron Corporation Securities Litigation, in the United States District Court, Southern District of Texas, Houston Division, Case Number: H-01- 3624 (May 24, 2006).

Testimony of Daniel R. Fischel In Re: Guidant Corporation Shareholders Derivative Litigation, in the United States District Court, Southern District of Indiana, Indianapolis Division, Master Derivative Docket No. 1:03-CV-955-SEB-WTL (January 20, 2006).

Testimony of Daniel R. Fischel In Re. Hideji Jumbo Tanaka v. Cerberus Far East Management, L.L.C., et al., AAA Case No. 50 T 116 00284 03, (December 15, 2005).

Deposition of Daniel R. Fischel In Re: McKesson HBOC, Inc. Securities Litigation, in the United States District Court for the Northern District of California, No. C-99-20743-RMW (August 16, 2005).

Testimony of Daniel R. Fischel In the Matter of Visconsi Companies Ltd., et al. and Lehman Brothers, et al., National Association of Securities Dealers Department of Arbitration, Grievance No. 03-07606 (July 26, 2005).

Testimony of Daniel R. Fischel In Re: John P. Crowley, as Receiver of Ambassador Insurance Company v. Doris June Chait, et al., in the United States District Court for the District of New Jersey, Case No. 85-2441 (HAA) (July 21 and 22, 2005).

Deposition of Daniel R. Fischel In Re: Electronic Data Systems Corporation Securities Litigation, in the United States District Court for the Eastern District of Texas, Tyler Division, Case No. 6:03-MD-1512 (July 20, 2005).

Testimony of Daniel R. Fischel In Re: United States of America v. Philip Morris, Inc., et al, in the United States District Court for the District of Columbia, Case No. 1:99CV02496 (May 26 and 27, 2005).

Deposition of Daniel R. Fischel In Re: Cordis Corporation v. Boston Scientific Corporation, et ano, in the United States District Court for the District of Delaware, Case No. 03-027-SLR (May 25, 2005).

Deposition of Daniel R. Fischel In Re: United States of America v. Philip Morris, Inc., et al, in the United States District Court for the District of Columbia, Case No. 1:99CV02496 (May 16, 2005).

Testimony of Daniel R. Fischel In Re: Drury Industries, Inc. v. Drury Properties, Inc., in the First Judicial District Court of the State of Nevada in and for Carson City, Nevada (April 6 and 7, 2005).

Deposition of Daniel R. Fischel In Re: Jerry R. Summers and George T. Lenormand, et al v. UAL Corporation ESOP Committee, Marty Torres, Barry Wilson, Doug Walsh, Ira Levy, Don Clements, Craig Musa, and State Street Bank and Trust Company, in the United States District Court for the North District of Illinois, Eastern Division, No. 03 C 1537 (March 9, 2005).

Deposition of Daniel R. Fischel In Re: Drury Industries, Inc. v. Drury Properties, Inc., in the First Judicial District Court of the State of Nevada in and for Carson City, Nevada (March 7 and 10, 2005).

Testimony of Daniel R. Fischel In the Matter of Fyffes PLC v. DCC PLC, S&L Investments Limited, James Flavin and Lotus Green Limited, in The High Court, Dublin, Ireland (2002 No. 1183P) (February 1 and 2, 2005).

Deposition of Daniel R. Fischel In the Matter of the Arbitration between The Canada Life Assurance Company and The Guardian Life Insurance Company of America (January 12, 2005).

Deposition of Daniel R. Fischel In Re: IDT Corporation vs. Telefonica, S.A., et al, in the United States District Court, District of New Jersey, Civil Action No. 01-CV 471 (December 14, 2004).

Deposition of Daniel R. Fischel In Re: DQE, Inc. Securities Litigation, in the United States District Court, Western District of Pennsylvania, Master File No. 01-1851 (December 7, 2004)

Testimony of Daniel R. Fischel In Re: United States of America v. Daniel Bayly, James A Brown, Robert S. Furst, Daniel O. Boyle, William R. Fuhs and Sheila K. Kahanek, in the United States District Court of Southern Texas Houston Division, Case No. H-CR-03-363 (November 4, 2004).

Testimony of Daniel R. Fischel In the Matter of the Arbitration Between the Canada Life Assurance Company, Petitioner v. Caisse Centrale De Reassurance, Respondent, (November 2, 2004).

Testimony of Daniel R. Fischel In Re: Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company v. The United States, in the United States Court of Federal Claims, Case Nos. 98-126C, 98-154C and 98-474C (August 9, 2004).

Affidavit of Daniel R. Fischel In Re: Oracle Corp. Derivative Litigation, in the Court of the Chancery of the State of Delaware In and For New Castle County, Consolidated Civil Action No. 18751 (June 8, 2004).

Deposition of Daniel R. Fischel In Re: Reading International, Inc., et al v. Regal Entertainment Group, et al, (Delaware Chancery Court) (May 30, 2004).

Affidavit of Daniel R. Fischel In Re: Reading International, Inc., et al v. Regal Entertainment Group, et al, (Delaware Chancery Court) (May 28, 2004).

Deposition of Daniel R. Fischel In Re: Northeast Savings, F.A. v. United States of America, in the United States Claims Court, Case No. 92-550-C (May 4, 5 and 6, 2004).

Deposition of Daniel R. Fischel In Re: Tyson Foods, Inc. Securities Litigation, in the United States District Court for the District of Delaware, Civil Action No. 01-425-SLR (March 18, 2004).

Testimony of Daniel R. Fischel In the Matter of Coram Healthcare Corp. and Coram, Inc., Debtors, In the United States Bankruptcy Court for the District of Delaware, Case No. 00- 3299 Through 00-3300 (MFW) (March 4, 2004).

Testimony of Daniel R. Fischel In Re: Tracinda Corporation v. DaimlerChrysler AG, et al, in the United States District Court for the District of Delaware, Civil Action No. 00-984 (February 11, 2004)

Deposition of Daniel R. Fischel In Re: Gerald K. Smith, as Plan Trustee for and on behalf of the Estates of Boston Chicken, Inc., et al. v. Arthur Anderson LLP, et al., in the United States District Court for the Northern District of Illinois, Case Nos. CIV-01-218-PHX-PGR, CIV-01- 246-PHX-EHC, CIV-02-1162-PHX-PGR, CIV-02-1248-PHX-PGR (Consolidated) (October 29 and 30, 2003).

Deposition of Daniel R. Fischel In Re: Irene Abrams, on behalf of herself and all others similarly situated v. Van Kampen Funds, Inc., Van Kampen Investment Advisory Corp., Van Kampen Prime Rate Income Trust, Howard Tiffen, Richard F. Powers III, Stephen L. Boyd, Dennis J. McDonnell and Jeffrey W. Maillet, in the United States District Court for the Northern District of Illinois, Eastern Division, Case No. 01-C-7538 (October 21, 2003).

Deposition of Daniel R. Fischel In the Matter of Coram Healthcare Corp. and Coram, Inc., Debtors, In the United States Bankruptcy Court for the District of Delaware, Case No. 00- 3299 Through 00-3300 (MFW) (October 13, 2003).

Testimony of Daniel R. Fischel In Re: Transcore Holdings, Inc. v. Rocky Mountain Mezzanine Fund II, LP; Hanifen Imhoff Mezzanine Fund, LP; Moramerica Capital Corporation; and NDSBIC, LP and W. Trent Ates and Fred H. Rayner, In Re: Jams Arbitration, Case No. 1410003193 (September 24, 2003).

Deposition of Daniel R. Fischel In Re: Transcore Holdings, Inc. v. Rocky Mountain Mezzanine Fund II, LP; Hanifen Imhoff Mezzanine Fund, LP; Moramerica Capital Corporation; and NDSBIC, LP and W. Trent Ates and Fred H. Rayner, In Re: Jams Arbitration, Case No. 1410003193 (May 13, 2003).

Deposition of Daniel R. Fischel In Re: AT&T Broadband Management Corporation v. CSG Systems, Inc., American Arbitration Association No. 77 181 00159 02 VSS (April 9, 2003).

Deposition of Daniel R. Fischel In Re: DaimlerChrysler AG Securities Litigation, in the United States District Court for the District of Delaware, Civil Action No. 00-993-JJF (February 11 and 12, 2003).

Deposition of Daniel R. Fischel In Re: David T. Bard, Commissioner of Banking and Insurance for the State of Vermont, as Receiver for Ambassador Insurance Company v. Arnold Chait, et al, in the United States District Court for the District of New Jersey, Civil Action No. 85- 2441 (December 12, 2002).

Testimony of Daniel R. Fischel In Re: MHC Financing Limited Partnership, et al vs. City of San Rafael, et al, in the United States District Court, Northern District of California, Case No. C 00-3785 VRW (November 6, 2002).

Deposition of Daniel R. Fischel In Re:  MHC Financing Limited Partnership, et al vs. City of San Rafael, et al, in the United States District Court, Northern District of California, Case No. C 00-3785 VRW (October 16, 2002).

Deposition of Daniel R. Fischel In Re: Maine Yankee Atomic Power Company v. United States of America, In the United States Court of Federal Claims, Case No. 98-474 C (October 8 and 9, 2002)

Testimony of Daniel R. Fischel In Re: California Federal Bank, FSB v. The United States of America, In the United States Court of Federal Claims, Case No. 92-138C (September 20 and 23, 2002).

Deposition of Daniel R. Fischel In Re: Maine Yankee Atomic Power Company v. United States of America, In the United States Court of Federal Claims, Case No. 98-474 C (September 4 and 6, 2002).

Deposition of Daniel R. Fischel In the Matter of RDM Sports Group, Inc., et al v. Smith, Gambrell, Russell, L.L.P.; et al, In the United States Bankruptcy Court for the Northern District of Georgia, Newnan Division, Case No. 00-1065 (May 14 and 15, 2002).

Deposition of Daniel R. Fischel In Re: Walter B. Hewlett, individually and as Trustee of the William R. Hewlett Revocable Trust, and Edwin E. van Bronkhorst as Co-Trustee of the William R. Hewlett Revocable Trust v. Hewlett-Packard Company, in the Court of the Chancery of the State of Delaware in and for New Castle County (April 24, 2002).

Deposition of Daniel R. Fischel In Re: California Federal Bank, FSB, v. The United States of America, in the United States District Court of Federal Claims, Case No. 92-138C (April 16 and 17, 2002).

Deposition of Daniel R. Fischel In Re: Computer Associates Class Action Securities Litigation, in the United States District Court, Eastern District of New York, File No. 98-CV-4839 (TPC) (MLO) (March 19 and 20, 2002).

Deposition of Daniel R. Fischel In Re: United States of America v. David Blech, In the United States District Court, Southern District of New York, Case No. S1 97 Cr. 402 (KTD) (February 13, 2002).

Testimony of Daniel R. Fischel In the Matter of Coram Healthcare Corp. and Coram, Inc., Debtors, In the United States Bankruptcy Court for the District of Delaware, Case No. 00- 3299 Through 00-3300 (MFW) (December 14, 2001).

Deposition of Daniel R. Fischel In Re: Sunbeam Securities Litigation, In the United States District Court, Southern District of Florida, Miami Division, Case No. 98-8258-CIV – Middlebrooks (December 4, 5 and 6, 2001).

Affidavit of Daniel R. Fischel In Re: Jack M. Webb, Special Deputy Receiver for American Eagle Insurance Company v. Elvis Mason, Mason Best Company, L.P., Don D. Hutson, American Eagle Group, Inc., Marion Phillip Guthrie, Frederick G. Anderson, George F. Cass, Richard M. Kurz, Patricia S. Pickard, Arthur Andersen & Co., L.L.P., and Towers, Perrin Forester & Crosby, Inc., D/B/A Tillinghast, In the District Court of Travis County, Texas, 201st Judicial District, Cause No. 99-08253 (September 7, 2001).

Declaration of Daniel R. Fischel In the Matter of Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities: Before the Federal Communications Commission, Washington DC, GN Docket No. 00-185, (Declaration with K. Arrow, G. Becker, D. Carlton, R. Gertner, J. Kalt, H. Sider, and Gustavo Bamberger) (July 24, 2001).

Declaration of Daniel R. Fischel In Re: Walter Green, on behalf of himself and all others similarly situated v. Merck-Medco Managed Care, L.L.C., United States District Court, Southern District of New York, Civil Action No. 99 CIV 0847 (CLB) (June 18, 2001).

Testimony of Daniel R. Fischel In Re:Tyson Foods, Inc. and Lasso Acquisition Corporation v. IBP, Inc., Delaware Chancery Court, (May 25, 2001).

Deposition of Daniel R. Fischel In Re:Tyson Foods, Inc. and Lasso Acquisition Corporation v. IBP, Inc., Delaware Chancery Court, (May 10, 2001).

Deposition of Daniel R. Fischel In Re: Myron Weiner, Nicholas Sitnycky, Ronald Anderson and Robert Furman on behalf of themselves and all others similarly situated v. The Quaker Oats Company and William D. Smithburg, United States District Court, Northern District of Illinois, Case No. 98 C 3123, (January 24, 2001).

Deposition of Daniel R. Fischel In Re: Retsky Family Limited Partnership v. Price Waterhouse, LLP, United States District Court, Northern District of Illinois, Eastern Division, No. 97 C 7694, (October 31, 2000).

Joint Affidavit of Daniel R. Fischel and David J. Ross In Re: Floyd D. Wilson, for himself and all others similarly situated v. Massachusetts Mutual Life Insurance Company, in the First Judicial District Court, County of Santa Fe, State of New Mexico, No. D0101 CV-98-02814 (August 4, 2000).

Affidavit of Daniel R. Fischel <u>In Re: T. Rowe Price Recovery Fund, L.P., and Carl Marks</u> <u>Management Co.,</u> <u>L.P., individually and derivatively on behalf of Seaman Furniture Co.,</u> <u>Inc. v. James Rubin, M.D. Sass</u> <u>Associates, Inc., Resurgence Asset Management, L.L.C.,</u> <u>M.D. Sass Corporation Resurgence Partners,</u> <u>L.P. , M.D. Sass Corporate Resurgence</u> <u>International, Ltd., Robert Symington, Byron Haney, Alan</u> <u>Rosenberg, Steven H. Halper,</u> <u>and Peter McGeough and Seaman Furniture Co., Inc.,</u> In the Court of Chancery of the State of Delaware in and for New Castle County, C.A. No. 18013, (June 7, 2000).

Testimony of Daniel R. Fischel <u>In Re: Bank United of Texas, FSB, et al., v. United States of</u> <u>America</u>, United States Court of Federal Claims, Case Number 95-437C, (October 12 and 14, 1999).

Deposition of Daniel R. Fischel <u>In Re: Bank United of Texas, FSB, et al., v. United States of</u> <u>America</u>, United States Court of Federal Claims, Case Number 95-437C, (September 26, 1999; July 10, 1999; and June 16, 17, 1999).

Testimony of Daniel R. Fischel <u>In Re: C. Robert Suess, et al., v. The United States</u>, United States Court of Federal Claims, No. 90- 981C (May 17, 1999).

Testimony of Daniel R. Fischel <u>In Re: Lexecon, Inc. v. Milberg Weiss Bershad Specthrie & Lerach, et al.,</u> in the United States District Court, Northern District of Illinois Eastern Division, Case No. 92 C 7768 (March 8, 9, 10 and 15, 1999).

Testimony of Daniel R. Fischel <u>In Re: California Federal Bank v. United States</u>, in the United States Court of Federal Claims, Case Number 92-138C, (February 4 and 11, 1999).

Deposition of Daniel R. Fischel <u>In Re: California Federal Bank v. United States</u>, in the United States Court of Federal Claims, Case Number 92-138C, (February 6, 1999; January 27 and 30, 1999).

Deposition of Daniel R. Fischel <u>In Re: C. Robert Suess, et al., v. The United States</u>, United States Court of Federal Claims, No. 90- 981C (October 27 and 28, 1998).

Deposition of Daniel R. Fischel <u>In Re: Connector Service Corporation v. Jeffrey Briggs</u>, United States District Court, Northern District of Illinois, Eastern Division, No. 97-C-7088 (August 28, 1998).

Deposition of Daniel R. Fischel <u>In Re: Statesman Savings Holding Corp., et al. v. United States of America</u>, United States Court of Federal Claims, Case No. 90-773C, (May 4, 1998 and February 12, 1998).

Testimony of Daniel R. Fischel <u>In Re: Glendale Federal Bank FSB v. United States of America</u>, United States Court of Federal Claims, No. 90-772C, (March 24, 25 and 26, 1998; September 2, 3, 4, 5, 8, 9, 10, 11, 12, 24, 25, 26 and 27, 1997; October 7, 9, 16, 17, 30 and 31, 1997; December 8, 9 and 10, 1997).

Affidavit of Daniel R. Fischel and David J. Ross <u>In Re: Publicis Communication v. True North</u> <u>Communications</u> <u>Inc., et al.,</u> United States District Court, Northern District of Illinois, Eastern Division, Case No. 97-C-8263, (December 7, 1997).

Deposition of Daniel R. Fischel <u>In Re: Glendale Federal Bank FSB v. United States of America</u>, United States Court of Federal Claims, No. 90-772C, (August 27 and 28, 1997).

Testimony of Daniel R. Fischel <u>In Re: AUSA Life Insurance Company, et al. v. Ernst & Young</u>, in the United States District Court, Southern District of New York, Master File No. 94 CIV. 3116 (CLB) (July 7 and 8, 1997).

Deposition of Daniel R. Fischel <u>In Re: Santa's Best, f/k/a National Rennoc, an Illinois general partnership, and</u> <u>Tinsel/Ruff Group Limited Partnership, an Illinois limited partnership v. Rennoc Limited Partnership, a</u> <u>New Jersey limited parternship, v. Tinsel/Ruff Group Limited Parternship, an Illinois limited partnership,</u> in the Circuit Court of Cook, Illinois County Department - Chancery Division, No. 95 CH 12160, (June 17, 1997).

Arbitration of Daniel R. Fischel <u>In Re: Lerner v. Goldman Sachs, et. al.</u>, Before the American Arbitration Association, 75-136-00090-94 (April 10, 1997).

Affidavit of Daniel R. Fischel <u>In Re: Hilton Hotels Corporation and HLT Corporation v. ITT Corporation</u>, United States District Court, District of Nevada, CV-S-97-00095-PMP (RLH) (March 24, 1997).

Deposition of Daniel R. Fischel <u>In Re: Glendale Federal Bank, FSB v. United States of America</u>, Washington, D.C., Case No. 90-772C, (March 19, 1997; January 30 and 31, 1997).

Deposition of Daniel R. Fischel <u>In Re: Statesman Savings Holding Corporation v. United States</u> of America, Washington, D.C., Case No. 90-773-C, (February 19 and 20, 1997).

Testimony of Daniel R. Fischel <u>In Re: Westcap Enterprises, Inc. and Westcap Corporation</u>, Debtor; in the United States Bankruptcy Court, for the Southern District of Texas, Houston Division, Houston, Texas; Case No. 96-43191-H2-11, (November 1996).

Testimony of Daniel R. Fischel <u>In Re: United States of America v. Robert R. Krilich</u>, in the United States District Court, Northern District of Illinois, Eastern Division, No. 94 CR 419, (August 20, 1996 and July 15, 1996)

Deposition of Daniel R. Fischel <u>In Re: McMahan & Company, Froley, Revy Investment Co., Inc.</u> and Wechsler & Krumholz, Inc. v. Wherehouse Entertainment, Inc., Louis A. Kwiker, George A. Smith, Michael T. O'Kane, Lawrence K. Harris, et al., United States District Court, Southern District of New York, Index No. 88 Civ. 0321 (SS) (AJP), (July 16, 1996 and June 10, 1996).

Deposition of Daniel R. Fischel <u>In Re: Joseph W. and Helen B. Teague, Steven Allen Barker,</u> Rita Strahowski, Swannee Beck, and Lifetime Partners of PTL, as representatives of a nationwide class consisting of 150,129 Lifetime Partners and 27,839 persons who have partially paid for Lifetime Partnerships v. James O. Bakker, in the United States District Court for the Western District of North Carolina, Civil Action No. 3:87CV514, (June 28, 1996).

Deposition of Daniel R. Fischel <u>In Re: Snapple Beverage Corporation Securities Litigation</u>, in the United States District Court, Eastern District of New York, Master File No. CV 94-3647 (May 30, 1996).

Testimony of Daniel R. Fischel <u>In Re: Chuck Quackenbush, Insurance Commissioner of the</u> State of California, in his capacity as Trustee of Mission Insurance Company Trust, et al. v. Borg-Warner Corporation, Borg Warner Equities Corporation, Borg-Warner Insurance Service, Inc., et al., for the Superior Court of the State of California, for the County of Los Angeles, No. C688487 (April 18, 1996).

Deposition of Daniel R. Fischel <u>In Re: Chuck Quackenbush, Insurance commissioner of the</u> State of California, in his capacity as Trustee of Mission Insurance Company Trust, et al. v. Borg-Warner Corporation, Borg Warner Equities Corporation, Borg-Warner Insurance Service, Inc., et al., for the Superior Court of the State of California, for the County of Los Angeles, No. C688487 (April 17, 1996).

Deposition of Daniel R. Fischel <u>In Re: Household Commercial Financial Services, Inc. a citizen</u> of the states of Delaware and Illinois v. Julius Trump, a citizen of the State of Florida, Edmond Trump, a citizen of the state of Florida, James M. Jacobson, a citizen of the State of New York, and Parker, Chapin, Flattau & Klimpl, a citizen of the states of New York and New Jersey, in the United States District Court, for the Northern District of Illinois Eastern Division, 92 C 5010 (February 1, 1996).

Deposition of Daniel R. Fischel <u>In Re: JWP, Inc. Securities Litigation</u>, in the United States District Court, Southern District of New York, Master File No. 92 Civ. 5815 (CLB); AUSA Life Insurance Company, et al. v. Ernst & Young, in the United States District Court, Southern District of New York, Master File No. 94 Civ. 3116 (CLB) (November 30, 1995; November 9, 1995; October 18 and 19, 1995; September 28, 1995).

Deposition of Daniel R. Fischel <u>In Re: City of Houston Municipal Employees Pension System, a</u> Texas association v. PaineWebber Group Inc., et al., in the United States District Court, Eastern District of Missouri, Eastern Division, No. 4:94CV0073CAS (November 15 and 16, 1995).

Testimony of Daniel R. Fischel <u>In Re: American Continental Corporation/Lincoln Savings & Loan</u> Securities Litigation - Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach and Kevin P. Roddy, in the United States District Court, District of Arizona, Civ-93-1087-PHX-JMR (July 25 and 26, 1995).

Deposition of Daniel R. Fischel <u>In Re: Keith C. Bogard, et al., v. National Community Bank Inc.,</u> et al., in the United States District Court, District of New Jersey, No. 90-5-32 (HAA) (December 20, 1994).

Deposition of Daniel R. Fischel <u>In Re: Harvey Rosen, Ben Rogers and Julie Rogers v. Deloitte</u> & Touche, Elias Zinn, Julius Zinn, Dennis Lamm, and Ronald Begnaud, in the 268th Judicial District Court, of Fort Bend County, Texas, Cause No. 84-482 (November 9, 1994).

Testimony of Daniel R. Fischel <u>In Re: PPM America, Inc., et al. v. Marriott Corporation et al.</u>, in the United States District Court, for the District of Maryland, Civil Docket No. H-92-3068 (October 12, 1994).

Deposition of Daniel R. Fischel In Re: Browning-Ferris Industries, Inc., Securities Litigation, United States District Court, for the Southern District of Texas, Houston Division, Civil Action H-903477 (September 1, 1994).

Testimony of Daniel R. Fischel In Re: Computer Associates International Inc. Securities Litigation, United States District Court, Eastern District of New York, CV-90-2398 (JBW) (May 26 and 27, 1994).

Deposition of Daniel R. Fischel In Re: PPM America, Inc., et al. v. Marriott Corporation et al., United States District, for the District of Maryland, H-92-3068 (May 10, 1994 and March 8, 1994).

Deposition of Daniel R. Fischel In Re: Securities and Exchange Commission v. Shared Medical Systems Corporation, R. James Macaleer, James C. Kelly and Clyde M. Hyde, United States District Court, for the Eastern District of Pennsylvania, Civil Action - Law: No. 91- CV-6549 (February 22, 1994).

Testimony of Daniel R. Fischel In Re: Peter M. Schultz and Pamela A. Schultz v. Rhode Island Hospital Trust National Bank, N.A., et al., United States District Court, District of Massachusetts, Civil Action No. 88-2870-T (February 16, 1994).

Deposition of Daniel R. Fischel In Re: Henry T. Endo, et al. v. John M. Albertine, et al., United States District Court, Northern District of Illinois, Eastern Division, No. 88 C 1815 (November 11 and 12, 1993; October 28, 1993).

Deposition of Daniel R. Fischel In Re: Computer Associates International Inc. Securities Litigation, United States District Court, Eastern District of New York, CV 90-2398 (JBW) (November 2, 1993 and February 4, 1993).

Affidavit of Daniel R. Fischel In Re: Peter M. Schultz and Pamela A. Schultz v. Rhode Island Hospital Trust National Bank, N.A. et al., United States District Court, District of Massachusetts, Civil Action No. SS-2870-T (October 28, 1993).

Deposition of Daniel R. Fischel In Re: Alpheus John Goddard, III, etc. v. Continental Bank N.A., etc., State of Illinois, County of Cook, Circuit Court of Cook County, County Department- Chancery Division, No. 89 CH 1081 (September 10, 1993).

Deposition of Daniel R. Fischel In Re: Taxable Municipal Bond Section "G" Securities Litigation, United States District Court, Eastern District of Louisiana, MDL No. 863 (September 2, 1993).

Reply Affidavit of Daniel R. Fischel In Re: Columbia Securities Litigation, United States District Court Southern District of New York, 89 Civ. 6821 (LBS) (August 30, 1993).

Affidavit of Daniel R. Fischel In Re: Consumers Gas & Oil, Inc. v. Farmland Industries, Inc., et al., United States District Court, for the District of Colorado, Civil Action No. 92-F-1394 (August 26, 1993).

Declaration of Daniel R. Fischel In Re: Equitec Rollup Litigation, United States District Court for the Northern District of California, Master file No. C90 2064 CAL (July 28, 1993).

Deposition of Daniel R. Fischel In Re: United Telecommunications, Inc. Securities Litigation, United States District Court for the District of Kansas, No. 90-2251-0 (July 22, 1993, April 21 and 22, 1993).

Deposition of Daniel R. Fischel In Re: Consumers Gas & Oil, Inc., a Colorado farm cooperative in liquidation, on behalf of itself and others similarly situated v. Farmland Industries, Inc., a Kansas farm cooperative, et al., United States District Court, District of Colorado, 92-F- 1394 (June 18, 1993).

Deposition of Daniel R. Fischel In Re:  Rosalind Wells v. HBO & Company, United States District Court, Northern District of Georgia, Atlanta Division, 8-87-CV-657A (JTC) (June 10, 1993 and May 24, 1993).

Deposition of Daniel R. Fischel In Re: Equitec Rollup Litigation, United States District Court, Northern District of California, No. C-90-2064 CAL (June 2 and 3, 1993).

Supplemental Declaration of Daniel R. Fischel In Re: Oracle Securities Litigation, United States District Court, Northern District of California, Master File No. C 90 0931 VRW (May 20, 1993).

Affidavit of Daniel R. Fischel and Kenneth R. Cone In Re: Raymond P. Hayden, et al. v. Jeffrey L. Feldman, et al., United States District Court, Southern District of New York No. 88 Civ. 8048 (JES) (May 12, 1993).

Testimony of Daniel R. Fischel In Re: Melridge, Inc., Securities Litigation, United States District Court for the District of Oregon, CV No. 87-1426-FR (May 4 and 5, 1993).

Declaration of Daniel R. Fischel In Re: Oracle Securities Litigation, United States District Court, Northern District of California, Master File No. C 90 0931 VRW (April 20, 1993).

Deposition of Daniel R. Fischel In Re: Gillette Securities Litigation, United States District Court, District of Massachusetts, No. 88-1858-K (April 1, 1993).

Affidavit of Daniel R. Fischel In Re: Columbia Securities Litigation, United States District Court, Southern District of New York, 89 Civ. 6821 (LBS) (March 25, 1993).

Deposition of Daniel R. Fischel In Re: Westinghouse Securities Litigation, United States District Court, Western District of Pennsylvania, CV No. 91 354 (March 23, 1993).

Declaration of Daniel R. Fischel In Re: Oracle Securities Litigation, United States District Court, Northern District of California, Master File No. C 90-0931 VRW (March 22, 1993).

Deposition of Daniel R. Fischel In Re: Kroy, Inc., a Minnesota corporation et al. v. Bankers Trust New York Corporation, et al., Superior Court of the State of Arizona in and for the County of Maricopa, No. CV 89-35680 (March 18, 1993).

Deposition of Daniel R. Fischel In Re: Amos M. Ames, Helen M. Ames, Robert F. Bourke, Louise L. Bourke, Leo E. Corr, April C. Corr, Wence M. Horak, Ruth Horak, Robert T. Freas, Maurita Freas, Bruce Fink, Jr., William H. Jones, Candace A. Jones, Richard Paul, William L. Paul, Carole Paul, Steven J. Paul, Best Power Technology, Incorporated, and Best Power Technology Sales Corporation, in the State of Wisconsin, Circuit Court, Juneau County, Consolidated Case Nos. 92-CV-31, 92-CV-32 (January 26, 1993).

Deposition of Daniel R. Fischel In Re: Federal Express Corporation Shareholder Litigation, in the United States District Court, Western District of Tennessee, Master File No. 90-2359- 4B (December 3, 1992).

Deposition of Daniel R. Fischel In Re: Raymond Snyder, Individually and on behalf of all those similarly situated v. Oneok, Inc., et al., in the United States District Court, Northern District of Oklahoma, Civil Action No. 88 C 1500 E (October 15 and 16, 1992).

Deposition of Daniel R. Fischel In Re: Melridge, Inc. Securities Litigation, Consolidated Actions, United States District Court, District of Oregon, Master File No. CV87-1426-JU and Nos. 387-06589-P11, 88-05-JU, 88-221-JU, 88-0699-PA, 88-1266-JU (September 17, 1992; July 25 and 26, 1991).

Deposition of Daniel R. Fischel In Re: Maxus Corporate Company v. Kidder, Peabody & Co. Incorporated, Martin A. Siegel and Ivan F. Boesky, in the District Court Dallas County, Texas, 298th Judicial District, No. 87-15583-M (September 11, 1992; August 18 and 19, 1992).

Deposition of Daniel R. Fischel In Re: Jennifer A. Florin and Alan L. Mundt, on behalf of themselves and all others similarly situated v. Wesray Capital Corp., Citizens and Southern Trust Company, a subsidiary of Citizens and Southern Corporation, Robert K. Barton, Leonard S. Gaby, Allen G. Lacoe, Robert A. Magnusson, Anthony A. Saliture, Harlan B. Smith, Thomas F. Stutzman, Raymond G. Chambers, Frank E. Richardson, E. Burke Ross, Jr., William E. Simon and Frank W. Walsh, Jr., in the United States District Court, Western District of Wisconsin, Civil Action No. 91C-0948 (August 12, 1992).

Deposition of Daniel R. Fischel In Re: Pearl Newman, Shanna Lehmann & Athanasios Tsivelekidis, on their own behalf and on behalf of all other persons similarly situated v. On- Line Software International, Inc. Jack M. Berdy, John C. Crocker, Richard A. Granger, Richard R. Holtmeier, Michael S. Juceam, Edward J. Siegel, Howard P. Sorgen and Richard Ward, United States District Court, District of New Jersey, Consolidated Civil Action Nos. 88-3247, 88-3411 (July 28 and 29, 1992).

Deposition of Daniel R. Fischel In Re: Crazy Eddie Securities Litigation, Oppenheimer-Palmieri Fund, I.P., et al. v. Peat Marwick Main & Co., et al., United States District Court for the Eastern District of New York, 87 Civ. 0033 (EHN), 88 Civ. 3481 (EHN) (June 11, 1992; March 26 and 27, 1992).

Testimony of Daniel R. Fischel In Re: American Continental Corporation/Lincoln Savings and Loan Securities Litigation, in the United States District Court, for the District of Arizona MDL Docket No. 834 (June 4, 1992; May 26, 27 and 28, 1992).

Testimony of Daniel R. Fischel In Re: State of West Virginia v. Morgan Stanley & Co. Incorporated, in the Circuit Court of Kanawha County, State of West Virginia, Civil Action No. 89-C-3700 (April 27, 1992).

Affidavit of Daniel R. Fischel In Re: William Steiner, on behalf of himself and all others similarly situated v. Tektronix, Inc., et al., in the United States District Court, District Court of Oregon, Civil No. 90-587-JO (March 23, 1992).

Deposition of Daniel R. Fischel In Re: Martin Kaplan and Selma Kaplan, on Behalf of Themselves and All Others Similarly Situated v. VICORP Restaurants, Inc., Charles R. Frederickson, Robert S. Benson, Emerson B. Kendall, Robert T. Marto and Johyn C. Hoyt, United States District Court, District of Colorado, Civil Action No. 90-C-2182 (February 11, 1992).

Deposition of Daniel R. Fischel In Re: Interco Incorporated v. Wasserstein, Perella & Co., Inc., United States District Court, Eastern District of Missouri, Eastern Division, No. 91-0151-C- 6 (February 3, 1992 and December 12, 1991).

Statement of Daniel R. Fischel In Re: Far West Federal Bank, S.B., et al. v. Director, Office of Thrift Supervision, et al., United States District Court for the District of Oregon, Civil Action No. 90-103 PA (February 3, 1992).

Deposition of Daniel R. Fischel In Re: Capital Bank of California v. Morgan Stanley & Co., Incorporated, United States District Court, Central District of California, No. 91-1650-R (January 24, 1992).

Deposition of Daniel R. Fischel In Re: Trinity Ventures, et al. v. Federal Deposit Insurance Corporation, in its own capacity and as successor to the Federal Savings and Loan Insurance Corporation, United States District Court, for the District of Oregon, No. 90-103- PA (January 6, 1992).

Deposition of Daniel R. Fischel In Re: First Republicbank Securities Litigation, United States District Court, Northern District of Texas, Dallas Division, Civil Action No. 3-88-0641-H (January 2, and 3, 1992; November 26, 1991).

Deposition of Daniel R. Fischel In Re: State of West Virginia v. Morgan Stanley & Co. Incorporated; Salomon Brothers Inc.; and Goldman Sachs & Co., in the Circuit Court of Kanawha County, State of West Virginia, Civil Action No. 89-C-3700 (December 19 and 20, 1991).

Deposition of Daniel R. Fischel In Re: The Regina Company, Inc. Securities Litigation, United States District Court, District of New Jersey, Civil Action No. 88-4149 (HAA) (October 31, 1991).

Affidavit of Daniel R. Fischel In Re: Gillette Securities Litigation, United States District Court, District of Massachusetts, Civil Action No. 88-1858-K (October 7, 1991)

Deposition of Daniel R. Fischel In Re: Capital Maritime Corporation v. Amfels, Inc., Far East Levingston Shipbuilding Ltd., John B. Allison and Patrick A. McDermid, United States District Court for the Southern District of Texas Houston Division, C.A. No. H-90-3417 (September 12, 1991).

Deposition of Daniel R. Fischel In Re: Thomas J. Caldarone, Jr. v. Isidore Brown, et al., and John E. Washburn, et al. v. Isidore Brown, et al., United States District Court, Northern District of Illinois, Eastern Division, Docket Nos. 80 C 6251 and 81 C 1475 (August 28, 29, and 30, 1991).

Testimony of Daniel R. Fischel In Re: Apple Securities Litigation, United States District Court, Northern District of California, Northern Division, Docket No. C-84-20148 (May 20 and 21, 1991).

Testimony of Daniel R. Fischel In Re: The Stuart-James Co., Inc., et al. Litigation, United States of America before the Securities & Exchange Commission, in Denver, Colorado, Administrative Proceeding File No. 3-7164 (May 6, 1991).

Deposition of Daniel R. Fischel In Re: Jennie Farber on behalf of herself and all others similarly situated v. Public Service Company of New Mexico; Jerry D. Geist; John P. Bundrant and Albert J. Robison, United States District Court for the District of New Mexico, CIV 89-456 JB WWD (April 17 and 18, 1991).

Affidavit of Daniel R. Fischel In Re: Moise Katz, Frederick Rand, Elias Weissman, Richard D. Morgan, Marion R. Morgan and Mortimer Schulman v. Raymond A. Hay, United States District Court, Southern District of New York, No. 86 Civ. 5640 (JES) (March 29, 1991).

Deposition of Daniel R. Fischel In Re: Standard Chartered PLC., a United Kingdom corporation, et al. v. Price Waterhouse, a general partnership, Superior Court of the State of Arizona, in and for the County of Maricopa, CV 88-34414 (March 13 and 14, 1991).

Affidavit of Daniel R. Fischel In Re: United States of America v. AVX Corporation, and Commonwealth of Massachusetts v. AVX Corporation, United States District Court, District of Massachusetts, Civil Action Nos. 83-3882-Y and 83-3899-Y (January 29, 1991).

Deposition of Daniel R. Fischel In Re: Apple Computer Securities, United States District Court Northern District of California, San Jose Division, No. C-84-20148 (a) JW (December 13 and 14, 1990).

Deposition of Daniel R. Fischel In Re: Polycast Technology Corporation, and Uniroyal Plastics Acquisition Corp. v. Uniroyal, Inc., et al., United States District Court Southern District of New York, No. 87 Civ. 3297 (December 6, 1990 and November 28, 1990).

Deposition of Daniel R. Fischel In Re: Ellen Rudd, on behalf of herself and all others similarly situated, and Mayer Corporation on behalf of themselves, and all others similarly situated, and Louis Brandt, and Israel Baker, Jay R. Kuhne, Pininfarina Corp., and American Transfer Co., on behalf of themselves and all others similarly situated v. Kirk Kerkorian, et al., Superior Court of the State of California, County of Los Angeles, Nos. CA 000980, CA 000981, CA 001017, CA 620279 (June 21, 1990).

Testimony of Daniel R. Fischel In Re: City of San Jose v. Paine, Webber, Jackson & Curtis, Incorporated, et al., and related counter- and Third-Party Claims, United States District Court, Northern District, No. C-84-20601 RPA (May 23 and 24, 1990).

Deposition of Daniel R. Fischel In Re: City of San Jose v. Paine, Webber, Jackson & Curtis, Incorporated, et al., and related counter- and Third-Party Claims, United States District Court, Northern District, No. C-84-20601 RPA (May 22, 1990), No. RPA 84-20601 (November 16, 1989 and September 8, 1989).

Testimony of Daniel R. Fischel In Re: Kulicke and Soffa Industries, Inc. Securities Litigation, United States District Court for the Eastern District of Pennsylvania, No. 86-1656 (March 20 and 21, 1990).

Deposition of Daniel R. Fischel In Re: Kulicke and Soffa Industries, Inc. Securities Litigation, United States District Court for the Eastern District of Pennsylvania, No. 86-1656 (March 9, 1990; December 19 and 21, 1989).

Affidavit of Daniel R. Fischel In Re: Viacom International Inc. v. Carl C. Icahn, et al., v. Ralph M. Baruch, et al., United States District Court, Southern District of New York, No. 86 Civ. 4215 (RPP) (March 8, 1990).

Deposition of Daniel R. Fischel In Re: Technical Equities Coordination Litigation, Superior Court of the State of California for the County of Santa Clara, Master File No. 1991, Santa Clara County Superior No. 600306 (March 1, 1990).

Deposition of Daniel R. Fischel In Re: Amalgamated Clothing and Textile Workers Union, AFL- CIO, et al. v. David A. Murdock, et al., United States District court for the Central District of California, No. CV-86-6410 IH (February 8, 1990).

Deposition of Daniel R. Fischel In Re: Connecticut National Life Insurance Company, et al. v. Peter A. Sprecher and Laventhol & Horwath, United States District Court, Central District of California, No. CV 87-1945 WJR (Tx) (January 30, 1990).

Deposition of Daniel R. Fischel In Re: Consolidated Capital Securities Litigation, United States District Court, Northern District of California, No. C-85-7332 AJZ (January 22, 1990).

Declaration of Daniel R. Fischel In Re Plaintiffs' Damages in Re: Liquidity Fund, et al. v. Southmark Corporation, et al. in the Superior Court of the State of California for the County of San Mateo, No. 332435 (January 18, 1990).

Deposition of Daniel R. Fischel In Re: Norman Kamerman, Shirley Brown, Edward Rosen, Lexim Investors Corp., and Dohsa Anstalt, on behalf of themselves and all others similarly situated, and Barnett Stepak v. Saul Steinberg, Reliance Group Holdings, Inc., Reliance Group, Inc., Reliance Financial Services corp., and Reliance Insurance Company, United States District Court, Southern District of New York, No. 84 Civ. 4440 (September 13, 1989).

A-25

Affidavit of Daniel R. Fischel In Re: Edward A. Taylor, et al. v. A. O. Smith Corporation et al., Circuit Court for Lincoln County, Tennessee, No. 098-84 (August 11, 1989).

Deposition of Daniel R. Fischel In Re: Container Products Inc. v. Pace Industries, United States District Court, Southern District of New York, No. 88-CIV. 3549 (KMW) (July 19, 1989).

Deposition of Daniel R. Fischel In Re: Joseph B. Moorman, et al. v. Southmark Corporation, et al., Liquidity Fund, et al. v. Southmark Corporation, et al., Superior Court of the State of California for the County of San Mateo, Nos. 322135 and 332435 (July 11, 1989).

Testimony of Daniel R. Fischel In Re: Tessie Wolfson, et al. v. Frederick S. Hammer, and Meritor Financial Group, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 87-8471 (June 20, 1989).

Deposition of Daniel R. Fischel In Re: Richard J. Heckmann, et al. v. C. L. Ahmanson, et al., and Consolidated Cases, Superior Court of the State of California for the County of Los Angeles, Nos. CA000851 and C642081 (June 8, 1989).

Deposition of Daniel R. Fischel In Re: Tessie Wolfson, et al. v. Frederick S. Hammer, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 87-8472 (May 11, 1989).

Testimony of Daniel R. Fischel In Re: Tessie Wolfson, et al. v. Frederick S. Hammer, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 87-8472 (April 13, 1989).

Deposition of Daniel R. Fischel In Re: National Union Fire Insurance Company of Pittsburgh, PA v. Wells Fargo Bank, N.A., District Court of Harris County, Texas, 125th Judicial District, No. 88-49246 (April 10 and 11, 1989).

Deposition of Daniel R. Fischel In Re: Susan Rothenberg, as Custodian for Stephen J. Rothenberg v. Charles E. Hurwitz, United Financial Corporation, United Savings Association of Texas, et al., United States District Court for the Southern District of Texas, Houston Division, Civil Action No. H-86-1435 (March 30, 1989).

Deposition of Daniel R. Fischel In Re: Jose Nodar, et al. v. William Weksel, Albert Bromberg, Henry B. Turner, IV, Frank L. Bryant, Leo Kuperschmid, Bennett S. Lebow, Ernst & Whinney and Oppenheimer & Co., Inc., United States District Court, Southern District of New York, No. 84 Civ. 3870 (VLB) and consolidation case No. 84 Civ. 5132 (VLB) (December 15 and 16, 1988).

Deposition of Daniel R. Fischel In Re: William Steiner, et al. v. Whittaker Corporation, et al., Superior Court of the State of California for the County of Los Angeles, No.CA000817 (December 7, 1988).

Deposition of Daniel R. Fischel In Re: Arnold I. Laven, et al. v. Western Union Corporation, et al., United States District Court for the District, Western District of Washington, MDL No. 551 (August 30 and 31, 1988).

Deposition of Daniel R. Fischel In Re: Washington Public Power Supply System Securities Litigation, United States District Court, Western District of Washington, MDL No. 551 (August 16 and 22, 1988).

Affidavit of Daniel R. Fischel In Re: District Business Conduct Committee for District No. 3 v. Blinder, Robinson & Company Inc., et al., National Association of Securities Dealers, Inc. National Business Conduct Committee, Complaint No. DEN-666 (July 21, 1988).

Deposition of Daniel R. Fischel In Re: Joseph Seidman, et al. v. Stauffer Chemical Company, et al, United States District Court for the District of Connecticut, No. B 84-543 (TFGD) (June 10, 1988 and May 5, 1987).

Deposition of Daniel R. Fischel In Re: Edlin Cattle Co., Inc., and James Edlin v. A. O. Smith Harvestore Products, Inc., et al., United States District Court for the Northern District of Texas, Amarillo Division, No. CA-2-86-0122 (May 12, 1988).

Deposition of Daniel R. Fischel In Re: MicroPro Securities Litigation, United States District Court for the Northern District of California, No. C-85-7428-EFL (A) (May 2, 1988).

Affidavit of Daniel R. Fischel In Re: Pizza Time Theatre Securities Litigation, United States District Court for the Northern District of California, Civil File No. 84-20048-(A)-RPA (March 25, 1988).

Affidavit of Daniel R. Fischel and Robert A. Sherwin In Re: First National Bank of Louisville v. Brooks Farms, and George C. Brooks, et al., Third-Party Plaintiffs v. A. O. Smith Corporation, et al., Circuit Court for Maury County, Tennessee, No. 2058 (March 3, 1988).

Testimony of Daniel R. Fischel In Re: Nucorp Energy Securities Litigation, United States District Court for the Southern District of California, M.D.L. 514 (March 15, 16, 17, and 18, 1988).

Deposition of Daniel R. Fischel In Re: Nucorp Energy Securities Litigation, United States District Court for the Southern District of California, M.D.L. 514 (January 27, 1988).

Deposition of Daniel R Fischel In Re: Anheuser-Busch Companies, Inc. v. W. Paul Thayer, et al., United States District Court for the Northern District of Texas, Dallas Division, No. CA- 3-85-0794-R (January 21, 1988; December 4, 1987; and November 5, 1987).

Testimony of Daniel R. Fischel In Re: Securities and Exchange Commission v. First City Finance Corporation Ltd., and Marc Belzberg, United States District Court for the District of Columbia, Civil Action No. 86-2240 (December 18, 1987).

Testimony of Daniel R. Fischel In Re: The Irvine Company v. Athalie Irvine Smith and Athalie R. Clarke, Trustee, State of Michigan Circuit Court for the county of Oakland, Civil Action No. 8327011-CZ (December 14, 15, and 16, 1987).

Deposition of Daniel R. Fischel In Re: Securities and Exchange Commission v. First City Finance Corporation, Ltd. and Marc Belzberg, United States District Court for the District of Columbia, Civil Action No. 86-2240 (December 11, 1987).

Affidavit of Daniel R. Fischel In Re: Gerald D. Broder and Constance D. Broder v. Alphonse H. Bellac and William B. Weinberger v. Combustion Equipment Associates, Inc., et al., and William B. Weinberger v. Coopers & Lybrand, United States District Court for the Southern District of New York, 80 CIV 6175 (CES), 80 CIV 6839 (CES), 84 CIV 8217 (CES) (July 22, 1987).

Deposition of Daniel R. Fischel In Re: The Irvine Company v. Athalie Irvine Smith and Athalie R. Clarke, Trustee, State of Michigan, Circuit Court for the County of Oakland, Civil Action No. 83270011-CZ (June 1, 1987).

Deposition of Daniel R. Fischel In Re: Fortune Systems Securities Litigation, United States District for the Northern District of California, Master File No. 83-3348A-WHO (May 7, 1987).

Deposition of Daniel R. Fischel In Re: Victor Technologies Securities Litigation, United States District Court for the Northern District of California, Master File No. C-83-3906(A)-RFP (FW) (January 8, 1987 and October 30, 1986).

Reply Declaration of Daniel R. Fischel in Support of the Motion by the Activision Defendants for Summary Judgment In Re: Activision Securities Litigation, United States District Court for the Northern District of California, Master File No. C-83-4639(A)-MHP (October 27, 1986).

Testimony of Daniel R. Fischel In Re: NVHomes, L.P. v. Ryan Homes, Inc.; and Ryan Homes, Inc. v. NVHomes, L.P., et al., United States District Court for the Western District of Pennsylvania, Civil Action No. 86-2139 (October 24, 1986).

Supplemental Affidavit of Daniel R. Fischel In Re: NVHomes, L.P. v. Ryan Homes, Inc.; and Ryan Homes, Inc. v. NVHomes, L.P. and NVAcquisition L.P., et al., United States District Court the Western District of Pennsylvania, Civil Action No. 86-2139 (October 24, 1986).

Affidavit of Daniel R. Fischel in Support of the Motion by the Activision Defendants for Summary Judgment In Re: Activision Securities Litigation, United States District Court for the Northern District of California, Master File No. C-86-2139 (October 20, 1986).

Declaration of Daniel R. Fischel in Support of the Motion by the Activision Defendants for Summary Judgment In Re: Activision Securities Litigation, United States District Court for the Northern District of California, Master File No. C-83-4639(A)-MHP (October 2, 1986).

Affidavit in Support of Defendants Motion for Summary Judgment In Re: MCorp Securities Litigation, United States Court for the Southern District of Texas, Civil Action No. H-85- 5894 (September 25, 1986).

Deposition of Daniel R. Fischel <u>In Re: Activision Securities Litigation</u>, United States District Court for the Northern District of California, No. C 83 4639 (August 18 and 19, 1986).

Deposition of Daniel R. Fischel <u>In Re: John Mancino v. James A. McMaghan, et al.</u>, United States District Court for the Northern District of California, Civil No. C-84-0407-TEH (August 14, 1986).

Testimony of Daniel R. Fischel <u>In Re: Charles W. Leigh, et al. and George Johnson, et al. v. Clyde William Engle, et al.</u>, United States District Court for the Northern District of Illinois, Eastern Division, Case No. 78 C 3799 (August 1, 1986).

Reply Affidavit of Daniel R. Fischel <u>In Re: The Amalgamated Sugar Company v. NL Industries</u>, United States District Court for the Southern District of New York, 86 Civ. 5010 (VLB) (July 28, 1986).

Affidavit of Daniel R. Fischel <u>In Re: The Amalgamated Sugar Company v. NL Industries</u>, United States District Court for the Southern District of New York, 86 Civ. 5010 (VLB) (July 18, 1986).

Deposition of Daniel R. Fischel <u>In Re: Charles W. Leigh, et al. and George Johnson, et al. v. Clyde William Engle, et al.</u>, United States District Court for the Northern District of Illinois, Eastern Division, Case No. 78 C 3799 (July 1, 1986).

Deposition of Daniel R. Fischel <u>In Re: Seafirst Corporation v. William M. Jenkins, et al.; and Seafirst Corporation v. John R. Boyd, et al.</u>, United States District Court for the Western District of Washington at Seattle, Case No. C83-771R (February 27, 1986).

Deposition of Daniel R. Fischel <u>In Re: Kreindler v. Sambo's Restaurants, Inc.</u>, United States District Court for the Southern District of New York, Case No. 79 Civ. 4538 (December 17, 1985).

Affidavit of Daniel R. Fischel <u>In Re: United States of America v. S. Richmond Dole and Clark J. Matthews II</u> (March 19, 1985).

Deposition of Daniel R. Fischel <u>In Re: Craig T. McFarland, et al. v. Memorex Corporation</u>, United States District Court for the Northern District of California, No. C 79-2926-WAI, C 79-2007-WAI, C 79-241-WAI (February 26, 1985; January 29 and 30, 1985).

Testimony of Daniel R. Fischel <u>In Re: Robert J. Lawrence v. Grumman Corp. Pension Plan, et al.</u>, United States District Court for the Eastern District of New York, No. CV-81-3530 (December 19, 1983).

Testimony of Daniel R. Fischel <u>In Re: Telvest, Inc. v. Junie L. Bradshaw, et al. and American Furniture Company</u>, United States District Court, for the Eastern District of Virginia Richmond Division, No. CA-79-0722-R (December 4, 1981).

## <u>OTHER ACTIVITIES</u>

Member, American Economic Association, American Finance Association.

Former Member of the Board of Overseers of the Becker-Friedman Institute at the University of Chicago.

Former Advisor to the Harvard Program on Corporate Governance at Harvard University.

Former Member, Board of Directors, Center for the Study of the Economy and the State.

Former Member, Mid-America Institute Task Force on Stock Market Collapse.

Have acted as a consultant and/or advisor to the New York Stock Exchange, the National Association of Securities Dealers, the Chicago Board of Trade, the Chicago Board Options Exchange, the Chicago Mercantile Exchange, the New York Mercantile Exchange, the Federal Trade Commission, the Department of Labor, the Securities and Exchange Commission, the Canadian Securities and Exchange Commission, the United States Department of Justice, the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, the Federal Housing Finance Agency, and the Office of Thrift Supervision.

Referee, Journal of Financial Economics, Journal of Law and Economics, Journal of Legal Studies.

Participant and speaker at multiple conferences on the Economics of Corporate, Securities and Commodities Law and the Regulation of Financial Markets.

Former Chairman, American Association of Law Schools' Section on Law and Economics.

## APPENDIX B

## Materials Relied Upon

**Expert Reports**

Expert Report of Matthew D. Cain, Ph.D., February 15, 2024 and Backup Materials

**Legal Documents**

*In Re Bed Bath & Beyond Corporation Securities Litigation*, Case No. 1:22-cv-02541-TNM, Second Amended Class Action Complaint, January 30, 2023

*In Re Bed Bath & Beyond Corporation Securities Litigation*, Case No. 1:22-cv-02541-TNM, Memorandum Opinion, July 27, 2023

*In Re Bed Bath & Beyond Corporation Securities Litigation*, Case No. 1:22-cv-02541-TNM, Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel, February 15, 2024

**Academic Literature and Practitioner Publications**

Adair, Troy and John R. Nofsinger, *Foundations of Investments* (Cengage 2024)

Beneish, M.D., C.M.C. Lee, and D.C. Nichols, "In short supply: Short-sellers and stock returns," 60 *Journal of Accounting and Economics* (2015)

Berk, Jonathan and Peter DeMarzo, *Corporate Finance*, 5th Ed. (Pearson 2020)

Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments*, 10th Ed. (McGraw-Hill Education 2014)

Chen, Sipeng and Gang Li, "Why does option-implied volatility forecast realized volatility? Evidence from news events," 156 *Journal of Banking and Finance* (2023)

Costola, Michele, Matteo Iacopini, and Carlo R.M.A. Santagiustina, "On the 'mementum' of meme stocks," 207 *Economics Letters* (2021)

Engelberg, Joseph E., Adam V. Reed, and Matthew C. Ringgenberg, "Short-Selling Risk," 73 *The Journal of Finance* (2018)

Fabozzi, Frank J., *Short Selling Strategies, Risks, and Rewards*, 2nd Ed. (John Wiley & Sons 2004)

Fama, Eugene F., et al., "The Adjustment of Stock Prices to New Information," 10 *International Economic Review* (1969)

**APPENDIX B**

**Materials Relied Upon**

Feinstein, Steven and O. Miguel Villanueva, "Securities Litigation Event Studies in the Covid Volatility Regime," *Journal of Forensic Economics* (2022)

Fischel, Daniel R., "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," 38 *The Business Lawyer* (1982)

Gold, Kevin L., Eric Korman, and Ahmer Nabi, "Federal Securities Acts and Areas of Expert Analysis," in *Litigation Services Handbook: The Role of the Financial Expert*, 6th Ed., Weil, Roman L. et al., eds. (John Wiley & Sons 2017)

Harris, Larry, *Trading and Exchanges – Market Microstructure for Practitioners* (Oxford University Press 2003)

Henderson, Jr., Glenn V., "Problems and Solutions in Conducting Event Studies," 57 *The Journal of Risk and Insurance* (1990)

Jones, Charles M. and Owen A. Lamont, "Short-sale constraints and stock returns," 66 *Journal of Financial Economics* (2002)

Kothari, Sagar P., and Jerold B. Warner, "Econometrics of Event Studies," in *Handbook of Empirical Corporate Finance* (Elsevier 2007)

Lamont, Owen A. and Richard H. Thaler, "Can the Market Add and Subtract? Mispricing in Tech Stock Carve-Outs," 111 *Journal of Political Economy* (2003)

MacKinlay, A. Craig., "Event Studies in Economics and Finance," 35 *Journal of Economic Literature* (1997)

Mankiw, N. Gregory, *Principles of Economics*, 8th Ed. (Cengage Learning 2018)

Mendenhall, William, James E. Reinmuth and Robert J. Beaver, *Statistics for Management and Economics* (Duxbury Press 1993)

Miller, Edward M., "Risk, Uncertainty, and Divergence of Opinion," 32 *The Journal of Finance* (1977)

Peterson, Pamela P., "Event Studies: A Review of Issues and Methodology," 28 *Quarterly Journal of Business and Economics* (1989)

Putniņš, Talis J., "Market Manipulation: A Survey," 26 *Journal of Economic Surverys* (2012)

Ramachandran, Lakshmi Shankar and Jitendra Tayal, "Mispricing, short-sale constraints, and the cross-section of option returns," 141 *Journal of Financial Economics* (2021)

Schwert, G. William, "Using Financial Data to Measure Effects of Regulation," 24 *The Journal of Law and Economics* (1981)

# APPENDIX B

## Materials Relied Upon

Tabak, David I. and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," in *Litigation Services Handbook,* 3rd Ed., Weil, Roman L. et al., eds. (John Wiley & Sons 2001)

## Public Documents

"PetSmart's Latest Bite at E-Commerce: Chewy.com," *Wall Street Journal*, April 18, 2017, 8:37 PM ET

"GameStop Rises on Investor's Plan to Make It an Amazon Rival," *Bloomberg*, September 21, 2020, 7:22 PM ET

"What Exactly Is a Short Squeeze?" *Kiplinger.com*, January 28, 2021

"Here's What Investment Gurus Including Michael Steinhardt And Jeremy Siegel Say About The Meme Stock Bubble," *Forbes*, January 31, 2021, 10:22 AM ET

"When Will The Ride End? Analyzing GameStop Short Squeeze By Looking At History," *Seeking Alpha*, February 1, 2021, 10:35 AM ET

"Nobel winner Eugene Fama on GameStop, market bubbles and why indexing is king," *MarketWatch*, March 3, 2021, last updated at 2:01 PM ET

"Bed Bath & Beyond Stock Slumps as CEO Steps Down and Loss Wilder Than Expected," *Dow Jones Institutional News*, June 29, 2022, 7:50 AM ET

"Bed Bath & Beyond shares soar 30%+ amid suspected short-squeeze," *Seeking Alpha*, August 5, 2022, 12:01 PM ET

"Bed Bath & Beyond jumps as retail investors chase highly shorted stocks," *Reuters News*, August 8, 2022, 11:01 AM ET

"Bed Bath & Beyond Stock Is Flying. Thank the Meme Trade," *Barron's Online*, August 8, 2022, 3:57 PM ET

"Post-Pandemic Meets Postwar Era on a Blind Curve: John Authers," *Bloomberg Opinion*, August 9, 2022, 12:37 AM ET

"Meme-Stock War Is Hedge Fund Versus Hedge Fund: Jared Dillian," *Bloomberg Opinion*, August 10, 2022, 8:30 AM ET

"Winning bets? Meme stock frenzy of 2021 makes a return," *The Guardian*, August 13, 2022, 3:01 AM ET

# APPENDIX B

## Materials Relied Upon

"Meme Stocks Phenomenon: Bed, Bath and Beyond & other stocks that more than doubled money in quick-time," *Financial Express Online*, August 13, 2022, 8:50 AM ET

"DISTRESSED DAILY: Memestock Traders Help Bed Bath & Beyond Bonds," *Bloomberg First Word*, August 18, 2022, 8:13 AM ET

"Bed Bath & Beyond success College kid's $110M 'meme stock' win," *New York Post*, August 19, 2022, 10:19 AM ET

"What the Bed Bath & Beyond Trade Says About Meme Stocks – Barrons.com," *Dow Jones Institutional News*, August 19, 2022, 1:52 PM ET

"UPDATE 3-Bed Bath & Beyond files for bankruptcy protection after long struggle, begins liquidation sale," *Reuters*, April 23, 2023, 7:12 AM ET


**SEC Filings**

Bed Bath & Beyond Form 10-K for the Fiscal Year Ended February 26, 2022

Bed Bath & Beyond Form 10-Q for the quarterly period ended May 28, 2022

Bed Bath & Beyond Form 10-Q for the quarterly period ended August 27, 2022

Bed Bath & Beyond Form 8-K, March 25, 2022

Bed Bath & Beyond Form 8-K, June 29, 2022

Bed Bath & Beyond Schedule 14A, June 1, 2022

Bed Bath & Beyond Form 12b-25, April 26, 2023

RC Ventures Schedule 13D, March 7, 2022

RC Ventures Schedule 13D, Amendment No. 1, March 25, 2022

RC Ventures Schedule 13D, Amendment No. 2, August 16, 2022

RC Ventures Schedule 13D, Amendment No. 3, August 18, 2022

RC Ventures Form 3, August 15, 2022

RC Ventures Form 144, August 16, 2022

**Industry and Analyst Reports**

DeRosa, David, "Bursting the Bubble. Rationality in a Seemingly Irrational Market," *CFA Institute Research Foundation* (2021)

# APPENDIX B

## Materials Relied Upon

"Maintain Sell Rating As Meme Stock Short Squeeze Doesn't Alter Fundamental View," Loop
Capital, August 12, 2022


## Websites and Online Forum Posts

"Biography – Ryan Cohen," available at https://investor.gamestop.com/board-member/ryan-
cohen (accessed May 17, 2024)

CNBC, Twitter Post, August 12, 2022, 7:04 AM ET, available at
https://twitter.com/CNBC/status/1558046723053953025 (accessed May 17, 2024)

Ryan Cohen, Twitter Post, August 12, 2022, 10:42 AM ET, available at
https://twitter.com/ryancohen/status/1558101541453795329?lang=en (accessed May 17,
2024)

2022-08-05 08:59:09 ET WallStreetBets Subreddit post by user: Piano-Calm (accessed May 17,
2024)

2022-08-05 09:14:11 ET WallStreetBets Subreddit post by user: lil_Dik_ThRoBn_stock
(accessed May 17, 2024)

2022-08-06 00:29:27 ET WallStreetBets Subreddit post by user: [deleted user] (accessed May
17, 2024)

2022-08-06 19:52:40 ET WallStreetBets Subreddit post by user: hitpopking (accessed May 17,
2024)

2022-08-12 16:02:58 ET WallStreetBets Subreddit post by user: NitrousXpress (accessed May
17, 2024)

2022-08-12 19:10:51 ET WallStreetBets Subreddit post by user: spicy_chimp5 (accessed May
17, 2024)

2022-08-18 16:46:54 ET WallStreetBets Subreddit post by user: BIRDZILLA26 (accessed May
17, 2024)

**APPENDIX B**

**Materials Relied Upon**

**News and Analyst Report Searches**

Bloomberg search for articles tagged with equity ticker BBBY, August 1, 2022 - August 19, 2022

Factiva search for articles using the following search criteria: (bbby or (bed w/1 bath w/2 beyond)), August 1, 2022 – August 12, 2022

Factiva search for articles with the following search criteria: ((bbby or (bed w/1 bath w/2 beyond)) and cohen and (tweet* or twitter), August 12, 2022 – August 19, 2022

Seeking Alpha articles for the ticker BBBY, August 1, 2022 – August 12, 2022

Capital IQ search for analyst reports on Bed Bath & Beyond, August 1, 2022 – August 19, 2022

Factset search for analyst reports on Bed Bath & Beyond, August 1, 2022 – August 19, 2022

LSEG search for analyst reports on Bed Bath & Beyond, August 1, 2022 – August 19, 2022

**Data Sources**

Bloomberg L.P.

Factiva

Nasdaq FIS Astec Analytics Short Interest Lending Data (SLD)

Tick Data, LLC

U.S. Stock and Index Databases © 2024 Center for Research in Security Prices (CRSP), The University of Chicago Booth School of Business

All other data and documents referenced in this report.

Exhibit 4

1                    Kim - Confidential

2                    (Exhibit 79, e-mail dated July 26, 2022

3           from David Freedman to Harriet Edelman and

4           others, was so marked for identification, as

5           of this date.)

6           Q.    Do you recognize this document?

7           A.    Vaguely, yes.

8           Q.    And what is it exactly?

9           A.    An e-mail from David Freedman to the

10    company.

11          Q.    And what is he exactly describing?

12          A.    It looks like he is describing the short

13    interest in BBBY.

14          Q.    Okay, and this e-mail was sent on

15    July 26, 2022, correct?

16          A.    Yes.

17          Q.    Okay.  So and Mr. Freedman was hired

18    just to go back a little bit, Mr. Freedman was

19    hired specifically to advise about RC Ventures,

20    correct?

21          A.    Yes.

22          Q.    Okay, and so Mr. Freedman notes the

23    short interest in BBBY has continued to climb, and

24    I want to take you to the last sentence.  "Given

25    RCV's ability to rally the Reddit crowd, one

1                   Kim - Confidential

2    wonders if he takes some action in regard to this

3    or if he would wait to see some incremental good

4    news and then try to ignite a short squeeze to

5    amplify the move upward."  Do you see that?

6         A.   Yes.

7         Q.   First, what was your reaction to this

8    e-mail?

9         A.   I recall being surprised to see an

10   e-mail from David Freedman, because I don't know

11   that he was engaged at the time.  I mean formally.

12   I don't know what his role was, because it was

13   July.  I think that was my reaction.  It was a name

14   I hadn't seen in a bit.

15        Q.   How about your reaction to the substance

16   of the e-mail?

17        A.   I didn't consider it insightful.  Short

18   interest is public data.  So I don't know that it

19   was surprising or particularly informative.

20        Q.   What about the last sentence where Mr.

21   Freedman postulates that Ryan Cohen take some

22   action with regards to rallying the Reddit crowd?

23        A.   I didn't react to it.  It's speculative.

24   I typically don't react to anything speculative

25   especially as it relates to the stock price.

```
 1                    Kim - Confidential
 2          A.   It's an e-mail discussing trading that I
 3     originally sent to Sue and Gustavo.
 4          Q.   Okay, and you sent this on August 16,
 5     2022 at 10:27 a.m., correct?
 6          A.   Yes.  The original e-mail.
 7          Q.   Okay, and so the e-mail reads, the
 8     original e-mail reads, "Sue/Gustavo, Wanted to send
 9     a quick note on this morning's trading as we are
10     currently up more than 50 percent at $24.62 on
11     tremendous volume of 152 million.  I await word
12     from our trader, but this movement is likely driven
13     by RCV's filings as well as (albeit less so)
14     positive sentiment across the peer group on the
15     heels of WMT's AM print."  Correct?
16          A.   Yes.
17          Q.   So you noted that this movement was
18     likely driven by RCV's filings, correct?
19          A.   Yes.
20          Q.   And by those filings, you're referring
21     to the Form 3 that was filed on August 15 and
22     the Schedule 13D that was filed on August 16,
23     correct?
24          A.   Yes.  I believe so.
25          Q.   Okay.  How did you reach that
```

1                        Kim - Confidential

2          A.   Yes.

3          Q.   And who is Bill Willis?

4          A.   I don't remember specifically, but DF

5     King was sort of, they were a third-party

6     surveillance company that public companies may hire

7     who, you know, provide insight into or track kind

8     of ownership or any other insight related to

9     ownership.

10         Q.   Okay, and just to go to Mr. Willis's

11    e-mail that was sent on August 16, 2022 at 1:24

12    p.m., he notes the heavy volume of Bed Bath shares

13    and the fact that it's up 65 percent, and he says

14    in the last line, "I have been looking for any

15    news, but nothing."  Do you see that?

16         A.   Yes.

17         Q.   And in response you just have a single

18    sentence, "Ryan Cohen filed Form 3."  Correct?

19         A.   Yes.

20         Q.   So and this response was sent at

21    August 16, 2022 at 2:25 p.m., correct?

22         A.   Yes.

23         Q.   So, in response, you were attributing

24    the increased volume in stock price to Ryan Cohen's

25    SEC filing of the Form 3?

```
 1                    Kim - Confidential

 2              MS. WEIANT:  Objection.

 3         A.   No.  I was responding most likely to "I

 4    have been looking for any news, but nothing," and

 5    the news is that Ryan Cohen filed a Form 3.

 6         Q.   So, in response to his, you know,

 7    looking for any news as to why, you said, well,

 8    Ryan Cohen filed a Form 3, correct?

 9         A.   Yes.

10         Q.   So, at this moment, you had no reason to

11    believe that there was any other cause for the

12    increase in volume and stock price than Ryan

13    Cohen's filing of the Form 3?

14         A.   It was the primary event.  Yes.

15         Q.   Okay.  I'm going to hand you what's

16    going to be Exhibit 87.

17              (Exhibit 87, e-mail chain dated

18              August 16, 2022 from Gustavo Arnal to Susie

19              Kim, was so marked for identification, as of

20              this date.)

21         Q.   Do you recognize this document?

22         A.   Vaguely, yes.

23         Q.   What is it exactly?

24         A.   It's an e-mail from me to Gustavo and

25    Arlene.
```

35:14
37:19,24
37:25
38:15,21
38:24,25
40:5 41:20
41:22 42:2
42:5,6,7
42:11,18
43:15,21
43:23
44:15,24
45:2 46:21
47:8 48:7
48:24 49:7
49:13,20
49:21 50:2
50:7 51:2
51:4,14,20
52:11 53:5
56:20
57:16 58:2
58:12,16
58:24
59:10 60:6
63:3,16
65:15
66:10
69:14,20
70:6,8,24
73:3 76:16
77:17
79:19,21
80:7 81:20
82:7,11
87:23
89:24 93:6
93:11,13
95:6,8
96:11,11
96:18,19
97:3,4
98:4,15
99:4,10,16
99:24
100:17
102:4,23
103:4,6,13
103:18,19
104:12,19

104:22,25
105:5,7,9
106:4
109:3,5,15
110:11
117:9
118:16
120:16
121:23
125:8,10
125:15
126:6,11
126:14,19
126:24
128:6,7,13
129:18
130:14,23
131:3
135:6
136:13
137:10
138:8,14
138:21,22
138:25
141:6
142:15
143:23
144:22
145:10,12
145:25
146:18
148:24
149:2,13
151:24
153:6
154:16
155:8
156:8,12
156:19
157:6
161:4,7,13
161:16,23
162:11,13
165:2
169:18
170:17
173:11
175:12,13
175:13
177:24

178:10
179:20
181:18
182:2
188:5
192:5,15
193:20
197:10,19
198:9,12
199:11,15
202:3,16
203:7,13
204:4,7,21
205:16
206:2,15
209:4,6
210:6,8,15
210:19,21
210:23
214:8
215:4
218:12,19
218:24
219:2,3
221:12,22
222:15,18
223:5
225:4
226:14
228:12
230:8
233:23
234:21
238:24,24
240:11
244:6,14
248:2
249:20
251:8
252:8,11
252:16,25
254:9
255:12,16
255:21
261:19
265:10
**Bath's** 39:16
84:10,23
86:15,22
87:5 136:9

136:18
140:25
164:6
207:6
**battle** 129:7
**BBBBY_SK...**
    147:12
    265:7
**BBBY** 43:11
97:11
98:10
102:2
108:8
140:14
195:13,23
**BBBY_SK_...**
    93:2
    264:19
**BBBY_SK_...**
    61:14
    264:15
**BBBY_SK_...**
    235:7
    266:8
**BBBY_SK_...**
    241:2
    266:10
**BBBY_SK_...**
    124:14
    265:4
**Bed** 1:4 4:7
    6:13,14
    9:6 12:11
    12:17
    19:22,24
    20:5,15,20
    20:25,25
    21:20,21
    23:5 29:7
    29:19,23
    30:12,13
    30:18,23
    32:23
    33:15
    35:13
    37:19,24
    37:25
    38:15,21
    38:24,25
    39:16 40:5

41:20,22
42:2,5,6,7
42:11,18
43:15,21
43:23
44:15,24
45:2 46:21
47:8 48:7
48:24 49:7
49:13,20
49:21 50:2
50:7 51:2
51:4,14,20
52:10 53:5
56:20
57:16 58:2
58:12,16
58:24
59:10 60:6
63:3,16
65:15
66:10
69:14,20
70:6,8,24
73:3 76:15
77:16
79:19,20
80:7 81:20
82:7,11
84:10,23
86:15,22
87:5,23
89:24 93:6
93:11,12
95:6,8
96:11,11
96:17,19
97:3,4
98:4,15
99:4,10,16
99:24
100:16
102:4,23
103:4,6,13
103:18,19
104:12,19
104:22,25
105:5,7,8
106:4
109:3,5,15

Exhibit 5

**To:**      Harriet Edelman[Harriet.Edelman@Consultant.Bedbath.com]; Sue Gove[Sue.Gove@bedbath.com]; Gustavo Arnal[Gustavo.Arnal@bedbath.com]; Arlene Hong[Arlene.Hong@bedbath.com]; Susie Kim[Susie.Kim@bedbath.com]
**Cc:**      LaGere, Jack C[jack.c.lagere@jpmorgan.com]; Gibson, Gina[gina.gibson@jpmorgan.com]; Johnston, Nik[nik.johnston@jpmorgan.com]; Dilwali, Kapil A[kapil.a.dilwali@jpmorgan.com]
**From:**  Freedman, David[dfreedman@jpmorgan.com]
**Sent:**   Tue 7/26/2022 6:18:50 PM (UTC-04:00)
**Subject:**  Jul-15 short interest data now available

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Team,

The short interest in BBBY has continued to climb, hitting 28.5mm share, up from 21.5mm on Jun-20. The stock price has been relatively flat since the earnings report on Jun-30 while the short interest has increased. While far below the ~75mm at the end of 2020, it is on a smaller share base so it represents ~42% of the BBY float. I would note that despite this high short relative to the float, the cost to borrow BBBY has **not** skyrocketed: it stands at ~1% on an annualized cost rate. Given RCV's ability to rally the Reddit crowd, one wonders if he takes some action in regard to this, or if he would wait to see some incremental good news and then try to ignite a short squeeze to amplify the move upward.

Regards,

David Freedman, CFA
Vice Chairman
Global Head of Shareholder Engagement and M&A Capital Markets
J.P. Morgan
383 Madison Avenue, 28th Floor
New York, NY 10179
david.freedman@jpmorgan.com
Office:  212-272-4209
Mobile:  917-406-9889

DEPOSITION
EXHIBIT
79
4-12-24 Dmo
PENGAD 800-631-6989

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

Exhibit 6

1        Q.   (By Mr. Jafri)  What -- and what are we

2    specifically talking about?

3        A.   Specifically, I observed that, when he

4    was active, that there would be movement in the stock

5    price.

6        Q.   By active, you mean when he would tweet

7    about the company?

8        A.   Yes.

9        Q.   And by movement on the stock price, you

10   mean the stock price would rise?

11       A.   Right.  There would be retail investors.

12   And, you know, again, back to your earlier questions,

13   the notion of retail investors was a new notion for me

14   in terms of seeing that kind of movement, because most

15   of my public company experience had been much more

16   heavily steeped in institutional investors.

17       Q.   Right.  So, you -- you came -- you became

18   aware of the fact that he had some retail investors who

19   followed him, and when he tweeted about the company,

20   the stock price rose, right?

21       A.   Yes.

22       Q.   Okay.  Are you aware of what happened to

23   the company's stock price when Mr. Cohen filed a Form 3

24   on August 15, 2022?

25       A.   Yes.  That was my birthday.

 1           Q.    Okay.  And -- and -- and -- and what

 2    happened with the stock price?

 3           A.    It -- it went -- it went up.

 4           Q.    Okay.  And what about the fact that he,

 5    on the next day, filed a Schedule 13-D in the morning?

 6    Do you remember that?

 7           A.    Yes.  I remember it well.

 8           Q.    What happened to the stock price when he

 9    did that?

10           A.    So, it was very confusing, because, when

11    that filing occurred, no one understood what it meant

12    and the -- the stock price was fairly schizophrenic at

13    that point in time.

14           Q.    But it was rising on that day?

15           A.    Yes.

16           Q.    There was no news about the company on

17    those dates released by the company itself, right?

18           A.    That's correct.

19           Q.    Or any other substantial news like a

20    government investigation for instance?  Nothing?

21           A.    No.

22           Q.    The only thing that was -- that was true

23    about that day is that he filed that form?

24           A.    Yes.

25                 MR. FARINA:  Objection; form.

1          Q.   (By Mr. Jafri)  Are you aware of when

2     Cohen sold all his shares in the company?

3          A.   I am now.

4          Q.   And that was on August 18th, correct?

5          A.   Yes.

6               MR. FARINA:  Objection; form, foundation.

7               MR. JAFRI:  Okay.

8               MR. FARINA:  Do you know what, can you

9     repeat -- read back the question?

10          Q.   (By Mr. Jafri)  The question was:  And

11     that was on August 18th, correct?

12               MR. FARINA:  Objection; form, foundation.

13          Q.   (By Mr. Jafri)  When did you become aware

14     of the fact that he had sold all his shares?

15          A.   Several days after.

16          Q.   Okay.  And -- and -- and several days

17     from -- oh -- oh --

18          A.   From August.

19          Q.   -- Oh, okay.  I hear what you're saying.

20               Right.  So, do you recall specifically

21     the date when you became aware that he had sold his

22     shares?

23          A.   Not off the top of my head.

24          Q.   Okay.  Do you know what happened to that

25     stock price when the market be -- became aware of the

1   fact that Cohen had sold all his shares?

2          A.   Yes.

3          Q.   What happened to it?

4          A.   It dropped.

5          Q.   Right.  And was there any company news

6   that came out on those days?

7          A.   No.

8          Q.   Was there any other news such as what we

9   discussed like a government investigation of the

10  company?

11         A.   No.

12         Q.   So, the only news that was out that day

13  was the fact that -- or on those days was the fact that

14  Cohen had dumped all his shares, right?

15         A.   That's right.

16         Q.   You were aware that between January 2022

17  and March 22, Mr. Cohen and his investment entity, RC

18  Ventures, bought around 9.8 percent of the company sha

19  -- stock?

20         A.   Yes.

21              MR. FARINA:  Objection; form.

22         Q.   (By Mr. Jafri)  Is he also sent the

23  company's board of directors a letter?

24         A.   Yes.

25         Q.   The letter said that he was focused on

1    was Ms. Bowen's view of that?

2         A.   So, when -- when Marjorie came into the

3    strategy committee, she was unaware of, you know,

4    again, what had been being developed.  So, she had to

5    get up to speed on the work that McKinsey was doing and

6    recognize that that was, you know, a component of how

7    we were viewing the baby business.  But she was very

8    motivated to sell the business initially, because I

9    think she, you know, again, felt like that was her

10   mandate, was to help drive that.  And so, she came in

11   with that bias certainly.  And, while she had that

12   bias, she tempered that with what had to take place to

13   get to that point in the business.

14        Q.   So, I -- I just wanted to understand more

15   clearly.  You said that she had to temper that with

16   what had to take place to get to that point in the

17   business.  What do you mean by that?

18        A.   So, again, she had to learn the strategy,

19   get up to speed on what the strategy developments

20   needed to be, what had to take place with the strategy

21   for buybuy Baby.  And then, there were a number of

22   presentations in that May/June timeframe by JP Morgan,

23   and those presentations were around what the options

24   were for the business.

25             There was also a major work stream

 1   that was underway, which was Deloitte separating the

 2   financials.  So, there was a work stream by McKinsey on

 3   strategy, there was a work stream by Deloitte on

 4   separating financials, because we couldn't go to market

 5   the business without financial statements.

 6          And everything with buybuy Baby had been

 7   integrated into Bed Bath.  There weren't standalone

 8   financials.  So, Deloitte had been engaged to develop

 9   that.

10          Again, Marjorie learned all of that once

11   she became part of the committee.  Didn't know that

12   ahead of time and so, recognized that it wasn't a,

13   "Let's hire somebody and let's sell the business," it

14   was, "We have to get the business ready to be sold," if

15   that ma -- if that is the right decision.  But the

16   Deloitte work had a timeline to it that slowed the

17   process down.

18          Q.   So, earlier on, you mentioned that Ms.

19   Bowen came in with a mandate.  What do you mean by

20   that?

21          A.   She was very focused initially on, "We

22   need to sell this business," you know, "We -- we need

23   to get this business sold."  And -- and from the view

24   of it is, you know, an asset that's -- that's got

25   value, that has significant value, and, as I said,

59

1   was made that there would no active way of trying to

2   sell a spin company or spin the -- the business off,

3   right?

4         A.   Right.   The Baby business, yes.

5         Q.   I wanted to move on a little bit to Mr.

6   Rosenzweig's views about the same kinds of things we've

7   talked about.

8              Did he also come in with a mandate?

9         A.   Yes.

10        Q.   Did he also push to sell and spin it off?

11        A.   Yes.

12        Q.   Was there ever a time where he realized

13   that that was not possible?

14        A.   Yes.   Yes, as -- similar to Marjorie.   I

15   mean, we -- they both were, you know, of similar

16   mindset.   I don't think that either one of them, you

17   know, had a -- had a differing point of view from the

18   other.

19        Q.   I see.   Okay.

20        A.   Nor from anyone else in the committee,

21   really.

22        Q.   When you say "nor from anyone else in the

23   committee," what do you mean?

24        A.   In terms of that decision that came at

25   the time that -- that Mark was exited, in terms of not

```
 1            THE VIDEOGRAPHER:  This is Segment Number

 2   3.  Back on the record at 10:47 a.m.

 3            Q.   (By Mr. Jafri)  Ms. Gove, I'm going to

 4   hand you now what we have previously marked as

 5   Exhibit 96.

 6            A.   (Reviewing document.)

 7            Q.   So, in this -- in this e-mail chain,

 8   there's only a couple of things that I wanted to refer

 9   you to, and I'm happy to do that.

10            I think we talked a little bit about Mr.

11   Rosenzweig's qualifications and his role on the

12   strategy committee, and I just want to spend some time

13   talking about this.

14            Did you ever have any concerns about

15   whether Mr. Rosenzweig had the requisite experience to

16   serve on the board itself?

17            A.   Yes.

18            Q.   What were those concerns?

19            A.   He had a general lack of experience, both

20   business and public company director experience.  But,

21   additionally, and I think that maybe this is what this

22   e-mail is referring to, he did indicate in conversation

23   that he, you know, was representing Ryan.  And, from my

24   experience with activists appointed or nominated

25   directors, that is still not their role.  They're still
```

1   supposed to be independent directors.  And so, he did

2   create a concern from that standpoint.

3           He later came back and said, "Oh, I

4   didn't really mean that," but, you know, again, he --

5   that was another indication of his lack of experience.

6       Q.   Did you have any concerns about Ms.

7   Lombard's fitness to serve on the board?

8       A.   Yes.

9       Q.   What were those concerns?

10      A.   She had a very, very narrow skill set,

11  and typically, having been chair of nominating and

12  governance committees, onboards, on public company

13  boards, the ideal board candidate is one that has more

14  of a breadth of experience that can contribute to an

15  overall discussion, and her experience was very

16  limited.

17      Q.   And Ms. Bowen, what about the fact that

18  -- actually, let me rephrase.

19          I think maybe it'll be helpful if I go to

20  --

21      A.   Uh-huh.

22      Q.   -- the document itself.

23      A.   Okay.

24      Q.   So --

25          MR. GERBER:  Can I just -- about the

80

1       A.    Typically, members of the executive

2   committee.

3       Q.    And, who was on the executive committee

4   at that time?

5       A.    The leaders of the business, so, it would

6   have been Mark Tritton, potentially, the general

7   counsel, Arlene, the CFO, Gustavo at that time.  Those

8   would be some of the key people.

9       Q.    So, did Mr. Rosenzweig -- Rosenzweig make

10  comments like this to all of those people that you

11  mentioned?

12      A.    I wasn't present, but I did hear feedback

13  from them that they got those indications yes.  I was

14  not present though.

15      Q.    Right.  And specifically feedback from

16  whom?

17      A.    From Gustavo, from Arlene, from Mark.

18      Q.    Okay.  So, those three for sure?

19      A.    Yeah.

20      Q.    Anyone else?

21      A.    Not that I can recall.

22      Q.    You agree that these comments were

23  inappropriate?

24      A.    Yes.

25      Q.    And you also agree that board members

1    should not be acting as proxies for the shareholders

2    who nominate them?

3         A.   Right.

4         Q.   You also agree that board members should

5    not be looking out for the interest of a shingle --

6    single shareholder as opposed to the interest of all

7    shareholders?

8         A.   Correct.

9         Q.   You also agree that board members should

10   not be giving special access or influence to a single

11   shareholder at the expense of other shareholders?

12        A.   Yes.

13        Q.   So, I'm going to represent to you that we

14   also deposed Mr. Rosenzweig in this case.

15        A.   Okay.

16        Q.   And we also received some documents from

17   him.

18        A.   Uh-huh.

19        Q.   And one thing that he produced to us was

20   a call log showing that he had frequent communications

21   on the phone with Mr. Cohen.

22             MR. FARINA:   Objection; form, foundation.

23   I think that is a misrepresentation.

24        Q.   (By Mr. Jafri)  So, he had -- he had

25   phone calls with Mr. Cohen in between April of 2020 and

1    May of 2022.

2              At his deposition, he claimed that he was

3    having high-level discussions about the personalities

4    of other board members, including whether they were

5    nice, difficult to work with, friendly, open minded,

6    and whether everybody was fitting in, and whether Mr.

7    Cohen's nominees were being included in calls.  This is

8    on Page 136 of the transcript, through 137 of the

9    transcript.

10              Did you know whether he was talking to

11    Mr. Cohen while he was sitting on the board?

12              MR. FARINA:  Objection; form, foundation.

13       A.    I did not know.

14       Q.    (By Mr. Jafri)  I'm sorry?

15       A.    I did not know.

16       Q.    Was that appropriate?

17       A.    No.

18       Q.    Okay.  Now, what about the fact that he

19    has already testified about the fact that he was having

20    these discussions with another shareholder privately

21    about the personalities of other board members?  Is

22    that appropriate?

23       A.    No.

24       Q.    Is it appropriate to discuss whether

25    those board members are open minded about ideas?

1          A.    No.

2          Q.    Why is it inappropriate?

3          A.    Because he was there to serve a role as

4     an independent director, and that is outside of the

5     guidelines of the -- it's -- it's -- one, outside of

6     the guidelines of the corporate governance principles.

7     It is -- he was specifically directed not to do that,

8     and he was not there to represent one shareholder, He

9     was there to represent all shareholders, so.

10         Q.    Right.  Right.  But, I'm talking about

11    the fact that he was having discussions about other

12    board members with the shareholder, including their

13    personalities and whether they were open minded.

14    That's very specific?

15         A.    Yeah.

16         Q.    Right?

17         A.    Yeah.

18         Q.    So, why is that inappropriate?

19         A.    Because it's not his role.

20         Q.    In your long career, have you ever come

21    across anyone -- anyone on -- on the board who

22    described themself as a proxy for a single shareholder?

23         A.    No.

24         Q.    In your long career, did you ever come

25    across another board nominee who talked in private

84

1  about the personalities of other board nominees with a

2  single shareholder?

3          A.   No.

4          Q.   In your long career, have you ever come

5  across another board nominee who talked in private with

6  a single shareholder concerning whether his board

7  colleagues were open minded?

8          A.   No.

9          Q.   Now, I will also represent to you that

10  Ms. Edelman also testified in this case.  And we -- her

11  and I had a discussion about a specific term, called

12  "material nonpublic information."  You may be aware of

13  it.

14          A.   Yeah.

15          Q.   And, on Pages 153, 1 -- Lines 1 through

16  25, and Page 154, Lines 1 through 15, Ms. Edelman said

17  that she would rely on counsel to determine what was or

18  was not MNPI, and that it was a legal question.

19          Do you agree with that?

20          A.   It is a -- it is a legal question, yes.

21          Q.   Right.

22          A.   Material nonpublic information is defi --

23  is a defined term.

24          Q.   Right.  Right.  I understand.  So, now,

25  putting aside the fact that it is a legal issue, do you

89

1    standing order.

2            Q.   (By Mr. Jafri)  Ms. Edel -- Ms. Gove --

3            MR. FARINA:  You're asking --

4            Q.   (By Mr. Jafri)  -- do you want me to --

5            MR. FARINA:  -- inappropriate questions.

6            MR. JAFRI:  No.  Please -- Steve, please.

7            Q.   (By Mr. Jafri)  Do you want me to repeat

8    the question?

9            A.   Sure.

10           Q.   Okay.  My question is that Cohen's

11   decision to sell all his holdings to other investors

12   would matter to the followers who followed him, right?

13           MR. FARINA:  Objection; form.

14           A.   Yes, I would think so.

15           Q.   (By Mr. Jafri)  Right.  Thank you very

16   much.  Now, let's move on to another exhibit.

17           So, I'm handing to you what we have

18   previously marked as Exhibit 32.

19           A.   (Reviewing document.)

20           Q.   So, earlier on, Ms. Gove, we had talked

21   about, you know, Mr. Cohen's nominees reaching out to

22   management and the board to discuss, you know, bringing

23   him under the tent and so on.  Do you recognize this

24   e-mail?

25           A.   (Reviewing document.)

1  bringing him under the tent with respect to the sale or

2  spinoff of buybuy Baby?

3       A.   Yeah.

4       Q.   Did any of the board members support Mr.

5  Rosenzweig's proposal to do this at this time?

6       A.   I think he had support from Marjorie and

7  Shelly.

8       Q.   Right.  Right.

9       A.   Yeah.

10       Q.   Anyone else?

11       A.   No.

12       Q.   Nobody except for those two other

13  nominees that Cohen placed on the board, right?

14       A.   Yes.

15       Q.   So, you know, I think that over here --

16  so, do you agree with me that he wanted to give him a

17  preview of earnings at this point as well?

18       A.   That was the -- the notion that was

19  presented, yes.

20       Q.   And did he ever explain why that would be

21  beneficial to the company?

22       A.   I think that he felt like Ryan could help

23  mastermind, you know, a plan of communication.  And I

24  think that knowing that, you know, the -- the results

25  were going to be challenging, that there needed to be

94

1      support in the communication plan.

2             Q.   But what kind of communication plan are

3      we talking about?

4             A.   External communication.

5             Q.   Right.

6             A.   Earnings.

7             Q.   Can -- can you be a little bit more

8      specific?

9             A.   No.  I think it's just, you know, the --

10     the overall communication plan, the earnings release.

11            Q.   Right.  Okay.  But, I guess going back to

12     this, like, what would the company achieve if Cohen was

13     given this information before other investors were?

14            A.   None that I could think of.

15            Q.   Did they ever explain why they wanted to

16     do this?

17            A.   No.

18            Q.   Did it make sense to you?

19            A.   No.

20            Q.   Did the company ever entertain a proposal

21     like this for any other shareholder while you were at

22     the company?

23            A.   No.

24            Q.   So, it was only Mr. Cohen?

25            A.   Right.  That it was suggested for.

1  have an idea, want to be more proactive, want to be

2  more engaged, and usually, my response was, you know,

3  "Let's take it under advisement."

4          Q.   When you say more active and more

5  engaged, are we talking about Mr. Rosenzweig being more

6  engaged --

7          A.   Yes.

8          Q.   -- and -- and proactive?

9          A.   In terms of suggesting things, directing

10  things, yes.

11          Q.   And when you say "things," do you mean

12  more than just outreach to Cohen?

13          A.   Yes.

14          Q.   Okay.

15          A.   Uh-huh.

16          Q.   So, you -- do you recall anything

17  specific about, you know, why he thought it was a good

18  idea at this time to reach out to Ryan Cohen?

19          A.   So, again, this was right before the

20  announcement of the CEO change.  This particular

21  weekend was, I believe, right before the announcement

22  of the CEO change.  And so, he felt strongly that Ryan

23  needed to be aware of that.  And so, the timing of him

24  being aware of that was important to him.  I think that

25  he did not want to blind side him, because those,

1  again, three directors had participated in that

2  decision, so, or the decision that was developing and

3  he wanted to make sure that he was aware.  I think that

4  he, again, as we've discussed before, they believed

5  that he had some communication sense, ala the Greg

6  Marose approach that might be beneficial in terms of

7  thinking about how this was going to be communicated,

8  the announcement of the change.

9       Q.   Right.  You mentioned the Greg Marose

10  approach.  What is that?

11      A.   There was always a sense from

12  particularly Marjorie and Ben and Shelly, that Greg and

13  his firm had a better way to communicate to retail

14  investors.  I can't tell you what that is, but they

15  always had a sense that it was better.

16      Q.   And that communi -- the -- so -- I'm glad

17  you brought that up.

18           So, when it comes to them saying, "Let's

19  reach out to retail investors," were they doing it in

20  the middle of 2022 as well?

21      A.   Yes.  Yes.  How -- in terms of how things

22  were communicated to them, yes.  They were very

23  aggressive, I would say, in terms of thinking that our

24  approach from an investor relation standpoint was dated

25  and specifically geared to institutional investors.

1        Q.   Okay.  And they wanted to move towards

2   trying to cultivate retail investors?

3        A.   Yes.

4        Q.   Did they explain why they wanted to do

5   that?

6        A.   Well, cultivate -- yes, because they felt

7   like that's where our stock ownership was shifting.

8        Q.   So, they wanted to pay special attention

9   to the retail investors?

10        A.   Yes.

11        Q.   And they wanted to do that -- did they

12   want to do that in April of 2022?

13             MR. FARINA:  Objection; form.

14        Q.   (By Mr. Jafri)  Go ahead, Ms. Gove.

15        A.   I don't recall the exact date, but it was

16   a developing conversation from early on when they

17   arrived.

18        Q.   Okay.  So, it was happening when they

19   arrived?

20        A.   Yeah.

21        Q.   Okay.

22        A.   It was a conversation that -- that --

23   they were trying --

24        Q.   And -- and did -- and they wanted Mr.

25   Marose to be involved in this process?

1    summary, which were more intended to be, you know, sort

2    of, thought starters for me.  That's the way I take

3    notes, but obviously, there's context beyond what's

4    here.

5           Q.   Right.

6           A.   Yeah.

7           Q.   How long did this conversation occur?

8           A.   Less than 30 minutes, I think.

9           Q.   Okay.

10          A.   It wasn't long.

11          Q.   And between July 20 -- sorry.  Between

12   July 15th, that's the day when you talked to him,

13   right?

14          A.   Uh-huh.

15          Q.   And August 16th of 2022, did you have any

16   other communications with him?

17          A.   No.

18          Q.   Did anyone have any other communications

19   with him?

20          A.   Not that I'm aware of.

21          Q.   So, nobody at the company told you that

22   they spoke to Ryan Cohen?

23          A.   Right.  Correct.

24          Q.   Did -- are you aware of whether his

25   nominees had any communications with him during that

1    time?

2            A.    I'm not aware.

3            Q.    Did they talk about bringing him under

4    the tent during that period?

5            A.    I don't recall.

6            Q.    Any proposals to give him, you know,

7    information about the company during that period?

8            A.    Not that -- no -- no -- no proposals, no.

9            Q.    So, when we look at the second page of

10   these notes --

11           A.    Uh-huh.

12           Q.    -- where -- and you wrote highlights from

13   the call with Ryan?

14           A.    Uh-huh.

15           Q.    And then, you wrote, "Focused on

16   liquidity."

17           A.    Uh-huh.

18           Q.    "Deep-dive questions and vendor support.

19   How bad is it?"

20                 So, the deep-dive questions were about

21   liquidity or both about liquidity and vendor support?

22           A.    "Deep-dive questions around vendor

23   support." "Liquidity and deep-dive questions around

24   vendor support."

25           Q.    Okay.  So, the -- so, what were the

1    deep-dive questions?

2        A.   So, as I mentioned before, he, you know,

3    prefaced all of this with, "I don't want any MNPI.  I

4    don't want any MNPI."  You know, "Don't want that.  Be

5    careful."  And then, he moved into questions on

6    liquidity and specifically asked were the vendors

7    providing support?  Had I had conversations with the

8    vendors?  You know, how was that going?  What was

9    taking place?

10            And I shared with him that I was having

11   conversations with vendors, and that I was, you know,

12   finding, you know, them to be supportive.  That you

13   know, there was some, you know, very positive

14   conversations in terms of their interest and excitement

15   around getting back to basics, because that was the

16   tone of those conversations.  And that was all, you

17   know, things that were disclosed in the end of June

18   announcement calls, the -- the analyst calls that I

19   had.

20            And, you know, again, we didn't get into

21   a great deal of specifics, but that it was generally

22   positive, they were glad we were getting back to

23   basics, they were not surprised that the unbrand

24   strategy wasn't working, but they were also concerned

25   about, you know, their payments.

1       Q.   At this point, were there vendors who

2  said they wouldn't be supportive anymore?

3       A.   At this point, there were no vendors that

4  hadn't -- that said they were not going to be

5  supportive, but that was not a conversation item with

6  Ryan.

7       Q.   Right.  No, I understand --

8       A.   Yeah, I mean, just --

9       Q.   -- (speaking simultaneously) --

10       A.   -- generally, yeah, yeah, okay, because

11  that was not part of the Ryan conversation.  But, at

12  that point, no, there were no vendors that said that

13  they would not be supportive.

14       Q.   So, when it comes to the point that you

15  made that he was focused on liquidity, what

16  specifically did he want to know?

17       A.   He wanted to make sure that we had enough

18  liquidity.  "Do you have liquidity?  How's it going?"

19  And I reported that, you know, that was what BRG was

20  working on.

21       Q.   Right.  But did you --

22       A.   Right.

23       Q.   -- tell him anything specific about, you

24  know, "This is how much cash we're trying to get," or

25  anything like that?

1          A.    No.

2          Q.    Did he say anything about, you know, more

3   specific about his concerns about the cash point?

4          A.    Well, again, that was the question, "How

5   bad is it?"  So, yes, he was wanting to have some

6   understanding of how bad it was.

7          Q.    Right.  Anything else he said other --

8   other than how bad is it?

9          A.    No.

10          Q.    Did he say anything about the revolver?

11          A.    Not specifically that I recall.

12          Q.    Did he say anything about whether the

13   company was trying to get funding from other sources?

14          A.    He didn't want specifics on that, but he

15   did indicate that he hoped that we were finding sources

16   of cash.

17          Q.    Okay.  So, he --

18          A.    Right.

19          Q.    -- so, from your conversations, you

20   gathered that he was concerned about whether the

21   company had enough cash?

22          A.    Yes, definitely.

23          Q.    And was wondering whether you were going

24   to find other sources of cash?

25          A.    Yes.

1      Q.   Like, from what kind of other sources?

2      A.   Well, as we talked about earlier, the

3  various liquidity levers that there might be.

4      Q.   Right.  Okay.

5      A.   Uh-huh.

6      Q.   And that would include the revolver?

7      A.   It would, yes.

8      Q.   Because, as you know, in his

9  conversations with Ms. Edelman, he had a specific

10  question about the revolver?

11      A.   Yeah.

12      Q.   Do you recall anything that he discussed

13  with you on this phone call?

14      A.   No.

15      Q.   Well, the reason why I wanted to know is

16  because it seems to me that Ms. Edelman punted and

17  expected you to get more granular with her?

18          MR. FARINA:  Objection; form.

19      Q.   (By Mr. Jafri)  Is that right?

20      A.   I don't think so, because getting more

21  granular would have, you know, again, required me to

22  give him an M -- MNPI, that I wouldn't have thought was

23  appropriate.

24      Q.   Sure.  But -- but, he wanted to know

25  though, right?

1           MR. FARINA:  Objection; form, foundation.

2      A.   He -- he didn't ask me specifically that.

3      Q.   (By Mr. Jafri)  Specifically that as in

4  what?

5      A.   About the revolver.

6      Q.   Okay.  But, he wanted to know about the

7  sources of cash?

8           MR. FARINA:  Objection; form.

9      A.   Yes.  He wanted to know about liquidity.

10      Q.   (By Mr. Jafri)  Okay.  Next, when you

11  mentioned in your next bullet point --

12      A.   Uh-huh.

13      Q.   -- you said, "Doesn't want us to do

14  anything that is dilutive to shareholders."

15      A.   Uh-huh.

16      Q.   And then, in brackets you wrote, "Under

17  the tent" comment.

18      A.   Yeah.

19      Q.   Is the "under the tent" comment a

20  reference to him saying he wanted to be brought under

21  an NDA?

22      A.   He was very specific that he did not want

23  anything that we were doing to be dilutive to

24  shareholders, and that if there was anything that

25  might, you know, that would have any potential of being

1   dilutive to shareholders, he would want to be -- he

2   would be wanting to consider being brought into the

3   tent at that point in time.

4           Q.   To get what, more information?

5           A.   To get information.

6           Q.   Anything else?

7           A.   Not that I perceived, but, you know,

8   again, it was message received, message delivered,

9   message received.  You know.

10          Q.   Right.  Okay.

11          A.   Yeah.

12          Q.   And did he say why he was concerned about

13  dilution?

14          A.   Not specifically, but it was certainly

15  implied he didn't want to be diluted.

16          Q.   Yeah.  That was --

17          A.   He's a shareholder.

18          Q.   Yeah.

19          A.   Right.  Yeah.

20          Q.   And then, so what -- what could the

21  company do that would dilute him?

22          A.   Well, any other outside sources of cash

23  could potentially be dilutive, correct?  So, even

24  additional financing could potentially be dilutive.

25  Certainly, anything that would be, you know, like a --

1   a share offering would be dilutive.

2          Q.   Right.  Share offering.  And I think you

3   mentioned financing.  You mean like a bond exchange?

4          A.   Yes.

5          Q.   Right.

6          A.   Uh-huh.

7          Q.   And then, the company was considering

8   that at that point?

9          A.   Uh-huh.

10         Q.   Okay.  Did you have any conversations

11  with him at this point during your Zoom call about any

12  -- any consideration of a capital raise or, you know, a

13  bond exchange or anything specific like that?

14         A.   No, no.  But, even in my mind, any

15  external source of financing has a potential of being

16  dilutive.

17         Q.   And can you explain to me why that would

18  be the case?

19         A.   It would be the case because it would be

20  secured potentially, a secured financing.  And a

21  secured financing, bringing in additional capital would

22  certainly put the shareholders, you know, further back

23  in terms of, you know, any kind of liquidity event.

24         Q.   Right.  And was that something that was

25  being considered at that point?

1          A.   Yes.

2          Q.   It was?

3          A.   Yes.

4          Q.   Okay.  And specifically what exactly?

5          A.   Well, the FILO was being considered.

6          Q.   Okay.  So, that's what you're referring

7     to?

8          A.   Yes.

9          Q.   Okay.  (Speaking simultaneously) --

10          A.   So, I -- I did consider that in my mind

11     to potentially have some air of being dilutive.

12          Q.   Okay.  Did you discuss the FILO with him?

13          A.   No.

14          Q.   At this point, by Ju -- by July 15th, did

15     you discuss the FILO with any of his nominees?

16          A.   Yes, the board was aware of the FILO

17     being considered.

18          Q.   Right.  But specifically, I'm talking

19     about just his nominees.

20          A.   No specific conversations, but they were

21     involved in, you know, what was being developed.

22          Q.   Okay.  Okay.  But there's a -- there's a

23     -- there's a document that I have that may jog your

24     memory.  We'll get into that later.

25          A.   Okay.

168

1          Q.    I wanted to focus in on one other thing,

2     staying on this -- this bullet point.  When it says

3     this "under the tent" comment, I'm trying to understand

4     --

5          A.    Uh-huh.

6          Q.    -- what it is that -- what -- what this

7     exactly means.  Why would a shareholder want an NDA to

8     get information about whether he or she is being

9     diluted before other shareholders would receive it?

10         A.    Why would he want that?

11         Q.    Yeah.

12         A.    It's a good question.  I -- I perceived

13    that he thought that if that were the case, he would

14    have impact on that decision by being brought in under

15    the tent.

16         Q.    In other words, he could influence that

17    decision?

18         A.    Yes.

19         Q.    To try to prevent that from happening?

20         A.    Potentially.

21         Q.    Right.  Okay.

22         A.    Or come to a different source if he had

23    other sources.

24         Q.    Right.  Okay.

25         A.    Right.  I didn't know what was on his

1    mind, but, clearly, he wanted to participate in that

2    thinking, was the indication.

3           Q.   I see.  Okay.

4           A.   Yeah.

5           Q.   Now, I understand.

6           A.   Yeah.

7           Q.   Because I was trying to figure out

8    whether it was just that he wanted the information for

9    the sake of curiosity, you know, as opposed to some

10   other purpose, but it looks like it's the latter,

11   right?

12          A.   Yeah.

13          Q.   Okay.  The next question -- I'm sorry,

14   the next bullet point that you had here in your notes

15   was, you said that he asked about the quality of the

16   CFO.  Are we talking about Mr. Arnal?

17          A.   Yes.

18          Q.   What did he say?

19          A.   He just asked, you know, was he any good,

20   was he being aggressive?  You know, what -- what my

21   sense was for his quality.

22          Q.   Any good about -- at what?  In general?

23          A.   Yeah.

24          Q.   And aggressive about what?

25          A.   About the cost takeout.

1       A.   Yes.

2       Q.   The next bullet point here that you

3 mention is that, you said, "Surprised by how quick it

4 collapsed."

5       A.   Uh-huh.

6       Q.   "Asked how board came to conclusion to

7 change."

8       A.   Uh-huh.

9       Q.   Is this something that Mr. Cohen said?

10      A.   Yes.

11      Q.   Well, what -- what -- what exactly did

12 you mean when you wrote "how quickly it collapsed?"

13      A.   What he was referring to was, you know,

14 again -- my interpretation of that in the conversation

15 was from the time that he invested to the time that we

16 made the announcement of, Mark, you know, there was a

17 fairly quick cash burn.

18           And so, he commented on that, you know,

19 quick collapse.  And the conversation was around --

20 there were supply chain issues that were developing

21 prior to January that we didn't know about, that, you

22 know, as things developed, you know, we started to

23 address them as quickly as we could.

24      Q.   So, in other words, he was surprised by

25 the fact that the company was burning more cash --

1          A.    Yes.

2          Q.    -- during the period of his investment

3    than he expected?

4          A.    Yes.

5          Q.    Okay.

6          A.    Yes.

7          Q.    And so, that's what the collapse is

8    about?

9          A.    Uh-huh.  Yes.

10         Q.    And then, he --

11         A.    And I would say that and the customer,

12   you know, voting no as I described before.  The

13   customer not going along with the strategy.

14         Q.    Well, you mean the own brand strategy?

15         A.    Right.

16         Q.    Okay.  And then, I guess, in the -- in

17   the next clause of this, as we -- as we discussed, he

18   said he wanted to know how the board came to the

19   conclusion to change -- change what?

20         A.    To make the change in Mark, the CEO

21   change.

22         Q.    And what did you say to him in response?

23         A.    He just wanted more color.  I told him it

24   was a process, that, you know, there -- what I just

25   described to you that --

1   that?

2         A.   Not that I recall.

3         Q.   And you're -- you're -- and you're not

4   aware of any other board member also having any other

5   communications with him, except for -- for his nominees

6   for instance, right?

7         A.   Right.

8         MR. FARINA:   Object -- objection; form.

9   You're talking about the period between July 15 and

10  August 12?

11        MR. JAFRI:   Yes.   That's the period I'm

12  talking about.

13        MR. FARINA:   Well, re-ask -- re-ask your

14  question, please.

15        Q.   (By Mr. Jafri)   Between Ju -- between

16  July 15th, 2022 and August 2022, are you aware of any

17  board member having communications with Mr. Cohen?

18        A.   I'm not aware of any.

19        Q.   Did anyone tell you anything with respect

20  to what Cohen thought of his investment in -- in the

21  company between July 15th, 2022 and August 12th, 2022?

22        A.   No.   No one shared that with me.   I'm not

23  aware of any.

24        Q.   Okay.   You can keep that away.

25        A.   Uh-huh.

1    e-mail, he wrote -- this is the final sentence of his

2    e-mail --

3          A.    Uh-huh.

4          Q.    "Given RCV's ability to rally the Reddit

5    crowd, one wonders if he takes some action in regard to

6    this, or if he would wait to see some incremental good

7    news, and then try to ignite a short squeeze to amplify

8    the move upward."

9          A.    Uh-huh.

10         Q.    Any reason to doubt that that is true?

11               MR. FARINA:  Objection; form, foundation.

12         A.    It would seem like a reasonable

13   hypothesis.

14         Q.    (By Mr. Jafri)  And why is that?

15         A.    Because I think at this time in July, I

16   don't think anybody had any expectation that Ryan was

17   going to be doing anything that would be harmful to the

18   company.  I think the perception was that he was trying

19   to help.

20         Q.    Right.  But my question is a little

21   different.

22         A.    Uh-huh.

23         Q.    My question is:  He said something very

24   specific, that --

25         A.    Uh-huh.

1          A.    Yeah.

2          Q.    Right.  And some of them obviously were

3    paying attention to the company's financials, right?

4          A.    I think so.

5          Q.    Yeah?

6          A.    Yeah.

7          Q.    Like, just because you're a retail

8    investor doesn't mean that all retail investors will be

9    alike, right?

10         A.    Right.

11         Q.    Right.  Okay.  Are you aware that Ms.

12   Bowen said she was addicted to Reddit?

13               MR. FARINA:  Objection; form.

14         A.    Yes.

15         Q.    (By Mr. Jafri)  You are aware?

16         A.    Yes.

17         Q.    How -- how did you become aware of that?

18         A.    Because she said it to me.  I -- I heard

19   her use those words.

20         Q.    I see.  Okay.  Can you explain more about

21   what she said?

22         A.    She would read -- she would stay up late

23   at night, she said, and read what they were saying.

24   She would get, kind of, caught up in it.

25         Q.    Caught up in it as in she was in

258

1    agreement with some of their ideas?

2         A.   I don't know how much agreement, but she

3    did like reading it.

4         Q.   Yeah.  Well, I'm -- are you aware that

5    she has described some of those people on Reddit as, to

6    use her word, "sophisticated?"

7         A.   I -- I had not heard her use the word

8    sophisticated, but okay.

9         Q.   Yeah.  So, you -- you haven't heard that?

10        A.   Right.

11        Q.   But you know that she was addicted to it,

12   right?

13        A.   Yes.

14        Q.   Did Mr. Rosenzweig say anything about

15   whether he also went and read the posts on Reddit about

16   the company?

17        A.   Yes.

18        Q.   He did?

19        A.   He did.

20        Q.   He said he was -- he was -- he was

21   reading them?

22        A.   Yes.

23        Q.   What did he say about that?

24        A.   I just recall that he and Marjorie and

25   Shelly all were much more familiar and were regularly

259

1    reading the Reddit comments.

2            Q.   Okay.  So, I think that's clarifying.

3    So, Ms. Lombard also was reading the Reddit comments?

4            A.   Yes, for sure.

5            Q.   Did they bring up any specific posts on

6    Reddit in their discussions with you or with anyone

7    else at the company?

8            A.   Not that I recall.

9            Q.   So, do you remember, for instance, if

10   they said, you know, "We read a post about Ryan Cohen?"

11           A.   Not that I recall.

12           Q.   Did they say why they were reading the

13   posts on Reddit?

14           A.   I think there was a fascination with it.

15   I -- I can't explain it.  You know, I'm not -- I'm not

16   one of those people that, you know, it becomes kind of

17   dizzying to me, but yeah, they did become fascinated

18   with it.

19           Q.   Did you ever go and read anything about

20   the company on Reddit?

21           A.   Rarely.

22           Q.   But you have?

23           A.   I have.

24           Q.   Why did you do that?

25           A.   I had a stalker for a while.  I had to

272

1          Q.   What -- who?

2          A.   It would have been the folks at JP

3    Morgan.  But, again, what she was indicating here was,

4    you know, again, perception that he was buying at the

5    time.  I mean, and again, the perception when the stock

6    price was going up and based on his filing, there was a

7    sentiment of perception that he was buying.

8          Q.   Right.  So, when people saw this filing,

9    they thought that he was positive on the stock, right?

10         A.   Correct.

11         Q.   Right.

12         A.   Yes.

13         Q.   Right.  And that's why the price is going

14   up?

15         A.   Yes.

16              MR. FARINA:  Objection; form.

17         Q.   (By Mr. Jafri)  And she also mentioned

18   over here how "AMC and GME are both down in trading

19   that morning."

20         A.   (Nodding head.)

21         Q.   Do you -- you have any understanding why

22   that was the case?

23         A.   Why they were down --

24         Q.   Yeah.

25         A.   -- or why she was reporting on it.

275

1  Bates stamp on this?

2              MR. JAFRI:  So, did I skip one?

3              MR. ARIFI:  Yeah.

4              MR. JAFRI:  Oh, I skipped this one.

5              MR. ARIFI:  Yeah.

6              MR. JAFRI:  Okay.  Sorry about that.

7        Q.   (By Mr. Jafri)  So, if you focus on that

8  first bullet point where it says "the furious buying."

9              MR. GERBER:  I think we don't have that.

10             THE WITNESS:  I don't have that.  Never

11 mind.  I'm not sure.

12             MR. ARIFI:  Pass those down.

13             MR. JAFRI:  Right.  So, this is Exhibit

14 196.

15             MR. ARIFI:  This one, you marked as 195,

16 the -- the --

17             MR. JAFRI:  This one?

18             MR. ARIFI:  Yes.

19             MR. JAFRI:  Okay.

20       Q.   (By Mr. Jafri)  So, now that you have

21 this, if you look at this -- the first bullet point

22 where it says "the furious buying," he wrote, "The

23 furious buying in the morning may have been driven by

24 some quantifying buying on the, quote/unquote,

25 increased stake reported by Ryan."

1            And then, in parentheses, he said, "Even

2    though his number of shares did not change, some

3    services reported a 1.7 million-dollar share increase,

4    because they included the call options now, but not

5    before."

6            Do you see that, Ms. Gove?

7        A.   Yes.

8        Q.   Do you know what a quant fund is?

9        A.   Yes.

10       Q.   What is it?

11       A.   It's a fund that operates on qua --

12   quantitative information as opposed to qualitative

13   information, often like an index fund.

14       Q.   So, not a retail investor?

15       A.   Not a retail investor.  Not usually.

16       Q.   Now, in the next line, next bullet point,

17   Mr. Freedman wrote -- he writes, "The reports of Ryan's

18   increased stake also probably caused retail buying

19   again."

20       A.   Uh-huh.

21       Q.   Did I read that correctly?

22       A.   Yeah.  Yeah.

23       Q.   And he --

24       A.   I mean, he's used the word -- I mean, he

25   -- again, this is what the chaos that was, kind of,

1    going on at the time, because even JP Morgan thought he

2    was buying on August 16th.

3         Q.   Right, right.  I understand.

4         A.   Yeah.

5         Q.   But he's -- he's saying that the -- that

6    to the extent there's confusion about the fact that,

7    you know, he may have increased the stake, that's the

8    reason why people are buying the stock, right?

9         A.   That's correct.  That's what he's saying.

10        Q.   No reason to doubt that that's true?

11        A.   Correct.

12        Q.   Now, I wanted to focus your attention on

13   another thing.  If you look at the final bullet point

14   -- sorry, actually, the -- the one right before the

15   final one, which starts with "The shares are on loan."

16        A.   Uh-huh.

17        Q.   So, he wrote this.  He wrote, "The shares

18   on loan took an even further jump to 61.5 million

19   shares coming into today."

20        A.   Uh-huh.

21        Q.   And then, in parentheses, he's wrote --

22   he wrote, "Up from approximately 50 million shares in

23   mid-July --

24        A.   Uh-huh.

25        Q.   -- and the cost to borrow has started to

278

1    elevate last week and reached nine percent coming into

2    today."

3         A.   Uh-huh.

4         Q.   "Yes, that is almost the size of your

5    public flow," and then, he writes, "Implication, even

6    as your stock price rose over the past nine trading

7    days, the shares on loan had increased."  In brackets,

8    then he says, "Which means the short interest probably

9    had to."

10             Did I read that right?

11        A.   Yeah.

12        Q.   Any reason to doubt that's not true?

13        A.   No.

14        Q.   So, the short interest was increasing

15   even as it became more expensive to short; isn't that

16   what he's saying here?

17        A.   Uh-huh.  Correct.

18        Q.   Are you aware of any prohibition on

19   shorting the company's stock at this time?

20        A.   No.

21        Q.   No government ban, right?

22        A.   No.

23        Q.   You could short without any legal

24   obstacle?

25        A.   Yeah.

281

1          Q.   Is this the first time that you became
2     aware that there was a Form 144 associated with what
3     this -- with what he had been filing --
4          A.   Yes.
5          Q.   -- in -- on these days?
6          A.   Yes.
7          Q.   And, when you saw this e-mail and you
8     read this, did you think that he had sold his shares?
9          A.   That was the first time that the word
10    "sold" was used, yes.  So, in David's note it says
11    "sold" as late as July and that sales could begin
12    August 16th.  The word "sale" and -- "sales" and "sold"
13    were the first time "sales" had ever been used or
14    considered in the process in this whole period of time.
15    This is the first time that ever came to light.
16         Q.   Yeah.  But he's saying that they could be
17    sold between this window, right, which is August 16th
18    to July 21st, 2023?
19         A.   Right.  Or -- right.
20         Q.   So --
21         A.   Uh-huh.
22         Q.   Right.  So, at this point, you did not
23    know whether he had sold his shares?
24         A.   No.
25         Q.   Did you have any reason to believe at

282

1   this point that he had?

2        A.   No.

3        Q.   Did anyone else tell you that he had sold

4   his shares at this point?

5        A.   No.

6        Q.   Did you -- so, you know, actually, I

7   wanted to focus on -- I wanted to focus on some other

8   specific things.

9             Did you have a view at all of -- of why

10  he filed this form?

11       A.   I assume that he had to file it, that it

12  was a requirement, because he was going to transact.

13       Q.   Right.  So --

14       A.   Right.

15       Q.   -- so you thought that there would be --

16  there would be some transaction, but you didn't know if

17  it was buying or selling?

18       A.   Correct.

19       Q.   Okay.  Thank you.  You can put that away.

20       A.   (Complying.)

21            Uh-huh.

22            THE WITNESS:  I'm going to grab a bottle

23  of water.

24            MR. JAFRI:  I think we need to mark all

25  of these.

285

1          A.   Uh-huh.

2          Q.   This is on the day that Cohen's forms

3    were released, showing that he had sold everything,

4    right?

5          A.   Right.  Uh-huh.

6          Q.   And the stock price is dropping

7    simultaneously on the same day?

8          A.   Uh-huh.  Uh-huh.

9          Q.   Is that -- is that a yes?

10         A.   Yup.  Yup.

11         Q.   Any reason to think that there was --

12   well, actually, let me rephrase.

13              No company news out on that date,

14   correct?

15         A.   No.

16         Q.   And no external company news like a

17   government investigation or something like that,

18   correct?

19         A.   No.

20         Q.   Only thing that was out there was the

21   fact that he had filed forms finally disclosing that he

22   had dumped everything, right?

23         A.   Right.

24         Q.   So, I wanted to focus on -- I wanted to

25   focus on the -- the -- the -- the next text -- set of

```
1    text messages --

2             A.    Uh-huh.

3             Q.    -- between you and Ms. Edelman on August

4    15th at 5:04 p.m., you know, where you and her are

5    talking --

6                   MR. GERBER:   18th.

7             Q.    (By Mr. Jafri)   -- about Mr. Cramer's

8    show."

9             A.    Yeah.

10            Q.    Is this Cramer on CNBC?

11            A.    Yes.

12            Q.    And so, he -- this is his show where he

13   closes out with, quote, "Bed Bath and Betrayal?"

14            A.    Yes.

15            Q.    Did you watch that show?

16            A.    I probably saw at least some of it.

17            Q.    Okay.  So, you -- you had an

18   understanding of what she was talking about?

19            A.    Yes.

20            Q.    So, you responded and said, "Still

21   negotiating and really don't feel betrayed.  That would

22   have been required a level of trust."

23                  Are you talking about Ryan Cohen here?

24            A.    Yes.

25            Q.    Okay.  So, you didn't trust him?
```

1          A.    No.

2          Q.    Why?

3          A.    Because he -- I -- I didn't trust him.  I

4    didn't trust what was taking place.  There was a lot of

5    things that had taken place between, you know, him and

6    Marjorie and Ben and the whole process that always left

7    me uncomfortable.  We were very careful with our

8    conversations with him.

9          Q.    So, you didn't trust him because you

10   didn't think he was an honest person?

11         A.    I didn't understand his motivations.  I

12   didn't understand what he was -- where -- what his

13   goals were.  He was very, I'll say, cagey in terms of

14   his communications and interactions.  You know, again,

15   I had one conversation with him, but it was a bit

16   cagey.  I felt like that the negotiations from the time

17   we had the settlement agreement were, you know, such

18   that it left questions in my mind.  You know, to your

19   point, he didn't specifically do anything overt, but

20   the actions were ones that put his trust as a, you

21   know, question in my mind.

22         Q.    Right, right.  Which actions are you

23   talking about?

24         A.    Just the actions of, you know, what he

25   was questioning, why he was questioning, where he was

1    going with things, you know.  And -- and obviously --

2           Q.    Right.

3           A.    -- by this point in time, that trust had

4    completely been, you know, exploded.

5           Q.    Right, right, yeah.

6           A.    Yeah.

7           Q.    But, I think in this text message, you're

8    saying that you never trusted him, right?

9           A.    I think that, you know, that's -- I mean,

10   never, I certainly didn't trust him at that point.

11          Q.    Okay.  Did you trust Mr. Rosenzweig?

12          A.    Not completely, no?

13          Q.    Why?

14          A.    Again, from the very first conversation I

15   had with him, you know, the comment that he was acting

16   as, you know, sort of, Ryan's agent, put me in, you

17   know, a -- a concerned state about that.

18          Q.    Anything else?

19          A.    From there, just his general approach in

20   terms of, you know, what information he wanted access

21   to, some of the things that we've discussed today.

22          Q.    Right.  Like pushing to get information

23   for Cohen?

24          A.    Uh-huh.

25          Q.    Did you trust Ms. Bowen?

1          A.    For different reasons, I had some lack of

2     trust for her, but it was more about the volatility of

3     her personality.

4          Q.    I see.  What about Ms. Lombard?

5          A.    I did not trust her.

6          Q.    Why?

7          A.    She wasn't that sophisticated.

8          Q.    By that, you mean she -- she didn't know

9     what she was doing?

10          MR. GERBER:  Objection to form.

11          A.    She did not have the depth of knowledge

12     or experience in some of the things she was dealing

13     with.

14          Q.    (By Mr. Jafri)  Okay.  You know, moving

15     on in this text message exchange, Ms. Edelman then

16     responded to you and said, "He's talking about the

17     Reddit crowd --

18          A.    Uh-huh.

19          Q.    -- not us."

20          A.    Uh-huh.

21          Q.    So, does that mean that Cramer that day

22     was talking about Cohen betraying the Reddit crowd?

23          A.    That's her perception, yeah.

24          Q.    Right.  And then, he -- and then, she

25     continues to write and says, "And started the clip

1    suggesting, that is, asking whether the three directors

2    he placed might have signaled."

3         A.   Uh-huh.

4         Q.   Right?  And you responded and said,

5    All good questions."

6         A.   Yup.

7         Q.   What did you understand her to mean when

8    she said "signaled?"

9         A.   Signaled to him.

10        Q.   Signaled what to him?

11        A.   Signaled concerns to him.

12        Q.   About the company?

13        A.   Yeah.

14        Q.   Like, sharing inside information?

15        A.   Yeah.

16        Q.   Right.  So, you had concerns?  And -- and

17   you -- you had concerns about that?

18        A.   As I -- my response, "All good

19   questions."  I certainly had questions about that.

20        Q.   Right.

21        A.   Yeah.

22        Q.   And the reason for that was what?

23        A.   The types of information that was being

24   requested.

25        Q.   So, and this is about the things that we

291

1    discussed earlier?

2            A.    Uh-huh.

3            Q.    Okay.

4            A.    Yeah.

5            Q.    Now, you know, following this text

6    message that you sent, Ms. Edelman said, "Uh-huh."

7            A.    Uh-huh.

8            Q.    So, she obviously agrees?

9            A.    Uh-huh.

10               MR. GERBER:   Objection.

11               MR. FARINA:   Objection; form.

12           Q.    (By Mr. Jafri)  Who as -- does she agree

13   --

14           A.    I believe so.

15           Q.    -- Ms. Gove?  Right?

16               Who else agreed and thought that Cohen's

17   nominees were signaling to him?

18           A.    I think from a board of director's

19   standpoint, you would have to ask each one, but I

20   would, you know, venture to say that probably most of

21   them.

22           Q.    You thought most of them had doubts about

23   that?

24           A.    Had concerns, yes.

25           Q.    So, I wanted to then move on to the next

292

1    text.

2              A.    Uh-huh.

3              Q.    You -- you wrote, "Just finished with

4    Steve and about to take off."

5              A.    Uh-huh.

6              Q.    Is this the same Steve we talked about

7    when we discussed the text messages with Rosenzweig?

8              A.    Yeah, Steve Coulin (phonetic) from FTI --

9              Q.    Right.

10             A.    -- I mean, from BRG.  Uh-huh.

11             Q.    Right.  And then, you -- you -- you went

12   on to say, "Still managing to run file for best

13   positioning.  Should settle by midday tomorrow.  I like

14   how it is playing.  Disappointed in the leak.  Steve

15   thinks he knows who the bad actor is."

16             A.    Uh-huh.

17             Q.    Is this leak a reference to the fact that

18   by this point the press had learned that the company

19   was hunting for a credit line?

20             A.    Yes.

21             Q.    That's what it is about, right?

22             A.    Uh-huh.  Yes.

23             Q.    That the -- the story isn't doing well at

24   the Wall Street Journal?

25             A.    Right.

293

1      Q.   Who did Steve think was the leaker?

2      A.   Gosh.  Let me think about that.  Steve

3  thought that the leak was one of the -- one of the

4  potential FILO lenders that had already been taken out

5  of the group, so to speak, that already was not going

6  to be -- because we were down to two finalists, and one

7  of those -- I'm trying to think of his name.  I can see

8  his face.  He's been around a long time.  But there was

9  one that Steve thought was probably the leaker, because

10  he didn't get the deal, so to speak.

11      Q.   Okay.  So, it wasn't anybody on the board

12  or management?

13      A.   No, no, no.  It was one of the competer

14  -- competitors for the FILO.

15      Q.   Okay.  I wanted to move on to another

16  text message --

17      A.   Dan.  Dan is his first name.  I don't

18  know his last name.  Yeah.  Yeah.

19          MR. GERBER:  That narrows it down.

20          THE WITNESS:  Yeah.  I'll think of his

21  last name in a minute.

22          MR. JAFRI:  We are going to mark this as

23  Exhibit 198.

24          (Deposition Exhibit No. 198 was marked

25  for identification.)

Exhibit 7

**From:** Shelly Lombard
**Sent:** Monday, September 5, 2022 12:10 PM
**To:** Harriet Edelman;Sue Gove;Sue Gove, CEO
**BCC:** Benjamin Rosenzweig;Marjorie Bowen
**Subject:** Privileged & Confidential

Harriet & Sue,

I know that it's a very challenging time. So, thanks for all of your hard work.

But separate and apart from communication around the CFO issue, we need a communications strategy with regard to the Reddit crowd.

The sell side stock analysts probably don't matter much at this point. Our ATM will not be successful without the Reddit audience.

The fact that the stock traded down after Wednesday's news indicates there's a need for us to pay attention to this audience. And next week's news will be about the unfortunate and sad CFO situation. It would be in our best interest to pay specific attention to this audience.

A call and strategy session with Rachel would be a start.

Shelly

COVY_CTL00213865

Exhibit 8

**Short Message Report**

| Conversations: 1 | Participants: 3 |
|---|---|
| Total Messages: 72 | Date Range: 8/16/2022 |

**Outline of Conversations**

 **CHAT - CB0000001 - 00838 - 2022/08/16** · 72 messages on 8/16/2022 · +13108497680 · Ben Rosensweig <+18134538665> · Lombard, Shelly <(973) 477-7205>

SLOMBARD_0081

**Messages in chronological order** (times are shown in GMT +00:00)

---

💬 **CHAT - CB0000001 - 00838 - 2022/08/16**

\# **+13108497680**                                                          ▶ 8/16/2022, 2:27 PM

This is an off the record comment. It must be nice to be a billionaire and have a legion of followers on social media pumping a stock price for you. However it was great to see him buying. I say this seriously. It will keep our board focused much more easily when they know he is sticking around.

\# **+13108497680**                                                          ▶ 8/16/2022, 3:07 PM

Jefferies.

\# **+13108497680**                                                          ▶ 8/16/2022, 3:07 PM

Stock w who has done meme stocks.

\# **+13108497680**                                                          ▶ 8/16/2022, 3:08 PM

Jefferies.  Push Jefferies.

\# **+13108497680**                                                          ▶ 8/16/2022, 3:08 PM

Follow Ryan's playbook.

\# **+13108497680**                                                          ▶ 8/16/2022, 3:09 PM

Which meme stocks have they done.

SL **Lombard, Shelly <(973) 477-7205>**                                      ◀ 8/16/2022, 3:09 PM

RC doesn't love Jefferies.

\# **+13108497680**                                                          ▶ 8/16/2022, 3:09 PM

Jpm is comflicted.

\# **+13108497680**                                                          ▶ 8/16/2022, 3:09 PM

Ok. But they did amc

\# **+13108497680**                                                          ▶ 8/16/2022, 3:10 PM

Who's did GameStop.

\# **+13108497680**                                                          ▶ 8/16/2022, 3:10 PM

Sue is right there.

BR **Ben Rosensweig <+18134538665>**                                         ▶ 8/16/2022, 3:10 PM

Sue and Josh just go with their friends

\# **+13108497680**                                                          ▶ 8/16/2022, 3:11 PM

Yep.

\# **+13108497680**                                                          ▶ 8/16/2022, 3:11 PM

Sucks

SL **Lombard, Shelly <(973) 477-7205>**                                      ◀ 8/16/2022, 3:12 PM

JPM in conflicted. I talked to Greg. They weren't happy with Jefferies. NEVER heard of UBS doing an ATM. WTH?

BR **Ben Rosensweig <+18134538665>**                                         ▶ 8/16/2022, 3:12 PM

JPM won't agree to it. Too much reputation risk

SLOMBARD_0082

| # | +13108497680 | ▶ 8/16/2022, 3:14 PM |
|---|---|---|
| | Specifics please.  Loan to own or not?? | |

| # | +13108497680 | ▶ 8/16/2022, 3:15 PM |
|---|---|---|
| | Be specifics as to who we expect term sheets from. | |

| # | +13108497680 | ▶ 8/16/2022, 3:15 PM |
|---|---|---|
| | Who are people?? | |

| # | +13108497680 | ▶ 8/16/2022, 3:16 PM |
|---|---|---|
| | Yes. Names. | |

| # | +13108497680 | ▶ 8/16/2022, 3:16 PM |
|---|---|---|
| | Why can't we get names? | |

| BR | Ben Rosensweig <+18134538665> | ▶ 8/16/2022, 3:16 PM |
|---|---|---|
| | This is nuts | |

| # | +13108497680 | ▶ 8/16/2022, 3:17 PM |
|---|---|---|
| | Not acceptable.  Given where we are and our expertise the board should have access to names and terms. | |

| SL | Lombard, Shelly <(973) 477-7205> | ◀ 8/16/2022, 3:17 PM |
|---|---|---|
| | They have NO IDEA how we can get can screwed by having the wrong lenders in this. | |

| # | +13108497680 | ▶ 8/16/2022, 3:26 PM |
|---|---|---|
| | We will go to Harriet after call. | |

| BR | Ben Rosensweig <+18134538665> | ▶ 8/16/2022, 3:26 PM |
|---|---|---|
| | Just like that... Stock back to 18 | |

| # | +13108497680 | ▶ 8/16/2022, 3:27 PM |
|---|---|---|
| | Yep. It's going to be a ride. | |

| # | +13108497680 | ▶ 8/16/2022, 3:27 PM |
|---|---|---|
| | I'll take 18. I'll take anything double digit. | |

| # | +13108497680 | ▶ 8/16/2022, 3:31 PM |
|---|---|---|
| | At a minimum Lazard should comment on players. | |

| # | +13108497680 | ▶ 8/16/2022, 3:31 PM |
|---|---|---|
| | Yes. He is saying the right thing. | |

| BR | Ben Rosensweig <+18134538665> | ▶ 8/16/2022, 3:33 PM |
|---|---|---|
| | "cash is the best currency". I'll remember that 😂 | |

| # | +13108497680 | ▶ 8/16/2022, 3:36 PM |
|---|---|---|
| | 2 week process.  Start today. | |

| # | +13108497680 | ▶ 8/16/2022, 3:36 PM |
|---|---|---|
| | We should ask Lazard who managed their example atms | |

| BR | Ben Rosensweig <+18134538665> | ▶ 8/16/2022, 3:37 PM |
|---|---|---|
| | It was bad enough they didn't have the shelf before. Then I called them out. Then the stock rallied all week. And now we're hearing they're ready but haven't started yet. | |

| # | +13108497680 | ▶ 8/16/2022, 3:37 PM |
|---|---|---|
| | Let's hear what cleary has to say. | |

**SL**  **Lombard, Shelly <(973) 477-7205>**  ◀ 8/16/2022, 3:38 PM
We need someone who has done ATMs for a distressed company and/or a meme stock. League tanked don't matter.

**#**  **+13108497680**  ▶ 8/16/2022, 3:38 PM
Liked "We need someone who has done ATMs for a distressed company and/or a meme stock. League tanked don't matter."

**#**  **+13108497680**  ▶ 8/16/2022, 3:39 PM
Doesn't another intermediary taking our stock that they will immediately sell create too much downward pressure.

**#**  **+13108497680**  ▶ 8/16/2022, 3:40 PM
??

**BR**  **Ben Rosensweig <+18134538665>**  ▶ 8/16/2022, 3:40 PM
It's just like atm deals. All about the volume

**BR**  **Ben Rosensweig <+18134538665>**  ▶ 8/16/2022, 3:40 PM
Can't do it if volume falls back to normal

**SL**  **Lombard, Shelly <(973) 477-7205>**  ◀ 8/16/2022, 3:40 PM
So far, I am NOT IMPRESSED with JPM. Lazard is so so.

**SL**  **Lombard, Shelly <(973) 477-7205>**  ◀ 8/16/2022, 3:42 PM
Retail investors rarely own bonds. That's interesting?

**#**  **+13108497680**  ▶ 8/16/2022, 3:48 PM
Not the first time we have heard this.

**#**  **+13108497680**  ▶ 8/16/2022, 3:48 PM
Harder to organize but cheaper to get rid of - I think.

**SL**  **Lombard, Shelly <(973) 477-7205>**  ◀ 8/16/2022, 3:49 PM
Investment grade covenants!!!! That's VERY helpful! Gives us a lot of options.

**SL**  **Lombard, Shelly <(973) 477-7205>**  ◀ 8/16/2022, 3:51 PM
I knew retail held our stock; more unusual for them to own bonds. Bonds typically trade in lot sizes that are too big. But I guess since they're trading at 20 cents!!!

**#**  **+13108497680**  ▶ 8/16/2022, 3:56 PM
I'm skeptical.  No institution is going to take our meme stock.

**#**  **+13108497680**  ▶ 8/16/2022, 3:56 PM
It's too volatile.

**SL**  **Lombard, Shelly <(973) 477-7205>**  ◀ 8/16/2022, 3:56 PM
I agree. He's on drugs.

**#**  **+13108497680**  ▶ 8/16/2022, 3:56 PM
And it ruins our ongoing atm abilities.

**#**  **+13108497680**  ▶ 8/16/2022, 3:58 PM
We are much better off controlling how many new shares are going into the market.

**#**  **+13108497680**  ▶ 8/16/2022, 4:03 PM
Go Shelly go!!!

CONFIDENTIAL

\# **+13108497680** ▶ 8/16/2022, 4:04 PM
We need to see filo grid as a board.

\# **+13108497680** ▶ 8/16/2022, 4:04 PM
Who are the players???

\# **+13108497680** ▶ 8/16/2022, 4:05 PM
Why can't we know who they are??

\# **+13108497680** ▶ 8/16/2022, 4:05 PM
So tell us who!?!

SL **Lombard, Shelly <(973) 477-7205>** ◀ 8/16/2022, 4:06 PM
I just told Harriet to call me.

\# **+13108497680** ▶ 8/16/2022, 4:07 PM
And is Lazard going to consult with us on the terms??

\# **+13108497680** ▶ 8/16/2022, 4:07 PM
Why so secretive on lender??

SL **Lombard, Shelly <(973) 477-7205>** ◀ 8/16/2022, 4:10 PM
Have we EVER steered them wrong yet?! I feel like I'm pushing a boulder up hill and they just want me to shut up.

\# **+13108497680** ▶ 8/16/2022, 4:34 PM
Want to do a wrap up call?

BR **Ben Rosensweig <+18134538665>** ▶ 8/16/2022, 4:34 PM
Sure

SL **Lombard, Shelly <(973) 477-7205>** ◀ 8/16/2022, 4:34 PM
Sure. I'm free for the rest of the evening

\# **+13108497680** ▶ 8/16/2022, 10:23 PM
Did you see that freeman capital sold today. That's what caused the stock to go down.

BR **Ben Rosensweig <+18134538665>** ▶ 8/16/2022, 10:24 PM
Did not. Where did you see that?

BR **Ben Rosensweig <+18134538665>** ▶ 8/16/2022, 10:25 PM
Ahh sorry I see the 13G now. Good for him I guess

\# **+13108497680** ▶ 8/16/2022, 10:25 PM
Haha. Yes. But saw it first on Reddit.

\# **+13108497680** ▶ 8/16/2022, 10:26 PM
These apes are not as dumb as the media makes them out to be.  They are actually experts at herd stock manipulation. If they were brokers or dealers or institutional investors it would be 100% illegal!

SL **Lombard, Shelly <(973) 477-7205>** ◀ 8/16/2022, 11:33 PM
I hope RC is in for the long term. If not, we're scr*wed.

SL **Lombard, Shelly <(973) 477-7205>** ◀ 8/16/2022, 11:37 PM
I sent a long text message to Harriet and the same text to Josh. Apparently Sue is not "feeling" B Riley. Probably not prestigious enough. I'm not a fan of Jefferies but I told Harriet that I will connect Sue with them. Just like she spoke to several advisors, she needs to talk to more firms than just UBS & JPM. Neither of them are right for us.

**#**   **+13108497680**                                                  ▶ 8/16/2022, 11:45 PM

Correct. We need someone who has seen this movie before.  I sent an atta girl to sue. Just wanted her to feel a little love and support. Which she has.  I think it was appreciated.

CONFIDENTIAL

Exhibit 9

**Short Message Report**

| Conversations: 1 | Participants: 2 |
|---|---|
| Total Messages: 2 | Date Range: 8/16/2022 |

**Outline of Conversations**

 **CHAT - CB0000001 - 00749 - 2022/08/16** · 2 messages on 8/16/2022 · +13108497680 · Lombard, Shelly <(973) 477-7205>

SLOMBARD_0087

**Messages in chronological order** (times are shown in GMT +00:00)

---

💬   **CHAT - CB0000001 - 00749 - 2022/08/16**

SL   **Lombard, Shelly <(973) 477-7205>**                                    ◄ 8/16/2022, 1:40 PM

Was just touching base with you before the meeting. I'll be tied up on another call from 1:45 to 3.

\#   **+13108497680**                                                       ► 8/16/2022, 1:46 PM

Holy crap just looked at our stock price. Ryan buying more obviously egg them all on. This is crazy. Did review the audit committee materials and I'm pleased to see that we are full speed ahead. Also talked to Josh. Maybe we get a lifeline here. I will be on the audit committee call in listen only mode.  Will try you before that but I am also in meetings as I know you are.

Exhibit 10

**Short Message Report**

| Conversations: 1 | Participants: 3 |
|---|---|
| Total Messages: 18 | Date Range: 8/17/2022 |

**Outline of Conversations**

 **CHAT - CB0000001 - 00838 - 2022/08/17** • 18 messages on 8/17/2022 • +13108497680 • Ben Rosensweig <+18134538665> • Lombard, Shelly <(973) 477-7205>

**Messages in chronological order** (times are shown in GMT +00:00)

---

💬    **CHAT - CB0000001 - 00838 - 2022/08/17**

BR    **Ben Rosensweig <+18134538665>**     ▶ 8/17/2022, 7:50 AM
Shelly--the Jefferies folks I've been speaking with on the banking and restructuring side already reached out to me about the ATM. So happy to make that intro. But if you know the specific ECM folks then let me know because that's better.

SL    **Lombard, Shelly <(973) 477-7205>**     ◀ 8/17/2022, 8:43 AM
I got my hand slapped by Harriet. Saying "we already have contacts at Jefferies so stay away". But I called her anyway to offer my contact who is the vice chair. He did the rights offering for my last board. We agreed I would just email Sue & offer.

BR    **Ben Rosensweig <+18134538665>**     ▶ 8/17/2022, 8:44 AM
OK perfect.

BR    **Ben Rosensweig <+18134538665>**     ▶ 8/17/2022, 2:06 PM
The state secrets have been revealed

SL    **Lombard, Shelly <(973) 477-7205>**     ◀ 8/17/2022, 2:11 PM
And we didn't have to learn a secret handshake!

SL    **Lombard, Shelly <(973) 477-7205>**     ◀ 8/17/2022, 3:59 PM
What did u guys think of our FILO participants?

BR    **Ben Rosensweig <+18134538665>**     ▶ 8/17/2022, 4:09 PM
No big issue from me.

SL    **Lombard, Shelly <(973) 477-7205>**     ◀ 8/17/2022, 4:14 PM
Same for me. As long as the covenants are lite and we have done the work to estimate that we won't need relief, I'm okay.

BR    **Ben Rosensweig <+18134538665>**     ▶ 8/17/2022, 4:37 PM
RC sold. Probably it all

SL    **Lombard, Shelly <(973) 477-7205>**     ◀ 8/17/2022, 4:53 PM
Call me!

BR    **Ben Rosensweig <+18134538665>**     ▶ 8/17/2022, 10:19 PM
https://www.ft.com/content/1b21bb08-6590-49c6-8baa-5ad8c527fbccAttachment Title: A38CAB62-87DA-4EE6-B96E-34B88F9691EE.pluginPayloadAttachmentAttachment Title: A243C803-EFB6-49F0-83CD-2E326E26F3D5.pluginPayloadAttachment

*Attachment: A38CAB62-87DA-4EE6-B96E-34B88F9691EE.pluginPayloadAttachment (47 KB)*

*Attachment: A243C803-EFB6-49F0-83CD-2E326E26F3D5.pluginPayloadAttachment (2 KB)*

\#    **+13108497680**     ▶ 8/17/2022, 11:01 PM
This post on Reddit actually may make sense....

\#    **+13108497680**     ▶ 8/17/2022, 11:01 PM
RC Ventures LLC was required to file a Form 144 because its ownership of BBBY because of the recent share buy-back. This tells us a lot of information:

(1) A insider of a company (one who holds +10%) must file a Form 144 for the ability to sell shares or other units within a three month period. RC Ventures filed for the opportunity to sell 9,450,100* shares (or other units) beginning 08/16/2022. This means he expects the price of BBBY to be AT LEAST reasonably higher than ~$15/share (which is

about the average price of BBBY when he bought his options back in March). My guess is that BBBY would be well above $100 for RC's calls to be worth the trouble (say $300-400, around the height of GME).

(2) But, RC only owns 7,780,000 shares of BBBY. Ah, he also owns 16,701 call options! If he were to exercise them, his ownership would then end up being 9,450,100 shares.

(3) I am guessing that RC Ventures LLC plans on exercising all his call options when BBBY finally squeezes so that he has the opportunity to sell 9,450,100 shares for a fricken-sweet cash profit. AND, he expects this to occur sometime in the next three months.

We all know our beloved Ryan Cohen has quite the passion for both GameStop and Bed, Bath, & Beyond. Along with that, OF COURSE he's gonna take profit with the short-squeeze! Anybody in their right mind would!

This filing has me extremely bullish. We now know RC's call option play as well as his timeframe.

| # | +13108497680 | ► 8/17/2022, 11:10 PM |

This one is also worth a read.  (Although by the time you read it there will be more info....)

| # | +13108497680 | ► 8/17/2022, 11:10 PM |

https://www.reddit.com/r/wallstreetbets/comments/wr7t8v/why_bbby_is_in_the_best_position_yet_or_how_i/Attachment Title: E2C06143-7C02-44A5-8F70-74529B5EAD89.pluginPayloadAttachmentAttachment Title: 14A705BF-00D4-47E9-B0F8-D26CF318BB8C.pluginPayloadAttachment

*Attachment: E2C06143-7C02-44A5-8F70-74529B5EAD89.pluginPayloadAttachment (199 KB)*

*Attachment: 14A705BF-00D4-47E9-B0F8-D26CF318BB8C.pluginPayloadAttachment (9 KB)*

| # | +13108497680 | ► 8/17/2022, 11:10 PM |

But It does suggest the press release did not hurt us with the apes.  😊

| # | +13108497680 | ► 8/17/2022, 11:24 PM |

AMC guy absolutely embraces the apes. Discounts for shareholders, even did an NFT for shareholders. All while he screwed them by issuing preferred stock that was approved in 2013 because he couldn't get enough shares to issue of common.

| # | +13108497680 | ► 8/17/2022, 11:24 PM |

Read the 8/4/22 amc press release. It's amusing

CONFIDENTIAL

Exhibit 11

**To:**     Arlene Hong[Arlene.Hong@bedbath.com]
**From:**   Gustavo Arnal[/o=ExchangeLabs/ou=Exchange Administrative Group
(FYDIBOHF23SPDLT)/cn=Recipients/cn=375e1dea3e484c71b70ce42da17f14c6-Gustavo Arn]
**Sent:**   Tue 8/16/2022 2:35:14 PM (UTC-04:00)
**Subject:**  Re: Trading Update

Of course!

DEPOSITION
EXHIBIT
85
1-12-24 gwo

---

**From:** Arlene Hong <Arlene.Hong@bedbath.com>
**Sent:** Tuesday, August 16, 2022 2:19:33 PM
**To:** Gustavo Arnal <Gustavo.Arnal@bedbath.com>
**Subject:** RE: Trading Update

Thank you for sharing. Ok if I ask Susie to include me directly in these trading updates?

**From:** Gustavo Arnal <Gustavo.Arnal@bedbath.com>
**Sent:** Tuesday, August 16, 2022 2:17 PM
**To:** Arlene Hong <Arlene.Hong@bedbath.com>
**Subject:** Fwd: Trading Update

---

**From:** Susie Kim <Susie.Kim@bedbath.com>
**Sent:** Tuesday, August 16, 2022 1:10 PM
**To:** Sue Gove <Sue.Gove@bedbath.com>; Gustavo Arnal <Gustavo.Arnal@bedbath.com>
**Subject:** Re: Trading Update

Sue,

Gustavo wanted to be sure I shared that our trading was halted briefly this morning - almost immediately following my note below. There were two 5-minute blocks during the 11am hour driven by outsized pricing.

I will be back with more in real time as the day progresses if there are any updates.

## Trade Halt Notifications

| | |
|---|---|
| **HALT DATE** | 8/16/2022 |
| **HALT TIME** | 11:37:07 |
| **STOCK SYMBOL/NAME** | BBBY - Bed Bath & Beyond Inc LUDP |
| **MARKET** | NASDAQ |

| | |
|---|---|
| **RESUME DATE** | 8/16/2022 |
| **QUOTE RESUME TIME** | 11:37:07 |
| **ANTICIPATED TRADE RESUME TIME** | 11:42:07 |

NASDAQ MarketWatch has issued the above trading status change(s). NASDAQ securities subject to a trading halt or trading pause may experience one-minute extensions due to an imbalance before trading resumes. Further detail on current and recent trading halt and trading pause activity is available on NASDAQTrader.com by clicking on the link above. Questions regarding trading halts or trading pauses may be directed to MarketWatch at (800) 537-3929 or (301) 978-8500.

Please refer to the link for additional trade halt updates.

http://www.nasdaqtrader.com/Trader.aspx?id=TradeHalts



## Trade Halt Notifications

| HALT DATE | 8/16/2022 |
|---|---|
| HALT TIME | 11:27:04 |
| STOCK SYMBOL/NAME | BBBY - Bed Bath & Beyond Inc LUDP |
| MARKET | NASDAQ |

| RESUME DATE | 8/16/2022 |
|---|---|
| QUOTE RESUME TIME | 11:27:04 |
| ANTICIPATED TRADE RESUME TIME | 11:32:04 |

NASDAQ MarketWatch has issued the above trading status change(s). NASDAQ securities subject to a trading halt or trading pause may experience one-minute extensions due to an imbalance before trading resumes. Further detail on current and recent trading halt and trading pause activity is available on NASDAQTrader.com by clicking on the link above. Questions regarding trading halts or trading pauses may be directed to MarketWatch at (800) 537-3929 or (301) 978-8500.

Please refer to the link for additional trade halt updates.

http://www.nasdaqtrader.com/Trader.aspx?id=TradeHalts

Susie A. Kim
**SVP, INVESTOR RELATIONS & TREASURY**
**NASDAQ: BBBY**
650 Liberty Avenue | Union, NJ 07083
susie.kim@bedbath.com



**From:** Susie Kim

**Sent:** Tuesday, August 16, 2022 10:27:52 AM
**To:** Sue Gove <Sue.Gove@bedbath.com>; Gustavo Arnal <Gustavo.Arnal@bedbath.com>
**Subject:** Trading Update

Sue/Gustavo,

Wanted to send a quick note on this morning's trading as we are currently up more than 50% at $24.62 on tremendous volume of 152M.   I await word from our trader but this movement is likely driven by RCV's filings as well as (albeit less so) positive sentiment across the peer group on the heels of WMT's AM print.

AMC and GME are both down in trading while retail is generally up Low single digits.

Thank you.

Susie A. Kim
**SVP, INVESTOR RELATIONS & TREASURY**
**NASDAQ: BBBY**
650 Liberty Avenue | Union, NJ 07083
susie.kim@bedbath.com



Exhibit 12

**To:**       Willis, William[wwillis@dfking.com]
**From:**    Susie Kim[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=35D75315D60342D6A974EB44AF252AB2-SUSIE KIM]
**Sent:**    Tue 8/16/2022 2:25:29 PM (UTC-04:00)
**Subject:**  Re: BBBY +65%

Ryan cohen filed form 3.



**Susie A. Kim**
**SVP, INVESTOR RELATIONS & TREASURY**
**NASDAQ: BBBY**
650 Liberty Avenue | Union, NJ 07083
susie.kim@bedbath.com





**From:** Willis, William <wwillis@dfking.com>
**Sent:** Tuesday, August 16, 2022 1:24:45 PM
**To:** Susie Kim <Susie.Kim@bedbath.com>
**Subject:** BBBY +65%

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hello Susie, as you know downgrades haven't had a negative impact on the shares as the price has ballooned to 26.40 up 65% (up 79% at day's high).  Volume is presently at 300M shares and I have never seen something like this.  Options are active.  I have been looking for any news, but nothing.

**Bill Willis**
**Senior Analyst / Investor Relations, D.F. King**

48 Wall Street - 22nd Floor New York, NY 10005
**T:** 212-269-5550
**C:** 516-479-7110
**E:** wwillis@dfking.com I astfinancial.com



# Exhibit 13

1        You had no contractual -- at this point --

2    maybe later I would suggest improper, but now I'm

3    talking proper.

4        Did you have any agreement with Cohen that

5    resulted in you receiving compensation regarding

6    Bed Bath & Beyond?

7        MR. GILMORE:  Objection to form.

8        MR. CAREY:  Objection to form.

9    A   There were no compensation agreements.

10   BY MR. BRONSTEIN:

11   Q   Okay.  Once you joined the board, can you

12   tell me about the conversations you had with him

13   between that time and the -- and the time he sold

14   his shares in August -- he did -- you know, we

15   would say decided to sell his shares maybe in

16   April, May, June, but before he sold his shares

17   actually in August, tell me about any

18   conversations you had with him.

19   A   I recall them being fairly high level and

20   nonsubstantive in terms of the finances of the

21   business or any data that I learned.  It was much

22   more related to the interpersonal workings of the

23   board.

24       It was a very large board.  And he wanted

25   to know what my opinions of the other board

52

1    members were.  If he thought I would be able to

2    work well with them.  If they were receptive to

3    new ideas.  If there was a good group dynamic,

4    things like that.

5        Q  Did you discuss with him after you got on

6    the board the fate of buybuy BABY?

7        A  I did not.

8        Q  So your testimony is you had no

9    substantive conversations with him about the

10   business of -- other than what you mentioned?  You

11   spoke to him about nothing else relating to Bed

12   Bath & Beyond?

13           MR. GILMORE:  Objection to form.

14       A  Correct.

15   BY MR. BRONSTEIN:

16       Q  If you had decided to share with him

17   information about the consideration of options for

18   buybuy BABY, if you had decided to share that with

19   him while you were a director, and assuming it's

20   confidential information, would you have been

21   permitted to do so?

22           MR. GILMORE:  Objection to form.

23       A  No.

24           MR. BRONSTEIN:  You keep objecting, but he

25       seems to understand my questions.

72

1          MR. CAREY:  No.

2          THE VIDEOGRAPHER:  Off the record at

3       11:18.

4          (A brief recess was held from 11:18 a.m.

5       to 11:33 a.m.)

6          THE VIDEOGRAPHER:  Back on the record at

7       11:33.

8   BY MR. BRONSTEIN:

9       Q  Mr. Rosenzweig, you said that you had

10  conversations with Mr. Cohen during your tenure --

11  tenure as a director about board composition and

12  other directors; is that correct?

13      A  Correct.

14      Q  Can you -- do you remember which directors

15  you were talking about?  What in particular you

16  discussed?  Can you give me more detail in those

17  calls?

18      A  Well, I had been on the board for only a

19  matter of weeks, so I think it was a very

20  high-level observation about most of the other

21  directors, whether they seemed, you know,

22  friendly, whether they seemed open to new

23  perspectives, whether we would be able to get

24  along and there are collegial, things like that.

25      Q  Was the underlying question whether the

1          you.

2                    What -- what are you saying here?  What

3          are you referring to?

4              A   I believe at that time frame, I had asked

5          Harriet and Mark Tritton, who was the CEO at the

6          time, whether they would be willing to have a

7          confidential discussion with Ryan Cohen.

8              Q   To discuss what?

9              A   Discuss the state of the business, solicit

10         his feedback, basically broaden and deepen the

11         relationship with him.

12             Q   How would they be able to do that and

13         disclose to him material nonpublic information?

14             A   I was suggesting that they do it under the

15         auspices of a confidentiality agreement.

16             Q   So it was your understanding that would

17         stop Mr. Cohen from trading -- he would not be

18         allowed to trade while those -- while that

19         information was nonpublic?

20             A   That would be my understanding, yes.

21             Q   Why did you want to do this?

22             A   I thought it would be beneficial for the

23         management and the board of the company to be able

24         to have an open dialogue -- dialogue with the

25         company's largest shareholder, who had also made a

1    very public and significant investment in the

2    company, to solicit his feedback as to what his

3    suggestions were that he would like to see the

4    board and management do in light of the recent

5    results at the company.

6       Q  Did you feel it was the right thing to

7    push this agenda because Mr. Cohen had nominated

8    you to the board?

9       A  No.

10      Q  Did you think Mr. Cohen was a competent

11   business manager?

12      A  I would say that I personally did not have

13   enough experience with him to be able to form my

14   own opinion.  By reputation, he seemed to have a

15   reputation as a competent and well-known business

16   manager.

17      Q  Right.  That's what I'm trying to

18   understand here is, you didn't really know him,

19   correct?

20      A  That is correct.

21      Q  And you had never done business with him?

22      A  That is correct.

23      Q  You knew that he had -- I assume, about

24   Chewy and GameStop and Bed Bath & Beyond, correct?

25      A  Correct.

1      below?

2          A   Yes.

3          Q   She's talking about bringing Ryan under

4      the tent, correct?

5          A   I believe that's correct.

6          Q   And then she says your variation is even

7      better.  I'm paraphrasing.

8              What did she mean your idea is a variation

9      that is better?

10         A   I don't remember exactly, but I think it

11     was rather than just giving him information,

12     working with him to get his feedback and reaction

13     to that information.

14         Q   What does that mean, "no capital needed"?

15         A   I really don't know.

16         Q   Just his perceived blessing.

17             Could it mean that the affiliation with

18     Cohen would bring up the price of the stock

19     without the need for capital investment by the

20     company?

21         A   Yes.

22         Q   So one of the reasons you wanted to

23     affiliate Cohen more directly with the company is

24     the investor perception and the effect it could

25     have on the price of the stock?

1       A   Correct.

2       Q   I'm going to ask a question on Page 9.

3   I'm going to try to find the text.

4           Can you look at the text in the middle of

5   the page from Marjorie Bowen at -- on June 25th at

6   7:04 a.m.?

7       A   Yes.

8       Q   It says -- she writes:   He should be told

9   early, and he can figure out what to do.

10          Do you know what she's referring to, being

11  told early?

12      A   Again, I think it's in regard to the

13  management changes at the company.

14      Q   When you say that, you mean the

15  termination of Mr. Tritton?

16      A   Yes.

17      Q   So she wanted to let Mr. Cohen know before

18  it was announced?

19      A   Yes.

20      Q   And hopefully make a positive statement to

21  the press, which would protect the price of the

22  stock?

23      A   Potentially.

24      Q   Were you -- did you agree that was a good

25  approach?

1  answered," you mean -- just -- just now I was

2  talking about the August 5th, not talking

3  about the August 12th.

4      MR. GILMORE:  We talked about this several

5  hours ago, Peretz.  You asked him the exact

6  same question.

7      MR. BRONSTEIN:  Okay.  We are going to

8  talk about it now.

9      So you -- read back the answer of the

10  witness, please.

11      (Whereupon, the record was read back by

12  the court reporter.)

13  BY MR. BRONSTEIN:

14      Q  Do you recall what Mr. Cohen meant?

15      A  That the cart was half full.

16      Q  And the emoji --

17      A  Yeah, I guess the moon emoji is a good

18  thing for stock.

19      Q  Do you know when you first saw the emoji?

20      A  I do not.

21      Q  Do you think it was -- assuming -- let's

22  just take August 16th of the date of how much --

23  all will agree he sold the stock.

24      Do you think you saw the emoji before that

25  date, meaning -- this was on the 12th of August

1          '22, four days later.

2                    Had you seen it yet, or you don't know?

3          A   I don't know.

4          Q   Did you -- you're aware that Mr. Cohen

5     sold out his Bed Bath & Beyond stock no later

6     than -- beginning on the -- four days after this

7     Tweeter was posted.

8                    Are you aware of that?

9          A   Yes.

10         Q   Do you think that the emoji, yeah, would

11     suggest that he's positive on the stock, and he

12     intends to hold --

13                   MR. GILMORE:   Objection to form.

14                   (Simultaneous unreportable crosstalk.)

15     BY MR. BRONSTEIN:

16         Q   -- and that others should buy?

17         A   I'm not well versed necessarily in the

18     meanings of emojis.

19         Q   So you had no -- you have no reaction to

20     that?   I mean, I'm not asking for legal advice.

21     It's not privileged.   You have a reaction; you

22     legally have to share it with me.

23                   Do you think that meant that he's -- do

24     you think that was consistent with selling four

25     days -- if he had already intended to sell, do you

1    think that emoji is consistent with his sale four

2    days later?

3         MR. GILMORE:  Objection to form.

4         A   Probably not.

5    BY MR. BRONSTEIN:

6         Q   Do you know what FTI is?

7         A   I do.

8         Q   I guess we talked about it before.

9         Do you think FTI had the expertise to

10   speak to the meme crowd?

11        A   I'm not sure.

12        Q   It's true that -- isn't it true that

13   Marjorie Bowen had expressed that sentiment, that

14   these were not the people to address the company's

15   relationship with the meme stock crowd?

16        A   Yes.

17        Q   And you concurred with that?

18        A   Yes.

19        Q   And I may have asked you this, but we are

20   really getting to the end here, so just cut me

21   some slack.

22        You don't know what percentage of the

23   shareholders of Bed Bath & Beyond were -- what I

24   think we all understand are meme stocks -- meme

25   purchasers?

Exhibit 14

```
 1                    Nebel - Confidential
 2    and then with the 13D it's promptly with the
 3    1 percent or greater change.
 4           Q.   I hear you, and I'm not challenging
 5    that.  I'm just asking why he didn't do it the
 6    proper legal time?  Why didn't he file it back
 7    then?
 8           A.   I would say that he did promptly file
 9    the 13D amendment upon becoming aware of the
10    obligation to do so.
11           Q.   And the Form 3?
12           A.   The same.  That, you know, he made the
13    filing as soon as he was aware of the obligation to
14    do so.
15           Q.   Was it your impression, and, if we need
16    to, we can go into the e-mails, that Ryan wanted
17    these sales to happen as soon as possible?
18           A.   No.  Ryan never mentioned sales
19    specifically to me.  He talked about trading, and,
20    you know, given our past correspondence, I was
21    actually under the impression that he was looking
22    to buy.
23           Q.   Even on August 15th you thought he was
24    looking to buy?
25           A.   I did.  If you look at my advice, you
```

1                    Nebel - Confidential

2      will see.

3            Q.   Can we look at Cohen17955.

4                 (Exhibit 230, e-mail from Ryan Nebel

5                 dated August 16th, 2022, 10:49 a.m. to Ryan

6                 Cohen and others, was so marked for

7                 identification, as of this date.)

8            Q.   The court reporter has marked as Exhibit

9      230 an e-mail from Ryan Nebel, August 16th, 2022,

10     10:49 a.m. to Ryan Cohen and others.

11           A.   I think that this might be 6:49 a.m.

12           Q.   This e-mail string, August 15th, first,

13     I want to show you on 17957, on the bottom August

14     15, 3:51 p.m., you were an affiliate if above

15     10 percent meaning you cannot trade yet.

16           A.   No.  That's not -- there's a question

17     before that.  Can you e-mail me confirming I am not

18     an affiliate in a separate thread.

19           Q.   Okay.

20           A.   I'm saying I cannot do that.

21           Q.   And then he writes back in the next

22     e-mail from Ryan Cohen, 3:52 p.m. "The bank won't

23     let me trade until I either file the form or

24     confirm I'm not an affiliate."  Okay.

25                 Then I just want to go to the page on

1
2        the bottom 17956 Bates number Ryan writes, Ryan
3        Cohen, to you and others, "Thank you.  Ryan," I
4        guess that's you, "has JPM reached out to you?  Can
5        you talk to them today?  I need to get this
6        resolved tonight so I can trade tomorrow."
7                 Oh, so you're saying he refers to
8        trading.  You didn't know that he was selling or
9        buying.  You thought he was going to buy.
10               A.   Correct.  Even if you go to 8/16, the
11       very top e-mail, it's implicit that I'm thinking
12       buying, because "You are subject to it for
13       purchases and sales after crossing 10 percent.  If
14       you make any purchases now above 10 percent and
15       then sell within a six-month period, you would have
16       potential short swing profit liability."  So I'm
17       thinking purchases.
18               Q.   Well, you didn't talk to him about what
19       transactions he was planning?
20               A.   He told me trade, that, you know, he may
21       buy.  He may sell.
22               Q.   Do you think he was intentionally hiding
23       the ball from you that he was planning on selling?
24               A.   No.  I don't feel that way.
25               Q.   Okay.  So it says on the next page,

1                    Nebel - Confidential

2      17956, "I need to get this resolved," at the end,

3      "tonight so I can trade tomorrow."

4                    Did you have an understanding of why he

5      was feeling some urgency about this?

6           A.    I believe he wanted to have trading

7      flexibility, given that the stock was extremely

8      volatile.

9           Q.    Well, you knew the stock was up at this

10     time, correct?

11          A.    From what?

12          Q.    From its price three months earlier.

13          A.    I couldn't, you know, say what it was

14     from three months earlier.

15          Q.    Well, so you didn't know one way or

16     another whether the stock had, to use a colloquial

17     term, shot up after these two tweets were

18     published?  You weren't aware of that?

19                    MS. WEIANT:  Objection.

20          A.    I wasn't aware that -- I was aware that

21     the stock had increased.

22          Q.    You were aware?

23          A.    In the month of August.

24          Q.    I'm just trying to understand why you

25     would have surmised that he was going to buy if the

Exhibit 15

Ryan Cohen Bails on Bed Bath & Beyond Stock and Sparks a Tumble

Bloomberg Law News 2024-06-14T23:38:0237272509-04:00

# Ryan Cohen Bails on Bed Bath & Beyond Stock and Sparks a Tumble

By Divya Balji2022-08-18T16:09:54643-04:00



- Home goods retailer slumps as much as 16% in premarket trading
- RC Ventures plans to sell as many as 7.78 million shares

Five months after disclosing a stake in Bed Bath & Beyond Inc., activist shareholder **Ryan Cohen** wants out, sparking a selloff in the shares of the home goods retailer.

The Union, New Jersey-based company slumped 20% to $18.55 on Thursday, in its biggest one-day drop since late June, after Cohen's RC Ventures said in a filing with the US Securities and Exchange Commission that it might sell as many as 7.78 million shares of Bed Bath & Beyond, along with some call options.



Bed Bath & Beyond shares have been on a tumultuous ride this year with its stock soaring by the most on record when, in March, RC Ventures first disclosed a 9.8% stake in the retailer and asked it

**Bloomberg Law**®

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

**// PAGE 1**

Ryan Cohen Bails on Bed Bath & Beyond Stock and Sparks a Tumble

to consider a sale of the company.

Since then, Cohen reached an agreement on the addition of three independent directors to the retailer's board and pushed for the exit of Chief Executive Officer **Mark Tritton**. The company announcedhis ouster in June, just minutes before releasing another lackluster earnings report that showed sales fell even more than expected in the first quarter. Cohen had also said the company's Buybuy Baby unit was undervalued, but no announcements have been made about a sale of that asset.

'Stick a Fork in Them': Bed Bath & Beyond Recovery Odds Fade

A representative for RC Ventures declined to comment.

The stock has been a favorite among retail traders, surging more than 400% from a July low to outperform other so-called meme stocks as individual investors piled in, pumping their bets on popular social media websites and chatrooms. They bought $58.2 million of the stock Wednesday, a day after snapping up a record $73.2 million, bringing their total net purchases in three weeks to $229.1 million, according to data compiled by Vanda Research.

## Dismal Fundamentals

While retail traders have been fueling the surge in Bed Bath & Beyond shares, the company's fundamentals remain dismal. Analysts have sounded the alarm over liquidity concerns and the flailing retailer said in a filing it's been working over the past several weeks with external financial advisers and lenders to strengthening its balance sheet with plans to provide an update at the end of the month.

"The writing is on the wall that BBBY shares have again decoupled from economic reality," Wells Fargo analyst **Zachary Fadem** wrote in a note, reiterating his $3 price target. The company's plans to address its balance sheet could mean a "capital raise" might be in store.

Wedbush downgraded the stock to underperform from neutral Thursday, making it the fourth Wall Street bank to recommend clients sell the stock in the past two weeks. All told, 13 analysts have sell-equivalent ratings while four rate it at a hold and none recommend investors buy the stock. The



Ryan Cohen Bails on Bed Bath & Beyond Stock and Sparks a Tumble

average 12-month share price target of $4.48 signals brokerage firms expect the stock to slump more than 75% from Thursday's close.

"From a fundamental standpoint, we believe trends at Bed Bath & Beyond remain challenged," said Keybanc Capital Markets analyst **Bradley Thomas** in a report after the disclosure from RC Ventures. He has an underweight rating with a price target of $2.

(Updates share price move.)

--With assistance from **John J. Edwards III**.

To contact the reporters on this story:
**Bailey Lipschultz** in New York at blipschultz@bloomberg.net;
**Divya Balji** in Toronto at dbalji1@bloomberg.net

To contact the editors responsible for this story:
**Vivianne Rodrigues** at vrodrigues3@bloomberg.net

Phil Serafino

© 2023 Bloomberg L.P. All rights reserved. Used with permission.



Exhibit 16

**To:** Freedman, David[dfreedman@jpmorgan.com]
**From:** Harriet Edelman

[FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=D5549419B8614DE7988A78DF0B2CAEF8-HARRIET EDE]
**Sent:** Thur 4/28/2022 4:27:08 PM (UTC-04:00)
**Subject:** Re: Suggested response to RC email

Get Outlook for iOS

---

**From:** Freedman, David <dfreedman@jpmorgan.com>
**Sent:** Thursday, April 28, 2022 4:12:22 PM
**To:** Harriet Edelman <Harriet.Edelman@Consultant.Bedbath.com>; Mark Tritton <Mark.Tritton@bedbath.com>; Arlene Hong <Arlene.Hong@bedbath.com>; Paul J. Shim (pshim@cgsh.com) <pshim@cgsh.com>
**Subject:** Suggested response to RC email

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Harriet.

Here is what Paul and I came up with as a suggested response.

Ryan,

Thank you for sharing your thoughts[; I have forwarded your email to the entire board]. The board has been discussing these specific issues actively. In particular, we are very focused on the operating plan, and we monitor and adjust our capital allocation decisions in light of business, market and macroeconomic considerations. As for the Strategic Committee, I can assure you that the Committee's work is not distracting the board or management from these other key issues.

May I suggest that you, Mark and I have a call in the second week in June to discuss the business? Perhaps Gustavo should join the call too, as his knowledge may be valuable in the conversation. Since you have spoken about the possibility of your buying more shares, we will make sure that we do not give you any material non-public information that would interfere with your ability to trade.

Best,

Harriet

You should make edits to put it in your voice, but we think that draft hits the right points.

Regards,

David Freedman, CFA
Vice Chairman
Global Head of Shareholder Engagement and M&A Capital Markets
J.P. Morgan
383 Madison Avenue, 28th Floor
New York, NY 10179
david.freedman@jpmorgan.com
Office:  212-272-4209
Mobile:  917-406-9889

**From:** Harriet Edelman [mailto:Harriet.Edelman@Consultant.Bedbath.com]
**Sent:** Wednesday, April 27, 2022 6:12 PM
**To:** Mark Tritton <Mark.Tritton@bedbath.com>; Arlene Hong <Arlene.Hong@bedbath.com>; Paul J. Shim (pshim@cgsh.com) <pshim@cgsh.com>; Freedman, David (CIB, USA) <dfreedman@jpmorgan.com>

**Subject:** RC email - 4/27/22 6:00 pm ET

Please see the communication just received.

H

Get Outlook for iOS

---

**From:** Ryan Cohen <ryan@rcmail.com>
**Sent:** Wednesday, April 27, 2022 6:04 PM
**To:** Harriet Edelman
**Subject:** Follow up

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Harriet -

Thank you again for continuing to engage with me, particularly following last quarter's disappointing results. I'm spending a lot of time working with my team to analyze the company's current state and go-forward needs/opportunities. Here are a few high-level thoughts I would like to get your view on and also have sent to the full Board:

- **SG&A should be cut as much as possible and as quickly as possible.** While I'm sure management had the best of intentions when it envisioned heightened SG&A supporting growth, the reality is that the company has not been able to stem the tide of market share losses for many years -- and it's hard to see a viable path to growth. The board has an obligation to be safeguarding capital and, quite frankly, heavily scrutinizing management's tactics and forecasting in light of recent events.
- **The scope of management's strategy needs to be immediately reduced to mitigate unnecessary CapEx, SG&A and risky bets**. The Board needs to direct management to narrow its 2020 cover-the-waterfront strategy. In the near term, the business needs to be run defensively and like a private equity portfolio company. I'd hope the Board has already asked management for a much narrower operating plan. If not, I hope one is requested and received within the next 2 weeks.
- Two areas that deserve particular focus are advertising spend and store renovations. Advertising spend continues to rise both in absolute dollars and as a percentage of sales. This despite revenue weakness and management commentary that there have been hundreds of millions of dollars in lost sales due to inventory shortages. Why is the team spending more on advertising when there's insufficient inventory on hand to sell? In light of recent and expected near-term results, store renovation pace should be slowed to conserve capital and gather more data on renovated store performance.
- **Capital allocation priority should be share repurchases.** The Board needs to think about risk management for shareholders, especially in light of the results we're expecting in coming quarters. The best risk-adjusted use of capital is likely going to be opportunistically repurchasing shares, particularly if the share price is below where the company was recently buying back shares. I would be supportive of the company authorizing another repurchase program even if it takes time to execute.
- **Don't make the strategic review process a distraction.** I want the new review committee to carry out a robust process to see if there are alternative paths to maximizing shareholder value for BABY or the company. With that said, the committee should function efficiently and not become a source of distraction for the full board or management. There shouldn't be wheel-spinning if the credit markets continue to tighten and the global environment makes deal-making too tough. The full board and management should be laser-focused on cost containment, narrowing the strategy and stemming the bleeding. Since we're under an agreement, there's mutual respect, and I'd like to hear your views via phone or email on these points. This is a partnership now and it shouldn't be a one-way conversation. We have to work together to get this business turned around as quickly as possible. I'm looking forward to collaborating with you often.

Best,
Ryan

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

Exhibit 17

MT: Need to be careful what we share here… no doubt that 2020 plan we should pursue and not pursue in the current environment… yes, that is all being discussed.

RC: Do you have the team in place to rationalize the business that significantly from an SGA standpoint?

MT: We have the team and partnership in place… yes.  This isn't about shaving your direct reports down… this is a bottoms up exercise…

HE: also the outside in and SG&A benchmark vs. our peers (and our legacy) – two tier effort on immediate as well as structural… underway but can't be communicated.

RC: Do you foresee any changes at the executive team or board in order to rationalize the business?

MT: Not at liberty to say at this point.

HE: Board level… going down by 3 directors as previously indicated to be revealed shortly.

RC: How do you feel about the balance sheet? Is it safe to assume we're in for more operating losses?

MT: Not at liberty to say at this point.  But, again, pressure on inventory and sales is a jam for everyone…

RC: Do you have a better handle on inventory held up in transit?

MT: Absolutely… get better flow and better clarity which we'll provide when we release results.

HE: And the board is monitoring it very frequently with management… absolutely inventory, cash, SG&A…

RC: So is the company going to be putting out a new plan in terms of SG&A and Capex vs. the October 2020 plan.

MT: We'll be sharing our thoughts on now, next, future on June 29th…

RC: So how do you currently feel about the balance sheet?

GA: A few things (already disclosed) -- Q1 is expected to be a loss and expected by the market with EBITDA in wide ranges contemplated by the market; key on balance sheet is getting into sustainable operating cash flow generation with key on inventory management… similar narrative across many retailers… cash flow generation challenges given inventory purchases and mismatch. Balance sheet insurance is ABL ($1B) liquidity…

HE: Given company's legacy, we are attuned to have more cash…

RC: Drawing down the ABL should only be done in a severe, catastrophic situation… feels like there are a lot of steps that could be taken to conserve cash besides drawing down on the ABL… cutting capex, reducing SG&A, turning inventory faster…

Confidential

Exhibit 18

**To:**    Sue Gove[segove@yahoo.com]
**From:**   Sue Gove[O=EXCHANGELABSOU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E662D99985FE4B5F9568BD177C8696FD-SUE GOVE]
**Sent:**    Wed 6/22/2022 7:53:20 AM (UTC-04:00)
**Subject:**    Fwd: Follow up on Strategy meeting

Get Outlook for iOS

---

**From:** Harriet Edelman <Harriet.Edelman@Consultant.Bedbath.com>
**Sent:** Tuesday, June 21, 2022 8:45 PM
**To:** Sue Gove <Sue.Gove@Consultant.Bedbath.com>
**Subject:** Re: Follow up on Strategy meeting

Thank you.

Get Outlook for iOS

---

**From:** Sue Gove <Sue.Gove@Consultant.Bedbath.com>
**Sent:** Tuesday, June 21, 2022 9:16 PM
**To:** Harriet Edelman
**Subject:** Re: Follow up on Strategy meeting

Well, I think we did the right thing. Let me know if I can help.
Sue

Get Outlook for iOS

---

**From:** Harriet Edelman <Harriet.Edelman@Consultant.Bedbath.com>
**Sent:** Tuesday, June 21, 2022 6:51 PM
**To:** Sue Gove <Sue.Gove@Consultant.Bedbath.com>
**Subject:** Fwd: Follow up on Strategy meeting

Sent about an hour after he tried to have a call with me earlier.

Get Outlook for iOS

---

**From:** Mark Tritton <Mark.Tritton@bedbath.com>
**Sent:** Tuesday, June 21, 2022 6:54 PM
**To:** Harriet Edelman
**Subject:** Fwd: Follow up on Strategy meeting

H,

Deeply concerned re this email on several levels.

- Sue summarizes the *'Strategy Committe and Board thoughts'*. To my understanding, there has been no formal presentation by the Committe to the *full* board of their recommendations and rationale, which is their remit. As a board member, I have not been involved in any board group discussions re a sale or no sale process, yet management are being informed of a decision.
- My understanding of this committee was to analyze the pros and cons of how to unlock value through multiple options like keep, sell, spin etc. The committee was then to be disbanded upon the completion of this task.

- At no point has it been clear to me that the Committee will now oversee the Baby strategy and drive our focus on execution and alter the strategy provided
- Requests below are directly in contrast to management's presentation and work over the last 18 months, and still pursue ideas we do not support.
- I look forward to discussing tomorrow meaning. Please share your availability so we can make a time.


Regards,

*M.*

Mark Tritton
PRESIDENT & CHIEF EXECUTIVE OFFICER
650 Liberty Avenue | Union, NJ 07083
mark.tritton@bedbath.com | o: 908.855.4884

---

**From:** Sue Gove <Sue.Gove@Consultant.Bedbath.com>
**Sent:** Tuesday, June 21, 2022 5:44 PM
**To:** Mark Tritton <Mark.Tritton@bedbath.com>; Anu Gupta <Anu.Gupta@bedbath.com>
**Cc:** Harriet Edelman <Harriet.Edelman@Consultant.Bedbath.com>; Andrea Weiss <Andrea.Weiss@Consultant.Bedbath.com>; Marjorie Bowen <marjorie.bowen@consultant.bedbath.com>; Benjamin Rosenzweig <benjamin.rosenzweig@consultant.bedbath.com>; Joshua Schechter <Joshua.Schechter@Consultant.Bedbath.com>
**Subject:** Follow up on Strategy meeting

Mark and Anu,
Below is a summary of the collective thoughts from yesterday's meetings. As stated yesterday, we truly appreciate the time and attention devoted to this Strategy review. It is clear there is tremendous focus and energy on driving improved results at BABY.

Summary of Strategy Committee and Board thoughts:
**Not currently seeking a sell process as a result of committee's work "exploring alternatives to unlock greater value"**
1. Synergy and growth potential of the BABY business is encouraging.
2. Timing/market conditions wouldn't be conducive and may not even be an issue if 1. Above proves out.
3. Should complete Deloitte work as should base for having clear financial picture of BABY business.
**Focus on Execution.**
1. Registry-Committee would like better understanding of what is needed to accelerate.
2. We would like to dig deeper into Digital investments- can we move faster, what are the gives and takes?
3. Are there any barriers to moving faster we need to be aware of-how can we help think through options
4. We would like to schedule a follow up with the committee and management team in the next 3-4 weeks to discuss above.
**Areas of Concern.**
1. Asset light- need further discussion around new store growth investment, and specifically near term (FY'22) capital spend.
2. Assortment-would like more data on consumables as traffic and basket builders. Also, need better understanding/clarity on private label investments and testing to ensure success.
3. Partnerships- are there additional options beyond Kroger
**Would like to include in upcoming session any early thinking on 2023 Budget, particularly as related to investments.**

Please let me know if you want to discuss further.
Best,
Sue

Get Outlook for iOS

Exhibit 19

**From:** Harriet Edelman
**Sent:** Wednesday, June 29, 2022 5:42 AM
**To:** Arlene Hong;Sue Gove
**Subject:** Re: Privileged Communication - FURTHER Discussion with Ryan Cohen

Please draft and we can at least make the next decision. Thx!

Get Outlook for iOS

---

**From:** Arlene Hong <Arlene.Hong@bedbath.com>
**Sent:** Tuesday, June 28, 2022 10:28:55 PM
**To:** Harriet Edelman <Harriet.Edelman@Consultant.Bedbath.com>; Sue Gove <Sue.Gove@Consultant.Bedbath.com>
**Subject:** RE: Privileged Communication - FURTHER Discussion with Ryan Cohen

Harriet and Sue,

As you already know, Ryan is subject to a standstill under the Cooperation Agreement that prohibits him from seeking more than the current three Board seats taken by Ben, Marjorie and Paul.  It also prohibits him from seeking removal of any current directors. It might be a good idea to respond in an email to Ryan recapping your last conversation and reminding him about the standstill obligations.  If you agree, I will work with Paul to craft this.  He's clearly not recalling the standstill with his asks and closing statement unless he's thinking of a year out, which doesn't seem likely.

We can discuss once we get through tomorrow of course.

Arlene

**From:** Harriet Edelman <Harriet.Edelman@Consultant.Bedbath.com>
**Sent:** Tuesday, June 28, 2022 7:46 PM
**To:** Mary Winston <Mary.Winston@Consultant.Bedbath.com>; Andrea Weiss <Andrea.Weiss@Consultant.Bedbath.com>; Ann Yerger <Ann.Yerger@Consultant.Bedbath.com>; John Fleming <John.Fleming@Consultant.Bedbath.com>; Joshua Schechter <Joshua.Schechter@Consultant.Bedbath.com>; Jeffrey Kirwan <Jeffrey.Kirwan@Consultant.Bedbath.com>; Benjamin Rosenzweig <benjamin.rosenzweig@consultant.bedbath.com>; Shelly Lombard <shelly.lombard@consultant.bedbath.com>; Marjorie Bowen <marjorie.bowen@consultant.bedbath.com>; Virginia Ruesterholz <Virginia.Ruesterholz@Consultant.Bedbath.com>; Minesh Shah <Minesh.Shah@consultant.bedbath.com>; Sue Gove <Sue.Gove@Consultant.Bedbath.com>
**Cc:** Paul J. Shim (pshim@cgsh.com) <pshim@cgsh.com>; Arlene Hong <Arlene.Hong@bedbath.com>
**Subject:** Privileged Communication - FURTHER Discussion with Ryan Cohen

All, I received a message from Ryan about 20 minutes after I wrote the recap below and he asked to get back together on zoom call, which I arranged.  He shared the following:

- He thought about our conversation; certain aspects of our financial situation remind him of GameStop
- Feel like shrinking the board significantly and getting himself on the board is necessary to 7 members
- By shrinking the board, specifically:  me and Sue stay; Ben, Shelly and Rosemary; additional RCV candidates added
- RC Ventures would help
- Asked whether I could even indicate tomorrow the possibility of adding RCV directors

I replied to this last point that it isn't going to happen tomorrow, but of course will think about it (and share with the Board).  I suggested we get through tomorrow, he'll have the full information shared about the quarter and the Company/Board's response, and is scheduled talk to Sue late afternoon; and we can pick up this conversation after earnings.  He said okay...and closed with "If I can't get into position, may sell my stock."

H

Get Outlook for iOS

---

**From:** Harriet Edelman <Harriet.Edelman@Consultant.Bedbath.com>
**Sent:** Tuesday, June 28, 2022 6:13 PM
**To:** Mary Winston; Andrea Weiss; Ann Yerger; John Fleming; Joshua Schechter; Jeffrey Kirwan; Benjamin Rosenzweig; Shelly

Lombard; Marjorie Bowen; Virginia Ruesterholz; Minesh Shah; Sue Gove

**Cc:** Paul J. Shim (pshim@cgsh.com); Arlene Hong

**Subject:** Privileged Communication - Discussion with Ryan Cohen

Call went well - longest one so far at ~ 45 minutes.  His key areas of interest or other notes

- Taken aback at results - all indicators - top line, margin, balance sheet
- Leadership change - acknowledged the board's action; was also interested in Mara's background
- I talked about Sue's background - well matched for what we need and already in the saddle working on issues
- SG&A - be very aggressive, "can't cut enough;" called out "corporate" vs. stores, consulting, overhead
- Cash flow and liquidity - asked if we were upsizing the revolver; would we consider selling shares; the 24s
- Inventory - size of challenge; understands what BRG is being brought in to do; asked if we had cancelled any (yes); asked if sufficient controls on not bringing in more
- CEO Succession - concerned about the risk of another outsider; asked are there no insiders ready/close to ready.  He asked about criteria…I said early in process, getting past tomorrow.  Welcomed a conversation on this at a later date.
- We talked about Owned Brands - indicated we will be looking at the assortment and OB inventory a major piece of what we have to deal with
- Baby - excerpted what we're saying…he didn't pick up the ball or comment on this
- I offered and he wants to talk to Sue tomorrow afternoon instead of Thursday (which was previously scheduled with Mark), which we will make happen
- Understands we will have a public update later in the summer
- I believe message sent, message received about the Board's sense of urgency and focus, company accountability for results vs. pointing to macro

H

Exhibit 20

**To:** Sue Gove[Sue.Gove@Consultant.Bedbath.com]
**From:** Harriet Edelman[/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=d5549419b8614de7988a78df0b2caef8-Harriet Ede]
**Sent:** Wed 6/29/2022 2:14:23 PM (UTC-04:00)
**Subject:** Privileged Communication - Discussion with Ryan Cohen

Hi.  because you asked this morning, just scanning my notes to perhaps customize them from the standpoint of your upcoming discussion.  He will now have the advantage of being able to connect all the dots with data, taken in the analyst community feedback, media headlines, etc. and perhaps have organized his priorities.  So, thinking about your question:

- Liquidity - what's happened in a matter of months; how much time do we have
- SG&A….has an aversion (as owner/entrepreneurs often do) to all the trappings of "corporate" - layered organizations, small spans of control, overhead groups, consultants; extra people make extra work. Cut cut cut
- We talked about "no one responsible, everyone responsible," end-to-end ownership of processes, focus.  I we are picking up some muddiness of accountability between planning and supply chain and an opportunity to address
- I imagine he will get more granular with you on the levers for liquidity and flexibility — what are including in the set as possible
- Inventory - I shared the size of our OB inventory and when asked what were we trying to clear out/liquidate on our way to health, I indicted in the half-billion range.
- I added to our reducing capex, the additional focus on ROIC
- On succession, he pressed on having no one successor-ready and clearly wary of another outsider and risk of an outsider; I offered to solicit his views/potential candidates.
- He will likely sound you out on the question of board composition changes - I cc'd you on a prior email; I think listen and se if his idea has morphed overnight.  Happy to have you probe the question, "how do you envision helping us?"

  That's it for now, hope this helps.

H

---

**From:** Harriet Edelman <Harriet.Edelman@Consultant.Bedbath.com>
**Sent:** Tuesday, June 28, 2022 6:13 PM
**To:** Mary Winston; Andrea Weiss; Ann Yerger; John Fleming; Joshua Schechter; Jeffrey Kirwan; Benjamin Rosenzweig; Shelly Lombard; Marjorie Bowen; Virginia Ruesterholz; Minesh Shah; Sue Gove
**Cc:** Paul J. Shim (pshim@cgsh.com); Arlene Hong
**Subject:** Privileged Communication - Discussion with Ryan Cohen

Call went well - longest one so far at ~ 45 minutes.  His key areas of interest or other notes

- Taken aback at results - all indicators - top line, margin, balance sheet
- Leadership change - acknowledged the board's action; was also interested in Mara's background
- I talked about Sue's background - well matched for what we need and already in the saddle working on issues
- SG&A - be very aggressive, "can't cut enough;" called out "corporate" vs. stores, consulting, overhead
- Cash flow and liquidity - asked if we were upsizing the revolver; would we consider selling shares; the 24s
- Inventory - size of challenge; understands what BRG is being brought in to do; asked if we had cancelled any (yes); asked if sufficient controls on not bringing in more
- CEO Succession - concerned about the risk of another outsider; asked are there no insiders ready/close to ready.  He asked about criteria…I said early in process, getting past tomorrow.  Welcomed a conversation on this at a later date.
- We talked about Owned Brands - indicated we will be looking at the assortment and OB inventory a major piece of what we have to deal with
- Baby - excerpted what we're saying…he didn't pick up the ball or comment on this
- I offered and he wants to talk to Sue tomorrow afternoon instead of Thursday (which was previously scheduled with Mark), which we will make happen
- Understands we will have a public update later in the summer
- I believe message sent, message received about the Board's sense of urgency and focus, company accountability

for results vs. pointing to more

H

Exhibit 21

7/21/22 — Board Meeting — Exec Session

Overview
- materials very much in flight around where we are and where we are going
  - I think it will come together for you in the next 2 days
- Our situation is challenging
  - We made the right decision
  - nothing was falling in place and no one was addressing the problem —
- We have had a call to action
  - some get it some don't
  - Mara gets it

Highlights from Call with Ryan

- focused on liquidity
  - deep dive questions around
    vendor support, how bad is it

- Doesn't want us to do anything
  that is dilutive to shareholders
  ( under the tent comet)

- Asked about quality of CFO

- Surprised by how quick it
  collapsed & asked how board
  came to conclusion to change

- Several comments on Mark —
  his fit for role

- Pushed on my commitment
  & engagement

I Ask. On Why BBBY ..
  - loves Both Brands
  - Strong foothold
  - capital allocation

BBBY_SG_00000002

Exhibit 22

**To:**     Ryan Cohen[ryan@rcmail.com]
**From:**   Harriet Edelman[/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=d5549419b8614de7988a78df0b2caef8-Harriet Ede]
**Sent:**   Fri 7/22/2022 9:46:53 AM (UTC-04:00)
**Subject:**  Re:

Thank you.  Will be in touch.
Have a good weekend,
H

Get Outlook for iOS

---

**From:** Ryan Cohen <ryan@rcmail.com>
**Sent:** Thursday, July 21, 2022 5:58:06 PM
**To:** Harriet Edelman <Harriet.Edelman@Consultant.Bedbath.com>
**Subject:** Re:

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

  Harriet,
Hope all is well. I really appreciate the offer to meet in person but there's no need. We can talk via video or phone at anytime.

Happy to do so before September if you'd like.

Best,
Ryan

> On Jul 21, 2022, at 8:41 AM, Harriet Edelman <Harriet.Edelman@Consultant.Bedbath.com> wrote:
>
> Good morning, Ryan.
>
> Sue debriefed me later Friday night about your discussion with her…please let me know if there's anything you would like to discuss with me.  I'd also like to suggest that Sue and I come to meet with you in September, assuming you agree. If so, please let me know if there are any weeks to avoid and location Florida —  but please confirm.  I will come back to you with a few date options and hopefully we can find a convenient time.
>
> Thanks,
> H
>
> Get Outlook for iOS

Exhibit 23

248

1                   Edelman - Confidential

2    that was canceled?

3          A.   Yes, on the 29th.

4          Q.   From these text messages I take it that

5    you know from Ms. Gove, you know, what it is that

6    Cohen discussed on this call?

7               MR. GILMORE:  Objection to form.

8          A.   She's telling me the call happened.

9    Give me a call, and then she caught me up on the

10   call.

11         Q.   So, in terms of the catching you up

12   part, what did she tell you about what they

13   discussed?

14         A.   I do not recall.

15         Q.   At all?

16         A.   No.

17         Q.   Earlier on I think you mentioned

18   something about him telling Ms. Gove something

19   about him being diluted.  You testified to that

20   earlier?

21         A.   I mentioned that in some call, and I

22   believe it was this one that I believe I recall he

23   said that to her.  I don't know where that is.

24         Q.   So what did he say about that?

25              MR. GILMORE:  Objection to form.

1                    Edelman - Confidential

2          A.   I believe he said that he would not want

3     to be diluted, but I'm paraphrasing.

4          Q.   I see, so this comment was made on this

5     July 15 call?

6                MR. GILMORE:   Objection to form.

7          A.   I'm looking for some backup to confirm

8     that.  Maybe you have it.

9          Q.   And maybe the next one may have it.  If

10    we go to the following page, this is just the next

11    page, Ms. Edelman.  I'm glad this has a time stamp

12    on it, thank goodness, so over here on top it says

13    July 22, 2022 at 5:15 p.m., right?

14         A.   Yes.

15         Q.   Is this a text message sent from you?

16         A.   Yes.

17         Q.   Okay.  So then it says, "I heard back

18    from Ryan.  He appreciated the offer, but said not

19    necessary, and perhaps he and I can talk in the

20    next couple of weeks.  I left it at that.  Safe

21    flight.  Thanks for all."

22               So this is a conversation on July 22nd

23    that you had with Ryan Cohen?

24         A.   This was an e-mail exchange.  We did not

25    have a conversation on that day.

1                      Edelman - Confidential

2          Q.   Okay.  However, the conversation was,

3   whether it was through e-mail or telephone, you

4   talked to each other, right, communicated with each

5   other?

6          A.   Communicated with each other.

7          Q.   So is it your testimony that Ms. Gove

8   talked to him twice in July?

9          A.   No.

10         Q.   She only talked to him once?

11         A.   Yes.

12         Q.   Alright.  I think now let's go back to

13  this.  You're saying in that one conversation that

14  Ms. Gove had with Cohen he told her that he didn't

15  want to be diluted?

16         A.   Yes.

17         Q.   And was that specifically in reference

18  to a capital raise that the company would do?

19         A.   I do not recall the context.

20         Q.   Well, I mean how else would he get

21  diluted?

22              MR. GILMORE:  Objection to form.

23         A.   All I can tell you is that is what she

24  reported what was said.  Nothing behind it.

25         Q.   Okay.  Now at this point you agree with

1                      Edelman - Confidential

2     me that the company was considering whether it

3     could raise capital, right, around this time frame?

4              A.    Around this time frame, the company was

5     working as I said headlong to an August 31 picture

6     of the company including financing.

7              Q.    So when was the first time the company

8     considered tapping public markets?

9              A.    I don't recall.

10             Q.    Was it in the summer of 2022?

11             A.    The summer of '22 we were talking about

12    it.  I don't recall when it began.

13             Q.    Did it begin before July 15, 2022?

14             A.    I don't recall.

15             Q.    Going to the next page, Ms. Edelman,

16    your understanding is that this July 22nd

17    conversation that you had with Cohen was only via

18    e-mail?  Is that right?

19             A.    The same page, right?

20             Q.    Yeah.

21             A.    You haven't moved pages.

22             Q.    Yes.

23             A.    Yes.

24             Q.    So you didn't have any phone calls with

25    him at this point?

```
 1                    Edelman - Confidential
 2    to travel to any other investors' location like you
 3    offered Cohen?
 4         A.   No.
 5         Q.   Did you offer to do this at any point
 6    during your tenure at Bed Bath?
 7         A.   To go on location?
 8         Q.   To some investor?
 9         A.   No.  To have calls, yes.
10         Q.   I'm talking about going and meeting in
11    person where they live.  Have you ever done that in
12    your long career serving as a board member of so
13    many different companies?
14              MR. GILMORE:  Objection to form.
15         A.   No.
16         Q.   So he is the only one who you offered to
17    go meet in person where he lived?
18         A.   Yes.
19         Q.   Okay.  Between July 22nd of 2022 and
20    August 17 of 2022, did you talk to Cohen again?
21         A.   No.
22         Q.   So there was no communication?
23         A.   Zero.
24         Q.   No e-mails?
25         A.   Zero.
```

1                    Edelman - Confidential

2          Q.   No Zoom calls?

3          A.   No.

4          Q.   No in-person meeting?

5          A.   No.

6          Q.   Is that true for every single executive

7    at Bed Bath that you know of, to your knowledge?

8          A.   I believe so.

9          Q.   So the same is true for Ms. Gove?

10         A.   I believe so.

11         Q.   The same is true for Mr. Arnal?

12         A.   I believe so.

13         Q.   The same is true for every board member?

14         A.   I don't know.

15         Q.   To the best of your knowledge?

16         A.   To the best of my knowledge.

17         Q.   No one told you that Cohen tried to

18   communicate in this time period?

19         A.   No.

20         Q.   So he went dark basically, right?

21              MR. GERBER:  Objection.

22         A.   For me, he went dark.

23         Q.   So you agree with me that between this

24   time period between July 22nd and August 17th he

25   was disengaged, right?

1               Edelman - Confidential

2               MR. GERBER:  Objection.

3        A.   I was not in contact with him.

4        Q.   I understand, but he is not e-mailing

5    you to talk about the company, he is not reaching

6    out to you?

7        A.   That's correct.

8        Q.   Or anybody else?

9        A.   Again, I can speak for myself.

10       Q.   To the best of your knowledge obviously?

11       A.   Yes.

12       Q.   I understand you cannot know everything,

13   but, to the best of your knowledge, that is

14   correct?

15       A.   That's correct.

16       Q.   Okay.  I wanted to go back to that

17   exhibit, the one that we said you should set aside,

18   the text between you and Ms. Bowen, Exhibit 105.

19       A.   Yeah.

20       Q.   Now I am interested in only one text.

21   This is under, this is on the page right before the

22   final page where she sends you a text on August 8

23   at 9:53 a.m.  Are you with me?

24       A.   Yes.

25       Q.   She says, "Good a.m.  Let's issue

Exhibit 24



March 29, 2022

Ben Rosenzweig
Privet Fund Management LLC
79 W. Paces Ferry Road, Suite 200
Atlanta, Georgia 30305

Dear Ben:

We are pleased that you are joining the Board and are looking forward to your making significant contributions as a director. Thank you for moving swiftly with the onboarding process and the Strategy Committee has been extended Thursday to provide more context and history for you and Marjorie. As you go through material on the board portal, please don't hesitate to contact me if I can help accelerate understanding and knowledge transfer.

The purpose of this letter is to address a few comments you shared last week during the nominee vetting process. As reported by multiple participants in different sessions, you described your duties on the Company's Board of Directors as if you were the "owner" of the company's shares owned by RC Ventures; furthermore, that your role was akin to an "indirect proxy" for Mr. Cohen. Our understanding is that the interviewers reminded you – on the spot -- of a director's obligations to all the Company's shareholders and you clarified your remarks. However, the comments were enough to warrant a more formal acknowledgement and response.

As directors of a public company, we have the duties of loyalty and care to all shareholders -- not only those who may have initially nominated or supported one's election to the Board. We also have clear legal and fiduciary obligations to keep all material, non-public information with respect to the company strictly confidential, including Board and Committee discussions. In addition, we will evaluate the independence of a Strategy Committee member if there is a potential conflict of interest with an entity that proposes a transaction. Given the composition and history of the board, these expectations have been communicated with intention and candor at all times, and specifically during our negotiations of the Cooperation Agreement with RCV.

On behalf of the Board of Directors, we look forward to your collaboration to that end. Thank you,


Harriet Edelman,
Chair, Board of Directors


Virginia Ruesterholz
Chair, Nominating & Corporate Governance Committee

EXHIBIT
0035

763

**To:**      Arlene Hong[Arlene.Hong@bedbath.com]; Katherine Walden[katherine.walden@bedbath.com]
**From:**   Harriet Edelman[O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=D5549419B8614DE7988A78DF0B2CAEF8-HARRIET EDE]
**Sent:**     Tue 3/29/2022 2:25:11 PM (UTC-04:00)
**Subject:**  Privileged communication - Quotes for the record-Ben Rosenzweig

Arlene, for the record, here are the quotes that were provided by Directors and RRA who participated in interviewing Ben Rosenzweig and took contemporaneous notes:

From session with Mark Tritton and Ann Yerger:
"I will be representing Ryan as if I owned the 10% myself"

From the session with RRA (and I believe Sue)
"Ryan does not want to be on the board — wants directors on as indirect proxy."

Harriet

Get Outlook for iOS

Exhibit 25

1       A.   It would be any message system.

2       Q.   Do you use any other apps to text?

3       A.   Occasionally, yeah.  I will use What's

4  App.

5       Q.   Any others?

6       A.   No -- well, Facebook Marketplace for

7  buying and selling stuff, but certainly not

8  business.

9       Q.   And you searched your What's App chat

10  history?

11      A.   Yes.

12      Q.   So do you know if you ever backed up your

13  What's App history?

14      A.   Yes, I know I haven't.  To be clear, you

15  asked, "Do you know?"  And I'm answering, yes, I

16  know.  And then I'm offering that I haven't because

17  that would be the next presumed question, and I want

18  to be clear that it's not yes, I have backed it up.

19          It is, yes, I know.  And no, I have not

20  backed it up.

21      Q.   Do you maintain any type of custom and

22  practice to delete your texts after a certain time?

23      A.   My texts?  I don't -- I don't know how my

24  IPhone is set, but I'm sure at some point things get

25  deleted.

33

 1      Q.   And I'm not asking whether, you know, they

 2   get deleted.  I'm asking whether you personally

 3   delete your texts?

 4      A.   Occasionally I've got to clean out my

 5   phone.

 6      Q.   And by "occasionally," what are we talking

 7   about here; monthly?

 8      A.   There would not be a normal cadence to

 9   that.

10      Q.   Earlier you mentioned that you also

11   searched for phone numbers on your phone.  Did you

12   search for Mr. Cohen's phone number?

13      A.   I -- I don't specifically recall.  You --

14   you asked me what I did to be responsive, and I gave

15   you the most encompassing, that I would have looked

16   any way I could have for anything that was

17   responsive.

18      Q.   Okay.

19           Do you have in your possession Mr. Cohen's

20   phone number?

21      A.   I believe he is a contact in my phone.

22      Q.   Okay.

23           How many phone numbers did Mr. Cohen

24   maintain -- strike that.

25           On your contact for Mr. Cohen on your

1  been an administration method.

2      Q.   And how about your texts with Ms. Lombard?

3      A.   I make the same caveat.

4      Q.   After you were appointed to the Bed Bath

5  board, did Bed Bath provide you with any type of

6  onboarding documents?

7      A.   I don't recall.  You know, we jumped in

8  pretty quick.  I'm sure they did in terms of

9  policies and procedures and, you know, code of

10  ethics and all this stuff.  But in terms of

11  onboarding, here's the company, no.  We just dove

12  right in, that I recall.

13      Q.   During the Bed Bath board process, did you

14  share with anyone, not including Mr. Cohen or

15  Mr. Marose, that you were being considered for a

16  directorship at Bed Bath?

17      A.   My husband.

18      Q.   Anyone else?

19      A.   No.

20              (Plaintiff's Exhibit 13 was marked

21              for identification and is attached

22              hereto.)

23  BY MR. ARIFI:

24      Q.   I want to show you what I have marked as

25  Exhibit 13.

1   objected, I was telling you I don't appreciate the

2   form of question, implying I interpreted that as

3   intentionally deleting something.

4           Normal course, okay?  I didn't have it.  I

5   produced everything I have.

6       Q.   Okay.

7           So is your testimony that you deleted it

8   in your normal course of business?

9       A.   If I didn't produce it, I don't have it.

10  And the only possible explanation is that it was

11  deleted.  But I don't remember deleting it.  I

12  didn't specifically delete or not delete.

13      Q.   Okay.

14          And I'm not asking --

15      A.   Okay.

16      Q.   -- whether you recall deleting it --

17      A.   Okay.

18      Q.   -- but thank you.

19          By the way, did you have a custom and

20  practice of deleting e-mails?

21      A.   I clean out my computer every now and

22  again.  Yes.

23      Q.   Every?

24      A.   Few months.  I start at the bottom.  If

25  something's really old and no longer relevant, I'll

1   delete it.

2       Q.   And how do you decide what is relevant and
3   what is not?

4       A.   My computer.  It's my personal e-mail.
5   I'm allowed to decide whatever I want.  I mean,
6   either it's a matter of importance to me or it's
7   not.

8       Q.   Earlier you brought up the fact that every
9   board member is obligated to represent the interests
10  of all shareholders.  Do you recall that testimony?

11      A.   Yes, I do.

12      Q.   You would agree that if a board member
13  represented the interest of a single shareholder
14  instead of all shareholders, they would be violating
15  that obligation; correct?

16      A.   Every board member represents all
17  shareholders.  To the extent that an individual
18  shareholder's interests are perfectly aligned with
19  all shareholders, no issue.  But you don't represent
20  an individual shareholder.  You represent all
21  shareholders.

22      Q.   And, again, I appreciate the answer, but
23  please listen to the question.  You did not answer
24  my question.

25           MR. FARINA:  Can you read back the

1   No.  It hadn't had any meetings.  Once the company

2   filed -- well, I -- strike that, because I don't

3   know what happened once the company filed.  I wasn't

4   there.

5          But once the company was on a very focused

6   effort to raise capital and enhance its liquidity as

7   opposed to doing anything else, the strategy

8   committee was not regularly or even meeting.

9          I think I testified the last time I recall

10   a meeting was maybe in the fall, but I honestly

11   don't recall.  It certainly wasn't active in

12   February of 2023.

13       Q.   Okay.

14          And do you know when the company began

15   focusing on the liquidity concerns?

16       A.   Yeah.  As soon as we fired Mark in June of

17   2022.

18       Q.   Here it references the submission of the

19   strategy committee's final recommendation.  Do

20   you -- are you aware whether the strategy committee

21   made a final recommendation with regards to Baby?

22       A.   During the course of my participation on

23   this committee, we did not have a final

24   recommendation.

25       Q.   When was the first time capital raise was

1      A.   I don't specifically recall, but it would
2  not surprise me at all.
3      Q.   At this point -- and by "this point," I
4  mean May 15th -- were you -- you yourself evaluating
5  whether getting Mr. Cohen more involved in
6  management might be beneficial to Bed Bath?
7      A.   I don't recall at this point.  But it
8  certainly, at some point, occurred to me that Ryan
9  was a potential resource.  That if Ryan was willing
10 to do it and the board wanted to do it, it could be
11 very synergistic.
12     Q.   And what type of resources would Mr. Cohen
13 bringing?
14     A.   He had successfully managed companies;
15 which was something that we didn't have at Bed Bath.
16     Q.   Which companies?
17     A.   When he sold Chewy for a lot of money,
18 and, at a minimum, figured out how to stop the
19 bleeding at GameStop for at least -- you know, it
20 had not filed bankruptcy when everyone thought it
21 would.  So he was two for two.
22     Q.   In your opinion, how was he -- strike
23 that.
24          Do you have an opinion of how he was able
25 to keep GameStop afloat?

1    could have been part of the solution.  If Ryan knew

2    we were firing Mark, and Ryan had an interest in

3    being interim CEO and having somebody who he knew be

4    interim CEO, then he could have helped fix the

5    problem.

6            Number 2, even in the absence of helping

7    to fix the problem, given Ryan's fairly public

8    ownership interest, meaning the public at large

9    understood Ryan was an investment company, it was

10   fairly likely that the press would ask him about

11   news relating to the company.

12           So having the opportunity to not surprise

13   him and be able to formulate with him a response

14   that was good for all of Bed Bath & Beyond was an

15   opportunity.

16       Q.   How would that decision be good for Bed

17   Bath?

18       A.   Meaning, having Ryan know ahead of time?

19       Q.   Correct.

20       A.   Because if Ryan knows ahead of time, then

21   he, at a minimum, can, if he agrees with the

22   decision, be supportive of the board and supportive

23   of the company when the media inevitably asks him

24   for a comment.

25       Q.   Did you consider asking -- strike that.

1          Did you consider letting any other

2    shareholder know regarding Bed Bath's decision to

3    fire its CEO ahead of making it public?

4          A.   No, no other shareholders were in a

5    similarly situated position as Ryan with respect to

6    A, size, and B, you know, being a shareholder that

7    we're going -- Fidelity is not going to comment on

8    something like this publicly.  Ryan was a very

9    public figure.

10         Q.   Who came up with this idea of letting

11   Mr. Cohen know prior to making it public?

12         A.   I don't remember specifically.  But it

13   was -- it was something that was discussed,

14   obviously based on this, and consistent with my

15   recollection that at least among this group but

16   possibly amongst the entire board.

17         Q.   I understand it may have been discussed.

18   I'm asking you who came up with this idea?

19         A.   And I said I don't recall specifically.

20         Q.   Did you discuss this idea with Ms. Lombard

21   and Mr.- -- strike that.

22         Did you discuss this idea with

23   Mr. Rosenzweig prior to bringing it up to the board?

24         A.   I don't recall, but it's certainly

25   possible.

1          Q.    Turning to the second page -- well, strike

2     that.

3               Let's begin with that last paragraph on

4     the first page.  It states:

5               "Ms. Gove provided an update on the

6               Strategy Committee process with respect

7               to buybuy BABY business, in parenthesis,

8               small B, small B, capital B, since

9               April.  She provided a high-level

10              overview of the independent outside-in

11              diligence work being conducted by

12              McKinsey & Company on bbB's growth

13              trajectory and long-term financial

14              potential.  She noted the status of the

15              three-year financial statement

16              preparation and audit by Deloitte and

17              KPMG.  She also noted that the Committee

18              identified deed independent legal

19              counsel options.  She further stated

20              that the committee had put the

21              engagement letter with JP Morgan and

22              independent counsel engagement on hold

23              due to the challenging macro-environment

24              and to allow time for McKinsey's work.

25              She stated that the Committee was

1          encouraged by bbB's potential and

2          further that the Committee believed that

3          the current macro-environment did not

4          support a possible sale."

5          Did I read that correctly?

6     A.   You did.

7     Q.   So by June 20, 2022, the strategy

committee had come to a conclusion that the sale of

Baby was not possible; correct?

10    A.   Well, yes, as I previously testified to.

There was -- it really wasn't possible to -- we

didn't have all of -- everything we needed to even

consider it.

14    Q.   I gotcha.

15         And here it refers to macro-environment

factors.  Do you know which macro-environment

factors it would be referring to?

18    A.   No.  I don't recall.

19    Q.   So as we took a look at the April 11th,

2022 board materials, and now we're looking at the

June 20th, 2022 meeting minutes, what changed

between those two dates that render the sale of Baby

not possible?

24    A.   The house was burning down, and the

financial results were deteriorating.  And there was

1    a lot of work to have Baby be a standalone entity,

2    which wasn't complete and wasn't the primary focus,

3    given that the house was burning down.

4        Q.   Was one of those factors that Baby's value

5    was not sufficient to cover the financial

6    shortcomings of Bed Bath?

7        A.   No.  Not directly.  I mean, it's -- Baby's

8    value was unascertained at the time because of the

9    fact that the allocation of expenses was incomplete

10   at best.  And Baby's -- and the financial

11   performance was heading in the wrong direction for

12   both Bed Bath and Baby.

13       Q.   Was there any conclusion reached by the

14   board regarding Baby?

15           MR. FARINA:  Objection.  Form.

16           THE WITNESS:  Everything was put on hold.

17   So the conclusion was, not now.

18   BY MR. ARIFI:

19       Q.   Was it discussed of when it could possibly

20   sell Baby?

21       A.   Not that I recall at the time.  Again,

22   these are -- you know, the house is burning down, we

23   needed a new CEO.  It was all concurrent.

24       Q.   And would it be fair to say that the board

25   would have looked at the option to sell Baby after

1  the house was not burning down anymore and things

2  were under control?

3       A.   Speculative at best.  Hard to know.

4       Q.   And, again, are you aware whether these

5  documents were shared with Mr. Cohen or with anyone

6  outside of Bed Bath?

7       A.   I am not aware that they were shared.

8                 (Plaintiff's Exhibit 24 was marked

9                 for identification and is attached

10                hereto.)

11  BY MR. ARIFI:

12       Q.   I'm handing you what I've marked as

13  Exhibit 24.

14            I will represent for the record that this

15  document was also provided by Bed Bath pursuant to

16  plaintiff's subpoena.

17            Ms. Bowen, do you know what this document

18  is?

19       A.   Yeah.  This is day one of the July board

20  meeting dec.

21       Q.   And when was the first meeting of the

22  board of directors in July?

23       A.   I don't recall the date.

24       Q.   Were you present for this meeting?

25       A.   I think so.  I'm trying to recall if this

Exhibit 26



2:34   🌐◁🔋54%

← (M) Marjorie Bowen   📹 📞 ⋮

Thursday, Apr 7, 2022 • 6:38 PM

Harriet said she'd rather leave things as-is and have Mark speak to Ryan after earnings. I'm trying to figure out how much to push

Thursday, Apr 7, 2022 • 9:00 PM

She may be letting him dig his own grave.

That's the only explanation

Saturday, Apr 9, 2022 • 1:24 PM

FYI, the materials for audit and comp are posted in addition to the strategy stuff. And harriet emailed me to say she still wants to bring up the NDA discussion in audit exec session even though Mark is against it (I had replied to Mark about how it could benefit him and he shut it down again)

Monday, Apr 11, 2022 • 2:43 PM

That's what I thought re stock buybacks.  On autopilot.

Ya and I get it up t⁰ ˢ FYE. March is inexcusable ↓

⊕ 🖼 Text message   ☺ 🎤

EXHIBIT
0030



2:35

Marjorie Bowen

Friday, Aug 12, 2022 • 1:25 PM

Call you back in 15

Ok. Thx

Hi. Looking at Ryan's 13d. He does have calls for 1.67 million shares. The call options exercise at $60, $75, and $80. I think These Reddit people (RC cult) are tying to help him get in the money.

Sunday, Aug 14, 2022 • 7:41 PM

When you talk to Greg tomorrow ask if he could give us a tutorial on what the GameStop board did or the amc board when they were in our shoes. Specifically- how did they execute both the share sales and their IR / public press releases to not spook the Reddit crowd.

Ok

Monday, Aug 15, 2022 • 11:28 AM

Ha I think we wore her down

Yep. I also reached ou_____achel over the weekend.

Text message



2:36      📶 ◢ 🔋 54%

← Ⓜ Marjorie Bowen    📹   📞   ⋮

Tuesday, Aug 16, 2022 • 2:34 PM

Yep, the very thing that we should've anticipated has now happened and we're slow walk to capitalize on it. However with the options expirations as far out as January, I am hopeful that we are safe. Only time will tell, but we may have a lifeline here. Thank God Ryan stayed in.

Give me 10.

Ok

I don't know what the hell else we should be talking about in the strat call besides marketing/PR and these financing logistics

Tuesday, Aug 16, 2022 • 5:11 PM

You want to conf her in at 515?

Tuesday, Aug 16, 2022 • 8:58 PM

Does media have it wrong and Ryan didn't buy more shares?  All media is that he bought more.

Never mind. I checke   ↓   3d he filed in feb. You are right. Same number of shares

⊕   🖼    Text message        ☺   🎤

CONFIDENTIAL



1:18

**Marjorie Bowen**

Ok

I don't know what the hell else we should be talking about in the strat call besides marketing/PR and these financing logistics

Tuesday, Aug 16, 2022 • 5:11 PM

You want to conf her in at 515?

Tuesday, Aug 16, 2022 • 8:58 PM

Does media have it wrong and Ryan didn't buy more shares?  All media is that he bought more.

Never mind. I checked the 13d he filed in feb. You are right. Same number of shares and options.

Ya. Media is dumb. Again, need to use to our advantage

Yep. Reading his 13d now.

No transactions since orig

Wednesday, A... 2022 • 3:08 PM

Text message

Exhibit 27

```
 1                      Lombard
 2   companies?
 3            MR. GILMORE:  Objection to form.
 4       Q.   You can answer.
 5       A.   I can't recall that I did.
 6       Q.   Before summer of 2022, did you know that
 7   Cohen posted on social media about his investments
 8   in public companies?
 9       A.   I was not aware of that.
10       Q.   Before you became a director for Bed
11   Bath, did you have any opinions about what kind of
12   entrepreneur Cohen was?
13       A.   Could you repeat the question.
14       Q.   Sure.  Before you joined the Bed Bath
15   board, did you have any opinion about what kind of
16   entrepreneur Cohen was?
17       A.   My opinion was that he was a successful
18   entrepreneur.
19       Q.   At that time did you have any opinion
20   about why he was a successful entrepreneur?
21       A.   Clarify your question.
22       Q.   We will come back to that.  At the time,
23   why did you think Cohen was a successful
24   entrepreneur?
25       A.   I viewed him as a successful
```

<pre>
 1                      Lombard
 2   entrepreneur because he had started Chewy and was a
 3   successful company and he was able to sell it for a
 4   good price.
 5        Q.   Other than his general success in
 6   starting Chewy and selling it for a good price, did
 7   you have an opinion about -- strike that.  Were
 8   there particular actions that Cohen took with
 9   respect to Chewy that in your opinion made him a
10   successful entrepreneur?
11        A.   I was not familiar with the details of
12   how he built Chewy.  I just know that he had and
13   that he had sold it.
14        Q.   Before you were selected as a Bed Bath
15   board member, did you have any opinion about what
16   kind of investor Cohen was?
17             MR. GILMORE:  Objection to form.
18        A.   I did not.
19        Q.   Before the summer of 2022, did you know
20   that Cohen had made large investments in companies
21   that attracted retail investors?
22             MR. GILMORE:  Objection to form.
23        A.   I knew that he was involved in GameStop.
24   That is the only one I knew of before Bed Bath.
25        Q.   And did you know that GameStop had many
</pre>

1                        Lombard

2          COHEN0004109, was so marked for

3          identification, as of this date.)

4      Q.   Please take a look at what has been

5  marked as Exhibit 156.  This appears to be a

6  notification to Mr. Cohen that you had joined his

7  Zoom meeting on May 21, 2022.  Did you have a Zoom

8  meeting with Mr. Cohen on May 21, 2022?

9      A.   Yes.

10     Q.   Is this the Zoom meeting that you

11 referenced earlier in this deposition?

12     A.   Yes.

13     Q.   You can put it aside for a second.

14          (Exhibit 157, Document Bates stamped

15          SLOMBARD0072 and 0073, was so marked for

16          identification, as of this date.)

17     Q.   Before we turn to the next exhibit, did

18 you reach out to Mr. Cohen to set up the Zoom

19 meeting that is referenced in Exhibit 156?

20     A.   Yes.

21     Q.   Why did you reach out to him?

22     A.   There had been some discussion on the

23 board about him getting restricted, so he could get

24 non-public, material non-public information and

25 assist with the turnaround of the company.

```
 1                         Lombard
 2        Q.   So what did you want to discuss with
 3   him?
 4        A.   The idea that he might be helpful in
 5   turning the company around.
 6        Q.   Did he say anything in response to your
 7   suggestion?
 8        A.   He was noncommittal.
 9        Q.   Turn back to what was marked as Exhibit
10   138 starting at S. Lombard 001.  Please turn to
11   page 27.  The Bates number will end with 27.
12             MR. GILMORE:  I will again renew my
13             objection that the defendants have never
14             seen these documents before today.
15        Q.   Actually please look at pages 24 through
16   27.  Do you recognize those pages?
17        A.   Yes.
18        Q.   Those are e-mails between you, Mr. Cohen
19   and someone with an e-mail address Alan@flzen.com,
20   correct?
21        A.   Yes.
22        Q.   The first e-mail that is sent in this
23   thread is from you to the two of them on May 20,
24   2022 at 11:27 a.m.  Correct?
25        A.   Yes.
```

<pre>
 1                          Lombard
 2    time Mr. Cohen indicated that he might sell his Bed
 3    Bath stock?
 4            A.   I believe so.
 5            Q.   Did you have any conversations with
 6    other members of the board about this statement by
 7    Mr. Cohen?
 8            A.   No, not this specific statement.  No.
 9            Q.   If you go back to earlier in the e-mail,
10    the second bullet point reads, "Feel like shrinking
11    the board significantly and getting himself on the
12    board is necessary to seven members."
13            The next bullet point reads, "By
14    shrinking the board, specifically me and Sue stay,
15    Ben, Shelly and Rosemary additional RCV candidates
16    added."  Do you see that?
17            A.   Yes.
18            Q.   So he was proposing to shrink the board
19    to seven members, correct?
20            MS. WEBSTER:  Objection to form.
21            A.   Yes.
22            Q.   And he wanted Ms. Edelman, Ms. Gove, Mr.
23    Rosenzweig, you and an individual by the name of
24    Rosemary to be on the new downsized board, correct?
25            MS. WEBSTER:  Objection to form.
</pre>

```
 1                    Lombard
 2        A.    I believe Rosemary was a typo that
 3  Harriet, she meant Marjorie.
 4        Q.    So Mr. Cohen wanted Ms. Edelman, Ms.
 5  Gove, Mr. Rosenzweig, you and Ms. Bowen to be on
 6  the downsized board, correct?
 7             MR. GILMORE:  Objection to form.
 8             MS. WEBSTER:  Objection to form.
 9        A.    Yes.
10        Q.    And, under his proposal, the two
11  remaining spots on the board would be filled by
12  other individuals chosen by Mr. Cohen, correct?
13             MR. GILMORE:  Objection to form.
14             MS. WEBSTER:  Objection to form.
15        A.    I believe Harriet said that.  I was not
16  involved in the conversation, but that is what she
17  said he proposed.
18        Q.    Under Mr. Cohen's proposal, a majority
19  of the board would have been nominated or selected
20  by Mr. Cohen, correct?
21             MR. GILMORE:  Objection to form.
22             MS. WEBSTER:  Objection to form.
23        A.    If Harriet recapped their conversation
24  correctly, then it appears that is what he was
25  asking.
```

1                          Lombard

2          Q.    To your knowledge, was this the first

3    time that Mr. Cohen indicated he wanted a majority

4    of the Bed Bath board to be composed of members

5    nominated or selected by him or RC Ventures?

6                    MR. GILMORE:  Objection to form.

7                    MS. WEBSTER:  Objection to form.

8          A.    To my knowledge, yes, but just as far as

9    I know.

10         Q.    You can put that aside.

11                    (Exhibit 158, Document Bates stamped

12                    SLOMBARD0076 and 0077, was so marked for

13                    identification, as of this date.)

14         Q.    Please look at what has been marked as

15   Exhibit 158.  Do you recognize this document?

16         A.    Yes.

17         Q.    Did you agree that Cohen should have

18   been brought in the loop sooner?

19                    MR. GILMORE:  Objection to form.

20         A.    Can you clarify your question.

21         Q.    Sure.  The first e-mail, strike that.

22   The first text is from Ms. Bowen and it reads, "we

23   were so right to have tried to get Ryan in loop

24   sooner."  Do you see that?

25         A.    Yes.

1                        Lombard

2          Q.    Did you agree with that sentiment?

3          A.    Yes.

4          Q.    What did Ms. Bowen mean by getting Ryan

5     in loop sooner?

6                MS. WEBSTER:  Objection to form.

7          A.    To alert him that Mark would be leaving.

8          Q.    Why did you believe it made sense to

9     give him a heads up that Mark would be leaving

10    earlier?

11               MS. WEBSTER:  Objection to form.

12         A.    Because he was sure to get phone calls

13    from the media and we did not want him to be

14    surprised or caught flat footed.

15         Q.    A little further on in the text chain,

16    there is discussion about planning a call on

17    June 29, 2022.  Do you see that?

18         A.    Yes.

19         Q.    Do you recall if that call took place?

20         A.    I can't recall.

21         Q.    Do you recall having a call with Ms.

22    Bowen and Mr. Rosenzweig shortly after the June

23    earnings call?

24         A.    I don't recall.

25         Q.    You can put it aside.

Exhibit 28






**Ryan Cohen**  4/16/22, 2:59 PM



**Ryan Cohen**  4/15/22, 3:54 PM

 **Ryan Cohen**
↗ 5/8/22, 3:50 PM

 REDACTED
↗ 5/8/22, 12:39 PM

 **Ryan Cohen**
↙ 5/7/22, 5:34 PM

 REDACTED
↗ 5/7/22, 5:24 PM

 **Ryan Cohen**
↗ 5/7/22, 4:57 PM

ROSENZWEIG_BBBYLITIG_00000122



CONFIDENTIAL

ROSENZWEIG_BBBYLITIG_00000123



CONFIDENTIAL

ROSENZWEIG_BBBYLITIG_00000124



CONFIDENTIAL

ROSENZWEIG_BBBYLITIG_00000125



CONFIDENTIAL

ROSENZWEIG_BBBYLITIG_00000126



CONFIDENTIAL

ROSENZWEIG_BBBYLITIG_00000127

Exhibit 29

From:        marjorie.bowen@icloud.com
Sent:        Mon 3/21/2022 11:24 AM (GMT-04:00)
To:          Tarita Jones <Tarita.Jones@russellreynolds.com>;Heller Jonathan
             <jheller@cblproperties.com>
Cc:
Bcc:
Subject:     reference please
Attachments: smime00001.p7s


Hello Jonathan -
I hope that all is well.
Jonathan - I apologize for the lack of notice, but wanted to give you a heads up that Tarita, or one
of her colleagues from Russell Reynolds, may be reaching out to you for a professional reference
regarding the board position for BBBY. We discussed this to clear any conflicts with CBL, and
they are now checking references as part of the process. You may have seen that RC Ventures
has purchase nearly 10% of the stock. What is not public is that RC Ventures is working
collaboratively with the company to refresh the board and conduct a strategic alternatives review,
and I would be part of both that refresh and the review committee.
I'm excited about the opportunity and appreciate you spending a few minutes with Russell
Reynolds so they can understand my disposition in the board room, my commitment to
shareholders and my work ethic.
Again, sorry for the lack of notice.
Tarita, Jonathan's email is above and his phone number is 917-359-8648. Jonathan was formerly
with Canyon Partners who was a large investor in Navient in a similar situation, and now is the
lead investor in CBL. Jonathan has left Canyon and is serving as Chair of CBL. We are working,
and have worked, closely together on many strategic and capital structure initiatives.
Best,
Marjorie



EXHIBIT 13

MARJORIE BOWEN
3/01/2024

Denise D. Ison, CSR, RPR, CLR

Exhibit 30

| **From:** | Ryan Cohen |
| **Sent:** | Tuesday, August 16, 2022 12:22 PM EDT |
| **To:** | Ryan Nebel |
| **Subject:** | Bed Bath & Beyond soars 70% as meme traders bet on Ryan Cohen |

https://www.cnbc.com/2022/08/16/bed-bath-beyond-soars-70percent-as-meme-traders-bet-on-ryan-cohen.html

CONFIDENTIAL

COHEN0012031

Exhibit 31

| **To:** | Harriet Edelman[Harriet.Edelman@Consultant.Bedbath.com]; Sue Gove[Sue.Gove@bedbath.com]; Gustavo Arnal[Gustavo.Arnal@bedbath.com]; Arlene Hong[Arlene.Hong@bedbath.com]; Susie Kim[Susie.Kim@bedbath.com] |
|---|---|
| **Cc:** | LaGere, Jack C[jack.c.lagere@jpmorgan.com]; Gibson, Gina[gina.gibson@jpmorgan.com]; Johnston, Nik[nik.johnston@jpmorgan.com]; Dilwali, Kapil A[kapil.a.dilwali@jpmorgan.com] |
| **From:** | Freedman, David[dfreedman@jpmorgan.com] |
| **Sent:** | Tue 8/16/2022 4:31:10 PM (UTC-04:00) |
| **Subject:** | Even by meme stock standards, a wild day |

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Team,

I have not been sending emails about the meme-stock trading we have been seeing because we had no real insight into which investors were driving it – other than to say we did not see institutional investor participation.  I am emailing today because we saw 386mm shares of reported volume today after trading almost 165mm yesterday.

• The furious buying in the morning may have been driven by some quant fund buying on the "increased" stake reported by Ryan (even though his number of shares did not change, some services reported a 1.7mm share increase because they included the call options now but not before).
• The reports of Ryan's increased stake also probably caused retail buying again
• Retail also may be trying to fight the short position:  I told you at the end of July that short interest in BBBY had hit 28.5mm share, up from 21.5mm on Jun-30, representing ~42% of the BBY float.  The cost to borrow BBBY had **not** skyrocketed then; it stood at ~1% on an annualized cost rate.
• The shares on loan took an even further jump to 61.5mm shares coming into today (up from ~50mm shares in mid-July), and the cost to borrow had started to elevate last week and reached 9% coming into today.  Yes that is almost the size of your public float. Implication:  even as your stock price rose over the past 9 trading days, the shares on loan had increased (which means the short interest probably had too).
• I would conclude that today may have represented some capitulation by the shorts in BBBY.  I would note the stock peaked near $28 before 11:30 this morning, stayed in a channel between $26-$28 until 14:30, and then fell sharply back down to the ~$20 level. 145mm shares of reported volume traded between 11:20-14:30 at a volume-weighted average price (VWAP) of $25.90.

It will be interesting to check the shares on loan data Friday morning to see how much of this may have been short covering.  We'll let you know.

Regards,

David Freedman, CFA
Vice Chairman
Global Head of Shareholder Engagement and M&A Capital Markets
J.P. Morgan
383 Madison Avenue, 28th Floor
New York, NY 10179
david.freedman@jpmorgan.com
Office:  212-272-4209
Mobile:  917-406-9889

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

Exhibit 32



https://x.com/dbrownie8445/status/1557554246861594624

Exhibit 33

**To:** Arlene Hong[Arlene.Hong@bedbath.com]
**From:** Gustavo Arnal[/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=375e1dea3e484c71b70ce42da17f14c6-Gustavo Arn]
**Sent:** Tue 8/16/2022 2:35:14 PM (UTC-04:00)
**Subject:** Re: Trading Update

Of course!

---

**From:** Arlene Hong <Arlene.Hong@bedbath.com>
**Sent:** Tuesday, August 16, 2022 2:19:33 PM
**To:** Gustavo Arnal <Gustavo.Arnal@bedbath.com>
**Subject:** RE: Trading Update

Thank you for sharing. Ok if I ask Susie to include me directly in these trading updates?

---

**From:** Gustavo Arnal <Gustavo.Arnal@bedbath.com>
**Sent:** Tuesday, August 16, 2022 2:17 PM
**To:** Arlene Hong <Arlene.Hong@bedbath.com>
**Subject:** Fwd: Trading Update

---

**From:** Susie Kim <Susie.Kim@bedbath.com>
**Sent:** Tuesday, August 16, 2022 1:10 PM
**To:** Sue Gove <Sue.Gove@bedbath.com>; Gustavo Arnal <Gustavo.Arnal@bedbath.com>
**Subject:** Re: Trading Update

Sue,

Gustavo wanted to be sure I shared that our trading was halted briefly this morning - almost immediately following my note below. There were two 5-minute blocks during the 11am hour driven by outsized pricing.

I will be back with more in real time as the day progresses if there are any updates.

## Trade Halt Notifications

| HALT DATE | 8/16/2022 |
|---|---|
| HALT TIME | 11:37:07 |
| STOCK SYMBOL/NAME | BBBY - Bed Bath & Beyond Inc LUDP |
| MARKET | NASDAQ |

| RESUME DATE | 8/16/2022 |
|---|---|
| QUOTE RESUME TIME | 11:37:07 |
| ANTICIPATED TRADE RESUME TIME | 11:42:07 |

NASDAQ MarketWatch has issued the above trading status change(s). NASDAQ securities subject to a trading halt or trading pause may experience one-minute extensions due to an imbalance before trading resumes. Further detail on current and recent trading halt and trading pause activity is available on NASDAQTrader.com by clicking on the link above. Questions regarding trading halts or trading pauses may be directed to MarketWatch at (800) 537-3929 or (301) 978-8500.

Please refer to the link for additional trade halt updates.

http://www.nasdaqtrader.com/Trader.aspx?id=TradeHalts



## Trade Halt Notifications

| HALT DATE | 8/16/2022 |
|---|---|
| HALT TIME | 11:27:04 |
| STOCK SYMBOL/NAME | BBBY - Bed Bath & Beyond Inc LUDP |
| MARKET | NASDAQ |

| RESUME DATE | 8/16/2022 |
|---|---|
| QUOTE RESUME TIME | 11:27:04 |
| ANTICIPATED TRADE RESUME TIME | 11:32:04 |

NASDAQ MarketWatch has issued the above trading status change(s). NASDAQ securities subject to a trading halt or trading pause may experience one-minute extensions due to an imbalance before trading resumes. Further detail on current and recent trading halt and trading pause activity is available on NASDAQTrader.com by clicking on the link above. Questions regarding trading halts or trading pauses may be directed to MarketWatch at (800) 537-3929 or (301) 978-8500.

Please refer to the link for additional trade halt updates.

http://www.nasdaqtrader.com/Trader.aspx?id=TradeHalts

**Susie A. Kim**
**SVP, INVESTOR RELATIONS & TREASURY**
**NASDAQ: BBBY**
650 Liberty Avenue | Union, NJ 07083
susie.kim@bedbath.com

**From:** Susie Kim

**Sent:** Tuesday, August 16, 2022 10:27:52 AM
**To:** Sue Gove <Sue.Gove@bedbath.com>; Gustavo Arnal <Gustavo.Arnal@bedbath.com>
**Subject:** Trading Update

Sue/Gustavo,

Wanted to send a quick note on this morning's trading as we are currently up more than 50% at $24.62 on tremendous volume of 152M.   I await word from our trader but this movement is likely driven by RCV's filings as well as (albeit less so) positive sentiment across the peer group on the heels of WMT's AM print.

AMC and GME are both down in trading while retail is generally up Low single digits.

Thank you.

## Susie A. Kim
**SVP, INVESTOR RELATIONS & TREASURY**
**NASDAQ: BBBY**
650 Liberty Avenue | Union, NJ 07083
susie.kim@bedbath.com

Exhibit 34

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

**From:** Gibson, Gina
**Sent:** Wednesday, August 17, 2022 5:05 PM
**To:** Freedman, David;Harriet Edelman;Sue Gove;Gustavo Arnal;Arlene Hong;Susie Kim
**CC:** LaGere, Jack C;Johnston, Nik;Dilwali, Kapil A
**Subject:** RE: RCV filed for a 144A sales of his entire position

Hi David,

There is concern / a query from Gustavo re the JPM involvement - are you able to clarify this for them, please, if possible? From the address I guess it's JPMAM (Private Bank)?

Many thanks,
Gina

**Please note new Mobile Number: +1 (646) 538 8921**

Gina Gibson, CFA | Managing Director | Corporate Client Banking & Specialized Industries | **Commercial Banking** | 383 Madison Avenue, Floor 23 | New York, NY 10017 | T: +1 (212) 622 3145 | Mobile: +1 (646) 538 8921 | gina.gibson@jpmorgan.com | jpmorganchase.com/commercial

Executive Assistant: Colleen M. McGinnis | T: 215 640 3632 | colleen.m.mcginnis@jpmorgan.com

**From:** Freedman, David (CIB, USA) <dfreedman@jpmorgan.com>
**Date:** Wednesday, 17 Aug 2022, 16:52
**To:** Harriet Edelman <Harriet.Edelman@Consultant.Bedbath.com>, Sue.Gove@Consultant.Bedbath.com <Sue.Gove@Consultant.Bedbath.com>, gustavo.arnal@bedbath.com <gustavo.arnal@bedbath.com>, Arlene Hong <Arlene.Hong@bedbath.com>, Susie Kim <Susie.Kim@bedbath.com>
**Cc:** LaGere, Jack C (CIB, USA) <jack.c.lagere@jpmorgan.com>, Gibson, Gina (CB, USA) <gina.gibson@jpmorgan.com>, Johnston, Nik (CIB, USA) <nik.johnston@jpmorgan.com>, Dilwali, Kapil A (CIB IBC, USA) <kapil.a.dilwali@jpmorgan.com>
**Subject:** RCV filed for a 144A sales of his entire position

Team,

As part of the SEC daily download of 144A sales, you will find the attached PDF. This is a Form 144 by RC Ventures, registering his entire stake (I highlighted the "Remarks" on page 2 which says that). The form indicates the sales could begin Aug-16, but could be sold as late as Jul31, 2023.

I would note that the following listed options traded today

- Jan-2023 $80-strike calls traded 41,000 contracts today (he owned 11,257)
- Jan-2023 $60-strike calls traded 15,600 contracts today (he owned 5,000)

With reported trading volume in the common shares 395mm shares yesterday and another 250mm shares today. BBBY traded at a VWAP of ~$25.50, closed at $23.08, and is trading around $20 as I type this.
Regards,

David Freedman, CFA
Vice Chairman
Global Head of Shareholder Engagement and M&A Capital Markets
J.P. Morgan
383 Madison Avenue, 28th Floor

New York, NY 10179
david.freedman@jpmorgan.com
Office: 212-272-4209
Mobile: 917-406-9889

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

Exhibit 35

Page 118

1          Q.    -- as scumbags, correct?

2          A.    No.  No.  Not like that.

3          Q.    Sir, --

4          A.    No.

5               MR. JAFRI:  Objection; form.

6     BY MR. GILMORE:

7          Q.    At 20:42, your brother says, "I'm

8     reading the WS Bet," which you agree is Reddit --

9     Reddit meme stock investors?

10         A.    Yes.  Because they "buy, buy, buy."  It

11    was going up, and we were not inside it.

12         Q.    Okay.

13         A.    So it -- so it's myself --

14         Q.    So you're -- you're --

15         A.    I am --

16         Q.    You're testifying --

17         A.    I am --

18         Q.    You're testifying --

19         A.    I am --

20         Q.    You're testifying that after your

21    brother told you --

22              A.    I am testifying --

Page 158

1          Q.   Why did you take the short position at

2     that time?

3          A.   Because we were thinking that if it

4     remains neutral, we wanted to make a premium to

5     be able, in the future, to have some cash to --

6     to buy shares.  It's also a strategy to make

7     premiums during some times.  And if at one

8     moment you feel that the company's taking a way

9     or another, then you can invest.  It's just to

10    make the capital turning --

11         Q.   So were you --

12         A.   -- at the moment you are waiting for

13    something to -- to come out.

14         Q.   We talked about earlier, when you take

15    a short position, you're getting against the

16    company's stock price, correct?

17         A.   No.  You can be short and the -- the

18    share remains the same.

19         Q.   Okay.

20         A.   It's waiting.

21         Q.   Leave aside that --

22         A.   It just brings a --

Page 198

1    this moment.

2    BY MR. GILMORE:

3         Q.  Okay.  So on August 5th, Ryan Cohen

4    tweets, correct?

5              On August 5th, Ryan Cohen tweets,

6    correct?

7         A.  Yes.

8         Q.  And Bratya didn't purchase any common

9    shares on August 5th, did it?

10        A.  We already had shares, huh?

11        Q.  Okay.

12        A.  We had shares, and we were even not

13   coming back to our purchase price at that moment.

14        Q.  Okay.  So three days after the tweet on

15   August 5th, Bratya sells a lot of call options,

16   correct?

17        A.  On the 8th, we generated some revenue on

18   the shares that we had.  Yes.

19        Q.  What do you mean by that?

20        A.  When you have a covered call, you

21   generate revenue.  You have already the shares.

22        Q.  Yeah, but you sold -- you sold call

Page 199

1   options on the 8th of August, right?

2        A.   Yes.   To generate money.   And you are

3   covered.   In case the price of the shares is going

4   to 100, for example, you just have to deliver the

5   shares that you already have.

6        Q.   Okay.   On August 12th, you sold stock,

7   correct?

8        A.   On August 12?   Yes, a little part of the

9   shares.

10       Q.   Okay.   And that's not taking a long

11   position in the company, correct?

12            MR. JAFRI:   Objection.   Form.

13            THE WITNESS:   At that moment, we need to

14   sell some shares.

15   BY MR. GILMORE:

16       Q.   Okay.   That's the first day of the class

17   period, right?

18       A.   It's?

19       Q.   August 12th is the first day of the class

20   period, correct?

21       A.   August 12th is the first date.   Yes.

22       Q.   And on the first day of the class period,

Page 203

```
 1          MR. JAFRI:  Are you talking about the

 2    15th?

 3          MR. GILMORE:  No.

 4          THE WITNESS:  No.  The 12th?  With a

 5    transaction recorded on the 15th with one week

 6    more at 16, so at a price which is higher.

 7    BY MR. GILMORE:

 8       Q.  Uh-huh.  But you sold call options worth

 9    $100,000 on August 12th, correct?

10       A.  Yeah.  It was call which were covered by

11    our shares.  So we were accompanying the move.

12       Q.  That's a short position you took on

13    August 12th, correct?

14       A.  No.  Because --

15          MR. JAFRI:  Objection.  Form.

16          THE WITNESS:  No, it's not a net short.

17    It's -- you have the share, you keep your stock

18    going up, so you accompany the upside move, and

19    you generate revenue on the way.

20    BY MR. GILMORE:

21       Q.  You generate revenue by betting against

22    the company, correct?
```

Page 204

1          MR. JAFRI:  Objection.  Form.

2          THE WITNESS:  Why?

3  BY MR. GILMORE:

4     Q.  Because you're selling call options

5  and --

6     A.  If they --

7     Q.  -- those make money -- excuse me.

8          Those make money after the stock price

9  decreases, correct?

10         MR. JAFRI:  Objection.  Form.

11         THE WITNESS:  No --

12 BY MR. GILMORE:

13    Q.  -- or stays the same.

14    A.  If they are naked.  If they are naked.

15 Here, it's not naked position because we were the

16 underlying.

17         Okay.  Continue.  So 15.

18    Q.  You sold more call options that same day,

19 on August 12th, this one for $141,000 and --

20 141,292, correct?

21    A.  At a much higher price than the stock was

22 at that moment.  We benefited from the volatility.

Page 229

1      A.  Yes, also.

2      Q.  Also a purchase of 26,711 --

3      A.  Yes.

4      Q.  -- common shares.

5          And then, in the next two trades below

6  that, you sell the same amount that you purchased

7  that day, right?  116,711?

8      A.  It's not the same amount.  We have a net

9  plus of 85,000 shares.

10     Q.  Right.  But leave aside the 85,000.

11         Why was Bratya purchasing 116,711 shares

12 and selling that same amount on that same day?

13     A.  Because we had on that day possible

14 situation that we were not financed by the bank,

15 and they were calling us in a margin.  I have to

16 check what happened specifically, but I could not

17 keep this exposure on that day.

18     Q.  But I think you said that before, right?

19 That every time you sell shares, it's because you

20 needed cash, correct?

21         MR. JAFRI:  Objection to form.

22         THE WITNESS:  There is a reason when you

 1  say.  You've got to answer my question.  Do you

 2  understand?

 3      A.  This is what we do.

 4      Q.  This is what we do.  Well, it's not what

 5  you've been doing, but let's keep going.

 6          MR. JAFRI:  Objection to form.  This is

 7  just argumentative.

 8  BY MR. GILMORE:

 9      Q.  After you saw Ryan Cohen's tweet on

10  August 12th, you sold call options, correct?

11          MR. JAFRI:  Objection.  Form.

12          THE WITNESS:  I kept my shares.  I

13  accompany the long position that we had with sales

14  of call cover to accompany the growth of the stock

15  and increasing the prices of the goal that were

16  generating revenue.

17          MR. GILMORE:  I'm going to move to strike

18  that as nonresponsive.

19          MR. JAFRI:  Objection.  Form.

20  BY MR. GILMORE:

21      Q.  Sir, after you saw Ryan Cohen's tweet on

22  August 12th, you sold call options, correct?  It's

Page 238

1      a yes or no question.

2            A.   Sir, I explained you the situation.   We

3      had some shares.   We were generating revenue.   So

4      technically, we were selling call which were

5      covered by the position we had.

6            Q.   After you saw Ryan Cohen's tweet on

7      August 12th, you sold common shares of Bed Bath &

8      Beyond, correct?

9                 MR. JAFRI:   Objection.   Asked and

10     answered.

11                THE WITNESS:   It's not after we saw the

12     tweet.   I'm telling you I don't have the

13     chronology of what time it was, the tweet and the

14     shares.

15     BY MR. GILMORE:

16           Q.   Is it your testimony that three days

17     later, you hadn't seen the tweet?

18           A.   Three days later, I saw the tweet.   And

19     that's why we tried to buy shares.   And obviously,

20     it was not possible to keep them because we had to

21     sell them.

22           Q.   So you sold common shares after you saw

Page 244

1  BY MR. GILMORE:

2      Q.  I don't understand what you mean.

3      A.  The fact that he exited the position

4  technically never was accompanied by a comment for

5  which reason this move was made.

6      Q.  So are you testifying today, sir, that

7  you purchased call options and common shares in

8  late August because of Ryan Cohen's August 12th

9  tweet?

10     A.  We were still believing that he had the

11 project to save the company and send it higher.

12     Q.  Okay.  So all of Bratya's purchases of

13 common shares and call options during the class

14 period were because of the August 12th tweet,

15 correct?

16     A.  It was one of the key elements.

17     Q.  And all of Bratya's purchases of shares

18 and call options after the class period were

19 because of Ryan Cohen's August 12 tweet?

20     A.  Because there was this communication,

21 which was making the fact that he wanted to turn

22 around this company.

Page 245

1      Q.   You really believed in Ryan Cohen, didn't

2   you?

3      A.   Yeah.

4      Q.   True believer?  You're a true believer in

5   Ryan Cohen?

6      A.   That he had an industrial project for

7   this company.

8      Q.   Even after he exited his position, you

9   continued to be a true believer in Ryan Cohen?

10     A.   Yes.

11     Q.   That's your sworn testimony today, sir?

12     A.   Yeah.

13     Q.   Okay.

14         MR. GILMORE:  I'm going to mark as

15   Exhibit 125 a document Bates stamped BRATYA_6 --

16   000605.

17             (Coti Deposition Exhibit 125 marked for

18             identification and attached to the

19             transcript.)

20   BY MR. GILMORE:

21     Q.   And I want to focus you -- again, this is

22   a -- the front is an English translation of a

Page 250

1   the class period that had nothing to do with the

2   fundamental performance of Bed Bath & Beyond,

3   correct?

4           MR. JAFRI:  Objection.  Form.

5           THE WITNESS:  With the fundamental

6   performance.  But with the communication which was

7   done, yes.  And with some assumptions of the

8   communications which were repeated.

9   BY MR. GILMORE:

10      Q.   But I want to ask my question again.

11          The stock price movement of Bed Bath &

12  Beyond during the class period had nothing to do

13  with the company's financial performance, correct?

14          MR. JAFRI:  Objection.  Form.

15          THE WITNESS:  The financial performance

16  was the same from a day before or a day after.

17  But the assumption that there is a transaction or

18  something due to the fact that there was this

19  tweet with the moon and the fact that there were

20  some clients was meaning for someone with insider

21  means of communication to say that there is

22  something which is improving and that the

Page 251

1   performance was on the path to improve.

2   BY MR. GILMORE:

3        Q.   Have you heard of a strategy called

4   momentum trading?

5        A.   Moment --

6        Q.   Have you heard of a strategy called

7   momentum trading?

8        A.   No.

9        Q.   You've never heard that phrase before?

10       A.   I heard what is the momentum, what to

11  trade when there is an opportunity.  But if it's a

12  name to designate a strategy of momentum trading,

13  this I don't know.

14       Q.   What do you mean when you say to trade

15  when there is an opportunity?

16       A.   If there is a news which is released, if

17  there is something which is -- or an event,

18  geopolitical event, it can be to catch a momentum,

19  to catch an opportunity at that moment.

20            That's why we have to be careful because

21  maybe there is some anglaise in some sentences, in

22  some -- so if there is a line, a sentence, where

Page 309

1   fact that there was a ground for something

2   interesting, as there were other good investors,

3   as there were a price at some moments which were

4   interesting and also a volatility in the stock.

5           MR. GILMORE:  Okay.

6           (Coti Deposition Exhibit 130 marked for

7           identification and attached to the

8           transcript.)

9   BY MR. GILMORE:

10      Q.  I'm handing you Exhibit 130,

11   BRATYA_000663.  Right at the top there your

12   brother writes, "But the fact is that, in the

13   increasing markets, Cohen's announcements are

14   dangerous and there are a lot of shorts, so as

15   soon as they get purchased and it crosses the

16   direct level, it's a squeeze."

17           What did you understand him to mean

18   there?

19      A.  What he says, that the good announcement

20   and the fact that the market, in general, was in a

21   position, could make some people buying more at

22   that prices that we consider to be overvalued.

Page 343

1          MR. JAFRI:  Objection.  Form.

2          THE WITNESS:  On the 16, we did not

3    bought shares.

4    BY MR. GILMORE:

5       Q.  When you saw this document on

6    August 16th, did you go out and purchase any Bed

7    Bath & Beyond long call options?

8          MR. JAFRI:  Objection.  Form.

9          THE WITNESS:  We could do it on the 17th.

10   17th.  Not on the 16th.

11   BY MR. GILMORE:

12      Q.  Okay.  This document didn't impact any of

13   Bratya's decisions to purchase or sell Bed Bath &

14   Beyond securities, did it?

15         MR. JAFRI:  Objection.  Form.

16         THE WITNESS:  Did in a way that he had a

17   consequent position in the company.

18   BY MR. GILMORE:

19      Q.  What do you mean by that?

20      A.  That he had this long position in the

21   company.  It was stated that Ryan Cohen has

22   11.8 percent of shares in the company.

Page 344

1      Q.   Okay.  But we discussed before, this

2   isn't new information, correct --

3           MR. JAFRI:  Objection.  Form.

4   BY MR. GILMORE:

5      Q.   -- at this time?

6      A.   Yeah.  It was positive news for the

7   company that he was keeping his shares and that

8   there was no transaction in the past 60 days, and

9   now since the filing of amendment number 1 to the

10   schedule 13.

11      Q.   Is it your testimony that you purchased

12   Bed Bath & Beyond common shares or long call

13   options because of this document?

14           MR. JAFRI:  Objection.  Form.

15           THE WITNESS:  On the 17, we could buy the

16   shares.

17   BY MR. GILMORE:

18      Q.   No, I understand that you bought shares

19   the day after.

20           I'm saying, did you buy the shares

21   because of this document?

22      A.   This document was also a element,

Page 345

1   fundamental element, like all the others, to have

2   the proof that Ryan Cohen was in the company with

3   a strong ground inside, with a strong shareholding

4   ground.

5        Q.   And that was important to you because

6   you're a believer in Ryan Cohen, correct?

7        A.   Exactly.

8        Q.   Okay.  Again, I'll represent to you that

9   this document wasn't produced to us.

10          Is that because it didn't relate to any

11   of Bratya's decisions --

12       A.   No, because --

13       Q.   Excuse me, let me finish the question.

14          Is that because it didn't relate to any

15   of Bratya's decisions to buy or sell Bed Bath &

16   Beyond securities?

17          MR. JAFRI:  Objection.  Form.

18          THE WITNESS:  This is a document which

19   can be downloaded from internet.

20   BY MR. GILMORE:

21       Q.   Yeah.  But you didn't download it and

22   produce it to us, did you?

Page 356

1    August 10th, "We need a squeeze on Beyond and

2    we're good," was that referring to Bed Bath &

3    Beyond?

4        A.  At 6:39?

5        Q.  Yes.

6        A.  Yes.  It means its upside.

7        Q.  Okay.  So he was referring to Bed Bath &

8    Beyond when he said, "We need a squeeze and we're

9    good"; is that correct?

10       A.  Obviously.

11       Q.  Okay.  And is that because Bratya was

12   hoping to profit from a short squeeze?

13       A.  Of the fact that it goes up.

14       Q.  Okay.  At the bottom of that page,

15   5:36 p.m. on the 12th of August, you sent a link.

16   The title was, "Bed Bath & Beyond stock has

17   rallied, but not enough to shake this bear."

18           And then you wrote, "Maybe buy a put if

19   there's equity offering and sell some calls."

20           Why would you buy a put and sell calls on

21   August 12th?

22       A.  It's a hedging strategy here.

Page 357

1      Q.   Okay.  But you thought on August 12th

2  that the stock price was going --

3      A.   Yeah.

4      Q.   -- to continue to go up?

5      A.   Because we had the shares.

6      Q.   But you bought more puts --

7      A.   You have to --

8      Q.   Excuse me.

9           You bought more puts and you sold more

10 calls on August 12th, correct?

11     A.   We made a covering strategy.

12     Q.   Okay.  A few lines down on August 15th,

13 2:43 p.m., here you write, "BBBY will be in a nice

14 position."

15          Your brother responds, "Yes, strong."

16          What are you referring to there?

17     A.   The upside.  So on the 15, it was

18 certainly -- (reading).

19          But that it's going to be a good fight,

20 that it will continue to go up.

21     Q.   And by a good fight, do you mean a short

22 squeeze?

1      A.   That there will be transformative

2   information that will make the stock up.

3      Q.   Information about a short squeeze?

4      A.   No.   Information that the company will go

5   up.

6      Q.   And --

7      A.   And of course, if there is a lot of

8   short, it can lead to a short squeeze.

9      Q.   Okay.   So the potential for a short

10  squeeze was what you were talking about here on

11  August 15th?

12     A.   That it can go up.   Yes.

13     Q.   Okay.   A little bit further down that

14  page, at 2:36 p.m. on August 16th, you sent your

15  brother a link to an article titled, "Bed Bath &

16  Beyond is a sell at B. Riley Financial due to

17  'unrealistic valuation.'"

18          And then you wrote, "It is true, but GME

19  and AMC that was the case... and this has boost."

20          What did you mean by boost?

21     A.   That it went up.

22     Q.   Boost --

```
                                          Page 360
 1   them, that it's an irrealistic [sic] valuation.
 2   What they have said, they are prone to give their
 3   opinion, but -- so because some analyst, what they
 4   say is true, their understanding of the situation
 5   is true, but it doesn't mean that there is not
 6   unlocked potential.
 7        Q.  Okay.  So when you say, "It is true,"
 8   it's your testimony that you don't agree that Bed
 9   Bath & Beyond is a sell?
10        A.  It is true what they said.
11        Q.  That investors should sell Bed Bath &
12   Beyond?
13        A.  No.  Some financial analysts can have
14   their view.  And what they were saying on the fact
15   that it was unrealistic from their eyes.
16        Q.  So when you said, "It is true," you just
17   meant it's true that they said that?
18        A.  The article was true, what they were
19   saying in the article.
20        Q.  Okay.  On August 17th, at the bottom of
21   this page, at 8:27, you write, "Maybe kaiff
22   purchase a put on BBBY."
```

Page 361

1          A.   Uh-huh.

2          Q.   Why did you think it would be a good idea

3     to purchase a put on BBBY on August 17th?

4          A.   Because if you have an attack from

5     analyst, you have to cover the position that you

6     bought.  You have to mitigate your risk.

7          Q.   So it's your testimony that, every time

8     you purchased a put and sold a call during the

9     class period, it was just a hedge risk?

10         A.   It?

11         Q.   It was just a hedge risk?

12         A.   At this moment, yes.  Because we were

13    still buying shares on the 17.

14         Q.   Right.  You say in the next line, "I can

15    actually see it getting knocked down right away by

16    20 or 30 points," correct?

17         A.   Uh-huh.

18         Q.   "And then it will rest a moment before

19    having another spike if an increase in shorts,"

20    correct?

21         A.   (No verbal response.)

22         Q.   Then your brother says, "But we're one

Page 383

1    Inc.'s common stock and long call options between

2    August 12th, 2022, and August 18th, 2022.

3         A.  Yes.

4         Q.  So purchasers of common shares,

5    purchasers of long call options, correct?

6         A.  Yes.

7         Q.  Okay.  The proposed class is made up

8    largely of retail investors, correct?

9              MR. JAFRI:  Objection.  Form.

10             THE WITNESS:  All the investors who

11   purchased during that time.

12   BY MR. GILMORE:

13        Q.  Including retail investors?

14        A.  Including retail investors.

15        Q.  Okay.  Are these the same retail

16   investors that you and your brother referred to as

17   mongols and ape mongols?

18             MR. JAFRI:  Objection.  Form.

19             THE WITNESS:  All the investors.

20   BY MR. GILMORE:

21        Q.  Including the investors that you referred

22   to as mongols and ape mongols?

Page 384

1           MR. JAFRI:  Objection.

2           THE WITNESS:  All the investors who are

3   considered to be in this.

4   BY MR. GILMORE:

5       Q.  Why do you feel qualified to represent a

6   class of people that you refer to as mongols?

7           MR. JAFRI:  Objection.  Form.

8           THE WITNESS:  I already explain you that

9   there was a misunderstanding on the meaning of the

10  wording, and we already discussed this topic.

11  BY MR. GILMORE:

12      Q.  But it wasn't a translation issue, right?

13  You used the word "mongols" in French, right?

14      A.  In the frenzy that it was, we used the --

15  a term at one moment for a certain thing.

16      Q.  The certain thing being GameStop

17  investors, correct?

18          MR. JAFRI:  Objection.  Form.

19          THE WITNESS:  No.

20  BY MR. GILMORE:

21      Q.  What was the certain thing?  You said, We

22  used the term at one moment for a certain thing.

Page 385

1           And I said, What was the certain thing?

2      A.   For people who were buying, obviously,

3  some stuff at values which were completely

4  decorrelated to reality.

5           I never used that wording, first of all.

6  BY MR. GILMORE:

7      Q.   I thought you testified earlier that you

8  used the word "mongols" to refer to everyone that

9  was defrauded by Ryan Cohen.  Wasn't that your

10  testimony?

11           MR. JAFRI:  Objection.  Form.

12           THE WITNESS:  No.

13  BY MR. GILMORE:

14      Q.   Okay.  The record states what it states.

15           Are you aware that the complaint that

16  Bratya filed in January of 2023 sought to

17  represent a larger class than the class it defined

18  in the motion that we're looking at now?

19      A.   Can you repeat, please, the phrase?

20      Q.   Sure.

21           Are you aware that the complaint that

22  Bratya filed in January 2023 sought to represent a

1   fairly significant information, isn't it, sir?

2            MR. JAFRI:  Objection.  Form.

3            THE WITNESS:  Why?

4   BY MR. GILMORE:

5       Q.  Why?  Your motivation for purchasing and

6   selling Bed Bath & Beyond securities during the

7   class period is central to this case.

8            Do you understand that?

9            MR. JAFRI:  Objection.  Form.

10           THE WITNESS:  What I explained, sir, and

11  told it, that if the company makes a turnaround

12  and is moving forward, of course, as a result, it

13  will be a short squeeze and it will go up.  We can

14  call it short squeeze or stock going up.  But it's

15  a result of making a good turnaround strategy.

16  BY MR. GILMORE:

17      Q.  Why did you not identify that motivation

18  for purchasing and selling Bed Bath & Beyond

19  securities during the class period in your

20  interrogatory responses?

21           MR. JAFRI:  Objection.  Form.

22           THE WITNESS:  Which element?

Page 402

1    BY MR. GILMORE:

2        Q.   The short squeeze motivation that we

3    discussed earlier in your testimony and that we

4    just talked about now.

5            Why was that not disclosed in your

6    interrogatory responses?

7            MR. JAFRI:   Objection.   Form.

8            THE WITNESS:   The short squeeze is a

9    result of something which is driven properly.

10   That's what I explained at many times today.

11   BY MR. GILMORE:

12       Q.   Okay.   After everything we've discussed

13   today, is it your sworn testimony that there are

14   no other reasons for any of your BBBY securities

15   transactions than a belief in defendants'

16   turnaround strategy?

17       A.   Another reason than the defendant

18   turnaround strategy?

19       Q.   Yes.

20       A.   So that the motivation was the turnaround

21   of the -- it's completely part of the strategy of

22   Ryan Cohen.

Page 403

1       Q.   I'll ask my question --

2       A.   Once again.

3       Q.   I'll ask my question again, sir.

4       A.   Rephrase it, please.

5       Q.   Yeah.

6            Sitting here now, at the end of a

7    deposition, is it your sworn testimony that you

8    had no other reasons for your Bed Bath & Beyond

9    securities transactions during the class period

10   other than a belief in defendants' turnaround

11   strategy?

12           MR. JAFRI:  Objection.  Asked and

13   answered.

14           THE WITNESS:  The turnaround strategy of

15   the defendants is completely around what we said.

16   The turnaround is recapitalizing the company.

17   It's also, as a result, having a short squeeze,

18   which allows to raise some money at some point to

19   diminish the level of indebtedment.

20           So it's the strategy of Mr. Cohen.

21   BY MR. GILMORE:

22      Q.   The turnaround strategy that was

Page 404

1  announced on March 7th of 2022 is the only reason

2  that you bought and sold Bed Bath & Beyond

3  securities during the class period?

4          MR. JAFRI:  Objection.  Asked and

5  answered.

6          THE WITNESS:  It was one of the elements.

7  BY MR. GILMORE:

8      Q.  And what were the other elements?

9          MR. JAFRI:  Objection.  Form.

10          THE WITNESS:  The fact that the company

11  was obviously on a good track when he posted that

12  someone had a full chart and that this person had

13  complete access to the board of directors and that

14  the things are -- were going better.

15  BY MR. GILMORE:

16      Q.  You took all that from a moon emoji?

17      A.  It's full part of the strategy of

18  communication.

19      Q.  Okay.

20          MR. GILMORE:  I have no further

21  questions.  Thanks.

22          MR. JAFRI:  Okay.  Unless you want to

Page 407

1   you know, the one about buybuy BABY.  Can you

2   read --

3          A.  "I think they will sell buybuy BABY and

4   on the announcement he will get out."

5          Q.  Who is "he"?

6          A.  Mr. Cohen.

7          Q.  Right.  And this statement you made after

8   the discussion about him selling his shares,

9   right --

10          MR. GILMORE:  Objection to form.

11   BY MR. JAFRI:

12          Q.  -- on August 17th?

13          A.  Yes.

14          Q.  Okay.  Now, you know, there was a lot of

15   discussion about how you remained a true believer

16   in Mr. Cohen, as Mr. Gilmore put it, right?

17          A.  Yes.

18          Q.  So on this day, on August 17th, did you

19   believe that Mr. Cohen had sold his shares?

20          MR. GILMORE:  Objection to form.

21          THE WITNESS:  Yes.

22          (Discussion off the record.)

Page 408

1    BY MR. JAFRI:

2         Q.  On August 17th, did you believe that

3    Mr. Cohen had sold his shares?

4              MR. GILMORE:  Objection to form.

5              THE WITNESS:  Yes.

6    BY MR. JAFRI:

7         Q.  Why is that?

8         A.  Because we were thinking, in the

9    turnaround process, going in time, and that he

10   would make a sale of the company in part or in

11   whole.

12        Q.  Okay.  And did you continue to have that

13   belief once he -- once you realized that he may

14   have sold the shares?

15             MR. GILMORE:  Objection to form.

16             THE WITNESS:  Yes.

17   BY MR. JAFRI:

18        Q.  Why?

19        A.  For some time.

20        Q.  Why?

21        A.  Because, technically, maybe there was

22   something which made him having to sell the shares

Page 409

1   to make a transaction.

2        Q.  And did any -- did -- at some point, did

3   you realize that that was not going to happen?

4        A.  In the end of August, beginning of

5   September, when it was the presentation -- end of

6   August -- of the management and -- they made a

7   presentation on the company.

8        Q.  Okay.  And when you realized that, you

9   know, he was not going to do anything about

10  buybuy BABY or about Bed Bath & Beyond itself at

11  that point, how did you feel?

12       A.  We felt that we were stabbed in the back.

13       Q.  Okay.  Great.  All right.

14           Now, actually, I have another question

15  about this document.  If you look at page 751 on

16  line -- sorry -- at 7:41, can you read that?  This

17  is something that you said.  Can you please read

18  that for the record?  7:41, where it says, "Ask

19  Barbelaii" -- I believe that's the correct quote.

20       A.  "Ask Barbelaii what he thinks about

21  it" --

22       Q.  Yeah.

1      A.  -- "at 84 that's more than 30" --

2      Q.  Okay.  So when --

3      A.  -- "bars."

4      Q.  When you said "he," is that the friend

5  that you were talking about --

6      A.  Yes.

7      Q.  -- when you --

8      A.  Barbelaii.

9      Q.  -- and your brother were talking --

10      A.  Yes.

11      Q.  -- about barbarians?  Okay.  All right.

12          Now, also, there was a lot of discussion

13  about mongol hordes, right?  Can you tell us

14  whether you were sure about the discussion?

15  Because you said several things.  At one point you

16  said, I believe, you thought you were talking

17  about Asians; isn't that right?

18          MR. GILMORE:  Objection to form.

19          THE WITNESS:  No.  At some point I made

20  the confusion, speculation --

21  BY MR. JAFRI:

22      Q.  So you were con- --

Page 411

1      A.   -- because I don't recall -- yes.

2   Exactly.

3      Q.   So you were confused?

4      A.   Yes.

5      Q.   And you don't really remember what

6   Edouard meant by --

7      A.   Yes --

8           MR. GILMORE:   Objection to form.

9           THE WITNESS:   -- what he was meaning.

10          THE REPORTER:   Sorry.   Could you just

11   wait till he's finished because I can't take you

12   talking at the same time.

13          MR. JAFRI:   Did you get my question or

14   would you like me to repeat it?

15          THE REPORTER:   Maybe.

16   BY MR. JAFRI:

17      Q.   So I guess my -- I'm going to repeat my

18   question, and just wait until I finish.   Okay?

19          When you had -- when you made some

20   statements about the Mongolian hordes, is it your

21   testimony that you were confused?

22      A.   I was.

Page 412

```
 1          MR. GILMORE:  Objection to form.
 2   BY MR. JAFRI:
 3      Q.  Do you know what Mr. Edouard Coti meant
 4   when he made that comment --
 5          MR. GILMORE:  Objection to form.
 6   BY MR. JAFRI:
 7      Q.  -- about the Mongolian hordes?
 8      A.  I made some assumptions, but maybe it was
 9   in the frenzy, some people doing at that moment
10   some stupid sayings.
11      Q.  When you mean [sic] frenzy, you mean
12   stock frenzy?
13          MR. GILMORE:  Objection to form.
14          THE WITNESS:  Yes.
15   BY MR. JAFRI:
16      Q.  Okay.  Now, at this -- at another point
17   Mr. Gilmore had discussed certain tweets that, you
18   know, were on a piece of paper that he -- we had
19   given to the defense counsel, right?
20      A.  Yes.
21      Q.  And what was the reason why we had done
22   those over?  Where did you find those?
```

Exhibit 36

Page 48

1          Q.    You've referred to retail investors as

2          ape mongols, correct?

3          A.    As?

4          Q.    Ape mongols.

5          A.    Are you using "mongol" in the French

6          term?  Yes?

7          Q.    Yes.

8          A.    Okay.  In fact, I didn't invented [sic]

9          anything here.  I just took the terms that retail

10         investors and use -- are using in Reddit to call

11         themselves.  So I took their nickname that they

12         are using and just translate in French as mongol

13         is an idiot, so nothing more.

14         Q.    Okay.  So if I go on Reddit, I will find

15         retail investors referring to themselves as ape

16         mongols?

17         A.    Because, as I said, mongol is the French

18         term.  But in English, if I remember, they used

19         the regards -- retards, some other words, I

20         think.  I don't remember well, but -- so I just

21         used the French term, as I am French.

22         Q.    Okay.

Page 49

1          A.   Didn't inventing -- invented anything

2     here.

3          Q.   Okay.   When you used the term mongols to

4     refer to retail investors, you were doing so in

5     an insulting way, correct?

6               MR. BRONSTEIN:   Objection.

7               THE WITNESS:   Not at all.

8               As I said, I'm just using the terms.

9     They are defining themselves.   So I didn't

10    express anything from my side.

11    BY MR. GILMORE:

12         Q.   A moment ago I think you mentioned the

13    term "retard."   Have you ever referred to retail

14    investors at "retards"?

15              MR. BRONSTEIN:   Objection.

16              THE WITNESS:   I said that is the term

17    that retail investors are -- are using for

18    themselves.   I can't remember if I used this

19    word.   But I say no, because I -- well, I don't

20    think so.

21    BY MR. GILMORE:

22         Q.   It's your testimony you've never called

Page 50

```
 1          a retail investor a retard?

 2              A.   I don't remember so.

 3              Q.   You might have done so?

 4              MR. BRONSTEIN:  Objection.  That's not

 5          what he said.

 6              THE WITNESS:  If I used this word, I

 7          used it as -- to -- in fact to qualify as they

 8          are qualifying themselves.

 9              So if someone tells that he is a boxer,

10          I would use the -- the term of boxer if this guy

11          is a boxer, and say that he is a boxer.  I won't

12          use that he's a swimmer or a tennis player.

13              So I saw on Reddit that they are using

14          this word to -- qualifying themselves, so I took

15          this term from Reddit for -- from retail

16          investors themselves to -- to use it.

17              I didn't invented anything, as I said.

18          BY MR. GILMORE:

19              Q.   And when you used the term "retard" to

20          refer to retail investors, were you doing so in a

21          complimentary way?

22              A.   Sorry.  Maybe we should translate.
```