# Exhibit 13 (amended)

1           You had no contractual -- at this point --
2      maybe later I would suggest improper, but now I'm
3      talking proper.
4           Did you have any agreement with Cohen that
5      resulted in you receiving compensation regarding
6      Bed Bath & Beyond?
7           MR. GILMORE:  Objection to form.
8           MR. CAREY:  Objection to form.
9        A  There were no compensation agreements.
10     BY MR. BRONSTEIN:
11       Q  Okay.  Once you joined the board, can you
12     tell me about the conversations you had with him
13     between that time and the -- and the time he sold
14     his shares in August -- he did -- you know, we
15     would say decided to sell his shares maybe in
16     April, May, June, but before he sold his shares
17     actually in August, tell me about any
18     conversations you had with him.
19        A  I recall them being fairly high level and
20     nonsubstantive in terms of the finances of the
21     business or any data that I learned.  It was much
22     more related to the interpersonal workings of the
23     board.
24           It was a very large board.  And he wanted
25     to know what my opinions of the other board

1  members were.  If he thought I would be able to
2  work well with them.  If they were receptive to
3  new ideas.  If there was a good group dynamic,
4  things like that.
5      Q  Did you discuss with him after you got on
6  the board the fate of buybuy BABY?
7      A  I did not.
8      Q  So your testimony is you had no
9  substantive conversations with him about the
10 business of -- other than what you mentioned?  You
11 spoke to him about nothing else relating to Bed
12 Bath & Beyond?
13         MR. GILMORE:  Objection to form.
14     A  Correct.
15 BY MR. BRONSTEIN:
16     Q  If you had decided to share with him
17 information about the consideration of options for
18 buybuy BABY, if you had decided to share that with
19 him while you were a director, and assuming it's
20 confidential information, would you have been
21 permitted to do so?
22         MR. GILMORE:  Objection to form.
23     A  No.
24         MR. BRONSTEIN:  You keep objecting, but he
25 seems to understand my questions.

1            MR. CAREY:  No.
2            THE VIDEOGRAPHER:  Off the record at
3       11:18.
4            (A brief recess was held from 11:18 a.m.
5       to 11:33 a.m.)
6            THE VIDEOGRAPHER:  Back on the record at
7       11:33.
8       BY MR. BRONSTEIN:
9       Q   Mr. Rosenzweig, you said that you had
10      conversations with Mr. Cohen during your tenure --
11      tenure as a director about board composition and
12      other directors; is that correct?
13      A   Correct.
14      Q   Can you -- do you remember which directors
15      you were talking about?  What in particular you
16      discussed?  Can you give me more detail in those
17      calls?
18      A   Well, I had been on the board for only a
19      matter of weeks, so I think it was a very
20      high-level observation about most of the other
21      directors, whether they seemed, you know,
22      friendly, whether they seemed open to new
23      perspectives, whether we would be able to get
24      along and there are collegial, things like that.
25      Q   Was the underlying question whether the

1    you.
2         What -- what are you saying here?  What
3    are you referring to?
4         A   I believe at that time frame, I had asked
5    Harriet and Mark Tritton, who was the CEO at the
6    time, whether they would be willing to have a
7    confidential discussion with Ryan Cohen.
8         Q   To discuss what?
9         A   Discuss the state of the business, solicit
10   his feedback, basically broaden and deepen the
11   relationship with him.
12        Q   How would they be able to do that and
13   disclose to him material nonpublic information?
14        A   I was suggesting that they do it under the
15   auspices of a confidentiality agreement.
16        Q   So it was your understanding that would
17   stop Mr. Cohen from trading -- he would not be
18   allowed to trade while those -- while that
19   information was nonpublic?
20        A   That would be my understanding, yes.
21        Q   Why did you want to do this?
22        A   I thought it would be beneficial for the
23   management and the board of the company to be able
24   to have an open dialogue -- dialogue with the
25   company's largest shareholder, who had also made a

1   very public and significant investment in the
2   company, to solicit his feedback as to what his
3   suggestions were that he would like to see the
4   board and management do in light of the recent
5   results at the company.
6       Q   Did you feel it was the right thing to
7   push this agenda because Mr. Cohen had nominated
8   you to the board?
9       A   No.
10      Q   Did you think Mr. Cohen was a competent
11  business manager?
12      A   I would say that I personally did not have
13  enough experience with him to be able to form my
14  own opinion.  By reputation, he seemed to have a
15  reputation as a competent and well-known business
16  manager.
17      Q   Right.  That's what I'm trying to
18  understand here is, you didn't really know him,
19  correct?
20      A   That is correct.
21      Q   And you had never done business with him?
22      A   That is correct.
23      Q   You knew that he had -- I assume, about
24  Chewy and GameStop and Bed Bath & Beyond, correct?
25      A   Correct.

1     below?

2          A   Yes.

3          Q   She's talking about bringing Ryan under

4     the tent, correct?

5          A   I believe that's correct.

6          Q   And then she says your variation is even

7     better.  I'm paraphrasing.

8              What did she mean your idea is a variation

9     that is better?

10         A   I don't remember exactly, but I think it

11    was rather than just giving him information,

12    working with him to get his feedback and reaction

13    to that information.

14         Q   What does that mean, "no capital needed"?

15         A   I really don't know.

16         Q   Just his perceived blessing.

17             Could it mean that the affiliation with

18    Cohen would bring up the price of the stock

19    without the need for capital investment by the

20    company?

21         A   Yes.

22         Q   So one of the reasons you wanted to

23    affiliate Cohen more directly with the company is

24    the investor perception and the effect it could

25    have on the price of the stock?

1     A   Correct.
2     Q   I'm going to ask a question on Page 9.
3  I'm going to try to find the text.
4         Can you look at the text in the middle of
5  the page from Marjorie Bowen at -- on June 25th at
6  7:04 a.m.?
7     A   Yes.
8     Q   It says -- she writes:  He should be told
9  early, and he can figure out what to do.
10        Do you know what she's referring to, being
11  told early?
12    A   Again, I think it's in regard to the
13  management changes at the company.
14    Q   When you say that, you mean the
15  termination of Mr. Tritton?
16    A   Yes.
17    Q   So she wanted to let Mr. Cohen know before
18  it was announced?
19    A   Yes.
20    Q   And hopefully make a positive statement to
21  the press, which would protect the price of the
22  stock?
23    A   Potentially.
24    Q   Were you -- did you agree that was a good
25  approach?

```
 1            answered," you mean -- just -- just now I was
 2            talking about the August 5th, not talking
 3            about the August 12th.
 4                MR. GILMORE:  We talked about this several
 5            hours ago, Peretz.  You asked him the exact
 6            same question.
 7                MR. BRONSTEIN:  Okay.  We are going to
 8            talk about it now.
 9                So you -- read back the answer of the
10            witness, please.
11                (Whereupon, the record was read back by
12            the court reporter.)
13        BY MR. BRONSTEIN:
14            Q    Do you recall what Mr. Cohen meant?
15            A    That the cart was half full.
16            Q    And the emoji --
17            A    Yeah, I guess the moon emoji is a good
18        thing for stock.
19            Q    Do you know when you first saw the emoji?
20            A    I do not.
21            Q    Do you think it was -- assuming -- let's
22        just take August 16th of the date of how much --
23        all will agree he sold the stock.
24                Do you think you saw the emoji before that
25        date, meaning -- this was on the 12th of August
```

1    '22, four days later.
2         Had you seen it yet, or you don't know?
3    A   I don't know.
4    Q   Did you -- you're aware that Mr. Cohen
5    sold out his Bed Bath & Beyond stock no later
6    than -- beginning on the -- four days after this
7    Tweeter was posted.
8         Are you aware of that?
9    A   Yes.
10   Q   Do you think that the emoji, yeah, would
11   suggest that he's positive on the stock, and he
12   intends to hold --
13        MR. GILMORE:  Objection to form.
14        (Simultaneous unreportable crosstalk.)
15   BY MR. BRONSTEIN:
16   Q   -- and that others should buy?
17   A   I'm not well versed necessarily in the
18   meanings of emojis.
19   Q   So you had no -- you have no reaction to
20   that?  I mean, I'm not asking for legal advice.
21   It's not privileged.  You have a reaction; you
22   legally have to share it with me.
23        Do you think that meant that he's -- do
24   you think that was consistent with selling four
25   days -- if he had already intended to sell, do you

1  think that emoji is consistent with his sale four
2  days later?
3       MR. GILMORE:  Objection to form.
4    A  Probably not.
5  BY MR. BRONSTEIN:
6    Q  Do you know what FTI is?
7    A  I do.
8    Q  I guess we talked about it before.
9       Do you think FTI had the expertise to
10 speak to the meme crowd?
11   A  I'm not sure.
12   Q  It's true that -- isn't it true that
13 Marjorie Bowen had expressed that sentiment, that
14 these were not the people to address the company's
15 relationship with the meme stock crowd?
16   A  Yes.
17   Q  And you concurred with that?
18   A  Yes.
19   Q  And I may have asked you this, but we are
20 really getting to the end here, so just cut me
21 some slack.
22      You don't know what percentage of the
23 shareholders of Bed Bath & Beyond were -- what I
24 think we all understand are meme stocks -- meme
25 purchasers?

```
1            A    No.
2            Q    Okay.  Do you consider yourself fluent in
3       emojis?
4            A    No.
5            Q    Do you consider yourself an expert in what
6       emojis mean?
7            A    No.
8            Q    Do you have any knowledge about what
9       Mr. Cohen actually meant with his August 12th
10      tweet?
11           A    No.
12           Q    And the testimony you provided earlier,
13      what was your basis for providing that -- that
14      testimony?
15           A    Just what I had read through third-party
16      analysis or reactions to his tweet.
17           Q    So you were testifying to what other
18      people had -- had construed his texts to --
19                MR. BRONSTEIN:  Objection, leading.
20                (Simultaneous unreportable crosstalk.)
21                THE STENOGRAPHER:  One at a time.
22           A    Correct.
23      BY MR. GILMORE:
24           Q    And beyond the -- what you just testified
25      that -- the reactions that other people had to the
```

1      tweet, did you yourself have any reaction to what
2      the tweet meant?
3           A   No.
4           Q   Did you ever provide Mr. Cohen material
5      nonpublic information about Bed Bath's financial
6      performance?
7           A   No.
8           Q   Did you ever provide Mr. Cohen material
9      nonpublic information about Bed Bath's efforts to
10     raise capital?
11          A   No.
12          Q   Did you ever provide Mr. Cohen with
13     material nonpublic information about a potential
14     sale of buybuy BABY?
15          A   No.
16          Q   Did you ever provide Mr. Cohen material
17     nonpublic information about a potential spinoff of
18     buybuy BABY?
19          A   No.
20          Q   Did you ever provide Mr. Cohen material
21     nonpublic information about the termination of
22     Mark Tritton?
23          A   No.
24          Q   Did you ever provide Mr. Cohen any
25     material nonpublic information whatsoever about

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078