1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2

3      * * * * * * * * * * * * * * * *    )
                                          )    Civil Action
4      IN RE:  BED BATH & BEYOND          )    No. 22-02541
       CORPORATION SECURITIES            )
5      LITIGATION                         )    Washington, D.C.
                                          )    August 2, 2024
6      * * * * * * * * * * * * * * * *    )    10:34 a.m.

7

8

9                   TRANSCRIPT OF EVIDENTIARY HEARING
            BEFORE THE HONORABLE TREVOR N. McFADDEN
10                 UNITED STATES DISTRICT JUDGE

11

       APPEARANCES:
12

13     FOR THE PLAINTIFF:       OMAR JAFRI, ESQ.
                                 JOSHUA B. SILVERMAN, ESQ.
14                               GENC ARIFI, ESQ.
                                 POMERANTZ, LLP
15                               10 South LaSalle Street
                                 Chicago, Illinois 60603
16
                                 JAN MESSERSCHMIDT, ESQ.
17                               COHEN, MILSTEIN, SELLERS & TOLL
                                 1100 New York Avenue, Northwest
18                               Fifth Floor
                                 Washington, D.C. 20005
19

20     FOR THE DEFENDANTS:      DANE H. BUTSWINKAS, ESQ.
                                 STEVEN M. FARINA, ESQ.
21                               BRIAN T. GILMORE, ESQ.
                                 MADELINE PREBIL, ESQ.
22                               JENNA ROMANOWSKI, ESQ.
                                 WILLIAMS & CONNOLLY, LLP
23                               680 Maine Avenue, Southwest
                                 Washington, D.C. 20024

24

25

```
 1    REPORTED BY:            LISA EDWARDS, RDR, CRR
                              Official Court Reporter
 2                            United States District Court for the
                                District of Columbia
 3                            333 Constitution Avenue, Northwest
                              Room 6706
 4                            Washington, D.C. 20001
                              (202) 354-3269
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2

3
       Opening Statement by Mr. Jafri                    Page 7
4
       Closing Argument by Mr. Jafri                     Page 195
5
       Closing Argument by Mr. Farina                    Page 204
6
       Rebuttal Closing Argument by Mr. Jafri            Page 217
7

8

9                              Direct    Cross     Redirect

10
       WITNESSES FOR THE PLAINTIFF:
11
       Matthew Cain, Ph.D.            15      63
12
       David Coti                    151     164       190
13

14     WITNESSES FOR THE DEFENSE:

15     Daniel Fischel                 81     119

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURTROOM DEPUTY:  Your Honor, this is Civil
 2     Action 22-2541, Pengcheng Si versus Bed Bath & Beyond
 3     Corporation, et al.
 4              Counsel, please come forward to identify
 5     yourselves for the record, starting with Plaintiff.
 6              MR. JAFRI:  Good morning.  Omar Jafri for
 7     Plaintiff, Bratya.  And we also have Mr. Coti here as the
 8     representative of Bratya.
 9              THE COURT:  Good morning, gentlemen.
10              MR. SILVERMAN:  Good morning, your Honor.  Joshua
11     Silverman for Plaintiffs.
12              THE COURT:  Good morning, Mr. Silverman.
13              MR. SOLOVEICHIK:  Good morning, your Honor.
14     Yitzchak Soloveichik for the Plaintiff.
15              THE COURT:  Good morning, sir.
16              MR. ARIFI:  Good morning, your Honor.  Genc Arifi
17     on behalf of the Plaintiff.
18              THE COURT:  Good morning.
19              MR. MESSERSCHMIDT:  Good morning, your Honor.  Jan
20     Messerschmidt, liaison counsel, for the Plaintiff.
21              THE COURT:  Good morning.
22              MR. BUTSWINKAS:  Good morning, your Honor.  Dan
23     Butswinkas on behalf of the Defendants.  I'm here with my
24     colleagues from Williams & Connolly.
25              THE COURT:  Good morning, sir.
```

```
 1              MR. FARINA:  Good morning, your Honor.  Steven
 2     Farina from Williams & Connolly.
 3              THE COURT:  Good morning, sir.
 4              MS. PREBIL:  Good morning, your Honor.  Madeline
 5     Prebil on behalf of the Defendant.
 6              THE COURT:  Good morning, ma'am.
 7              MR. GILMORE:  Good morning, your Honor.  Brian
 8     Gilmore on behalf of the Defendant.
 9              THE COURT:  Good morning, Mr. Gilmore.
10              MS. ROMANOWSKI:  Good morning, your Honor.  Jenna
11     Romanowski for the Defendant.
12              THE COURT:  Good morning, ma'am.
13              All right.  I have a criminal matter I want to
14     take up in a minute, but I just wanted to make sure we're
15     all on the same page about what we're accomplishing today.
16              Mr. Jafri, are you speaking for Plaintiffs?
17              MR. JAFRI:  Yes, your Honor.  That's right.
18              THE COURT:  What do you have on tap for me today?
19              MS. JAFRI:  So, your Honor, we're --
20              THE COURT:  Approach the podium, sir.
21              MS. JAFRI:  Your Honor, the Plaintiff is going to
22     present two witnesses, Mr. Codi and -- who's the
23     representative, the proposed representative, as well as
24     Dr. Matthew Cain, who is our expert on market efficiency.
25              We would propose, unless you disagree, that the
```

```
 1    experts go first so we can keep it topic by topic; and then

 2    we will present Mr. Codi to testify about the issues related

 3    to typicality and adequacy.

 4               THE COURT:  How long would you expect your directs

 5    of each of them to last?

 6               MS. JAFRI:  So I think for Mr. Codi, it should be

 7    between 30 and 40 minutes.  And the same for Dr. Cain, most

 8    likely.

 9               Your Honor, before you came, the parties discussed

10    it, and we think we probably need about three hours in total

11    for everything.

12               THE COURT:  Okay.  Thank you, Mr. Jafri.

13               MS. JAFRI:  Thank you.

14               THE COURT:  Who's speaking for defense?

15               MR. BUTSWINKAS:  Yes, your Honor.

16               We would cross the two witnesses.  We have an

17    expert, Dr. Fischel, and then we are hoping that the Court

18    will reserve some time for argument.

19               As he mentioned, we thought approximately three

20    hours would be about right, although my wife says I'm really

21    crummy at these predictions.

22               THE COURT:  Well, so I'm going to hold you to your

23    prediction on direct.  How long do you expect your direct to

24    be?

25               MR. BUTSWINKAS:  About an hour.
```

```
 1              THE COURT:  All right.  That all sounds about
 2      right to me.
 3              So I'll pass this case and we'll take up the
 4      criminal matter and be back with you all in a few minutes.
 5              MR. BUTSWINKAS:  Thank you, your Honor.
 6              (Thereupon, the Court went on to hear other
 7      matters, after which the following proceedings were had:)
 8              THE COURT:  Mr. Jafri, do you want to make a very
 9      brief opening statement?  Or one of your colleagues?
10              MR. JAFRI:  Thank you, your Honor.
11              I think that you have all the papers in front of
12      you.  You've seen all the reports.  I'll be brief.
13              I think the key issue over here is that there is
14      no legal case that says that if there's a short squeeze the
15      market isn't efficient.  It just -- it doesn't exist.  To
16      the extent that you even credit any of their arguments, it
17      only goes towards the third Cammer factor, which is market
18      makers.  And the only way -- and short selling is not the
19      only way that you can have market makers.  You can have
20      them, for instance, if there's a large number of
21      institutional investors.
22              And so to the extent that -- even if you credit
23      their arguments, they have not contested that the other
24      Cammer -- most of the other Cammer factors have been met, or
25      that the Krogman factors have been met.  And those are
```

1    uncontested.  Professor Fischel does not contest them.  He,

2    in fact, testified that he hasn't even analyzed them.

3              And then the question becomes -- all we have to do

4    is show a rebuttable presumption of reliance.  And we did

5    that with the factors.

6              The burden then shifts to Mr. Cohen.  And he had

7    the burden to show that there was no price impact whatsoever

8    for each misrepresentation and each corrective disclosure.

9              Mr. Cohen and his expert chose to only discuss one

10   statement, which was the tweet.  And they said that they

11   didn't find any price inflation.

12             But the law is clear that even if you assume that

13   there is no uptick in inflation, if there is a corrective

14   disclosure, meaning the stock price drops, and the Defendant

15   doesn't challenge it, then the Defendant has lost the price

16   impact argument.

17             That's what I would say even if you assume that

18   any of what they say is true.

19             However, your Honor, as you will hear from this

20   testimony, there is, in fact, no evidence that to the extent

21   there was a squeeze, that it impacted any efficiency or that

22   it has any core relationship whatsoever with any of the

23   prices of the associated -- the stock prices and the

24   associated misrepresentations for the stock prices.

25             THE COURT:  Are you disagreeing that there was a

Opening Statement by Mr. Jafri

1    short squeeze?

2              MR. JAFRI:  No, your Honor.  I'm not -- we're

3    not -- we're not specifically disagreeing that there was

4    one.  We are just saying it's sort of irrelevant even if it

5    was.

6              THE COURT:  Understood.

7              MR. JAFRI:  And I think our point here, which may

8    have been missed on the other side, is that Professor

9    Fischel did not show that there was a short squeeze.  And

10   his entire thesis is that the short squeeze renders the

11   market inefficient, but he constantly calls it a rumored

12   short squeeze.

13             And other than taking a look at some articles and

14   Bloomberg opinion pieces -- and then he looked at the short

15   interest utilization rate, and we believe that his analysis

16   of that is completely incorrect.  In fact, just to give you

17   a preview, we're going to establish at this hearing that the

18   short interest utilization rate has no co-relationship with

19   the prices.

20             And, finally, he mentioned price volatility, which

21   is prices going up and down.  But that can happen even if

22   there is no misrepresentation, for instance.  You know, you

23   can have volatility for all kinds of reasons.

24             And Professor Fischel admitted that just the fact

25   that you have implied options volatility by itself doesn't

1    render the market inefficient.

2            So given all of these concessions, and the fact

3    that the Defendants barely made any effort to show a lack of

4    price impact -- and to the extent they chose that one

5    statement, it's a very weak argument and they have not

6    carried their burden.

7            And for that reason, we not only have shown that

8    there's a rebuttable presumption of reliance, but we've also

9    shown that there is price impact.

10           And we did -- we went the extra mile and we did

11   extra work.  So we had no responsibility to show that there

12   was any price impact or statistical significance.  But we

13   did do that when Mr. Cohen's expert challenged whether there

14   was price impact.

15           In the reply report, Dr. Cain looked at all of

16   Mr. Cohen's misrepresentations and the corrective disclosure

17   on the 18th when he finally put out news that he had sold

18   everything.  And they're all statistically significant at

19   the 95 percent confidence level or higher.

20           He did that based on an estimation window, for

21   instance, which is used in the majority of event studies.

22   Professor Fischel has admitted that that is the standard way

23   of doing it, although he chose to do something else here.

24           So given that we went that extra mile, we've, in

25   fact, shown that there is price impact, even though we

Opening Statement by Mr. Jafri

1      didn't have any burden to do so.

2              That would be my summation of the market

3      efficiency argument.

4              On the typicality and adequacy issues, I'll start

5      with adequacy first because it's very easy.

6              Most of the time, to the extent that courts have

7      said that a Plaintiff is not adequate, it's usually in

8      flagrant cases, like really extreme cases where a plaintiff

9      comes and says, "I don't know; I've not read the complaint;

10     I don't know anything about these claims; the lawyers are

11     driving this litigation" or he says, "I don't care that

12     there was a fraud," for instance.  Right?

13             That's not the case.  Or if the plaintiff is not

14     involved in the litigation and the lawyers are just doing

15     it, if the plaintiff doesn't know what's been filed, has no

16     understanding, has not made any effort to participate in the

17     litigation.

18             That's not the case.

19             The argument isn't even that any of those things

20     exist.  So there's no basis to say that he's inadequate.

21             They came up with this new argument based on --

22             THE COURT:  And, Mr. Jafri, I'll give you a chance

23     to give closing arguments.  I'm really just looking for kind

24     of a brief overview of what your evidence is going to show

25     here.

```
 1                    MR. JAFRI:  Oh, sure.

 2                    So, your Honor, on the adequacy point, Mr. Coti is

 3          going to testify that he is involved in the litigation and

 4          that he has done everything that he needs to do to be an

 5          adequate Plaintiff.

 6                    On the typicality issue, you will hear from him

 7          that he was always net long on the stock, that he was never

 8          net short, and that he never took any positions with respect

 9          to either the common stock or the options, with the

10          intention or with the hope that the price of the company

11          stock would go down.  He never had that intention.  He was

12          doing this to -- on premiums or to hedge against a downside

13          risk, like an insurance policy.

14                    And that's very typical when people are trading in

15          a lot of stocks.  And Bratya is a trader that has

16          investments in all kinds of companies across its portfolio.

17          So that would be my argument on that.

18                    THE COURT:  Thank you, sir.

19                    MR. JAFRI:  Thank you, your Honor.

20                    THE COURT:  Can you remind me of your name, sir?

21          There were a lot of names.

22                    MR. BUTSWINKAS:  Yes, your Honor.  Dane Butswinkas

23          on behalf of the Defendants.

24                    THE COURT:  Got you.  All right.  Thank you.

25                    MR. BUTSWINKAS:  Your Honor, we believe you've
```

Opening Statement by Mr. Jafri

 1    identified three important questions that we have evidence

 2    on.  We'll reserve until we've heard from Dr. Cain and

 3    Professor Fischel as to our argument.

 4            I have one procedural question as to whether the

 5    Court has a protocol that I'm not aware of on witnesses,

 6    because obviously Mr. Coti can be here during testimony.

 7    He's a party.

 8            Mr. Fischel is in the courtroom now.  Do you have

 9    any rule as to whether he can be present?  He's obviously

10    responding to Dr. Cain, so we'd prefer to have him present,

11    but I didn't want to find out later that that would violate

12    court protocol.

13            THE COURT:  I'm inclined to think that experts

14    should be able to be in the courtroom and hear the other

15    testimony.

16            Do you have any objection to that, Mr. Jafri?

17            MR. JAFRI:  No, your Honor.

18            MR. BUTSWINKAS:  That's all we have right now,

19    your Honor.

20            THE COURT:  Thanks.

21            Mr. Jafri.

22            MR. JAFRI:  Your Honor, just one preliminary issue

23    is that we prepared all the exhibits in binders and they're

24    in tabs.  We brought four copies.  And I think it would be

25    more efficient if we just handed those and referred to them

1    in tab form rather than coming and going and seeking your

2    permission each time.

3                THE COURT:  Yes.

4                MR. JAFRI:  So that's the one preliminary thing

5    that I wanted you to be aware of.

6                The second thing is, we do have two slides that we

7    will show.  And one of my colleagues will show that, so that

8    will be on the screen.  And I just wanted you to know.

9                And then we will begin with Dr. Cain's direct; and

10   my colleague Mr. Silverman would do that.

11               THE COURT:  Okay.

12               MR. JAFRI:  Thank you.

13               THE COURT:  Mr. Silverman.

14               MR. SILVERMAN:  Good morning, your Honor.  We'd

15   call to the stand Dr. Matthew Cain.

16               Your Honor, we also do have a very short set of

17   slides for Dr. Cain's presentation.

18               THE COURT:  Sir, if you can remain standing for

19   just a moment.

20           MATTHEW CAIN, Ph.D., PLAINTIFF WITNESS, SWORN.

21               THE COURT:  Good morning, sir.

22               MR. SILVERMAN:  Good morning.  Your Honor, before

23   I begin my questioning, would it be helpful if I handed a

24   hard copy of the slides to your Honor or the court reporter?

25               THE COURT:  Sure.

```
 1                  MR. SILVERMAN:  (Distributes documents to the

 2       Court.)

 3                           DIRECT EXAMINATION

 4       BY MR. SILVERMAN:

 5       Q.  Good morning, Dr. Cain.  Could you state your full name

 6       for the record and spell your last name, please.

 7       A.  Matthew Cain, C-A-I-N.

 8       Q.  Dr. Cain, you have in front of you a binder.  Your

 9       opening report and your reply report are Exhibits 1 and 2 of

10       that binder, I understand.

11       A.  Yes.  That's correct.

12       Q.  And you've prepared some slides today.  Correct?

13       A.  Yes.

14                  MR. SILVERMAN:  Could we put up the first slide,

15       please.

16       BY MR. SILVERMAN:

17       Q.  Dr. Cain, could you summarize your education for the

18       Court, please?

19       A.  I've got an undergraduate degree in finance as well as a

20       Ph.D. in finance.

21       Q.  And from where did you receive your Ph.D.?

22       A.  From Purdue University.

23       Q.  Do you have any academic teaching experience?

24       A.  Yes, I do.

25       Q.  Could you summarize that, please?
```

1   A.  I've taught undergraduate and MBA-level courses at

2   Purdue University in corporate finance, financial markets

3   and institutions.  I've taught courses in mergers and

4   acquisitions at the undergraduate and MBA level at the

5   University of Notre Dame.  I've also taught courses on

6   economics of securities litigation at Berkeley Law School.

7   Q.  And have you done any work for any regulators?

8   A.  Yes, I have.

9   Q.  Could you briefly describe that work.

10  A.  I was a financial economist at the U.S. Securities and

11  Exchange Commission for about four and a half years.  I've

12  also provided consulting services to a variety of

13  regulators, including the SEC and other regulators.

14  Q.  Could you describe your responsibilities while working

15  at the SEC?

16  A.  While at the SEC as a financial economist, I worked in

17  the office of litigation economics with enforcement staff on

18  investigations, settlement negotiations, trial testimony.

19  And I also spent some of my time as an advisor to

20  Commissioner Rob Jackson.

21  Q.  And have you served as a testifying expert for the SEC?

22  A.  Yes.

23  Q.  About how many times?

24  A.  I think at trial -- probably around four or five times

25  at trial and some additional times on expert reports and

1    depositions or cases that were settled prior to public

2    disclosure.

3    Q.  And have you been published in any journals?

4    A.  Yes.

5    Q.  About how many times?

6    A.  Probably somewhere around ten to 15 times.

7    Q.  Could you name a few of the journals in which you've

8    been published?

9    A.  Sure.  *Journal of Financial Economics, Journal of*

10   *Financial and Quantitative Analysis, Journal of Law and*

11   *Economics, Journal of Empirical Legal Studies* and a variety

12   of law reviews and other journals.

13   Q.  Have you served as a referee for any journals?

14   A.  Yes, I have.

15   Q.  And what did that entail?

16   A.  That entails reviewing research articles that have been

17   submitted for publication, critiquing those articles,

18   providing feedback to the authors, and also recommendations

19   to the journal editors regarding whether an article should

20   be either accepted for publication, rejected, or sent back

21   to the authors for revisions and reconsideration.

22   Q.  You mentioned some of the classes you taught.  Have any

23   of those involved econometric analysis?

24   A.  Yes, they have.

25   Q.  And have any of the classes you taught involved

1    assessing market efficiency?

2    A.  Yes.

3    Q.  Have any of the classes you taught involved conducting

4    an event study?

5    A.  Yes.

6    Q.  What about short selling?

7    A.  Yes.

8    Q.  Have any of the classes you've taught involved assessing

9    whether a particular disclosure impacts the price of a

10   stock?

11   A.  Yes.

12   Q.  Have any of the classes you've taught involved stock

13   options?

14   A.  Yes.

15   Q.  Have you served as an expert on market efficiency before

16   in securities litigation?

17   A.  Yes, I have.

18   Q.  Approximately how many times have you done so?

19   A.  Probably somewhere in the ballpark of 25 times.

20   Q.  And have you testified in deposition or court about

21   market efficiency?

22   A.  Yes, I have.

23   Q.  About how many times?

24   A.  I'd estimate maybe 15 or 20 times.

25   Q.  Have any of your market efficiency opinions been

```
 1    excluded by a court?

 2    A.  No.

 3    Q.  Have they been accepted by courts?

 4    A.  Yes, they have.

 5    Q.  More than once?

 6    A.  I'm sorry?

 7    Q.  More than once?

 8    A.  Yes.  Multiple times.

 9    Q.  Okay.

10          MR. SILVERMAN:  Your Honor, at this time, I would

11    move to allow Dr. Cain to testify as an expert in the areas

12    of market efficiency and econometrics.

13          THE COURT:  Any objection, Mr. Butswinkas?

14          MR. FARINA:  No objection, your Honor.

15          THE COURT:  Without objection, I will recognize

16    Dr. Cain as an expert in the area of market efficiencies and

17    econometrics.

18          Mr. Silverman.

19          MR. SILVERMAN:  Thank you, your Honor.

20    BY MR. SILVERMAN:

21    Q.  Dr. Cain, I want to begin by asking what you mean in

22    your reports and what you mean today when you discuss market

23    efficiency.

24    A.  So when I assess market efficiency in a market

25    efficiency report, such as the matter at hand, I'm analyzing
```

1    informational efficiency, which is the question of whether

2    company prices react to disclosures of new information.

3              I would contrast that with another type of market

4    efficiency, which is fundamental efficiency, which is a

5    different question, asking whether stock prices are true,

6    correct and accurate reflections of fundamental value for a

7    company.

8              So there can be overlap between these two

9    different types of efficiency, but also significant

10   differences.

11   Q.  Does it matter to your -- for your purposes whether a

12   stock reaches the correct value that you believe should --

13   it should reach based on the information available?

14   A.  No, not for purposes of assessing informational

15   efficiency.

16   Q.  And does this usage of the term "market efficiency"

17   differ in any way from what you have come across in the

18   academic context?

19   A.  Yes.  Like I said, there's overlap.  Unfortunately, we

20   have one word or phrase, market efficiency, but it has

21   different meanings.  So in the academic context, academics

22   will often study questions that pertain to fundamental

23   efficiency, whether it is an anomaly that an investor could

24   exploit, things of that nature.

25              And as an academic, I'm also interested in those

1    questions, and I enjoy debating other academics.  But that's

2    a separate type of market efficiency relative to the

3    question of informational efficiency in an analysis such as

4    this.

5    Q.  And are there different types of market efficiency that

6    are debated among economists?

7    A.  Yes.

8    Q.  And is that debate important to your context when

9    serving as an expert witness in the context of securities

10   litigation?

11   A.  You know, ultimately, again, while I find those debates

12   to be interesting as an academic, they are really debating

13   more theoretical questions that are not relevant to, again,

14   a question of informational efficiency in a case like this.

15   Q.  Okay.  I'd like to turn to the issue of short selling.

16   And, again, I think we should probably go through a few

17   terms so we're all talking about the same thing.

18              Are you familiar with the term "short

19   constraints"?

20   A.  Yes.

21   Q.  What does that mean?

22   A.  Well, different people can use the phrase differently;

23   but generally, short selling constraints would refer to an

24   inability of short sellers, or someone who's interested in

25   short selling, to go out and locate shares that they could

1      short.

2              So investors who want to bet against a company,

3      predicting that the stock price is going to go down, are

4      unable to do so, unable to locate shares to short.

5      Q.  Okay.

6              MR. SILVERMAN:  At this point, I'd like to put up

7      Slide 3.

8      BY MR. SILVERMAN:

9      Q.  Did you reach an opinion as to whether shorting of Bed

10     Bath & Beyond shares were constrained in your report?

11     A.  Yes.  I did reach an opinion.

12     Q.  And what was that opinion?

13     A.  My opinion is that during the class period in this case,

14     investors were able to short-sell Bed Bath & Beyond stock

15     and, in fact, they did short-sell Bed Bath & Beyond common

16     stock throughout the class period.

17     Q.  And what's being displayed on the screen is Slide 3 of

18     the presentation.  Is this a subset of the analysis that you

19     did and that's contained in Paragraph 24 of the reply

20     report?

21     A.  Yes, it is.

22     Q.  And what does this show you in the -- let's go through

23     first the shares available for shorting.

24              What does that show you?

25     A.  So after the Date column, the first column, Shares

1    Available For Shorting, reflects the number of additional

2    shares that institutions or lenders were willing to lend out

3    to investors who were interested in selling short the common

4    stock, but that just stood out there and were not utilized

5    or taken advantage of by additional short sellers.

6            So what that means is that because that number is

7    not zero -- if that number was zero, then I would say

8    there's evidence of short selling constraints because

9    there's no shares available to short.

10           But in fact, throughout the class period there's

11   roughly half a million shares each day that were available

12   to be shorted but which investors chose not to take

13   advantage of.

14   Q.  And where did you get that information from?

15   A.  This data comes from a data vendor, data provider,

16   called S3 Partners.

17   Q.  And is S3 Partners considered reputable in your field as

18   a provider of data related to short selling?

19   A.  Yes, it is.

20   Q.  Is it widely accepted by experts in your field --

21   A.  Yes.

22   Q.  -- opining on the issue of short selling?

23   A.  Yes.

24           THE COURT:  Dr. Cain, being a public servant, I'm

25   both financially and ethically limited in my ability to do a

1    lot of stock trading.

2         Can you kind of explain what -- how kind of short

3    selling works and the idea behind that?

4         THE WITNESS:  Sure.  So if you've got investors

5    who would like to bet against a company stock or predict

6    that the stock price is going to go down, there are

7    different ways that you could try to trade based off of that

8    belief.

9         One of the things that I'll also talk about is

10   that you're not limited to short selling.  You could also

11   trade in the options markets.  So there's other ways to

12   trade based on that belief.

13        But one of the ways you can do it is by, instead

14   of purchasing the stock if you believe the price is going to

15   go up, you can sell the stock if you believe the price is

16   going to go down.  But you don't have to own the stock to

17   actually sell it.  You can sell stock that you don't own.

18   It's sort of like taking out a loan and promising to pay

19   back the loan at a future date.

20        But if at that future date the stock price has

21   gone down, you can go out on the market, purchase the shares

22   at a lower price, and then deliver those shares to the

23   person that you borrowed them from.

24        So let's say that the price is trading at $30 per

25   share today.  You think it's going to go down to $20.  So

1      you borrow the stock from somebody.  You promise to return

2      it at some future point.  You sell that stock into the

3      market.

4              Maybe a month later, the price has gone down.  You

5      buy it in the open market for $20 per share and you return

6      that to the person that you borrowed it from.  So you've

7      made a profit of $10 per share because you borrowed it and

8      repaid it at a lower price.

9              THE COURT:  And so there's a market of people who

10     are holding stocks that I guess they think are going to get

11     more valuable, but nonetheless they're willing to lend them

12     out to people who think they're going to get less valuable?

13             THE WITNESS:  Correct.  There's -- so institutions

14     do this as a way -- because they charge an interest rate to

15     loan the shares out, and they earn additional money through

16     the interest payments that they receive for loaning out

17     their stock.

18             So they don't necessarily believe that the price

19     is going to be dropping, because they own the stock for the

20     long run.  But they're able to gain additional profits by

21     loaning out the stock and charging an interest rate for

22     doing so.  A lot of institutions engage in that -- those

23     types of lending programs.

24             THE COURT:  And the short sales, the loan is --

25     has a specific maturation date.  Right?  It must be repaid

     1          by a certain date?

     2                    THE WITNESS:  No.  There's not a stipulated

     3          deadline where you have to return it.  But the institution

     4          who lends out the shares can re-call those shares and force

     5          you to deliver the shares.  So you might have to go out and

     6          locate the shares and return them if an institution demands

     7          repayment of those shares, but there's not a contract that

     8          stipulates a deadline like that.

     9                    THE COURT:  I see.

    10                    All right.  You may proceed, Mr. Silverman.

    11                    MR. SILVERMAN:  Thank you.

    12          BY MR. SILVERMAN:

    13          Q.  Based on your analysis that is summarized on Slide 3 and

    14          set forth in Paragraph 24, did you come to a conclusion as

    15          to whether a substantial amount of shares were available

    16          each day during the class period for shorting?

    17          A.  Yes, I did.

    18          Q.  What was that conclusion?

    19          A.  Each day throughout the class period, there was a

    20          substantial amount of shares available, roughly half a

    21          million shares available above and beyond -- as you can see

    22          in the middle column there, there was roughly 30 to

    23          31 million shares being shorted each day.  But above and

    24          beyond that, investors could have shorted additional shares

    25          had they chosen to.

1    Q.  And you've mentioned the short interest.  Let's move

2    then to the third column, the Options Trading Volume.

3             What did that inform you?

4    A.  So one of the things I mentioned a minute ago is that

5    investors can also trade based off of a belief that the

6    stock price is going to go down in the options market.  They

7    don't have to use short selling.  So they could buy a put

8    option or sell a call option.  Those are other -- and

9    there's other, more complex options, trading strategies

10    investors can use.

11             So what we can see in the final column is that,

12    throughout the class period, there was also a very healthy

13    amount of options trading volume on each day.

14    Q.  Did you --

15             THE COURT:  Can you go back and explain the middle

16    column?  I don't think I understood that.

17             THE WITNESS:  Yes.  So the middle column, it shows

18    on a daily basis how many shares right now today are being

19    shorted.  So for example, on August 12th, 2022, 31 million

20    shares are being sold short.  So 31 million shares are

21    being -- are in the market by investors who are predicting a

22    decrease in the stock price.

23             THE COURT:  And that doesn't necessarily mean they

24    did anything on that day; that just means that they're

25    holding --

1          THE WITNESS:  They could have established those

2    positions days or weeks or months prior.  That's correct.

3    It's just a snapshot in time of the amount of shares that

4    are sold short.  That's correct.

5          THE COURT:  All right.  And so -- I mean, would

6    you say that as long as there's one share available, that

7    that's sufficient?  Or -- I mean, should I be considering

8    whether 500,000 is a lot, given that 31 million are out

9    there?

10          THE WITNESS:  Right.  That's a good question,

11    because obviously you could take 500,000 and you could

12    divide it by 31 million or the total float of 90 million,

13    and that's a very small percentage on a percentage basis.

14          But ultimately, the question is, if I'm an

15    investor who wants to short Bed Bath & Beyond stock, could I

16    do so -- pick a day, like August 16th -- if I wanted to do

17    so?  And the answer is yes.  When you look at this, I could

18    short -- easily short 500,000, half a million shares.

19          Now, if there's only one share available for

20    shorting and I want to short ten, then the answer would be

21    actually no.  There's a constraint.  I would not be able to

22    easily locate with the data that's reported here.

23          So it's relative to the interest or the demand

24    among short sellers.  So if that demand reaches 100 percent,

25    then we would say the utilization has reached a cap.  Right?

1    That there's no more shares available to be shorted.  And

2    sometimes we see that in the marketplace.

3             And again, you could still trade in the options

4    market.  You're not limited to selling shares short.

5             But what this means is that on each day there were

6    roughly half a million shares that, you know, exceeded the

7    demand for -- among short sellers.

8             THE COURT:  Okay.  Thank you.

9    BY MR. SILVERMAN:

10   Q.  Did you form an opinion as to whether all or nearly all

11   of the public float of Bed Bath & Beyond was shorted during

12   the class period?

13   A.  Yes.  I have looked at data that speaks to that

14   question.

15   Q.  And what did that say?

16   A.  What that said, the answer is no.  All of the public

17   float was not being shorted.  It was well below 50 percent

18   leading up to and during the class period.

19   Q.  I'd like to ask you about the term "short squeeze."  Is

20   that something that has a generally accepted objective

21   definition in the field of financial economics?

22   A.  It is something that is talked about.  But

23   unfortunately, there is not one clear, widely accepted

24   definition of a short squeeze.

25   Q.  Okay.  Did you reach an opinion as to whether Bed Bath &

1    Beyond was in a short squeeze during the class period?

2    A.  No.  That was not a relevant factor among the *Cammer* and

3    the *Krogman* factors in assessing market efficiency.

4    Q.  Was there a significant short position that you observed

5    in Bed Bath & Beyond during the class period?

6    A.  Yes.  There was a very healthy amount of short selling

7    throughout the class period.  Certainly -- speaking to your

8    question about a short squeeze, I saw no -- I've not seen

9    any evidence that the short selling activity or short

10   positions who were trying to buy shares to close out their

11   positions, that that had any impact on the pricing dynamics

12   of Bed Bath & Beyond stock.

13   Q.  Did you review what Professor Fischel said in his report

14   about a rumored short squeeze?

15   A.  Yes.

16   Q.  Did you agree with Professor Fischel that there were

17   rumors of a short squeeze?

18   A.  Yes.

19   Q.  And when did you first observe those rumors?

20   A.  One of the things I noted in my opening efficiency

21   report was that for at least a year leading up to the class

22   period, there were rumors, people posting on message boards

23   rumors about a -- or speculation or rumors about an

24   impending short squeeze in Bed Bath & Beyond stock.

25   Q.  Is observing rumors on message boards or in news

Cain - DIRECT - By Mr. Silverman

1    articles a generally accepted method among experts in your

2    field to determine whether or not a stock is, in fact, moved

3    by a short squeeze?

4    A.   No.  I don't believe that that would represent a

5    scientific or an objective analysis.

6    Q.   Did you consider the evidence that Professor Fischel

7    cited in his report about short utilization?

8    A.   Yes.

9    Q.   And could you explain for the record what short

10   utilization means?

11   A.   Yeah.  So going back to something I mentioned earlier,

12   this question of how many shares are available for shorting,

13   that speaks to the question of utilization.

14           So if all of the shares that are -- that investors

15   are willing to lend out to short sellers are being utilized,

16   or are being shorted, then utilization would be 100 percent.

17           And so, again, as I mentioned earlier, from the

18   table you can see that they did not reach a 100 percent

19   utilization rate during the class period.

20   Q.   And did you come to an opinion as to why the source

21   cited by Professor Fischel listed 100 percent or near 100

22   percent utilization at a time the data that you received

23   from S3 listed half a million or more shares available?

24   A.   Yes.

25   Q.   And what was that opinion?

1  A.  So I've used the data that Professor Fischel relied on

2  before.  But one of the things that I've noted when using

3  that data is that there's no one single source of reporting

4  of short -- of shares that are available for short sellers.

5  And so many data sets cover only a subset of the lending

6  data.

7          So that FIS data that Professor Fischel relied on

8  is not a complete picture of all the shares that are

9  available to be lent out to short sellers.

10  Q.  And having observed the S3 data you just discussed, do

11  you believe there's any reliable or scientific basis to

12  support Professor Fischel's conclusion that shorts were 100

13  percent utilized in the case of Bed Bath & Beyond during the

14  class period?

15  A.  No.

16  Q.  At this time, I'd like to address the *Cammer* and *Krogman*

17  factors.

18          Is this -- is there a standard process you

19  undertake when serving as a market efficiency expert to

20  assess informational efficiency of a stock?

21  A.  Yes.

22  Q.  Can you describe what that is?

23  A.  Yes.  In every single market efficiency report, over 25

24  reports, I follow the same process that other experts

25  follow, which has been laid out by the courts, which is to

1    analyze the *Cammer* factors as well as the *Krogman* factors as

2    indicators of market efficiency.

3    Q.  In your experience as an economic expert, is a *Cammer*

4    factor analysis widely accepted among economists assessing

5    market efficiencies for purposes of securities litigation?

6    A.  Yes, it is.

7    Q.  Is it something that other experts in the field besides

8    yourself use?

9    A.  Yes.

10   Q.  Is there any other form of efficiency analysis for that

11   purpose that is more widely used than analyzing the *Cammer*

12   factors?

13   A.  No.

14   Q.  Have you ever seen a market efficiency analysis for

15   that -- for the purpose of securities litigation that did

16   not involve a *Cammer* factor analysis?

17   A.  No.  I don't believe so.

18   Q.  Is there anything in your experience with the *Cammer*

19   factors, or your familiarity with them, that cautions

20   against considering those factors in a heavily shorted

21   market?

22   A.  No.

23   Q.  And how about the *Krogman* factors?

24   A.  Same with the *Krogman* factors, as with the *Cammer*

25   factors.

1    Q.  Now let's get into it a bit more granularly as we

2    explore each factor.  But is there any reason in your mind

3    that a *Cammer* factor analysis cannot be used in the presence

4    of a high level of short selling?

5    A.  No.

6    Q.  Have you reviewed expert market efficiency reports from

7    your peers prepared in the context of securities litigation

8    that use the *Cammer* or *Krogman* factors despite a high level

9    of short selling?

10   A.  Yes.

11   Q.  Could you give us an example or two of that?

12   A.  Two examples that I cite in my reports.  One would be a

13   case involving Tesla in which there were very similar rumors

14   of short squeeze that people were posting on Reddit

15   similarly about short squeeze.  The market efficiency expert

16   in that case analyzed the *Cammer* and *Krogman* factors to

17   determine that the market was efficient, and that class was

18   certified.

19        And then, similarly, a case involving Groupon a

20   few years prior.  Similar questions about short selling

21   constraints.  The expert evaluated the *Cammer* and *Krogman*

22   factors, which supported market efficiency, and I believe

23   that case was also certified.

24   Q.  Is there any generally accepted alternative that you

25   believe would be better suited than the *Cammer* and *Krogman*

Cain - DIRECT - By Mr. Silverman

1    factors to assess the efficiency for a stock with a high

2    level of short selling?

3    A.  No.

4    Q.  Let's turn, then, to the first *Cammer* factor.

5            What does *Cammer* Factor 1 analyze?

6    A.  That looks at the amount of trading volume in the stock.

7    Q.  Why does volume matter for purposes of assessing

8    informational market efficiency?

9    A.  So the question about informational efficiency is

10   whether disclosures of information make it to investors.

11   And so when we see that investors are paying attention to a

12   company and its information environment and that information

13   affects their buying and selling decisions, we can directly

14   observe their buying and selling decisions by observing

15   trading volume.  That's what buying and selling is, is

16   trading volume.

17   Q.  Is there anything unique to a market involving a high

18   level of short selling that might make volume irrelevant?

19   A.  No.

20   Q.  And I know in your report that you discuss certain

21   thresholds that matter for *Cammer* Factor 1.  Could you

22   describe for the record what those are?

23   A.  Yes.  The *Cammer* court said that a weakly trading volume

24   of 1 percent or 2 percent of shares outstanding -- any

25   volume higher than those two thresholds would weigh in favor

1   of market efficiency.

2   Q.  And what did you observe with Bed Bath & Beyond?

3   A.  Bed Bath & Beyond was well above both of those

4   thresholds, over 600 times higher than those thresholds,

5   during the class period.

6           MR. SILVERMAN:  If we could move to the next

7   slide.

8   BY MR. SILVERMAN:

9   Q.  What does *Cammer* Factor 2 address?

10  A.  That looks at coverage by research analysts.

11  Q.  And why is that important for assessing market

12  efficiency?

13          THE COURT:  Sorry.  Can we go back to Factor 1?

14          So I think, you know, the defense suggests that

15  maybe this factor isn't super helpful in a short

16  squeeze-type situation, that, you know, we're looking at a

17  volume that is just so much higher than anything the *Cammer*

18  court considered, that maybe this is not a useful factor at

19  some point.

20          What do you say to that?

21          THE WITNESS:  So what I would say is that when you

22  think about a short squeeze, if we're talking about -- like,

23  what is a short squeeze?  Right?

24          Going back to what is a short squeeze, if we're

25  talking about investors who have short positions who are

1    looking for shares to go out and purchase to close out their

2    short positions, and they're unable to locate any shares --

3    right? -- to buy on the open market to close out their short

4    positions, to the extent that you see significant trading

5    volume, that -- those are people who are willing to buy and

6    sell shares in the marketplace that could be potentially

7    available to the short sellers if they wish to close out

8    their short positions.

9            So I do think that even -- if there is a short

10   squeeze taking place, that volume can still be relevant

11   for -- again, what we're talking about is informational

12   efficiency.  And ultimately, do disclosures of information

13   affect people's buying and selling decisions?

14           And so a short squeeze certainly doesn't overturn

15   that premise.  Right?  Investors could look at a short

16   squeeze as one type of information.  But if you've got an

17   earnings announcement coming out, are they still reacting to

18   the earnings announcement?  Or are they not?  And that's

19   what we look at with the *Cammer* factors.

20           MR. SILVERMAN:  Are you done with *Cammer* Factor 1?

21           THE COURT:  Yes.

22   BY MR. SILVERMAN:

23   Q.  You said that *Cammer* Factor 2 involves analyst coverage.

24   Why does that matter?

25   A.  So research analysts, they follow companies closely.

1    They ask questions on earnings calls.  They interact with

2    management.  And then they package up their research into

3    reports that they disseminate to investors.  And so that can

4    be one of the ways in which information makes its way to

5    investors.  That's why it's a relevant factor for

6    consideration.

7    Q.  Are there other ways that information reaches investors

8    that you discuss in your reports?

9    A.  Yes.

10   Q.  And what are those?

11   A.  So investors are not limited to relying exclusively on

12   research analyst reports for learning information.  They can

13   turn to SEC filings, where companies disclose information;

14   press releases; quarterly or annual reports or other

15   filings; the financial press or the media.  Or -- there's

16   also electronic platforms where individuals or companies can

17   post research, such as Seeking Alpha, or other electronic

18   means to disseminate information to investors.

19   Q.  Well, let's start with the official analyst reports.

20            What did the level of official analyst reports you

21   observed about Bed Bath & Beyond during the class period

22   tell you about market efficiency?

23   A.  So during the class period, there were multiple analyst

24   reports issued.  Obviously, with a short class period of one

25   week, I think it's also relevant to just ask more generally:

1    How was the company being followed by research analysts?

2           So I think -- in the year leading up to it, it

3    was, I think, hundreds of analyst reports.  But certainly

4    during the class period, even a short time window of one

5    week, there were multiple -- I think eight different

6    research analyst reports published, as well as other sources

7    of information.

8    Q.  Did you have any reason -- did you find any reason to

9    believe that investors who traded in Bed Bath & Beyond

10   stocks or options lacked access to company-specific news?

11   A.  No.  I don't believe so.

12   Q.  Why don't we move to the third *Cammer* factor, then.

13   Could you describe for us what that measures?

14   A.  The third *Cammer* factor looks at market makers.

15   Q.  And can you describe what a market maker is?  First,

16   let's talk about an official market maker.

17   A.  The historical context goes back to when trading was

18   done person-to-person on exchange floors.  And so there

19   would be professionals who were paid to make a market or to

20   facilitate trading in a company stock.  Over time,

21   everything has become electronic.  So we still have people

22   who work at firms like this who make a market, but we also

23   have brokers or hedge funds who electronically serve as

24   market makers who facilitate the buying and selling of

25   securities.

1    Q.  And what did you observe with respect to that for Bed

2    Bath & Beyond?

3    A.  So the *Cammer* court said that this was an important

4    factor for companies that were not exchange listed.  If they

5    were just traded over the counter, then market makers could

6    be very important to facilitate trading.

7              The court said that, for over-the-counter markets,

8    five to ten market makers would lead to a strong presumption

9    of efficiency.

10             Bed Bath & Beyond was exchange-listed on the

11   NASDAQ, so by virtue of an exchange listing satisfied

12   that -- the intent of this *Cammer* factor.

13             Moreover, it had 48 -- sorry -- had 58 market

14   makers during the class period, or more than five times the

15   *Cammer* threshold.

16   Q.  Is there anything unique to the function of a market

17   maker that would make it irrelevant in a period of high

18   short selling?

19   A.  No.

20   Q.  Do you believe it to be relevant for assessing market

21   efficiency in a market with high short selling?

22   A.  Yes.  It's still equally relevant.

23   Q.  And you mentioned 58 market makers that were recognized.

24             Are there other forms of investors that serve a

25   similar function in modern markets?

1    A.  Yes.

2    Q.  Could you describe that, please?

3    A.  Yes.  So we've got, for example, high-frequency traders

4    who have electronic or algorithmic trading on computers who

5    today serve the same role of market makers.  So if I want to

6    purchase stock and I submit a buy order, it's very likely

7    that that will be filled very, very quickly by an electronic

8    trading firm.

9    Q.  And the fourth *Cammer* factor is -- you list S-3

10   eligibility or that it is S-3 eligible.

11         And just so we have a clear record, I guess I

12   should start out, the term "S-3" in this context is

13   different than the data provider S3 that you mentioned

14   earlier.  Right?

15   A.  That is correct.  There's no relation between those two.

16   Q.  And what does S-3 eligibility mean in this context?

17   A.  So the SEC, Securities and Exchange Commission, allows

18   companies who meet certain requirements to issue

19   registration statements to raise capital without having to

20   fill out very lengthy registration statements.

21         So the S stands for short.  It's a shortened

22   registration statement for companies who meet the

23   eligibility requirements, which includes not being

24   delinquent in making their SEC filings, so they're providing

25   information on a timely basis to investors; they're not

1    delinquent on any required dividends or loans; and they've

2    got a minimum market capitalization of least $75 million.

3    Q.  Why does the S-3 eligibility matter for market

4    efficiency?

5    A.  So one reason is that it reflects the fact that the

6    company has been providing information to investors on a

7    timely basis.  They've not filed a notification of an

8    inability to file quarterly or annual reports to investors.

9    So we've got a robust information environment for investors.

10             Another reason is that it allows companies to

11   raise capital quickly.  So if they see their stock price

12   increase even hypothetically in a short squeeze, they could

13   take advantage of that and raise a bunch of additional

14   stock, investments, through an equity offering from

15   investors to try to get their information about the value of

16   the company into -- to investors and bring the price back

17   down potentially.

18   Q.  And then the fifth is listed as cause and effect.  Could

19   you describe what that *Cammer* factor is?

20   A.  Yes.  So this looks at disclosures of new information

21   and whether the securities prices react to disclosures of

22   information.

23   Q.  And why is that important to market efficiency?

24   A.  Yes.  When we talk about informational efficiency,

25   ultimately that -- the question is:  Is information making

1    its way to investors?  And so one of the ways we test for

2    that is looking at disclosures of information and seeing,

3    does it seem to be making its way to investors?  Are the

4    prices responding to new information that's coming out?

5    Q.  How do you assess that, Dr. Cain?

6    A.  So a pretty standard way for a lot of companies is to

7    look at earnings announcements, because that's a very

8    objective metric.  There's no subjectivity.  Just every

9    quarter, most companies report earnings.

10        This may not be the right testing ground for

11   companies that have no earnings.  So there can be, you know,

12   drug development companies where you might need to look at

13   other types of metrics.  But for companies that are

14   reporting earnings quarterly, you can look at those earnings

15   announcements and see, does the stock price tend to react to

16   the earnings information coming out each quarter?

17   Q.  And is this -- first, for definitional purposes, you

18   said you use earnings dates.  Are those what you call in

19   your report news events?

20   A.  Yes.  In my report I refer to those as the news days.

21   Q.  And is your selection of earnings announcements as news

22   days unique to you or is it something used by others?

23   A.  It's definitely not unique to me.  It's used by a

24   variety of experts assessing market efficiency.  It's also

25   been studied in probably hundreds of academic publications

1    as well.

2    Q.  Do you believe it to be a widely accepted method of

3    selecting a -- news days for an event study?

4    A.  Yes.

5           THE COURT:  We have about 20 minutes left,

6    Mr. Silverman.

7           MR. SILVERMAN:  Okay.  I'll pick up my pace.

8    Thank you, your Honor.

9    BY MR. SILVERMAN:

10    Q.  In a heavily shorted market, is it important whether the

11    stock reacts to earnings?

12    A.  Yes.  It's definitely relevant to looking at whether the

13    stock reacts to earnings.

14    Q.  You did not in your initial report use the statement and

15    disclosure dates from the complaint as news days.  Is that

16    correct?

17    A.  Correct.

18    Q.  Why?

19    A.  Defendants commonly criticize experts when they include

20    dates that are alleged in the plaintiff's complaint.  So my

21    goal in an opening report is to be as objective and agnostic

22    as possible by relying on something like earnings

23    announcements.

24    Q.  And did you consider Professor Fischel's criticism of

25    your *Cammer* 5 analysis?

1    A.  Yes.

2    Q.  And what was your reaction to his criticism?

3    A.  So his criticism was that there were no earnings

4    announcements that actually fell during the one-week class

5    period, which is -- you know, part of the benefit of this

6    test is that it's out of my hands when earnings

7    announcements actually fall.  But in response to his

8    criticism of no-news days being during the class period, I

9    provided an alternative test of *Cammer* 5 by looking at days

10   on which news came out about Cohen's potential involvement

11   with Bed Bath & Beyond, limited exclusively to the class

12   period itself.

13   Q.  And let me ask first whether your initial event study

14   allowed you to form an opinion as to whether the market for

15   Bed Bath & Beyond shares was generally efficient during the

16   period that embraced the class period.

17   A.  Yes.  I did conclude that that weighed in favor of

18   market efficiency, because the price did react to earnings

19   announcements.

20   Q.  And did that view change at all as a result of the

21   further work that you did that you just referenced in

22   reaction to Professor Fischel's criticism?

23   A.  I reached the same conclusion.  Looking only at the

24   class period dates, there was also clear evidence of the

25   price responding to that type of information as well.

1   Q.  And your opening report contains analysis of additional

2   factors as well.  Correct?

3   A.  Yes.

4            MR. SILVERMAN:  Could you put those up?

5   BY MR. SILVERMAN:

6   Q.  We've had a lot of testimony about the *Krogman* factors.

7   Are those included in the additional factors?

8   A.  Yes.

9   Q.  The first one is market capitalization.  Could you

10  explain what that means and why it's significant?

11  A.  It's -- we're looking at the size of the company.  It's

12  relevant because if you look at a company with a very small

13  market cap, investors may not really be interested in

14  trading in that company's stock.  So when you see a larger

15  market cap, that weighs in favor of market efficiency.

16  Q.  And what did you determine with respect to Bed Bath &

17  Beyond?

18  A.  I determined that it favored market efficiency.

19  Q.  And the next additional factor you address is bid-ask

20  spread.  Could you describe why that is relevant and what

21  you determined?

22  A.  That reflects the cost to an investor of buying and

23  selling the stock.  So if I purchase the stock and then

24  turnaround and sell it a few hours later, I'll typically

25  have to pay a small spread or, in some companies, a very

1    large spread.  So the question is:  How easy is it for

2    investors to trade at low cost?

3    Q.  And did you find that investors were able to trade at a

4    low cost in Bed Bath & Beyond?

5    A.  Yes.  It was very low cost.

6    Q.  The next factor -- and we've touched on this earlier --

7    was float.  Could you describe what that is, please?

8    A.  Yes.  That looks at -- we could have a company with a

9    large market cap.  But if all of the shares are owned by the

10   insiders and not freely tradeable, there may not be much

11   float of shares that are out in the marketplace to trade.

12   So it looks at how many of the shares are not owned by

13   insiders but are freely tradeable by outside investors.

14   Q.  What did you determine with respect to Bed Bath &

15   Beyond?

16   A.  The vast majority, over 90 percent of the shares, were

17   available to be traded.

18   Q.  And the next factor you list is institutional ownership.

19   And why is that important?

20   A.  It reflects the willingness of institutions to invest in

21   a company.  Institutions have a lot of money on the line

22   when they invest millions of dollars in investment.  They

23   monitor management, the information; and so that can be a

24   way in which information makes its way to investors, through

25   the monitoring of institutional investors.

1    Q.  And what did you find with respect to Bed Bath &

2    Beyond's institutional ownership?

3    A.  There was significant investment by institutions.  Over

4    200 different institutional investors owned over 50 percent

5    of the float around the time of the class period.

6    Q.  The next factor you list is auto-correlation.  Could you

7    describe what that means?

8    A.  That looks at whether today's stock return can predict

9    tomorrow's stock return.  Is there some sort of anomaly that

10   an investor could exploit because the stock is

11   systematically underreacting or overreacting to earnings

12   announcements or other disclosures of information?

13   Q.  And what did your analysis -- well, first, let me ask

14   how you determined whether there was auto-correlation in Bed

15   Bath & Beyond.

16   A.  Yes.  So I just ran a regression of today's abnormal

17   returns versus tomorrow's abnormal returns over time to

18   document whether it was a statistically significant

19   predictive power.

20   Q.  And when you use the term "abnormal returns," what does

21   that mean?

22   A.  That's the return from the event study after

23   controlling -- it's basically the movement in the stock

24   price each day after controlling for movements in the market

25   and the industry.

1    Q.  And what did your analysis of auto-correlation show

2    about Bed Bath & Beyond shares?

3    A.  It showed there was no statistically significant

4    auto-correlation.

5    Q.  And the last additional factor you list is active

6    options trading.  Why is that significant?

7    A.  So going back to something I mentioned earlier,

8    investors can trade in the stock, but they're not limited to

9    stock.  They can also trade in options, and that can be

10   another way in which information can be reflected into

11   securities prices.

12   Q.  Now, we covered this with the *Cammer* factors.  I'd like

13   to ask you the same thing about these additional factors.

14   Are there any of those additional factors that would -- that

15   you would deem not relevant in a heavily shorted market?

16   A.  No.

17   Q.  We talked a lot about market efficiency.  I'd like to

18   shift to price impact.

19            Could you describe for the record what that term

20   means?

21   A.  Yes.  Price impact is the question of whether alleged

22   misrepresentations in a case affected the price of the

23   securities, affected the stock price.

24   Q.  And is there a difference in terminology about how

25   you -- how you discuss price impact in the context of a

1    statement at the time of a statement or a disclosure at the

2    time of a disclosure?

3    A.  So when I assess price impact, I look at disclosures

4    that come out.  And that could be at the front end when

5    alleged misrepresentations are made.  It can also be at the

6    back end when corrective disclosures come out.  So looking

7    at each of those in the same way:  Did they move the stock

8    price?

9    Q.  And how does price impact relate to the more general

10    market efficiency?

11    A.  Well, it's related to the same question of, does

12    information make its way to investors?  Does it affect stock

13    prices?

14    Q.  Okay.  Did you include a price impact analysis in your

15    opening report?

16    A.  No.

17    Q.  Why not?

18    A.  My understanding that I've had in all of my market

19    efficiency reports to date is that defendants bear the

20    burden of disproving price impact.  So if I receive a

21    rebuttal report that purports to opine on a lack of price

22    impact, then I respond to that.

23    Q.  And was price impact something that Professor Fischel

24    raised in his report?

25    A.  Yes.

1    Q.  Did he raise it -- you said front end for the statement

2    dates and back end for the disclosures.  Let's start with

3    that.

4              Did he raise front-end price impact?

5    A.  No.  On only one date for the front end.

6    Q.  Okay.  And what about back end?

7    A.  No.  He did not assess it at the back end.

8    Q.  Okay.  What -- was the date you're talking about

9    August 12th?

10   A.  Yes.

11   Q.  Did you consider Professor Fischel's analysis to be

12   scientific?

13   A.  No.

14             MR. SILVERMAN:  If we can put up the chart.

15   BY MR. SILVERMAN:

16   Q.  And you have in front of you Slide 8.  This is -- is

17   this a slide that you took from Professor Fischel's report

18   and annotated?

19   A.  Yes, it is.  I added a dotted line at the opening price

20   on August 12th.  But otherwise, this chart is from his

21   report.

22   Q.  Okay.  And do you agree with Professor -- that Professor

23   Fischel correctly marked the opening price around $11 on

24   August 12th?

25   A.  Yes.

1    Q.  And do you agree he correctly marked the price at

2    around -- of the morning tweet at 10:42 a.m. at perhaps a

3    few cents under $11?

4    A.  Yes.

5    Q.  And do you agree that he correctly marked the close that

6    day at around 12.95, or just under 13?

7    A.  Yes.

8    Q.  That's a gain of, what, about 18 percent?

9    A.  A roughly 18 percent increase that day.  Yes.

10   Q.  Okay.  Is that a normal intra-day fluctuation in your

11   experience?

12   A.  No.  That's a fairly abnormal change within one day.

13           THE COURT:  And do you say that -- what's normal?

14   Is that, like, for Bed Bath & Beyond?

15           THE WITNESS:  So -- I can talk separately about

16   Bed Bath & Beyond.  But just at a high level, the way that I

17   would talk about it is that if you think about an

18   institutional investor, like a mutual fund, it would be

19   thrilled to have an increase of 18 percent over one year.

20   Right?  So an increase of 18 percent over one year would be

21   fantastic.

22           So to see that within one day would be somewhat

23   extraordinary.

24           THE COURT:  Sure.  How about for Bed Bath &

25   Beyond?

1           THE WITNESS:  Yes.  So what my analysis showed was

2      that this was a very statistically significant increase for

3      the stock of Bed Bath & Beyond relative to the previous

4      six-month time period.

5      BY MR. SILVERMAN:

6      Q.  Professor Fischel says in Paragraph 40 of his report

7      that this price increase, 18 percent, is not statistically

8      different from zero.

9           Did you consider an 18 percent price increase to

10     be the same as zero?

11     A.  It's definitely not the same as a zero-dollar movement.

12     Q.  Did you have your own opportunity to assess the

13     statistical significance of the August 12th date?

14     A.  Yes.

15     Q.  And --

16          MR. SILVERMAN:  Let's put up the next slide.

17     BY MR. SILVERMAN:

18     Q.  Is your own analysis summarized in this slide?

19     A.  Yes.

20     Q.  For the August 12th date, you note an abnormal return of

21     16.82 percent.  Correct?

22     A.  Yes.  So after controlling for what took place in the

23     overall market and industry on that date, the increase in

24     Bed Bath & Beyond stock was 16.82 percent above and beyond

25     the movements in the overall market and industry that day.

1    Q.  And there are columns to the right that say P-Value and

2    Statistical Significance.  Could you explain what that

3    means?

4    A.  Yes.  So that refers to the likelihood that we would

5    observe a return of that magnitude just due to random

6    chance, due to random volatility for -- here over the prior

7    six months.  And what you can see on this top row is that

8    the likelihood of observing that magnitude of a movement in

9    Bed Bath & Beyond stock would be less than a 5 percent

10    chance just due to random movements.

11    Q.  And what does that tell you about the price impact of

12    the tweet on the date of August 12th?

13    A.  That is consistent with the price impact of the tweet.

14           THE COURT:  Is it fair to say, though, that it had

15    already moved pretty significantly even prior to the tweet?

16           THE WITNESS:  If you go back to the previous

17    graph, I think -- if you look at the price, it was actually

18    trading right around the same price that it had opened at

19    that day.  So basically all of that abnormal return is

20    basically coming after the tweet itself.

21           THE COURT:  But it had dropped pretty

22    significantly.  Right?

23           THE WITNESS:  In the -- basically, in the first

24    hour and ten minutes of trading, it dropped, and then it

25    came back up a little bit.

 1              THE COURT:  Yes.  So I guess I'm wondering, is

 2    this kind of evidence of a volatile stock regardless of

 3    that?

 4              THE WITNESS:  It's definitely a volatile stock.

 5    And that's why it's important to do sort of a benchmarking

 6    exercise, looking at the -- what's the typical day-to-day

 7    volatility for the stock itself, which is what the event

 8    study controls for.

 9              So basically, the event study is saying, you've

10    got a certain level of volatility, which, for this stock,

11    was definitely higher than a lot of other stocks.  But

12    even relative to that typical volatility, this movement was

13    very significant relative to that typical volatility for the

14    stock.

15              THE COURT:  And are you able to look at kind of

16    volatility before versus after the tweet, or is that not a

17    useful analysis?

18              THE WITNESS:  So the event study does look at,

19    like, what was the volatility in the six months leading up

20    to the tweet versus, basically, the volatility following the

21    tweet through the market close at 4:00 p.m. on that day?

22              So there's also a possibility that it -- that

23    could sort of increase forward-looking volatility, but I

24    think that's really a separate question.  Right?  I mean,

25    that's still consistent with price impact.  Right?  If you

1     put out a statement and then it causes increased volatility

2     for the stock, even if that lasts for weeks, that's still

3     supportive of the fact that the statement itself impacted

4     the price and the volatility and the trading volume and all

5     of those things.

6               MR. SILVERMAN:  Let's move back to the chart.

7     BY MR. SILVERMAN:

8     Q.  Did Professor Fischel assess the -- whether there was a

9     price impact on August 16th, 2022?

10    A.  No.

11    Q.  Did you do that work in your reply report?

12    A.  Yes.

13    Q.  What did you observe?

14    A.  I observed that the price increased significantly

15    following that alleged misrepresentation, abnormal price

16    increase of over 20 percent.  And that increase was

17    statistically significant at better than the 99 percent

18    level.

19    Q.  And on August 19th, 2022, did Professor Fischel assess

20    the price impact?

21    A.  No.

22    Q.  Did you do that work?

23    A.  Yes.

24    Q.  And what did you observe?

25    A.  The stock price dropped by almost 50 percent, and that

 1    drop was statistically significant at well above the 99

 2    percent level.

 3    Q.  Did you consider Professor Fischel's conclusion that

 4    price moves might be linked to short selling during the

 5    class period?

 6    A.  I considered that.

 7    Q.  And did you reach any opinion in relation to that?

 8    A.  Ultimately, I think that even if there was some movement

 9    triggered by short selling activity that was caused by the

10    alleged misrepresentations, that would not be inconsistent

11    with Plaintiff's theory of liability in this case.

12    Q.  Professor Fischel also included a few social media posts

13    in his report.

14              Did you review those?

15    A.  Yes.

16    Q.  Did you form a conclusion about whether he sampled the

17    social media posts about Bed Bath & Beyond in a reliable,

18    scientific manner?

19    A.  Yes.  I did not find any sort of replicable analysis

20    that would meet any sort of objective or scientific metric

21    to form any sort of opinions.

22    Q.  Did Professor Fischel provide the identities of the

23    persons he quoted?

24    A.  No.

25    Q.  Did he provide any information that would allow you to

1    ascertain whether or not the persons he quoted even traded

2    during the class period?

3    A.  No.

4    Q.  Did Professor Fischel provide any analysis of their

5    social media history that would allow you to ascertain

6    whether they considered the activities by Mr. Cohen in their

7    trading decisions, if they did trade?

8    A.  No.

9    Q.  Did the few posts that Professor Fischel included

10    indicate to you any absence of price impact from the alleged

11    conduct of Mr. Cohen?

12    A.  No.  In fact, I think at least one of the posts was

13    actually consistent with the price impact.

14    Q.  Just to summarize your opinions, did you form an opinion

15    as to whether Bed Bath & Beyond stock traded in a generally

16    efficient market at the time of the class period?

17    A.  Yes.

18    Q.  What was that opinion?

19    A.  I concluded that it did trade in a market that was

20    efficient throughout the class period.

21    Q.  Did you form an opinion as to whether it was scientific

22    and reliable to apply the *Cammer* and *Krogman* factors for a

23    stock that had a heavy level of short interest?

24    A.  Yes.

25    Q.  And what was that opinion?

1    A.  My conclusion is that those factors remain equally

2    relevant in such a stock.

3    Q.  Did you form an opinion as to what the *Cammer* and

4    *Krogman* factors indicated about the market efficiency of

5    this specific stock, Bed Bath & Beyond?

6    A.  Yes.

7    Q.  What did they indicate?

8    A.  They indicate market efficiency for Bed Bath & Beyond

9    stock.

10    Q.  Did you form an opinion as to whether Professor

11    Fischel's report rebutted any presumption of efficiency by

12    showing an absence of price impact?

13    A.  Yes.

14    Q.  And what was that opinion?

15    A.  My opinion is that there's no evidence rebutting price

16    impact in Professor Fischel's opinions.

17    Q.  Did you form an opinion as to whether there was

18    affirmative evidence that the price was, in fact, impacted

19    by the conduct alleged by Plaintiffs?

20    A.  Yes.

21    Q.  And what was that opinion?

22    A.  There's very strong evidence that the prices were

23    impacted by the alleged misrepresentations.

24    Q.  And I know we didn't address it at this opinion, but --

25    or in this hearing, but just as an overview of your

1    opinions, did you form an opinion as to whether damages

2    could be proved on a class-wide basis?

3    A.  Yes.

4    Q.  What was that opinion?

5    A.  My opinion is that damages are able to be calculated on

6    a class-wide basis.

7    Q.  And did you form an opinion as to whether the market for

8    options in Bed Bath & Beyond securities was generally

9    efficient during the class period?

10   A.  Yes.

11   Q.  What was that opinion?

12   A.  My opinion is that the options were also efficient

13   throughout the class period.

14            MR. SILVERMAN:  Thank you, Dr. Cain.

15            If the Court has nothing further, at this time, I

16   pass the witness.

17            THE COURT:  I have kind of a different topic.

18            Meme stock investors:  Is there -- it seems to me

19   they act different than your average investor, possibly

20   irrationally.  Does that impact how we should think through

21   the *Cammer* factors?

22            THE WITNESS:  Right.  It's something that I've

23   considered in this case.  And I've also seen it in other

24   cases that I've worked on, as well as just other separate

25   work.

Cain - DIRECT - By Mr. Silverman

```
1              So the -- I think the question -- the relevant
2     question for any investor is, regardless of their own
3     beliefs, when they're executing trades, are they trading at
4     prevailing market prices that reflect information?  Right?
5              So when you think about any investor -- it doesn't
6     have to be a retail investor; it could be an institution --
7     you've got different institutions who have different
8     beliefs.  Some -- one institution may believe the stock is
9     going to go up a lot; another institution may believe the
10    stock is going to go down a lot.  They -- there's not a
11    consensus -- right? -- of views.
12             And yet, when each of them trade with each other,
13    they're still trading at the same price -- right? -- which
14    reflects information which is driven by disclosures from a
15    company.  And it's the same dynamic for retail investors.
16    They may have a wide variety of beliefs, and those beliefs
17    may not even be accurately reflected on message boards,
18    because you often see people posting very inflammatory
19    messages that they may not actually be trading consistently
20    with.
21             But regardless of their beliefs, you may have some
22    meme investors who are very excited and other ones who are
23    more pessimistic.  But they're still all trading at the same
24    price that reflects the information environment of a given
25    company.
```

1           The other thing that I've considered in a variety

2    of cases is the question of whether the presence of retail

3    investors dramatically fundamentally pushes companies into a

4    market that's totally inefficient.  Right?

5           And what you actually see is that institutions

6    enjoy trading against retail investors because retail

7    investors are generally viewed as, quote -- in the academic

8    literature they refer to them as "uninformed investors,"

9    meaning that they don't have private, nonpublic information

10   about the company.  It doesn't mean that they're stupid or

11   incompetent, but just that they don't have private

12   information.

13          And so if you have institutions who are trading

14   against meme investors or retail investors, then -- that's

15   why these factors remain relevant, because institutions, if

16   they feel that individual investors are pushing the price

17   too high, they can trade against them.

18          But there can be times where there's a question

19   of, has it a reached a level of frothiness that the stock

20   price is no longer efficient?  And that's why these factors

21   are relevant, because you can look at, well, earnings

22   announcements were made.  Did the price react to that?  Or

23   are the meme investors so dominant that the price is no

24   longer reacting to information itself?

25          So the question is not a question of fundamental

 1    efficiency:  Are the investors correct?  Right?  Because,

 2    ex-post, some people are correct and some people are not

 3    correct.  But rather:  Does the price reflect information?

 4              THE COURT:  Thank you.

 5              Why don't we get started and go about ten minutes

 6    and then we'll break for lunch.

 7              MR. FARINA:  Sure.

 8                       CROSS-EXAMINATION

 9    BY MR. FARINA:

10    Q.  Good morning, Dr. Cain.  I'm Mr. Farina.

11              All right.  Dr. Cain, you would agree that a

12    particular stock can trade at some point in an efficient

13    market and at other points that same stock might not be

14    trading in an efficient market?

15    A.  It's certainly possible.  I'm always careful, in

16    answering that question, to explain that if I assess market

17    efficiency over a certain time period, then my conclusions

18    apply throughout that time period.  But I'm not opining

19    before or after the time period that I've assessed.

20    Q.  All right.  But you agree, conceptually, that the same

21    stock could trade efficiently at one point and not

22    efficiently at another point?

23    A.  Again, it's -- hypothetically, it's possible.  It's

24    certainly not consistent -- if I provide an opinion about a

25    class period or an analysis period, then I would not agree

1      that it would be trading inefficiently during any portion of

2      that period that I've analyzed.  But before and after that

3      period, I don't provide opinions if I've not assessed it or

4      analyzed the other time periods.

5      Q.  And you also would agree that a short squeeze can cause

6      the market for a particular stock to be temporarily

7      inefficient?

8      A.  It can certainly cause it to have an element of

9      fundamental inefficiency, where the stock price might be

10     pushed away from the fundamental value, which, as I

11     explained earlier, is not the relevant question in a market

12     efficiency analysis such as this.  But I think it remains an

13     open question as to whether the stock would be

14     informationally inefficient such that it would no longer

15     react to things like earnings announcements.

16     Q.  The relevant question here is whether or not Bed Bath &

17     Beyond traded in an efficient market during the class

18     period.  Do you agree with that?

19     A.  Yes.

20     Q.  And the class period here is five days long, five

21     trading days?

22     A.  Correct.

23     Q.  All right.  And I'd like to talk with you just briefly

24     about the fifth *Cammer* factor.  What is the fifth *Cammer*

25     factor?

1   A.  That's the cause-and-effect relationship between

2   disclosures of new information and resulting movements in

3   the stock price.

4   Q.  The fifth *Cammer* factor relates to whether a company's

5   stock price responds and incorporates new value-relevant

6   information.  Isn't that correct?

7   A.  Well, I -- I think that's generally consistent.  What I

8   would point you to is what the *Cammer* court said, is looking

9   at, over time, whether there's a relationship between

10  disclosures of new information and resulting movements in

11  the stock price.

12          So there's a lot of assumptions that are embedded

13  within your question.  But I think generally, at a high

14  level, it's largely consistent with what the *Cammer* court

15  has said.

16  Q.  Do you have your report in front of you?

17  A.  Yes.

18  Q.  Can I ask you to look at Paragraph 57 of your report?

19          MR. FARINA:  Does your Honor have the report?

20          THE COURT:  I imagine I do in one of these tabs.

21          MR. FARINA:  Can I ask which tab that is?

22          MR. SILVERMAN:  Tab 1.

23          THE COURT:  Thank you.  I've found it.

24  BY MR. FARINA:

25  Q.  So this is your report.  Correct?

1    A.  Yes.

2    Q.  It's your report in connection with this matter.

3    Correct?

4    A.  Yes.

5    Q.  All right.  And this is on Page 20, Paragraph 57.

6    You're introducing the fifth *Cammer* factor.  Correct?

7    A.  Yes.

8    Q.  And in your own report you wrote:  The fifth *Cammer*

9    factor relates to whether a company's stock price quickly

10   responds to and incorporates new value-relevant information.

11         Correct?

12   A.  Yes.

13   Q.  And you used that same formulation in your report when

14   you discussed your analysis of *Cammer* Factor 5.  Correct?

15   A.  I believe so, yes.

16   Q.  And if you look at -- if you want to look at

17   Paragraph 73 -- it's right about in the middle of the

18   paragraph.  And it's the sentence that begins:  These

19   announcements represent a potential opportunity for the

20   public release of new value-relevant company information to

21   investors.

22         Do you see that?

23   A.  I do.

24   Q.  All right.  So would you agree that the *Cammer* factor,

25   *Cammer* Factor 5, relates to how a stock price reacts to new

1    information?  Correct?

2    A.  Yes.

3    Q.  And value-relevant information.  Correct?

4    A.  That's the way that I've tested it.  Again, I'd point

5    you back to the quote from the *Cammer* court in Paragraph 57.

6    It doesn't say value-relevant, but certainly the way that I

7    test it, looking at earnings announcements, for example,

8    would be consistent with that.  Yes.

9    Q.  All right.  And the fifth *Cammer* factor is actually the

10   only *Cammer* factor that directly looks at or tests whether a

11   stock price is reacting to new relevant information.

12   Correct?

13   A.  That's -- that is the one factor that's focused on that

14   aspect of disclosures of information.  I think the other

15   factors are also consistent with that, but this is the one

16   that looks at disclosures.  Yes.

17   Q.  Okay.  And when you created your efficiency report, your

18   first report, you looked at news days and no-news days.

19   Correct?

20   A.  Yes.

21   Q.  And all of the news days that you selected for your

22   *Cammer* 5 analysis were outside of the class period.

23   Correct?

24   A.  I believe that's when all of the earnings announcements

25   fell, since those are only done quarterly.  Yes.

1    Q.  And when did the class period start?  Do you recall?

2    A.  I believe August 12th of 2022.

3    Q.  Okay.  And your news days, for purposes of your *Cammer*

4    analysis, are September 30, 2021; January 6, 2022; April 13,

5    2022; and June 29th, 2022.  Correct?

6    A.  Yes.

7    Q.  All right.  So some of those dates are well before the

8    class period.  Correct?

9    A.  I think all of those days are before the class period.

10   Yes.

11   Q.  All right.  And what you observed generally supported

12   your view that -- not on all of those days, but on enough of

13   those news days the price of BBBY stock was reacting to new

14   value-relevant information.  Correct?

15   A.  I believe on 75 percent of those days, yes.

16   Q.  Okay.  So that analysis, though, was restricted to what

17   you looked at as news days that all are outside the class

18   period.  Correct?

19   A.  It's comparing it to both the news days and the no-news

20   days.  So it's not only limited to those four days.  But

21   yes, the earnings announcements, like we said, all fell

22   prior to the one-week class period.

23   Q.  All right.  And I think you testified here today that

24   you try to be as objective and agnostic as possible in

25   conducting this type of analysis.  Correct?

1    A.  Correct.

2    Q.  And did you feel that you were objective in how you

3    selected the criteria for your news days for your study?

4    A.  Yes.

5    Q.  All right.  And --

6            THE COURT:  Mr. Farina, why don't we break there

7    for lunch.

8            MR. FARINA:  Okay.  Terrific.

9            THE COURT:  Dr. Cain, I'll direct you not to

10   discuss the contents of your testimony with anyone over the

11   lunch break.

12           And why don't we be back at 1:35.  Thanks, folks.

13           MR. FARINA:  Thank you.

14           (Thereupon, a luncheon recess was taken, after

15   which the following proceedings were had:)

16           THE COURT:  Good afternoon.

17           All right.  We're back on the record.

18           Mr. Farina.

19           And, Dr. Cain, I'll remind you you're still under

20   oath.

21           THE WITNESS:  Yes.

22           MR. FARINA:  Thank you.

23   BY MR. FARINA:

24   Q.  Dr. Cain, when we broke right before lunch, we were

25   talking about your *Cammer* 5 analysis.  Correct?

1    A.  Yes.

2    Q.  This was the analysis in your original report.  Correct?

3    A.  Correct.

4    Q.  All right.  We talked about -- just to orient ourselves,

5    we talked about your selection of news days for your

6    analysis.  Correct?

7    A.  Yes.

8    Q.  Now I want to ask you some questions about your

9    selection of no-news days.

10           And in order to conduct your analysis, you applied

11    certain criteria to identify no-news days for your analysis.

12    Correct?

13    A.  Yes.

14    Q.  And the criteria that you used were days on which there

15    were no news headlines from Dow Jones or SEC filings.

16    Correct?  Paragraph 57 of your report.

17    A.  Yes.  That's correct.

18    Q.  And that's also objective criteria.  Correct?

19    A.  Yes.

20    Q.  All right.  After the submission of your original report

21    and after your deposition was taken in the case, did you

22    conduct a new *Cammer* Factor 5 analysis?

23    A.  I did conduct an additional analysis in response to

24    Professor Fischel's critiques.

25    Q.  For your new analysis, you selected different criteria

1    for both your news days and your no-news days.  Correct?

2    A.  Correct.

3    Q.  The new criteria for news days were days when -- where

4    news was released regarding Defendant Cohen's stake in BBBY.

5    Correct?

6    A.  Yes.  I believe so.

7    Q.  And your no-news days were days on which that didn't

8    happen.  Correct?

9    A.  I believe so.

10   Q.  And you called your new news days alternative news days.

11   Correct?

12   A.  Yes.

13   Q.  So I'm right, aren't I, that none of your alternative

14   news days would have met the criteria that you used for new

15   days in your original study?

16   A.  That's correct.  These are two different analyses that

17   are completely separate and independent.

18             THE COURT:  Dr. Cain, can you just move the

19   microphone a little closer.  Yes.  Thank you.

20             THE WITNESS:  Sure.

21   BY MR. FARINA:

22   Q.  The first alternative news day that you looked at was

23   August 12th.  Correct?

24   A.  Yes.  That's correct.

25   Q.  And you discussed this a little bit on your direct

1    testimony.  That's the day on which there was a CNBC tweet

2    that talked about an analyst report from Loop Capital.

3    Correct?

4    A.  It was the -- I believe the 10:42 a.m. tweet by

5    Mr. Cohen that's an alleged misrepresentation in this case.

6    Q.  And you've looked at that tweet.  Correct?

7    A.  Yes.

8    Q.  And you understand that that tweet is responding to a

9    tweet from CNBC about a Loop Capital analyst report?

10   A.  I'd have to go back and review the entirety of what he

11   was responding to.

12   Q.  All right.  Let me ask you this:  There were no news

13   headlines from Dow Jones about Mr. Cohen's tweet, were

14   there?

15   A.  None that I recall.

16   Q.  Okay.  And you also did something in your first report.

17   You conducted some searches on Factiva.  Correct?

18   A.  Yes.

19   Q.  And Factiva is a news aggregator?

20   A.  Correct.

21   Q.  And in fact, a Factiva search on August 12th would have

22   revealed that there were no news articles at all about

23   Mr. Cohen's tweet.  Correct?

24   A.  I'd have to go back and look at the underlying data.  I

25   don't have it memorized off the top of my head.

1    Q.  Okay.  But you do list the articles that you identified

2    and reviewed for purposes of your analysis in your opening

3    report.  Correct?

4    A.  I believe those are included in the turnover documents.

5    I don't think I have an appendix that lists every single

6    headline.

7    Q.  But sitting here today, you're not aware of a single

8    news article on August 12th discussing Mr. Cohen's tweet?

9    A.  Again, off the top of my head, I'd have to go back and

10   review the underlying files to look at what they show.

11   Q.  Sitting here today, you're not aware of a single analyst

12   report during the class period that discussed Mr. Cohen's

13   tweet, are you?

14   A.  Off the top of my head, I don't have those memorized.

15   I'd have to review those as well.

16   Q.  Is it your view that Mr. Cohen's tweet contained new

17   news that was value-relevant?

18   A.  That was not a question that I was trying to answer

19   within that *Cammer* 5 analysis.

20   Q.  Okay.  So you're not -- you're not expressing any

21   opinion on that in your reply report?

22   A.  Correct.

23   Q.  All right.  So let's go to the next alternative news

24   day.  That was August 16th.  Correct?

25   A.  Yes.

1    Q.  And on August 16th, there were certain SEC filings made

2    on behalf of Mr. Cohen.  Correct?

3    A.  Yes.  That might have been after hours on the 15th and

4    the morning of the 16th.  But in terms of the market impact

5    date, yes.  Both would impact on August 16th.

6    Q.  There was an amended Schedule 13D filed by Mr. Cohen's

7    attorneys.  Correct?

8    A.  I believe so, yes.

9    Q.  Have you reviewed that document?

10   A.  I believe so, yes.

11   Q.  And you understand that Mr. Cohen had a Schedule 13D

12   filed on his behalf as early as March 7th.  Correct?

13   A.  I don't have those dates memorized off the top of my

14   head.

15   Q.  You're aware, though, that Mr. Cohen had a 13D filed

16   sometime earlier?

17   A.  Yes.

18   Q.  And the 13D that was filed sometime earlier contained

19   information about Mr. Cohen's holdings in BBBY securities.

20   Correct?

21   A.  Yes.

22   Q.  And the 13D that was filed on August 16th also contained

23   information about Mr. Cohen's holdings in BBBY securities.

24   Correct?

25   A.  Yes.

1    Q.  And that's one of the reasons why that meets your

2    criteria as a news day.  Correct?

3    A.  It's consistent with that, yes.

4    Q.  All right.  And it's true, isn't it, that the August

5    16th amended 13D had the exact same information about the

6    common stock and options that were owned by Mr. Cohen as had

7    been disclosed previously?  Correct?

8    A.  I'd have to go back and compare both filings in order to

9    assess that question.

10   Q.  Okay.  But you're not looking to see whether there was

11   any new news in that filing that wasn't part of your

12   analysis?

13   A.  I'm not doing that type of comparison.  Same with the

14   earnings announcements:  I'm not looking at earnings

15   announcements to ask, What were the reported earnings or how

16   did those differ to previous quarters, things like that.

17   Q.  You're aware, aren't you, that MSNBC misreported the

18   substance of Mr. Cohen's supplemental 13D?

19   A.  No.  I don't have familiarity with that off the top of

20   my head.

21   Q.  Have you seen any articles that reflected a misreporting

22   of his 13D to the effect that he had purchased new options?

23   A.  I do recall in subsequent work with -- in connection

24   with my merits report that I did assess the information

25   environment.  And I think the way you described it is

1    consistent with some of the coverage during that time

2    period.

3    Q.  And that erroneous reporting was corrected as of the

4    next day, August 17th.  Correct?

5    A.  That I don't know off the top of my head.

6    Q.  Was August 17th a news day for you?

7    A.  No, not in Exhibit 3-A of the reply report.

8    Q.  Was the correction of a prior misidentification of

9    Mr. Cohen's holdings news that was released regarding

10   Defendant Cohen's stake in BBBY?

11   A.  I'm not really sure what you mean with "correction of

12   his holdings."  I don't recall that the amended 13D filed on

13   August 16th had an incorrect holdings statistic.

14   Q.  It didn't.

15          But there was misreporting to the effect that he

16   had new purchases of options.  Correct?

17   A.  Again, I don't have all of the media coverage memorized.

18   Q.  Why wasn't August 17th a news day?

19   A.  Because again, like I discussed earlier with the first

20   *Cammer* analysis, my goal is to be agnostic and objective.

21   I'm not going into the earnings announcements.  I'm not

22   asking, What's the level of earnings that are recorded?  How

23   does that differ from previous quarters?  I'm just taking

24   those announcements at face value.

25          Similarly, with the alternative *Cammer* analysis in

1    direct response to Professor Fischel's critiques that there

2    were no news days during the class period, I sought to

3    construct an objective criteria to identify news days as

4    pointed to through the complaint in Plaintiff's allegations

5    that related to Cohen's involvement with Bed Bath & Beyond.

6    So those are the criteria that I followed.

7         There could certainly be -- I'm certainly not

8    opining that there was no other value-relevant information

9    swirling around this time period.

10   Q.  And the --

11   A.  But again, the goal is for me to be objective.  So I'm

12   focusing on the SEC filings.  If you look at August 16th,

13   August 18th, August 19th, those all relate to SEC filings.

14   There could be additional media coverage or analyst reports

15   that might have provided additional interpretation or

16   context, but that was not a component of the test itself.

17   Q.  The criteria you selected was whether there was news

18   released regarding Defendant Cohen's stake in BBBY.

19   Correct?  That's the criteria you selected?

20   A.  Let me just --

21   Q.  Paragraph 38 of your reply report.

22   A.  Yes.  So Paragraph 38.  That I think provides an

23   accurate reflection.  News relating to Cohen's stake in

24   BBBY.

25   Q.  And when I asked you about August 16th, you said that

1    one of the reasons why that was a news day is the 13D had

2    information regarding Defendant Cohen's stake in BBBY.

3    Correct?

4    A.  Right.  That's correct, yes.

5    Q.  So if the original report of Mr. Cohen's stake in BBBY

6    was a news day, why isn't the correction by MSNBC of their

7    prior misreportings of that same filing not also a news day?

8    A.  Oh, sure.  So again, I think you're asking something

9    completely separate from the news day itself.  So the news

10   day here is driven by the SEC filings.  It's not driven by

11   the media stories and looking at subsequent media stories to

12   see how they're commenting back.

13        But that would lead to an endless round of

14   evaluation of news days.  If we're always looking for one

15   news story, seeing if that was updated on a different day,

16   seeing if that was responded to by an additional news story

17   on a subsequent day, that would be sort of an endless

18   iteration.

19        Again, here, the news day was not identified

20   because of some MSNBC news article.  It was identified by

21   the SEC filings.  So we've got SEC filings with market

22   impact dates of August 16th, 18th and 19th.  And that's the

23   objective criteria for the news days here.

24   Q.  The next alternative news day that you selected was

25   August 18.  Correct?

1    A.  Let me turn back.

2            Yes.  That is correct.

3    Q.  And you identified that as a news day because the

4    company issued a Form 8-K stating that it had reached a

5    constructive agreement with RC Ventures regarding

6    Mr. Cohen's stake in the company.  Correct?

7    A.  In part, yes.

8    Q.  Well, that's the reason that you gave in your report.

9    Correct?

10   A.  Yes.

11   Q.  Okay.  Now, Mr. Cohen had reached that agreement with

12   the company back in March.  Correct?

13   A.  I don't recall the date of that agreement as stated in

14   the 8-K.  I'd have to take a look at the 8-K.

15   Q.  Mr. Cohen's cooperation agreement with the company was

16   publicly disclosed back in March.  Correct?

17   A.  Again, I'd have to go back and take a look at that.

18   Q.  And it was publicly disclosed by both Mr. Cohen and the

19   company.  Correct?

20   A.  Again, I'd have to go back and review these files.

21   Q.  Did you make any determination of whether what you

22   identified as the reason for this being a news day actually

23   reflected new news?

24   A.  Again, like the previous ones, earnings announcements,

25   SEC filings, I don't go in and ask what's new, what's

1    redundant.  That would be a subjective assessment or

2    subjective analysis.

3            The fact that the company deemed information

4    material that would trigger an 8-K filing is sufficient

5    evidence for me that the company itself viewed it as worthy

6    of a new SEC filing disclosing the information.

7    Q.  Your own articulation of the *Cammer* Factor 5 test is

8    whether or not there's a price reaction to new

9    value-relevant information.  Correct?

10   A.  It's potentially value-relevant.  So you have to keep in

11   mind the word is that it could be potentially new and

12   value-relevant.

13           Again, we can have a earnings announcement where a

14   company announces earnings that's in line with expectations.

15   There may be no price reaction to that.  The investors may

16   have determined that it was consistent with expectations and

17   it wasn't really new and it didn't move the needle on price.

18   That's not inconsistent with market efficiency.

19           But again, I don't go into an earnings

20   announcement during 8-K or an SEC filing and say, Well, I'm

21   going to throw this out because to me it looks not all that

22   new.  That would be a very subjective analysis.  I take each

23   news day at face value, put it into the test and see what

24   the statistic is that comes out of the test.

25           MR. FARINA:  Thank you, Dr. Cain.  I have no

 1    further questions.

 2              THE COURT:  Thank you, Mr. Farina.

 3              Redirect, Mr. Silverman?

 4              MR. SILVERMAN:  Thank you, your Honor.  I have

 5    nothing further with Dr. Cain.

 6              THE COURT:  All right.  Thank you, Dr. Cain.  You

 7    may step down.

 8              THE WITNESS:  Thanks.

 9              (Witness excused.)

10              THE COURT:  Mr. Farina.

11              MR. FARINA:  At this time, we call Professor

12    Daniel Fischel.

13              THE COURT:  Sir, if you can remain standing for

14    just a moment.

15              THE WITNESS:  Good afternoon.

16              THE COURTROOM DEPUTY:  Please raise your right

17    hand.

18              DANIEL FISCHEL, DEFENSE WITNESS, SWORN.

19              THE COURTROOM DEPUTY:  Thank you.  Please be

20    seated.

21                      DIRECT EXAMINATION

22    BY MR. FARINA:

23    Q.  Good afternoon, Professor Fischel.

24    A.  Good afternoon.

25    Q.  Could you briefly describe your credentials for the

1    Court.

2    A.  Yes.  I have two -- an undergraduate degree in history

3    and a minor in economics, then a master's degree in history.

4    Then I went to the University of Chicago Law School, where I

5    studied law and economics with various members of the

6    faculty.  Then I clerked for a couple of years.

7          But then I began my economic career initially at

8    Northwestern, where I taught various courses relating to

9    business law and the overlay between principles of finance

10   and various legal roles.

11         Then I went to the University of Chicago, where I

12   spent most of my career as an academic studying principally

13   the same areas:  economics of financial markets and various

14   subjects relating to law and economics.

15         I've published several books and I think

16   approximately 50 articles, including a book *Economic*

17   *Structure of Corporate Law*, co-authored with my frequent

18   co-author, now-Judge Frank Easterbrook.

19         My articles and books have been cited hundreds of

20   times by courts of all levels, from the United States

21   Supreme Court on down.

22         I've written extensively on the concept of

23   efficient markets, event study methodology.  One of my early

24   articles on the use of the -- the proper use of event study

25   methodology was cited favorably by the United States Supreme

1    Court.

2           In my academic career, I have also done a lot of

3    related things:  lecturing to various audiences, regulators,

4    business groups, conferences of federal judges.

5           I've also had a parallel career as an economic

6    consultant, primarily in connection with -- I should also

7    say in my academic career I've held also courtesy

8    appointments at the University of Chicago Graduate School of

9    Business, where I've also taught courses.  I also have been

10   a visiting professor at Northwestern University, where I

11   also had a joint appointment with the business school and

12   the law school.

13          In my consulting career, it's been originally with

14   a firm by the name of Lexicon that was formed by several of

15   my professors at the University of Chicago, now named

16   Compass Lexicon.  It started as sort of a little

17   fly-by-night entity.  It's now a big worldwide business.

18   I'm the head of the entire firm.

19          In that connection, apart from my role as head of

20   the firm, I've had a very active practice as a consultant

21   and an expert witness on multiple matters relating to

22   concepts of efficient markets, event studies, the role of

23   different trading strategies, including short selling.

24          And I've -- in addition to testifying many, many

25   times, I've also -- not only for -- for different types of

 1    clients, for business entities, groups of investors, also

 2    governing regulatory agencies, I've been an expert witness

 3    for the United States Department of Justice many times.  And

 4    I've also been a consultant to the New York Stock Exchange,

 5    the National Association of Securities Dealers, the

 6    Securities and Exchange Commission, many of the other

 7    regulatory authorities.

 8            So I could continue.  But I think that's a short

 9    summary.

10            MR. FARINA:  Your Honor, we offer Professor

11    Fischel as an expert in market efficiency and also valuation

12    and the operation of financial markets.

13            THE COURT:  Any objection, Mr. Jafri?

14            MR. JAFRI:  No objection, your Honor.

15            THE COURT:  I will find Professor Fischel to be an

16    expert in the area of market efficiency and valuation and

17    operation of financial markets.

18            Mr. Farina.

19            MR. FARINA:  Yes, your Honor.

20    BY MR. FARINA:

21    Q.  Professor Fischel, did you prepare demonstratives for

22    use with your testimony?

23    A.  Yes.

24            MR. FARINA:  With the Court's permission, I can

25    hand out to everyone copies, hard copies.

```
 1                   THE COURT:  That would be great.

 2                   MR. FARINA:  We're also going to publish them on

 3      the screen.

 4                   With the Court's permission, we'd also provide

 5      Professor Fischel with a copy of his report if he'd like to

 6      refer to it.

 7                   THE COURT:  Yes.

 8                   MR. FARINA:  (Tenders documents to the Court and

 9      opposing counsel.)

10                   THE COURT:  Mr. Farina, if we can get one more

11      copy.

12                   MR. FARINA:  Oh, absolutely.  Sorry.

13                   THE COURT:  Thank you.

14                   MR. FARINA:  Your Honor, do you have a copy of the

15      demonstratives?

16                   THE COURT:  Yes.

17                   MR. FARINA:  Perfect.

18                   MR. BUTSWINKAS:  Last but not least.

19                   THE COURT:  He wisely figured my law clerk was the

20      one to send it to.

21      BY MR. FARINA:

22      Q.  All right.  So what we have on the screen right now is

23      Demonstrative No. 12.

24                   Professor Fischel, are you aware of the three

25      questions that the Court's law clerk asked the parties to
```

 1    address in this hearing?

 2    A.  Yes.

 3    Q.  And have you reviewed those questions?

 4    A.  I have.

 5    Q.  Are you prepared to help provide responses?

 6    A.  Hopefully.

 7    Q.  All right.  Which questions are you intending to provide

 8    responses to?

 9    A.  Primarily, 2 and 3.  There's some relevance to one of my

10    opinions with -- in connection with Opinion 1 -- excuse

11    me -- Question 1.  But I think that's primarily going to be

12    the focus of the testimony of the named Plaintiff and the

13    cross-examination.

14    Q.  Excellent.

15              Before we get into detail, could you provide a

16    brief overview of your conclusions?

17    A.  Sure.

18              You know, let me start with Question 3, because I

19    think question -- the answer to Question 2 depends in

20    significant part on Question 3.

21              I do think the *Cammer* factors provide an

22    appropriate method for evaluating market efficiency during a

23    short squeeze, and I would say particularly *Cammer* Factor

24    No. 5.

25              The other factors and *Krogman* factors that were

1    discussed in Dr. Cain's previous testimony, I think, are

2    largely irrelevant to the issues in this case because they

3    would be satisfied whether or not the market was efficient;

4    for a public company going through a period of artificial

5    prices, for example.  But *Cammer* 5 is really a key and a

6    perfect example of that as the first one, volume.

7                As my exhibits will show -- and I think I've

8    discussed it in my report -- volume during the class period

9    was astronomical.  That was described as a factor

10   demonstrating market efficiency.

11               But it's just as easily, in my opinion, more

12   accurately described as aberrational market behavior during

13   the class period demonstrating inefficiency.

14               And the same thing could be said for all the other

15   factors that were gone through other than *Cammer* Factor No.

16   5.

17               And with respect to the question of, if they're

18   not appropriate, what alternative method would be used,

19   well, first of all, I think they are appropriate.  But

20   beyond that, the *Cammer* factors, particularly *Cammer* Factor

21   No. 5, relates to a general understanding of the meaning of

22   efficient markets.

23               And it really doesn't so much depend on how you

24   define efficient markets, because whatever definition you

25   use there has to be a relationship between the disclosure of

1    new value-relevant information and prices.  There's no

2    definition of efficient markets where that's not the case.

3          And therefore, I would say the alternative method

4    is the basic learning in financial markets that the *Cammer*

5    factors, particularly *Cammer* Factor 5, is based on.

6          THE COURT:  Professor, is your sense it's really

7    down to whose event study do I credit?  Is that really what

8    this is about?

9          THE WITNESS:  Respectfully, your Honor, I would

10    say no, because while I have an event study and I'm prepared

11    to talk about it, an event study is premised on the

12    existence of efficient markets.  If the market is not

13    efficient -- because what you're measuring in an event study

14    is again the relationship between information and price

15    movements.  If the market is not efficient, there is no

16    reason to believe that that relationship exists.  It hasn't

17    been demonstrated.

18          And so one of the things that is routine in

19    analyses of event study is a predicate analysis of market

20    efficiency, because without -- what the event study is

21    measuring is whether there's a relationship between

22    information in price and what the -- whether the event --

23    the price reaction is large enough to be statistically

24    significant or not statistically significant.

25          That's premised on the underlying assumption that

1    the dynamics of the market at a particular point in time

2    allow you to be confident that you can measure the

3    relationship between prices and information.  If there's no

4    relationship, for example, then an event study doesn't tell

5    you anything.

6            THE COURT:  And it's Factor 5 that will get to

7    that?

8            THE WITNESS:  Factor 5 is a function -- is a test

9    of efficiency because, again, Factor 5 depends on whether

10    there's a relationship between price movements and the

11    disclosure of value-relevant information.

12            If you have huge price movements with no

13    value-relevant information being disclosed, that's

14    characteristic of an inefficient market, not an efficient

15    market.  And while you can do -- in an event study, you can

16    do whether a market is efficient or inefficient.  But the

17    usual predicate for being able to rely on an event study is

18    that you have a belief that the underlying market is

19    efficient.

20            All that said, I do have an event study, which I

21    will be -- which will be discussed with your Honor's

22    permission, if I'm asked.

23            THE COURT:  Okay.

24    BY MR. FARINA:

25    Q.  How about Question No. 2?

1    A.  Yes.  Well, really my answer in Question 2 is really

2    what I just said to his Honor's questions.

3    Q.  Okay.

4    A.  Without having an efficient market, it's very difficult,

5    really -- it's not meaningful to test whether there's a

6    price impact to alleged misrepresentations because you don't

7    have the underlying belief that the relationship between

8    stock price movements and alleged misrepresentations exists.

9    And, you know, so for example, just listening to the

10    testimony that was just given, on August 12th, you have a

11    tweet and you have a price movement.

12        Now, there's a separate question relating to the

13    Court's initial question about whether that price movement

14    is statistically significant.

15        But to conclude, as was stated, that there is a

16    tweet with no opinion on whether it's value-relevant and a

17    price movement and to draw a conclusion about price impact,

18    that's a contradiction in terms.  You can't have a

19    disclosure of information where you have no opinion on

20    whether the information that's disclosed has any

21    value-relevant information in it, which was the opinion that

22    was given, and then conclude that that has a price impact

23    that's -- first of all, that there's any price impact based

24    on that or that that price impact is in any way supportive

25    of the concept of *Cammer* Factor 5 or the concept of

1    efficient markets.

2    Q.  Professor Fischel, let's dig in now to market

3    efficiency.

4           Did you look at the conditions of the market for

5    BBBY securities both before and during the class period?

6    A.  I did.

7    Q.  Can you tell us what Demonstrative No. 13 is?

8    A.  Okay.  This is an analysis, following up on the Court's

9    questions, during the period immediately before the class

10   period from July 29th to August 11th.

11          What the change in market price was for Bed Bath &

12   Beyond, it went up 113 percent in the approximately two

13   weeks before the class period, as compared with the overall

14   market, the S&P and the S&P 500 retail index.  In other

15   words, that's a market movement.  That's obviously not

16   explained by what was going on in the overall market or the

17   overall industry.

18          And then I investigated whether there was any new

19   value-relevant information that was disclosed during this

20   period that could explain that price movement.  And I didn't

21   find any, and I don't think there's any discussion of any.

22   And again, that by itself is inconsistent with *Cammer* Factor

23   No. 5 and inconsistent with the concept of efficient

24   markets.

25   Q.  Let's take a look at the next demonstrative.  This is

1    Demonstrative No. 14.

2              What is this one?

3    A.  This is basically the same analysis during the class

4    period.  The first five days of the -- first four days of

5    the class period before the price began to decline on August

6    18th.

7              And you get a very similar pattern of Bed Bath &

8    Beyond increasing in price by 117.1 percent, whereas the S&P

9    went up 1.6 percent and the S&P 500 specialty retail index

10   went up 5 percent.  So it's exactly the same pattern with

11   exactly the same conclusion.

12             This is a price movement that's not explained by

13   the disclosure of new value-relevant information, more

14   consistent with what you would observe in an inefficient

15   market than what you would expect in an efficient market.

16   Q.  Did you investigate what market commentators were saying

17   about these price moves, both the dramatic price move before

18   the class period and the dramatic price move during the

19   class period?

20   A.  Yes, I did.

21   Q.  Let's take a look at Demonstrative No. 15.  What is

22   this?

23   A.  I mean, this is illustrative market commentary on the

24   price movement of BBBY both before the class period and

25   during the class period.  This is just a snippet of

1    commentary.

2         I have extensive discussion of market commentary

3    in my report.  But I think this captures the essence of it.

4    And what the quotes have in common is the statement that

5    there is no value-relevant information that could explain

6    the price movements, and also that a likely cause of the

7    price movement is a rumored short squeeze.

8    Q.  What is a short squeeze?

9    A.  A short squeeze is a situation where there's a large

10   short interest where -- and it's become somewhat

11   characteristic of certain episodes involving what's

12   described as meme stocks, where investors start to

13   dramatically increase their purchasing decisions while there

14   is a large short interest, causing the price to rise.

15        And the reason why it's a short squeeze is in

16   order for an investor who takes a short interest, which they

17   do by borrowing a share of stock and then selling it, they

18   have to deliver the stock back at some point in time.  And

19   to deliver the stock back at some point in time, they have

20   to purchase another share of stock.

21        And so the idea of a short squeeze is where

22   there's a lot of investors holding short positions where

23   they have to purchase a stock in order to meet their

24   obligations, if there's a huge surge of buying activity, so

25   to so-called squeeze the shorts, to push prices up and make

1    it more and more expensive for investors holding short

2    positions to comply with their obligations to buy a stock to

3    return, where some of them -- some of the short investors

4    can't keep holding on, so they have to start purchasing to

5    cover their position in order to return the share of stock.

6    But those purchasing decisions just accelerate the short

7    squeeze and push prices continually up.

8              And that's what a short squeeze is.  It's widely

9    understood to be a temporary aberrational artificial price

10   movement, which is relatively short in duration; but it

11   causes, if it succeeds, a dramatic departure actually from

12   market efficiency for that relatively short time period when

13   the prices are distorted by the short squeeze.

14   Q.  Can a short squeeze cause a market departure from

15   efficiency in the absence of value-relevant information?

16   A.  Yes.  That's the whole point, that the short squeeze can

17   cause dramatic changes in price, both up and then down, even

18   in the absence of any value-relevant information.

19   Q.  Did you analyze the objective evidence of a short

20   squeeze in BBBY securities?

21   A.  Yes.  As I said, there's extensive commentary on the

22   lack of value-relevant information during these dramatic

23   price increases before and during the class period.

24             But I wanted to go beyond that by looking at

25   whether there was not just commentary, but whether there was

1    objective evidence consistent with the existence of a short

2    squeeze.

3            And the demonstrative that's currently on the

4    screen is the investigation that I conducted.  It's also

5    included in my report.  And what it shows is during the

6    shaded area, which is the entire month of August 2022, the

7    ratio of the number of shares online, namely the number of

8    shares that were available to be loaned out to investors who

9    were interested in going short, to the number of shares

10   available for lending, that there was basically no

11   difference between the two.

12           So basically, 100 percent of the shares that were

13   on loan were also already taken, basically.  So there were

14   no further shares available for lending.

15           Now, let me just say, this exhibit based on this

16   data, when it reaches the number 100 percent, it doesn't

17   mean that there's not a single share available for somebody

18   that wants to go short.  But looking in the aggregate,

19   basically it means that all the shares that were available

20   to be used for lending for investors to go short were

21   already taken.

22   Q.  I'm going to show you in just one moment the

23   demonstrative that was put up during Dr. Cain's testimony

24   about the short interest.

25           Let me just ask you first, though, when did this

 1   phenomenon, the dramatic escalation in the short interest

 2   utilization, start?

 3   A.  Well, I mean, that's what the blue line on the graph

 4   represents.  It's -- I mean, the data speak for themselves.

 5   It's a fairly gradual increase.  But it reaches dramatic

 6   proportions, the 100 percent level in the period where I

 7   already described, where there were huge price increases of

 8   BBBY stock that were not explained by any new disclosure of

 9   value-relevant information.

10              MR. FARINA:  If you can put up the demonstrative,

11   please.

12   BY MR. FARINA:

13   Q.  Do you recall this chart?

14   A.  I do.

15   Q.  Do you have any views on this chart?

16   A.  Yes, I do.  I looked at it previously.  And one of the

17   things that was said that was -- if I heard it correctly --

18   that was a little bit misleading was the right inquiry was

19   whether short interest was affecting prices or short selling

20   was affecting prices.

21              That's really the wrong way to state the question.

22   The right way to state the question is whether the

23   constraints on short selling prevented increases in market

24   prices that would not have occurred had short selling been

25   more available.

1         And so the right inquiry -- you can't just look at

2    the shares available for shorting relative to the short

3    interest or the options trading volume, although the

4    relationship between the short interest is itself somewhat

5    relevant.

6         But what's really relevant is the shares available

7    for shorting relative to volume.  And that's not included on

8    this exhibit, because what short selling does, it introduces

9    downward pricing pressure on a particular stock.  And if a

10    price is rising dramatically, if short selling is available

11    in a way that's as a relationship with volume, then short

12    selling can operate as a break, basically, as a downward

13    influence on prices.

14         And if the relationship between short selling and

15    volume is completely disproportionate, then there's not

16    enough availability of shares to short-sell that can operate

17    as an effective check on an artificial price increase.

18    Q.  Did you --

19    A.  This just shows the number of shares available for

20    shorting.  But there's no benchmark as to how that number

21    compares with the outstanding volume.

22    Q.  Is that something that you looked at?

23    A.  I did look at it.

24         MR. FARINA:  Alex, can you pull up No. 23.

25

1    BY MR. FARINA:

2    Q.  Professor Fischel, can you tell us what this

3    demonstrative shows.

4    A.  Right.  This is basically the data from the alternative

5    data source S3 that was used by Dr. Cain.  And it's just a

6    different S3 source that -- one that I used initially, but

7    they're both widely used, respectable S3 sources.

8              But what it shows is during the entire class

9    period -- during the entire analysis period by Dr. Cain from

10   August 12, 2021, to August 18, 2022, if you look at the

11   relationship between average daily volume, 13.2 million

12   shares, and the average available lendable shares, 15.2

13   million shares, there's no shortage of shares that are

14   available as lendable shares to investors who want to sell

15   short in relation to daily volume.

16             But if you by contrast -- if you look at August

17   '22 -- and let me just say, the blue line here, the 1.2

18   line, that's just adding up all of the shares available to

19   short in Dr. Cain's exhibit in the first column that we just

20   looked at.

21             But if you look at that number, which Dr. Cain

22   testified was available for short selling, giving the

23   impression that there was no constraint on short selling

24   that could have any effect on prices, that's really an --

25   respectfully, that's really an incorrect conclusion because

1     it's not scaled to volume.

2          If you have this massive new amount of volume

3     that's pushing prices up, the question is:  How effective,

4     even if every single one of the shares that Dr. Cain

5     concluded were available for short selling, how effective

6     are those shares even though it's 500,000 on particular days

7     on average, actually over a million for the entire month of

8     August, how effective is that going to be as a constraint on

9     the explosion of volume during the August 2022 period that's

10    pushing prices up in the way that we've already seen?

11         And for that reason, I think Dr. Cain's exhibit

12    was really sort of conceptually flawed because he reached a

13    conclusion based on sort of an eyeball "I know it when I see

14    it" test, like this looks like a lot of shares, so there

15    must have been a lot of ability to short-sell, without

16    making the relevant comparison of the amount of shares that

17    were available to sell short relative to how effective that

18    number would be against the explosive increase in volume.

19              MR. FARINA:  Let's take a look at Demonstrative

20    17, Alex.

21    BY MR. FARINA:

22    Q.  We're going to look at -- well, did you look at price

23    and volume in the period immediately before the class period

24    and then also in the class period?

25              THE COURT:  Sorry.  A couple of questions on this

1    last one.

2              THE WITNESS:  Sure.

3              THE COURT:  So is the 500,000 or so that Dr. Cain

4    pointed out, is that the difference between 99 point

5    whatever that you saw in the top of your graph and 100

6    percent?

7              THE WITNESS:  Well, it could be.  There's two

8    different S3 sources.  You know, as I said, 100 percent, I

9    don't think it's literally to mean every single -- there's

10   not a single share available for short selling.

11             But the two S3 sources are fairly close.  I think

12   one is 100 percent; the other is 98 or 99 percent, something

13   like that.

14             But, you know, I would say there's no exact way to

15   measure how many shares are available to lend because

16   basically you don't know every single investor in the

17   marketplace as to whether they're willing to lend their

18   shares.  So there's always going to be some imprecision in

19   the numbers.

20             But I would say, rather than the difference, I

21   would say what's most meaningful is how similar they are in

22   terms of demonstrating that the period of August 2022 was a

23   period where there was a very limited ability to sell short,

24   which is characteristic of what a short squeeze is.

25             THE  COURT:  And so I think what you said might

1    help answer my next question.  But if there's 500,000 shares

2    to be shorted out there and there's this presumably

3    incredible demand to do that, why wouldn't those have gotten

4    snapped up?  Why doesn't it go down to zero or next to zero?

5            THE WITNESS:  Well, short selling is risky.  I

6    mean, the short sellers during this period lost a lot of

7    money.

8            So there's no real answer that I can give the

9    Court to that question other than not 100 percent of the

10   shares were demanded to be used for short selling because --

11   well, first of all, short selling is expensive.  You have to

12   pay an interest rate in order to get the shares.  You

13   typically purchase them on margin, which exposes you to

14   additional risk.  If the price moves in the wrong direction,

15   as a short seller you can really get hurt.

16           So in other words, even if you believe -- let's

17   say you're a potential short seller.  And even if you

18   believe that this is an artificial bubble and it's going to

19   burst and the prices are going to decline, you don't know if

20   that's going to happen tomorrow; you don't know if that's

21   going to happen a week from now.  And if you go short and

22   the price goes up dramatically and you have to post

23   additional margin, you really can run out of capital and you

24   have to cover even if you're ultimately right that the price

25   is too high.

1          THE COURT:  Sure.  That makes a lot of sense to

2    me.

3          But it seems to me that all of those answers would

4    pertain, whether there's 500,000 shares or 500 million

5    shares out there.  Right?

6          THE WITNESS:  Yes.  But the reason why there's 500

7    as opposed to 500 million is because there is an

8    understanding that there's a huge price increase that's not

9    related to fundamentals.  It's not related to disclosure of

10   new value-relevant information.

11         And so there's a general understanding that the

12   price levels that occurred in August are temporary.  And

13   even the commentary that talks about the price increase also

14   recognizes that the price increase is temporary.  It's not a

15   new permanent equilibrium.

16         So just that recognition is going to be an

17   incentive to sell short, a belief that there's a temporary

18   price increase that is going to fall.  So you would expect

19   there to be a lot more short selling when there's a belief

20   that prices are going to fall.

21         But again, that doesn't mean that every single

22   share is going to be taken, because it's risky.  You can be

23   wrong.

24         Even if -- as I said, even if you're right about

25   that the prices will fall, you also have to be right about

1    the timing of when prices will fall and you have to be able

2    to have enough capital to basically stick it out if prices

3    start to rise and you start getting hit with margin calls.

4    You have to pay the interest.  And if you can't meet margin

5    calls, you have to post additional collateral or you have

6    to, you know, sell the stock at prices that you know are too

7    high or inflated.

8            And, you know, for some investors, it's just the

9    cost of the short sell and the practicalities of figuring

10   out where to get the shares from.  You know, it just might

11   not be something that convinces them to go short.

12           But the fact that not every share -- that every

13   share is taken that's a potentially lendable share doesn't

14   change the fact that there's a huge increase in the amount

15   of short selling during the -- particularly the August

16   period, when there's this dramatic price increase that is

17   unconnected to any new value-relevant information.

18           THE COURT:  Thank you, Professor.

19           MR. FARINA:  Thank you.

20   BY MR. FARINA:

21   Q.  Can you explain what you took from Demonstrative 17?

22   A.  It's really what I've already been testifying about.  If

23   you look at the green lines, that's a representation of

24   volume.  That's a huge increase in volume during this

25   period.

1          And then there's a huge spike in price, which is

2     the blue line, which again is temporary.  It's not something

3     that -- a price increase that's responsive to new

4     value-relevant information is not temporary; it's a new

5     equilibrium.

6          But an artificial price movement caused by a

7     distortion of a meme stock related to a rumored short

8     squeeze, that could cause exactly the pattern that's

9     observed on this exhibit of a huge temporary increase in

10     price, a huge temporary increase in volume.  And that's

11     exactly what occurred during August of 2022.

12     Q.  His Honor asked a couple of questions earlier about

13     volatility.

14          Did you examine volatility during this period

15     prior to the class period and then also during the class

16     period?

17     A.  I did.

18     Q.  What is Demonstrative 18?

19     A.  Again, it's the same pattern of -- a dramatic increase

20     in volatility during August of 2022.  That is again

21     temporary, because it's -- these are all interrelated

22     phenomena.  The dramatic price increase that's not connected

23     to value-relevant information, increase in volume and

24     increase in volatility, they're all just different aspects,

25     different manifestations, of what was going on in the market

1    at that time.

2    Q.  All right.  Let's take a look now at some of the price

3    movements during the class period.  Let me put up

4    Demonstrative No. 19.  And I think this has been used in

5    Dr. Cain's testimony.

6         Can you explain what Demonstrative No. 19 is?

7    A.  Yes.  This is a closer look at stock price movements and

8    volume on August 12th, 2022, the date of Mr. Cohen's tweet

9    at 10:42 a.m.

10        And the reason why I focused on it was, even

11   though there wasn't a lot of reference to it this morning,

12   the allegations in the case are that there was a

13   pump-and-dump scheme orchestrated by Mr. Cohen during the

14   class period.  So the key to a pump-and-dump scheme is the

15   pump, because without a pump there's no dump.

16        And so I took a very close look at August 12th,

17   2022.  And what this shows -- and this is just old S3 about

18   one day -- is that the prices -- the price for BB&B stock

19   was rising already before the time of the tweet and then

20   continued after the time of the tweet.

21        And if you look at this exhibit in conjunction

22   with my earlier exhibit of the price movement through August

23   11th, where prices had risen over 100 percent in that -- a

24   little bit less than a two-week period, and then look at

25   what happened on August 12th, and particularly given the

1      nature of the tweet and the timing of the tweet, it looks

2      like a more reasonable interpretation of the S3 is that the

3      price increase on October 12th is related to the price

4      increase that occurred on October -- excuse me.  I'm saying

5      October.  So on August -- from July 29 to August 11, which

6      was my earlier exhibit.

7              And the timing of the tweet in relation to the

8      price movement on that day, I don't think it's reasonable to

9      conclude that the tweet is causing the price movement on

10     August 12th, and particularly when there's no reason to

11     believe that it -- as was stated, that it contains new

12     value-relevant information.

13     Q.  We're going to be discussing Dr. Cain's event study and

14     some of the price movement he looked at in the class period

15     in just a moment.

16              But let me ask you before we get to that, did you

17     also look at price movement in BBBY stock on August 16th?

18     A.  I did.

19     Q.  And what did you conclude about the price movement on

20     August 16th?

21     A.  Well, another characteristic of efficient markets is, as

22     was stated, there has to be a relationship between price

23     movements and new value information.

24              But what occurred on August 16th was the filing of

25     a 13D, which contained exactly the same information as was

1    disclosed, I think, by Mr. Cohen earlier and I think even

2    repeated by the company earlier at different times.

3           And again, once it's established that there's no

4    new value-relevant information in a disclosure in an

5    efficient market, absent some other circumstance, you would

6    not expect any price increase because the information has

7    already been reflected in prices.  So it's not new, and

8    there's no reason why it would generate a price movement.

9           But there was other things that were happening on

10   that day.  I think you alluded to in your cross-examination

11   about an incorrect report, that the 13D did in fact contain

12   new potentially value-relevant information about a

13   significant increase in Mr. Cohen's holdings that was later

14   corrected beginning in the afternoon of August 16th and then

15   on August 17th as well.

16   Q.  All right.  Now, Professor Fischel, can you please

17   summarize your conclusions regarding the efficiency of the

18   market for BBBY securities both before and during the class

19   period?

20   A.  Yeah.  The last thing I want to say about August 16th is

21   when the incorrect information was corrected but the price

22   increase did not return to the price before the price

23   increase on August 16th, that's also characteristic of an

24   inefficient market, because if there was incorrect

25   information that resulted in a price increase that was

1   corrected in an efficient market, you would expect the

2   correction to reverse the price increase caused by the

3   incorrect information to begin with.

4   Q.  Professor Fischel, if you could summarize your

5   conclusions about efficiency for the price movements of BBBY

6   securities during this period.

7   A.  Yes.  I believe that the price movements of BBBY leading

8   up to the class period and during the class period do not

9   demonstrate the characteristics of an efficient market, do

10  not satisfy *Cammer* Factor No. 5, and therefore I believe

11  that it's much more accurate to say that there was a

12  temporary period of market inefficiency caused by a rumored

13  short squeeze that if you look at the objective S3 seems to

14  be supported by the S3.

15  Q.  The vast majority of Dr. Cain's testimony was discussing

16  and walking through the various *Cammer* factors.  And my

17  understanding is Dr. Cain's view is that none of those

18  factors are affected by a short squeeze, and therefore you

19  should still reach the same conclusion.

20          Do you have a view on the other *Cammer* factors and

21  their relevance for determining market efficiency during a

22  short squeeze?

23  A.  I think I said earlier if you're referring to *Cammer*

24  factors other than Factor 5, I don't think they shed any

25  light one way or the other.

Fischel - DIRECT - By Mr. Farina

1          And again, the classic example is *Cammer* Factor

2     No. 1, volume.  The statement was made by Dr. Cain that the

3     volume during the class period exceeded the minimum level

4     that's required for market efficiency under *Cammer* Factor

5     No. 1.

6          That's true.  But it leaves out the fact that

7     there was this explosion in volume during the class period

8     that for reasons that I've described I think accurately

9     referred to it as an indicia of market inefficiency rather

10    than efficiency.

11    Q.  Dr. Cain had his opening report, which had his *Cammer*

12    Factor 5 analysis, and then he did another report after

13    that.

14         Let me ask you about his opening report.  Do you

15    agree with Dr. Cain's analysis of market efficiency that he

16    laid out in his opening report?

17    A.  I think one of the striking things about Dr. Cain's

18    opening report is that he had no analysis of market

19    efficiency during the class period, notwithstanding that

20    that's the critical issue in terms of economic analysis of

21    prices.

22         One of the things that I criticized Dr. Cain's

23    initial report for was he completely ignored entirely the

24    subject of market efficiency during the class period.  He

25    had an analysis of over a yearlong S3 of -- where he used

1   his stock versus no stock -- I'm sorry -- news-day versus

2   no-news-day analysis.  But none of that had any relevance or

3   relationship to the class period.

4          It was -- and the only thing, if I remember

5   correctly, that Dr. Cain said about the class period in his

6   opening report was about volume.  And for the reasons that

7   I've stated, if anything, that cuts in the opposite

8   direction.

9          But with respect to *Cammer* Factor 5 or just the

10  more general subject of the economics of efficient markets,

11  Dr. Cain's analysis was completely silent.  There wasn't one

12  word in it about efficiency during the class period.

13  Q.  So what's wrong with looking at news days that predate

14  the class period for purposes of a *Cammer* 5 analysis?

15  What's wrong with that in this case?

16  A.  Well, I think it's the question of whether, because you

17  can demonstrate that a stock traded efficiently in one

18  period, does that necessarily mean it traded in an efficient

19  market in all periods?  And particularly when the period

20  that's particularly at issue in this case is the class

21  period, not a year earlier than the class periods or six

22  months earlier than the class period?

23         To have a complete absence of any analysis, any

24  discussion, not one word of even commentary of market

25  efficiency during the class period, I thought was a

1    fundamental flaw in Dr. Cain's initial report.

2    Q.  After you provided your own report identifying what you

3    believe is the fundamental flaw, did Dr. Cain do a new

4    analysis?

5    A.  He did.

6    Q.  And what is your view of the new analysis that Dr. Cain

7    did?

8    A.  I also don't think it demonstrates anything about market

9    efficiency during the class period.

10   Q.  So what did he do and why doesn't it demonstrate in your

11   view efficiency during the class period?

12   A.  Well, for several reasons.  First of all, even though he

13   said -- he testified that his alternative analysis was an

14   analysis during the class period, it's not just an analysis

15   during the class period.  He added days before and he added

16   days after, because without that he couldn't get the result

17   that he wanted to get.  It's not an analysis simply of the

18   class period.  So that's one problem.

19        The second problem is in his initial analysis, his

20   initial news-day versus no-news-day analysis, he emphasized,

21   as he did in testimony, the importance of objective criteria

22   to define what's a news day and what's not a news day.

23        One of the things that's absent in Dr. Cain's new

24   supplemental news-day -- non-news-day analysis is he never

25   analyzes whether his description of news days and non-news

1    days, if you used the same criteria, same objective criteria

2    during the days of the class period, would the days that he

3    now classifies as news days, would they be non-news days

4    under his original criteria?

5            And so there's -- it's a complete abdication of

6    the standards that were used for the initial study for a new

7    set of completely subjective, in my opinion, standards that

8    again are not limited to the class period where there is no

9    objective methodology to determine what's a news day, what's

10   a non-news day.

11           And if anything, if you applied the same criteria

12   of the objective definition, you would get completely

13   different results of how many news days or non-news days

14   there were.

15           And again, the difference between earnings

16   releases, which was the criteria that Dr. Cain used in my

17   opinion appropriately in the news and non-news-day analysis

18   that he did originally, even though not relevant to the

19   class period, it's appropriate because there is academic

20   learning that earnings releases frequently contain

21   value-relevant information.

22           So therefore, there's an objective reason to

23   classify earnings releases as news days.

24           But when you go to the class period, and you have

25   August 12 a tweet in midmorning, there's no objective method

1    that exists to classify that as a news day.  There's no

2    reason to believe that a tweet in the middle of the day is

3    going to contain value-relevant information in the same way

4    that earnings releases do, given the academic learning about

5    earnings releases.

6         So there's not only a complete change in standards

7    of what's a news day and what's not a news day; the premise

8    of something being a news day, that there's a basis to

9    conclude that there's news on that day that contains

10   value-relevant information, that doesn't exist in the class

11   period other than what I would say is Dr. Cain's completely

12   subjective and arbitrary classification to generate the

13   result that he generated, again, not based on the class

14   period, but based on the class period plus days before and

15   days after.

16        So I think there's nothing wrong with Dr. Cain's

17   original analysis.  I think it met basically high levels of

18   academic standards.

19        The only problem was, it didn't have anything to

20   do with the class period.  And when he did try and do

21   something with the class period, I don't think that could be

22   described as a standard methodology; in fact, quite the

23   opposite.  I don't think it would meet any definition of

24   appropriate methodology in order to analyze market

25   efficiency during the period of time during the -- during

1    the class period.

2    Q.  Let me ask you, who is Eugene Fama?

3              THE COURT:  You've got about five minutes.

4    BY MR. FARINA:

5    Q.  I'm going to skip --

6    A.  Sorry.  It's my fault for talking too long.

7    Q.  I'm going to skip my question about Eugene Fama.

8              I want to talk a little bit about price impact.

9    And this goes to the event study that you did and the event

10   study that he did and the different conclusions that you

11   reached.

12             First of all, did you do an event study?

13   A.  Yes.

14   Q.  Did you disclose the parameters of your event study in

15   your opening report?

16   A.  Yes.

17   Q.  And Dr. Cain has also done an event study.  Correct?

18   A.  Correct.

19   Q.  Can we talk about Demonstrative 21?  It's a complicated

20   document, but I would like to review this with you.

21   A.  Yes.

22   Q.  Does this reflect both Dr. Cain's event study and your

23   event study?

24   A.  Two events.  Yes, it does.  It --

25   Q.  You mentioned two event studies.  If you look at the

1    right-hand column, do you see Fischel 1 and Fischel 2?

2    A.  Yes.

3    Q.  Are they both in your original report?

4    A.  Yes.

5    Q.  All right, sir.  So let me ask this:  What is the

6    principal difference between Dr. Cain's event study and your

7    event study?  And why does it matter?

8    A.  Okay.  Dr. Cain's event study with respect to the class

9    period in my opinion is based on a really fundamental and

10   basic error.  And that is, he is using -- what an event

11   study is is it takes a period called an estimation period

12   and uses it to predict prices, prices that you'd expect, and

13   then compares actual prices with the predicted prices to

14   determine whether that difference is statistically

15   significant.

16         So what Professor Cain did was he took a period,

17   his 120-day rolling estimation period, of low volatility and

18   used it to compare prices in a period -- to project prices

19   in a period of high volatility.

20         And when you do that, when you're using your

21   projection based on a period of low volatility but you're in

22   a period of high volatility, then you're going to have a lot

23   of days that look like there's big price moves because

24   they're price moves relative to a period of low volatility.

25         And so that's why if you look at all the red in

1    Dr. Cain's event study, he finds all these days have big

2    statistically significant price movements, although he does

3    not link those price movements to new value-relevant

4    information, which is another flaw.

5            And this is all assuming the existence of an

6    efficient market, which for reasons I've said I don't think

7    exist.

8            But what my two event studies did was they tried

9    to make this statistical analysis more apples to apples

10   using a period of high volatility to predict prices in a

11   period of high volatility as opposed to low volatility and

12   high volatility.

13           And when you do that, the conclusion about

14   statistical significance disappears for each of the days.

15   And what that means in statistical terms is when you don't

16   have statistical significance in an event study on a

17   particular day, it means you can't reject the hypothesis

18   that the price movement on that day is attributable -- is a

19   random movement or attributable to chance alone.  But you

20   cannot conclude that the price movement is related to new

21   value-relevant information, which is what my two event

22   studies show.

23   Q.  And your two event studies look at the price movements

24   on each of the trading days in the class period.  Right?

25   A.  Correct.  But they use estimation periods.  One of them

1    uses a 40-day estimation period beginning on August 1st,

2    which sort of covers the class period.

3         The second one uses 20 days before the class

4    period and 20 days after the class period in order to avoid

5    the arguably contaminating effect of price movements during

6    the class period.

7    Q.  Did your two analyses using different estimation periods

8    both come to the same conclusion about whether or not there

9    was statistically significant price movements on any day in

10   the class period?

11   A.  Yes, they did.

12        But let me also say, even if they reached the

13   opposite conclusion that there was statistically significant

14   price movements, which is not the conclusion that they

15   reached, but even if they did, that would not mean that the

16   price movements were as a result of new value-relevant

17   information.  And that's also an important point.  That's

18   also an important point.

19   Q.  Those could be price movements that are simply a

20   continuation of the short squeeze?

21   A.  Correct.

22        MR. FARINA:  I have no further questions.

23        THE COURT:  Professor, do you agree with the

24   *PolyMedica* requirement that I'm supposed to be looking at

25   something -- an informationally efficient market?  That's

1    really the focus here?

2              THE WITNESS:  I mean, I think for purposes of this

3    case, there's not in my opinion really a meaningful

4    distinction between informational efficiency and fundamental

5    efficiency, because both require that there be a

6    relationship between new value-relevant information and

7    price movements.

8              The difference between them is that informational

9    efficiency requires that relationship, that prices react to

10   new value-relevant information.  And fundamental efficiency

11   means that when the market reacts, it has to do it

12   accurately.

13             So you can have --

14             THE COURT:  So I don't need to worry about

15   accuracy?

16             THE WITNESS:  Well, it's not my place to tell your

17   Honor what you need to worry about.  But --

18             THE COURT:  The First Circuit says I don't have

19   to.

20             THE WITNESS:  But if your Honor is asking me, if

21   the issue is informational efficiency, does the price

22   movements of BBBY in the class period and leading up to the

23   class period, do they meet the requirement for informational

24   efficiency -- and it's really the same question as, Do they

25   meet the requirements for *Cammer* 5? -- I would say no.

```
 1                    THE COURT:  Thank you.

 2                    MR. FARINA:  Thank you.

 3                    Your Honor, if we may have some brief argument

 4       after the testimony, I would like to talk quite a bit about

 5       PolyMedica.

 6                    THE COURT:  I'm hoping we're going to have time

 7       for that.

 8                    MR. FARINA:  I'm hoping so as well.

 9                    Thank you.

10                    THE COURT:  Mr. Jafri.

11                         CROSS-EXAMINATION

12       BY MR. JAFRI:

13       Q.  Good to see you again, Professor Fischel.

14       A.  Nice to see you as well, sir.

15       Q.  I wanted to start with something that you've talked

16       about a lot in your direct, which is value-relevant

17       information.

18                    You agree that what investors do by their trades

19       can be value-relevant information.  Right?

20       A.  You're asking me in any circumstance?

21       Q.  Yes.

22       A.  Yes.  Absolutely.

23       Q.  Right.

24                    And you also agree that a large shareholder with a

25       long position in the company can provide value-relevant
```

1    information.  Correct?

2    A.  Potentially.  The decisions by informed investors can

3    provide information in the marketplace.  Yes.  That's

4    correct.

5    Q.  Ryan Cohen was one of the largest shareholders of BBBY.

6    Correct?

7    A.  Yes, he was.

8    Q.  And he sent a tweet about BBBY on August 12th.  Correct?

9    A.  I will say it was a tweet in response to an earlier

10    tweet about BBBY.

11    Q.  But the subject matter related to the company.  Correct?

12    A.  I mean, the subject matter is what it was.  It was

13    saying the basket is full or the wagon is full, whatever the

14    statement was.  It doesn't refer to BBBY itself, but it's

15    understood to be a response to an earlier tweet about BBBY.

16    Q.  Right.

17         And that earlier tweet was about a Loop Capital

18    report that came out -- I'll rephrase.

19         So the CNBC tweet that Cohen responded to was

20    about a Loop Capital report that came out in the class

21    period on August 12.  Correct?

22    A.  I think maybe the earlier tweet came out just before the

23    class period, if I remember correctly.

24    Q.  You analyzed a Loop Capital report that came out on

25    August 12 of 2022 in your report?

1    A.  Yes.  Correct.

2    Q.  So you don't recall it was the same report?

3    A.  No.  I do recall it.  I just don't remember if it was

4    just before the class period or just -- I should say, just

5    before the market opened or after the market -- the markets

6    opened.

7    Q.  That's fine.

8          I wanted to move on to another topic, a subtopic

9    of this, which is, you agree that expectations about mergers

10   and spinoffs would be value-relevant information.  Right?

11   A.  I would say information about mergers or spinoffs can

12   definitely be value-relevant information.

13   Q.  And you also believe that that would be true even if the

14   company's performance financially is terrible.  Correct?

15   A.  Yes.  One thing doesn't necessarily have anything to do

16   with the other.

17   Q.  But that wasn't my question.

18          My question is:  Even if the company's financial

19   results are very bad, an expectation that there would be a

20   merger can still constitute value-relevant information.

21   Right?

22   A.  Yes.  As I said, the company's bad financial performance

23   doesn't have anything to do with expectations about the

24   merger.

25   Q.  Right.

1          And you're aware that one of the things that Cohen

2     talked about in his letter was his expectation that the

3     company should evaluate options for selling or spinning off

4     the buybuy BABY asset.  Correct?

5     A.  What date are you talking about?  Which -- this letter

6     that you're referring to, what is the date of it?

7     Q.  This is the cooperation agreement that came out in March

8     of 2022.

9     A.  Yeah.  I mean, that's the point.  It's long before the

10    beginning of the class period.

11    Q.  But that wasn't my question.

12          My question is:  That was one of the things that

13    he said was important to him.  Right?  Whether they could

14    sell or spin off buybuy BABY.  Right?

15    A.  Yes.  That's correct.

16    Q.  You also agree that a company can have very poor current

17    performance and still be worth a lot of money because prices

18    are forward-looking.  Correct?

19    A.  Yes.  That certainly can happen.

20    Q.  I wanted to move on to another topic, Professor Fischel.

21    And I know that -- I was going to go through all the *Cammer*

22    factors with you, but I will try to be brief about that

23    because I think you have -- your testimony earlier was that

24    you don't believe most of them are relevant.  Right?

25    A.  I don't believe most of them are relevant to distinguish

1     between a period where shares are trading in an efficient

2     market versus for a public company shares are trading for a

3     limited period of time in an inefficient market, with the

4     exception of *Cammer* Factor No. 5.

5     Q.   Okay.  So -- but putting that aside, you don't contest

6     that four of the *Cammer* factors that were analyzed in the

7     class period here exist.  Correct?

8     A.   When you say "exist," you mean are satisfied?

9     Q.   Correct.

10    A.   Yes.  I don't disagree with that.

11    Q.   And one of those *Cammer* factors is about market makers,

12    the third one.  Right?

13    A.   Yes.  That's correct.

14    Q.   And you understand that when the *Cammer* court was

15    talking about market makers, it was talking about

16    arbitrageurs.  Right?

17    A.   If you're talking about what the *Cammer* court was

18    talking about, that I'd have to look at.

19    Q.   Okay.  I'll rephrase my question.

20         Arbitrageurs are market makers.  Right?

21    A.   They can be.

22    Q.   And short selling is a form of arbitrage.  Right?

23    A.   You know, it might or might not be.

24    Q.   Well, but short selling can be a form of arbitrage.

25    Right?

1    A.  It can be.

2    Q.  Professor Fischel, it's also true that you did not

3    determine whether any of these four factors that you would

4    concede existed actually existed.  Right?

5    A.  I did not have any analysis of those factors in my

6    report.

7    Q.  So, for instance, you do not know whether the company

8    was eligible to file a Form S-3.  Right?

9    A.  I didn't have an opinion about that one way or the

10   other.

11   Q.  However, you know, given your -- your extensive

12   experience that any company that has at least $75 million in

13   equity and has filed financial reports in the previous 12

14   months is eligible to file a Form S-3.  Right?

15   A.  That sounds reasonable.  But actually, I did not know

16   that.

17   Q.  Okay.  Well, you do know that there are several *Krogman*

18   factors that courts also take a look at when they try to

19   analyze whether a market is efficient?

20   A.  Yes.  I do know that.

21   Q.  And you did not contest whether Dr. Cain's analysis

22   about any of those factors was incorrect.  Right?

23   A.  No, for the reasons that I stated.

24   Q.  And one of those factors is the total market cap of the

25   company.  Right?

1    A.  Correct.

2    Q.  And you don't know what the market cap of the company

3    was in the class period.  Right?

4    A.  Not from memory, no.

5    Q.  So you don't know that it exceeded a billion dollars?

6    A.  Again, that sounds reasonable to me.  I believe that's

7    the case.

8    Q.  I wanted to move on to another topic, which is I think a

9    significant portion of your report, which is about short

10   selling, which courts, as we discussed, sometimes analyze

11   under the third *Cammer* factor.

12           You agree that short selling constraints by

13   themselves do not necessarily mean a market is inefficient.

14   Right?

15   A.  Correct.

16   Q.  You also agree that implied options volatility by itself

17   doesn't mean that a market is inefficient.  Right?

18   A.  Not necessarily correct.

19   Q.  I'm sorry.  I don't think I understand what you're

20   saying.

21   A.  Maybe the question was a little bit unclear.  It doesn't

22   necessarily mean that the market is inefficient.

23   Q.  So that's a yes?

24   A.  Yes.  I'm agreeing with you.

25   Q.  You calculated the short interest utilization rate here,

1    Professor Fischel, by looking at the number of shares sold

2    short as a percentage of the shares available to borrow.

3    Right?

4    A.  Yes, basically.

5    Q.  What you did not do is consider any S3 from any other

6    vendor other than NASDAQ FIS.  Right?

7    A.  Well, I have now.  But at the time of my report, I used

8    the S3 source that's referred to in my report.

9    Q.  And now that we've established the formula that you

10   used, you did not measure the short interest utilization

11   rate by calculating the number of shares sold short as a

12   percentage of the company's daily float.  Right?

13   A.  Well, that -- I didn't calculate that, but that's also a

14   misleading statistic, because the company's float is not the

15   same as shares available to lend.

16   Q.  Okay.  Are you aware that Ryan Cohen in one of the

17   briefs that he filed in court compared it to the daily

18   float?  Are you aware of that, Professor Fischel?

19   A.  No, I'm not.

20   Q.  So we wanted to show you a slide that we have put

21   together based on your backup data.

22          MR. JAFRI:  If we could please put it up.

23   BY MR. JAFRI:

24   Q.  So, Professor Fischel, if you turn to your report -- and

25   I think Mr. Farina also showed some of these charts to

1    you -- do you recognize that one of these is the short

2    interest line that is taken from your report?

3         Just to give you some background, this -- I'm

4    going to represent to you that both of these are separated

5    out in your report.  One of them is the price of BBBY

6    securities and the other one, the gray one, is the short

7    utilization interest rate, which you will find on Pages 12

8    and 18 of your report.

9         We have it in front of you in the binder, if you

10   want to take a look.  I believe it's Tab 9.  And -- sorry.

11   Not Tab 9.  It's Tab 8.

12        But what we will -- what I would represent to you

13   is that you produced some backup materials, and we used

14   those exact backup materials to put both these graphs

15   together.

16        So what I wanted to speak to you about is that you

17   did not do any statistical significance testing to test the

18   relationship between the short interest utilization rate and

19   BBBY's stock price.  Right?

20   A.  Well, I'm not sure what you mean by "statistical

21   relationship."  I demonstrated that the price rose

22   dramatically for a temporary period of time in a period

23   where BBBY's utilization rate was at least, according to the

24   S3 vendor that I relied on, 100 percent and with respect to

25   the other S3 vendor maybe 99 percent, something like that.

1   Q.  That wasn't my question.  Let me rephrase.

2          What I'm trying to say is that you did not test

3   whether there was any statistical co-relationship between

4   the short interest utilization rate here and the prices of

5   BBBY securities.  Right?

6   A.  I mean, I don't know what you mean by "test."  I showed

7   that prices rose dramatically during a time when the

8   utilization rate rose to 100 percent.

9   Q.  Okay.  Well, let's take a look at the chart, then.  If

10  you focus your attention on the dates between August 1st,

11  2021, and March 1st, 2022, you agree that the price over

12  here is overall declining.  Right?  That's what the chart

13  shows.  This is your chart.

14  A.  Well, obviously, the price reaches an apex and then

15  declines --

16  Q.  Right.

17  A.  -- after that.

18  Q.  But, Professor Fischel, the short interest utilization

19  rate is increasing here in this period, isn't it?  That's

20  what it shows.

21  A.  Well, but this isn't my exhibit, is it?

22  Q.  These -- so I mentioned, these are taken from Page 12

23  and 18 of your report.  The only thing we did was put them

24  together.

25  A.  Well, can I just look at my report for a second?

1    Q.  Go ahead.  So it's Tab 8 in the binder we have.  I

2    believe Mr. Farina also gave you a copy of it.

3    A.  It looks like what you've done is change my chart to --

4    you've kept the blue line the same, but you've extended the

5    short interest utilization?  That's what you did?  I mean,

6    in other words, that's your addition to my exhibit?

7    Q.  What is the specific addition here?

8    A.  Let me make sure I'm looking at the right exhibit.

9    Which number is it?

10   Q.  So the short interest utilization rate that you had on

11   your report was on Page 18.  And over here, it's the gray

12   line.

13   A.  Just let me look.  Hold on.

14            I see.  I was looking at the wrong exhibit.

15   Q.  So we --

16   A.  My mistake.  I apologize.

17   Q.  So we are on the same page that this is exactly the

18   same.  Right?

19   A.  Yes.  This is -- these are two different exhibits from

20   my -- two -- two parts of exhibits from my report.  Correct.

21   Q.  So I want to go back to my question, which is:  If you

22   look at the prices here of the BBBY securities, I believe

23   you agree that the overall price is declining between August

24   1st of 2021 and March 1st of 2022, right, as a general

25   trend?

Fischel - CROSS - By Mr. Jafri

1    A.  That's right.  I agree.

2    Q.  But the short interest utilization rate is increasing,

3    isn't it?

4    A.  Well, it looks like it stays roughly the same.

5    Q.  You think this looks exactly -- well, but it's generally

6    increasing in this period, isn't it?

7    A.  The short interest utilization rate --

8    Q.  Right.

9    A.  -- it looks to me to be constant.  Maybe I'm

10    misunderstanding your question.

11    Q.  Well, if you look at it on March 1st, 2022, isn't it

12    over 50 percent?

13    A.  Oh, I'm sorry.  You're not looking at just the gray

14    area.

15    Q.  No.  That's what I'm looking at.  What I'm saying is if

16    you look at the gray line on March --

17    A.  I'm sorry.  The gray shaded area.  That's what I was

18    confused about.  My mistake.  I apologize.

19    Q.  Right.  So I'm going to again say this.

20          You agree that the short interest utilization rate

21    during this period, August 1st, 2021, and March 1st, 2022,

22    is increasing.  Right?

23    A.  Yes.  I would agree with that.

24    Q.  Now, Professor Fischel, you also did not do anything to

25    analyze whether the company was subject to any other short

1    squeezes other than this one that overlaps with Cohen's

2    alleged fraud.  Correct?

3    A.  You mean, did I analyze short squeezes in any other

4    period other than the class period?

5    Q.  Right.  Like whether the company was ever subject to a

6    short squeeze on any other date, a rumored short squeeze on

7    any other date, even a rumored short squeeze.

8    A.  I did not do any systematic analysis other than the

9    class period.

10   Q.  Right.

11          But you have seen Dr. Cain's report, and he

12   mentioned that there were rumors of a short squeeze in

13   November of 2021.  Right?

14   A.  I believe there was reference in Dr. Cain's report to at

15   least some stories about rumored short squeezes at other

16   points in time.

17   Q.  Right.

18          And if you look at this chart over here, in

19   November of 2021, the price of BBBY securities is much

20   higher than the short utilization interest rate.  Right?

21   A.  I'm sorry.  What date?

22   Q.  November 2021.

23   A.  November 2021?  The price is higher than the short

24   interest -- the utilization rate.  Correct.

25   Q.  Right.  Okay.

```
1              And as we discussed, that's one of the places
2    where Dr. Cain said that he thought based on the information
3    that he looked at that there was a rumored short squeeze.
4    Correct?
5    A.  I'm not sure that's right.
6    Q.  Okay.  Maybe this --
7    A.  In fact, I don't think it is right.  But go ahead.
8    Q.  Well, let me -- maybe this will jog your memory.  Do you
9    remember he mentioned a Dow Jones article saying that there
10   could be a rumored short squeeze in November of 2021?
11   Right?
12   A.  You know, if you're asking me that specifically, I'd
13   like to see it.
14   Q.  Okay.  And let's move on to another thing.
15   A.  Because I don't think there is the same kind of
16   relationships that I described in August of 2022 in terms of
17   price movements, volatility, short interest S3 as well as
18   volume of price.
19   Q.  But that wasn't my question.
20              My question was whether you're aware that he
21   looked at a news article to conclude that there was a
22   rumored short squeeze in November of 2021.  And I believe
23   you said that you weren't aware.  Right?
24   A.  Well, I said -- I remember he had some earlier articles.
25   But if you're asking me something that specific, I'd like to
```

1  see the article.

2  Q.  Okay.  But you do take a look at articles to make

3  conclusions about rumored short squeezes like the Seeking

4  Alpha article that is a significant part of your analysis in

5  your report.  Right?

6  A.  Certainly part of my analysis.

7  Q.  And the title of that article was that there was a

8  suspected short squeeze.  Right?

9  A.  The title of which article?

10 Q.  The one in Seeking Alpha.

11 A.  Can you show it to me?

12 Q.  Well, never mind.  The title speaks for itself.  Let's

13 move on.

14        Now, I wanted to go back to the chart over here

15 and I wanted to speak to you about some other things.

16        So if you look at the -- this chart in May of 2022

17 and July of 2022, do you see that the stock price is

18 plummeting despite the fact that the short interest

19 utilization rate is skyrocketing at this point?

20 A.  Tell me the dates again.

21 Q.  So the dates that I mentioned are May 2022 through July

22 of 2022.

23        THE COURT:  If it would be helpful, you can

24 actually touch the screen there.

25        MR. JAFRI:  Sure.

```
1              THE WITNESS:  Oh, okay.
2     BY MR. JAFRI:
3     Q.  So I'm talking about that area over here, May 1st, 2022,
4     and this area over here, which is July 1st, 2022.
5     A.  Okay.  I see that.
6     Q.  I'm going to repeat my question.  The stock price over
7     here plummeted, but the short interest utilization rate
8     increased significantly.  Correct?
9     A.  Yes.  That's right.
10    Q.  Now let's talk about when the short interest utilization
11    rate hit 100 percent.
12              You agree, based on what we're seeing in this
13    chart, that it hit 100 percent in early July.  Right?
14    A.  You're calling that 100 percent?
15    Q.  Well, it's almost 100 percent.  I believe your
16    conclusion was "at only 100 percent."  So let's talk about
17    that.
18              It's at only 100 percent at this point.  Right?
19    A.  I mean, I'm looking at -- maybe I'm misunderstanding the
20    question.  But it looks like it's about 70 percent.
21    Q.  Okay.  Well, if you move on, before the class period, it
22    hit 100 percent.  Right?
23    A.  Yes.  That's right.
24    Q.  So that's before Mr. Cohen made misrepresentations.
25    Correct?
```

Fischel - CROSS - By Mr. Jafri

1    A.  Well, before the alleged misrepresentations during the

2    class period.  Correct.

3    Q.  Right.  Okay.

4         So it was already at 100 percent before at least

5    August 1st of 2022.  I would say it's even earlier than

6    that.  But at least we've agreed that before the class

7    period, it already hit 100 percent.  Correct?

8    A.  Correct.

9    Q.  But you see over here that there is no rise in the stock

10   price.  Correct?

11   A.  Because there's no reason to expect a one-for-one

12   relationship or for -- or any relationship.  What a short

13   squeeze is is when there's a large short interest and

14   there's a dramatic increase in volume.  It's not the short

15   interest by itself without the dramatic increase in volume

16   that's pushing prices up.

17   Q.  Right.

18   A.  That's what creates the short squeeze.

19   Q.  Okay.  So now the parameters have changed.  I see.

20        But if I told you that the volume in November of

21   2021 also increased, you wouldn't know that because you

22   didn't study whether there was a short squeeze then.  Right?

23   A.  Actually, I think I do report volume over the period

24   that Dr. Cain relied on.

25   Q.  But, Professor Fischel, you didn't study whether there

1    was a short squeeze in November of 2021?

2    A.  I don't think there's any basis to conclude that there

3    was a short squeeze with these kind of aberrational price

4    movements in the absence of any value-relevant information

5    in any period other than August of 2022.

6    Q.  Right.

7         But we already established that what a large

8    shareholder who's long says is value-relevant information.

9    Correct?

10   A.  Can be.

11   Q.  Right.

12        And we also established that expectations about

13   mergers and spinoffs are value-relevant information.  Right?

14   A.  Can be.

15   Q.  Professor Fischel, why is it that in your report you did

16   not combine these two charts and try to explain why they

17   have no connection with each other?

18   A.  Well, first of all, I wouldn't say they have no

19   connection to each other.  But it's also an incomplete

20   description of what I relied on as well as my description of

21   what creates a temporary short squeeze.

22        Price increases, even -- no matter what the short

23   interest is, are by definition temporary.  If you look at

24   the academic literature, they tend to last somewhere between

25   12 and 14 days, if I remember correctly.

1              And it's not the case that anytime short interest

2      utilization is high that there's a short squeeze.  You need

3      a particular confluence of circumstances, not all of which

4      are represented on this particular exhibit.

5      Q.   Okay.

6      A.   But let me just say, the fact that you have this

7      dramatic increase in price that's temporary at a time when

8      there is an explosion in volume and there's 100 percent or

9      close to it short interest utilization and a complete

10     absence of any new value-relevant information, those are all

11     the characteristics of a short squeeze.

12     Q.   Professor Fischel, in this chart, you also see that the

13     price again plummets beyond the class period.  Right?  So

14     now we're talking beyond November -- sorry -- September 1st

15     of 2022.  The price is decreasing.  Correct?

16     A.   Yes.  I mean, that's part of the point.  The price

17     increase is temporary.  It's artificial.  It's a distortion.

18     It can't last.  It's by definition temporary.  And that's

19     exactly what happened here, and even as a partial

20     combination of my various exhibits of what this shows.

21     Q.   Putting that speculation aside, I think my next question

22     is that, despite that happening, the short interest

23     utilization rate here in your chart remained at 100 percent.

24     Correct?

25     A.   Yeah.  It appears to be correct.

1   Q.  Okay.  Did Ryan Cohen tell you to keep this information

2   out of your report?

3   A.  I've never spoken to Ryan Cohen.  And I think it is in

4   my report.  You took it from my report, so how can you say

5   it's not in my report?

6   Q.  Well, I'm talking about the discussion that we just had,

7   the fact that both of these charts are completely different

8   from one another and, for instance, the fact that the price

9   is plummeting but the short interest remains at 100 percent.

10  You didn't address this in your report.  Right?

11  A.  I think all that -- you took this from my report.  So

12  it's in my report.

13  Q.  The S3 is in your report, but you didn't have anything

14  to say about this topic that we just discussed.

15  A.  No.  I actually did.  I talked about the characteristics

16  of a short squeeze, and it's by definition temporary and why

17  it occurred and in connection with the absence of any new

18  value-relevant information and then the price of BBBY stock

19  after this period of artificial distortion basically

20  returned to its pre-short squeeze level.

21  Q.  And that's based on a few articles that you read and

22  that you cited in your report?

23  A.  It's based on a few articles in connection with a lot of

24  economic S3 as well as commentary as well as economic

25  literature on short selling and short squeezes --

1    Q.  You're not aware --

2    A.  -- all of which is in my report.

3    Q.  You're not aware of any legal decision that has said the

4    market is inefficient because there's a short selling

5    constraint and the utilization rate is near 100 percent,

6    even though there are shares available to short.  Correct?

7    A.  I haven't based my analysis on any legal decisions one

8    way or the other.  I mean, I speak about some other cases

9    that I've been involved in, if you want to speak about that.

10   But in terms of -- my analysis is meant to be an economic

11   analysis.  It's not meant to rely on legal precedence for

12   purposes of reaching my conclusions.

13   Q.  But, Professor Fischel, you agree that the way the

14   courts analyze efficiency in terms of public information

15   affecting prices is very different from the way an economist

16   looks at whether the value of the prices is reflecting

17   correct information.  Right?

18   A.  You know, I really hesitate to talk about what courts

19   look at or anything legal.  I mean, I've taught this subject

20   my entire career.  I've written about it.  So I'm basing my

21   analysis on the economic S3 and the economic literature that

22   is contained in my report.

23   Q.  Let's move on to another topic.

24            You do not know whether Ryan Cohen is a social

25   media influencer.  Right?

1    A.  Is a what?

2    Q.  A social media influencer.

3    A.  You know, well, at a minimum I'll say I have no opinion

4    on that subject.

5    Q.  So you have no understanding of whether and how he

6    influences anybody on social media.  Correct?

7    A.  I have no opinion on that subject.

8    Q.  Professor Fischel, you also did not take a look at

9    subreddits like BBBY to see what people were saying about

10   Ryan Cohen and his tweets.  Correct?

11   A.  I did look at social media.  I'm not sure in that

12   category that you mentioned if I ever looked at that.

13   Q.  Well, so I was talking about a specific subreddit, BBBY.

14   You did not -- you did not have anyone take information from

15   that.  Correct?

16   A.  I don't know.  I don't know what that is, frankly.

17          So I do have social media commentaries that I

18   describe in my report, which I think is not relevant for the

19   reasons I describe in my report.  But I'm certainly not a

20   social media expert or expert on all the different

21   categories of social media.

22   Q.  You examined in your report the August 12th tweet.

23   Right?

24   A.  Yes.

25   Q.  But you did not look at any of his other tweets.

1    Correct?

2    A.  Well, to say I didn't look at them, that's not quite

3    right.  I did look at some.  But I didn't look at any other

4    ones in the class period for -- because as far as I'm aware,

5    that was the only one that was at issue in the class period.

6    Q.  Right.  That's your explanation for not doing it.

7            My question is:  In your report, you do not

8    analyze any other tweet other than the one on August 12,

9    2022.  Correct?

10   A.  In my report, that's correct.

11   Q.  Right.

12           And you know that the price of BBBY securities

13   went up by over 40 percent on August 8th of 2022.  Right?

14   A.  I'm aware that there was a significant price increase on

15   August 8th.

16   Q.  Right.

17           And you did not examine whether there was any

18   price -- let me rephrase.

19           You did not examine whether that price increase

20   happened because of anything Ryan Cohen tweeted the day

21   before.  Right?

22   A.  It was the Friday before, actually, on the 5th.  You

23   know, I did look at that.  And basically, I reached the

24   conclusion that I reached about the absence of any new

25   value-relevant information during that period.

1          As I recall, that tweet was, you know, something

2    like, "Don't ask what your country can do for you,"

3    something like what John Kennedy said, if I remember

4    correctly.

5    Q.  Yeah.  That's right.

6          But --

7    A.  So --

8    Q.  But you didn't see what other people online were

9    saying -- were saying about the tweet.  Right?

10   A.  On August 5th?  No, I did not.

11   Q.  In fact, you did not see anything about what people said

12   in response to his tweets.  Correct?

13   A.  Well, no.  I mean, in my report, I highlighted that

14   there was no news stories that attributed the price increase

15   on August 12th to the tweet.  And that was true on August

16   12th; that was true on August 13th, 14th.

17         So the absence of any contemporaneous market

18   participant that attributed the price increase to the tweet

19   on August 12th was something that I did look at.  But I

20   didn't do a systematic study of commentary on all tweets

21   that had nothing to do with the facts and circumstances of

22   this case.

23   Q.  I'm going to get more specific.  What I meant is, you

24   did not see any replies or anyone reposting his tweet on

25   Twitter.  Correct?

1    A.  I'm not sure I exactly analyzed that question.

2    Q.  But it's not in your report.  Right?

3    A.  Not in my report.

4    Q.  Now, one thing I wanted to go back to, because you

5    mentioned news articles and value-relevant information.  But

6    you agree that public information about companies with

7    efficient securities does not always just have to come from

8    the news media.  Right?

9    A.  I'm sorry.  Can you repeat the question?

10   Q.  I'll rephrase my question.

11         You agree that important information about

12   companies does not have to exclusively come from the news

13   media.  Right?

14   A.  Yes.  That's correct.

15   Q.  Right.  So for instance, if a company releases an SEC

16   filing, right, and for whatever reason the news doesn't

17   cover it, that doesn't mean that it's not public or that

18   investors haven't seen it.  Right?

19   A.  It doesn't necessarily mean it.  I'm not sure I would,

20   based on what you've told me, express an opinion one way or

21   the other as to whether it's public, although SEC filings

22   are generally considered to be public information.

23   Q.  Right.

24         What I meant is, if you just have an SEC filing

25   that discloses information, you think that's value-relevant

1    information.  Correct?

2    A.  Not necessarily.

3    Q.  Well, let me rephrase.

4         The extent that -- some information about a

5    company comes out.  And it says that, you know, We're going

6    to get indicted and the company's going to implode.  Is that

7    value-relevant information?

8    A.  So there's a disclosure that the CEO is going to be

9    indicted and the company is going to go broke?

10   Q.  Right.

11   A.  I mean, you'd have to look.  But it certainly sounds

12   like it.

13   Q.  Right.

14        And if it just comes out from an SEC filing, you

15   wouldn't say that, Well, I don't like the source, so it's

16   not value-relevant information.  Right?

17   A.  I've never said I don't like the source of SEC filings,

18   first of all.

19        But, you know, again, without knowing any context,

20   it's hard to say definitively.  But I would suspect, if this

21   were a public company with an SEC filing, if it contained

22   that disclosure it would be picked up somewhere.

23   Q.  Right.

24        And you did not examine anything about what

25   investors were saying about Ryan Cohen's

1    misrepresentation -- alleged misrepresentations on any of

2    these forums.  Correct?

3    A.  Well, other than news articles, you know, which I did

4    analyze.  I also did some analysis of social media.  So I

5    wouldn't agree that I did no analysis.  But I didn't make --

6    I didn't do any analysis of what investors were saying, if

7    that's what you're asking me.

8    Q.  Right.  That's my question, that you did not do any

9    analysis of how people were reacting to his statements on

10    social media platforms.  Correct?

11    A.  Some analysis on social media platforms, which I

12    contain -- discuss in my report.  But as I said, I don't

13    pretend to be a social media expert and don't pretend to

14    have exhausted every possible social media site.

15    Q.  Right.

16         But, Professor Fischel, earlier you told me that

17    you didn't look at the likes or the reposts on Twitter with

18    respect to any of his tweets.  Correct?

19    A.  I don't think I ever did that analysis.  Correct.

20    Q.  Right.  Okay.

21         So to the extent you looked at anything, it wasn't

22    complete.  Right?

23    A.  It wasn't what?

24    Q.  It was not complete to whatever extent you looked at

25    anything about what investors said online about his

1    representations.  You do not believe that you did a complete

2    analysis of that.  Right?

3    A.  I didn't do a complete -- you're right.  I agree.  I did

4    not do a complete analysis of everything that was said on

5    social media.

6           I did do a -- what I hope was a complete analysis

7    of whether there were any public articles, you know, such

8    as, you know, *The Wall Street Journal* or other sources that

9    follow financial news.  I tried to look at every one of

10   them.  And I didn't see any reference in any of them that

11   attributed the price increase on August 12th to the tweet.

12   Q.  Right.

13          And you also did not analyze in your report

14   whether there were thousands of investors online on forums

15   saying, We're going to buy shares because Ryan Cohen thinks

16   that we should buy shares.  Right?

17   A.  I didn't do that investigation.

18   Q.  I wanted to move on to the final topic, Professor

19   Fischel, about price impact.

20          THE COURT:  You've got about five minutes, sir.

21          MR. JAFRI:  Your Honor, I don't need more than

22   five.

23          THE COURT:  Great.

24   BY MR. JAFRI:

25   Q.  So, Professor Fischel, you talked about estimation

1    windows, and you criticized Dr. Cain for using a rolling

2    window that was 120 days before the event in this case.

3    Right?

4    A.  Correct.

5    Q.  But you agree with me that a majority of event studies

6    actually used that 120-day window.  Correct?

7    A.  Or something like it.

8    Q.  Right.

9    A.  In general, that's true.

10   Q.  Because estimation periods typically are chosen before

11   the event period.  Right?

12   A.  Not always.  It depends a little bit on the facts and

13   circumstances.  But I would say more often than not.

14   Q.  And you chose an estimation window over here that

15   overlaps with Mr. Cohen's misrepresentations.  Correct?

16   A.  In one of my estimation periods, correct.

17   Q.  Right.

18           But your report does not contain any analysis of

19   whether price movements following Cohen's SEC filings on

20   August 16th was statistically significant.  Right?

21   A.  In my report as opposed to what I've presented today?

22   Q.  Correct.

23   A.  Correct.  It's not in my report.

24   Q.  Well, even today, Professor Fischel, you have not opined

25   on whether the SEC filing -- the price movements associated

Fischel - CROSS - By Mr. Jafri

1    with the SEC filings on August 16th are statistically

2    significant?

3    A.  No.

4    Q.  Right.

5    A.  That's incorrect.  In response to Dr. Cain's revised

6    analysis that I didn't have in my possession when I did my

7    original report, where he analyzed the statistical

8    significance during the class period, I did the same thing.

9    I corrected his, in my opinion, what was really a

10   fundamental error of comparing a low-volatility period to a

11   high-volatility period.

12           And I reached a conclusion that there was no

13   statistically significant price movement on August 16th, nor

14   should there be, since there was no new value-relevant

15   information disclosed in the 13D.

16   Q.  But that's another way of saying that you don't agree

17   with his estimation windows.  Right?

18   A.  It's a way of saying that when you, in my opinion,

19   perform the analysis correctly, in a way that is standard in

20   event study methodology -- and I discussed this at length in

21   my report -- you get different -- completely different

22   results.

23           So I do not agree with the methodology that

24   Dr. Cain used in his event study.  That's correct.

25   Q.  Right.

1          But in your testimony, you did not tell us what

2     the statistical significance, if any, was for the August

3     16th filings.  I'm talking quantitatively.

4     A.   That's incorrect.  If you look at my event study, it

5     shows what my conclusion is about August 16th.

6     Q.   Which event study are you talking about?

7     A.   The one I testified in court about today.

8     Q.   Okay.  Well, let's move on to one other thing that you

9     said.

10         You know that on August 16th, Cohen filed a 13D

11    that didn't say anything about whether he had a plan to

12    sell.  Correct?

13    A.   I believe that's correct.

14    Q.   And then finally, in your report you did not do any --

15    you had nothing to say about whether there were any price

16    movements on any day once news of Cohen's sales emerged on

17    August 18th and whether those price movements were

18    statistically significant.  Right?

19    A.   I did not analyze statistical significance of those days

20    in my report, although I have now.  And I testified about it

21    in my earlier testimony today.

22    Q.   But that's not in the report?

23    A.   Not in my report.

24         MR. JAFRI:  Thank you.  I don't have any further

25    questions, your Honor.

```
 1                    THE COURT:  Thank you.

 2                    Any redirect?

 3                    MR. FARINA:  No, your Honor.

 4                    THE COURT:  Professor Fischel, thank you for your

 5      testimony here today.

 6                    THE WITNESS:  Thank you, your Honor.

 7                    THE COURT:  You're excused.

 8                    (Witness excused.)

 9                    THE COURT:  Mr. Jafri, do you wish to call your

10      client?

11                    MR. JAFRI:  Yes, your Honor.  We call Mr. Coti on

12      behalf of Bratya.

13                    THE COURT:  Sir, if you could come up here and

14      remain standing for a moment.

15                    MR. JAFRI:  Your Honor, could we actually take a

16      break for five minutes?  He wanted to go to the restroom.

17                    THE COURT:  That's fine.

18                    MR. JAFRI:  Thanks.

19                    (Thereupon a recess was taken, after which the

20      following proceedings were had:)

21                    THE COURT:  Mr. Jafri.

22                    MR. JAFRI:  Your Honor, at this time we would like

23      to call Mr. Coti for the lead Plaintiff.

24                    THE COURT:  Mr. Coti, if you could come up here

25      and remain standing for just a moment, sir.
```

 1          THE COURTROOM DEPUTY:  Please raise your right

 2     hand.

 3               DAVID COTI, PLAINTIFF WITNESS, SWORN.

 4          THE COURTROOM DEPUTY:  Thank you.  Please be

 5     seated.

 6          THE COURT:  How are you, sir?  Just feel free to

 7     adjust that microphone to be close to your mouth.

 8          THE WITNESS:  Okay.

 9                    DIRECT EXAMINATION

10     BY MR. JAFRI:

11     Q.  Mr. Coti, can you please state your name for the record?

12     A.  David Coti, C-O-T-I.

13     Q.  Where do you live?

14     A.  In Dubai, in United Arab Emirates.

15     Q.  Are you there -- are you from there originally?

16     A.  No.  I was born in France, in Paris.

17     Q.  Why did you move to Dubai?

18     A.  For business.

19     Q.  When was that?

20     A.  Eight years ago.

21     Q.  Did you grow up in France?

22     A.  In France, in Paris, where I got bachelor's in business

23     administration in a business school.

24          THE COURT:  You're missing the Olympics.

25          THE WITNESS:  Yeah.  For you, sir.

1          THE COURT:  Well, thanks for coming.

2     BY MR. JAFRI:

3     Q.  What is your highest level of education?

4     A.  Bachelor.

5     Q.  Bachelor in what?

6     A.  Bachelor in business administration.

7     Q.  Are you the largest shareholder of the lead Plaintiff,

8     Bratya?

9     A.  Yes.

10    Q.  Does it have any other shareholders?

11    A.  Yes.  My brother.  He's a minority shareholder of the

12    company.

13    Q.  Are you the majority shareholder?

14    A.  In Bratya, I am majority shareholder in Gerant, which is

15    manager/CEO.

16    Q.  Can you please tell us what the nature of Bratya's

17    business is?

18    A.  Bratya is an investment firm holding company with a

19    stake in several businesses, public businesses and private

20    equity ones in different spheres:  technology, green tech

21    and clean tech, med tech, with a company in France doing

22    prosthesis of heart transplant to replace a dead heart.

23    It's a public company where I sit at the board.  We have

24    several investments in Fortune 100 companies also and in

25    companies that we select if there is an opportunity, for

1    example, of turnaround process.

2    Q.   Okay.   Now, with respect to that final thing that you

3    said about the turnaround, can you tell us which companies

4    Bratya invested in that you thought were potential

5    turnarounds?

6    A.   I thought the BBBY project.

7    Q.   Why did Bratya invest in BBBY?

8    A.   We invested after Ryan Cohen became a bigger shareholder

9    in this company and came with a plan of making a turnaround

10   of this company with several divisions; and he had a vision

11   for turning around this company, which was struggling with

12   debt and poor performances in sales.

13   Q.   So with respect to his turnaround strategy, what did you

14   think was the most important aspect of it?

15   A.   The most important aspect was, first, he's a good

16   marketer with -- he's known in the distribution and the

17   retail business.   Also, he identified value in e-commerce

18   part of Bed Bath & Beyond, buybuy BABY division.   So it was

19   really interesting to have such an export in this field with

20   a company which needed expertise and make a value out of

21   certain assets.

22   Q.   Has Bratya ever bought an investment in a company only

23   because of a short squeeze?

24   A.   No.

25   Q.   Did Bratya buy any BBBY securities only because of a

1    short squeeze?

2    A.  No.

3    Q.  When did Bratya start investing in BBBY?

4    A.  We started operations on March 2022.

5    Q.  Let's talk a little bit about your BBBY transactions.

6           So if you could please look at Tab 4, Mr. Coti.

7    This is a document we previously filed with the Court.  Can

8    you -- once you turn to it, can you please tell us what it

9    is?

10   A.  Which one?

11          THE COURT:  Tab 4.

12   BY MR. JAFRI:

13   Q.  Tab 4.

14   A.  Exhibit 10, right?

15   Q.  Yes.  Do you recognize this document?

16   A.  Yes.

17   Q.  What is it?

18   A.  It's the report of my bank, the bank of Bratya, Société

19   Générale, with the reports of transactions on Bed Bath &

20   Beyond stock and options.

21   Q.  So I think you were telling us what this document is;

22   and you said you got it from Société Générale?

23   A.  Yes, on the request.  We requested this document to

24   produce to the Defendants' request.

25   Q.  Does this document fairly and accurately show all of

```
1    your transactions in the common stock of BBBY?

2    A.  Yes.

3    Q.  When did you first receive this document?

4    A.  Sorry.  Can you repeat?

5    Q.  When did you first receive this document?

6    A.  When I see this document?  When we ask it.

7    Q.  You mean when the Defendants wanted us to give it --

8    A.  Yes.  Yes.

9    Q.  Okay.  I'm going to show you a slide now that -- which

10   has S3 that we derived from this exhibit.

11          Does this slide show all the purchases of common

12   stock that you made in BBBY that are also shown in the

13   exhibit we just discussed?

14   A.  Yeah.  Here you have the positions of the stocks.

15   Q.  Is this a fair and accurate reflection of the common

16   stock purchases and sales that are in the exhibit that I

17   just showed you?

18   A.  Yes.

19   Q.  Mr. Coti, can you tell us what the alleged class period

20   in this case is?

21   A.  12 of August till 18 of August 2022.

22   Q.  And as of August 11th of 2022, how much shares of common

23   stock did -- of BBBY did Bratya own?

24   A.  By 11 of August, 50,900.

25   Q.  Did Bratya sell any shares on August 12, 2022?
```

1    A.  There is a diminishing number of shares because of an

2    option -- exercise of an option that we sold before.  If I

3    remember well, it was on the 8th of August, so before the

4    considered period.  And they were exercised, so we had to

5    deliver 11,500 shares.

6    Q.  So this was not, for instance, you directly going and

7    just selling your common stock.  Right?

8    A.  No.

9    Q.  Okay.  How much --

10            THE COURT:  I don't understand.  So what happened

11   there?

12            THE WITNESS:  These shares had covered calls on

13   them, an option to generate revenue.  And the counterpart

14   asked to make an exercise of these options.  He wanted to

15   receive the shares.  So as we had the option, we had to

16   deliver these 11,500 shares.

17            THE COURT:  So this was a relationship you had

18   with a third party that required you to --

19            THE WITNESS:  A third party who sold -- who bought

20   an options that we sold.

21            THE COURT:  I see.  Thank you.

22   BY MR. JAFRI:

23   Q.  Once that option was sold and these shares were

24   offloaded, how many shares of common stock did Bratya have

25   on August 12 of 2022?

1    A.  39,400.

2    Q.  Did Bratya buy any additional shares of common stock

3    between August 12 and August 17 of 2022?

4    A.  Yes.  We bought additional shares.

5    Q.  Let me rephrase my question.

6            Did Bratya -- when was the next time Bratya bought

7    shares?

8    A.  On the 17 of August.

9    Q.  Why did Bratya not buy any shares between August 12 and

10   August 17 of 2022?

11   A.  We had no cash at this moment available because we owned

12   several positions in the portfolio.  Different -- there are

13   different loan-to-value on the stocks that we own.  So

14   sometimes we need more cash to be -- to avoid the margin

15   call.  Sometimes we have to sell shares.  So it's an

16   exercise to maintain on the overall portfolio certain

17   collateral value to allow us to continue trading and being

18   able to be active on the market.

19   Q.  When you mentioned your total portfolio, do you mean all

20   of the investments that Bratya owns inclusive of other

21   stocks that are --

22   A.  Yes.

23   Q.  -- not BBBY securities?

24   A.  Yes.

25   Q.  When was the next time that Bratya bought any shares of

1    common stock?

2    A.  On the 17 of August.

3    Q.  Why did Bratya buy shares on that day?

4    A.  We had cash available.  There was the tweet of the 12 of

5    August, which was a sign that Ryan Cohen had the confidence

6    in the project, that he posted a moon and a full cart of

7    customer in the store.  Also was the post of the filing on

8    the 16 that his stake in the company was increasing.

9         So it was speculation that potentially with the

10    buyback of the shares of the company that increase the

11    footprint of Ryan Cohen on the shareholding of BBBY with the

12    idea that he presented in March to have a vision of

13    transforming this company.  Also, putting some people at the

14    board.

15    Q.  So you took all of that into consideration when you

16    purchased these shares?

17    A.  Yes.  And also was the move on the market that we were

18    speculating at that moment with all this informations that

19    M&A or something was soon to happen.

20    Q.  Mr. Coti, did Bratya sell any shares of common stock on

21    August 17th of 2022?

22    A.  Yes.

23    Q.  Why did that happen?

24    A.  Because we bought too much and we arrived in a region of

25    margin calls.  So the bank asked me before the close to

1    offset some positions out of what we bought.  We were -- we

2    bought 85,000, 90,000, 26,711.  And we had to sell off

3    116,711.  So actually, we added -- anyway, we added shares

4    to our portfolio on that day.

5    Q.  So my next question, Mr. Coti, is:  Can you explain to

6    us why this margin call occurred?  Can you explain to us why

7    the margin call caused you to sell these shares?

8    A.  In fact, the bank is giving you a financing according to

9    the value of your portfolio.  And if you buy more shares

10   with a lower loan-to-value than cash, you arrive in a margin

11   call zone.

12            So here, the Bed Bath & Beyond shares were quite

13   poorly valued compared to blue chip, which worth billions of

14   dollars, or compared to cash that is on the bank account.

15   So in fact, the fact that we bought that shares decreased

16   our collateral level, so we had to sell some shares.

17            THE COURT:  So you hadn't intended to do this.

18   You were just kind of overextended.  Is that right?  The

19   buying and the selling all on the same day?

20            THE WITNESS:  Yeah.  In fact, I bought too much,

21   so I had to resell a part.

22            THE COURT:  Understood.

23   BY MR. JAFRI:

24   Q.  Did Bratya buy any additional shares of BBBY common

25   stock on August 18th of 2022?

1    A.  Yes.

2    Q.  And why did Bratya do that?

3    A.  Because we were in a speculation timing.  After the

4    filing of the 144 filing was released that Ryan Cohen may

5    sell his shares in the future, so it was also a clue that he

6    was willing to make an operation.

7         Also, we thought at that moment that there could

8    be a conflict of interest if he's the shareholder of Bed

9    Bath & Beyond and wants to buy the subsidiary that he was

10   very interested in in terms of e-commerce development, the

11   buybuy BABY subsidiary.

12        So with all these informations, we thought that it

13   was imminent that with the commitment he had to make a

14   turnaround of this company with board members that he

15   placed, that it was imminent that the company would be sold

16   in part or in whole.

17   Q.  And when you say "imminent," you mean Ryan Cohen's

18   initial turnaround strategy to try and sell or spin off

19   buybuy BABY?

20   A.  Yes.

21   Q.  So you interpreted this Form 144 to be consistent with

22   that intention.  Right?

23   A.  Yes.

24   Q.  I wanted to turn your attention now to some of the

25   options.  If you could go back to the exhibit, please, the

1      Société Générale one, which shows all your purchases and
2      sales.
3              And if you look at the sale of call options during
4      the class period, so, you know, on the 12th of August and I
5      believe the 16th of August, you sold some calls.  Maybe it
6      was the 15th of August.  Can you explain to us why you were
7      engaging in this kind of options trading where you were
8      selling calls and on one occasion at least in early August,
9      not in the class period, but in early August you bought a
10     put?
11     A.  Okay.  So the advantage of selling options is to get a
12     premium.  So it's to generate cash.  So -- and it's not
13     consuming as much collateral as selling some put, especially
14     when you sell calls with a higher strike price than the
15     stock quote at that moment.
16             THE COURT:  And "put," that's just the word for
17     short selling.  Is that correct?
18             THE WITNESS:  No.  A put is an insurance.  And
19     when he's asking me if we had the occasions to buy some put,
20     yes, we bought some put.  A put option is a warranty that at
21     the maturity of your contract you can sell your stock, your
22     underlying, the underlying asset of this option, at the
23     price which is already defined.
24             When you have a put in your portfolio, if the
25     bank, for example, give a 20 percent financing on BBBY

Coti - DIRECT - By Mr. Jafri

1    share, if you have a put, it will consider a 100 percent

2    like if it's cash, because the bank has the warranty that --

3    the maturity that it will be able to sell these assets at

4    this price.  So it's giving a hedge on the portfolio in case

5    of a downturn and it gives a bit more of a collateral.

6    BY MR. JAFRI:

7    Q.  My next question, Mr. Coti, is:  Did Bratya ever buy or

8    sell any security of BBBY with the hope that the price of

9    that security would go down?

10    A.  No.  Otherwise, we would not have bought them.

11    Q.  When you say "them," what do you mean?

12    A.  The stocks.

13    Q.  The common stock?

14    A.  Yeah, because during all the time we were long on the

15    quantities of stock we had.

16    Q.  Okay.  I wanted to move on to the final topic now about

17    your involvement in this case.

18            Have you received and reviewed most of the filings

19    in this case?

20    A.  Yes.

21    Q.  Did you participate in any strategy sessions with your

22    counsel --

23    A.  Yes.

24    Q.  -- about this litigation?

25    A.  Yes.

 1    Q.  Did you fly to the United States all the way from Dubai

 2    just to sit for a deposition for an entire day in

 3    Washington, D.C.?

 4    A.  Yes.

 5    Q.  How often do you speak to the lawyers that are hired to

 6    represent you in this case?

 7    A.  Quite often, depending on the evolution of the

 8    litigation.

 9    Q.  Have you read important documents in the case like the

10    complaint?

11    A.  Yes.

12    Q.  There is one other thing, actually, that I just

13    remembered and then I'll be done.  A few more questions.

14              Do you know what the word "Mongol" means in

15    French?

16    A.  Retards.

17    Q.  Did you ever think that that word meant something else?

18    A.  Yes.  In fact, I was trying to guess what was the

19    meaning of this word which was used in a chat with my

20    brother.  And I understood after his deposition what was the

21    meaning.  In fact, it's a definition that the retail

22    investors, a certain class of retail investors on the

23    Reddit, defines themselves, Up Mongols.

24    Q.  Thank you very much, Mr. Coti.

25              MR. JAFRI:  Your Honor, I don't have any other

 1    questions.

 2              THE COURT:  Yes, sir.

 3              MR. BUTSWINKAS:  Thank you very much.

 4              Judge, I have a few demonstratives that I'm going

 5    to use, if I may hand them out first.

 6              THE COURT:  Yes.

 7              MR. BUTSWINKAS:  (Distributes documents to the

 8    Court and opposing counsel.)

 9                        CROSS-EXAMINATION

10    BY MR. BUTSWINKAS:

11    Q.  Good afternoon, Mr. Coti.

12              I have this chart up that you were just talking

13    about.  You talked about the tweet on August 12th, 2022,

14    during the class period.  Do you remember talking about

15    that?  Do you remember talking about that, sir?

16    A.  Yes.

17    Q.  On August 12th, 2022, you didn't buy any shares?

18    A.  No.

19    Q.  So after the tweet that you talked about giving you

20    great confidence, you bought no shares?

21    A.  Yeah, because we had no cash.

22    Q.  Then on August 18th, you knew that Mr. Cohen had sold

23    all of his shares?

24    A.  On August?

25    Q.  August 18.

1    A.  But it was after market.

2    Q.  No.  That was on the 17th.  Right?  You learned that

3    Mr. Cohen had sold all of his shares.

4    A.  On 17 that he may sell his shares.

5    Q.  At the end -- when the trading day began on August 18,

6    you knew that Mr. Cohen had sold all of his shares.  Isn't

7    that correct?

8    A.  Yes, because in the speculation process that's what we

9    say:  We thought that he had to get rid of his shares in

10   terms of conflict of interest for acquiring buybuy BABY

11   potentially.

12   Q.  And after he sold all of his shares, you purchased

13   shares.

14   A.  And?

15   Q.  After Mr. Cohen sold all of his shares and after you

16   knew he'd sold all of his shares, you purchased shares?

17   A.  Yes.  Exactly.  And I told you, because we were

18   confident in his turnaround strategy and that he wanted

19   to -- he had to exit because he was in the process of making

20   an offer on the company or on a subsidiary of the company.

21   Q.  And was there a tweet that said that?

22   A.  No.  It was not a tweet.  But he had the three people at

23   the board.  He had the commitment of making a turnaround.

24   The company renewed the fact that they had an agreement with

25   Ryan Cohen with the view of making a turnaround of the

1     company, a constructive agreement.

2     Q.  So you were speculating about an M&A prospect?

3     A.  Of course.

4     Q.  I believe --

5     A.  But speculate with the --

6     Q.  -- you said --

7              THE COURT:  Sir, sorry.

8     BY MR. BUTSWINKAS:

9     Q.  I'm sorry.  I didn't mean to talk over you.

10             You founded Bratya.  Am I saying that correct?

11    A.  Yes.

12    Q.  "Bratya."  And that was 2016?

13    A.  Yes.

14    Q.  You've been an investor in securities for more than 20

15    years?

16    A.  Yes.

17    Q.  Bratya is a holding company; is that right?

18    A.  Yes.

19    Q.  I think you testified that it was -- the shares were

20    held by you and your brother?

21    A.  Yes.

22    Q.  I think you have 76 percent of those shares.  Is that

23    right?

24    A.  (No audible response.)

25    Q.  You have to answer out loud.

1  A.  Yes.

2  Q.  Your brother has the remaining 24 percent?

3  A.  Yes.

4  Q.  I take it that you and your brother communicate and

5  interact about the investments that you will make on behalf

6  of Bratya?

7  A.  (No audible response.)

8        THE COURT:  I need you to answer for the record,

9  sir, orally.

10        THE WITNESS:  Yes.

11  BY MR. BUTSWINKAS:

12  Q.  Yes?

13  A.  Yes.  Yes.

14  Q.  The only source of revenue that Bratya has are the

15  investments that you make.  Is that right?

16  A.  Yes.  Or dividends or -- yeah.

17  Q.  And you've never personally invested in Bed Bath &

18  Beyond stock.  Is that correct?

19  A.  No.

20  Q.  You haven't -- all the investments that you had in Bed

21  Bath & Beyond stock were through Bratya.  Correct?

22  A.  Yes.  But Bratya is my property at 76 percent.  So --

23  Q.  And you make your investments based on the underlying

24  fundamentals of the company?

25  A.  On several parameters, like for everything.

1    Q.  Does that include looking at whether there are good

2    management forces?

3    A.  Yes.  You look at the team.  Of course.

4    Q.  People around the table, I think you said at your

5    deposition?

6    A.  Once again, please?

7    Q.  Credible managers of the company?

8    A.  Credible people, yes.  It's part of --

9    Q.  You look at financial reports?

10   A.  Also.

11   Q.  Analyst reports?

12   A.  Yes.

13   Q.  Liquidity ratios?

14   A.  Yes.

15   Q.  Earnings reports?

16   A.  Everything is a parameter that can be considered in

17   making an investment.  That's true.

18   Q.  I want to ask you some questions about directional

19   investing.  Do you know what I mean by that?

20   A.  Yes.

21   Q.  There are lots of different ways that you can take a

22   long position in a company.  Correct?

23   A.  Yes.

24   Q.  Okay.  One might be buying shares?

25   A.  Yes.

```
1    Q.  Another might be buying call options?

2    A.  Yes.

3    Q.  And another might be buying put options?

4    A.  Yes.

5    Q.  Or selling put options?

6    A.  Selling put.

7    Q.  Those are all ways of taking a long position in a

8    company.  Is that right?

9    A.  Yes.

10   Q.  And then in those instances, the idea is that you're

11   betting that the price of the stock will increase.  Is that

12   right?

13   A.  It means you go all in.  But you can also go more quiet

14   and step by step.  It's two different things.  It's the --

15   Q.  On the other side of the equation, there's taking a

16   short position.  Right?  You're familiar with that concept?

17   A.  There is also this concept.

18   Q.  And one way to do that directionally is selling shares?

19   A.  Yes.

20   Q.  And another way to do that would be selling --

21   A.  But if you -- sorry.  I finish.

22        You can sell shares for a certain reason.  It

23   doesn't mean that you bet against the company if you have to

24   sell some shares at some moment.

25   Q.  Another way of taking a short position is selling call
```

1    options?

2    A.  It depends at which level.

3    Q.  Or buying put options?

4    A.  Why it's going -- it's just to hedge your position that

5    you have.  And it's not playing against the company if you

6    have to hedge and protect your investment from an external

7    event.

8    Q.  And I think you described to the judge in your earlier

9    testimony that a put is insurance that protects you against

10   a downward slide in the stock price?

11   A.  Yes, sir.  But you can pay an insurance for your car.

12   It doesn't mean you want your car to be crashed.

13   Q.  And a call is the opposite.  Right?  It's an opportunity

14   to purchase on the way up?

15   A.  It's also a tool to generate revenue, depending on which

16   level you sell your call.

17   Q.  Now, you talked about the turnaround strategy that I

18   think you said gave you great confidence.  Do you remember

19   that?

20   A.  It's something which can generate value.  Yes.

21   Q.  Was that the principal driver of your investment in Bed

22   Bath & Beyond, a turnaround strategy?

23   A.  Yes.

24   Q.  And that was announced in March of 2022.  Correct?

25   A.  Yes.

```
1    Q.  So that was long before the class period.  Right?
2    A.  Exactly.
3    Q.  And that happened -- that started with the public
4    disclosure of a lengthy letter from Mr. Cohen.  Is that
5    right?
6    A.  Right.
7    Q.  And that was on March 6th of 2022.  Correct?
8    A.  Yes.
9    Q.  And in that letter, Mr. Cohen went on at length about
10   how he could substantively affect the fundamentals of the
11   company.  Isn't that right?
12   A.  Yes.
13   Q.  And are you saying that that's what gave you enthusiasm,
14   that drove your stock activity in that company going
15   forward?
16   A.  That's why we started to look at this company.  Yes.
17   Q.  And your first Bed Bath & Beyond investment was
18   literally the day after Mr. Cohen sent the letter announcing
19   this turnaround strategy.  Isn't that right?
20   A.  Yes.
21        MR. BUTSWINKAS:  Your Honor, I've made some
22   demonstratives from the exhibit that was used earlier
23   because they're so tiny.  And they're small, but luckily
24   they're also in French.
25        THE COURT:  Okay.
```

1          MR. BUTSWINKAS:  So I'm going to put them up.

2          THE COURT:  It'll be equally incomprehensible.

3          MR. BUTSWINKAS:  Yes.

4          I want to pull up what we've marked as Defendants'

5     Demonstrative Exhibit No. 3.  And the part of it that is

6     mine are the lines.  They're just to divide between days.

7     BY MR. BUTSWINKAS:

8     Q.  Do you see this demonstrative on your screen, Mr. Coti?

9     A.  Yes.

10    Q.  And these are your trades on March 7th, March 8th and

11    March 14th.  Do you see that?

12    A.  Yes.

13    Q.  Okay.  And all of these are sales of call options.

14    Isn't that right?

15    A.  Right.  Much above the level of the stock at that

16    moment.

17    Q.  So on the 7th, the day after the letter that Mr. Cohen

18    wrote that you just talked about about the turnaround

19    strategy, you have three transactions.  Correct?

20    A.  Yes.

21    Q.  And they're all sales of call options.  Is that right?

22    A.  Right.

23    Q.  And they involve 350 contracts, 500 contracts and three

24    contracts.  Isn't that right?

25    A.  Yes; with the strike price of 30.  And what was the

1    stock price?

2    Q.  And each of those contracts are worth -- account for 100

3    shares.  Is that right?

4    A.  The quantity is 100.  Yes.

5    Q.  And so that is -- you've sold call options for 87,000

6    shares on the day after Mr. Cohen's letter.  Is that right?

7    A.  At a much higher level than the stock price.

8    Q.  And then two days later, on the 9th, you did the same

9    thing.  You sold call options.  Isn't that right?

10   A.  Obviously, yes.

11   Q.  Yes.

12           And these are all naked short positions, aren't

13   they?

14   A.  It's a position to generate revenue.

15   Q.  It's a naked short position, isn't it?

16   A.  At this moment, it's a sale of calls with a much higher

17   level than the stock price.

18   Q.  My question was different.

19           It's a naked short position?

20   A.  It's a sale of calls.

21   Q.  Yes.

22           And then on the 15th, which is now a week later,

23   you have two more transactions.  Right?  Do you see that?

24   A.  14.  Yes.  Yes.  Yes.

25   Q.  There are two more transactions, and they are also both

1    selling call options.  Isn't that right?

2    A.  Yeah.  It's right.

3    Q.  And so those are naked short transactions?

4    A.  We generated revenue.  I told you.

5    Q.  Am I correct?

6    A.  That we sold some call options, yes.

7    Q.  That all of these transactions in the week after

8    Mr. Cohen's announced transformation of the company, all of

9    your initial transactions were naked shorts.  Isn't that

10   right?

11   A.  That there was an intention to make a turnaround of the

12   company.  Do you think it can be done in one week or in two

13   weeks?  Because here, the maturity of the options, we are

14   very close.

15   Q.  And in --

16   A.  It's just a trading strategy?

17   Q.  In this week, March 7th to March 14th, the week after

18   the announced transformation strategy, you didn't buy any

19   shares?

20   A.  I had no cash.

21   Q.  Okay.  You didn't buy any shares?

22   A.  No.  I had no cash.

23   Q.  And you didn't buy any call options?

24   A.  No.

25   Q.  You didn't do any of the things that we just talked

1   about that constitute a long strategy?

2   A.  Here, it's our strategy.  We start with putting one foot

3   in the water to start to see how is going all the

4   developments they were doing with the new board, with the

5   valuation, with the review, which were ongoing.  And we

6   started with a strategy which is not a full all-in and a

7   very risky one, maybe.

8           But Mr. Cohen did not bought 100 percent as well

9   on all his net worth and his wealth of Bed Bath & Beyond.

10  He only took a stake of 10 percent.

11  Q.  When you read this lengthy letter that Mr. Cohen wrote

12  about how to fix stuff, substantive fundamentals underlying

13  the company, you did eight short transactions?

14  A.  Yes; with a much higher price than the --

15  Q.  By the way, you don't have a copy of the turnaround

16  letter in your files, do you?

17  A.  I saw it.  It was published.

18  Q.  But in your files that you produced in this litigation,

19  there was no copy of that.

20  A.  Maybe because it was one of the -- you know on the

21  WhatsApp, when we made the copy of WhatsApp, you had a copy

22  of the text, but not the copy of full images and pictures.

23  Otherwise, the period is much reduced if the copy is done

24  with the attached documents or without the attached

25  documents.

1    Q.  I don't know whether that's true or not, but I'll ask

2    this question.

3    A.  It's true.  It's 100 percent.  You can check that on

4    the --

5    Q.  You didn't produce any WhatsApp texts that talk about

6    the turnaround letter either, did you?

7    A.  I produced all the WhatsApp chats that we had and with

8    the pictures.

9    Q.  Can you identify for the Court any writing of any kind

10   during the period in the week following the turnaround

11   letter where you talked about the turnaround strategy with

12   anyone, including your brother with whom you communicate to

13   invest?

14   A.  We have to check also where we were at that moment.  We

15   could be together on a holiday and talk about it one to one

16   or being also on the phone.

17   Q.  I'm sorry.  Can I ask you to respond to my question?

18   Can you identify for the Court any writing of any kind,

19   text, email, memo, WhatsApp, social media, where you talked

20   about with anyone, including your brother, this turnaround

21   strategy?

22   A.  At that moment, there is a wish.  There is a letter.

23   There is something.  We consider it as being something which

24   is interesting.

25          It doesn't mean that it's done.  It doesn't mean

1    that we have to go all-in to trust in Mr. Cohen's capability

2    to do a transaction.

3    Q.  So there is no such document?

4    A.  Sorry?

5    Q.  So there is no such document?

6    A.  I provided the documents of the WhatsApp, the calls that

7    we had to -- that we exchanged and what was available on all

8    the WhatsApps that we had.

9    Q.  About a month after Mr. Cohen's letter, the company Bed

10   Bath & Beyond announced a cooperation agreement with

11   Mr. Cohen.  Do you remember that?

12   A.  Yes.

13   Q.  And do you remember that that was the last week of March

14   of 2022?

15   A.  Possibly.

16   Q.  Do you remember learning about that in realtime?

17   A.  That I heard about it, yes.

18   Q.  And do you remember that in the month after that

19   cooperation agreement that paved the way for the turnaround

20   strategy to be implemented, you made no trades?

21   A.  Yes.

22   Q.  No -- you didn't buy any stock.  Right?  Right?

23   A.  Possible.  If you have the report and you state it, I

24   trust that what you say is correct.

25   Q.  You didn't buy any call options for 30 days after this

1    cooperation agreement.  Is that right?

2    A.  And a collaboration agreement doesn't mean that there is

3    something concrete.

4    Q.  On --

5    A.  Many M&A deal and opportunities don't finish with a

6    concrete transaction.  So --

7    Q.  Let me ask you --

8         MR. BUTSWINKAS:  Alex, if you could put up

9    Defendants' Exhibit 1.

10   BY MR. BUTSWINKAS:

11   Q.  Mr. Coti, you've seen this before.  Right?

12   A.  Yes.

13   Q.  So this is Mr. Cohen's text from a tweet from August

14   5th?

15   A.  Yes.

16   Q.  And did you see it at the time?

17   A.  Yes; or a bit after.  Yes.  I saw it.

18   Q.  Did you talk about it with your brother?

19   A.  I think so.

20   Q.  Did you write to him?

21   A.  I'm not sure.  But we had a talk on this.

22   Q.  Did you take a screenshot of this?

23   A.  It's possible that there was the pictures.  Yes.

24   Q.  Did you forward it to anybody?

25   A.  No.

1    Q.  But you did produce this text in the case?

2    A.  Yes.

3    Q.  But it was based on a screenshot that was taken after

4    the case started.  Did you have this in your file at the

5    time?

6    A.  Yes.  It was.  It was certainly in the print screens or

7    in another way in one of our hardware, because you asked us

8    the copy of all hardwares and phones with a certain list and

9    stuff.

10   Q.  So if you had it, we got it?

11   A.  Yes.

12   Q.  Okay.  And did this tweet give you the same sort of

13   confidence that the moon face did?

14   A.  It's something which is pretty positive.

15   Q.  Okay.

16   A.  It looks to me that there is a will to do something.

17   Q.  So let's look at August 8th, which is Defendants'

18   Exhibit No. 5 -- or Demonstrative Exhibit No. 5.  Sorry.

19   These are the investments that you made after the August 5th

20   tweet.  Do you see that on your screen, sir?

21   A.  Yes.

22   Q.  Okay.  And these are all short positions again.

23   Correct?

24   A.  If you consider that buying a put is a short position.

25           What I don't consider and what is not true, you

1    have two experts in this room.  I think you can ask them

2    that having an insurance or hedging your position is not

3    being short.

4            And for example -- if you have some shares and the

5    brokerage company is offering you to get a revenue on your

6    shares and they lend these shares to someone who will short,

7    who will borrow them, are you a short in the company?

8    Q.  You heard the two experts here.  You heard Dr. Cain

9    testify earlier.  And he said buying a put is a short

10   strategy and buying a call is a long strategy.  Do you

11   remember that?

12   A.  He said his position is you -- I'm telling you that --

13   Q.  You agree with that, don't you?

14   A.  No.  It depends if you have the underlying or not.  He

15   did not precise.

16   Q.  So let's look at the individual transactions.

17   A.  But it's very --

18   Q.  You have -- let's -- Mr. Coti, we have to try

19   desperately not to talk over each other or she's going to

20   kill us.

21           The first transaction that you have on the 8th

22   after the August 5th tweet is buying a put option.  Is that

23   right?

24   A.  Yes.

25   Q.  And then the next two are selling call options.  Do you

1    see that?

2    A.  Yes.

3    Q.  And the next one is buying a put option.  Do you see

4    that?

5    A.  Yes.  I think this transaction --

6    Q.  Let's just stick with my questions, sir.

7           The last two are selling call options.  Do you see

8    that?

9    A.  Yes.  I see that.

10   Q.  These are contracts involving over 2 million shares of

11   Bed Bath & Beyond, are they not?  Because each one of the

12   contract amounts is times 100.  Isn't that right?

13   A.  This was strategies.  If you look --

14   Q.  I'm not asking you, sir, if it was your strategy.  I'm

15   asking the question of whether these contracts involved over

16   2 million shares of Bed Bath & Beyond stock.

17   A.  If you multiply by 100 the quantities, certainly.

18   Q.  And the truth is that the August 5th tweet did not

19   influence at all your strategy on Bed Bath & Beyond stock.

20   Isn't that right?  Do you remember saying that at your

21   deposition?

22   A.  Yes.  Here, we have a strategy.  And I want to explain

23   this position.

24   Q.  Mr. Coti, can you focus on my question?

25           The truth is that the August 5th tweet that we

1    just looked at had no influence on your Bed Bath & Beyond

2    strategy.  Do you remember saying that at your deposition?

3    A.  It has.

4    Q.  I'm sorry?

5    A.  It has, because we took some positions.  So maybe the

6    situation with the market obliged us to cover and to make

7    our trades.  But the thing is that we were always long with

8    the stocks.

9            MR. BUTSWINKAS:  Your Honor, may I approach?

10           THE COURT:  You may approach.

11           MR. BUTSWINKAS:  This is the deposition.

12   BY MR. BUTSWINKAS:

13   Q.  Mr. Coti, do you remember having your deposition taken

14   in the case?

15   A.  Yes.

16   Q.  Let me ask you if I can get you to turn to the bottom of

17   Page 160.  And the lines are marked on the left side.  It's

18   Line 18.  Let me know when you're there.

19   A.  Yes.

20   Q.  All I want you to do is make sure I read this right.

21   Okay?

22           "Question:  On the 5th of August, there was a

23   tweet?

24           "Answer:  Yep.

25           "Question:  What was the tweet?

Coti - CROSS - By Mr. Butswinkas

1          "Answer:  'Don't wait what your company's doing,

2     but what you will do for your company' or something in this

3     context.

4          "Question:  Okay.  And did that tweet influence

5     Bratya's securities trading in Bed Bath & Beyond?

6          "No.  But it was already that something can start

7     to move, clearly."

8          That was your testimony.  Right, sir?

9     A.  Yes.

10          MR. BUTSWINKAS:  Can you put up Defendants'

11     Exhibit 2, please?

12     BY MR. BUTSWINKAS:

13     Q.  You talked about this earlier.  Do you remember?

14     A.  Yes.

15          MR. JAFRI:  Your Honor, I object.  Under 106,

16     under Rule 106, Mr. Butswinkas should read the rest of the

17     testimony where he does talk about the turnaround.

18          THE COURT:  I'll give you an opportunity to handle

19     that in redirect.

20     BY MR. BUTSWINKAS:

21     Q.  You've seen this before.  Right?

22     A.  The tweet with the cart is full and the moon?

23     Q.  Yes.

24     A.  Yes.

25     Q.  And did you read the Loop Capital analyst's report?

1    A.  Yes.

2    Q.  Did you?  What did it say?

3    A.  It's like everything.  You have a view from certain

4    analysts.  Sometimes you have a view from other analysts.

5    Some hedge funds are taking a position and some others are

6    taking the contrary position.

7         As I say, it's not something.  What you want to

8    summarize is that because I did not put all my wealth and

9    all the net worth of Bratya on Bed Bath & Beyond at the

10   moment, Ryan Cohen entered with a project.  I'm not

11   investing in the project.

12        No.  You go step by step and you build a position

13   in the time.  We had to generate some revenue, because of

14   course we understood also that it can be a risky investment,

15   as every investment basically in the world.  There can be

16   something which goes wrong.

17        And --

18   Q.  And this was a super-risky investment, wasn't it?

19   A.  But it was a company which was struggling.

20   Q.  And incredible stock volatility.  Is that correct?

21   A.  It was also some volatility.  It was --

22   Q.  Wide variations in price?

23   A.  Yes.  Variations in price.

24   Q.  Major --

25   A.  Let me finish, please.

1    Q.  Sorry, sir.

2          Major changes from day to day in how the stock was

3    reacting?

4    A.  Yes.  Many things were moving.  And also, no --

5    Q.  Sir, sir --

6          THE COURT:  Sir, I just need you to answer --

7    BY MR. BUTSWINKAS:

8    Q.  But the Loop Capital analyst's report said the stock is

9    going to go to a dollar.  Right?

10   A.  Yes.

11   Q.  But what you say influenced you was the cartoon face of

12   the moon.  Is that right?

13   A.  But that there was -- the main investor in the company

14   was replying to a guy of Loop, who maybe doesn't even have

15   shares, and make a comment on the media.  And there is the

16   first shareholder of the company with three people on the

17   board who is replying, saying the cart is full.

18          So --

19   Q.  I think you told the judge that when you saw this tweet,

20   it gave you confidence?

21   A.  That it increased the confidence that Mr. Cohen was

22   still committed to make a turnaround in the company.

23   Q.  And it made you want to invest more?

24   A.  Also.

25   Q.  Okay.  So let's look and see what you did.

1          MR. BUTSWINKAS:  If we can put Demonstrative

2     Exhibit No. 6 up, please.

3     BY MR. BUTSWINKAS:

4     Q.  These are your trades in the days that followed this

5     tweet.  Do you see it on your screen, sir?  I should have

6     said it earlier, but obviously they work in reverse

7     chronological order.

8          Do you see there are one, two, three, four, five

9     entries on the 12th, the day of this tweet?  Do you see

10    that?

11    A.  Yes.

12    Q.  Okay.  One is the expiration of a put option.  Is that

13    right?  The first one.

14    A.  Certainly.

15    Q.  Do you see that?  And you can tell that because there's

16    zeroes all the way across in the Price and Financial

17    Characteristics sections of this chart.  Correct?  Is that

18    right?

19    A.  Sell a put.  Yes.  It's a line.

20    Q.  And the second entry, Buying a Call, that's the same

21    thing.  Right?  That's the expiration of that call option?

22    Again, you can tell that because if we go all the way across

23    there is zeroes showing that it had no impact on the

24    portfolio.  Right?

25    A.  And what was the stock price at this moment?

1    Q.  And then the next two are two new positions that you

2    took, right?  On the day of this tweet.  Do you see that?

3    Do you see those two entries?  They're both selling call

4    options.

5    A.  Call on the --

6    Q.  On the 12th.

7    A.  Yes.

8    Q.  Yes.

9            So the day of this tweet, you entered into two

10   transactions selling call options that involved 160,000

11   shares of Bed Bath & Beyond.  Right?

12   A.  Yes.  And some shares were exercised.  Some options were

13   exercised.  And what I did, I bought the stock to compensate

14   and not to lose my shares.

15   Q.  The only other entry on this date is Selling Stock.

16   Correct?  You explained earlier how that came about, where

17   you sold 11,500 shares.  Right?

18   A.  That it was due to exercise of some options.

19   Q.  Can you tell the judge how many shares you bought on

20   August 12th, 2022?

21   A.  On the 12 of August?

22   Q.  Yes.

23   A.  We did not bought shares.  We had an exercise of some

24   options.

25   Q.  Can you tell the Court how many call options you bought

1    on the 12th?

2    A.  I did not bought at this date, on this day.

3    Q.  Let's look at the 15th.  The 15th, starting from the

4    top, there are four new transactions.  Is that right?  Do

5    you see that?

6    A.  15, yes.

7    Q.  Yes.  And they are all selling call options.  Correct?

8    A.  On the 15, yes.  With the higher strike price.

9    Q.  And there are four different sets of call option

10   contracts totaling 208,000 shares.  Correct?

11   A.  Certainly, if you make the calculation.

12   Q.  We can see it.  Right?  It's 90,000, 60,000, 80,000 and

13   50,000, which, if my math is right, adds up to 280,000

14   shares.  Correct?

15   A.  Yes.

16   Q.  So three days after this tweet, you are selling

17   opportunities to buy shares?

18   A.  With a much higher strike price.  And we generated

19   revenue that we converted into purchasing shares when we had

20   the opportunity in the days after.

21   Q.  And this is a little bit repetitive, but I want to turn

22   to the 18th.

23         As of 10:11 p.m. on August 17th, you knew that

24   Ryan Cohen had sold his entire stake in Bed Bath & Beyond.

25   Isn't that right?

1    A.  Obviously.

2    Q.  And you were happy about it?

3    A.  Because it was the operation, the transformation deal

4    which may occurred.  That turnaround operation may occurred.

5    Q.  So when the complaint in this case says all of these

6    folks were duped and blindsided when Mr. Cohen sold his

7    entire stake, you were happy about it?

8    A.  It was one of the speculation that it was due to the

9    fact that operation was to be done.

10   Q.  So let's see how you reacted.

11        MR. BUTSWINKAS:  Would you put up Demonstrative

12   Exhibit 8, please.

13   BY MR. BUTSWINKAS:

14   Q.  On the 18th, after you knew that Mr. Cohen had sold all

15   of his shares, you only opened new long positions in the

16   company.  Isn't that right?

17   A.  We increased because we had the cash that we generated

18   and we could.  And for us, we were clearly in the idea that

19   he was going till the end of his turnaround operation and

20   that it was due to a conflict of interest that he had to

21   sell his stake.

22   Q.  I mean, you took a long position that involved more than

23   300 shares of Bed Bath & Beyond stock after you learned that

24   Mr. Cohen had sold his entire stake.  Isn't that right?

25   A.  This is the calculation.  So you saw that --

```
 1    Q.  Am I right about that, sir?

 2    A.  If you take the events and the number of shares, yes.

 3    Q.  Okay.  And the truth is that you thought during this

 4    period of the class period that you were trading in a short

 5    squeeze.  Isn't that right?

 6    A.  There was the shares going up.

 7    Q.  I'm not asking you to describe what was going --

 8    A.  That's what it was --

 9    Q.  Please answer my question.  And it is this:  When you

10    were trading in the class period, you thought that you were

11    reacting to a short squeeze?

12    A.  That it was a kind of short squeeze.

13              MR. BUTSWINKAS:  I have nothing further, your

14    Honor.  Thank you.

15              Thank you, sir.

16              THE COURT:  Thank you, Mr. Butswinkas.

17              Mr. Jafri, any redirect?

18                     REDIRECT EXAMINATION

19    BY MR. JAFRI:

20    Q.  Mr. Coti, if you look at the binder that we gave you,

21    can you please turn your attention to Tab 6, which I believe

22    is the chats between you and your brother.

23    A.  Yes.

24    Q.  Do you recognizes this document?

25    A.  Yes.
```

1    Q.   What is it?

2    A.   It's the chat with my brother.

3    Q.   How do you know that this is the chat between you and

4    your brother?

5    A.   Because it is naming in my phone Bo Russe New.

6    Q.   Was this a conversation just between you and your

7    brother?

8    A.   Yes.

9    Q.   Was anyone else participating in this conversation?

10   A.   No.

11   Q.   Where were you when this conversation took place?

12   A.   I was in Dubai.

13   Q.   And where was he?

14   A.   He was in Russia.  And the time, as it is with my French

15   phone, is two hours before Dubai time or France.

16   Q.   So this --

17   A.   So it's six hours' difference with U.S.

18   Q.   Right.

19            So this chat is occurring six -- when the United

20   States is six hours behind the time that's reflected in your

21   WhatsApp chats?

22   A.   Yes.

23   Q.   Can you please turn your attention to Page 749, Bratya

24   749, that -- it's Page 30 of 316 on top, if you take a look.

25   A.   Yes.

1    Q.  And then if you look at the message that Mr. Edward Coti

2    sent you at 6:56 a.m. on August 18.  Do you see that?

3    A.  6:56?  Yes.

4    Q.  Okay.  So you're with me, right, on this?

5    A.  Yes.

6    Q.  This is what your brother said to you.  He said, "With

7    his announcement on the calls, the thing popped.  And in the

8    line, he apparently completed the filing to be able to

9    sell."  And then in parentheses it says, "No link found with

10   the SEC.  Maybe it's a fake released by the short sellers.

11   My rumor exists."

12               Is your brother talking about the Form 144 here?

13   A.  Yes.

14   Q.  And then he then said, again at 6:56 a.m., "Whatever

15   happens, he had to get out of his idea of calls to issue new

16   shares or proof to the funds he brought in to finance that

17   he could add value."

18               Do you see that?

19   A.  Yes.

20   Q.  And your brother said, "He had to wait two days, so

21   tomorrow, to have the sale filing if he sold."

22               Right?

23   A.  Yes.

24   Q.  Okay.  And then he sent you some links to some articles.

25               And then at 12:57 a.m. on August 18th, can you

Coti - REDIRECT - By Mr. Jafri

1    direct your attention there?

2    A.  Yes.

3    Q.  And this would be six hours ahead of the time in the

4    U.S.  Right?  So this is early -- this is -- if you look at

5    it from the perspective of Eastern Standard Time, this is

6    like around 6:00-something in the morning.  Right?

7    A.  Yes.

8    Q.  So at this point you said to your brother, "I think they

9    will sell buybuy BABY, and on the announcement he will get

10   out."

11          Do you see that at 12:57?

12   A.  Yes.

13   Q.  And next you said, "I think it is like that and it will

14   be reboosted."

15          Now, I know that this is a translation.  You were

16   talking in French.  Right?

17   A.  Yes.

18   Q.  So to the best of your recollection, can you tell the

19   Court what exactly is it that you and your brother were

20   talking about here?

21   A.  We were talking that we thought that this view of making

22   a transaction with buybuy BABY was being on the verge to

23   happen, that it was happening, and that Cohen prepared with

24   the 144 filing this announcement that he was still committed

25   to make the turnaround for the company.

1    Q.  Did you ever realize that that turnaround was not going

2    to happen?

3    A.  Yes.

4    Q.  When was that?

5    A.  At the presentation of the company at the end of August.

6    Q.  What happened on that date?

7    A.  The management of the company presented the prospects

8    for the coming months.  And it was no more talks about the

9    constructive agreements and nothing that was going forward.

10   Q.  Do you mean to say that during the presentation there

11   was no announcement of a sale or spinoff of buybuy BABY?

12   A.  Exactly.  No presentation on buybuy BABY.

13   Q.  So is this when you realized that the strategy was not

14   going to happen?

15   A.  Yes.  We understood that they -- the turnaround was not

16   done and that Cohen left, stabbing us in the back at that

17   moment.

18            MR. JAFRI:  Thank you very much.  I don't have

19   anything further.

20            Thank you, your Honor.

21            THE COURT:  Thank you, Mr. Coti.  You may step

22   down.

23            (Witness excused.)

24            THE COURT:  All right, gentlemen.  It's 4:50.

25   I'll give you half an hour together or we can come back

1    later or you can do written closings.

2             What's your preference, Mr. Jafri?

3             MR. JAFRI:  Your Honor, we can do our argument in

4    15 minutes.

5             MR. FARINA:  Your Honor, in light of what -- all

6    the evidence that's been received today, we would prefer to

7    make written submissions.  I'm happy to talk today.  But I

8    think the Court and we would all benefit from written

9    submissions about the evidence today.

10            THE COURT:  Okay.  So I'm going to give you each

11   15 minutes.  You're on a clock.  I can get briefing

12   afterward.

13            But, Mr. Jafri, how much time do you want to

14   reserve for your rebuttal?

15            MR. JAFRI:  Five minutes.

16            THE COURT:  All right.  I'll hear from you now,

17   sir.

18            MR. JAFRI:  Thank you, your Honor.

19            I wanted to start from backwards because Mr. Coti

20   just testified right now.

21            When it comes to typicality and adequacy, he meets

22   both of these criteria.  He basically bought in reliance on

23   the statements.  And the law says that everybody doesn't

24   have to have the same motive.  There can be factual

25   variations between the members who are suing or the class

 1    members who are represented by the representative.

 2              And that makes perfect sense.  This is not like

 3    all these investors are sheep and they act all in the same

 4    way or they are motivated in the same way.  What matters is

 5    whether he is on the same side as those investors and

 6    whether there is any antagonism between them.  And there

 7    isn't, because he was long throughout the period.  He

 8    explained, I think, pretty convincingly that he was

 9    basically --

10              THE COURT:  When you say "the period," you mean

11    the class period?

12              MR. JAFRI:  Yes, your Honor.  Yes.

13              THE COURT:  So what should I make, though, of the

14    evidence that he had been shorting, really, for much of the

15    time, including when Mr. Cohen was ostensibly laying out his

16    grand plan?

17              MR. JAFRI:  So the first thing is, that's not even

18    relevant because it's not in the class period.  But to the

19    extent it's relevant, it's only relevant to whether he

20    believed in the turnaround strategy.  And I think that he

21    did.  And the chat that I showed you from the 18th is

22    contemporaneous.

23              What he said in the deposition or any of this

24    other confusing testimony that has been pointed to is less

25    relevant because we have hard evidence of what was in his

1    mind and what was his mental state when he bought those

2    shares on the 18th, which I believe they think is the most

3    controversial.

4            That day, they thought there was going to be a

5    sale or a spinoff.  It's there for all of us to see.

6            To the extent that he had any sales of call

7    options or the fact that he bought the puts, he told you

8    that he was doing that either because he didn't have the

9    cash; and you can sell options to generate a little bit of

10   money because you get the premiums when you sell them.  And

11   so they were only doing what they could at that point to

12   make money.

13           If he had the cash inclusive of his entire

14   portfolio to make the common stock purchases, he may have

15   done that.  But in any event, he was already net long.  As

16   you know, as we saw, short, you get tens of thousands of

17   shares.  And when he had the next opportunity, he bought

18   stock.

19           The hedge was buying one of the puts.  And the

20   reason why he did that is because if the stock price

21   declined -- and I believe the part that was bought was

22   somewhere around $14 or $15 while the price was going up.

23   And the reason why he did that was so that if the price was

24   collapsing, if the put was exercised, at that point he would

25   still have the cash and the stock to meet his margin

1    requirements or the collateral that the bank wanted.  That

2    was the strategy.

3            It was not a directionally short bet.  That's what

4    matters:  a directionally short bet.  So a directionally

5    short bet would be if there was any evidence suggesting that

6    the brothers were investing in any of these options or even

7    shorting the stock, which there's no evidence of, with the

8    hope that the price would go down or that the company would

9    implode.  That's what a short seller would do, a typical

10   short seller.

11           And they were not doing that.  There is no

12   evidence to suggest that they were at all.

13           THE COURT:  Let's move to the experts.

14           Talk to me about why Professor Fischel is wrong

15   that Dr. Cain's event studies, you know, one is irrelevant;

16   the other is erroneous.  I think that's the bottom line from

17   Professor Fischel.

18           MR. JAFRI:  Right.  So with respect to first one,

19   what Dr. Cain did was he used an objective factor that he

20   always uses in all of his reports, which is an earnings

21   announcement.

22           As you know, this is a five-day class period.

23   Right?  And there was no earnings announcement.  That's the

24   only reason why he didn't choose the event.  Had there been

25   one, he would have studied it.

1          And there are some cases, including the *Barclay's*

2     case in the Southern District of New York, where there was a

3     short period and the Court understood that, look, from a

4     commonsense perspective, if it's a short period, there may

5     not be an event to choose, in which case you don't have to

6     show a cause-and-effect relationship in that period because

7     you don't have an event to study.

8          And when that case was appealed, it went to the

9     Second Circuit.  And the Second Circuit said:  It's fine.

10    We don't -- you don't need to have an event study.  That's

11    not a dispositive factor if there are other indicators of

12    efficiency.  That's what the law says.

13         Professor Fischel came in here and he said:  I

14    don't care about all these other factors.  They are not

15    relevant to me.  I'm only going to focus on two of them:

16    the shorts, which is *Cammer* 3 and *Cammer* 5.  Right?

17         Now, when it comes to -- and he's wrong about that

18    for the reasons that we mentioned in our briefs and for the

19    testimony that he provided, where he had to admit that there

20    was no co-relationship between the short utilization

21    interest and the price, because there was a wide gulf

22    between those two things.

23         So the central thesis that he has has been

24    undermined by his own S3.

25         As far as that second study about the question

1    that you had, had Dr. Cain only focused on the

2    misrepresentations of the corrective disclosures, the

3    Defendants would have said:  This is a biased study.  It's

4    not telling us anything about the efficiency.  You're only

5    focusing on the period that you care about, and it's only

6    five days.  Look at the small sample that you've chosen.

7            That's what would have happened, because it

8    happens in cases when that happens.

9            The reason why he chose the different parameters

10   is because Professor Fischel opened the door to it by only

11   focusing on the tweet.  He ran the statistical significance

12   on it.  And it's kind of contradictory, because at some

13   point Professor Fischel said, Well, how can you see any

14   value-relevant information in this tweet?

15           You know, so if that's the case, then why did he

16   study it?  He studied it.  And he determined, based on his

17   own parameters, which were contaminated by Mr. Cohen's

18   fraud, that it wasn't statistically significant.

19           I think Dr. Cain has done a better, more robust

20   study.  If you look at Professor Fischel's report, he even

21   admitted that the 120-day estimation window, which is

22   looking at the data 120 days before the event, is the

23   majority of the way -- is the way that a majority of the

24   studies have been done and that's the typical way of doing

25   it.

1          Professor Fischel said he did something different

2     here because of this rumored short squeeze, which is based

3     on some news stories and the fact that -- the short

4     utilization interest rate, which I think has been debunked

5     based on the slides we discussed.

6          As far as the news stories are concerned, well,

7     why should they take precedence over what the investors are

8     saying on Reddit?  This is a market where apparently

9     everyone is in agreement that most of the people who are

10     investing were tens of thousands of retail investors.

11          And as we showed you in our brief, even Cohen's

12     own appointees thought that these people were buying shares

13     because of Cohen and his tweets.  And they interpreted his

14     statements just as the way as we said, that they were false,

15     and just as the way the Reddit investors interpreted them.

16          THE COURT:  Sir, so on Dr. Cain's two studies, are

17     you -- you agree that they're kind of going after two

18     different things.  Right?

19          MR. JAFRI:  Well, so they are -- in terms of other

20     testing, *Cammer* 5 and cause and effect, that's the same

21     thing.  Are they an indication of market efficiency?  They

22     are.

23          Because in his analysis period --

24          THE COURT:  I guess on the first one, you know, I

25     think Professor Fischel makes a good point that that period,

1    the class period, is really a pretty extraordinary period in

2    the overall progress of Bed Bath & Beyond's stock prices.

3    And so I guess I'm wondering what to do with that first

4    study.

5         MR. JAFRI:  Right.  So I think -- so first of all,

6    that study doesn't have to -- the study -- the first study,

7    it's not a requirement that it must focus on the

8    misrepresentations and the corrective disclosures.  That's

9    the only way that he could have done it.

10        He stayed away from that to be objective.  Once

11   the door was opened, then he focused on it, which is the

12   correct way to do it.

13        To go back to your question about, Well, what do I

14   do with that study, that study's analysis period, it runs

15   through the class period.  Right?  So there may not have

16   been an event that's chosen, but the period that he studied

17   overlapped with that.

18        And the question the *Cammer* court addressed is:

19   Is it an efficient market over time?  And so that's what he

20   tested.

21        To the extent that there is an argument about

22   whether there was this inefficiency during this five-day

23   period, that's for the Defendants to show with a lack of

24   price impact.  And they failed to do it.  They don't even

25   focus on the corrective disclosure over here, for instance.

1        There's no argument that when the stock price

2   collapses, that there wasn't a price impact.  And in his

3   second study, Dr. Cain tested that.

4        I think, to go back to what I wanted to say to you

5   is, we were only required to show a rebuttable presumption

6   applies.  That doesn't mean that we have to go out and prove

7   it.  Only a presumption.

8        And I believe you can say, Well, all the other

9   factors are met; and this fifth factor, to the extent that

10  you think that there's some weakness in it, suggests that

11  there is a rebuttable presumption.

12       Then they try to rebut it with a field event study

13  that doesn't even focus on all of these corrective

14  disclosures or the misrepresentations.

15       And from a legal standpoint, this is very, very

16  important, because either you can show a front-end impact,

17  meaning from the misrepresentations, or you can show a

18  back-end impact from the corrective disclosures.

19       And even if we assume that there was no price

20  impact from any of the misstatements, the fact that there

21  was a 50 percent decline with the corrective disclosure,

22  that Dr. Cain has shown price impact, and that Professor

23  Fischel hasn't even addressed it, is enough -- that's fatal.

24  That's fatal to the Defendants' claim there was no price

25  impact.

1          And I think that sort of settles it, because let's

2      just assume someone says the market's not efficient.  The

3      Plaintiffs can still come back and say, But I am showing you

4      price impact.  Right?

5          And here, that is what has happened with respect

6      to that corrective disclosure, which is uncontested.

7          Your Honor, I would like to --

8          THE COURT:  I'll give you the --

9          MR. JAFRI:  -- reserve the rest of my time.  Thank

10     you.

11         THE COURT:  Mr. Farina?

12         MR. FARINA:  Thank you, your Honor.

13         I have a few demonstratives which include a number

14     of materials that we've looked at today.

15         THE COURT:  All right.

16         MR. FARINA:  If I may hand those up.

17         THE COURT:  Yes, please.

18         (Tenders documents to the Court and opposing

19     counsel.)

20         MR. FARINA:  We'll publish these as well.

21         Your Honor, I may end up skipping over a number of

22     these.

23         THE COURT:  Yes.  Please.

24         MR. FARINA:  I'm sure it will be appreciated.

25         Obviously, it's settled law.  This is Plaintiff's

Closing Argument by Mr. Farina

1      burden to prove all the elements of Rule 23.  And they have

2      the burden of proving that, not just pleading it.

3              The question is:  Have they done it?

4              We're focusing on the prerequisites of adequacy

5      and typicality of the lead Plaintiff and then of course

6      predominance, which leads you to the issue of whether or not

7      there was market efficiency during the class period.

8              All right.  Let me start with typicality.

9      Typicality is an important prerequisite.  It is an essential

10     prerequisite.  And it basically looks to see whether or not

11     the lead Plaintiff is typical of the class as alleged by the

12     Plaintiff.

13             So if you look at the allegations in the

14     complaint, what Plaintiff's counsel has chosen to say was

15     going on here, does the lead Plaintiff's own trading

16     activity corroborate those allegations or do they contradict

17     those allegations?

18             We think it's clear that Bratya's actual trading

19     activity conflicts with the allegations, which entirely

20     undermines the allegations in the complaint, which we

21     obviously don't think have merit, but it also separates him

22     from what they are alleging is the class.

23             They are alleging that the class was relying on

24     Mr. Cohen and betting with Mr. Cohen.  But throughout the

25     class period and before the class period, Bratya is betting

1    against those class members.  He's betting against the

2    company.  He's betting against Mr. Cohen.

3            THE COURT:  Yes.  So obviously, I want to follow

4    the law.  But I'm also -- help me understand why this

5    matters even if you're right that he was doing this.  He

6    still at the end of the day, I think, is going to want to

7    get your clients' money and he's going to want to get it for

8    his class.

9            MR. FARINA:  Adequacy and typicality are

10   prerequisites to certification.

11           He does not meet the requirements of either of

12   those two things because not only is he differently situated

13   from what they're claiming is the typical class member; he

14   is antagonistic to them in the sense that he is doing the

15   opposite of what the allegations say that everyone else in

16   the class was doing in reliance upon Mr. Cohen.  So he

17   entirely undermines their claims.

18           Now, again, if I'm going to actually litigate

19   class, I would much rather litigate it against Bratya than

20   against some other Plaintiff.

21           But it doesn't meet the requirements of Rule 23.

22   And if it doesn't meet the requirements of Rule 23, then the

23   class can't be certified.

24           THE COURT:  Isn't it true he's long throughout the

25   class period?

1              MR. FARINA:  That is not true.  That is not true.

2          So he owns certain positions.  He owns 59,000

3      shares.  He then ends up selling a number of those, so he's

4      down to about 38,000 shares.

5          So he owns common stock.  But against that common

6      stock, he is initiating new bearish positions throughout the

7      class period.  And those new bearish positions are naked

8      because he is writing calls that exceed the amount of shares

9      that he owns.

10         So those are not covered positions.  Those are not

11     hedges.  If the stock goes to the moon, he gets wrecked

12     because there is tremendous leverage in the positions that

13     he's initiated.

14         The last thing he wants is for the stock to go up.

15     The last thing that he wants is for the stock to go up a

16     lot.  If the stock goes up in any material amount, given all

17     of the leverage of the positions that he's initiated in the

18     class period, he loses money and he loses enormous amounts

19     of money.

20         So this starts from the very beginning, in March,

21     after the Schedule 13D is filed and Mr. Cohen has taken a --

22             THE COURT:  I get that.

23             MR. FARINA:  Okay.

24             THE COURT:  Let's talk about the class period,

25     though.

1              MR. FARINA:  The class period.  All right.

2              Here you go.  This is the beginning of the class

3     period.  It's August 12, the day of the tweet.  The

4     complaint alleges that the response was overwhelmingly

5     positive and that this was a rallying cry, a rallying cry to

6     buy BBBY stock.

7              And what does he do?  He initiates new bearish

8     positions.  So these are the trading records.  We have that

9     in a demonstrative that I can show you that I think makes it

10    a little clearer.  But I'm happy to walk through both.

11             These are his positions on the day of the tweet

12    and immediately after that.  So on August 12th, he sells 800

13    calls.  Those are naked.  He has already written so many

14    calls before the class period, he does not have the common

15    stock to cover it.  So if the stock goes up and if it goes

16    up a lot, he loses money.  That is a bearish position.

17             Again, on the 12th, he sells another 800 calls.

18    Those are naked.  He doesn't own enough underlying stock to

19    cover them.  If the stock goes up, he loses.

20             On the 15th, he sells more call options, another

21    500.  That is again a naked position.  It is a bearish

22    position.  He is betting against the company's stock going

23    up in any material amount.

24             Again, on 8/15, he sells another 600 calls.  Those

25    are also naked.

1          THE COURT:  So why shouldn't I believe his

2     explanation about what he understood to be happening on the

3     17th and 18th?

4          MR. FARINA:  Well, focus -- I'm happy to address

5     that.

6          But focusing first on what happened after -- the

7     centerpiece of their case is the tweet.  And what he did

8     upon that tweet is to initiate six new bearish positions.

9     And that's what he did through the 15th.

10          On the 18th, and through the 17th and the 18th,

11     this is his chat on the 17th, where he and his brother

12     realize and believe that Mr. Cohen has sold his position.

13     And he's very happy about that.

14          Okay.  This is supposed to be the corrective

15     disclosure when, according to the allegations made on behalf

16     of the class, everyone realizes they're duped and Ryan Cohen

17     actually doesn't have confidence in the company.  That's

18     their allegation.

19          What do they do?  They go out and buy stock.  So

20     they're acting in a way that's inconsistent with the

21     allegations in the complaint when they are shorting and then

22     they are again acting in a manner that's inconsistent with

23     the allegations in the complaint when they then go long.

24     They're at odds with the allegations in the complaint in

25     both directions.

1          They are not an adequate class representative.

2     They are not typical.  If they are typical, then the

3     allegations are completely meritless.  But they are not

4     typical in the sense that they are not consistent with what

5     counsel has alleged is going on here and what is happening

6     with the class.

7          THE COURT:  Okay.  Let's move to the experts.

8          MR. FARINA:  Yes.

9          So I want to talk briefly about *PolyMedica* and

10     then I'll get into the event studies.

11          *PolyMedica* is a case that we think, in light of

12     everything that's happened here today, is incredibly

13     important and demonstrative of what has happened here.  In

14     *PolyMedica*, the district court certified a class because the

15     Plaintiff's expert marched through the *Cammer* factors and

16     said, "Check, check, check, check, check.  They're all

17     satisfied."

18          The Court did not receive additional evidence on

19     the inefficiency in the market, including short-selling

20     constraints.

21          It went up to the First Circuit.  The First

22     Circuit said:  This mechanical application of *Cammer* is

23     wrong.  The test is whether or not the market was efficient.

24     The test is not whether you've satisfied the *Cammer* factors.

25     You have to look at whether the market was efficient.  They

 1    sent it back to the district court to examine whether the

 2    market was efficient and to consider all relevant evidence

 3    about that.

 4            The district court on remand -- it was a different

 5    judge -- looked at the *Cammer* factors and said:  Several of

 6    them are met.  There's a very weak showing on *Cammer* 5 and

 7    then there are other indicia of inefficiency.  And among the

 8    other indicia of inefficiency were short-selling

 9    constraints.  Exactly like this case.  And the Court

10    declined to certify the class.

11            This is not a mechanical exercise.  None of the

12    courts that cite *Cammer* say it's a mechanical exercise.

13    Those are indicia.  They should be considered.  They should

14    be considered in the context of the facts of the case.

15            And the context of the facts of the case that

16    Professor Fischel walked through in his report and in his

17    testimony demonstrate that the market was not efficient,

18    that Dr. Cain and the Plaintiffs have not met their burden

19    of demonstrating efficiency.

20            Dr. Cain had two studies that he offered.  The

21    first one doesn't tell you anything about the reaction of

22    the price to -- I'm sorry -- the reaction of the stock to

23    information in the class period because he only tested days

24    that were outside the class period.  He looked at four news

25    days that all predate the class period.

1          Even if he were able to demonstrate a valid price

2     reaction on those days, the most that that could prove is

3     that the market was efficient on those days.

4          What Professor Fischel showed is that the

5     circumstances of BBBY's market and the trades for that stock

6     changed dramatically between the time period where he's

7     testing informational efficiency and the class period.

8          So the first go doesn't prove anything unless you

9     accept the premise that what was going on before is

10    reflective of what was going on in the class period, because

11    the question for the Court is:  Was the market for these

12    securities efficient in the class period?

13          So --

14          THE COURT:  Do I need to be concerned -- I mean, I

15    kind of get the impression that if you're correct that

16    there's kind of this get-out-of-jail-free card during short

17    squeezes that you're not -- somebody can give misleading

18    tweets or statements and it's not going to be an efficient

19    market, and therefore you're not going to be able to bring a

20    class action.

21          Do I need to be worried about that?

22          MR. FARINA:  You do not need to be worried about

23    that.  But I certainly understand the question.

24          I think what's incredibly important here is that

25    the inefficiencies in the market predate the alleged

Closing Argument by Mr. Farina

1    misstatement.

2         So we're not saying that an alleged misstatement

3    can cause the market to be inefficient and therefore you

4    can't certify the class.

5         THE COURT:  I get that.

6         MR. FARINA:  The market here, as Professor Fischel

7    demonstrated, was not efficient weeks before the alleged

8    misstatement.

9         There's no valid argument that Mr. Cohen's

10   statements on the 12th, the first statements alleged to be

11   actionable, caused the short squeeze that started at the end

12   of July.  All of the indicia, all of the objective evidence,

13   all of the economic evidence, demonstrates that the short

14   squeeze started in July.

15        So the stock had already doubled by the time of

16   the alleged misstatement.

17        THE COURT:  I do understand that.

18        I'm just -- if you realize there's a short squeeze

19   going on, you kind of can do what you want and there's going

20   to be no liability.

21        MR. FARINA:  All right.  In terms of the second

22   efforts at the event study, as Professor Fischel mentioned,

23   it is entirely -- I want to spend just a moment on this,

24   because I think it's important.

25        The reason why the conclusions reached by Dr. Cain

1    about the statistical significance of the price movements

2    during the class period is wrong is because he has an

3    improper estimation window.

4         And the way they do this, these event studies, is

5    they try to find a period where they can assess the

6    volatility of the company's stock and then they compare the

7    price movements in the class period or in the days that

8    you're studying; and using that estimation window as a

9    baseline -- and there are a few other factors that go in,

10   including the comparator groups, the index, the retail index

11   in this case -- you evaluate whether the price movements on

12   those days are statistically significant.  And if they're

13   not statistically significant, it doesn't satisfy *Cammer* 5.

14        The problem with what Dr. Cain did is he took as

15   your baseline a period where there was very low volatility

16   and he used that to assess whether or not the price

17   movements in the class period were statistically

18   significant.  And the problem with that is that the stock

19   had already before the class period entered into a period of

20   extreme volatility.  So the stock was already having much

21   larger price movements before any alleged

22   misrepresentations.

23             THE COURT:  Yes.

24             MR. FARINA:  That taints his entire --

25             THE COURT:  Mr. Farina, I get that.

1          I'm thinking about a tweet and I'm having a hard

2     time seeing how this would not be informationally efficient,

3     especially this high-profile tweet from an investor that --

4     I mean, certainly it seems like people could still react to

5     it and go higher, understanding that we're in the middle of

6     a short squeeze.

7          Why isn't that an informationally efficient

8     environment?

9          MR. FARINA:  Well, first of all, a properly

10    conducted event study shows that there is no statistically

11    significant price reaction.  So as a matter of econometrics,

12    they have not demonstrated that.  So that's the first

13    answer.

14         The second answer is *Cammer* 5 itself, as I pointed

15    out with Dr. Cain, requires that the information be

16    value-relevant and new.

17         And our position is there's nothing value-relevant

18    in Mr. Cohen who, in response to this incredibly dismal

19    analyst report, which CNBC decided to accompany with a

20    picture of some woman with a full shopping cart, he thought

21    that was funny.  And he wrote, "At least her cart was full."

22    It's clearly sarcastic.  It's clearly a joke.  And he

23    accompanied it with a smiley-face emoji to indicate that he

24    was being sarcastic.

25         Whatever you think of that smiley-face emoji, it

1    is not new, value-relevant information.  And to say that

2    that smiley-face emoji is new, value-relevant information is

3    entirely ungrounded in any valid economics or econometric

4    foundation.  It's just not value-relevant information.

5        If Mr. Cohen had gone out and said, "I think the

6    stock is great; I think it's going to go up," that wouldn't

7    be actionable under the securities laws.

8        So having a moon emoji with a smiley face

9    accompanying what is clearly a joke, that is not

10   value-relevant new information.  But regardless of whether

11   that is true or not, a properly conducted event study

12   demonstrates that there is no statistically significant

13   price movement on that day.

14       Before August 12th, the stock had gone up 11 out

15   of 12 days.  There is no scientific basis to say that the

16   price movement on the 12th had anything to do with any

17   information that was released on that day, because a valid,

18   properly conducted event study does not demonstrate that it

19   did.

20       THE COURT:  Thank you, Mr. Farina.

21       MR. FARINA:  Thank you.

22       THE COURT:  Mr. Jafri, I'll give you the last

23   word.

24       MR. JAFRI:  Your Honor, starting with adequacy, we

25   are not here because Bratya and its lawyers are antagonistic

1    to the other investors.  We are here because Bratya pled a

2    well-pled complaint, got most of the claims against

3    Mr. Cohen sustained, has vigorously pursued its discovery

4    and has found proof of the claims.  That's adequacy.

5           As far as atypicality is concerned, I'm just going

6    to say one thing, which the Defendants have failed to

7    address because they cannot address it:  If Mr. Coti really

8    wanted to short all these positions and was betting against

9    Ryan Cohen at every turn like they said, why did he hold on

10   to tens of thousands of shares?  He should have sold those

11   or shorted stock.

12          He didn't, because it's not consistent with what

13   they're saying.  And the evidence shows that they believed

14   in the turnaround strategy.  In fact, they are the ideal

15   representatives, because you cannot say that they were

16   irrationally doing it or doing it for fun and profit like

17   the way that they assume without presenting any evidence of

18   who these people were who were just irrationally doing it

19   for fun and profit.

20          He came on the stand and explained to you the

21   rational reason why he purchased the stock.

22          So I think not only are they not atypical, but

23   they are the ideal representative to represent everyone.

24          Now, going back to your point about informational

25   efficiency, it just occurred to me that that is actually the

1    most important thing, because if you put all these studies

2    aside and everything else, what really matters is what the

3    Supreme Court has said:  Are the misrepresentations public

4    and are they affecting prices?  That's it.

5          And to what degree this is happening or how

6    perfect it is is irrelevant, just like the Supreme Court's

7    majority opinion said in *Halliburton II*.  That's the test.

8          Now, what about that test?  We know that Mr. Cohen

9    made this misrepresentation on the 12th.  He has admitted in

10    court in his opposition -- sorry -- in his motion to dismiss

11    that he was being sarcastic and expressing pessimism in --

12    with respect to Bed Bath & Beyond's performance.

13          That was not how thousands of investors online

14    interpreted it.  They interpreted it to mean that it was a

15    positive signal, just as you analyzed in your order on the

16    motion to dismiss.  He did nothing, nothing ever, to come

17    and contradict them or correct them and say, Hey, you

18    misinterpreted me.

19          And following that tweet the price, as you know,

20    exploded.

21          Now, can you please put up that slide?

22          The central thesis of Mr. -- sorry -- Professor

23    Fischel's argument is this whole thing about the short

24    interest and the short utilization rate.

25          And I think if -- so here we have it.  This is

1    really when the first squeeze happened, or at least the

2    rumored squeeze.  That's when Dow Jones came up with an

3    article saying there's a rumored short squeeze.

4          If you look at this, the short interest

5    utilization rate is not really changing, but this price is

6    increasing on this date.  Right?

7          So to the extent that he's trying to develop a

8    correlation there, it doesn't make any sense.

9          And when you look at what was happening to the

10   price on the -- for the rest of the period, it's going down

11   until March of 2022.  But the short interest, you know, is

12   not really impacted.  And then the price goes up in March,

13   which is, as you know, when Mr. Cohen had filed a form.

14   That's why it's increasing.

15         And then when you look at what's happening to the

16   price over here, it increases.  And all this volatility is

17   caused by Mr. Cohen.

18         And this is the reason why Professor Fischel's

19   event study is unreliable, because he assumes the volatility

20   has nothing to do with this tweet.

21         Yet Professor Fischel did not do anything to

22   examine how the tweet was interpreted or how people reacted

23   to it.  He admitted that he has not even examined how any of

24   these people on Twitter or Reddit were saying -- were

25   interpreting the tweet or what they took away from it.

1            Thank you, your Honor.

2            THE COURT:  So what about Mr. Farina's point that

3    the stock was already exploding when the moon emoji tweet

4    went out?

5            MR. JAFRI:  Right.  So now, well, if you take a

6    look at that fact, the short interest, for instance, has

7    already hit 100 percent.  Right?  Before the stock price

8    rises.  It's already there.

9            So this is where it's at:  100 percent.  There's

10   no price increase here.  The price increase is happening

11   later.

12           And then if you look over here, it's still 100

13   percent.  And yet the price has plummeted.

14           So I think that these charts show that there is no

15   co-relationship.  It's an assumed co-relationship.

16           But what's really driving the price is Mr. Cohen's

17   tweet.  And if you look at this period, for instance, this

18   is now -- you know, this is here in August.  Professor

19   Fischel was looking at the period over here, and he included

20   all of this.

21           So the price, to the extent it rose, I think as

22   you know there were rumors in the market that there was a

23   short squeeze.  Right?  We -- I think whether there was a

24   short squeeze or there wasn't and regardless of whether

25   there is empirical evidence of it, the reason why that

1    matters is because Mr. Cohen had benefited from it before.

2    He knew that there was rumors of it.  And that was a

3    motivation as to why he went and sent this tweet out.

4            As you know, and as we pled in the complaint --

5    and it's unchallenged -- a lot of people thought that it was

6    a squeeze play, that on August 10th he sent this purple

7    heart which now, based on expert testimony, we've learned

8    meant that he was showing support for the investor community

9    that was hostile to hedge funds.  He sent that two days

10    before he sent this tweet.

11            So to the extent that there's anything about

12    whether the short squeeze is causing it or what about the

13    price before, all of that was exacerbated by Mr. Cohen's

14    conduct.

15            THE COURT:  Thank you.

16            MR. JAFRI:  Thank you, your Honor.

17            THE COURT:  Thanks to all the lawyers for your

18    hard work and your arguments and motions.

19            Thanks to Mr. Coti, Professor Fischel, Dr. Cain.

20            Mr. Coti, we had our own little Olympics here.  It

21    felt like a wrestling match.

22            All right.  I will accept post-period briefing.

23    You can file it simultaneously by August 14th.

24            And I will take the matter under advisement.

25            Mr. Jafri, anything further for Plaintiff?

Rebuttal Closing Argument by Mr. Jafri

1            MR. JAFRI:  Nothing for the Plaintiff.  Thank you,

2    your Honor.

3            THE COURT:  Mr. Farina?

4            MR. FARINA:  No, your Honor.  But can I ask the

5    page limit?

6            THE COURT:  Yes.  Thank you.  25 pages.

7            MR. FARINA:  Very good.  Thank you.

8            THE COURT:  Thanks.  Have a good weekend, folks.

9            MR. JAFRI:  Thank you.

10            MR. BUTSWINKAS:  Thank you.

11            (Proceedings concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         <u>**CERTIFICATE**</u>

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8

9

10                   Dated this 5th day of August, 2024.

11

12              <u>/s/ Lisa Edwards, RDR, CRR</u>
               Official Court Reporter
13             United States District Court for the
                 District of Columbia
14             333 Constitution Avenue, Northwest
               Washington, D.C. 20001
15             (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$10** [1] - 25:7
**$11** [2] - 51:23, 52:3
**$14** [1] - 197:22
**$15** [1] - 197:22
**$20** [2] - 24:25, 25:5
**$30** [1] - 24:24
**$75** [2] - 42:2, 124:12

## '

**'22** [1] - 98:17

## /

**/s** [1] - 223:12

## 1

**1** [13] - 15:9, 35:5, 35:21, 35:24, 36:13, 37:20, 65:22, 86:10, 86:11, 109:2, 109:5, 115:1, 178:9
**1.2** [1] - 98:17
**1.6** [1] - 92:9
**10** [3] - 1:14, 154:14, 175:10
**100** [40] - 28:24, 31:16, 31:18, 31:21, 32:12, 95:12, 95:16, 96:6, 100:5, 100:8, 100:12, 101:9, 105:23, 127:24, 128:8, 134:11, 134:13, 134:14, 134:15, 134:16, 134:18, 134:22, 135:4, 135:7, 137:8, 137:23, 138:9, 139:5, 152:24, 162:1, 173:2, 173:4, 175:8, 176:3, 181:12, 181:17, 220:7, 220:9, 220:12
**106** [2] - 183:15, 183:16
**10:11** [1] - 188:23
**10:34** [1] - 1:6
**10:42** [3] - 52:2, 72:4, 105:9
**10th** [1] - 221:6
**11** [3] - 106:5, 155:24, 216:14
**11,500** [3] - 156:5, 156:16, 187:17
**1100** [1] - 1:17

**113** [1] - 91:12
**116,711** [1] - 159:3
**117.1** [1] - 92:8
**119** [1] - 3:15
**11th** [3] - 91:10, 105:23, 155:22
**12** [19] - 85:23, 98:10, 112:25, 120:21, 120:25, 124:13, 127:7, 128:22, 136:25, 141:8, 155:21, 155:25, 156:25, 157:3, 157:9, 158:4, 187:21, 208:3, 216:15
**12.95** [1] - 52:6
**120** [2] - 147:2, 200:22
**120-day** [3] - 115:17, 147:6, 200:21
**12:57** [2] - 192:25, 193:11
**12th** [36] - 27:19, 51:9, 51:20, 51:24, 53:13, 53:20, 54:12, 68:2, 71:23, 72:21, 73:8, 90:10, 105:8, 105:16, 105:25, 106:3, 106:10, 120:8, 140:22, 142:15, 142:16, 142:19, 146:11, 161:4, 164:13, 164:17, 186:9, 187:6, 187:20, 188:1, 208:12, 208:17, 213:10, 216:14, 216:16, 218:9
**13** [3] - 52:6, 68:4, 91:7
**13.2** [1] - 98:11
**13D** [15] - 74:6, 74:11, 74:15, 74:18, 74:22, 75:5, 75:18, 75:22, 76:12, 78:1, 126:25, 107:11, 148:15, 149:10, 207:21
**13th** [1] - 142:16
**14** [3] - 92:1, 136:25, 173:24
**144** [4] - 160:4, 160:21, 192:12, 193:24
**14th** [4] - 142:16, 172:11, 174:17, 221:23
**15** [8] - 3:11, 17:6, 18:24, 92:21, 188:6, 188:8, 195:4, 195:11
**15.2** [1] - 98:12

**151** [1] - 3:12
**15th** [7] - 74:3, 161:6, 173:22, 188:3, 208:20, 209:9
**16** [1] - 158:8
**16.82** [2] - 53:21, 53:24
**160** [1] - 182:17
**160,000** [1] - 187:10
**164** [1] - 3:12
**16th** [25] - 28:16, 56:9, 73:24, 74:1, 74:4, 74:5, 74:22, 75:5, 76:13, 77:12, 77:25, 78:22, 106:17, 106:20, 106:24, 107:14, 107:20, 107:23, 147:20, 148:1, 148:13, 149:3, 149:5, 149:10, 161:5
**17** [7] - 99:20, 103:21, 157:3, 157:8, 157:10, 158:2, 165:4
**17th** [10] - 76:4, 76:6, 76:18, 107:15, 158:21, 165:2, 188:23, 209:3, 209:10, 209:11
**18** [17] - 52:8, 52:9, 52:19, 52:20, 53:7, 53:9, 78:25, 98:10, 104:18, 127:8, 128:23, 129:11, 155:21, 164:25, 165:5, 182:18, 192:2
**18th** [15] - 10:17, 77:13, 78:22, 92:6, 149:17, 159:25, 164:22, 188:22, 189:14, 192:25, 196:21, 197:2, 209:3, 209:10
**19** [2] - 105:4, 105:6
**190** [1] - 3:12
**195** [1] - 3:4
**19th** [3] - 56:19, 77:13, 78:22
**1:35** [1] - 69:12
**1st** [12] - 117:1, 128:10, 128:11, 129:24, 130:11, 130:21, 134:3, 134:4, 135:5, 137:14

## 2

**2** [13] - 1:5, 15:9, 35:24, 36:9, 37:23, 86:9, 86:19, 89:25,

90:1, 115:1, 181:10, 181:16, 183:11
**20** [8] - 18:24, 44:5, 56:16, 66:5, 117:3, 117:4, 161:25, 166:14
**200** [1] - 48:4
**20001** [2] - 2:4, 223:14
**20005** [1] - 1:18
**20024** [1] - 1:23
**2016** [1] - 166:12
**202** [2] - 2:4, 223:15
**2021** [13] - 68:4, 98:10, 128:11, 129:24, 130:21, 131:13, 131:19, 131:22, 131:23, 132:10, 132:22, 135:21, 136:1
**2022** [49] - 27:19, 56:9, 56:19, 66:8, 68:2, 68:4, 68:5, 95:6, 98:10, 99:9, 100:22, 104:11, 104:20, 105:8, 105:17, 120:25, 122:8, 128:11, 129:24, 130:11, 130:21, 132:16, 133:16, 133:17, 133:21, 133:22, 134:3, 134:4, 135:5, 136:5, 137:15, 141:9, 141:13, 154:4, 155:21, 155:22, 155:25, 156:25, 157:3, 157:10, 158:21, 159:25, 164:13, 164:17, 170:24, 171:7, 177:14, 187:20, 219:11
**2024** [2] - 1:5, 223:10
**204** [1] - 3:5
**208,000** [1] - 188:10
**21** [1] - 114:19
**217** [1] - 3:6
**22-02541** [1] - 1:4
**22-2541** [1] - 4:2
**23** [4] - 97:24, 205:1, 206:21, 206:22
**24** [3] - 22:19, 26:14, 167:2
**25** [3] - 18:19, 32:23, 222:6
**26,711** [1] - 159:2
**280,000** [1] - 188:13
**29** [1] - 106:5
**29th** [2] - 68:5, 91:10

## 3

**3** [8] - 22:7, 22:17, 26:13, 86:9, 86:18, 86:20, 172:5, 199:16
**3-A** [1] - 76:7
**30** [6] - 6:7, 26:22, 68:4, 172:25, 177:25, 191:24
**300** [1] - 189:23
**31** [5] - 26:23, 27:19, 27:20, 28:8, 28:12
**316** [1] - 191:24
**333** [2] - 2:3, 223:14
**350** [1] - 172:23
**354-3269** [2] - 2:4, 223:15
**38** [2] - 77:21, 77:22
**38,000** [1] - 207:4
**39,400** [1] - 157:1

## 4

**4** [3] - 154:6, 154:11, 154:13
**40** [3] - 6:7, 53:6, 141:13
**40-day** [1] - 117:1
**48** [1] - 40:13
**4:00** [1] - 55:21
**4:50** [1] - 194:24

## 5

**5** [36] - 44:25, 45:9, 54:9, 66:14, 66:25, 67:22, 68:3, 69:25, 70:22, 73:19, 80:7, 86:24, 87:5, 87:16, 87:21, 88:5, 89:6, 89:8, 89:9, 90:25, 91:23, 92:10, 108:10, 108:24, 109:12, 110:9, 110:14, 118:25, 123:4, 179:18, 199:16, 201:20, 211:6, 214:13, 215:14
**50** [6] - 29:17, 48:4, 56:25, 82:16, 130:12, 203:21
**50,000** [1] - 188:13
**50,900** [1] - 155:24
**500** [7] - 91:14, 92:9, 102:4, 102:6, 102:7, 172:23, 208:21
**500,000** [1] - 28:8, 28:11, 28:18, 99:6,

100:3, 101:1, 102:4
**57** [4] - 65:18, 66:5, 67:5, 70:16
**58** [2] - 40:13, 40:23
**59,000** [1] - 207:2
**5th** [9] - 141:22, 142:10, 178:14, 179:19, 180:22, 181:18, 181:25, 182:22, 223:10

## 6

**6** [3] - 68:4, 186:2, 190:21
**60,000** [1] - 188:12
**600** [2] - 36:4, 208:24
**60603** [1] - 1:15
**63** [1] - 3:11
**6706** [1] - 2:3
**680** [1] - 1:22
**6:00-something** [1] - 193:6
**6:56** [3] - 192:2, 192:3, 192:14
**6th** [1] - 171:7

## 7

**7** [1] - 3:3
**70** [1] - 134:20
**73** [1] - 66:17
**749** [2] - 191:23, 191:24
**75** [1] - 68:15
**76** [2] - 166:22, 167:22
**7th** [4] - 74:12, 172:10, 172:17, 174:17

## 8

**8** [4] - 51:16, 127:11, 129:1, 189:12
**8-K** [2] - 79:4, 79:14, 80:4, 80:20
**8/15** [1] - 208:24
**80,000** [1] - 188:12
**800** [2] - 208:12, 208:17
**81** [1] - 3:15
**85,000** [1] - 159:2
**87,000** [1] - 173:5
**8th** [6] - 141:13, 141:15, 156:3, 172:10, 179:17, 180:21

## 9

**9** [2] - 127:10, 127:11
**90** [2] - 28:12, 47:16
**90,000** [2] - 159:2, 188:12
**95** [1] - 10:19
**98** [1] - 100:12
**99** [5] - 56:17, 57:1, 100:4, 100:12, 127:25
**9th** [1] - 173:8

## A

**a.m** [7] - 1:6, 52:2, 72:4, 105:9, 192:2, 192:14, 192:25
**abdication** [1] - 112:5
**aberrational** [3] - 87:12, 94:9, 136:3
**ability** [4] - 23:25, 99:15, 100:23, 223:7
**able** [14] - 13:14, 22:14, 25:20, 28:21, 47:3, 55:15, 60:5, 89:17, 103:1, 157:18, 162:3, 192:8, 212:1, 212:19
**abnormal** [7] - 48:16, 48:17, 48:20, 52:12, 53:20, 54:19, 56:15
**absence** [10] - 58:10, 59:12, 94:15, 94:18, 110:23, 136:4, 137:10, 138:17, 141:24, 142:17
**absent** [2] - 107:5, 111:23
**absolutely** [2] - 85:12, 119:22
**academic** [14] - 15:23, 20:18, 20:21, 20:25, 21:12, 43:25, 62:7, 82:12, 83:2, 83:7, 112:19, 113:4, 113:18, 136:24
**academics** [2] - 20:21, 21:1
**accelerate** [1] - 94:6
**accept** [2] - 212:9, 221:22
**accepted** [9] - 17:20, 19:3, 23:20, 29:20, 29:23, 31:1, 33:4, 34:24, 44:2
**access** [1] - 39:10
**accompanied** [1] -

215:23
**accompany** [1] - 215:19
**accompanying** [1] - 216:9
**accomplishing** [1] - 5:15
**according** [3] - 127:23, 159:8, 209:15
**account** [2] - 159:14, 173:2
**accuracy** [1] - 118:15
**accurate** [5] - 20:6, 77:23, 108:11, 155:15, 223:4
**accurately** [5] - 61:17, 87:12, 109:8, 118:12, 154:25
**acquiring** [1] - 165:10
**acquisitions** [1] - 16:4
**act** [2] - 60:19, 196:3
**acting** [2] - 209:20, 209:22
**Action** [2] - 1:3, 4:2
**action** [1] - 212:20
**actionable** [2] - 213:11, 216:7
**active** [2] - 49:5, 83:20, 157:18
**activities** [1] - 58:6
**activity** [6] - 30:9, 57:9, 93:24, 171:14, 205:16, 205:19
**actual** [2] - 115:13, 205:18
**add** [1] - 192:17
**added** [5] - 51:19, 111:15, 159:3
**adding** [1] - 98:18
**addition** [3] - 83:24, 129:6, 129:7
**additional** [24] - 16:25, 23:1, 23:5, 25:15, 25:20, 26:24, 42:13, 46:1, 46:7, 46:19, 49:5, 49:13, 49:14, 70:23, 77:14, 77:15, 78:16, 101:14, 101:23, 103:5, 157:2, 157:4, 159:24, 210:18
**address** [9] - 32:16, 36:9, 46:19, 59:24, 86:1, 138:10, 209:4, 217:7
**addressed** [2] - 202:18, 203:23
**adds** [1] - 188:13

**adequacy** [9] - 6:3, 11:4, 11:5, 12:2, 195:21, 205:4, 206:9, 216:24, 217:4
**adequate** [3] - 11:7, 12:5, 210:1
**adjust** [1] - 151:7
**administration** [2] - 151:23, 152:6
**admit** [1] - 199:19
**admitted** [5] - 9:24, 10:22, 200:21, 218:9, 219:23
**advantage** [4] - 23:5, 23:13, 42:13, 161:11
**advisement** [1] - 221:24
**advisor** [1] - 16:19
**affect** [3] - 37:13, 50:12, 171:10
**affected** [3] - 49:22, 49:23, 108:18
**affecting** [4] - 96:19, 96:20, 139:15, 218:4
**affects** [1] - 35:13
**afternoon** [6] - 69:16, 81:15, 81:23, 81:24, 107:14, 164:11
**agencies** [1] - 84:2
**aggregate** [1] - 95:18
**aggregator** [1] - 72:19
**agnostic** [3] - 44:21, 68:24, 76:20
**ago** [2] - 27:4, 151:20
**agree** [34] - 30:16, 51:22, 52:1, 52:5, 63:11, 63:20, 63:25, 64:5, 64:18, 66:24, 109:15, 117:23, 119:18, 119:24, 121:9, 122:16, 125:12, 125:16, 128:11, 129:23, 130:1, 130:20, 130:23, 134:12, 139:13, 143:6, 143:11, 145:5, 146:3, 147:5, 148:16, 148:23, 180:13, 201:17
**agreed** [1] - 135:6
**agreeing** [1] - 125:24
**agreement** [12] - 79:5, 79:11, 79:13, 79:15, 122:7, 165:24, 166:1, 177:10, 177:19, 178:1, 178:2, 201:9

**agreements** [1] - 194:9
**ahead** [3] - 129:1, 132:7, 193:3
**al** [1] - 4:3
**Alex** [3] - 97:24, 99:20, 178:8
**algorithmic** [1] - 41:4
**all-in** [2] - 175:6, 177:1
**allegation** [1] - 209:18
**allegations** [13] - 77:4, 105:12, 205:13, 205:16, 205:17, 205:19, 205:20, 206:15, 209:15, 209:21, 209:23, 209:24, 210:3
**alleged** [23] - 44:20, 49:21, 50:5, 56:15, 57:10, 58:10, 59:19, 59:23, 72:5, 90:6, 90:8, 131:2, 135:1, 145:1, 155:19, 205:11, 210:5, 212:25, 213:2, 213:7, 213:10, 213:16, 214:21
**alleges** [1] - 208:4
**alleging** [2] - 205:22, 205:23
**allow** [5] - 19:11, 57:25, 58:5, 89:2, 157:17
**allowed** [1] - 45:14
**allows** [2] - 41:17, 42:10
**alluded** [1] - 107:10
**almost** [2] - 56:25, 134:15
**alone** [1] - 116:19
**Alpha** [3] - 38:17, 133:4, 133:10
**alternative** [12] - 34:24, 45:9, 71:10, 71:13, 71:22, 73:23, 76:25, 78:24, 87:18, 88:3, 98:4, 111:13
**amended** [3] - 74:6, 75:5, 76:12
**amount** [12] - 26:15, 26:20, 27:13, 28:3, 30:6, 35:6, 99:2, 99:16, 103:14, 207:8, 207:16, 208:23
**amounts** [2] - 181:12, 207:18
**analyses** [3] - 71:16,

88:19, 117:7

**analysis** [92] - 9:15, 17:23, 21:3, 22:18, 26:13, 31:5, 33:4, 33:10, 33:14, 33:16, 34:3, 44:25, 46:1, 48:13, 49:1, 50:14, 51:11, 53:1, 53:18, 55:17, 57:19, 58:4, 63:25, 64:12, 66:14, 67:22, 68:4, 68:16, 68:25, 69:25, 70:2, 70:6, 70:10, 70:11, 70:22, 70:23, 70:25, 73:2, 73:19, 75:12, 76:20, 76:25, 80:2, 80:22, 88:19, 91:8, 92:3, 98:9, 109:12, 109:15, 109:18, 109:20, 109:25, 110:2, 110:11, 110:14, 110:23, 111:4, 111:6, 111:13, 111:14, 111:17, 111:19, 111:20, 111:24, 112:17, 113:17, 116:9, 124:5, 124:21, 131:8, 133:4, 133:6, 139:7, 139:10, 139:11, 139:21, 145:4, 145:5, 145:6, 145:9, 145:11, 145:19, 146:2, 146:4, 146:6, 147:18, 148:6, 148:19, 201:23, 202:14

**Analysis** [1] - 17:10

**analyst** [13] - 37:23, 38:12, 38:19, 38:20, 38:23, 39:3, 39:6, 72:2, 72:9, 73:11, 77:14, 168:11, 215:19

**analyst's** [2] - 183:25, 185:8

**analysts** [5] - 36:10, 37:25, 39:1, 184:4

**analyze** [13] - 33:1, 35:5, 94:19, 113:24, 124:19, 125:10, 130:25, 131:3, 139:14, 141:8, 145:4, 146:13, 149:19

**analyzed** [9] - 8:2, 34:16, 64:2, 64:4, 120:24, 123:6, 143:1, 148:7, 218:15

**analyzes** [1] - 111:25

**analyzing** [2] - 19:25, 33:11

**annotated** [1] - 51:18

**announced** [4] - 170:24, 174:8, 174:18, 177:10

**announcement** [10] - 37:17, 37:18, 80:13, 80:20, 192:7, 193:9, 193:24, 194:11, 198:21, 198:23

**announcements** [19] - 43:7, 43:15, 43:21, 44:23, 45:4, 45:7, 45:19, 48:12, 62:22, 64:15, 66:19, 67:7, 67:24, 68:21, 75:14, 75:15, 76:21, 76:24, 79:24

**announces** [1] - 80:14

**announcing** [1] - 171:18

**annual** [2] - 38:14, 42:8

**anomaly** [2] - 20:23, 48:9

**answer** [16] - 28:17, 28:20, 29:16, 73:18, 86:19, 90:1, 101:1, 101:8, 166:25, 167:8, 182:24, 183:1, 185:6, 190:9, 215:13, 215:14

**answering** [1] - 63:16

**answers** [1] - 102:3

**antagonism** [1] - 196:6

**antagonistic** [2] - 206:14, 216:25

**anytime** [1] - 137:1

**anyway** [1] - 159:3

**apart** [1] - 83:19

**apex** [1] - 128:14

**apologize** [2] - 129:16, 130:18

**appealed** [1] - 199:8

**aPPEARANCES** [1] - 1:11

**appendix** [1] - 73:5

**apples** [2] - 116:9

**application** [1] - 210:22

**applied** [2] - 70:10, 112:11

**applies** [1] - 203:6

**apply** [2] - 58:22, 63:18

**appointees** [1] - 201:12

**appointment** [1] - 83:11

**appointments** [1] -

83:8

**appreciated** [1] - 204:24

**approach** [3] - 5:20, 182:9, 182:10

**appropriate** [5] - 86:22, 87:18, 87:19, 112:19, 113:24

**appropriately** [1] - 112:17

**April** [1] - 68:4

**Arab** [1] - 151:14

**arbitrage** [2] - 123:22, 123:24

**arbitrageurs** [2] - 123:16, 123:20

**arbitrary** [1] - 113:12

**area** [7] - 19:16, 84:16, 95:6, 130:14, 130:17, 134:3, 134:4

**areas** [2] - 19:11, 82:13

**arguably** [1] - 117:5

**argument** [14] - 6:18, 8:16, 10:5, 11:3, 11:19, 11:21, 12:17, 13:3, 119:3, 195:3, 202:21, 203:1, 213:9, 218:23

**Argument** [3] - 3:4, 3:5, 3:6

**arguments** [4] - 7:16, 7:23, 11:23, 221:18

**ARIFI** [2] - 1:13, 4:16

**Arifi** [1] - 4:16

**arrive** [1] - 159:10

**arrived** [1] - 158:24

**article** [10] - 17:19, 73:8, 78:20, 132:9, 132:21, 133:1, 133:4, 133:7, 133:9, 219:3

**articles** [18] - 9:13, 17:16, 17:17, 31:1, 72:22, 73:1, 75:21, 82:16, 82:19, 82:24, 132:24, 133:2, 138:21, 138:23, 143:5, 145:3, 146:7, 192:24

**articulation** [1] - 80:7

**artificial** [7] - 87:4, 94:9, 97:17, 101:18, 104:6, 137:17, 138:19

**ascertain** [2] - 58:1, 58:5

**aside** [3] - 123:5, 137:21, 218:2

**aspect** [3] - 67:14,

153:14, 153:15

**aspects** [1] - 104:24

**assess** [4] - 19:24, 32:20, 35:1, 43:5, 50:3, 51:7, 53:12, 56:8, 56:19, 63:16, 75:9, 75:24, 214:5, 214:16

**assessed** [2] - 63:19, 64:3

**assessing** [9] - 18:1, 18:8, 20:14, 30:3, 33:4, 35:7, 36:11, 40:20, 43:24

**assessment** [1] - 80:1

**asset** [2] - 122:4, 161:22

**assets** [2] - 153:21, 162:3

**associated** [3] - 8:23, 8:24, 147:25

**Association** [1] - 84:5

**assume** [5] - 8:12, 8:17, 203:19, 204:2, 217:17

**assumed** [1] - 220:15

**assumes** [1] - 219:19

**assuming** [1] - 116:5

**assumption** [1] - 88:25

**assumptions** [1] - 65:12

**astronomical** [1] - 87:9

**attached** [2] - 175:24

**attention** [6] - 35:11, 128:10, 160:24, 190:21, 191:23, 193:1

**attorneys** [1] - 74:7

**attributable** [2] - 116:18, 116:19

**attributed** [3] - 142:14, 142:18, 146:11

**atypical** [1] - 217:22

**atypicality** [1] - 217:5

**audible** [2] - 166:24, 167:7

**audiences** [1] - 83:3

**August** [133] - 1:5, 27:19, 28:16, 51:9, 51:20, 51:24, 53:13, 53:20, 54:12, 56:9, 56:19, 68:2, 71:23, 72:21, 73:8, 73:24,

74:1, 74:5, 74:22, 75:4, 76:4, 76:6, 76:13, 76:18, 77:12, 77:13, 77:25, 78:22, 78:25, 90:10, 91:10, 92:5, 95:6, 98:10, 98:16, 99:8, 99:9, 100:22, 102:12, 103:15, 104:11, 104:20, 105:8, 105:16, 105:22, 105:25, 106:5, 106:10, 106:17, 106:20, 106:24, 107:14, 107:15, 107:20, 107:23, 112:25, 117:1, 120:8, 120:21, 120:25, 128:10, 129:23, 130:21, 132:16, 135:5, 136:5, 140:22, 141:8, 141:13, 141:15, 142:10, 142:15, 142:16, 142:19, 146:11, 147:20, 148:1, 148:13, 149:2, 149:5, 149:10, 149:17, 155:21, 155:22, 155:24, 155:25, 156:3, 156:25, 157:3, 157:8, 157:9, 157:10, 158:2, 158:5, 158:21, 159:25, 161:4, 161:5, 161:6, 161:8, 161:9, 164:13, 164:17, 164:22, 164:24, 164:25, 165:5, 178:13, 179:17, 179:19, 180:22, 181:18, 181:25, 182:22, 187:20, 187:21, 188:23, 192:2, 192:25, 194:5, 208:3, 208:12, 216:14, 220:18, 221:6, 221:23, 223:10

**author** [1] - 82:18

**authored** [1] - 82:17

**authorities** [1] - 84:7

**authors** [2] - 17:18, 17:21

**auto** [4] - 48:6, 48:14, 49:1, 49:4

**auto-correlation** [4] - 48:6, 48:14, 49:1, 49:4

**availability** [1] - 97:16

**Available** [1] - 23:1

**available** [40] - 20:13, 22:23, 23:9, 23:11, 26:15, 26:20, 26:21, 28:6, 28:19, 29:1, 31:12, 31:23, 32:4, 32:9, 37:7, 47:17, 95:8, 95:10, 95:14, 95:17, 95:19, 96:25, 97:2, 97:6, 97:10, 97:19, 98:12, 98:14, 98:18, 98:22, 99:5, 99:17, 100:10, 100:15, 126:2, 126:15, 139:6, 157:11, 158:4, 177:7

**Avenue** [4] - 1:17, 1:22, 2:3, 223:14

**average** [4] - 60:19, 98:11, 98:12, 99:7

**avoid** [2] - 117:4, 157:14

**aware** [16] - 13:5, 14:5, 73:7, 73:11, 74:15, 75:17, 85:24, 122:1, 126:16, 126:18, 132:20, 132:23, 139:1, 139:3, 141:4, 141:14

**B**

**BABY** [10] - 122:4, 122:14, 153:18, 160:11, 160:19, 165:10, 193:9, 193:22, 194:11, 194:12

**bachelor** [3] - 152:4, 152:5, 152:6

**bachelor's** [1] - 151:22

**back-end** [1] - 203:18

**background** [1] - 127:3

**backup** [3] - 126:21, 127:13, 127:14

**backwards** [1] - 195:19

**bad** [2] - 121:19, 121:22

**ballpark** [1] - 18:19

**bank** [8] - 154:18, 158:25, 159:8, 159:14, 161:25, 162:2, 198:1

**Barclay's** [1] - 199:1

**barely** [1] - 10:3

**based** [28] - 10:20,

11:21, 20:13, 24:7, 24:12, 26:13, 27:5, 88:5, 90:23, 95:15, 99:13, 113:13, 113:14, 115:9, 115:21, 126:21, 132:2, 134:12, 138:21, 138:23, 139:7, 143:20, 167:23, 179:3, 200:16, 201:2, 201:5, 221:7

**baseline** [2] - 214:9, 214:15

**basic** [2] - 88:4, 115:10

**basing** [1] - 139:20

**basis** [11] - 11:20, 27:18, 28:13, 32:11, 41:25, 42:7, 60:2, 60:6, 113:8, 136:2, 216:15

**basket** [1] - 120:13

**BATH** [1] - 1:4

**Bath** [61] - 4:2, 22:10, 22:14, 22:15, 28:15, 29:11, 29:25, 30:5, 30:12, 30:24, 32:13, 36:2, 36:3, 38:21, 39:9, 40:2, 40:10, 45:11, 45:15, 46:16, 47:4, 47:14, 48:1, 48:15, 49:2, 52:14, 52:16, 52:24, 53:3, 53:24, 54:9, 57:17, 58:15, 59:5, 59:8, 60:8, 64:16, 77:5, 91:11, 92:7, 153:18, 154:19, 159:12, 160:9, 167:17, 167:21, 170:22, 171:17, 175:9, 177:10, 181:11, 181:16, 181:19, 182:1, 183:5, 184:9, 187:11, 188:24, 189:23, 202:2, 218:12

**BB&B** [1] - 105:18

**BBBY** [45] - 68:13, 71:4, 74:19, 74:23, 76:10, 77:18, 77:24, 78:2, 78:5, 91:5, 92:24, 94:20, 96:8, 106:17, 107:18, 108:5, 108:7, 118:22, 120:5, 120:8, 120:10, 120:14, 120:15, 127:5, 128:5, 129:22, 131:19, 138:18,

140:9, 140:13, 141:12, 153:6, 153:7, 153:25, 154:3, 154:5, 155:1, 155:12, 155:23, 157:23, 158:11, 159:24, 161:25, 162:8, 208:6

**BBBY's** [3] - 127:19, 127:23, 212:5

**bear** [1] - 50:19

**bearish** [6] - 207:6, 207:7, 208:7, 208:16, 208:21, 209:8

**became** [1] - 153:8

**become** [2] - 39:21, 93:10

**becomes** [1] - 8:3

**BED** [1] - 1:4

**Bed** [61] - 4:2, 22:9, 22:14, 22:15, 28:15, 29:11, 29:25, 30:5, 30:12, 30:24, 32:13, 36:2, 36:3, 38:21, 39:9, 40:1, 40:10, 45:11, 45:15, 46:16, 47:4, 47:14, 48:1, 48:14, 49:2, 52:14, 52:16, 52:24, 53:3, 53:24, 54:9, 57:17, 58:15, 59:5, 59:8, 60:8, 64:16, 77:5, 91:11, 92:7, 153:18, 154:19, 159:12, 160:8, 167:17, 167:20, 170:21, 171:17, 175:9, 177:9, 181:11, 181:16, 181:19, 182:1, 183:5, 184:9, 187:11, 188:24, 189:23, 202:2, 218:12

**BEFORE** [1] - 1:9

**began** [3] - 82:7, 92:5, 165:5

**begin** [4] - 14:9, 14:23, 19:21, 108:3

**beginning** [5] - 107:14, 117:1, 122:10, 207:20, 208:2

**begins** [1] - 66:18

**behalf** [10] - 4:17, 4:23, 5:5, 5:8, 12:23, 74:2, 74:12, 150:12, 167:5, 209:15

**behavior** [1] - 87:12

**behind** [2] - 24:3, 191:20

**belief** [7] - 24:8, 24:12, 27:5, 89:18, 90:7, 102:17, 102:19

**beliefs** [5] - 61:3, 61:8, 61:16, 61:21

**below** [1] - 29:17

**benchmark** [1] - 97:20

**benchmarking** [1] - 55:5

**benefit** [2] - 45:5, 195:8

**benefited** [1] - 221:1

**Berkeley** [1] - 16:6

**best** [2] - 193:18, 223:7

**bet** [6] - 22:2, 24:5, 169:23, 198:3, 198:4, 198:5

**better** [3] - 34:25, 56:17, 200:19

**betting** [7] - 169:11, 205:24, 205:25, 206:1, 206:2, 208:22, 217:8

**between** [40] - 6:7, 20:8, 41:15, 65:1, 65:9, 82:9, 87:25, 88:14, 88:21, 89:3, 89:10, 90:7, 95:11, 97:4, 97:14, 98:11, 100:4, 106:22, 112:15, 115:6, 118:4, 118:6, 118:8, 123:1, 127:18, 128:3, 128:10, 129:23, 136:24, 157:3, 157:9, 172:6, 190:22, 191:3, 191:6, 195:25, 196:6, 199:20, 199:22, 212:6

**beyond** [7] - 26:21, 26:24, 53:24, 87:20, 94:24, 137:13, 137:14

**BEYOND** [1] - 1:4

**Beyond** [58] - 4:2, 22:10, 22:14, 22:15, 28:15, 29:11, 30:1, 30:5, 30:12, 30:24, 32:13, 36:2, 36:3, 38:21, 39:9, 40:2, 40:10, 45:11, 45:15, 46:17, 47:4, 47:15, 48:15, 49:2, 52:14, 52:16, 52:25, 53:3, 53:24, 54:9, 57:17, 58:15, 59:5, 59:8, 60:8, 64:17, 77:5, 91:12, 92:8, 153:18, 154:20, 159:12, 160:9, 167:18, 167:21, 170:22, 171:17, 175:9, 177:10, 181:11,

181:16, 181:19, 182:1, 183:5, 184:9, 187:11, 188:24, 189:23

**Beyond's** [3] - 48:2, 202:2, 218:12

**biased** [1] - 200:3

**bid** [1] - 46:19

**bid-ask** [1] - 46:19

**big** [3] - 83:17, 115:23, 116:1

**bigger** [1] - 153:8

**billion** [1] - 125:5

**billions** [1] - 159:13

**binder** [5] - 15:8, 15:10, 127:9, 129:1, 190:20

**binders** [1] - 13:23

**bit** [14] - 34:1, 54:25, 71:25, 96:18, 105:24, 114:8, 119:4, 125:21, 147:12, 154:5, 162:5, 178:17, 188:21, 197:9

**blindsided** [1] - 189:6

**Bloomberg** [1] - 9:14

**blue** [5] - 96:3, 98:17, 104:2, 129:4, 159:13

**Bo** [1] - 191:5

**board** [6] - 152:23, 158:14, 160:14, 165:23, 175:4, 185:17

**boards** [3] - 30:22, 30:25, 61:17

**book** [1] - 82:16

**books** [2] - 82:15, 82:19

**born** [1] - 151:16

**borrow** [3] - 25:1, 126:2, 180:7

**borrowed** [3] - 24:23, 25:6, 25:7

**borrowing** [1] - 93:17

**bottom** [2] - 182:16, 198:16

**bought** [25] - 153:22, 156:19, 157:4, 157:6, 157:25, 158:24, 159:1, 159:2, 159:15, 159:20, 161:9, 161:20, 162:10, 164:20, 175:8, 187:13, 187:19, 187:23, 187:25, 188:2, 195:22, 197:1, 197:7, 197:17, 197:21

**Bratya** [40] - 4:7, 4:8, 12:15, 150:12, 152:8,

152:14, 152:18, 153:4, 153:7, 153:22, 153:25, 154:3, 154:18, 155:23, 155:25, 156:24, 157:2, 157:6, 157:9, 157:20, 157:25, 158:3, 158:20, 159:24, 160:2, 162:7, 166:10, 166:12, 166:17, 167:6, 167:14, 167:21, 167:22, 184:9, 191:23, 205:25, 206:19, 216:25, 217:1

**Bratya's** [3] - 152:16, 183:5, 205:18

**break** [5] - 63:6, 69:6, 69:11, 97:12, 150:16

**BRIAN** [1] - 1:20

**Brian** [1] - 5:7

**brief** [7] - 7:9, 7:12, 11:24, 86:16, 119:3, 122:22, 201:11

**briefing** [2] - 195:11, 221:22

**briefly** [4] - 16:9, 64:23, 81:25, 210:9

**briefs** [2] - 126:17, 199:18

**bring** [2] - 42:16, 212:19

**broke** [2] - 69:24, 144:9

**brokerage** [1] - 180:5

**brokers** [1] - 39:23

**brother** [18] - 152:11, 163:20, 166:20, 167:2, 167:4, 176:12, 176:20, 178:18, 190:22, 191:2, 191:4, 191:7, 192:6, 192:12, 192:20, 193:8, 193:19, 209:11

**brothers** [1] - 198:6

**brought** [2] - 13:24, 192:16

**bubble** [1] - 101:18

**build** [1] - 184:12

**bunch** [1] - 42:13

**burden** [8] - 8:6, 8:7, 10:6, 11:1, 50:20, 205:1, 205:2, 211:18

**burst** [1] - 101:19

**Business** [1] - 83:9

**business** [11] - 82:9, 83:4, 83:11, 83:17, 84:1, 151:18, 151:22,

151:23, 152:6, 152:17, 153:17

**businesses** [2] - 152:19

**Butswinkas** [5] - 4:23, 12:22, 19:13, 183:16, 190:16

**BUTSWINKAS** [33] - 1:19, 4:22, 6:15, 6:25, 7:5, 12:22, 12:25, 13:18, 85:18, 164:3, 164:7, 164:10, 166:8, 167:11, 171:21, 172:1, 172:3, 172:7, 178:8, 178:10, 182:9, 182:11, 182:12, 183:10, 183:12, 183:20, 185:7, 186:1, 186:3, 189:11, 189:13, 190:13, 222:10

**buy** [27] - 25:5, 27:7, 30:10, 37:3, 37:5, 41:6, 94:2, 146:15, 146:16, 153:25, 157:2, 157:9, 158:3, 159:9, 159:24, 160:9, 161:19, 162:7, 164:17, 174:18, 174:21, 174:23, 177:22, 177:25, 188:17, 208:6, 209:19

**buyback** [1] - 158:10

**buybuy** [10] - 122:4, 122:14, 153:18, 160:11, 160:19, 165:10, 193:9, 193:22, 194:11, 194:12

**Buying** [1] - 186:20

**buying** [19] - 35:13, 35:14, 35:15, 37:13, 39:24, 46:22, 93:24, 159:19, 168:24, 169:1, 169:3, 170:3, 179:24, 180:9, 180:10, 180:22, 181:3, 197:19, 201:12

**BY** [50] - 2:1, 15:4, 15:16, 19:20, 22:8, 26:12, 29:9, 36:8, 37:22, 44:9, 46:5, 51:15, 53:5, 53:17, 56:7, 63:9, 65:24, 69:23, 71:21, 81:22, 84:20, 85:21, 89:24, 96:12, 98:1, 99:21, 103:20, 114:4, 119:12, 126:23, 134:2, 146:24,

151:10, 152:2, 154:12, 156:22, 159:23, 162:6, 164:10, 166:8, 167:11, 172:7, 178:10, 182:12, 183:12, 183:20, 185:7, 186:3, 189:13, 190:19

## C

**C-A-I-N** [1] - 15:7

**C-O-T-I** [1] - 151:12

**CAIN** [1] - 14:20

**Cain** [55] - 3:11, 5:24, 6:7, 10:15, 13:2, 13:10, 14:15, 15:5, 15:7, 15:8, 15:17, 19:11, 19:16, 19:21, 23:24, 43:5, 60:14, 63:10, 63:11, 69:9, 69:19, 69:24, 71:18, 80:25, 81:5, 81:6, 98:5, 98:9, 98:21, 99:4, 100:3, 109:2, 109:11, 110:5, 111:3, 111:6, 112:16, 114:17, 115:16, 132:2, 135:24, 147:1, 148:24, 180:8, 198:19, 200:1, 200:19, 203:3, 203:22, 211:18, 211:20, 213:25, 214:14, 215:15, 221:19

**Cain's** [28] - 14:9, 14:17, 87:1, 95:23, 98:19, 99:11, 105:5, 106:13, 108:15, 108:17, 109:15, 109:17, 109:22, 110:11, 111:1, 111:23, 113:11, 113:16, 114:22, 115:6, 115:8, 116:1, 124:21, 131:11, 131:14, 148:5, 198:15, 201:16

**calculate** [1] - 126:13

**calculated** [2] - 60:5, 125:25

**calculating** [1] - 126:11

**calculation** [2] - 188:11, 189:25

**Cammer** [98] - 7:17, 7:24, 30:2, 32:16,

33:1, 33:3, 33:11, 33:16, 33:18, 33:24, 34:3, 34:8, 34:16, 34:21, 34:25, 35:4, 35:5, 35:21, 35:23, 36:9, 36:17, 37:19, 37:20, 37:23, 39:12, 39:14, 40:3, 40:12, 40:15, 41:9, 42:19, 44:25, 45:9, 49:12, 58:22, 59:3, 60:21, 64:24, 65:4, 65:8, 65:14, 66:6, 66:8, 66:14, 66:24, 66:25, 67:5, 67:9, 67:10, 67:22, 68:3, 69:25, 70:22, 73:19, 76:20, 76:25, 80:7, 86:21, 86:23, 87:5, 87:15, 87:20, 88:4, 88:5, 90:25, 91:22, 108:10, 108:16, 108:20, 108:23, 109:1, 109:4, 109:11, 110:9, 110:14, 118:25, 122:21, 123:4, 123:6, 123:11, 123:14, 123:17, 125:11, 199:16, 201:20, 202:18, 210:15, 210:22, 210:24, 211:5, 211:6, 211:12, 214:13, 215:14

**cannot** [4] - 34:3, 116:20, 217:7, 217:15

**cap** [6] - 28:25, 46:13, 46:15, 47:9, 124:24, 125:2

**capability** [1] - 177:1

**Capital** [7] - 72:2, 72:9, 120:17, 120:20, 120:24, 183:25, 185:8

**capital** [4] - 41:19, 42:11, 101:23, 103:2

**capitalization** [2] - 42:2, 46:9

**captures** [1] - 93:3

**car** [2] - 170:11, 170:12

**card** [1] - 212:16

**care** [3] - 11:11, 199:14, 200:5

**career** [7] - 82:7, 82:12, 83:2, 83:5, 83:7, 83:13, 139:20

**careful** [1] - 63:15

**carried** [1] - 10:6

**cart** [5] - 158:6, 183:22, 185:17, 215:20, 215:21

**cartoon** [1] - 185:11

**case** [46] - 7:3, 7:14, 11:13, 11:18, 21:14, 22:13, 32:13, 34:13, 34:16, 34:19, 34:23, 49:22, 57:11, 60:23, 70:21, 72:5, 87:2, 88:2, 105:12, 110:15, 110:20, 118:3, 125:7, 137:1, 142:22, 147:2, 155:20, 162:4, 162:17, 162:19, 163:6, 163:9, 179:1, 179:4, 182:14, 189:5, 199:2, 199:5, 199:8, 200:15, 209:7, 210:11, 211:9, 211:14, 211:15, 214:11

**cases** [8] - 11:8, 17:1, 60:24, 62:2, 139:8, 199:1, 200:8

**cash** [14] - 157:11, 157:14, 158:4, 159:10, 159:14, 161:12, 162:2, 164:21, 174:20, 174:22, 189:17, 197:9, 197:13, 197:25

**categories** [1] - 140:21

**category** [1] - 140:12

**cause-and-effect** [2] - 65:1, 199:6

**caused** [7] - 57:9, 104:6, 108:2, 108:12, 159:7, 213:11, 219:17

**causes** [2] - 56:1, 94:11

**causing** [3] - 93:14, 106:9, 221:12

**cautions** [1] - 33:19

**centerpiece** [1] - 209:7

**central** [2] - 199:23, 218:22

**cents** [1] - 52:3

**CEO** [1] - 144:8

**certain** [15] - 26:1, 35:20, 41:18, 55:10, 63:17, 70:11, 74:1, 93:11, 153:21, 157:16, 163:22, 169:22, 179:8, 184:3, 207:2

**certainly** [19] - 30:7, 37:14, 39:3, 63:15, 63:24, 64:8, 67:6, 77:7, 122:19, 133:6, 140:19, 144:11,

179:6, 181:17, 186:14, 188:11, 212:23, 215:4
**CERTIFICATE** [1] - 223:1
**certification** [1] - 206:10
**certified** [4] - 34:18, 34:23, 206:23, 210:14
**certify** [3] - 211:10, 213:4, 223:4
**challenge** [1] - 8:15
**challenged** [1] - 10:13
**chance** [4] - 11:22, 54:6, 54:10, 116:19
**change** [6] - 45:20, 52:12, 91:11, 103:14, 113:6, 129:3
**changed** [2] - 135:19, 212:6
**changes** [2] - 94:17, 185:2
**changing** [1] - 219:5
**characteristic** [5] - 89:14, 93:11, 100:24, 106:21, 107:23
**Characteristics** [1] - 186:17
**characteristics** [3] - 108:9, 137:11, 138:15
**charge** [1] - 25:14
**charging** [1] - 25:21
**chart** [17] - 51:14, 51:20, 56:6, 96:13, 96:15, 128:9, 128:12, 128:13, 129:3, 131:18, 133:14, 133:16, 134:13, 137:12, 137:23, 164:12, 186:17
**charts** [4] - 126:25, 136:16, 138:7, 220:14
**chat** [6] - 163:19, 191:2, 191:3, 191:19, 196:21, 209:11
**chats** [3] - 176:7, 190:22, 191:21
**check** [8] - 97:17, 176:3, 176:14, 210:16
**Chicago** [5] - 1:15, 82:4, 82:11, 83:8, 83:15
**chip** [1] - 159:13
**choose** [2] - 198:24, 199:5
**chose** [6] - 8:9, 10:4, 10:23, 23:12, 147:14, 200:9
**chosen** [5] - 26:25,

147:10, 200:6, 202:16, 205:14
**chronological** [1] - 186:7
**Circuit** [5] - 118:18, 199:9, 210:21, 210:22
**circumstance** [2] - 107:5, 119:20
**circumstances** [4] - 137:3, 142:21, 147:13, 212:5
**cite** [2] - 34:12, 211:12
**cited** [5] - 31:7, 31:21, 82:19, 82:25, 138:22
**Civil** [2] - 1:3, 4:1
**claim** [1] - 203:24
**claiming** [1] - 206:13
**claims** [4] - 11:10, 206:17, 217:2, 217:4
**class** [170] - 22:13, 22:16, 23:10, 26:16, 26:19, 27:12, 29:12, 29:18, 30:1, 30:5, 30:7, 30:21, 31:19, 32:14, 34:17, 36:5, 38:21, 38:23, 38:24, 39:4, 40:14, 45:4, 45:8, 45:11, 45:16, 45:24, 48:5, 57:5, 58:2, 58:16, 58:20, 60:2, 60:6, 60:9, 60:13, 63:25, 64:17, 64:20, 67:22, 68:1, 68:8, 68:9, 68:17, 68:22, 73:12, 77:2, 87:8, 87:13, 91:5, 91:9, 91:13, 92:3, 92:5, 92:18, 92:19, 92:24, 92:25, 94:23, 98:8, 99:23, 99:24, 104:15, 105:3, 105:14, 106:14, 107:18, 108:8, 109:3, 109:7, 109:19, 109:24, 110:3, 110:5, 110:12, 110:14, 110:20, 110:21, 110:22, 110:25, 111:9, 111:11, 111:14, 111:15, 111:18, 112:2, 112:8, 112:19, 112:24, 113:10, 113:13, 113:14, 113:20, 113:21, 114:1, 115:8, 116:24, 117:2, 117:3, 117:4, 117:6, 117:10, 118:22, 118:23,

120:20, 120:23, 121:4, 122:10, 123:7, 125:3, 131:4, 131:9, 134:21, 135:2, 135:6, 137:13, 141:4, 141:5, 148:8, 155:19, 161:4, 161:9, 163:22, 164:14, 171:1, 190:4, 190:10, 195:25, 196:11, 196:18, 198:22, 202:1, 202:15, 205:7, 205:11, 205:22, 205:23, 205:25, 206:1, 206:8, 206:13, 206:16, 206:19, 206:23, 206:25, 207:7, 207:18, 207:24, 208:1, 208:2, 208:14, 209:16, 210:1, 210:6, 210:14, 211:10, 211:23, 211:24, 211:25, 212:7, 212:10, 212:12, 212:20, 213:4, 214:2, 214:7, 214:17, 214:19
**class-wide** [2] - 60:2, 60:6
**classes** [5] - 17:22, 17:25, 18:3, 18:8, 18:12
**classic** [1] - 109:1
**classification** [1] - 113:12
**classifies** [1] - 112:3
**classify** [2] - 112:23, 113:1
**clean** [1] - 152:21
**clear** [5] - 8:12, 29:23, 41:11, 45:24, 205:18
**clearer** [1] - 208:10
**clearly** [5] - 183:7, 189:18, 215:22, 216:9
**clerk** [2] - 85:19, 85:25
**clerked** [1] - 82:6
**client** [1] - 150:10
**clients** [1] - 84:1
**clients'** [1] - 206:7
**clock** [1] - 195:11
**close** [12] - 30:10, 37:1, 37:3, 37:7, 52:5, 55:21, 100:11, 105:16, 137:9, 151:7, 158:25, 174:14
**closely** [1] - 37:25
**closer** [2] - 71:19, 105:7

**Closing** [3] - 3:4, 3:5, 3:6
**closing** [1] - 11:23
**closings** [1] - 195:1
**clue** [1] - 160:5
**CNBC** [4] - 72:1, 72:9, 120:19, 215:19
**co** [7] - 9:18, 82:17, 82:18, 128:3, 199:20, 220:15
**co-author** [1] - 82:18
**co-authored** [1] - 82:17
**co-relationship** [5] - 9:18, 128:3, 199:20, 220:15
**Codi** [3] - 5:22, 6:2, 6:6
**COHEN** [1] - 1:16
**Cohen** [66] - 8:6, 8:9, 58:6, 58:11, 72:5, 74:2, 74:11, 74:15, 75:6, 79:11, 79:18, 105:13, 107:1, 120:5, 120:19, 122:1, 126:16, 134:24, 138:1, 138:3, 139:24, 140:10, 141:20, 146:15, 149:10, 153:8, 158:5, 158:11, 160:4, 164:22, 165:3, 165:6, 165:15, 165:25, 171:4, 171:9, 171:18, 172:17, 175:8, 175:11, 177:11, 184:10, 185:21, 188:24, 189:6, 189:14, 189:24, 193:23, 194:16, 196:15, 201:13, 205:24, 206:2, 206:16, 207:21, 209:12, 209:16, 215:18, 216:5, 217:3, 217:9, 218:8, 219:13, 219:17, 221:1
**Cohen's** [40] - 10:13, 10:16, 45:10, 71:4, 72:13, 72:23, 73:8, 73:12, 73:16, 74:6, 74:19, 74:23, 75:18, 76:9, 76:10, 77:5, 77:18, 77:23, 78:2, 78:5, 79:6, 79:15, 105:8, 107:13, 131:1, 144:25, 147:15, 147:19, 149:16, 160:17, 173:6, 174:8, 177:1, 177:9, 178:13,

200:17, 201:11, 213:9, 220:16, 221:13
**collaboration** [1] - 178:2
**collapses** [1] - 203:2
**collapsing** [1] - 197:24
**collateral** [6] - 103:5, 157:17, 159:16, 161:13, 162:5, 198:1
**colleague** [1] - 14:10
**colleagues** [3] - 4:24, 7:9, 14:7
**Columbia** [2] - 2:2, 223:13
**COLUMBIA** [1] - 1:1
**column** [9] - 22:25, 26:22, 27:2, 27:11, 27:16, 27:17, 98:19, 115:1
**columns** [1] - 54:1
**combination** [1] - 137:20
**combine** [1] - 136:16
**coming** [7] - 14:1, 37:17, 43:4, 43:16, 54:20, 152:1, 194:8
**comment** [1] - 185:15
**commentaries** [1] - 140:17
**commentary** [9] - 92:23, 93:1, 93:2, 94:21, 94:25, 102:13, 110:24, 138:24, 142:20
**commentators** [1] - 92:16
**commenting** [1] - 78:12
**commerce** [2] - 153:17, 160:10
**Commission** [3] - 16:11, 41:17, 84:6
**Commissioner** [1] - 16:20
**commitment** [2] - 160:13, 165:23
**committed** [2] - 185:22, 193:24
**common** [20] - 12:9, 22:15, 23:3, 75:6, 93:4, 155:1, 155:11, 155:15, 155:22, 156:7, 156:24, 157:2, 158:1, 158:20, 159:24, 162:13, 197:14, 207:5, 208:14
**commonly** [1] - 44:19

**commonsense** [1] - 199:4

**communicate** [2] - 167:4, 176:12

**community** [1] - 221:8

**companies** [20] - 12:16, 37:25, 38:13, 38:16, 40:4, 41:18, 41:22, 42:10, 43:6, 43:9, 43:11, 43:12, 43:13, 46:25, 62:3, 143:6, 143:12, 152:24, 152:25, 153:3

**company** [89] - 12:10, 20:2, 20:7, 22:2, 24:5, 35:12, 39:1, 39:10, 39:20, 42:6, 42:16, 46:11, 46:12, 47:8, 47:21, 61:15, 61:25, 62:10, 66:20, 79:4, 79:6, 79:12, 79:15, 79:19, 80:3, 80:5, 80:14, 87:4, 107:2, 119:25, 120:11, 122:3, 122:16, 123:2, 124:7, 124:12, 124:25, 125:2, 130:25, 131:5, 143:15, 144:5, 144:9, 144:21, 152:12, 152:18, 152:21, 152:23, 153:9, 153:10, 153:11, 153:20, 153:22, 158:8, 158:10, 158:13, 160:14, 160:15, 165:20, 165:24, 166:1, 166:17, 167:24, 168:7, 168:22, 169:8, 169:23, 170:5, 171:11, 171:14, 171:16, 174:8, 174:12, 175:13, 177:9, 180:5, 180:7, 184:19, 185:13, 185:16, 185:22, 189:16, 193:25, 194:5, 194:7, 198:8, 206:2, 209:17

**company'** [1] - 183:2

**company's** [12] - 46:14, 65:4, 66:9, 121:14, 121:18, 121:22, 126:12, 126:14, 144:6, 183:1, 208:22, 214:6

**company-specific** [1] - 39:10

**comparator** [1] - 214:10

**compare** [3] - 75:8, 115:18, 214:6

**compared** [4] - 91:13, 126:17, 159:13, 159:14

**compares** [2] - 97:21, 115:13

**comparing** [2] - 68:19, 148:10

**comparison** [2] - 75:13, 99:16

**Compass** [1] - 83:16

**compensate** [1] - 187:13

**complaint** [14] - 11:9, 44:15, 44:20, 77:4, 163:10, 189:5, 205:14, 205:20, 208:4, 209:21, 209:23, 209:24, 217:2, 221:4

**complete** [12] - 32:8, 110:23, 112:5, 113:6, 137:9, 145:22, 145:24, 146:1, 146:3, 146:4, 146:6, 223:6

**completed** [1] - 192:8

**completely** [12] - 9:16, 71:17, 78:9, 97:15, 109:23, 110:11, 112:7, 112:12, 113:11, 138:7, 148:21, 210:3

**complex** [1] - 27:9

**complicated** [1] - 114:19

**comply** [1] - 94:2

**component** [1] - 77:16

**computers** [1] - 41:4

**concede** [1] - 124:4

**concept** [6] - 82:22, 90:25, 91:23, 169:16, 169:17

**concepts** [1] - 83:22

**conceptually** [2] - 63:20, 99:12

**concerned** [3] - 201:6, 212:14, 217:5

**concessions** [1] - 10:2

**conclude** [9] - 45:17, 90:15, 90:22, 106:9, 106:19, 113:9, 116:20, 132:21, 136:2

**concluded** [3] - 58:19, 99:5, 222:11

**conclusion** [20] - 26:14, 26:18, 32:12, 45:23, 57:3, 57:16, 59:1, 90:17, 92:11, 98:25, 99:13, 108:19, 116:13, 117:8, 117:13, 117:14, 134:16, 141:24, 148:12, 149:5

**conclusions** [8] - 63:17, 86:16, 107:17, 108:5, 114:10, 133:3, 139:12, 213:25

**concrete** [2] - 178:3, 178:6

**conditions** [1] - 91:4

**conduct** [6] - 58:11, 59:19, 70:10, 70:22, 70:23, 221:14

**conducted** [5] - 72:17, 95:4, 215:10, 216:11, 216:18

**conducting** [2] - 18:3, 68:25

**conferences** [1] - 83:4

**confidence** [8] - 10:19, 158:5, 164:20, 170:18, 179:13, 185:20, 185:21, 209:17

**confident** [2] - 89:2, 165:18

**conflict** [3] - 160:8, 165:10, 189:20

**conflicts** [1] - 205:19

**confluence** [1] - 137:3

**confused** [1] - 130:18

**confusing** [1] - 196:24

**conjunction** [1] - 105:21

**connected** [1] - 104:22

**connection** [9] - 66:2, 75:23, 83:6, 83:19, 86:10, 136:17, 136:19, 138:17, 138:23

**CONNOLLY** [1] - 1:22

**Connolly** [2] - 4:24, 5:2

**consensus** [1] - 61:11

**consider** [11] - 31:6, 44:24, 51:11, 53:9, 57:3, 126:5, 162:1, 176:23, 179:24, 179:25, 211:2

**consideration** [2] - 38:6, 158:15

**considered** [11] - 23:17, 36:18, 57:6, 58:6, 60:23, 62:1, 143:22, 156:4, 168:16, 211:13, 211:14

**considering** [2] - 28:7, 33:20

**consistent** [16] - 54:13, 55:25, 58:13, 63:24, 65:7, 65:14, 67:8, 67:15, 75:3, 76:1, 80:16, 92:14, 95:1, 160:21, 210:4, 217:12

**consistently** [1] - 61:19

**constant** [1] - 130:9

**constantly** [1] - 9:11

**constitute** [2] - 121:20, 175:1

**constitutes** [1] - 223:4

**Constitution** [2] - 2:3, 223:14

**constrained** [1] - 22:10

**constraint** [4] - 28:21, 98:23, 99:8, 139:5

**constraints** [8] - 21:19, 21:23, 23:8, 34:21, 96:23, 125:12, 210:20, 211:9

**construct** [1] - 77:3

**constructive** [3] - 79:5, 166:1, 194:9

**consultant** [3] - 83:6, 83:20, 84:4

**consulting** [2] - 16:12, 83:13

**consuming** [1] - 161:13

**contain** [5] - 107:11, 112:20, 113:3, 145:12, 147:18

**contained** [7] - 22:19, 73:16, 74:18, 74:22, 106:25, 139:22, 144:21

**contains** [3] - 46:1, 106:11, 113:9

**contaminated** [1] - 200:17

**contaminating** [1] - 117:5

**contemporaneous** [2] - 142:17, 196:22

**contents** [1] - 69:10

**contest** [3] - 8:1, 123:5, 124:21

**contested** [1] - 7:23

**context** [14] - 20:18, 20:21, 21:8, 21:9, 34:7, 39:17, 41:12, 41:16, 49:25, 77:16, 144:19, 183:3, 211:14, 211:15

**continually** [1] - 94:7

**continuation** [1] - 117:20

**continue** [2] - 84:8, 157:17

**continued** [1] - 105:20

**contract** [3] - 26:7, 161:21, 181:12

**contracts** [7] - 172:23, 172:24, 173:2, 181:10, 181:15, 188:10

**contradict** [2] - 205:16, 218:17

**contradiction** [1] - 90:18

**contradictory** [1] - 200:12

**contrary** [1] - 184:6

**contrast** [2] - 20:3, 98:16

**controlling** [3] - 48:23, 48:24, 53:22

**controls** [1] - 55:8

**controversial** [1] - 197:3

**conversation** [3] - 191:6, 191:9, 191:11

**converted** [1] - 188:19

**convinces** [1] - 103:11

**convincingly** [1] - 196:8

**cooperation** [5] - 79:15, 122:7, 177:10, 177:19, 178:1

**copies** [3] - 13:24, 84:25

**copy** [12] - 14:24, 85:5, 85:11, 85:14, 129:2, 175:15, 175:19, 175:21, 175:22, 175:23, 179:8

**core** [1] - 8:22

**Corporate** [1] - 82:17

**corporate** [1] - 16:2

**Corporation** [1] - 4:3
**CORPORATION** [1] -
1:4
**correct** [158] - 15:11,
15:12, 20:6, 20:12,
25:13, 28:2, 28:4,
41:15, 44:16, 44:17,
46:2, 53:21, 63:1,
63:2, 63:3, 64:22,
65:6, 65:25, 66:3,
66:6, 66:11, 66:14,
67:1, 67:3, 67:12,
67:19, 67:23, 68:5,
68:8, 68:14, 68:18,
68:25, 69:1, 69:25,
70:2, 70:3, 70:6,
70:12, 70:16, 70:17,
70:18, 71:1, 71:2,
71:5, 71:8, 71:11,
71:16, 71:23, 71:24,
72:3, 72:6, 72:17,
72:20, 72:23, 73:3,
73:22, 73:24, 74:2,
74:7, 74:12, 74:20,
74:24, 75:2, 75:7,
76:4, 76:16, 77:19,
78:3, 78:4, 78:25,
79:2, 79:6, 79:9,
79:12, 79:16, 79:19,
80:9, 114:17, 114:18,
116:25, 117:21,
120:1, 120:4, 120:6,
120:8, 120:11,
120:21, 121:1,
121:14, 122:4,
122:15, 122:18,
123:7, 123:9, 123:13,
125:1, 125:15,
125:18, 129:20,
131:2, 131:24, 132:4,
134:8, 134:25, 135:2,
135:7, 135:8, 135:10,
136:9, 137:15,
137:24, 137:25,
139:6, 139:17, 140:6,
140:10, 140:15,
141:1, 141:9, 141:10,
142:12, 142:25,
143:14, 144:1, 145:2,
145:10, 145:18,
145:19, 147:4, 147:6,
147:15, 147:16,
147:22, 147:23,
148:24, 149:12,
149:13, 161:17,
165:7, 166:10,
167:18, 167:21,
168:22, 170:24,
171:7, 172:19, 174:5,
177:24, 179:23,
184:20, 186:17,

187:16, 188:7,
188:10, 188:14,
202:12, 212:15,
218:17
**corrected** [5] - 76:3,
107:14, 107:21,
108:1, 148:9
**correction** [4] - 76:8,
76:11, 78:6, 108:2
**corrective** [12] - 8:8,
8:13, 10:16, 50:6,
200:2, 202:8, 202:25,
203:13, 203:18,
203:21, 204:6, 209:14
**correctly** [9] - 51:23,
52:1, 52:5, 96:17,
110:5, 120:23,
136:25, 142:4, 148:19
**correlation** [5] -
48:6, 48:14, 49:1,
49:4, 219:8
**corroborate** [1] -
205:16
**cost** [5] - 46:22,
47:2, 47:4, 47:5,
103:9
**COTI** [1] - 151:3
**Coti** [28] - 3:12, 4:7,
12:2, 13:6, 150:11,
150:23, 150:24,
151:11, 151:12,
154:6, 155:19,
158:20, 159:5, 162:7,
163:24, 164:11,
172:8, 178:11,
180:18, 181:24,
182:13, 190:20,
192:1, 194:21,
195:19, 217:7,
221:19, 221:20
**counsel** [8] - 4:4,
4:20, 85:9, 162:22,
164:8, 204:19,
205:14, 210:5
**counter** [2] - 40:5,
40:7
**counterpart** [1] -
156:13
**country** [1] - 142:2
**couple** [3] - 82:6,
99:25, 104:12
**course** [4] - 166:3,
168:3, 184:14, 205:5
**courses** [5] - 16:1,
16:3, 16:5, 82:8, 83:9
**COURT** [151] - 1:1,
4:9, 4:12, 4:15, 4:18,
4:21, 4:25, 5:3, 5:6,
5:9, 5:12, 5:18, 5:20,
6:4, 6:12, 6:14, 6:22,

7:1, 7:8, 8:25, 9:6,
11:22, 12:18, 12:20,
12:24, 13:13, 13:20,
14:3, 14:11, 14:13,
14:18, 14:21, 14:25,
19:13, 19:15, 23:24,
25:9, 25:24, 26:9,
27:15, 27:23, 28:5,
29:8, 36:13, 37:21,
44:5, 52:13, 52:24,
54:14, 54:21, 55:1,
55:15, 60:17, 63:4,
65:20, 65:23, 69:6,
69:9, 69:16, 71:18,
81:2, 81:6, 81:10,
81:13, 84:13, 84:15,
85:1, 85:7, 85:10,
85:13, 85:16, 85:19,
88:6, 89:6, 89:23,
99:25, 100:3, 100:25,
102:1, 103:18, 114:3,
117:23, 118:14,
118:18, 119:1, 119:6,
119:10, 133:23,
146:20, 146:23,
150:1, 150:4, 150:7,
150:9, 150:13,
150:17, 150:21,
150:24, 151:6,
151:24, 152:1,
154:11, 156:10,
156:17, 156:21,
159:17, 159:22,
161:16, 164:2, 164:6,
166:7, 167:8, 171:25,
172:2, 182:10,
183:18, 185:6,
190:16, 194:21,
194:24, 195:10,
195:16, 196:10,
196:13, 198:13,
201:16, 201:24,
204:8, 204:11,
204:15, 204:17,
204:23, 206:3,
206:24, 207:22,
207:24, 209:1, 210:7,
212:14, 213:5,
213:17, 214:23,
214:25, 216:20,
216:22, 220:2,
221:15, 221:17,
222:3, 222:6, 222:8
**court** [20] - 13:12,
14:24, 18:20, 19:1,
35:23, 36:18, 40:3,
40:7, 65:8, 65:14,
67:5, 123:14, 123:17,
126:17, 149:7,
202:18, 210:14,
211:1, 211:4, 218:10

**Court** [28] - 2:1, 2:2,
6:17, 7:6, 13:5, 15:2,
15:18, 60:15, 82:1,
82:21, 83:1, 85:8,
101:9, 154:7, 164:8,
176:9, 176:18,
187:25, 193:19,
195:8, 199:3, 204:18,
210:18, 211:9,
212:11, 218:3,
223:12, 223:13
**Court's** [6] - 84:24,
85:4, 85:25, 90:13,
91:8, 218:6
**courtesy** [1] - 83:7
**COURTROOM** [5] -
4:1, 81:16, 81:19,
151:1, 151:4
**courtroom** [2] - 13:8,
13:14
**courts** [9] - 11:6,
19:3, 32:25, 82:20,
124:18, 125:10,
139:14, 139:18,
211:12
**cover** [7] - 32:5,
94:5, 101:24, 143:17,
182:6, 208:15, 208:19
**coverage** [5] - 36:10,
37:23, 76:1, 76:17,
77:14
**covered** [3] - 49:12,
156:12, 207:10
**covers** [1] - 117:2
**crashed** [1] - 170:12
**created** [1] - 67:17
**creates** [2] - 135:18,
136:21
**credentials** [1] -
81:25
**credible** [2] - 168:7,
168:8
**credit** [3] - 7:16,
7:22, 88:7
**criminal** [2] - 5:13,
7:4
**criteria** [20] - 69:3,
70:11, 70:14, 70:18,
70:25, 71:3, 71:14,
75:2, 77:3, 77:6,
77:17, 77:19, 78:23,
111:21, 112:1, 112:4,
112:11, 112:16,
195:22
**critical** [1] - 109:20
**criticism** [5] - 44:24,
45:2, 45:3, 45:8,
45:22
**criticize** [1] - 44:19
**criticized** [2] -

109:22, 147:1
**critiques** [2] - 70:24,
77:1
**critiquing** [1] - 17:17
**cross** [3] - 6:16,
86:13, 107:10
**Cross** [1] - 3:9
**CROSS** [3] - 63:8,
119:11, 164:9
**cross-examination**
[2] - 86:13, 107:10
**CROSS-**
**EXAMINATION** [3] -
63:8, 119:11, 164:9
**CRR** [3] - 2:1, 223:3,
223:12
**crummy** [1] - 6:21
**cry** [2] - 208:5
**current** [1] - 122:16
**customer** [1] - 158:7
**cuts** [1] - 110:7

## D

**D.C** [6] - 1:5, 1:18,
1:23, 2:4, 163:3,
223:14
**daily** [5] - 27:18,
98:11, 98:15, 126:12,
126:17
**damages** [2] - 60:1,
60:5
**Dame** [1] - 16:5
**Dan** [1] - 4:22
**DANE** [1] - 1:19
**Dane** [1] - 12:22
**Daniel** [2] - 3:15,
81:12
**DANIEL** [1] - 81:18
**data** [21] - 23:15,
23:18, 28:22, 29:13,
31:22, 32:1, 32:3,
32:5, 32:6, 32:7,
32:10, 41:13, 72:24,
95:16, 96:4, 98:4,
98:5, 126:21, 200:22
**date** [23] - 24:19,
24:20, 25:25, 26:1,
50:19, 51:5, 51:8,
53:13, 53:20, 53:23,
54:12, 74:5, 79:13,
105:8, 122:5, 122:6,
131:6, 131:7, 131:21,
187:15, 188:2, 194:6,
219:6
**Date** [1] - 22:25
**Dated** [1] - 223:10
**dates** [11] - 43:18,
44:15, 44:20, 45:24,

51:2, 68:7, 74:13,
78:22, 128:10,
133:20, 133:21
**DAVID** [1] - 151:3
**David** [2] - 3:12,
151:12
**day-to-day** [1] - 55:6
**days** [83] - 28:2,
43:20, 43:22, 44:3,
44:15, 45:8, 45:9,
64:20, 64:21, 67:18,
67:21, 68:3, 68:9,
68:12, 68:13, 68:15,
68:17, 68:19, 68:20,
69:3, 70:5, 70:9,
70:11, 70:14, 71:1,
71:3, 71:7, 71:10,
71:14, 71:15, 77:2,
77:3, 78:14, 78:23,
92:4, 99:6, 110:13,
111:15, 111:16,
111:25, 112:1, 112:2,
112:3, 112:13,
112:23, 113:14,
113:15, 115:23,
116:1, 116:14,
116:24, 117:3, 117:4,
136:25, 147:2,
149:19, 172:6, 173:8,
177:25, 186:4,
188:16, 188:20,
192:20, 200:6,
200:22, 211:23,
211:25, 212:2, 212:3,
214:7, 214:12,
216:15, 221:9
**dead** [1] - 152:22
**deadline** [2] - 26:3,
26:8
**deal** [2] - 178:5,
189:3
**Dealers** [1] - 84:5
**debate** [1] - 21:8
**debated** [1] - 21:6
**debates** [1] - 21:11
**debating** [2] - 21:1,
21:12
**debt** [1] - 153:12
**debunked** [1] - 201:4
**decided** [1] - 215:19
**decision** [1] - 139:3
**decisions** [8] -
35:13, 35:14, 37:13,
58:7, 93:13, 94:6,
120:2, 139:7
**decline** [3] - 92:5,
101:19, 203:21
**declined** [2] -
197:21, 211:10
**declines** [1] - 128:15

**declining** [2] -
128:12, 129:23
**decrease** [1] - 27:22
**decreased** [1] -
159:15
**decreasing** [1] -
137:15
**deem** [1] - 49:15
**deemed** [1] - 80:3
**Defendant** [9] - 5:5,
5:8, 5:11, 8:14, 8:15,
71:4, 76:10, 77:18,
78:2
**DEFENDANTS** [1] -
1:19
**Defendants** [8] -
4:23, 10:3, 12:23,
44:19, 155:7, 200:3,
202:23, 217:6
**defendants** [1] -
50:19
**Defendants'** [6] -
154:24, 172:4, 178:9,
179:17, 183:10,
203:24
**defense** [2] - 6:14,
36:14
**DEFENSE** [2] - 3:14,
81:18
**define** [2] - 87:24,
111:22
**defined** [1] - 161:23
**defines** [1] - 163:23
**definitely** [6] - 43:23,
44:12, 53:11, 55:4,
55:11, 121:12
**definition** [10] -
29:21, 29:24, 87:24,
88:2, 112:12, 113:23,
136:23, 137:18,
138:16, 163:21
**definitional** [1] -
43:17
**definitively** [1] -
144:20
**degree** [4] - 15:19,
82:2, 82:3, 218:5
**delinquent** [2] -
41:24, 42:1
**deliver** [6] - 24:22,
26:5, 93:18, 93:19,
156:5, 156:16
**demand** [4] - 28:23,
28:24, 29:7, 101:3
**demanded** [1] -
101:10
**demands** [1] - 26:6
**demonstrate** [6] -
108:9, 110:17,
111:10, 211:17,

212:1, 216:18
**demonstrated** [4] -
88:17, 127:21, 213:7,
215:12
**demonstrates** [3] -
111:8, 213:13, 216:12
**demonstrating** [4] -
87:10, 87:13, 100:22,
211:19
**Demonstrative** [14] -
85:23, 91:7, 92:1,
92:21, 99:19, 103:21,
104:18, 105:4, 105:6,
114:19, 172:5,
179:18, 186:1, 189:11
**demonstrative** [8] -
91:25, 95:3, 95:23,
96:10, 98:3, 172:8,
208:9, 210:13
**demonstratives** [5] -
84:21, 85:15, 164:4,
171:22, 204:13
**Department** [1] -
84:3
**departure** [2] -
94:11, 94:14
**deposition** [10] -
18:20, 70:21, 163:2,
163:20, 168:5,
181:21, 182:2,
182:11, 182:13,
196:23
**depositions** [1] -
17:1
**DEPUTY** [5] - 4:1,
81:16, 81:19, 151:1,
151:4
**derived** [1] - 155:10
**describe** [16] - 16:9,
16:14, 32:22, 35:22,
39:13, 39:15, 41:2,
42:19, 46:20, 47:7,
48:7, 49:19, 81:25,
140:18, 140:19, 190:7
**described** [9] -
75:25, 87:9, 87:12,
93:12, 96:7, 109:8,
113:22, 132:16, 170:8
**description** [3] -
111:25, 136:20
**desperately** [1] -
180:19
**despite** [3] - 34:8,
133:18, 137:22
**detail** [1] - 86:15
**determination** [1] -
79:21
**determine** [7] - 31:2,
34:17, 46:16, 47:14,
112:9, 115:14, 124:3

**determined** [5] -
46:18, 46:21, 48:14,
80:16, 200:16
**determining** [1] -
108:21
**develop** [1] - 219:7
**development** [2] -
43:12, 160:10
**developments** [1] -
175:4
**differ** [3] - 20:17,
75:16, 76:23
**difference** [9] -
49:24, 95:11, 100:4,
100:20, 112:15,
115:6, 115:14, 118:8,
191:17
**differences** [1] -
20:10
**different** [44] - 20:5,
20:9, 20:21, 21:5,
21:22, 24:7, 39:5,
41:13, 48:4, 53:8,
60:17, 60:19, 61:7,
70:25, 71:16, 78:15,
83:23, 83:25, 98:6,
100:8, 104:24,
104:25, 107:2,
112:13, 114:10,
117:7, 129:19, 138:7,
139:15, 140:20,
148:21, 152:20,
157:12, 157:13,
168:21, 169:14,
173:18, 188:9, 200:9,
201:1, 201:18, 211:4
**differently** [2] -
21:22, 206:12
**difficult** [1] - 90:4
**dig** [1] - 91:2
**diminishing** [1] -
156:1
**DIRECT** [3] - 15:3,
81:21, 151:9
**Direct** [1] - 3:9
**direct** [8] - 6:23,
14:9, 69:9, 71:25,
77:1, 119:16, 193:1
**direction** [2] -
101:14, 110:8
**directional** [1] -
168:18
**directionally** [4] -
169:18, 198:3, 198:4
**directions** [1] -
209:25
**directly** [3] - 35:13,
67:10, 156:6
**directs** [1] - 6:4
**disagree** [2] - 5:25,

123:10
**disagreeing** [2] -
8:25, 9:3
**disappears** [1] -
116:14
**disclose** [2] - 38:13,
114:14
**disclosed** [8] - 75:7,
79:16, 79:18, 89:13,
90:20, 91:19, 107:1,
148:15
**discloses** [1] -
143:25
**disclosing** [1] - 80:6
**disclosure** [22] - 8:8,
8:14, 10:16, 17:2,
18:9, 44:15, 50:1,
50:2, 87:25, 89:11,
90:19, 92:13, 96:8,
102:9, 107:4, 144:8,
144:22, 171:4,
202:25, 203:21,
204:6, 209:15
**disclosures** [19] -
20:2, 35:10, 37:12,
42:20, 42:21, 43:2,
48:12, 50:3, 50:6,
51:2, 61:14, 65:2,
65:10, 67:14, 67:16,
200:2, 202:8, 203:14,
203:18
**discovery** [1] - 217:3
**discuss** [7] - 8:9,
19:22, 35:20, 38:8,
49:25, 69:10, 145:12
**discussed** [15] - 6:9,
32:10, 66:14, 71:25,
73:12, 76:19, 87:1,
87:8, 89:21, 125:10,
132:1, 138:14,
148:20, 155:13, 201:5
**discussing** [3] -
73:8, 106:13, 108:15
**discussion** [4] -
91:21, 93:2, 110:24,
138:6
**dismal** [1] - 215:18
**dismiss** [2] - 218:10,
218:16
**displayed** [1] - 22:17
**dispositive** [1] -
199:11
**disproportionate** [1]
- 97:15
**disproving** [1] -
50:20
**disseminate** [2] -
38:3, 38:18
**distinction** [1] -
118:4

**distinguish** [1] - 122:25

**distorted** [1] - 94:13

**distortion** [3] - 104:7, 137:17, 138:19

**Distributes** [1] - 15:1

**distributes** [1] - 164:7

**distribution** [1] - 153:16

**DISTRICT** [3] - 1:1, 1:1, 1:9

**District** [4] - 2:2, 2:2, 199:2, 223:13

**district** [4] - 210:14, 211:1, 211:4, 223:13

**divide** [2] - 28:12, 172:6

**dividends** [2] - 42:1, 167:16

**division** [1] - 153:18

**divisions** [1] - 153:10

**document** [14] - 48:18, 74:9, 114:20, 154:7, 154:15, 154:21, 154:23, 154:25, 155:3, 155:5, 155:6, 177:3, 177:5, 190:24

**documents** [9] - 15:1, 73:4, 85:8, 163:9, 164:7, 175:24, 175:25, 177:6, 204:18

**dollar** [2] - 53:11, 185:9

**dollars** [3] - 47:22, 125:5, 159:14

**dominant** [1] - 62:23

**done** [20] - 12:4, 16:7, 18:18, 37:20, 39:18, 67:25, 83:2, 114:17, 129:3, 163:13, 174:12, 175:23, 176:25, 189:9, 194:16, 197:15, 200:19, 200:24, 202:9, 205:3

**door** [2] - 200:10, 202:11

**dotted** [1] - 51:19

**doubled** [1] - 213:15

**Dow** [4] - 70:15, 72:13, 132:9, 219:2

**down** [21] - 9:21, 12:11, 22:3, 24:6, 24:16, 24:21, 24:25, 25:4, 27:6, 42:17, 61:10, 81:7, 82:21, 88:7, 94:17, 101:4,

162:9, 194:22, 198:8, 207:4, 219:10

**downside** [1] - 12:12

**downturn** [1] - 162:5

**downward** [3] - 97:9, 97:12, 170:10

**Dr** [81] - 5:24, 6:7, 6:17, 10:15, 13:2, 13:10, 14:9, 14:15, 14:17, 15:5, 15:8, 15:17, 19:11, 19:16, 19:21, 23:24, 43:5, 60:14, 63:10, 63:11, 69:9, 69:19, 69:24, 71:18, 80:25, 81:5, 81:6, 87:1, 95:23, 98:5, 98:9, 98:19, 98:21, 99:4, 99:11, 100:3, 105:5, 106:13, 108:15, 108:17, 109:2, 109:11, 109:15, 109:17, 109:22, 110:5, 110:11, 111:1, 111:3, 111:6, 111:23, 112:16, 113:11, 113:16, 114:17, 114:22, 115:6, 115:8, 116:1, 124:21, 131:11, 131:14, 132:2, 135:24, 147:1, 148:5, 148:24, 180:8, 198:15, 198:19, 200:1, 200:19, 201:16, 203:3, 203:22, 211:18, 211:20, 213:25, 214:14, 215:15, 221:19

**dramatic** [13] - 92:17, 92:18, 94:11, 94:17, 94:22, 96:1, 96:5, 103:16, 104:19, 104:22, 135:14, 135:15, 137:7

**dramatically** [7] - 62:3, 93:13, 97:10, 101:22, 127:22, 128:7, 212:6

**draw** [1] - 90:17

**driven** [3] - 61:14, 78:10

**driver** [1] - 170:21

**driving** [2] - 11:11, 220:16

**drop** [1] - 57:1

**dropped** [3] - 54:21, 54:24, 56:25

**dropping** [1] - 25:19

**drops** [1] - 8:14

**drove** [1] - 171:14

**drug** [1] - 43:12

**Dubai** [5] - 151:14, 151:17, 163:1, 191:12, 191:15

**due** [6] - 54:5, 54:6, 54:10, 187:18, 189:8, 189:20

**dump** [3] - 105:13, 105:14, 105:15

**duped** [2] - 189:6, 209:16

**duration** [1] - 94:10

**during** [85] - 13:6, 22:13, 26:16, 29:11, 29:18, 30:1, 30:5, 31:19, 32:13, 36:5, 38:21, 38:23, 39:4, 40:14, 45:4, 45:8, 45:15, 57:4, 58:2, 60:9, 64:1, 64:17, 73:12, 76:1, 77:2, 80:20, 86:22, 87:8, 87:12, 91:5, 91:9, 91:19, 92:3, 92:18, 92:25, 94:22, 94:23, 95:5, 95:23, 98:8, 98:9, 99:9, 101:6, 103:15, 103:24, 104:11, 104:14, 104:15, 104:20, 105:3, 105:13, 107:18, 108:6, 108:8, 108:21, 109:3, 109:7, 109:19, 109:24, 110:12, 110:25, 111:9, 111:11, 111:14, 111:15, 112:2, 113:25, 117:5, 128:7, 130:21, 135:1, 141:25, 148:8, 161:3, 162:14, 164:14, 176:10, 190:3, 194:10, 202:22, 205:7, 212:16, 214:2

**dynamic** [1] - 61:15

**dynamics** [2] - 30:11, 89:1

## E

**e-commerce** [2] - 153:17, 160:10

**early** [6] - 74:12, 82:23, 134:13, 161:8, 161:9, 193:4

**earn** [1] - 25:15

**earnings** [40] - 37:17, 37:18, 38:1, 43:7, 43:9, 43:11,

43:14, 43:16, 43:18, 43:21, 44:11, 44:13, 44:22, 45:3, 45:6, 45:18, 48:11, 62:21, 64:15, 67:7, 67:24, 68:21, 75:14, 75:15, 76:21, 76:22, 79:24, 80:13, 80:14, 80:19, 112:15, 112:20, 112:23, 113:4, 113:5, 168:15, 198:20, 198:23

**easily** [3] - 28:18, 28:22, 87:11

**Easterbrook** [1] - 82:18

**Eastern** [1] - 193:5

**easy** [2] - 11:5, 47:1

**econometric** [2] - 17:23, 216:3

**econometrics** [3] - 19:12, 19:17, 215:11

**economic** [10] - 33:3, 82:7, 83:5, 109:20, 138:24, 139:10, 139:21, 213:13

**Economic** [1] - 82:16

**economics** [9] - 16:6, 16:17, 29:21, 82:3, 82:5, 82:13, 82:14, 110:10, 216:3

**Economics** [2] - 17:9, 17:11

**economist** [3] - 16:10, 16:16, 139:15

**economists** [2] - 21:6, 33:4

**editors** [1] - 17:19

**education** [2] - 15:17, 152:3

**Edward** [1] - 192:1

**Edwards** [1] - 223:12

**EDWARDS** [2] - 2:1, 223:3

**effect** [8] - 42:18, 65:1, 75:22, 76:15, 98:24, 117:5, 199:6, 201:20

**effective** [5] - 97:17, 99:3, 99:5, 99:8, 99:17

**efficiencies** [2] - 19:16, 33:5

**efficiency** [97] - 5:24, 8:21, 11:3, 18:1, 18:15, 18:21, 18:25, 19:12, 19:23, 19:24, 19:25, 20:1, 20:4, 20:9, 20:15, 20:16,

20:20, 20:23, 21:2, 21:3, 21:5, 21:14, 30:3, 30:20, 32:19, 32:20, 32:23, 33:2, 33:10, 33:14, 34:6, 34:15, 34:22, 35:1, 35:8, 35:9, 36:1, 36:12, 37:12, 38:22, 40:9, 40:21, 42:4, 42:23, 42:24, 43:24, 45:18, 46:15, 46:18, 49:17, 50:10, 50:19, 59:4, 59:8, 59:11, 63:1, 63:17, 64:12, 67:17, 80:18, 84:11, 84:16, 86:22, 87:10, 88:20, 89:9, 91:3, 94:12, 94:15, 107:17, 108:5, 108:21, 109:4, 109:10, 109:15, 109:19, 109:24, 110:12, 110:25, 111:9, 111:11, 113:25, 118:4, 118:5, 118:9, 118:10, 118:21, 118:24, 139:14, 199:12, 200:4, 201:21, 205:7, 211:19, 212:7, 217:25

**efficient** [51] - 7:15, 13:25, 34:17, 45:15, 58:16, 58:20, 60:9, 60:12, 62:20, 63:12, 63:14, 64:17, 82:23, 83:22, 87:3, 87:22, 87:24, 88:2, 88:12, 88:13, 88:15, 89:14, 89:16, 89:19, 90:4, 91:1, 91:23, 92:15, 106:21, 107:5, 108:1, 108:9, 110:10, 110:18, 116:6, 117:25, 123:1, 124:19, 143:7, 202:19, 204:2, 210:23, 210:25, 211:2, 211:17, 212:3, 212:12, 212:18, 213:7, 215:2, 215:7

**efficiently** [3] - 63:21, 63:22, 110:17

**effort** [2] - 10:3, 11:16

**efforts** [1] - 213:22

**eight** [3] - 39:5, 151:20, 175:13

**either** [6] - 12:9, 17:20, 176:6, 197:8, 203:16, 206:11

**electronic** [5] -

38:16, 38:17, 39:21, 41:4, 41:7
**electronically** [1] - 39:23
**element** [1] - 64:8
**elements** [1] - 205:1
**eligibility** [4] - 41:10, 41:16, 41:23, 42:3
**eligible** [3] - 41:10, 124:8, 124:14
**email** [1] - 176:19
**embedded** [1] - 65:12
**embraced** [1] - 45:16
**emerged** [1] - 149:16
**Emirates** [1] - 151:14
**emoji** [5] - 215:23, 215:25, 216:2, 216:8, 220:3
**emphasized** [1] - 111:20
**empirical** [1] - 220:25
**Empirical** [1] - 17:11
**end** [16] - 50:4, 50:6, 51:1, 51:2, 51:4, 51:5, 51:6, 51:7, 165:5, 189:19, 194:5, 203:16, 203:18, 204:21, 206:6, 213:11
**endless** [2] - 78:13, 78:17
**ends** [1] - 207:3
**enforcement** [1] - 16:17
**engage** [1] - 25:22
**engaging** [1] - 161:7
**enjoy** [2] - 21:1, 62:6
**enormous** [1] - 207:18
**entail** [1] - 17:15
**entails** [1] - 17:16
**entered** [3] - 184:10, 187:9, 214:19
**enthusiasm** [1] - 171:13
**entire** [13] - 9:10, 83:18, 95:6, 98:8, 98:9, 99:7, 139:20, 163:2, 188:24, 189:7, 189:24, 197:13, 214:24
**entirely** [5] - 109:23, 205:19, 206:17, 213:23, 216:3
**entirety** [1] - 72:10
**entities** [1] - 84:1
**entity** [1] - 83:17
**entries** [2] - 186:9, 187:3

**entry** [2] - 186:20, 187:15
**environment** [5] - 35:12, 42:9, 61:24, 75:25, 215:8
**episodes** [1] - 93:11
**equally** [3] - 40:22, 59:1, 172:2
**equation** [1] - 169:15
**equilibrium** [2] - 102:15, 104:5
**equity** [3] - 42:14, 124:13, 152:20
**erroneous** [2] - 76:3, 198:16
**error** [2] - 115:10, 148:10
**escalation** [1] - 96:1
**especially** [2] - 161:13, 215:3
**ESQ** [9] - 1:12, 1:13, 1:13, 1:16, 1:19, 1:20, 1:20, 1:21, 1:21
**essence** [1] - 93:3
**essential** [1] - 205:9
**establish** [1] - 9:17
**established** [5] - 28:1, 107:3, 126:9, 136:7, 136:12
**estimate** [1] - 18:24
**estimation** [14] - 10:20, 115:11, 115:17, 116:25, 117:1, 117:7, 146:25, 147:10, 147:14, 147:16, 148:17, 200:21, 214:3, 214:8
**et** [1] - 4:3
**ethically** [1] - 23:25
**Eugene** [2] - 114:2, 114:7
**evaluate** [2] - 122:3, 214:11
**evaluated** [1] - 34:21
**evaluating** [1] - 86:22
**evaluation** [1] - 78:14
**event** [64] - 10:21, 18:4, 44:3, 45:13, 48:22, 55:7, 55:9, 55:18, 82:23, 82:24, 83:22, 88:7, 88:10, 88:11, 88:13, 88:19, 88:20, 88:22, 89:4, 89:15, 89:17, 89:20, 106:13, 114:9, 114:12, 114:14, 114:17, 114:22, 114:23, 114:25,

115:6, 115:7, 115:8, 115:10, 116:1, 116:8, 116:16, 116:21, 116:23, 147:2, 147:5, 147:11, 148:20, 148:24, 149:4, 149:6, 170:7, 197:15, 198:15, 198:24, 199:5, 199:7, 199:10, 200:22, 202:16, 203:12, 210:10, 213:22, 214:4, 215:10, 216:11, 216:18, 219:19
**events** [3] - 43:19, 114:24, 190:2
**evidence** [28] - 8:20, 11:24, 13:1, 23:8, 30:9, 31:6, 45:24, 55:2, 59:15, 59:18, 59:22, 80:5, 94:19, 95:1, 195:6, 195:9, 196:14, 196:25, 198:5, 198:7, 198:12, 210:18, 211:2, 213:12, 213:13, 217:13, 217:17, 220:25
**EVIDENTIARY** [1] - 1:8
**evolution** [1] - 163:7
**ex** [1] - 63:2
**ex-post** [1] - 63:2
**exacerbated** [1] - 221:13
**exact** [3] - 75:5, 100:14, 127:14
**exactly** [14] - 92:10, 92:11, 104:8, 104:11, 106:25, 129:17, 130:5, 137:19, 143:1, 165:17, 171:2, 193:19, 194:12, 211:9
**EXAMINATION** [7] - 15:3, 63:8, 81:21, 119:11, 151:9, 164:9, 190:18
**examination** [2] - 86:13, 107:10
**examine** [6] - 104:14, 141:17, 141:19, 144:24, 211:1, 219:22
**examined** [2] - 140:22, 219:23
**example** [12] - 27:19, 34:11, 41:3, 67:7, 87:5, 87:6, 89:4, 90:9, 109:1, 153:1, 161:25, 180:4

**examples** [1] - 34:12
**exceed** [1] - 207:8
**exceeded** [3] - 29:6, 109:3, 125:5
**excellent** [1] - 86:14
**exception** [1] - 123:4
**Exchange** [4] - 16:11, 41:17, 84:4, 84:6
**exchange** [4] - 39:18, 40:4, 40:10, 40:11
**exchange-listed** [1] - 40:10
**exchanged** [1] - 177:7
**excited** [1] - 61:22
**excluded** [1] - 19:1
**exclusively** [3] - 38:11, 45:11, 143:12
**excuse** [2] - 86:10, 106:4
**excused** [4] - 81:9, 150:7, 150:8, 194:23
**executing** [1] - 61:3
**exercise** [8] - 55:6, 156:2, 156:14, 157:16, 187:18, 187:23, 211:11, 211:12
**exercised** [4] - 156:4, 187:12, 187:13, 197:24
**exhausted** [1] - 145:14
**exhibit** [18] - 95:15, 97:8, 98:19, 99:11, 104:9, 105:21, 105:22, 106:6, 128:21, 129:6, 129:8, 129:14, 137:4, 155:10, 155:13, 155:16, 160:25, 171:22
**Exhibit** [9] - 76:7, 154:14, 172:5, 178:9, 179:18, 183:11, 186:2, 189:12
**exhibits** [5] - 13:23, 87:7, 129:19, 129:20, 137:20
**Exhibits** [1] - 15:9
**exist** [6] - 7:15, 11:20, 113:10, 116:7, 123:7, 123:8
**existed** [2] - 124:4
**existence** [3] - 88:12, 95:1, 116:5
**exists** [4] - 88:16, 90:8, 113:1, 192:11

**examples** [1] - 34:12
**exit** [1] - 165:19
**expect** [8] - 6:4, 6:23, 92:15, 102:18, 107:6, 108:1, 115:12, 135:11
**expectation** [2] - 121:19, 122:2
**expectations** [5] - 80:14, 80:16, 121:9, 121:23, 136:12
**expensive** [2] - 94:1, 101:11
**experience** [5] - 15:23, 33:3, 33:18, 52:11, 124:12
**expert** [24] - 5:24, 6:17, 8:9, 10:13, 16:21, 16:25, 18:15, 19:11, 19:16, 21:9, 32:19, 33:3, 34:6, 34:15, 34:21, 83:21, 84:2, 84:11, 84:16, 140:20, 145:13, 210:15, 221:7
**expertise** [1] - 153:20
**experts** [12] - 6:1, 13:13, 23:20, 31:1, 32:24, 33:7, 43:24, 44:19, 180:1, 180:8, 198:13, 210:7
**expiration** [2] - 186:12, 186:21
**explain** [15] - 24:2, 27:15, 31:9, 46:10, 54:2, 63:16, 91:20, 93:5, 103:21, 105:6, 136:16, 159:5, 159:6, 161:6, 181:22
**explained** [7] - 64:11, 91:16, 92:12, 96:8, 187:16, 196:8, 217:20
**explanation** [2] - 141:6, 209:2
**exploded** [1] - 218:20
**exploding** [1] - 220:3
**exploit** [2] - 20:24, 48:10
**explore** [1] - 34:2
**explosion** [3] - 99:9, 109:7, 137:8
**explosive** [1] - 99:18
**export** [1] - 153:19
**exposes** [1] - 101:13
**express** [1] - 143:20
**expressing** [2] - 73:20, 218:11
**extended** [1] - 129:4

**extensive** [3] - 93:2, 94:21, 124:11
**extensively** [1] - 82:22
**extent** [16] - 7:16, 7:22, 8:20, 10:4, 11:6, 37:4, 144:4, 145:21, 145:24, 196:19, 197:6, 202:21, 203:9, 219:7, 220:21, 221:11
**external** [1] - 170:6
**extra** [3] - 10:10, 10:11, 10:24
**extraordinary** [2] - 52:23, 202:1
**extreme** [2] - 11:8, 214:20
**eyeball** [1] - 99:13

# F

**face** [8] - 76:24, 80:23, 179:13, 185:11, 215:23, 215:25, 216:2, 216:8
**facilitate** [3] - 39:20, 39:24, 40:6
**fact** [39] - 8:2, 8:20, 9:16, 9:24, 10:2, 10:25, 22:15, 23:10, 31:2, 42:5, 56:3, 58:12, 59:18, 72:21, 80:3, 103:12, 103:14, 107:11, 109:6, 113:22, 132:7, 133:18, 137:6, 138:7, 138:8, 142:11, 159:8, 159:15, 159:20, 163:18, 163:21, 165:24, 189:9, 197:7, 201:3, 203:20, 217:14, 220:6
**Factiva** [3] - 72:17, 72:19, 72:21
**Factor** [26] - 35:5, 35:21, 36:9, 36:13, 37:20, 37:23, 66:14, 66:25, 70:22, 80:7, 86:23, 87:15, 87:20, 88:5, 89:6, 89:8, 89:9, 90:25, 91:22, 108:10, 108:24, 109:1, 109:4, 109:12, 110:9, 123:4
**factor** [35] - 7:17, 30:2, 33:4, 33:16, 34:2, 34:3, 35:4, 36:15, 36:18, 38:5, 39:12, 39:14, 40:4, 40:12, 41:9, 42:19, 46:19, 47:6, 47:18,

48:6, 49:5, 64:24, 64:25, 65:4, 66:6, 66:9, 66:24, 67:9, 67:10, 67:13, 87:9, 125:11, 198:19, 199:11, 203:9
**factors** [55] - 7:24, 7:25, 8:5, 30:3, 32:17, 33:1, 33:12, 33:19, 33:20, 33:23, 33:24, 33:25, 34:8, 34:16, 34:22, 35:1, 37:19, 46:2, 46:6, 46:7, 49:12, 49:13, 49:14, 58:22, 59:1, 59:4, 60:21, 62:15, 62:20, 67:15, 86:21, 86:25, 87:15, 87:20, 88:5, 108:16, 108:18, 108:20, 108:24, 122:22, 123:6, 123:11, 124:3, 124:5, 124:18, 124:22, 124:24, 199:14, 203:9, 210:15, 210:24, 211:5, 214:9
**facts** [4] - 142:21, 147:12, 211:14, 211:15
**factual** [1] - 195:24
**faculty** [1] - 82:6
**failed** [2] - 202:24, 217:6
**fair** [2] - 54:14, 155:15
**fairly** [4] - 52:12, 96:5, 100:11, 154:25
**fake** [1] - 192:10
**fall** [5] - 45:7, 102:18, 102:20, 102:25, 103:1
**false** [1] - 201:14
**Fama** [2] - 114:2, 114:7
**familiar** [2] - 21:18, 169:16
**familiarity** [2] - 33:19, 75:19
**fantastic** [1] - 52:21
**far** [4] - 141:4, 199:25, 201:6, 217:5
**FARINA** [59] - 1:20, 5:1, 19:14, 63:7, 63:9, 65:19, 65:21, 65:24, 69:8, 69:13, 69:22, 69:23, 71:21, 80:25, 81:11, 81:22, 84:10, 84:19, 84:20, 84:24, 85:2, 85:8, 85:12, 85:14, 85:17, 85:21, 89:24, 96:10, 96:12,

97:24, 98:1, 99:19, 99:21, 103:19, 103:20, 114:4, 117:22, 119:2, 119:8, 150:3, 195:5, 204:12, 204:16, 204:20, 204:24, 206:9, 207:1, 207:23, 208:1, 209:4, 210:8, 212:22, 213:6, 213:21, 214:24, 215:9, 216:21, 222:4, 222:7
**Farina** [15] - 3:5, 5:2, 63:10, 69:6, 69:18, 81:2, 81:10, 84:18, 85:10, 126:25, 129:2, 204:11, 214:25, 216:20, 222:3
**Farina's** [1] - 220:2
**fatal** [2] - 203:23, 203:24
**fault** [1] - 114:6
**favor** [3] - 35:25, 45:17, 46:15
**favorably** [1] - 82:25
**favored** [1] - 46:18
**federal** [1] - 83:4
**feedback** [1] - 17:18
**fell** [3] - 45:4, 67:25, 68:21
**felt** [1] - 221:21
**few** [14] - 7:4, 17:7, 21:16, 34:20, 46:24, 52:3, 57:12, 58:9, 138:21, 138:23, 163:13, 164:4, 204:13, 214:9
**field** [7] - 23:17, 23:20, 29:21, 31:2, 33:7, 153:19, 203:12
**fifth** [8] - 42:18, 64:24, 65:4, 66:6, 66:8, 67:9, 203:9
**Fifth** [1] - 1:17
**figured** [1] - 85:19
**figuring** [1] - 103:9
**file** [5] - 42:8, 124:8, 124:14, 179:4, 221:23
**filed** [14] - 11:15, 42:7, 74:6, 74:12, 74:15, 74:18, 74:22, 76:12, 124:13, 126:17, 149:10, 154:7, 207:21, 219:13
**files** [4] - 73:10, 79:20, 175:16, 175:18
**filing** [17] - 75:11, 78:7, 80:4, 80:6, 80:20, 106:24, 143:16, 143:24,

144:14, 144:21, 147:25, 158:7, 160:4, 192:8, 192:21, 193:24
**filings** [18] - 38:13, 38:15, 41:24, 70:15, 74:1, 75:8, 77:12, 77:13, 78:10, 78:21, 79:25, 143:21, 144:17, 147:19, 148:1, 149:3, 162:18
**fill** [1] - 41:20
**filled** [1] - 41:7
**final** [4] - 27:11, 146:18, 153:2, 162:16
**finally** [3] - 9:20, 10:17, 149:14
**finance** [5] - 15:19, 15:20, 16:2, 82:9, 192:16
**Financial** [3] - 17:9, 17:10, 186:16
**financial** [14] - 16:2, 16:10, 16:16, 29:21, 38:15, 82:13, 84:12, 84:17, 88:4, 121:18, 121:22, 124:13, 146:9, 168:9
**financially** [2] - 23:25, 121:14
**financing** [2] - 159:8, 161:25
**fine** [3] - 121:7, 150:17, 199:9
**finish** [3] - 169:21, 178:5, 184:25
**firm** [5] - 41:8, 83:14, 83:18, 83:20, 152:18
**firms** [1] - 39:22
**First** [3] - 118:18, 210:21
**first** [50] - 6:1, 11:5, 15:14, 22:23, 22:25, 30:19, 35:4, 39:15, 43:17, 45:13, 46:9, 48:13, 54:23, 67:18, 71:22, 72:16, 76:19, 87:6, 87:19, 90:23, 92:4, 95:25, 98:19, 101:11, 111:12, 114:12, 136:18, 144:18, 153:15, 155:3, 155:5, 164:5, 171:17, 180:21, 185:16, 186:13, 196:17, 198:18, 201:24, 202:3, 202:5, 202:6, 209:6, 211:21, 212:8, 213:10, 215:9, 215:12, 219:1
**FIS** [2] - 32:7, 126:6

**FISCHEL** [1] - 81:18
**Fischel** [69] - 3:15, 6:17, 8:1, 9:9, 9:24, 10:22, 13:3, 13:8, 30:13, 30:16, 31:6, 31:21, 32:1, 32:7, 50:23, 51:23, 53:6, 56:8, 56:19, 57:12, 57:22, 58:4, 58:9, 81:12, 81:23, 84:11, 84:15, 84:21, 85:5, 85:24, 91:2, 98:2, 107:16, 108:4, 115:1, 119:13, 122:20, 124:2, 126:1, 126:18, 126:24, 128:18, 130:24, 135:25, 136:15, 137:12, 139:13, 140:8, 145:16, 146:19, 146:25, 147:24, 150:4, 198:14, 198:17, 199:13, 200:10, 200:13, 201:1, 201:25, 203:23, 211:16, 212:4, 213:6, 213:22, 219:21, 220:19, 221:19
**Fischel's** [13] - 32:12, 44:24, 45:22, 51:11, 51:17, 57:3, 59:11, 59:16, 70:24, 77:1, 200:20, 218:23, 219:18
**five** [15] - 16:24, 40:8, 40:14, 64:20, 92:4, 114:3, 146:20, 146:22, 150:16, 186:8, 195:15, 198:22, 200:6, 202:22
**five-day** [2] - 198:22, 202:22
**fix** [1] - 175:12
**flagrant** [1] - 11:8
**flaw** [3] - 111:1, 111:3, 116:4
**flawed** [1] - 99:12
**float** [9] - 28:12, 29:11, 29:17, 47:7, 47:11, 48:5, 126:12, 126:14, 126:18
**Floor** [1] - 1:17
**floors** [1] - 39:18
**fluctuation** [1] - 52:10
**fly** [2] - 83:17, 163:1
**fly-by-night** [1] - 83:17
**focus** [9] - 86:12,

118:1, 128:10,
181:24, 199:15,
202:7, 202:25,
203:13, 209:4
**focused** [4] - 67:13,
105:10, 200:1, 202:11
**focusing** [5] - 77:12,
200:5, 200:11, 205:4,
209:6
**folks** [3] - 69:12,
189:6, 222:8
**follow** [5] - 32:24,
32:25, 37:25, 146:9,
206:3
**followed** [3] - 39:1,
77:6, 186:4
**following** [9] - 7:7,
55:20, 56:15, 69:15,
91:8, 147:19, 150:20,
176:10, 218:19
**foot** [1] - 175:2
**footprint** [1] - 158:11
**FOR** [5] - 1:1, 1:12,
1:19, 3:10, 3:14
**force** [1] - 26:4
**forces** [1] - 168:2
**foregoing** [1] - 223:4
**Form** [5] - 79:4,
124:8, 124:14,
160:21, 192:12
**form** [16] - 14:1,
29:10, 33:10, 45:14,
57:16, 57:21, 58:14,
58:21, 59:3, 59:10,
59:17, 60:1, 60:7,
123:22, 123:24,
219:13
**formed** [1] - 83:14
**forms** [1] - 40:24
**formula** [1] - 126:9
**formulation** [1] -
66:13
**forth** [1] - 26:14
**Fortune** [1] - 152:24
**forums** [2] - 145:2,
146:14
**forward** [6] - 4:4,
55:23, 122:18,
171:15, 178:24, 194:9
**forward-looking** [2] -
55:23, 122:18
**foundation** [1] -
216:4
**founded** [1] - 166:10
**four** [9] - 13:24,
16:11, 16:24, 68:20,
92:4, 123:6, 124:3,
186:8, 188:4, 188:9,
211:24
**fourth** [1] - 41:9

**France** [5] - 151:16,
151:21, 151:22,
152:21, 191:15
**Frank** [1] - 82:18
**frankly** [1] - 140:16
**fraud** [3] - 11:12,
131:2, 200:18
**free** [2] - 151:6,
212:16
**freely** [2] - 47:10,
47:13
**French** [4] - 163:15,
171:24, 191:14,
193:16
**frequency** [1] - 41:3
**frequent** [1] - 82:17
**frequently** [1] -
112:20
**Friday** [1] - 141:22
**front** [10] - 7:11,
51:8, 50:4, 51:1, 51:4,
51:5, 51:16, 65:16,
127:9, 203:16
**front-end** [2] - 51:4,
203:16
**frothiness** [1] -
62:19
**full** [11] - 15:5,
120:13, 158:6, 175:6,
175:22, 183:22,
185:17, 215:20,
215:21, 223:5
**fun** [2] - 217:16,
217:19
**function** [3] - 40:16,
40:25, 89:8
**fund** [1] - 52:18
**fundamental** [12] -
20:4, 20:6, 20:22,
62:25, 64:9, 64:10,
111:1, 111:3, 115:9,
118:4, 118:10, 148:10
**fundamentally** [1] -
62:3
**fundamentals** [4] -
102:9, 167:24,
171:10, 175:12
**funds** [4] - 39:23,
184:5, 192:16, 221:9
**funny** [1] - 215:21
**future** [4] - 24:19,
24:20, 25:2, 160:5

**G**

**gain** [2] - 25:20, 52:8
**GENC** [1] - 1:13
**Genc** [1] - 4:16
**general** [6] - 50:9,

87:21, 102:11,
110:10, 129:24, 147:9
**generally** [14] -
21:23, 29:20, 31:1,
34:24, 38:25, 45:15,
58:15, 60:8, 62:7,
65:7, 65:13, 68:11,
130:5, 143:22
**generate** [9] - 107:8,
113:12, 156:13,
161:12, 170:15,
170:20, 173:14,
184:13, 197:9
**generated** [4] -
113:13, 174:4,
188:18, 189:17
**gentlemen** [2] - 4:9,
194:24
**Gerant** [1] - 152:14
**get-out-of-jail-free**
[1] - 212:16
**GILMORE** [2] - 1:20,
5:7
**Gilmore** [2] - 5:8, 5:9
**given** [10] - 10:2,
10:24, 28:8, 61:24,
90:10, 90:22, 105:25,
113:4, 124:11, 207:16
**goal** [3] - 44:21,
76:20, 77:11
**governing** [1] - 84:2
**gradual** [1] - 96:5
**Graduate** [1] - 83:8
**grand** [1] - 196:16
**granularly** [1] - 34:1
**graph** [3] - 54:17,
96:3, 100:5
**graphs** [1] - 127:14
**gray** [5] - 127:6,
129:11, 130:13,
130:16, 130:17
**great** [5] - 85:1,
146:23, 164:20,
170:18, 216:6
**green** [2] - 103:23,
152:20
**ground** [1] - 43:10
**Groupon** [1] - 34:19
**groups** [3] - 83:4,
84:1, 214:10
**grow** [1] - 151:21
**guess** [6] - 25:10,
41:11, 55:1, 163:18,
201:24, 202:3
**gulf** [1] - 199:21
**guy** [1] - 185:14
**Générale** [3] -
154:19, 154:22, 161:1

**H**

**half** [7] - 16:11,
23:11, 26:20, 28:18,
29:6, 31:23, 194:25
**Halliburton** [1] -
218:7
**hand** [7] - 19:25,
81:17, 84:25, 115:1,
151:2, 164:5, 204:16
**handed** [2] - 13:25,
14:23
**handle** [1] - 183:18
**hands** [1] - 45:6
**happy** [6] - 189:2,
189:7, 195:7, 208:10,
209:4, 209:13
**hard** [6] - 14:24,
84:25, 144:20,
196:25, 215:1, 221:18
**hardware** [1] - 179:7
**hardwares** [1] -
179:8
**head** [6] - 72:25,
73:9, 73:14, 74:14,
75:20, 76:5, 83:18,
83:19
**headline** [1] - 73:6
**headlines** [2] -
70:15, 72:13
**healthy** [1] - 27:12,
30:6
**hear** [5] - 7:6, 8:19,
12:6, 13:14, 195:16
**heard** [5] - 13:2,
96:17, 177:17, 180:8
**HEARING** [1] - 1:8
**hearing** [3] - 9:17,
59:25, 86:1
**heart** [3] - 152:22,
221:7
**heavily** [3] - 33:20,
44:10, 49:15
**heavy** [1] - 58:23
**hedge** [8] - 12:12,
39:23, 162:4, 170:4,
170:6, 184:5, 197:19,
221:9
**hedges** [1] - 207:11
**hedging** [1] - 180:2
**held** [2] - 83:7,
166:20
**help** [3] - 86:5,
101:1, 206:4
**helpful** [3] - 14:23,
36:15, 133:23
**hereby** [1] - 223:3
**hesitate** [1] - 139:18
**high** [21] - 34:4, 34:8,

35:1, 35:17, 40:17,
40:21, 41:3, 52:16,
62:17, 65:13, 101:25,
103:7, 113:17,
115:19, 115:22,
116:10, 116:11,
116:12, 137:2,
148:11, 215:3
**high-frequency** [1] -
41:3
**high-profile** [1] -
215:3
**high-volatility** [1] -
148:11
**higher** [14] - 10:19,
35:25, 36:4, 36:17,
55:11, 131:20,
131:23, 161:14,
173:7, 173:16,
175:14, 188:8,
188:18, 215:5
**highest** [1] - 152:3
**highlighted** [1] -
142:13
**hired** [1] - 163:5
**historical** [1] - 39:17
**history** [3] - 58:5,
82:2, 82:3
**hit** [6] - 103:3,
134:11, 134:13,
134:22, 135:7, 220:7
**hold** [3] - 6:22,
129:13, 217:9
**holding** [7] - 25:10,
27:25, 93:22, 94:1,
94:4, 152:18, 166:17
**holdings** [6] - 74:19,
74:23, 76:9, 76:12,
76:13, 107:13
**holiday** [1] - 176:15
**Honor** [70] - 4:1,
4:10, 4:13, 4:16, 4:19,
4:22, 5:1, 5:4, 5:7,
5:10, 5:17, 5:19, 5:21,
6:9, 6:15, 7:5, 7:10,
8:19, 9:2, 12:2, 12:19,
12:22, 12:25, 13:17,
13:19, 13:22, 14:14,
14:16, 14:22, 14:24,
19:10, 19:14, 19:19,
44:8, 65:19, 81:4,
84:10, 84:14, 84:19,
85:14, 88:9, 104:12,
118:17, 118:20,
119:3, 146:21,
149:25, 150:3, 150:6,
150:11, 150:15,
150:22, 163:25,
171:21, 182:9,
183:15, 190:14,

194:20, 195:3, 195:5, 195:18, 196:12, 204:7, 204:12, 204:21, 216:24, 220:1, 221:16, 222:2, 222:4

**Honor's** [2] - 89:21, 90:2

**HONORABLE** [1] - 1:9

**hope** [4] - 12:10, 146:6, 162:8, 198:8

**hopefully** [1] - 86:6

**hoping** [3] - 6:17, 119:6, 119:8

**hostile** [1] - 221:9

**hour** [3] - 6:25, 54:24, 194:25

**hours** [7] - 6:10, 6:20, 46:24, 74:3, 191:15, 191:20, 193:3

**hours'** [1] - 191:17

**huge** [9] - 89:12, 93:24, 96:7, 102:8, 103:14, 103:24, 104:1, 104:9, 104:10

**hundreds** [3] - 39:3, 43:25, 82:19

**hurt** [1] - 101:15

**hypothesis** [1] - 116:17

**hypothetically** [2] - 42:12, 63:23

---

**I**

---

**idea** [6] - 24:3, 93:21, 158:12, 169:10, 189:18, 192:15

**ideal** [2] - 217:14, 217:23

**identified** [7] - 13:1, 73:1, 78:19, 78:20, 79:3, 79:22, 153:17

**identify** [5] - 4:4, 70:11, 77:3, 176:9, 176:18

**identifying** [1] - 111:2

**identities** [1] - 57:22

**ignored** [1] - 109:23

**II** [1] - 218:7

**Illinois** [1] - 1:15

**illustrative** [1] - 92:23

**images** [1] - 175:22

**imagine** [1] - 65:20

**immediately** [3] - 91:9, 99:23, 208:12

**imminent** [3] - 160:13, 160:15, 160:17

**impact** [47] - 8:7, 8:16, 10:4, 10:9, 10:12, 10:14, 10:25, 30:11, 49:18, 49:21, 49:25, 50:3, 50:9, 50:14, 50:20, 50:22, 50:23, 51:4, 54:11, 54:13, 55:25, 56:9, 56:20, 58:10, 58:13, 59:12, 59:16, 60:20, 74:4, 74:5, 78:22, 90:6, 90:17, 90:22, 90:23, 90:24, 114:8, 146:19, 186:23, 202:24, 203:2, 203:16, 203:18, 203:20, 203:22, 203:25, 204:4

**impacted** [5] - 8:21, 56:3, 59:18, 59:23, 219:12

**impacts** [1] - 18:9

**impending** [1] - 30:24

**implemented** [1] - 177:20

**implied** [2] - 9:25, 125:16

**implode** [2] - 144:6, 198:9

**importance** [1] - 111:21

**important** [22] - 13:1, 21:8, 36:11, 40:3, 40:6, 42:23, 44:10, 47:19, 55:5, 117:17, 117:18, 122:13, 143:11, 153:14, 153:15, 163:9, 203:16, 205:9, 210:13, 212:24, 213:24, 218:1

**imprecision** [1] - 100:18

**impression** [2] - 98:23, 212:15

**improper** [1] - 214:3

**IN** [1] - 1:4

**inability** [2] - 21:24, 42:8

**inadequate** [1] - 11:20

**incentive** [1] - 102:17

**inclined** [1] - 13:13

**include** [4] - 44:19, 50:14, 168:1, 204:13

**included** [7] - 46:7, 57:12, 58:9, 73:4, 95:5, 97:7, 220:19

**includes** [1] - 41:23

**including** [9] - 16:13, 82:16, 83:23, 176:12, 176:20, 196:15, 199:1, 210:19, 214:10

**inclusive** [2] - 157:20, 197:13

**incompetent** [1] - 62:11

**incomplete** [1] - 136:19

**incomprehensible** [1] - 172:2

**inconsistent** [6] - 57:10, 80:18, 91:22, 91:23, 209:20, 209:22

**incorporates** [2] - 65:5, 66:10

**incorrect** [10] - 9:16, 76:13, 98:25, 107:11, 107:21, 107:24, 108:3, 124:22, 148:5, 149:4

**increase** [50] - 42:12, 52:9, 52:19, 52:20, 53:2, 53:7, 53:9, 53:23, 55:23, 56:16, 93:13, 96:5, 97:17, 99:18, 102:8, 102:13, 102:14, 102:18, 103:14, 103:16, 103:24, 104:3, 104:9, 104:10, 104:19, 104:22, 104:23, 104:24, 106:3, 106:4, 107:6, 107:13, 107:22, 107:23, 107:25, 108:2, 135:14, 135:15, 137:7, 137:17, 141:14, 141:19, 142:14, 142:18, 146:11, 158:10, 169:11, 220:10

**increased** [6] - 56:1, 56:14, 134:8, 135:21, 185:21, 189:17

**increases** [5] - 94:23, 96:7, 96:23, 136:22, 219:16

**increasing** [8] - 92:8, 128:19, 130:2, 130:6, 130:22, 158:8, 219:6, 219:14

**incredible** [2] - 101:3, 184:20

**incredibly** [3] -

210:12, 212:24, 215:18

**independent** [1] - 71:17

**index** [4] - 91:14, 92:9, 214:10

**indicate** [4] - 58:10, 59:7, 59:8, 215:23

**indicated** [1] - 59:4

**indication** [1] - 201:21

**indicators** [2] - 33:2, 199:11

**indicia** [5] - 109:9, 211:7, 211:8, 211:13, 213:12

**indicted** [2] - 144:6, 144:9

**individual** [2] - 62:16, 180:16

**individuals** [1] - 38:16

**industry** [4] - 48:25, 53:23, 53:25, 91:17

**inefficiencies** [1] - 212:25

**inefficiency** [8] - 64:9, 87:13, 108:12, 109:9, 202:22, 210:19, 211:7, 211:8

**inefficient** [15] - 9:11, 10:1, 62:4, 64:7, 64:14, 89:14, 89:16, 92:14, 107:24, 123:3, 125:13, 125:17, 125:22, 139:4, 213:3

**inefficiently** [1] - 64:1

**inflammatory** [1] - 61:18

**inflated** [1] - 103:7

**inflation** [2] - 8:11, 8:13

**influence** [4] - 97:13, 181:19, 182:1, 183:4

**influenced** [1] - 185:11

**influencer** [2] - 139:25, 140:2

**influences** [1] - 140:6

**inform** [1] - 27:3

**information** [131] - 20:2, 20:13, 23:14, 35:10, 35:12, 37:12, 37:16, 38:4, 38:7, 38:12, 38:13, 38:18, 39:7, 41:25, 42:6, 42:9, 42:15, 42:20, 42:22, 42:25, 43:2,

43:4, 43:16, 45:25, 47:23, 47:24, 48:12, 49:10, 50:12, 57:25, 61:4, 61:14, 61:24, 62:9, 62:12, 62:24, 63:3, 65:2, 65:6, 65:10, 66:10, 66:20, 67:1, 67:3, 67:11, 67:14, 68:14, 74:19, 74:23, 75:5, 75:24, 77:8, 78:2, 80:3, 80:6, 80:9, 88:1, 88:14, 88:22, 89:3, 89:11, 89:13, 90:19, 90:20, 90:21, 91:19, 92:13, 93:5, 94:15, 94:18, 94:22, 96:9, 102:10, 103:17, 104:4, 104:23, 106:12, 106:23, 106:25, 107:4, 107:6, 107:12, 107:21, 107:25, 108:3, 112:21, 113:3, 113:10, 116:4, 116:21, 117:17, 118:6, 118:10, 119:17, 119:19, 120:1, 120:3, 121:10, 121:11, 121:12, 121:20, 132:2, 136:4, 136:8, 136:13, 137:10, 138:1, 138:18, 139:14, 139:17, 140:14, 141:25, 143:5, 143:6, 143:11, 143:22, 143:25, 144:1, 144:4, 144:7, 144:16, 148:15, 200:14, 211:23, 215:15, 216:1, 216:2, 216:4, 216:10, 216:17

**informational** [15] - 20:1, 20:14, 21:3, 21:14, 32:20, 35:8, 35:9, 37:11, 42:24, 118:4, 118:8, 118:21, 118:23, 212:7, 217:24

**informationally** [4] - 64:14, 117:25, 215:2, 215:7

**informations** [2] - 158:18, 160:12

**informed** [1] - 120:2

**initial** [10] - 44:14, 45:13, 90:13, 109:23, 111:1, 111:19, 111:20, 112:6, 160:18, 174:9

**initiate** [1] - 209:8

**initiated** [2] - 207:13, 207:17
**initiates** [1] - 208:7
**initiating** [1] - 207:6
**inquiry** [2] - 96:18, 97:1
**insiders** [2] - 47:10, 47:13
**instance** [11] - 7:20, 9:22, 10:21, 11:12, 124:7, 138:8, 143:15, 156:6, 202:25, 220:6, 220:17
**instances** [1] - 169:10
**instead** [1] - 24:13
**institution** [5] - 26:3, 26:6, 61:6, 61:8, 61:9
**institutional** [6] - 7:21, 47:18, 47:25, 48:2, 48:4, 52:18
**institutions** [11] - 16:3, 23:2, 25:13, 25:22, 47:20, 47:21, 48:3, 61:7, 62:5, 62:13, 62:15
**insurance** [5] - 12:13, 161:18, 170:9, 170:11, 180:2
**intended** [1] - 159:17
**intending** [1] - 86:7
**intent** [1] - 40:12
**intention** [4] - 12:10, 12:11, 160:22, 174:11
**interact** [2] - 38:1, 167:5
**interest** [52] - 9:15, 9:18, 25:14, 25:16, 25:21, 27:1, 28:23, 58:23, 93:10, 93:14, 93:16, 95:24, 96:1, 96:19, 97:3, 97:4, 101:12, 103:4, 125:25, 126:10, 127:2, 127:7, 127:18, 128:4, 128:18, 129:5, 129:10, 130:2, 130:7, 130:20, 131:20, 131:24, 132:17, 133:18, 134:7, 134:10, 135:13, 135:15, 136:23, 137:1, 137:9, 137:22, 138:9, 160:8, 165:10, 189:20, 199:21, 201:4, 218:24, 219:4, 219:11, 220:6
**interested** [6] - 20:25, 21:24, 23:3, 46:13, 95:9, 160:10

**interesting** [3] - 21:12, 153:19, 176:24
**interpretation** [2] - 77:15, 106:2
**interpreted** [6] - 160:21, 201:13, 201:15, 218:14, 219:22
**interpreting** [1] - 219:25
**interrelated** [1] - 104:21
**intra** [1] - 52:10
**intra-day** [1] - 52:10
**introduces** [1] - 97:8
**introducing** [1] - 66:6
**invest** [5] - 47:20, 47:22, 153:7, 176:13, 185:23
**invested** [1] - 153:4, 153:8, 167:17
**investigate** [1] - 92:16
**investigated** [1] - 91:18
**investigation** [2] - 95:4, 146:17
**investigations** [1] - 16:18
**investing** [5] - 154:3, 168:19, 184:11, 198:6, 201:10
**investment** [11] - 47:22, 48:3, 152:18, 153:22, 168:17, 170:6, 170:21, 171:17, 184:14, 184:15, 184:18
**investments** [9] - 12:16, 42:14, 152:24, 157:20, 167:5, 167:15, 167:20, 167:23, 179:19
**investor** [15] - 20:23, 28:15, 46:22, 48:10, 52:18, 60:19, 61:2, 61:5, 61:6, 93:16, 100:16, 166:14, 185:13, 215:3, 221:8
**investors** [78] - 7:21, 22:2, 22:14, 23:3, 23:12, 24:4, 26:24, 27:5, 27:10, 27:21, 31:14, 35:10, 35:11, 36:25, 37:15, 38:3, 38:5, 38:7, 38:11, 38:18, 39:9, 40:24, 41:25, 42:6, 42:8, 42:9, 42:15, 42:16,

43:1, 43:3, 46:13, 47:2, 47:3, 47:13, 47:24, 47:25, 48:4, 49:8, 50:12, 60:18, 61:15, 61:22, 62:3, 62:6, 62:7, 62:8, 62:14, 62:16, 62:23, 63:1, 66:21, 80:15, 84:1, 93:12, 93:22, 94:1, 94:3, 95:8, 95:20, 98:14, 103:8, 119:18, 120:2, 143:18, 144:25, 145:6, 145:25, 146:14, 163:22, 196:3, 196:5, 201:7, 201:10, 201:15, 217:1, 218:13
**involve** [2] - 33:16, 172:23
**involved** [11] - 11:14, 12:3, 17:23, 17:25, 18:3, 18:8, 18:12, 139:9, 181:15, 187:10, 189:22
**involvement** [3] - 45:10, 77:5, 162:17
**involves** [1] - 37:23
**involving** [5] - 34:13, 34:19, 35:17, 93:11, 181:10
**irrationally** [3] - 60:20, 217:16, 217:18
**irrelevant** [6] - 9:4, 35:18, 40:17, 87:2, 198:15, 218:6
**issue** [12] - 7:13, 12:6, 13:22, 21:15, 23:22, 41:18, 109:20, 110:20, 118:21, 141:5, 192:15, 205:6
**issued** [2] - 38:24, 79:4
**issues** [3] - 6:2, 11:4, 87:2
**it'll** [1] - 172:2
**iteration** [1] - 78:18
**itself** [16] - 9:25, 45:12, 54:20, 55:7, 56:3, 62:24, 77:16, 78:9, 80:5, 91:22, 97:4, 120:14, 125:16, 133:12, 135:15, 215:14

**J**

**Jackson** [1] - 16:20
**Jafri** [19] - 3:3, 3:4, 3:6, 4:6, 5:16, 6:12,

7:8, 11:22, 13:16, 13:21, 84:13, 119:10, 150:9, 150:21, 190:17, 195:2, 195:13, 216:22, 221:25
**JAFRI** [53] - 1:12, 4:6, 5:17, 5:19, 5:21, 6:6, 6:13, 7:10, 9:2, 9:7, 12:1, 12:19, 13:17, 13:22, 14:4, 14:12, 84:14, 119:12, 126:22, 126:23, 133:25, 134:2, 146:21, 146:24, 149:24, 150:11, 150:15, 150:18, 150:22, 151:10, 152:2, 154:12, 156:22, 159:23, 162:6, 163:25, 183:15, 190:19, 194:18, 195:3, 195:15, 195:18, 196:12, 196:17, 198:18, 201:19, 202:5, 204:9, 216:24, 220:5, 221:16, 222:1, 222:9
**jail** [1] - 212:16
**Jan** [1] - 4:19
**JAN** [1] - 1:16
**January** [1] - 68:4
**jenna** [1] - 5:10
**JENNA** [1] - 1:21
**jog** [1] - 132:8
**John** [1] - 142:3
**joint** [1] - 83:11
**joke** [2] - 215:22, 216:9
**Jones** [4] - 70:15, 72:13, 132:9, 219:2
**JOSHUA** [1] - 1:13
**Joshua** [1] - 4:10
**Journal** [5] - 17:9, 17:10, 17:11, 146:8
**journal** [1] - 17:19
**journals** [4] - 17:3, 17:7, 17:12, 17:13
**judge** [5] - 164:4, 170:8, 185:19, 187:19, 211:5
**Judge** [1] - 82:18
**JUDGE** [1] - 1:9
**judges** [1] - 83:4
**July** [8] - 91:10, 106:5, 133:17, 133:21, 134:4, 134:13, 213:12, 213:14

June [1] - 68:5
Justice [1] - 84:3

**K**

**keep** [4] - 6:1, 80:10, 94:4, 138:1
**Kennedy** [1] - 142:3
**kept** [1] - 129:4
**key** [3] - 7:13, 87:5, 105:14
**kill** [1] - 180:20
**kind** [18] - 11:23, 24:2, 55:2, 55:15, 60:17, 132:15, 136:3, 159:18, 161:7, 176:9, 176:18, 190:12, 200:12, 201:17, 212:15, 212:16, 213:19
**kinds** [2] - 9:23, 12:16
**knowing** [1] - 144:19
**known** [1] - 153:16
**Krogman** [15] - 7:25, 30:3, 32:16, 33:1, 33:23, 33:24, 34:8, 34:16, 34:21, 34:25, 46:6, 58:22, 59:4, 86:25, 124:17

**L**

**lack** [4] - 10:3, 50:21, 94:22, 202:23
**lacked** [1] - 39:10
**laid** [2] - 32:25, 109:16
**large** [9] - 7:20, 47:1, 47:9, 88:23, 93:9, 93:14, 119:24, 135:13, 136:7
**largely** [2] - 65:14, 87:2
**larger** [2] - 46:14, 214:21
**largest** [2] - 120:5, 152:7
**LaSalle** [1] - 1:14
**last** [13] - 6:5, 15:6, 49:5, 85:18, 100:1, 107:20, 136:24, 137:18, 177:13, 181:7, 207:14, 207:15, 216:22
**lasts** [1] - 56:2
**Law** [4] - 16:6, 17:10, 82:4, 82:17
**law** [12] - 8:12,

17:12, 82:5, 82:9,
82:14, 83:12, 85:19,
85:25, 195:23,
199:12, 204:25, 206:4
**laws** [1] - 216:7
**lawyers** [5] - 11:10,
11:14, 163:5, 216:25,
221:17
**laying** [1] - 196:15
**lead** [7] - 40:8, 78:13,
150:23, 152:7, 205:5,
205:11, 205:15
**leading** [6] - 29:18,
30:21, 39:2, 55:19,
108:7, 118:22
**leads** [1] - 205:6
**learned** [3] - 165:2,
189:23, 221:7
**learning** [5] - 38:12,
88:4, 112:20, 113:4,
177:16
**least** [12] - 30:21,
42:2, 58:12, 85:18,
124:12, 127:23,
131:15, 135:4, 135:6,
161:8, 215:21, 219:1
**leaves** [1] - 109:6
**lecturing** [1] - 83:3
**left** [3] - 44:5,
182:17, 194:16
**Legal** [1] - 17:11
**legal** [7] - 7:14,
82:10, 139:3, 139:7,
139:11, 139:19,
203:15
**lend** [7] - 23:2,
25:11, 31:15, 100:15,
100:17, 126:15, 180:6
**lendable** [3] - 98:12,
98:14, 103:13
**lenders** [1] - 23:2
**lending** [5] - 25:23,
32:5, 95:10, 95:14,
95:20
**lends** [1] - 26:4
**length** [2] - 148:20,
171:9
**lengthy** [3] - 41:20,
171:4, 175:11
**lent** [1] - 32:9
**less** [4] - 25:12, 54:9,
105:24, 196:24
**letter** [13] - 122:2,
122:5, 171:4, 171:9,
171:18, 172:17,
173:6, 175:11,
175:16, 176:6,
176:11, 176:22, 177:9
**level** [26] - 10:19,
16:1, 16:4, 34:4, 34:8,

35:2, 35:18, 38:20,
52:16, 55:10, 56:18,
57:2, 58:23, 62:19,
65:14, 76:22, 96:6,
109:3, 138:20, 152:3,
159:7, 170:2,
170:16, 172:15,
173:7, 173:17
**levels** [3] - 82:20,
102:12, 113:17
**leverage** [2] -
207:12, 207:17
**Lexicon** [2] - 83:14,
83:16
**liability** [2] - 57:11,
213:20
**liaison** [1] - 4:20
**light** [3] - 108:25,
195:5, 210:11
**likelihood** [2] - 54:4,
54:8
**likely** [3] - 6:8, 41:6,
93:6
**limit** [1] - 222:5
**limited** [10] - 23:25,
24:10, 29:4, 38:11,
45:11, 49:8, 68:20,
100:23, 112:8, 123:3
**line** [14] - 47:21,
51:19, 80:14, 96:3,
98:17, 98:18, 104:2,
127:2, 129:4, 129:12,
130:16, 186:19,
192:8, 198:16
**Line** [1] - 182:18
**lines** [3] - 103:23,
172:6, 182:17
**link** [2] - 116:3, 192:9
**linked** [1] - 57:4
**links** [1] - 192:24
**liquidity** [1] - 168:13
**LISA** [2] - 2:1, 223:3
**Lisa** [1] - 223:12
**list** [6] - 41:9, 47:18,
48:6, 49:5, 73:1,
179:8
**listed** [5] - 31:21,
31:23, 40:4, 40:10,
42:18
**listening** [1] - 90:9
**listing** [1] - 40:11
**lists** [1] - 73:5
**literally** [2] - 100:9,
171:18
**literature** [4] - 62:8,
124:20, 138:25,
139:21
**litigate** [2] - 206:18,
206:19
**litigation** [14] -

11:11, 11:14, 11:17,
12:3, 16:6, 16:17,
18:16, 21:10, 33:5,
33:15, 34:7, 162:24,
163:8, 175:18
**LITIGATION** [1] - 1:5
**live** [1] - 151:13
**LLP** [2] - 1:14, 1:22
**loan** [7] - 24:18,
24:19, 25:15, 25:24,
95:13, 157:13, 159:10
**loan-to-value** [2] -
157:13, 159:10
**loaned** [1] - 95:8
**loaning** [2] - 25:16,
25:21
**loans** [1] - 42:1
**locate** [5] - 21:25,
22:4, 26:6, 28:22,
37:2
**look** [95] - 9:13,
28:17, 37:15, 37:19,
43:7, 43:12, 43:14,
46:12, 50:3, 54:17,
55:15, 55:18, 62:21,
65:18, 66:16, 72:24,
73:10, 77:12, 79:14,
79:17, 91:4, 91:25,
92:21, 97:1, 97:23,
98:10, 98:16, 98:21,
99:19, 99:22, 103:23,
105:2, 105:7, 105:16,
105:21, 105:24,
106:17, 108:13,
114:25, 115:23,
115:25, 116:23,
123:18, 124:18,
127:10, 128:9,
128:25, 129:13,
129:22, 130:11,
130:16, 131:18,
133:2, 133:16,
136:23, 139:19,
140:8, 140:11,
140:25, 141:2, 141:3,
141:23, 142:19,
144:11, 145:17,
146:9, 149:4, 154:6,
161:3, 168:3, 168:9,
171:16, 179:17,
180:16, 181:13,
185:25, 188:3,
190:20, 191:24,
192:1, 193:4, 199:3,
200:6, 200:20,
205:13, 210:25,
219:4, 219:9, 219:15,
220:6, 220:12, 220:17
**looked** [20] - 9:14,
10:15, 29:13, 67:18,

68:17, 71:22, 72:6,
96:16, 97:22, 98:20,
106:14, 132:3,
132:21, 140:12,
145:21, 145:24,
182:1, 204:14, 211:5,
211:24
**looking** [31] - 11:23,
36:16, 37:1, 43:2,
44:12, 45:9, 45:23,
46:11, 50:6, 55:6,
55:23, 65:8, 67:7,
75:10, 75:14, 78:11,
78:14, 94:24, 95:18,
110:13, 117:24,
122:18, 126:1, 129:8,
129:14, 130:13,
130:15, 134:19,
168:1, 200:22, 220:19
**looks** [20] - 35:6,
36:10, 39:14, 42:20,
47:8, 47:12, 48:8,
67:10, 67:16, 80:21,
99:14, 106:1, 129:3,
130:4, 130:5, 130:9,
134:20, 139:16,
179:16, 205:10
**Loop** [8] - 72:2, 72:9,
120:17, 120:20,
120:24, 183:25,
185:8, 185:14
**lose** [1] - 187:14
**loses** [4] - 207:18,
208:16, 208:19
**lost** [2] - 8:15, 101:6
**loud** [1] - 166:25
**low** [9] - 47:2, 47:4,
47:5, 115:17, 115:21,
115:24, 116:11,
148:10, 214:15
**low-volatility** [1] -
148:10
**lower** [3] - 24:22,
25:8, 159:10
**luckily** [1] - 171:23
**lunch** [4] - 63:6,
69:7, 69:11, 69:24
**luncheon** [1] - 69:14

---

# M

**M&A** [3] - 158:19,
166:2, 178:5
**ma'am** [2] - 5:6, 5:12
**MADELINE** [1] - 1:21
**Madeline** [1] - 5:4
**magnitude** [2] - 54:5,
54:8
**main** [1] - 185:13

**Maine** [1] - 1:22
**maintain** [1] - 157:16
**major** [2] - 184:24,
185:2
**majority** [9] - 10:21,
47:16, 108:15, 147:5,
152:13, 152:14,
200:23, 218:7
**maker** [2] - 39:15,
39:16, 40:17
**makers** [12] - 7:18,
7:19, 39:14, 39:24,
40:5, 40:8, 40:14,
40:23, 41:5, 123:11,
123:15, 123:20
**management** [4] -
38:2, 47:23, 168:2,
194:7
**manager/CEO** [1] -
152:15
**managers** [1] - 168:7
**manifestations** [1] -
104:25
**manner** [2] - 57:18,
209:22
**March** [22] - 74:12,
79:12, 79:16, 122:7,
128:11, 129:24,
130:11, 130:16,
130:21, 154:4,
158:12, 170:24,
171:7, 172:10,
172:11, 174:17,
177:13, 207:20,
219:11, 219:12
**marched** [1] - 210:15
**margin** [10] - 101:13,
101:23, 103:3, 103:4,
157:14, 158:25,
159:6, 159:7, 159:10,
197:25
**marked** [5] - 51:23,
52:1, 52:5, 172:4,
182:17
**market** [181] - 5:24,
7:15, 7:17, 7:19, 9:11,
10:1, 11:2, 18:1,
18:15, 18:21, 18:25,
19:12, 19:16, 19:22,
19:24, 20:3, 20:16,
20:20, 21:2, 21:5,
24:21, 25:3, 25:5,
25:9, 27:6, 27:21,
29:4, 30:3, 32:19,
32:23, 33:2, 33:5,
33:14, 33:21, 34:6,
34:15, 34:17, 34:22,
35:8, 35:17, 36:1,
36:11, 37:3, 38:22,
39:14, 39:15, 39:16,

39:19, 39:22, 39:24, 40:5, 40:8, 40:13, 40:16, 40:20, 40:21, 40:23, 41:5, 42:2, 42:3, 42:23, 43:24, 44:10, 45:14, 45:18, 46:9, 46:13, 46:15, 46:18, 47:9, 48:24, 49:15, 49:17, 50:10, 50:18, 53:23, 53:25, 55:21, 58:16, 58:19, 59:4, 59:8, 60:7, 61:4, 62:4, 63:13, 63:14, 63:16, 64:6, 64:11, 64:17, 74:4, 78:21, 80:18, 84:11, 84:16, 86:22, 87:3, 87:10, 87:12, 88:12, 88:15, 88:19, 89:1, 89:14, 89:15, 89:16, 89:18, 90:4, 91:2, 91:4, 91:11, 91:14, 91:15, 91:16, 92:15, 92:16, 92:23, 93:2, 94:12, 94:14, 96:23, 104:25, 107:5, 107:18, 107:24, 108:1, 108:9, 108:12, 108:21, 109:4, 109:9, 109:15, 109:18, 109:24, 110:19, 110:24, 111:8, 113:24, 116:6, 117:25, 118:11, 121:5, 123:2, 123:3, 123:11, 123:15, 123:20, 124:19, 124:24, 125:2, 125:13, 125:17, 125:22, 139:4, 142:17, 157:18, 158:17, 165:1, 182:6, 201:8, 201:21, 202:19, 205:7, 210:19, 210:23, 210:25, 211:2, 211:17, 212:3, 212:5, 212:11, 212:19, 212:25, 213:3, 213:6, 220:22

**market's** [1] - 204:2
**marketer** [1] - 153:16
**marketplace** [5] - 29:2, 37:6, 47:11, 100:17, 120:3
**markets** [19] - 16:2, 24:11, 40:7, 40:25, 82:13, 82:23, 83:22, 84:12, 84:17, 87:22, 87:24, 88:2, 88:4, 88:12, 91:1, 91:24, 106:21, 110:10, 121:5

**massive** [1] - 99:2
**master's** [1] - 82:3
**match** [1] - 221:21
**material** [3] - 80:4, 207:16, 208:23
**materials** [3] - 127:13, 127:14, 204:14
**math** [1] - 188:13
**matter** [15] - 5:13, 7:4, 19:25, 20:11, 35:7, 35:21, 37:24, 42:3, 66:2, 115:7, 120:11, 120:12, 136:22, 215:11, 221:24
**matters** [7] - 7:7, 83:21, 196:4, 198:4, 206:5, 218:2, 221:1
**Matthew** [4] - 3:11, 5:24, 14:15, 15:7
**MATTHEW** [1] - 14:20
**maturation** [1] - 25:25
**maturity** [3] - 161:21, 162:3, 174:13
**MBA** [2] - 16:1, 16:4
**MBA-level** [1] - 16:1
**McFADDEN** [1] - 1:9
**mean** [58] - 19:21, 19:22, 21:21, 27:23, 28:5, 28:7, 41:16, 48:21, 55:24, 62:10, 76:11, 92:23, 95:17, 96:3, 96:4, 100:9, 101:6, 102:21, 110:18, 117:15, 118:2, 120:12, 122:9, 123:8, 125:13, 125:17, 125:22, 127:20, 128:6, 129:5, 131:3, 134:19, 137:16, 139:8, 139:19, 142:13, 143:17, 143:19, 144:11, 155:7, 157:19, 160:17, 162:11, 166:9, 168:19, 169:23, 170:12, 176:25, 178:2, 189:22, 194:10, 196:10, 203:6, 212:14, 215:4, 218:14
**meaning** [6] - 8:14, 62:9, 87:21, 163:19, 163:21, 203:17
**meaningful** [3] - 90:5, 100:21, 118:3

**meanings** [1] - 20:21
**means** [15] - 23:6, 27:24, 29:5, 31:10, 38:18, 46:10, 48:7, 49:20, 54:3, 95:19, 116:15, 116:17, 118:11, 163:14, 169:13
**meant** [6] - 139:10, 139:11, 142:23, 143:24, 163:17, 221:8
**measure** [3] - 89:2, 100:15, 126:10
**measures** [1] - 39:13
**measuring** [2] - 88:13, 88:21
**mechanical** [3] - 210:22, 211:11, 211:12
**med** [1] - 152:21
**media** [25] - 38:15, 57:12, 57:17, 58:5, 76:17, 77:14, 78:11, 139:25, 140:2, 140:6, 140:11, 140:17, 140:20, 140:21, 143:8, 143:13, 145:4, 145:10, 145:11, 145:13, 145:14, 146:5, 176:19, 185:15
**meet** [12] - 41:18, 41:22, 57:20, 93:23, 103:4, 113:23, 118:23, 118:25, 197:25, 206:11, 206:21, 206:22
**meets** [2] - 75:1, 195:21
**member** [1] - 206:13
**members** [5] - 82:5, 160:14, 195:25, 196:1, 206:1
**meme** [6] - 60:18, 61:22, 62:14, 62:23, 93:12, 104:7
**memo** [1] - 176:19
**memorized** [4] - 72:25, 73:14, 74:13, 76:17
**memory** [2] - 125:4, 132:8
**mental** [1] - 197:1
**mentioned** [20] - 6:19, 9:20, 17:22, 27:1, 27:4, 31:11, 31:17, 40:23, 41:13, 49:7, 114:25, 128:22, 131:12, 132:9, 133:21, 140:12, 143:5, 157:19,

199:18, 213:22
**merger** [2] - 121:20, 121:24
**mergers** [4] - 16:3, 121:9, 121:11, 136:13
**merit** [1] - 205:21
**meritless** [1] - 210:3
**merits** [1] - 75:24
**message** [4] - 30:22, 30:25, 61:17, 192:1
**messages** [1] - 61:19
**MESSERSCHMIDT** [2] - 1:16, 4:19
**Messerschmidt** [1] - 4:20
**met** [7] - 7:24, 7:25, 71:14, 113:17, 203:9, 211:6, 211:18
**method** [6] - 31:1, 44:2, 86:22, 87:18, 88:3, 112:25
**methodology** [7] - 82:23, 82:25, 112:9, 113:22, 113:24, 148:20, 148:23
**metric** [2] - 43:8, 57:20
**metrics** [1] - 43:13
**microphone** [2] - 71:19, 151:7
**middle** [6] - 26:22, 27:15, 27:17, 66:17, 113:2, 215:5
**midmorning** [1] - 112:25
**might** [15] - 26:5, 35:18, 43:12, 57:4, 63:13, 64:9, 74:3, 77:15, 100:25, 103:10, 123:23, 168:24, 169:1, 169:3
**mile** [2] - 10:10, 10:24
**million** [20] - 23:11, 26:21, 26:23, 27:19, 27:20, 28:8, 28:12, 28:18, 29:6, 31:23, 42:2, 98:11, 98:13, 99:7, 102:4, 102:7, 124:12, 181:10, 181:16
**millions** [1] - 47:22
**MILSTEIN** [1] - 1:16
**mind** [4] - 34:2, 80:11, 133:12, 197:1
**mine** [1] - 172:6
**minimum** [3] - 42:2, 109:3, 140:3
**minor** [1] - 82:3

**minority** [1] - 152:11
**minute** [2] - 5:14, 27:4
**minutes** [11] - 6:7, 7:4, 44:5, 54:24, 63:5, 114:3, 146:20, 150:16, 195:4, 195:11, 195:15
**misidentification** [1] - 76:8
**misinterpreted** [1] - 218:18
**misleading** [3] - 96:18, 126:14, 212:17
**misreported** [1] - 75:17
**misreporting** [2] - 75:21, 76:15
**misreportings** [1] - 78:7
**misrepresentation** [6] - 8:8, 9:22, 56:15, 72:5, 145:1, 218:9
**misrepresentations** [18] - 8:24, 10:16, 49:22, 50:5, 57:10, 59:23, 90:6, 90:8, 134:24, 135:1, 145:1, 147:15, 200:2, 202:8, 203:14, 203:17, 214:22, 218:3
**missed** [1] - 9:8
**missing** [1] - 151:24
**misstatement** [4] - 213:1, 213:2, 213:8, 213:16
**misstatements** [1] - 203:20
**mistake** [2] - 129:16, 130:18
**misunderstanding** [2] - 130:10, 134:19
**modern** [1] - 40:25
**moment** [19] - 14:19, 81:14, 95:22, 106:15, 150:14, 150:25, 157:11, 158:18, 160:7, 161:15, 169:24, 172:16, 173:16, 176:14, 176:22, 184:10, 186:25, 194:17, 213:23
**money** [10] - 25:15, 47:21, 101:7, 122:17, 197:10, 197:12, 206:7, 207:18, 207:19, 208:16
**Mongol** [1] - 163:14
**Mongols** [1] - 163:23

**monitor** [1] - 47:23
**monitoring** [1] - 47:25
**month** [6] - 25:4, 53:4, 95:6, 99:7, 177:9, 177:18
**months** [6] - 28:2, 54:7, 55:19, 110:22, 124:14, 194:8
**moon** [7] - 158:6, 179:13, 183:22, 185:12, 207:11, 216:8, 220:3
**moreover** [1] - 40:13
**morning** [29] - 4:6, 4:9, 4:10, 4:12, 4:13, 4:15, 4:16, 4:18, 4:19, 4:21, 4:22, 4:25, 5:1, 5:3, 5:4, 5:6, 5:7, 5:9, 5:10, 5:12, 14:14, 14:21, 14:22, 15:5, 52:2, 63:10, 74:4, 105:11, 193:6
**most** [16] - 6:7, 7:24, 11:6, 43:9, 82:12, 100:21, 122:24, 122:25, 153:14, 153:15, 162:18, 197:2, 201:9, 212:2, 217:2, 218:1
**motion** [2] - 218:10, 218:16
**motions** [1] - 221:18
**motivated** [1] - 196:4
**motivation** [1] - 221:3
**motive** [1] - 195:24
**mouth** [1] - 151:7
**move** [25] - 19:11, 27:1, 36:6, 39:12, 50:7, 56:6, 71:18, 80:17, 92:17, 92:18, 121:8, 122:20, 125:8, 132:14, 133:13, 134:21, 139:23, 146:18, 149:8, 151:17, 158:17, 162:16, 183:7, 198:13, 210:7
**moved** [2] - 31:2, 54:15
**movement** [28] - 48:23, 53:11, 54:8, 55:12, 57:8, 90:11, 90:13, 90:17, 91:15, 91:20, 92:12, 92:24, 93:7, 94:10, 104:6, 105:22, 106:8, 106:9, 106:14, 106:17, 106:19, 107:8,

116:18, 116:19, 116:20, 148:13, 216:13, 216:16
**movements** [36] - 48:24, 53:25, 54:10, 65:2, 65:10, 88:15, 89:10, 89:12, 90:8, 93:6, 105:3, 105:7, 106:23, 108:5, 108:7, 116:2, 116:3, 116:23, 117:5, 117:9, 117:14, 117:16, 117:19, 118:7, 118:22, 132:17, 136:4, 147:19, 147:25, 149:16, 149:17, 214:1, 214:7, 214:11, 214:17, 214:21
**moves** [5] - 57:4, 92:17, 101:14, 115:23, 115:24
**moving** [1] - 185:4
**MR** [175] - 4:6, 4:10, 4:13, 4:16, 4:19, 4:22, 5:1, 5:7, 5:17, 6:15, 6:25, 7:5, 7:10, 9:2, 9:7, 12:1, 12:19, 12:22, 12:25, 13:17, 13:18, 13:22, 14:4, 14:12, 14:14, 14:22, 15:1, 15:4, 15:14, 15:16, 19:10, 19:14, 19:19, 19:20, 22:6, 22:8, 26:11, 26:12, 29:9, 36:6, 36:8, 37:20, 37:22, 44:7, 44:9, 46:4, 46:5, 51:14, 51:15, 53:5, 53:16, 53:17, 56:6, 56:7, 60:14, 63:7, 63:9, 65:19, 65:21, 65:22, 65:24, 69:8, 69:13, 69:22, 69:23, 71:21, 80:25, 81:4, 81:11, 81:22, 84:10, 84:14, 84:19, 84:20, 84:24, 85:2, 85:8, 85:12, 85:14, 85:17, 85:18, 85:21, 89:24, 96:10, 96:12, 97:24, 98:1, 99:19, 99:21, 103:19, 103:20, 114:4, 117:22, 119:2, 119:8, 119:12, 126:22, 126:23, 133:25, 134:2, 146:21, 146:24, 149:24, 150:3, 150:11, 150:15, 150:18, 150:22, 151:10, 152:2,

154:12, 156:22, 159:23, 162:6, 163:25, 164:3, 164:7, 164:10, 166:8, 167:11, 171:21, 172:1, 172:3, 172:7, 178:8, 178:10, 182:9, 182:11, 182:12, 183:10, 183:12, 183:15, 183:20, 185:7, 186:1, 186:3, 189:11, 189:13, 190:13, 190:19, 194:18, 195:3, 195:5, 195:15, 195:18, 196:12, 196:17, 198:18, 201:19, 202:5, 204:9, 204:12, 204:16, 204:20, 204:24, 206:9, 207:1, 207:23, 208:1, 209:4, 210:8, 212:22, 213:6, 213:21, 214:24, 215:9, 216:21, 216:24, 220:5, 221:16, 222:1, 222:4, 222:7, 222:9, 222:10
**MS** [6] - 5:4, 5:10, 5:19, 5:21, 6:6, 6:13
**MSNBC** [3] - 75:17, 78:6, 78:20
**multiple** [4] - 19:8, 38:23, 39:5, 83:21
**multiply** [1] - 181:17
**must** [3] - 25:25, 99:15, 202:7
**mutual** [1] - 52:18

# N

**naked** [10] - 173:12, 173:15, 173:19, 174:3, 174:9, 207:7, 208:13, 208:18, 208:21, 208:25
**name** [6] - 12:20, 15:5, 15:6, 17:7, 83:14, 151:11
**named** [2] - 83:15, 86:12
**namely** [1] - 95:7
**names** [1] - 12:21
**naming** [1] - 191:5
**NASDAQ** [2] - 40:11, 126:6
**National** [1] - 84:5
**nature** [3] - 20:24, 106:1, 152:16
**near** [2] - 31:21, 139:5

**nearly** [1] - 29:10
**necessarily** [9] - 25:18, 27:23, 110:18, 121:15, 125:13, 125:18, 125:22, 143:19, 144:2
**need** [13] - 6:10, 43:12, 118:14, 118:17, 137:2, 146:21, 157:14, 167:8, 185:6, 199:10, 212:14, 212:21, 212:22
**needed** [1] - 153:20
**needle** [1] - 80:17
**needs** [1] - 12:4
**negotiations** [1] - 16:18
**net** [5] - 12:7, 12:8, 175:9, 184:9, 197:15
**never** [8] - 12:7, 12:8, 12:11, 111:24, 133:12, 138:3, 144:17, 167:17
**New** [4] - 1:17, 84:4, 191:5, 199:2
**new** [69] - 11:21, 20:2, 42:20, 43:4, 65:2, 65:5, 65:10, 66:10, 66:20, 66:25, 67:11, 68:13, 70:22, 70:25, 71:3, 71:10, 71:14, 73:16, 75:11, 75:22, 76:16, 79:23, 79:25, 80:6, 80:8, 80:11, 80:17, 80:22, 88:1, 91:18, 92:13, 96:8, 99:2, 102:10, 102:15, 103:17, 104:3, 104:4, 106:11, 106:23, 107:4, 107:7, 107:12, 111:3, 111:6, 111:23, 112:6, 116:3, 116:20, 117:16, 118:6, 118:10, 137:10, 138:17, 141:24, 148:14, 175:4, 187:1, 188:4, 189:15, 192:15, 207:6, 207:7, 208:7, 209:8, 215:16, 216:1, 216:2, 216:10
**news** [100] - 10:17, 30:25, 39:10, 43:19, 43:20, 43:21, 44:3, 44:15, 45:8, 45:10, 67:18, 67:21, 68:3, 68:13, 68:17, 68:19, 69:3, 70:5, 70:9, 70:11, 70:15, 71:1,

71:3, 71:4, 71:7, 71:10, 71:14, 71:22, 72:12, 72:19, 72:22, 73:8, 73:17, 73:23, 75:2, 75:11, 76:6, 76:9, 76:18, 77:2, 77:3, 77:17, 77:23, 78:1, 78:6, 78:7, 78:9, 78:14, 78:15, 78:16, 78:19, 78:20, 78:23, 78:24, 79:3, 79:22, 79:23, 80:23, 110:1, 110:2, 110:13, 111:20, 111:22, 111:24, 111:25, 112:3, 112:9, 112:10, 112:13, 112:17, 112:23, 113:1, 113:7, 113:8, 113:9, 132:21, 142:14, 143:5, 143:8, 143:12, 143:16, 145:3, 146:9, 149:16, 201:3, 201:6, 211:24
**news-day** [3] - 110:1, 111:20, 111:24
**next** [22] - 36:6, 46:19, 47:6, 47:18, 48:6, 53:16, 73:23, 76:4, 78:24, 91:25, 101:1, 101:4, 137:21, 157:6, 157:25, 159:5, 162:7, 180:25, 181:3, 187:1, 193:13, 197:17
**nice** [1] - 119:14
**night** [1] - 83:17
**no-news** [7] - 45:8, 67:18, 68:19, 70:9, 70:11, 71:1, 71:7
**no-news-day** [2] - 110:2, 111:20
**non** [6] - 111:24, 111:25, 112:3, 112:10, 112:13, 112:17
**non-news** [4] - 111:25, 112:3, 112:10, 112:13
**non-news-day** [2] - 111:24, 112:17
**none** [5] - 71:13, 72:15, 108:17, 110:2, 211:11
**nonetheless** [1] - 25:11
**nonpublic** [1] - 62:9
**normal** [2] - 52:10, 52:13
**Northwest** [3] - 1:17, 2:3, 223:14
**Northwestern** [2] -

82:8, 83:10
**note** [1] - 53:20
**noted** [2] - 30:20,
32:2
**notes** [1] - 223:5
**nothing** [12] - 60:15,
81:5, 113:16, 142:21,
149:15, 190:13,
194:9, 215:17,
218:16, 219:20, 222:1
**notification** [1] -
42:7
**Notre** [1] - 16:5
**notwithstanding** [1]
- 109:19
**November** [9] -
131:13, 131:19,
131:22, 131:23,
132:10, 132:22,
135:20, 136:1, 137:14
**now-Judge** [1] -
82:18
**number** [20] - 7:20,
23:1, 23:6, 23:7, 95:7,
95:9, 95:16, 97:19,
97:20, 98:21, 99:18,
126:1, 126:11, 129:9,
156:1, 190:2, 204:13,
204:21, 207:3
**numbers** [1] - 100:19

## O

**oath** [1] - 69:20
**object** [1] - 183:15
**objection** [6] - 13:16,
19:13, 19:14, 19:15,
84:13, 84:14
**objective** [24] -
29:20, 31:5, 43:8,
44:21, 57:20, 68:24,
69:2, 70:18, 76:20,
77:3, 77:11, 78:23,
94:19, 95:1, 108:13,
111:21, 112:1, 112:9,
112:12, 112:22,
112:25, 198:19,
202:10, 213:12
**obligations** [2] -
93:24, 94:2
**obliged** [1] - 182:6
**observe** [8] - 30:19,
35:14, 36:2, 40:1,
54:5, 56:13, 56:24,
92:14
**observed** [6] - 30:4,
32:10, 38:21, 56:14,
68:11, 104:9
**observing** [3] -

30:25, 35:14, 54:8
**obviously** [12] - 13:6,
13:9, 28:11, 38:24,
91:15, 128:14,
173:10, 186:6, 189:1,
204:25, 205:21, 206:3
**occasion** [1] - 161:8
**occasions** [1] -
161:19
**occurred** [10] -
96:24, 102:12,
104:11, 106:4,
106:24, 138:17,
159:6, 189:4, 217:25
**occurring** [1] -
191:19
**October** [3] - 106:3,
106:4, 106:5
**odds** [1] - 209:24
**OF** [2] - 1:1, 1:8
**offer** [2] - 84:10,
165:20
**offered** [1] - 211:20
**offering** [2] - 42:14,
180:5
**office** [1] - 16:17
**Official** [1] - 2:1
**official** [4] - 38:19,
38:20, 39:16, 223:12
**offloaded** [1] -
156:24
**offset** [1] - 159:1
**often** [5] - 20:22,
61:18, 147:13, 163:5,
163:7
**old** [1] - 105:17
**Olympics** [2] -
151:24, 221:20
**OMAR** [1] - 1:12
**Omar** [1] - 4:6
**once** [8] - 19:5, 19:7,
107:3, 149:16, 154:8,
156:23, 168:6, 202:10
**one** [120] - 7:9, 8:9,
9:4, 10:4, 13:4, 13:22,
14:4, 14:7, 20:20,
24:9, 24:13, 27:4,
28:6, 28:19, 29:23,
30:20, 32:2, 32:3,
34:12, 37:16, 38:4,
38:24, 39:4, 42:5,
43:1, 45:4, 46:9, 51:5,
52:12, 52:19, 52:20,
52:22, 58:12, 61:8,
63:21, 65:20, 67:13,
67:15, 68:22, 75:1,
78:1, 78:14, 82:23,
85:10, 85:20, 86:9,
87:6, 88:18, 92:2,
95:22, 96:16, 98:6,

99:4, 100:1, 100:12,
105:18, 108:25,
109:17, 109:22,
110:11, 110:17,
110:24, 111:18,
111:23, 116:25,
117:3, 120:5, 121:15,
122:1, 122:12,
123:11, 123:12,
124:9, 124:24,
126:16, 127:1, 127:5,
127:6, 131:1, 132:1,
133:10, 135:11,
138:8, 139:7, 141:5,
141:8, 143:4, 143:20,
146:9, 147:16, 149:7,
149:8, 154:10, 161:1,
161:8, 163:12,
168:24, 169:18,
174:12, 175:2, 175:7,
175:20, 176:15,
179:7, 181:3, 181:11,
186:8, 186:12,
186:13, 189:8,
197:19, 198:15,
198:18, 198:25,
201:24, 211:21, 217:6
**one-for-one** [1] -
135:11
**one-week** [2] - 45:4,
68:22
**ones** [4] - 61:22,
79:24, 141:4, 152:20
**ongoing** [1] - 175:5
**online** [5] - 95:7,
142:8, 145:25,
146:14, 218:13
**open** [3] - 25:5, 37:3,
64:13
**opened** [6] - 54:18,
121:5, 121:6, 189:15,
200:10, 202:11
**Opening** [1] - 3:3
**opening** [15] - 7:9,
15:9, 30:20, 44:21,
46:1, 50:15, 51:19,
51:23, 73:2, 109:11,
109:14, 109:16,
109:18, 110:6, 114:15
**operate** [2] - 97:12,
97:16
**operation** [7] -
84:12, 84:17, 160:6,
189:3, 189:4, 189:9,
189:19
**operations** [1] -
154:4
**opine** [1] - 50:21
**opined** [1] - 147:24
**opining** [3] - 23:22,

63:18, 77:8
**opinion** [45] - 9:14,
22:9, 22:11, 22:12,
22:13, 29:10, 29:25,
31:20, 31:25, 45:14,
57:7, 58:14, 58:18,
58:21, 58:25, 59:3,
59:10, 59:14, 59:15,
59:17, 59:21, 59:24,
60:1, 60:4, 60:5, 60:7,
60:11, 60:12, 63:24,
73:21, 87:11, 90:16,
90:19, 90:21, 112:7,
112:17, 115:9, 118:3,
124:9, 140:3, 140:7,
143:20, 148:9,
148:18, 218:7
**Opinion** [1] - 86:10
**opinions** [7] - 18:25,
57:21, 58:14, 59:16,
60:1, 64:3, 86:10
**opportunities** [2] -
178:5, 188:17
**opportunity** [7] -
53:12, 66:19, 152:25,
170:13, 183:18,
188:20, 197:17
**opposed** [3] - 102:7,
116:11, 147:21
**opposing** [3] - 85:9,
164:8, 204:18
**opposite** [5] - 110:7,
113:23, 117:13,
170:13, 206:15
**opposition** [1] -
218:10
**option** [14] - 27:8,
156:2, 156:13,
156:15, 156:23,
161:20, 161:22,
180:22, 181:3,
186:12, 186:21, 188:9
**options** [53] - 9:25,
12:9, 18:13, 24:11,
27:6, 27:9, 27:13,
29:3, 39:10, 49:6,
49:9, 60:8, 60:12,
75:6, 75:22, 76:16,
97:3, 122:3, 125:16,
154:20, 156:14,
156:20, 160:25,
161:3, 161:7, 161:11,
169:1, 169:3, 169:5,
170:1, 170:3, 172:13,
172:21, 173:5, 173:9,
174:1, 174:6, 174:13,
174:23, 177:25,
180:25, 181:7, 187:4,
187:10, 187:12,
187:18, 187:24,

187:25, 188:7, 197:7,
197:9, 198:6, 208:20
**Options** [1] - 27:2
**orally** [1] - 167:9
**orchestrated** [1] -
105:13
**order** [11] - 41:6,
70:10, 75:8, 93:16,
93:23, 94:5, 101:12,
113:24, 117:4, 186:7,
218:15
**orient** [1] - 70:4
**original** [8] - 70:2,
70:20, 71:15, 78:5,
112:4, 113:17, 115:3,
148:7
**originally** [3] - 83:13,
112:18, 151:15
**ostensibly** [1] -
196:15
**otherwise** [3] -
51:20, 162:10, 175:23
**ourselves** [1] - 70:4
**outside** [4] - 47:13,
67:22, 68:17, 211:24
**outstanding** [2] -
35:24, 97:21
**over-the-counter** [1]
- 40:7
**overall** [9] - 53:23,
53:25, 91:13, 91:16,
91:17, 128:12,
129:23, 157:16, 202:2
**overextended** [1] -
159:18
**overlap** [2] - 20:8,
20:19
**overlapped** [1] -
202:17
**overlaps** [2] - 131:1,
147:15
**overlay** [1] - 82:9
**overreacting** [1] -
48:11
**overturn** [1] - 37:14
**overview** [3] - 11:24,
59:25, 86:16
**overwhelmingly** [1] -
208:4
**own** [17] - 24:16,
24:17, 25:19, 53:12,
53:18, 61:2, 66:8,
80:7, 111:2, 155:23,
157:13, 199:24,
200:17, 201:12,
205:15, 208:18,
221:20
**owned** [5] - 47:9,
47:12, 48:4, 75:6,
157:11

**ownership** [2] - 47:18, 48:2
**owns** [5] - 157:20, 207:2, 207:5, 207:9

**P**

**P-Value** [1] - 54:1
**p.m** [2] - 55:21, 188:23
**pace** [1] - 44:7
**package** [1] - 38:2
**page** [3] - 5:15, 129:17, 222:5
**Page** [10] - 3:3, 3:4, 3:5, 3:6, 66:5, 128:22, 129:11, 182:17, 191:23, 191:24
**pages** [1] - 222:6
**Pages** [1] - 127:7
**paid** [1] - 39:19
**papers** [1] - 7:11
**Paragraph** [10] - 22:19, 26:14, 53:6, 65:18, 66:5, 66:17, 67:5, 70:16, 77:21, 77:22
**paragraph** [1] - 66:18
**parallel** [1] - 83:5
**parameter** [1] - 168:16
**parameters** [5] - 114:14, 135:19, 167:25, 200:9, 200:17
**parentheses** [1] - 192:9
**Paris** [2] - 151:16, 151:22
**part** [13] - 45:5, 75:11, 79:7, 86:20, 133:4, 133:6, 137:16, 153:18, 159:21, 160:16, 168:8, 172:5, 197:21
**partial** [1] - 137:19
**participant** [1] - 142:18
**participate** [2] - 11:16, 162:21
**participating** [1] - 191:9
**particular** [9] - 18:9, 63:12, 64:6, 89:1, 97:9, 99:6, 116:17, 137:3, 137:4
**particularly** [8] - 86:23, 87:20, 88:5, 103:15, 105:25,

106:10, 110:19, 110:20
**parties** [2] - 6:9, 85:25
**Partners** [2] - 23:16, 23:17
**parts** [1] - 129:20
**party** [3] - 13:7, 156:18, 156:19
**pass** [2] - 7:3, 60:16
**pattern** [4] - 92:7, 92:10, 104:8, 104:19
**paved** [1] - 177:19
**pay** [5] - 24:18, 46:25, 101:12, 103:4, 170:11
**paying** [1] - 35:11
**payments** [1] - 25:16
**peers** [1] - 34:7
**Pengcheng** [1] - 4:2
**people** [27] - 12:14, 21:22, 25:9, 25:12, 30:22, 34:14, 37:5, 39:21, 61:18, 63:2, 140:9, 142:8, 142:11, 145:9, 158:13, 165:22, 168:4, 168:8, 185:16, 201:9, 201:12, 215:4, 217:18, 219:22, 219:24, 221:5
**people's** [1] - 37:13
**per** [3] - 24:24, 25:5, 25:7
**percent** [70] - 10:19, 28:24, 29:17, 31:16, 31:18, 31:21, 31:22, 32:13, 35:24, 47:16, 48:4, 52:8, 52:9, 52:19, 52:20, 53:7, 53:9, 53:21, 53:24, 54:9, 56:16, 56:17, 56:25, 57:2, 68:15, 91:12, 92:8, 92:9, 92:10, 95:12, 95:16, 96:6, 100:6, 100:8, 100:12, 101:9, 105:23, 127:24, 127:25, 128:8, 130:12, 134:11, 134:13, 134:14, 134:15, 134:16, 134:18, 134:20, 134:22, 135:4, 135:7, 137:8, 137:23, 138:9, 139:5, 141:13, 161:25, 162:1, 166:22, 167:2, 167:22, 175:8, 175:10, 176:3,

203:21, 220:7, 220:9, 220:13
**percentage** [4] - 28:13, 126:2, 126:12
**perfect** [4] - 85:17, 87:6, 196:2, 218:6
**perform** [1] - 148:19
**performance** [4] - 121:14, 121:22, 122:17, 218:12
**performances** [1] - 153:12
**perhaps** [1] - 52:2
**period** [230] - 22:13, 22:16, 23:10, 26:16, 26:19, 27:12, 29:12, 29:18, 30:1, 30:5, 30:7, 30:22, 31:19, 32:14, 36:5, 38:21, 38:23, 38:24, 39:4, 40:14, 40:17, 45:5, 45:8, 45:12, 45:16, 45:24, 48:5, 53:4, 57:5, 58:2, 58:16, 58:20, 60:9, 60:13, 63:17, 63:18, 63:19, 63:25, 64:2, 64:3, 64:18, 64:20, 67:22, 68:1, 68:8, 68:9, 68:18, 68:22, 73:12, 76:2, 77:2, 77:9, 87:4, 87:8, 87:13, 91:5, 91:9, 91:10, 91:13, 91:20, 92:4, 92:5, 92:18, 92:19, 92:24, 92:25, 94:12, 94:23, 96:6, 98:9, 99:9, 99:23, 99:24, 100:22, 100:23, 101:6, 103:16, 103:25, 104:14, 104:15, 104:16, 105:3, 105:14, 105:24, 106:14, 107:19, 108:6, 108:8, 108:12, 109:3, 109:7, 109:19, 109:24, 110:3, 110:5, 110:12, 110:14, 110:18, 110:19, 110:21, 110:22, 110:25, 111:9, 111:11, 111:14, 111:15, 111:18, 112:2, 112:8, 112:19, 112:24, 113:11, 113:14, 113:20, 113:21, 113:25, 114:1, 115:9, 115:11, 115:16, 115:17, 115:18, 115:19,

115:21, 115:22, 115:24, 116:10, 116:11, 116:24, 117:1, 117:2, 117:4, 117:6, 117:10, 118:22, 118:23, 120:21, 120:23, 121:4, 122:10, 123:1, 123:3, 123:7, 125:3, 127:22, 128:19, 130:6, 130:21, 131:4, 131:9, 134:21, 135:2, 135:7, 135:23, 136:5, 137:13, 138:19, 141:4, 141:5, 141:25, 147:11, 148:8, 148:10, 148:11, 155:19, 156:4, 161:4, 161:9, 164:14, 171:1, 175:23, 176:10, 190:4, 190:10, 196:7, 196:10, 196:11, 196:18, 198:22, 199:3, 199:4, 199:6, 200:5, 201:23, 201:25, 202:1, 202:14, 202:15, 202:16, 202:23, 205:7, 205:25, 206:25, 207:7, 207:18, 207:24, 208:1, 208:3, 208:14, 211:23, 211:24, 211:25, 212:6, 212:7, 212:10, 212:12, 214:2, 214:5, 214:7, 214:15, 214:17, 214:19, 219:10, 220:17, 220:19, 221:22
**periods** [7] - 64:4, 110:19, 110:21, 116:25, 117:7, 147:10, 147:16
**permanent** [1] - 102:15
**permission** [4] - 14:2, 84:24, 85:4, 89:22
**person** [4] - 24:23, 25:6, 39:18
**person-to-person** [1] - 39:18
**personally** [1] - 167:17
**persons** [2] - 57:23, 58:1
**perspective** [2] - 193:5, 199:4
**pertain** [2] - 20:22,

102:4
**pessimism** [1] - 218:11
**pessimistic** [1] - 61:23
**Ph.D** [4] - 3:11, 14:20, 15:20, 15:21
**phenomena** [1] - 104:22
**phenomenon** [1] - 96:1
**phone** [3] - 176:16, 191:5, 191:15
**phones** [1] - 179:8
**phrase** [2] - 20:20, 21:22
**pick** [2] - 28:16, 44:7
**picked** [1] - 144:22
**picture** [2] - 32:8, 215:20
**pictures** [3] - 175:22, 176:8, 178:23
**pieces** [1] - 9:14
**place** [4] - 37:10, 53:22, 118:16, 191:11
**placed** [1] - 160:15
**places** [1] - 132:1
**PLAINTIFF** [4] - 1:12, 3:10, 14:20, 151:3
**Plaintiff** [17] - 4:5, 4:7, 4:14, 4:17, 4:20, 5:21, 11:7, 12:5, 86:12, 150:23, 152:7, 205:5, 205:11, 205:12, 206:20, 221:25, 222:1
**plaintiff** [3] - 11:8, 11:13, 11:15
**Plaintiff's** [6] - 57:11, 77:4, 204:25, 205:14, 205:15, 210:15
**plaintiff's** [1] - 44:20
**Plaintiffs** [5] - 4:11, 5:16, 59:19, 204:3, 211:18
**plan** [3] - 149:11, 153:9, 196:16
**platforms** [3] - 38:16, 145:10, 145:11
**play** [1] - 221:6
**playing** [1] - 170:5
**pleading** [1] - 205:2
**pled** [3] - 217:1, 217:2, 221:4
**plummeted** [2] - 134:7, 220:13
**plummeting** [2] - 133:18, 138:9
**plummets** [1] -

137:13
  **plus** [1] - 113:14
  **podium** [1] - 5:20
  **point** [28] - 9:7, 12:2, 22:6, 25:2, 36:19, 63:12, 63:21, 63:22, 65:8, 67:4, 89:1, 93:18, 93:19, 94:16, 100:4, 117:17, 117:18, 122:9, 133:19, 134:18, 137:16, 193:8, 197:11, 197:24, 200:13, 201:25, 217:24, 220:2
  **pointed** [4] - 77:4, 100:4, 196:24, 215:14
  **points** [2] - 63:13, 131:16
  **policy** [1] - 12:13
  **PolyMedica** [5] - 117:24, 119:5, 210:9, 210:11, 210:14
  **POMERANTZ** [1] - 1:14
  **poor** [2] - 122:16, 153:12
  **poorly** [1] - 159:13
  **popped** [1] - 192:7
  **portfolio** [10] - 12:16, 157:12, 157:16, 157:19, 159:4, 159:9, 161:24, 162:4, 186:24, 197:14
  **portion** [2] - 64:1, 125:9
  **position** [24] - 30:4, 94:5, 119:25, 168:22, 169:7, 169:16, 169:25, 170:4, 173:14, 173:15, 173:19, 179:24, 180:2, 180:12, 181:23, 184:5, 184:6, 184:12, 189:22, 208:16, 208:21, 208:22, 209:12, 215:17
  **positions** [28] - 12:8, 28:2, 30:10, 30:11, 36:25, 37:2, 37:4, 37:8, 93:22, 94:2, 155:14, 157:12, 159:1, 173:12, 179:22, 182:5, 187:1, 189:15, 207:2, 207:6, 207:7, 207:10, 207:12, 207:17, 208:8, 208:11, 209:8, 217:8

**positive** [3] - 179:14, 208:5, 218:15
  **possession** [1] - 148:6
  **possibility** [1] - 55:22
  **possible** [7] - 44:22, 63:15, 63:23, 68:24, 145:14, 177:23, 178:23
  **possibly** [2] - 60:19, 177:15
  **post** [6] - 38:17, 63:2, 101:22, 103:5, 158:7, 221:22
  **post-period** [1] - 221:22
  **posted** [1] - 158:6
  **posting** [3] - 30:22, 34:14, 61:18
  **posts** [4] - 57:12, 57:17, 58:9, 58:12
  **potential** [4] - 45:10, 66:19, 101:17, 153:4
  **potentially** [9] - 37:6, 42:17, 80:10, 80:11, 103:13, 107:12, 120:2, 158:9, 165:11
  **power** [1] - 48:19
  **practicalities** [1] - 103:9
  **practice** [1] - 83:20
  **pre** [1] - 138:20
  **pre-short** [1] - 138:20
  **PREBIL** [2] - 1:21, 5:4
  **Prebil** [1] - 5:5
  **precedence** [2] - 139:11, 201:7
  **precise** [1] - 180:15
  **predate** [3] - 110:13, 211:25, 212:25
  **predicate** [2] - 88:19, 89:17
  **predict** [4] - 24:5, 48:8, 115:12, 116:10
  **predicted** [1] - 115:13
  **predicting** [2] - 22:3, 27:21
  **prediction** [1] - 6:23
  **predictions** [1] - 6:21
  **predictive** [1] - 48:19
  **predominance** [1] - 205:6
  **prefer** [2] - 13:10, 195:6
  **preference** [1] -

195:2
  **preliminary** [2] - 13:22, 14:4
  **premise** [3] - 37:15, 113:7, 212:9
  **premised** [2] - 88:11, 88:25
  **premium** [1] - 161:12
  **premiums** [2] - 12:12, 197:10
  **prepare** [1] - 84:21
  **prepared** [6] - 13:23, 15:12, 34:7, 86:5, 88:10, 193:23
  **prerequisite** [2] - 205:9, 205:10
  **prerequisites** [2] - 205:4, 206:10
  **presence** [2] - 34:3, 62:2
  **present** [4] - 5:22, 6:2, 13:9, 13:10
  **presentation** [5] - 14:17, 22:18, 194:5, 194:10, 194:12
  **presented** [3] - 147:21, 158:12, 194:7
  **presenting** [1] - 217:17
  **press** [2] - 38:14, 38:15
  **pressure** [1] - 97:9
  **presumably** [1] - 101:2
  **presumption** [7] - 8:4, 10:8, 40:8, 59:11, 203:5, 203:7, 203:11
  **pretend** [2] - 145:13
  **pretty** [6] - 43:6, 54:15, 54:21, 179:14, 196:8, 202:1
  **prevailing** [1] - 61:4
  **prevented** [1] - 96:23
  **preview** [1] - 9:17
  **previous** [7] - 53:3, 54:16, 75:16, 76:23, 79:24, 87:1, 124:13
  **previously** [3] - 75:7, 96:16, 154:7
  **price** [250] - 8:7, 8:11, 8:14, 8:15, 9:20, 10:4, 10:9, 10:12, 10:14, 10:25, 12:10, 18:9, 22:3, 24:6, 24:14, 24:15, 24:20, 24:22, 24:24, 25:4, 25:8, 25:18, 27:6, 27:22, 42:11, 42:16, 43:15, 45:18, 45:25, 48:24, 49:18, 49:21,

49:22, 49:23, 49:25, 50:3, 50:8, 50:9, 50:14, 50:20, 50:21, 50:23, 51:4, 51:19, 51:23, 52:1, 53:7, 53:9, 54:11, 54:13, 54:17, 54:18, 55:25, 56:4, 56:9, 56:14, 56:15, 56:20, 56:25, 57:4, 58:10, 58:13, 59:12, 59:15, 59:18, 61:13, 61:24, 62:16, 62:20, 62:22, 62:23, 63:3, 64:9, 65:3, 65:5, 65:11, 66:9, 66:25, 67:11, 68:13, 80:8, 80:15, 80:17, 88:14, 88:22, 88:23, 89:10, 89:12, 90:6, 90:8, 90:11, 90:13, 90:17, 90:22, 90:23, 90:24, 91:11, 91:20, 92:5, 92:8, 92:12, 92:17, 92:18, 92:24, 93:6, 93:7, 93:14, 94:9, 94:17, 94:23, 96:7, 97:10, 97:17, 99:22, 101:14, 101:22, 101:24, 102:8, 102:12, 102:13, 102:14, 102:18, 103:16, 104:1, 104:3, 104:6, 104:10, 104:22, 105:2, 105:7, 105:18, 105:22, 106:3, 106:8, 106:9, 106:14, 106:17, 106:19, 106:22, 107:6, 107:8, 107:21, 107:22, 107:25, 108:2, 108:5, 108:7, 114:8, 115:23, 115:24, 116:2, 116:3, 116:18, 116:20, 116:23, 117:5, 117:9, 117:14, 117:16, 117:19, 118:7, 118:21, 127:5, 127:19, 127:21, 128:11, 128:14, 129:23, 131:19, 131:23, 132:17, 132:18, 133:17, 134:6, 135:10, 136:3, 136:22, 137:7, 137:13, 137:15, 137:16, 138:8, 138:18, 141:12, 141:14, 141:18, 141:19, 142:14, 142:18, 146:11,

146:19, 147:19, 147:25, 148:13, 149:15, 149:17, 161:14, 161:23, 162:4, 162:8, 169:11, 170:10, 172:25, 173:1, 173:7, 173:17, 175:14, 184:22, 184:23, 186:25, 188:8, 188:18, 197:20, 197:22, 197:23, 198:8, 199:21, 202:24, 203:1, 203:2, 203:19, 203:22, 203:24, 204:4, 211:22, 212:1, 214:1, 214:7, 214:11, 214:16, 214:21, 215:11, 216:13, 216:16, 218:19, 219:5, 219:10, 219:12, 219:16, 220:7, 220:10, 220:13, 220:16, 220:21, 221:13
  **Price** [1] - 186:16
  **prices** [53] - 8:23, 8:24, 9:19, 9:21, 20:2, 20:5, 42:21, 43:4, 49:11, 50:13, 59:22, 61:4, 87:5, 88:1, 89:3, 93:25, 94:7, 94:13, 96:19, 96:20, 96:24, 97:13, 98:24, 99:3, 99:10, 101:19, 102:20, 102:25, 103:1, 103:2, 103:6, 105:18, 105:23, 107:7, 109:21, 115:12, 115:13, 115:18, 116:10, 118:9, 122:17, 128:4, 128:7, 129:22, 135:16, 139:15, 139:16, 202:2, 218:4
  **pricing** [2] - 30:11, 97:9
  **primarily** [3] - 83:6, 86:9, 86:11
  **principal** [2] - 115:6, 170:21
  **principally** [1] - 82:12
  **principles** [1] - 82:9
  **print** [1] - 179:6
  **private** [3] - 62:9, 62:11, 152:19
  **problem** [5] - 111:18, 111:19, 113:19, 214:14, 214:18

**procedural** [1] - 13:4
**proceed** [1] - 26:10
**Proceedings** [1] -
222:11
**proceedings** [4] -
7:7, 69:15, 150:20,
223:6
**process** [5] - 32:18,
32:24, 153:1, 165:8,
165:19
**produce** [3] - 154:24,
176:5, 179:1
**produced** [4] -
127:13, 175:18,
176:7, 223:6
**professionals** [1] -
39:19
**professor** [3] -
83:10, 88:6, 117:23
**Professor** [80] - 8:1,
9:8, 9:24, 10:22, 13:3,
30:13, 30:16, 31:6,
31:21, 32:1, 32:7,
32:12, 44:24, 45:22,
50:23, 51:11, 51:17,
51:22, 53:6, 56:8,
56:19, 57:3, 57:12,
57:22, 58:4, 58:9,
59:10, 59:16, 70:24,
77:1, 81:11, 81:23,
84:10, 84:15, 84:21,
85:5, 85:24, 91:2,
98:2, 103:18, 107:16,
108:4, 115:16,
119:13, 122:20,
124:2, 126:1, 126:18,
126:24, 128:18,
130:24, 135:25,
136:15, 137:12,
139:13, 140:8,
145:16, 146:18,
146:25, 147:24,
150:4, 198:14,
198:17, 199:13,
200:10, 200:13,
200:20, 201:1,
201:25, 203:22,
211:16, 212:4, 213:6,
213:22, 218:22,
219:18, 219:21,
220:18, 221:19
**professors** [1] -
83:15
**profile** [1] - 215:3
**profit** [3] - 25:7,
217:16, 217:19
**profits** [1] - 25:20
**programs** [1] - 25:23
**progress** [1] - 202:2
**project** [5] - 115:18,

153:6, 158:6, 184:10,
184:11
**projection** [1] -
115:21
**promise** [1] - 25:1
**promising** [1] -
24:18
**proof** [2] - 192:16,
217:4
**proper** [1] - 82:24
**properly** [2] - 215:9,
216:11, 216:18
**property** [1] - 167:22
**proportions** [1] -
96:6
**propose** [1] - 5:25
**proposed** [1] - 5:23
**prospect** [1] - 166:2
**prospects** [1] - 194:7
**prosthesis** [1] -
152:22
**protect** [1] - 170:6
**protects** [1] - 170:9
**protocol** [2] - 13:5,
13:12
**prove** [4] - 203:6,
205:1, 212:2, 212:8
**proved** [1] - 60:2
**provide** [12] - 57:22,
57:25, 58:4, 63:24,
64:3, 85:4, 86:5, 86:7,
86:15, 86:21, 119:25,
120:3
**provided** [6] - 16:12,
45:9, 77:15, 111:2,
177:6, 199:19
**provider** [3] - 23:15,
23:18, 41:13
**provides** [1] - 77:22
**providing** [3] -
17:18, 41:24, 42:6
**proving** [1] - 205:2
**public** [18] - 17:1,
23:24, 29:11, 29:16,
66:20, 87:4, 123:2,
139:14, 143:6,
143:17, 143:21,
143:22, 144:21,
146:7, 152:19,
152:23, 171:3, 218:3
**publication** [2] -
17:17, 17:20
**publications** [1] -
43:25
**publicly** [2] - 79:16,
79:18
**publish** [2] - 85:2,
204:20
**published** [5] - 17:3,
17:8, 39:6, 82:15,

175:17
**pull** [2] - 97:24,
172:4
**pump** [4] - 105:13,
105:14, 105:15
**pump-and-dump** [2]
- 105:13, 105:14
**purchase** [8] - 24:21,
37:1, 41:6, 46:23,
93:20, 93:23, 101:13,
170:14
**purchased** [5] -
75:22, 158:16,
165:12, 165:16,
217:21
**purchases** [5] -
76:16, 155:11,
155:16, 161:1, 197:14
**purchasing** [5] -
24:14, 93:13, 94:4,
94:6, 188:19
**Purdue** [2] - 15:22,
16:2
**purple** [1] - 221:6
**purports** [1] - 50:21
**purpose** [2] - 33:11,
33:15
**purposes** [10] -
20:11, 20:14, 33:5,
35:7, 43:17, 68:3,
73:2, 110:14, 118:2,
139:12
**pursued** [1] - 217:3
**push** [2] - 93:25,
94:7
**pushed** [1] - 64:10
**pushes** [1] - 62:3
**pushing** [4] - 62:16,
99:3, 99:10, 135:16
**put** [45] - 10:17,
15:14, 22:6, 27:7,
46:4, 51:14, 53:16,
56:1, 80:23, 95:23,
96:10, 105:3, 126:20,
126:22, 127:14,
128:23, 161:10,
161:13, 161:16,
161:18, 161:19,
161:20, 161:24,
162:1, 169:3, 169:5,
169:6, 170:3, 170:9,
172:1, 178:8, 179:24,
180:9, 180:22, 181:3,
183:10, 184:8, 186:1,
186:12, 186:19,
189:11, 197:24,
218:1, 218:21
**puts** [2] - 197:7,
197:19
**putting** [4] - 123:5,

137:21, 158:13, 175:2

## Q

**Quantitative** [1] -
17:10
**quantitatively** [1] -
149:3
**quantities** [2] -
162:15, 181:17
**quantity** [1] - 173:4
**quarter** [2] - 43:9,
43:16
**quarterly** [4] - 38:14,
42:8, 43:14, 67:25
**quarters** [2] - 75:16,
76:23
**questioning** [1] -
14:23
**questions** [21] -
13:1, 20:22, 21:1,
21:13, 34:20, 38:1,
70:8, 81:1, 85:25,
86:3, 86:7, 90:2, 91:9,
99:25, 104:12,
117:22, 149:25,
163:13, 164:1,
168:18, 181:6
**quickly** [3] - 41:7,
42:11, 66:9
**quiet** [1] - 169:13
**quite** [5] - 113:22,
119:4, 141:2, 159:12,
163:7
**quote** [3] - 62:7,
67:5, 161:15
**quoted** [2] - 57:23,
58:1
**quotes** [1] - 93:4

## R

**raise** [7] - 41:19,
42:11, 42:13, 51:1,
51:4, 81:16, 151:1
**raised** [1] - 50:24
**rallying** [1] - 208:5
**ran** [2] - 48:16,
200:11
**random** [4] - 54:5,
54:6, 54:10, 116:19
**rate** [28] - 9:15, 9:18,
25:14, 25:21, 31:19,
101:12, 125:25,
126:11, 127:7,
127:18, 127:23,
128:4, 128:8, 128:19,
129:10, 130:2, 130:7,
130:20, 131:20,

131:24, 133:19,
134:7, 134:11,
137:23, 139:5, 201:4,
218:24, 219:5
**rather** [5] - 14:1,
63:3, 100:20, 109:9,
206:19
**ratio** [1] - 95:7
**rational** [1] - 217:21
**ratios** [1] - 168:13
**RC** [1] - 79:5
**RDR** [3] - 2:1, 223:3,
223:12
**RE** [1] - 1:4
**re** [1] - 26:4
**re-call** [1] - 26:4
**reach** [7] - 20:13,
22:9, 22:11, 29:25,
31:18, 57:7, 108:19
**reached** [13] - 28:25,
45:23, 62:19, 79:4,
79:11, 99:12, 114:11,
117:12, 117:15,
141:23, 141:24,
148:12, 213:25
**reaches** [6] - 20:12,
28:24, 38:7, 95:16,
96:5, 128:14
**reaching** [1] - 139:12
**react** [8] - 20:2,
42:21, 43:15, 45:18,
62:22, 64:15, 118:9,
215:4
**reacted** [2] - 189:10,
219:22
**reacting** [7] - 37:17,
62:24, 67:11, 68:13,
145:9, 185:3, 190:11
**reaction** [9] - 45:2,
45:22, 80:8, 80:15,
88:23, 211:21,
211:22, 212:2, 215:11
**reacts** [4] - 44:11,
44:13, 66:25, 118:11
**read** [7] - 11:9,
138:21, 163:9,
175:11, 182:20,
183:16, 183:25
**real** [1] - 101:8
**realize** [3] - 194:1,
209:12, 213:18
**realized** [1] - 194:13
**realizes** [1] - 209:16
**really** [38] - 6:20,
11:8, 11:23, 21:12,
46:13, 55:24, 76:11,
80:17, 87:5, 87:23,
88:6, 88:7, 90:1, 90:5,
96:21, 97:6, 98:24,
98:25, 99:12, 101:15,

101:23, 103:22, 115:9, 118:1, 118:3, 118:24, 139:18, 148:9, 153:19, 196:14, 202:1, 217:7, 218:2, 219:1, 219:5, 219:12, 220:16

**realtime** [1] - 177:16

**reason** [28] - 10:7, 34:2, 39:8, 42:5, 42:10, 79:8, 79:22, 88:16, 93:15, 99:11, 102:6, 105:10, 106:10, 107:8, 112:22, 113:2, 135:11, 143:16, 169:22, 197:20, 197:23, 198:24, 200:9, 213:25, 217:21, 219:18, 220:25

**reasonable** [4] - 106:2, 106:8, 124:15, 125:6

**reasons** [10] - 9:23, 75:1, 78:1, 109:8, 110:6, 111:12, 116:6, 124:23, 140:19, 199:18

**rebooosted** [1] - 193:14

**rebut** [1] - 203:12

**rebuttable** [4] - 8:4, 10:8, 203:5, 203:11

**Rebuttal** [1] - 3:6

**rebuttal** [2] - 50:21, 195:14

**rebutted** [1] - 59:11

**rebutting** [1] - 59:15

**receive** [7] - 15:21, 25:16, 50:20, 155:3, 155:5, 156:15, 210:18

**received** [3] - 31:22, 162:18, 195:6

**recess** [2] - 69:14, 150:19

**recognition** [1] - 102:16

**recognize** [3] - 19:15, 127:1, 154:15

**recognized** [1] - 40:23

**recognizes** [2] - 102:14, 190:24

**recollection** [1] - 193:18

**recommendations** [1] - 17:18

**reconsideration** [1] - 17:21

**record** [9] - 4:5, 15:6, 31:9, 35:22, 41:11, 49:19, 69:17, 151:11, 167:8

**recorded** [1] - 76:22

**records** [1] - 208:8

**red** [1] - 115:25

**Reddit** [5] - 34:14, 163:23, 201:8, 201:15, 219:24

**REDIRECT** [1] - 190:18

**redirect** [4] - 81:3, 150:2, 183:19, 190:17

**Redirect** [1] - 3:9

**reduced** [1] - 175:23

**redundant** [1] - 80:1

**refer** [5] - 21:23, 43:20, 62:8, 85:6, 120:14

**referee** [1] - 17:13

**reference** [3] - 105:11, 131:14, 146:10

**referenced** [1] - 45:21

**referred** [3] - 13:25, 109:9, 126:8

**referring** [2] - 108:23, 122:6

**refers** [1] - 54:4

**reflect** [3] - 61:4, 63:3, 114:22

**reflected** [6] - 49:10, 61:17, 75:21, 79:23, 107:7, 191:20

**reflecting** [1] - 139:16

**reflection** [2] - 77:23, 155:15

**reflections** [1] - 20:6

**reflective** [1] - 212:10

**reflects** [6] - 23:1, 42:5, 46:22, 47:20, 61:14, 61:24

**regarding** [7] - 17:19, 71:4, 76:9, 77:18, 78:2, 79:5, 107:17

**regardless** [5] - 55:2, 61:2, 61:21, 216:10, 220:24

**region** [1] - 158:24

**registration** [3] - 41:19, 41:20, 41:22

**regression** [1] - 48:16

**regulators** [4] - 16:7, 16:13, 83:3

**regulatory** [2] - 84:2, 84:7

**reject** [1] - 116:17

**rejected** [1] - 17:20

**relate** [2] - 50:9, 77:13

**related** [11] - 6:2, 23:18, 50:11, 77:5, 83:3, 102:9, 104:7, 106:3, 116:20, 120:11

**relates** [4] - 65:4, 66:9, 66:25, 87:21

**relating** [5] - 77:23, 82:8, 82:14, 83:21, 90:12

**relation** [4] - 41:15, 57:7, 98:15, 106:7

**relationship** [30] - 8:22, 9:18, 65:1, 65:9, 87:25, 88:14, 88:16, 88:21, 89:3, 89:4, 89:10, 90:7, 97:4, 97:11, 97:14, 98:11, 106:22, 110:3, 118:6, 118:9, 127:18, 127:21, 128:3, 135:12, 156:17, 199:6, 199:20, 220:15

**relationships** [1] - 132:16

**relative** [9] - 21:2, 28:23, 53:3, 55:12, 55:13, 97:2, 97:7, 99:17, 115:24

**relatively** [2] - 94:10, 94:12

**release** [1] - 66:20

**released** [6] - 71:4, 76:9, 77:18, 160:4, 192:10, 216:17

**releases** [7] - 38:14, 112:16, 112:20, 112:23, 113:4, 113:5, 143:15

**relevance** [3] - 86:9, 108:21, 110:2

**relevant** [93] - 21:13, 30:2, 37:10, 38:5, 38:25, 40:20, 40:22, 44:12, 46:12, 46:20, 49:15, 59:2, 61:1, 62:15, 62:21, 64:11, 64:16, 65:5, 66:10, 66:20, 67:3, 67:6, 67:11, 68:14, 73:17, 77:8, 80:9, 80:10, 80:12, 88:1, 89:11, 89:13, 90:16, 90:21, 91:19, 92:13, 93:5, 94:15, 94:18, 94:22,

96:9, 97:5, 97:6, 99:16, 102:10, 103:17, 104:4, 104:23, 106:12, 107:4, 107:12, 112:18, 112:21, 113:3, 113:10, 116:3, 116:21, 117:16, 118:6, 118:10, 119:16, 119:19, 119:25, 121:10, 121:12, 121:20, 122:24, 122:25, 136:4, 136:8, 136:13, 137:10, 138:18, 140:18, 141:25, 143:5, 143:25, 144:7, 144:16, 148:14, 196:18, 196:19, 196:25, 199:15, 200:14, 211:2, 215:16, 215:17, 216:1, 216:2, 216:4, 216:10

**reliable** [3] - 32:11, 57:17, 58:22

**reliance** [4] - 8:4, 10:8, 195:22, 206:16

**relied** [5] - 32:1, 32:7, 127:24, 135:24, 136:20

**rely** [2] - 89:17, 139:11

**relying** [3] - 38:11, 44:22, 205:23

**remain** [6] - 14:18, 59:1, 62:15, 81:13, 150:14, 150:25

**remained** [1] - 137:23

**remaining** [1] - 167:2

**remains** [2] - 64:12, 138:9

**remand** [1] - 211:4

**remember** [20] - 110:4, 120:23, 121:3, 132:9, 132:24, 136:25, 142:3, 156:3, 164:14, 164:15, 170:18, 177:11, 177:13, 177:16, 177:18, 180:11, 181:20, 182:2, 182:13, 183:13

**remembered** [1] - 163:13

**remind** [2] - 12:20, 69:19

**render** [1] - 10:1

**renders** [1] - 9:10

**renewed** [1] - 165:24

**repaid** [2] - 25:8, 25:25

**repayment** [1] - 26:7

**repeat** [3] - 134:6, 143:9, 155:4

**repeated** [1] - 107:2

**repetitive** [1] - 188:21

**rephrase** [7] - 120:18, 123:19, 128:1, 141:18, 143:10, 144:3, 157:5

**replace** [1] - 152:22

**replicable** [1] - 57:19

**replies** [1] - 142:24

**reply** [7] - 10:15, 15:9, 22:19, 56:11, 73:21, 76:7, 77:21

**replying** [2] - 185:14, 185:17

**report** [124] - 10:15, 15:9, 19:25, 22:10, 22:20, 30:13, 30:21, 31:7, 32:23, 35:20, 43:9, 43:19, 43:20, 44:14, 44:21, 46:1, 50:15, 50:21, 50:24, 51:17, 51:21, 53:6, 56:11, 57:13, 59:11, 65:16, 65:18, 65:19, 65:25, 66:2, 66:8, 66:13, 67:17, 67:18, 70:2, 70:16, 70:20, 72:2, 72:9, 72:16, 73:3, 73:12, 73:21, 75:24, 76:7, 77:21, 78:5, 79:9, 85:5, 87:8, 93:3, 95:5, 107:11, 109:11, 109:12, 109:14, 109:16, 109:18, 109:23, 110:6, 111:1, 111:2, 114:15, 115:3, 120:18, 120:20, 120:24, 120:25, 121:2, 124:6, 125:9, 126:7, 126:8, 126:24, 127:2, 127:5, 127:8, 128:23, 128:25, 129:11, 129:20, 131:11, 131:14, 133:5, 135:23, 136:15, 138:2, 138:4, 138:5, 138:10, 138:11, 138:12, 138:13, 138:22, 139:2, 139:22, 140:18, 140:19, 140:22, 141:7,

141:10, 142:13,
143:2, 143:3, 145:12,
146:13, 147:18,
147:21, 147:23,
148:7, 148:21,
149:14, 149:20,
149:22, 149:23,
154:18, 177:23,
183:25, 185:8,
200:20, 211:16,
215:19
   **REPORTED** [1] - 2:1
   **reported** [2] - 28:22,
75:15
   **reporter** [1] - 14:24
   **Reporter** [2] - 2:1,
223:12
   **reporting** [3] - 32:3,
43:14, 76:3
   **reports** [24] - 7:12,
16:25, 19:22, 32:24,
34:6, 34:12, 38:3,
38:8, 38:12, 38:14,
38:19, 38:20, 38:24,
39:3, 39:6, 42:8,
50:19, 77:14, 142:13,
154:19, 168:9,
168:11, 168:15,
198:20
   **reposting** [1] -
142:24
   **reposts** [1] - 145:17
   **represent** [6] - 31:4,
66:19, 127:4, 127:12,
163:6, 217:23
   **representation** [1] -
103:23
   **representations** [1] -
146:1
   **representative** [6] -
4:8, 5:23, 196:1,
210:1, 217:23
   **representatives** [1] -
217:15
   **represented** [2] -
137:4, 196:1
   **represents** [1] - 96:4
   **reputable** [1] - 23:17
   **request** [2] - 154:23,
154:24
   **requested** [1] -
154:23
   **require** [1] - 118:5
   **required** [4] - 42:1,
109:4, 156:18, 203:5
   **requirement** [3] -
117:24, 118:23, 202:7
   **requirements** [7] -
41:18, 41:23, 118:25,
198:1, 206:11,

206:21, 206:22
   **requires** [2] - 118:9,
215:15
   **research** [8] - 17:16,
36:10, 37:25, 38:2,
38:12, 38:17, 39:1,
39:6
   **resell** [1] - 159:21
   **reserve** [4] - 6:18,
13:2, 195:14, 204:9
   **respect** [15] - 12:8,
40:1, 46:16, 47:14,
48:1, 87:17, 110:9,
115:8, 127:24,
145:18, 153:2,
153:13, 198:18,
204:5, 218:12
   **respectable** [1] -
98:7
   **respectfully** [2] -
88:9, 98:25
   **respond** [2] - 50:22,
176:17
   **responded** [2] -
78:16, 120:19
   **responding** [5] -
13:10, 43:4, 45:25,
72:8, 72:11
   **responds** [2] - 65:5,
66:10
   **response** [11] - 45:7,
70:23, 77:1, 120:9,
120:15, 142:12,
148:5, 166:24, 167:7,
208:4, 215:18
   **responses** [2] - 86:5,
86:8
   **responsibilities** [1] -
16:14
   **responsibility** [1] -
10:11
   **responsive** [1] -
104:3
   **rest** [3] - 183:16,
204:9, 219:10
   **restricted** [1] - 68:16
   **restroom** [1] -
150:16
   **result** [4] - 45:20,
111:16, 113:13,
117:16
   **resulted** [1] - 107:25
   **resulting** [2] - 65:2,
65:10
   **results** [3] - 112:13,
121:19, 148:22
   **retail** [13] - 61:6,
61:15, 62:2, 62:6,
62:14, 91:14, 92:9,
153:17, 163:21,

163:22, 201:10,
214:10
   **retards** [1] - 163:16
   **return** [13] - 25:1,
25:5, 26:3, 26:6, 48:8,
48:9, 48:22, 53:20,
54:5, 54:19, 94:3,
94:5, 107:22
   **returned** [1] - 138:20
   **returns** [3] - 48:17,
48:20
   **revealed** [1] - 72:22
   **revenue** [6] - 156:13,
167:14, 170:15,
173:14, 174:4, 180:5,
184:13, 188:19
   **reverse** [2] - 108:2,
186:6
   **review** [8] - 30:13,
57:14, 72:10, 73:10,
73:15, 79:20, 114:20,
175:5
   **reviewed** [5] - 34:6,
73:2, 74:9, 86:3,
162:18
   **reviewing** [1] - 17:16
   **reviews** [1] - 17:12
   **revised** [1] - 148:5
   **revisions** [1] - 17:21
   **rid** [1] - 165:9
   **right-hand** [1] -
115:1
   **rise** [3] - 93:14,
103:3, 135:9
   **risen** [1] - 105:23
   **rises** [1] - 220:8
   **rising** [2] - 97:10,
105:19
   **risk** [2] - 12:13,
101:14
   **risky** [5] - 101:5,
102:22, 175:7,
184:14, 184:18
   **Rob** [1] - 16:20
   **robust** [2] - 42:9,
200:19
   **role** [3] - 41:5, 83:19,
83:22
   **roles** [1] - 82:10
   **rolling** [2] - 115:17,
147:1
   **ROMANOWSKI** [2] -
1:21, 5:10
   **Romanowski** [1] -
5:11
   **room** [1] - 180:1
   **Room** [1] - 2:3
   **rose** [4] - 127:21,
128:7, 128:8, 220:21
   **roughly** [6] - 23:11,

26:20, 26:22, 29:6,
52:9, 130:4
   **round** [1] - 78:13
   **routine** [1] - 88:18
   **row** [1] - 54:7
   **Rule** [4] - 183:16,
205:1, 206:21, 206:22
   **rule** [1] - 13:9
   **rumor** [1] - 192:11
   **rumored** [15] - 9:11,
30:14, 93:7, 104:7,
108:12, 131:6, 131:7,
131:15, 132:3,
132:10, 132:22,
133:3, 201:2, 219:2,
219:3
   **rumors** [10] - 30:17,
30:19, 30:22, 30:23,
30:25, 34:13, 131:12,
220:22, 221:2
   **run** [2] - 25:20,
101:23
   **runs** [1] - 202:14
   **Russe** [1] - 191:5
   **Russia** [1] - 191:14
   **Ryan** [19] - 120:5,
126:16, 138:1, 138:3,
139:24, 140:10,
141:20, 144:25,
146:15, 153:8, 158:5,
158:11, 160:4,
160:17, 165:25,
184:10, 188:24,
209:16, 217:9

---

## S

   **S&P** [4] - 91:14,
92:8, 92:9
   **S-3** [7] - 41:9, 41:10,
41:12, 41:16, 42:3,
124:8, 124:14
   **S3** [25] - 23:16,
23:17, 31:23, 32:10,
41:13, 98:5, 98:6,
98:7, 100:8, 100:11,
105:17, 106:2,
108:13, 108:14,
109:25, 126:5, 126:8,
127:24, 127:25,
132:17, 138:13,
138:24, 139:21,
155:10, 199:24
   **sale** [6] - 161:3,
173:16, 173:20,
192:21, 194:11, 197:5
   **sales** [8] - 25:24,
149:16, 153:12,
155:16, 161:2,

172:13, 172:21, 197:6
   **sample** [1] - 200:6
   **sampled** [1] - 57:16
   **sarcastic** [3] -
215:22, 215:24,
218:11
   **satisfied** [5] - 40:11,
87:3, 123:8, 210:17,
210:24
   **satisfy** [2] - 108:10,
214:13
   **saw** [7] - 30:8, 100:5,
175:17, 178:17,
185:19, 189:25,
197:16
   **scaled** [1] - 99:1
   **Schedule** [3] - 74:6,
74:11, 207:21
   **scheme** [2] - 105:13,
105:14
   **school** [3] - 83:11,
83:12, 151:23
   **School** [3] - 16:6,
82:4, 83:8
   **scientific** [7] - 31:5,
32:11, 51:12, 57:18,
57:20, 58:21, 216:15
   **screen** [9] - 14:8,
22:17, 85:3, 85:22,
95:4, 133:24, 172:8,
179:20, 186:5
   **screens** [1] - 179:6
   **screenshot** [2] -
178:22, 179:3
   **search** [1] - 72:21
   **searches** [1] - 72:17
   **seated** [2] - 81:20,
151:5
   **SEC** [27] - 16:13,
16:15, 16:16, 16:21,
38:13, 41:17, 41:24,
70:15, 74:1, 77:12,
77:13, 78:10, 78:21,
79:25, 80:6, 80:20,
143:15, 143:21,
143:24, 144:14,
144:17, 144:21,
147:19, 147:25,
148:1, 192:10
   **Second** [2] - 199:9
   **second** [9] - 14:6,
111:19, 117:3,
128:25, 186:20,
199:25, 203:3,
213:21, 215:14
   **sections** [1] - 186:17
   **SECURITIES** [1] -
1:4
   **securities** [29] - 16:6,
18:16, 21:9, 33:5,

33:15, 34:7, 39:25, 42:21, 49:11, 49:23, 60:8, 74:19, 74:23, 91:5, 94:20, 107:18, 108:6, 127:6, 128:5, 129:22, 131:19, 141:12, 143:7, 153:25, 157:23, 166:14, 183:5, 212:12, 216:7

**Securities** [4] - 16:10, 41:17, 84:5, 84:6

**security** [2] - 162:8, 162:9

**see** [63] - 26:9, 26:21, 27:11, 29:2, 31:18, 35:11, 37:4, 42:11, 43:15, 46:14, 52:22, 54:7, 61:18, 62:5, 66:22, 75:10, 78:12, 80:23, 99:13, 115:1, 119:13, 119:14, 129:14, 132:13, 133:1, 133:17, 134:5, 135:9, 135:19, 137:12, 140:9, 142:8, 142:11, 142:24, 146:10, 155:6, 156:21, 172:8, 172:11, 173:23, 175:3, 178:16, 179:20, 181:1, 181:3, 181:7, 181:9, 185:25, 186:5, 186:8, 186:9, 186:15, 187:2, 187:3, 188:5, 188:12, 189:10, 192:2, 192:18, 193:11, 197:5, 200:13, 205:10

**seeing** [5] - 43:2, 78:15, 78:16, 134:12, 215:2

**seeking** [1] - 14:1

**Seeking** [3] - 38:17, 133:3, 133:10

**seem** [1] - 43:3

**select** [1] - 152:25

**selected** [6] - 67:21, 69:3, 70:25, 77:17, 77:19, 78:24

**selecting** [1] - 44:3

**selection** [3] - 43:21, 70:5, 70:9

**sell** [41] - 22:14, 22:15, 24:15, 24:17, 25:2, 27:8, 37:6, 46:24, 97:16, 98:14, 99:15, 99:17, 100:23, 102:17, 103:6, 103:9,

122:14, 149:12, 155:25, 157:15, 158:20, 159:2, 159:7, 159:16, 160:5, 160:18, 161:14, 161:21, 162:3, 162:8, 165:4, 169:22, 169:24, 170:16, 186:19, 189:21, 192:9, 193:9, 197:9, 197:10

**seller** [4] - 101:15, 101:17, 198:9, 198:10

**sellers** [10] - 21:24, 23:5, 28:24, 29:7, 31:15, 32:4, 32:9, 37:7, 101:6, 192:10

**SELLERS** [1] - 1:16

**selling** [76] - 7:18, 18:6, 21:15, 21:23, 21:25, 23:3, 23:8, 23:18, 23:22, 24:3, 24:10, 27:7, 29:4, 30:6, 30:9, 34:4, 34:9, 34:20, 35:2, 35:13, 35:14, 35:15, 35:18, 37:13, 39:24, 40:18, 40:21, 46:23, 57:4, 57:9, 83:23, 93:17, 96:19, 96:23, 96:24, 97:8, 97:10, 97:12, 97:14, 98:22, 98:23, 99:5, 100:10, 101:5, 101:10, 101:11, 102:19, 103:15, 122:3, 123:22, 123:24, 125:10, 125:12, 138:25, 139:4, 156:7, 159:19, 161:8, 161:11, 161:13, 161:17, 169:5, 169:6, 169:18, 169:20, 169:25, 174:1, 180:25, 181:7, 187:3, 187:10, 188:7, 188:16, 207:3, 210:19, 211:8

**Selling** [1] - 187:15

**sells** [4] - 208:12, 208:17, 208:20, 208:24

**send** [1] - 85:20

**sense** [6] - 88:6, 102:1, 196:2, 206:14, 210:4, 219:8

**sent** [10] - 17:20, 120:8, 171:18, 192:2, 192:24, 211:1, 221:3, 221:6, 221:9, 221:10

**sentence** [1] - 66:18

**separate** [6] - 21:2, 55:24, 60:24, 71:17, 78:9, 90:12

**separated** [1] - 127:4

**separately** [1] - 52:15

**separates** [1] - 205:21

**September** [2] - 68:4, 137:14

**servant** [1] - 23:24

**serve** [3] - 39:23, 40:24, 41:5

**served** [3] - 16:21, 17:13, 18:15

**services** [1] - 16:12

**serving** [2] - 21:9, 32:19

**sessions** [1] - 162:21

**set** [3] - 14:16, 26:14, 112:7

**sets** [2] - 32:5, 188:9

**settled** [2] - 17:1, 204:25

**settlement** [1] - 16:18

**settles** [1] - 204:1

**several** [10] - 82:15, 83:14, 111:12, 124:17, 152:19, 152:24, 153:10, 157:12, 167:25, 211:5

**shaded** [2] - 95:6, 130:17

**share** [15] - 24:25, 25:5, 25:7, 28:6, 28:19, 93:17, 93:20, 94:5, 95:17, 100:10, 102:22, 103:12, 103:13, 162:1

**shareholder** [9] - 119:24, 136:8, 152:7, 152:11, 152:13, 152:14, 153:8, 160:8, 185:16

**shareholders** [2] - 120:5, 152:10

**shareholding** [1] - 158:11

**shares** [158] - 21:25, 22:4, 22:10, 22:23, 23:2, 23:9, 23:11, 24:21, 24:22, 25:15, 26:4, 26:5, 26:6, 26:7, 26:15, 26:20, 26:21, 26:23, 26:24, 27:18, 27:20, 28:3, 28:18, 29:1, 29:4, 29:6, 30:10, 31:12, 31:14,

31:23, 32:4, 32:8, 35:24, 37:1, 37:2, 37:6, 45:15, 47:9, 47:11, 47:12, 47:16, 49:2, 95:7, 95:8, 95:9, 95:12, 95:14, 95:19, 97:2, 97:6, 97:16, 97:19, 98:12, 98:13, 98:14, 98:18, 99:4, 99:6, 99:14, 99:16, 100:15, 100:18, 101:1, 101:10, 101:12, 102:4, 102:5, 103:10, 123:1, 123:2, 126:1, 126:2, 126:11, 126:15, 139:6, 146:15, 146:16, 155:22, 155:25, 156:1, 156:5, 156:12, 156:15, 156:16, 156:23, 156:24, 157:2, 157:4, 157:7, 157:9, 157:15, 157:25, 158:3, 158:10, 158:16, 158:20, 159:3, 159:7, 159:9, 159:12, 159:15, 159:16, 159:24, 160:5, 164:17, 164:20, 164:23, 165:3, 165:4, 165:6, 165:9, 165:12, 165:13, 165:15, 165:16, 166:19, 166:22, 168:24, 169:18, 169:22, 169:24, 173:3, 173:6, 174:19, 174:21, 180:4, 180:6, 181:10, 181:16, 185:15, 187:11, 187:12, 187:14, 187:17, 187:19, 187:23, 188:10, 188:14, 188:17, 188:19, 189:15, 189:23, 190:2, 190:6, 192:16, 197:2, 197:17, 201:12, 207:3, 207:4, 207:8, 217:10

**Shares** [1] - 22:25

**shed** [1] - 108:24

**sheep** [1] - 196:3

**shift** [1] - 49:18

**shifts** [1] - 8:6

**shopping** [1] - 215:20

**short** [258] - 7:14, 7:18, 9:1, 9:9, 9:10, 9:12, 9:14, 9:18, 12:8,

14:16, 18:6, 21:15, 21:18, 21:23, 21:24, 21:25, 22:1, 22:4, 22:14, 22:15, 23:3, 23:5, 23:8, 23:9, 23:18, 23:22, 24:2, 24:10, 25:24, 27:1, 27:7, 27:20, 28:4, 28:15, 28:18, 28:20, 28:24, 29:4, 29:7, 29:19, 29:24, 30:1, 30:4, 30:6, 30:8, 30:9, 30:14, 30:17, 30:24, 31:3, 31:7, 31:9, 31:15, 32:4, 32:9, 34:4, 34:9, 34:14, 34:15, 34:20, 35:2, 35:18, 36:15, 36:22, 36:23, 36:24, 36:25, 37:2, 37:3, 37:7, 37:8, 37:9, 37:14, 37:15, 38:24, 39:4, 40:18, 40:21, 41:21, 42:12, 57:4, 57:9, 58:23, 64:5, 83:23, 84:8, 86:23, 93:7, 93:8, 93:9, 93:10, 93:14, 93:15, 93:16, 93:21, 93:22, 94:1, 94:3, 94:6, 94:8, 94:10, 94:12, 94:13, 94:14, 94:16, 94:19, 95:1, 95:9, 95:18, 95:20, 95:24, 96:1, 96:19, 96:23, 96:24, 97:2, 97:4, 97:8, 97:10, 97:11, 97:14, 97:16, 98:15, 98:19, 98:22, 98:23, 99:5, 99:15, 99:17, 100:10, 100:23, 100:24, 101:5, 101:6, 101:10, 101:11, 101:15, 101:17, 101:21, 102:17, 102:19, 103:9, 103:11, 103:15, 104:7, 108:13, 108:18, 108:22, 117:20, 123:22, 123:24, 125:9, 125:12, 125:25, 126:2, 126:10, 126:11, 127:1, 127:6, 127:18, 128:4, 128:18, 129:5, 129:10, 130:2, 130:7, 130:20, 130:25, 131:3, 131:6, 131:7, 131:12, 131:15, 131:20, 131:23, 132:3, 132:10,

249

132:17, 132:22,
133:3, 133:8, 133:18,
134:7, 134:10,
135:12, 135:13,
135:14, 135:18,
135:22, 136:1, 136:3,
136:21, 136:22,
137:1, 137:2, 137:9,
137:11, 137:22,
138:9, 138:16,
138:20, 138:25,
139:4, 139:6, 153:23,
154:1, 161:17,
169:16, 169:25,
173:12, 173:15,
173:19, 174:3,
175:13, 179:22,
179:24, 180:3, 180:6,
180:7, 180:9, 190:4,
190:11, 190:12,
192:10, 197:16,
198:3, 198:4, 198:5,
198:9, 198:10, 199:3,
199:4, 199:20, 201:2,
201:3, 210:19, 211:8,
212:16, 213:11,
213:13, 213:18,
215:6, 217:8, 218:23,
218:24, 219:3, 219:4,
219:11, 220:6,
220:23, 220:24,
221:12

**short-sell** [4] - 22:14,
22:15, 97:16, 99:15
**short-selling** [2] -
210:19, 211:8
**shortage** [1] - 98:13
**shorted** [13] - 23:12,
26:23, 26:24, 27:19,
29:1, 29:11, 29:17,
31:16, 33:20, 44:10,
49:15, 101:2, 217:11
**shortened** [1] -
41:21
**shorting** [11] - 22:9,
22:23, 26:16, 28:20,
31:12, 97:2, 97:7,
97:20, 196:14, 198:7,
209:21
**Shorting** [1] - 23:1
**shorts** [4] - 32:12,
93:25, 174:9, 199:16
**show** [27] - 8:4, 8:7,
9:9, 10:3, 10:11,
11:24, 14:7, 22:22,
22:24, 49:1, 73:10,
87:7, 95:22, 116:22,
126:20, 133:11,
154:25, 155:9,
155:11, 199:6,

202:23, 203:5,
203:16, 203:17,
208:9, 220:14
**showed** [8] - 49:3,
53:1, 126:25, 128:6,
155:17, 196:21,
201:11, 212:4
**showing** [5] - 59:12,
186:23, 204:3, 211:6,
221:8
**shown** [5] - 10:7,
10:9, 10:25, 155:12,
203:22
**shows** [13] - 27:17,
95:5, 97:19, 98:3,
98:8, 105:17, 128:13,
128:20, 137:20,
149:5, 161:1, 215:10,
217:13
**Si** [1] - 4:2
**side** [4] - 9:8, 169:15,
182:17, 196:5
**sign** [1] - 158:5
**signal** [1] - 218:15
**significance** [10] -
10:12, 53:13, 116:14,
116:16, 127:17,
148:8, 149:2, 149:19,
200:11, 214:1
**Significance** [1] -
54:2
**significant** [35] -
10:18, 20:9, 30:4,
37:4, 46:10, 48:3,
48:18, 49:3, 49:6,
53:2, 55:13, 56:17,
57:1, 86:20, 88:24,
90:14, 107:13,
115:15, 116:2, 117:9,
117:13, 125:9, 133:4,
141:14, 147:20,
148:2, 148:13,
149:18, 200:18,
214:12, 214:13,
214:18, 215:11,
216:12
**significantly** [4] -
54:15, 54:22, 56:14,
134:8
**silent** [1] - 110:11
**SILVERMAN** [34] -
1:13, 4:10, 14:14,
14:22, 15:1, 15:4,
15:14, 15:16, 19:10,
19:19, 19:20, 22:6,
22:8, 26:11, 26:12,
29:9, 36:6, 36:8,
37:20, 37:22, 44:7,
44:9, 46:4, 46:5,
51:14, 51:15, 53:5,

53:16, 53:17, 56:6,
56:7, 60:14, 65:22,
81:4
**Silverman** [8] - 4:11,
4:12, 14:10, 14:13,
19:18, 26:10, 44:6,
81:3
**similar** [5] - 34:13,
34:20, 40:25, 92:7,
100:21
**similarly** [3] - 34:15,
34:19, 76:25
**simply** [2] - 111:17,
117:19
**simultaneously** [1] -
221:23
**single** [11] - 32:3,
32:23, 73:5, 73:7,
73:11, 95:17, 99:4,
100:9, 100:10,
100:16, 102:21
**sit** [2] - 152:23, 163:2
**site** [1] - 145:14
**sitting** [2] - 73:7,
73:11
**situated** [1] - 206:12
**situation** [3] - 36:16,
93:9, 182:6
**six** [9] - 53:4, 54:7,
55:19, 110:21,
191:17, 191:19,
191:20, 193:3, 209:8
**six-month** [1] - 53:4
**size** [1] - 46:11
**skip** [2] - 114:5,
114:7
**skipping** [1] - 204:21
**skyrocketing** [1] -
133:19
**slide** [10] - 15:14,
36:7, 51:17, 53:16,
53:18, 126:20, 155:9,
155:11, 170:10,
218:21
**Slide** [4] - 22:7,
22:17, 26:13, 51:16
**slides** [5] - 14:6,
14:17, 14:24, 15:12,
201:5
**small** [5] - 28:13,
46:12, 46:25, 171:23,
200:6
**smiley** [4] - 215:23,
215:25, 216:2, 216:8
**smiley-face** [3] -
215:23, 215:25, 216:2
**snapped** [1] - 101:4
**snapshot** [1] - 28:3
**snippet** [1] - 92:25
**so-called** [1] - 93:25

**social** [17] - 57:12,
57:17, 58:5, 139:24,
140:2, 140:6, 140:11,
140:17, 140:20,
140:21, 145:4,
145:10, 145:11,
145:13, 145:14,
146:5, 176:19
**Société** [3] - 154:18,
154:22, 161:1
**sold** [28] - 10:17,
27:20, 28:4, 126:1,
126:11, 156:2,
156:19, 156:20,
156:23, 160:15,
161:5, 164:22, 165:3,
165:6, 165:12,
165:15, 165:16,
173:5, 173:9, 174:6,
187:17, 188:24,
189:6, 189:14,
189:24, 192:21,
209:12, 217:10
**SOLOVEICHIK** [1] -
4:13
**Soloveichik** [1] -
4:14
**someone** [3] - 21:24,
180:6, 204:2
**sometime** [2] -
74:16, 74:18
**sometimes** [5] -
29:2, 125:10, 157:14,
157:15, 184:4
**somewhat** [3] -
52:22, 93:10, 97:4
**somewhere** [5] -
17:6, 18:19, 136:24,
144:22, 197:22
**soon** [1] - 158:19
**sorry** [26] - 19:6,
36:13, 40:13, 85:12,
99:25, 110:1, 114:6,
125:19, 127:10,
130:13, 130:17,
131:21, 137:14,
143:9, 155:4, 166:7,
166:9, 169:21,
176:17, 177:4,
179:18, 182:4, 185:1,
211:22, 218:10,
218:22
**sort** [15] - 9:4, 24:18,
48:9, 55:5, 55:23,
57:19, 57:20, 57:21,
78:17, 83:16, 99:12,
99:13, 117:2, 179:12,
204:1
**sought** [1] - 77:2
**sounds** [4] - 7:1,

124:15, 125:6, 144:11
**source** [8] - 31:20,
32:3, 98:5, 98:6,
126:8, 144:15,
144:17, 167:14
**sources** [5] - 39:6,
98:7, 100:8, 100:11,
146:8
**South** [1] - 1:14
**Southern** [1] - 199:2
**Southwest** [1] - 1:22
**speaking** [3] - 5:16,
6:14, 30:7
**speaks** [3] - 29:13,
31:13, 133:12
**specialty** [1] - 92:9
**specific** [7] - 25:25,
39:10, 59:5, 129:7,
132:25, 140:13,
142:23
**specifically** [2] - 9:3,
132:12
**speculate** [1] - 166:5
**speculating** [2] -
158:18, 166:2
**speculation** [6] -
30:23, 137:21, 158:9,
160:3, 165:8, 189:8
**spell** [1] - 15:6
**spend** [1] - 213:23
**spent** [2] - 16:19,
82:12
**spheres** [1] - 152:20
**spike** [1] - 104:1
**spin** [2] - 122:14,
160:18
**spinning** [1] - 122:3
**spinoff** [2] - 194:11,
197:5
**spinoffs** [3] - 121:10,
121:11, 136:13
**spoken** [1] - 138:3
**spread** [3] - 46:20,
46:25, 47:1
**squeeze** [80] - 7:14,
8:21, 9:1, 9:9, 9:10,
9:12, 29:19, 29:24,
30:1, 30:8, 30:14,
30:17, 30:24, 31:3,
34:14, 34:15, 36:16,
36:22, 36:23, 36:24,
37:10, 37:14, 37:16,
42:12, 64:5, 86:23,
93:7, 93:8, 93:9,
93:15, 93:21, 93:25,
94:7, 94:8, 94:13,
94:14, 94:16, 94:20,
95:2, 100:24, 104:8,
108:13, 108:18,
108:22, 117:20,

131:6, 131:7, 131:12, 132:3, 132:10, 132:22, 133:8, 135:13, 135:18, 135:22, 136:1, 136:3, 136:21, 137:2, 137:11, 138:16, 138:20, 153:23, 154:1, 190:5, 190:11, 190:12, 201:2, 213:11, 213:14, 213:18, 215:6, 219:1, 219:2, 219:3, 220:23, 220:24, 221:6, 221:12

**squeeze-type** [1] - 36:16

**squeezes** [6] - 131:1, 131:3, 131:15, 133:3, 138:25, 212:17

**stabbing** [1] - 194:16

**staff** [1] - 16:17

**stake** [14] - 71:4, 76:10, 77:18, 77:23, 78:2, 78:5, 79:6, 152:19, 158:8, 175:10, 188:24, 189:7, 189:21, 189:24

**stand** [2] - 14:15, 217:20

**Standard** [1] - 193:5

**standard** [5] - 10:22, 32:18, 43:6, 113:22, 148:19

**standards** [4] - 112:6, 112:7, 113:6, 113:18

**standing** [4] - 14:18, 81:13, 150:14, 150:25

**standpoint** [1] - 203:15

**stands** [1] - 41:21

**start** [18] - 11:4, 38:19, 41:12, 51:2, 68:1, 86:18, 93:12, 94:4, 96:2, 103:3, 119:15, 154:3, 175:2, 175:3, 183:6, 195:19, 205:8

**started** [9] - 63:5, 83:16, 154:4, 171:3, 171:16, 175:6, 179:4, 213:11, 213:14

**starting** [3] - 4:5, 188:3, 216:24

**starts** [1] - 207:20

**state** [6] - 15:5, 96:21, 96:22, 151:11, 177:23, 197:1

**statement** [13] - 7:9, 8:10, 10:5, 41:22,

44:14, 50:1, 51:1, 56:1, 56:3, 93:4, 109:2, 120:14

**Statement** [1] - 3:3

**statements** [8] - 41:19, 41:20, 145:9, 195:23, 201:14, 212:18, 213:10

**STATES** [2] - 1:1, 1:9

**States** [7] - 2:2, 82:20, 82:25, 84:3, 163:1, 191:20, 223:13

**stating** [1] - 79:4

**statistic** [3] - 76:13, 80:24, 126:14

**Statistical** [1] - 54:2

**statistical** [14] - 10:12, 53:13, 116:9, 116:14, 116:15, 116:16, 127:17, 127:20, 128:3, 148:7, 149:2, 149:19, 200:11, 214:1

**statistically** [24] - 10:18, 48:18, 49:3, 53:2, 53:7, 56:17, 57:1, 88:23, 88:24, 90:14, 115:14, 116:2, 117:9, 117:13, 147:20, 148:1, 148:13, 149:18, 200:18, 214:12, 214:13, 214:17, 215:10, 216:12

**stayed** [1] - 202:10

**stays** [1] - 130:4

**stenographic** [1] - 223:5

**step** [6] - 81:7, 169:14, 184:12, 194:21

**STEVEN** [1] - 1:20

**Steven** [1] - 5:1

**stick** [2] - 103:2, 181:6

**still** [20] - 29:3, 37:10, 37:17, 39:21, 40:22, 55:25, 56:2, 61:13, 61:23, 69:19, 108:19, 121:20, 122:17, 185:22, 193:24, 197:25, 204:3, 206:6, 215:4, 220:12

**stipulated** [1] - 26:2

**stipulates** [1] - 26:8

**stock** [176] - 8:14, 8:23, 8:24, 12:7, 12:9, 12:11, 18:10, 18:12, 20:5, 20:12, 22:3,

22:14, 22:16, 23:4, 24:1, 24:5, 24:6, 24:14, 24:15, 24:16, 24:17, 24:20, 25:1, 25:2, 25:17, 25:19, 25:21, 27:6, 27:22, 28:15, 30:12, 30:24, 31:2, 32:20, 35:1, 35:6, 39:20, 41:6, 42:11, 42:14, 43:15, 44:11, 44:13, 46:14, 46:23, 48:8, 48:9, 48:10, 48:23, 49:8, 49:9, 49:23, 50:7, 50:12, 53:3, 53:24, 54:9, 55:2, 55:4, 55:7, 55:10, 55:14, 56:2, 56:25, 58:15, 58:23, 59:2, 59:5, 59:9, 60:18, 61:8, 61:10, 62:19, 63:12, 63:13, 63:21, 64:6, 64:9, 64:13, 65:3, 65:5, 65:11, 66:9, 66:25, 67:11, 68:13, 75:6, 90:8, 93:17, 93:18, 93:19, 93:20, 93:23, 94:2, 94:5, 96:8, 97:9, 103:6, 104:7, 105:7, 105:18, 106:17, 110:1, 110:17, 127:19, 133:17, 134:6, 135:9, 138:18, 154:20, 155:1, 155:12, 155:16, 155:23, 156:7, 156:24, 157:2, 158:1, 158:20, 159:25, 161:15, 161:21, 162:13, 162:15, 167:18, 167:21, 169:11, 170:10, 171:14, 172:15, 173:1, 173:7, 173:17, 177:22, 181:16, 181:19, 184:20, 185:2, 185:8, 186:25, 187:13, 189:23, 197:14, 197:18, 197:20, 197:25, 198:7, 202:2, 203:1, 207:5, 207:6, 207:11, 207:14, 207:15, 207:16, 208:6, 208:15, 208:18, 208:19, 208:22, 209:19, 211:22, 212:5, 213:15, 214:6, 214:18, 214:20, 216:6, 216:14, 217:11, 217:21,

220:3, 220:7

**Stock** [2] - 84:4, 187:15

**stocks** [10] - 12:15, 25:10, 39:10, 55:11, 93:12, 155:14, 157:13, 157:21, 162:12, 182:8

**stood** [1] - 23:4

**store** [1] - 158:7

**stories** [6] - 78:11, 131:15, 142:14, 201:3, 201:6

**story** [2] - 78:15, 78:16

**strategies** [3] - 27:9, 83:23, 181:13

**strategy** [26] - 153:13, 160:18, 162:21, 165:18, 170:17, 170:22, 171:19, 172:19, 174:16, 174:18, 175:1, 175:2, 175:6, 176:11, 176:21, 177:20, 180:10, 181:14, 181:19, 181:22, 182:2, 194:13, 196:20, 198:2, 217:14

**Street** [2] - 1:14, 146:8

**strike** [4] - 161:14, 172:25, 188:8, 188:18

**striking** [1] - 109:17

**strong** [2] - 40:8, 59:22

**Structure** [1] - 82:17

**struggling** [2] - 153:11, 184:19

**studied** [5] - 43:25, 82:5, 198:25, 200:16, 202:16

**studies** [14] - 10:21, 83:22, 114:25, 116:8, 116:22, 116:23, 147:5, 198:15, 200:24, 201:16, 210:10, 211:20, 214:4, 218:1

**Studies** [1] - 17:11

**study** [62] - 18:4, 20:22, 44:3, 45:13, 48:22, 55:8, 55:9, 55:18, 69:3, 71:15, 82:23, 82:24, 88:7, 88:10, 88:11, 88:13, 88:19, 88:20, 89:4, 89:15, 89:17, 89:20, 106:13, 112:6, 114:9,

114:10, 114:12, 114:14, 114:17, 114:22, 114:23, 115:6, 115:7, 115:8, 115:11, 116:1, 116:16, 135:22, 135:25, 142:20, 148:20, 148:24, 149:4, 149:6, 199:7, 199:10, 199:25, 200:3, 200:16, 200:20, 202:4, 202:6, 202:14, 203:3, 203:12, 213:22, 215:10, 216:11, 216:18, 219:19

**study's** [1] - 202:14

**studying** [2] - 82:12, 214:8

**stuff** [2] - 175:12, 179:9

**stupid** [1] - 62:10

**subject** [9] - 109:24, 110:10, 120:11, 120:12, 130:25, 131:5, 139:19, 140:4, 140:7

**subjective** [5] - 80:1, 80:2, 80:22, 112:7, 113:12

**subjectivity** [1] - 43:8

**subjects** [1] - 82:14

**submission** [1] - 10:20

**submissions** [2] - 195:7, 195:9

**submit** [1] - 41:6

**submitted** [1] - 17:17

**subreddit** [1] - 140:13

**subreddits** [1] - 140:9

**subsequent** [3] - 75:23, 78:11, 78:17

**subset** [2] - 22:18, 32:5

**subsidiary** [3] - 160:9, 160:11, 165:20

**substance** [1] - 75:18

**substantial** [2] - 26:15, 26:20

**substantive** [1] - 175:12

**substantively** [1] - 171:10

**subtopic** [1] - 121:8

**succeeds** [1] - 94:11

**sufficient** [2] - 28:7,

80:4
**suggest** [1] - 198:12
**suggesting** [1] - 198:5
**suggests** [2] - 36:14, 203:10
**suing** [1] - 195:25
**suited** [1] - 34:25
**summarize** [6] - 15:17, 15:25, 58:14, 107:17, 108:4, 184:8
**summarized** [2] - 26:13, 53:18
**summary** [1] - 84:9
**summation** [1] - 11:2
**super** [2] - 36:15, 184:18
**super-risky** [1] - 184:18
**supplemental** [2] - 75:18, 111:24
**support** [2] - 32:12, 221:8
**supported** [3] - 34:22, 68:11, 108:14
**supportive** [2] - 56:3, 90:24
**supposed** [2] - 117:24, 209:14
**Supreme** [4] - 82:21, 82:25, 218:3, 218:6
**surge** [1] - 93:24
**suspect** [1] - 144:20
**suspected** [1] - 133:8
**sustained** [1] - 217:3
**swirling** [1] - 77:9
**SWORN** [3] - 14:20, 81:18, 151:3
**systematic** [2] - 131:8, 142:20
**systematically** [1] - 48:11

---

# T

**Tab** [9] - 65:22, 127:10, 127:11, 129:1, 154:6, 154:11, 154:13, 190:21
**tab** [2] - 14:1, 65:21
**table** [2] - 31:18, 168:4
**tabs** [2] - 13:24, 65:20
**taints** [1] - 214:24
**talks** [2] - 102:13, 194:8
**tap** [1] - 5:18

**taught** [11] - 16:1, 16:3, 16:5, 17:22, 17:25, 18:3, 18:8, 18:12, 82:8, 83:9, 139:19
**teaching** [1] - 15:23
**team** [1] - 168:3
**tech** [1] - 152:20, 152:21
**technology** [1] - 152:20
**temporarily** [1] - 64:6
**temporary** [17] - 94:9, 102:12, 102:14, 102:17, 104:2, 104:4, 104:9, 104:10, 104:21, 108:12, 127:22, 136:21, 136:23, 137:7, 137:17, 137:18, 138:16
**ten** [5] - 17:6, 28:20, 40:8, 54:24, 63:5
**tend** [2] - 43:15, 136:24
**Tenders** [2] - 85:8, 204:18
**tens** [3] - 197:16, 201:10, 217:10
**term** [6] - 20:16, 21:18, 29:19, 41:12, 48:20, 49:19
**terminology** [1] - 49:24
**terms** [13] - 21:17, 74:4, 90:18, 100:22, 109:20, 116:15, 132:16, 139:10, 139:14, 160:10, 165:10, 201:19, 213:21
**terrible** [1] - 121:14
**terrific** [1] - 69:8
**Tesla** [1] - 34:13
**test** [18] - 43:1, 45:6, 45:9, 67:7, 77:16, 80:7, 80:23, 80:24, 89:8, 90:5, 99:14, 127:17, 128:2, 128:6, 210:23, 210:24, 218:7, 218:8
**tested** [4] - 67:4, 202:20, 203:3, 211:23
**testified** [9] - 8:2, 18:20, 68:23, 98:22, 111:13, 149:7, 149:20, 166:19, 195:20
**testify** [4] - 6:2, 12:3,

19:11, 180:9
**testifying** [3] - 16:21, 83:24, 103:22
**testimony** [27] - 8:20, 13:6, 13:15, 16:18, 46:6, 69:10, 72:1, 84:22, 86:12, 87:1, 90:10, 95:23, 105:5, 108:15, 111:21, 119:4, 122:23, 149:1, 149:21, 150:5, 170:9, 183:8, 183:17, 196:24, 199:19, 211:17, 221:7
**testing** [4] - 43:10, 127:17, 201:20, 212:7
**tests** [1] - 67:10
**text** [4] - 175:22, 176:19, 178:13, 179:1
**texts** [1] - 176:5
**THE** [197] - 1:1, 1:9, 1:12, 1:19, 3:10, 3:14, 4:1, 4:9, 4:12, 4:15, 4:18, 4:21, 4:25, 5:3, 5:6, 5:9, 5:12, 5:18, 5:20, 6:4, 6:12, 6:14, 6:22, 7:1, 7:8, 8:25, 9:6, 11:22, 12:18, 12:20, 12:24, 13:13, 13:20, 14:3, 14:11, 14:13, 14:18, 14:21, 14:25, 19:13, 19:15, 23:24, 24:4, 25:9, 25:13, 25:24, 26:2, 26:9, 27:15, 27:17, 27:23, 28:1, 28:5, 28:10, 29:8, 36:13, 36:21, 37:21, 44:5, 52:13, 52:15, 52:24, 53:1, 54:14, 54:16, 54:21, 54:23, 55:1, 55:4, 55:15, 55:18, 60:17, 60:22, 63:4, 65:20, 65:23, 69:6, 69:9, 69:16, 69:21, 71:18, 71:20, 81:2, 81:6, 81:8, 81:10, 81:13, 81:15, 81:16, 81:19, 84:13, 84:15, 85:1, 85:7, 85:10, 85:13, 85:16, 85:19, 88:6, 88:9, 89:6, 89:8, 89:23, 99:25, 100:2, 100:3, 100:7, 100:25, 101:5, 102:1, 102:6, 103:18, 114:3, 117:23, 118:2, 118:14, 118:16, 118:18, 118:20,

119:1, 119:6, 119:10, 133:23, 134:1, 146:20, 146:23, 150:1, 150:4, 150:6, 150:7, 150:9, 150:13, 150:17, 150:21, 150:24, 151:1, 151:4, 151:6, 151:8, 151:24, 151:25, 152:1, 154:11, 156:10, 156:12, 156:17, 156:19, 156:21, 159:17, 159:20, 159:22, 161:16, 161:18, 164:2, 164:6, 166:7, 167:8, 167:10, 171:25, 172:2, 182:10, 183:18, 185:6, 190:16, 194:21, 194:24, 195:10, 195:16, 196:10, 196:13, 198:13, 201:16, 201:24, 204:8, 204:11, 204:15, 204:17, 204:23, 206:3, 206:24, 207:22, 207:24, 209:1, 210:7, 212:14, 213:5, 213:17, 214:23, 214:25, 216:20, 216:22, 220:2, 221:15, 221:17, 222:3, 222:6, 222:8
**themselves** [3] - 96:4, 125:13, 163:23
**theoretical** [1] - 21:13
**theory** [1] - 57:11
**therefore** [6] - 88:3, 108:10, 108:18, 112:22, 212:19, 213:3
**Thereupon** [3] - 7:6, 69:14, 150:19
**thesis** [3] - 9:10, 199:23, 218:22
**they've** [2] - 42:1, 42:7
**thinking** [1] - 215:1
**thinks** [1] - 146:15
**third** [8] - 7:17, 27:2, 39:12, 39:14, 123:12, 125:11, 156:18, 156:19
**thousands** [5] - 146:14, 197:16, 201:10, 217:10, 218:13
**three** [10] - 6:10,

6:19, 13:1, 85:24, 165:22, 172:19, 172:23, 185:16, 186:8, 188:16
**threshold** [1] - 40:15
**thresholds** [4] - 35:21, 35:25, 36:4
**thrilled** [1] - 52:19
**throughout** [12] - 22:16, 23:10, 26:19, 27:12, 30:7, 58:20, 60:13, 63:18, 196:7, 205:24, 206:24, 207:6
**throw** [1] - 80:21
**timely** [2] - 41:25, 42:7
**timing** [4] - 103:1, 106:1, 106:7, 160:3
**tiny** [1] - 171:23
**title** [3] - 133:7, 133:9, 133:12
**today** [20] - 5:15, 5:18, 15:12, 19:22, 24:25, 27:18, 41:5, 68:23, 73:7, 73:11, 147:21, 147:24, 149:7, 149:21, 150:5, 195:6, 195:7, 195:9, 204:14, 210:12
**today's** [2] - 48:8, 48:16
**together** [5] - 126:21, 127:15, 128:24, 176:15, 194:25
**TOLL** [1] - 1:16
**tomorrow** [2] - 101:20, 192:21
**tomorrow's** [2] - 48:9, 48:17
**took** [16] - 12:8, 51:17, 53:22, 103:21, 105:16, 115:16, 138:4, 138:11, 158:15, 175:10, 182:5, 187:2, 189:22, 191:11, 214:14, 219:25
**tool** [1] - 170:15
**top** [10] - 54:7, 72:25, 73:9, 73:14, 74:13, 75:19, 76:5, 100:5, 188:4, 191:24
**topic** [10] - 6:1, 60:17, 121:8, 122:20, 125:8, 138:14, 139:23, 146:18, 162:16
**total** [4] - 6:10, 28:12, 124:24, 157:19

**totaling** [1] - 188:10
**totally** [1] - 62:4
**touch** [1] - 133:24
**touched** [1] - 47:6
**towards** [1] - 7:17
**trade** [16] - 24:7,
24:11, 24:12, 27:5,
29:3, 47:2, 47:3,
47:11, 49:8, 49:9,
58:7, 58:19, 61:12,
62:17, 63:12, 63:21
**tradeable** [2] - 47:10,
47:13
**traded** [8] - 39:9,
40:5, 47:17, 58:1,
58:15, 64:17, 110:17,
110:18
**trader** [1] - 12:15
**traders** [1] - 41:3
**trades** [7] - 61:3,
119:18, 172:10,
177:20, 182:7, 186:4,
212:5
**Trading** [1] - 27:2
**trading** [45] - 12:14,
24:1, 24:24, 27:9,
27:13, 35:6, 35:15,
35:16, 35:23, 37:4,
39:17, 39:20, 40:6,
41:4, 41:8, 46:14,
49:6, 54:18, 54:24,
56:4, 58:7, 61:3,
61:13, 61:19, 61:23,
62:6, 62:13, 63:14,
64:1, 64:21, 83:23,
97:3, 116:24, 123:1,
123:2, 157:17, 161:7,
165:5, 174:16, 183:5,
190:4, 190:10,
205:15, 205:18, 208:8
**transaction** [5] -
177:2, 178:6, 180:21,
181:5, 193:22
**transactions** [13] -
154:5, 154:19, 155:1,
172:19, 173:23,
173:25, 174:3, 174:7,
174:9, 175:13,
180:16, 187:10, 188:4
**TRANSCRIPT** [1] -
1:8
**transcript** [2] -
223:5, 223:6
**transformation** [3] -
174:8, 174:18, 189:3
**transforming** [1] -
158:13
**translation** [1] -
193:15
**transplant** [1] -

152:22
**tremendous** [1] -
207:12
**trend** [1] - 129:25
**TREVOR** [1] - 1:9
**trial** [3] - 16:18,
16:24, 16:25
**tried** [2] - 116:8,
146:9
**trigger** [1] - 80:4
**triggered** [1] - 57:9
**true** [19] - 8:18, 20:5,
75:4, 109:6, 121:13,
124:2, 142:15,
142:16, 147:9,
168:17, 176:1, 176:3,
179:25, 206:24,
207:1, 216:11, 223:4,
223:5
**trust** [2] - 177:1,
177:24
**truth** [3] - 181:18,
181:25, 190:3
**try** [11] - 24:7, 42:15,
68:24, 113:20,
122:22, 124:18,
136:16, 160:18,
180:18, 203:12, 214:5
**trying** [5] - 30:10,
73:18, 128:2, 163:18,
219:7
**turn** [12] - 21:15,
35:4, 38:13, 79:1,
126:24, 154:8,
160:24, 182:16,
188:21, 190:21,
191:23, 217:9
**turnaround** [30] -
46:24, 153:1, 153:3,
153:9, 153:13,
160:14, 160:18,
165:18, 165:23,
165:25, 170:17,
170:22, 171:19,
172:18, 174:11,
175:15, 176:6,
176:10, 176:11,
177:19, 177:19,
183:17, 185:22,
189:4, 189:19,
193:25, 194:1,
194:15, 196:20,
217:14
**turnarounds** [1] -
153:5
**turning** [1] - 153:11
**turnover** [1] - 73:4
**tweet** [82] - 8:10,
52:2, 54:12, 54:13,
54:15, 54:20, 55:16,

55:20, 55:21, 72:1,
72:4, 72:6, 72:8, 72:9,
72:13, 72:23, 73:8,
73:13, 73:16, 90:11,
90:16, 105:8, 105:19,
105:20, 106:1, 106:7,
106:9, 112:25, 113:2,
120:8, 120:9, 120:10,
120:15, 120:17,
120:19, 120:22,
140:22, 141:8, 142:1,
142:9, 142:15,
142:18, 142:24,
146:11, 158:4,
164:13, 164:19,
165:21, 165:22,
178:13, 179:12,
179:20, 180:22,
181:18, 181:25,
182:23, 182:25,
183:4, 183:22,
185:19, 186:5, 186:9,
187:2, 187:9, 188:16,
200:11, 200:14,
208:3, 208:11, 209:7,
209:8, 215:1, 215:3,
218:19, 219:20,
219:22, 219:25,
220:3, 220:17, 221:3,
221:10
**tweeted** [1] - 141:20
**tweets** [7] - 140:10,
140:25, 142:12,
142:20, 145:18,
201:13, 212:18
**Twitter** [3] - 142:25,
145:17, 219:24
**two** [48] - 5:22, 6:16,
14:6, 20:8, 34:11,
34:12, 35:25, 41:15,
71:16, 82:2, 91:12,
95:11, 100:7, 100:11,
105:24, 114:24,
114:25, 116:8,
116:21, 116:23,
117:7, 129:19,
129:20, 136:16,
169:14, 173:8,
173:23, 173:25,
174:12, 180:1, 180:8,
180:25, 181:7, 186:8,
187:1, 187:3, 187:9,
191:15, 192:20,
199:15, 199:22,
201:16, 201:17,
206:12, 211:20, 221:9
**two-week** [1] -
105:24
**type** [7] - 20:3, 21:2,
36:16, 37:16, 45:25,

68:25, 75:13
**types** [5] - 20:9,
21:5, 25:23, 43:13,
83:25
**typical** [11] - 12:14,
55:6, 55:12, 55:13,
198:9, 200:24,
205:11, 206:13,
210:2, 210:4
**typicality** [8] - 6:3,
11:4, 12:6, 195:21,
205:5, 205:8, 205:9,
206:9
**typically** [3] - 46:24,
101:13, 147:10

**U**

**U.S** [3] - 16:10,
191:17, 193:4
**ultimately** [6] -
21:11, 28:14, 37:12,
42:25, 57:8, 101:24
**unable** [3] - 22:4,
37:2
**unchallenged** [1] -
221:5
**unclear** [1] - 125:21
**unconnected** [1] -
103:17
**uncontested** [2] -
8:1, 204:6
**under** [10] - 52:3,
52:6, 69:19, 109:4,
112:4, 125:11,
183:15, 183:16,
216:7, 221:24
**undergraduate** [4] -
15:19, 16:1, 16:4,
82:2
**underlying** [11] -
72:24, 73:10, 88:25,
89:18, 90:7, 161:22,
167:23, 175:12,
180:14, 208:18
**undermined** [1] -
199:24
**undermines** [2] -
205:20, 206:17
**underreacting** [1] -
48:11
**understood** [10] -
9:6, 27:16, 94:9,
120:15, 159:22,
163:20, 184:14,
194:15, 199:3, 209:2
**undertake** [1] - 32:19
**unfortunately** [2] -
20:19, 29:23

**ungrounded** [1] -
216:3
**uninformed** [1] -
62:8
**unique** [4] - 35:17,
40:16, 43:22, 43:23
**United** [7] - 82:20,
82:25, 84:3, 151:14,
163:1, 191:19, 223:13
**UNITED** [2] - 1:1, 1:9
**united** [1] - 2:2
**University** [8] -
15:22, 16:2, 16:5,
82:4, 82:11, 83:8,
83:10, 83:15
**unless** [2] - 5:25,
212:8
**unreliable** [1] -
219:19
**Up** [1] - 163:23
**up** [70] - 5:14, 7:3,
9:21, 11:21, 15:14,
22:6, 24:15, 29:18,
30:21, 38:2, 39:2,
44:7, 46:4, 51:14,
53:16, 54:25, 55:19,
61:9, 91:8, 91:12,
92:9, 92:10, 93:25,
94:7, 94:17, 95:23,
96:10, 97:24, 98:18,
99:3, 99:10, 101:4,
101:22, 105:3, 108:8,
118:22, 126:22,
135:16, 141:13,
144:22, 150:13,
150:24, 151:21,
164:12, 170:14,
172:1, 172:4, 178:8,
183:10, 186:2,
188:13, 189:11,
190:6, 197:22,
204:16, 204:21,
207:3, 207:14,
207:15, 207:16,
208:15, 208:16,
208:19, 208:23,
210:21, 216:6,
216:14, 218:21,
219:2, 219:12
**updated** [1] - 78:15
**uptick** [1] - 8:13
**usage** [1] - 20:16
**useful** [2] - 36:18,
55:17
**uses** [4] - 115:12,
117:1, 117:3, 198:20
**usual** [1] - 89:17
**utilization** [36] -
9:15, 9:18, 28:25,
31:7, 31:10, 31:13,

31:16, 31:19, 31:22,
96:2, 125:25, 126:10,
127:7, 127:18,
127:23, 128:4, 128:8,
128:18, 129:5,
129:10, 130:2, 130:7,
130:20, 131:20,
131:24, 133:19,
134:7, 134:10, 137:2,
137:9, 137:23, 139:5,
199:20, 201:4,
218:24, 219:5
    **utilized** [3] - 23:4,
31:15, 32:13

---

**V**

---

    **valid** [4] - 212:1,
213:9, 216:3, 216:17
    **valuable** [2] - 25:11,
25:12
    **valuation** [3] - 84:11,
84:16, 175:5
    **Value** [1] - 54:1
    **value** [78] - 20:6,
20:12, 42:15, 64:10,
65:5, 66:10, 66:20,
67:3, 67:6, 68:14,
73:17, 76:24, 77:8,
80:9, 80:10, 80:12,
80:23, 88:1, 89:11,
89:13, 90:16, 90:21,
91:19, 92:13, 93:5,
94:15, 94:18, 94:22,
96:9, 102:10, 103:17,
104:4, 104:23,
106:12, 106:23,
107:4, 107:12,
112:21, 113:3,
113:10, 116:3,
116:21, 117:16,
118:6, 118:10,
119:16, 119:19,
119:25, 121:10,
121:12, 121:20,
136:4, 136:8, 136:13,
137:10, 138:18,
139:16, 141:25,
143:5, 143:25, 144:7,
144:16, 148:14,
153:17, 153:20,
157:13, 157:17,
159:9, 159:10,
170:20, 192:17,
200:14, 215:16,
215:17, 216:1, 216:2,
216:4, 216:10
    **value-relevant** [62] -
65:5, 66:10, 66:20,
67:3, 67:6, 68:14,

---

73:17, 77:8, 80:9,
80:10, 80:12, 88:1,
89:11, 89:13, 90:16,
90:21, 91:19, 92:13,
93:5, 94:15, 94:18,
94:22, 96:9, 102:10,
103:17, 104:4,
104:23, 106:12,
107:4, 107:12,
112:21, 113:3,
113:10, 116:3,
116:21, 117:16,
118:6, 118:10,
119:16, 119:19,
119:25, 121:10,
121:12, 121:20,
136:4, 136:8, 136:13,
137:10, 138:18,
141:25, 143:5,
143:25, 144:7,
144:16, 148:14,
200:14, 215:16,
215:17, 216:1, 216:2,
216:4, 216:10
    **valued** [1] - 159:13
    **variations** [3] -
184:22, 184:23,
195:25
    **variety** [5] - 16:12,
17:11, 43:24, 61:16,
62:1
    **various** [7] - 82:5,
82:8, 82:10, 82:13,
83:3, 108:16, 137:20
    **vast** [2] - 47:16,
108:15
    **vendor** [4] - 23:15,
126:6, 127:24, 127:25
    **Ventures** [1] - 79:5
    **verge** [1] - 193:22
    **versus** [8] - 4:2,
48:17, 55:16, 55:20,
110:1, 111:20, 123:2
    **view** [11] - 45:20,
68:12, 73:16, 108:17,
108:20, 111:6,
111:11, 165:25,
184:3, 184:4, 193:21
    **viewed** [2] - 62:7,
80:5
    **views** [2] - 61:11,
96:15
    **vigorously** [1] -
217:3
    **violate** [1] - 13:11
    **virtue** [1] - 40:11
    **vision** [2] - 153:10,
158:12
    **visiting** [1] - 83:10
    **volatile** [2] - 55:2,

---

55:4
    **volatility** [38] - 9:20,
9:23, 9:25, 54:6, 55:7,
55:10, 55:12, 55:13,
55:16, 55:19, 55:20,
55:23, 56:1, 56:4,
104:13, 104:14,
104:20, 104:24,
115:17, 115:19,
115:21, 115:22,
115:24, 116:10,
116:11, 116:12,
125:16, 132:17,
148:10, 148:11,
184:20, 184:21,
214:6, 214:15,
214:20, 219:16,
219:19
    **Volume** [1] - 27:2
    **volume** [41] - 27:13,
35:6, 35:7, 35:15,
35:16, 35:18, 35:23,
35:25, 36:17, 37:5,
37:10, 56:4, 87:6,
87:8, 97:3, 97:7,
97:11, 97:15, 97:21,
98:11, 98:15, 99:1,
99:2, 99:9, 99:18,
99:23, 103:24,
104:10, 104:23,
105:8, 109:2, 109:3,
109:7, 110:6, 132:18,
135:14, 135:15,
135:20, 135:23, 137:8

---

**W**

---

    **wagon** [1] - 120:13
    **wait** [2] - 183:1,
192:20
    **walk** [1] - 208:10
    **walked** [1] - 211:16
    **walking** [1] - 108:16
    **Wall** [1] - 146:8
    **wants** [5] - 28:15,
95:18, 160:9, 207:14,
207:15
    **warranty** [2] -
161:20, 162:2
    **Washington** [6] -
1:5, 1:18, 1:23, 2:4,
163:3, 223:14
    **water** [1] - 175:3
    **ways** [8] - 24:7,
24:11, 24:13, 38:4,
38:7, 43:1, 168:21,
169:7
    **weak** [2] - 10:5,
211:6
    **weakly** [1] - 35:23

---

    **weakness** [1] -
203:10
    **wealth** [2] - 175:9,
184:8
    **week** [13] - 38:25,
39:5, 45:4, 68:22,
101:21, 105:24,
173:22, 174:7,
174:12, 174:17,
176:10, 177:13
    **weekend** [1] - 222:8
    **weeks** [5] - 28:2,
56:2, 91:13, 174:13,
213:7
    **weigh** [1] - 35:25
    **weighed** [1] - 45:17
    **weighs** [1] - 46:15
    **well-pled** [1] - 217:2
    **WhatsApp** [7] -
175:21, 176:5, 176:7,
176:19, 177:6, 191:21
    **WhatsApps** [1] -
177:8
    **whatsoever** [2] - 8:7,
8:22
    **whereas** [1] - 92:8
    **whole** [3] - 94:16,
160:16, 218:23
    **wide** [5] - 60:2, 60:6,
61:16, 184:22, 199:21
    **widely** [7] - 23:20,
29:23, 33:4, 33:11,
44:2, 94:8, 98:7
    **wife** [1] - 6:20
    **Williams** [2] - 4:24,
5:2
    **WILLIAMS** [1] - 1:22
    **willing** [6] - 23:2,
25:11, 31:15, 37:5,
100:17, 160:6
    **willingness** [1] -
47:20
    **window** [8] - 10:20,
39:4, 147:2, 147:6,
147:14, 200:21,
214:3, 214:8
    **windows** [2] - 147:1,
148:17
    **wisely** [1] - 85:19
    **wish** [3] - 37:7,
150:9, 176:22
    **witness** [7] - 21:9,
60:16, 81:9, 83:21,
84:2, 150:8, 194:23
    **WITNESS** [39] -
14:20, 24:4, 25:13,
26:2, 27:17, 28:1,
28:10, 36:21, 52:15,
53:1, 54:16, 54:23,
55:4, 55:18, 60:22,

---

69:21, 71:20, 81:8,
81:15, 81:18, 88:9,
89:8, 100:2, 100:7,
101:5, 102:6, 118:2,
118:16, 118:20,
134:1, 150:6, 151:3,
151:8, 151:25,
156:12, 156:19,
159:20, 161:18,
167:10
    **witnesses** [3] - 5:22,
6:16, 13:5
    **WITNESSES** [2] -
3:10, 3:14
    **woman** [1] - 215:20
    **wondering** [2] -
55:1, 202:3
    **word** [9] - 20:20,
80:11, 110:12,
110:24, 161:16,
163:14, 163:17,
163:19, 216:23
    **words** [4] - 91:15,
101:16, 129:6
    **works** [1] - 24:3
    **world** [1] - 184:15
    **worldwide** [1] -
83:17
    **worried** [2] - 212:21,
212:22
    **worry** [2] - 118:14,
118:17
    **worth** [5] - 122:17,
159:13, 173:2, 175:9,
184:9
    **worthy** [1] - 80:5
    **wrecked** [1] - 207:11
    **wrestling** [1] -
221:21
    **write** [1] - 178:20
    **writing** [3] - 176:9,
176:18, 207:8
    **written** [6] - 82:22,
139:20, 195:1, 195:7,
195:8, 208:13
    **wrote** [4] - 66:8,
172:18, 175:11,
215:21

---

**Y**

---

    **year** [5] - 30:21, 39:2,
52:19, 52:20, 110:21
    **yearlong** [1] - 109:25
    **years** [5] - 16:11,
34:20, 82:6, 151:20,
166:15
    **Yitzchak** [1] - 4:14
    **York** [3] - 1:17, 84:4,

199:2
**yourself** [1] - 33:8
**yourselves** [1] - 4:5

## Z

**zero** [7] - 23:7, 53:8, 53:10, 53:11, 101:4
**zero-dollar** [1] - 53:11
**zeroes** [2] - 186:16, 186:23
**zone** [1] - 159:11