**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE BED BATH & BEYOND CORPORATION SECURITIES LITIGATION | Case No. 1:22-CV-02541 (TNM) |

**SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 2

    I.      Bratya Is Atypical ................................................................................. 2

          A.      Bratya's Trades Conflict with Its Allegations .................................... 2

          B.      Bratya's Net-Short Position Betrays Its Lack of Reliance ................. 5

    II.     Individualized Questions of Reliance Predominate ........................................ 7

          A.      Bratya Cannot Invoke the *Basic* Presumption of Class-Wide Reliance ...................................................................................... 8

          B.      Even If Bratya Could Satisfy *Basic* (It Cannot), the Presumption Is Rebutted Because the Challenged Statements Had No Price Impact ...................................................... 20

    III.    This Court Should Deny Certification Because It Is Right To Do So ................................................................................................................ 22

CONCLUSION .............................................................................................................. 24

CERTIFICATE OF SERVICE ........................................................................................ 24

# TABLE OF AUTHORITIES

## CASES

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013) .......................................5

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74 (2d Cir. 2023) .............................22

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)................................................................... *passim*

*Bell v. Ascendant Sols., Inc.*, 2004 WL 1490009 (N.D. Tex. July 1, 2004),
    *order aff'd and remanded*, 422 F.3d 307 (5th Cir. 2005) ........................................................20

*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ........................................................ *passim*

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994).........23

*Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427 (D. Ariz. 2019) .........................................7

*Fleck v. Cablevision VII, Inc.*, 763 F. Supp. 622 (D.D.C. 1991) ....................................................6

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) .....................................................................2

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113 (2021) ..................................7, 22

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014)......................................1, 7, 20

*IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*,
    2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ............................................................14, 18, 20

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
    281 F.R.D. 174 (S.D.N.Y. 2012) ......................................................................................15

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29 (2d Cir. 2009)....................................2

*In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321 (N.D. Ill. Mar. 5, 2015) ...............................14

*In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90 (D.C. Cir. 2015) ...................................23

*In re Jan. 2021 Short Squeeze Trading Litig.*,
    2023 WL 9035671 (S.D. Fla. Nov. 13, 2023).........................................................................13

*In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017) ...................................................................7, 15

*In re PolyMedica Corp. Sec. Litig.*, 224 F.R.D. 27 (D. Mass. 2004),
    *vacated and remanded*, 432 F.3d 1 (1st Cir. 2005) ...............................................................9

*In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1 (1st Cir. 2005).........................................7, 8, 9, 10

*In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260 (D. Mass. 2006)...............8, 9, 10, 12, 13

*In re Safeguard Scis.*, 216 F.R.D. 577 (E.D. Pa. 2003) ..........................................................5

*In re Tesla, Inc. Sec. Litig.*, No. 18-4865 (N.D. Cal. Oct. 13, 2020) ...............................14

*Kas v. Fin. Gen. Bankshares, Inc.*, 105 F.R.D. 453 (D.D.C. 1984)......................................6

*Kovaleff v. Piano*, 142 F.R.D. 406 (S.D.N.Y. 1992) ............................................................5

*Lewis v. Johnson*, 92 F.R.D. 758 (E.D.N.Y. 1981).............................................................5

*Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
    762 F.3d 1248 (11th Cir. 2014) .................................................................................8

*Malack v. BDO Seidman, LLP*, 617 F.3d 743 (3d Cir. 2010) ...............................................6

*Malriat v. QuantumScape Corp.*, 2022 WL 17974629 (N.D. Cal. Dec. 19, 2022) .....................14

*Monroe Cnty. Employees' Ret. Sys. v. Southern Co.*, 332 F.R.D. 370 (N.D. Ga. 2019) ................7

*Pendleton v. Rumsfeld*, 628 F.2d 102 (D.C. Cir. 1980) .......................................................2

*Rolex Emps. Ret. Tr. v. Mentor Graphics Corp.*, 136 F.R.D. 658 (D. Or. 1991) ..........................5

*Smilovits v. First Solar, Inc.*, 295 F.R.D. 423 (D. Ariz. 2013) ..........................................7

*Stoneridge Inv. Partners, LLC v. Sci-Atlanta*, 552 U.S. 148 (2008) ...........................................23

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008)....................................................................15, 18, 19

*Unger v. Amedisys Inc.*, 401 F.3d 316 (5th Cir. 2005) ................................................8, 9

*Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017)...............................................19

## STATUTES AND RULES

Fed. R. Civ. P. 23(a)(3)......................................................................................................1

Fed. R. Civ. P. 23(a)(4)......................................................................................................5

Fed. R. Civ. P. 23(b)(3)...................................................................................................1, 7

## OTHER AUTHORITIES

7A Charles Alan Wright et al., Federal Practice and Procedure § 1764 (4th ed. 2024) .................2

*Bed Bath & Beyond Inc. (BBBY)*, Wells Fargo (Aug. 18, 2022) .................................................10

Connor Smith, *Bed Bath & Beyond Stock Is Pricey to Borrow. Short Sellers Are Doing It Anyway*, Barron's (Aug. 17, 2022) .................................................................................12, 14

*Division of Enforcement*, SEC (last visited Aug. 10, 2024), https://tinyurl.com/24ec8yus ..........24

Lauren Thomas, *Bed Bath & Beyond Soars As Much As 70% As Meme Traders Talk Up Ryan Cohen's Call Options Purchase*, CNBC (Aug. 16, 2022), https://tinyurl.com/3brzyrjz ........................................................................................17

*Squawk On The Street*, CNBC (Aug. 17, 2022), https://tinyurl.com/debwn6e9 .........................17

## INTRODUCTION

"[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014).  Certification should be denied because Bratya fails this burden.

*First*, Bratya cannot demonstrate that its claims "are typical of the claims ... of the class." Fed. R. Civ. P. 23(a)(3).  Bratya is an atypical plaintiff, even for a remarkably atypical class. Bratya cannot serve as a representative of a class that supposedly bet with Ryan Cohen, when it so consistently did the opposite.

*Second*, Bratya cannot satisfy the Court that "questions of law or fact common to class members predominate over" individualized questions of reliance.  Fed. R. Civ. P. 23(b)(3).  During the putative Class Period, the market for BBBY stock demonstrated aberrational price movements that preclude a finding of market efficiency as required under *Basic Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988).  Reliance would need to be proved on an individual basis, and such issues would overwhelm common questions.

Bratya offered nothing at the evidentiary hearing that could remedy its otherwise insufficient showing of typicality and predominance.  Bratya cannot deflect attention from these failures by lobbing criticisms at Cohen.  No amount of diversion can obscure Bratya's failure to satisfy each requirement of Rule 23.  Bratya's motion for class certification must be denied.

1

**ARGUMENT**

## I.   Bratya Is Atypical

### A. Bratya's Trades Conflict with Its Allegations

Typicality "serve[s] as [a] guidepost[] for determining whether…the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982).  Courts use typicality "to screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present."  7A Charles Alan Wright et al., Federal Practice and Procedure § 1764 (4th ed. 2024); *cf. Pendleton v. Rumsfeld*, 628 F.2d 102, 105 (D.C. Cir. 1980). A class representative is atypical if its claims would be "subject to any unique defenses which threaten to become the focus of the litigation."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009) (quotation marks omitted).

Bratya typifies an atypical lead plaintiff.  Its actions are irreconcilable with a putative class that allegedly relied upon Cohen or the integrity of the market.  Bratya's claims suffer from at least four factual deficiencies that would inevitably "become the focus of the litigation."  *Id.*

*March 7th Schedule 13D.*  Cohen's investment in BBBY became public "[o]n March 7, 2022[] [when] Cohen filed a Schedule 13D, stating that he ... now owned 9.8% of the Company's total outstanding shares."  ECF No. 66 (SAC) ¶ 92.  Bratya alleges "[r]etail investors on Reddit" whom Bratya purports to typify "immediately reacted with enthusiasm" to Cohen's Schedule 13D. *Id.* ¶ 96.  Bratya offers examples of exuberant Redditors:  One "user ... stated that 'I suddenly Love Bed bath & beyond[]'" while another user "wrote that he or she was 'ALL IN on BBBY.'"  *Id.*

But Bratya cannot represent class members that believed Cohen's investment marked a brighter future for BBBY because, on March 7th, Bratya *shorted* the Company by writing naked

2

call options.  Ex.1 at 8 (Def. Hr'g Demonstrative); Ex.2 (BRATYA_000123) at 3.  Bratya opened yet more short positions in subsequent days.  All told, in the week after Cohen announced his intention to revitalize BBBY, Bratya initiated "naked short transactions" to the tune of 2,653 call options (or 265,300 shares).  Hr'g Tr. 174:3-4.  Asked for explanation, Coti testified that Cohen's investment "doesn't mean that we have to go all-in to trust in Mr. Cohen's capability to do a transaction."  *Id.* 176:25-177:2.

**August 5th Tweet.**  Bratya contends that "[o]n August 5, 2022, Cohen stoked Bed Bath retail investors with" a tweet that said "[a]sk not what your company can do for you–ask what you can do for your company."  SAC ¶ 139.  According to Bratya, "[t]he response was overwhelmingly positive," and "[o]n August 8, 2022, the next trading day after Cohen tweeted on August 5, 2022, Bed Bath's stock price rose in reaction."  *Id.* ¶¶ 140, 143.

But Bratya's response diverged from that of the putative class.  On August 8, 2022, Bratya *initiated new short positions* in BBBY "involving over two million shares of Bed Bath & Beyond stock."  Hr'g Tr. 181:10-17; *see also* Ex.2 at 2; Ex.1 at 10.  Coti testified that this "was strategies."  Hr'g Tr. 181:13.  Perhaps, but it is a strategy antithetical to a class that allegedly relied upon Cohen's investment in BBBY.

**August 12th Tweet.**  Bratya cannot even typify the allegation that commences the putative Class Period.  On August 12th, "CNBC tweeted a link to a negative article about Bed Bath" and "Cohen replied to CNBC's post with a tweet that said 'At least her cart is full'".  SAC ¶ 146-47.  Bratya alleges this tweet had powerful effect, "[t]he response on Twitter was overwhelmingly positive, and Twitter users understood Cohen's tweet as a rallying cry to buy Bed Bath's stock and 'take it to the moon.'"  *Id.* ¶ 149.

3

Bratya, however, did not reflect the putative class's "overwhelmingly positive" reaction, and did not heed Cohen's alleged "rallying cry." *Id.* On August 12th, Bratya "did not b[uy] shares." Hr'g Tr. 187:23. On August 12th, Bratya instead initiated *new short positions* in transactions "that involved 160,000 shares of Bed Bath & Beyond." *Id.* 187:9-11; *see also* Ex.2 at 2; Ex.1 at 12. And on August 15th, Bratya sold short *an additional* 2,800 naked call options, representing 280,000 shares of BBBY. Ex.2 at 2; Ex.1 at 12. Bratya hastens to add that it sold these options "at a much higher strike price" than BBBY's market price, and "generated revenue" from doing so. Hr'g Tr. 188:16-18. Those protests make no difference. When Cohen issued a tweet that allegedly caused the putative class to double-down on BBBY, Bratya double-downed against BBBY.

**Cohen's Exit From BBBY.** Perhaps most striking is Bratya's response to Cohen's sales. Bratya alleges that news of Cohen's selloff on August 18th prompted the putative class to lose faith in BBBY, as "the Company's stock price plunged over the next three days." SAC ¶ 178.

Bratya did not share the putative class's reaction. When trading opened on August 18th, Bratya knew that Cohen had closed his investment in BBBY. Hr'g Tr. 165:5-8. Even so, Coti confirmed that "[a]fter Mr. Cohen sold all of his shares and after [Bratya] knew he'd sold all of his shares, [Bratya] purchased shares." *Id.* 165:15-17. Specifically, on August 18th, Bratya bought 25,600 shares of BBBY stock. Ex.2 at 1; Ex.1 at 14. Bratya also bought call options involving 300,000 shares of BBBY—reflecting a bullishness that Bratya had never evidenced during Cohen's investment. *Id.*

In Coti's words, Bratya "increased" its stake in BBBY on August 18th "because we had the cash that we generated and we could." Hr'g Tr. 189:17-18. Bratya's decision to invest *after* the revelation of Cohen's alleged misstatements is necessarily atypical of a putative class that

invested *because* of Cohen's alleged misstatements.  *Cf. In re Safeguard Scis.*, 216 F.R.D. 577, 582 (E.D. Pa. 2003) (holding plaintiff atypical where he "increased his holdings in [company] stock even after public disclosure of the alleged fraud"); *Kovaleff v. Piano*, 142 F.R.D. 406, 408 (S.D.N.Y. 1992) (same); *Rolex Emps. Ret. Tr. v. Mentor Graphics Corp.*, 136 F.R.D. 658, 664 (D. Or. 1991) (same); *Lewis v. Johnson*, 92 F.R.D. 758, 760 (E.D.N.Y. 1981) (same).

At every turn, Bratya parted from the putative class it seeks to represent.[1]  Bratya has conjured an array of explanations for acting contrary to the putative class.  *E.g.*, Hr'g Tr. 174:17-24 (claiming Bratya had "no cash"); *id.* 161:11-12 (claiming Bratya wanted "a premium"); *id.* 161:18-162:5 (claiming Bratya sought to "hedge"); *id.* 165:8-11 ("speculat[ing]" on reasons for Cohen's sale).  These excuses, however, underscore and exacerbate Bratya's deficiencies.  Bratya's claims are plagued by "issues creat[ing] the possibility of defenses which could prejudice the class by becoming the focus of the litigation and diverting attention from the merits of the class action."  *Lewis*, 92 F.R.D. at 760.

### B.  Bratya's Net-Short Position Betrays Its Lack of Reliance

Bratya offers two rejoinders in support of its typicality.  One is a misstatement of fact; one is a misstatement of law.  Neither disturbs the conclusion that Bratya's conduct disqualifies its representation of the putative class.

As for the facts:  Bratya insists it is typical because "[a]t no time during the Class Period was Plaintiff net short on BBBY securities."  ECF No. 119 (Bratya Reply) at 20.  This claim is false.  Before the putative Class Period began, Bratya sold call options for more shares of BBBY

---

[1] Bratya's atypical trades also undermine its adequacy.  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 473 (2013) (noting a court could not "confidently conclude" that a lead plaintiff with atypical trades "would 'fairly and adequately protect the interests' of [other] investors" in the putative class (quoting Fed. R. Civ. P. 23(a)(4))).

5

than it owned.  Ex.2 at 2.  When the putative Class Period began, Bratya had no BBBY stock that could have possibly covered new short positions.  Thus, when Bratya sold calls representing 440,000 BBBY shares on August 12th and August 15th, every single one of those sales was a naked, uncovered short.  *See* Ex.1 at 12; Ex.2 at 2.

Bratya was heavily short on BBBY by August 16th.  And because of the short squeeze roiling BBBY, closing these short positions cost Bratya dearly.  Bratya did so on August 17th and 18th by purchasing offsetting call options.  Ex.1 at 12; Ex.2 at 1-2.  Given BBBY's rising share price, however, purchasing those options resulted in multi-million dollar losses.  Ex.1 at 10, 12.  Bratya lost money on BBBY, but not because it relied on Cohen or the market's integrity.  Bratya knew it was trading in "a kind of a short squeeze."  Hr'g Tr. 190:12 (statement by Coti).  Bratya may wish to recover losses from those risky bets, but securities law is not investor insurance.  *Cf. Malack v. BDO Seidman, LLP*, 617 F.3d 743, 752 (3d Cir. 2010) (observing plaintiff's request "for a kind of investor insurance that eliminates the need for proving reliance," is "contrary to the goals of securities laws.").

Bratya finally argues "the law says that everybody doesn't have to have the same motive." Hr'g Tr. 195:23-24; 197:10-12.  In a class action securities lawsuit, however, the law requires exactly that.  "Several courts have denied class certification in securities actions when the proposed class representatives were subject to special reliance issues."  *Fleck v. Cablevision VII, Inc.*, 763 F. Supp. 622, 627 (D.D.C. 1991) (collecting cases); *see also Kas v. Fin. Gen. Bankshares, Inc.*, 105 F.R.D. 453, 461 (D.D.C. 1984) (holding that plaintiffs were atypical because "plaintiffs took [action] for reasons unrelated to any alleged misrepresentations").  Bratya itself did not rely on Cohen and cannot typify a putative class that allegedly did.

## II.    Individualized Questions of Reliance Predominate

"[W]ithout the benefit of the *Basic* presumption, investors would have to prove reliance on an individual basis, meaning that individual issues would predominate over common ones," precluding class certification under Rule 23(b)(3).  *Halliburton*, 573 U.S. at 265-66.  To invoke the so-called *Basic* reliance presumption, a plaintiff must establish that—at the time the alleged misstatements were made—the stock traded in an efficient market.  *Basic*, 485 U.S. at 246-47.

"[A]n efficient market is one in which the market price of the stock *fully reflects* all publicly available information."  *In re PolyMedica Corp. Sec. Litig.* (*PolyMedica II*), 432 F.3d 1, 14 (1st Cir. 2005).  In an efficient market, the "market price responds so quickly to *new information* that ordinary investors cannot make trading profits on the basis of such information."  *Id.* at 19 (emphasis added).  A consistent and timely price reaction to "new value-relevant information" is the touchstone of efficiency.  ECF No. 108-1 (Cain Rep.) ¶ 57; *see also In re Petrobras Sec.*, 862 F.3d 250, 277 (2d Cir. 2017); *Monroe Cnty. Employees' Ret. Sys. v. Southern Co.*, 332 F.R.D. 370, 386 (N.D. Ga. 2019); *Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 441 (D. Ariz. 2019); *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 434 n.6 (D. Ariz. 2013).

If a plaintiff demonstrates market efficiency, a defendant may nonetheless rebut the *Basic* presumption in a number of ways, "including by showing that the alleged misrepresentation did not actually affect the stock's price."  *Halliburton*, 573 U.S. at 263-64.  "In assessing price impact at class certification, courts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense."  *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 122 (2021) (quotation marks omitted).

### A. Bratya Cannot Invoke the *Basic* Presumption of Class-Wide Reliance

#### 1. Bratya Fixates on *Cammer* But Fails *Basic*

With a myopic focus, Bratya directs this Court to the factors outlined in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).  Across extensive briefing, Bratya repeatedly has claimed entitlement to the *Basic* presumption of class-wide reliance because "almost all the *Cammer* ... factors existed during the Class Period."  Bratya Reply at 1.  Again and again, Bratya misses the point.  "The *Cammer* and *Krogman* factors are simply tools to help district courts analyze market efficiency in determining whether the *Basic* presumption of reliance applies in class certification decision-making.  But they are no more than tools in arriving at that conclusion."  *Waggoner v. Barclays PLC*, 875 F.3d 79, 98 (2d Cir. 2017).  "The relevant inquiry ... is not whether trading in [BBBY] stock met the *Cammer* factors; rather, the test is whether its stock price was information efficient."  *In re PolyMedica Corp. Sec. Litig.* (*PolyMedica III*), 453 F. Supp. 2d 260, 271 (D. Mass. 2006).

Neither the Supreme Court nor the D.C. Circuit has addressed the *Cammer* factors.  The circuit courts that have considered *Cammer*, however, instruct that the *Cammer* factors are relevant—but neither necessary nor sufficient—indicators of market efficiency.  *E.g.*, *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1255 (11th Cir. 2014) (rejecting "suggestion that we adopt the *Cammer* factors as the mandatory analytical framework for market efficiency inquiries."); *PolyMedica II*, 432 F.3d at 18 ("While we agree with Plaintiff that the [*Cammer*] factors considered by the district court were relevant to the issue of market efficiency, these factors are not exhaustive."); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323-25 (5th Cir. 2005) ("Although [*Cammer*] does not represent an exhaustive list, ... once a court endeavors to apply these factors, they must be weighed analytically, not merely counted.").  These

circuits uniformly caution against applying the *Cammer* factors, like Bratya and Dr. Cain attempt to do, "as a checklist rather than an analytical tool." *Unger*, 401 F.3d at 325.

A court cannot consider *Cammer* to the exclusion of other relevant evidence. *PolyMedica* illustrates the rule. There, the plaintiff sought to invoke the *Basic* presumption of class-wide reliance and argued that the market during the class period satisfied the *Cammer* factors. *In re PolyMedica Corp. Sec. Litig.* (*PolyMedica I*), 224 F.R.D. 27, 43 (D. Mass. 2004), *vacated and remanded*, 432 F.3d 1 (1st Cir. 2005). The defendant acknowledged many of the *Cammer* factors were satisfied, but nonetheless insisted the *Basic* presumption was inapplicable because "[s]erious constraints on the availability of shares of PolyMedica stock to short," precluded a finding of efficiency. Def. Opp'n to Class Cert. at 11, *PolyMedica I* (D. Mass. Feb. 27, 2004), ECF No. 65. Having found that most *Cammer* factors were met, the district court rejected defendant's evidence as irrelevant and certified the class. *PolyMedica I*, 224 F.R.D. at 43.

The First Circuit vacated and remanded the district court's decision. *PolyMedica II*, 432 F.3d at 19. The First Circuit began by announcing the proper standard: A plaintiff seeking to invoke *Basic* must prove "a particular market has absorbed all available information (and misinformation)—such that an ordinary investor cannot beat the market by taking advantage of unexploited profit opportunities." *Id*. at 16. To assess whether a plaintiff's showing meets this standard, the First Circuit explained, the five *Cammer* factors may be "relevant" but "not exhaustive." *Id.* at 18. "The district court's error, therefore, was *not in analyzing the factors that it did*, but in applying an erroneous definition of market efficiency that prevented it from analyzing other arguably relevant evidence." *Id.* at 18-19 (emphasis added).

On remand, the district court denied class certification. *PolyMedica III*, 453 F. Supp. 2d at 278. The court observed "that the first four *Cammer* factors favor a finding of market efficiency"

but the fifth, and "most important *Cammer* factor," presented "problems." *Id.* The plaintiff's "weak showing" on the fifth *Cammer* factor was compounded by defendant's evidence suggesting that the relevant market violated the "random walk" principle[2] and had "significant barriers to short selling, a mechanism which is both relevant to information efficiency and essential to fundamental value efficiency." *Id.* at 277-78. Thus, notwithstanding that the plaintiff managed to check most of the *Cammer* boxes, the district court denied class certification.

Bratya's showing fails for the same reasons. Although the balance of the *Cammer* factors may weigh in Bratya's favor, the weight of economic evidence demonstrates that the market price of BBBY securities during the putative Class Period did not fully reflect all public information. *PolyMedica II*, 432 F.3d at 14. To the contrary, BBBY's aberrational prices movements during the putative Class Period suggest a market disconnected from new, value-relevant information.

## 2. Bratya Ignores the Inefficiencies Arising From the Short Squeeze

Bratya was not shy about alleging "that a short squeeze was taking place" during the putative Class Period. SAC ¶ 24. Allegations of a "squeeze" are found throughout Bratya's complaint; the term appears nearly 30 times in Bratya's pleading. In its motion for class certification, Bratya also acknowledged that the BBBY securities market demonstrated "short squeeze dynamics" during the putative Class Period. ECF No. 109 (Bratya Mot.) at 20. And at the evidentiary hearing, Bratya likewise did not deny that a short squeeze occurred.[3] Hr'g Tr. 9:2-4. Dr. Cain observed that short squeezes, like the one at issue here, may create market frictions

---

[2] For an explanation of the "random walk" principle and its relevance here, *see* ECF No. 117-1 (Fischel Rep.) ¶¶ 32–35.

[3] In the next breath, Bratya's counsel curiously added that "Professor Fischel did not show that there was a short squeeze." Hr'g Tr. 9:7–9. Not so. Professor Fischel extensively detailed the dynamics consistent with a short squeeze during the Class Period. Fischel Rep. ¶¶ 23–29. In any event, a defendant is not obligated to prove facts that *the plaintiff itself* alleges in its complaint.

and inefficiencies.  *Id.* 64:8-12; *cf.* ECF No. 117 (Cohen Opp'n) at 5 (quoting Dr. Cain stating "there can be times when stock may not trade efficiently and that could include times when they are subject to short squeeze.").  Yet Bratya steadfastly refuses to recognize or reconcile the market frictions created by the short squeeze with its claim of market efficiency.

BBBY was heavily shorted before and during the putative Class Period.  In early August 2022, more than 30 million shares of BBBY were on loan to short sellers.  ECF No. 120-1 (New Cain Rep.) at 9.  This 30 million accounted for "basically, 100 percent of the shares that were" available for shorting, meaning that there were functionally "no further shares available for lending" to prospective short sellers.  Hr'ng Tr. 95:12-14.

And then the shorts got squeezed.  A "huge surge of buying activity," exhibited by the stock's dizzying trading volume, "push[ed] prices up and ma[d]e it more and more expensive for investors holding short positions to comply with their obligations to buy a stock to return."  Hr'g Tr. 93:21-94:7.  As a result, short sellers "ha[d] to start purchasing to cover their position ... but those purchasing decisions just accelerate[d] the short squeeze and push[ed] prices continually up."  *Id.* 93:21-94:7.  This overwhelming volume—coupled with cascading layers of short sellers forced to close their position by buying stock—created "a temporary aberrational artificial price movement" that caused "a dramatic departure … from market efficiency."  *Id.* 94:11-12.

These phenomena spurred "dramatic changes in price, both up and then down, even in the absence of any value-relevant information."  *Id.* 94:16-18.  In two weeks preceding the putative Class Period, BBBY's market price climbed 113%.  *Id.* 91:11-14; Ex.1 at 21.  Likewise, in the "first four days of the Class Period ... Bed Bath & Beyond increas[ed] in price by 117.1%."  Hr'g Tr. 92:7-10; Ex.1 at 22.  Professor Fischel "investigated whether there was any new value-relevant information ... disclosed during this period that could explain" such drastic price movements.  Hr'g

11

Tr. 91:18-20.  Finding none, Professor Fischel opined that BBBY's unexplained price movements were "more consistent with what you would observe in an inefficient market than what you would expect in an efficient market." *Id.* 92:12-15.  Analysts agreed.  Contemporaneous analyst coverage announced "the writing is on the wall that BBBY shares have again decoupled from economic reality."  *Bed Bath & Beyond Inc. (BBBY)*, Wells Fargo (Aug. 18, 2022).

Bratya takes issue with this evidence in two ways.  *First*, Bratya points to Dr. Cain's assertion that short sales were not constrained because the number of shares available to short was "not zero."  Hr'g Tr. 23:6-9.  Here, Bratya confuses an impediment with an absolute bar.  Dr. Cain opined that "hundreds of thousands" of shares were available to short, but this figure accounted for only 0.5% of BBBY's trading volume.[4]  *Compare* New Cain Rep. ¶ 24 (available shares), *with* Cain Rep. ¶ 37 (volume).  No one disputes that BBBY shares available to short were few, far between, and pricey.  Indeed, the precious few shares that *were* available to short sellers were prohibitively expensive—far costlier than those in *PolyMedica III*.  *Compare* Connor Smith, *Bed Bath & Beyond Stock Is Pricey to Borrow.  Short Sellers Are Doing It Anyway*, Barron's (Aug. 17, 2022) (reporting 50% stock borrow fees for new short positions), *with* 453 F.Supp.2d at 273-74 (concluding stock borrow fees "from 15% to 35%" made "transaction costs for short selling ... extraordinarily high").  Under such circumstances, the difference between short interest utilization of 98% (per Dr. Cain's source) and 100% (per Professor Fischel's source) does not matter.  "What matters is that in this case, the barriers to short selling in the market for [BBBY] stock in particular were uncommonly high."  *PolyMedica III*, 453 F.Supp.2d at 274 n. 18.

---

[4] That there are *some* shares available for loan reflects the fact that when a short seller capitulates to a squeeze and covers its short position, those shares become available.  But the act of covering creates upward pressure on the price.

*Second*, Bratya attacks Professor Fischel for "not do[ing] any statistical significance testing to test the relationship between the short interest utilization rate and BBBY's stock price." Hr'g Tr. 127:16-19. The point of this criticism is unclear given that Bratya does not dispute the short squeeze it alleged. But regardless, as Professor Fischel explained, "there's no reason to expect a one-for-one relationship" between short interest and price. *Id.* 135:11-12. Conditions are ripe for a short squeeze as short interest utilization approaches 100%, but no one has suggested that there is a direct correlation between utilization rate and price before a squeeze begins. Notably, Dr. Cain offered no support for counsel's criticism of Professor Fischel not "testing" this correlation.

Leaving aside these criticisms, Bratya advances a bolder argument: Bratya asks this Court to ignore evidence of inefficiency during the putative Class Period insofar as that evidence does not slot neatly within a *Cammer* factor. Consistent with this request, Bratya claimed at the evidentiary hearing that "it's sort of irrelevant even if [there] was" a short squeeze. *Id.* 9:4-5. Similarly, Dr. Cain decided he did not need to "reach an opinion as to whether [BBBY] was in a short squeeze during the Class Period" because "[t]hat was not a relevant factor among the *Cammer* and the *Krogman* factors in assessing market efficiency." *Id.* 29:25-30:3; *but see id.* 64:8-15 (Dr. Cain admitting a short squeeze may create market inefficiency).

Bratya's singular focus on *Cammer* echoes the errors of *PolyMedica I*. But try as it might, Bratya cannot bend the law to its will. Bratya contends there is no "legal decision that has said the market is inefficient because there's a short selling constraint and the utilization rate is near 100 percent, even though there are shares available to short." *Id.* 139:3-6. But there are several such cases. In *In re Jan. 2021 Short Squeeze Trading Litig.*, the court denied class certification because plaintiffs had not shown market efficiency during a squeeze in which short selling was constrained. 2023 WL 9035671 at *37 (S.D. Fla. Nov. 13, 2023). The court in *PolyMedica III* cited short sale

13

constraints among its grounds for denying class certification, notwithstanding that shares remained available to short.  453 F.Supp.2d at 273-74.  And in *IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*, the court concluded that impediments to short selling precluded class certification where short sales were prohibited for roughly 22% of the class period.  2013 WL 5815472, at *21 (S.D.N.Y. Oct. 29, 2013).

Conversely, Bratya claims that courts have certified classes during similar periods of turmoil.  Bratya Reply at 11-13.  But no such case has yet to appear.  Before this Court, Dr. Cain cited as analogous examples *In re Tesla, Inc. Sec. Litig.*, No. 18-4865 (N.D. Cal. Oct. 13, 2020) and *In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at *4, 9 (N.D. Ill. Mar. 5, 2015).  Hr'g Tr. 34:12-23.  But in *In re Tesla*, the court granted class certification *because the parties' jointly stipulated* to it.  *See* Stip. and Proposed Order (Nov. 23, 2020), ECF No. 296.  And, in *In re Groupon*, the weekly trading volume stood at 1.8%, there were millions of shares (of the company's 40.25 million float) available to short, and stock borrow fees were 35%.  *See* App. to Defs. Mem. ¶¶ 39,50 (May 2, 2014), ECF No. 235-2 (float and borrow fees); 2015 WL 1043321, at *4, 9 (volume and available shares).  Those conditions bears little resemblance to BBBY, where weekly trading volume stood at 1346.6%, "hundreds of thousands" (among the Company's 107 million float) were available to short, and stock borrow fees reached 50%.  Cain Rep. ¶¶ 37,90 (volume and float); New Cain Rep. ¶ 24 (available shares); Smith, *supra* (borrow fees).

The market conditions in Bratya's cited authority are also, at best, mere whitecaps compared to the maelstrom observed here.  *E.g.*, Bratya Reply at 10 (citing *Malriat v. QuantumScape Corp.*, 2022 WL 17974629 at *7 (N.D. Cal. Dec. 19, 2022), in which weekly trading volume reached a measly 43.61% compared to the 1346.6% exhibited here); *see also* ECF No. 121-1 (Proposed Sur-Reply) at 6-7 n.4 (explaining inapplicability of Bratya's cited caselaw).

The overwhelming weight of economic evidence suggests that during the Class Period, the BBBY stock market endured a "dramatic departure ... from market efficiency."  Hr'g Tr. 94:10-13.  The presence of three out of five *Cammer* factors does not disturb that conclusion.[5]  And as explained below, the fifth *Cammer* factor, "the *sine qua non* of efficiency," dispels any doubt.  *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 182 (S.D.N.Y. 2012).

### 3. Bratya Cannot Show a Relationship Between New Value-Relevant Information and Price Movements During the Class Period

The *Cammer* court considered the fifth factor, "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price" to be "the essence of an efficient market and the foundation for the fraud on the market theory."  711 F. Supp. at 1287.  This is because "[a]ll but one of the *Cammer* factors examine indirect indicia of market efficiency for a particular security" and only the fifth *Cammer* factor "invites plaintiffs to submit direct evidence" of a causal relationship between value-relevant information and stock price.  *In re Petrobras Sec.*, 862 F.3d at 276.  "Without the demonstration of such a causal relationship, it is difficult to presume that the market will integrate the release of material information about a security into its price."  *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 207-08 (2d Cir. 2008) (affirming denial of class certification where "[event] study was flawed because it sought to measure the impact of immaterial information").

---

[5] Although Bratya maintains BBBY satisfied *Cammer* factor one (weekly trading volume), it does so only under a "you can never have too much of a good thing" theory of economics.  Under mainstream schools of economic thought, however, the astronomical volume during the putative Class Period is "more accurately described as aberrational market behavior … demonstrating inefficiency."  Hr'g Tr. 87:11–13.

Bratya afforded itself two tries to demonstrate a connection between BBBY's stock price and new, value-relevant information during the putative Class Period. This Court aptly summarized Cohen's criticisms of Dr. Cain's event studies: "one is irrelevant; the other is erroneous." Hr'g Tr. 198:14-16.

Starting with the irrelevant, "there's nothing wrong with Dr. Cain's original analysis ... The only problem was, it didn't have anything to do with the Class Period." *Id.* 113:19-20. Indeed, in his original event study, Dr. Cain articulated an objective definition of a "News Day"—that is, "dates of BBBY's quarterly earnings announcements"—and purported to demonstrate a statistically significant price reaction on three out of four such days. Cain Rep. ¶¶ 73-78. Those News Days were September 30, 2021, January 6, 2022, and June 29, 2022. *Id.* at Ex.6b. The issue for Bratya is that the putative Class Period did not begin until months later, on August 12, 2022. Thus, in his original event study "Dr. Cain prove[d] only a premise that Cohen does not dispute, that the market for BBBY securities was efficient before the Class Period began, under starkly different conditions than the Class Period." Cohen Opp'n at 20.

Moving to the erroneous, Dr. Cain conducted a new analysis, with the goal of assessing BBBY's market efficiency during the putative Class Period. According to Dr. Cain's second bite of the apple, there were three News Days during the putative Class Period, and BBBY stock exhibited statistically significant price movements on each of those days when compared against the prior 120-trading days. New Cain Rep. ¶¶ 38-43 (adding fourth "News Day" outside Class Period). But no new, value-relevant information was released on any of Dr. Cain's "News Days," and none of the price movements were statistically significant.

The first flaw plaguing Dr. Cain's new event study is the "complete abdication of the standards that were used for the initial study" in favor of "a new set of completely subjective ...

standards" for determining "alternative" News Days.[6]  Hr'g Tr. 112:5-10.  For his new event study, Dr. Cain defined alternative "News Days" (at least on paper) as "days when news was released regarding Defendant Cohen's stake in BBBY."  New Cain Rep. ¶ 38.  Yet Dr. Cain seems only minimally committed to even this malleable new definition.

For one thing, Dr. Cain classified August 12th as an alternative News Day because Cohen published a tweet.  But that tweet on its face contained no news "regarding ... Cohen's stake in BBBY," and was the subject of no press articles or analyst reports.  Hr'g Tr. 71:3-6, 72:12-73:19. Dr. Cain also classified August 16th a "News Day" because Cohen's attorney filed an amended Schedule 13D with the SEC, but that filing "had the exact same information about the common stock and options that were owned by Mr. Cohen as had been disclosed previously."  *Id.* 75:4-20 (Dr. Cain conceding he did not assess whether the filing contained new information).  Dr. Cain similarly deemed August 18th a "News Day" because BBBY issued a statement about its cooperation agreement with Cohen.  *Id.* 78:24-79:10.  BBBY's August 18th statement, however, contained *no new information* about Cohen's stake, because "Cohen's cooperation agreement with the Company was publicly disclosed back in March."  *Id.* 79:15-16.  Moreover, Dr. Cain did *not* consider August 17th a "News Day"—despite the fact that news *was* released about Cohen's stake in BBBY.[7]  *Id.* 76:3-78:4.  Of course, because August 17th did not return a statistically significant

---

[6] Dr. Cain conceded that "none of [his] alternative News Days would have met the criteria that [he] used for News Days in [his] original study."  Hr'g Tr. 71:13–15.

[7] On August 17th, CNBC released news about Cohen's *actual* ownership, correcting earlier reporting that falsely stated Cohen had purchased additional options.  Note the erroneous reporting and subsequent correction were issued by CNBC *not* MSNBC, as counsel mistakenly stated during the hearing.  Lauren Thomas, *Bed Bath & Beyond Soars As Much As 70% As Meme Traders Talk Up Ryan Cohen's Call Options Purchase*, CNBC (Aug. 16, 2022), https://tinyurl.com/3brzyrjz; *Squawk On The Street*, CNBC (Aug. 17, 2022), https://tinyurl.com/debwn6e9.  BBBY's price increase on August 16th in the absence of new information is itself inconsistent with efficiency, but that movement should have been, and was not, reversed upon the August 17th correction.

price movement under Dr. Cain's new study, classifying it as a "News Day" would have done Bratya no good.

These apparent inconsistencies underscore a lack of principled methodology for identifying new, value-relevant information.  The selection of alternative "News Days" "without any analysis of the materiality of information released on those dates, or whether price movements were directionally appropriate, undermines" Dr. Cain's conclusions.  *Deutsche Bank AG*, 2013 WL 5815472, at *21; *see also Bombardier*, 546 F.3d at 207-08 (disregarding study that "measure[d] the impact of immaterial information").

Were that not enough, Dr. Cain's new event study suffers from a second, "fundamental and basic error" defect:  The new study used price movements in a period of low volatility as a yardstick to measure price movements during a highly volatile period that began weeks before the Class Period.  Hr'g Tr. 115:8-15.  As Professor Fischel observed, "when you're using ... projection[s] based on a period of low volatility but you're in a period of high volatility, then ... a lot of days ... look like ... big price moves."  *Id.* 115:16-19.  And as Professor Fischel showed (Ex.1 at 26, *supra*),  BBBY's volatility had increased dramatically by August 2022:



As of August 12th, BBBY's stock price had risen on ten of the preceding eleven trading days. On four of those eleven days, BBBY's stock price fluctuated more than 14%. On two such days, BBBY's stock price increased more dramatically than it did on August 12. For instance, on August 5th—an undisputed "No News Day"—BBBY's stock price climbed 32.7%, well outpacing the 21.8% increase observed on August 12th.[8] *See* Cohen Demonstrative 21, *infra*. Measured against a fitting cohort, the price movements observed by Dr. Cain are revealed for what they are: Relatively normal occurrences in an absolutely abnormal month.

Perhaps recognizing these shortcomings, Bratya suggests that this Court could throw out its event studies and *still* certify the putative class. Bratya Reply at 10 (citing *Waggoner*, 875 F.3d 79, for proposition that "plaintiffs are not required to show direct evidence of price impact through event studies under *Cammer V*"); Hr'g Tr. 199:15-16 (same). Bratya's hedge is not supported by the law. In Bratya's cited authority, the Second Circuit held that "a plaintiff seeking to demonstrate market efficiency *need not always* present direct evidence of price impact through event studies," in instances where there is "strong indirect evidence of an efficient market." *Id.* at 97, 99 (emphasis added). The court went on to explain, however, that "[d]irect evidence of an efficient market may be more critical" when indirect evidence of efficiency is "less compelling." *Id.* at 98. If "certain of the indirect factors d[o] not demonstrate market efficiency" and "plaintiffs' event study [i]s flawed," then class certification is appropriately denied. *Id.*

Confronted with similarly unreliable event studies and a dearth of facts suggesting efficiency, courts deny class certification. In *Bombardier*, the Second Circuit affirmed the denial of certification where the "district court correctly concluded that the disclosures studied were

---

[8] Even believing Bratya's unbelievable theory that Cohen's boilerplate tweet on August 5th affected BBBY's stock price, that tweet was published *after* market-close, and thus could not have had any impact until after market-open on August 8th.

immaterial, [such that] any fluctuations in the [stock] prices documented by the event study could not reasonably be interpreted to reflect market efficiency." 546 F.3d at 210. In *Deutsche Bank AG*, the court denied certification after criticizing an event study that selected news days "without any analysis of the materiality of information released on those dates, or whether price movements were directionally appropriate." 2013 WL 5815472, at *21. In *Bell v. Ascendant Sols., Inc.*, the court denied, and the Fifth Circuit affirmed the denial of, class certification because plaintiff's expert used a "limited data set of just six or seven 'information days,'" and "fail[ed] to control for industry effects." 2004 WL 1490009, at *3 n. 2 (N.D. Tex. July 1, 2004), *order aff'd and remanded*, 422 F.3d 307 (5th Cir. 2005). This Court should do the same.

## B.   Even If Bratya Could Satisfy *Basic* (It Cannot), the Presumption Is Rebutted Because the Challenged Statements Had No Price Impact

Because Bratya did not establish market efficiency during the Class Period, it cannot invoke *Basic*'s presumption of reliance. But even if Bratya could satisfy the *Basic* presumption, that presumption is rebutted by the fact that Cohen's alleged attempt to manipulate the stock did not "actually affect the stock's market price." *Halliburton Co.*, 573 U.S. at 282.

A properly conducted regression analysis, like that put forth by Professor Fischel, shows that none of Cohen's alleged misstatements caused a statistically significant movement in the price of BBBY securities. In contrast to Dr. Cain's new event study, Professor Fischel "tried to make this statistical analysis more apples to apples [by] using a period of high volatility to [measure] prices in a period of high volatility as opposed to low volatility and high volatility." Hr'g Tr. 116:8-12. To do so, Professor Fischel first conducted an event study that compared the price movements on the date of each alleged misstatement against the 40-trading days from August 1st onward. *Id.* 116:25-117:2. Then, Professor Fischel doublechecked his work, by conducting an event study that measured the price movements on each alleged misstatement date against the "20

days before the Class Period and 20 days after the Class Period in order to avoid the arguably contaminating effect of price movements during the Class Period." *Id.* 117:3-6.

Professor Fischel's results were unequivocal.  When the confounding errors tainting Dr. Cain's event study were corrected, Dr. Cain's "conclusion about statistical significance disappears for each of the days." *Id.* 116:13-14.  As demonstrated by Professor Fischel, *none* of Cohen's alleged misstatements had a statistically significant impact on BBBY's stock price:

### Bed Bath & Beyond
### Summary and Comparison of Event Study Results During Class Period

| | | | | | | Fischel 1 | | Fischel 2 | |
|---|---|---|---|---|---|---|---|---|---|
| | **Dr. Cain's Reply Report** | | | | | | | | |
| **Date** | **Dr. Cain's Description** | **Actual Return** | **Abnormal Return** | **t-stat** | | **Abnormal Return** | **t-stat** | **Abnormal Return** | **t-stat** |
| 08/12/22 | "Defendant Cohen posts the Tweet, allegedly alerting retail investors of his intent to maintain his stake in BBBY." | 19.74% | 16.82% | 2.31 | | 14.47% | 1.06 | 16.27% | 1.36 |
| 08/15/22 | Dr. Cain's Alternative No News Day | 21.15% | 20.31% | 2.73 | | 20.40% | 1.45 | 20.82% | 1.77 |
| 08/16/22 | "Defendant Cohen files a delinquent Form 3 and Amended Schedule 13D, allegedly suggesting an increase in his overall stake in BBBY. In reality, the increase had allegedly occurred in April 2022." | 25.51% | 20.67% | 2.70 | | 9.92% | 0.79 | 15.21% | 1.16 |
| 08/17/22 | Dr. Cain's Alternative No News Day | 11.13% | 10.74% | 1.36 | | 8.25% | 0.59 | 8.69% | 0.73 |
| 08/18/22 | "BBBY files an 8-k stating it had reached a 'constructive agreement' with RC Ventures regarding Cohen's stake in the Company." | -21.85% | -22.19% | (2.79) | | -20.29% | (1.45) | -20.65% | (1.75) |

Ex.1 at 29 (noting significance "is defined as a t-stat of ±1.96 or above and noted in red.").

In economic terms, this lack of statistical significance "means you can't reject the hypothesis that the price movement on that day—is a random movement or attributable to chance alone."  Hr'g Tr. 116:17-19.  And certainly "you cannot conclude that the price movement is related to new value-relevant information." *Id.* 116:19-21.

Professor Fischel's conclusions are bolstered by qualitative evidence.  No analyst covering BBBY mentioned the August 12th tweet.  Fischel Rep. ¶ 42.  According to Factiva, a news aggregator favored by Dr. Cain, no press outlet contemporaneously published *anything* about the tweet.  Hr'g Tr. 72:16-25.  Market commentators' resounding silence corroborates Professor

Fischel's findings.  *Cf. Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 104-05 (2d Cir. 2023) (reversing and remanding with instructions to decertify class).

Perhaps most importantly, Bratya's price impact arguments fail the smell test.  *Goldman Sachs Grp.*, 594 U.S. at 122 ("assessing price impact at class certification, courts should be open to *all* probative evidence ... aided by a good dose of common sense." (quotation marks omitted)). Bratya observes a sarcastic mid-morning tweet about a photo that accompanied an analyst report predicting ruin for shareholders, and a rise in BBBY's stock price, and concludes that the first event must have caused the second.  But even students of introductory statistics understand that correlation does not imply causation (particularly where the share price had already started to rise that morning before the tweet).  Evidence and common sense suggest that the market price of BBBY securities on August 12th rose for the same reasons as it had over the prior two weeks: "aberrational market behavior ... demonstrating inefficiency."  Hr'g Tr. 87:11-13.

### III.   This Court Should Deny Certification Because It Is Right To Do So

A market's inefficiency—including inefficiency created by a meme-stock short squeeze—does not afford Cohen, or any other investor, immunity from applicable securities laws and regulations.  Neither do those peculiar circumstances afford Bratya a relaxed standard for certifying a class or establishing liability against Cohen.

Bratya might have opinions about Cohen's approach to social media, his feelings about short sellers, or his interactions with advisors and counsel.  *See* Bratya Supp. Br. (citing Cohen Dep. 110-20, 264-68, 153-54).  None of that, however, has *anything* to do with whether Bratya's proposed class satisfies the requirements of Rule 23.  It has even less bearing on the questions this Court posed to the parties about Bratya's atypicality and BBBY's lack of market efficiency. *See* Ex.1 at 2 (reiterating the Court's questions).  Bratya hopes that by pointing at Cohen, it can

distract from its failure to demonstrate typicality and class-wide reliance.  The effort is obvious and unavailing.

When the Supreme Court recognized an implied private right of action for Rule 10b-5, it explicitly required reliance as an element of any such action.  *See Basic*, 488 U.S. at 243.  And in adopting the *Basic* presumption for efficient markets, the Court struck a careful balance between the element of reliance, and the burden on plaintiffs to prove a speculative state of facts.  *Id*. at 243-47.  The Court has since guarded this equilibrium and rejected pleas to lower the reliance requirement—even when the result does not hold alleged fraudsters accountable.  *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 180 (1994) (holding that plaintiffs may not maintain suit when "[a]llowing plaintiffs to circumvent the reliance requirement would disregard the careful limits on 10b-5 recovery mandated by our earlier cases"); *Stoneridge Inv. Partners, LLC v. Sci-Atlanta*, 552 U.S. 148 (2008) (holding that Rule 10b-5 did not reach vendor of company because investors did not rely upon vendor's statements).  Congress likewise ratified the implied right of action as defined by the Supreme Court, and "chose to extend it no further."  *Stoneridge*, 552 U.S. at 166.  Bratya cannot defy Congress's and the Supreme Court's clear mandates regarding reliance just because it wishes to recover from Cohen.

Of course, the denial of class certification does not grant alleged violators a free pass. Bratya's claims lack merit and should fail in any event (an investor with no material non-public information is permitted to express enthusiasm or comment on analyst reports).  *See In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 109 (D.C. Cir. 2015).  But for a meritorious securities claim, there are alternative avenues for liability.  For one, the Securities and Exchange Commission's Division of Enforcement "conduct[s] investigations into possible securities law violations, fil[es] ... enforcement actions ... against wrongdoers, and return[s] money to harmed

investors whenever possible."[9]  And Bratya, or other allegedly harmed investors, remains free to pursue individual claims.  Bratya alleges an injury of $4.3 million, a far cry from the kinds of nominal recoveries that dissuade a class member from seeking individual relief.  ECF No. 14-1 at 1.  Having failed to demonstrate typicality and predominance, however, Bratya may not pursue class-wide resolution of its claims.

## CONCLUSION

For the reasons set forth above, Bratya's motion should be denied.

Dated: August 14, 2024

Respectfully submitted,

*/s/ Steven M. Farina*
Dane H. Butswinkas (D.C. Bar # 425056)
Steven M. Farina (D.C. Bar # 437078)
Brian T. Gilmore (D.C. Bar # 1030601)
Madeline C. Prebil (D.C. Bar # 1778724)
680 Maine Avenue, S.W.
Washington, DC 20024
(202) 434-5000
dbutswinkas@wc.com
sfarina@wc.com
bgilmore@wc.com
mprebil@wc.com

*Counsel for RC Ventures LLC and Ryan Cohen*

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2024, I caused to be electronically transmitted a copy of the foregoing Notice of Appearance to the Clerk's Office using the CM/ECF system, and service was effected electronically to all counsel of record.

*/s/ Steven M. Farina*
Steven M. Farina

---

[9] *Division of Enforcement*, SEC (last visited Aug. 10, 2024), https://tinyurl.com/24ec8yus.