**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE BED BATH & BEYOND CORPORATION SECURITIES LITIGATION | Case No. 1:22-cv-02541-TNM |
| | CLASS ACTION |
| | Jury Trial Demanded |

**LEAD PLAINTIFF'S POST-HEARING BRIEF IN SUPPORT**
**OF LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND**
**APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

I.    INTRODUCTION ...............................................................................................1

II.   ARGUMENT.......................................................................................................4

      Informational Efficiency ....................................................................................4

      Price Impact .......................................................................................................6

      Value-Relevant Information .............................................................................12

      Additional Evidence of Efficiency...................................................................16

      Ability to Short BBBY Securities....................................................................17

      Volatility and Volume......................................................................................20

      Bratya's Typicality and Adequacy...................................................................22

III.  CONCLUSION..................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*,
623 F. Supp. 3d 470 (E.D. Pa. 2022) ...............................................................................7

*\*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013).........................................................................................................14

*\*Ap-Fonden v. Goldman Sachs Grp., Inc.*,
No. 18-CV-12084 (VSB) (KHP), 2024 U.S. Dist. LEXIS 64060 (S.D.N.Y. Apr. 5, 2024) .........10

*\*Bond v. Clover Health Invs., Corp.*,
No. 3:21-cv-00096, 2023 U.S. Dist. LEXIS 24749 (M.D. Tenn. Feb. 14, 2023).....................7, 24

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ......................................................................................16

*Cheney v. Cyberguard Corp.*,
213 F.R.D. 484 (S.D. Fla. 2003)......................................................................................20

*Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"),
563 U.S. 804 (2011).........................................................................................................14

*Ferris v. Wynn Resorts Ltd.*,
No. 2:18-cv-00479-APG-DJA, 2023 U.S. Dist. LEXIS 35374 (D. Nev. Mar. 1, 2023) ................7

*FindWhat Investor Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) .......................................................................................7

*\*Freeland v. Iridium World Communs., Ltd.*,
233 F.R.D. 40 (D.D.C. 2006)......................................................................................24, 25

*\*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) ...........................................................................................6

*\*Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"),
573 U.S. 258 (2014)................................................................................................3, 4, 19

*\*Howard v. Liquidity Servs.*,
322 F.R.D. 103 (D.D.C. 2017).................................................................................22, 24, 25

*In re Apple Sec. Litig.*,
No. 4:19-cv-2033-YGR, 2022 U.S. Dist. LEXIS 23771 (N.D. Cal. Feb. 4, 2022) ......................7

*In re Allstate Corp. Sec. Litig.*,
966 F.3d 595 (7th Cir. 2020) ........................................................................6

*\*In re Bed Bath & Beyond Corp. Sec. Litig.*,
687 F. Supp. 3d 1 (D.D.C. 2023) .......................................................3, 4, 5 13, 16, 19

*In re Groupon Inc. Sec. Litig.*,
No. 12 C 2450, 2015 U.S. Dist. LEXIS 27334 (N.D. Ill. Mar. 5, 2015) ......................................17

*\*In re Initial Pub. Offering Sec. Litig.*,
260 F.R.D. 81 (S.D.N.Y. 2009) .......................................................................7, 17

*In re Lithium Ion Batteries Antitrust Litig.*,
No. 13-MD-2420 YGR, 2017 U.S. Dist. LEXIS 57340 (N.D. Cal. Apr. 12, 2017)......................10

*In re Petrobras Sec. Litig.*,
312 F.R.D. 354 (S.D.N.Y. 2016) .......................................................................4

*\*In re PolyMedica Corp. Sec. Litig.*,
432 F.3d 1 (1st Cir. 2005).......................................................................5, 19

*In re PolyMedica Corp. Sec. Litig.*,
453 F. Supp. 2d 260 (D. Mass. 2006) .................................................................18

*In re Teva Sec. Litig.*,
No. 3:17-cv-558 (SRU), 2021 U.S. Dist. LEXIS 43316 (D. Conn. Mar. 9, 2021)......................17

*\*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016).......................................................................6

*Lewis v. Cytodyn, Inc.*,
No. C21-5190 BHS, 2021 U.S. Dist. LEXIS 158054 (W.D. Wash. Aug. 19, 2021) ...................24

*Li v. Aeterna Zentaris, Inc.*,
324 F.R.D. 331 (D.N.J. 2018).......................................................................10

*Malriat v. QuantumScape Corp.*,
No. 3:21-cv-00058-WHO, 2022 U.S. Dist. LEXIS 232497 (N.D. Cal. Dec. 19, 2022)...............16

*\*McIntire v. China MediaExpress Holdings, Inc.*,
38 F. Supp. 3d 415 (S.D.N.Y. 2014).................................................................17, 18

*\*Monroe Cty. Employees' Ret. Sys. v. S. Co.*,
332 F.R.D. 370 (N.D. Ga. 2019).......................................................................9

*Pearlstein v. Blackberry Ltd.*,
2021 U.S. Dist. LEXIS 14888 (S.D.N.Y. Jan. 26, 2021)...........................................................7, 8

*\*Pelletier v. Endo Int'l PLC*,
338 F.R.D. 446 (E.D. Pa. 2021)...................................................................................................6

*Plymouth Cty. Ret. Sys. v. Patterson Cos.*,
No. 18-871 (MJD/HB), 2020 U.S. Dist. LEXIS 177505 (D. Minn. Sep. 28, 2020).......................7

*Pirnik v. Fiat Chrysler Autos., N.V.*,
327 F.R.D. 38 (S.D.N.Y. 2018) ................................................................................................10

*Schleicher v. Wendt*,
618 F.3d 679 (7th Cir. 2010) ...................................................................................................14

*\*Smilovits v. First Solar, Inc.*,
295 F.R.D. 423 (D. Ariz. 2013) ..........................................................................................17, 18

*\*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017)......................................................................................................16

## **Rules**

Fed. R. Civ.  P. 26.....................................................................................................................20

## **Additional Citations**

DeGroot, M. H., & Schervish, M. J. (2010). *Probability and Statistics* (4th edition). Addison-
Wesley......................................................................................................................................10

## I.    INTRODUCTION

The August 2, 2024 evidentiary hearing confirms what the briefs establish: that the market for Bed Bath & Beyond's ("BBBY" or the "Company") securities was informationally efficient, that the well-accepted *Cammer* and *Krogman* factors courts consider all support a finding of efficiency, that Defendant Ryan Cohen ("Cohen") failed to rebut the presumption of reliance by proving the absence of price impact, and that Bratya SPRL ("Bratya") is an adequate class representative with claims typical of the Class.  Bratya's Motion for Class Certification should be granted.

If anything, Cohen's presentation at the hearing confirms that neither he nor his expert meaningfully dispute that the traditional standards for class certification have been satisfied.  They either conceded or did not dispute that:

- *Cammer* factors 1-4 and all of the *Krogman* factors were met during the Class Period;

- Dr. Matthew Cain's ("Cain") assessment of *Cammer* 5 used a well-accepted, objective methodology for identifying event dates;

- Dr. Cain's follow-up event study of Class Period events used a standard and well-accepted analysis period;

- BBBY investors cared deeply about Cohen's involvement and turnaround plan, rendering information about his involvement "value-relevant";

- that tens of thousands of investors on Twitter and Reddit understood Cohen's representations about BBBY as a rallying cry to buy or hold the Company's securities;

- that throughout the Class Period, Company-specific information reached investors who traded in BBBY;

- that the price of BBBY common stock on the first day of the Class Period was about

even with the opening price until Cohen tweeted, but rose 18% thereafter in that single day;

- that the price of BBBY common stock fell a statistically significant amount at the impact date of the corrective disclosure ending the Class Period;

- that Bratya was long BBBY common stock for the entire Class Period, and like other investors, invested due to misplaced faith in Cohen and his false statements;

- that Bratya's short option trades were intended to generate revenue, not make directional bets against the Company;

- that Bratya retained experienced counsel; and

- that Bratya has zealously sought to advance the claims of all Class Members throughout this litigation.

Unable to raise any colorable basis to avoid certification under existing standards, Cohen asks the Court to disregard well-established precedent because of a "rumored short squeeze." None of the cases cited by either party even remotely supports this proposition. Nor does it make sense under the facts of this case. As shown at the hearing, the "rumored short squeeze" did not correlate with BBBY's stock price. As testimony revealed, BBBY's stock price did not consistently move along with the short interest utilization rates Cohen claimed in his brief were responsible for the fluctuation in price. Moreover, under oath, Professor ("Prof.") Daniel Fischel ("Fischel") was forced to admit the inaccuracy of his short interest utilization rate analysis, which did not count the several hundreds of thousands of shares that a better source, S3, showed were available to short every single day of the Class Period. And, as Dr. Cain established, the short interest changed very little over the Class Period, ranging from 30,609,064 million shares to 31,511,919 million shares. Cain Reply Rept. at ¶24. Neither Cohen nor his expert had any

explanation as to why that figure could be largely unmoved if BBBY's stock price increase was caused by massive short covering (*i.e.*, closing of short positions) rather than market excitement about Cohen's involvement.

Notwithstanding Defendants' attempt to move the goalposts, the critical question is whether information about BBBY reached investors, who were able to trade thereon. *See In re Bed Bath & Beyond Corp. Sec. Litig.*, 687 F. Supp. 3d 1, 16 (D.D.C. 2023) (citing *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 272-73, (2014)). As shown at the hearing, it was. Even Defendants' expert admitted that news about BBBY reached investors. Indeed, his whole analysis of August 12, 2022 concedes informational efficiency. On that day, he reports that an analyst reported on BBBY pre-market. Fischel Rept. at ¶11. That was picked up and re-reported by CNBC within hours, and shortly thereafter was spread further by Cohen, who tried to undermine the analyst report.[1] *Id*.

Empirical proof of efficiency was also provided. While Prof. Fischel indicated that manipulating certain parameters could alter the significance of certain statement and partial disclosure dates, he did not dispute Dr. Cain's finding that the final disclosure was ***highly statistically significant.*** Nor could he. Backup data from the "Fischel 2 study," which Cohen omitted from his hearing demonstratives, concedes that at least one Class Period misrepresentation as well as the key corrective disclosure alleged are statistically significant. *See infra* at 5-12. This alone is enough to reject all of Cohen's arguments and certify the proposed Class.

By contrast, Cohen provided no evidence establishing ***the total absence*** of price impact

---

[1] While Cohen now argues that his tweet was a meaningless and misunderstood joke, that is a question common to the Class that a jury must decide. At any rate, the undisputed record indicates that Cohen never said anything at the time about joking, and never corrected any of the many, many investor responses on Reddit and Twitter construing his tweet as indicating a positive outlook on BBBY.

necessary to rebut the fraud-on-the-market presumption.  To do so, Cohen had to disprove both front-end and back-end price impact.  He did neither.  At the hearing, Prof. Fischel admitted that the price of BBBY shares rose by over 18% after Cohen tweeted.  The staggering increases in both price and volume were disproportionately higher than at any time before or after the Class Period.  Nor did he provide any evidence disputing back-end price impact.  In fact, to this day, Prof. Fischel has not disputed that BBBY shares dropped significantly at the back-end on August 19, 2022.

Cohen's arguments concerning Bratya's fitness to represent the Class also remain meritless.  Bratya's representative, David Coti ("Coti"), traveled across the globe for the second time in the last four months to represent Class Members in person at the hearing.  Cohen presented no evidence that Bratya currently has any conflict with Class Members, or that Bratya is not sufficiently involved in the litigation to be adequate.  Nor did Cohen present any evidence that Bratya either knew about the fraud or was indifferent to it.  Instead, it was injured by the same course of conduct as all Class Members.  Thus, the hearing not only confirmed Bratya's adequacy, but that it is an ideal Class Representative.

For all of these reasons, Bratya respectfully requests that the Court certify the proposed Class, appoint Bratya as the Class Representative, and appoint Lead Counsel as Class Counsel.

## II.    ARGUMENT

***Informational Efficiency:***  The test for market efficiency in the federal courts is whether stock prices react to company-specific public information.  Transcript of Evidentiary Hearing, ECF No. 127 ("Hearing Tr."), 19:21-20:10.  The Supreme Court has held that the degree to which stock prices accurately reflect public information is irrelevant.  *Halliburton II*, 573 U.S. at 272-73; *see also In re Bed Bath & Beyond Corp. Sec. Litig.*, 687 F. Supp. 3d at 16 (citing *Halliburton II*, 573 U.S. at 272-73) (same).  "In assessing market efficiency, courts should not let the perfect become

the enemy of the good." *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 371 (S.D.N.Y. 2016).

Instead of addressing the controlling standard, Cohen's expert suggested that the Court should disregard any information which he does not agree has relevance to a Company's fundamentals. *See, e.g.*, Hearing Tr. 89:12-20 (Prof. Fischel testifying that event studies are of no consequence if price movements do not react to value-relevant information); *id*. at 90:15-25 (stating that price impact analyses are irrelevant if public representations do not convey value-relevant information); *id*. at 92:7-15 (concluding that price increases in BBBY securities were not associated with value-relevant information); *id*. at 96:3-9 (same); *id*. at 102:6-10 (explaining that while short selling can be expensive and risky regardless of whether there are 500,000 or 500 million available shares, the "constraints" matter in this case because the price increases "are not related to the fundamentals."); *id*. at 103:12-17 (similar); *id*. at 106:7-12 (stating that Cohen's tweet did not cause the price to rise because it did not contain value-relevant information); *id*. at 113:1-5 (opining, without studying investors' responses, that tweets do not "contain value-relevant information in the same way that earnings releases do."). But that is simply another way of advancing the widely-rejected argument that fundamental value efficiency is what matters. *See In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 15 (1st Cir. 2005).

Even worse, Prof. Fischel provided no evidence supporting his assumption that Cohen's public representations lacked value-relevant information. At the pleading stage, the Court correctly found that:

> So meme stock investors conceivably understood Cohen's tweet to mean that Cohen was confident in Bed Bath and that he was encouraging them to act. For example, one investor replied to Cohen "buy $ BBBY. Got it. Thanks." *Id.* ¶ 150. And Bratya plausibly alleges that Redditors gleaned the same message.

*In re Bed Bath & Beyond Corp. Sec. Litig.*, 687 F. Supp. 3d at 12. Nothing has changed.

In his briefs and at the hearing, Cohen did not challenge that tens of thousands of investors

on Reddit and Twitter understood his tweet to mean that he was confident in BBBY and was encouraging them to act.  *Id.  See also infra* at 12-16.

 ***Price Impact:***  Cohen had the burden to show a complete lack of price impact by a preponderance of the evidence.  *See, e.g.*, *Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 469 (E.D. Pa. 2021).  To do so, he was required to dispel both front-end and back-end price impact.  And he had to completely sever the relationship between the misrepresentations, rather than showing a lack of price impact.

 Back-end impact must be disproved to rebut the presumption because misleading statements can "cause[] the stock price to remain higher than it would have been had the statements been truthful."  *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 419 (7th Cir. 2015). For this reason, "the stock price may even decline after a false statement, but be inflated nonetheless because the price might have fallen even more if the full extent of the bad news were known" to investors.  *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 612 (7th Cir. 2020).  This is known as the "price inflation maintenance" theory in securities litigation.  Under this theory, "[t]he best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect."  *Glickenhaus*, 787 F.3d at 415.

 Here, after the truth about Cohen's sales emerged on August 18, 2022, the price of BBBY's common stock nosedived by over 40% on August 19, 2022.  ¶¶177-78.[2]  Cohen's failure to address this back-end decline means he cannot show the absence of price impact.[3]  On August 12, 2022,

---

[2] ¶__  and ¶¶__  citations are to the operative Second Amended Complaint filed at ECF No. 66.

[3] The overwhelming weight of authority in the federal courts holds that a defendant cannot rebut

before the market opened, CNBC posted an article on Twitter about a Loop Capital report opining that the price of BBBY's common stock was headed for $1 a share as the Company teetered on bankruptcy. ¶146. Prof. Fischel has previously explained that "academic research indicate[s] that the adjustment to share prices following an announcement lasts anywhere from one to seventeen hours after a news release." *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 102 (S.D.N.Y. 2009) (internal alterations omitted). But, before the market absorbed this new information, Cohen immediately undermined any negative inference with his Twitter post conveying his false but positive outlook on BBBY.

Tens of thousands of investors online understood Cohen's tweet as an endorsement of BBBY securities and a rallying cry to take the stock price to the moon. ¶¶146-56. Astronomical increases in the price and volume of BBBY securities occurred after, not before, Cohen started to make misrepresentations. *Id.*; Plf.'s Ex. 37. *See also* Plf.'s Ex. 38. Neither Cohen nor Prof. Fischel can dispute these facts. Prof. Fischel concedes that he did not examine how Cohen's misrepresentations were interpreted online. He did not look at any posts on the subreddit r/BBBY and he does not know what that sub-reddit is. Hearing Tr. 140:8-16. He did not analyze the responses or reactions on Twitter to Cohen's tweet or what investors said about Cohen's misrepresentations on Reddit forums. *Id.* at 142:23-143:3; 145:3-20. He admits that he did

---

the fraud-on-the-market presumption by addressing only front-end price impact, but must also disprove back-end price impact. *See, e.g.*, *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 259 (2d Cir. 2016); *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1316 (11th Cir. 2011); *Ferris v. Wynn Resorts Ltd.*, No. 2:18-cv-00479-APG-DJA, 2023 U.S. Dist. LEXIS 35374, at *22-23 (D. Nev. Mar. 1, 2023); *Bond v. Clover Health Invs., Corp.*, No. 3:21-cv-00096, 2023 U.S. Dist. LEXIS 24749, at *37-38 (M.D. Tenn. Feb. 14, 2023); *Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 491 (E.D. Pa. 2022); *In re Apple Sec. Litig.*, No. 4:19-cv-2033-YGR, 2022 U.S. Dist. LEXIS 23771, at *22 n.9 (N.D. Cal. Feb. 4, 2022); *Pearlstein v. Blackberry Ltd.*, 2021 U.S. Dist. LEXIS 14888, at *45 (S.D.N.Y. Jan. 26, 2021); *Plymouth Cty. Ret. Sys. v. Patterson Cos.*, No. 18-871 (MJD/HB), 2020 U.S. Dist. LEXIS 177505, at *32-33 (D. Minn. Sep. 28, 2020).

nothing to investigate whether thousands on Reddit and other forums bought shares in reliance on Cohen's misrepresentations.  *Id*. at 145:24-146:16.

Thus, the undisputed hearing evidence cannot rebut back-end price impact, or that Cohen's misrepresentations maintained the inflated prices of BBBY securities during the Class Period.  The implosion of BBBY's stock price upon the announcement of Cohen's dump at the end of the trading day on August 18, 2022 is direct evidence that the price was previously inflated because of Cohen's misrepresentations.  *See, e.g.*, *Pearlstein*, 2021 U.S. Dist. LEXIS 14888, at *45 (noting that courts can infer defendants' misrepresentations inflated the price by the amount of the reduction in share price upon the announcement of corrective disclosures).  Additionally, Prof. Fischel relied on op-ed pieces and speculative articles to conclude that there was a "rumored short squeeze," but he ignored news stories reporting that there was no other reason for the decline in BBBY's stock price except for Cohen's dump and exit.  *See* Plf.'s Ex. 15 at ECF No. 120-2.

Prof. Fischel's Report conspicuously said nothing about the impact of the corrective disclosures on BBBY's stock price.  Hearing Tr. 147:18-23; 149:14-23.  During cross-examination at the hearing, Prof. Fischel claimed that he testified about the statistical significance of the corrective disclosure during his direct, but he has yet again testified inaccurately.  *Id*. at 149:14-23.  The Demonstrative Cohen used (No. 21) does not even ***mention*** August 19, 2022 (the first trading date following Cohen's corrective disclosure on the night of August 18, 2022 after market close), and Prof. Fischel said nothing about it during his direct testimony.  Dr. Cain, unlike Prof. Fischel, was candid about that date and its unmistakable price impact.  *See* Plf.'s Ex. 39; Cain Reply Rept. at 18 (establishing an abnormal negative return in BBBY shares on August 19, 2022 exceeding -50%, statistically significant under any parameters).  Cohen has failed to show a lack of price impact despite multiple rounds of briefing and a full-day hearing that was held at Cohen's

request.  But the facts are even worse.  Backup data for Prof. Fischel's Report shows that, under

the "Fischel 2" study, *see* Plf.'s Ex. 39, the August 19, 2022 impact date of the corrective disclosure

from the night before is certainly statistically significant:

| | Price | Volume | Actual Return | Predicted Return | Excess Return | Std. Err. of Residual | Std. Err. of Ind. Pred. Val. | t-stat | |t|>1.65 |
|---|---|---|---|---|---|---|---|---|---|
| 7/15/2022 | $4.96 | 8121651 | 4.86% | 5.22% | -0.35% | 11.23% | | 12.03% | -0.03 |
| 7/18/2022 | $4.96 | 5922491 | 0.00% | 3.61% | -3.61% | 11.27% | | 11.99% | -0.32 |
| 7/19/2022 | $5.25 | 6469721 | 5.85% | 7.65% | -1.81% | 10.96% | | 12.27% | -0.16 |
| 7/20/2022 | $5.59 | 7217839 | 6.48% | 4.36% | 2.11% | 11.46% | | 11.82% | 0.18 |
| 7/21/2022 | $5.81 | 18210863 | 3.94% | 2.66% | 1.28% | 11.41% | | 11.86% | 0.11 |
| 7/22/2022 | $5.11 | 9372995 | -12.05% | 4.54% | -16.59% | 11.14% | | 12.11% | -1.49 |
| 7/25/2022 | $5.04 | 6396338 | -1.37% | 0.46% | -1.83% | 11.46% | | 11.81% | -0.16 |
| 7/26/2022 | $4.60 | 7364398 | -8.73% | -8.28% | -0.45% | 10.77% | | 12.44% | -0.04 |
| 7/27/2022 | $4.68 | 6508823 | 1.74% | 1.87% | -0.13% | 10.59% | | 12.59% | -0.01 |
| 7/28/2022 | $4.84 | 3886320 | 3.42% | 3.56% | -0.14% | 11.38% | | 11.89% | -0.01 |
| 7/29/2022 | $5.03 | 8413416 | 3.93% | 0.76% | 3.17% | 11.14% | | 12.11% | 0.28 |
| 8/1/2022 | $5.77 | 11426784 | 14.71% | 8.56% | 6.16% | 10.85% | | 12.37% | 0.57 |
| 8/2/2022 | $5.79 | 18999792 | 0.35% | -4.14% | 4.49% | 11.24% | | 12.02% | 0.4 |
| 8/3/2022 | $6.07 | 13822012 | 4.84% | 7.54% | -2.70% | 11.28% | | 11.98% | -0.24 |
| 8/4/2022 | $6.15 | 9034219 | 1.32% | 2.93% | -1.62% | 11.47% | | 11.80% | -0.14 |
| 8/5/2022 | $8.16 | 52708181 | 32.68% | 4.70% | 27.98% | 11.37% | | 11.90% | 2.46 *** |
| 8/8/2022 | $11.41 | 124559260 | 39.83% | 6.19% | 33.64% | 11.24% | | 12.02% | 2.99 *** |
| 8/9/2022 | $9.79 | 74610631 | -14.20% | -4.89% | -9.31% | 11.11% | | 12.14% | -0.84 |
| 8/10/2022 | $10.51 | 51908258 | 7.35% | 6.59% | 0.76% | 11.19% | | 12.07% | 0.07 |
| 8/11/2022 | $10.63 | 37470736 | 1.14% | 4.24% | -3.10% | 11.42% | | 11.85% | -0.27 |
| 8/12/2022 | $12.95 | 80085299 | 21.83% | 5.55% | 16.27% | . | | 11.97% | 1.36 |
| 8/15/2022 | $16.00 | 164540794 | 23.55% | 2.74% | 20.82% | . | | 11.79% | 1.77 *** |
| 8/16/2022 | $20.65 | 395054899 | 29.06% | 13.85% | 15.21% | . | | 13.15% | 1.16 |
| 8/17/2022 | $23.08 | 261170147 | 11.77% | 3.08% | 8.69% | . | | 11.92% | 0.73 |
| 8/18/2022 | $18.55 | 174714752 | -19.63% | 1.02% | -20.65% | . | | 11.80% | -1.75 *** |
| 8/19/2022 | $11.03 | 136364839 | -40.54% | -1.71% | -38.83% | . | | 11.91% | -3.26 *** |

Plf.'s Ex. 40.[4]

Courts often decline to engage in a battle of the experts concerning the inputs used in event

studies.  *See, e.g.*, *Monroe Cty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 387-88 (N.D. Ga.

2019).  Here, however, both experts agree that the corrective disclosure is statistically significant.

Hearing Tr. 56:19-57:2; Plf.'s Ex. 40.  That alone is dispositive of price impact.

Nevertheless, there are other statistically significant dates under the Fischel 2 study, which

---

[4]  Plf.'s Ex. 40 is a snapshot of an excel file produced by Cohen, and bate stamped
COHEN0023015.  It is the backup data for the Fischel 2 study, which relies on an estimation
window consisting of 20 days before the Class Period and 20 days after the impact date of the
corrective disclosure on August 19, 2022.  Impact dates on August 18, 2022 and August 19, 2022
are highlighted by Plaintiff in the snapshot above.  Prof. Fischel largely said nothing about the
Fischel 2 study in his Report, claiming in a footnote that it was merely a "robustness check" of the
results from the Fischel 1 study, which uses a contaminated estimation window of 40 days starting
on August 1, 2022.  Fischel Rept. at 24 n.83.  Prof. Fischel agrees that a t-statistic of +/- 1.96 or
above is statistically significant.  Plf.'s Ex. 39.  Under Fischel 2, August 19, 2022, the impact date
of the corrective disclosure, is statistically significant with a whopping t-statistic of -3.26.

reports that the impact date of August 18, 2022 for the Form 144 released on August 17, 2022 has a t-statistic of -1.75.  Plf.'s Ex. 39.  That correlates to a confidence level of 90%, meaning that there is only a 10% chance that Cohen's Form 144 did not cause the price of BBBY securities to move.[5]  Courts have repeatedly held that a 90% confidence level evidences price impact.  *See, e.g.*, *Ap-Fonden v. Goldman Sachs Grp., Inc.*, No. 18-CV-12084 (VSB) (KHP), 2024 U.S. Dist. LEXIS 64060, at *62-63 (S.D.N.Y. Apr. 5, 2024) (certifying class with price movements statistically significant at the 90% confidence level); *Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 344-45 (D.N.J. 2018) (certifying class where plaintiff's expert found statistical significance at the 84% confidence level); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2017 U.S. Dist. LEXIS 57340, at *86 (N.D. Cal. Apr. 12, 2017) (observing that regression analyses that result in significance at the 90% and 95% confidence level are both widely accepted for evidentiary purposes).

This leaves Cohen's false Twitter post from August 12, 2022 and misleading Schedule 13d filed with the SEC on August 16, 2022, which both the Fischel 1 and Fischel 2 studies claim to lack statistical significance.  Plf.'s Ex. 39.  But an absence of statistical significance is not enough to demonstrate a lack of price impact.  *See, e.g.*, *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 46-47 (S.D.N.Y. 2018).  Still, Dr. Cain's less biased calculations found those dates to be statistically significant.  Hearing Tr. 53:18-54:13.  Dr. Cain used an estimation window of 120 days before the Class Period, which Prof. Fischel admits is standard and used in a majority of event studies.  *Id*. at 146:24-147:17.  Prof. Fischel also concedes that estimation periods are usually

---

[5] In his backup materials (Ex. 41), Prof. Fischel highlighted in column J the t-stats that exceed 1.65 in absolute value. Absolute t-stats greater than 1.65 (rounded from 1.645) represent either higher than 90% significance in a two-sided test or 95% significance in a one-sided test.  *See* DeGroot, M. H., & Schervish, M. J. (2010). *Probability and Statistics* (4th edition) at 574, 861. Addison-Wesley.

chosen before the Class Period, and should be long enough to capture a reliable sample. Fischel Rept. at 23-24 and n.80. Prof. Fischel also admitted at the hearing that his Fischel 1 study, the focus of his Report, was contaminated by Cohen's fraud. Hearing Tr. 116:23-117:6. As Dr. Cain explains, that unscientific approach renders Fischel 1 unreliable. Cain Reply Rept. at ¶45 and n.60. Fischel 2 had different flaws but was equally unreliable. It departs from standard estimation practice by looking at 20 days after the Class Period ended, and is not long enough on either end of its non-contiguous periods to properly test for efficiency over time. Cain Reply Rept. at ¶¶35-36. For these reasons, the Court should reject Prof. Fischel's criticisms and credit Dr. Cain's studies.

At any rate, the price impact of Cohen's August 12, 2022 tweet is obvious to the naked eye. Cohen relies greatly on pre-Class Period prices and volume to make assumptions about stock price movements during the Class Period, but the price of BBBY common stock rose only from $5.03 to $8.16 between July 29, 2022 and August 5, 2022. Plf.'s Ex. 37. The highest daily trading volume during that period was 52.78 million shares, which was on the day that investors began to interpret Cohen's tweets as a signal to purchase BBBY securities. *Id.* In contrast, hundreds of millions of shares were traded on each day during the Class Period, and the price of BBBY's common stock went from $11.04 to $23.08 between August 12, 2022 and August 18, 2022. *Id.* Even on August 12, 2022 alone, the price of BBBY common stock dropped after the market opened, and then rose by over 18% only after Cohen tweeted. Fischel Rept. at 25. Cohen's misconduct is thus a determinative factor behind the rise in both price and volume during the Class Period. Moreover, Cohen has offered nothing to explain away the fact that tens of thousands of investors on Twitter and Reddit forums interpreted his misrepresentations in exactly the way Bratya alleged and bought shares because of Cohen's misrepresentations. His expert chose to

blind himself to these critical facts.  Hearing Tr. 145-46.

The Court should certify the Class because Cohen has failed to show a complete absence of price impact from his false Twitter post, and his expert concedes the price impact of at least one misrepresentation made on August 17, 2022 as well as the corrective disclosure's impact date of August 19, 2022.

*Value-Relevant Information*: Prof. Fischel claimed to be unable to discern any value-relevant information disclosed in the days preceding the Class Period.  *Id*. at 91:8-24.  But he admitted his inquiry was deficient; Prof. Fischel did not look at relevant forums on Reddit to examine how investors interpreted Cohen's misrepresentations, and did not consider any of Cohen's tweets except for the August 12, 2022 post.  *Id*. at 140:7-25, 141-143.  Cohen provided no evidence disputing that investors interpreted his August 5, 2022 tweet as a signal to buy BBBY stock.

Prof. Fischel concedes that he looked almost exclusively to news articles to make determinations about what constitutes value-relevant information, *id*. at 92:20-93:7, but admits that value-relevant information is not exclusively found in financial publications or analyst reports. *Id*. at 143-144, 145:1-7.  His decision to look at sources other than those that held focus for BBBY investors rendered his approach unreliable.  Nothing in law, economics or logic dictates that value-relevant information cannot exist in online forums where tens of thousands of investors discussed their investment strategies in BBBY and affirmed that they bought shares because Cohen told them to do so.  In fact, Prof. Fischel admits that "what investors do by their trades" is value-relevant information, *id*. at 119:18-22, but chose not to study how BBBY traders tracked Cohen's involvement.  As a result, Prof. Fischel does not and cannot refute that the retail investors who followed Cohen drove up the price and volume of BBBY securities during the Class Period "by

their trades." ¶¶142-44, 149-56.  These retail investors were so important that Cohen's own Board appointees told BBBY's management to pay attention to them instead of sell-side analysts.  Reply Br., Ex. 7, ECF No. 120-2, at 176-77.

Under cross-examination, Prof. Fischel was also forced to admit that large shareholders like Cohen with long positions provide value-relevant information, Hearing Tr. 119:24-25-120:1-15, and their strategies concerning corporate transactions are material even if the Company's fundamentals are poor because stock prices are forward-looking.  *Id*. at 121:7-122:15.  Despite all of this, Prof. Fischel chose to ignore all but one of Cohen's tweets, and did not do a proper analysis of the buying activity of tens of thousands of investors online who followed Cohen and "reasonably [saw] Cohen as an insider sympathetic to the little guy's cause . . . ."  *In re Bed Bath & Beyond Corp. Sec. Litig.*, 687 F. Supp. 3d at 12; *see also e.g.*, Hearing Tr. 185:11-24 (Coti testifying that Bratya interpreted Cohen's August 12, 2022 false Twitter post as a reaffirmation of Cohen's turnaround strategy).

Cohen does not contest that his misleading SEC filings contained value-relevant information.  Cohen argues that his Schedule 13d filed on August 16, 2022 contained no new information because the market incorrectly interpreted it as an increase in his BBBY holdings, Hearing Tr. 106:19-25-107:1-15, but Cohen does not dispute that the Schedule 13D omitted to disclose his plan to sell his BBBY holdings.  *See In re Bed Bath & Beyond Corp. Sec. Litig.*, 687 F. Supp. 3d at 12 (citing this fact as one basis to deny dismissal).  Nor has Cohen offered any explanation regarding why any of the misrepresentations made in his Form 144 released on August 17, 2022 are immaterial.  *Id.* at 14 (sustaining claims because complaint plausibly alleged that sales described as merely "potential" had already occurred, and Cohen traded on inside information).

Cohen now argues that the market cannot be informationally efficient because his August 12, 2022 tweet was a meaningless joke lacking in value-relevant information.  Hearing Tr. 215:1-216:19.  First, this is an impermissible merits argument on falsity and materiality because calling it a joke is another way of saying that no reasonable investor would find it false or material.  *Id.* Like any other merits argument, these are questions common to all Class Members and cannot prevent certification of the Class.  *See, e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 467 (2013) (holding that falsity and materiality are merits questions to be decided after the class certification stage); *Schleicher v. Wendt*, 618 F.3d 679, 687-88 (7th Cir. 2010) (same); *see also Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 809 (2011) (holding the same concerning the element of loss causation).

Second, Cohen's conflicting positions about the meaning of his tweet in this very litigation are enough to shred his credibility at trial.  In the motion to dismiss, Cohen stated that his views of BBBY "began to sour long before August 12," 2022, and his tweet on August 12, 2022 "was an expression of pessimism about BBBY's future."  ECF No. 70 at 35.  Cohen read and approved the filing that contained these admissions.  Cohen's Dep. at 153:13-22 (Plf.'s Ex. 41).  But, at his deposition, Cohen contradicted his previous representations made to the Court, and stated that he does not know what it means to "sour on something," and that his August 12, 2022 tweet ***was not expressing any pessimism about BBBY***.  *Id.* at 435-447.  He claimed that he had no opinion on the article that CNBC posted, and his tweet was merely a "sarcastic comment in response to a negative article, making fun of the fact that the article was negative and the picture was a woman who had her cart filled to the top."  *Id.* at 448:7-12.  But Cohen admitted that he never provided any further explanation on Twitter, Reddit or in any financial publication or media outlet, and he had no persuasive explanation for the inconsistent positions he has taken before the Court.  *Id.* at

14

449-451; *see also id.* at 474-475 (admitting that he made no public comment on whether investors misinterpreted his Schedule 13D); *id.* at 263-64 (conceding that he has never disavowed the titles Papa Cohen, Meme King and Meme Lord); *id.* at 264-68 (failing to recall a single instance where he told investors that his public representations were misinterpreted); *id.* at 325-30 (admitting that he made no public representation denying that he is a role model for apes or influential amongst retail investors).

Cohen did not previously state the tweet was a meaningless joke because his new explanation is a concoction. On numerous other occasions, Cohen unwittingly admitted at his deposition that he had every reason to lose, and lost, all interest in his BBBY investments before the Class Period began. For example, Cohen testified that the Company's former CEO, Mark Tritton ("Tritton"), had already driven the Company off the cliff before he left. *Id.* at 493-98. Tritton left the Company six weeks before the Class Period commenced. *See also id.* at 371-76 (discussing how the Company lost hundreds of millions of dollars between April 2022 and June 2022 and was driven off the cliff by management).

Cohen also repeatedly claimed that he considered buying additional BBBY securities between June 30, 2022 and July 1, 2022 because he "liked the price," but decided against it because he "wasn't going to go further into the investment." *Id.* at 404-09. The price of BBBY's common stock closed at $4.71 on July 1, 2022. *See* Plf.'s Ex. 37. Yet, in a desperate attempt to maintain (implausible) deniability in this lawsuit, Cohen repeatedly testified that he considered buying BBBY securities on the days that he actually sold them even though the price of the Company's common stock defied history to skyrocket from $12.95 on August 12, 2022 to $23.08 on August 17, 2022 even though he gave up at least a month before. *Id.* at 404-09, 453-66. Along the way, Cohen destroyed whatever advice of counsel defense was apparently crafted for him concerning

his false and misleading SEC filings.  Opposition Br., 14-16, ECF No. 117 at 20-22.

For all of these reasons, Cohen's claim that his August 12, 2022 is a joke without value-relevant information is false.  Hearing Tr. 215:1-216:19.  A preponderance of the evidence already shows that Cohen's tweet conveyed exactly what tens of thousands of investors understood: that he thought the price of BBBY securities "was going up *and* that they should buy or hold."  *In re Bed Bath & Beyond Corp. Sec. Litig.*, 687 F. Supp. 3d at 11 (emphasis in original).  That is a prime example of objective, value-relevant information.

***Additional Evidence of Efficiency:***  At the hearing, Prof. Fischel repeated his false claim that Dr. Cain did not analyze any *Cammer* factor except for volume.  As testimony unequivocally established, Dr. Cain determined that all the *Cammer* and *Krogman* factors were satisfied during the Class Period.  Hearing Tr. 35-49.  Prof. Fischel did not disagree that these factors were met, *id*. at 123:1-10, but claims that a market cannot be informationally efficient unless the fifth *Cammer* factor is satisfied.  *Id*. at 87:14-22, 118:14-25.  That is demonstrably untrue, and the federal courts have repeatedly rejected this assertion.  *See, e.g.*, *Waggoner v. Barclays PLC*, 875 F.3d 79, 98-99 (2d Cir. 2017) (affirming lower court's decision to find market efficiency based on the other *Cammer* and *Krogman* factors, and holding that the lower court's "decision not to rely on direct evidence of price impact under *Cammer* 5 in this case fell comfortably within the range of permissible decisions."); *Malriat v. QuantumScape Corp.*, No. 3:21-cv-00058-WHO, 2022 U.S. Dist. LEXIS 232497, at *37 (N.D. Cal. Dec. 19, 2022) (noting that plaintiffs may be able to establish market efficiency even without a cause-and-effect test under the fifth *Cammer* factor); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015) (observing that most Circuits have held that no *Cammer* factor, including *Cammer* 5, is dispositive).

Nevertheless, Dr. Cain did establish *Cammer* 5.  *See supra* at 9-12.  His industry-standard event study, which used earnings announcements as test days, concluded that there was a cause-and-effect relationship between Company-specific news and BBBY's stock price, and his second test confirmed the relationship he identified over time specifically carried through to the short Class Period.  By contrast, Prof. Fischel concedes his Fischel 1 study is contaminated by Cohen's fraud.  *Compare In re Teva Sec. Litig.*, No. 3:17-cv-558 (SRU), 2021 U.S. Dist. LEXIS 43316, at *104-05 (D. Conn. Mar. 9, 2021) (noting that many courts accept earnings announcements as the proper criteria for a cause-and-effect test) *with* Hearing Tr. 117:3-6 (explaining that Fischel 2 uses dates outside the Class Period "to avoid the arguably contaminating effect of price movements during the class period.").  In addition, both experts determined that the final corrective disclosure had a statistically significant price impact.  *See supra* at 6-12.  The Fischel 2 study also finds that one other disclosure date is statistically significant at the 90% confidence level.  *Id.*  The Court should also credit Dr. Cain's analysis for the remaining disputed dates because Dr. Cain's studies adhere to standard practices while Prof. Fischel's do not.  *Id.*

   ***Ability to Short BBBY Securities:*** Short-selling constraints are never enough on their own to deem a market inefficient.[6]  This argument has been made before, and the federal courts have rejected it.  *See, e.g.*, *In re Groupon Inc. Sec. Litig.*, No. 12 C 2450, 2015 U.S. Dist. LEXIS 27334, at *28-30 (N.D. Ill. Mar. 5, 2015); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 432 (S.D.N.Y. 2014); *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 433-34 (D. Ariz. 2013); *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. at 100-01.  Prof. Fischel did not dispute this point

---

[6] Cohen hates short sellers.  Cohen's Dep. at 110-20.  He has publicly advocated that the government should crack down on them.  *Id.*  He claims to be unaware of claims made on his behalf that short selling constraints rendered the market for BBBY securities inefficient during the Class Period.  *Id.*  But his opposition to Class Certification fails even if the Court takes it at face value.

at the hearing.  Hearing Tr. 125:12-15.

During closing arguments, Cohen claimed that the district court's decision on remand in *In re PolyMedica Corp. Sec. Litig.* supports a finding that the market for BBBY securities was inefficient during the Class Period.  453 F. Supp. 2d 260 (D. Mass. 2006).  It does not.  There, the district court did not find inefficiency merely because of short-selling constraints.  It cited two other more important reasons to support its decision.  First, the district court found that the identification of news days with large price movements in an event study was insufficient without comparing them to no news days.  *See In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d at 270. That is not the case here.  Both of Dr. Cain's studies compared news days to no news days.  Cain Rept. at 20-28; Cain Reply Rept. at 14-17.

Second, the district court found direct evidence of inefficiency because the prices of *PolyMedica* securities were serially correlated (*i.e.* past stock prices correlate to future prices).  *See In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d at 276-78.  In contrast, Dr. Cain found here that there was no statistically significant autocorrelation with respect to BBBY securities.  Hearing Tr. 48:6-49:4.  Cohen does not challenge that finding.  *See also McIntire*, 38 F. Supp. 3d at 432 (rejecting defendants' reliance on the district court's decision in *Polymedica* because the woefully inadequate event study was the decisive factor in the denial of class certification).

Even as to short-selling constraints in *PolyMedica*, the district court only relied on them because the defendants there demonstrated the existence of a put-call disparity that might be explained by the constraints.  Defendants here offer no evidence of a put-call disparity.  *See Smilovits*, 295 F.R.D. at 433-34 (distinguishing *Polymedica*'s analysis of short-selling constraints because, like Cohen, the defendants did not establish an absence of put-call disparity, the securities traded on a national exchange with a heavy short interest, and the constraints were temporary).

18

At the hearing, the Court asked Prof. Fischel how he could claim that there were short-selling constraints when at least half a million shares were available to short each day of the Class Period.  Hearing Tr. 101:1-4.  In response, Prof. Fischel stated that short-selling was expensive and the short-sellers could risk exhausting their capital.  *Id*. at 101:8-25.  The Court then perceptively noted both would be true regardless of whether there were 500,000 shares or 500 million shares available to short.  *Id*. at 102:1-5.  Prof. Fischel agreed, but argued that "the reason why there's 500 [thousand] as opposed to 500 million is because there is an understanding that there's a huge price increase that's not related to the fundamentals.  It's not related to disclosure of value-relevant information."  *Id*. at 102:6-10.  This explanation (such as it is) conceded that short selling was not constrained by a lack of shares.  Prof. Fischel simply fell back on his argument that the market was not fundamentally efficient.  His insistence on reverting to a fundamental efficiency standard is the opposite of what the law instructs.  *See In re Bed Bath & Beyond Corp. Sec. Litig.*, 687 F. Supp. 3d at 16 (citing *Halliburton II*, 573 U.S. at 271-73); *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d at 14-17; *see also* Hearing Tr. 19-21 (explaining the difference between fundamental efficiency and informationally efficiency).  And Cohen's misrepresentations and disclosures during the Class Period contained value-relevant information even under Prof. Fischel's own standards.  *See supra* at 12-16.

Nor did hearing evidence support Cohen's speculative claim that a "rumored short squeeze" ***caused*** the increase in BBBY's share price.  There was a rumored short squeeze of BBBY securities in November 2021.  Cain Report at 37 n.104.  Price at that time increased, but the short interest utilization rate barely budged.  Plf.'s Ex. 42; Plf.'s Ex. 38.  The short interest utilization rate increased between August 1, 2021 and March 1, 2022, but the price of BBBY's common stock dramatically decreased, showing that the relationship between the two can be inverse.  Plf.'s Ex.

42.  Between May 1, 2022 and August 1, 2022, the price of BBBY's common stock declined, but the short interest utilization rate was near 100% according to Prof. Fischel's data.  *Id.*  It remained at or near 100% after September 1, 2022, but the price of BBBY's common stock plummeted.  Prof. Fischel does not deny any of this.  Hearing Tr. 127-38.  There is thus no reason to assume that the high short interest utilization rate can provide any scientific or reliable insight into the causes of price movements during the Class Period.

When Prof. Fischel was confronted with these hard facts at the hearing, he again changed his story, claiming that "[i]t's not the short interest by itself without the dramatic increase in volume that's pushing prices up."  *Id.* at 135:11-16.  But this new opinion—omitted from his Report in violation of Rule 26—is also deeply flawed.  There was a minor increase in volume during a rumored short squeeze in November 2021 but it was anything but "dramatic."  Plf.'s Ex. 38.  And Prof. Fischel could not limit the volume increase to short covering. Instead, volume reached unprecedented heights during the Class Period because of Cohen's misrepresentations.  His tweets and SEC filings were the principal cause of trading activity at that time.  *See also infra* at 20-22.

***Volatility and Volume:***  Prof. Fischel admits that an increase in volatility does not by itself render a market inefficient.  Hearing Tr. 125:16-24.  The federal courts also recognize that high volatility does not preclude market efficiency.  *See, e.g.*, *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 500-01 (S.D. Fla. 2003).  Dr. Cain explains that volatility in price can be caused by a defendant's representations and can last for weeks after they are made.  Hearing Tr. 55:15-25, 56:1-5.  Volume does not exist in a vacuum.  *Id.*  Dr. Cain explains that investors' decision to buy and sell securities can be directly observed by trading volume.  *Id.* at 35:9-16.  Prof. Fischel acknowledges that what investors do by their trades is value-relevant information.  *Id.* at 119:18-

32.  The dramatic increase in price and volume during the Class Period is thus consistent with market efficiency.

Cohen caused an increase in both price and volume both before and during the Class Period, regardless of whether there was a "rumored short squeeze."  First, the "rumored short squeeze" overlapped with Cohen's communications with investors.  His August 5, 2022 tweet was interpreted by investors as a signal to purchase BBBY securities, and he did nothing to discourage investors from interpreting his tweet in that way at any point in time.  ¶¶139-45.  Some investors believed that Cohen was already engaged in a "squeeze play" before the Class Period.  *Id.*  He did not deny it.  On August 10, 2022, Cohen sent a purple heart emoji without comment, expressing his love for retail investors and their hostility to hedge funds.  ECF No. 123 at 10 and n.2.  Prof. Fischel chose to ignore investors' reaction to these tweets.  Hearing Tr. 141-43.

Additional documents produced in discovery and deposition testimony further support that Cohen caused the increase in price and volume.  BBBY's Board of Directors acknowledged that Cohen could send signals to investors on twitter, confirming the value-relevance of his tweets. Reply Br., Ex. 5, ECF No. 120-2 at 119.  In late July 2022, BBBY's CEO and its investor expert believed that Cohen could "ignite a short squeeze."  *Id.*  Talking points prepared for Cohen by his fixer and media consultant, Greg Marose ("Marose"), in connection with Cohen's first meeting with BBBY management directed Cohen to say that he was not trying to cause a short squeeze, acknowledging Cohen could do so.  Plf.'s Ex. 43.  Other talking points Marose prepared in connection with Cohen's meeting with BBBY management in April 2022 after poor Q4 2021 financial results state that: "I honestly feel that if I wasn't in this stock, it would have plummeted into the single digits."  Plf.'s Ex. 44; Plf.'s Ex. 45.

The quantitative evidence confirms that Cohen caused the increase in price and volume

during the Class Period. The largest increases occurred during the Class Period. For example, before Cohen's August 5, 2022 tweet, only 52.78 million shares traded. Plf.'s Ex. 37. The next day, volume more than doubled to 124.71 million shares. *Id.* After Cohen sent a false Twitter post on August 12, 2022, the volume of shares traded increased from 80.13 million shares to 164.67 million the next trading day. *Id.* It reached an unprecedented high during the Class Period of 395.32 million shares after Cohen filed his Schedule 13D on the morning of August 16, 2022. *Id.* Volume finally began to plummet on August 19, 2022, the impact date of the corrective disclosure based on Cohen's disclosure of all his sales on August 18, 2022 after the market closed. Thus, volume tracked Cohen's misconduct, and was not an independent confounding factor.

***Bratya's Typicality and Adequacy:*** Hearing evidence confirmed that Bratya is both typical and adequate. Generally, typicality is satisfied in class actions when the class representative's claims arise from the same common set of facts, and the members of the class rely on similar legal theories to prove liability. *See Howard v. Liquidity Servs.*, 322 F.R.D. 103, 118-19 (D.D.C. 2017). Cohen does not dispute this requirement is met. Cohen's argument on this issue has been legally incoherent from the start, but he appears to claim that Bratya is subject to unique defenses because its trading strategy is not aligned with absent Class Members, and Bratya did not rely on Cohen's misrepresentations because it would have purchased shares despite the fraud. Hearing Tr. 209:4-25. Neither assertion has any support in law or fact. To show that Bratya did not rely on the misrepresentations, Cohen must demonstrate that Bratya was either aware of the fraud or the subject of the fraud was entirely irrelevant to Bratya's decision to purchase BBBY securities. *See Howard*, 322 F.R.D. at 120-23. As for Bratya's trading strategy, Cohen must show that his fraud either made BBBY securities a more attractive investment or that Bratya would have purchased BBBY securities even if it knew that a fraud was afoot. Cohen cannot satisfy these standards. *Id.*

at 123-26.   Cohen tries to shoehorn disparate facts from various, unrelated sources into these formidable requirements, but his effort amounts to nothing more than throwing spaghetti at the wall.

Cohen has presented nothing to even remotely suggest that Bratya was aware of or indifferent to the fraud.   Nor has Cohen presented any evidence to suggest that the fraud made BBBY securities more attractive to Bratya or that Bratya would have purchased securities even if it knew of the fraud.   Bratya was long BBBY common stock throughout the Class Period.   Hearing Tr. 155-60.   It did not buy any additional long positions at the beginning of the Class Period because cash was limited due to the bank's margin requirements.   *Id.*   Once it had cash, Bratya purchased hundreds of thousands of shares of common stock during the Class Period and suffered significant losses because of Cohen's fraud.   *Id.*   The only instances that caused its common stock holdings to decline were to fulfill a contractual obligation to deliver shares upon exercise of a call option sold before the Class Period, and to return a fraction of shares bought on August 17, 2022 because it had bought beyond what the bank determined its collateral would support.   *Id*. at 156:10-21, 158:20-159:22.

On the last day of the Class Period, Bratya's minority shareholder, like other investors, contemplated the possibility that Cohen's Form 144 was a fake released by short sellers. Opposition Br., Ex. 3, ECF No. 117-2 at 24-40.   Bratya also speculated that perhaps the Form was a precursor to a sale or spinoff of buybuy BABY and the implementation of Cohen's turnaround strategy was thus imminent.   *Id*.   Nothing in that shows Bratya was indifferent to fraud or creates a unique defense.   Bratya cannot be faulted for considering these possibilities.   Cohen is responsible for the confusion he created in the marketplace by omitting his plan to dump all his holdings, and referring to any sales as "potential" without any substantive explanation whatsoever.

Bratya was ultimately misled by Cohen's Form 144 to buy and hold BBBY securities because it interpreted the false and misleadingly incomplete language in the Form as an indication that Cohen would do what he publicly said he would do when he bought nearly 10% of the Company's shares and claimed to stay with BBBY through long term profitability.  Contemporaneous evidence exists to prove these facts.  *Id*.  That is all that matters—how or why Bratya was defrauded or whether it was defrauded in the same way as all other investors is irrelevant.  *See Howard*, 322 F.R.D. at 120-21 (ruling that defendants failed to defeat typicality because they did not show that the subject of the fraud was irrelevant to plaintiff's decision to buy securities).

Trading in options does not make Bratya atypical.  At the hearing, Cohen spent considerable time jousting with Mr. Coti about Bratya's pre-Class period transactions.  Hearing Tr. 172-73.  Pre-Class Period transactions are irrelevant because they are not compensable under the law or necessarily indicative of why Bratya bought shares during the Class Period.  *See Lewis v. Cytodyn, Inc.*, No. C21-5190 BHS, 2021 U.S. Dist. LEXIS 158054, at *11-12 (W.D. Wash. Aug. 19, 2021).  Post-Class Period transactions are similarly irrelevant because they have nothing to do with reliance.  *See, e.g.*, *Bond*, 2023 U.S. Dist. LEXIS 24749, at *24.

Regardless, Bratya does not assert any claims related to the call options it sold to generate premium, a non-directional strategy embraced by many long investors, or for the put it bought before the Class Period as a hedging strategy to protect against downside risk.  Instead of getting "wrecked," Bratya protected against the risk of having to deliver shares upon exercise by selling call options that expired within days, showing the transactions were intended to only generate premium.  Hearing Tr. 207:1-19; *see also* Opposition Br., Ex. 10, ECF No. 117-2 at 190-193 (showing that many call options had short-term expiration dates).  Regardless, courts in this District recognize that individual trading strategies take a back seat to common questions on

falsity, materiality and scienter, which "bind class members with more force" than factual variations that could "drive them apart." *Freeland v. Iridium World Communs., Ltd.*, 233 F.R.D. 40, 48 (D.D.C. 2006).

Cohen's argument concerning Bratya's adequacy fails to the extent that he claims Bratya is atypical of the Class it seeks to represent. *See Howard*, 322 F.R.D. at 134 (noting that typicality and adequacy tend to merge, but rejecting claim that plaintiffs were inadequate because their claims were typical of the class). With respect to involvement in the litigation, Bratya has "vigorously prosecute[d] the interests of the [C]lass through qualified counsel." *Id.* at 134. Mr. Coti's uncontroverted testimony establishes that Bratya's knowledge, involvement and efforts in this case far surpass the average class representative, and the results speak for themselves. Hearing Tr. 162:16-163:1. Defendants resist Bratya only because it and its counsel have zealously advanced the interests of all absent Class members.

## III.    CONCLUSION

The hearing only demonstrated the appropriateness of Class Certification. For the reasons explained herein as well as in Bratya's prior filings, Bratya respectfully requests the Court to grant its Motion for Class Certification.

Dated: August 14, 2024                           Respectfully submitted,

/s/ *Omar Jafri*
Omar Jafri

**POMERANTZ LLP**

Joshua B. Silverman (admitted *pro hac vice*)
Omar Jafri (admitted *pro hac vice*)
Christopher P.T. Tourek (admitted *pro hac vice*)
Genc Arifi (admitted *pro hac vice*)
10 S. LaSalle Street, Suite 3505
Chicago, IL 60603

Tel: (312) 377-1181
Fax: (312) 377-1184
Email: jbsilverman@pomlaw.com
ojafri@pomlaw.com
ctourek@pomlaw.com
garifi@pomlaw.com

-and-

Jeremy A. Lieberman (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
E-mail: jalieberman@pomlaw.com

*Counsel for Lead Plaintiff Bratya SPRL and Co-Lead Counsel for the Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**

Peretz Bronstein (admitted *pro hac vice*)
Yitzchak E. Soloveichik (admitted *pro hac vice*)
Eitan Kimelman (admitted *pro hac vice*)
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel: (212) 697-6484
Fax: (212) 697-7296
peretz@bgandg.com
soloveichik@bgandg.com
eitank@bgandg.com

*Counsel for Lead Plaintiff Bratya SPRL and Co-Lead Counsel for the Class*

**COHEN MILSTEIN SELLERS & TOLL PLLC**

Steven J. Toll (D.C. Bar No. 225623)
Daniel S. Sommers (D.C. Bar No. 416549)
Jan E. Messerschmidt (D.C. Bar No. 1031488)
1100 New York Avenue, N.W., Fifth Floor
Washington, D.C. 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com

26

jmesserschmidt@cohenmilstein.com

*Liaison Counsel for Lead Plaintiff Bratya SPRL and for the Class*