Plaintiff's Exhibit 41

1    you were investing more money into GameStop,

2    correct?

3           A.     I have invested since 2019 more

4    money into GameStop.  And I've never sold any

5    GameStop shares to date.

6           Q.     And you've never shorted any

7    GameStop shares?

8           A.     No.

9           Q.     Not even one?

10          A.     Not that I believe.

11          Q.     Okay.  Mr. Cohen, you don't like

12   short sellers, right?

13          A.     Correct.

14          Q.     And I believe that you had sent

15   out a tweet on May 15th 2022 saying that

16   taxpayer money should be spent cracking down

17   on hedge funds and short sellers; isn't that

18   right?

19          A.     Yes.

20          Q.     Why did you -- did you delete

21   that tweet?

22          A.     I don't think so.

1          Q.     So you don't believe that you

2    deleted it?

3          A.     I don't know.  Can you show me

4    the tweet?

5          Q.     Well, I -- I cannot, because I --

6    I couldn't find it.  It's not there on your

7    page anymore.

8          A.     So then it was deleted.

9          Q.     Do you remember why you deleted

10   it?

11               MR. FARINA:  Objection, form.

12               THE WITNESS:  No, I don't

13   remember.

14               BY MR. JAFRI:

15         Q.     Well, let me -- let me back up a

16   little bit.

17               Did you delete the tweet?

18         A.     I have made multiple tweets and

19   comments about the fact that I do not like

20   both hedge funds and short sellers.

21         Q.     What is the reason for that?  Why

22   don't you like them?

1        A.        I think it's unAmerican to bet

2    on -- and to profit on someone else's

3    failure.   It's one thing not to invest in

4    someone's success.   It's another thing to

5    profit on someone's failure.   And I think

6    it's unAmerican.   And it's legal and they're

7    entitled to it, but I don't like them.

8        Q.        What do you mean by unAmerican?

9        A.        I mean that's my opinion.   I

10   don't feel as though people should profit

11   on -- and bet that someone is going to fail

12   and then employ tactics in order to increase

13   the odds that they're going to be -- that

14   they'll end up failing.   And that's what a

15   lot of these hedge fund short sellers do.

16       Q.        Why do you feel so strongly about

17   the fact that they're unAmerican when you're

18   not an American citizen?

19            MR. FARINA:   Objection, form.

20            THE WITNESS:   It's not about

21       being a citizen.   Being unAmerican

22       doesn't mean about whether -- has

1          anything to do with citizenship or

2          not.

3                   BY MR. JAFRI:

4          Q.    So then --

5          A.       It has to do with innovation and

6     entrepreneurism and the fact that this is the

7     greatest country in the world.  Less than

8     5 percent of the population has 25 percent in

9     GEP.  So much innovation has come out of

10    America, companies like Apple and Amazon and

11    Chewy.  And so for someone to go and bet

12    against entrepreneurship, in my opinion, is

13    unAmerican.

14         Q.       Okay.  So let me just get this

15    straight.  You don't like short sellers and

16    you want the government to crack down on

17    them.  But you allowed your lawyers in this

18    case to make filings saying that retail

19    investors were crooked manipulators because

20    they were trying to bet against the shorts?

21                  MR. FARINA:  Objection, form.

22                  THE WITNESS:  I don't know what

1       my lawyers said.  What I'd say with

2       respect to hedge fund short sellers is

3       I find it ironic that if you have a

4       large position, you disclose that long

5       position.  But if you short that

6       position, there's not the same kind of

7       disclosure requirements.

8            So I believe there should be

9       more transparency with respect to

10      short sellers.

11           BY MR. JAFRI:

12           Q.    But you said more than that.  You

13      said short sellers are against

14      entrepreneurship and are unAmerican, right?

15           A.    Yes.

16           Q.    Okay.  So it's just not about the

17      disclosures.  It's more than that, right?

18           A.    Yes.

19           Q.    Okay.  So I'm going to go back to

20      my question about your filings in this case.

21           Are you aware that there is a

22      motion for class certification that's pending

1       in this case?

2            A.     Yes.

3            Q.     Do you understand what that is?

4                   MR. FARINA:  Objection, form.

5            I don't think he can have an

6            understanding, other than what he

7            obtained from counsel.

8                   MR. JAFRI:  It's a public

9            document.  He can have an

10           understanding of a public document.

11                  BY MR. JAFRI:

12           Q.     Mr. -- Mr. Cohen, unless

13      Mr. Farina tells you not to address my

14      question, you have to address my question.

15                  Would you like me to repeat it?

16                  MR. FARINA:  Well, if you can

17           address the question without anything

18           that you learned from your lawyer.

19                  Why don't you go ahead and

20           repeat the question.

21                  MR. JAFRI:  I'll rephrase.

22

1                    BY MR. JAFRI:

2          Q.      Have you read the motion for

3    class certification that was filed in this

4    case?

5                    MR. FARINA:  The motion?

6                    MR. JAFRI:  Yeah.

7                    THE WITNESS:  Not the full

8          thing.  Parts of it.

9                    BY MR. JAFRI:

10         Q.      Parts of it, okay.

11                  You know that your lawyers have

12   opposed that motion, right?

13         A.      I believe so.

14         Q.      Did you read that motion?  Sorry.

15                  Did you read that opposition they

16   filed?

17         A.      Not the full thing.

18         Q.      What do you mean by not the full

19   thing?

20         A.      I didn't read the full thing.

21         Q.      So how much of it did you read?

22         A.      I don't remember.  I relied on

1    them to have all the facts and put together a

2    good case.

3         Q.    Okay.  Do you know that one of

4    the principal arguments that they have in

5    terms of opposing certification in this case

6    is that the company shares couldn't be

7    shorted enough?

8              MR. FARINA:  Objection, form.

9              THE WITNESS:  I don't

10         understand what that means.

11              BY MR. JAFRI:

12         Q.    I'll -- I'll rephrase.

13              One of the things that they have

14    said in the motion -- in the -- in the papers

15    is that there was a very high short

16    utilization rate.

17              Are you aware of that?

18         A.    No, I'm not aware of that.

19         Q.    Okay.  Are you aware of the fact

20    that they have argued on your behalf that the

21    fact that people couldn't short GameStop

22    stock enough meant that the market for the

1      stock was inefficient?

2            A.      We're talking about GameStop or

3      Bed Bath & Beyond?

4            Q.      Bed Bath & Beyond.  That's what I

5      meant.  Sorry.

6            A.      Can you repeat your question?

7            Q.      Yeah.  Sure.  My question was,

8      are you aware of the fact that the -- your

9      attorneys, in your name, have argued that the

10     fact that people couldn't short BBBY stock

11     enough meant that the market for that stock

12     was inefficient?

13           A.      I'm aware that they --

14                   MR. FARINA:  Sorry.  I don't --

15                   I don't know how he's going to be able

16                   to answer this question without

17                   disclosing information that we told

18                   him.

19                   MR. JAFRI:  Well, he -- he said

20                   he read the papers.

21                   MR. FARINA:  Well, no, he

22                   didn't, actually.  He said -- and --

1      and he's -- he's told you he did not

2      read all of it.  He said he read some

3      of it.

4           MR. JAFRI:  Well, maybe this

5      was some of it, as --

6           MR. FARINA:  Okay.

7           MR. JAFRI:  Are you telling him

8      not to answer?

9           MR. FARINA:  I'm -- I'm -- I'm

10      telling him -- I'm not telling him not

11      to answer.  I'm telling him if he

12      answers, he should not be disclosing

13      information that came from his

14      lawyers.

15           MR. JAFRI:  Sure.  And I'm not

16      interested in that.

17           BY MR. JAFRI:

18      Q.     To the extent that you had any

19      conversations with them, I'm -- I don't care

20      about those.  You don't have to disclose

21      those to me.  I'm just talking more of your

22      general knowledge --

1      A.     I'm not familiar with that part.

2      Q.     Okay.  So you're not familiar

3  with that part.  Okay.

4          One thing I wanted to know,

5  Mr. Cohen, is you know that the -- the --

6  the -- so I wanted to go back to one thing

7  on -- about GameStop.

8          You believe that the people who

9  were shorting that stock were -- were wrong,

10  right?

11          MR. FARINA:  Objection, form.

12          THE WITNESS:  No, I don't know.

13  I said we'll see what happens at the

14  company.

15          BY MR. JAFRI:

16      Q.     No.  No.  But that wasn't my

17  question.

18          My question is, you had long

19  position, right?

20      A.     Yeah, I hope the company is

21  successful and I'm working hard to make sure

22  that the -- to make the company successful.

1   your plan to sell BBBY securities?

2       A.    I understand that that's part of

3   it, yeah.

4       Q.    Okay.

5       A.    That's one of the allegations.

6       Q.    Have you -- I know we talked

7   about the motion for certification and -- and

8   you don't have to address that again.

9             Have you reviewed any of the

10  other papers that your attorneys have filed

11  in this case?

12      A.    Do you have examples?

13      Q.    Right.  Like so you know that

14  when we filed a complaint, at that point I

15  believe you were represented by

16  Vinson & Elkins, right?  And, again, I'm not

17  interested in any attorney-client

18  communications.  But you know that they tried

19  to have the case dismissed, right?

20      A.    Yes.

21      Q.    And they filed something called a

22  Motion to Dismiss?

1        A.      Yes.

2        Q.      Did you read it?

3        A.      Parts of it, yes.

4        Q.      Okay.  It was filed with your

5    authorization?

6        A.      Yes.

7        Q.      Okay.  They sent you the final

8    version before it was filed?

9        A.      Yes.

10       Q.      And you said okay, go ahead

11   and -- and file it?

12       A.      I approved it.

13       Q.      Is that the case with -- again,

14   I'm not interested in any attorney-client

15   communications.  I just want to know.  With

16   respect to all the filings in this case, are

17   you made aware of the filings that would

18   be -- are you aware of what gets filed in

19   this case?

20              MR. FARINA:  Objection, form.

21       I don't know -- I don't know how he

22       would be --

1    fact that they were monitoring Reddit for

2    you?

3        A.    No.

4        Q.    Okay.  Other than these E-mails,

5    did you have any phone calls with Greg Marose

6    where he called and said hey, I found this

7    thing on Reddit.  I wanted you to know about

8    it?

9        A.    Not that I remember, no.  You I

10   said he sent hundreds of news clippings from

11   a variety of different sources.

12       Q.    Okay.  Now, in the first sentence

13   it refers to you as the meme king, correct,

14   in the first box?

15       A.    Yes.

16       Q.    Okay.  Mr. Cohen, you've never

17   done anything to disavow that label, right?

18            MR. FARINA:  Objection, form.

19            THE WITNESS:  What does that

20       mean?

21            BY MR. JAFRI:

22       Q.    I mean you've never gone and said

1    publicly that I'm not the meme king?

2         A.    I've never said I am the meme

3    king.

4         Q.    But you've never said that you're

5    not, right?

6         A.    I've been called a lot of

7    different things.

8         Q.    Mr. Cohen, it's a yes or no

9    question.  You've never gone and publicly

10   said I'm not the meme king?

11        A.    I don't believe so.

12        Q.    Okay.  And you've never gone

13   publicly and said I'm not the meme lord?

14        A.    No, I have not.

15        Q.    You've never gone publicly and

16   said don't call me Papa Cohen?

17        A.    No, I don't believe so.

18        Q.    You've never discouraged

19   investors like these -- people who we just

20   talked about, like this post, you never

21   discouraged these investors from interpreting

22   your statements like your tweets?

1          MR. FARINA:  Objection, form.

2          THE WITNESS:  I've never what?

3          BY MR. JAFRI:

4     Q.     You've never discouraged them

5     from trying to find meanings in your Twitter

6     posts, correct?

7     A.     I don't even know what that

8     means.

9     Q.     Well, what I mean by that is if

10    they have -- if they read certain things that

11    you post on Twitter, you've never gone and

12    said hey, you know, I'm being misinterpreted,

13    that's not what I meant?

14    A.     No, actually, I don't think that

15    that's true.

16    Q.     You -- do you -- is it -- is it

17    your testimony that you've done that on

18    Twitter?

19    A.     Well, I had an interview with Joe

20    Fonicello on GMEdd, where he asked me about

21    my tweets and I said these are just how I

22    feel, they're random thoughts, and we went

1      through each of them one by one.

2          Q.     Yes.  I -- I remember that

3      vividly and I --

4          A.     Okay.

5          Q.     -- know what's in it.

6                 But I think that my question is a

7      little different, which is, when it comes to

8      those people who interpret your tweets, like

9      the ones that you discussed with Joe

10     Fonicello, right, like the people on Twitter

11     who respond to your tweets, you've never

12     tried to correct them in any way and say you

13     are misunderstanding what I meant?

14                MR. FARINA:  Objection, form.

15                THE WITNESS:  My tweets are

16           just me being me.  They're -- I don't

17           know what tweets you're referring to.

18           I don't know which comments you're

19           talking about.  And you're -- again,

20           you're talking about people as in

21           they --

22

1                    BY MR. JAFRI:

2          Q.     Um-hmm.

3          A.     And you're speaking in

4    generalities.

5                    So if you have a specific

6    question, I'll answer, but I don't understand

7    these -- these generalities, it's impossible

8    to answer the question.

9          Q.     Well, I mean, anybody, really.

10   Anybody.  It doesn't matter who.  And we'll

11   get more specific on the other tweets.

12                   But my question is very simple,

13   which is, when you go and post things and

14   people respond to your posts and say Ryan,

15   yes, we get it, we know what you mean or --

16   at -- at -- or if they have some message,

17   you've never said hey, that's not what I

18   meant publicly?

19         A.     I've provided more context, like

20   I said, in interviews, but I don't know in --

21   specifically what you're referring to.

22         Q.     I'm specifically referring to

1   Twitter.

2         A.      Yes.   And which comment on

3   Twitter and which post did I make?

4         Q.      Any comment.   Do you recall even

5   one instance --

6         A.      I rarely reply to my comments --

7         Q.      Sure.   That's not my question,

8   Mr. Cohen.

9               My question is, do you recall

10  even one instance where you posted something

11  and someone interpreted a meaning and you

12  said that's not what I meant?

13        A.      I don't remember.

14        Q.      Okay.

15              MS. REPORTER:   Can we take a

16      break?

17              MR. JAFRI:   Sure.

18              VIDEO OPERATOR:   Off the record

19      at 2:01.

20              (Thereupon, a brief recess was

21      taken.)

22              VIDEO OPERATOR:   Back on the

1    specifically, unless you put one in front of

2    me like this one.

3         Q.    Can we focus on this final

4    sentence here in the third paragraph, you

5    know the one that started with, As a role

6    model among apes?  We talked about that

7    already.  You know in the final sentence

8    here --

9         A.    Yeah.

10        Q.    -- when it says, Any news about

11   the investor is often enough to generate

12   positive sentiment among apes active on

13   Reddit.

14             Do you see that?

15        A.    Yes.

16        Q.    Okay.  Now, have you seen other

17   articles that have said that specific thing

18   that we -- that I just read to you?

19        A.    I don't remember.

20        Q.    Okay.  But you may have?

21        A.    No.  I mean I don't -- what I

22   said is I don't remember.

1        Q.      Okay.  Now, you've never gone

2    ever publicly and said I am not a role model

3    for the apes?

4        A.      I don't believe so.

5        Q.      Okay.  And you've never gone

6    publicly and said --

7        A.      I've never said I am a role model

8    for the apes either.

9        Q.      Please let me finish my question.

10       A.      Okay.

11       Q.      You've never gone and said that

12   you are not influential among this community

13   of retail investors?

14       A.      I've never said that I was.

15       Q.      That wasn't my question.

16               You've never said that you

17   weren't, correct?

18       A.      I don't believe so.

19       Q.      Okay.  You have publicly said

20   nothing, in fact, to assert ever that you do

21   not influence stock prices?

22       A.      I don't give out investment

1    advice.

2         Q.     That's not my question.  Please,

3    it's a yes or no question.  You have never

4    gone publicly and said I, Ryan Cohen, do not

5    influence stock prices, correct?

6         A.     I don't believe so.

7         Q.     And you've never gone and said I,

8    Ryan Cohen, don't generate positive sentiment

9    among meme stock investors on Reddit?

10        A.     I never said I do.

11        Q.     But you've never said that you

12   didn't, right?

13        A.     I don't believe so.

14        Q.     Okay.  You've never contested any

15   of --

16        A.     Just to be clear, I don't give

17   out investment advice.  I don't tell people

18   what to do with their money.  My father

19   always told me don't tell people what to do

20   with their money.

21                So I think in one video

22   appearance when I was asked what should

1    investors do with their money, I said the

2    best thing to do is to invest in a low cost

3    index fund that follows the S&P 500.  And I

4    was asked, well, you don't do that.  You

5    don't diversify.  You invest in specific

6    companies.  I said well I'm entrepreneurial

7    and that's what I'm comfortable with, but I

8    don't recommend it to other people.  That's

9    just my strategy, like what I told you

10   earlier in the deposition.

11           So I don't give people investment

12   advice, so why would I go and say any of the

13   things that you're suggesting if I'm not

14   going and telling people what they should do

15   with their money?

16       Q.    Mr. Cohen, I -- my question

17   wasn't whether you should provide investment

18   advice --

19       A.    Your question is putting words in

20   my mouth.

21       Q.    Please let me finish the

22   question.  Please.  Please.

1              MR. FARINA:  Yeah, let him ask

2         the question before you start to

3         answer.

4              BY MR. JAFRI:

5         Q.    You are giving me a justification

6    for why you didn't do this.  I understand.

7    I'm not interested.  And I don't care.

8              My question is very, very simple.

9              You have never gone and said

10   something like, you know, please stop saying

11   that I generate positive sentiment among

12   these so-called apes on Reddit?

13             You've never done that, right?

14        A.    I answered your question.

15        Q.    Which is a yes, that you've never

16   done it?

17        A.    I answered your question.

18        Q.    What was the answer?  Is it a yes

19   or a no?  It's a simple yes or a no --

20        A.    You can go through the transcript

21   and you'll see my answer.

22        Q.    Well, I think you said yes to

1    some of the things and I don't know why

2    you're struggling so much with this one.

3              So when I -- when I -- when I

4    told you have you ever said, for instance,

5    that you do not have influence on stock

6    prices, you said that you haven't.  So this

7    is a very similar question.  It's just about

8    a different topic, which is, have you ever

9    said that you don't generate positive

10   sentiment among the apes on Reddit publicly?

11        A.    I don't know.

12        Q.    You haven't, right?

13        A.    No, I mean I don't know.

14        Q.    You don't recall any instance?

15   You can't tell me one example where you have

16   publicly said it?

17        A.    I don't know.

18        Q.    Okay.

19        A.    I don't remember every single

20   thing that I've said.

21        Q.    All right.  Let's move on to

22   another exhibit.  You can keep that away.

1    very, very risky transformation that the

2    company, especially going into a macro time

3    of a lot of uncertainty, especially given the

4    balance sheet.

5              You -- you see all that?

6         A.    Yes.

7         Q.    So when you said that, I --

8    you -- is it true that you said that the

9    company did not have the balance sheet to

10   transform the business?

11        A.    I don't remember exactly.  These

12   are not my notes.

13        Q.    Okay.  But do you believe that

14   the company did not have the balance sheet

15   to -- to do a transformation?

16        A.    I believe that the company was

17   doing a lot worse than I expected and losing

18   a lot of money.  I didn't have visibility,

19   obviously, into the future trajectory, but

20   based on what I saw in the previous quarter,

21   the company was losing a lot of money.

22        Q.    Okay.  Now, if we focus on the --

1          the final section on this page here that

2          again is attributed to you -- it says RC, do

3          you see that, but operationalizing a plan?

4               A.     Yes.

5               Q.     You see that?

6                      So it says, but operational --

7          operationalizing a plan, SG&A at 33 percent

8          isn't sustainable and GM contracting by

9          400bps, so getting back to SG&A mid

10         20 percent will involve pretty significant

11         changes at the company.  Given the macro

12         backdrop we're heading into, there are

13         probably some big changes that have to be

14         made to address business and to conserve

15         cash.  Is that happening?  Have we scrapped

16         the 2020 plan?

17                     Is it true that you wanted the

18         company to cut back on SG&A expenses and get

19         it down to the mid 20 percent?

20              A.     I wanted them to reduce expenses,

21         yes.

22              Q.     To mid 20 percent?

1          A.      I mean, that sounds like a good

2     target.

3          Q.      Okay.  And that number happened

4     while you were invested, correct?

5          A.      I don't believe so.

6          Q.      Okay.  And then over here, does

7     this jog your memory, where it says, Have we

8     scrapped the 2020 plan?

9                  Do you remember that?

10          A.      I don't remember specifically the

11     2020 plan.  I think this was a 150-page God

12     knows what that they paid McKinsey to do,

13     talking about how they were going to have

14     private label and all kinds of things.  And I

15     thought it was crazy, and I said that in the

16     letter, that I thought it was crazy, to go to

17     a bunch of consultants and spend God knows

18     how much money to come up with a -- a

19     beautiful PowerPoint deck that I did not

20     believe was achievable.

21          Q.      Okay.  But they never changed

22     their behavior, right?  Like it's not like

1   they scrapped this plan or didn't stop -- or

2   stopped consulting with McKinsey or all of

3   those things while you were investing?

4          A.     I have no idea --

5          Q.     You're not aware?

6          A.     I don't know.  I -- no, I'm not

7   aware.  I don't know what they did.

8          Q.     Okay.  So when you were saying

9   scrap this plan and your criticism right now

10  of McKinsey, you never felt that there was a

11  change in behavior --

12         A.     It could have been BCG.

13         Q.     Or BCG, right, sure, Consultants.

14  I know that you -- you're critical of those.

15              But what I'm saying is, you never

16  felt, ever while you were invested, that they

17  did any of these things, correct?

18         A.     The company was losing hundreds

19  of millions of dollars.  I don't know what

20  they did or they didn't do.  They did a

21  remarkable job driving the company off of a

22  cliff.  They get an A plus for that.

1          Q.      I understand, Mr. Cohen.  But my

2     question is different.  My question if you

3     had have certain ideas about what they

4     would -- they should be doing, like, for

5     instance, cutting costs down to --

6                  MS. REPORTER:  Slow down,

7          please.

8                  BY MR. JAFRI:

9          Q.      Like, for instance, cutting costs

10    down to the 20 percent range, right?  And

11    they never did that to your knowledge?

12                 MR. FARINA:  Objection, form,

13         foundation.

14                 THE WITNESS:  I don't know what

15         they did or they didn't do.  They did

16         not get their expenses in line.

17                 You had their gross margin

18         going down.  You had their expenses

19         going up.  You had revenues going

20         down.  That was very, very clear from

21         the April results.

22                 So these were -- again, I don't

1     remember exactly what I said in this

2     note.  These are not my notes.  These

3     are notes from the company.  But it's

4     not healthy to go and lose hundreds of

5     millions of dollars.  And they needed

6     to improve the performance and they

7     didn't.  They drove the company off of

8     a cliff.

9          BY MR. JAFRI:

10         Q.    So in other words, there was no

11    improvement and you didn't feel like they had

12    implemented any of your proposed solutions,

13    correct?

14         A.    I -- I don't know.

15         Q.    You're not aware that they did?

16         A.    I don't know.

17         Q.    You're not aware that they did,

18    is that --

19         A.    I don't -- no, I don't know.

20         Q.    Okay.  All right.  So you have no

21    knowledge of them taking any steps to

22    implement any of these ideas that you had,

1          MR. FARINA:  -- so not the

2     second E-mail in the chain.

3          THE WITNESS:  From me to my

4     lawyer?

5          BY MR. JAFRI:

6     Q.     Yeah.  Yeah.  I'm talking about

7     the --

8     A.     Yeah.

9     Q.     -- first one, the first page at

10    2:42 p.m.

11    A.     Um-hmm.

12    Q.     You see that?

13         So you wrote, Given I'm going to

14    be in the market buying, I'd like to cancel

15    the call and ask her to speak next week.

16    What is the best way to slow this down so

17    that I'm not restricted from buying tomorrow

18    and Friday.  He says to you that you should

19    just say something has come up and you need

20    to reschedule.

21         Did you consider buying BBBY

22    shares on June 30th and July 1st of 2022?

1          A.      I was thinking about it.

2          Q.      And why was that?

3          A.      Because I liked the price.

4          Q.      But what was the reason why you

5     wanted to buy shares at that point?

6          A.      Because I liked the price.

7          Q.      I understand.  But did you have

8     some sort of goal in mind about how much you

9     would buy?

10         A.      No.

11         Q.      And --

12         A.      I believe, according to the

13    cooperation agreement, I was -- I could only

14    go up to 20 percent.

15         Q.      And you considered going up to

16    20 percent?

17         A.      No.  I told you I didn't have

18    a -- a goal, but that was the maximum that I

19    could go up to, as per the cooperation

20    agreement.

21         Q.      Okay.  But why on this day did

22    you decide that you may want to buy some

1    shares following this conversation that you

2    had about how terrible the results were?

3           A.      Because I liked the price.

4           Q.      Okay.  Was that the only reason?

5           A.      Yes.

6           Q.      Did you consider buying shares to

7    try and get more influence at the company?

8           A.      I had to like the price.  The

9    most important thing was I liked the price.

10          Q.      No.  No.  My -- my question is,

11   was one of those the motivation?  Somehow if

12   you increased your stake, you would have,

13   like, more influence?

14          A.      The motivation was liking the

15   price.

16          Q.      Was that the only -- that was the

17   only reason?

18          A.      I -- I believe so.  I thought it

19   was attractive.

20          Q.      So why didn't you end up buying

21   any shares?

22          A.      I changed my mind.

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

1        Q.      When?

2        A.      I don't remember exactly when.

3        Q.      And what was the reason for that?

4        A.      I didn't -- I decided I wasn't

5    going to go further into the investment.

6        Q.      Okay.  Because of the fact that

7    the results were terrible?

8        A.      I don't remember exactly why I

9    changed my mind.  But I changed my mind.  I

10    thought about it.  I was considering it and I

11    didn't do it.

12        Q.      Because buying more shares was a

13    bad idea?

14        A.      Well, I -- I mean, I don't know.

15    I changed my mind.

16        Q.      Because it was not a good

17    decision to buy more shares?

18        A.      I changed my mind because I

19    decided I did not -- not want to.  And I

20    don't remember why I changed my mind --

21        Q.      Do you think it --

22        A.      -- why I -- what -- how I came to

1    that conclusion, I don't remember what I was

2    thinking at the time that I decided.  I was

3    thinking about it and then I decided I wasn't

4    going to do it.

5    Q.    Do you remember when you decided

6    that you weren't going to do it?

7    A.    No.

8    Q.    Was it in July 2022?

9    MR. FARINA:  Objection, form.

10    THE WITNESS:  You just asked me

11    if I remember when, I told you no and

12    then you asked me the dates.

13    BY MR. JAFRI:

14    Q.    Yeah.  I'm trying to be more

15    specific because you were trying to buy some

16    shares at the end of June and early July,

17    right, in the --

18    A.    If I would -- if I -- I knew the

19    date, I would have said it to you, so --

20    Q.    Okay.

21    A.    -- I answered your question.

22    Q.    I'm just trying to understand the

1    timeline.  I'm just wondering when, you know,

2    you had this -- you had this desire at this

3    point to buy shares, whether you recall that

4    you changed your mind about it, you know,

5    within a few days of sending Ryan Nebel these

6    E-mails.

7        A.    I don't remember when I changed

8    my mind.

9        Q.    Okay.  All right.  You can put

10    that away.

11            Did you have any communications

12    with Sue Gove in July of 2022?

13        A.    We spoke at a certain point, but

14    I don't remember when.

15        Q.    Was that conversation on Zoom?

16        A.    I believe so.

17        Q.    Did you -- did you question her

18    about whether there was a bankruptcy risk?

19        A.    I don't believe so.

20        Q.    Okay.  All right.  So we will

21    show you one document.  So this is -- this

22    was previously marked as Exhibit 188.

1              MR. FARINA:  Objection, form,

2         foundation.

3              THE WITNESS:  I don't remember

4         the article specifically going and

5         saying a -- a target price of the

6         company.

7              BY MR. JAFRI:

8         Q.    But it was a negative --

9         A.    I remember it was a negative

10    article.

11        Q.    Okay.  And you retweeted it with

12    this message, At least her cart is full,

13    right?

14        A.    The article had a picture of --

15    it was a negative article and it had a

16    picture of a woman whose shopping cart was

17    filled.  So I made a sarcastic remark, saying

18    At least her cart is filled to a negative

19    article because I thought it was funny that

20    they picked a picture showing someone that

21    looked like they had a pretty nice, fun

22    shopping spree.  So I made a sarcastic

1     comment saying at least her cart is filled.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1                      EVENING SESSION    5:00 p.m. EDT

2            BY MR. JAFRI:

3       Q.      Right.  I -- I have a couple of

4   questions about this.

5                Now, earlier on you and I had

6   talked about the motion to dismiss that you

7   filed earlier on, you know, in -- with

8   respect to this case to try and get it

9   dismissed.

10      A.      That my lawyers filed?

11      Q.      Yeah.

12      A.      Yes.

13      Q.      And you told me that you read it,

14  right?

15      A.      Parts of it I told you.

16      Q.      Yeah.  And you told me that it

17  was authorized by you before it was filed?

18      A.      Yes.

19      Q.      Okay.  Now, you are aware that in

20  that motion they said that you had soured on

21  your investment long before you sent this

22  tweet, correct?

1              MR. FARINA:  Objection, form,

2         foundation.

3              THE WITNESS:  No, I don't

4         remember that.

5              BY MR. JAFRI:

6         Q.    Okay.

7         A.    I don't remember what my lawyer

8    said.

9         Q.    All right.  So -- but -- but you

10   authorized -- you authorized that filing,

11   right?

12        A.    I don't remember what my lawyer

13   said.

14        Q.    That -- my question is different.

15              It was signed on your behalf by

16   your attorneys and filed --

17        A.    Okay.

18        Q.    -- with your permission, right?

19        A.    Okay.

20        Q.    It was?

21        A.    I don't remember exactly.  I'm

22   assuming I signed off on that.

1      Q.    Okay.  Well, I mean, it's a fact

2   about you, so they couldn't have made it up,

3   right?

4              MR. FARINA:  Objection, form.

5              THE WITNESS:  I answered your

6   question.

7              BY MR. JAFRI:

8      Q.    I have a different question.

9      A.    Okay.

10     Q.    You have no reason to doubt that

11  there's anything false in that filing?

12     A.    I -- I don't have the filing in

13  front of me and you're not asking me

14  something specifically.  So I have no way to

15  answer this question.

16     Q.    So it's a possibility that things

17  that are filed in court on your behalf

18  contain false information?

19     A.    I rely on my lawyers to file

20  forms correctly.

21     Q.    But you -- you're not 100 percent

22  sure whether there's anything false in these

1      filings?

2          A.     I rely on my lawyers to file

3      accurate forms.  I can't say whether

4      something is 100 percent.  Nothing is

5      100 percent --

6          Q.     Okay.

7          A.     -- besides death and taxes.

8          Q.     So do you -- do you agree that

9      you had already lost interest in BBBY before

10     you sent this tweet?

11         A.     No.

12         Q.     So what they said is false in

13     that filing?

14         A.     I don't know in what context they

15     said it and --

16         Q.     Well --

17         A.     -- I don't have it in front of

18     me.

19         Q.     Let me rephrase.

20         A.     And I did not -- when you say

21     lose interest, what does that mean exactly,

22     to lose interest?

1    Q.    Okay.  I'll be more specific.

2          Did you sour on your investment

3    in BBBY securities before you sent this

4    tweet?

5    A.    The company had done a lot worse

6    than I expected.  I -- I already shared that

7    on multiple occasions.

8    Q.    Sure.  So does that mean yes?

9    Does that mean you did sour on --

10   A.    I don't know what it means to

11   sour on something.

12   Q.    You had lost interest in your

13   investment by the time you tweeted this?

14   A.    It depends on the price.  Like I

15   told you, I'm a value investor.  If something

16   is a certain price, I'm interested.  If

17   something is at a certain price and it's 2X

18   that, then I'm not interested.  It depends on

19   the price.

20   Q.    Now, are you familiar --

21   A.    Did I sour on the investment?  I

22   thought that the company was doing worse than

1     I expected.  I was surprised that they were

2     losing as much money as they did.

3          Q.     Mr. Cohen, sitting over here, you

4     have no reason to believe that your attorneys

5     filed anything in this case that is false,

6     correct?

7                 MR. FARINA:  Objection, form.

8                 THE WITNESS:  You asked me this

9          already.

10                 BY MR. JAFRI:

11     Q.     No --

12                 MR. FARINA:  Why don't you just

13          ask him directly whether he soured on

14          his investment.

15                 MR. JAFRI:  I did.

16                 MR. FARINA:  Okay.

17                 MR. JAFRI:  I did.  And he

18          responded.

19                 MR. FARINA:  Okay.  Then --

20          then you should move on.

21                 MR. JAFRI:  No, I -- it's -- I

22          have a different question.

1              BY MR. JAFRI:

2         Q.    My question is, Mr. Cohen, you

3    don't have any reason sitting over here to

4    believe that any of your attorneys --

5         A.    You asked --

6         Q.    -- have filed anything that is

7    factually inaccurate, right?

8              MR. FARINA:  Why don't you show

9         him -- show him what you --

10             THE WITNESS:  You asked me --

11             MR. FARINA:  Hang on.  Hang on.

12        Hang on.

13             Why don't you show him what

14        you're referring to and ask him

15        whether he agrees with it.

16             MR. JAFRI:  No.  I think we've

17        already moved on from that point.

18             MR. FARINA:  Well, then, we'll

19        move on.

20             BY MR. JAFRI:

21        Q.    Mr. Cohen, do you want me to

22   repeat the question?

1          MR. FARINA:  No, no, no.  If

2     you want to ask his opinion, you now

3     have him under oath giving his

4     testimony.  If you want to show him

5     something and ask him whether he

6     agrees with it, he will tell you

7     whether or not he agrees with it and

8     then you'll have his testimony.

9          MR. JAFRI:  Okay.  Thank you

10     for the advice.

11          BY MR. JAFRI:

12     Q.    Going back to my question,

13 sitting over here, you do not believe that

14 there was any filing in this case that

15 contained any factual errors, right?

16          MR. FARINA:  Objection, form.

17          THE WITNESS:  I rely on my

18     lawyers to prepare my filings.

19          BY MR. JAFRI:

20     Q.    Yes.  And you trust them to say

21 things that are correct, correct?

22     A.    Do I trust them to say things

1    that are -- that's a big statement.  I trust

2    that they do the best job that they can to

3    prepare my filings, period.

4         Q.    Mr. Cohen --

5         A.    You keep on going back to did I

6    sour on my investment.  I don't know what

7    that means, to sour on something.

8              What -- the company was doing

9    worse than I thought.  They had two quarters

10   already losing lots of money.  They were

11   doing worse than I thought.  So if that

12   would -- if that's what they meant when they

13   said I soured on the investment, yeah.  I

14   wasn't happy that the company was losing so

15   much money.

16        Q.    Okay.  Now we're getting

17   somewhere.

18        A.    Okay.

19        Q.    All right.  Now, the next thing

20   that I want to discuss with you is are you

21   aware of the fact that factual

22   representations on your behalf were made in

446

1    the motion to dismiss about this tweet

2    stating that you were expressing pessimism

3    about this -- the company in this tweet?

4            MR. FARINA:  Objection, form,

5        foundation.

6            If you're -- look, if you're

7        going to ask him about the motion,

8        then show him the motion and ask him

9        whether he agrees with it.

10           VIDEO OPERATOR:  You can't move

11       around your mic, sir.

12           MR. FARINA:  We're going to

13       take a break.  I would suggest you get

14       the document if you want to ask him

15       about it.

16           MR. JAFRI:  All right.  Let's

17       take a ten-minute break.

18           VIDEO OPERATOR:  Okay.  Off the

19       record at 5:06.

20           (Thereupon, a brief recess was

21       taken.)

22           VIDEO OPERATOR:  Back on the

1          record at 5:17.

2                    BY MR. JAFRI:

3          Q.     Ready?

4          A.     Yes.

5          Q.     Okay.  So before we left, we were

6     talking about your August 12th tweet.  I'm

7     just going to directly, you know, pose this

8     question to you.

9                    Were you expressing pessimism in

10    this tweet about the company and its

11    prospects?

12         A.     No.

13         Q.     But when you suggested to me that

14    you were being sarcastic about the -- the

15    woman with the shopping cart, what did you

16    mean?

17         A.     I mean that the article was

18    negative and the picture of the shopping cart

19    was filled.  So I made a sarcastic comment

20    that said at least her cart is full.  And

21    then I chose a face that, in my mind,

22    indicated -- it was complementary to the

1    sentence that I said, which was being

2    sarcastic.

3        Q.     Okay.  But other than the fact

4    that you were being sarcastic, were you

5    expressing agreement with what was in the

6    CNBC article?

7        A.     No.  I said at least her cart is

8    full.  It was a sarcastic comment in response

9    to a negative article, making fun of the fact

10   that the article was negative and the picture

11   was a woman who had her cart filled to the

12   top.

13       Q.     So you didn't agree with the

14   article?

15       A.     I did not say that.

16       Q.     Well, I mean --

17       A.     I didn't give an opinion on the

18   article.  I gave an opinion on the actual

19   picture.

20       Q.     So your testimony is that you had

21   no opinion whatsoever on the CNBC article?

22       A.     Correct.

449

1      Q.     Okay.  You have never publicly

2    stated ever that you were being sarcastic in

3    this tweet, correct?

4      A.     I've not been -- I have not

5    commented publicly on the litigation.

6      Q.     That's not my question.  I'm

7    talking about this specific tweet.

8           You have never publicly said that

9    you were being sarcastic in this tweet,

10   correct?

11     A.     The tweet was sarcastic.

12     Q.     Mr. Cohen, you have never

13   publicly said that you were being sarcastic

14   when you sent this tweet, correct?

15     A.     I don't know what I said.  I -- I

16   don't know what I -- you asked me if I've

17   never said something.  I don't know.

18     Q.     You never tweeted in response to

19   this tweet or at any other time that you were

20   being sarcastic when you sent out this

21   tweet --

22     A.     I don't -- I don't know.

1          Q.      You have no idea whether you

2     tweeted something in response explaining this

3     tweet?

4          A.      No, you asked me if I've ever

5     publicly said before that I was being

6     sarcastic.  And I said I don't know.

7          Q.      Yeah.  And then I had a different

8     question.

9          A.      Okay.

10         Q.      My different question is, you

11    have never tweeted any other explanation

12    about this tweet saying that you were being

13    sarcastic, correct?

14         A.      I don't believe so.

15         Q.      Okay.  You never went on Reddit

16    and said I was being sarcastic when I sent

17    this tweet, correct?

18         A.      I've never posted on Reddit

19    before.

20         Q.      I understand.  So you obviously

21    didn't go on there and say hey, guys, I was

22    being sarcastic, right?

1          A.      Correct.

2          Q.      Okay.  You've never told anybody

3     in any of the interviews you've given with

4     respect to any articles that have been

5     published about you anywhere, really --

6     there's never been a comment from you saying

7     that you were being sarcastic when you sent

8     this tweet, correct?

9          A.      I don't believe so.

10          Q.      Okay.  All right.  I wanted to

11     move on to a couple of other things and then

12     we can get out of here.

13                    So I wanted to show you another

14     exhibit which you produced.  So this is a --

15     an exhibit you produced, Mr. Cohen.  We're

16     going to mark it as 295.

17                         (Thereupon, Exhibit 295 was

18                    marked for identification.)

19                    THE WITNESS:  Thank you.

20                    BY MR. JAFRI:

21          Q.      This is a long chain.  Again, I

22     just have a couple of questions.  You know,

1          A.      I don't remember.

2          Q.      What about Diandra Weaver?

3          A.      It would have been around the

4    same time as this E-mail.

5          Q.      Okay.  Who else knew at Olshan or

6    JPMorganChase that you were planning to sell

7    your shares?

8          A.      I don't know.

9          Q.      John Moon?

10         A.      I don't know.

11                 MR. JAFRI:  Moon, M-O-O-N.

12                 BY MR. JAFRI:

13         Q.      On August 15th you did not tell

14    Mr. Nebel that you were going to sell all

15    your shares, correct?

16         A.      I don't believe so.

17         Q.      Is that I don't believe so?

18                 MR. FARINA:  That's what he

19         said.

20                 THE WITNESS:  I don't know -- I

21         didn't know whether I was going to

22         sell all my shares.

1          BY MR. JAFRI:

2          Q.     My question was different.  My

3     question is, on August 15th you did not tell

4     Mr. Nebel that you were going to sell all

5     your shares, correct?

6          A.     On August 15th -- what -- what's

7     in here is what I said.

8          Q.     Okay.  I'll rephrase it in

9     another way.

10              On August 15th you did not tell

11     Mr. Nebel that you were selling at all,

12     correct?

13          A.     I was not selling.

14          Q.     Well, when -- when it says over

15     here at the bottom of the chain -- well,

16     actually over here, if you go to the page

17     where it begins -- or ends with 70?

18          A.     Which page?

19          Q.     This is 8070.  So it's like the

20     third page from the back.

21          A.     Yeah.

22          Q.     This is an E-mail from you to

1      Nebel, cc'ing another person --

2          A.      Yeah.

3          Q.      And you wanted to know how long

4      will this take.  Am I prevented from trading

5      in the meantime.  Can this be done today.

6                  So you told him that you were

7      trading, but you didn't tell him that you

8      were selling, right?

9          A.      I was not trading.

10         Q.      So then why were you telling him

11     that you -- why were you -- why were you

12     questioning him about whether you could --

13     whether you were prevented from trading?

14         A.      Because my bank told me that I

15     was prevented from trading.  I told them what

16     the bank said.

17         Q.      Okay.  And why did you contact

18     the bank?

19         A.      Because I was interested in

20     the -- being able to trade.

21         Q.      Okay.  Being able to trade and do

22     what?

 1          A.      That, being able to trade.

 2          Q.      Sell?

 3          A.      Depends on the price.

 4          Q.      So you were thinking of buying

 5     shares on this day?

 6          A.      Depended on what the price would

 7     have been.

 8          Q.      Did you think of buying shares on

 9     this day at all?

10          A.      It depends on what the price

11     would have been.

12          Q.      That's not my question.

13                  On this day, did you think of

14     buying shares?

15          A.      It depends on what the price

16     would have been.  I'm always thinking about

17     investing.

18          Q.      Mr. Cohen, my question is very

19     specific.

20                  Did you have a thought in your

21     head on this day that you may buy shares of

22     BBBY?

1      A.     It -- yes.  It depended on the

2   price.  I may have bought depending on the

3   price.  I may have sold.  The stock on that

4   day, I believe, was going up, so it -- it --

5   I didn't buy.

6      Q.     Okay.  But my question has

7   nothing to do with your response.  My

8   question is whether you at any point thought

9   of buying shares on August 15th with respect

10   to BBBY securities.

11      A.     I don't remember what I was

12   thinking on that day.

13      Q.     Okay.  So since -- so based on

14   your testimony, then, you obviously didn't

15   tell Nebel on this day that you were selling

16   any shares, correct?

17      A.     I was not selling shares on that

18   day.

19      Q.     So you only told him that you

20   were trading?

21      A.     I told him what's in the E-mail.

22      Q.     That you were contemplating

1     trading?

2         A.    He was in communication with the

3     bank that I was contemplating trading and I

4     wanted the option to be able to trade.

5         Q.    Was that also true on

6     August 16th?

7         A.    Was what also true?

8         Q.    That you were just -- you just

9     told Nebel that you were trading.

10         MR. FARINA:  Objection, form.

11         BY MR. JAFRI:

12         Q.    Go ahead, Mr. Cohen.

13         A.    I don't understand your question.

14         Q.    On August 16th did you tell

15     Mr. Nebel that you were only trading shares

16     as opposed to specifically buying or selling?

17         A.    I don't remember exactly what I

18     told him.

19         Q.    Did you tell Mr. Nebel on

20     August 16th that you were selling shares?

21         A.    I don't remember exactly what I

22     told them.

1          Q.     So you have no recollection

2     whatsoever of what you told Mr. Nebel on

3     August 16th?

4          A.     That I wanted the ability to

5     trade.

6          Q.     So it was only about ability to

7     trade, not I'm trading, correct?

8          A.     I was -- I was prevented from

9     trading.

10         Q.     I'm talking about August 16th

11     now.

12         A.     I believe on August 16th at a

13     certain point I was also -- and he was

14     counseling me and he was giving -- he was

15     working with the bank so that I was -- had

16     the ability to be able to trade.

17         Q.     Okay.  Can we look at another

18     E-mail over here.  So if you go to the page

19     that ends with 68, this is the E-mail at the

20     bottom of the chain, Mr. Cohen, from you on

21     August 15th, 6:09 p.m.

22         A.     Yeah.

1          Q.     So you wrote, Thank you.  Ryan,

2     has JPM reached out to you.  Can you talk to

3     them today.  I need to get this resolved

4     tonight so I can trade tomorrow.

5                 You see that?

6          A.     Yeah.

7          Q.     Why were you in such a rush?

8          A.     Because I wanted the option to be

9     able to trade.

10         Q.     I know, but, I mean, why on this

11    day did you really want this to be wrapped

12    up?  I mean, you're sending this E-mail to

13    somebody at 6:09 p.m.  That's -- that's --

14    that was beyond business hours, right?

15         A.     I don't -- my business hours are

16    24 hours a day.

17         Q.     That's fine, Mr. Cohen.  But

18    everybody does not work like that.

19                You sent this E-mail to your

20    attorneys at 6:09 p.m., right?

21         A.     Yes.

22         Q.     And you told them that you wanted

1    to have this done before the night ended,

2    correct?

3         A.    Yes.

4         Q.    Okay.  So what was the reason for

5    that?  Explain to me why you wanted it to be

6    done that night.

7         A.    Because I wanted the ability to

8    be able to trade.

9         Q.    Why?  Why at that time?

10        A.    I don't understand your question

11   why.

12        Q.    Well, I mean, if I wanted to

13   trade, for instance, and I told somebody I

14   want you to wrap this up tonight because I

15   really want to trade --

16        A.    Yeah.

17        Q.    -- the next day, I probably have

18   some motive or some reason why I want to do

19   it so quickly.

20              Are you telling me that you're

21   not like that?

22        A.    I'm telling you I wanted the

1      ability to trade.

2           Q.     I understand that.  I can read

3      the E-mail.  My question is, why did you want

4      to trade in this hurried fashion?

5           A.     Wasn't -- it -- I was being

6      prevented from trading.  I wanted it to be

7      resolved so that I could trade.

8           Q.     Okay.  So when you sent this

9      E-mail at 6:09 p.m. on August 15th, what did

10     you want to do?  Did you want to buy or did

11     you want to sell?

12          A.     When I sent which E-mail?

13          Q.     The one that I just talked about,

14     6:09 p.m. August 15th.

15          A.     I wanted to be able to trade.

16          Q.     Buy or sell?

17          A.     I wanted to be able to be in the

18     market to trade.  I was prevented from

19     trading.

20          Q.     Mr. -- Mr. Cohen, my question is,

21     did you want to buy or did you want to sell?

22     Please address the question.

463

1          A.      It depended on the price.

2          Q.      So you -- you -- you -- you --

3          A.      It always depends on the price.

4          Q.      Okay.  And -- and you are telling

5     me that when the price skyrocketed on this

6     day, you were thinking of buying shares?

7          A.      It depends on the price.  It was

8     very volatile, so the stock was going up.

9     The stock was going down.

10         Q.      What price --

11         A.      It depends on the price.

12         Q.      Okay.  What the price point would

13    you have sold your shares at?

14         A.      I sold my shares.

15         Q.      Right.  I -- what I want to know

16    is what was the ideal price point for you to

17    sell your shares?

18         A.      I don't know that I had an ideal

19    price point to sell my shares.

20         Q.      Okay.  What about -- what about

21    buying shares?  What -- was there a price

22    where you would have been, like, this is too

1    expensive?

2         A.    Yeah, but I didn't have a -- a

3    set number in my mind.

4         Q.    Okay.  I just want to be clear

5    about one thing.

6               Your testimony is that even

7    though the price of the BBBY securities was

8    skyrocketing on these days --

9         A.    Yeah.

10        Q.    -- you were still contemplating

11   at 6:09 p.m. on August 15th purchasing

12   shares?

13        A.    The price can change.  The price

14   could have gone down -- the same way the

15   price went up, the price could have gone down

16   also.  So I -- I wanted the option to trade.

17        Q.    Okay.  So you thought that the

18   price could go down --

19        A.    Anything can happen.

20        Q.    -- the next trading day on

21   August 16th?

22               MR. FARINA:  Can you guys --

1          one at a time, please.

2                    THE WITNESS:  Anything can

3          happen.

4                    BY MR. JAFRI:

5          Q.     Okay.  So your testimony --

6          A.     If the price skyrocketed, it

7     could have also go down.  It could go up.  It

8     could go down.  I don't know.

9          Q.     Right.  So your testimony is that

10    as of the end of the trading day on

11    August 15th, you were contemplating that the

12    price could collapse on the 16th?

13         A.     No, I did not say that.  You said

14    that.

15         Q.     Okay.  You were contemplating --

16         A.     I said anything can happen.

17         Q.     Okay.

18         A.     Stocks can go up.  Stocks can go

19    down.

20         Q.     But you thought --

21         A.     I wanted the option to trade.

22         Q.     Okay.  Mr. Cohen, you were

1    considering at least the possibility that the

2    stock would decrease on the 16th?

3        A.     No, I'm saying I don't know what

4    a stock is going to do tomorrow.

5               Do you?  Does anyone?

6        Q.     Okay.  I think I have what I

7    need.

8               Is it true, Mr. Cohen, that you

9    called JPMorganChase many times on the 15th

10   and 16th to try and get this issue resolved?

11       A.     I tried to get the issue

12   resolved, yeah.

13       Q.     Okay.

14       A.     They called me.  I called them.

15   And they were -- and they were working with

16   Olshan to get it resolved also.

17       Q.     How many times did you call

18   JPMorganChase on the 15th and the 16th?

19       A.     I don't remember.

20       Q.     Were you calling them -- do you

21   remember if it was more than ten times?

22       A.     I don't remember.

474

1        A.       Yes.

2        Q.       Okay.  How did you come across

3    this article?

4        A.       You asked me that already.

5        Q.       You don't remember?

6        A.       I don't remember.

7        Q.       You did nothing publicly on that

8    day to say that you, in fact, had not bought

9    any additional BBBY securities, correct?

10        A.       I didn't say that I did.

11        Q.       My question is, you did -- you

12    said nothing publicly to correct the record

13    that day and say that you did not buy any

14    additional BBBY securities, correct?

15        A.       I never said that I did buy more.

16        Q.       But you never said that you

17    didn't, correct?

18        A.       I believe that I discussed the

19    issue with my advisors and I asked them to

20    clear it up.

21        Q.       But publicly there was no comment

22    from you on -- at any point in August of 2022

1    saying that you didn't buy any additional

2    shares?

3         A.    I followed the advice of my

4    lawyers.

5         Q.    You didn't tweet out --

6         A.    I never said that I did.

7         Q.    I understand.  You didn't tweet

8    and say I'm being misinterpreted, I did not

9    buy any shares?

10        A.    I wasn't being misinterpreted.  I

11   never said that I bought more shares.  This

12   was incorrectly reported.

13        Q.    Okay.  But you never said on

14   Twitter it has been incorrectly reported,

15   correct?

16        A.    I followed the advice of my

17   lawyers.

18        Q.    Okay.  I'm going to show you

19   another exhibit.

20             MR. JAFRI:  So we're going to

21        mark this as 296.

22

1          thought it was going to do.

2                  Q.      Mr. Cohen --

3                  A.      That's my statement.

4                  Q.      Did you underestimate --

5                  A.      These are not my words.

6                  Q.      Did you --

7                  A.      These are his.

8                  Q.      Okay.  Well, I -- my -- now I

9          want to know your views.

10                 Did you underestimate the amount

11         of damage that was done?

12                 A.      The company lost more money than

13         I thought it was going to lose.

14                 Q.      Did you underestimate the

15         amount --

16                 A.      The company did worse than I

17         thought it would.

18                 Q.      Okay.  I understand.

19                 A.      Okay.

20                 Q.      My question is --

21                 A.      So that's my statement.

22                 Q.      My question is, did you

1  underestimate the amount of damage that was

2  done, yes or no?

3      A.     I'm -- I think he did a

4  remarkable job screwing up the company,

5  exceptional, A plus.

6      Q.     Who are you talking about?

7      A.     The company.

8      Q.     Okay.

9      A.     Mark Tritton.

10     Q.     Okay.  But once -- that had

11  already happened before you sold your shares,

12  right?

13     A.     No.

14            MR. FARINA:  Objection, form.

15            THE WITNESS:  I -- I don't

16  know.  I --

17            What?

18            MR. FARINA:  I said objection,

19  form.

20            THE WITNESS:  Yeah.  I -- I

21  have no idea what had happened.  We

22  know now.

1                    BY MR. JAFRI:

2          Q.      Okay.  But he left --

3          A.      He drove the company off of a

4    cliff.  He gets an A plus for driving the

5    company off of a cliff.

6          Q.      And he left at the end of June --

7          A.      Yeah.

8          Q.      -- of 2022?

9                  So by that point he had already

10   driven the company off the cliff?

11         A.      No, I didn't say that.

12         Q.      Well --

13         A.      Wasn't -- it -- it was not just

14   him, by the way.  I mean, they -- he left and

15   the company did not get better.

16         Q.      Mr. Cohen, I'm going to read back

17   your testimony to you.

18                 You said he drove the company off

19   a cliff.  He gets an A plus for driving the

20   company off a cliff.

21         A.      Well, him -- him and everyone

22   else that was involved.

1     Q.    Okay.

2     A.    Him and the management team, the

3  board.  Everyone is responsible.

4     Q.    I understand.  Mr. Cohen --

5     A.    He was the leader, but everyone

6  else is responsible for it.

7     Q.    Mr. Cohen, that was something

8  that you said later.  I'm talking about the

9  specific --

10     A.    Well, I'm just clarifying the

11  statement now.

12     Q.    Okay.  Well --

13     A.    Him and everyone else at the

14  company.

15     Q.    Okay.  And he left on June 29th

16  2022, right?

17     A.    I believe so.

18     Q.    Okay.  So if he was the one also

19  driving the company off the cliff, he could

20  have only done it before June 29, 2022,

21  right?

22     A.    I did not say that.  You're

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

1     saying that.  And then you're trying to get

2     me to agree with you and I'm not.

3           Q.     How could -- how could he

4     logically drive the company off the cliff at

5     a time when he's not even there?

6           A.     Exactly.  That's why I said it

7     was him and everyone else.

8           Q.     Okay.  But if he's -- if he also

9     has driven the company off the cliff, he can

10    only do that while he's at the company,

11    right?

12          A.     It was a group effort.

13          Q.     I'm just talking about his --

14    his -- his -- his --

15          A.     I -- I don't -- I -- I don't

16    understand.

17          Q.     I'm just talking about his

18    contribution, Mr. Cohen.

19          A.     I already gave you my statements.

20          Q.     I -- I think -- so when you said

21    that everyone drove the company off the

22    cliff, who are you talking about?  Who is

1    everyone?

2         A.      I don't know.

3         Q.      Well, you must have some idea.  I

4    mean, you said everyone.

5         A.      I wasn't -- I was not on the

6    inside.  The company -- the people who are in

7    charge of the company, the management team,

8    the board of directors, it was ...

9         Q.      Yeah, go ahead.  You -- you said

10   it was --

11        A.      That's it.  I don't know.

12        Q.      Okay.  But you think there's --

13   there's a lot of people to blame?

14        A.      Yes.

15        Q.      Okay.  Mr. Cohen, between

16   June 29th of 2022 and August 18th of 2022,

17   did the company release any public

18   information about its financial results?

19        A.      Between when and when?

20        Q.      I just told you the date range.

21   Between June 28th 2022 and August 18th of

22   2022.