# Exhibit 3

# UNITED STATES DISTRICT COURT

# DISTRICT OF COLUMBIA

| | |
|---|---|
| In re BED BATH & BEYOND CORPORATION SECURITIES LITIGATION | Case No. 1:22-cv-02541-TNM <br><br> <u>CLASS ACTION</u> |
| *This Document Relates to:* <br><br>    *ALL ACTIONS* | |

## EXPERT REPLY REPORT OF MATTHEW D. CAIN, PHD

October 9, 2024

# **Table of Contents**

1   Introduction .......................................................................................................... 1

2   Summary of Opinions ........................................................................................... 3

3   Market Efficiency of BBBY Securities During the Class Period ......................... 5

4   My Event Study and Artificial Inflation Estimates are Reasonable and Reliable ........ 6

   4.1   My Event Study Approach is Standard, Reasonable, and Reliable .......................... 7

   4.2   A Rumored Short Squeeze is Appropriately Considered Within My Analysis ........... 9

   4.3   My Analysis Establishes Economic Materiality of the Alleged Misrepresentations and Alleged Corrective Disclosures ........................................................................ 9

   4.4   Prof. Fischel Mischaracterizes the Results of My Event Study and Artificial Inflation Estimates ................................................................................................ 13

5   Damages For Call Option Holders can be Calculated on a Class-Wide Basis .................... 14

   5.1   Prof. Fischel's Opinions are Based on a Misleading Apples-to-Oranges Comparison Between *Intraday* BBBY Call Option Trades and *Daily* Artificial Inflation ............ 16

   5.2   Prof. Fischel's Opinion Regarding BBBY Put Options is Speculative and Represents a Legal Opinion Regarding Class Definition ............................................ 17

# 1   Introduction

1.      I have previously filed expert reports in this matter (collectively, my "Prior Reports") and incorporate them here by reference in their entirety.[1] On February 15, 2024, I submitted an expert report in this matter (my "Efficiency Report") in which I concluded that:

a) the market for shares of Bed Bath & Beyond ("BBBY" or the "Company") Common Stock was efficient throughout the course of the Class Period;

b) the market for BBBY Options (together with BBBY Common Stock, "BBBY Securities") was efficient throughout the course of the Class Period; and

c) and Common Stock and Options damages in this matter can be calculated on a class-wide basis subject to a common methodology for each of Plaintiffs' pending claims.[2]

2.      On June 21, 2024, I submitted another expert report in this matter (my "Efficiency Reply Report") in response to the expert report of Prof. Fischel ("First Fischel Report"), dated May 17, 2024, as well as Defendants' Opposition to Class Certification ("Defendants' Opp Brief"). In his report, Prof. Fischel offered the following conclusions:[3]

a) There is no reliable basis to conclude that BBBY's Common Stock and Options traded in an efficient market;

b) The Tweet had no price impact;

c) Class members did not rely on the integrity of BBBY's market prices; and

d) My Efficiency Report analyses did not account for changed circumstances around the Class Period.

3.      In my Efficiency Reply Report, I concluded that nothing in the First Fischel Report nor Defendants' Opp. Brief disturb the opinions expressed in my Efficiency Report.[4] I also testified as to my opinions in deposition on April 4, 2024 and in a court hearing on August 2, 2024 (the

---

[1] Unless otherwise noted, capitalized terms in this report have the same meaning as in my Prior Reports, all emphasis in this report is added, and all times cited in this report are in Eastern Time.

[2] Efficiency Report ¶ 3.

[3] First Fischel Report ¶ 19.

[4] Efficiency Reply Report ¶ 5.

"Hearing").

4.      On July 12, 2024 I submitted an expert report on loss causation and damages (my "Merits Report"). In that report:[5]

   a) I concluded that the alleged misrepresentations and omissions in this matter were economically material to investors;

   b) I concluded that the Corrective Disclosure Events dissipated artificial inflation that was maintained as of the start of the Class Period, as well as introduced into the prices of BBBY Securities via the Inflation Creating Events during the Class Period; and

   c) I quantified the amount of artificial inflation in BBBY Securities on each day during the Class Period and provided the necessary inputs to calculate class-wide damages for Plaintiffs' claims under Sections 9, 10(b), 20(a), and 20A of the Securities Exchange Act of 1934.

5.      Following the submission of my Merits Report, Counsel provided me with the September 9, 2024 report of Prof. Fischel ("Second Fischel Report"). Prof. Fischel offered the following opinions in his second report:[6]

   a) He repeated his critiques contained within the First Fischel Report, and opined that an efficient market "did not exist during the Class Period";

   b) My artificial inflation analysis failed to take into account the impact of a rumored short squeeze during the Class Period;

   c) My event study analysis is flawed and produces "nonsensical" results; and

   d) My artificial inflation analysis of BBBY's Call Options is flawed and produces "nonsensical" results.

6.      Nothing I have reviewed or analyzed as part of the Second Fischel Report has caused me to change any of the opinions expressed in my Prior Reports, and I continue to hold those opinions.

7.      My qualifications and rate of compensation for work in this matter are identified in my Efficiency Report, and I attach an updated version of my curriculum vitae as **Appendix A**. I reserve the right to amend my reports to reflect new information that becomes available to me in light of

---

[5] Merits Report ¶¶ 14-20; Sections 10-13 and related appendices.

[6] Second Fischel Report ¶ 11.

the discovery process or future rulings from the Court.

8.      In formulating my opinions set forth in this Expert Reply Report, I have relied upon the analyses already described in my Prior Reports, as well as my knowledge, professional experience, and formal training in economics, finance, and statistics, in addition to the allegations and facts in this matter. All of the materials I considered in forming my opinions are identified in **Appendix B** to this report in addition to the documents considered in my Prior Reports.

## 2    Summary of Opinions

9.      Nothing in the First or Second Fischel Report disturbs the opinions expressed in my Prior Reports. There are a number of opinions I express in my Prior Reports that Prof. Fischel does not dispute. First, Prof. Fischel does not dispute my analysis of 10 out of the 11 factors (including the standard *Cammer* and *Krogman* factors) in my Efficiency Report. While he critiques my *Cammer* 5 cause-and-effect analysis, he does not offer his own *Cammer* 5 analysis, nor does he provide any affirmative analysis of the other standard market efficiency factors during the Class Period.

10.     Second, Prof. Fischel does not dispute my conclusion that the alleged corrective disclosures were followed by a statistically significant decline in BBBY's Common Stock price on August 19, 2022.

11.     Third, Prof. Fischel does not dispute that the general damages framework and methodology (*i.e.*, the out-of-pocket method) that I rely on is standard, reasonable, and utilized in virtually all securities class action matters alleging fraud claims under Section 10(b) of the Exchange Act. Nor does he put forward any alternative approach that would be more suitable in this matter.

12.     Prof. Fischel, however, now claims that "there was a temporary period of market inefficiency for BBBY stock and options caused by a rumored short squeeze during the Class Period."[7] As the basis for this claim, he points to Section IV of the First Fischel Report.[8] However, in that report he did not reach an affirmative conclusion that the market for BBBY's Securities was inefficient during the Class Period. His new opinion on inefficiency thus lacks any foundation,

---

[7] Second Fischel Report ¶ 13.

[8] *Id.*

rendering it flawed and unpersuasive.

13.     Prof. Fischel repeats his assertions made within the First Fischel Report that BBBY was subject to a rumored short squeeze leading up to and including the Class Period, which he claims renders all of my analyses flawed. As I explained in my Prior Reports and testimony, BBBY was subject to rumors of a short squeeze for at least one year prior to the Class Period, and yet BBBY's stock price reacted efficiently to disclosures of new information.[9] Moreover, regarding Prof. Fischel's pointing to supposed short constraints as affecting market efficiency, at least roughly half a million shares of BBBY Common Stock were available for short-sellers on each day before, during, and after the Class Period, yet short sellers elected not to take advantage of these available shares to engage in further short-selling activity, undermining Prof. Fischel's speculations about short constraints.

14.     As further explained below, contrary to Prof. Fischel's opinions that my results are flawed and "nonsensical," the results of my event study, artificial inflation, and damages estimates for BBBY's Securities are reasonable. As one example, Prof. Fischel claims that my "analysis of alleged artificial inflation leads to nonsensical results" because BBBY's Common Stock price increased by $3.05 per share on August 15, 2022 (and by lesser amounts on other days during the Class Period). Yet, after performing an event study and adjusting for my artificial inflation estimates, the implied but-for stock price increase on this date is the same: $3.05 per share. Because the actual and implied change in BBBY's price is the same on this date, my event study clearly does not lead to "nonsensical" results, rendering his opinions unpersuasive.

15.     Prof. Fischel argues that most of the alleged misrepresentations and corrective disclosures did not have statistically significant impacts on BBBY's stock prices. However, I demonstrate that Prof. Fischel's event study approach is mathematically flawed: it is impossible for *any* security to have more than two trading days register as statistically significant at the 95% level in his 40-day event study model. In other words, Prof. Fischel has created a test that is impossible to pass, rendering his event study approach fundamentally flawed and thus irrelevant.

---

[9] Efficiency Report ¶5; Efficiency Reply Report ¶ 12-13, 25; Cain Tr. 21:7-22:1.

16.    Other opinions in the Second Fischel Report represent legal opinions lacking foundation. For example, Prof. Fischel opines that some investors could obtain a "windfall" if they experienced measurable damages on call option purchases, but had offsetting gains in other securities that are not part of the Class. Such a concern could be raised in any class involving a company with multiple securities, and can be handled within a plan of allocation if the finder of fact determines that such an adjustment is necessary. Separately, Prof. Fischel claims that my "analysis of the alleged corrective disclosures makes no sense because [I fail] to demonstrate that there are any prior misstatements to correct."[10] As explained in my Merits Report, my opinions are premised upon Defendants being found to have made material misstatements or omissions during the Class Period.[11] My role is not to prove Plaintiffs' allegations. Thus, Prof. Fischel's legal opinions lack foundation and are unpersuasive.

17.    In summary, none of Prof. Fischel's criticisms disturb my Merits Report conclusions, which I reaffirm herein. The following sections explain the various flaws in the Second Fischel Report.

## 3   Market Efficiency of BBBY Securities During the Class Period

18.    I concluded in my Efficiency Report that the market for BBBY's Common Stock and Options was efficient during the Class Period.[12] I reached this conclusion by analyzing the *Cammer* and *Krogman* factors, which have been accepted by numerous courts in assessing market efficiency, including among companies that are subject to rumored short squeezes.[13]

19.    In the First Fischel Report, Prof. Fischel opined that there is no reliable basis to conclude that BBBY's Common Stock and Options traded in an efficient market.[14] In my Efficiency Reply Report, I opined that nothing in the First Fischel Report, nor Defendants' Opp. Brief, disturbed my

---

[10] Second Fischel Report, p. 12 Section IV.B heading.

[11] Merits Report ¶ 13.

[12] Efficiency Report ¶ 3.

[13] Efficiency Reply Report ¶ 50, fn. 67; Cain Tr. 108:9-109:12.

[14] First Fishel Report ¶ 19.

conclusion that BBBY's Securities traded in an Efficient Market during the Class Period.[15] In the Second Fischel Report, Prof. Fischel repeated his prior critiques of market efficiency but provided a new opinion that "there was a temporary period of market inefficiency for BBBY stock and options caused by a rumored short squeeze during the Class Period."[16] As the basis for this claim, he points to Section IV of the First Fischel Report.[17] However, in that report he did not reach an affirmative conclusion that the market for BBBY's Securities was inefficient during the Class Period.

20.     Prof. Fischel repeats his assertions made within the First Fischel Report that BBBY was subject to a rumored short squeeze leading up to and including the Class Period, which he claims renders all of my analyses flawed. As I explained in my Prior Reports and testimony, BBBY was subject to rumors of a short squeeze for at least one year prior to the Class Period, and yet BBBY's stock price reacted efficiently to disclosures of new information.[18] Moreover, at least roughly half a million shares of BBBY Common Stock were available for short-sellers on each day before, during, and after the Class Period,[19] yet short sellers elected not to take advantage of these available shares to engage in further short-selling activity, further undermining Prof. Fischel's speculations about supposed short constraints.

21.     Because Prof. Fischel does not present any persuasive new evidence of market inefficiency, I reaffirm my prior analyses and conclusion that BBBY's Securities traded in an efficient market throughout the Class Period.[20]

## 4   My Event Study and Artificial Inflation Estimates are Reasonable and Reliable

22.     The Second Fischel Report repeats the criticisms of my event study methodology contained

---

[15] Efficiency Reply Report ¶ 5.

[16] Second Fischel Report ¶ 13.

[17] *Id*.

[18] Efficiency Report ¶5; Efficiency Reply Report ¶¶ 12-13, 25; Cain Tr. 21:7-22:1.

[19] Efficiency Reply Report ¶ 24, Table 1 at p. 9.

[20] Efficiency Report, Sections IV-VI; Efficiency Reply Report, Section 3.

within the First Fischel Report.[21] Prof. Fischel again advances his own flawed event study approach. For the same reasons explained within my Efficiency Reply Report, his criticisms of my event study approach are flawed and without merit, and his event study approach is flawed and unreliable.[22] I provide further responses to Prof. Fischel's critiques in the sections below.

### 4.1   My Event Study Approach is Standard, Reasonable, and Reliable

23.     Prof. Fischel claims that my event study is flawed because it uses a 120-day estimation window which fails to account for the increased volatility in BBBY's stock returns shortly before and during the Class Period.[23] He asserts this approach "is highly likely to find false positives, i.e., determinations that residual returns are statistically significant when they are in fact not unusual in the context of heightened stock price volatility."[24] He is wrong, as explained below.

24.     First, my event study relies on rolling regressions that are re-estimated on each day. These regressions reasonably incorporate the changing volatility over time, including the increased volatility of BBBY's Common Stock in August 2022. As can be seen in my Efficiency Report, my regression demonstrates a significantly increased volatility in August 2022.[25] In fact, this represented the highest degree of volatility measured by my event study regressions over the entire year leading up to the Class Period. It is for this reason that a rolling regression estimation procedure – as I have employed in all of my reports in this matter – is widely-considered to be reasonable, reliable, and commonly used in expert analyses of both market efficiency and merits issues.[26]

25.     Second, if my event study approach were to produce false positives, as speculated by Prof. Fischel, then this phenomenon would manifest in my *Cammer* 5 tests. In other words, my event

---

[21] Efficiency Reply Report, Sections 3.5, 4.

[22] Efficiency Reply Report ¶¶ 35-37, 45-48.

[23] Second Fischel Report ¶ 17.

[24] *Id*.

[25] Efficiency Report, Exhibit 5.

[26] *See, e.g.*, *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.); *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.); *Homyk v. ChemoCentryx, Inc. et al.*, Case No. 4:21-cv-03343-JST. (N.D. Ca.).

study would generate a high proportion of statistically significant stock price movements on No News Days. But as demonstrated in both my Efficiency Report and my Efficiency Reply Report, this is not the case.[27]

26.     Third, Prof. Fischel's event study approach does not adjust for changing volatility over time. Rather, his fixed event study estimation window – which includes the weeks before and after the Class Period – is contaminated by the alleged misconduct, which allegedly caused the increase in BBBY's volatility during the Class (and could take additional time beyond the end of the Class Period to fully dissipate). Such an approach is unsupported in the academic literature. For example, MacKinlay explains:

> Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period **prior to the event window** for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally, the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.[28]

27.     Fourth, Prof. Fischel's short estimation window of only 40 days means that in order for a stock price change to be statistically significant at the 95% level, it must have been one of the two largest movements during that time period (top 5% * 40 days = 2 days). His event study approach sets an unreasonably high bar of requiring that any alleged misrepresentations or corrective disclosures must have been one of the two most influential disclosures during his 40-day windows. In his first event study model, this becomes mathematically impossible given that there are four market impact dates associated with the alleged misrepresentations and corrective disclosures in this matter.[29] In other words, Prof. Fischel has created a test that is impossible to pass, rendering his event study approach fundamentally flawed and thus irrelevant.

---

[27] Efficiency Report, Exhibit 7; Efficiency Reply Report, Exhibit 7.

[28] A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, at 15 (emphasis added).

[29] Merits Report ¶¶ 15, 18; Second Fischel Report, Table 1 at p. 12: "Fischel 1 are results for a 40 day estimation window that includes all trading days and begins 8/01/22 and ends 9/26/22."

## 4.2   A Rumored Short Squeeze is Appropriately Considered Within My Analysis

28.     Prof. Fischel repeats his assertions made within the First Fischel Report that BBBY was subject to a rumored short squeeze leading up to and including the Class Period, which he claims renders all of my analyses flawed.[30] As I explained in my Prior Reports and testimony, BBBY was subject to rumors of a short squeeze for at least one year prior to the Class Period, and yet BBBY's stock price reacted efficiently to disclosures of new information.[31] Moreover, at least roughly half a million shares of BBBY Common Stock were available for short-sellers on each day before, during, and after the Class Period,[32] yet short sellers elected not to take advantage of these available shares to engage in further short-selling activity, further undermining Prof. Fischel's speculations about short constraints.

29.     Moreover, my *Cammer* 5 tests indicate that the persistent rumors of a short squeeze before and during the Class Period did not cause the observed price changes in response to the alleged misrepresentations and corrective disclosures. If a short squeeze would have caused the observed price movements on these dates, then it also would have caused similar price movements on the No News Days in my *Cammer* 5 tests. Yet, as demonstrated in both my Efficiency Report and my Efficiency Reply Report, this was not the case.[33]

30.     As explained in my Merits Report, I considered whether any such confounding information was present in BBBY's stock price movements, and I concluded that no confounding information was present, and thus no disaggregation was required.[34] I reaffirm that opinion herein. As a result, Prof. Fischel's opinions remain unpersuasive.

## 4.3   My Analysis Establishes Economic Materiality of the Alleged Misrepresentations and Alleged Corrective Disclosures

31.     Prof. Fischel asserts that I have failed "to demonstrate that there are any prior

---

[30] Second Fischel Report ¶¶ 4, 14-16.

[31] Efficiency Report ¶ 5; Efficiency Reply Report ¶¶ 12-13, 25; Cain Tr. 21:7-22:1.

[32] Efficiency Reply Report ¶ 24, Table 1 at p. 9.

[33] Efficiency Report, Exhibit 7; Efficiency Reply Report, Exhibit 4.

[34] Merits Report ¶¶ 17, 19, 57, 66, 68, 73, 80, 83, 88, 92.

misstatements to correct."[35] As explained in my Merits Report, my economic opinions are premised upon Defendants being found to have made material misstatements or omissions during the Class Period.[36] My role is not to prove Plaintiffs' allegations. Thus, Prof. Fischel's legal opinions lack foundation and are unpersuasive. I further explain the flaws in his opinions below.

32.   **Artificial Inflation at Start of Class Period**: Prof. Fischel claims that my $6.15 per share estimate of artificial inflation at the start of the Class Period is fundamentally flawed because it "requires that Mr. Cohen should have disclosed an intention to sell his entire position in BBBY before the market opened on August 12, 2022, despite the fact that he had not initiated any such sale."[37] He makes similar claims regarding the alleged corrective disclosure events.[38] Again, Prof. Fischel presents a legal opinion regarding liability, and his view misinterprets Plaintiffs' stated theory of liability. As noted in my Merits Report:

> My opinions regarding economic materiality, loss causation, and damages in this matter arising under Sections 9, 10(b), 20(a), and 20A of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder by the SEC, are premised upon Defendants being found to have knowingly or recklessly made material misstatements or omissions during the Class Period regarding Defendant Cohen's confidence in BBBY Securities, encouragement of other investors to buy BBBY Securities, his continued involvement in attempting to turn the Company around, and simultaneous omissions and misrepresentations concerning a pre-existing plan to sell all of his own BBBY holdings.[39]

33.   **August 12, 2022 Tweet**: Prof. Fischel claims that BBBY's stock return on this date was statistically insignificant.[40] As explained above, his event study approach is flawed, and my standard and reasonable event study approach establishes price impact following the Tweet.[41] Prof. Fischel also argues that there was no market commentary attributing the increase in BBBY's price to the Tweet. Yet his claim is undermined by his subjective reliance on online posts in the First

---

[35] Second Fischel Report, Section IV.B heading at p. 12, ¶¶ 19-29.

[36] Merits Report ¶ 13.

[37] Second Fischel Report ¶ 19.

[38] Second Fischel Report ¶ 20.

[39] Merits Report ¶ 13.

[40] Second Fischel Report ¶ 23.

[41] **Section 4.1**; Efficiency Reply Report ¶¶ 35-37, 45-48.

Fischel Report.[42] A review of those online posts reveals many who expressed a view that the Tweet had price impact, consistent with the Complaint's allegations that numerous "investors unambiguously understood [the Tweet] as a rallying cry to buy or hold" BBBY securities.[43] For example:

- "Sold gme for bbby"[44]
- "Gona buy more BBBY because i think its going to 🚀, also i put my money where my mouth is"[45]
- "Retail buying $BBBY shares. LFG!!"[46]
- "Loop just been thrown for one. Huge buy volume today of the back of this fud [fear, uncertainty, doubt] article."[47]
- "Let's go $bbby in Ryan we trust"[48]
- "Bullish #BBBY … Cohen with that reply 👏🏅🚀 @ryancohen 👏🏅"[49]
- "buy $BBBY. Got it. Thanks!"[50]
- "Loop Capital says its going to $1? Well time to buy some shares. Deep in $GME already, but can get $BBBY also. And of course remember to 💜. PS - 🏴🚀👏🌙"[51]
- "So are my $BBBY bags. 😩"[52]

34.  **August 16, 2022 SEC Filings**: Prof. Fischel asserts that "the information in the filings was not new"[53] and therefore I "cannot reject the possibility that the best explanation for the observed

---

[42] First Fischel Report ¶ 46.

[43] Complaint ¶¶ 147-155.

[44] *See* https://x.com/emanuelvertizz/status/1558101602413715457.

[45] *See* https://x.com/zingerberger/status/1558102466922684420. The rocket emoji (🚀) refers to the stock price going "to the moon", *See* Complaint ¶ 48.

[46] *See* https://x.com/joeygallinal/status/1558110249403535362.

[47] *See* https://x.com/EdmondDantez_/status/1558102828043964416.

[48] *See* https://x.com/182Maxime/status/1558103833808625666.

[49] *See* https://x.com/MouahhidAnas/status/1558105478160334850.

[50] *See* https://x.com/thepepperedchef/status/1558106837433561089.

[51] *See* https://x.com/MarcusY31451279/status/1558112149934903296.

[52] *See* https://x.com/TaraBull808/status/1560439349724221440.

[53] Second Fischel Report ¶ 26.

stock price movement on August 16, 2022 is the rumored short squeeze..."[54] However, Prof. Fischel does not demonstrate that there was no new information related to Plaintiff's allegation that the August 16 filings "failed to disclose that [Cohen] had already formed a plan to sell Bed Bath securities in violation of the Exchange Act."[55] Moreover, as demonstrated in my Efficiency Reply Report and in **Section 4.2** above, the rumors of a BBBY short squeeze existed for at least one year prior to the Class Period, and did not represent confounding information that needs to be disaggregated from BBBY's stock price movements on this date. Moreover, I demonstrated in my Merits Report that numerous market commentators attributed BBBY's price movement on August 16, 2022 to Cohen's Schedule 13D and Form 3 filings. For example:

> *Investing.com*: Bed Bath & Beyond (NASDAQ:BBBY) stock soared 24%, adding to the previous session's hefty gains, with retail investors seeking out the meme favorite **after a filing revealed activist investor Ryan Cohen's latest bet** on the home goods retailer.[56]

> *Institutional Investor Magazine*: **Shares of Bed Bath & Beyond soared about 30 percent Tuesday** amid several trading halts due to the spike in activity, which was **boosted by the news that GameStop Chairman Ryan Cohen bought more call options** on the struggling retailer.[57]

> *Financial Times*: This week's buying frenzy in Bed Bath & Beyond appeared to have been **triggered by news that the vehicle of investment influencer Ryan Cohen had bought call options** betting the stock can rise as high as $80 a share.[58]

> *NYTimes*: The activist investor Ryan Cohen made a filing on Monday about options to purchase Bed Bath & Beyond shares that sent the stock soaring as much as 70 percent[59]

> *Seeking Alpha*: At one point in the session, BBBY was up nearly 79% for the day. The furious activity also prompted a trading halt for volatility. The rally came as the stock continued to draw attention from short squeeze-eyeing **meme traders following the disclosure of call-buying from GameStop (GME) chairman Ryan Cohen's** venture capital firm RC Ventures. Per the disclosure, the Chewy founder

---

[54] Second Fischel Report ¶ 28.

[55] Complaint ¶ 9.

[56] COHEN0023722 (emphasis added).

[57] COHEN0023814 (emphasis added).

[58] COHEN0023817 (emphasis added).

[59] COHEN0023828.

bought January 2023 calls on more than 1.6M shares with strike prices between $60 and $80, fueling a squeeze.[60]

35. **August 18-19, 2022 Corrective Disclosures of Cohen's Sales**: Prof. Fischel does not dispute the statistically significant decline in BBBY's Common Stock on August 19, 2022, nor does he dispute the corrective information identified in my Merits report on August 18, 2022. Rather, he claims that the artificial inflation measured from the decline on August 19, 2022 "makes no sense because there is no allegation that Mr. Cohen should have disclosed the fact that he had liquidated his entire stake on the first day of the Class Period as Dr. Cain's opinions require, nor could there be because it hadn't happened yet."[61] As explained above, Prof. Fischel presents a legal opinion which misconstrues Plaintiffs' allegations in this matter. Plaintiffs allege that artificial inflation was present and maintained in BBBY's Securities prices by the start of the Class Period because Cohen failed to disclose his *intent* and *plan* to liquidate his stake prior to or by the start of the Class Period.[62]

36. As noted in my Merits Report:

> My opinions regarding economic materiality, loss causation, and damages in this matter arising under Sections 9, 10(b), 20(a), and 20A of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder by the SEC, are premised upon Defendants being found to have knowingly or recklessly made material misstatements or omissions during the Class Period regarding Defendant Cohen's confidence in BBBY Securities, encouragement of other investors to buy BBBY Securities, his continued involvement in attempting to turn the Company around, and simultaneous omissions and misrepresentations concerning a pre-existing plan to sell all of his own BBBY holdings.[63]

37. As a result, Prof. Fischel's opinions are flawed, irrelevant, and unpersuasive.

## 4.4 Prof. Fischel Mischaracterizes the Results of My Event Study and Artificial Inflation Estimates

38. Prof. Fischel claims that my event study and analysis of artificial inflation "leads to

---

[60] COHEN0024020 (emphasis added).

[61] Second Fischel Report ¶ 20.

[62] Complaint ¶¶ 7-9, 36, 148, 161, 174, 182, 193.

[63] Merits Report ¶ 13.

nonsensical results."[64] As one example, he states that: "absent the alleged wrongdoing, BBBY's stock price would have increased by 63% on August 15, 2022 (more than twice the actual return that day)…"[65] He thus asserts that my analysis implies large price movements during the Class Period, and that "extraordinarily large price movements over such short periods of time are nonsensical" in this matter.[66]

39.     Prof. Fischel's claim is simply wrong. My event study analysis does not generate large implied stock price changes for BBBY; rather, the Common Stock's actual closing prices experienced these movements during the Class Period. Taking his example above: BBBY's actual price increased by $3.05 per share on August 15, 2022. My analysis does not identify a change in artificial inflation on this date. As a result, my implied but-for stock price for BBBY also increased by $3.05 per share on this date – the same amount. There is no difference between the actual and but-for implied stock price change on this date. The same is true for BBBY's actual and implied stock price increase of $2.43 per share on August 17, 2022. Prof. Fischel's criticisms thus relate to questions of market efficiency (addressed above), and are not related to or caused by my event study or artificial inflation analysis, rendering them unpersuasive.

## 5    Damages For Call Option Holders can be Calculated on a Class-Wide Basis

40.     In my Efficiency Report, I conclude that similar to BBBY Common Stock, damages for BBBY Options can be calculated on a class-wide basis subject to a common methodology.[67] As described in my Merits Report, I apply the well-established Black-Scholes model to calculate BBBY Call Option price inflation at the time of each purchase and sale.[68] To calculate Option damages, I use the out-of-pocket methodology, as I do for economic damages related to BBBY Common Stock.

---

[64] Second Fischel Report ¶ 29, Table 2 at p. 17.

[65] *Id*.

[66] *Id*.

[67] Efficiency Report ¶¶ 3, 128.

[68] Merits Report ¶¶ 108-114.

41.     Like BBBY Common Stock, BBBY Call Options were continuously traded on exchanges through each trading day. Consistent with my presentation of *daily* historical inflation for BBBY Common Stock (a frequency which Prof. Fischel does not dispute),[69] I calculate BBBY Call Option inflation on a *daily* basis. This choice of frequency is clearly defined within my Merits Report and accompanying backup materials.[70] This choice of a daily frequency is both reasonable and standard across cases, as investors commonly submit their claims transaction data on a daily basis.

42.     Prof. Fischel does not dispute the use of the Black-Scholes model and the out-of-pocket methodology for estimating Option damages. Rather, he misleadingly compares low *intraday* Options transactions prices with my *daily* Options inflation estimates. This flawed, apples-to-oranges comparison leads him to report misleading statistics, resulting in his unsupported and erroneous opinion that my Options inflation estimates are "nonsensical."

43.     In reaching his opinion, Prof. Fischel also disregards that I employ the out-of-pocket methodology as described in both my Efficiency Report and Merits Report, which limits recovery to the actual losses incurred.[71] His failure to recognize this important step in my damages calculations also contradicts his own publication, in which he describes the out-of-pocket method as "the traditional method for computing damages in open market trading cases under rule 10b-5, which limits recovery to the difference between the price paid or received, and the 'real' value of the security at the time of the purchase/sale."[72]

44.     Additionally, Prof. Fischel mischaracterizes my factor *x* methodology as an "alternative method" in my Merits Report.[73] I did not propose this approach as an alternative for calculating Option damages; rather, it is included within my damages calculations and functions as a loss causation limit designed to prevent damages from surpassing the total price changes of the

---

[69] Merits Report ¶¶ 54, 97, 128.

[70] Merits Report ¶¶ 110, 119, fn. 137, Appendix C, Appendix D, Appendix E.

[71] Merits Report, ¶¶ 113-119.

[72] Fischel, D. R. (1982). Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities. *The Business Lawyer*, 38(1), 1–20. Fn. 25.

[73] Second Fischel Report ¶ 34.

Options directly attributable to the fraud.[74] Therefore, his critique is flawed and irrelevant.

45.     Prof. Fischel's assertion that my damages calculations create a windfall for Class Members using common put option strategies is also without merit. He ignores the fact that the purported Class in this matter includes only BBBY Common Stock and Call Options,[75] and that I was asked to provide opinions related to Plaintiff's class-wide claims.[76] By ignoring these facts, he misrepresents the scope of my Merits Report, and he presents legal opinions about the Class definition. Moreover, as explained below, the Black-Scholes model could also be applied to estimate put option gains if a finder of fact determines it reasonable to net gains on put options against losses incurred due to Class losses. Finally, Prof. Fischel fails to analyze any actual BBBY put options or option strategies to support his opinion. He instead *speculates* that Class members had significant economic incentives to adopt a long straddle position.[77]

## 5.1   Prof. Fischel's Opinions are Based on a Misleading Apples-to-Oranges Comparison Between *Intraday* BBBY Call Option Trades and *Daily* Artificial Inflation

46.     In his report, Prof. Fischel highlights instances in which the *daily* BBBY Call Option artificial inflation, calculated using the Black-Scholes model, appears to exceed *intraday* Option trading prices. His analysis is fundamentally flawed and misleading because he compares artificial inflation derived from *daily* prices with low *intraday* trading prices. This represents an asynchronous comparison – *i.e.* comparing trading prices at different points in time – and thus, represents an apples-to-oranges comparison. A similar critique could be made in any matter involving *daily* artificial inflation of common stock: investors frequently trade at *intraday* prices that differ from *daily* prices, and thus *daily* artificial inflation. This phenomenon is routinely controlled for via the claims administration process.

47.     A closer examination of Prof. Fischel's illustrative example involving the September 23,

---

[74] Merits Report ¶¶ 104, 108, 113, 114.

[75] *See*, Lead Plaintiff's Motion For Class Certification And Appointment Of Class Representative And Class Counsel, *In re Bed Bath & Beyond Corporation Securities Litigation*, No. 1:22-cv-02541-TNM, February 15, 2024, at 1.

[76] Merits Report ¶ 3.

[77] Second Fischel Report ¶ 36.

2022 expiration BBBY Call Option with a $20 strike price demonstrates the fundamental flaw of his comparisons.[78] He claims that my *daily* artificial inflation estimate of $3.45 per contract would provide a "windfall to Class members" because the *intraday* trading price for this contract was as low as $3.00.[79] As explained above, the out-of-pocket methodology ensures that investors cannot claim damages on amounts exceeding their losses. Moreover, if the finder of fact were to determine that an *intraday* calculation of inflation was warranted, then one would simply calculate *intraday* inflation and use those calculations along with *intraday* transactions prices, as opposed to the reasonable and widely-accepted *daily* calculations. I also note that this particular Option series expired worthless, as BBBY's Common Stock price closed at $6.67 on September 23, 2022, in contrast to the Option's $20 strike price. Thus, it is not surprising that my daily artificial inflation ribbon implies that the Option had no value to investors who may have purchased it at low prices during the Class Period.

48.     Prof. Fischel relies on the same flawed logic in claiming that "over 30% of all contracts traded during the Class Period traded at prices lower than Dr. Cain's estimate of alleged artificial inflation using the Black-Scholes model."[80] In reality, Prof. Fischel is simply documenting intraday volatility in many Options series. His analysis fails to recognize that such fluctuations are a normal characteristic of both Common Stock and Options markets, which in no way disturb the reasonableness of the out-of-pocket methodology.

## 5.2     Prof. Fischel's Opinion Regarding BBBY Put Options is Speculative and Represents a Legal Opinion Regarding Class Definition

49.     Prof. Fischel contends that my damages methodology could provide a windfall to Class Members who may have suffered Call Option damages which were offset by hedging strategies in other securities such as BBBY put options. Prof. Fischel's opinion is unfounded because he fails to provide any analysis of actual BBBY put options or relevant option strategies, nor does he examine the trading behaviors of any Class members. Instead, he speculates that many Class members had strong economic incentives to adopt such hedging strategies. The lack of any such

---

[78] Second Fischel Report ¶¶ 33-34.

[79] *Id*.

[80] *Id*.

economic analysis undermines his opinion.

50.     More importantly, Prof. Fischel's opinion is logically flawed because it misleadingly overlooks that the purported Class in this case includes only BBBY Common Stock and Call Options.[81] While it is true that put option prices can be influenced by fluctuations in underlying stocks,[82] my Merits Report specifically addresses only the securities included in the Class. Therefore, my damages methodology does not provide damages or offsets to investors who traded BBBY's put options, which are not included in the Class definition. Prof. Fischel's opinion thus represents a legal opinion regarding the Class definition, rendering it irrelevant.

51.     In addition to put options, Prof. Fischel also appears to argue that *any* trades which yielded gains for investors should be factored into a damages analysis.[83] Once again, he offers a legal opinion on the definition of the Class, which is irrelevant to my Merits Report. Such legal questions apply in all previously certified securities classes, because investors may hedge their trades in numerous ways, including via securities in other companies. Prof. Fischel has described this hedging in his prior work: "[i]nvestors in public corporations have a broad choice of investments and can hedge risk by purchasing a diversified portfolio of securities."[84]

52.     If a finder of fact determines that it is reasonable to include put options or other securities in the purported Class, my damages methodology can easily be adapted to include such securities. For example, the Black-Scholes model employed for BBBY's Call Options can also be used to calculate inflation or deflation in put options, should a finder of fact deem such calculations necessary.

---

[81] *See*, Lead Plaintiff's Motion For Class Certification And Appointment Of Class Representative And Class Counsel, *In re Bed Bath & Beyond Corporation Securities Litigation*, No. 1:22-cv-02541-TNM, February 15, 2024, at 1.

[82] Efficiency Report ¶¶ 109-112

[83] Second Fischel Report, fn. 80.

[84] Easterbrook, F. H., & Fischel, D. R. (1985). Optimal Damages in Securities Cases. *U. Chi. L. Rev.*, 52, 611.

53.     I declare under the penalty of perjury that the foregoing is true and correct.


                                             Executed on October 9, 2024


                                             Matthew D. Cain

## Appendix A

**Matthew D. Cain, Ph.D.**                                         October 2024

E-mail: mdcain@outlook.com
Mobile: 574-485-8065

### Education

Ph.D., Finance, August 2007                    Purdue University, West Lafayette, IN
B.S., Finance, May 2001                         Grove City College, Grove City, PA

### Professional and Academic Experience

*Senior Fellow*, New York University School of Law, 2024-Present

*Senior Fellow*, Berkeley Center for Law and Business, 2019-2024

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

### Publications

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

## Presentations

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden

- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group
- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Peregrine Economics
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**: *Review of Financial Studies, Journal of Financial and Quantitative Analysis, Journal of Corporate Finance, Journal of Banking and Finance, European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics, Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law

LAW 246.31: Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2024

LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2023

University of Notre Dame, Mendoza College of Business
FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013
FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management
MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008
MGMT 610: Financial Management I (MBA Core), Fall: 2007


**Expert Witness Experience**

- *Miami Firefighters' Relief & Pension Fund v. Carl C. Icahn et al.*, Index No. 657447/2019 (N.Y. Sup. Ct.). Declaration September 2024.

- *Securities and Exchange Commission v. American Renal Associates Holdings, Inc., et al.*, Case No. 22-cv-10651-NMG (D. Mass.). Report June 2024. Deposition September 2024.

- *Securities and Exchange Commission v. Kevin A. Van de Grift and Gil Friedman*, Case No. 1:23-cv-01491 (S.D. N.Y.). Report June 2024.

- *El Paso Firemen & Policemen's Pension Fund, et al. v. InnovAge Holding Corp., et al.*, Case No. 21-cv-02770-WJM-SKC (D. Co.). Report May 2024.

- *In re Bed Bath & Beyond Corporate Securities Litigation*, Case No. 1:22-cv-02541-TNM (D.D.C.). Report February 2024. Deposition April 2024. Rebuttal Report June 2024. Report July 2024. Hearing August 2024.

- *In the Matter of Joshua Abrahams*, File No. 3-21214, (SEC Admin. Proc.). Rebuttal Report February 2024.

- *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.). Report February 2024.

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.). Report January 2024. Deposition April 2024.

- *Jed Lemen, et al. v. Redwire Corporation, et al.*, Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.). Report January 2024. Deposition March 2024. Rebuttal Report July 2024. Declaration September 2024.

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024.

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.). Report January 2024.

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023. Deposition January 2024. Rebuttal Report March 2024. Report July 2024. Deposition August 2024. Rebuttal Report September 2024.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023. Deposition January 2024. Rebuttal Report February 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023. Rebuttal Report January 2024. Report September 2024.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022. Report March 2024.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021. Rebuttal Report March 2024. Report September 2024.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

## Appendix B

### Documents Considered

**Case Related Documents:**

Expert Report of Matthew D. Cain, Ph.D., February 15, 2024.

Lead Plaintiff's Motion For Class Certification And Appointment Of Class Representative And Class Counsel, February 15, 2024 (Dkt. 109)

Expert Report of Daniel R. Fischel, May 17, 2024.

Memorandum in Opposition to Plaintiff's Motion for Class Certification, May 17, 2024 (Dkt. 117).

Expert Report of Matthew D. Cain, Ph.D., June 21, 2024.

Deposition of Matthew D. Cain, Ph.D., July 12, 2024.

Expert Report of Matthew D. Cain, Ph.D., September 9, 2024.

**Deposition Testimony:**

Deposition of Matthew D. Cain, Ph.D., April 4, 2024.

**Court Documents:**

*Homyk v. ChemoCentryx, Inc. et al.*, Case No. 4:21-cv-03343-JST. (N.D. Ca.)

*In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.)

*In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.).

**Academic Articles:**

A. Craig MacKinlay, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35.

Easterbrook, F. H., & Fischel, D. R. (1985). Optimal Damages in Securities Cases. *U. Chi. L. Rev.*, 52, 611.

Fischel, D. R. (1982). Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities. *The Business Lawyer*, 38(1) , 1–20.

**Data Sources:**

Twitter

**Other:**

All other documents cited or referred to within this report